**GREGORY A. CHAIMOV,** OSB # 822180
gregorychaimov@dwt.com
**PAUL C. SOUTHWICK**, OSB #095141
paulsouthwick@dwt.com
**DAVIS WRIGHT TREMAINE LLP**
1300 SW Fifth Avenue, Suite 2300
Portland, OR 97201
Tel:    (503) 241-2300

**MARCIA ROBINSON LOWRY** (*pro hac vice pending*)
mlowry@abetterchildhood.org
**DAWN J. POST** (*pro hac vice pending*)
dpost@abetterchildhood.org
**A BETTER CHILDHOOD**
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel: (646) 795-4456

**EMILY COOPER**, OSB #   182254
ecooper@droregon.org
**THOMAS STENSON**, OSB 152894
tstenson@droregon.org
**CHRISTINE SHANK** (*admission pending*)
cshank@droregon.org
**DISABILITY RIGHTS OREGON**
511 SW 10th Avenue, Suite 200
Portland OR 97205
Tel: (503) 243 2081

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| WYATT B. and NOAH F. by their next friend Michelle McAllister; KYLIE R. and ALEC R. by their next friend Kathleen Megill Strek; UNIQUE L. by her next friend Annette Smith; SIMON S. by his next friend Paul Aubry; RUTH T. by her next friend Michelle Bartov; BERNARD C. by his next friend Ksen Murry; NAOMI B. by her next friend Kathleen Megill Strek; and NORMAN N. by his next friend Tracy Gregg, individually and on behalf of all others similarly situated, | Case No. 19-556<br><br>**CLASS ACTION COMPLAINT** |

Page 1 – COMPLAINT

|  | |
|---|---|
| Plaintiffs, | |
| v. | |
| KATE BROWN, Governor of Oregon in her official capacity; FAIRBORZ PAKSERESHT, Director, Oregon Department of Human Services in his official capacity; MARILYN JONES, Director, Child Welfare in her official capacity, and OREGON DEPARTMENT OF HUMAN SERVICES, | |
| Defendants. | |

## PRELIMINARY STATEMENT

1.     There are thousands of children for whom the state of Oregon has assumed responsibility and, for many, is often their only parent. And it is, has been, and continues to be a constitutionally inadequate parent, revictimizing already vulnerable and innocent children.

2.     Issues permeate every part of the Oregon foster care system. Overworked caseworkers struggle to not only stay on top of their daily tasks, but do so while making critical judgments in an overburdened and underfunded system. The lack of foster homes results in children being placed solely based upon availability rather than suitability, and frequent moves compound the uncertainty that foster children confront every day about what will happen to them. Oregon irregularly and infrequently assesses the needs of children in the foster care system, with the result that the child's medical, mental health, and social needs often remain unknown and unmet.

3.     The problems in the Oregon foster care system have been exhaustively documented for well over a decade. It is time that Oregon is held accountable.

///

///

///

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

## INTRODUCTION

4.      Children who need foster care in the State of Oregon have a daunting road ahead of them.

5.      These are children, young and old, who should be a very high priority for the state, because they have been removed from their family homes and either need places to live while they and their parents either receive necessary services so they can be reunited – as quickly as possible s– or they need the state's efforts to find them other permanent homes in which they can safely grow up.

6.      Yet the state agency with responsibility for foster care, the Department of Human Services ("DHS"), has failed to address the desperate need for an additional number and range of appropriate placements and necessary services, despite the fact that this problem has been known and growing for years.

7.      Children who need to be placed in foster care experience frequent moves among many different homes and institutions, scattered throughout the state, increasing the trauma that these children have already suffered after being removed from troubled home situations. Often, they are separated from their siblings during placement.

8.      Decisions about their service needs are made by caseworkers with too many children to serve, too few resources, and too little training. Many caseworkers do not stay long in their jobs and are replaced by new, inexperienced workers.

9.      The system is so overwhelmed, under-resourced, and ineffective that older children and children with even relatively mild behavior problems are often not placed by DHS in family homes with necessary supports and services. Instead, DHS places these children in inappropriate institutions, ships them out of state where they are placed in costly and questionable for-profit congregate programs that do not address their needs, or largely abandons them so they wind up in homeless shelters or on the streets.

10.      Although Oregon is a state-run child welfare system, policies and practices differ

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

widely from county to county. There is little meaningful effort by state leadership at DHS to ensure the uniform applicability of these policies and practices and the uniform availability of necessary services to children who should be the beneficiaries, not the victims, of this system.

11.    A separate, more limited lawsuit, seeking to regulate the placement of children in hotels, has instead resulted in simply a shifting of the problem, with an increasing number of children now being sent out of state to congregate care and placed in inappropriate, overly restrictive institutions, including repurposed juvenile detention facilities.

12.    Individual lawsuits against DHS have resulted in large damage awards for widespread violations of individual children's rights, at a resulting cost to the state of over $39 million since 2006. The state of Oregon currently faces eight personal injury lawsuits brought on behalf of current and former foster children.

13.    After more than a decade of reports, audits, and reviews exhaustively documenting these problems, DHS has failed to adequately redress the worsening conditions for foster children.

14.    Even when the state has attempted to respond to the call for lower caseloads, it has done so ineffectively. It has hired additional workers while other workers continue to depart only resulting in a net gain of a handful of workers a month, statewide, because the state has not addressed systematic problems in a child welfare system that is continuing to harm the very children who are dependent on it.

15.    Specifically,

a.    DHS fails to employ a minimally adequate number of caseworkers to provide appropriate care and services for children, many case workers are not provided adequate training or support necessary to carry out their responsibilities, and the turnover rate among child protection case workers is high;

b.    Defendants do not promptly evaluate and assess the unique needs of each child, in many cases failing to evaluate their needs at all, preventing

Page 4 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

caseworkers from adequately planning for appropriate placements and outcomes for foster children;

c.  When it is necessary to remove children from their homes, children often languish in over-taxed and improperly utilized temporary placements, and many children experience multiple destabilizing moves between foster homes and institutions;

d.  DHS has placed children in hospitals for days when there was no medical reason for doing so, lodged children in homeless shelters and minimally refurbished delinquency institutions, refrained from removing children from known abusive or neglectful homes, temporarily housed children in overcrowded general foster care homes, or placed children in poorly screened child-specific kith or kin foster homes.

e.  Children who have emotional, intellectual, psychological or physical disabilities, whose health conditions often worsen while in foster care, are deprived of necessary and appropriate services and treatment to ensure equal access to a stable, family-like foster placement in the least restrictive environment.

f.  Lesbian, gay, bisexual, transgender, queer and questioning ("LGBTQ")[1] children, particularly transgender children in transition and children who are in the process of coming out about their sexuality or gender identity, are often deprived of a safe and stable placement and face the dangerous choice of either staying in the closet or risking the termination of their placements.

---

[1] To be inclusive of the many sexual orientations and gender identities of children in Oregon's child welfare system, the term sexual and gender minorities ("SGM"), rather than LGBTQ, will be used throughout the remainder of the complaint. SGM is an umbrella term encompassing LGBTQ, two-spirit, non-binary and intersex populations and others whose sexual orientation, gender identity, gender expressions, or reproductive development varies from traditional, societal, cultural, or physiological expectations.

Page 5 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

g. DHS fails to provide foster parents with adequate support, to adequately train and financially compensate foster parents, and to recruit additional foster parents, particularly those willing and able to care for children with disabilities.

h. For children who are or should be available for adoption, Defendants fail to seek and secure appropriate adoptive homes in a timely manner. Many such children may remain in foster care for years or, in some cases, until they become legal adults and age out of the child welfare system, frequently into homelessness.

i. For older children who remain in foster care, many receive no placements or planning for transition to adulthood at all, and are forced into institutions or homeless shelters, without the skills and resources necessary to survive on their own when they leave foster care.

16. The children who are in the custody of DHS, and those who will be in DHS custody in the future, bring this civil rights action against DHS and its leaders, who are their legal custodians, for violations of their rights under federal law. They seek declaratory and injunctive relief for the many violations of these rights.

## PARTIES

## I. PLAINTIFFS

17. Plaintiffs Wyatt B. and Noah F.[2] are respectively three- and one-year-old children who are in the custody of DHS, who have undergone multiple foster home moves, and who are separated. They appear through their next friend, Michelle McAllister.

18. Plaintiffs Kylie and Alec R. are respectively seven- and eight-year-old children who are in the custody of DHS and who have undergone multiple foster home moves. Kylie is currently

---

[2] The children's names are pseudonyms, but their actual first and last initials are used.

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

placed at the Parry Center and Alec is in his fourth foster home placement. They appear through their next friend, Kathleen Megill Strek.

19.     Plaintiff Unique L. is nine years old, is in the custody of DHS, and is currently placed at Acadia Montana. She appears through her next friend, Annette Smith.

20.     Plaintiff Simon S. is 13 years old, is in the custody of DHS, was recently released from Jasper Mountain, and is living with his paternal grandmother. He appears through his next friend, Paul Aubry.

21.     Plaintiff Ruth T. is 15 years old, is in the custody of DHS, and is currently placed at Forest Ridge in Iowa. She appears through her next friend, Michelle Bartov.

22.     Plaintiff Bernard C. is 15 years old, is in the custody of DHS, and is currently placed in River Rock, a wing of the Douglas County juvenile detention facility. He appears through his next friend, Ksen Murry.

23.     Plaintiff Naomi B. is 16 years old, is in the custody of DHS, and is currently placed at the Jackson Street Homeless Shelter. She appears through her next friend, Kathleen Megill Strek.

24.     Plaintiff Norman N. is 17 years old, is in the custody of DHS, and is currently placed at St. Mary's Home for Boys. He appears through his next friend, Tracy Gregg.

## II.     DEFENDANTS

25.     Defendant Kate Brown is the Governor of the state of Oregon and is sued solely in her official capacity. She is the chief executive of Oregon and is charged with faithfully executing the laws of the state and of the federal government.

26.     Defendant Fariborz Pakseresht is the Director of the Oregon Department of Human Services ("DHS") and is sued solely in his official capacity. DHS is the principal human services agency of the government of the state of Oregon and has responsibility for the Child Welfare Agency, which is a subdivision of the Department. Defendant is responsible for DHS' policies, practices, and operations, and for ensuring that DHS complies with all applicable federal and state

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

laws.

27.     Marilyn Jones is the Director of Child Welfare, a subdivision within the Oregon Department of Human Services, and is sued solely in her official capacity. She oversees programs including safety, well-being and permanency, and is responsible for Child Welfare's policies, practices, and operations, and for ensuring that Child Welfare complies with all applicable federal and state laws.

28.     Defendant Oregon Department of Human Services ("DHS") is a state agency created and authorized under the laws of the State of Oregon. It is authorized by law to maintain and ultimately is responsible for maintaining the Department, and its Child Welfare department, which acts as DHS' agent in the area of protecting the safety and welfare of children.

## JURISDICTION AND VENUE

29.     This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. The Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a), as well as the under the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), 42 U.S.C. § 670 et. seq., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2), Section 504 of the Rehabilitation Act ("Section 504" or "RA"), 29 U.S.C. § 794, and the respective implementing regulations.

30.     This Court has jurisdiction to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2002 and Rule 57 of the Federal Rules of Civil Procedure.

31.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) and divisional venue is appropriate in the Eugene Division pursuant to local rule 3-2 because the claims arise in this district. Although the governor, DHS, and Child Welfare are responsible for children all over the state, their administrative and managerial functions are operated out of their headquarters, which are located in Salem, in the Eugene Division.

## CLASS ACTION ALLEGATIONS

32.     This action is properly maintained as a class action pursuant to Rules 23(a) and

Page 8 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

23(b)(2) of the Federal Rules of Civil Procedure.

33.    This action consists of one major class and three sub-classes:

a.    All children for whom the Department of Human Services has or will have legal responsibility and who are or will be in the legal and physical custody of the Department of Human Services, ("the general class"); and, as sub-classes:

i.    Children who have or will have physical, intellectual, cognitive, or mental health disabilities (the "ADA sub-class").

ii.    Children who are or will be 14 years old and older, who are eligible for transition services and lack an appropriate reunification or other permanency plan (the "aging out sub-class").

iii.    Children who identify as sexual or gender minorities, including lesbian, gay, bisexual, queer, transgender, intersex, gender non-conforming and non-binary children (the "SGM sub-class").

34.    Each class is sufficiently numerous to make joinder impracticable.

a.    The general class consists of approximately 8,000 children who currently are in the foster care custody of the Oregon Department of Human Services.

b.    The ADA sub-class consists of over 50% of children currently in foster care who experience physical, intellectual, cognitive, or mental health conditions;

c.    The aging out sub-class consists of at least 900 youth. Based on reports that roughly 1300 Oregon foster children are 16 years or older, and estimates that 71% of them will depart foster care other than to adoption, reunification, or permanent family-like placement. DHS is required to provide Independent Living Services ("ILS") to children 14 years and older and it is reasonable to assume that there are at least 200 children between

Page 9 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

the ages of 14 and 16 in foster care.

    d.    The SGM sub-class consists of approximately 400 youth, based on research studies demonstrating that nearly 20% of foster children 12 years or older identify as SGM (including 13.4% identifying as lesbian, gay, bisexual or queer and 5.6% identifying as transgender), and reports that roughly 2,000 Oregon foster children are 12 years or older. Moreover, 40% of homeless foster children identify as SGM, and of those, approximately 30% report aging out of the child welfare system into homelessness.

35.    The questions of fact and law raised by named Plaintiffs are common to and typical of those of each putative member of the class and sub-classes whom they seek to represent.

36.    The named Plaintiffs rely on Defendants for foster care services in Oregon and wholly depend on DHS for provision of those services.

37.    Defendants' long-standing and well-documented actions and inactions substantially depart from accepted professional judgment and constitute deliberate indifference to the harm, risk of harm, and violations of legal rights suffered by the named Plaintiffs and the class and sub-classes they represent.

38.    Questions of fact common to the classes include:

    a.    whether Defendants fail to protect the general class from physical, psychological, and emotional harm, and risk of harm;

    b.    whether Defendants deprive Plaintiffs of the ADA sub-class necessary and appropriate services and treatment to make them as able as their non-disabled peers to access an array of community-based placements and services to ensure access to the least restrictive environment.;

    c.    whether Defendants deny members of the Plaintiffs' aging out sub-class skills and resources necessary to learn to live independently, and providing them with necessary training, skills, and assistance in securing appropriate

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

housing upon discharge;

d.    whether Defendants deny Plaintiffs of the SGM sub-class necessary and appropriate services and placements to prevent them from experiencing a higher than average number of foster care placements, a higher likelihood of living in a congregate care setting and a higher incidence of violence and harassment from foster parents and peers;

e.    whether the Defendants operate a system that promptly and adequately assesses the individual needs of members of the class;

f.    whether Defendants operate a system that adequately plans placements, treatment, and supports appropriate to the individual needs of the members of the class and sub-classes;

g.    whether the Defendants operate a system that provides an adequate diversity of placements to permit the members of the class to reside in the most integrated, least restrictive, and most family-like environment;

h.    whether the Defendants provide adequate case worker resources to ensure that members of the class can routinely meet with caseworkers face-to-face and engage in individual services; and

i.    whether the Defendants offer supports and case worker resources adequate to ensure that foster children 14 years or older receive transition planning to ensure children that age out of the system into adulthood have adequate planning and resources to meet future housing, employment, educational, and other social needs.

39.    Questions of law common to the classes include:

a.    whether Defendants' systemic failures violate Plaintiffs' substantive rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including exposing children to further neglect, abuse,

Page 11 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

and trauma by exposing them to unnecessary and too-frequent moves;

b.      whether Defendants' systemic failures violate Plaintiffs' right to all reasonable efforts to achieve permanency, under the First, Ninth, and Fourteenth Amendments to the United States Constitution, including by separating them unnecessarily from their families, siblings, and moving them to isolated placements;

c.      whether Defendants' systemic failures violate Plaintiffs' rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, including their right to placement in the least restrictive, most family-like home and their right to all reasonable efforts to achieve permanency; and

d.      whether Defendants' systemic failures violate Plaintiffs' rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2), Section 504 of the Rehabilitation Act ("Section 504" or "RA"), 29 U.S.C. § 794, and the respective implementing regulations, including by unnecessarily placing youth with disabilities in institutional settings and denying them access to community-based treatment.

40.      The violations of law and resulting harms alleged by Plaintiffs are typical of the legal violations and harms and/or risk of harms experienced by all of the children in the class and sub-classes.

41.      The named Plaintiffs will fairly and adequately protect the interests of the class and sub-classes that they seek to represent.

42.      Defendants have acted or failed to act on grounds generally applicable to all members of the class or, where appropriate, sub-classes, necessitating class-wide declaratory and injunctive relief.

43.      Counsel for Plaintiffs know of no conflict among the class members.

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

44. The named Plaintiffs are represented by the following attorneys, who are competent and experienced in class action litigation, child welfare litigation, and complex civil litigation:

- Attorneys from Davis Wright Tremaine LLP, a full-service law firm with eight offices in the U.S., including partner Greg Chaimov, who served as attorney-in-charge of the Special Litigation Unit for the Oregon Department of Justice and who is experienced in class action litigation, and counsel Paul Southwick, an expert in legal advocacy for SGM youth, both of whom who have extensive experience and expertise in complex litigation, in state and federal courts throughout the United States;

- Attorneys from A Better Childhood, Inc., a non-profit legal advocacy organization, including the Executive Director, Marcia Robinson Lowry, who has extensive experience and expertise in federal child welfare class actions throughout the United States, and Deputy Director Dawn J Post, who has over 16 years of experience in child welfare practice and litigation; and

- Attorneys from Disability Rights Oregon, the designated protection and advocacy agency for the state of Oregon pursuant to ORS 192.517, who have brought individual and class action litigation to cause substantial, systemic changes to improve access and services for individuals with disabilities, including Legal Director, Emily Cooper, Deputy Legal Director Ted Stenson, and Managing Attorney Christine Shank.

## FACTS

## III.    THE PLAINTIFF CHILDREN

### A.    Wyatt B. & Noah F.

45. Three-year-old Wyatt B. and one-year-old Noah F. have been in the custody of the Department of Human Services off and on since September 2018. They are both members of the general class.

Page 13 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

46.     Wyatt and Noah appear through their next friend, Michelle McAllister. Ms. McAllister is a former Social Service Specialist having served the state of Oregon for a total of 10 years. She has known Wyatt and Noah since their births and regularly sees them when she facilitates or attends visits with the biological mother. She is familiar with both the family's background and Wyatt and Noah's current needs and is truly dedicated to their best interests.

47.     Wyatt was born with a congenital heart defect, which will require surgery as soon as he gains enough weight. Wyatt has been under the care of a cardiologist since birth and takes a number of medications three times a day.

48.     Wyatt and his infant brother Noah were placed in the custody of DHS in mid-September 2018 due to allegations of domestic violence and drug abuse in the home.

49.     Despite Wyatt's medical condition, neither he nor his brother, Noah, were identified as having any other special needs or behavioral issues.

50.     Upon information and belief, during the children's first three weeks of placement in foster care, beyond one initial foster home, the children were moved almost constantly, sometimes twice within a 24-hour period, totaling 6-7 placements, because of the lack of longer-term foster homes in Oregon. This compounded the trauma that they had already experienced due to their removal from their mother's care.

51.     Ultimately a decision was reached to separate the children and a supervisor was sent to remove the infant Noah from the latest foster home. When the supervisor opened Noah's packed bag, he found Wyatt's heart medications and discovered that the foster parents had been giving the infant not only medications that were not necessary, but ones intended for a much larger child. In addition, Wyatt had not been receiving the medications necessary to manage his congenital heart defect. Noah was immediately hospitalized and remained for two nights. Despite the fact that Wyatt had not been provided his necessary medication, DHS did not take him to be evaluated by either the hospital or his cardiologist.

52.     By happenstance, their mother had a scheduled visit that same day. However, DHS

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

did not notify her about the medication mix-up or hospitalization. She was simply informed that when the Social Service Assistant ("SSA") had gone to pick up the children for the visit she had discovered that the children were unavailable, as they had just been moved. Upon information and belief, the SSA and/or their mother was provided this information to conceal the medication mix-up. While Noah remained in the hospital, Wyatt was left in the home where the medication mix-up had occurred.

53.    Two days later, their mother was informed that her scheduled visit with the children had been cancelled because the children were ill. Again, DHS did not affirmatively notify her about the medication mix-up or Noah's hospitalization.

54.    When their mother was finally able to reach the DHS supervisor, several hours later, he discussed the mother's case plan with her before finally telling her about the medication mix-up and hospitalization, which he casually described as a "total goof-up."

55.    When their mother expressed concern about the children's frequent placement moves, the supervisor stated, "I know, it's ridiculous."  He then stated that DHS had even conducted a state-wide search and had not been able to find a single home that would be able to accept both children. The children's Court Appointed Special Advocate ("CASA") recognized the gravity of the situation, describing the mix-up in her report to the court as a "potentially life threatening mistake."

56.    DHS then developed an in-home plan, which allowed the children to be returned to the mother, which occurred on or about October 5, 2018.

57.    During the children's first period in foster care, in addition to multiple moves, the children had two case workers, two permanency workers, and two supervisors, compounding the confusion not only for the children but for the adults involved as well.

58.    Due to allegations, Wyatt and Noah's mother had contact with her husband, who had been charged with domestic violence against her, the children were again placed in foster care shortly after Thanksgiving. Over the course of approximately one week, the children were moved

Page 15 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

almost daily. They were then separated and placed in different foster homes.

59.     During one of their mother's visits, she observed that the dosage of Wyatt's medication had been lowered without explanation or consultation with his cardiologist. Their CASA reported to the court that "Wyatt's medicines have been mishandled twice now that this CASA is aware of. That is unacceptable, when these medications can be fatal if given incorrectly. DHS needs to set up a protocol that ensures proper oversight of these meds."

60.     Prior to their removal, the children had rarely spent time away from their mother. As a result of the trauma of being removed from his mother and subsequently cycled through 12-14 homes in two different placement episodes, Wyatt has begun to exhibit significant behavioral issues. He is now described by the caseworker and CASA in reports as an angry child, displaying fits including flailing, hitting, kicking, screaming and throwing things.

61.     The infant Noah has begun to have night terrors, screaming loudly in the middle of the night while appearing to remain asleep. His foster parent makes efforts to soothe him until he eventually wakens and the cycle begins again. Noah needs be held constantly and throws a tantrum if he is put down or if focus is moved away from him.

62.     DHS has informed the court that the only way to keep the children together was "at the expense of frequently moving placements" as "[t]he county was not able to locate a suitable and sustainable placement that could house both children long term in county or anywhere else in the state of Oregon."   DHS acknowledged that "the frequent changes in placement [had] a significant adverse impact on each child's behavior."

63.     In mid-March 2019, Wyatt's foster mother informed DHS that she was taking a break from fostering and asked that he be moved by April 1, 2019. DHS was unable to locate a placement by the deadline which has now been extended to April 4, 2019.

64.     Upon information and belief, to date DHS has been unable to develop a plan to reunite the siblings, made any new efforts to locate a suitable placement to do so, or developed a plan to allow the children to be returned to their mother.

Page 16 – COMPLAINT

65.     Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate Wyatt and Noah's substantive due process and federal statutory rights. Defendants have failed to protect Wyatt and Noah from harm and risk of harm while in their care by failing to properly provide for their medical needs, subjecting them to placement instability, and separating them. Wyatt and Noah continue to be at risk of irreparable harm as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

**B.      Kylie R. and Alec R.**

66.     Kylie R. and Alec R. are seven- and eight-year-old siblings who have been in the custody of DHS since late January 2019, and are members of the general class.

67.     Kylie and Alec were removed from their mother due to allegations of neglect and substance abuse. Kylie and Alec were unable to remain with their mother with an in-home safety plan because DHS was unable to locate a substance abuse program for her.

68.     Both Kylie and Alec were extremely bonded to their mother and experienced significant trauma from their removal. Their trauma was then exacerbated by near constant moves as DHS was unable to locate a suitable placement. Despite having been in care for less than two months, Kylie has been in five different placements and Alec has been in four. Kylie has run away from the two separate foster placements and found her way back to her mother's home.

69.     Kylie suffers from tantrums, which have escalated in duration and intensity during her placement in foster care. DHS has failed to find appropriate placements and, perhaps more critically, failed to advise any of her foster parents about these behaviors so that they would be prepared and properly equipped to immediately address them.

70.     During one placement, the foster parents advised Kylie and Alec's attorney that the children were dropped off with the foster family on a Friday afternoon, which was not even provided with the children's last name or with their Oregon Health Plan cards, let alone advised about the tantrums. Kylie had tantrums throughout the weekend and DHS did not respond to the foster parents' multiple frantic phone calls for advice on how to address them. As a result, on

4835-4444-9939v.3 0050033-004090                    DAVIS WRIGHT TREMAINE LLP
                                                1300 S.W. Fifth Avenue · Suite 2400
                                             Portland, Oregon  97201 · (503) 241-2300

Sunday afternoon, the foster parents took Kylie to the hospital because they were concerned that she would hurt herself. However, the foster parents were unable to complete the intake process because they did not know the children's last names and could not reach anyone at DHS.

71.     Kylie and Alec had lice when they came into foster care. Upon information and belief, they were not appropriately treated, and had lice visibly crawling on their heads. DHS had not provided any of the foster parents with Kylie and Alec's Oregon Health Plan numbers, so they were not able to access their primary physician to obtain a prescription for lice treatment. Kylie was extremely embarrassed about her lice and did not want to attend school.

72.     Kylie and Alec have now been separated. Kylie was placed in a residential psychiatric facility, the Parry Center, in Portland. Upon admission, Kylie was finally treated for the lice, more than six weeks after her initial placement foster care. However, her shoulder length hair had to be shaved off. As a result, Kylie now refers to herself as a boy. Alec remains in the last foster home he was placed in just a few weeks ago. Their mother has now been referred for services and visits them regularly.

73.     Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate Kylie and Alec's substantive due process and federal statutory rights. Defendants have failed to protect Kylie and Alec from harm and risk of harm while in their care by failing to properly provide for their medical and behavioral needs, subjecting them to placement instability, and separating them. Kylie and Alec continue to be at risk of irreparable harm as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

**C.     Unique L.**

74.     Unique L. is nine years old and has been in the custody of DHS for two and a half years. She is a member of the general class and ADA sub-class. Unique appears through her next friend, Annette Smith. Ms. Smith has been Unique's attorney for two and half years, visits her regularly, remains in regular communication with her, and is truly dedicated to Unique's best

Page 18 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

interests.

75.     When 9-year-old Unique came into foster care, her mother was diagnosed with a significant mental health condition, was verbally abusive to her children, and kept them out of school. In addition, Unique's step-father was sent to prison for sexually abusing Unique's sibling and it is suspected he also sexually abused Unique. Unique's mother has a long history with child welfare including having her parental rights terminated with respect to two older children. Unique has struggled with emotional and behavioral issues since she was six.

76.     After Unique became involved with DHS, she changed placements multiple times and periodically cycled through Jasper Mountain's SAFE Center, a short-term 30-90 day program designed to help stabilize residents. During these placements Unique generally did not have contact with her mother, based upon therapeutic recommendations as well as her mother's failure to follow-up on the prescribed case plan. Due to DHS' lack of therapeutic placements, Unique spent months at the SAFE Center well past her scheduled discharge dates.

77.     In June 2017, Unique was finally moved to a therapeutic placement. She continued to have no have contact with her mother, who was focused on maintaining custody of Unique's siblings. Following a period of phone contact, visitation with her mother began again in October 2017. Around the same time, Unique began Attention Deficit/Hyperactivity Disorder ("ADHD") medication, which benefitted her focus in school. However, Unique's behavior in the foster home began to decline, culminating in April 2018 when the therapeutic foster home informed DHS that they could no longer care for Unique, following a visit with her mother.

78.     Despite the fact that the mother's therapist had informed DHS that the mother was not ready to have Unique returned to her care, DHS nevertheless returned Unique to her mother when they were unable to locate a therapeutic placement for her. Inexplicably, DHS simultaneously sought to dismiss the case, however, over Unique's attorney's objection. Shortly thereafter, Unique's mother locked her outside on the porch and began leaving messages with multiple professionals involved in the case demanding that Unique be removed from her home.

Page 19 – COMPLAINT

79.     Specifically, in one voicemail message, the mother stated: "…it's time for us to have someone come and intervene and get this little bitch out of my house, cause I'm fucking done now, she can't come back in, she's on the porch, she ain't allowed in my fucking house. All her shit is packed. Her fucking dresser is gonna be out there, anything I can get out of this house right now, she got to go, she gotta fucking go, she ain't sleeping in here tonight. So, unless I need to call 911, somebody needs to fucking come and get her."

80.     In a second voicemail message, an exchange between the mother and Unique was recorded in which Unique can be heard crying and screaming, "Mommy please don't do this."

81.     Unique was placed at the SAFE Center for a 72-hour stay, then moved to a temporary foster home, before being placed in an Oregon Community Program ("OCP") therapeutic foster home.

82.     On July 17, 2018, Unique received a psychiatric assessment that recommended "a combination of mental health and behavioral support services to manage her symptoms of anxiety, ADHD, PTSD and especially transitions between foster homes and the adjustment to the differing expectations in a new home and school setting…Placement in a BRS Treatment Foster Care home seems an appropriate level of care at this time to evaluate and stabilize her."

83.     On July 18, 2018, Unique removed a piece of broken glass from her makeup bag and threatened to hurt herself.

84.     On August 8, 2018, Unique destroyed property in the OCP lobby. OCP informed DHS that Unique needed to be discharged within 30 days. On August 14, 2018, the police were called to the OCP foster home because Unique was being verbally and physically aggressive and was destroying property. OCP requested an immediate discharge and Unique was again moved the SAFE Center for a short stay.

85.     Between August 16, 2018 and October 23, 2018, Unique was placed at Albertina Kerr Sub-Acute facility in Portland, in a regular foster home in Veneta, and at least twice in the emergency department of a hospital.

Page 20 – COMPLAINT

86.    Unique saw a psychiatrist at Albertina Kerr who diagnosed her with PTSD, combined type ADHD, noted a significant history of unpredictability and volatility, and noted the impact of significant disruptions in attachment to caregivers.

87.    On September 27, 2018, Unique walked into the street, yelling obscenities at other students, stated she did not want to be alive and tried multiple times to walk into traffic.

88.    In October 2018, Unique was placed in Acadia Montana in the state of Montana. Acadia Montana is a 108-bed Residential Treatment Center for young people ages 5-18 and is advertised as short-term with the average length of the stay lasting three to six months.

89.    At Acadia Montana, Unique has engaged in tantrums that have resulted in her being placed in 4-person holds, 2-person holds, and seclusion by staff. Unique weighs approximately 90 pounds.

90.    Unique is also regularly subjected to the use of chemical restraint by the Acadia Montana staff when she engages in a tantrum. Specifically, Unique has a significant number of "as needed" medications, authorized in the moment by the doctor, which are either generally administered through intra-muscular injections unless Unique cooperates and takes the medications orally. The staff uses these medications to induce calming effects. Unique is also on a daily course of oral medications including an anti-psychotic and an anti-convulsant/anti-epileptic although she does not experience seizures.

91.    In addition to concerns that Unique's attorney has raised about the effects such drugs may have on a developing nine-year-old body, the regular use of holds, seclusion and injections at Acadia Montana demonstrates that little to no therapeutic interventions are being used to promote self-regulation and skill development.

92.    Upon information and belief, no one from any child welfare agency has visited Unique since she was initially placed at Acadia Montana in October 2018. Despite being advertised as a short-term facility, upon information and belief, DHS has no plan or timeline to bring Unique back to Oregon. DHS is currently paying $330 per day, $120,450 per year, for Unique's placement

Page 21 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

at Acadia Montana.

93.    Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate Unique's due process and federal statutory rights. Defendants have failed to protect Unique from harm and risk of harm while in their care by failing to properly provide for her behavioral and mental health needs, failing to provide her necessary therapeutic placement in Oregon, and confining her in locked facilities. She has been deprived of necessary and appropriate services and treatment to ensure equal access to a stable, family-like foster placement and for appropriate placements including the least restrictive environment. Unique continues to be at risk of irreparable injury as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

### D.    Simon S.

94.    Simon S. is a 13-year-old boy who was recently released from Jasper Mountain and placed with his paternal grandmother in a licensed foster home. He appears through his next friend, Paul Aubry. Mr. Aubry has been Simon's attorney for over one year, visits him regularly, remains in regular communication with him, and is truly dedicated to Simon's best interests. Simon is a member of the general class and the ADA sub-class.

95.    Simon and his younger sister were first referred to DHS in 2010. To date, over 35 reports have been made, many by mandated reporters, detailing physical abuse, sexual abuse, and neglect. Simon was frequently reported to have facial bruising and black eyes, scratches, bruising on his body, welts and bruising including on his forehead, and cut and swollen lips. In October 2011 alone, six reports were made documenting injuries to Simon's face, head and body. On every occasion, Simon stated that the injuries were caused by his father.

96.    No action was taken until February 2012 when Simon was removed for a period of ten months due to allegations of physical abuse and neglect. In May 2012, Simon told a staff member that he had been sexually abused by another relative, and a report of maltreatment was immediately made to DHS. The reporter noted that Simon's disclosure was consistent with

Page 22 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

observed sexualized behaviors. Nonetheless, DHS closed the case at screening. Simon was ultimately returned to his parents' home.

97.     Despite the fact that multiple reports were made concerning Simon's continuing sexual abuse, DHS took no action with regard to these reports for over three years. In the interim, Simon attended the same school as his abuser, and DHS made no efforts to investigate the claims he had made, or to provide any counselling or services.

98.     In January 2014, a school official contacted DHS regarding their concerns that Simon was being sexually abused by a family member who also attended the same school. The school reported during this call that, "no charges were brought against the [alleged abuser] though DHS did an investigation and has every reason to believe abuse did occur […] there is nothing legal to keep the two apart though the school has been doing its best."

99.     The school official informed DHS that Simon had started defecating in his pants after seeing his abuser in the hallways, apparently as a means of protecting himself against further molestation, and regularly arrived at school with feces in his pants and pockets. While Simon started seeing a counselor at school, the counselor stated, "It's difficult to treat a child with these issues who lives in a home that is not safe, supportive and sanitary." DHS yet again closed the case at screening and Simon remained in the home.

100.     For over a year thereafter, Simon came to school with feces in his underwear, pants, and pockets. Despite additional reports to DHS, Simon's mother minimized his behavior, stating it was merely because "Simon is just too lazy to go to the bathroom and won't use the toilet as the seat is too cold." DHS closed the case at screening.

101.     Simon was removed from the house for a second time in June 2015 for a period of fourteen months and placed into foster care. However, rather than provide services and treat and protect Simon, DHS staff  imposed "safety plan" restrictions on Simon's presence in his family household, on the grounds that Simon could pose a threat of a sexual nature to his younger sister due to the abuse he had suffered. As a result, DHS restricted Simon from being in the home with

Page 23 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

his sister, allowing one child only in the home at one time. DHS maintained legal custody over Simon, and required that the children were never in the parents' home at the same time together for more than a year. When Simon was not in the home, he was placed in non-kinship foster care.

102.    In December 2017, Simon was removed from the parents' home and placed in a high-level therapeutic treatment center called SAFE Center at the Jasper Mountain facility in Springfield, Oregon. According to Jasper Mountain's website, it is intended to be a 30-day to 90-day program. Simon remained at the program for 15 months.

103.    Jasper Mountain determined that Simon could step down to a lower level of care as early as October 2018, if an appropriate level of placement was identified, because he no longer required the high level of care they provided. In addition, the court issued an order that Simon be placed in a therapeutic placement close to home. However, DHS failed to locate an appropriate therapeutic foster home for Simon, as had been recommended by Jaspar Mountain and directed by the court.

104.    After a number of extensions, Jasper Mountain finally discharged Simon on March 8, 2019. Despite having known that his grandmother was willing to have Simon live with her as early as February 2019, DHS delayed certifying her as a foster parent and he lived with her in a hotel on a "visit" for a week and then at her home for a week until she could be certified as a foster parent on Mach 20, 2019.

105.    An independent psychologist hired by Simon's attorney has concluded that Simon should continue to be maintained in a relative placement where he could receive treatment and services in the least restrictive environment that meets his needs, and an independent sexual behavioral therapist identified by Simon's attorney, and recommended by the psychologist, has been willing to treat Simon. Yet, to date no such treatment has begun.

106.    As of March 2019, Simon has been removed from his home on three different occasions and been in either foster care or a therapeutic residential facility for a total of 38 months, in eight different settings, in his fifty-eighth month (almost 5 years) of being under DHS

Page 24 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

supervision and care.

107.    Despite having ample time to do so, DHS has failed to create a viable plan for either reunification with his family or other permanent plan.

108.    Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate Simon's due process and federal statutory rights. Defendants have failed to protect Simon from harm and risk of harm while in their care by failing to properly provide for his behavioral and mental health needs, failing to provide him necessary therapeutic placement, and until recently unnecessarily confining him at Jasper Mountain, which is a locked facility. He has been deprived of necessary and appropriate services and treatment to ensure equal access to a stable, family-like foster placement and for appropriate placements including in the least restrictive environment. Simon continues to be at risk of irreparable harm as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practice.

### E.    Ruth T.

109.    Fifteen-year-old Ruth T. entered foster care in the spring of 2017, and is a member of the general class, the ADA sub-class, and the aging out sub-class. She is currently placed out of state, in Iowa, in a residential facility called Forest Ridge.

110.    Ruth appears through her next friend, Michelle Bartov. Ms. Bartov has served as Ruth's attorney for close to one year and is in regular communication with her. She is truly dedicated to Ruth's best interests.

111.    Ruth and her younger brother entered foster care after their mother died of an accidental drug overdose while Ruth was in the home. The household was chaotic, and Ruth was effectively left in charge of the home and of her brother. She experienced trauma as a result of being left frequently in the care of drug dealers and because of effective abandonment by parents who, though physically present, played little parental role. According to reports, DHS suspects that Ruth had been sexually abused.

112.    DHS placed the children with their maternal grandmother, licensed as a kinship

Page 25 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

foster parent, immediately after they entered DHS custody.

113.    At the time of her mother's death, Ruth was attending school only a few hours a day because she had poor socialization skills and behavioral issues, and the rural school district was unable to provide necessary supportive services for her to remain in the classroom.

114.    Ruth did not have a psychological evaluation until six months after she was placed with her grandmother although DHS has a policy requiring that children be evaluated within 60 days of placement. The evaluator noted that "[t]here was profound object hunger and attention-seeking, most of it negative, loud or demanding, for this clearly lonely, needy, regressed youngster who came across in the interview as one might expect of a child of six or 7, not a young lady of over the age 14."  Ruth presented as "desperate to be noticed but with no social skills […] with clearly pathologically deficient social skills, a pathological degree of insecure anxiety, and pathological needs for control of immediate interpersonal situations."

115.    The evaluator provided a list of recommendations for DHS to implement in order to assist Ruth therapeutically and academically. The evaluator also recommended that, given the maternal grandmother's hesitancy about keeping Ruth long-term, DHS develop a plan to transfer Ruth to longer-term therapeutic foster care so that if a transfer were to occur it could happen with minimal confusion. In a therapeutic foster home, the evaluator noted, Ruth would need to begin "intensive behavioral reconditioning" and work on issues relating to authority and boundaries.

116.    DHS did not implement any of the recommendations to ensure services were provided in the least restrictive environment.

117.    Because DHS did not ensure that Ruth received the appropriate treatment, her dysfunctional behaviors continued unaddressed. Just a few months later, DHS was contacted by Ruth's school and informed that Ruth displayed very defiant behaviors and that the school indicated they were reluctant to work with her further. DHS developed a plan to remove Ruth from a regular educational setting in order to be homeschooled through a web-based program. As a result of DHS's failure to address her emotional and behavioral needs, Ruth lost her opportunity

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

to participate in community-based education in her neighborhood school.

118.    In March 2018, Ruth was re-evaluated. The evaluator found that "[w]hile Ruth was unable to or unwilling to give details, it sounds like her childhood was traumatic at worst and without parental structure or appropriate socialization at best." The most outstanding characteristic of the interview was Ruth's "disrespectful speech and attitude" and reports of "extreme social impulsiveness and inappropriateness." The evaluator recommended that Ruth receive three specific courses of behavioral therapy.

119.    Again, DHS did not implement the recommendations.

120.    Ruth was finally removed from the maternal grandmother's home in April 2018 when she reported that her grandmother had hit her. After an unsuccessful placement in a subsequent foster home, which lasted only a few weeks, Ruth was sent to Creekside, a refurbished police department facility in Douglas County, over six hours away. Creekside quickly decided that they could not keep her long term, set a deadline for DHS to pick her up, and advised: "She is very much spiraling out of control…. She definitely operates at about a 6-year-old, if not younger, mentally…. She also follows around other residents and pesters them, even when they ask for space. It's pretty bad."

121.    As DHS searched for an alternative placement, Ruth's attorney was informed: "DHS has NO one and NO place at this moment who will agree to care for her." On June 29, 2018, Ruth's attorney questioned why DHS had made no effort to implement the recommendations that had been made by mental health professionals in an effort to obtain a therapeutic placement for her. The case planner admitted the recommended treatments had been "somewhat put on hold."

122.    DHS has now placed Ruth in a residential facility in Iowa called Forest Ridge. Ruth has never demonstrated behaviors that typically require a higher level of care, such as an unusual diagnosis requiring specialized treatment, sexualized behaviors, fire setting, or extreme violent acts. Despite this, DHS stated to Ruth's attorney that not only was there no one or place who would take Ruth in Oregon, there was also no other place in the entire country that would accept Ruth

Page 27 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

despite at that time not having made any other referrals nor ensuring access to services in the least restrictive environment.

123.    Forest Ridge specializes in Gender Responsive Services for adolescent girls in the juvenile justice system and is run under an umbrella for-profit organization called Sequel, with which Oregon has contracted to place foster children with all over the country. DHS is currently paying $330 per day, $120,450 per year, for Ruth's placement at Forest Ridge.

124.    Forest Ridge employs a system in which residents are "offered immediate feedback from both staff and peers." Forest Ridge is a campus-like setting where children are housed in cottages. Forest Ridge also employs restraints.

125.    Ruth is visited once a month by a courtesy worker from Iowa's local Department of Human Services. Upon information and belief, the visits are cursory and the reports are boilerplate with a few extra lines are added after each visit when they are submitted to DHS.

126.    To date, recommendations concerning Ruth's educational and therapeutic needs have been ignored and DHS has no plan or timeline to bring her back to Oregon. Ruth struggles to understand her current circumstances, feels isolated and abandoned by the system that was supposed to help her, and cannot envision a future where she will ever be able to return home.

127.    Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate Ruth's due process and federal statutory rights. Defendants have failed to protect Ruth from harm and risk of harm while in their care by failing to properly provide for her behavioral and mental health needs, failing to provide her with a necessary therapeutic placement in Oregon, and confining her in locked facilities. She has been deprived of necessary and appropriate services and treatment to make her as able as her non-disabled peers to access a stable, family-like foster placement and for an appropriate placement in the least restrictive environment. Ruth continues to be at risk of irreparable harm as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

F.    Bernard C.

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

128.    Fifteen-year-old Bernard C. first entered foster care at the age of three and was adopted with his sister by his great-grandparents in 2008. Bernard's great-grandfather passed away in 2009 and his great-grandmother in 2012, at which point DHS placed the children back in their biological mother's care.   The children re-entered foster care in 2013 when Bernard was approximately 10 years old, after DHS received reports of physical abuse by Bernard's mother, sexual abuse by his brother, and substance use and domestic violence in the home.

129.    Bernard is transgender and is a member of the general class, ADA sub-class, aging out sub-class, and SGM sub-class.

130.    Bernard appears through his next friend, Ksen Murry, who is sincerely dedicated to Bernard's best interests.  Mr. Murry is a solo practitioner whose practice is dedicated to providing accessible representation in family law matters with an emphasis on serving traditionally underserved populations, including members of the LGBT community.

131.    As Bernard entered placement in December 2013, his primary permanency goal was listed as Another Planned Permanent Living Arrangement ("APPLA").  Bernard was placed in two different foster homes in the first month of placement.

132.    Bernard came into foster care with a history of significant trauma manifesting as flashbacks, intrusive thoughts, and occasional nightmares.  DHS' failure to address the trauma, or to place Bernard with foster parents who understood trauma and resulting behaviors, has resulted in his experiencing ongoing depression, anxiety and anger throughout his time in foster care which in turn has resulted in further placement instability.

133.    In 2015, a psychologist noted it was likely that Bernard was emotionally abused and/or neglected in kinship placements and that these placements negatively impacted him and exacerbated his level of insecurity and increased his symptoms of Post-Traumatic Stress Disorder ("PTSD").

134.    The psychologist noted that enrollment and continuity in therapy was critical if Bernard were to make progress with respect to addressing his acting out behaviors, to help him

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

feel more secure and socially comfortable, to prevent continued thoughts related to harming himself, to improve relationships with peers, and begin to make plans for the future.

135.    Since placement, DHS has not ensured that Bernard has received continuity in therapy.

136.    The psychologist also recommended that DHS ensure that Bernard be placed in a highly supportive, predictable, and loving home environment in order to formulate a strong bond with a care provider and experience long-term support, nurturance, role modeling, and guidance from a parental figure.

137.    Since placement, DHS has not ensured that Bernard be maintained in such a placement.

138.    DHS acknowledged this itself within the first two years of placement, stating "[Bernard] has suffered tremendous loss in [his] life with significant moves.  [Bernard] has not been able to engage in services to address [his] needs for the appropriate amount of time due to placement disruption."  Despite the fact that Bernard had at that point identified as transgender, DHS placed him in an all-girls facility called Wildflowers through Whiteshield.  This placement created more confusion and aggravated Bernard's gender dysphoria.

139.    In the past five years, Bernard has been placed in 12-15 different foster homes and more than seven residential facilities. He has experienced rejection from some short-term foster families because of his gender identity.  Bernard's complex history of trauma, abandonment, and multiple moves impact his day to day functioning, ability to make and maintain healthy relationships, and his overall mood and anxiety levels, particularly in unsuitable and unstable placements.

140.    Over the years, Bernard's birthname has not been treated confidentially by staff at some of his residential placements. Other foster youth at his residential facilities have seen or heard his birth name and have used it to taunt him. The lack of confidentiality has caused him to be outed as transgender and has provoked his gender dysphoria. Bernard becomes severely emotionally

Page 30 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

triggered when he is referred to by his birth name or the wrong pronoun.

141.    Bernard has no sense of home or community and feels incredibly isolated.  He has few supports in his life.  In 2018, a psychologist observed that: "[Bernard's] sense of self, while mature and well-formed for his age (rather than being nebulous or wavering), is quite negative. Both his depressed mood and his poor sense of self are driven by feelings of being isolated, lonely, and rejected. Although wary of others and expecting rejection, [Bernard] also feels quite needy for others' care and closeness, which he has not consistently had in his life. He may go back and forth between trying to keep himself detached and feeling almost desperate, which will come out in his behaviors in interactions. This intensity and lability will also be seen in [Bernard's] moods and how he expresses them. Ultimately, his desperation is maladaptive, frustrating him into flashes of acting-out behaviors and impacting his ability to perceive others and interactions realistically, and at times even resulting in illogical reasoning."

142.    Bernard is currently placed at River Rock, a shelter facility in a section of the Douglas County juvenile detention center. Upon entering the facility, children are subjected to physically invasive strip-searches and a thorough search of their belongings. Upon information and belief, the cells and furnishings in the dependency facility at River Rock are the same as those in the delinquency facility. The children take daily cold showers at scheduled times. At night children are secured in old delinquency cells where the doors are closed remotely and simultaneously.  The doors are locked preventing children from using the bathroom at night and are controlled from the delinquency control center.

143.    In addition to placements and therapy, Bernard's education has been significantly disrupted.  Currently, Bernard attends an alternative school for three hours per day which includes physical education, gardening and shop.  Bernard is worried that this path of continued institutionalization will not provide him with the skills or resources necessary to live on his own when he ages out of foster care.

144.    As a transgender male, Bernard has been taking prescription testosterone for over

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

two years. His hormone injections should be administered weekly. In the month since he has been placed at River Rock, he has only had one testosterone injection. Abrupt cessation of testosterone has been linked to immediate withdrawal symptoms.

145.    Failure to provide the treatment will result not only in intensified psychological harm as Bernard's depression will worsen but also in irreversible, unwanted physical changes that will have a permanent negative impact on his later treatment options and quality of life as he may be flooded with estrogen and start female puberty. Bernard has already started to experience hot flashes.

146.    Bernard does not have any clothing except what has been provided by the facility which is "jailhouse" garb consisting of a sweatpants and t-shirts. Although he been provided with binders for his chest he only has been provided with two pairs of underwear.

147.    This has been compounded by the fact that Bernard has also not been receiving his anti-depressant medication while at River Rock. Bernard has a history of suicidal thoughts and engaging in self-harming behaviors such as cutting when he is depressed. In the past he has made statements such as "I hate my life. I just want to die" and "I want my life to be over." He has attempted to overdose on several occasions. Moreover, Bernard's difficulties with accessing medically necessary medication have been compounded by the loss of his therapist in Portland who is also transgender and he has not received appropriate therapeutic support since he was placed at River Rock.

148.    Bernard currently struggles with living in a rural, less tolerant environment, as well as in an institution where he has been harassed due to his gender identity. Other children make fun of him for being transgender and call him degrading names like "transformer" and "faggot." The facility does not have windows and Bernard has been deprived of any private time outside, effectively isolating him inside the facility with his bullies.

149.    Placement disruptions have also led to delays in Bernard getting gender conforming surgery.

Page 32 – COMPLAINT

150.    Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continued to violate Bernard's due process and federal statutory rights. Defendants have failed to protect Bernard from harm and risk of harm while in their care by failing to properly provide for his medical and mental health needs, failing to provide him with a necessary therapeutic placement, and restraining him in locked facilities.  As a transgender youth, he has been deprived of necessary and appropriate LGBTQ-specific services and treatment. The only LGBTQ-specific residential treatment programs available to Bernard are in Texas and Utah. Bernard continues to be at risk of harm as a result of Defendants' actions and inactions, policies, patterns, customs, and/or practices.

**G.    Naomi B.**

151.    Naomi B. is 16 years old and has been in the custody of DHS since November 2018. She is a member of the general class, ADA sub-class, and the aging out sub-class. Naomi appears through her next friend, Kathleen Megill Strek. Ms. Strek has been Naomi's attorney for approximately five months, visits her regularly, remains in regular communication with her, and is truly dedicated to Naomi's best interests.

152.    Prior to being taken into DHS custody, Naomi had been living with her father in Corvallis, Oregon. Naomi had previously been treated by her primary physician with a mild anti-depressant for agoraphobia and depression, but she was unable to engage in therapy because her father objected.

153.    On November 14, 2018, Naomi presented at the emergency room at Good Samaritan Hospital threatening suicide. The hospital recommended that she receive therapy but her father objected. Naomi was brought back to the emergency room the following week, after cutting her arm with a razor. DHS initiated an immediate investigation.

154.    Naomi was never officially admitted into the hospital although she remained in the emergency room for six days. The hospital recommended that she be placed in foster care.

155.    When DHS was unable to locate a placement for her, and DHS had concluded that

Page 33 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

Naomi would be at serious risk if returned to her father, Naomi's father gave DHS permission to place Naomi at the Jackson Street youth shelter, a homeless shelter which DHS contracts with for placements. Upon discharge to the shelter, the hospital recommended that Naomi follow-up with her primary care physician and participate in outpatient mental health treatment. Naomi stayed at the homeless shelter for approximately 15 days and did not receive any mental health treatment during that time despite these medical recommendations.

156.    On December 13, 2018, Naomi was moved by DHS to a higher level of care at Creekside, a refurbished police department headquarters.

157.    On her first day at Creekside, Naomi was attacked by another resident who "didn't like how [she] looked." Later that evening, after Naomi was locked in her room, her roommate attempted suicide by cutting her wrists in front of Naomi. Naomi ran away from Creekside and was picked-up by the local police.

158.    Naomi was then placed at River Rock, a shelter facility in a refurbished section of the Douglas County juvenile detention center. Upon entering the facility Naomi was subject to a physically invasive strip-search and a thorough inspection of her belongings. Upon information and belief, the cells and furnishings in the dependency facility at River Rock are the same as those in the delinquency facility.

159.    In order to avoid returning to Creekside, Naomi stated that she was overwhelmed and "didn't want to be around anymore." As a result, she was held in a cell until she received transport to the emergency room. Naomi explained to the Mercy Hospital staff in Roseburg that Creekside triggered her PTSD. Upon discharge from the emergency room, Naomi was transported back to Corvallis and re-placed at the Jackson Street youth shelter for another four days. During all this time, she received no mental health treatment or services.

160.    Naomi had provided DHS with information on three families she believed would be willing to care for her. Upon information and belief, DHS failed to contact any of these families. Finally, and at the prompting of Naomi's attorney, DHS was able to approve and place her in one

Page 34 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

of these homes. However, the placement disrupted after ten days.

161.   Again, because DHS had no other placement options, Naomi was placed for the third time at the Jackson Street youth shelter.

162.   A hearing to determine Naomi's status in foster care took place on January 8 and 9, 2019. Although Naomi asked to be allowed to live with her mother in Idaho, the court denied the application and DHS was granted custody of Naomi.

163.   When DHS again placed Naomi in the Jackson Street youth shelter, for the fifth time, Naomi ran away and went to Idaho to try to live with her mother. Shortly thereafter, Naomi was picked up by local law enforcement and transported to the local Juvenile Detention Center in Bonner County, Idaho, where she remained for two days until she was transported back to Corvallis in a secure, locked transport.

164.   On January 16, 2019, Naomi was returned to Jackson Street for the sixth time.

165.   On January 23, 2019, Naomi was placed at the Youth Inspiration Program ("YIP") in Klamath Falls, Oregon. The YIP is a rehabilitation program designed as, "the most intensive service for girls at risk of going to the state youth correctional facilities."

166.   At the program's inauguration, Dan Golden, the director of Klamath County's Juvenile Department, described the YIP as, "the last step before the big jail for them, a youth correctional facility." In a recent editorial, State Representative E. Warner Reschke (HD 56) said of his support for YIP funding, "I am advocating for the Klamath Youth Inspiration Program's funding …. to help troubled young women learn life skills in order to change their trajectory of crime to self-supporting stable citizens." There have been no allegations that Naomi is at risk of delinquent behavior and her placement at the YIP did not meet her emotional and mental health needs.

167.   Upon information and belief, the Klamath Falls YIP facility is a delinquency facility with which DHS contracts to place foster children in extra beds. The building is divided into two otherwise identical sections: the YIP side, and the juvenile delinquency side. The foster

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

children placed in the YIP program, like Naomi, share an exercise yard with the other facilities. The outdoor exercise yard is approximately 30 feet by 30 feet, entirely concrete, and enclosed by a 20-foot-tall chain-link fence with quills of barbed wire along the top. They also share an indoor exercise yard, approximately the size of a racquetball court.

168.    An independent case manager hired by Naomi's attorney verified that the facility is locked. It is not possible to enter or leave without being buzzed in or out. Naomi was not allowed outside privileges while at the YIP.

169.    If the child is deemed by staff to be a safety risk at YIP they are not allowed to have personal possessions in their room. Children are permitted one book in their rooms at a time. All clothes and other personal items are secured in lockers in a locker room.

170.    Behavioral issues from children trigger lock down events where all the children are required to return to their cells, which are then locked. The independent case manager observed this occur several times during her visit with Naomi. In addition, children are required to be locked out of their rooms for periodic searches.

171.    Since being taken into care in November, Naomi was unable to maintain her education. The YIP only allows the girls to complete approximately one-and-a-half to two-and-a-half hours of online schooling daily. In the two months that Naomi was placed at the YIP, she nearly exhausted all educational online offerings.

172.    Since November 2018 until present, Naomi has not been provided adequate counseling or therapy. Between superficially cutting herself with a razor on November 21, 2018, and her sixth placement at Jackson Street on January 16, 2019, Naomi did not have access to any counseling or therapy. Her subsequent placement at the YIP did not offer sufficient counseling or therapy to meet Naomi's needs. Naomi was required to attend daily group substance abuse therapy sessions, despite the fact that she did not have a substance abuse problem, as well as sex abuse sessions, despite not having been sexually abused. While she received one hour of weekly individual therapy, it was insufficient to address the issues that she presented with.

Page 36 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

173.    DHS contracts with a local provider, Klamath Basin Behavioral Health (KBBH), for medical and mental health treatment for parents and children in custody. While at YIP Naomi was not only prescribed Trazadone and Zoloft but the psychotropic, Risperdal, as well. Risperdal is used to treat schizophrenia in adults and children who are at least 13 years old as well as symptoms of bipolar disorder in adults and children who are at least 10 years old. Upon information and belief, the Risperdal was not prescribed by a psychiatrist but by a "qualified mental health provider." KBBH was recently sued by two former therapists who claimed that they were fired after blowing the whistle on illegal mental health hold practices.

174.    The YIP uses behavior interventions with children to help them learn how to self-regulate. If the girls were found to exhibit "good behavior" in the program, they were allowed to wear dresses on Fridays and were supplied with tampons during their monthly cycles. Otherwise, they were required to use sanitary napkins. Naomi immediately informed her attorney who brought it to the attention of DHS, lawmakers and the media in late March 2019.

175.    At the time that this issue was raised, Governor Brown had asked lawmakers to expand Klamath County's YIP program to serve more teenage girls in DHS custody. At that time, Dan Golden, the director of the YIP, directed that girls be granted access to three free tampons at a time, but only if they turned over their used hygiene products to staff.

176.    Golden defended the county program, in part by referring to Naomi, who was identified by name in correspondence he shared with the lawmakers and others, including details he said were her experiences and health challenges before she arrived at the program. Upon information and belief, the experiences and health challenges that he raised were grossly distorted. Golden also shared portions of Naomi's records with at least one politician. Both actions clearly violated state and federal confidentiality laws.

177.    Following an investigation by DHS, four girls in foster care who were assigned to the YIP program, including Naomi, were moved to other locations.

178.    On March 29, 2019, Naomi was returned to the Jackson Street homeless shelter for

Page 37 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

the seventh time.

179.    Upon information and belief, DHS does not have a plan for Naomi's care beyond her current placement at the Jackson Street homeless shelter.

180.    Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate Naomi's due process and federal statutory rights. Defendants have failed to protect Naomi from harm and risk of harm while in their care by failing to properly provide for her behavioral and mental health needs, failing to provide her necessary therapeutic placement, placing her in homeless shelters, and confining her in locked facilities. She has been deprived of necessary and appropriate services and treatment to ensure equal access to a stable, family-like foster placement and for an appropriate placement in the least restrictive environments. Naomi continues to be at irreparable risk of harm as a result of Defendants' actions and inactions, policies, patterns, customs and/practices.

**H.    Norman N.**

181.    Norman N. is 17 years old and has been in and out of the custody of DHS since November 2005.  He is a member of the general class, ADA sub-class, and the aging out sub-class. Norman is currently placed at St. Mary's Home for Boys ("St. Mary's") where he has been for the past ten months.

182.    Norman appears through his next friend, Tracy Gregg.  Ms. Gregg has been Norman's attorney for over 2 years, visits him regularly, remains in regular communication with him and is truly dedicated to Norman's best interests.

183.    Norman was initially removed from his home when he was two and a half years old due to his parents' drug use and his father's verbal abuse.  Upon information and belief, between 2005 and 2012, Norman was returned to his father's sole care at least five times.  It is unclear what services and supports were provided to ensure reunification was successful as Norman returned to foster care each time and has effectively grown up in the child welfare system.  His final removal from his father's home was in November 2012 after the police performed a wellness check and

Page 38 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

found Norman and his two younger siblings at home unattended with drug paraphernalia scattered throughout the house.

184.    Cycling back and forth into foster care, and experiencing at least 50 placements, has taken a significant toll on Norman as he has suffered trauma, abuse, neglect, and experienced related anger issues.  A psychological evaluation from 2013 indicates that Norman "has an extensive history of trauma, including neglect, physical and emotional abuse, witnessing parental substance abuse, and suspected sexual abuse."

185.    Norman has been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), Anxiety, and Post-Traumatic Stress Disorder (PTSD) and has been prescribed medications to help manage these conditions.   Norman is also currently on an Individualized Education Plan (IEP) to support his disability related behaviors in the classroom.

186.    Consistent mental health treatment has been recommended for Norman to address his trauma since he was two years old.  He has also been assessed and found eligible to receive assistive learning services to learn and modulate his impulsive and disruptive behaviors. However, access to all of these necessary and recommended therapeutic treatment has been interrupted regularly by a constant revolving door of placements and lack of assistive learning services.

187.    Norman estimates that he has been through 50 placements, including dozens of foster homes, hotel rooms, and at least four facilities including Children's Farm Home, Jasper Mountain SAFE center, two stays at St. Mary's, and the Northwest Children's Home in Idaho. Some of these placements include time in juvenile detention for non-compliance with the terms of his probation, including running away from foster homes in order to be with his mother.  None of these placements were with tribal members or individuals who identified as Native American despite the fact that Norman identifies as being a member of the Pokagon Band of Potawatomi.

188.    Despite documentation of Norman's tribal membership in his 2018 DHS care plan, he has been denied the opportunity to practice native heritage in his current placement at St. Mary's.  For example, he would like to grow his hair out in accordance with Native American

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

tradition.  However, due to a rule at St. Mary's, he has only been able to maintain short hair.

189.    Due in large part to DHS' failure to provide for Norman's disabilities, including near constant placement changes, Norman has had explosive outbursts that resulted in property damage.

190.    For example, after Norman's final removal from his father in 2012, he was placed in a foster home with his two younger siblings who had never been in foster care before. Norman felt very protective of them and did not trust the strangers that were now responsible for their care. Scared, Norman had a behavior outburst and was removed from the foster home and separated from his brothers.

191.    Norman was also placed in a foster home that was very dirty.  He ran away, but returned to reclaim his belongings.  When the foster parent denied Norman access to his bedroom and belongings Norman became angry.   Norman engaged in property damage for which he was placed on probation and owes restitution.

192.    During institutional placement through Christian Community Placement Center ("CCPC"), Norman was supposed to be permitted to visit with his mother every Tuesday. However, upon information and belief, he was denied these visits with his mother if he hadn't showered, cleaned his room, woke up on time, or otherwise followed the strict rules at this facility.

193.    Norman was also placed in a therapeutic foster home through CCPC.  During this placement he witnessed the foster parent smoke marijuana and aggressively headbutt his foster brother.  The boys reported this to DHS and Norman was moved again: this time, out of state.

194.    Norman was placed at the Northwest Children's Home in Idaho in September of 2017.  His caseworker alleged this out of state placement was the only available option as they were unable to find another placement in Oregon although it is unclear what efforts were made by DHS to find a less restrictive placement in his community.  Norman remained in the Idaho facility for ten months.

195.    Norman describes the program in Idaho as chaotic and unstructured.  Children often

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

fought and staff would not intervene. Staff routinely placed children in restraints after tackling them and taking them forcibly to the ground. Staff would also drag youth into locked seclusion rooms. As a result of the restraints, Norman suffered abrasions on his arms and dislocated joints. Once, while Norman was being restrained by staff members, multiple other youth assaulted Norman. Staff did not protect Norman from the assault and his nose was broken.

196.    In June 2018 when Norman was discharged from this facility and screened into his now second placement at St. Mary's, Norman was identified to have begun engaging in self-harming behaviors including cutting.

197.    Norman's permanency goal is Another Permanent Plan Living Arrangement "APPLA." However, he has not received the appropriate skills and resources necessary to survive on his own when he leaves foster care through case planning appropriate to meet the health care, educational, employment, housing, and other social needs that he needs when he ages out.

198.    DHS has recently begun planning with Norman's mother as a discharge resource when he turns 18. Norman's mother has had substance abuse issues and experienced housing instability. Recently, however, she has been working with counselor at St. Mary's and following up with all case worker recommendations including regular family therapy sessions. While Norman and his mother are both hopeful that this plan will be successful, Norman needs to continue to receive supports and resources from DHS when he is discharged from St. Mary's such as learning appropriate independent living skills to ensure he can survive in adulthood in case it does not.

199.    Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate Norman' due process and federal statutory rights. Defendants have failed to protect Norman from harm and risk of harm while in their care by failing to properly provide for his behavioral and mental health needs, failing to provide his necessary therapeutic placement, and confining him in locked facilities. He has been deprived of necessary and appropriate services and treatment as well as the skills and resources necessary to live

Page 41 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

independently when he ages out of foster care.   Norman continues to be at risk of irreparable harm

as a result of Defendants' actions and inactions, policies, patterns, customs and/practices

**Federal and State Requirements for Child Protection Systems**

IV.    **THE UNITED STATES CONSTITUTION AND FEDERAL LAW IMPOSE CERTAIN REQUIREMENTS FOR THE OREGON CHILD WELFARE SYSTEM.**

200.    The Due Process Clause of the United States Constitution imposes an affirmative

obligation upon state and local child welfare officials to:

a.      Ensure that each child placed in foster care is free from the foreseeable risk

of physical, mental, and emotional harms;

b.      Ensure that each child placed in foster care receives the services necessary

to ensure their physical, mental, intellectual, and emotional well-being in

the least restrictive environment;

c.      Provide each child placed in foster care with conditions, treatment, and care

consistent with the purpose and assumption of custody;

d.      Ensure that each child placed in foster care is not maintained in custody

longer than is necessary to accomplish the purpose of custody; and

e.      Provide each child placed in foster care with reasonable efforts to obtain an

appropriate permanent home and family within a reasonable period of time.

201.    Federal law requires that state and local child welfare officials:

a.      Place each child in foster care in a foster placement that conforms to

nationally recommended professional standards, 42 U.S.C. § 671(a)(10);

b.      Provide for each child placed in foster care a written case plan that includes

a plan to provide safe, appropriate, and stable foster care placements and

implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(A);

c.      Provide for each child placed in foster care, where reunification is not

possible or appropriate, a written case plan that ensures the location of an

Page 42 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

appropriate adoptive or other permanent home for the child and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(E);

d.    Provide for each child placed in foster care a written case plan that ensures the educational stability of the child while in foster care and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(G);

e.    Maintain a case review system in which each child in foster care has a case plan designed to achieve safe, appropriate, and stable foster care placements, 42 U.S.C. §§ 671(a)(16), 675(5)(A);

f.    Maintain a case review system in which the status of each child in foster care is reviewed every six months by a court, or person responsible for case management, for purposes of determining the safety of the child, the continuing necessity and appropriateness of the foster placement, the extent of compliance with the permanency plan, and the projected date of permanency, 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(C);

g.    Maintain a case review system that ensures that for each child in foster care for 15 of the most recent 22 months, the responsible child welfare agency files a petition to terminate the parental rights of the child's parents and concurrently identifies, recruits, processes, and approves a qualified family for an adoption, or documents compelling reasons for determining that filing such a petition would not be in the best interests of the child, 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(E); and

h.    Provide to each child in foster care quality services to protect his or her safety and health, 42 U.S.C. § 671(a)(22).

202.    The American with Disabilities Act requires that DHS provide children who experience physical, mental, intellectual or cognitive disabilities, necessary with an array of community-based placements and services to ensure access to the least restrictive environment.

Page 43 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

42 U.S.C. § 12131(2), 29 U.S.C. § 794, and the respective implementing regulations; 42 U.S.C. § 622(b)(8)(A)(iii); 42 U.S.C. § 675(5)(A); ORS 419B.090 (2)(A)(a) and ORS 419B.090 (3).

203.    The Oregon State Legislature has likewise committed itself to the fair treatment of children and to provide for their needs by statute, including mandating a youth's right to know what is happening in their case planning process, the right to attend and to participate in hearings, and the protection of the rights described by federal law. ORS 418.201.

204.    Defendants have committed themselves to meeting the rights of foster children by issuing a Foster Children's Bill of Rights. ORS 418.202; OAR 413-010-0180.

205.    The state of Oregon recognizes the rights of foster children to "be placed in the least restrictive environment that appropriately meets individual needs," to "be provided routine and necessary medical, dental, and mental health care and treatment," to "be protected from physical and sexual abuse, emotional abuse, neglect, and exploitation," to be reunified with their families where possible and to "be provided services to develop a safe permanent alternative to the family" when reunification is not possible. OAR 413-010-0180(1).

206.    DHS staff must "[d]envelop[] and implement[] service plans and agreements that address the needs, rights, and best interests of the child," and "[a]dvocat[e] for the child's rights when family members, community institutions (such as school/law enforcement), or the Department administrative practices appear to encroach upon the child's rights." OAR 413-010-0210.

207.    Each child must receive a monthly visit with DHS case worker staff, and the staffer must determine if the child's needs are being met, and determine if their needs have changed. OAR 413-020-0245(1); OAR 413-080-0054(1).

208.    The State, through the Department of Human Services, has accepted responsibility for the safety and well-being of all Oregon children who have been placed in foster care or who are at risk of being placed in foster care.

///

Page 44 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

## V.   THERE ARE SYSTEMIC DEFICIENCIES IN OREGON'S CHILD WELFARE SYSTEM.

### A.   Oregon Has Failed to Follow-Up on Necessary, Recommended Changes for Over a Decade

209.   Oregon's foster care system is so dysfunctional that Oregon cannot accurately track how bad its services are. The 2018 Secretary of State's audit described Oregon's foster care records as: "unreliable for our audit purposes" due to "uncertain and untested data integrity and accuracy, incompleteness, data entry errors and poor quality data conversion… ." The Secretary of State noted that DHS management staff did not have confidence in its own data and that case workers were tracking their required visits by "handwritten notes on cubicle walls" instead of the state database. Oregon is more than likely performing far worse than data which the state utilizes actually suggests.

210.   Nevertheless, a long series of reports and recommendations, including two periodic reviews from the Children's Bureau of the Health and Human Services Administration, the federal agency which regularly audits state child welfare systems, has repeatedly found significant flaws and made serious recommendations for reform. These recommendations have been largely ignored for over a decade.

211.   In 2008 the federal audit, the Child and Family Services Review ("CFSR") found that children in Oregon were not in stable placements, that many children were placed in over-capacity homes and that children were still not receiving the permanency that federal law required. The state made commitments to improving the workforce, increasing the safety of children, and providing more resources. These recommendations have not been implemented.

212.   In 2012, then Secretary of State Kate Brown, now Governor, issued a new audit. This report, too, included recommendations to improve the delivery of services to children, noting that the Department was only staffed to meet the needs of 68% of its caseload. These recommendations in the report were either not implemented or have been implemented in ways that were minimal and ineffectual.

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

213.    In 2016, following the Give Us This Day scandal, the Governor commissioned a study examining placement issues and the way that potential abuse in placements is investigated and responded to. In regard to placement issues the report included four recommendations and findings: there are a lack of appropriate placements for children in foster care, the state's capacity for high needs children was shrinking, providers across a range of placement settings were not getting the appropriate training, and the urgency to place children was compromising the certification and licensing standards.

214.    The report also recommended that efforts be made to: improve the DHS culture, focus the whole DHS Agency and Child Welfare on safety, adopt data-driven decision making, and increase staffing resources for Child Protective Services and other DHS entities. Despite the widespread attention that the media brought to bear on congregate care and DHS, the key systemic problems described in the report, such as the lack of case workers, insufficiency of placements, and impermanency of children remain largely unchanged and have, in some cases, gotten worse.

215.    In the 2016 federal audit conducted by the federal Children's Bureau, the CFSR, the state again did not achieve any of the "outcomes" relating to the permanency, safety and well-being of children in care, and was in "substantial conformity" with just two of the systemic factors. Notably, just 20% of children had "permanency and stability in their living situations." "In more than half of the applicable cases in which placement instability was identified, children were placed with non-relative foster parents who may not have had the necessary skills to care for, or been appropriately matched to, the children in their homes. Both DHS and stakeholders interviewed attributed this, in part, to the lack of a foster-parent pool that reflects the needs and characteristics of the children requiring placement. Due to this shortage of foster homes, placement decisions appear to be driven, at times, by foster home availability rather than the needs of the child."

216.    Critically, the federal Children's Bureau noted "practice concerns with making face-to-face contact with alleged victims of child abuse and neglect during investigations, and with conducting comprehensive assessments of risk and safety." This also impacted permanency "in

Page 46 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

the vast majority of cases where a lack of agency and/or court concerted efforts to achieve permanency was noted, the contributing factors are either a lack of adequate needs assessment and service provision or the failure to complete administrative paperwork."

217.    "The lack of quality caseworker visitation is the primary factor driving areas needing improvement across various practice areas, …[including] lack of comprehensive risk and safety assessments, placement stability, engagement in case planning, assessing and meeting the service needs of children and parents, and achievement of permanency."

218.    In the area of well-being, the agency "addressed the mental/behavioral health needs of the children" in only 49% of applicable cases. For service array, the Children's Bureau found: "although most services are available throughout the state, they are not available to the extent, or at times or the quality, required to meet the identified needs of children and families."

219.    In the Program Improvement Plan, issued after that federal review, the state made a commitment to, once again, improve children's safety, permanency, well-being and to improve workforce development. The state has failed to follow up on those promises.

220.    The subsequent 2018 Secretary of State audit also made various recommendations to improve management in DHS and Child Welfare, to improve management of foster care and recruitment and retention of foster parents, and to improve chronic understaffing, overwhelming caseloads and high turnover.

221.    The audit specifically found a persistent shortage of foster homes due to lack of support and failure to recruit new foster parents.

222.    The audit highlighted how the inadequate recruitment and retention of foster parents negatively impacts SGM foster children due to the lack of appropriate SGM placements. During the audit, Oregon's SGM foster children reported the pain they experienced by being placed in a home that treated their gender identity and sexual orientation as problems rather than as important parts of their identity.

223.    The audit stated that the state has no plan to recruit new foster families and no data

Page 47 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

on how many foster parents are needed. And once people become foster parents, the audit found that rather than receive support, the parents were frequently asked to take on work that should fall to caseworkers and called upon to accept "emergency" foster children who suddenly needed homes. Oregon has not addressed the issues identified in this audit.

224.    A new audit issued recently issued in 2019 found after examining a random sample of foster care cases, that eligibility regulations weren't always met, and, in some cases, home studies and background checks of new and continuing foster care providers either were not done at all or were incomplete.

**B.    Oregon Needs More Case Workers Who Are Adequately Supported and Trained to Meet the Needs of Children in Its Care**

225.    Child welfare research has clearly demonstrated that high caseworker caseloads negatively impact children in foster care. Specifically, caseworkers with high caseloads have less time to interact with children, families, and service providers or to provide meaningful and appropriate case plans, necessary services, and timely casework and decision-making. It is therefore critical that caseworkers have manageable caseloads. However, Oregon has failed for at least well over a decade to ensure that its caseworkers carry caseloads consistent with reasonable professional standards.

226.    The Child Welfare League of America, a coalition of private and public agencies that develops child welfare policies and promotes sound child welfare practice, has established nationally recognized standards for caseworker caseloads. Those standards governing foster care caseworkers limit caseloads to between 12 and 15 children in foster care per worker.

227.    As a direct and proximate result of Oregon's failure to ensure that caseworkers maintain regular contact with children, parents, and foster parents, foster children have been and will continue to be harmed because their assigned caseworkers are unable to meaningfully assess their safety and well-being and to facilitate the provision of services that are necessary to reunite them with their parents or to place them into a safe, legally permanent home.

Page 48 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

228.    Because most Oregon caseworkers are overburdened, it has alarmingly high caseworker turnover. Oregon's high caseworker turnover exacerbates problems throughout its child protection system because Child Welfare is compelled to fill growing numbers of vacancies with less qualified applicants, because caseworkers have less experience in the field, and because of diminished caseworker continuity in particular cases. Research has shown that high caseworker turnover is strongly correlated with children experiencing multiple placements, receiving fewer services, staying in foster care longer, and failing to achieve permanency.

229.    Ultimately, Oregon's failure to ensure that caseworkers carry reasonable caseloads and make sufficient contacts with the children in its custody substantially departs from widely accepted professional standards and demonstrates a deliberate indifference to the risk of harm to the children brought into care.

230.    DHS' Critical Incident Review Team reports issued over the last decade have repeatedly identified high caseloads as a contributing factor in child maltreatment and fatalities. Moreover, Oregon Annual Progress & Service Reports to the federal government have repeatedly stated that required face-to-face contact with children and families have not occurred due to high workloads.

231.    In Service Employee International Union ("SEIU") Local 503's statewide survey of child welfare employees at DHS in August 2016, 57% of respondents reported that their caseloads were over the recommended limits set by the Council on Accreditation. Some respondents reported nearly 28 cases, which was higher than the recommendation of "no more than 15 children in foster care or kinship care, and no more than 8 children in treatment foster care." DHS employees noted that caseload burnout has led to staffing shortages, increasing the burden among remaining caseworkers. New employees enter a system so strained that over 30% of survey respondents admit receiving little to no training, basing the majority of their work on observing experienced co-workers. Many offices reported an inefficient or complete lack of oversight.

Page 49 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

232.    The 2018 Secretary of State audit found that burnout had led to a 23% turnover rate of child welfare staff in 2016, and that roughly one-third of staff had been on the job less than 18 months.  Actual caseloads reported by caseworkers and district managers far exceeded the levels used in a prior workload model study commissioned by Oregon. According to CPS workers in Salem, they were assigned 21 investigations per month — more than three times the 6.85 investigations per month that the model supports. Permanency staff in Prineville reported having to cover as many as 45 cases at one time when they were short on staff, nearly four times the recommended 11.5 cases per worker, and permanency staff in Roseburg reported having roughly 20 cases each. Caseworkers who certify foster homes in Roseburg reported averaging 60 to 80 cases each, three to four times the 21.6 cases recommended in the workload model for certification staff.[3]

233.    Upon information and belief, currently approximately 70% of child welfare's current workforce have been on the job for less than 18 months.

234.    DHS' failure to ensure that caseworkers carry reasonable caseloads and make sufficient contacts with the children in its custody substantially departs from widely accepted professional standards and demonstrates a deliberate indifference to the risk of harm to Plaintiffs and the class and sub-classes they represent.

C.    **DHS Has Inadequate Permanency Planning**

1.    **Lack of Planning for Permanence in Foster Care**

235.    Oregon fails to ensure that children remain in foster care for as short a time period as possible, contrary to the requirements of federal law.

---

[3] This issue has been known for well over a decade. An expert review conducted in 2005 determined that Oregon needed to address the critical child welfare system workload. "Caseload sizes and supervisor-to-caseworker ratios exceed even outdated national standards and significantly compromise the safety response capacity." A 2006 technical report similarly found that that escalating workload had stretched caseworkers and possibly produced poor performance. Significantly, in a workload study commissioned in 2008, Oregon's caseworkers spent less time on direct client contact than any of the other states that recently implemented Child Welfare staffing studies. The time survey in the diagnostic showed that caseworkers spent most of their time on administration and supportive work.

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

236.    Many children in foster care fail to receive appropriate case plans that fully comply with the requirements for such plans. Further, children often do not receive necessary services that are required by their case plans, in part because defendants fail to either provide those services directly or contract for those services. In addition, many caseworkers have inappropriately heavy caseloads that preclude them from either developing appropriate case plans or ensuring that necessary services are provided.

237.    In the 2016 federal audit, the CFSR, the Children's Bureau found that periodic reviews and permanency hearings usually do occur in a timely manner, but these hearings often do not contribute to the achievement of permanency for children in foster care: "in the vast majority of cases where a lack of agency and/or court concerted efforts to achieve permanency was noted, the contributing factors are either a lack of adequate needs assessment and service provision or the failure to complete administrative paperwork."   The case review documented that "concerted efforts" were being made towards achieving a permanency goal for children in only 41% of cases.

238.    Visitation with family members is essential in case plans for a child's well-being, is fundamental to permanency, and is vital to a child maintaining family relationships and cultural connections. However, upon information and belief due to lack of resources and planning, DHS routinely defaults to one hour supervised visitation weekly or bi-weekly.

239.    When children are ready to be returned home, visitation plans are not expanded in a meaningful way, such as through graduated visitation plans in order to optimize the chances for success in reunification.

240.    Although federal law requires that case plans must be meaningful and that necessary services must be provided, children often remain on waiting lists for services, accurate and necessary information about children's circumstances, medical and social history, and special needs is withheld from foster parents, and biological parents are referred for services that exist in such small numbers that they never become available within the limited timeframe the parents have to comply with their case plans.

Page 51 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

241.    Oregon's failure to provide necessary services to children and parents substantially impedes reunification efforts because reunification often is not possible, legally and practically, in the absence of such services.

242.    Children often are returned to the care of their parents even though the conditions underlying the removal of the children have not been addressed.

243.    Children who remain in foster care longer than 12 months often linger for years without permanency. Adoption is appropriate for many of those children, but in 2016, 46% of children waited 36 months or more for adoption, and children are left in a legal limbo. The large percentage of children who remain in care without either being returned home or being moved through the system toward adoption is well below the federal standard for permanency for children, and is a violation of federal law.

244.    Moreover, from January-December 2018, while 47% of children who were legally freed for adoption were adopted within 12 months of the TPR, of the remaining 53% of children (1% had other discharge), only 12% were in adoptive placements, resulting in 41% of children who could be classified as "legal orphans," potentially children growing up in foster care, the very status the law was intended to obviate.

245.    For older teens who may express the view that they do not want to be adopted, DHS often fails to explore non-adoptive options that nevertheless would be conducive to the child's long-term stability, such as facilitating the child's connection with a non-adoptive kinship resource who will maintain a stable, long-term relationship with the child after he or she ages out of the system.

246.    DHS does not comply with requirements that it effectively plan for, and make ongoing reasonable efforts to achieve, permanency for children who cannot be reunified with their parents, failing to seek termination of parental rights within the time periods required by federal law, and failing to seek and secure adoptive homes for children for whom they are appropriate.

## 2.    Transition Planning and Discharge From Foster Care

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

247.    Youth are currently being placed while in foster care into homeless shelters. Others are being placed in unstable living situations which results in many ending up on the streets. Oregon foster children 16 year or older leaving foster care are disproportionately likely to exit the system without reunifying with family members or creating a new bond to a permanent family: 71% in Oregon aged out, compared to 51% nationally in 2016.

248.    WalletHub's 2018 States with the Most Underprivileged Children report recently indicated that Oregon ranks first in the nation for the rate of homeless children and youth. During FY 2017, teens (13 years and older) comprised 27% of the foster care population in Oregon.

249.    Case planning for adolescents is generally delegated to a variety of Independent Living Providers with long waiting lists for services.

250.    Adolescents in and aging out of foster care generally are those individuals least prepared, and most lacking in the skills and resources necessary, to survive on their own and, not surprisingly, those individuals fall far behind their non-foster care peers in education, employment, health care, and housing. Studies have repeatedly highlighted poor outcomes related not only to homelessness, but to pregnancy, incarceration and death.

   a.    Oregon Children Suffer From Maltreatment in Foster Care

251.    The fact that Oregon has removed a child from an abusive or neglectful home does not always mean that the child will then be safe. Oregon foster children are, all too often, subjected to maltreatment while in foster care.

252.    According to Oregon's Annual Progress and Service Report submitted in 2017, the national data indicator for maltreatment in foster care has a national standard of 8.5. This data indicator measures the following: of all children in a foster care episode during a 12-month period, what is the rate of victimization, per 100,000 days of care. The rate of maltreatment in Oregon during the foster care episode from 2014-2016 showed a steady increase in the rate of maltreatment from 14.6 to 18.5, peaking thereafter in the April 2016 - March 2017 data with a rate of 21.6.

253.    The Secretary of State 2018 audit noted that, "[s]ince 2006, DHS has paid out $39

Page 53 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

million in legal settlements due to the agency's inability to consistently keep children in their care safe from abuse and neglect. While some risk of exposure is expected within the Child Welfare program, the frequency and amount of these legal awards suggest a lack of strategic risk management within the agency and an unhealthy tolerance for serious risks to children."

254.    The high rate of maltreatment of children in DHS custody is a direct result of Defendants' long-standing and well-documented actions and inactions and Defendants' failure to remedy structural and systemic deficiencies that have plagued Oregon's child protection system for years. Oregon's failure to ensure that children are protected from maltreatment while in the custody and care of the DHS substantially departs from accepted professional judgment and norms and demonstrates a deliberate indifference to the risk of harm to Plaintiffs and the classes they represent.

## VI.    DHS PERFORMS INADEQUATE ASSESSMENTS AND CASE PLANNING

255.    Before the foster care system can provide the services a child needs, it must know what the child needs and create an individualized plan for delivering those services.

256.    Oregon falls far below basic norms for timely assessing the needs of foster children. Although Oregon does not effectively track this information on a statewide basis, its own data set in the 2016 CFSR report indicated only 44% of children received an evaluation for any emotional or behavioral health needs within 60 days of removal from the family home, and 37% of children in the dataset never had their needs assessed at all.

257.    Children entering the foster care system should quickly receive a detailed case plan setting forth their needs for services, but only 26% actually received such a case plan in their first 60 days in the system, according to the federal audit.

258.    Fewer than two of every three children in foster care had a completed, updated case plan, according to Oregon's own review of 200 case files in 2016. One in four had no case plan at all.

259.    Because of the perpetual crisis in finding placements, Oregon cannot meaningfully

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

fulfill a case plan for many children. Instead, children in need of placement are matched with available beds, any bed, regardless of whether the placement is appropriate to the child's needs. DHS courts disaster by sending children with complex needs from placement to placement, without any sense of what the child needs or how DHS plans to meet those needs.

260.    While the resources of DHS, the number of case workers, and the number of placements all contribute to Oregon's failures of its children, the lack of timely, appropriate assessment and case planning ensures that the limited resources Oregon makes available are not used well.

## VII.    OREGON HAS AN INADEQUATE ARRAY OF APPROPRIATE FOSTER PLACEMENTS

261.    Oregon has not ensured that it has a sufficient number of available foster home and other community resources to handle the large number of children who are removed from their homes and placed in foster care.

262.    This problem is specifically acute for children with disabilities, who have higher therapeutic needs, and for SGM youth. Because the Oregon Department of Human Services has not recruited and retained a sufficient number of foster homes, when it determines that a child should be removed from his or her home, it often places the child in a temporary placement.

263.    Federal law and widely accepted professional standards require Oregon to ensure that each child in its custody is placed in the most appropriate, least restrictive placement available, consistent with the child's needs. See 42 U.S.C. § 622(b)(8)(A)(iii); 42 U.S.C. § 675(5)(A).

264.    Children who are diagnosed with physical, mental, intellectual, or cognitive disabilities often find their health conditions worsen while in foster care. Instead, these children must be provided necessary and appropriate services and treatment ensure equal access to a stable, family-like foster placement and for appropriate placements including in the least restrictive environment.

265.    The abrupt removal of a child from their home can be overwhelming and often

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

exacerbates the trauma caused by the abuse or neglect that warranted the child's removal.

266.    Oregon routinely fails to make sufficient efforts to ensure that children achieve placement stability and many Oregon children shuffle through a large number of temporary placements, displaying increasingly difficult behavioral health needs which, in turn, makes it ever more difficult to find an appropriate placement for them.

267.    This longstanding practice results in additional placements for children in foster care in Oregon, despite clear goals in the child welfare field to minimize the number of placements and moves that children experience. This systemic practice also relies indiscriminately on institutional care for children, despite extensive evidence and guidance in the child welfare field about the importance of minimizing institutional care for children as well as federal prohibitions on segregating people with disabilities away from their homes and communities.

268.    Children placed in temporary placements often lose continuity of schooling, are often not placed with siblings, and often experience disruption of, or unavailability of, mental, medical, behavioral, and other health services they need.

269.    Upon information and belief, Oregon's foster care system is so overwhelmed, and there is such an acute shortage of adequate foster home placements, that in some instances DHS has placed children in hospitals for days when there was no medical reason for doing so. DHS has also lodged children in homeless shelters and refurbished delinquency facilities, refrained from removing children from known abusive or neglectful homes, temporarily housed children in overcrowded foster care homes, or placed children in inadequate and unlicensed child-specific kith or kin foster homes due to lack of availability of better, more integrated services and supports.

270.    These significant failures in Oregon's use of temporary foster care resources substantially depart from widely accepted professional standards, violate federal law prohibiting discrimination, and demonstrate a deliberate indifference to the risk of harm to the Plaintiffs and the classes.

Page 56 – COMPLAINT

## VIII.  OREGON USES POORLY SUPERVISED OUT-OF-STATEMENT PLACEMENTS TO FILL THE GAP.

271.    Almost simultaneously with the decrease in both regular and specialized placements for children with disabilities in Oregon, the state has increased the number of foster children sent out of state to for-profit residential facilities. As of March 2018, Child Welfare had 50 children and children placed in residential programs in other states. As of March 2019, Oregon now has approximately 86 children placed out of state, in facilities in Arizona, Arkansas, Idaho, Illinois, Indiana, Iowa, Montana, Oklahoma, Pennsylvania, Tennessee, Utah, Washington and Wyoming.

272.    Out of state for-profit facilities have repeatedly demonstrated ineffective management practices, lack of staff training, misuse of physical restraints and deceptive marketing practices, and federal and many local governments have called for enhanced oversight of those that deal with children with emotional disabilities.

273.    Upon information and belief, many of these children have been sent out of state because they were determined to not meet the criteria for payment for higher levels of care by Oregon Coordinated Care Organizations. As a result, DHS has turned to out-of-state for-profit residential facilities that accept any child and is paying anywhere from $275 - $803 per day per child.

274.    Oregon's oversight of the children placed at these facilities is sporadic and limited.

275.    The majority of the out-of-state residential placements operate under two umbrella organizations:  Sequel Youth and Family Services and Acadia Healthcare.

276.    Over a decade ago, Joey Jacobs was CEO at Psychiatric Solutions (PSI) where investors sued for fraud alleging that Jacobs had "downplayed the alarming incidents of abuse, neglect, and even death" at company facilities, ultimately winning a $65 million settlement. After selling PSI amidst regulatory investigations, Jacobs and five members of his management team from PSI joined Acadia, increasing it from a handful of centers into one of the country's largest

Page 57 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

for-profit behavioral health providers through acquisitions and building new facilities.

277.    In October 2018, two months before Jacob's termination at Acadia, a research analyst who covers Acadia, which is traded on Nasdaq, published a stock downgrade report based on Acadia's concealing widespread patient abuse and neglect that resulted from pervasive understaffing at its facilities. According to the research analyst, "at Acadia, cutting staffing costs to the bone is the 'secret sauce' used by management to inflate short term profits. Acadia's existence makes the world a worse place because its business model depends on acquiring new facilities and then degrading care, a losing proposition that victimizes patients. We believe the fundamental problem for investors is that Acadia's slash and burn approach to behavioral healthcare is inherently unsustainable and increasingly at risk of unraveling."   Currently, ten children from Oregon are placed in Acadia facilities, including named Plaintiff, Unique.

278.    Similarly, Sequel Youth & Family Services was previously known as Youth Services International (YSI), a for-profit company that specialized in residential programs for juvenile justice populations. Federal and local officials determined that youth placed in YSI facilities were exposed to physical and sexual abuse. One of the co-founders of YSI is now the founding stockholder, president, CFO and COO of Sequel. Seventy-six children from Oregon are currently placed at Sequel facilities including the named Plaintiff, Ruth.

279.    Notably, the State of Washington recently committed to stop placing children and work to move children currently placed at Clarinda Academy in Iowa, following a report published by Disability Rights Washington. Upon information and belief, at least five Oregon children are placed at Clarinda Academy, which is run like a correctional facility and where documented abuses have occurred. Clarinda Academy used to be a YSI facility before moving under the umbrella of Sequel.

280.    New Mexico issued a cease and desist ordering the facility Desert Hills to shut down due to serious and multiple allegations against facility employees for assault, battery and sexual contact. In February 2019, one Oregon child was placed there.

Page 58 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

281.    In the year 2018 alone criminal investigations and charges for sexual abuse have been brought against employees at Northern Illinois Academy in Illinois, for which Oregon pays $803 per child per day, Norris Academy in Tennessee, for which Oregon pays $610 per child per day and Red Rock Canyon Academy in Utah, for which Oregon pays $330 per child per day. At least 30 Oregonian children are currently placed at these facilities.

282.    As of February 22, 2019, the Tennessee Department of Child Services removed 18 of their own foster children, ages five to 17, from Kingston Academy, a Sequel facility, in Tennessee, while they investigated concerns. One Oregon child is placed there for which Oregon pays $450 per day.

283.    These facilities are uniformly located far from any population centers. They are generally locked or secure facilities. Children are so distant from their families, friends, or other Oregon ties that maintaining those connections is virtually impossible for the detained youth.

284.    Youth, during their time at these facilities, have no contact with the community outside of other detained children and staff. Meaningful integration with the community is impossible.

285.    As of March 2019, there were 86 youth at various out-of-state placements who are in the custody of Oregon's Department of Human Services (DHS). Each facility charges DHS a specified per diem rate. Based on data detailing the per diem rate for each of the 86 out-of-state residents, the average daily cost is $29,358. Extrapolating this data, the total monthly and annual costs associated with these placements are $880,736 and $10,568,826 respectively. By comparison, for similarly-profiled children based on age and therapeutic service needs, the state of Oregon pays a monthly rate of $2,385 or $2,447[4] per child for foster care home placements. The monthly and annual total cost of foster home care placements for this child population of 86 are $210,442 and $2,525,304 respectively.

---

[4] Age-specific Monthly Base Rate Payment + CANS Level of Care Payment for Level 3 (advanced needs) + Personal Care Services.

4835-4444-9939v.3 0050033-004090
DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

IX.    **PLACEMENT INSTABILITY HARMS CHILDREN**

286.    It is agreed among behavioral therapists, policy makers, and child welfare advocates that permanency is the most important factor affecting a foster child's well-being. The negative implications of placement instability for permanency goals are compounded because each new placement delays permanency, and statistically, children experience more placements the longer they linger in foster care. Generally, children coming into foster care have already experienced trauma in their young lives. The separation from their families represents another new trauma with which to deal, and each subsequent placement move represents a new trauma. Studies show that children without any internalizing or externalizing behaviors in their first placement are likely to develop behavioral challenges if they are moved, given the additional trauma that accompanies each move, and has a severe negative impact on a child's psychological, emotional, behavioral, social, cognitive, and mental health outcomes.

287.    Placement instability poses a greater risk of harm toward young children due to the fragility of their developing brains. Neuroscientists have found that placement instability can fundamentally and permanently alter the functioning of key neural systems involved in learning, memory, and self-regulation. One study examining the performance in neuropsychological tasks of a group of preschool-aged foster children found that those with multiple placements performed poorly compared to those with stable placements.

288.    Further, children who experience a lack of stability in early caregiving due to placement instability in foster care are at an increased risk for deficits in executive functioning abilities. Research has shown that executive functioning deficits in early childhood lead to poor academic achievement, a variety of behavioral health needs, and ADHD.

289.    Placement stability also plays a critical role in the development of adolescent-aged foster children. Problems linked to a lack of placement stability in adolescent children include substance abuse, juvenile arrests, failing out of school, social network disruption, and mental health issues. Research shows that children who age out of foster care systems are more likely to

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

experience negative life outcomes, such as pregnancy, incarceration and homelessness. Further, placement instability in adolescent children greatly inhibits academic achievement.

290.    DHS subjects children in Oregon's foster care system to the harm, and risk of harm, of placement instability, and has long known the negative consequences of doing so, yet has failed and refused to take action to address this issue.

      a.    DHS Routinely Fails to Obtain Timely Mental Health Services; Fails to Follow up on Therapeutic Recommendations;  and Fails to Ensure that There is an Adequate Array of Mental Health Services Available to Foster Children

291.    Lack of placements is inextricably intertwined with mental health and related cognitive and behavioral needs in Oregon because the children and adolescents who are undergoing multiple placements generally have been exposed to trauma and the resulting behavioral health issues. If they do not have behavioral health needs when they enter foster care, children often develop these needs because of their experiences in foster care.

292.    The American Academy of Pediatrics, Healthy Foster Care American Initiative, identifies mental and behavioral health as the "greatest unmet heath need for children and teens in foster care."

293.    The State of Oregon has effectively conceded the inadequacy of its efforts to obtain appropriate mental health treatment for its foster children. A report co-authored by Oregon Governor Kate Brown in September 2018 stated: "Currently, there are not adequate resources so that children who require partial hospitalization, short-term psychiatric residential treatment services, and subacute programs are able to access those settings at the right time, and at their level of need."

294.    This lack of services is borne out by the 2016 CFSR, which found that obtaining mental health treatment by DHS has been inadequate. The review found that the "current state of therapeutic placement resources is poor" and that DHS "continues to struggle with accessing

Page 61 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

timely and quality Mental Health services for children for outpatient therapy with trained clinicians in the clinical issues of foster care, attachment, engagement and trauma."

295.    This lack of mental health resources is compounded by the fact that every time a child goes to a different foster parent in a different county a new agency affiliated with different providers may take over managing the child's Medicaid insurance. Upon information and belief, this confusion frequently results in a delay or even denial of necessary care or discontinuation of prescribed medications. In addition, children in temporary placements do not receive appropriate mental health and medical assessments much less the resulting services.

296.    The need for timely and appropriate therapeutic interventions cannot be underestimated given the prevalence of mental health conditions in the foster care population, such as adjustment disorder, ADHD, and PTSD.

297.    Upon information and belief, there are numerous instances during the life of a foster care case where therapeutic interventions are missed or ignored by DHS, and a pattern in which DHS tends to advocate for care planning services, instead of following a clinician's recommendations.

298.    Oregon lacks adequate community-based support services that would enable children to either remain in their own homes or to be placed in community-based, family-like settings, such as family therapy, respite care, wrap-around services, and other supports appropriate to the emotional and behavioral needs of Oregon youth. The number of therapeutic family foster homes, with foster parents who have experience and training in dealing with emotional and behavioral needs, has diminished sharply.

299.    All of these failures have been well known to defendants, and all of them constitute significant departures from reasonable professional standards and deliberate indifference to the substantial harm and risk of harm to the children in foster care in Oregon.

Page 62 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**42 U.S.C. § 1983 - Substantive Due Process (On Behalf of the General Class and All Sub-classes Against All Defendants)**

300.    Each of the foregoing allegations is incorporated as if fully set forth herein.

301.    A state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to provide reasonable care, to and to protect from harm, a child with whom it has formed a special relationship, such as a child in foster care.

302.    Moreover, a state assumes affirmative duties to provide reasonable efforts to obtain a permanent home and family derived from the First Amendment's right of association and the Ninth Amendment's reservation of rights to the people.

303.    The foregoing actions and omissions of Defendants constitute a policy, pattern, practice, and/or custom that is inconsistent with the exercise of accepted professional judgment and amounts to deliberate indifference to the constitutionally protected liberty and privacy interests of all of the members of the general class.

304.    Defendants are well aware of the policies and practices that prevent these class members from receiving adequate protection from harm after the State has formed a special relationship with them.

305.    As a result, the named Plaintiffs and all of the members of the general class of children to whom the state owes a special duty, children in foster care, have been, and are, at risk of being deprived of substantive due process rights conferred upon them by the United States Constitution.

306.    These substantive due process rights include, but are not limited to:

    a.    the right to freedom from maltreatment while under the protective supervision of the State;

    b.    the right to protection from unnecessary intrusions into the child's

Page 63 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

emotional well-being once the State has established a special relationship with that child;

c.    the right to services necessary to prevent unreasonable risk of harm;

d.    the right to conditions and duration of foster care reasonably related to the purpose of government custody;

e.    the right to treatment and care consistent with the purpose and assumptions of government custody; and

f.    the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody.

307.    Moreover, the named Plaintiffs and all of the members of ADA, aging out and SGM sub-classes have been, and are, at risk of being deprived of substantive due process rights conferred upon them by the United States Constitution.

a.    With respect to the ADA sub-class of children, the substantive due process rights include, but are not limited to:

    i.    The right to be free from discrimination by reason of disability;

    ii.    The right to services in the most integrated setting appropriate to the person's needs;

    iii.    The right to be free from unnecessary institutionalization and to be placed in least restrictive setting; and

    iv.    The right an ensure access to an array of community-based placements and services to ensure access to the least restrictive alternative.

b.    With respect to the SGM sub-class of children, the substantive due process rights include, but are not limited to:

    i.    The right to freedom from bias-related violence, abuse and

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon 97201 · (503) 241-2300

harassment while in state custody;

    ii.    The right to freedom from systemic discrimination based on sexual orientation, gender identity and gender expression;

    iii.    The right to privacy regarding sexual orientation, gender identity and gender expression;

    iv.    The right to medically necessary gender-affirming medical and psychological care;

    v.    The right to culturally competent reproductive healthcare and sexual health services, including HIV prevention and treatment; and

    vi.    The right to be clothed and groomed consistent with one's sexual orientation, gender expression and gender identity.

c.    With respect to the aging out sub-class of children, the substantive due process rights include, but are not limited to:

    i.    The right to independent living services to prepare to exit foster care successfully including, but not limited to, vocational and other educational services; money management, household maintenance, transportation, legal issues, health, community resources, housing options, personal hygiene, employment readiness, and educational assistance;

    ii.    The right to assistance to find lawful, suitable permanent housing that will not result in homelessness upon exit from foster care; and

    iii.    The right to a connection with an adult resource who will maintain a stable, long-term relationship with the child after he or she ages out of the system.

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983 - The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 et seq. (On Behalf of the General Class and All Sub-classes Against All Defendants)

308.    Each of the foregoing allegations is incorporated as if fully set forth herein.

309.    The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, and/or custom of depriving the named Plaintiffs and the classes they represent of the rights contained in the Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, to:

a.    a written case plan that includes a plan to provide safe, appropriate and stable placements, 42 U.S.C. §§ 671(a)(16), 675(1)(A);

b.    a written case plan that ensures that the child receives safe and proper care while in foster care and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

c.    a written case plan that ensures provision of services to parents, children, and foster parents to facilitate reunification, or where that is not possible, the permanent placement of the child and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B); and

d.    a case review system in which each child has a case plan designed to achieve safe and appropriate foster care placements in the least restrictive and most family-like setting, closest to their home community, 42 U.S.C. §§ 671(a)(16), 675(5)(A).

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 12131 et seq. - Americans with Disabilities Act ("ADA")
### (On Behalf of the ADA Sub-class Against All Defendants)

310.    Each of the foregoing allegations is incorporated as if fully set forth herein.

311.    Title II of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12132, and its enabling regulations, 28 C.F.R. 35.101 et seq., prohibit discrimination against individuals with

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon 97201 · (503) 241-2300

disabilities.

312.    Plaintiffs have physical, mental, intellectual, or cognitive disabilities that qualify them as individuals with disabilities within the meaning of the ADA, 42 U.S.C. § 12131(2). They meet the essential eligibility requirements for the receipt of foster care services provided by DHS.

313.    Defendants are public entities, or are public officials of a public entity, subject to the provisions of the ADA. 42 U.S.C. § 12131(1)(A).

314.    Title II of the ADA prohibits a public entity from excluding a person with a disability from participating in, or denying the benefits of, the goods, services, programs and activities of the entity or otherwise discriminating against a person on the basis of disability.

315.    Under the regulations enforcing the ADA, the state may not "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others. . . ." 28 C.F.R. § 35.130(b)(1)(iii).

316.    Accordingly, DHS must provide children with disabilities an equal opportunity to access foster care services as it provides to children without disabilities in its custody.

317.    Moreover, defendants have an affirmative duty, to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

318.    As set forth above, the regulatory hallmark and guiding force of disability law requires the provision of services, including the child's placement in the most integrated environment appropriate to the youth's needs. 28 C.F.R. § 35.130(d); *Olmstead v. L.C.*, 527 US 581, 602 (1999).

319.    As a result of the foregoing, named Plaintiffs and all members of the class have, and are at risk of being, deprived of their statutory right to access additional mental health services

Page 67 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

to make them as able as their non-disabled peers to access a stable, family-like foster placement and for appropriate placement in the most integrated setting appropriate to their needs.

320.    As a direct and proximate result of defendants' violations of Title II of the ADA, plaintiffs have been or are at risk of being injured as set forth above and will continue to suffer injury until defendants are required to, and have, come into compliance with the requirements of the ADA.

## FOURTH CAUSE OF ACTION

### 29 U.S.C. § 794 - Rehabilitation Act ("ADA")

321.    Each of the foregoing allegations is incorporated as if fully set forth herein.

322.    Plaintiffs have physical, mental, intellectual, or cognitive disabilities that qualify them as individuals with disabilities within the meaning of the Rehabilitation Act. 29 U.S.C. § 794; 29 U.S.C. § 705(20). They meet the essential eligibility requirements for the receipt of foster care services provided by DHS.

323.    DHS receives substantial federal funding to support its child welfare operations and thus must comply with the Rehabilitation Act. 29 U.S.C. § 794(b); 34 C.F.R. 104.51. The individually-named Defendants are all agents for the state of Oregon sued in their official capacities. Their respective agencies and offices all receive substantial federal funding.

324.    Like the ADA, the Rehabilitation Act and its enabling regulations prohibit discrimination in the provision of services by any entity receiving federal funding. 29 U.S.C. § 794(a); 34 C.F.R. 104.4.

325.    Like the ADA, the Rehabilitation Act also requires an "equal opportunity" for people with disabilities to benefit from the services of a public entity. 34 C.F.R. 104.4(b)(1)(ii) & (b)(2); 34 C.F.R. 104.52(a)(2).

326.    Like the ADA, the Rehabilitation Act requires a federal funds recipient to provide services in the most integrated setting appropriate. 34 C.F.R. 104.4(b)(2).

327.    Defendants, in actions and omissions described above, fail to give children with

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

disabilities an equal opportunity to succeed in remaining in a family home, reunifying with their parents, finding a permanent home, receiving necessary health care, and receiving appropriate placement in the most integrated, community-based setting appropriate to their needs.

328.    As a direct and proximate result of defendants' violations of Rehabilitation Act, Plaintiffs have been or are at risk of being injured as set forth above and will continue to suffer injury until Defendants are required to, and have, come into compliance with the requirements of the Rehabilitation Act.

WHEREFORE, the named Plaintiffs, on behalf of themselves and the classes, respectfully request that this Court:

329.    Order that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

330.    Pursuant to Rule 57 of the Federal Rules of Civil Procedure, declare unconstitutional and unlawful:

  a.    Defendants' violation of Plaintiffs' and class members' right to be free from harm under the Fourteenth Amendment to the United States Constitution;

  b.    Defendants' violation of Plaintiffs' and class members' rights under the First, Ninth, and Fourteenth Amendments to the United States Constitution;

  c.    Defendants' violation of Plaintiffs' and class members' rights under the Adoption Assistance and Child Welfare Action of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. § 670 et seq.; and

  d.    Defendants' violation of Plaintiffs' and class members' rights under Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2), Section 504 of the Rehabilitation Act ("Section 504" or "RA"), 29 U.S.C. § 794, and the respective implementing regulations.

331.    Permanently enjoin Defendants from subjecting Plaintiff Children to practices that violate their rights, including:

Page 69 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

a.    With regard to all children in the general class:

i.    Require DHS to contract with an appropriate outside entity to complete a needs assessment of the state's provision of foster care placement and services no later than six months after judgement, to determine the full range and number of appropriate foster care placements and services for all children needing foster care placement, including the development of a plan, with timetables, within which such placements and services shall be secured, and ensure that DHS shall comply with those timetables;

ii.    Require that DHS ensure that all children who enter foster care placement receive within 30 days of entering care a complete and thorough evaluation of the child's needs, performed by a qualified individual, including whether the child has any physical and/or mental disabilities sufficient to be categorized as a child with disabilities under the ADA and that the child be re-evaluated as the child's needs and the information available to DHS change;

iii.    Require that DHS ensure that all children who enter foster care placement receive within 60 days of entering care an adequate and individualized written case plan for treatment, services, and supports to address the youth's identified needs; describe a plan for reunification with the child's parents, for adoption, or for another permanent, family-like setting; describing any interim placements appropriate for the child while the child moves towards a permanent home-like setting; and describing the steps needed to keep the child safe during the child's time in DHS's custody.

iv.    Require that DHS shall ensure that all children whose case plan

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

identifies a need for services and/or treatment timely receive those services and/or treatment;

    v.    Require that DHS shall ensure that all children who are placed in foster care are placed in a safe home or facility and are adequately monitored in accordance with federal standards;

    vi.    Require that DHS shall hire, employ, and retain an adequate number of qualified and appropriately trained caseworkers, and ensure that caseloads do not exceed 15 children per-worker for children in placement, with caseloads adjusted for caseworkers who carry mixed caseloads including children not in foster care custody; and

    vii.    Require DHS to develop an adequate statewide plan, to be approved by the Monitor referred to below, for recruiting and retaining foster and adoptive homes, including recruitment goals and timetables for achieving those goals, with which DHS shall comply.

  b.    For all children in the ADA sub-class:

    i.    Require that DHS shall ensure that all children with physical, mental, intellectual, or cognitive disabilities shall receive foster care services in the most integrated setting appropriate to the child's needs, including, in as many instances as is required by reasonable professional standards, family foster homes with supportive services;

    ii.    Require that DHS ensure that an adequate array of community-based therapeutic services are available to children with disabilities;

    iii.    Require that DHS ensure that it develop an adequate array of community-based therapeutic foster homes and therapeutic placements to meet the needs of children with disabilities;

Page 71 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

iv.    Require that DHS shall report to the Monitor referred to below on the placement type and the provision of services to all children who are in the ADA sub-class.

c.    For all children in the aging out sub-class:

i.    Require that DHS, when a child turns 14 years old while in its custody and is not imminently likely to be reunified with family, adopted, or otherwise placed in a permanent family-like setting, engage in transition planning to meet the health care, educational, employment, housing, and other social needs of the children in transitioning to adulthood;

ii.    Require that DHS ensure that children be placed in foster family homes whenever possible or, if the young person declines such a placement, in an appropriate group home with appropriate, necessary and individualized services;

iii.    Prohibit DHS from refusing to place a young person in a foster care placement because the child is 14 or older.

iv.    Require that DHS report to the Monitor referred to below on all children 14 and older, where the child is placed, and the type of services the child is receiving; and

d.    For all children in the SGM sub-class:

i.    Require that DHS shall ensure that all SGM children shall receive foster care services that support and respect a child's sexual orientation, gender identity and gender expression;

ii.    Require that DHS shall ensure that SGM children are not placed in placements where a child's sexual and gender identity or expression are viewed as immoral, undesirable, or problematic or where SGM

4835-4444-9939v.3 0050033-004090

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

children are subjected to regulation that does not apply to non-SGM children;

iii.     Require that DHS shall ensure that an SGM child's clothing, personal care, hygiene, hairstyle, makeup, jewelry or other accessories and grooming be consistent with the child's gender identity, gender expression and sexual orientation;

iv.     Require that DHS shall ensure that an SGM child's name and pronouns are used and respected, whether or not they conform to the child's assigned sex at birth or external anatomy, and that the child's wishes are honored with regard to the times and place in which the foster child wishes to be addressed by that name and pronoun or in another manner;

v.     Require that DHS shall ensure that the confidentiality of a child's gender identity, gender expression and sexual orientation are maintained and not disclosed without the consent of the child or when necessitated by an emergency;

vi.     Require DHS to develop guidance and identify, coordinate, and support foster children seeking access to gender affirming health care and gender affirming mental health care;

vii.     Require that DHS shall report to the Monitor referred to below on the placement type and the provision of services to all children who are in the SGM sub-class.

332.     The Court shall appoint a neutral Monitor, paid for by the defendants, to monitor the terms of this Order. The Monitor shall have access to all relevant documents and information necessary and shall conduct record reviews as necessary to ensure compliance with its terms.

333.     Award reasonable costs and expenses incurred in the prosecution of this action,

Page 73 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

including reasonable attorneys' fees, pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

334.    Grant such other and further relief as the Court deems just, necessary, and proper to protect Plaintiffs and the class members from further harm.

**DAVIS WRIGHT TREMAINE LLP**

Dated:    April 16, 2019     *s/ Gregory A. Chaimov*
Gregory A. Chaimov, OSB #822180
gregorychaimov@dwt.com
Paul C. Southwick, OSB #095141
paulsouthwick@dwt.com
1300 SW Fifth Avenue, Ste. 2400
Portland, OR 97201
Tel: (503) 241-2300
Fax: (503) 778-5299

**A BETTER CHILDHOOD**

Marcia Robinson Lowry (*pro hac vice pending*)
mlowry@abetterchildhood.org
Dawn J. Post (*pro hac vice pending*)
dpost@abetterchildhood.org
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel: (646) 795-4456
Fax: (212) 692-0415

**DISABILITY RIGHTS OREGON**

Emily Cooper, OSB # 182254
ecooper@droregon.org
Thomas Stenson, OSB 152894
tstenson@droregon.org
Christine Shank (*admission pending*)
cshank@droregon.org
511 SW 10th Avenue, Suite 200
Portland OR 97205
Tel: (503) 243 2081
Fax: (503) 243 1738

*Attorneys for Plaintiffs*

Page 74 – COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300