GREGORY A. CHAIMOV, OSB # 822180
gregorychaimov@dwt.com
PAUL C. SOUTHWICK, OSB #095141
paulsouthwick@dwt.com
DAVIS WRIGHT TREMAINE LLP
1300 SW Fifth Avenue, Suite 2300
Portland, OR 97201
Tel: (503) 241-2300

*Attorneys for Plaintiffs*
*Additional Counsel of Record Listed on Signature Page*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| WYATT B. and NOAH F. by their next friend Michelle McAllister; KYLIE R. and ALEC R. by their next friend Kathleen Megill Strek; UNIQUE L. by her next friend Annette Smith; SIMON S. by his next friend Paul Aubry; RUTH T. by her next friend Michelle Bartov; BERNARD C. by his next friend Ksen Murry; NAOMI B. by her next friend Kathleen Megill Strek; and NORMAN N. by his next friend Tracy Gregg, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KATE BROWN, Governor of Oregon in her official capacity; FAIRBORZ PAKSERESHT, Director, Oregon Department of Human Services in his official capacity; JANA MCLELLAN, Interim Director, Child Welfare in her official capacity; and OREGON DEPARTMENT OF HUMAN SERVICES,<br><br>Defendants. | Case No. 6:19-cv-00556-AA<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................... 1

II.    FACTUAL BACKGROUND.......................................................................... 2

III.   ARGUMENT ................................................................................................. 5

  A.   The Court Should Not Abstain From Hearing Plaintiffs' Claims................................. 5

    1.   *Younger* abstention does not apply to federal court review of executive action. ... 8

      i.   Abstention is not warranted because Plaintiffs seek review of executive action. .. 9

      ii.   None of the NOPSI "exceptional circumstances" are present. ....................... 11

      iii.   The third Middlesex factor is not satisfied. .................................... 14

    2.   *O'Shea* abstention does not apply**.**........................................................ 15

  B.   Plaintiffs Have Sufficiently Alleged That Defendants Violated Their Constitutional Rights. ........................................................................... 17

    1.   Plaintiffs have a constitutional right to be free from harm and to have their basic human needs met.............................................................. 17

    2.   Defendants' claimed remedial efforts do not bar plaintiffs' Substantive Due Process claim. ........................................................... 22

    3.   Plaintiffs' claims are sufficiently plead for this court to grant relief. .................. 23

  C.   The Right to an Adequate Case Plan and Case Review System under the Child Welfare Act is Well-Established and Individually Enforceable. ............................... 25

  D.   Defendants' Motion to Dismiss the ADA and Section 504 Claims Lacks Legal Merit ................................................................................. 27

    1.   Plaintiffs' Complaint Sufficiently Alleges Facts Supporting a Claim of Failure to Provide Federally Mandated Integrated Services ................................. 27

    2.   Defendants' Legal Argument is Inconsistent with Federal Guidance and Established Federal Law Requiring More Than Mere Equal Treatment.............. 30

IV.    CONCLUSION.............................................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*31 Foster Children v. Bush*,
    329 F.3d 1255 (11th Cir. 2003) ................................................................6, 7, 12

*Alexander v. Choate*,
    469 U.S. 287 (1985)................................................................................33

*American Council of the Blind v. Paulson*,
    525 F.3d 1256 (D.C. Cir. 2008) ..............................................................33

*B.K. by Tinsley v. Snyder*,
    922 F.3d 957 (9th Cir. 2019) ..................................................................18

*Baby Neal*,
    821 F.Supp 320 (E.D.Pa 1993) ..............................................................21

*Belinda K. v. Cnty of Alameda*,
    2012 U.S. Dist. LEXIS 11336 (N.D. Cal. 2012) ............................................12, 13

*Bird v. Lewis & Clark Coll.*,
    104 F. Supp. 2d 1271 (D. Or. 2000) ..........................................................33

*Brian A. ex rel. Brooks v. Sundquist*,
    149 F. Supp. 2d 941 (M.D. Tenn. 2000).......................................... *passim*

*Charlie H. v. Whitman*,
    83 F.Supp.2d 476 (D.N.J. 2000) ..............................................................21, 31

*Clark K. v. Guinn*,
    No. 2:06-CV-1068 RCF-RJJ, 2007 WL 1435348 (D. Nev. May 14, 2007).....................21, 22

*Colorado River Water Conservation Dist. v. United States*,
    424 U.S. 800 (1976)................................................................................5

*Connor B. ex rel. Vigurs v. Patrick*,
    771 F. Supp. 2d 142 (D. Mass. 2011) ..........................................................6, 11, 14

*Connor B. ex rel. Vigurs v. Patrick*,
    985 F. Supp. 2d 129 (D. Mass. 2013) ..........................................................22

*Courthouse News Serv. v. Planet*,
    750 F.3d 776 (9th Cir. 2014) ..................................................................16

ii

*Crowder v. Kitagawa,*
  81 F.3d 1480 (9th Cir. 1996) .................................................................31

*D.G. v. Yarbrough,*
  2011 WL 6960613 (N.D. Okla. Dec. 16, 2011).........................................6

*DeShaney v. Winnebago Cty. Dept. of Soc. Servs.,*
  489 U.S. 189 (1989).................................................................................17

*Duvall v. Cty. of Kitsap,*
  260 F.3d 1124 (9th Cir. 2001) ..........................................................31, 34

*Dwayne B. v. Granholm,*
  2007 WL 1140920 (E.D. Mich. Apr. 17, 2007)............................6, 10, 15

*E.T. v. Cantil-Saka*uye,
  682 F.3d 1121 (9th Cir. 2012) .................................................................16

*Eric L. By and Through Schierberl v. Bird,*
  848 F.Supp 303 (D.N.H. 1994).........................................................20, 32

*Garcia v. Cty. of San Diego,*
  No. 15-CV-189 JLS (NLS), 2018 WL 3019931 (S.D. Cal. June 18, 2018),
  *reconsideration denied,* No. 15-CV-189 JLS (NLS), 2018 WL 6334286 (S.D.
  Cal. Dec. 5, 2018) ....................................................................................21

*Hason v. Med. Bd. of California,*
  279 F.3d 1167 (9th Cir. 2002) .................................................................34

*Henry A. v. Willden,*
  678 F.3d 991 (9th Cir. 2012) ...................................................... *passim*

*Hook v. Arizona Dep't of Corrections,*
  107 F.3d 1397 (9th Cir. 1997) (District Court did not err in declining to
  modify an injunction appointing a special master when doing so was
  necessary to uphold prisoners' constitutional rights)..............................16

*Hoptowit v. Spellman,*
  753 F.2d 779 (9th Cir. 1984) ...................................................................18

*Huffman v. Pursue, Ltd.,*
  420 U.S. 592 (1975)...................................................................................6

*J.B. ex. Rel. Hart v. Valdez,*
  186 F3d 1280 (10th Cir. 1999) ................................................................13

*Joseph A. by Wolfe v. New Mexico Dep't of Human Servs.,*
  No. CV 80-623 JC/DJS, 2003 WL 27385532, at *11 (D.N.M. Jan. 16, 2003) ........................7

iii

*Joseph A. ex rel. Corrine Wolfe v. Ingram*,
  275 F.3d 1253 (10th Cir. 2002) ........................................................6

*K.H. ex rel. Murphy v. Morgan*,
  914 F.2d 846 (7th Cir. 1990) ..........................................................21

*Kenny A. ex rel. Winn v. Perdue*,
  218 F.R.D. 277 (N.D. Ga. 2003)..........................................6, 10, 12, 14

*Kenny A. v. Perdue*,
  2004 WL 5503780 (N.D. Ga. Dec. 13, 2004)..................................22, 24

*L.H. v. Jamieson*,
  643 F.2d 1351 (9th Cir. 1981) ......................................................6, 11

*Lane v. Kitzhaber*,
  841 F. Supp. 2d 1199 (D. Or. 2012) ..................................................28

*Laurie Q. v. Contra Costa Cnty.*,
  304 F. Supp. 2d 1185 (N.D. Cal. 2004) ....................................7, 12, 13

*Lipscomb v. Simmons*,
  962 F.2d 1374 (9th Cir. 1992) ........................................................17

*M.D. ex rel. Stukenberg v. Abbott*,
  907 F.3d 237 (5th Cir. 2018) ..................................................18, 19, 20

*M.D. v. Perry*,
  152 F. Supp. 3d 684 (S.D. Tex. 2015) ................................................18

*M.D. v. Perry*,
  799 F. Supp. 2d 712 (S.D. Tex. 2011) ......................................6, 9, 11, 14

*M.J., et. al., v. District of Columbia*,
  No. 1:18-cv-01901-EGS. 2019 WL 3344459 (D.D.C. July 25, 2019) ...................28

*M.K. ex rel. Mrs. K. v. Sergi.*
  554 F. Supp. 2d 175 (D. Conn. 2008) ................................................31

*M.R. v. Dreyfus*,
  663 F.3d 1100 (9th Cir. 2011), *opinion amended and superseded on denial of
  reh'g*, 697 F.3d 706 (9th Cir. 2012)..........................................27, 29

*Marisol A. by Forbes v. Giuliani*,
  929 F. Supp. 662 (S.D.N.Y. 1996) ............................................6, 24, 32

*Mark H. v. Hamamoto*,
  620 F.3d 1090 (9th Cir. 2010) ........................................................31

iv

*McGary v. City of Portland,*
    386 F.3d 1259 (9th Cir. 2004) ........................................................30

*McHenry v. Renne,*
    84 F.3d 1172 (9th Cir. 1996) ..........................................................25

*Middlesex County Ethics Committee v. Garden State Bar Association,*
    457 U.S. 423 (1982) ..........................................................8, 9, 12, 14

*Murphy v. Minn. Dept. Human Servs.,*
    260 F.Supp.3d 1084 (D. Minn. 2017) ..............................................31

*New Orleans Public Service, Inc. v. Council of City of New Orleans,*
    491 U.S. 350 (1989) : (1) ....................................................... *passim*

*Olivia Y. ex rel. Johnson v. Barbour,*
    351 F. Supp. 2d 543 (S.D. Miss. 2004) .............................................6

*Olmstead v. L.C. by Zimring,*
    527 U.S. 581 (1999) ..............................................27, 28, 29, 30

*People United for Children, Inc. v. City of New York,*
    108 F. Supp. 2d 275 (S.D.N.Y. 2000) ...........................................6, 14

*Pierce v. Cty. of Orange,*
    526 F.3d 1190 (9th Cir. 2008) ...........................................................5

*Sam M. ex rel. Elliott v. Chafe*e,
    800 F. Supp. 2d 363 (D.R.I. 2011) ..................................................13

*Sameer v. Right Moves 4 U,*
    No. 1:17-CV-886 AWI-EPG, 2018 WL 1875536, at *3 (E.D. Cal. Apr. 19,
    2018) ........................................................................................25

*Southeastern Community College v. Davis,*
    442 U.S. 397 (1979) .......................................................................33

*Sprint Communications Inc. v. Jacobs,*
    134 S. Ct. 584, 593 (2013) ...................................................... *passim*

*State of Connecticut Office of Prot. & Advocacy for Persons with Disabilities v.*
*Connecticut,*
    706 F. Supp. 2d 266 (D. Conn. 2010) ..........................................26, 32

*Sukumar v. Direct Focus, Inc.,*
    349 Fed. Appx. 163 .......................................................................16

*Tamas v. Dep't of Soc. & Health Servs.*,
  630 F.3d 833 (9th Cir. 2010) ...............................................................17

*Tennessee v. Lane*,
  541 U.S. 509 (2004)...........................................................................31

*Tinsley v. McKay*,
  156 F. Supp. 3d 1024 (D. Ariz. 2015) ....................................... *passim*

*Townsend v. Quasim*,
  328 F.3d 511 (9th Cir. 2003) ...............................................28, 30, 34

*V.L. v. Wag*ner,
  669 F. Supp. 2d 1106 (N.D. Cal. 2009) ............................................30

*Washington v. California Dep't of Corr. & Rehab.*,
  No. CV 19-169-VAP (KK), 2019 WL 1206487 (C.D. Cal. Mar. 14, 2019) .........................25

*Younger v. Harris*,
  401 U.S. 37 (1997)............................................................... *passim*

## Federal Statutes

42 U.S.C. § 675(1) ...................................................................................26

42 U.S.C. § 675(1)(b) ..............................................................................25

42 U.S.C. § 675(5) ...................................................................................26

42 U.S.C. § 675(5)(A)...............................................................................25

42 U.S.C. § 12132 ....................................................................................33

Adoption Assistance and Child Welfare Act ...........................................26

Americans with Disabilities Act ........................................... *passim*

Americans with Disabilities Act, Title II ...........................................31, 33

Child Welfare Act .................................................................................4, 25

Rehabilitation Act ...............................................................................27, 31

Rehabilitation Act § 504 ...................................................................27, 30, 31

## State Statutes

O.R.S. § 419B.132 .....................................................................................6

O.R.S. § 419B.349 (1) ..................................................................................................6

ORS 418.015 ...............................................................................................................34

**Regulations**

28 C.F.R. § 35.130(b)(1)(iii)......................................................................................33

28 C.F.R. § 35.130(d) .................................................................................................27

OAR 413-010-0180(1)(d) ...........................................................................................34

**Constitutional Provisions**

First, Ninth and Fourteenth Amendments.............................................................4, 22

Federal Constitution......................................................................................................4

The United States Constitution, Fourteenth Amendment ...............................17, 20, 22

**Other Authorities**

Civil Rights, U.S. Dept. Health & Human Servs., *Your Rights as a Person with a
    Disability in the Child Welfare Systems* (Sept. 2016) *available at*
    https://www.hhs.gov/sites/default/files/ocr-child-welfare-disability-factsheet-
    september-2016.pdf (last accessed Aug. 7, 2019) .................................................31

Justice, *Protecting the Rights of Parents and Prospective Parents with
    Disabilities: Technical Assistance for State and Local Child Welfare Agencies
    and Courts under* .................................................................................................31

Technical Assistance Manual, at II-3.3000 E *available at*
    https://www.ada.gov/taman2.html (last accessed on Aug. 7, 2019).......................33

4819-9726-5567v.2 0201450-000001

## I.    INTRODUCTION

The gravamen of the State's motion to dismiss is that this Court should trust the State to adequately care for Oregon's foster children in compliance with federal constitutional and statutory mandates without the intervention of this Court. Unfortunately, the State has repeatedly demonstrated that it is a constitutionally inadequate parent to the most vulnerable children in its care. The State loses its moral and legal authority to ask this Court to "trust us" when it takes the position that routinely housing traumatized foster youth in repurposed jail cells, without access to appropriate healthcare and education, is adequate parenting. The State's plea to "trust us" rings hollow when it houses foster youth in facilities where girls can only access tampons for "good behavior." The State's practice of frantically placing foster youth in multiple placements over a period of months and in up to fifty placements over a period of years demonstrates that the State is not adequately caring for Oregon's foster children on its own.

Moreover, the State continues to demonstrate that it cannot be trusted to assess its own performance. When the State was criticized for sending Oregon foster youth to for-profit facilities in Utah earlier this year, the State evaluated one of the facilities and then described the facility in a positive light to the legislature. The State noted that the youth at the facility "have yoga and meditation options," with "opportunities to express themselves through art and art therapy," and "positive experiences in [educational settings]." In contrast, a day before Oregon's report to the legislature, the Utah DHS reported on the same facility and described understaffing as conducive to facilitating "violence… sexual misconduct… and staff and residents feeling unsafe." It described child abuse that was confirmed by video footage, incident reports and interviews conducted with residents and noted that staff even allowed "residents… to physically restrain other residents," with one resident dropping "to his knees and [losing] consciousness as a

result of" another resident's restraint. When asked about the disparate information in the reports, Oregon's Deputy Child Welfare Director Jana McLellan said that, "I think we were taking the word that was given to us and sharing that," admitting that DHS was "not as knowledgeable about what was going on."

The State cannot be trusted to fulfill its federal constitutional and statutory responsibilities to the plaintiffs because its vision of adequate care is constitutionally deficient and because it lacks the capability of accurately assessing its own performance. These systemic problems are compounded by the fact that the State's Director of Child Welfare Programs resigned in June of this year and a permanent replacement has not been made. The ship is sailing in the wrong direction and without a captain.

According to the State's own report from July 2019, there are fewer foster homes in Oregon now than there were a year ago. Caseworker turnover remains high and the state has lowered standards, rather than raised standards, for caseworkers, further jeopardizing the health and safety of Oregon's foster children.

The State has failed as a parent. The plaintiffs, and the classes of foster children who the plaintiffs represent, are suffering. While the State's motion asks the Court to "trust us," the plaintiffs ask the Court to "help us." The State's long, dark history of constitutionally inadequate care necessitates this Court's intervention in a child welfare system desperately in need of systemic reform.

## II.    FACTUAL BACKGROUND

The Defendants' statement of facts minimizes DHS's role in harming Plaintiffs and callously blames foster children for their own circumstances. Dkt. 31 ("Dkt. 31") at 4. Rather than accurately describing the allegations of the complaint, and DHS's alleged role in harming

the Plaintiffs after they have entered into DHS custody, Defendants completely ignore such allegations and blame the harms experienced by Plaintiffs on Plaintiffs' past experiences and behavioral issues. *Id*. Defendants also artfully ignore that Plaintiffs have directed their allegations at Defendants, not at Oregon's juvenile courts. The complaint describes the disturbing experiences of the named Plaintiffs while in DHS custody and exposes the consequences of DHS's systemic, long-term failures. The complaint illustrates how DHS's role in Oregon's broken child welfare system causes an unacceptable level of harm to Plaintiffs and the classes of children they represent.

The complaint contains allegations of how DHS repeatedly moved Noah and Wyatt from placement to placement and exposed them to a life-endangering medication mix-up. Dkt. 1, ¶¶ 49-61. The complaint describes how DHS repeatedly moved Alec and Kylie from placement to placement and did not provide them with appropriate and timely medical care. *Id.* ¶¶ 67-72. It recounts how DHS moved Unique from placement to placement, denied her adequate mental health care and, for about six months, abandoned her in an out-of-state facility where she was abused and illegally restrained. *Id*. ¶¶76-93. The complaint alleges that DHS denied Simon mental health care for 14 months despite his obvious trauma and emotional disturbance, repeatedly failed to find him an appropriate placement, and forced him into a hotel for a week because DHS lacked adequate placements. *Id.* ¶¶ 101-08. It describes how DHS repeatedly failed to evaluate Ruth's needs, failed to provide her with appropriate and recommended care after her delayed evaluation, placed her in a converted police facility, and inappropriately placed her out-of-state. *Id*. ¶¶ 111-27. The complaint alleges that DHS placed Bernard in more than 20 facilities and homes over 4 years, did not provide him with appropriate treatments or placements, did not provide him appropriate care around his gender identity, and placed him in a converted

detention center. *Id.* ¶¶ 131-50. The complaint illustrates how DHS repeatedly ignored Naomi's mental health needs, placed her in a homeless shelter and a converted detention center, where she lived in a locked cell. *Id.* ¶¶ 152-80. It describes how DHS placed Norman in more than 50 placements, including hotels and an out-of-state facility where Norman was assaulted by staff and other youth, resulting in physical injury to him. *Id.* ¶¶ 181-99. The complaint alleges that DHS, the custodian of plaintiffs, is responsible for these harms, not that Oregon's juvenile courts are somehow responsible. DHS's litigation strategy of ignoring its alleged role in causing harm to plaintiffs perpetuates DHS's decades-long refusal to take a hard look in the mirror at the results of its failed policies, practices and proposals.

In addition to ignoring the allegations in the complaint directed at Defendants, Defendants mischaracterize Plaintiffs' request for relief. Plaintiffs have requested the specific relief described by Defendants in their motion. Dkt. 31, at 5. However, Defendants fully ignored two of the fundamental requests for relief, which are: (1) a declaration that the State's treatment of plaintiffs and class members is unconstitutional under the First, Ninth and Fourteenth Amendments and unlawful under the federal constitution, the Child Welfare Act and the American Disabilities Act; and (2) an injunction to permanently enjoin Defendants from subjecting the plaintiff children to practices that violate their rights. As for specific injunctive relief, in addition to the relief mentioned by Defendants, plaintiffs ask this court to require DHS to ensure that children in foster care "are placed in a safe home or facility and are adequately monitored in accordance with federal standards," to require that children with disabilities "receive foster care services in the most integrated setting appropriate to the child's needs," and to require DHS to "ensure that the confidentiality of a child's gender identity, gender expression

4

and sexual orientation are maintained," among other requested relief.  Moreover, plaintiffs do not

request individualized review of specific case plans. Rather, plaintiffs request systemic changes.

The Defendants end their recitation of the facts by discussing the State's current plans

and recent performance evaluation, all of which post-date the filing of this complaint. As

described more fully in plaintiffs' concurrently filed motion to strike, the June 2019 Audit and

the Governor's April 18, 2019 Executive Order, issued two days after plaintiffs filed their

complaint, are disputed extrinsic evidence that are not proper subjects of judicial notice.

Improper at any phase, declarations of intent to reform are not actual evidence of future

outcomes in any procedural posture. *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1223 (9th Cir.

2008). The Court should reject Defendants' request for an inference that a child welfare system

that has been broken for a decade, and the subject of numerous unfulfilled promises of

improvement, can be fixed by this October (the date the Governor's Executive Order is set to

expire), even by those with the greatest of intentions. Moreover, Defendants' contested evidence

should be rejected because, while clearly aimed at supporting a generalized notion that the State

can be trusted to fix itself, it is wholly irrelevant to the legal arguments the Defendants advance.

### III.    ARGUMENT

**A.    The Court Should Not Abstain From Hearing Plaintiffs' Claims.**

Defendants assert that this Court should abstain from exercising its jurisdiction to enforce

federal law. Dkt. 31, at 8-13.  Abstention is "an extraordinary and narrow exception to the duty

of a District Court to adjudicate a controversy properly before it." *Colorado River Water

Conservation Dist. v. United States,* 424 U.S. 800, 813 (1976). Indeed, federal courts have a

"virtually unflagging" obligation to hear and decide cases that are properly brought before them.

*Sprint Comm'cns v. Jacobs*, 134 S. Ct. 584, 591 (2013).

Several policies underlie the abstention doctrine and inform courts on when to refrain from granting relief. One is the traditional doctrine of equity that a federal court should not issue an injunction when an adequate remedy at law exists in a state court. *Huffman v. Pursue, Ltd.*, 420 U.S. 592 at 600-1 (1975), *citing, Younger v. Harris*, 401 U.S. 37 at 43 (1997). However, this is not a case in which the very narrow abstention doctrine should be applied.

The Oregon juvenile court system functions largely the same way that all juvenile courts function in this country: it reviews the executive actions of DHS. The juvenile court does not have the authority to, among other things, direct that a foster child be placed in a specific home or facility. *See* O.R.S. § 419B.349 (1) ("The actual planning and placement of the child or ward is the responsibility of the department."). The juvenile court for each county also lacks the jurisdiction to resolve statewide constitutional violations. *See e.g.* O.R.S. § 419B.132 (outlining how cases are transferred between county juvenile courts). The Oregon juvenile court system is thus indistinguishable from the juvenile court systems in Texas, Arizona, Massachusetts, Mississippi, Oklahoma, and numerous other states in which virtually identical abstention motions have been denied. *See M.D. v. Perry*, 799 F. Supp. 2d 712, 723 (S.D. Tex. 2011).[1]

Only two circuits have even considered granting abstention in the foster care context— the 11th, in *31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003) and the 10th, in *Joseph A. ex rel. Corrine Wolfe v. Ingram*, 275 F.3d 1253 (10th Cir. 2002). Both of those cases sought

---

[1] See also *L.H. v. Jamieson*, 643 F.2d 1351, 1352-54 (9th Cir. 1981); *Tinsley*, 156 F. Supp. 3d at 1030-41; *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 153-58 (D. Mass. 2011); *D.G. v. Yarbrough*, 2011 WL 6960613 (N.D. Okla. Dec. 16, 2011); *Dwayne B. v. Granholm*, 2007 WL 1140920, at *5-7 (E.D. Mich. Apr. 17, 2007); *Olivia Y. ex rel. Johnson v. Barbour*, 351 F. Supp. 2d 543, 565-70 (S.D. Miss. 2004); *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 285-89 (N.D. Ga. 2003); *Brian A. ex rel. Brooks v. Sundquist*, 149 F. Supp. 2d 941, 957 (M.D. Tenn. 2000); *People United for Children, Inc. v. City of New York*, 108 F. Supp. 2d 275, 289-92 (S.D.N.Y. 2000); *Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 688-89 (S.D.N.Y. 1996).

significantly different relief than what is sought here--they each sought interference in juvenile

court proceedings. In *31 Foster Children,* the court found that plaintiffs were "placing decisions

that are now in the hands of the state courts under the direction of the federal district court." *31

Foster Children* at 1278. In *Joseph A.* the Circuit remanded the case to the District Court to

determine if the provisions of a proposed settlement agreement were enforceable in light of

*Younger. Joseph A. by Wolfe v. New Mexico Dep't of Human Servs.*, No. CV 80-623 JC/DJS,

2003 WL 27385532, at *11 (D.N.M. Jan. 16, 2003) (holding, with the exception of one

provision, the settlement enforceable.). Defendants rely on these cases, and on *Laurie Q. v.

Contra Costa Cnty.*, in which the plaintiffs there wanted the court to "oversee the Juvenile

Court's performance" by "pass[ing] upon the efficacy and propriety of [specific] case plans."

304 F. Supp. 2d 1185, 1204-05 (N.D. Cal. 2004). These cases are all inapposite to the case at

hand, which seeks relief that does not oversee or interfere with the juvenile court's operation. In

any event, as discussed in further detail below, all of those cases are no longer good law because

they were decided before *Sprint Comm'cns v. Jacobs*, 134 S. Ct. 584, 591 (2013), and thus

engage in analysis explicitly forbidden by the Supreme Court in *Sprint*.

Given the strength of the authority against abstention—as well as a Supreme Court

decision that implicitly overruled the decisions on which Defendants rely—Defendant's

abstention argument lacks legal merit. As discussed further below, Defendants contend the Court

must abstain from exercising its jurisdiction, pursuant to *O'Shea*, which involved explicit

interference with a state juvenile court. However, much of the case law and principles that the

Defendants cite to are specific to the similarly narrow *Younger* doctrine and its progeny, of

which *O'Shea* is one. Accordingly, both doctrines will be discussed.

7

1.       _Younger_ abstention does not apply to federal court review of executive action.

_Younger_ abstention applies where federal court relief would interfere with a state court criminal or quasi-criminal case. _See Sprint Comm'cns_, 134 S. Ct. at 591. In _Younger_, the plaintiff asked a federal court to issue an injunction requiring a state court judge to dismiss a state court criminal case, even though the federal plaintiff's constitutional challenge to the validity of the prosecution could have been made in state court. _Younger_, 401 U.S. at 38-40. That, of course, is not the type of case before the Court here. This case has nothing to do with criminal or quasi-criminal state court proceedings. Plaintiffs are not asking this Court to interfere with—much less enjoin or exercise oversight over—any ongoing state court proceedings.

In 2013, the United States Supreme Court held that _Younger_ only applies in the three very specific "exceptional circumstances" identified in _New Orleans Public Service, Inc. v. Council of City of New Orleans_, 491 U.S. 350 (1989) ("_NOPSI_"): (1) criminal prosecutions; (2) related quasi-criminal enforcement proceedings; and (3) "civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions." _Sprint Comm'cns.,_ 134 S. Ct. at 591 (quoting _NOPSI_, 491 U.S. at 368). Not long after _NOPSI_, in _Middlesex County Ethics Committee v. Garden State Bar Association_, the Court further identified three factors that together warrant abstention: 1) "an ongoing state judicial proceeding"; 2) which "implicate[s] important state interests"; and 3) in which "there [is] an adequate opportunity . . . to raise constitutional challenges." 457 U.S. 423, 432 (1982).

More recently, in _Sprint Communications Inc. v. Jacobs_, the Supreme Court made clear that the three factors enumerated in _Middlesex_ are actually additional factors to be considered once a court establishes that the ongoing state proceeding is quasi-criminal in nature. 134 S. Ct. 584, 593 (2013) ("Divorced from their quasi-criminal context, the three _Middlesex_ conditions would extend _Younger_ to virtually all parallel state and federal proceedings, at least where a

8

party could identify a plausibly important state interest."). Thus, *Sprint* arguably narrowed the application of *Younger* abstention. The *Sprint* Court emphasized *Younger* is "exceptional," that federal courts have an overarching duty to "entertain and resolve on the merits [actions] within the scope of a jurisdictional grant," and the "general rule" that "[t]he pendency of an action in [a] state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." 134 S. Ct. 584, 588 (2013) (citations and internal quotation marks omitted). *see also Tinsley v. McKay*, 156 F. Supp. 3d 1024, 1032 (D. Ariz. 2015) ("[T]he Supreme Court made clear [in *Sprint Communications*] that the three factors enumerated in *Middlesex* are actually *additional* factors to be considered once a court establishes the ongoing state proceeding is quasi-criminal in nature." (emphasis in original)).  Even before the Supreme Court considerably narrowed the *Younger* doctrine, the "overwhelming majority of cases" had "rejected *Younger* abstention" in "lawsuits challenging foster care systems." *M.D. v. Perry*, 799 F. Supp. 2d 712, 723 (S.D. Tex. 2011).

Defendants' request that the Court abstain faces a high bar. To prevail, Defendants must first show that Plaintiffs' requested relief involves review of judicial rather than executive action to which *Younger* abstention does not apply. *See NOPSI*, 491 U.S. at 368. Then, Defendants must show both (1) that Plaintiffs' claims implicate one of the three "exceptional circumstances" identified in *NOPSI*; and (2) that the *Middlesex* factors additionally warrant abstention.  As discussed below, Defendants cannot meet this bar because Plaintiffs seek federal court relief for systemic, constitutional challenges to DHS's operation of Oregon's child welfare system.

> i. *Abstention is not warranted because Plaintiffs seek review of executive action.*

Defendants' *Younger* argument is fatally flawed because *Younger* abstention is unwarranted where the District Court is called upon to review "legislative or executive action,"

as opposed to judicial action. *NOPSI*, 491 U.S. at 368. Here, Defendants attempt to place Plaintiffs' Complaint within the realm of review of the judicial action of Oregon's juvenile courts. However, Plaintiffs' Complaint does not contain a single allegation, or request for relief, concerning the processes, operations or rulings of Oregon's juvenile courts. Rather, Plaintiffs' Complaint seeks systemic relief directed at DHS's executive actions. Numerous courts have rejected the misleading argument Defendants advance on this issue. *See Kenny A.*, 218 F.R.D. at 286 ("Although plaintiffs all have periodic reviews before the state juvenile courts, the declaratory and injunctive relief plaintiffs seek is not directed at their review hearings, or at Georgia's juvenile courts, juvenile court judges, or juvenile court personnel. Rather, plaintiffs seek relief directed solely at *executive* branch defendants to remedy their alleged failures as plaintiffs' custodians." (emphasis in original)); *Dwayne B.*, 2007 WL 1140920, at *6 ("Defendants' claim that there are ongoing judicial proceedings is misleading. While it is true that Michigan has in place a juvenile court system that sets out procedures for bringing and maintaining a child under that court's jurisdiction and there may be some ongoing juvenile court proceedings for individual foster care children, this lawsuit does not seek to interfere with any such proceedings. The relief sought here is not directed at the juvenile courts. It is directed at the executive branch. *See Brian A. v. Sundquist*, 149 F.Supp.2d 941, 957 (M.D.Tenn.2000) (declining to invoke the *Younger* abstention doctrine in a similar suit brought on behalf of foster care children in the Tennessee Department of Children's Services and observing that 'nothing in this litigation seeks to interfere with or enjoin' ongoing and pending state juvenile proceedings and further observing that the injunctive relief sought is against the executive branch and not the courts)).[2]

---

[2] Moreover, even if the Court were to construe plaintiffs' complaint as a request for review of

ii.    *None of the NOPSI "exceptional circumstances" are present.*

While not specifically articulated as a *Younger* or *NOPSI* argument, Defendants contend that this case would interfere with the ability of Oregon juvenile courts to perform their judicial function (Dkt. 31, at 11) which is the third *NOPSI* exception.  Numerous courts have considered and rejected this argument in systemic challenges to the adequacy of child welfare systems, because the objective in the federal case is to improve the overall system for administering services, not to micromanage how individual juvenile courts rule on specific issues in specific cases.[3]

For the third *NOPSI* exception to apply, the relief sought in federal court must directly undermine the ability of a state court to perform an essential judicial function such as issuing contempt orders or allowing the execution of judgments. Nothing like that is present here. Plaintiffs are asking the Court to order the Defendants, state executive level officials, to do a better job of protecting children, not to strip Oregon courts of their ability to adjudicate juvenile cases.

---

judicial action, such review would not be grounds for abstention. Although Oregon's juvenile courts are empowered to modify DHS's decisions, *Younger* abstention does not apply to that type of judicial review because such proceedings involve "reviewing . . . executive action." *See M.D*, 799 F. Supp. 2d at 718  ("The Supreme Court in [NOPSI] held that *Younger* abstention does not extend to judicial proceedings that, like those at issue here, are focused solely upon review of executive actions."); *see also Connor B.*, 771 F. Supp. 2d at 154 (declining to abstain under *Younger* where "the state court proceeding is limited to a review of executive action").

[3] *See Tinsle*y, 156 F. Supp. 3d at 1037 ("[T]he requested relief would not interfere with the functioning of the juvenile courts [because] the juvenile courts rule on individual cases, not how to remedy deficiencies in the overall administration of foster care."); *M.D.*, 799 F. Supp. 2d at 719-21 ("Plaintiffs seek broad injunctive and declaratory relief aimed at improving the Texas foster care system as a whole, not to interrupt, alter, or in any other manner change a particular state court placement review decision."); *L.H.*, 643 F.2d at 1354 (holding that "requesting an order that would require Arizona to spend more money to fund dispositional alternatives for juveniles in state custody" would "enrich the variety of dispositional alternatives available to a juvenile court judge, and, to this extent, affect pending and ongoing state juvenile proceedings" but does not "have the wholly disruptive consequences associated with enjoining a state judicial proceeding or enjoining further enforcement of a state statute.").

11

Defendants' reliance on *31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003), is misplaced. *31 Foster Children* is distinguishable because the court found that the relief the plaintiffs sought would have "plac[ed] decisions that are now in the hands of the state courts under the direction of the federal district court," inviting "conflicting orders about what is best for a particular plaintiff, such as whether a particular placement is safe or appropriate or whether sufficient efforts are being made to find an adoptive family." *Id.* at 1278-79. Federal interference would also have been caused by appointing a requested federal panel that would have "authority to implement a systemwide plan to revamp and reform dependency proceedings in Florida." *Id*. No such federal interference in state court proceedings is sought here. *See Kenny A.*, 218 F.R.D. at 287-88 (finding *31 Foster Children* inapplicable where "plaintiffs do not ask the Court to make individualized determinations with respect to particular foster children. Instead, Plaintiffs seek relief mandating, on a system-wide basis, that State Defendants institute reforms to ensure that deprived children's constitutional and statutory rights are not violated" and noting that "the relief requested in *31 Foster Children* went far beyond what is sought here").

In any event, *31 Foster Children* is no longer good law.  That court did what the Supreme Court held, ten years later in *Sprint Communications*, is forbidden: it applied the *Middlesex* factors without first determining whether any of the three *NOPSI* exceptions applied. 329 F.3d at 1274-82.  The same is true of the case of *Laurie Q. v. Contra Costa Cnty.,* 304 F. Supp. 2d 1185 (N.D. Cal. 2004). Moreover, the plaintiffs in *Laurie Q.* wanted the federal court to directly "oversee the Juvenile Court's performance" by "pass[ing] upon the efficacy and propriety of [specific] case plans." 304 F. Supp. 2d at 1204-05. Defendants also cite *Belinda K. v. Cnty of Alameda,* 2012 U.S. Dist. LEXIS 11336 (N.D. Cal. 2012) which involved the structure and

12

funding of the state courts. No relief like that which was requested in *Laurie Q.* or *Belinda K.* is sought here.[4]

Defendants cite no authority for their assertion that ordering Oregon DHS to do a better job would "bypass[] the state court juvenile court in favor of the federal court-appointed monitor's evaluation of the 'case' plan for adequacy, and the adequacy of DHS' steps to effectuate the plan" (Dkt. 31, at 8) or require them to "assess and evaluate the propriety of placements already ordered by the juvenile courts as well as those the juvenile court has yet to make." (*Id.* at 9). This argument also misstates the relief Plaintiffs requested.

For example, one of Plaintiffs' requests is that DHS ensure the availability of a minimally adequate array of placements. Plaintiffs do not, however, seek to play a role in how DHS chooses to place children, or how the juvenile court oversees the review of individual placement decisions; Plaintiffs seek instead to require DHS to increase its placements array and ensure that the full range of placement options are available to all children. *See Sam M. ex rel. Elliott v. Chafe*e, 800 F. Supp. 2d 363, 380 (D.R.I. 2011) (holding "increase[ing] the array and types of available placements, are not within the province of the Family Court, although they would assist in implementing the Family Court's orders. [And] [w]ith respect to those measures, 'the mere possibility of inconsistent results in the future is insufficient to justify *Younger* abstention.'").

Oregon juvenile courts review and modify individual placement decisions that have been made by the executive branch agency. This lawsuit seeks to compel executive branch officials— not state courts—to perform better investigations, to employ more and better trained case workers, to expand the number and type of placements, and to supervise placements and pursue

---

[4] Other cases which Defendants cite are similarly outliers and inapplicable. *See*, *J.B. ex. Rel. Hart v. Valdez,* 186 F3d 1280 (10th Cir. 1999).

permanency more effectively, all on a system-wide basis. This includes developing the range of requirements that help insure a child welfare system can meet constitutional standards and protect children from harm while in foster care. There is absolutely no basis for Defendants' claim that granting Plaintiffs relief would "replace Oregon's democratically elected state government with out-of-state advocates and consultants, and to substitute a paid private entity's decisions for the judgments of Oregon's sworn judicial officers." Dkt. 31, at 8.

### iii.    The third *Middlesex* factor is not satisfied.

Even if one of the *NOPSI* exceptions applied to Plaintiffs' claims, which is not the case, Defendants' argument would still fail.  Their argument fails because the third *Middlesex* factor—whether there is an adequate opportunity for Plaintiffs to raise their systemic constitutional claims in Oregon juvenile courts—is not satisfied. Courts have repeatedly held this factor is not met where, as here, federal plaintiffs seek systemic injunctive relief that is unavailable in individual state court cases. *See Tinsley*, 156 F. Supp. 3d at 1040-41 ("[I]t does not appear Plaintiffs could raise their classwide claims or pursue the systemic reforms they seek within the framework of the periodic review hearings in the juvenile courts.").[5]

---

[5] *M.D.,* 799 F. Supp. 2d at 721-22 (declining to abstain under *Younger* because "[s]tate court placement review hearings focus on whether the particular child's needs are being met, not overarching systemic concerns or constitutional violations"); *Connor B.,* 771 F. Supp. 2d at 158 ("Massachusetts juvenile courts are tasked with handling difficult questions of family law on an ad-hoc basis, not with crafting broad-based injunctive relief that could potentially revamp an executive agency. They cannot and do not afford Plaintiffs an adequate opportunity to seek relief for the systemic failures alleged in the complaint."); *Kenny A.,* 218 F.R.D. at 287 ("Plaintiffs seek prospective injunctive relief on behalf of themselves and others to remedy ongoing violations of their rights. The juvenile court, however, as a court of limited jurisdiction, lacks the power to grant such relief."); *Brian A.,* 149 F. Supp. 2d at 957 ("Although technically Plaintiffs could raise constitutional questions in their individual juvenile proceedings, there is no pending judicial proceeding which could serve 'as an adequate forum for the class of children in this case to present its multifaceted request for broad-based injunctive relief' based on the Constitution and on federal and state law."); *People United for Children*, 108 F. Supp. 2d at 291 ("[T]he Court does not believe that the Family Court can adequately consider plaintiffs' claims in the

2.        *O'Shea* abstention does not apply.

*O'Shea* is an outgrowth of *Younger*.  Under *O'Shea,* a federal court may not issue an injunction which would result in an "ongoing federal audit" of state court proceedings that would "indirectly accomplish the kind of interference that *Younger v. Harris* . . . and related cases sought to prevent." 414 U.S. at 500.

The interference with state court proceedings must be explicit in order to warrant *O'Shea* abstention. In *O'Shea*, plaintiffs alleged widespread race discrimination in the administration of state court criminal prosecutions, and sought a federal injunction limiting the state courts' discretion to set bail and sentence criminals. *Id.* at 491-92. The Supreme Court found that the federal injunction was "aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials." *Id.* at 500. Because the injunction there "contemplate[d] interruption of state proceedings to adjudicate assertions of noncompliance" with a federal order, it amounted to "nothing less than an ongoing federal audit of state proceedings" that would be "intrusive and unworkable." *Id.*

Here, Plaintiffs are not asking the Court to issue any injunction that would directly or indirectly interrupt any Oregon juvenile court proceedings. Defendants misconstrue Plaintiffs' requested relief by suggesting, for example, that the neutral monitor that might ultimately be appointed to monitor compliance with any system-wide injunction that is issued would be simultaneously reviewing, modifying, and approving plans for individual children.  Moreover, the concern expressed in *O'Shea* does not apply here because the relief Plaintiffs seek is directed at state level executive agencies, not state courts, and therefore would not result in an "ongoing federal audit" of state court proceedings. *See Tinsley*, 156 F. Supp. 3d at 1043 (declining to

---

context of a multi-faceted lawsuit challenging a system-wide policy rather than ACS's actions in individual cases."); *Dwyane B.,* 2007 WL 1140920, at *6.

abstain under *O'Shea* because "although the juvenile courts play a significant role in overseeing the care of children within the custody and care of the Arizona child welfare agencies, the courts are not involved in adjudicating and remedying the types of claims raised here").

It is axiomatic that federal courts may and do appoint monitors or special masters to ensure that state officials comply with federal remedial orders without running afoul of *O'Shea*. *See Sukumar v. Direct Focus, Inc*., 349 Fed. Appx. 163, 165 (*citing Jaros v. E.I. Dupont (In re Hanford Nuclear Reservation Litig*.), 292 F.3d 1124, 1138 (9th Cir. 2002) ("The district court has discretion to appoint a special master and to decide the extent of his duties."); *Hook v. Arizona Dep't of Corrections*, 107 F.3d 1397 (9th Cir. 1997) (District Court did not err in declining to modify an injunction appointing a special master when doing so was necessary to uphold  prisoners' constitutional rights).

Defendants' reliance on *E.T. v. Cantil-Saka*uye, 682 F.3d 1121 (9th Cir. 2012), is also misplaced. In that case, the plaintiffs alleged that the state juvenile protection courts themselves (as opposed to executive branch child welfare officials) were violating their rights by conducting state court proceedings in a manner that failed to provide due process, and the plaintiffs sought a federal court order that would have directly changed the state court system. The Ninth Circuit subsequently clarified that an *O'Shea* abstention is appropriate when the federal court would need to "monitor the substance of individual cases on an ongoing basis to administer its judgment" but inappropriate "where the requested relief may be achieved without an ongoing intrusion into the state's administration of justice." *Courthouse News Serv. v. Planet*, 750 F.3d 776, 790 (9th Cir. 2014). The systemic requested relief in this case is clearly not seeking that the federal court, or anyone appointed by it, should monitor the substance of "individual cases."

This case seeks systemic remedies, and seeks to require executive officials to fix a failing child welfare system that, according to Plaintiffs' complaint, is harming Oregon's foster children. At this preliminary stage, there is no basis for the Court to abdicate its "virtually unflagging" obligation to adjudicate Plaintiffs' federal claims.

**B.     Plaintiffs Have Sufficiently Alleged That Defendants Violated Their Constitutional Rights.**

The Due Process Clause of the Fourteenth Amendment prohibits the State from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "Its purpose [is] to protect people from the State," and to prevent government from "abusing its power, or employing it as an instrument of oppression. *DeShaney v. Winnebago Cty. Dept. of Soc. Servs.,* 489 U.S. 189, 196 (1989).

    1.      <u>Plaintiffs have a constitutional right to be free from harm and to have their basic human needs met.</u>

Plaintiffs assert that DHS' system-wide practices violate their substantive due process rights under the Fourteenth Amendment to the U.S. Constitution to be free from a substantial risk of harm while in the State's care. Children who have been removed from their homes into state foster care custody, such as the Named Plaintiffs in this case, are in a "special relationship" with the state, triggering Fourteenth Amendment due process protections. *Tamas v. Dep't of Soc. & Health Servs.,* 630 F.3d 833, 846-47 (9th Cir. 2010); *Henry A. v. Willden*, 678 F.3d 991, 1000 (9th Cir. 2012). A foster child has a "protected liberty interest" in "reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child." *Lipscomb v. Simmons*,962 F.2d 1374, 1379 (9th Cir. 1992) (citations omitted). Plaintiffs contend that DHS' practices reflect deliberate indifference to a substantial risk of harm to children while in foster care. By this conduct, DHS has violated the Constitutional rights of children in foster care to reasonable safety and minimally adequate care and treatment. *Lipscomb*, 962 F.2d at

17

1379; *see also B.K. by Tinsley v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019)(evidence of harm related to inadequate medical care and foster care placements "due to statewide policies and practices expose her to a risk of similar future harms" may be "abated by an injunction").

In the Ninth Circuit and elsewhere, children in foster care have an actionable claim under the Constitution when agency practices put them at an unreasonable risk of harm. *Henry A.,* 678 F.3d at 1000-01; *M.D. v. Perry*, 152 F. Supp. 3d 684, 696 (S.D. Tex. 2015) (collecting cases holding that a "foster child's right to be free from an unreasonable risk of harm 'encompasses a right to protection from psychological as well as physical abuse'"). Plaintiffs need not wait until they have suffered actual injury before asserting a constitutional claim seeking injunctive relief––a substantial risk of harm is sufficient to support the claims. *See, e.g., Parsons*, 754 F.3d at 676 (prisoners' claim for injunctive relief based on risk of future harm due to unsafe conditions was "firmly established in our constitutional law"); *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1984) (plaintiffs "need not wait until actual casualties occur in order to obtain relief from [unsafe] conditions").

In a hyperbolic argument, Defendants state that they need only to provide for foster children's "basic human needs" and that their conduct can only be measured against the "minimally adequate care standard." (Dkt. 31, at 17). They claim that they cannot be required to protect foster children from incidental harm while in their care because "many of the plaintiffs have suffered trauma from being raised by abusive or neglectful parents, and that being taken into protective custody intensified that trauma," as if that justifies the many harms of which plaintiffs complain. *Id.* at p.18.

But in *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 264-65, 267-68 (5th Cir. 2018), a review after a full trial on the merits, the Court broadly affirmed the district court's liability

18

findings as to caseloads and monitoring/oversight because the Court held that children in the custody of the State's foster care system have a right to "personal security and reasonably safe living conditions." *Id.* at 250 (quoting *Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 880 (5th Cir. 2004)). The Court emphasized that "foster children are, at minimum, entitled to protection from physical abuse and violations of bodily integrity." *Id.* The Fifth Circuit also observed that the substantive due process right to "personal security and reasonably safe living conditions" includes the limited right "to be free from *severe* psychological abuse and emotional trauma—both of which are often inextricably related to some form of physical mistreatment or deprivation." *Id.* at 250 (Court's emphasis).[6]

As to liability, the Court found that while the deliberate indifference standard is a subjective standard of recklessness, state officials need not be warned of "a specific danger." *Id.* at 252 (internal citations omitted). A plaintiff, the Court ruled, is "required to demonstrate only that the State 'knew of the underlying facts indicating a sufficiently substantial danger and that [it] did not believe that the risks to which the facts gave rise [were] insubstantial or nonexistent.'" *Id.* at 253 (cite omitted; Court's alteration). And a deliberately indifferent state of mind "can be inferred 'from the fact that the risk of harm is obvious.'" *Id.* (cite omitted).  As to causation, the Court said that a plaintiff must identify with particularity, the policies or practices that cause the constitutional violation and prove a direct causal link, but it also noted that the district court need not consider each policy or practice "in a vacuum." *Id.* at 255. Nor is this particularity required at the pleading stage. Instead, the district court "may properly consider how individual policies or practices interact with one another within the larger system." *Id.* The district court in the Texas case did that, the circuit court found, both by accepting a "totality of

---

[6] The 9th circuit has have also defined foster children's interests to include "food, clothing, shelter, medical care, and reasonable safety."  *Henry A., 678 F.3d at 1000.*

4819-9726-5567v.2 0201450-000001

conditions" approach and by addressing "each of the State's specific policies and practices on an individual basis" and "how the harmful effects of some policies are exacerbated by other." *Id.*

The Court rejected the State's "overarching" defense as to causation, noting that it is "illogical to argue that because a child comes in already 'damaged' the State cannot be held liable for inflicting further harm that compounds that damage—even if it cannot be measured with mathematical certainty." *Id.* And Plaintiff Children "need not show that every member of the class has actually been harmed while in State custody; they need only demonstrate that they face a *risk* of serious harm as a result of the State's policies and that the State was deliberately indifferent to the risk." *Id.* at 256 (Court's emphasis).

Here, Plaintiffs are not arguing that Defendants need to utilize "best practices" to avoid a finding of liability on constitutional grounds. Rather, Defendants' practices are so deficient *collectively* that they are re-inflicting injury on the Plaintiffs. Consistent with *M.D. ex rel. Stukenberg v. Abbott,* the facts pled here demonstrate that Defendants' actions rise to such a level that foster children are suffering severe psychological abuse and emotional trauma. Moreover, *M.D. ex rel. Stukenberg v. Abbott* clearly rejected Defendants' position that because Plaintiffs come into foster care already damaged by abusive and neglectful parents, any additional harm is incidental and they cannot be held liable. Accordingly, Plaintiffs' articulated claims all fall squarely within the Fourteenth Amendment substantive due process right to be free from an unreasonable risk of harm caused by the Defendants. Plaintiffs are entitled to the presumption of truth at this stage in the proceedings and dismissal is unwarranted.

Contrary to Defendants' position, *Eric L. By and Through Schierberl v. Bird*, 848 F.Supp 303, 307 (D.N.H. 1994) does not stand for an absolute rejection of substantive due process claims to placement stability. Rather, the court held that the complaint "plead[] no facts tending

to establish that DCYS's placement of children with successive foster parents is so devoid of justification as to give rise to the Substantive Due Process Clause." Here, the complaint clearly sets forth facts sufficient to establish that Defendants have long known of their inadequate number and array of placements such that foster children are subjected to a revolving door of foster homes and institutions and are therefore subjected to an unreasonable risk of harm as a result.   Moreover, a district court has held that whether placement in a shelter violated the duty of reasonable care posed a question of fact that survived even a motion for summary judgment. *See* G*arcia v. Cty. of San Diego*, No. 15-CV-189 JLS (NLS), 2018 WL 3019931, at \*17 (S.D. Cal. June 18, 2018), *reconsideration denied*, No. 15-CV-189 JLS (NLS), 2018 WL 6334286 (S.D. Cal. Dec. 5, 2018).

*K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846 (7th Cir. 1990), which Defendants cite, arose out of a vastly different context in that it was an individual damages case.  *See, e.g., K.H.,* 914 F.2d at 853 (holding that defendants were "immune from damages liability" with respect to plaintiffs' challenge to the "general practice of shuttling children among foster parents.").  The *K.H.* court instead endorsed the federal courts' preference for suits for injunctive relief like the present one. *Id.* (holding that "deep-seated problems of public responsibility are to be explored not in damages suits but in equity actions - a route that K.H.'s guardian rather ostentatiously forwent in this case").

Defendants cite *Clark K. v. Guinn*, No. 2:06-CV-1068 RCF-RJJ, 2007 WL 1435348 (D. Nev. May 14, 2007) and *Charlie H. v. Whitman*, 83 F.Supp.2d 476, 504-8 (D.N.J. 2000) rejecting substantive due process claims related to remaining in care unnecessarily and in the least restrictive placement.  Both cases cite to *Baby Neal v. Casey*, 821 F.Supp 320 (E.D.Pa 1993) for this proposition, in which the court held that, as a matter of law, a state's duty does not

21

extend as far as requiring a state to provide foster children with permanent homes or pre-adoptive homes.  These cases relate to Defendants' further argument that several of Plaintiffs' claims for relief draw from other sources than the Fourteenth Amendment, specifically, "an obligation on the State's part to make reasonable efforts to obtain appropriate permanent homes." (Dkt. 31, at 18).  However, Defendants misapprehend the nature of these particular claims.

Defendants are operating a child welfare system that systematically fails to take sufficient steps to accomplish the ultimate purpose to be served by taking a child into government custody—to find children a stable and permanent home, whether with the child's birth parents or with someone else.  Defendants thus violate Plaintiffs' rights when they fail to engage in meaningful permanency planning, which deprives Plaintiffs of the opportunity to be placed in a permanent home and maintain a family relationship; such a right is cognizable under the First, Ninth, and Fourteen Amendments.[7]

2.    Defendants' claimed remedial efforts do not bar plaintiffs' Substantive Due Process claim.

While not specifically pled as such, Defendants include a section asserting that they are "actively working to address those systemic challenges and improve outcomes for all Oregon children," Dkt. 31, at 5; they have made progress on addressing recommendations from the original 2018 audit; and "Governor Brown has also acted to address specific gaps in the foster care system" with the Executive Order that was issued two days after this lawsuit was filed. *Id.* at

_____

[7] *See, e.g., Connor B. ex rel. Vigurs v. Patrick*, 985 F. Supp. 2d 129, 163 (D. Mass. 2013) (acknowledging First, Ninth, and Fourteenth Amendment right to familial association); *Kenny A. v. Perdue*, 2004 WL 5503780, at *7-8 (N.D. Ga. Dec. 13, 2004) (denying motion for summary judgment based on evidence that state failed to implement safe and appropriate placements and services and thus a reasonable factfinder could conclude state interfered with child's rights of familial association); *Brian A.,* 149 F. Supp. 2d at 952-53, 956 (denying motion to dismiss claims based on allegations that defendants violated constitutional rights to not be deprived of family relationships through systemic failure to provide plaintiffs with required child protection services and finding such rights embodied in the First, Ninth, and Fourteenth Amendments).

22

6.  This argument does not entitle Defendants to dismissal at the pleading stage.  Defendants do not explain how these purported efforts have ameliorated any of the allegations identified in the Complaint, or how mere "efforts" are defenses to Plaintiffs' allegations.  This information is irrelevant and inappropriate to consider on a motion to dismiss.

3.        Plaintiffs' claims are sufficiently pled for this court to grant relief.

Plaintiffs' allegations are more than sufficient to withstand a motion to dismiss or to make their complaint "more definite and certain." Plaintiffs have alleged with specificity that Defendants were aware of facts from which an inference could be drawn that children in the custody of DHS were at substantial risk of serious harm due to Defendants' many and pervasive failings with respect to its child welfare system.[8]  These allegations are rooted in publicly available data.[9]  Defendants know this, but have systematically failed to address chronically inadequate policies and practices for years.

These facts include data showing: (1) that Oregon deviates substantially from federal and state legal requirements implemented to protect children; (2) that Oregon has done poorly on all three federal audits of its child welfare system; (3) information from the damning 2018 state audit identifying numerous substantial systemic deficiencies in Oregon's child protection system that have gone largely unaddressed; (4) the use of out-of-state for-profit institutions and refurbished delinquency facilities to warehouse foster children; and (5) an acknowledged

---

[8] *See supra* Introduction (summarizing harms alleged to named plaintiffs).
[9] *Id.* ¶¶ 209-224 (discussing, from 2008 to 2019, multiple Secretary of State audits, federal reviews, and other reports finding substantial deficits in the overall operations of the child welfare system); *id.* ¶¶ 230-234 (discussing multiple reports identifying serious understaffing and excessive caseloads for child welfare workers).

inadequate array of placements, some of them so inappropriate that the state's maltreatment in care data was nearly triple the national average.[10]

These allegations, taken as a whole, establish that Plaintiffs have alleged that DHS' policies and practices place Plaintiffs (and all other foster children) at substantial risk of serious harm. Further, it can be plausibly inferred from these facts that Defendants actually drew the inference that Plaintiffs and the putative class members were at substantial risk of serious harm. Numerous courts have refused to dismiss substantive due process claims based on almost identical allegations to those Plaintiffs make here.[11]

On a motion to dismiss Plaintiffs are entitled to the presumption of truth. Defendants argue unconvincingly that Plaintiffs only make a conclusory allegation of policy-or-practice acts or omissions and Defendants' knowledge of them. And they argue that Plaintiffs have failed to establish a causal link between individual factual pleadings and their legal claims. This argument does not identify a pleading deficiency, but rather Defendants' misunderstanding of the nature of Plaintiffs' claims.  That each child may not have suffered precisely the same deprivation of his or her rights is not a basis to dismiss any of their claims.  Ultimately, the cases which Defendants cite in support of their application for Plaintiffs to make their claims more definite and certain do

---

[10]  *Id.* ¶¶ 220-224 (2018 Secretary of State Audit and subsequent update); *id.* ¶¶ 210-11 &  ¶¶ 215-19 (discussing 2016 federal review); *id.* ¶252 (showing high rates of maltreatment for children in substitute care); *Id.* ¶¶

[11] *See, e.g., Kenny A.,* 2004 WL 5503780, at *5 (denying motion for summary judgment on substantive due process claim where plaintiffs had evidence defendants "often place children in inappropriate and overcrowded homes, unnecessarily shuffle them from one unsuitable home to another, and overuse institutional placements" and "fail to provide timely case plans and services necessary to facilitate prompt reunification of children with their families or to achieve prompt adoptions"); *Brian A.*, 149 F. Supp. 2d at 943-44 (denying motion to dismiss based on an alleged "systemic failure of Defendants to fulfill their legal obligations to provide Plaintiffs with required [child protective] services under federal law"); *Marisol A.*, 929 F. Supp. at 669-70, 676 (denying motion to dismiss substantive due process claim based on factual allegations that "portray a child welfare program in crisis and collectively suggest systemic deficiencies of gross proportions").

24

not apply to the instant case. [12]  For all these reasons, Plaintiffs' substantive due process claims should not be dismissed.

### C.    The Right to an Adequate Case Plan and Case Review System under the Child Welfare Act is Well-Established and Individually Enforceable.

Every child in foster care must have a case plan that provides "safe and proper care" and is calculated to "address the needs of the child while in foster care, including a discussion of the appropriateness of the services." 42 U.S.C. § 675(1)(b). A state must also have a case review system in place that is, among other requirements, "designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child." 42 U.S.C. § 675(5)(A).

The plaintiffs have alleged facts showing that children in Oregon's foster system do not receive safe and proper care, do not have their needs met, nor are they routinely placed in the least restrictive, most family-like setting close to a parent's home. The Court should disregard the Defendants' apparent argument that *any* case plan or case review system, regardless of efficacy, is adequate under the law.  Dkt. 31, at 20-23. Congress would not have included exhaustive and specific requirements for an adequate case plan and an adequate case review system if it intended

---

[12] *Cf., e.g., McHenry v. Renne*, 84 F.3d 1172, 1178 (9th Cir. 1996) (plaintiffs' complaint was argumentative, prolix, redundant, and that it could not be determined who was being sued for what relief and on what theory); *Sameer v. Right Moves 4 U*, No. 1:17-CV-886 AWI-EPG, 2018 WL 1875536, at *3 (E.D. Cal. Apr. 19, 2018) (in the context of a history of frivolous motions, the pro se litigant failed to follow the court's instructions for a short and plain statement of the claims as prior complaints were prolix and incomprehensible and to name and serve the proper party); *Washington v. California Dep't of Corr. & Rehab.,* No. CV 19-169-VAP (KK), 2019 WL 1206487, at *5 (C.D. Cal. Mar. 14, 2019) (the statement of facts did not mention the defendants and it was difficult to determine "who is being sued, for what relief, and on what theory).

them to be disregarded.[13]  Plaintiffs have all had multiple failed placements within a matter of months and thus have a sound argument that their case plans, assuming they exist, and the state's case review system failed to meet the statutory requirements.

The Ninth Circuit has already held as a matter of law that the case planning requirement, the case review system requirement, and related statutory provisions of the Adoption Assistance and Child Welfare Act are all directly enforceable. *Henry A.*, 678 F.3d at 1009 ("We conclude that, like the case plan provisions, the records provisions [of the CWA] can be enforced through § 1983.").  While citing to this same authority, the Defendants invite the Court to commit reversible error by urging it to rule contrary to direct, circuit-level precedent and hold that the provisions of these requirements are too vague to enforce.[14]  The federal requirements of the case planning and case review system are specific and enforceable.

The Defendants' motion to dismiss urges this court that the case plan and the case review system requirements award foster youth only a theoretical right to an unimplemented case plan, protected by a purely theoretical case review system. Dkt. 31, at 20-23. The *Henry A.* court rejected the claim that the CWA statutes failed to express "concern with whether the needs of any particular child are met."[15] The Child Welfare Act's "provisions benefit individual foster children and parents." 678 F.3d at 1008. The lengthy definitions of a case plan and case review system that the defendants claim are unenforceable were those determined by the Ninth Circuit

---

[13] Dkt. 31, at 23-24; 42 U.S.C. § 675(5)(discussing in depth the nature of the required case review system); 42 U.S.C. § 675(1)(discussing in depth the requirements for an adequate case plan).

[14] Dkt., at 31, at 23-24; *see also* 678 F.3d at 1007 (case planning requirement not too "vague and amorphous" to enforce); 678 F.3d at 1009 (holding case review system "contain[s] detailed, concrete requirements that are capable of judicial enforcement").

[15] 678 F.3d at 1008; *compare with* Dkt., 31at 22 (arguing CWA does not "contain language 'ensuring' any particular contents, nor does the section speak to 'implementation'" of the plan at all).

"detailed, concrete requirements that are capable of judicial enforcement." 678 F.3d at 1009.

Although the defendants construe the CWA only to require "the State to document the efforts

that the State has undertaken," the *Henry A*. court held foster children could demand actual

performance of the CWA's requirements, not mere reporting of the State's progress in doing so.

678 F.3d at 1008 (holding plaintiffs could seek actual, individual enforcement of the requirement

to deliver certain records to foster families).  *Henry A*. firmly asserts that the rights of foster

children to an adequate case plan and adequate case review process are real and enforceable.

Defendants' attempts to dismiss these claims should be denied.

**D.    Defendants' Motion to Dismiss the ADA and Section 504 Claims Lacks Legal Merit**

Defendants' motion to dismiss the Americans with Disabilities Act ("ADA") and Section

504 of the Rehabilitation Act ("Section 504") claims[16] should be denied because the Plaintiffs'

complaint sufficiently alleges Defendants' failure to provide services in the most integrated

setting and the Defendants' failure to offer reasonable modifications to foster youth with

disabilities. Defendants' motion is also inconsistent with established law, and, instead,

Defendants erroneously rely on disfavored doctrines rather than following Ninth Circuit

precedent and federal agency guidance.

1.    Plaintiffs' Complaint Sufficiently Alleges Facts Supporting a Claim of Failure to Provide Federally Mandated Integrated Services

The integration mandate, as clearly articulated by Congress and the United States

Supreme Court, requires the state to offer all services to foster youth in the most integrated

setting appropriate to meet their care needs. 28 C.F.R. § 35.130(d); *Olmstead v. L.C. by Zimring*,

527 U.S. 581 (1999).   In *M.R. v. Dreyfus*, 663 F.3d 1100, 1117 (9th Cir. 2011), *opinion

amended and superseded on denial of reh'g*, 697 F.3d 706 (9th Cir. 2012), the "elimination of

---

[16] Since the substance of both acts are construed similarly, the plaintiffs refer to both the ADA and Rehabilitation Act claims collectively as "the ADA" for brevity's sake.

services" that tends to increase the risk of placement in an institutional or less integrated setting

can likewise be challenged under the integration mandate.[17] Neither is the mere transfer of

services received in an institutional setting to a community setting, without more, a fundamental

alteration under the ADA. *Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003). Finally, the

requirement to provide services in the most integrated setting extends to all government services.

*Lane v. Kitzhaber*, 841 F. Supp. 2d 1199, 1205 (D. Or. 2012).

      Defendants argue that Plaintiffs' federal integration mandate claims should be dismissed

because foster youth with disabilities have not been segregated from "non-disabled individuals."

The Plaintiffs have alleged that foster youth are kept in numerous restrictive and inappropriately-

segregated settings, including highly segregated converted detention centers and secure treatment

facilities, where at least two plaintiffs were kept in locked detention cells.[18] The Plaintiffs have

alleged that the out-of-state facilities are generally "locked or secure" and allow "no contact with

the community outside of other detained children and staff." Dkt. 1, at ¶¶ 283-84. Many of the

sites where youth are housed are obviously exclusively for youth with disabilities, such as

residential treatment facilities and psychiatric treatment centers, while analysis, context, and

---

[17] *Accord M.J., et. al., v. District of Columbia,* No. 1:18-cv-01901-EGS. 2019 WL 3344459, at *1 (D.D.C. July 25, 2019) (allegation that state "failed to provide required services in their homes, or in the community, they are unnecessarily institutionalized" stated an *Olmstead* claim).
[18] Dkt. 1, ¶ 72 (Kylie placed at Parry Center, a psychiatric treatment center for children); *id.* ¶¶ 76 (Unique left at stabilization placement too long); *id.* ¶ 85 (Unique sent to hospital emergency department and Albertina Kerr sub-acute unit); *id.* ¶¶88-92 (Unique's detention at Acadia Montana); *id.* ¶¶ 103, 108 (Simon stayed at Jasper Mountain, a locked facility, past his time for release because DHS had not found him a community placement); *id.* ¶120 (Ruth held in former police facility); *id.* ¶¶ 122-27(Ruth held inappropriately out-of-state in Sequel facility); *id.* ¶¶ 142 (Bernard held in converted juvenile detention center in a locked cell); *id.* ¶¶ 156-57 (Naomi placed in former police facility); *id.* ¶¶ 158-59 (Naomi placed in converted juvenile detention center); *id.* ¶¶165-77 (Naomi placed in locked, converted cells inside current juvenile detention center); *id.* ¶¶ 191-93 (Norman placed in institutional setting and denied family visits for petty reasons); *id.* ¶¶ 194-96 (Norman placed inappropriately in out-of-state setting with punitive lock up unit).

4819-9726-5567v.2 0201450-000001

experience show that other restrictive facilities house children with disabilities exclusively. Defendants do not explain, nor cite any authority for, the proposition that a child whose home is a locked detention cell lives in an integrated, community-based setting.

Defendants also appear to concede dozens of home and community-based placements have been eliminated and the resulting gap "drive inappropriate placement decisions." Dkt. 31-1 at 27-28. (showing a loss of 33% of contracted behavioral residential capacity and the loss of 50 or more beds for children with developmental disabilities). *Id.* Similar to the court in *M.R.,* this court may also find that the elimination of these services and the facts surrounding Plaintiffs reveal they are being discriminated against because they are only obtaining services in the most restricted setting in violation of the integration mandate. Thus, the Defendants' motion should be denied.

The Defendants likewise allege that, because the foster system as a whole lacks the full array of foster placements needed, that the Plaintiffs are not subject to discrimination: essentially, youth with disabilities are just as badly off as foster youth without disabilities. Dkt. 31, at 27. While each foster youth suffers from the lack of adequate resources, the lack of resources, especially disability-specific services, will naturally hit youth with disabilities hardest. The state's argument, that one needs a comparison class to state a discrimination claim, resurrects an argument rejected by the United States Supreme Court: that an ADA integration mandate claim must be based on "similarly situated individuals [without disabilities] given preferential treatment." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598 (1999).The Supreme Court held that Congress, passing the ADA, showed a "more comprehensive view of the concept of discrimination" than merely requiring equal treatment of similarly situated classes.

As alleged in the Plaintiffs' Complaint, foster children of Oregon who have disabilities are disproportionately placed in locked settings, in institutional settings, in converted detention cells, in isolated out-of-state placements, and otherwise in less integrated settings, when, with adequate services and supports in the community, they could often avoid the placement in a less integrated setting.  Under the ADA and its integration mandate, the state must adequately fund and, if necessary, create community-based services to prevent the institutionalization of foster children to support an integration mandate claim. *Townsend*, 328 F.3d at 517; *V.L. v. Wag*ner, 669 F. Supp. 2d 1106, 1119 (N.D. Cal. 2009).  Ultimately, the plaintiffs have adequately alleged an integration mandate claim.

2.    <u>Defendants' Legal Argument is Inconsistent with Federal Guidance and Established Federal Law Requiring More Than Mere Equal Treatment</u>

Defendants argue that the ADA and Section 504 require mere equal treatment, an argument that has been staunchly rejected by the Ninth Circuit as the "facade of 'equal treatment' when particular accommodations are necessary to level the playing field."[19]  The Defendants adopt Justice Thomas's rejected, narrow view of the ADA: that it only mandates strict equal treatment.[20] The *Olmstead* opinion itself specifically discarded that narrow view.[21] Courts today recognize that students with disabilities may need different educational services in

---

[19] *McGary v. City of Portland*, 386 F.3d 1259, 1267 (9th Cir. 2004); *id.* ("[E]qual treatment may not beget equality and facially neutral policies may be, in fact, discriminatory if their effect is to keep persons with disabilities from enjoying the benefits of services that, by law, must be available to them.") *see* Dkt. 31,at 27 (arguing "a plaintiff…is only entitled to receive existing services on a non-discriminatory basis."); *id. at* 25 (characterizing complaint as failing to state a viable claim because it seeks "additional" or "different" services).
[20] *Olmstead*, 527 U.S.at 619 (1999) (Thomas, J. dissenting) ("[W]e previously rejected the argument that § 504 requires the type of "affirmative efforts to overcome the disabilities caused by handicaps. . . ."); *id.* 619-20 (Thomas, J. dissenting) (ADA requires only "evenhanded treatment" relative to those persons without disabilities").
[21] *Olmstead*, 527 U.S. at 598, (endorsing more "comprehensive view of the concept of discrimination advanced in the ADA"); *id.* at 598 n.10 (specifically dismissing Justice Thomas's narrow view of the ADA).

4819-9726-5567v.2 0201450-000001

order to benefit from public education,[22] that deaf litigants may need different accommodations in order to participate in state family court hearings,[23] that wheelchair users may need lifts and elevators to access courthouses surrounded by stairs,[24] and that people with service dogs may need exceptions from local animal handling laws.[25] The two out-of-circuit district court cases taking the alternate view are strongly disfavored.[26] Foster children with disabilities need and may demand adequate services in order to benefit from the child welfare program.

Like federal case law, federal agency guidance robustly requires that government agencies relax requirements and offer unique services as needed to ensure that people with disabilities can benefit from child welfare services.[27] Beyond ensuring equal access to services,

---

[22] *Mark H. v. Hamamoto*, 620 F.3d 1090, 1098 (9th Cir. 2010) (allegation that students with autism needed autism-specific interventions to access education stated a claim under the Rehabilitation Act).

[23] *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1136 (9th Cir. 2001) (overturning grant of summary judgment to state court officials where deaf litigant needed live videotext to understand proceedings, because live videotext could be a reasonable accommodation).

[24] *Tennessee v. Lane*, 541 U.S. 509, 532 (2004) (physical access to courthouse).

[25] *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996) (holding that service dog users should be exempt from Hawaii's quarantine requirement for dogs coming to the islands); *id.* ("It is no response to assert that the visually-impaired, like anyone else, can leave their dogs in quarantine and enjoy the public services they desire.").

[26] *Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 501 (D.N.J. 2000); *M.K. ex rel. Mrs. K. v. Sergi.* 554 F. Supp. 2d 175, 198 (D. Conn. 2008); *but see Murphy v. Minn. Dept. Human Servs.,* 260 F.Supp.3d 1084 (D. Minn. 2017) (finding *M.K.* and other cases narrowly reading the scope of relief under the ADA "distinguishable and unpersuasive with respect to this case"). *Charlie H.* has not been cited favorably by a single court anywhere in the nation regarding its ADA holding for 19 years.

[27] U.S. Dep't of Justice, *Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, available at* https://www.ada.gov/doj_hhs_ta/child_welfare_ta.html (last accessed Aug. 7, 2019) ["DOJ Guidance"]; Office of Civil Rights, U.S. Dept. Health & Human Servs., *Your Rights as a Person with a Disability in the Child Welfare Systems,* (Sept. 2016) *available at* https://www.hhs.gov/sites/default/files/ocr-child-welfare-disability-factsheet-september-2016.pdf (last accessed Aug. 7, 2019) ["DHHS Factsheet"]. Although both publications specifically address parents in the system, the requirements to make modifications in policy extend to all

31

child welfare agencies "must provide reasonable modifications to policies, practices, and procedures when necessary to avoid discrimination." DOJ Guidance, at 5. Modifications may include "[p]roviding respite care [and p]roviding one-on-one parenting training" to enable full access to child welfare services. DHHS Factsheet. The DOJ requires child welfare agencies to "provide additional, individually tailored services and resources." DOJ Guidance, at 15.

The present Plaintiffs' claims resemble successful ADA claims of other foster youth. In *Marisol A. v. Giuliani*, a plaintiff stated a claim by alleging that the state failed to assess his needs promptly, "transferred him from one inappropriate placement to another including a group home that lacked the medical staff needed to monitor his condition," neglected to inform subsequent placements of his medical needs, and provided case planning inconsistent with his medical needs. 929 F. Supp. 662, 685 (1996). Another plaintiff stated an ADA claim by merely alleging that he was placed in a home unsuited to his neurological needs. *Id.* A New Hampshire complaint likewise survived a motion to dismiss by generally alleging that foster youth were denied "services and placement opportunities comparable to those available to non-disabled children." *Eric L.*, 848 F. Supp. at 313. The complaint here adequately alleges that Oregon foster children with disabilities are moved from placement to placement, that the state does not appropriately plan for their needs, that the state does not adequately advise placements of their medical needs, and that the state does not promptly assess their needs.[28]

---

"child welfare-related activities and programs of child welfare agencies" and the qualified people with disabilities within the scope of the guidance include "children." DHHS Factsheet.

[28] *State of Connecticut Office of Prot. & Advocacy for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 278 (D. Conn. 2010) (holding plaintiffs stated an ADA claim by alleging state "failed to adequately assess and identify the long-term care needs" of plaintiff class and "to determine whether those needs could be appropriately met in integrated, community-based settings").

4819-9726-5567v.2 0201450-000001

Defendants' arguments fail and their motion should be denied because the antidiscrimination statutes, associated regulations, relevant federal guidance, and case law all establish that public entities must alter how they provide services where necessary to allow people with disabilities equal opportunity to benefit from the services offered.[29] Foster youth with disabilities will not likely succeed in foster placements, find a permanent adoptive home, or reunify with their parents while the untreated or inadequately treated symptoms of their underlying disabilities make it impossible for them to benefit from the state's services.

The Defendants' final argument is that the plaintiffs seek "additional services" that the ADA does not require. Dkt. 31, at 26. Federal guidance and case law distinguish between modifications to access existing services and additional services that create free-standing, separate programs for the sole purpose of eliminating general disparities inherent in disability status. The United States Department of Justice ("DOJ") illustrates its meaning of "additional services" with the example that cities do not have to "provide snow removal service for the private driveways of residents with disabilities, if the city does not provide such service for residents without disabilities."[30] The case law and federal guidance make clear that the ADA may require states to provide auxiliary services to ensure a person can benefit from already existing services, short of a demand for a "substantively different benefit."[31]

---

[29] 42 U.S.C. § 12132 (the ADA prohibits discrimination against qualified people with disabilities in the provision of public services, by denying them "the benefits of the services, programs, or activities" of the agency); 28 C.F.R. § 35.130(b)(1)(iii); *Bird v. Lewis & Clark Coll.*, 104 F. Supp. 2d 1271, 1275 (D. Or. 2000); *Southeastern Community College v. Davis,* 442 U.S. 397, 410 (1979); *Alexander v. Choate,* 469 U.S. 287, 300-01 & nn. 20-2 (1985).

[30] U.S. Dep't of Justice, ADA Title II Technical Assistance Manual, at II-3.3000 E *available at* https://www.ada.gov/taman2.html (last accessed on Aug. 7, 2019).

[31] *Id.* at II-3.4000 ("Separate programs are permitted where necessary to ensure equal opportunity."); *American Council of the Blind v. Paulson*, 525 F.3d 1256, 1268 (D.C. Cir. 2008) (holding, even where alteration of size, color, and texture of currency was requested, blind

When considering whether an ADA litigant demands prohibited "additional services" or permissible modifications to enable them to participate in or benefit from an existing service, a court should broadly construe the existing service.[32] The plaintiffs may insist on improved mental health services and disability supports within the foster care system because those services are necessary to ensure full access to the benefits of the child welfare system and because Oregon has already committed itself to providing all needed medical and mental health care to all foster children, with and without disabilities. ORS 418.015; OAR 413-010-0180(1)(d). While the defendants characterize therapeutic foster care homes and mental health care as an additional service, Dkt. 31, at 26, the state already provides those services in some cases. Dkt. 1, at ¶193. Case law embraces the responsibility of state authorities to provide accommodations that do not currently exist.[33] If the court could order the state to provide services not currently provided, surely the court can order the state to provide those services it does provide and has committed to providing in a manner that enables foster youth with disability to enjoy the other benefits of child welfare services.

The ADA has routinely been read broadly to fulfill Congressional intent to ensure the full participation of people with disabilities in government services. *Hason v. Med. Bd. of California*, 279 F.3d 1167, 1172 (9th Cir. 2002). The District Court should continue this proud tradition by

---

litigants did not seek a "substantively different benefit than is already provided by the U.S. currency system") .

[32] *Townsend*, 328 F.3d at 517  (reversing as error district court accepting state's narrow definition of its services based on where and how the service was delivered, instead broadly declaring the nature of the service to be "long term care" generally); *American Council of the Blind¸*525 F.3d at (nature of public service blind litigants sought access to was the program of currency and "engag[ing] in economic activity generally").

[33] *Duvall*, 260 F.3d at 1136 (overturning district court holding that accommodation was unreasonable because the county did not offer it);  *Townsend*, 328 F.3d at 518 (reversing district court for rejecting community based services sought by plaintiffs on state's position that it offered long term care services in nursing homes only).

following the overarching themes of Ninth Circuit case law. Foster children with disabilities must be able to find stable foster placements and healthy, permanent families. Without the supports the state has committed to providing and the supports that foster children with disabilities need, foster youth will not have an "equal opportunity" to benefit from child welfare services.

## IV.    CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss and allow Plaintiffs' constitutional and statutory claims to proceed to resolution on their merits.

Dated this 8th day of August, 2019.

**DAVIS WRIGHT TREMAINE LLP**

 *s/ Paul C. Southwick*
Gregory A. Chaimov, OSB #822180
gregorychaimov@dwt.com
Paul C. Southwick, OSB #095141
paulsouthwick@dwt.com
1300 SW Fifth Avenue, Ste. 2400
Portland, OR 97201
Tel: (503) 241-2300

**A BETTER CHILDHOOD**

Marcia Robinson Lowry (*pro hac vice*)
mlowry@abetterchildhood.org
Dawn J. Post (*pro hac vice*)
dpost@abetterchildhood.org
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel: (646) 795-4456

**DISABILITY RIGHTS OREGON**

Emily Cooper, OSB #182254
ecooper@droregon.org
Thomas Stenson, OSB #152894
tstenson@droregon.org
511 SW 10th Avenue, Suite 200
Portland OR 97205
Tel: (503) 243 2081

Attorneys for Plaintiffs