**GREGORY A. CHAIMOV, OSB #822180**
gregorychaimov@dwt.com
**PAUL C. SOUTHWICK, OSB #095141**
paulsouthwick@dwt.com
**DAVIS WRIGHT TREMAINE LLP**
1300 SW Fifth Avenue, Suite 2300
Portland, OR 97201
Tel: (503) 241-2300

**MARCIA ROBINSON LOWRY (pro hac vice)**
mlowry@abetterchildhood.org
**DAWN J. POST (pro hac vice)**
dpost@abetterchildhood.org
**ANASTASIA BENEDETTO (pro hac vice)**
abenedetto@abetterchildhood.org
**A BETTER CHILDHOOD**
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel: (646) 795-4456

**EMILY COOPER, OSB #182254**
ecooper@droregon.org
**THOMAS STENSON, OSB #152894**
tstenson@droregon.org
**CHRISTINE SHANK (admission pending)**
cshank@droregon.org
**DISABILITY RIGHTS OREGON**
511 SW 10th Avenue, Suite 200
Portland, OR 97205
Tel: (503) 243 2081

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| WYATT B. and NOAH F. by their next friend Michelle McAllister; KYLIE R. and ALEC R. by their next friend Kathleen Megill Strek; UNIQUE L. by her next friend Annette Smith; SIMON S. by his next friend Paul Aubry; RUTH T. by her next friend Michelle Bartov; BERNARD C. by his next friend Ksen Murry; NAOMI B. by her next friend Kathleen Megill Strek; and NORMAN N. by his next friend Tracy Gregg, individually and on behalf of all others similarly situated,<br><br>**PLAINTIFFS,** | Case No. 6:19-cv-00556-AA<br><br>**CLASS ACTION ALLEGATION**<br>[Fed. R. Civ. P. 23]<br><br>**PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION**<br><br>**ORAL ARGUMENT REQUESTED** |

v.

KATE BROWN, Governor of Oregon in her
official capacity; FARIBORZ PAKSERESHT,
Director, Oregon Department of Human
Services in his official capacity; JANA
MCLELLAN, Interim Director, Child Welfare
in her official capacity, and OREGON
DEPARTMENT OF HUMAN SERVICES,

**DEFENDANTS**.

4833-3216-3758v.3 0201450-000001                DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

# TABLE OF CONTENTS

CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.1 ............................................ 1

MOTION............................................................................................................................... 1

MEMORANDUM OF LAW ................................................................................................. 1

I.      INTRODUCTION .................................................................................................... 1

II.     STATEMENT OF FACTS ....................................................................................... 4

        A.      Oregon's Foster Care System Has a Long Record of Common Failures. ............. 4
        B.      Defendants' Policies and Practices Expose Named Plaintiffs to Actual, Substantial
                Harm. ..................................................................................................................... 6
                1.      Wyatt and Noah. ......................................................................................... 7
                2.      Kylie and Alec. ........................................................................................... 7
                3.      Bernard. ...................................................................................................... 8
                4.      Naomi. ......................................................................................................... 8
                5.      Unique. ........................................................................................................ 9
                6.      Ruth. ............................................................................................................ 9
                7.      Norman. ..................................................................................................... 10
                8.      Simon. ........................................................................................................ 10

III.    LEGAL STANDARD OF REVIEW ...................................................................... 11

        A.      The Legal Standard for Class Certification. ......................................................... 12
        B.      The Ninth Circuit's Approval of Class Certification Supports Class Certification
                Here. ...................................................................................................................... 13
        C.      The Supreme Court's Decision in *Wal-Mart Stores, Inc. v. Dukes* Supports Class
                Certification Here. ................................................................................................. 14

IV.     THE COURT SHOULD CERTIFY THE GENERAL CLASS AND ALL THREE
        SUBCLASSES BECAUSE PLAINTIFF CHILDREN MEET THE REQUIREMENTS
        OF RULE 23(A) ...................................................................................................... 17

        A.      The Putative Class is so Numerous that Joinder is Impracticable. ....................... 17
                1.      The Numerosity Standard. ........................................................................ 17
                2.      Plaintiffs have satisfied the Numerosity Requirement.............................. 17
        B.      The Putative Classes and Subclasses Share Common Questions of Law and Fact.
                ............................................................................................................................... 18
                1.      The Commonality Standard. ..................................................................... 18
                2.      There is substantial evidence of Commonality with respect to the General
                        Class. ......................................................................................................... 20
                        a.      Inadequate array of appropriate placements. ................................ 21
                        b.      Lack of appropriate case planning. ............................................... 26
                        c.      High caseloads and chronic understaffing. ................................... 29
                3.      There is substantial evidence of Commonality with respect to the ADA
                        Subclass..................................................................................................... 32

4833-3216-3758v.3 0201450-000001
DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

|  |  | 4. | There is substantial evidence of Commonality with respect to the SGM Subclass.................................................................................................. 37 |
|  |  | 5. | There is substantial evidence of Commonality with respect to the Aging Out Subclass.......................................................................................... 42 |
|  | C. | The Claims of Named Plaintiff Children Are Typical......................................... 45 |  |
|  |  | 1. | The Typicality Standard.......................................................................... 45 |
|  |  | 2. | Plaintiffs have satisfied the Typicality Requirement. .............................. 46 |
|  | D. | The Named Plaintiff Children Will Adequately Represent the Class.................. 48 |  |
|  |  | 1. | The Adequacy Standard........................................................................... 48 |
|  |  | 2. | Plaintiffs have satisfied the Adequacy Requirement. .............................. 48 |
|  | E. | The Named Plaintiff Children Satisfy the Requirements of Rule 23(b). ............. 50 |  |
|  |  | 1. | The Rule 23(b) Standard.......................................................................... 50 |
|  |  | 2. | Plaintiffs have satisfied the Rule 23(b)(2) Requirement......................... 51 |

V.    THE COURT SHOULD APPOINT CLASS COUNSEL ............................................. 53

VI.    CONCLUSION.............................................................................................................. 54

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7-2(B) .......................................... 55

4833-3216-3758v.3 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Armstrong v. Davis*,
  275 F.3d 849 (9th Cir. 2001) ...............................................................19, 45, 46, 47

*B.K. v. Snyder*,
  922 F.3d 957 (9th Cir. 2019) ........................................................................ *passim*

*Baby Neal v. Casey*,
  43 F.3d 48 (3d Cir. 1994)...........................................................................................14

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir. 1975) .....................................................................................12

*Blake v. City of Grants Pass*,
  No. 1:18-cv-01823-CL, 2019 U.S. Dist. LEXIS 132508 (D. Or. Aug. 7, 2019)....................48

*Californians for Disability Rights, Inc. v. California Dep't of Transp.*,
  249 F.R.D. 334 (N.D. Cal. 2008)................................................................................53

*Daggett v. Blind Enters.*,
  CV-95-421-ST, 1996 U.S. Dist. LEXIS 22465 (D. Or. Apr. 18, 1996) ..................................49

*DG v. Devaughn*,
  594 F.3d 1188 (10th Cir. 2010) ...............................................................................14

*Ganci v. MBF Insp. Servs.*,
  323 F.R.D. 249 (S.D. Ohio 2017) ..............................................................................18

*Gen. Tel. Co. of the Sw. v. Falcon*,
  457 U.S. 147, 102 S. Ct. 2364 (1982)........................................................................48

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ...............................................................................45, 48

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) .....................................................................................46

*Lane v. Kitzhaber*,
  283 F.R.D. 587 (D. Or. 2012) ..................................................................... *passim*

*M.D. v. Abbott*,
  907 F.3d 237 (5th Cir. 2018) .....................................................................................14

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

*M.D. v. Perry*,
  294 F.R.D. 7 (S.D. Tex. 2013) ................................................................38

*Marisol A. by Forbes v. Giuliani*,
  126 F.3d 372 (2d Cir. 1997) ..................................................................14

*Parsons v. Ryan*,
  289 F.R.D. 513 (D. Ariz. 2013) ..............................................................22

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014) ...................................................... *passim*

*Partl v. Volkswagen, AG (In re Volkswagen "Clean Diesel" Mktg., Sales*
  *Practices, & Prods. Liab. Litig)*,
  895 F.3d 597 (9th Cir. 2018) ..................................................................48

*Penk v. Or. State Bd. of Higher Educ.*,
  93 F.R.D. 45 (D. Or. 1981) ..............................................................46, 49

*R.G. v. Koller*,
  415 F. Supp. 2d 1129 (D. Haw. 2006) ...................................................52

*Rannis v. Recchia*,
  380 F. App'x 646 (9th Cir. 2010) ...........................................................17

*Rodriguez v. Hayes*,
  578 F.3d 1032 (9th Cir. 2009) ..........................................................19, 46

*Rodriguez v. Hayes*,
  591 F.3d 1105 (9th Cir. 2010) ................................................................50

*Romero v. Producers Dairy Foods, Inc.*,
  235 F.R.D. 474 (E.D. Cal. 2006) ...........................................................18

*Sali v. Corona Reg'l Med. Ctr.*,
  909 F.3d 996 (9th Cir. 2018) ..................................................................12

*Sorenson v. Concannon*,
  893 F. Supp. 1469 (D. Or. 1994) ...........................................................49

*Tinsley v. McKay*,
  156 F. Supp. 3d 1024 (D. Ariz. 2015) ....................................................22

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) .................................................................... *passim*

4833-3216-3758v.3 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) ...............................................................................50

*Young v. Nationwide Mut. Ins. Co.*,
    693 F.3d 532 (6th Cir. 2012) ...............................................................................38

**Federal Statutes**

42 U.S.C. § 622(b)(8)(A)(iii) .....................................................................................21

42 U.S.C. § 675(5)(A) ................................................................................................21

42 U.S.C. § 12132 ............................................................................................ *passim*

Rehabilitation Act § 504 .....................................................................................15, 32

**Rules**

Fed. R. Civ. P. 23 ................................................................................................12, 46

Fed. R. Civ. P. 23(a) ....................................................................................... *passim*

Fed. R. Civ. P. 23(a)(1) .......................................................................................12, 17

Fed. R. Civ. P. 23(a)(2) .......................................................................................12, 18

Fed. R. Civ. P. 23(a)(3) ...................................................................................13, 46, 48

Fed. R. Civ. P. 23(a)(4) ...................................................................................13, 48, 50

Fed. R. Civ. P. 23(b) ...........................................................................................12, 50

Fed. R. Civ. P. 23(b)(2) ................................................................................... *passim*

Fed. R. Civ. P. 23(g)(1) ..............................................................................................53

Fed. R. Civ. P. 23(g)(1)(A) .........................................................................................53

Fed. R. Civ. P. 23(g)(1)(B) .........................................................................................53

Fed. R. Civ. P. 23(g)(4) ..............................................................................................53

Fed. R. Civ. P. 30(b)(6) ..............................................................................................30

USDC OREGON LOCAL RULE 7.1 ............................................................................1

4833-3216-3758v.3 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

**Regulations**

OAR 413-010-0180 ...................................................................................................43

OAR 413-015 .........................................................................................................29

OAR 413-030 .........................................................................................................43

OAR 413-040-0010 ..............................................................................................26, 27

OAR 413-070 ..........................................................................................................22

**Legislative History**

*Establishes Statewide System of Care Task Force: Public Hearing on S.B. 1*
    *Before the S. Comm. on Human Servs.*, 2019 Leg., 80th Sess. (2019)
    (statement of Kate Brown, Governor), available at
    http://oregon.granicus.com/MediaPlayer.php?clip_id=26287 ................................36

H.B. 2033, 2019 Leg., 80th Sess. (2019), available at
    https://olis.leg.state.or.us/liz/2019R1/Downloads/MeasureDocument/HB2033/
    Introduced ..........................................................................................................3, 29

*Placement of Foster Youth in Refurbished Juvenile Detention Facilities:*
    *Informational Meeting Before the S. Comm. on Human Servs.*, 2019 Leg.,
    80th Sess. (2019) (statement of Fariborz Pakseresht, Director, Department of
    Human Services), available at
    http://oregon.granicus.com/MediaPlayer.php?clip_id=8cdf2e98-be58-4b5f-
    a896-bd0f7cf95406&meta_id=92ac1976-68cc-4ff0-8085-3f6c742595ab ............................24

*Relating to child welfare caseworkers: Hearing on H.B. 2033 Before the H.*
    *Comm. on Human Servs. and Hous.,* 2019 Leg., 80th Sess. 2 (2019)
    (statement of Marilyn Jones, Child Welfare Director, Dep't of Human Servs.),
    available at
    https://olis.leg.state.or.us/liz/2019R1/Downloads/CommitteeMeetingDocumen
    t/157766 ..............................................................................................................3

*Relating to child welfare caseworkers: Hearing on H.B. 2033 Before the H.*
    *Comm. on Human Servs. and Hous.*, 2019 Leg., 80th Sess. 3 (2019)
    (statement of Marilyn Jones, Child Welfare Director, Dep't of Human Servs.),
    available at
    https://olis.leg.state.or.us/liz/2019R1/Downloads/CommitteeMeetingDocumen
    t/157766 ..........................................................................................................3, 29

4833-3216-3758v.3 0201450-000001
DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main • (503) 778-5299 fax

## Other Authorities

Aimee Green, *Oregon jury awards $1.5 million, finds DHS fired 2 whistleblowers in retaliation*, THE OREGONIAN, Nov. 18, 2019, https://www.oregonlive.com/news/2019/11/oregon-jury-awards-15-million-finds-dhs-fired-2-whistleblowers-in-retaliation.html?outputType=amp&__twitter_impression=true ...............................................18

Annual Progress & Service Report, *State of Oregon Department of Human Resources, Office of Child Welfare Programs, Annual Progress & Service Report* (2017), available at https://www.oregon.gov/DHS/CHILDREN/Documents/oregon-apsr-2016-2017.pdf ...........................................................................................................26

*Children's Bureau, Child Welfare Outcomes* (2019), available at https//cwoutcomes.acf.hhs.gov/cwodatasite/pdf/oregon.html .................................42

*Children's Bureau, U.S. Dep't of Health & Human Servs., The Risk and Prevention of Maltreatment of Children with Disabilities* (Jan. 2018) available at https://www.childwelfare.gov/pubPDFs/focus.pdf ..............................................33

Gordon Friedman, *Class action suit aims to keep DHS from housing foster kids in hotels, offices*, STATESMAN JOURNAL, Sept. 27, 2016, https://www.statesmanjournal.com/story/news/politics/2016/09/27/class-action-suit-aims-keep-dhs-putting-foster-kids-hotels-offices/91171894/ ................................2

Gordon Friedman, *DHS settles class action suit over foster care housing*, STATESMAN JOURNAL, Nov. 29, 2016, https://www.statesmanjournal.com/story/news/politics/2016/11/29/dhs-settles-class-action-suit-over-foster-care-housing/94612510/ .............................................2

Hillary Borrud, *Kate Brown signs lower caseworker degree requirements into law,* THE OREGONIAN, May 28, 2019 ...................................................................3

Hillary Borrud, *Oregon foster care officials, lawmaker at odds over housing kids in converted juvenile jails*, THE OREGONIAN, April 26, 2019 ...............................3

Lauren Dake, *Oregon Sending Foster Children to Facilities Accused of Abuse*, OREGON PUBLIC BROADCASTING, Feb. 14, 2019, https://www.opb.org/news/article/oregon-foster-care-abuse/...................................3

Lauren Dake, *Oregon Sent Foster Children With Disabilities Out of State, Hearing Reveals*, OREGON PUBLIC BROADCASTING, April 24, 2019, https://www.opb.org/news/article/oregon-foster-care-children-disabilities-out-of-state/ ...................................................................................................................3

4833-3216-3758v.3 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

*Oregon Dep't of Human Servs., Children, Adults, and Families*, Policy No. I-A.1,Client Rights – Policy (2007), available at https://www.dhs.state.or.us/policy/childwelfare/manual_1/i-a1.pdf .......................................39

*Oregon Youth Development Council, Youth & You, Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) Youth: Addressing the Need for Statewide Policies and Supports* (2016), available at http://www.oregonyouthdevelopmentcouncil.org/wp-content/uploads/2016/09/Lesbian-Gay-Bisexual-Transgender-Questioning-Youth-Position-Paper_YDC.pdf ..........................................................................................38

*State of Oregon Department of Human Services, Office of Child Welfare Programs, Annual Progress & Service Report* (2017), available at https://www.oregon.gov/DHS/CHILDREN/Documents/oregon-apsr-2016-2017.pdf ...............................................................................................................................27

*U.S. Dep't of Health & Human Servs., U.S. Dep't of Justice, Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act* (August 2015), available at https://www.ada.gov/doj_hhs_ta/child_welfare_ta.html#_ftnref12 ..................................33, 34

4833-3216-3758v.3 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

### CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.1

In compliance with Local Rule 7.1, the parties conferred in good faith regarding this Motion through counsel by telephone and e-mail and were unable to reach a resolution.

### MOTION

Plaintiffs hereby move the Court to certify this case as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2). Plaintiffs ask the Court to certify a class of all Oregon foster children (the "General Class") as well as three subclasses: 1) children with disabilities (the "ADA[1] Subclass"), 2) children who identify as a gender or sexual minority (the "SGM[2] Subclass"), and 3) older teens susceptible to "aging out" of foster care without transitional support (the "Aging Out" Subclass). Plaintiffs also ask the Court to appoint the undersigned attorneys as class counsel.

### MEMORANDUM OF LAW

### I.    INTRODUCTION

The vulnerable children in Oregon's child welfare system are at the mercy of a system rife with severe constitutional inadequacies. There are not enough safe, home-like placements where they can live. There are not enough qualified caseworkers to assess their needs and plan for their futures. Timely and adequate case plans are the exception, not the rule. But for Oregon's foster care system, that's business as usual.

The foster children represented by this putative class action seek to enjoin Defendants from exposing them to the substantial risk of harm created by statewide policies and practices that gamble with their safety and well-being. As identified in Plaintiffs' Complaint, those policies and practices include the lack of an appropriate range and number of placements, high caseloads and chronic understaffing, and the lack of timely and adequate assessments and case plans. The harms experienced by all Oregon foster children are particularly acute for the children in this action's

---

[1] Members of the ADA Subclass are protected by the Americans with Disabilities Act ("ADA"). 42 U.S.C. § 12132.
[2] The term sexual and gender minority ("SGM"), as used in this action, is inclusive of lesbian, gay, bisexual, and transgender populations, among others.

Page 1 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

subclasses: children with disabilities, children who identify as SGM, and older teens susceptible to "aging out" of foster care without transitional support.

"Historically, Oregon has not done well" on measures assessing the state's ability to serve and protect children in its care, "and has gotten worse over time."[3] DHS acknowledged as much in a recent Unified Child and Youth Safety Implementation Plan, noting DHS has received reports, reviews, and other forms of feedback since 2004, "nearly always" containing recommendations that impact the safety and well-being of foster children.[4] "In too many cases, recommendations were not implemented or leadership did not sustain change efforts. Full consideration was not given to the systemic impacts of policy and operational changes and the result is an unharmonious…child safety system."[5]

Defendants' failure to consider the systemic impact of their actions and inactions is well-documented—and at this point, constitutes a pattern of responding reactively to crises in the child welfare system, to the detriment of long-term child welfare solutions. Just three years ago, the state settled a class action lawsuit challenging the practice of "hoteling":[6] housing foster children overnight in hotels instead of proper placements, rendering them "functionally homeless."[7] Instead of addressing the underlying issue—a severe shortage of appropriate placements—the state

---

[3] Ex. 1, at Wyatt_DHS_0059767, 776 (Jan. 2018 Secretary of State Audit). All cited exhibits will hereinafter be referenced as "Ex. __" and are attached to the Declaration of Marcia Robinson Lowry, filed concurrently with this Memorandum with a citation to the relevant pages.
[4] Ex. 2, at Wyatt_DHS_0057498, 502 (Unified Child and Youth Safety Implementation Plan).
[5] Ex. 2, at Wyatt_DHS_0057498, 502 (Unified Child and Youth Safety Implementation Plan).
[6] Gordon Friedman, *DHS settles class action suit over foster care housing*, STATESMAN JOURNAL, Nov. 29, 2016,
https://www.statesmanjournal.com/story/news/politics/2016/11/29/dhs-settles-class-action-suit-over-foster-care-housing/94612510/.
[7] Gordon Friedman, *Class action suit aims to keep DHS from housing foster kids in hotels, offices*, STATESMAN JOURNAL, Sept. 27, 2016,
https://www.statesmanjournal.com/story/news/politics/2016/09/27/class-action-suit-aims-keep-dhs-putting-foster-kids-hotels-offices/91171894/.

Page 2 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon 97201-5610
(503) 241-2300 main · (503) 778-5299 fax

merely shifted the problem by sending children to out-of-state, for-profit institutions[8], or housing them in barely modified jail cells.[9]  Those out-of-state facilities are now the subject of extensive maltreatment reports and legislative hearings, prompting Defendants to bring many of those children back to Oregon.[10]

Defendants have taken a similar reactive approach to staffing concerns. "Child welfare caseworkers are one of the few professions that have their educational requirements defined in the statute," testified Marilyn Jones, former Child Welfare Director, before the Oregon State Legislature in February 2019.[11]  But in response to DHS' "struggle[]…around recruitment and retention of our child welfare staff throughout the state",[12] Defendant Governor Kate Brown signed into law a bill that lowers educational requirements for DHS caseworkers.[13] And as always, it is Oregon's foster children who will bear the burden of Defendants' perfunctory quick-fixes.

---

[8] Lauren Dake, *Oregon Sending Foster Children to Facilities Accused of Abuse*, OREGON PUBLIC BROADCASTING, Feb. 14, 2019, https://www.opb.org/news/article/oregon-foster-care-abuse/.

[9] Hillary Borrud, *Oregon foster care officials, lawmaker at odds over housing kids in converted juvenile jails*, THE OREGONIAN, April 26, 2019, https://www.oregonlive.com/politics/2019/04/oregon-foster-care-officials-lawmaker-at-odds-over-housing-kids-in-converted-juvenile-jails.html.

[10] Lauren Dake, *Oregon Sent Foster Children With Disabilities Out of State, Hearing Reveals*, OREGON PUBLIC BROADCASTING, April 24, 2019, https://www.opb.org/news/article/oregon-foster-care-children-disabilities-out-of-state/.

[11] *Relating to child welfare caseworkers: Hearing on H.B. 2033 Before the H. Comm. on Human Servs. and Hous.*, 2019 Leg., 80th Sess. 3 (2019) (statement of Marilyn Jones, Child Welfare Director, Dep't of Human Servs.), available at https://olis.leg.state.or.us/liz/2019R1/Downloads/CommitteeMeetingDocument/157766.

[12] *Relating to child welfare caseworkers: Hearing on H.B. 2033 Before the H. Comm. on Human Servs. and Hous.*, 2019 Leg., 80th Sess. 2 (2019) (statement of Marilyn Jones, Child Welfare Director, Dep't of Human Servs.), available at https://olis.leg.state.or.us/liz/2019R1/Downloads/CommitteeMeetingDocument/157766.

[13] Hillary Borrud, *Kate Brown signs lower caseworker degree requirements into law,* THE OREGONIAN, May 28, 2019, https://www.oregonlive.com/politics/2019/05/kate-brown-signs-lower-caseworker-degree-requirements-into-law.html. *See also* H.B. 2033, 2019 Leg., 80th Sess. (2019), available at https://olis.leg.state.or.us/liz/2019R1/Downloads/MeasureDocument/HB2033/Introduced.

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

Plaintiffs now seek class certification on behalf of a general class of foster children, and three subclasses, to redress the federal statutory and constitutional violations that are common practice in Oregon's child welfare system.

## II.    STATEMENT OF FACTS

Plaintiffs filed their Complaint on April 16, 2019. The Parties have since engaged in preliminary discovery. Defendants have produced approximately 220,000 pages of discovery to date, including nearly 100,000 pages of case files for the Named Plaintiff Children. Plaintiffs have deposed four Defendant representatives with knowledge of the SGM, ADA, and Aging Out populations, and Defendants' data practices. Plaintiffs retained social work experts, who reviewed the Named Plaintiff Children's files and highlighted common practices and policies.[14]  Plaintiffs retained experts in the SGM[15] and Aging Out[16] subclass populations, who highlighted common practices and policies. And Plaintiffs retained an expert in data practices related to child welfare systems who reviewed and analyzed Oregon's federal submissions to the Children's Bureau.[17] From preliminary discovery and Defendants' own admissions, it is abundantly clear that a number of Oregon's policies and practices expose children in Defendants' care to a substantial risk of harm.

### A.    OREGON'S FOSTER CARE SYSTEM HAS A LONG RECORD OF COMMON FAILURES.

The evidentiary record unequivocally demonstrates that DHS practices and policies expose the vulnerable children in its care to a substantial risk of harm, in violation of their constitutional and federal statutory rights, by (1) failing to maintain an adequate array of foster care placements,

---

[14] *See* Ex. 3, Declarations and Expert Report of Sue D. Steib, Ph.D., LCSW and Patricia Rideout, J.D. (Hereinafter referred to as "Steib and Rideout Report").

[15] *See* Ex. 4, Declaration and Expert Report of Bianca D.M. Wilson, Ph.D. (Hereinafter referred to as "Wilson Report").

[16] *See* Ex. 5, Declaration and Expert Report of Angelique Day, Ph.D., MSW. (Hereinafter referred to as "Day Report").

[17] *See* Ex. 6, Declaration and Expert Report of Alan M. Puckett, Ph.D. (Hereinafter referred to as "Puckett Report").

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main ᛫ (503) 778-5299 fax

both in number and type; (2) failing to engage in adequate and appropriate case planning; and (3) failing to maintain appropriate staffing, resulting in high caseloads and chronic understaffing.

The Named Plaintiffs' case files further demonstrate Defendants' common failures, and the resultant harms. Though the ten Named Plaintiff children entered foster care in different counties, for different reasons, and at different times, their case files reveal DHS failed them in the same ways. As Plaintiffs' experts Dr. Sue Steib and Patricia Rideout concluded from their case file review,[18] "[t]he documentation in the children's cases raises very serious concerns about DHS practice related to child placement. Every single plaintiff child experienced serious placement instability, and their experiences…portray a system that is critically deficient in its array of resources and practices necessary to serve high need children in out of home care and to provide them with [a] stable, healing placement experience."[19]   The reviewers also found that DHS "viewed [placing a child in a new home] largely as a matter of transportation rather than as the emotionally laden event that it is, in all cases, for the child."[20]

Plaintiffs' experts further observed that "caseworkers did not have clinical expertise, nor access to staff with that expertise, and were working within a system with very limited capacity to provide placement settings matched to the needs of these children"—suggesting that Oregon's foster care system "is without resources to support frontline staff."[21]   "Records repeatedly referred to extensive efforts made by caseworkers to find placements that resulted in only rejections based on capacity or inability to serve the needs of the child/youth", culminating in "ill-prepared," "under-resourced", and "inappropriate" placements.[22]

---

[18] The case files of Named Plaintiff children have not been produced with this Motion because they contain confidential information, are extremely voluminous, and are in Defendants' possession. Plaintiffs will produce these files in whichever format the Court requests.
[19] Ex. 3, Steib and Rideout Report, at 6.
[20] Ex. 3, Steib and Rideout Report, at 6.
[21] Ex. 3, Steib and Rideout Report, at 7.
[22] Ex. 3, Steib and Rideout Report, at 8.

Page 5 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

The harm posed by Defendants' system-wide practices and policies is well-recognized amongst professionals involved in Oregon's child welfare system. Amy Miller, the Executive Director of Youth, Rights & Justice ("YRJ"), has spent the last decade representing and advocating for Oregon's most vulnerable children. In her declaration in support of Plaintiffs' Motion for Class Certification,[23] Miller notes that "many of the allegations in the Complaint concerning [the treatment of] children in foster care accurately reflect my experience advancing the rights of children and their families throughout the child welfare system."[24] Her declaration also identifies a number of system-wide failures plaguing Oregon's child welfare system, including: "[c]hronic turnover among case workers"; the lack of timely assessments of children's medical, mental health, and social needs by trained evaluators; and the lack of appropriate foster homes, which "results in placement decisions being made on what is available rather than what is the least restrictive setting appropriate to meet a child's needs."[25]

The Named Plaintiff Children have suffered actual injuries that the General Class is similarly at substantial risk of suffering due to Defendants' common policies and practices. In the Ninth Circuit, that exposure to a substantial risk of harm establishes a constitutional injury.

**B.    DEFENDANTS' POLICIES AND PRACTICES EXPOSE NAMED PLAINTIFFS TO ACTUAL, SUBSTANTIAL HARM.**

The Named Plaintiffs' case records, produced by Defendants, demonstrate the actual injuries each child suffered as a result of Defendants' policies and practices. These actual injuries illustrate the harms every child in the General Class is at risk of suffering as a result of Defendants' policies and practices.

---

[23] The Declaration of Amy Miller in Support of Plaintiffs' Motion for Class Certification was filed concurrently with this Memorandum. (Hereinafter referred to as "Miller Dec.").
[24] Miller Dec., at 2.
[25] Miller Dec., at 4-5.

Page 6 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

### 1.    *Wyatt and Noah.*[26]

Wyatt and Noah are brothers who are now four and two years old. DHS removed the children after receiving 23 separate reports to the DHS hotline, alleging their parents were violent, neglectful, and used methamphetamine. DHS moved them through a variety of different foster homes, including one home that gave Noah the heart medication prescribed for Wyatt due to DHS' failure to provide written instructions— a potentially life-threatening error "demonstrat[ing] the haphazard nature of the casework services and placement preparation provided for these children". Many of the children's placements began and ended on the same day, or lasted a single night. DHS even claimed it was "unable to locate a suitable placement that could house both children in county or anywhere in the state of Oregon," and therefore, after three months in care, decided to separate the brothers. Wyatt celebrated his fourth birthday this past summer in his 16th foster home. Wyatt and Noah are members of the General Class.

### 2.    *Kylie and Alec.*[27]

Kylie and Alec are siblings who are now eight and nine years old. DHS removed the children in January 2019, after receiving multiple reports alleging their mother used methamphetamine. Both children tested positive for methamphetamine upon removal. During their first month in care, DHS moved these young children to six different placements. The children's CASA even made a formal complaint against DHS, stating that the children's foster parents received "no historical information about the children" and "did not even know their last names" when Kylie required hospitalization. DHS then sent eight-year-old Kylie to a residential treatment facility two hours away from her community and her brother, who was placed in a separate foster home. DHS failed to provide the foster family crucial information necessary for Alec's medical care, such as his prior exposure to methamphetamine. Kylie and Alec are members of the General Class.

---

[26] Ex. 3, Steib and Rideout Report, at 12-35.
[27] *See* Ex. 3, Steib and Rideout Report, at 36-55.

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

### 3. Bernard.[28]

Bernard is a sixteen-year-old transgender teenager who was the subject of nearly 50 reports to the DHS hotline throughout his childhood, alleging severe sexual abuse, physical abuse, and neglect. Mental health professionals found his mother to be "extremely troubled and possibly dangerous." DHS placed Bernard with his great-grandparents at age three, but both died before Bernard turned ten. Bernard then lived with his "highly unstable, abusive mother" for a full year without any intervention with DHS—despite DHS' awareness that the mother had sexually and physically abused her children, or at the least, allowed her partners to do so. After removing him from his mother's custody in November 2013, DHS exposed Bernard to "nearly constant instability". The case record reflects 21 different placements, including a number of residential treatment centers and a converted juvenile detention facility. Despite the fact that Bernard identifies as a male, DHS placed him in an all-girls facility where staff failed to respect his gender identity or use appropriate pronouns—prompting him to file a grievance against the staff. When Bernard was just 12, DHS changed his permanency goal to Another Planned Permanent Living Arrangement ("APPLA"), despite the fact that federal law prohibits APPLA as a goal for children younger than sixteen. Bernard is a member of the General Class, the ADA Subclass, the SGM Subclass, and the Aging Out Subclass.

### 4. Naomi.[29]

Naomi is a seventeen-year-old girl who was taken into foster care after DHS received at least 20 separate reports to its hotline. Her father was psychologically abusive, and once told her he would supply the razor blades if she would kill herself. DHS moved Naomi approximately 16 times in the span of seven months—including four emergency hospitalizations and seven stays in a youth homeless shelter. DHS also placed Naomi in a converted section of a facility for juvenile delinquents, where even child welfare residents were subject to lockdowns and strip searches. At

---

[28] See Ex. 3, Steib and Rideout Report, at 139-168.
[29] See Ex. 3, Steib and Rideout Report, at 169-184.

Page 8 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

one point, Naomi was also forced to remain in a psychiatric hospital longer than necessary because DHS was unable to find a therapeutic foster home that could meet her needs. A Citizens Review Board's analysis of Naomi's case found DHS failed to comply with mandates to "ensure that appropriate services are in place to safeguard the child's safety, health and well-being". In the words of the Citizens Review Board: "This is a larger, systemic issue." Naomi is a member of the General Class, the ADA Subclass, and the Aging Out Subclass.

### 5.  *Unique.*[30]

Unique is a ten-year-old child who first entered foster care as an infant, due to her mother's volatile behavior and mental health issues. Despite the fact that Unique's mother lost parental rights to Unique's older siblings as a result of those issues, DHS returned Unique to her mother's custody when she was only nine months old. DHS removed Unique again when she was seven years old. She was subsequently cycled through a variety of residential treatment programs, including spending almost six months at an out-of-state facility in Montana because "DHS failed to find anything suitable in Oregon." Unique, only nine, was subjected to multiple bodily restraints, seclusions, and, on some occasions "emergency medication" including injections of Benadryl meant to calm her behavior. Unique is a member of the General Class and the ADA Subclass.

### 6.  *Ruth.*[31]

Ruth is a sixteen-year-old girl. DHS removed Ruth and her brother in 2017 after their mother died of a drug overdose while Ruth's brother was sleeping in the same bed. DHS placed Ruth in numerous facilities, including a "hotel diversion bed" and an out-of-state residential facility in Iowa. Despite being a candidate for recruitment and development of a specialized therapeutic family setting, there is no evidence that DHS made any such efforts. Instead, Ruth's record demonstrates that decisions about where Ruth would live were based on availability rather

---

[30] *See* Ex. 3, Steib and Rideout Report, at 56-87.
[31] *See* Ex. 3, Steib and Rideout Report, at 106-138.

Page 9 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

4833-3216-3758v.3 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

than on any defined attributes of either the foster home or the provider agency that suggested the ability to meet her needs. Ruth is a member of the General Class, and the ADA Subclass.

### 7. Norman.[32]

Norman is an eighteen-year-old boy currently in his fourth stay in DHS custody. Norman experienced sexual abuse, neglect, and domestic violence as a child. His psychiatrist recommended that Norman would do best in a "therapeutic foster care placement in which he was the only child" and "would benefit immensely from the consistency and structure a solid and caring family could provide", adding that "a placement in a group home or some other type of institutional setting would likely lead to a regression." Despite these recommendations, DHS not only placed Norman in a regular foster home because there were no therapeutic beds available, but also bounced Norman between 12 different residential facilities in a 13-month period. DHS told one hospital that "DHS had not been able to locate a placement for [Norman] and he would be sleeping at the office on a couch if he was discharged." When Norman was barely 12, DHS changed his permanency goal to APPLA—suggesting, essentially, that DHS had given up on finding Norman a stable home or family. APPLA remained Norman's official permanency goal until 2017, "when it came to the court's attention that federal law did not allow this to be the plan for a fifteen-year-old." Less than a month after Norman turned sixteen, his plan was promptly changed back to APPLA. Norman will soon age out of care without the necessary supports or life skills to ensure his safety and well-being. Norman is a member of the General Class, the ADA Subclass, and the Aging Out Subclass.

### 8. Simon.[33]

Simon is a thirteen-year-old boy who has experienced three separate stays in foster care, due to repeated reports of physical abuse, sexual abuse, and neglect. Throughout his childhood, Simon has been the subject of 31 different reports to DHS. During his third stay in foster care,

---

[32] See Ex. 3, Steib and Rideout Report, at 185-222.
[33] See Ex. 3, Steib and Rideout Report, at 88-105.

Page 10 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

Simon spent extensive time in a residential treatment center located far away from his home and community. When doctors and staff at the facility deemed Simon ready for discharge to a less restrictive placement, DHS was unable to find a suitable placement to meet his needs. As a result, Simon spent an additional three months in the residential facility where he "became more anxious and frustrated". DHS then placed Simon in a hotel room with his grandmother for a ten-day "visit" while they attempted to locate an appropriate home. At the end of those ten days DHS had still failed to locate an appropriate placement for Simon and resorted to placing him with his grandmother – despite knowing the placement was inappropriate. The most recent documentation suggests that Simon is still without a stable placement, with DHS funding a temporary stay in a motel with his father. Despite being in foster care for many years, DHS does not have a clear plan to either return him to his family's care or find him another permanent living arrangement. Simon is a member of the General Class and the ADA Subclass.

## III.   LEGAL STANDARD OF REVIEW

In the Ninth Circuit, it is well-established that class certification is proper where, as here, class members seek to enjoin state defendants from violating their rights through statewide policies and practices that expose them to a substantial risk of harm. Indeed, only a few months ago, the Ninth Circuit affirmed the certification of a class of foster care children in state custody— essentially the same Plaintiffs as here—who alleged defendants violated their substantive due process rights by failing to care adequately for the children in the class—essentially the same claim made by Plaintiffs here. *See B.K. v. Snyder*, 922 F.3d 957 (9th Cir. 2019) (*"B.K."*). In affirming the class certification, the Ninth Circuit expanded upon its previous ruling in *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014), in which the court affirmed the certification of a class of prisoners who similarly challenged state policies and practices that exposed them to a substantial risk of harm while in state custody. The Plaintiffs here and the harms they seek to redress fit precisely within the precedent set by this Circuit, warranting class certification.

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

### A.    THE LEGAL STANDARD FOR CLASS CERTIFICATION.

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure. Class certification is permitted where the class meets the numerosity, commonality, typicality, and adequacy requirements of Fed. R. Civ. P. 23(a), and at least one of the requirements of Fed. R. Civ. P. 23(b). Plaintiffs seek class certification under Fed. R. Civ. P. 23(b)(2), which authorizes a class action if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

While "[a] plaintiff seeking class certification bears the burden of affirmatively demonstrating" compliance with Rule 23, "we have never equated a district court's 'rigorous analysis' at the class certification stage with conducting a mini-trial." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1003-04 (9th Cir. 2018). The Ninth Circuit has recognized class certification is a "tentative, preliminary, and limited phase." *B.K.*, 922 F.3d at 973. As such, "merits questions, while not irrelevant to the class certification inquiry, do not preclude certification as a matter of law unless proving the answer to a common question or crafting uniform injunctive relief will be impossible." *B.K.*, 922 F.3d at 973. "Notably, the evidence needed to prove a class's case often lies in a defendant's possession…And transforming a preliminary stage into an evidentiary shooting match inhibits an early determination of the best manner to conduct the action." *Sali*, 909 F.3d at 1004; *see also Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975) ("An extensive evidentiary showing of the sort requested by defendants is not required.").

Here, the putative classes—the General Class and the three subclasses—all meet the requirements of Rule 23.  Each class "is so numerous that joinder of all members is impracticable". Fed. R. Civ. P. 23(a)(1).  In their Complaint, Plaintiffs identify several "questions of law or fact common to the class", stemming from Defendants' conduct towards all Plaintiffs and thus capable of class-wide resolution. Fed. R. Civ. P. 23(a)(2).  Plaintiffs' due process and federal statutory allegations of system-wide deficiencies in Oregon's foster care system are "typical of the

Page 12 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

claims…of the class." Fed. R. Civ. P. 23(a)(3). The Named Plaintiffs and their counsel will continue to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). And lastly, Defendants have "acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). Plaintiffs' requested injunctive relief is aimed at correcting Defendants' conduct and therefore "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

### B.    THE NINTH CIRCUIT'S APPROVAL OF CLASS CERTIFICATION SUPPORTS CLASS CERTIFICATION HERE.

The plaintiffs in *B.K. v. Snyder* successfully sought certification of a General Class consisting of "[a]ll children who are or will be in the legal custody of [child welfare agency] due to a report or suspicion of abuse or neglect." *B.K.*, 922 F.3d at 965. Plaintiffs alleged the state's child welfare agency had statewide policies and practices that subjected class members to a substantial risk of harm, in violation of their constitutional rights; the district court identified a number of "statewide practices affecting the proposed General Class" such as failure to provide timely access to health care, the overuse of congregate care for children with unmet mental health needs, and excessive caseworker caseloads. *B.K.*, 922 F.3d at 969. The Ninth Circuit, in affirming the district court's certification of the General Class, found those statewide policies and procedures were "the 'glue' that holds the class together", such that "their constitutional[ity] can properly be litigated in a class setting." *Id. at* 969. Citing Parsons, the Ninth Circuit acknowledged "[w]e have previously recognized in the Eighth Amendment context that a state's policies and practices can expose all persons within its custody to a substantial risk of harm, which is the legal standard required by [plaintiffs'] due process claim." *B.K.*, 922 F.3d at 968. "The same reasoning applies here", confirmed the court: "the constitutionality of statewide policies and practices" is a "common question of law or fact that can be litigated in one stroke." *Id.* at 969 (internal quotations omitted).

*B.K. v. Snyder* is the most recent addition to a long line of cases finding constitutional claims on behalf of foster children appropriate for class treatment. Indeed, courts across the country have granted class certification where, as here, the plaintiff children allege constitutional violations

Page 13 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon 97201-5610
(503) 241-2300 main · (503) 778-5299 fax

due to systemic and structural issues in the foster care system.[34]  It is clear, therefore, that in the Ninth Circuit, as in others, actions asserting constitutional claims on behalf of foster children in state custody who challenge systemic state policies and practices are appropriate for class treatment.

### C. THE SUPREME COURT'S DECISION IN *WAL-MART STORES, INC. V. DUKES* SUPPORTS CLASS CERTIFICATION HERE.

In *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) (*"Wal-Mart Stores"*), the Supreme Court reversed class certification on behalf of "all women employed at any Wal-Mart domestic retail store at any time since December 26, 1998 who have been or may be subjected to Wal-Mart's challenged pay and management track promotions policies and practices." *Wal-Mart Stores*, 564 U.S. at 346. In "one of the most expansive class actions ever," plaintiffs purported to represent approximately 1.5 million women, claiming "the discretion exercised by their local supervisors over pay and promotion matters violate[d] Title VII by discriminating against women," and seeking backpay in addition to injunctive and declaratory relief. *Id.* at 342.  The Supreme Court found that because "[t]he crux of a Title VII inquiry is the reason for a particular employment decision", plaintiffs' claims challenged "literally millions of employment decisions at once. Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id.* (emphasis in the original).  What class certification requires is "a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 564 U.S. at 350. The plaintiffs in *Wal-Mart* had no such "common contention" because their gender discrimination claims asked *why* employment decisions were made—which is not a "yes" or "no"

---

[34] *See, e.g. Marisol A. by Forbes v. Giuliani*, 126 F.3d 372, 380 (2d Cir. 1997); *Baby Neal v. Casey*, 43 F.3d 48, 54 (3d Cir. 1994); *DG v. Devaughn*, 594 F.3d 1188, 1192 (10th Cir. 2010); *M.D. v. Abbott*, 907 F.3d 237, 271 (5th Cir. 2018).

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

question answerable in "one stroke"; "[w]ithout some glue holding together" plaintiffs' discrimination claims, class certification was inappropriate. *Wal-Mart Stores,* 564 U.S. 338 at 350-52.

*Wal-Mart* indeed directs class certification in actions like this one, where plaintiffs allege constitutional violations (which do not ask "why" but "whether") stemming from defendants' statewide policies and practices (which serve as "the glue" holding plaintiffs' claims together). Defendants opposing class certification in constitutional actions tend to argue that the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) changed the governing standards for class certification, or somehow otherwise made class certification more difficult to obtain.[35]   However, as post-*Wal-Mart* decisions from the Ninth Circuit and Oregon district courts alike demonstrate, the Supreme Court's holding did no such thing.

The plaintiffs in *Lane v. Kitzhaber*, 283 F.R.D. 587 (D. Or. 2012), for instance, sought to certify a class consisting of "all individuals in Oregon with intellectual or developmental disabilities" who were in, or were referred to, sheltered workshops; plaintiffs "challenge[d] defendants' system-wide policies, practices, and failures which have allegedly damaged all class members by unnecessarily segregating them in sheltered workshops," in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. *Lane*, 283 F.R.D. at 589-94. "Primarily relying on *Wal-Mart*," defendants argued class treatment was inappropriate because "resolution of this case will necessitate numerous fact-intensive, individualized inquiries in light of the differing types of disabilities and differing needs for employment services for each class member." *Lane*, 283 F.R.D. at 595.

The *Lane* court disagreed. "Unlike this case, *Wal-Mart* was a Title VII gender discrimination case in which the plaintiffs sought damages…In contrast, the Rehabilitation Act claims alleged in this case do not require proof of the intent behind the alleged discrimination, but instead rely on a denial of benefits to disabled persons." *Lane*, 283 F.R.D. at 595.  Therefore, "the

---

[35] *See, e.g. Lane*, 283 F.R.D. at 595; *Parsons*, 754 F.3d at 675-76.

Page 15 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

Title VII analysis in *Wal-Mart* is not closely on point." *Lane*, 283 F.R.D. at 595.  The *Lane* court concluded that "a class of disabled individuals seeking reasonable accommodation may be certified without the need for an individualized assessment of each class member's disability or the type of accommodation needed" and granted class certification. *Id.*

The defendants in *Parsons* also attempted to make a similar argument regarding *Wal-Mart's* effect on class certification standards: according to defendants, the "systemic constitutional violation" alleged by plaintiffs was really "a collection of individual constitutional violations, each of which hinges on the particular facts and circumstances of each case", and class certification was inappropriate because "*Wal-Mart* instructs that dissimilarities between class members impede the generation of common answers." *Parsons*, 754 F.3d at 675.

The court, again, disagreed: "Although the defendants assert that *Wal-Mart* prohibits class certification here, a comparison of *Wal-Mart* and this case strongly supports affirmance." *Parsons*, 754 F.3d at 681.  As the Ninth Circuit explained, *Wal-Mart* denied class certification for a proposed class of 1.5 million female employees challenging discretionary decisions made by managers in thousands of stores across the country.  *Parsons*, 754 F.3d at 681.  The court continued:

> This case is different than *Wal-Mart* in every respect that matters. It involves uniform statewide practices created and overseen by two individuals who are charged by law with ultimate responsibility for health care and other conditions of confinement in all ADC facilities, not a grant of discretion to thousands of managers. It involves 33,000 inmates in the custody of a single state agency, not millions of employees scattered throughout the United States. It looks to whether current conditions in ADC facilities create a risk of future harm, not to the varied reasons for millions of decisions made in the past. Whereas there may have been many answers in *Wal-Mart* to the question 'why was I disfavored?' here there is only a single answer to questions such as 'do ADC staffing policies and practices place inmates at a risk of serious harm?'

*Parsons*, 754 F.3d at 681. "It is therefore not surprising," the Ninth Circuit observed, that "in deciding analogous class certification motions since *Wal-Mart*, numerous courts have concluded that the commonality requirement can be satisfied by proof of the existence of systemic policies and practices that allegedly expose inmates to a substantial risk of harm." *Id.*

Page 16 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

The Supreme Court's ruling in *Wal-Mart* does not impede class certification here, but rather illustrates why class resolution of Plaintiffs' claims is particularly appropriate. This action, with approximately 8,000 class members, has far fewer putative class members than *Wal-Mart's* purported 1.5 million. Plaintiffs here seek injunctive relief, not monetary damages. This action brings constitutional claims—like those brought by the plaintiffs in *Parsons*—and ADA claims— like those brought by the plaintiffs in *Lane*, rather than claims requiring inherently individualized analysis, like the Plaintiffs' Title VII claims in *Wal-Mart*. As such, Plaintiffs' claims here are capable of resolution in "one stroke," as *Wal-Mart* requires, and are thus appropriate for class treatment.

## IV.   THE COURT SHOULD CERTIFY THE GENERAL CLASS AND ALL THREE SUBCLASSES BECAUSE PLAINTIFF CHILDREN MEET THE REQUIREMENTS OF RULE 23(A)

### A.   THE PUTATIVE CLASS IS SO NUMEROUS THAT JOINDER IS IMPRACTICABLE.

#### 1.   *The Numerosity Standard.*

To maintain a class action, the plaintiffs of each proposed class and subclass must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "In general, courts find the numerosity requirement satisfied when a class includes at least 40 members." *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010).

#### 2.   *Plaintiffs have satisfied the Numerosity Requirement.*

The General Class and each of the three subclasses easily satisfy the numerosity requirement. The General Class consists of approximately 8,000 children who are currently in the foster care custody of the Oregon Department of Human Services.[36] The ADA Subclass consists of thousands of children currently in foster care.[37] The Aging-Out Subclass consists of at least

---

[36] Ex. 5, Day Report, at 1.
[37] Ex. 6, Puckett Report, at 9-10.

Page 17 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

4833-3216-3758v.3 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

900 youth[38] and the SGM Subclass consists of approximately 400 youth.[39]  The General Class and each subclass far exceed 40 members, and therefore each satisfies numerosity.

Additionally, courts have noted that joinder is "impracticable" if class members potentially fear retaliation, causing reluctance to bring individual suits.  *See, e.g. Ganci v. MBF Insp. Servs.*, 323 F.R.D. 249, 256 (S.D. Ohio 2017); *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 485 (E.D. Cal. 2006).  Here, Defendants are not simply a state agency, but also each class member's legal guardian. And Defendants are no strangers to allegations of retaliation, as an Oregon jury just recently found in favor of two former caseworkers who claimed they were fired for speaking out against violations of DHS policy and state law.[40]  Plaintiffs' legitimate retaliation concerns make them unlikely to be willing to bring individual suits asserting their claims, and makes joinder particularly "impracticable".

### B.    THE PUTATIVE CLASSES AND SUBCLASSES SHARE COMMON QUESTIONS OF LAW AND FACT.

#### 1.    *The Commonality Standard.*

Commonality is met where "there are questions of law or fact common to the class". Fed. R. Civ. P. 23(a)(2).  "[E]ven a single common question will do."  *Wal-Mart*, 564 U.S. at 359 (internal quotations omitted). That "common contention…must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.  "Thus, where the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Parsons*, 754 F.3d at 675 (internal quotations omitted).

---

[38] Ex. 5, Day Report, at 1.
[39] Ex. 4, Wilson Report, Ph.D., at 6.
[40] Aimee Green, *Oregon jury awards $1.5 million, finds DHS fired 2 whistleblowers in retaliation*, THE OREGONIAN, Nov. 18, 2019, https://www.oregonlive.com/news/2019/11/oregon-jury-awards-15-million-finds-dhs-fired-2-whistleblowers-in-retaliation.html?outputType=amp&__twitter_impression=true.

Page 18 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

The Supreme Court has compared commonality to the "glue" holding together plaintiffs' claims. *See Wal-Mart*, 564 U.S. at 352. And as the Ninth Circuit has confirmed, "policies and practices which affect all members" of the class "are the 'glue'" where plaintiffs allege such policies and practices expose them to a substantial risk of harm. *Parsons*, 754 F.3d at 678; *see also Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) ("[I]n a civil-rights suit…commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members"). "[E]ither each of the policies and practices is unlawful as to every [class member] or it is not. That inquiry does not require us to determine the effect of those policies and practices upon any individual class member (or class members) or to undertake any other kind of individualized determination." *Parsons*, 754 F.3d at 678.

Indeed, in the foster care context, *B.K. v. Snyder* affirmed that "statewide policies and practices" such as failure to provide timely access to health care, overuse of congregate care for children with unmet mental needs, and excessive caseworker caseloads, were "the 'glue' that holds the class together." *B.K.*, 922 F.3d at 969. "[A]s in *Parsons*," either each of those policies and practices were unlawful as to every class member, or it was not. *B.K.*, 922 F.3d at 969. Here, Plaintiffs satisfy commonality here for the same reasons articulated in *B.K.* and *Parsons*. DHS' system-wide policies and practices place *all* members of the General Class and each subclass at substantial risk of harm, rendering it possible to resolve the litigation in a "single stroke."

Furthermore, it is well established that in civil rights actions challenging system-wide practices and policies that affect all class members, such as this one, "individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality." *Armstrong*, 275 F.3d at 868; *see also Rodriguez v. Hayes*, 578 F.3d 1032, 1048 (9th Cir. 2009) ("We have found the existence of shared legal issues with divergent factual predicates is sufficient") (internal quotations omitted). Thus, commonality may exist even "where the circumstances of each particular class member vary." *Parsons*, 754 F.3d at 675 (internal quotations omitted). This Court has confirmed that "as was the situation before *Wal-Mart*, despite

Page 19 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

the individual dissimilarities among class members, commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Lane*, 283 F.R.D. at 597.

While "class certification is not a decision on the merits," *B.K.*, 922 F.3d at 971, Plaintiffs submit ample evidence in support of this motion, confirming the existence of common policies, practices, and procedures that harm all class members or expose them to a substantial risk of harm. "Their constitutional[ity] can properly be litigated in a class setting", satisfying commonality. *Id.* at 969.

### 2. *There is substantial evidence of Commonality with respect to the General Class.*

The common questions of fact and law raised by the General Class, each of which alone satisfies the commonality requirement, and are capable of resolution in "one stroke" on a classwide basis, include the following:

- Whether Defendants fail to protect the General Class from physical, psychological, and emotional harm, and risk of harm;
- Whether Defendants operate a system that promptly and adequately assesses the individual needs of members of the General Class;
- Whether Defendants operate a system that adequately plans placements, treatment, and supports appropriate to the individual needs of the members of the General Class;
- Whether Defendants operate a system that provides an adequate diversity of placements to permit the members of the General Class to reside in the most integrated, least restrictive, and most family-like environment;
- Whether Defendants provide adequate case worker resources to ensure that members of the General Class can routinely meet with caseworkers face-to-face and engage in individual services;
- Whether Defendants' systemic failures violate Plaintiffs' substantive rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including exposing children to further neglect, abuse, and trauma by exposing them to unnecessary and too-frequent moves;
- Whether Defendants' systemic failures violate Plaintiffs' right to all reasonable efforts to achieve permanency, under the First, Ninth, and Fourteenth Amendments to the United States Constitution, including by separating them unnecessarily from their families, siblings, and moving them to isolated placements;
- Whether Defendants' systemic failures violate Plaintiffs' rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, including their right to placement in the least restrictive, most family-like home and their right to all reasonable efforts to achieve permanency.

Page 20 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

"[P]roof of the existence of systemic policies and practices" that expose class members to a "substantial risk of harm" satisfies the commonality requirement. *See Parsons*, 754 F.3d at 681. Here, Plaintiffs allege that Defendants' system-wide policies and practices expose all members of the General Class to a substantial risk of harm, in violation of their constitutional and federal statutory rights. Plaintiffs identify a number of Defendants' practices and policies that affect all members of the General Class, and which expose them to a substantial risk of harm, including:

### a.    Inadequate array of appropriate placements.

"Foster care is intended to provide safe, temporary homes for children and youth who must be removed from their families."[41]  There are more than 8,000 children in DHS' legal and physical custody who depend on DHS to provide them a safe and appropriate place to live after removal from their homes.[42]  Defendants are required to ensure that children "achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available," "in close proximity to the parents' home" and "consistent with the best interest and special needs of the child." *See* 42 U.S.C. § 675(5)(A); 42 U.S.C. § 622(b)(8)(A)(iii).  But for years, reports and audits have confirmed what Defendants know to be true: that Defendants consistently fail in their most fundamental duty as caregiver to these children—providing them a safe and adequate place to live.  The number and array of foster placements available in Oregon are a direct function of Defendants' policies and practices related to identifying and maintaining foster placements. Whether such policies and practices expose members of the General Class to a substantial risk of harm is a common question of law and fact, capable of resolution in "one stroke" on a classwide basis—and thus meets the commonality requirement.

Discovery yielded a number of DHS policies, applicable statewide, related to the matching of children to safe and appropriate placements.  DHS' policy on Placement Assessment and Matching, for instance, requires DHS staffers to evaluate the appropriateness of a placement on a

---

[41] Ex. 6, Puckett Report, at 6.
[42] Ex. 6, Puckett Report, at 3.

Page 21 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

variety of factors, including the extent to which a placement meets the child's needs for physical and emotional safety, stability, and continuity.[43]    DHS staffers must consider whether the placement "has expressed a desire to provide permanency", and determine whether a placement "demonstrates competency in meeting the specific and unique needs of the child" for "educational, developmental, emotional, and physical support."[44]

But in Oregon, as in *Parsons*, "despite [Defendants'] stated policies," crucial placement decisions are in fact made based on availability, rather than based on the children's needs, due to Defendants' statewide failure to maintain an adequate number and array of foster placements.  *See Parsons v. Ryan*, 289 F.R.D. 513, 520-21 (D. Ariz. 2013). And as in *Tinsley v. McKay*, Defendants' policies and practices related to "capacity and array of placements" constitute "systemic problems."  *See Tinsley v. McKay*, 156 F. Supp. 3d 1024, 1037-38 (D. Ariz. 2015).

The systemic nature of Defendants' failure to maintain an adequate placement array is well-documented by reports and audits, as is Defendants' awareness of those failures.  The 2016 Child and Family Services Review report on the Oregon foster care system, for example, found that a "shrinking pool of foster homes has led to the inability to consistently match placement options with the needs of children entering foster care," and noted that, [d]ue to this shortage of foster homes, placement decisions appear to be driven…by foster home availability rather than the needs of the child."[45]    A 2016 Public Knowledge report, addressed to Defendant Governor Brown, similarly stated that "Oregon's placement capacity, especially for children and youth with high needs is inadequate to meet the demand", adding that "[m]ultiple recent reports and reviews have found this to be the case."[46]

Defendants are aware, and have even admitted, that children are often placed in inappropriate or unsafe settings due to lack of foster placements. According to the Secretary of

---

[43] Ex. 7, at Wyatt_DHS_0059631, 697-699 (OAR Ch. 413, Division 70 – Substitute Care).
[44] Ex. 7, at Wyatt_DHS_0059631, 697-699 (OAR Ch. 413, Division 70 – Substitute Care).
[45] Ex. 8, at Wyatt_DHS_0062317, 321-322 (2016 CFSR).
[46] Ex. 9, at Wyatt_DHS_0057414, 433 (2016 Public Knowledge Report).

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

State's 2018 audit of Oregon's child welfare system, "[t]he supply of suitable foster homes and treatment facilities for these children is falling, leaving children entering foster care with increasingly limited placement options.  At times, these options are inappropriate and even unsafe."[47]  Indeed, DHS too often places children in improperly utilized temporary placements, such as homeless shelters,[48] emergency rooms,[49] refurbished delinquency facilities,[50] and inappropriate institutional care settings.[51] Amy Miller, the Executive Director of Youth, Rights & Justice, similarly notes that in her personal experience representing and advocating for vulnerable Oregon children, "the placement of foster children in temporary placements such as hotels and in institutional, out-of-state facilities has grown dramatically from 2008 to present."[52]  In Miller's experience, children are "inappropriately placed in overly restrictive placements, far from their families and their communities", as well as in "inappropriate programs"—such as a child victim of sex abuse placed in a program that treats *perpetrators* of sexual abuse.[53]  Plaintiffs' experts Dr. Steib and Patricia Rideout also found evidence of this practice in their case record review, noting that, "[r]esidential placement seems to be used out of desperation, because of the lack of family-based specialized foster care."[54] Named Plaintiff Kylie's case record illustrates as much. Kylie was only eight years old when she was placed in a residential facility. Yet Plaintiffs' expert, Patricia Rideout, observes that, "[n]owhere in the case record…is there any reflection of a concern that Kylie was far too young, at age 8, for a facility."[55]  She adds that: "[it] is my strongly held

---

[47] Ex. 1, at Wyatt_DHS_0059767, 781 (Jan. 2018 Secretary of State Audit).
[48] Ex. 10, at Wyatt_DHS_0010631, 638 (BRS Grid) (Lists "Boys & Girls Aid/Safe Place" e.g., a homeless shelter).
[49] Ex. 9, at Wyatt_DHS_0057414, 431 (2016 Public Knowledge Report).
[50] Ex. 11, at Wyatt_DHS_0000095, 097 (DHS Response to Sen. Gelser's Questions).
[51] According to a May 2019 DHS report on identifying capacity needs "up to an additional 6% of children"—approximately 480 children—"could be successfully served in a foster care setting." Ex. 12, at Wyatt_DHS_047768, 789 (2019 ORRAI Report).
[52] Miller Dec., at 2-3.
[53] Miller Dec., at 5-6.
[54] Ex. 3, Steib and Rideout Report, at 8.
[55] Ex. 3, Steib and Rideout Report, at 54.

Page 23 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

4833-3216-3758v.3 0201450-000001

professional opinion that no child of Kylie's tender age should be placed in a congregate care setting…Therefore, it's my opinion that Oregon DHS is clearly deficient in its duty to ensure levels of care, especially for younger children, that can support their special emotional and behavioral needs within family settings."[56]

Defendants themselves recognize that Oregon's child welfare system is "a system within which children and youth languish in inappropriate settings such as emergency departments and institutions."[57] DHS' Oregon Child and Family Services Plan also concedes DHS "struggles with appropriate placement matching due to the complexities of children's needs and the limited capacity of the number of providers…there are times when homes are not available for children with complex behavioral or health care needs."[58] Defendant Fariborz Pakseresht testified before the Oregon State Legislature in April 2019 that "one of the challenges that we have currently because of lack of capacity…we may place a youth in a facility or…foster home that is not the best match."[59]

Defendants' failure to maintain an adequate number and array of placements also exposes children to the risk of placement instability. In the words of Plaintiffs' expert Dr. Puckett: "Stability of foster care placements is essential to healthy development and for prospects of finding safe, permanent homes for children and youth in foster care…Frequent or excessive transitions between placement settings can be jarring and disruptive to children's emotional health and may leave them anxious, fearful and unable to form and benefit from potential supportive relationships."[60] However, Dr. Puckett's analysis of Oregon's AFCARS data "shows that

---

[56] Ex. 3, Steib and Rideout Report, at 55.
[57] Ex. 13, at Wyatt_DHS_0062790 (2018 Task E Project Status Summary).
[58] Ex. 14, at Wyatt_DHS_0062138, 190 (CFSP 2015-2019).
[59] *Placement of Foster Youth in Refurbished Juvenile Detention Facilities: Informational Meeting Before the S. Comm. on Human Services*, 2019 Leg., 80th Sess. (2019) (statement of Fariborz Pakseresht, Director, Department of Human Services), available at http://oregon.granicus.com/MediaPlayer.php?clip_id=8cdf2e98-be58-4b5f-a896-bd0f7cf95406&meta_id=92ac1976-68cc-4ff0-8085-3f6c742595ab.
[60] Ex. 6, Puckett Report, at 10.

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

substantial numbers of children and youth in the DHS foster care system experience placement changes with excessive frequency and have multiple placements while in care."[61]

Dr. Puckett found that "[a]mong 8719 children and youth who spent at least one day in Oregon's foster care system during the period October 1st, 2018 to March 31, 2019, more than 3000, or about 36% of those in care during this 6-month period, experienced 3 or more placements."[62]  Troublingly, 61 children and youth had been in 20 or more placements, and one had been in 40 different placements.[63]  Dr. Puckett attributed the high levels of placement instability in part "to the state's well-documented difficulty recruiting and retaining qualified home providers in geographic areas throughout the state at levels required to support placement matching based on the child's or youth's needs."[64]

Despite Defendants' awareness of their failure to maintain adequate placement arrays, Defendants continue to fail to recruit and retain the appropriate number and type of foster homes. A follow-up to the 2018 Secretary of State audit, published only a few months ago, states that "[t]he ongoing lack of appropriate foster placements in Oregon is a serious risk to the safety and wellbeing of children in the foster system," adding that "the total number of foster homes has actually fell [sic] by 137 since our audit."[65]  As the 2018 audit concluded, "DHS management has not prioritized foster care recruitment and retention, which has contributed to a steep decline in career foster homes that serve the majority of Oregon's foster children."[66]

Whether Defendants' statewide failure to recruit and retain an adequate array of appropriate foster placements exposes all children in Oregon's foster care system to a substantial risk of harm is a common question of law and fact suitable for class treatment, and thus satisfies commonality.

---

[61] Ex. 6, Puckett Report, at 16.
[62] Ex. 6, Puckett Report, at 10.
[63] Ex. 6, Puckett Report, at 10.
[64] Ex. 6, Puckett Report, at 10-11.
[65] Ex. 15, at Wyatt_DHS_0061108, 119 (June 2019 Follow-up Audit).
[66] Ex. 1, at Wyatt_DHS_0059767, 794 (Jan. 2018 Secretary of State Audit).

Page 25 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

### b.    Lack of appropriate case planning.

All children who enter foster care in Oregon are supposed to receive a case plan. Caseworkers are required to develop case plans to identify children's needs and arrange for the services and supports necessary to meet those needs. Proper case planning is essential for the safety and well-being of all children, but is especially significant for the most vulnerable children, such as the class members that make up the ADA Subclass, the SGM Subclass, and the Aging Out Subclass. Indeed, proper case planning can help avoid placement instability, aid in achieving timely permanency, and ensure that services are appropriately tailored to children's needs.

Defendants' policies and procedures concerning case planning may look good on paper— but as Plaintiffs allege and as experts' review of case files demonstrates, what happens on paper and how DHS actually operates are very different. As the 2016 Public Knowledge report noted, "DHS is not able to adequately put this policy into practice."[67]  And in the words of Plaintiffs' expert Dr. Alan Puckett: "Case plans and permanency goals are not 'just paperwork', but provide essential documentation and guidance to help assure that children and youth who enter foster care are placed in appropriate settings and do not remain in care for unreasonable lengths of time."[68]

DHS policy states, for instance, that a caseworker must develop a case plan within 60 days of a child's removal from home, or the completion of a CPS assessment where the child remains in home.[69]  But only 26% of children actually received such a case plan within that timeframe, according to DHS' 2017 Annual Progress & Service Report.[70]  DHS' 2019 Annual Progress & Service Report suggests that figure is slipping with time, as the most recent numbers indicate that only 11% of children receive a timely case plan, with only 9.9% receiving a timely case plan

---

[67] Ex. 9, at Wyatt_DHS_0057414, 432 (2016 Public Knowledge Report).

[68] Ex. 6, Puckett Report, at 9.

[69] Ex. 16, at Wyatt_DHS_0059513, 515 (OAR 413-040-0010 Case Management – Service Plans).

[70] *State of Oregon Department of Human Resources, Office of Child Welfare Programs, Annual Progress & Service Report* (2017), available at https://www.oregon.gov/DHS/CHILDREN/Documents/oregon-apsr-2016-2017.pdf.

Page 26 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

4833-3216-3758v.3 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

related to treatment or permanency.[71]  DHS policy also requires case plans include the identified needs of the child and make appropriate and timely referrals to services and service providers.[72] But children in the Oregon foster care system are not being connected with those services or service providers in a timely and appropriate manner, because too often children are not receiving timely evaluations to identify which services are necessary.  According to DHS' 2017 Annual Progress & Service Report, only 44% of children received an evaluation for emotional and behavioral health needs within 60 days,[73] and 37% of children never had their needs assessed at all.[74]

Information obtained through discovery demonstrates that inadequate case planning is indeed a systemic issue in Oregon's child welfare system. Defendants routinely approve case plans that disregard all reasonable professional case-planning standards. A review of Oregon's Adoption and Foster Care Analysis and Reporting System ("AFCARS") data by Dr. Puckett "shows several points at which DHS records list case plan goals inappropriate to the facts in the case, or show that the agency has failed to meet case plan or permanency plan timelines."[75]  His AFCARS review indicates, for instance, that 916 children and youth in care for sixty days or longer as of March 31, 2019 have no established case plan goal—a number that represents more than 10% of the total DHS foster population. More than 16% of the total population had been in care for over two years without a termination of parental rights ("TPR") granted against either parent.[76]  Almost 9% of children who had been granted TPRs against both parents had the inappropriate case plan goal of "reunification."[77]  Further, of the 430 children who had been removed from their original homes

---

[71] Ex. 17, at Wyatt_DHS_0062358, 437 (DHS 2019 Annual Progress and Service Report).
[72] Ex.16, at Wyatt_DHS_0059513 (OAR 413-040-0010 Case Management – Service Plans).
[73] *State of Oregon Department of Human Services, Office of Child Welfare Programs, Annual Progress & Service Report* (2017), available at https://www.oregon.gov/DHS/CHILDREN/Documents/oregon-apsr-2016-2017.pdf.
[74] *State of Oregon Department of Human Services, Office of Child Welfare Programs, Annual Progress & Service Report* (2017), available at https://www.oregon.gov/DHS/CHILDREN/Documents/oregon-apsr-2016-2017.pdf.
[75] Ex. 6, Puckett Report, at 8.
[76] Ex. 6, Puckett Report, at 8.
[77] Ex. 6, Puckett Report, at 8.

Page 27 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

three or more times, 187 had the inappropriate case plan goal of "reunification."[78]  As Dr. Puckett concluded: "The numbers of cases shown…to have incomplete case plans, inappropriate or missing permanency plan goals and unmet clinical assessment timelines indicates that substantial numbers of children and youth in the DHS foster care system do not receive timely, appropriate care, may be placed in settings which could be unsafe or otherwise do not support healthy development and positive well-being outcomes, and may experience needless delay in progressing to safe, permanent homes."[79]  Dr. Steib and Patricia Rideout also highlighted DHS' lack of appropriate case planning, adding that "[p]ermanency planning was generally poor and reflected a system that was focused more on short-term crises than on long-term planning for permanency."[80]

Policies mean little if they are not consistently and uniformly enforced. In May 2018, DHS randomly surveyed a group of Child Welfare staff on their use of the Child Welfare Procedure Manual.[81]  Only 32% of staff surveyed agreed that "the procedure manual aligns with current policies and/or rules."[82]  Telling observations from those sampled include "I feel like many people have never heard of [the procedure manual]" and "I do not use it much; no one ever really encouraged me or suggested I use or refer to it."[83]

Defendants may promulgate any number of case-planning rules, but as Plaintiffs have alleged and demonstrated, in Oregon proper case planning is the exception, not the rule. Because every class member, including every member of each subclass, should receive a case plan, every class member is at substantial risk of harm by Defendants' actions and inaction in ensuring adequate case-planning.  Whether Defendants' policies and practices related to case-planning exposes children to a substantial risk of harm, in violation of their constitutional rights, is a common question of law and fact that satisfies the commonality requirement.

---

[78] Ex. 6, Puckett Report, at 8.
[79] Ex. 6, Puckett Report, at 9.
[80] *See* Ex. 3, Steib and Rideout Report, at 9.
[81] Ex. 18, at Wyatt_DHS_0062979, 980 (Employee Survey re: Manual).
[82] Ex. 18, at Wyatt_DHS_0062979, 991 (Employee Survey re: Manual).
[83] Ex. 18, at Wyatt_DHS_0062979, 993 (Employee Survey re: Manual).

Page 28 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

c.      **High caseloads and chronic understaffing.**

All children who enter foster care in Oregon are assigned a caseworker. Caseworkers are "assigned primary responsibility" for children in Defendants' care,[84] including "conduct[ing] child abuse investigations" and "mak[ing] determinations regarding the protective custody of children."[85]   But in Oregon, caseworkers are chronically overworked and understaffed, to the detriment of Oregon children's safety and well-being. Oregon's severe staffing shortages and excessive caseworker workloads are the product of Defendants' hiring, training, and retention policies and practices.  The number of caseworkers Defendants hire, train, and retain necessarily and directly impacts each caseworker's respective workload. And because Defendants fail on a system-wide level to ensure caseworkers only carry reasonable and safe workloads, caseworkers are left overburdened and often unable to adequately fulfill their vital duties—duties like investigating child abuse and making custody decisions that have enormous consequences on a child's safety and well-being.   In *B.K. v. Snyder*, the Ninth Circuit determined that "excessive caseworker caseloads" were one of the many "statewide practices" affecting class members, and thus satisfying commonality.   Here, as in *B.K. v. Snyder*, whether Defendants' policies and practices related to the hiring, training, and retention of caseworkers expose all class members to a substantial risk of harm is a common question of law and fact that satisfies the commonality requirement.

In February 2019, former Child Welfare Director Marilyn Jones testified before the House Human Services and Housing Committee and admitted "[o]ne of the areas that we have struggled with has been around recruitment and retention of our child welfare staff throughout the state."[86] Her admission echoes findings from a January 2018 Secretary of State Audit, which confirmed

---

[84] Ex. 19, at Wyatt_DHS_0059962, 968 (Chapter 413, Division 015 – Child Protective Services).
[85] H.B. 2033, 2019 Leg., 80th Sess. (2019), available at https://olis.leg.state.or.us/liz/2019R1/Downloads/MeasureDocument/HB2033/Introduced.
[86] *Relating to child welfare caseworkers: Hearing on H.B. 2033 Before the H. Comm. on Human Servs. and Hous.*, 2019 Leg., 80th Sess. 3 (2019) (statement of Marilyn Jones, Child Welfare Director, Dep't of Human Servs.), available at https://olis.leg.state.or.us/liz/2019R1/Downloads/CommitteeMeetingDocument/157766.

Page 29 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

"[c]hild welfare workers are burning out and consistently leaving the system in high numbers", but "DHS and child welfare managers have not strategically addressed severe and chronic caseworker understaffing."[87]  According to the 2018 audit, Defendants, for example, "failed to provide the Legislature with accurate staffing data for funding and decision making."[88]  They "oversaw installation of a faulty case management computer system that leaves caseworkers with inadequate information" and "takes more time than the prior system to do the same work."[89]  And despite serious understaffing concerns, they hold "150 field positions vacant every year for budgeting purposes."[90]

Fewer caseworkers mean, of course, larger caseloads. DHS Deputy Child Welfare Director, Defendant. Jana McLellan, claimed at her deposition that DHS maintained caseload standards for caseworkers at "15 to 1."[91]  Only a few minutes later, McLellan asserted that "district managers and branch managers do manage individual caseloads…and that is not tied back to a central office oversight. We give that responsibility for the managing of our cases to the district managers and their program managers or branch managers."[92]  But over a month later, Defendants informed Plaintiffs through supplemental deposition testimony that Defendant McClellan's testimony had changed: "I previously testified that DHS has a caseload standard of 15 family cases to every one caseworker for in-custody cases. This was inaccurate. Based on my subsequent research after the deposition, I am now aware that DHS does not have a caseload limited standard by statute, regulation, or policy."[93]

Defendants' caseload admissions comport with the 2018 audit's findings. According to that audit, "DHS does not have accurate numbers on caseloads."  Further, "[r]eported caseloads are

---

[87] Ex. 1, at Wyatt_DHS_0059767, 769 (Jan. 2018 Secretary of State Audit).
[88] Ex. 1, at Wyatt_DHS_0059767, 781 (Jan. 2018 Secretary of State Audit).
[89] Ex. 1, at Wyatt_DHS_0059767, 785 (Jan. 2018 Secretary of State Audit).
[90] Ex. 1, at Wyatt_DHS_0059767, 810 (Jan. 2018 Secretary of State Audit).
[91] Ex. 20, Jana McLellan Dep. Tr., 72:06-73:11.
[92] Ex. 20, Jana McLellan Dep. Tr., 90:19-90:25.
[93] Ex. 21, Defs.' Rule 30(b)(6) Data Topics Deposition Supplemental Testimony, at 17.

Page 30 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

three to four times higher than what is optimal", such that "[m]any caseworkers are struggling to have meaningful visits with children under their supervision even once a month, the bare minimum."[94]   Those high caseloads "are generating a continuous negative cycle"—because caseworkers are "having to handle unsafe situations alone, adequate training has been slow to develop, and busy supervisors are not able to adequately support staff", turnover is high, which adds to the workload of remaining staff.[95]   Newer staff are forced to take on full caseloads, "even though many have not been through the recommended 18-month training period."[96]   Indeed, about one-third of Oregon caseworkers are still in their first 18 months on the job—which is alarming considering that "[n]avigating even relatively straightforward cases requires a high degree of familiarity with DHS policy and practice, local courts, local and regional public services, schools, and mental health and health care providers."[97]

Ultimately, the 2018 audit found that "Oregon's child welfare system is critically understaffed, turnover and overtime are high, and an inexperienced workforce is taking on heavy caseloads, increasing the risks of child endangerment."[98]   For example, "[h]igh caseloads and high turnover can negatively affect children during initial investigations and as caseworkers try to build relationships with parents, children, and foster care providers."[99]   The audit pointed out that caseworkers are responsible for investigating reports of abuse or neglect, where "[m]iscalculations can lead to children being left in dangerous home situations, removed inappropriately, or placed in inappropriate foster homes or residential centers. The wrong decision can lead to further trauma for the children, and in some cases, endanger their lives."[100]   Caseworkers are also responsible for finding appropriate placements, which "requires time and a thoughtful approach"; however, "[i]n

---

[94] Ex. 1, at Wyatt_DHS_0059767, 781, 809, 811 (Jan. 2018 Secretary of State Audit).
[95] Ex. 1, at Wyatt_DHS_0059767, 815 (Jan. 2018 Secretary of State Audit).
[96] Ex. 1, at Wyatt_DHS_0059767, 815 (Jan. 2018 Secretary of State Audit).
[97] Ex. 1, at Wyatt_DHS_0059767, 818 (Jan. 2018 Secretary of State Audit).
[98] Ex. 1, at Wyatt_DHS_0059767, 809 (Jan. 2018 Secretary of State Audit).
[99] Ex. 1, at Wyatt_DHS_0059767, 820 (Jan. 2018 Secretary of State Audit).
[100] Ex. 1, at Wyatt_DHS_0059767, 821 (Jan. 2018 Secretary of State Audit).

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

Oregon's system, high caseloads reduce the amount and quality of time caseworkers can spend evaluating their cases. This increases the risk of making wrong decisions."[101]

Every class member has a caseworker upon whom they depend to plan for their future and keep them safe. Defendants' failure to support, train, and retain caseworkers increases "the risk of making wrong decisions" in all class members' cases. Defendants' system-wide policies and practices place all children in Oregon's child welfare system at a substantial risk of harm, raising common questions of law and fact and therefore satisfying the commonality requirement.

### 3. *There is substantial evidence of Commonality with respect to the ADA Subclass.*

The common questions of fact and law raised by all members of the ADA Subclass, each of which *alone* satisfies the commonality requirement for the ADA Subclass, and are capable of resolution in "one stroke" on a classwide basis, include the following:

- Whether Defendants deprive Plaintiffs of the ADA Subclass necessary and appropriate services and treatment to make them as able as their non-disabled peers to access an array of community-based placements and services to ensure access to the least restrictive environment;
- Whether Defendants have a practice of unnecessarily placing youth with disabilities into institutional settings and denying them access to community-based treatment;
- Whether Defendants have a practice of failing to build and maintain an adequate infrastructure of mental health providers and other therapeutic service providers capable of meeting the needs of ADA Subclass members.

Plaintiffs allege that all members of the ADA Subclass are exposed to a substantial risk of harm as a result of Defendants' policies and practices, in violation of their rights under the Constitution and the ADA. Whether Defendants' policies and practices expose the ADA Subclass, as a whole, to a substantial risk of harm, is a common question of law and fact that may be answered in "one stroke" on a classwide basis, and thus satisfies commonality. It is worth noting that "in almost every case involving a challenge under Title II of the ADA and/or Section 504 of the Rehabilitation Act to discriminatory governmental policies and practices, courts have certified a class." *Lane*, 283 F.R.D. at 595.

---

[101] Ex. 1, at Wyatt_DHS_0059767, 821 (Jan. 2018 Secretary of State Audit).

Page 32 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

Federal law forbids child welfare agencies from discriminating against children with disabilities.[102]  The United States Department of Health and Human Services ("DHHS") and the United States Department of Justice ("DOJ") specifically require that children with disabilities be provided with meaningful and equal access to *all* child welfare services, programs, and activities, including assessments, case planning and service planning, provision of in-home services, and foster care.[103]  As mandated by law, DHS policies conform with the requirements of the ADA. In reality, however, Defendants' statewide practices routinely violate the rights of children in the ADA Subclass by failing to adequately assess their needs, engage in appropriate case planning, maintain placement arrays with sufficient therapeutic options to meet their needs, or provide timely and adequate access to medical, behavioral, mental and other health services.

Children with disabilities are particularly vulnerable and face heightened risks within the child welfare system. According to the DHHS, they are at least three times more likely to be abused or neglected than their peers without disabilities and they are more likely to experience sexual abuse due to placement in isolating environments that allow easy access by others, like group homes, residential facilities, and hospitals.[104]  In Oregon, Plaintiffs' expert Dr. Puckett further notes that "[c]hildren and youth with diagnosed disabilities re-enter Oregon's foster care system at notably higher rates than those without disabilities."[105]

Protecting children with disabilities begins with a timely and thorough assessment of their needs; according to the DHHS and DOJ, "[t]he child welfare agency's obligation to ensure

---

[102] 42 U.S.C. § 12132.

[103] *U.S. Dep't of Health & Human Servs., U.S. Dep't of Justice, Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act* (August 2015), available at https://www.ada.gov/doj_hhs_ta/child_welfare_ta.html#_ftnref12.

[104] *Children's Bureau, U.S. Dep't of Health & Human Servs., The Risk and Prevention of Maltreatment of Children with Disabilities*, at 1 (Jan. 2018) available at https://www.childwelfare.gov/pubPDFs/focus.pdf.

[105] Ex. 6, Puckett Report, at 17.

Page 33 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

individualized assessments applies at the outset and throughout any involvement that an individual with a disability has with the child welfare system."[106]  The ADA requires that "assessments be individualized"; "[a]n individualized assessment is a fact-specific inquiry that evaluates the strengths, needs, and capabilities of a particular person with disabilities based on objective evidence, personal circumstances, demonstrated competencies, and other factors that are divorced from generalizations and stereotypes regarding people with disabilities."[107]

Despite those federal mandates, Defendants systematically fail to conduct timely and adequate needs assessments for children with disabilities. Documents produced by Defendants confirm as much. A DHS report prepared in May 2019 indicates that 30% of children in foster care have "high needs" behaviorally, with another 10% of children having "high" medical needs,[108] which amounts to approximately 3,000 children.[109]  And yet, according to DHS, there were only 598 children in foster care with a diagnosed disability as of May 2019,[110] indicating that only about 6% of foster children have diagnosed disabilities.[111]

Preliminary data analysis of Defendants' AFCARS data by Plaintiffs' expert Dr. Alan Puckett further indicates that 790 children in foster care have *no record* of clinical assessment by a qualified professional.[112]  In Dr. Puckett's expert opinion, "Oregon's apparent failure to

---

[106] U.S. Dep't of Health & Human Servs., U.S. Dep't of Justice, *Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act* (August 2015), available at https://www.ada.gov/doj_hhs_ta/child_welfare_ta.html#_ftnref12.

[107] U.S. Dep't of Health & Human Servs., U.S. Dep't of Justice, *Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act* (August 2015), available at https://www.ada.gov/doj_hhs_ta/child_welfare_ta.html#_ftnref12.

[108] Ex. 11, at Wyatt_DHS_0047768, 774 (2019 ORRAI Report).

[109] Ex. 22, at Wyatt_DHS_0047825, 854 (Children in Foster Care by Caseworker on 05/31/2019).

[110] Ex. 23, at Wyatt_DHS_0047855 (Confirmed Disability Diagnosis on 05/31/2019).

[111] Ex. 6, Puckett Report, at 9.

[112] Ex. 6, Puckett Report, at 9.

Page 34 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

consistently complete required clinical assessments on a timely basis for the highly vulnerable population of children and youth who enter foster care makes it likely that DHS is failing to identify and provide appropriate services for some individuals with disabilities, may as a result place such individuals in settings inappropriate to their needs and best interests, and may keep children and youth with disabilities in care for longer periods of time than is appropriate based on their needs."[113]  Defendants' failure to assess and diagnose children with disabilities not only violates the ADA, but also exposes *all* children with disabilities to a substantial risk of harm in violation of their constitutional rights.

Defendants' policies and practices related to placement array also place *all* members of the ADA Subclass at a disproportionately substantial risk of harm. Defendants acknowledge that they are "responsible for securing appropriate placements for children and youth with high needs and assuring timely discharge."[114]  But Defendants have consistently failed to maintain a sufficient number of foster homes and residential placements to meet the needs of foster children with disabilities.  The 2018 audit found that "[w]ith limited appropriate placement options available, some of Oregon's highest need children are moved from place to place and sometimes end up housed by DHS in hotels because there is nowhere else for them to go."[115]  The June 2019 follow-up report further found that "[m]ore high-needs children are being placed in out-of-state facilities and repurposed juvenile detention facilities than in previous years," a result of "declining residential treatment options in Oregon for children with high needs."[116]  Those conclusions are corroborated by data produced by Defendants: children with disabilities are significantly overrepresented in congregate care settings, experience more placements on average than the general population, and spend more than twice as much time in care.[117]

---

[113] Ex. 6, Puckett Report, at 9.
[114] Ex. 1, at Wyatt_DHS_0059767, 835 (Response to 2018 Audit, produced at end of audit).
[115] Ex. 1, at Wyatt_DHS_0059767, 794 (Jan. 2018 Secretary of State Audit).
[116] Ex. 15, at Wyatt_DHS_0061108, 119 (June 2019 Follow-up Audit).
[117] Ex. 24, at Wyatt_DHS_0030960. (Exhibit 24 is a data file that has not been produced with this Motion for Class Certification because it contains confidential information, is extremely

Page 35 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

Defendants are well-aware of their failure to maintain enough safe and appropriate placements for children with disabilities. Defendant Governor Kate Brown testified before the Senate Committee on Human Services only a few months ago, admitting that children with specialized needs "all too often" are "shuffled around the system in settings that are not conducive to healing…living in hotels, or sleeping in detention centers."[118]    Some children, she acknowledged, are "forced to spend weeks at a time in our emergency rooms" or are sent for treatment "hundreds, or even thousands, of miles away."[119]  Defendants admitted that "[t]he placement of children/youth in Oregon has been primarily dictated by bed availability, with limited recognition of a child's specific needs and/or foster parent capabilities."[120]  DHS' Unified Child and Youth Safety Implementation Plan for Oregon similarly notes "there is not enough special consideration given to…[children's] disability and mental health needs when making placement decisions."[121]  As demonstrated by their own admissions, Defendants' systemic failure to maintain an adequate number and array of appropriate placements for children with disabilities exposes all children in the ADA Subclass to a substantial risk of harm.

Children with disabilities are also exposed to a substantial risk of harm as a result of Defendants' policies and practices related to the provision of services and treatment.  As the Executive Director of Youth, Rights & Justice, Amy Miller has personal experience with Defendants' failure to provide appropriate homes and services for children with special needs. She explains that "[w]e do the best we can with trying to locate and advocate for services and

---

voluminous, and is in Defendants' possession. Plaintiffs will produce this file in whichever format the Court requests). *See also* Ex. 6, Puckett Report, at, Appendix B, 10-13, 13-16, 6-8.

[118] *Establishes Statewide System of Care Task Force: Public Hearing on S.B. 1 Before the S. Comm. on Human Servs.*, 2019 Leg., 80th Sess. (2019) (statement of Kate Brown, Governor), available at http://oregon.granicus.com/MediaPlayer.php?clip_id=26287.

[119] *Establishes Statewide System of Care Task Force: Public Hearing on S.B. 1 Before the S. Comm. on Human Servs.*, 2019 Leg., 80th Sess. (2019) (statement of Kate Brown, Governor), available at http://oregon.granicus.com/MediaPlayer.php?clip_id=26287.

[120] Ex. 1, at Wyatt_DHS_0059767, 839 (Response to 2018 Audit, produced at end of audit).

[121] Ex. 2, at Wyatt_DHS_0057498, 514 (Unified Child and Youth Safety Implementation Plan).

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

placements for our child clients", but Oregon lacks an appropriate number of therapeutic foster homes, and cannot provide timely access to mental health services, "particularly for children with acute treatment needs."[122]  Defendant Governor Kate Brown agreed, in her testimony before the Senate Committee on Human Services, that "[f]ar too many Oregon children and youth are falling through the cracks" because "Oregon doesn't provide enough support for children and youth with specialized needs."[123]

Though each child in the ADA Subclass may have unique physical and mental health needs, placement needs, or safety needs, whether Defendants' policies and procedures as they relate to *the class as a whole* expose class members to a substantial risk of harm "does not require [the court] to determine the effect of those policies and practices upon any individual class member (or class members) or to undertake any other kind of individualized determination."  *See Parsons*, 754 F.3d at 678. "[D]espite the individual dissimilarities among class members, commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members."  *Lane*, 283 F.R.D. at 597.  Defendants' system-wide policies and practices place all members of the ADA Subclass at a substantial risk of harm, raising common questions of law and fact and therefore satisfying the commonality requirement.

### 4.    *There is substantial evidence of Commonality with respect to the SGM Subclass.*

The common question of fact and law raised by all members of the SGM Subclass, which satisfies the commonality requirement for the SGM Subclass, and is capable of resolution in "one stroke" on a classwide basis, is:

- Whether Defendants deny Plaintiffs of the SGM Subclass necessary and appropriate services and placements to prevent them from experiencing a higher than average number of foster care placements, a higher likelihood of living in a congregate care setting and a higher incidence of violence and harassment from foster parents and peers.

---

[122] Miller Dec., at 6.
[123] *Id. at fn 119.*

Page 37 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main • (503) 778-5299 fax

Members of the SGM Subclass face unique challenges by virtue of their sexual or gender identity: 40% of homeless children, for instance, identify as SGM.[124]  SGM foster children are also particularly vulnerable to violence, abuse, and harassment while in state custody.  A national probability study conducted by Plaintiffs' expert, Bianca D.M. Wilson, found that even "despite changing social conditions," SGM youth "experience as much bullying, discrimination, and, likely as a consequence, feelings of self-hatred about their sexuality as older generations of [SGM] adults."[125]

Oregon's foster care system purports to respect, and advocate for, the specific needs of children who identify as a sexual and gender minority—but, as Plaintiffs learned during class discovery, Defendants have *no idea* how many children in the Oregon foster care system even identify as a sexual and gender minority. This ignorance is willful, and a result of Defendants' policy against collecting quantitative data regarding the SGM Subclass, including documentation of their very existence. As other courts certifying classes of foster children have noted, "failure to act can also constitute a policy or practice."  *M.D. v. Perry*, 294 F.R.D. 7, 27 (S.D. Tex. 2013). The failure to implement a data collection procedure, in particular, can constitute a policy or practice.  *See Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012).  Defendants' policy necessarily affects all members of the SGM Subclass, and has far-reaching implications for their placement options, permanency odds, and basic safety and well-being.

DHS' anti-discrimination policy states that "[n]o individual shall, on the grounds of…gender [or] sexual orientation…be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under programs and activities for which the

---

[124] *Oregon Youth Development Council, Youth & You, Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) Youth: Addressing the Need for Statewide Policies and Supports* (2016), available at http://www.oregonyouthdevelopmentcouncil.org/wp-content/uploads/2016/09/Lesbian-Gay-Bisexual-Transgender-Questioning-Youth-Position-Paper_YDC.pdf.
[125] Ex. 4, Wilson Report, Ph.D., at 9.

Page 38 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

Department of Human Services has responsibility."[126]  But that policy is no more than an idea in light of Defendants' conflicting policy against collecting quantitative data on children who identify as a sexual or gender minority. As child permanency program manager Lacey Andresen testified, Defendants' policy against "tracking specifics to children's identification"[127] means there is "not a reportable data point" related to *any* issue related to the SGM population, including the number of children in the SGM population at all. In the absence of accurate data, Defendants operate a necessarily inadequate system that is ill-equipped to meet the needs of SGM youth.

To illustrate: in May 2019, a DHS report dedicated to "Identifying Capacity Needs for Children within the Oregon Child Welfare System" analyzed a random sample of 1,000 removals pulled from Oregon's IT system, OR-Kids. Based on DHS' available data, only 2% of children in the Oregon foster care system identify as LGBTQQ.[128]  Dr. Wilson's research indicates that, to the contrary, "a significant proportion of youth in foster care are LGBTQ, approximately 19.1%."[129] Lacey Andresen herself agreed that 2% "[would] be a floor and not a ceiling on the number of SGM children in Oregon's foster care system,"[130] acknowledging that DHS had no reason to doubt estimates that "approximately 22.8 percent of children in out-of-home care identified as LGBQ."[131]  And yet, due to Defendants' data collection policy, Defendants are "identify[ing] capacity needs" premised on the notion that only 2% of the foster care population identify as sexual and gender minorities.[132]

Dr. Wilson observed that "[b]ecause their method of determining this calculation was through a review of pre-existing case files and caseworkers were not required to collect

---

[126] *Oregon Dep't of Human Servs., Children, Adults, and Families*, Policy No. I-A.1, Client Rights – Policy (2007), available at https://www.dhs.state.or.us/policy/childwelfare/manual_1/i-a1.pdf Oregon DHS Client Rights Policy I-A.1.
[127] Ex. 25, Lacey Andresen SGM Dep. Tr., 37: 8-9.
[128] Ex. 11, Wyatt_DHS_0047768, 774 (2019 ORRAI Report).
[129] Ex. 4, Wilson Report, at 6.
[130] Ex. 25, Lacey Andresen SGM Dep. Tr., 23: 3-6.
[131] Ex. 25, Lacey Andresen SGM Dep. Tr., 95: 4-15.
[132] *See generally* Ex. 11, Wyatt_DHS_0047768 (2019 ORRAI Report).

Page 39 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

information on sexual orientation and gender identity for every case, it is not possible for their report to reflect the actual foster youth population of LGBTQ youth."[133]  Dr. Wilson further observed that "[t]he problems with the state's current records on sexual orientation and gender identity demographics highlights a broader problem in the child welfare system."[134]

To be sure, Defendants' policy against gathering reliable and consistent data concerning the SGM population has far-reaching ramifications in case-planning and placement stability—exposing members of the SGM Subclass to a substantial risk of harm. As DHS' own data suggests, for the vast majority of SGM youth, case-planning is effected by a caseworker who does not know how the child identifies—because, again, DHS' policy is not to ask. That case-planning will necessarily fail to make service referrals or placement decisions with that child's identification in mind. Indeed, the 2016 Public Knowledge report addressed to Defendant Brown pinpointed DHS' failure to "consider race, culture, or sexual orientation or identity in placement decisions" due to, as Plaintiffs here have identified, "[g]aps in data collection, training, and communications that impact the way…culture inform[s] policy and decision making within the System."[135]

Defendants' inadequate array of appropriate placements also disproportionately affects SGM children, as confirmed by the 2018 audit, which found "[r]ecruitment of LGBTQ+ friendly foster homes is limited to a handful of scattered efforts, and in part, the lack of appropriate LGBTQ+ placements also stem from poor recruitment efforts of the agency overall."[136]  Dr. Wilson similarly notes that "[i]n addition to discrimination and safety concerns, LGBTQ youth in foster care are less likely to find a permanent home (reunification or adoption) than other youth, with transgender youth having the most difficult time achieving permanency."[137]  "The bottom line", according to Dr. Wilson's report, is that SGM youth "are experiencing disparities and

---

[133] Ex. 4, Wilson Report, at 6-7.
[134] Ex. 4, Wilson Report, at 7.
[135] Ex. 9, at. Wyatt_DHS_0057414, 461 (2016 Public Knowledge Report).
[136] Ex. 1, at Wyatt_DHS_0059767, 799 (Jan. 2018 Secretary of State Audit).
[137] Ex. 4, Wilson Report, at 4.

Page 40 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

4833-3216-3758v.3 0201450-000001

negative outcomes, including higher rates of homelessness and being moved around more to different placements", and "report that they are treated less well in the child welfare system."[138] This was borne out in Bernard's case, when he was placed in an all-female facility, and filed a grievance due to the facility's staff failing to use his correct pronouns.[139]

Defendants are well-aware of their policy's inadequacies, having received—and ignored—clear recommendations related to SGM data collection. DHS' PRIDE Employee Resource Group, whose mission is to "help Oregonians receiving services from DHS who are LGBTQIA+" and "work toward ensuring they have accepting and affirming DHS workers and caregivers", prepared a 2018-2019 report, in which the group states that DHS "need[s] to understand and collect demographical information regarding SOGIE [sexual orientation, gender identity, and gender expression] so that we can identify disparities, recognize service gaps, and better communicate the true need for supports and services."[140]

Though each child in the SGM Subclass may have unique physical and mental health needs, placement needs, or safety needs, whether Defendants' policies and procedures as they relate to *the class as a whole* expose class members to a substantial risk of harm "does not require [this court] to determine the effect of those policies and practices upon any individual class member (or class members) or to undertake any other kind of individualized determination." *See Parsons,* 754 F.3d at 678. Defendants' system-wide policies and practices place all members of the SGM Subclass at a substantial risk of harm, raising common questions of law and fact and therefore satisfying the commonality requirement.

---

[138] Ex. 4, Wilson Report, at 5-6.
[139] Ex. 3, Steib and Rideout Report, at 44.
[140] Ex. 26, at Wyatt_DHS_0047857, 878 (2018-2019 PRIDE Report).

Page 41 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

4833-3216-3758v.3 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main ∙ (503) 778-5299 fax

**5.    *There is substantial evidence of Commonality with respect to the Aging Out Subclass.***

The common questions of fact and law raised by all members of the Aging Out Subclass, each of which *alone* satisfies the commonality requirement for the Aging Out Subclass, and are capable of resolution in "one stroke" on a classwide basis, include the following:

- Whether Defendants deny members of the Plaintiffs' Aging Out Subclass skills and resources necessary to learn to live independently, and providing them with necessary training, skills, and assistance in securing appropriate housing upon discharge;
- Whether Defendants offer supports and case worker resources adequate to ensure that foster children 14 years or older receive transition planning to ensure children that age out of the system into adulthood have adequate planning and resources to meet future housing, employment, educational, and other social needs.

The Aging Out Subclass seeks to represent "transition-aged" youth, who are exposed to a substantial and disproportionate risk of harm by Defendants' policies and practices toward older children in their care as a whole. One in approximately five children in Oregon's foster care system are older teens who have reached the age of 14.[141]  Older children in the foster care system, Plaintiffs' expert Dr. Angelique Day notes, "face unique challenges and are at higher risk of educational disruptions, underemployment, criminal justice involvement, homelessness, and many other negative life outcomes."[142]  Indeed, in 2018, nearly three-quarters of transition-aged youth in Oregon aged out of care without being connected with a permanent family—a rate 20% higher than the national average.[143]  However, Dr. Day found that "[d]espite this population's elevated risk of aging out of care and experiencing poor life outcomes, transition-aged youth are chronically underserved by Oregon's DHS…These failures to provide transition-aged youth with the skills, resources, and social connections necessary to survive on their own leave youth unprepared and at risk of harm when they leave care."[144]

---

[141] *Children's Bureau, Child Welfare Outcomes* (2019), available at https//cwoutcomes.acf.hhs.gov/cwodatasite/pdf/oregon.html.
[142] Ex. 5, Day Report, at 1.
[143] Ex. 5, Day Report, at 1.
[144] Ex. 5, Day Report, at 1-2.

Page 42 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

In addition to the rights afforded to members of the General Class, DHS policy states that children who have reached the age of 14 have the specific right to "[a] transition toolkit, including a comprehensive transition plan" within 60 days of the date of any placement or change in placement.[145]  Per DHS policy, Members of the Aging Out Subclass are entitled to "youth transition services," such as "[s]kill building services" and independent living housing subsidies.[146] DHS policy also states "[t]he Department must initiate the development of the comprehensive transition plan" for members of the Aging Out Subclass.[147]  The comprehensive transition plans must include a number of components, including:  a completed "life skills assessment" that includes a description of the child's strengths and the child's need for ongoing skill development in a variety of specific areas.[148]  The comprehensive transition plan must also "identify goals and services" in education, employment, health, housing, life skills, supportive relationships, community connections, and transportation.[149]  Such transition plans are "crucial for achieving permanency,"[150] and "[a]chieving permanency is known to protect youth from poor life outcomes and increases the chance that they will survive and thrive as adults."[151]

What DHS policy promises, however, is a far cry from what DHS actually delivers. DHS routinely fails to provide members of the Aging Out Subclass with timely and adequate transition services. According to DHS' own 2019 Annual Progress and Service Report, only 36% of transition-aged children have any entries at all in their youth transitions plans.[152]  For children aged

---

[145] Ex. 27, at Wyatt_DHS_0059510, 511 (OAR 413-010-0180).
[146] Ex. 28, at Wyatt_DHS_0030782, 804 (OAR Chapter 413, Division 30 Case Management – Program Eligibility).
[147] Ex. 28, at Wyatt_DHS_0030782, 805 (OAR Chapter 413, Division 30 Case Management – Program Eligibility).
[148] Ex. 28, at Wyatt_DHS_0030782, 805 (OAR Chapter 413, Division 30 Case Management – Program Eligibility).
[149] Ex. 28, at Wyatt_DHS_0030782, 806 (OAR Chapter 413, Division 30 Case Management – Program Eligibility).
[150] Ex. 5, Day Report, at 15.
[151] Ex. 5, Day Report, at 13.
[152] Ex. 17, at Wyatt_DHS_0062358, 500 (DHS 2019 Annual Progress and Service Report).

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

14 to 15, that number plummets to 8.8%.[153]  And a concerning 4.9% of transition-aged youth have no established permanency plan at all.[154]  As Dr. Day observes, "[f]or many older children, the lack of individualized assessment and availability of quality caregivers leads to youths' placement in repurposed juvenile detention facilities, group homes, hotels, and homeless shelters."[155]  Dr. Day adds that "[r]esearch has consistently shown that children placed in institutional care have worse life outcomes because they are not able to form a trusting relationship with a supportive adult."[156]  And yet, nearly a quarter of transition-aged youth in Oregon are placed in such non-family settings.[157]  The vast majority of children placed in out-of-state facilities are transition-aged as well.[158]

Defendants are well-aware of the serious harms facing the Aging Out Subclass as a result of their systemic failures. Defendants' own submissions to the National Youth Transition Database illustrate them in detail: 27% of 17-year-olds in DHS' care have experienced homelessness within their lifetime, 26% have been incarcerated, and 20% have been referred for substance abuse treatment.[159]  In a separate sample of 21-year-olds that transitioned from DHS' care, only half were employed full-time or part-time.[160]  A third had experienced homelessness within the past two years, with another third failing to finish high school or attain their GED.[161]  Defendants admit that older children are not a priority for them: DHS' 2017 Research Agenda, sponsored by the Director of Child Welfare, suggested that rather than hiring additional caseworkers to lower caseloads, "[a]n alternative solution is to prioritize cases with low probability of safety (severe maltreatment) to high probability of safety (disobedient or truant youth)…In reality, this prioritization occurs

---

[153] Ex. 17, at Wyatt_DHS_0062358, 501 (DHS 2019 Annual Progress and Service Report).
[154] Ex. 24, at Wyatt_DHS_0030960. *See also* Ex. 5, Day Report, at 15.
[155] Ex. 5, Day Report, at 9.
[156] Ex. 5, Day Report, at 10.
[157] Ex. 5, Day Report, at 9.
[158] Ex. 5, Day Report, at 10.
[159] Ex. 29, at Wyatt_DHS_0062111, 112 (NYTD Data Snapshot FY 2013-2017).
[160] Ex. 30, at Wyatt_DHS_0060324, 325 (NYTD Data Snapshot FY 2014-2018).
[161] Ex. 30, at Wyatt_DHS_0060324, 325 (NYTD Data Snapshot FY 2014-2018).

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

today…less serious cases are triaged."[162]   As. Dr. Day points out, "[t]his is severely concerning considering that many transition-aged youth may fall into the latter category of 'disobedient or truant youth,' thus being relegated to the lowest priority for caseworker attention and services."[163] It is not surprising then, that transitions planning has gotten worse in recent years. In 2013, for example, 76.9% of transition-aged children had at least one entry in their youth transitions plans,[164] compared to the 36% of transition-aged children who had at least one entry in their transition plans in 2019.[165]

Defendants' system-wide policies and practices place all members of the Aging Out Subclass at a substantial risk of harm, raising common questions of law and fact and therefore satisfying the commonality requirement.

### C.   THE CLAIMS OF NAMED PLAINTIFF CHILDREN ARE TYPICAL.

#### 1.   *The Typicality Standard.*

"Although the commonality and typicality requirements tend to merge into one another," commonality focuses on common questions of law or fact.  *Armstrong*, 275 F.3d at 868. "Typicality, by contrast, is said to require that the claims of the class representatives be typical of those of the class, and to be satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Armstrong*, 275 F.3d at 868.

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Parsons,* 754 F.3d at 685. The Ninth Circuit has repeatedly noted that the typicality standard is "permissive"; claims "need not be substantially identical" to be typical, but rather merely "reasonably coextensive."  *See Hanlon v.*

---

[162] Ex. 31, at Wyatt_DHS_0062021, 034 (DHS' 2017 Research Agenda).
[163] Ex. 5, Day Report, at 8.
[164] Ex. 17, at Wyatt_DHS_0062358, 500 (DHS 2019 Annual Progress and Service Report).
[165] Ex. 17, at Wyatt_DHS_0062358, 500 (DHS 2019 Annual Progress and Service Report).

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main ⋅ (503) 778-5299 fax

*Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998); *Parsons*, 754 F.3d at 685; B.K., 922 F.3d at 969.

## 2. *Plaintiffs have satisfied the Typicality Requirement.*

Typicality properly focuses on "the nature of the claim" and not "the specific facts from which it arose." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). It is easy to point out factual dissimilarities between the Named Plaintiffs and class members—obviously not every class member will have identical reasons for placement in DHS custody, for example, or identical placement histories. But courts in the Ninth Circuit have made clear that for the purposes of Rule 23's typicality requirement, those factual dissimilarities are irrelevant.[166]

The histories of each of the Named Plaintiff Children[167] contain varying factual injuries, such as physical abuse, sexual abuse, neglect, and inadequate mental and physical healthcare, among others. But in the context of the Named Plaintiffs' *legal theory*, the injury suffered by all is the same: the exposure to a substantial risk of serious harm by DHS policies and practices.

Plaintiffs' Complaint alleges several specific Department of Human Services' policies and practices that violate Plaintiffs' constitutional and federal statutory rights and cause them harm, such as unacceptably high caseworker caseloads; woefully inadequate case planning; and a severe lack of appropriate placements.  Even the limited discovery conducted thus far supports Plaintiffs' allegations.  Defendants are the Oregon Department of Human Services and other state officials; by virtue of their positions as a state agency and officials, their conduct cannot be unique to the Named Plaintiffs. "The challenged conduct is a policy or practice that affects all class members",

---

[166] *See Parsons*, 754 F.3d at 686 ("It does not matter that the named plaintiffs may have in the past suffered varying injuries or that they may currently have different health care needs; Rule 23(a)(3) requires only that their claims be 'typical' of the class, not that they be identically positioned to each other or to every class member."); *Rodriguez*, 578 F.3d at 1049-50 (typicality met where class members "raise similar constitutionally-based arguments and are alleged victims of the same practice," even if "detained under different statutes" or at "different points in the [immigration] process"). *See also Armstrong*, 275 F.3d at 868-69; *Penk v. Or. State Bd. of Higher Educ.*, 93 F.R.D. 45, 50 (D. Or. 1981).
[167] *See* Ex. 3, Steib and Rideout Report.

Page 46 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

and therefore, "the typicality inquiry involves comparing the injury asserted in the claims raised by the named plaintiffs with those of the rest of the class." *Armstrong*, 275 F.3d at 868.

The Ninth Circuit in *Parsons v. Ryan*, and more recently, in *B.K. v. Snyder*, found the typicality requirement met where, as here, named plaintiffs asserted constitutional claims based on the risk of harm caused by state policies. The named plaintiffs in *Parsons v. Ryan* were all inmates in the custody of the state's corrections department; typicality was satisfied because "[e]ach declares that he or she is being exposed, like all other members of the putative class, to a substantial risk of serious harm by the challenged ADC policies and practices." *Parsons*, 754 F.3d at 685. "Further, given that every inmate in ADC custody is highly likely to require medical, mental health, and dental care, each of the named plaintiffs is similarly positioned to all other ADC inmates with respect to a substantial risk of serious harm resulting from exposure to the defendants' policies and practices governing health care." *Parsons*, 754 F.3d at 685-86. The Named Plaintiffs here, similarly, are all children in Defendants' custody. They have declared, and demonstrated, that they are being exposed to a substantial risk of serious harm by Defendants' policies and practices.[168] None of identified policies and practices are unique to the Named Plaintiffs—to the contrary, every child in Defendants' custody is highly likely to be subject to Defendants' conduct. Every child in Oregon's foster care system, for instance, is at risk by Defendants' systemic failure to support and train their caseworkers, or to ensure their caseworkers carry safe and reasonable workloads. Every child in Oregon's foster care system is at risk because of Defendants' fundamentally flawed case planning policies, and Defendants' failure to maintain enough safe placements. Indeed, the Ninth Circuit has recognized the risk of harm caused by child welfare policies and practices to a child in state custody as "a cognizable constitutional injury under our precedent." *B.K.*, 922 F.3d at 970.

---

[168] *See* Ex. 3, Steib and Rideout Report.

Page 47 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

4833-3216-3758v.3 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

Because the Named Plaintiffs have identified specific statewide policies and procedures, not unique to the Named Plaintiffs, that subject them and other class members to a substantial risk of harm, the typicality requirement of Rule 23(a)(3) is met.

## D. THE NAMED PLAINTIFF CHILDREN WILL ADEQUATELY REPRESENT THE CLASS.

### 1. *The Adequacy Standard.*

The final requirement of Rule 23(a), adequacy, is met if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy inquiry concerns "the competency of class counsel and conflicts of interest." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n.13, 102 S. Ct. 2364, 2370 (1982). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. "The burden is on the defendant to show that representation will be inadequate." *Blake v. City of Grants Pass*, No. 1:18-cv-01823-CL, 2019 U.S. Dist. LEXIS 132508, at *16 (D. Or. Aug. 7, 2019).

### 2. *Plaintiffs have satisfied the Adequacy Requirement.*

While "[s]erious conflicts of interest can impair adequate representation", those disqualifying conflicts of interest tend to involve monetary relief, such as "interests in the allocation of limited settlement funds." *See Partl v. Volkswagen, AG (In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig)*, 895 F.3d 597, 607-08 (9th Cir. 2018). Plaintiffs here do not seek monetary relief, but rather only injunctive relief intended to alter Defendants' conduct and improve child welfare practices for all class members. And all class members share the same interest in improving Oregon's foster care system. This common interest is not diminished by the fact that some Plaintiff-Children belong to the ADA Subclass, or the Aging Out Subclass, or the SGM Subclass. Oregon courts have repeatedly found that class

Page 48 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

members do not have conflicting interests when "[a]ll want the same thing."[169]  Here, members of the General Class and of each subclass "want the same thing"—a child welfare system that complies with constitutional and federal statutory requirements.

In *Daggett v. Blind Enters.*, CV-95-421-ST, 1996 U.S. Dist. LEXIS 22465, at *57-58 (D. Or. Apr. 18, 1996), defendants argued blind plaintiffs and partially blind plaintiffs seeking class certification for their ADA claims lacked adequacy of representation due to purported conflicting interests. Defendants argued that one of the named plaintiffs was completely blind, and "believes partially blind employees were treated better than completely blind employees," while another was partially blind, and "has little or no incentive to sincerely assert the claims of completely blind employees who cast her, and her group, in an unfavorable light." *Daggett,* 1996 U.S. Dist. LEXIS 22465, at *58.  The court, however, was unconvinced: "[t]he basis of the discrimination claims is that sighted workers were treated better than blind [] employees, including partially blind and totally blind employees"; that blind plaintiffs may believe they were treated more severely than partially blind plaintiffs "does not diminish [their] belief that *the class as a whole* was treated less favorably than sighted workers." *Id.* at *59.

Here, the *class as a whole* seeks to enjoin Defendants from violating class members' constitutional and federal statutory rights while in Defendants' custody.  There is no money to be divvied up between class members to form potential conflicts, and there is no competition to achieving a foster care system in compliance with the Constitution and federal law.  Indeed, the presence of named plaintiffs with disabilities, or who will be aging out of the foster care system, or who identify as a sexual or gender minority only "ensures that the interests of [those] members of the putative class will be adequately represented." *Id.*

---

[169] *See, e.g. Lane*, 283 F.R.D. at 600 ("All want the same thing, namely an integrated employment setting."); *Sorenson v. Concannon*, 893 F. Supp. 1469, 1478 n.12 (D. Or. 1994) ("both Plaintiffs and the class members seek correction of the disability determination system used in Oregon"); *Penk*, 93 F.R.D. at 50 ("The interest shared by all is elimination of sex discrimination from the state system of higher education. The court fails to perceive any potential conflict of interest between the representatives and the class as a whole.").

Page 49 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main • (503) 778-5299 fax

In addition to sharing the interests of the class, Named Plaintiffs and their counsel are committed to prosecuting this putative class action vigorously.  Named Plaintiffs' Next Friends are familiar with this litigation and the underlying claims, and Named Plaintiffs are represented by competent experienced attorneys with experience in class action litigation, child welfare litigation, and complex civil litigation.[170]

Plaintiffs thus meet the adequacy requirement of Fed. R. Civ. P. 23(a)(4).

**E.    THE NAMED PLAINTIFF CHILDREN SATISFY THE REQUIREMENTS OF RULE 23(B).**

**1.    *The Rule 23(b) Standard.***

Rule 23(b) authorizes class certification where Rule 23(a)'s requirements are satisfied, and where defendants have acted or refused to act on grounds generally applicable to the class. Fed. R. Civ. P. 23(b)(2). Class actions to enforce civil rights are "precisely the sorts of claims that Rule 23(b)(2) was designed to facilitate." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998).

Rule 23(b)(2), does not require this Court to "examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010); *see also Walters*, 145 F.3d at 1047 ("It is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole."). Rule 23(b)(2) is met where "plaintiffs have described the general contours of an injunction that would provide relief to the whole class"; injunctions "can be given greater substance and specificity at an appropriate stage in the litigation through fact-finding, negotiations, and expert testimony." *Parsons*, 754 F.3d at 689 n.35. Concerns about funding and lack of resources, or even federalism concerns "do not per se forbid" certification under Rule 23(b)(2). *B.K.*, 922 F.3d at 972. "It also does not matter whether crafting appropriate injunctive relief will be difficult or not." *B.K.,* 922 F.3d at 973.

---

[170] Declaration of Thomas Stenson, at 2-7. (Hereinafter referred to as the "Stenson Dec.").

Page 50 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

The Ninth Circuit has found Rule 23(b)(2) met in civil rights actions, like this one, brought by foster children challenging statewide child welfare policies and practices. *See B.K.*, 922 F.3d at 971 (holding a "single, indivisible injunction ordering state officials to abate those policies and practices would provide relief to each member of the class, thus satisfying Rule 23(b)(2)" and that "[i]n this case, the 'general contours of an injunction' are enjoining DCS to abate the nine policies identified by the district court as amenable to class-wide litigation. That was enough.")

### 2.    *Plaintiffs have satisfied the Rule 23(b)(2) Requirement.*

The Rule 23(b)(2) inquiry properly focuses on the injunctive relief sought by Plaintiffs to redress the constitutional and federal statutory harms caused by Defendants' actions and inactions. As previously discussed, while the individual details of Plaintiffs' lives may differ, all Plaintiffs suffer the same constitutional and federal statutory harm as a result of Defendants' policies and practices. The injunctive relief necessary to abate those harms, accordingly, does not require individualized determinations; to the contrary, Plaintiffs' requested injunctive relief is aimed at reforming Defendants' conduct on a class-wide level, through uniform changes to Defendants' policies and practices. Though Plaintiffs "do not need to specify the precise injunctive relief they will ultimately seek at the class certification stage," *B.K.*, 922 F.3d at 972, Plaintiffs' Complaint identifies the need for injunctions to increase caseworker staffing, raise case-planning standards, and improve the quantity and quality of Oregon foster placements. The Ninth Circuit has acknowledged the appropriateness of such injunctions for the purposes of Rule 23(b)(2). *See B.K.*, 922 F.3d at 971-73 (finding "the district court could enjoin DCS to hire more caseworkers in order to meet health care delivery deadlines in a manner that ensures the plaintiffs receive timely medical evaluations and care", or "enjoin the Directors to take concrete steps to meet specific placement deadlines, such as by expanding the number of foster homes").

Each subclass similarly seeks broad, uniform injunctive relief to redress the particular harms suffered by all children of the subclass as a result of Defendants' policies and practices. *See B.K.*, 922 F.3d at 973 (finding Rule 23(b)(2) met for non-kinship subclass of foster children due

Page 51 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

4833-3216-3758v.3 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon 97201-5610
(503) 241-2300 main · (503) 778-5299 fax

to "uniformity of injunctive relief", also noting it "does not matter whether crafting appropriate injunctive relief will be difficult or not").

The ADA Subclass seeks injunctive relief requiring Defendants to develop and maintain an adequate array of therapeutic services and foster placements, and to provide foster services to children with disabilities in "the most integrated setting appropriate to the child's needs". As this Court found in *Lane v. Kitzhaber*, in which an analogous class of plaintiffs brought ADA claims challenging the state's system-wide policies and practices, "[t]his type of injunctive relief focuses on defendants' conduct, not on the treatment needs of each class member." *Lane*, 283 F.R.D. at 602. There, the injunctive relief sought by plaintiffs was aimed at providing "classwide" relief, "regardless of a person's individualized support needs, by modifying the way defendants fund, plan, and administer the existing…system." *Id.* Here, too, the ADA Subclass' requested relief does not depend on the necessarily varied service and placement needs of each individual class member. Rather, the subclass seeks common, unified injunctive relief, satisfying Rule 23(b)(2).

The SGM Subclass requests foster care services that support and respect a child's sexual orientation, gender identity, and gender expression. As is true of the General Class, the SGM Subclass' requested relief does not require adjudication or determination of any individual child's treatment, and instead is aimed at Defendants' conduct towards members of the SGM Subclass as a whole. Courts in the Ninth Circuit have approved of similar injunctions aimed at state defendants to redress the constitutional harm caused to SGM youth as a result of state policies and procedures. *Cf. R.G. v. Koller*, 415 F. Supp. 2d 1129, 1162 (D. Haw. 2006) (authorizing a broad preliminary injunction compelling state of Hawaii to "adopt polic[i]es, procedures, and training so as to provide wards with a reasonably safe environment at" juvenile facility to protect SGM youth harassed by staff and other detainees).

Lastly, the Aging Out Subclass seeks injunctive relief requiring DHS to begin appropriate transition planning for youth over 14 who are not imminently likely to achieve permanency, requiring placement of consenting older foster youth family homes wherever possible, and

Page 52 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

prohibiting the refusal of a foster placement on the grounds of the youth being over 14 years of age. That injunctive relief "would provide relief to each member of the class, thus satisfying Rule 23(b)(2)." *B.K.*, 922 F.3d at 971.

The General Class and each subclass request an "indivisible" injunction, rather than relief that would entitle each individual class member to receive their own injunction, thus satisfying Rule 23(b)(2). *B.K.,* 922 F.3d at 971.

## V.    THE COURT SHOULD APPOINT CLASS COUNSEL

When a court certifies a class, it must also appoint class counsel. Fed. R. Civ. P. 23(g)(1). In making the appointment, a court must consider the class counsel's prior work to identify and develop the claims, experience in class actions and other complex litigation, knowledge of the applicable law, and resources for litigation. Fed. R. Civ. P. 23(g)(1)(A). The appointed counsel must be able to represent the class fairly and adequately. Fed. R. Civ. P. 23(g)(1)(B), (g)(4).

Proposed class counsel consists of attorneys from A Better Childhood, Davis Wright Tremaine, and Disability Rights Oregon.[171]  Counsel have dedicated substantial efforts to developing the class allegations in this matter over more than a year.[172]  Counsel has demonstrable experience, expertise, and knowledge in matters relating to foster care litigation, disability rights litigation, class action litigation, constitutional litigation, and other complex litigation.[173]  Counsel also has knowledge of the applicable law, and the resources for litigation.[174]

Proposed class counsel also has the ability to represent the class fairly and adequately. Fed. R. Civ. P. 23(g)(1)(B), (g)(4). "Adequate representation is usually presumed in the absence of contrary evidence*." Californians for Disability Rights, Inc. v. California Dep't of Transp.*, 249 F.R.D. 334, 349 (N.D. Cal. 2008). Plaintiffs' counsel have no conflicts of interest with the Named

---

[171] A detailed description of class counsels' qualifications is contained in the Declaration of Thomas Stenson, filed concurrently with this Memorandum.
[172] Stenson Dec., at 6.
[173] Stenson Dec., at 2-7.
[174] Stenson Dec., at 2-7.

Page 53 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

Plaintiffs or any known individual within the putative classes.[175]    Accordingly, Plaintiffs respectfully request this Court appoint proposed class counsel.

## VI.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully ask that the Court grant Plaintiffs' Motion and certify the General Class and each subclass because the defined classes meet the requirements of Rule 23(a) and 23(b)(2).

DATED this 9th day of December, 2019.

**DAVIS WRIGHT TREMAINE LLP**

By */s/ Paul C. Southwick*
Gregory A. Chaimov, OSB #822180
gregorychaimov@dwt.com
Paul C. Southwick, OSB #095141
paulsouthwick@dwt.com
1300 SW Fifth Avenue, Ste. 2400
Portland, OR 97201
Tel: (503) 241-2300; Fax: (503) 778-5299

**A BETTER CHILDHOOD**
Marcia Robinson Lowry (pro hac vice)
mlowry@abetterchildhood.org
Dawn J. Post (pro hac vice)
dpost@abetterchildhood.org
Anastasia Benedetto (pro hac vice)
abenedetto@abetterchildhood.org
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel: (646) 795-4456; Fax: (212) 692-0415

**DISABILITY RIGHTS OREGON**
Emily Cooper, OSB #182254
ecooper@droregon.org
Thomas Stenson, OSB #152894
tstenson@droregon.org
Christine Shank (admission pending)
cshank@droregon.org
511 SW 10th Avenue, Suite 200
Portland OR 97205
Tel: (503) 243 2081; Fax: (503) 243 1738

Attorneys for Plaintiffs

---

[175] Stenson Dec., at 7.

Page 54 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main • (503) 778-5299 fax

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7-2(B)

On November 22, 2019, Plaintiffs filed a Motion for Extension of Time and Page Limits (Dkt. 59) requesting permission to extend the page limit in connection with Plaintiffs' Motion for Class Certification from 35 pages to 60 pages. If Plaintiffs' Motion for Extension of Time and Page Limits is granted, this brief will comply with the applicable word-count and page limitations under LR 7-2(b) because it contains 54 page (18,345 words), including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

Page 55 – PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served a copy of the foregoing **PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION** on:

Renee Stineman
Carla Scott
Sheila H. Potter
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: 971-673-1915
Fax: 971-673-1884
renee.stineman@doj.state.or.us
carla.a.scott@doj.state.or.us
sheila.potter@doj.state.or.us

Attorneys for Defendants

David B. Markowitz
Anna Marie Joyce
Harry B. Wilson
Laura R. Salerno Owens
Lauren F. Blaesing
Markowitz Herbold PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Tel: 503-295-3085
Fax: 503-323-9105
DavidMarkowitz@MHGM.com
annajoyce@markowitzherbold.com
harrywilson@markowitzherbold.com
LauraSalerno@MarkowitzHerbold.com
LaurenBlaesing@MarkowitzHerbold.com

Attorneys for Defendants

☐ by mailing a copy thereof in a sealed, first-class postage prepaid envelope, addressed to said attorney's last-known address and deposited in the U.S. mail at Portland, Oregon on the date set forth below;

☐ by causing a copy thereof to be hand-delivered to said attorney's address as shown above on the date set forth below;

☐ by sending a copy thereof via overnight courier in a sealed, prepaid envelope, addressed to said attorney's last-known address on the date set forth below;

☒ by using CM/ECF electronic service.

Dated this 9th day of December, 2019.

**DAVIS WRIGHT TREMAINE LLP**

_s/ Paul C. Southwick_
Gregory A. Chaimov, OSB #822180
gregorychaimov@dwt.com
Paul C. Southwick, OSB #095141
paulsouthwick@dwt.com
Tel: (503) 241-2300
Fax: (503) 778-5299

Attorneys for Plaintiffs

Page i – CERTIFICATE OF SERVICE

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main • (503) 778-5299 fax