**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**Anna M. Joyce, OSB #013112**
AnnaJoyce@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Lauren F. Blaesing, OSB #113305**
LaurenBlaesing@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Tel: (503) 295-3085
Fax: (503) 323-9105

    Special Assistant Attorneys General for Defendants
    (Additional Counsel of Record listed on signature page)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| WYATT B. and NOAH F. by their next friend Michelle McAllister; KYLIE R. and ALEC R. by their next friend Kathleen Megill Strek; UNIQUE L. by her next friend Annette Smith; SIMON S. by his next friend Paul Aubry; RUTH T. by her next friend Michelle Bartov; BERNARD C. by his next friend Ksen Murry; NAOMI B. by her next friend Kathleen Megill Strek; and NORMAN N. by his next friend Tracy Gregg, individually and on behalf of all others similarly situated,<br><br>                                     Plaintiffs,<br><br>     v.<br><br>KATE BROWN, Governor of Oregon in her official capacity; FARIBORZ PAKSERESHT, Director, Oregon Department of Human Services in his official capacity; REBECCA JONES GASTON, Director, Child Welfare in her official capacity; and OREGON DEPARTMENT OF HUMAN SERVICES,<br><br>                                     Defendants. | No. 6:19-cv-00556-AA<br><br>**DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. WILSON, DR. STEIB, MS. RIDEOUT, DR. PUCKETT, AND DR. DAY**<br><br>**Oral Argument Requested** |

## CERTIFICATE OF COMPLIANCE

In compliance with Local Rule 7-1, the parties made a good faith effort, by telephone conferral on July 22, 2020, to resolve the disputes that are the subject of this motion and have been unable to do so.

## MOTION

Defendants move to exclude the expert opinion testimony of Dr. Wilson, Ms. Rideout, Dr. Steib, Dr. Puckett, and Dr. Day, and to strike their expert reports.

## INTRODUCTION

Plaintiffs offer testimony from five experts to support their motion for class certification. As the Ninth Circuit recently explained, "[i]n evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*." *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 984-85 (9th Cir. 2020) (internal quotations omitted) (affirming exclusion of expert testimony at the class certification stage because it was the result of unreliable methodology).

Here, plaintiffs' experts' testimony does not meet the *Daubert* standard for reliability. Various methodological errors infect each expert's opinion: Dr. Wilson's testimony directly contradicts the peer-reviewed study on which it is based; Dr. Steib and Ms. Rideout rely entirely on unrepresentative case studies and do not use any accepted standards; Dr. Puckett permitted plaintiffs' legal team to perform the calculations underlying his testimony; and Dr. Day admits that her testimony could not survive peer review and that she did not have sufficient time to educate herself on the very topic on which she opines.

Plaintiffs have the burden of showing that the testimony of their experts meets the *Daubert* standard for reliability. Because they cannot do so, the Court should exclude their testimony.

///

///

///

**Page 2 -   DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. WILSON, DR. STEIB, MS. RIDEOUT, DR. PUCKETT, AND DR. DAY**

## BACKGROUND

I.    **Dr. Wilson**

Plaintiffs offered Dr. Wilson as an expert in support of their putative "SGM" subclass. Dr. Wilson opined about the number of LGBTQIA+[1] youth in the foster care system, concluding that "there are at least 592 LGBTQ youth" in Oregon's foster care system.  (Declaration of Marcia Robinson Lowry ("Lowry Decl.") (Dkt. 67-1), Ex. 4 at 8 ("Wilson Report").)  She based her calculation entirely on a study of LGBTQIA+ youth that she had conducted in Los Angeles County (the "Los Angeles Study").  (*Id.*)  She authored and published an article explaining the Los Angeles Study's findings and limitations in The Child and Youth Services Review, a peer-reviewed journal.  (*Id.* at 32; Declaration of Lauren Blaesing ("Blaesing Decl.") Ex. 1.)  One of the "Limitations" that she recognized is that "it is important to recognize that these estimates were derived from a study of one large urban county welfare service department. . . . However, more research is needed to understand the experiences of foster youth in other locations and to assess the usefulness of the methodology and generalizability of the results beyond Los Angeles County."  (*Id.* at 5.)

In her report, Dr. Wilson states that the findings of her study were "indicative of child welfare departments nationwide as there is no evidence that Los Angeles, as the largest child welfare system in the country, would be significantly different from others."  (Wilson Report at 7.)  She cited generally to two other studies but used only the Los Angeles Study to arrive at her calculation of the number of LGBTQIA+ youth in Oregon.  (*Id.* at 7-8.)

At deposition, Dr. Wilson responded to a line of questions whether the Los Angles data was "representative of all other counties and all other states."  (Blaesing Decl. Ex. 2 at 122:17-124:23.)  She admitted that the data did not exist to make an empirical conclusion.  (*Id.* at 124:3-6) ("My answer to that – and I don't claim to have an empirical basis because we can't actually make that comparison because the data are not there.").)  Dr. Wilson justified her conclusion by

---

[1] Defendants use this, more inclusive, version of the term LGBTQ to refer to the population about whom Dr. Wilson offered expert testimony.

explaining that because "Los Angeles is in one of the more public-policy-forward states like the state of California . . . if there is a difference between counties and states to LA, I would be surprised that it was LA was doing worse."  (*Id.* at 124:7-17.)

## II.    Dr. Steib and Ms. Rideout

Dr. Steib and Ms. Rideout both claimed to identify system-wide deficiencies in Oregon's foster care policies and practices after conducting a case study of the ten named plaintiffs.  (*Id.*, Ex. 3 at 86:11-17; Ex. 4 at 163:15-19, 179:18-180:17.)  Neither relied on any federal or Oregon standards when arriving at their conclusions.  (*Id.*, Ex. 3 at 137:21-138:2, 139:8-11; Ex. 4 at 172:25-173:24.)

Their information about Oregon's child welfare system came primarily from the case studies.  (Lowry Decl. Ex. 3 at 7 ("Steib and Rideout Report").)  Ms. Rideout took only a "peek" at the 1807-page Child Welfare Procedure Manual while Dr. Steib "didn't review it to any extent" other than referring to the section on hotline screening.  (Blaesing Decl. Ex. 4 at 56:18-57:11; Ex. 3 at 124:7-18.)  Neither knew basic information about the child welfare system like the number of children in care, the average caseload, or the policies regarding trauma-informed care.  (*Id.*, Ex. 3 at 91:1-92:21, 127:21-25; Ex. 4 at 69:8-71:18.)

## III.    Dr. Puckett

Dr. Puckett offered opinions of Oregon's foster system based on a "quantitative analysis."  (*Id.*, Ex. 5 at 167:9-10, 191:10-19; Lowry Decl. Ex. 6 ("Puckett Report").)  At deposition, Dr. Puckett was asked about the accuracy of a number in his report.  (Blaesing Decl. Ex. 5 at 148:6-8.)  He was unsure of the answer to the question.  (*Id.* at 148:9-14.)  Jared Hirsch, plaintiffs' paralegal, interjected and confirmed that the number was accurate.  (*Id.* at 148:15-19.)  Plaintiffs' paralegal was not being deposed or under oath.

Upon further questioning, Dr. Puckett admitted that he "was not doing the actual number-crunching."  (*Id.* at 151:7-152:10.)  Instead, he relied on plaintiffs' paralegal, to perform the calculations "accurately" and "reliably."  (*Id.* at 152:11-16.)  Dr. Puckett also admitted that

plaintiffs' paralegal was the only one with "firsthand knowledge of . . . the steps that were taken to arrive at" all of the calculations contained in his report. (*Id.* at 154:9-18.)

Dr. Puckett also based some of his conclusions on calculations performed by plaintiffs' paralegal derived from "a fairly large sample size." (*Id.* at 211:2-25.) Dr. Puckett could only assume how plaintiffs' paralegal had created the sample, agreeing that "[i]t would be good" to check with Mr. Hirsch regarding any details about the sample. (*Id.* at 211:17-19.) Dr. Puckett's justification was that his role was not to perform the calculations, but to "interpret some of the quantitative output." (*Id.* at 191:10-19.)

## IV.    Dr. Day

Dr. Day's expert testimony relates to "Oregon's policies and practices for the provision of transition services to youth 14 and older in the legal custody of the Oregon Department of Human Services." (Lowry Decl. Ex. 5 at 3 ("Day Report").) She referred to this population as "transition-aged" and "aging-out youth." (*Id.*)

Dr. Day admitted that her report would not "qualify as something that could be published in a peer-reviewed journal." (Blaesing Decl. Ex. 6 at 82:11-14.) Dr. Day admitted that she did not spend time doing "any research regarding anything to do with foster care youth in Oregon" before undertaking this project and had never done policy analysis "specific[] to -- to the State of Oregon as it relates to aging out." (*Id.* at 79:2-5; 82:11-83:8.) She wrote her report "without the benefit of knowing any of the Oregon laws that govern foster care youth who are aging out[.]" (*Id.* at 92:10-23.) Instead, she explained that she focused on outcomes rather than policies. (*Id.*)

Dr. Day also candidly admitted that she did not have enough time to complete her analysis and report. (*Id.* at 60:12-20.) Instead of the three months that she requires to develop a report that she is "proud of," she had only "two and a half weeks to get this turned around." (*Id.*) Plaintiffs began investigating this case in August of 2018, (*see* Declaration of Thomas Stenson (Dkt. 66) ¶ 14), and filed suit in April 2019, (Class Action Compl. (Dkt. 1)). Their motion for class certification was initially due on October 8, 2019. (Scheduling Order (Dkt. 41).) The Court extended the due date for the class certification motion on October 7, 2019. (Order

(Dkt. 56).)  Plaintiffs did not contact Dr. Day until November 5, 2019.  (Blaesing Decl. Ex. 7 at

3.)  Plaintiffs hired Dr. Day on November 8, 2019 and her report is dated November 27, 2019.

(*Id*., Ex. 8; Day Report at 2.)

**ARGUMENT**

Plaintiffs have not met their burden of showing that their experts' testimony meets the

*Daubert* reliability standard.  Their experts contradict their own peer-reviewed studies (Dr.

Wilson), base their opinions solely on unrepresentative case studies and fail to use any industry

standards (Dr. Steib and Ms. Rideout), allow plaintiffs' legal team to perform the calculations

underlying their quantitative analysis (Dr. Puckett), and admit that their work in this case would

not survive peer-review (Dr. Day).  Thus, this is the unusual case where the Court should

exercise its gatekeeping role at the class certification stage and exclude all of plaintiffs' experts.

**A.    The Court's gatekeeping function allows it to exclude expert testimony that is the product of unreliable methodologies.**

The trial judge serves as a "gatekeeper" to ensure the expert's testimony is reliable and

relevant.  *McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1099 (D. Or. 2010) (Aiken, C.J.)

(citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)).  Federal Rule of

Evidence 702  permits expert testimony that "will assist the trier of fact . . . so long as (1) the

testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

principles and methods, and (3) the witness has applied the principles and methods reliably to the

facts of the case."  *McClellan*, 710 F. Supp. 2d at 1098 (internal quotations omitted).  "In short,

an expert's conclusion must meet the trilogy of restrictions on expert testimony: qualification,

reliability and fit."  *Id.* (citations and internal quotation marks omitted).  *Daubert* can and does

apply to testimony by experts about social science.  *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d

571, 602 (9th Cir. 2010), *rev'd on other grounds*, 564 US 338 (2011) (recognizing that "properly

analyzed social science data" can pass *Daubert* standard).  The burden is on the proponent of the

expert testimony to prove admissibility.  *Daubert*, 509 U.S. at 592 n.10.

This Court's gatekeeping role applies at the class certification stage.  *Grodzitsky*, 957

F.3d at 987.  When "evaluating challenged expert testimony in support of class certification, a

district court should evaluate admissibility under the standard set forth in *Daubert*[.]" *Id.* at 984 (citation and internal quotation marks omitted). The Court's analysis "must be solely on principles and methodology, not on the conclusions that they generate, and the court's task is to analyze not what the experts say, but what basis they have for saying it." *Id.* at 984-85 (citations and internal quotation marks omitted).

The Court may consider "whether the theory or technique employed by the expert is generally accepted in the scientific community; whether it's been subjected to peer review and publication; whether it can be and has been tested; and whether the known or potential rate of error is acceptable. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*"). One "very significant fact" is whether the expert testifies on "matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Id.* at 1317. If the testimony is not based on independent research, "the party proffering it *must* come forward with other objective, verifiable evidence that the testimony is based on scientifically valid principles." *Id.* at 1317-18 (emphasis added; internal quotations omitted). An expert's "bald assurance of validity is not enough. Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Id.* at 1316.

Case studies "are universally regarded as an insufficient scientific basis for a conclusion regarding causation because case reports lack controls." *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1411 (D. Or. 1996) (Jones, J.) (citing *Casey v. Ohio Medical Products*, 877 F.Supp. 1380 (N.D. Ca. 1995)); *Muzzey v. Kerr-McGee Chemical Corp.*, 921 F.Supp. 511, 519-20 (N.D. Il. 1996); *In re Three Mile Island Litigation Cases Consolidated II*, 911 F.Supp. 775, 795-96 (M.D. Pa. 1996); *Grimes v. Hoffmann-LaRoche, Inc.*, 907 F.Supp. 33, 35 n. 2 (D. N.H. 1995)). Therefore, "these cannot be the basis of an opinion based on scientific knowledge under *Daubert*." *Id.*

///

**B.    The Court should exclude plaintiffs' experts' testimony because they fail peer-review, are not based on "objective, verifiable evidence," rely on case studies, fail to cite any accepted standards, use a small, skewed sample, and rely on calculations performed by the legal team.**

Here, none of plaintiffs' experts use a reliable methodology to arrive at their conclusions. Their experience in the field does not overcome their fundamental methodological errors. *Wanke Cascade Dist., Ltd. v. Forbo Flooring, Inc.*, No. 3:13-CV-768-AC, 2017 WL 2403046, at *18-19 (D. Or. May 4, 2017) (Acosta, Mag. J.) (excluding testimony of expert with 45 years of experience in the industry because of methodological errors).

**1.    Dr. Wilson's testimony contradicts her own peer-reviewed study.**

Dr. Wilson's testimony about the number of LGBTQIA+ youth in Oregon's foster care system is not based on any peer-reviewed study or "objective, verifiable evidence." In fact, her own peer-reviewed study (for which she received no compensation) directly contradicts her expert opinion here (for which she received $200/hour). *See Daubert II*, 43 F.3d at 1317 ("experts whose findings flow from existing research are less likely to have been biased toward a particular conclusion by the promise of remuneration."). Dr. Wilson, in her peer-reviewed Los Angeles Study, wrote that "more research is needed . . . to assess the usefulness of the methodology and generalizability of the results beyond Los Angeles County." (Blaesing Decl. Ex. 1 at 5.) But her expert opinion does just what she cautions against in her peer-reviewed study—it generalizes the results beyond one county, Los Angeles County, to an entire state, Oregon. Consequently, her expert opinion does not derive from "matters growing naturally and directly out of research [she has] conducted independent of the litigation." *See Daubert II*, 43 F.3d at 1317.

Dr. Wilson falls far short of providing "objective, verifiable evidence" as she must under *Daubert II. Id.* at 1317-18. In fact, she admits that empirical data does not exist. (Blaesing Decl. Ex. 2 at 123:17-124:17.) At best, she provides only a "bald assurance of validity" when she rests her conclusion on the fact that she "would be surprised" if Los Angeles trailed Oregon with respect to sex and gender affirming policies. (*Id.*) But she cannot resort to speculation in lieu of data. *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1088

(10th Cir. 2000) ("It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate.").

Therefore, the Court must reject Dr. Wilson's testimony. *See Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1422-23 (9th Cir. 1998) (affirming court's decision to exclude testimony of expert who "could not identify any peer-reviewed research justifying his conclusion" or "any [other] objective source, or demonstrate he followed a scientific method embraced by at least some other experts in the field."); *see Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1166 (E.D. Wash. 2009) (excluding expert's opinion as unreliable where it "fl[ew] in the face of the scientific literature reviewed and other expert testimony in this case").

### 2. Fatal methodological errors infect Dr. Steib's and Ms. Rideout's testimony: they rely on case studies and fail to cite to any industry standards.

Dr. Steib and Ms. Rideout base their testimony entirely on case studies of the ten named plaintiffs. But case studies "cannot be the basis of an opinion based on scientific knowledge under *Daubert*." *Hall*, 947 F. Supp. at 1166; *Williams v. Invenergy, LLC*, No. 2:13-CV-01391-AC, 2016 WL 1725990, at *12 (D. Or. Apr. 28, 2016) (Acosta, Mag. J.) (explaining that they "are universally regarded as an insufficient scientific basis for a conclusion regarding causation because case reports lack controls" and that they "do[] not provide sufficient statistical reliability to constitute scientific evidence") (internal citations and quotations omitted).

Moreover, neither expert applied any industry standards to reach their conclusions. Both admit that they did not rely on any federal or Oregon standards when arriving at their conclusions; each of them leaned on their experience in the field. (Blaesing Decl. Ex. 3 at 137:3-9, 137:21-138:2, 139:8-11; Ex. 4 at 167:22-175:7; Steib and Rideout Report at 7.) But their general familiarity with various standards does not ensure that their methodology meets the *Daubert* reliability standard, provide any "objective, verifiable evidence" about reliability, or any information about whether their methods are generally accepted in the field. Therefore, the Court should reject it. *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 516-17 (C.D. Cal. 2012) (excluding entire expert report because the methodology "raise[d] concerns about

reliability" and expert did not provide any information "concerning his methods or whether [those methods] are generally approved in his field.")

In sum, Dr. Steib and Ms. Rideout's methodology amounts to applying a subjective standard to case studies of a small number of unrepresentative cases. Individually, each of the flaws is fatal under *Daubert*. In combination, they give this Court no basis to trust either the "principles and methods" that Dr. Steib and Ms. Rideout relied on or the conclusions they reached. Thus, the Court should reject their testimony.

### 3.    Dr. Puckett's methodology remains a mystery.

Dr. Puckett cannot describe the methodology that resulted in his various conclusions regarding Oregon's foster system. He admits that plaintiffs' paralegal did all the "number-crunching" and is the only person with "firsthand knowledge" of how the calculations were performed. (Blaesing Decl. Ex. 5 at 151:25-152:10, 154:9-13.) Dr. Puckett could not even independently verify either the accuracy or reliability of the calculations upon which he based his conclusions. (*See id.* at 152:11-16.) This outsourcing of "number-crunching" to an interested party does not result in a reliable methodology, so the Court should exclude it. *McClellan*, 710 F. Supp. 2d at 1121 (holding testimony of the plaintiffs' expert was unreliable due to litigation bias where the plaintiffs' counsel provided the expert with the data for the expert's study).

Dr. Puckett's justification that he was only "interpret[ing] some quantitative output" does not pass the *Daubert* test. (*See* Blaesing Decl. Ex. 5 at 191:10-19.) His interpretation is meaningless if he cannot testify that the calculations are valid. *See Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 137 (M.D. Pa. 2015) (rejecting an expert's use of "unreliable and unverifiable inputs" as "garbage in, garbage out"). His inability to independently verify and validate his report's calculations is evident from his testimony. He was unable to explain why his choice of calculations was accurate or appropriate—plaintiffs' paralegal had to interject and supply Dr. Puckett with the correct answer. (Blaesing Decl. Ex. 5 at 148:6-19.) Nor could he testify about the accuracy, validity, or reliability of a sample size upon which his conclusions were based. (*Id.* at 152:11-16.) His inability to answer basic questions about the methodology prevents the Court

from exercising its gatekeeping role under *Daubert*.  Thus, his justification does not give the Court sufficient basis to rely on his testimony.  *Bruno*, 311 F.R.D. at 137 (rejecting expert testimony where expert relied "solely" on another's calculations, "conducted no independent investigation[] into the validity of those [calculations], and had no knowledge of the details surrounding their generation.").

### 4.    Dr. Day admits that her report could not survive peer-review and that she knows little about Oregon's aging-out population.

There is little reason for the Court to rely on Dr. Day's testimony regarding the aging-out population.  She candidly admits that her report could not "qualify as something that could be published in a peer-reviewed journal."  (Blaesing Decl. Ex. 6 at 82:11-14.)  While the inability to publish "weighs against admissibility," it is not necessarily determinative.  *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1235-36 (9th Cir. 2017).  That said, what tips the scales against admissibility is Dr. Day's self-professed ignorance of the topic on which she is offering expert testimony.  Despite offering an expert opinion about Oregon's aging out policies, she admits that she "did not do a deep analytical assessment of Oregon laws . . . and how that was applied."  (Blaesing Decl. Ex. 6 at 82:15-83:8.)  Nor has she ever "done policy analysis . . . specifically . . . to the State of Oregon as it relates to aging out."  (*Id.*)

Instead of focusing on Oregon's policies and practices, Dr. Day focused on outcomes.  (*Id.* at 92:10-23.)  Consequently, she did not establish the necessary connection between Oregon's policies and practices and the outcomes for aging-out youth.  *See B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 969 (9th Cir. 2019), *cert. den.*, *sub nom. Faust v. B. K. by Tinsley*, 206 L. Ed. 2.d 463 (Mar. 23, 2020) (requiring identification of practices "affecting the proposed General Class" to establish commonality).  Nor could she, having failed to study Oregon's policies or practices.  As a result, her methodology fails to provide any insight into the core issue: whether and to what extent Oregon's policies or practices, as opposed to factors outside the State's control, "affect" the outcomes she describes.  *See id.*  Therefore, she has no basis for concluding that "transition-aged youth are chronically underserved by Oregon's DHS."

(Day Report at 3.)  The Court should exclude her testimony.  *See Grodzitsky*, 957 F.3d at 984-85 (explaining that the court admits or excludes evidence based on reliability).

Finally, plaintiffs' delay in hiring Dr. Day prevented her from producing a report that she was "proud of."  (Blaesing Decl. Ex. 6 at 60:12-17.)  Despite investigating the case for over a year, plaintiffs had not even contacted Dr. Day by the time that their class certification motion was initially due.  (*Compare* Dkt. 41 ("motion for class certification is due by 10/8/2019") with Blaesing Decl. Ex. 7 at 3 (plaintiffs making first contact with Dr. Day on 11/5/2019).)  Even after securing an extension, plaintiffs waited a month before contacting Dr. Day, giving her only 19 days to complete her report.  (*Compare* Dkt. 56 ("Motion for class certification is due by 12/2/2019") with Blaesing Decl. Ex. 7 at 3 (plaintiffs making first contact with Dr. Day on 11/5/2019).)  As a result, Dr. Day admits that she did not have enough time to conduct the necessary research or draft her report.  (Blaesing Decl. Ex. 6 at 60:12-20.)  Instead of the three months that she requires to develop a report that she is "proud of," she had only "two and a half weeks to get this turned around."  (*Id.*)  Thus, Dr. Day has not proffered evidence that her opinion is reliable, so the Court should reject it.

///

///

///

///

///

///

///

///

///

///

///

///

///

**Page 12 - DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. WILSON, DR. STEIB, MS. RIDEOUT, DR. PUCKETT, AND DR. DAY**

## CONCLUSION

The unreliable methodologies used by plaintiffs' experts requires the Court to perform its gatekeeping role. The Court should exclude the expert opinion testimony of Dr. Wilson, Ms. Rideout, Dr. Steib, Dr. Puckett, and Dr. Day.

DATED this 3rd day of August, 2020.

ELLEN ROSENBLUM
ATTORNEY GENERAL
FOR THE STATE OF OREGON

By:    *s/ Anna M. Joyce*

David B. Markowitz, OSB #742046
DavidMarkowitz@MarkowitzHerbold.com
Laura Salerno Owens, OSB #076230
LauraSalerno@MarkowitzHerbold.com
Anna M. Joyce, OSB #013112
AnnaJoyce@MarkowitzHerbold.com
Harry B. Wilson, OSB #077214
HarryWilson@MarkowitzHerbold.com
Lauren F. Blaesing, OSB #113305
LaurenBlaesing@MarkowitzHerbold.com
Telephone: (503) 295-3085
    *Special Assistant Attorneys General for*
    *Defendants*

Carla A. Scott, OSB #054725
carla.a.scott@doj.state.or.us
Sheila H. Potter, OSB #993485
sheila.potter@doj.state.or.us
    *Of Attorneys for Defendants*

1013725