**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**Anna M. Joyce, OSB #013112**
AnnaJoyce@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Lauren F. Blaesing, OSB #113305**
LaurenBlaesing@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Tel: (503) 295-3085
Fax: (503) 323-9105

       Special Assistant Attorneys General for Defendants
       Additional Counsel of Record Listed on Signature Page

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| WYATT B. and NOAH F. by their next friend Michelle McAllister; KYLIE R. and ALEC R. by their next friend Kathleen Megill Strek; UNIQUE L. by her next friend Annette Smith; SIMON S. by his next friend Paul Aubry; RUTH T. by her next friend Michelle Bartov; BERNARD C. by his next friend Ksen Murry; NAOMI B. by her next friend Kathleen Megill Strek; and NORMAN N. by his next friend Tracy Gregg, individually and on behalf of all others similarly situated,<br><br>                   Plaintiffs,<br><br>   v.<br><br>KATE BROWN, Governor of Oregon in her official capacity; FARIBORZ PAKSERESHT, Director, Oregon Department of Human Services in his official capacity; REBECCA JONES GASTON, Director, Child Welfare in her official capacity; and OREGON DEPARTMENT OF HUMAN SERVICES,<br><br>                   Defendants. | No. 6:19-cv-00556-AA<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION** |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

SUMMARY OF ARGUMENT ....................................................................................... 2

FACTUAL BACKGROUND ........................................................................................... 4

I.     Oregon's child welfare agency is part of a larger system of care committed to improving the lives of Oregon's foster children. ................................................. 4

     A.     DHS works closely with juvenile courts and other community partners to provide services to foster children, services that are reviewed by juvenile courts and other third parties. ..................................................... 4

     B.     In recognition of needed improvements in the child welfare system, the State is implementing system-wide changes to Oregon's child welfare systems. ......................................................................................................... 6

II.     Plaintiffs' cases are some of "the most challenging types of cases" that a child welfare agency deals with. ................................................................................... 8

ARGUMENT ................................................................................................................... 9

I.     Legal Framework ................................................................................................. 10

     A.     Class actions are the exception, not the rule. ........................................... 10

     B.     *Wal-Mart* demonstrates the limited nature of the class action exception. ............ 11

II.     Plaintiffs have failed to carry their significant burden of proving that any class or subclass can be certified for violation of the Substantive Due Process Clause. ................................................................................................................ 12

     A.     Commonality and typicality: plaintiffs have failed to prove that they are typical of any common policy or practice that binds the class. ........................... 12

     B.     The named plaintiffs are not typical of a class subject to the purported policies and practices to which the State is deliberately indifferent that plaintiffs contend violate substantive due process. ................................................ 15

          1.     Plaintiffs have failed to affirmatively demonstrate that the named plaintiffs are typical of the policies and practices that plaintiffs rely on. ............................................................................... 15

          2.     The named plaintiffs are not typical; rather, their circumstances and experiences are unique to most children in foster care. .................... 15

     C.     Because plaintiffs have failed to prove the existence of the policies and practices that underly their complaint, plaintiffs have failed to prove any common question of law or fact. ..................................................................... 21

          1.     Plaintiffs have fallen short of providing significant proof that the State has acted with deliberate indifference. ........................................ 22

2.     Plaintiffs have failed to prove that the State has a current policy or practice of maltreatment of LGBTQIA+ foster children that causes a substantial risk of harm................................................................ 24

     a.     The State has a policy and practice of providing support and services to every foster child who identifies as LGBTQIA+........................................................................... 24

     b.     Given the State's policies and practices that support LGBTQIA+ foster children, plaintiffs cannot prove that any policy or practice causes a substantial risk of harm to LGBTQIA+ children in foster care........................................... 28

3.     Plaintiffs have failed to prove that the State has a current policy or practice of "inappropriate" or inadequate case planning that causes a substantial risk of harm................................................................. 29

     a.     The State's policies and practices provide for adequate case planning and evaluations for foster children....................... 29

     b.     The State's case planning does not cause a substantial risk of harm to children................................................. 32

4.     Plaintiffs have failed to prove that the State has a current policy or practice of high caseloads.................................................. 34

     a.     The State's recent hiring surge and sustained efforts to increase the number of caseworkers demonstrate that the State does not have a policy or practice of high caseloads. ................................................................. 34

     b.     Plaintiffs have failed to prove that any policy or practice related to caseloads causes a substantial risk of harm. ................. 35

5.     Plaintiffs have failed to prove that the State has a current policy or practice of failing to provide services for the aging-out population that creates a substantial risk of harm..................................... 35

     a.     The State provides a range of services for the aging-out population. ................................................................ 35

     b.     Plaintiffs have failed to prove that the State's policies and practices related to transition planning create a substantial risk of harm................................................. 37

6.     Plaintiffs have failed to prove that the State has a current policy or practice of an inadequate placement array that causes a substantial risk of harm................................................................. 38

     a.     The State's placement array has significantly improved and continues to do so................................................. 38

     b.     Plaintiffs have failed to provide any evidence of a substantial risk of harm caused by a purported lack of placement array.......................................................... 40

III.    There is no class to certify for a CWA claim ................................................................ 41

IV.    Plaintiffs cannot obtain certification of an ADA subclass ................................................. 43

    A.    Plaintiffs have failed to prove that the named plaintiffs are typical of an ADA subclass ................................................................................................................ 43

    B.    Because there is no evidence that the State discriminates against children because of their disability, no ADA subclass exists to certify ................ 44

V.    Plaintiffs' putative subclasses fail to satisfy Fed. R. C. P. 23(c)(5). ................................ 45

VI.    Plaintiffs cannot meet their burden to show that a single injunction can remedy the claims that plaintiffs bring. ........................................................................................ 47

VII.    Several of the named plaintiffs' next friends are inadequate ............................................ 49

    A.    Legal standard for determining the adequacy of next friends ............................. 49

    B.    Ksen Murry, next friend for Bernard .................................................................. 50

    C.    Michelle McAllister, next friend of Wyatt and Noah .......................................... 50

    D.    Kathleen Megill Strek, next friend of Naomi, Kylie, and Alec .......................... 51

CONCLUSION ........................................................................................................................ 51

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*31 Foster Children*,
  329 F.3d 1255, 1271-74 (11th Cir. 2003) ............................................................ 42

*Arc of Wash. State Inc. v. Braddock*,
  427 F.3d 615, 620 (9th Cir. 2005) ...................................................................... 45

*B.K. by next friend Tinsley v. Snyder*,
  922 F.3d 957 (9th Cir. 2019) ...................................................................... passim

*Bhatia v. Corrigan*,
  No. C 07-2054 CW, 2007 WL 1455908 (N.D. Cal. May 16, 2007)................................ 49

*Braam ex rel. Braam v. State*,
  150 Wash.2d 689 (2003)..................................................................................... 42

*Brittain v. Hansen*,
  451 F.3d 982 (9th Cir. 2006) .............................................................................. 21

*Carson P. ex rel. Foreman v. Heineman*,
  240 F.R.D. 456 (D. Neb. 2007)................................................................... passim

*Charlie H. v. Whitman*,
  83 F.Supp.2d 476 (D.N.J. 2000) .................................................................... 42, 45

*Connor B. ex rel. Vigurs v. Patrick*,
  774 F.3d 45 (1st Cir. 2014)........................................................................... 42, 43

*Connor B. ex rel. Vigurs v. Patrick*,
  985 F.Supp.2d 129 (D. Mass. 2013), *aff'd*, 774 F.3d 45 (1st Cir. 2014)................. 33, 41

*D.G. ex rel. Stricklin v. Henry*,
  594 F.Supp.2d 1273 (N.D. Okla. 2009) ................................................................ 42

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ......................................................................... 14, 42

*Evans v. Jeff D.*,
  475 U.S. 717 (1986)........................................................................................... 46

*Farmer v. Brennan*,
  511 U.S. 825 (1994)...................................................................................... 22, 23

*Faust v. B. K. by Tinsley*,
  206 L. Ed. 2.d 463 (Mar. 23, 2020) ................................................................. 11, 12

*Gallant v. Heckler*,
  753 F.2d 1450 (9th Cir. 1984) ............................................................................ 40

*Henry A. v. Willden*,
  678 F.3d 991 (9th Cir. 2012) .............................................................................. 22

*In re Cendant Corp. Sec. Litigation,*
    404 F.3d 173 (3d Cir. 2005)............................................................................ 46

*J.B. ex rel. Hart v. Valdez,*
    186 F. 3d 1280 (10th Cir. 1999) .................................................................... 45

*John B. v. Goetz,*
    626 F.3d 356 (6th Cir. 2010) ........................................................................ 42

*Lewis v. Casey,*
    518 U.S. 343 (1996).................................................................................... 1, 48

*M.B. by Eggemeyer v. Corsi,*
    No. 2:17-CV-04102-NKL, 2018 WL 327767 (W.D. Mo. Jan. 8, 2018) ......... 42

*M.D. by Stukenberg v. Abbott,*
    907 F.3d 237 (5th Cir. 2018) ........................................................................ 41

*M.D. ex rel. Stukenberg v. Perry,*
    675 F.3d 832 (5th Cir. 2012) ........................................................................ 48

*Maney v. Brown,*
    No. 6:20-CV-00570-SB, 2020 WL 2839423 at *18 (D. Or. June 1, 2020).................... 23

*Mendoza v. Tucson Sch. Dist.,*
    No. 1, 623 F.2d 1338 (9th Cir. 1980)............................................................ 46

*Olivia Y. ex rel. Johnson v. Barbour,*
    351 F.Supp.2d 543 (S.D. Miss. 2004)............................................................ 42

*Olmstead v. L.C.,*
    527 U.S. 581 (1999)...................................................................................... 45

*Parsons v. Ryan,*
    289 F.R.D. 513 (D. Az. Mar. 6, 2013)........................................................... 22

*Parsons v. Ryan,*
    754 F.3d 657 (9th Cir. 2014) ................................................................ passim

*Sam M. ex rel. Elliott v. Carcieri,*
    608 F.3d 77 (1st Cir. 2010)........................................................................... 49

*Shook v. Bd. of Cty. Commissioners of Cty. Of El Paso,*
    543 F.3d 597 (10th Cir. 2008) ...................................................................... 48

*Simmons v. Navajo Cnty., Arizona,*
    609 F.3d 1011 (9th Cir. 2010) ...................................................................... 44

*Standal's Patents Ltd. v. Weyerhaeuser Co.,*
    No. CIV. 86-219-FR, 1986 WL 582 (D. Or. Dec. 11, 1986)........................... 47

*T.F. by Keller v. Hennepin Cnty.,*
    No. CV 17-1826(PAM/BRT), 2018 WL 940621 (D. Minn. Feb. 16, 2018) .................. 42

*Tamas v. Department of Social & Health Services,*
    630 F.3d 833 (9th Cir. 2010) ................................................................ 21, 22

*Tinsley v. Flanagan*,
    No. CV-15-00185-PHX-ROS, 2016 WL 8200450 (D. Ariz. May 13, 2016) ................. 49

*United States v. Graf*,
    610 F.3d 1148 (9th Cir. 2010) ....................................................... 41

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .......................................................... passim

*Whitley v. New Mexico Children, Youth & Families Department*,
    184 F.Supp.2d 1146 (D.N.M. 2001) .............................................. 42

*Willis v. City of Seattle*,
    943 F.3d 882 (9th Cir. 2019) ....................................................... 29

**Statutory Authorities**

42 U.S.C. § 671(a)(16) ................................................................ 42

42 U.S.C. § 675(5)(A) ................................................................ 39

ORS 336.807 ........................................................................... 36

ORS 350.300 ........................................................................... 36

ORS 419A.106(1)(a) ................................................................... 5

ORS 419A.116(1)(d)(e) ............................................................... 5

ORS 419A.200 .......................................................................... 5

ORS 419B ............................................................................. 30

ORS 419B.112. ......................................................................... 5

ORS 419B.112(2) ....................................................................... 5

ORS 419B.337(2)(3) .................................................................... 5

ORS 419B.343(1) ....................................................................... 4

ORS 419B.346. ......................................................................... 5

ORS 419B.349 .......................................................................... 5

ORS 419B.360. ........................................................................ 30

ORS 419B.440 .......................................................................... 6

ORS 419B.449. ......................................................................... 5

ORS 419B.470 .......................................................................... 5

**Rules and Regulations**

28 CFR § 35.130(d) ................................................................... 45

45 CFR § 1355.43, § 1355.44(a) ..................................................... 26

Fed. R. Civ. P. 23 ............................................................................................. 15, 24

Fed. R. Civ. P. 23(a) ............................................................................................. 10

Fed. R. Civ. P. 23(b)(2) .................................................................................... 10, 47

Fed. R. Civ. P. 23(c)(5) .................................................................................... 45, 46

Local Rule 26-4(c) ................................................................................................... 3

OAR 410-170-0020(23) ........................................................................................ 25

OAR 410-170-020(11) ............................................................................................. 8

OAR 410-170-0030(4)(d)(A) ................................................................................ 25

OAR 413-015-0465(1)(a) ................................................................................. 26, 30

OAR 413-015-0465(1)(d) ...................................................................................... 30

OAR 413-030-0400 ............................................................................................... 36

OAR 413-040-0010 ............................................................................................... 29

OAR 413-200-0308(2)(k) ...................................................................................... 25

OAR 413-200-0335(1)(b)(A) ................................................................................ 25

OAR 413-200-0352(1)(d) ...................................................................................... 25

OAR 413-200-0358(2)(f) ....................................................................................... 25

OAR 413-215-0031 ............................................................................................... 25

OAR 413-215-0316(3)(g) ...................................................................................... 25

**Treatises**

William B. Rubenstein, *Conte Alba., and Herbert B. Newberg, Newberg on Class Actions*, § 3:28 (5th ed. 2011) ......................................................................... 18

## INTRODUCTION

Plaintiffs' case uses experiences of a handful of extremely high-needs children in the Oregon foster care system to demand statewide class certification.  Plaintiffs assert that system-wide policies put all children at risk; however, most of those "policies" do not exist at all. Moreover, none of the purported policies are the cause of the named plaintiffs' experiences.  It is no surprise then, that the plaintiffs' experiences and needs are not typical of children in Oregon Department of Human Services ("DHS") custody.  Plaintiffs cannot maintain a class action by stringing together a handful of tragic experiences with unrelated statistics that do nothing more than illustrate the enormous challenges facing all foster care systems.

When the curtains are pulled back on plaintiffs' claims, it becomes apparent that this case follows the playbook that plaintiffs' counsel has used in 22 other lawsuits: they select a handful of children with unusually high and complex needs and then extrapolate those children's circumstances to the thousands of other children in the child welfare system, all in an attempt to sidestep elected officials, state juvenile courts, and state agencies in favor of third-party monitors and perpetual federal court intervention.  Plaintiffs' counsel's playbook has forced other states to spend millions of dollars on litigation and settlement, followed by decades of monitoring by third parties, without ascertainable benefit to children in those states.  And despite asking the Court to appoint a monitor to oversee nearly all aspects of Oregon's child welfare system, plaintiffs have done little to tailor their claims and evidence to Oregon's child welfare system; plaintiffs' experts, for instance, admit to knowing nearly nothing of Oregon's policies and practices, having conducted isolated reviews of incomplete data hand-picked by plaintiffs' counsel.

The State agrees that more needs to be done to improve the child welfare system, which is precisely why DHS, the Governor, the Legislature, and community partners have been working in concert to fund and implement significant changes to that system.  Those changes have resulted in more caseworkers, more foster homes, and greater placement array.  Oregon's leaders must retain their ability to continue shaping and reforming Oregon's child welfare system, rather than allowing plaintiffs' counsel to imbue themselves with that authority.  *Lewis v. Casey*, 518 U.S. 343, 349-50 (1996) ("it is not the role of courts, but that of the political

branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution . . . But the distinction between the two roles would be obliterated if, to invoke intervention of the courts, no actual or imminent harm were needed, but merely the status of being subject to a governmental institution that was not organized or managed properly.").

Thus, defendants Governor Brown, Director of the Oregon Department of Human Services Fariborz Pakseresht, Director of Child Welfare Rebecca Jones Gaston, and the Department of Human Services (collectively, "the State"), ask this Court to deny plaintiffs' motion for class certification and allow the State, in conjunction with the Governor, the Legislature, juvenile courts, and other community partners, to continue strengthening Oregon's child welfare system successes and serving Oregon's foster children and their families.

## SUMMARY OF ARGUMENT

Class actions are the exception, not the rule. To qualify for the exception, plaintiffs carry a heavy burden. They must demonstrate, among other things, that (1) the State has common policies or practices that violate the law; (2) plaintiffs are typical of those policies or practices; (3) a class-wide injunction would provide relief to every class member; and (4) that plaintiffs' next friends are adequate.

As to each of their burdens, plaintiffs here have failed. They have not—and indeed, cannot—demonstrate that any of the five policies and practices that plaintiffs identify exist or cause harm to Oregon's foster children. Nor have plaintiffs demonstrated that the State has been deliberately indifferent to those purported policies or practices. To the contrary, as plaintiffs' own expert acknowledges, the evidence demonstrates that the State has fully embraced recommendations to improve its child welfare system and has made significant strides in doing so, defying the notion that the State has been deliberately indifferent.

Plaintiffs have also failed to demonstrate that they are typical of any such policies or practices; to the contrary, each of plaintiffs' cases are among the most exceptional cases that child welfare agencies deal with. In fact, their cases are so exceptional that most caseworkers will only have one or two such cases in their career.

Plaintiffs are also not typical because they have not demonstrated that they have experienced harm from the purported policies or practices.  Bernard C., for instance, cannot be typical of a class of LGBTQIA+ foster children in Oregon that have been harmed by the State's policies and practices related to LGBTQIA+ foster children.  As a transgender male, ███ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████[1]  His case reflects exemplary casework and positive outcomes and thus cannot be typical of any harmful State policy or practice.

Moreover, plaintiffs must prove that an injunction can provide relief to each member of the class.  But plaintiffs cannot meet that burden.  The relief that plaintiffs seek is far too specific and individualized to allow a court, as it must be able to do under Rule 23(b)(2), to enjoin or declare unlawful a policy or practice as to *all* class members.

Finally, several of plaintiffs' next friends are inadequate and should not be allowed to serve in that role.  By their own admissions, two of the next friends have expressly declined to educate themselves about plaintiffs' cases, which prevents them from fulfilling their duty to discover the current circumstances facing the named plaintiffs.  Yet another of the next friends cannot serve because of a conflict of interest ████████████████████████████ ███████████████████████████████████████████████████

For each of those reasons—either individually or in combination—plaintiffs have failed to demonstrate that their motion for class certification falls into the exception to the general rule that cases should be litigated individually.  At their core, plaintiffs' claims are fundamentally

---

[1] Consistent with Local Rule 26-4(c) and the Amended Stipulated Protective Order (Dkt. 50), the publicly filed version of the State's opposition filing contains redactions of protected information that could identify or cause harm to the named plaintiffs and third-party individuals.  The Court has instructed the parties to "take seriously their obligation to make every effort to protect the identities of protected individuals" (Order and Opinion (Dkt. 49) at 7), and the Court requires the parties to use pseudonyms, appropriate redactions, and file documents under seal to protect individuals from identification and harm.  (*Id.* at 6; Amended Stipulated Protective Order (Dkt. 50) ¶ 4.)  Additionally, the State has redacted quotations from Ex. 3 to the Decl. of Marcia Robinson Lowry in Support of Named Plaintiff Children's Motion for Class Certification (Dkt. 67-1) because it is currently filed under seal and is the subject of the State's pending motion to permanently seal the exhibit.  (Dkt. 72.)

**Page 3 -   DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION**

incompatible with the notion of a class action: plaintiffs are attempting to certify a class of every single foster child in Oregon, notwithstanding that each of those children are differently situated, have dramatically different needs, are receiving individually tailored care, and—by plaintiffs' expert's own admission—the State is not deliberately indifferent to foster children. This Court should therefore deny their motion to certify.

## FACTUAL BACKGROUND

### I.     Oregon's child welfare agency is part of a larger system of care committed to improving the lives of Oregon's foster children.

#### A.     DHS works closely with juvenile courts and other community partners to provide services to foster children, services that are reviewed by juvenile courts and other third parties.

The decision whether to certify the putative general class and subclasses must be made within the framework of Oregon's child welfare system. That is because what plaintiffs are challenging is not an insular set of one agency's policies but rather a collaborative, and by extension, interconnected and multi-layered system. Stated differently, the child welfare system does not operate in a vacuum. Rather, it is one part of a statewide system tasked with overseeing the welfare of Oregon's foster children. The other parts of the system include the Legislature, the Governor, juvenile courts, Oregon's Citizen Review Board ("CRB"), the children's attorneys, the parents' attorneys, federally recognized tribes as applicable, Court Appointed Special Advocates ("CASAs"), and other community partners.

Each part of the system has a particular role, but none functions in isolation. For example, DHS and the juvenile courts work in tandem to develop, approve, and implement plans for care and treatment of children. After DHS takes a child into care, and once the juvenile court establishes jurisdiction and wardship, DHS must create the plan for care or treatment of the child. DHS also provides a copy of the case plan and timetable for its implementation to the juvenile court for review. The juvenile court must then review (1) whether DHS has prepared a written case plan and (2) the contents of that plan. ORS 419B.343(1); (Decl. of Shawnna Bennett ("Bennett Decl.") Ex. 1 at 17-22.) Additionally, the juvenile court can also specify the particular care, supervision, and services to be provided by DHS, and may make an order

regarding visitation of the child's parents or siblings.  ORS 419B.337(2)(3).  The juvenile court must review placements or proposed placements, *see* ORS 419B.349, and may hold review hearings to evaluate the child's condition and circumstances and whether modifications in placement are necessary, *see* ORS 419B.449.  At specified intervals, the juvenile court must also determine whether DHS has offered "appropriate services" and has made reasonable efforts towards the child's permanency plan.  ORS 419B.470, .476(3)(b).  If a child needs medical care or other special treatment by reason of a physical or mental condition, the juvenile court may indicate the general care it deems appropriate.  ORS 419B.346.  Parties have the right to appeal from certain juvenile court orders.  ORS 419A.200, 419B.449(7), .476(8).

Similarly, the CRB provides periodic oversight of the cases of children in foster care.  As part of their work, the CRB convenes no less frequently than every six months, *see* ORS 419A.106(1)(a), to evaluate the "appropriateness of the placement" and the State's compliance with the case plan for each child in foster care.  ORS 419A.116(1)(d)(e).  In making those evaluations, the CRB reviews court orders and judgments, DHS's court reports and case plans, and CASA reports.  (Bennett Decl. Ex. 4 at 12-17.)  At the conclusion of the review, the CRB provides findings and recommendations on DHS's reasonable efforts and whether DHS made diligent efforts to place the child with a relative, has ensured that the child is receiving services that will safeguard the child's safety, health, and well-being, and is in compliance with the case plan and court orders.  (*Id*. at 16-17.)

Additionally, in every juvenile case, a court "shall appoint" a CASA, and that CASA is deemed a party in the proceedings.  ORS 419B.112.  A CASA's duties include investigating "all relevant information" about the case, advocating for the child and ensuring that all relevant facts are brought to the court's attention, "facilitat[ing] and negotiat[ing] to ensure that the court, [DHS], if applicable, and the child or ward's attorney, if any, fulfill[ing] their obligations to the child or ward in a timely fashion[,]" and monitoring "all court orders to ensure compliance and to bring to the court's attention any change in circumstances" that might require modification of an order.  ORS 419B.112(2).

Every child has their own attorney, as do the biological parents.  Any parent or attorney for the child may request a review hearing after receiving reports from the agency that include information about the child's placement, treatment, and care.  ORS 419B.440, .443, .449.

Furthermore—and particularly with respect to children who have needs that require the involvement of multiple systems—DHS works in coordination with the Oregon Health Authority ("OHA") to ensure care coordination and access to appropriate levels of care.  When children in foster care have significant mental health needs, they may require Psychiatric Residential Treatment Services ("PRTS").  OHA, in conjunction with Coordinated Care Organizations, establish and provide PRTS.  (Decl. of Anna Joyce ("Joyce Decl.") Ex. 1 at 5, Ex. 2 at 13, Ex. 3 at 1, Ex 4 at 1.)  The Oregon Youth Authority ("OYA") also provides services for youth.  (Joyce Decl. Ex. 1 at 5.)

In sum, DHS acts in concert with multiple independent stakeholders, some of whom, like the juvenile court, have decision-making authority about the very issues that plaintiffs criticize. As described in the legal argument below, the interplay between the various stakeholders and decision-makers undermines the ability of the court to resolve all of plaintiffs' claims in a single stroke and underscores how care for each child is individually tailored and specific to the child's particular needs.

**B.     In recognition of needed improvements in the child welfare system, the State is implementing system-wide changes to Oregon's child welfare systems.**

Beginning in 2018, the State, in cooperation with its non-governmental partners, began implementing changes to the child welfare system in Oregon.  Those changes began with a 2018 Secretary of State audit, which made various recommendations to improve management of foster care (including recruitment and retention of foster parents) and addressed understaffing and high caseloads.  (Class Action Compl. (Dkt. 1) ("Compl."), ¶¶ 220-223.)

DHS prepared a response to the audit, agreeing with the Secretary of State's recommendations and explaining what DHS was doing to address the recommendations.  (Joyce Decl. Ex. 5 at 64-85.)  DHS described the steps that it would take to implement the recommendations and improve the child welfare system.  (*Id.*)  In a follow-up audit, the

Secretary of State concluded that DHS "made progress on *all* 24 recommendations from the original audit, fully implementing eight." (Joyce Decl. Ex. 6 at 2) (emphasis added.)

Governor Brown has also acted to address specific gaps in the foster care system. On April 18, 2019, she issued Executive Order No. 19-03. (*Id.*, Ex. 7.) In that order, Governor Brown acknowledged that the Child Welfare Program is understaffed, that the most suitable available placements for some high-needs youth were at facilities outside of Oregon, and that there are not enough foster home placements in Oregon. (*Id.* at 1.)

She ordered the creation of a Child Welfare Oversight Board ("Board") to advise the Governor on DHS's Child Welfare Program. (*Id.* at 1.) Governor Brown further ordered the creation of a management team to implement her directives, directives that will be based on the Board's recommendations. (*Id.*) Together, the management team and Board were tasked with making and implementing recommendations related to: (1) out-of-state foster care placements; (2) building capacity for both therapeutic and general foster care; (3) developing adequate in-home capacity for children of color and with intellectual and developmental disabilities, and for LGBTQIA+ youth; and (4) developing recommendations to address workforce challenges in providing services to foster children. (*Id.* at 2.) The Governor also hired Alvarez & Marshal ("A&M"), a global professional services firm with a reputation for performance improvement, to help DHS improve various parts of its programs. (Joyce Decl. Ex. 8.)

The Oregon Legislature has also been an important part of the changes. In 2019, the Legislature passed Senate Bill 1, establishing a Systems of Care Advisory Council. The purpose of that Council is to "develop and maintain a state system of care policy and a comprehensive, long-range plan and recommendations for a coordinated state system of care" between multiple agencies. (*Id.*, Ex. 4 at 2.) The Council is tasked with making recommendations about how to maintain and strengthen the systems of care and works in conjunction with DHS, OHA, and OYA. (*Id.*)

The result of these collective efforts is notable. The number of children residing in out-of-state placements has decreased from 88 to 0. (*Id.*, Ex. 9 at 1-2.) The number of children in foster care is down to 6,724 (*id.* at 3)—the lowest number in at least fourteen years—and the

number of DHS-certified foster homes has increased from 3,661 to 3,802.  (*Id.*, Ex. 9 at 3-4, Ex. 10 at 9, Ex. 11 at 7, Ex. 12 at 3.)  Additionally, a recent Secretary of State audit noted that the "Systems of Care" approach is a "significant step" towards upgrading coordination of services for children with distinctive mental or behavioral health needs.  (*Id.*, Ex. 1 at 24.)  That same audit observed that Oregon "ranked relatively well—from 10th [in 2016] to 25th—on seven key family measures among states."  (*Id.* at 14.)

Additionally, DHS, OHA, and OYA have increased behavior rehabilitation services ("BRS") and PRTS for high-needs foster children.  DHS contracts with private agencies to provide BRS services, including behavioral intervention, counseling, and skills-training for foster children who have psychosocial, emotional, and behavioral disorders in therapeutic foster care or residential settings.  OAR 410-170-020(11), (14)-(15).  As noted above, PRTS provides for children with longer-term residential or psychiatric care.  (Joyce Decl. Ex. 13 at 3.)

The number of BRS and PRTS beds has steadily increased over the past two years.  DHS has increased bed capacity for high-needs children by 90 in 2019, with more beds anticipated in 2020.  (*Id.*, Ex. 3 at 1, Ex. 10 at 12.)  Additionally, DHS, in partnership with OHA, created seven new PRTS beds and has plans to add 25 more in 2020.  (*Id.*, Ex. 3 at 1, Ex. 14 at 2.)

Those improvements are just the beginning.  The State recognizes that the kinds of transformations that the State is undertaking will take years to fully implement.  (Joyce Decl. Ex. 6 at 21.)  That amount of time is not a function of inertia or negligence, but rather a reflection of the length of time that making these kinds of changes takes.

## II.   Plaintiffs' cases are some of "the most challenging types of cases" that a child welfare agency deals with.

The array of services that the State is in the process of improving is particularly impactful for foster children with the highest needs.  Although plaintiffs fall into that category, the majority of foster children do not.  Most children in Oregon's foster care system experience few placements and reside with a family in Oregon.  For example, the typical foster child has two or fewer placements and resides in a family setting, not an institution.  (Decl. of Kevin Cahill ("Cahill Decl.") Ex. 1 ¶¶ 83-84.)  In addition, the typical child has not experienced

 (Decl. of Julie Collins ("Collins Decl.")
Ex. 1 at 4-6.)  Nor has the typical child has not experienced ███████████████████
███████████████ (*Id*. at 4-6.)

Plaintiffs, in contrast, do not resemble the typical child in foster care (and, as detailed

below, that in turn means that a class cannot be certified).  Rather, their experiences represent

"some of the most challenging types of cases that a child-welfare agency deals with."  (Collins

Decl. Ex. 1 at 4.)  A quantitative analysis of Oregon's foster care population underscores that

point.  Less than 10% of Oregon foster children have 11 or more placements, but 40% of the

named plaintiffs fall into this category.  (Cahill Decl. Ex. 1 ¶ 83.)  Only 9% of Oregon foster

children live in ██████ and ██████ counties, but ██████ of the named plaintiffs come from those

counties.  (*Id.* ¶ 82.)  30% of Oregon foster children come from the tri-county area, but none of

the named plaintiffs come from any of Oregon's three most populous counties.  (*Id.* ¶¶ 82, 91.)

Less than 10% of Oregon foster children have an institutional placement during their time in

care, but 70% of the named plaintiffs required intensive services that only an institutional facility

can provide, at some point during their time in foster care.  (*Id.* ¶ 84.).

In addition, each plaintiff came into foster care with a constellation of injuries that

differentiate them from most children in foster care.  (Collins Decl. Ex. 1 at 16.) ████████████

████████████████████████████████████████, both of which are areas

of emerging concerns in the child welfare field and defy simple solutions.  (*Id.* at 4-6.)  In fact,

recognition of these injuries is so new within the child welfare field that it has yet to develop

evidence-based solutions to address either.  (*Id.* at 4.)  Each plaintiff presents DHS with a unique

confluence of challenges that differentiates them from the typical child that enters care.  (*Id.* at 6-

16.)  As described below, the complexity and uniqueness of their cases is ultimately fatal to their

request to have the general and subclasses certified.

## ARGUMENT

Plaintiffs' motion for class certification should be denied because plaintiffs fail to

demonstrate that there are common questions of law or fact or that their claims are typical of

those in the putative general class. Plaintiffs' evidence is also insufficient to show, as they must, that the State has been deliberately indifferent to their needs: to the contrary, all of plaintiffs' evidence demonstrates the opposite. Moreover, the court cannot rely on their experts' testimony because they admit to knowing little about Oregon's foster population, policies, or practices and use unreliable methodologies to arrive at their conclusions.[2] Finally, plaintiffs have failed to show, as they must, that their claims are remediable through a single class-wide injunction and that all of plaintiffs' next friends are adequate.[3]

## I.     Legal Framework

### A.     Class actions are the exception, not the rule.

Class certification "is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quotation marks and citation omitted). Plaintiffs bear the burden of establishing: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. FRCP 23(a). Plaintiffs must also establish that the State "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FRCP 23(b)(2).

---

[2] The State has filed a separate motion to exclude plaintiffs' experts' opinions in their entirety. To the extent that the Court declines to do so, it should nonetheless afford the opinions little weight for the reasons explained herein.

[3] Plaintiffs' claims should also be dismissed outright for the reasons set forth in the State's Motion to Dismiss: (1) the foster care conditions included in plaintiffs' complaint do not constitute a constitutional violation; (2) plaintiffs have no privately enforceable right under the Child Welfare Act; and (3) plaintiffs' ADA and Rehabilitation Act allegations fail to state a cognizable claim. (Defs.' Mot. to Dismiss or, in the Alternative, Make More Definite and Certain (Dkt. 31) ("Motion to Dismiss").) The State will not repeat those arguments here, but they nonetheless remain bases upon which plaintiffs' motion should be denied.

Rule 23 is not "a mere pleading standard." *Wal-Mart*, 564 U.S. at 350. Plaintiffs' burden is significantly higher: they must "affirmatively demonstrate" that there are *in fact* common questions of law or fact and that the representative parties are typical of the claims and defenses of the class. *Parsons v. Ryan*, 754 F.3d 657, 674 (9th Cir. 2014), quoting *Wal-Mart*, 564 U.S. at 350. In this context, plaintiffs must make a factual showing to "affirmatively prove" their compliance with the Rule 23. *Id.*

**B.      *Wal-Mart* demonstrates the limited nature of the class action exception.**

*Wal-Mart* itself reflects the narrow scope of class actions and, concomitantly, the heavy burden that plaintiffs seeking class certification carry. In *Wal-Mart*, the plaintiffs alleged sex discrimination by their supervisors. In addressing the question of commonality, the court observed that Rule 23(a)(2)'s language is easy to misread, since "any competently crafted class complaint literally raises common 'questions.'" *Wal-Mart*, 564 U.S. at 349 (internal citation omitted). Instead, the plaintiffs' claims must "depend upon a common contention" that is capable of class-wide resolution. *Id.* at 350. Doing so requires "significant proof," after a "rigorous analysis." *Id*. at 350, 351, 353 (internal quotation omitted). The *Wal-Mart* plaintiffs failed to do so; more specifically, the plaintiffs failed to identify a "specific employment practice" that tied the 1.5 million claims together. *Id*. at 357. In reaching that conclusion, the Court observed that the plaintiffs filed 120 affidavits reflecting experiences of discrimination relating to 235 Wal-Mart stores, out of a total of 3,400 stores. More than half of the 120 reports were concentrated in six states, and 14 states reflected no reports of discrimination. The court concluded that evidence fell short of demonstrating that the entire company "operate(s) under a general policy of discrimination." *Wal-Mart*, 564 U.S. at 358 (internal quotation omitted). Other than their gender and the lawsuit, the plaintiffs failed to prove any unifying policy. *Id*. at 359-60 (citing Kozinski, J. dissent).

The Ninth Circuit's recent decision in *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957 (9th Cir. 2019), *cert. den.*, *sub nom. Faust v. B. K. by Tinsley*, 206 L. Ed. 2.d 463 (Mar. 23, 2020), does not alter *Wal-Mart*'s caution that class actions are the exception, not the rule. Indeed, both

factually and legally, *B.K.* is inapposite. *B.K.* involved Arizona's foster care system, which faces unique challenges that do not reflect Oregon's experience, legal framework, or ongoing reforms.

Moreover, in *B.K.*, the state agency did not "seriously dispute" whether, as a factual matter, Arizona's challenged policies and practices existed. *Id*. at 969. Instead, the agency challenged the legal validity of *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014). *B.K.*, 922 F.3d at 969 ("counsel for the [defendants] conceded that they were not challenging the district court's application of *Parsons*, but the validity of *Parsons* itself."). In contrast, here, the State is in fact "seriously disput[ing]" the existence of the policies and practices and whether plaintiffs are typical of any of those policies and practices. *B.K.* thus provides little guidance concerning this case. *Id.*

**II.    Plaintiffs have failed to carry their significant burden of proving that any class or subclass can be certified for violation of the Substantive Due Process Clause.**

As demonstrated below, this case does not fall within the exception to the general rule that litigants must bring individual claims. Much like the plaintiffs in *Wal-Mart*, plaintiffs here have failed to demonstrate a common practice or policy that binds any class or subclass together or that they are typical of any such policy or practice.

**A.    Commonality and typicality: plaintiffs have failed to prove that they are typical of any common policy or practice that binds the class.**

To demonstrate commonality in the context of a civil rights lawsuit, plaintiffs must demonstrate that there is a set of policies or practices that apply to all of the members of the class in the same way; those policies and practices are the critical foundation for both the substantive constitutional challenge as well as the requirement that there be "questions of law or fact common to the class" under Rule 23(a)(2). As *Wal-Mart* made clear, plaintiffs bear the burden of showing that all their claims "depend upon a common contention . . . of such a nature that it is capable of class-wide resolution." *Wal-Mart*, 564 U.S. at 350.

In the context of civil rights claims, this "common contention" turns on the identification of an allegedly unconstitutional system-wide practice or policy that affects all the putative class members. *Id.* at 350. This requires identification of the elements of the class members' claims.

*Parsons*, 754 at 676 ("to assess whether the putative class members share a common question, the answer to which 'will resolve an issue that is central to the validity of each one of the [class members'] claims,' we must identify the elements of the class members' case-in-chief." (internal citation omitted)).  The court thus looks to the merits of the plaintiffs' underlying claims: a court must "probe behind the pleadings" because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  *Wal-Mart*, 564 U.S. at 350-51 (quotation marks and citations omitted).

Here, the centerpiece of plaintiffs' lawsuit is a substantive due process claim on behalf of "[a]ll Oregon foster children."  (*See.* Pls.' Mot. to Certify As Class Action (Dkt. 64) ("Mot.").)  The elements of that claim require proof (1) of State policies *and* practices that expose all class members to a substantial risk of harm to their liberty interests and (2) that state officials acted with such deliberate indifference towards that risk of harm that their actions "shock the conscience."  *B.K.*, 922 F.3d at 968.  Clearly identifying the challenged policies is essential because those policies are the "glue" that hold a class together.  *Id.* at 969.  Moreover, these policies must "expose *all* persons within [the putative class] to a substantial risk of harm" and that "all members of the class are subject *identically* to those same policies and practices."  *Id.* at 968*; Parsons*, 922 F.3d at 679 (emphasis added).

Because analyzing the propriety of any putative class depends on the substantive law underlying the claims, *see B.K.*, 922 F.3d at 968-69, it is critical to evaluate each alleged policy and practice within its legal framework, as well as within the legal framework of a class action. Here, plaintiffs' motion is replete with over a dozen bullet point "common questions," but it is not clear as to what specific state agency *policies* they challenge.  At best, the five purported policies that thread throughout plaintiffs' motion appear to be:

- failure to count LGBTQIA+ children;

- inappropriate case planning and evaluations;

- high caseloads and understaffing;

- failure to provide aging-out/transition planning services; and

- an inadequate array of appropriate placements.[4]

In addition to providing the existence of common policies or practices to which the State is deliberately indifferent, plaintiffs must also prove that they are typical of the alleged common policies or practices and that the State has been deliberately indifferent to those policies and practices. The representative must be part of the class and "possess the same interest and suffer the same injury as the class members." *Wal-Mart*, 564 U.S. at 348-49 (quotation marks and citation omitted). The named plaintiffs' representative claims are "typical" if they are "reasonably coextensive with those of absent class members." *B.K.*, 922 F.3d at 969-70 (quotation marks and citation omitted). The "test for typicality" is whether the other members have "the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Parsons*, 754 F.3d at 685 (quotation marks and citation omitted). As with commonality, plaintiffs must "affirmatively demonstrate" typicality.[5] *Id.* at 674.

Although courts generally address commonality and typicality in sequential order—first determining whether a common policy or practice exists and then determining whether plaintiffs are typical of that policy or practice—the State here inverts that analysis. That is because, although plaintiffs fail to meet both burdens, they do little to try to establish that plaintiffs' claims are typical, which in turn makes disposing of their motion on that ground an easier analytical path. As described below, the putative plaintiffs' experiences are not, by any stretch, typical; rather, their experiences are among the most unique facing child welfare agencies, and they represent the circumstances of only a very small portion of children in foster care.

---

[4] If plaintiffs add more policies in their reply brief, the State requests the opportunity to file a sur-reply before a class action is certified on a policy for which plaintiffs have put no evidence in the record.

[5] Whether a plaintiff is typical must be decided in the context of several factors, including defenses to each of the named plaintiffs' claims. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). But because there has been no ruling on the State's Motion to Dismiss, the State has yet to file an answer in which it will raise any applicable defenses. If this Court certifies the class, and if any of the State's defenses would defeat typicality, the State will seek to de-certify the appropriate class or subclass.

**Page 14 - DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION**

**B.    The named plaintiffs are not typical of a class subject to the purported policies and practices to which the State is deliberately indifferent that plaintiffs contend violate substantive due process.**

**1.    Plaintiffs have failed to affirmatively demonstrate that the named plaintiffs are typical of the policies and practices that plaintiffs rely on.**

Plaintiffs have not met their burden to show that the ten named plaintiffs are typical for a class-wide substantive due process claim.  In fact, plaintiffs have failed to offer any detail regarding how the ten named plaintiffs are typical of the 6,724 children that they seek to represent.  In lieu of a thorough analysis connecting the ten individual cases across an entire class of thousands, plaintiffs note only that plaintiffs are in the foster care system and their experiences "contain varying factual injuries, such as physical abuse, sexual abuse, neglect, and inadequate mental and physical healthcare, among others."  (Mot. at 46.)  Nevertheless, plaintiffs assume that they all face the same risk of harm and that risk of harm can be attributed to the putative general and subclasses as a whole.

But plaintiffs have not shown, statistically or otherwise, how the named plaintiffs' unique circumstances can be projected onto the class that they seek to represent.  Not only does plaintiffs' cursory effort shortchange the Court of meaningful analysis as to how each of the purported policies affects each of the named plaintiffs, it also falls short of plaintiffs satisfying their burden to prove that they are in fact typical of the putative class.  Plaintiffs seek relief spanning the entire scope of Oregon's foster care system, up to and including monitoring of thousands of individual children's cases.  To obtain that relief, they must at a minimum fulfill their obligations under FRCP 23 to demonstrate typicality.  They have failed to do so.[6]

**2.    The named plaintiffs are not typical; rather, their circumstances and experiences are unique to most children in foster care.**

The evidence falls short in any event.  Plaintiffs represent the exceptional foster child, not the typical one.  Their family histories alone— ███████████████████████████
███████████████—depict children who have experienced exceptionally challenging

---

[6] If plaintiffs file a reply in which they make typicality arguments in the first instance, the State requests a sur-reply to respond, if necessary.

circumstances.  (Collins Decl. Ex. 1 at 6-16.)  ███████████████████

█████████████████████████████  (*Id.* at 16.)  Predictably, as a result, ██████

███████████████████████  that most children in the foster system do not have.

(*Id.*)  Their symptoms manifest in unique ways (████████████████████████

████████████████).  (*Id.*)  But their cases are "not the norm"; rather, they take up an

"inordinate amount of a case workers' time" because of the multitude of issues facing the

children and their families.  (*Id.* at 6.)  Indeed, plaintiffs' cases are "some of the most challenging

types of cases that a child-welfare agency might have to deal with.  They are by no means

representative of the most common cases that a child-welfare agency deals with."  (*Id.* at 4.)

Additionally, the number of plaintiffs is also "too few" to establish typicality and "their

inclusion is far from random."[7]  (Cahill Decl. Ex. 1 ¶ 81.)  They are not geographically typical of

children in foster care as none come from any of Oregon's three most populous counties and

████████████████████████  (*Id.* ¶ 82.)  Their experience in foster care is also an outlier.

Most children in foster care do not experience more than 11 placements or require placement in

an institutional setting; in fact, less than 10% of children experience either one.  (*Id.* ¶¶ 83-84.)

Yet both are typical experiences for the named plaintiffs, 40% of whom have more than 11

placements and ██████████████████████████████████████████████████

(*Id.* ¶ 83.)

Moreover, as described below, as to the specific policies and practices that plaintiffs

allege, plaintiffs are not typical because they have not suffered the injuries that they allege apply

class-wide.  *Wal-Mart*, 564 U.S. at 348-49 (to be typical, plaintiffs must "possess the same

interest and suffer the same injury as the class").

**Inadequate case planning**:  Plaintiffs allege that the State has a policy or practice of

failing to provide adequate or appropriate case planning to which the State is deliberately

indifferent.  But every single named plaintiff has a case plan, a child and adolescent needs and



---

[7] As described in the concurrently filed Motion to Dismiss Moot Claims, five of the ten
named plaintiffs have left the child welfare system.  Thus, if ten is too few, five is even far too
fewer.

strengths ("CANS") assessment, and/or a nursing assessment; in fact, many plaintiffs have multiple case plans and assessments.[8]  In every case, the juvenile court has approved the case plan; where it did not initially approve, the caseworker developed a new one to meet the court's expectations.  *See* n. 8.  Plaintiffs cannot be typical of a class of inadequate or inappropriate case planning when an independent juvenile court has ruled on the adequacy of those plans.  And plaintiffs' own evidence does not establish that plaintiffs are typical; indeed, as described below, plaintiffs' own experts were complimentary of the State's case planning.

**High caseloads/understaffing**:  Plaintiffs also allege that the State has a policy or practice of too few caseworkers, resulting in heavy caseloads and an inability to render necessary services to foster children.  As to that alleged policy, the named plaintiffs are not typical.  Plaintiffs' experts were complimentary of DHS's casework and services that caseworkers provided for the named plaintiffs.  For instance,

- Kylie R. ("Kylie") and Alec R. ("Alec") received  (Decl. of Marcia Robinson Lowry ("Lowry Decl.") Ex. 3 (Dkt. 67-1) at 57); and both children had "in fact healed a bit" during their time in care.  (Patricia Rideout Dep. attached to Joyce Decl. as Ex. 15 at 189:4-8 ("Rideout Dep.").)

- As to Kylie and Alec, plaintiffs' expert highlighted  (Lowry Decl. Ex. 3 at 56, 59.)  The State's foster care ombudsman similarly commended the caseworker for her efforts and long hours to help the siblings and ██████ ████ by the DHS team.  (Bennett Decl. Ex. 2 at 2.)

- ████████████████████████████

---

[8]  (Bennett Decl. Ex. 1 at 1-16, 23-128 (Wyatt and Noah); Ex. 2 at 5-12, 72-151 (Kylie and Alec); Ex 3 at 1-160, 176-200 (Unique); Ex. 4 at 1-11, 18-65, 67-238 (Simon); Ex. 5 at 1-32, 37-111, 115-122 (Ruth); Ex. 6 at 82-233 (Bernard); Ex. 7 at 4-45 (Naomi); Ex. 8 at 1-203, 219-364, 366-459, 461-465 (Norman).)

██████████████████████ (Lowry Decl. Ex. 3 at 36.)

- Ruth T.'s ("Ruth") ███████████████████████████████
  ████████████████████████████████████████
  ██████████████████ (Lowry Decl. Ex. 3 at 143; Bennett Decl. Ex. 5 at 33, 112, 114, 115, 116.)

In sum, given the extensive casework by the named plaintiffs' caseworkers, plaintiffs cannot be typical of a practice of overburdened caseworkers not being able to attend to foster children's needs.

**Inadequate placement array**:  Nor are the named plaintiffs typical of a general policy or practice of an inadequate placement array.  The named plaintiffs have experienced a far higher percentage of institutional settings than the majority of children in Oregon's foster care system. (Cahill Decl. Ex. 1 ¶ 84.)  That is due to their experiences with ████████████████ ██████████████████████, thus creating a far higher need for this type of placement than the majority of children in Oregon's foster care system.  (Collins Decl. Ex. 1 at 4-6.)  Although the named plaintiffs might be typical of a class of high-needs children who need BRS, PRTS, or other intensive placements, the number of Oregon's foster children falling into that category is quite small (approximately 5%).  (Joyce Decl. Ex. 16 at 2.)  Framed slightly differently, the named plaintiffs simply are not typical of a policy of inadequate placement arrays of *all* sorts (including relatives or family-like settings).  *Parsons*, 754 F.3d at 685 (typicality is defeated when the challenged conduct is "unique to the named plaintiffs").

**LGBTQIA+ subclass**:  The single plaintiff in the putative LGBTQIA+ subclass, Bernard C. ("Bernard"), is not typical of a subclass class harmed by a policy of failure to track or provide services to LGBTQIA+ children.  More obviously, DHS counted and tracked Bernard as an LGBTQIA+ foster child; DHS was aware of his gender identity.  (Rideout Dep., Joyce Decl. Ex. 15 at 83:20-22.)

Moreover, Bernard is not typical of the LGBTQIA+ subclass because he has not been denied a single service related to his LGBTQIA+ status.  *See* William B. Rubenstein, Conte

Alba., and Herbert B. Newberg, *Newberg on Class Actions* § 3:28 (5th ed. 2011) (Rule 23 commits itself to a particular concept of representativeness that is not necessarily obvious— namely, that the representative will be a member of the class that she seeks to represent.").  To the contrary, DHS placed Bernard in ██████████████████████████████ and engaged in targeted recruitment seeking LGBTQIA+-identifying families. (Lowry Decl. Ex. 3 at 149, 163; Decl. of Timothy Kenney ("Kenney Decl.") ¶¶ 4, 8, 11, 15; Decl. of Julie Shaffer ("Shaffer Decl.") ¶¶ 9, 12-13; Joyce Decl. Ex. 17 at 5-9.)   Bernard's caseworkers have worked diligently to provide Bernard opportunities to engage in inclusive and supportive environments that support his gender identity; they have connected Bernard with ██████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████, helping him file court documents to try to legally change his name and gender, and ██████████████████████████████████.[9]  Bernard also receives ██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████.[10]  DHS supports Bernard's goal to get ██████████████  (*Id.*)  And plaintiffs' own expert testified that the case record contains no evidence that DHS failed to support Bernard's gender identity or gender expression.  (Rideout Dep., Joyce Decl. Ex. 15 at 83:23-84:2.)[11]

---

[9]  (Kenney Decl. ¶¶ 7-11; Shaffer Decl. ¶¶ 4-11; Bennett Decl. Ex. 6 at 21-33, 35-36, 48-62, 234, 245, 249-62.)

[10]  (Lowry Decl. Ex. 3 at 149, 167; *see* Rideout Dep., Joyce Decl. Ex. 15 at 83:13-22; Dep. of Ksen Murry attached to Joyce Decl. as Ex. 18 at 54:3-6, 91:4-92:4; Bennett Decl. Ex. 6 at 21, 32-33, 47-51, 250-53; *see* ████████████████████████████████████████████████ ████████████████████████; Joyce Decl. Exs. 19, 20.)

[11] ████████████████████████████████████  (*See* Lowry Decl. Ex. 3 at 153, 158.)  For example, ██████████████████  (Decl. of Jessica Bull ¶¶ 7-9.)  But contrary to plaintiffs' claims, ████████████████████████████  (*Id.*; Bennett Decl. Ex. 6 at 8-16, 38-46.) ██████████████████████████  (Bennett Decl. Ex. 6 at 22-24, 241, 257; Shaffer Decl. ¶ 11.)

**Page 19 - DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION**

Indeed, the single issue that plaintiffs have identified is a grievance that Bernard filed

███████████████████████████████████████████████████████████████████

████████████████████. (Mot. at 41.) However, ████████████████████████

███████████████████████ (Decl. of Jessica Bull ¶¶ 6, 12.)[12] ███████████████████

██████████████████████████████████████████████. (*Id.* ¶ 12.)

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████. (*Id.* ¶

12.) Bernard's caseworker at the time supported him by considering his gender identity, in

addition to all of Bernard's other needs, when planning around his case. (*Id.* ¶ 14.) In addition,

Bernard's subsequent caseworkers strongly support Bernard's gender identity by consistently

addressing him by his pronouns (he/him/his) and chosen name, connecting Bernard with

opportunities to engage in inclusive environments, such as LGBTQIA+ resource groups, as well

as making case planning decisions that were congruent with and supportive of his gender

identity. (Kenney Decl. ¶¶ 6-11; Shaffer Decl. ¶¶ 4-9.) In sum, plaintiffs have presented no

evidence that Bernard is typical of risk of harm experienced by the putative LGBTQIA+

subclass.

**Aging-out subclass**: Similarly, the four plaintiffs (Naomi B. ("Naomi"), Norman N.

("Norman"), Bernard, and Ruth) in the putative aging-out subclass are not typical of a policy or

practice of failing to provide transition services. To the contrary, the State provided these four

plaintiffs with transition services, including referrals for independent living skills.[13] For

example, ████████████████████████████████████████████████████████

███████████████████████████ (Shaffer Decl. ¶ 12; Bennett Decl. Ex. 6 at 234, 238-

---

[12] (Bennett Decl. Ex. 6 at 2, 4, 17, 37; *see* Lowry Decl. Ex. 3 at 149, 167; *see* Rideout Dep., Joyce Decl. Ex. 15 at 83:13-22.)

[13] (Bennett Decl. Ex. 5 at 123-24 (Ruth); Ex. 6 at 253, 260 (Bernard); Ex. 7 at 1-3 (Naomi); Ex. 8 at 206-18, 365, 376, 460 (Norman); Shaffer Decl. ¶¶ 12-13.)

39.)  That placement provided Bernard access to the community and opportunities to learn independent living skills.  (Bennett Decl. Ex. 6 at 253, 255, 257-58; Shaffer Decl. ¶ 12.) ███



████████████████████████████████████████████

████████████████████████████████████████

████████████████ (Shaffer Decl. ¶ 13.) ██████████████████████

████████████████████████████████████

████████████ (*Id.* ¶¶ 13-14.)

In sum, as to each alleged policy and practice, plaintiffs have failed to satisfy their burden of demonstrating that they "possess the same interest and suffer the same injury as the class members."  *Wal-Mart*, 564 U.S. at 348-49 (internal quotations and citations omitted).  The motion for class certification should thus be denied.

> **C.    Because plaintiffs have failed to prove the existence of the policies and practices that underly their complaint, plaintiffs have failed to prove any common question of law or fact.**

In addition to having failed to carry their burden on typicality, none of plaintiffs' evidence provides the necessary "significant proof" that the policies or practices they challenge exist and have harmful impacts on a class-wide basis to which the State has been deliberately indifferent.  *Wal-Mart*, 564 U.S. at 353; *Parsons*, 754 F.3d at 683.

As noted above, to demonstrate commonality on a substantive due process claim, plaintiffs must first prove that the policies and practices may be unlawful as to all foster children.  *See B.K*, 922 F.3d at 968-69, citing *Parsons*, 754 F.3d at 678.  Second, plaintiffs must prove that state officials acted with such "deliberate indifference" toward plaintiffs' constitutionally protected liberty interest so as to "shock the conscience."  *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 844 (9th Cir. 2010), quoting *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006).  Although courts generally treat that analysis in sequential order, the State begins with the deliberate indifference element.  That is because plaintiffs have fallen so far short of providing significant proof that beginning with deliberate indifference is once again the easier analytical path for disposing of plaintiffs' motion.

**1.    Plaintiffs have fallen short of providing significant proof that the State has acted with deliberate indifference.**

Plaintiffs have not provided "significant proof" that the State engages in any of the challenged policies or practices with deliberate indifference. A state actor acts with deliberate indifference when she or he "knows of and disregards an excessive risk to [a person's] health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). This requires proof of (1) an "objectively substantial risk of harm" and (2) the official's subjective awareness of the risk. *Tamas*, 630 F.3d at 844-45.

Thus, the Court must consider whether plaintiffs have carried their burden of "significant proof," *see Wal-Mart*, 564 U.S. at 353, that defendants have been deliberately indifferent to children's needs, thereby creating a risk of substantial harm. *B.K.*, 922 F.3d at 968-69.

The Ninth Circuit, for example, has recognized that a foster child's substantive due process rights are violated when state officials knowingly disregard the child's serious medical needs—such as by failing to provide necessary psychotropic medication—or suspected physical or sexual abuse by a foster parent. *Henry A. v. Willden*, 678 F.3d 991, 1000-01 (9th Cir. 2012). Conversely, a state actor is *not* deliberately indifferent to a substantial risk of harm if she "respond[s] reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

Plaintiffs have failed to carry their significant burden. Here, the "crucial question" is whether plaintiffs provide "sufficient evidence of systemic issues…or whether plaintiffs' allegations are simply many examples of isolated instances of deliberate indifference." *Parsons v. Ryan*, 289 F.R.D. 513, 521 (D. Az. Mar. 6, 2013). Plaintiffs' own experts agreed that they saw no evidence that the Governor, DHS leadership, or any DHS employees have acted with deliberate indifference. (Alan Puckett Dep. attached to Joyce Decl. as Ex. 21 at 101:14-23, 194:2-10 ("Puckett Dep."); Rideout Dep., Joyce Decl. Ex. 15 at 73:13-17, 166:16-167:18; Sue Steib Dep. attached to Joyce Decl. as Ex. 22 at 24:6-25:3; 148:23-149:20 ("Steib Dep.").) In fact, Dr. Puckett testified that "I seriously doubt that Kate Brown is indifferent to this. I know

for that fact that [Reb]ecca Jones Gaston isn't." (Puckett Dep., Joyce Decl. Ex. 21 at 194:24-195:14.)

That absence of evidence is consistent with the evidence that *does* exist; far from being deliberately indifferent to any deficiencies in the child welfare system, the State has actively been working to improve the system and is seeing the benefits of that work taking hold. *Maney v. Brown*, No. 6:20-CV-00570-SB, 2020 WL 2839423 at *18 (D. Or. June 1, 2020) (concluding that the plaintiffs could not show deliberate indifference where the defendants responded reasonably to the risks posed by COVID-19, even if harm is not ultimately averted), citing *Farmer*, 511 U.S. at 844. Reference to the 2019 Secretary of State updated audit demonstrates as much. In the course of a single year—from the original 2018 Secretary of State audit to the 2019 update—the State fully implemented or resolved 33% of the recommendations, partially implemented 66% of the recommendations, and had not yet implemented only a single sub recommendation. (*See* Joyce Decl. Ex. 6 at 21.)

That result does not stand alone. In addition to addressing the Secretary of State audit findings, the State has:

- Reduced the number of children in out-of-state placements from 88 to 0. (Joyce Decl. Ex. 9 at 1, 2.)

- Conducted surge hiring of over 345 additional caseworkers, including hotline screeners, caseworkers, supervisors, and support staff to help ease caseworker caseloads. (*Id.*, Ex. 23 at 19.)

- Hired 50 Mentoring, Assisting, and Promoting Success (MAPS) positions and 28 case aids to help with caseworker retention and to provide support to front-line staff. (*Id.*, Ex. 6 at 18, Ex. 24 at 1-3.)

- Continued to increase the number of caseworkers while simultaneously decreasing the number of separations. (*Id.*, Ex. 9 at 1, 4.)[14]

- Created new training programs to improve existing training and train new child welfare employees. (*Id.*, Ex. 23 at 19.)

---

[14] On July 30, 2020, DHS issued a three-month hiring pause in light of budget shortfalls. (Joyce Decl. Ex. 25.) However, that hiring pause exempts "All Child Welfare positions[,]" thus allowing caseworker hiring to continue.

**Page 23 - DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION**

- Centralized public records requests and reduced the backlog to nearly zero. (*Id.*, Ex. 26 at 8.)

- Requested approximately $126 million from the Legislature in February 2020. (*Id.*, Ex. 27.)

- Hired Rebecca Jones Gaston, a child welfare leader with a long history of successful leadership of child welfare agencies. (*Id.*, Ex. 28 at 1.)

- Convened a Child Welfare Oversight Board and gave oversight responsibility to the Children's Cabinet. (*Id.*, Exs. 7, 29.)

- Implemented a streamlined approval process for legally changing a minor's name. (*Id.*, Ex. 30 at 110-13.)

- Reduced the number of foster children from 8,136 in May 2017 to 6,724. (*Id.*, Ex. 12 at 3; compared to *Id.*, Ex. 9 at 3; *see also* Ex. 31 at 7.)

- Streamlined the process for supporting foster family certification and increasing the availability of foster homes. (*Id.*, Ex. 32 at 6.)

Those instances are but some of the actions that the State is taking to protect children in foster care and demonstrate the precise opposite of deliberate indifference. Because plaintiffs have failed to satisfy their threshold burden on this element, they have failed to demonstrate commonality, as required by FRCP 23.

> **2.    Plaintiffs have failed to prove that the State has a current policy or practice of maltreatment of LGBTQIA+ foster children that causes a substantial risk of harm.**

Plaintiffs have also failed to meet their burden of showing the existence of policies and practices that may be unlawful as to all foster children. *See B.K.*, 922 F.3d at 968-69, citing *Parsons*, 754 F.3d at 678.

> **a.    The State has a policy and practice of providing support and services to every foster child who identifies as LGBTQIA+.**

Plaintiffs maintain that the State has a policy or practice that harms LGBTQIA+ children in foster care. (Mot. at 37-41.) Their claim primarily rests on facts that no party disputes: being a member of the LGBTQIA+ community, whether in foster care or not, increases the risk of bullying, violence, and harassment. But plaintiffs cannot litigate society's bigotry as a whole in

a class action against the State. Rather, they must show that a statewide practice or policy binds all LGBTQIA+ children in foster care into a coherent class. Plaintiffs have failed to make that showing; to the contrary, the State has a robust set of policies and practices that support foster children who identify as LGBTQIA+.

By way of example, the Child Welfare Procedure Manual has an entire chapter devoted to supporting and providing services for children with diverse sexual orientation, gender identity, and expression. (Joyce Decl. Ex. 30 at 78-88.) DHS's policies emphasize creating an environment that is affirming, supportive, and understanding. (*Id*. at 78.) Examples include using the child's correct pronouns, engaging caregivers in supporting and affirming sexual orientation, gender identity, and gender expression, providing appropriate services and medical care (including transgender affirming medical interventions), and adherence to the Foster Children Bill of Rights. (*Id*. at 79-80.) Several DHS administrative rules similarly emphasize support, acceptance, and affirmation by foster families and caregivers.[15]

Additionally, the State has included questions related to sexual orientation, identity, and gender expression in its intake nursing assessment, which every child entering care receives.

---

[15] *See e.g.* OAR 413-200-0308(2)(k), (3)(a), (c), and (f) (requiring certified families to respect, accept, and support the sexual orientation, gender identity, and gender expression of children and youth in their care, and to engage in positive caregiving practices, including providing opportunities to engage in activities appropriate to the foster child and youth's culture); OAR 413-200-0335(1)(b)(A) (requiring certified families to meet the needs of children and youth in their care, including providing adequate sleeping arrangements that are age-appropriate and meet the cultural, gender identity, and gender expression of the child or youth); OAR 413-200-0352(1)(d) (requiring certified families to meet the needs of children and youth in their care, including providing adequate clothing that is age-appropriate and meets the cultural, gender identity, and gender expression of the child or youth); OAR 413-200-0358(2)(f) (prohibiting certified families from using derogatory remarks about the child or youth, or the family characteristics, physical traits, culture, sexual orientation, gender identity and expression, or traditions of the child or youth); OAR 413-215-0031 (requiring child-caring agencies to respect the sexual orientation, gender identity, and gender expression of children in their care, and to provide opportunities to enhance the positive self-concept and understanding of the child in care); OAR 413-215-0316(3)(g), (p), (q) (requiring DHS to assess proctor foster home applicant's ability to respect the sexual orientation, gender identity, and gender expression of children in their care); OAR 410-170-0020(23) (describing the practice of "Gender-Responsive Approach" employed by BRS programs, that entails integrating things that intentionally allow gender identity and development); OAR 410-170-0030(4)(d)(A) (requiring BRS providers to ensure that staff and program coordinators who directly work with BRS clients receive training on a multitude of topics, including gender- and cultural-specific services, behavior and crisis management, and suicide prevention).

**Page 25 - DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION**

(*See* Decl. of Heidi Beaubriand ("Beaubriand Decl.") ¶¶ 4-6, Ex. 1); *see also* OAR 413-015-0465(1)(a) (requiring an intake nursing assessment for every child shortly after entering care). DHS conducted a training on the intake nursing assessments and a follow-up meeting with nurses in the field about the information requested on the assessments. (Beaubriand Decl. ¶¶ 6-7.) The State also has a PRIDE Employee Resources Group, developed to support Oregonians receiving services from DHS who are LGBTQIA+. (Joyce Decl. Ex. 17 at 2.)

Those affirming and supportive policies and practices serve as the foundation for allowing DHS to treat children on a case-by-case basis to ensure that the child's case plans are specific to the child and their needs. (Lacey Andresen LGBTQIA+ Dep. attached to Joyce Decl. as Ex. 33 at 38:4-10, 48:8-20, 49:6-14, 50:4-14.) If a child identifies as LGBTQIA+ and has a particular need related to that identity, the State plans appropriately for those needs. (*Id*. at 62:22-63:11.)

Plaintiffs point to the fact that the State does not count and track children's gender identities and sexual orientations. (Mot. at 39.) As an initial matter, that argument fails to follow plaintiffs' own statement of the common question that defines the putative "LGBTQIA+ subclass," which is that its members are uniformly "den[ied] . . . necessary and appropriate services and placements." (*Id*. at 37.) But the failure to count and track LGBTQIA+ children does not show that the services and placements that are available to them are inappropriate on a class-wide basis.

In any event, no law supports plaintiffs' argument that failure to collect data on LGBTQIA+ foster children amounts to an unconstitutional practice. Federal law does not require child welfare agencies to collect data on LGBTQIA+ foster children. 45 CFR § 1355.43, § 1355.44(a) and (b). Plaintiffs' own expert, Dr. Wilson, acknowledged the absence of any law or general practice requiring that data be collected on LGBTQIA+ foster children. In fact, Dr. Wilson testified that she has "never seen [data on LGBTQIA+ foster children] reported anywhere[.]" (*See* Bianca Wilson Dep. attached to Joyce Decl. as Ex. 34 at 59:4-60:22 ("Wilson Dep.").) Dr. Wilson does not even recommend asking children about sexual identity prior to "11 or 12" years old and that "most children" enter foster care before they identify as LGBTQIA+.

**Page 26 - DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION**

(*Id.* at 36:7-21.)  In Oregon, nearly 40% of children coming into foster care are far younger, between the ages of 0-5, and another 32% are between the ages of 6-12.  (Joyce Decl. Ex. 35 at 16.)  Plaintiffs cannot demonstrate a *class-wide* policy or practice based on a failure to count LGBTQIA+ children coming into foster care when over two-thirds of the children in that putative class, according to plaintiffs' own expert, should not be asked how they identify.

What is more, plaintiffs' expert's opinion is of no value.  Dr. Wilson collected *no* Oregon-specific data; rather, she assumed, without doing any empirical analysis, that the percentage of youth identifying as LGBTQIA+ in Los Angeles County would be the same as the percentage of youth in Oregon.  (Wilson Dep., Joyce Decl. Ex. 34 at 122:17-124:17; Cahill Decl. Ex. 1 ¶¶ 63-64.)  Yet Dr. Wilson herself acknowledged that more research would need to be done to determine whether her study of a single large urban county's child welfare system could be generalized beyond Los Angeles County.  (*Id*. at 65; Joyce Decl. Ex. 36 at 39.)  And given the differences in the populations of Los Angeles County and Oregon, the evidence suggests that the foster care population, and the proportion of LGBTQIA+ youth in foster care, differs between Los Angeles County and Oregon.  (Cahill Decl. Ex. 1 ¶ 68.)

That is not to say that plaintiffs could not have gathered such Oregon-specific data.  Dr. Wilson testified that studies like the one that she conducted in Los Angeles County could be performed in Oregon; plaintiffs simply chose not to do so.  (Wilson Dep., Joyce Decl. Ex. 34 at 42:10-12, 55:5-56:3, 139:12-16.)  Plaintiffs cannot construct an entire class action claim based on a report from a single county in a different state in lieu of doing a study that is specific to the state that they are actually suing.

Plaintiffs point to no other policy or practice that fails to protect LGBTQIA+ foster children.  To the contrary, another of plaintiffs' experts, Dr. Rideout, testified that she saw no evidence of policies or practices by DHS that discriminated against sexual or gender minorities. (Rideout Dep., Joyce Decl. Ex. 15 at 85:13-18.)  Similarly, Dr. Wilson, when shown the numerous DHS policies aimed at protecting and supporting LGBTQIA+ foster children, agreed that DHS's policies reflect what "we'd like to see for children."  (Joyce Decl. Exs. 19, 20, 37; Wilson Dep., Joyce Decl. Ex. 34 at 155:7-166:1.)

In short, plaintiffs have failed to identify any state policy or practice—let alone with "sufficient precision and specificity"—that denies LGBTQIA+ foster children the services that they need. *Parsons*, 754 F.3d at 683-84 (noting that the plaintiffs had shown practices that "involve particular and readily identifiable conduct on the part of the defendants").

> **b.    Given the State's policies and practices that support LGBTQIA+ foster children, plaintiffs cannot prove that any policy or practice causes a substantial risk of harm to LGBTQIA+ children in foster care.**

Because the State has a myriad of policies and practices that support LGBTQIA+ foster children, plaintiffs cannot—and indeed, have not—offered *any* Oregon-specific data showing poor outcomes for LGBTQIA+ youth in Oregon foster care, let alone connected such data to the "policy" of not tracking children's LGBTQIA+ status.

Instead, plaintiffs assert—once more without support—that the lack of tracking the number of LGBTQIA+ children results in a failure to properly create case plans, appropriately place children, and recruit LGBTQIA+ friendly placements. (Mot. at 40). Plaintiffs offer no data, analysis, or expert opinion to support that assertion. Dr. Wilson could not link the collection of data to any benefit or detriment to children. (Wilson Dep., Joyce Decl. Ex. 34 at 149:5-15.) Similarly, Dr. Wilson was not aware of any Oregon policies, customs, or practices that have a negative impact on LGBTQIA+ youth in the Oregon foster care system. (*Id.* at 127:19-25.) Likewise, for the purposes of the Los Angeles County survey, Dr. Wilson testified that she did not study outcomes for LGBTQIA+ youth leaving the Los Angeles County foster care system, nor did she evaluate the system itself. (*Id.* at 49:25-51:25, 52:22-53:22.)

Because plaintiffs can point to no harm being caused to LGBTQIA+ foster children as a result of any State policy or practice, much less the same kind of harm across this putative subclass, this Court should deny plaintiffs' request to certify this subclass.

///

///

///

3.    **Plaintiffs have failed to prove that the State has a current policy or practice of "inappropriate" or inadequate case planning that causes a substantial risk of harm.**

a.    **The State's policies and practices provide for adequate case planning and evaluations for foster children.**

Plaintiffs have also failed to demonstrate the existence of a practice of systemic inadequate case planning that applies to all putative class members.

As an initial matter, case planning is highly individualized and thus the "appropriateness" or "adequacy" of any case plan is an issue inherently unsuitable to class-wide resolution. Every case plan must consider and address a number of factors, including the child's specific needs and goals. *See* OAR 413-040-0010. That case planning information is by definition child-specific. For instance, the case plan "must" include information identifying every child and parent, the original safety threats, the safety plan, the identified needs of the child, health information, referrals to service providers, the permanency plan, and conditions of return, among others. *Id.* Each of those pieces of information is strictly dependent upon the particular child and family; for example, safety threats for one child will not be the same as for another. Thus, the appropriateness or adequacy of a case plan for one child necessarily will not be the same as for another. That individualized information and case plan development thus defies the notion that the adequacy of case planning can be assessed on a class-wide basis. *Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 506-07 (D. Neb. 2007) (denying certification as to whether child welfare agency "fails to develop and implement appropriate permanency plans" because foster children "have entered Nebraska's child welfare system for vastly different reasons with highly specific and challenging needs."); *Willis v. City of Seattle*, 943 F.3d 882, 885 (9th Cir. 2019) (due process claims of putative class of homeless individuals challenging sweeping of homeless encampments lacked commonality because "each sweep is different.") (internal quotation marks omitted).

Moreover, the determination whether a case plan is adequate is precisely the kind of question that state law tasks juvenile courts and CRBs with. As described above, state law requires the juvenile court to independently evaluate the appropriateness and adequacy of every

child's case plan.  More specifically, the juvenile courts and CRBs must make findings about the components of an individual case plan and whether those case plans fit the needs of the individual children.  If the court deems a placement or case plan to be inappropriate, then it can order the State to make changes accordingly.  ORS 419B.360.  Plaintiffs do not address why that process amounts to a policy or practice of inadequate case planning.

Furthermore, DHS's case planning policies and practices are comprehensive.  State law requires case plans, *see* ORS 419B.343[16], addressing specific issues.  Each child coming into care receives an intake nursing assessment.  OAR 413-015-0465(1)(a).  The purpose of the intake assessment is to evaluate the child's immediate health needs, provide child-specific health education and training to the foster family, and make community referrals, as needed. (Beaubriand Decl. ¶ 4, Ex. 1.)  If during the intake assessment a nurse identifies a child with diagnoses that impact the child's ability to perform daily activities, that child will also receive a personal care assessment to address additional care needs including nursing supervision in the foster home.  (*Id*., Ex. 2.)  DHS also provides a CANS screening, which integrates information about a child's needs and strengths for the purpose of case planning, service planning, and determining the supervision needs of the child.  (Joyce Decl. Ex. 38 at 39:16-21); OAR 413-015-0465(1)(d).  Given the nature and extent of DHS's planning, it can hardly be inadequate.

Plaintiffs' evidence does not demonstrate otherwise.  Plaintiffs' own expert testimony directly contradicts their claims that the State has a uniform practice of failing to perform adequate case planning.  Drs. Steib and Rideout, plaintiffs' case file review experts, testified that DHS's case planning was thorough and effective.  They found ███████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████  (Lowry Decl. Ex. 3 at 15.)  They also observed evidence of ████████████████████████████ that included regular contact with children and their families, ████████████ to available services, and

---

[16] State law does not place a timeframe on their completion.  DHS policy requires development of a case plan within 60 days.

████████████ referral information to external providers, and regular child and family visits. (*Id.*)  And although Dr. Puckett, another of plaintiffs' experts, concluded there are "needless delay[s] in progressing to safe permanent homes," (Puckett Dep., Joyce Decl. Ex. 21 at 161:19-162:4), the vast majority of foster children are able to reunify safely with their parents or caretakers, reflecting appropriate case planning goals.  (*See* Cahill Decl. Ex. 1 ¶ 58, n.35.)

Plaintiffs also argue that the State fails to provide case plans within 60 days, thereby demonstrating the existence of a practice of inadequate case planning.  Plaintiffs' own data does not support their claims.  Dr. Puckett's reliance on the Adoption and Foster Care Analysis and Reporting System ("AFCARS") data is misleading.[17]  First, there may be a time delay between the formal establishment of a case plan and it being recorded in AFCARS.  (Cahill Decl. Ex. 1 ¶¶ 32, 57.)  Second, the AFCARS data is only measured twice a year.  (*Id*. ¶ 29.)  As a result, a child who is placed in DHS custody one day before the first period reporting could receive a case plan on day three of being in care—but that plan would still be recorded in AFCARS as having a plan recorded by the end of their second reporting period.  Furthermore, 94% of children in foster care have an established case plan goal within two six-month reporting periods.  (*Id*. ¶ 57.)[18],[19]

Dr. Puckett's conclusions about "inappropriate" case planning based on AFCARS statistics related to permanency planning are equally unavailing.  Dr. Puckett bases his

---

[17] Dr. Puckett acknowledged the limits of his own report.  The basis for his report was AFCARS data selected for him by plaintiffs' counsel, but he said that he would have liked to have visited caseworkers and other child welfare workers "on the ground" to fill in the blanks, because "sometimes the case record just doesn't tell you the whole story."  (Puckett Dep., Joyce Decl. Ex. 21 at 165:17-166:20.)

[18] Plaintiffs assert that 37% of children "never had their needs assessed at all."  (Mot. at 27.)  Plaintiffs have decontextualized that statistic, inasmuch as the 37% figure relates to the number of child protective services assessments that were overdue, as of June 2016.  (*See* https://www.oregon.gov/DHS/CHILDREN/Documents/oregon-apsr-2016-2017.pdf at 10.)  Child Protective Services ("CPS") assessments and case plans or needs assessments are distinct— CPS is an investigatory body that identifies whether a safety threat exists.  (Joyce Decl. Ex. 30 at 15.)

[19] Moreover, the fact that AFCARS does not report a case plan does not necessarily mean that the child does not have a case plan; in some cases, a case plan exists but is not "final" for AFCARS counting purposes.  (Decl. of Lacey Andresen ¶¶ 3-10.)  That evidence falls well short of significant proof of a uniformly applicable practice of untimely case planning.

**Page 31 - DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION**

conclusions on incomplete data and a misunderstanding of AFCARS data. He concludes that 187 children have an inappropriate case goal of reunification because each had been removed from their home three or more times. (Lowry Decl. Ex. 6 at 10.) In short, he is concerned that the State plans to return children to homes from which they have been removed multiple times. If he had looked at data from the next reporting period, he would find that his concerns were unfounded. Many of those children's case plan goals were changed to adoption and many other children were adopted. (Cahill Decl. Ex. 1 ¶ 51.) That same data shows that only eight children had actually been reunified. (*Id*.) Had he checked, Dr. Puckett would find that in each case, reunification was warranted: in three cases, a parent successfully appealed the termination of parental rights and the child was reunified with that parent; in the remaining five cases, the child was reunified with adoptive parents who did not have a termination of parental rights ("TPR") designation. (Cahill Decl. Ex. 1 ¶ 52.)

In short, plaintiffs attempt to aggregate diverse claims to define a common contention regarding the State's case planning practices: that DHS fails to meet its timelines and that the plans are themselves insufficiently sensitive to the facts of each child's case. These claims are inadequately supported based on their own data and experts, are belied by the practice of individualized case review by the juvenile courts and CRBs, and do not add up to a common claim that can define this putative class.

> **b.    The State's case planning does not cause a substantial risk of harm to children.**

Plaintiffs have also failed to connect alleged untimely or inadequate case planning with a substantial risk of harm to foster children. Nor could they, given that the State's case planning, overseen and reviewed by the juvenile courts and CRBs, is extensive and thorough.

As to plaintiffs' claim of untimely case plans, plaintiffs have not offered any evidence that children are at a greater risk of harm if they lack a case plan on their 59th day as opposed to their 79th day in DHS supervision. Plaintiffs offer nothing more than conjecture that 60 days is a constitutional magic number – that an evaluation on the 55th day in DHS care ensures safety, but an evaluation on the 65th day exposes a child to a substantial risk of harm.

**Page 32 - DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION**

Likewise, plaintiffs' expert testimony does not provide proof of a link between this purported practice and a substantial risk of harm.  To the contrary, Dr. Puckett testified that he was not aware of any evidence that establishes that outcomes for children are different if a case plan goal is established after the 60-day timeframe.  (Puckett Dep., Joyce Decl. Ex. 21 at 158:19-23.)  He could not determine whether children who had been in care for 60 days had not received timely, appropriate care.  (*Id.* at 170:17-171:4.)  Likewise, he did not know whether children who did not have case plans within 60 days were unsafe or experienced any delay in safety and permanency.  (*Id.* at 171:6-19.)

Similarly, plaintiffs present no statistical correlation between the absence of a timely case plan and an increased risk of harm.  (Cahill Decl. Ex. 1 ¶¶ 57-59.)  Nor could they, because the individual caseworkers who know and work with the children (and who plaintiffs' experts repeatedly praise, *see* Lowry Decl. Ex. 3 at 15-16, 56-57, 143, are the ones who connect children to services and placements.  *See, e.g.*, *Connor B. ex rel. Vigurs v. Patrick*, 985 F.Supp.2d 129, 166 (D. Mass. 2013), *aff'd*, 774 F.3d 45 (1st Cir. 2014) (in the context of the Child Welfare Act ("CWA") where 35% of children had no case plans at all but caseworkers still exercised professional judgment for each child that "mere gaps in record keeping hardly constitute grave statutory error").  As an example, plaintiffs repeatedly note that Bernard's case plan goal was temporarily (and erroneously) listed as "Another Planned Permanent Living Arrangement (APPLA)" and  (Mot. at 8; Lowry Decl. Ex. 3 at 159.) However, despite this error, DHS repeatedly connected Bernard with families, not permanent foster care.  (*See id.*; Kenney Decl. ¶¶ 8, 11, 15; Shaffer Decl. ¶ 9.)

In short, plaintiffs have failed to carry their burden of showing that any case planning policies or practices cause a substantial risk of harm for plaintiffs.

///

///

///

///

**Page 33 - DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION**

4.    **Plaintiffs have failed to prove that the State has a current policy or practice of high caseloads.**

a.    **The State's recent hiring surge and sustained efforts to increase the number of caseworkers demonstrate that the State does not have a policy or practice of high caseloads.**

Plaintiffs have also failed to meet their burden to show that the State currently has a policy or practice of chronic understaffing and high caseloads.

DHS, in conjunction with the Governor and the Legislature, has made great strides in increasing the number of caseworkers. In April 2019, Governor Brown recognized that the Child Welfare Program was "significantly understaffed." (Joyce Decl. Ex. 7 at 1.) The Legislature acted almost immediately, appropriating $58.8 million to hire new caseworkers. (Joyce Decl. Ex. 39 at 4-5.) DHS has put that money to good use and hired over 345 staff in less than six months. (Joyce Decl. Ex. 23 at 19.) The Legislature also changed the hiring qualifications for caseworkers to eliminate the 4-year college degree requirement and allow for equivalent work experience. That change allows DHS to recruit from a more diverse applicant pool, which in turn reflects the diverse communities from which foster children come. (Joyce Decl. Ex. 26 at 13, Ex. 40.)

The hiring surge has reduced the number of remaining vacancies by over 75%. (Compare October 2019 Child Welfare Progress Report, Joyce Decl. Ex. 28 at 16 showing over 100 vacancies to November 2019 Child Welfare Progress Report, Joyce Decl. Ex. 23 at 18 showing only 24.) DHS has continued to steadily add caseworkers. (Joyce Decl. Ex. 9 at 4.) The Secretary of State audit noted DHS's progress as well, observing that DHS had reduced caseworker vacancies and had "implemented/resolved" the audit recommendation to develop and implement strategies to reduce workload stress and turnover. (Joyce Decl. Ex. 6 at 17.)

In arguing to the contrary, plaintiffs once again rely on outdated evidence. Plaintiffs' only "proof" that DHS has a policy or practice of maintaining high caseloads is a 2018 audit from the Secretary of State and testimony from a prior Director of Child Welfare. This focus on the past cannot support a claim that DHS has a *current* policy and practice of maintaining caseworker shortages resulting in high caseloads. To the contrary, plaintiffs' own expert agrees

that the State's key decision makers—Governor Kate Brown, Director Jones Gaston, and the Legislature—have already "taken the first steps towards addressing the workload issues in Oregon." (Puckett Dep., Joyce Decl. Ex. 21 at 97:5-11.)

> **b.    Plaintiffs have failed to prove that any policy or practice related to caseloads causes a substantial risk of harm.**

Plaintiffs have likewise failed to demonstrate any substantial risk of harm related to a policy of inadequate caseworkers. In fact, plaintiffs' own experts establish that, with respect to the named plaintiffs, none have been harmed by the State's staffing policies or practices. Drs. Rideout and Steib recognized ████████████ and found █████████ ████████████████████████████████████████ ██████ (Lowry Decl. Ex. 3 at 14, 12.) Dr. Steib testified that their case file review project observed "a lot of casework activity" including "consistent activity on the part of the caseworkers; regular contact; referral for services." (Steib Dep., Joyce Decl. Ex. 22 at 23:4-5, 23:16-17, 24:13-16, 26:5-7.) Nor do plaintiffs' experts connect any criticism of any of the named plaintiffs' care and overworked caseworkers.[20] Therefore, plaintiffs cannot establish either a substantial risk of harm resulting from the State's actions or any connection between staffing levels and any harm faced by plaintiffs.

> **5.    Plaintiffs have failed to prove that the State has a current policy or practice of failing to provide services for the aging-out population that creates a substantial risk of harm.**

> **a.    The State provides a range of services for the aging-out population.**

Plaintiffs' assertion that the State's policies or practices fail to provide necessary treatment and services to the aging-out population also fails. To the contrary, DHS provides life skills training through contracted independent living planners, local offices, caregivers, or

_____

[20] Although plaintiffs' experts were critical of two of the named plaintiffs siblings' caseworkers for an error with medication and critiqued that ███████████████████ ██████████████████████████ the expert did not attribute these criticisms to caseworker caseloads or shortages. (Lowry Decl. Ex. 3 at 37-39.)

community partners. (Joyce Decl. Ex. 30 at 20-77, 94-102); OAR 413-030-0400 to 460. DHS also provides housing funding, education and training vouchers and grants, discretionary funds, driver education course fees, and summer teen events. (Joyce Decl. Ex. 30 at 20-77, 89-96, 100-109; Decl. of Rosemary Iavenditti ("Iavenditti Decl.") ¶ 3); ORS 336.807. DHS recently added a new program that provides a transitional living program, in which the youth pays reduced rent, participates in a weekly tenant meeting, and an onsite support person is present 24 hours a day, seven days a week. (Iavenditti Decl. ¶ 5.) In addition, DHS provides for a tuition and fee waiver program, in which college tuition and fees are waived. ORS 350.300.

Individual cases reflect the myriad of services that DHS provides to aging-out youth. For instance, DHS paid for a tuxedo for a foster youth for his prom. (Iavenditti Decl. ¶ 4.) He wrote a thank-you note, saying that being able to wear a tuxedo at his prom meant that he had "could not have had as much fun" as he would have been able to have without the help. (Iavenditti Decl. ¶¶ 3d, 5, Ex. 1.) DHS also purchased a pig for a foster child who wanted to participate in the local farm service agency program and provided tribal regalia for a youth to attend a pow-wow. (Iavenditti Decl. ¶ 3d.)

Plaintiffs emphasize several of Dr. Day's conclusions but fail to acknowledge that Dr. Day knows little about transition-aged youth in Oregon. Dr. Day did not spend time doing "any research regarding anything to do with foster care youth in Oregon" before undertaking this project and had never done policy analysis "specific[] to -- to the State of Oregon as it relates to aging out." (Angelique Day Dep. attached to Joyce Decl. as Ex. 41 at 79:2-5; 82:20-83:8 ("Day Dep.").) She wrote her report "without the benefit of knowing any of the Oregon laws that govern foster care youth who are aging out." (*See id.* at 92:10-23.)[21]

Lastly, plaintiffs rely on the lack of an entry in many youth's case plan around transition planning services. (Mot. at 45.) But the lack of an entry related to transition planning in a case

---

[21] As explained in the concurrently filed motion to exclude, Dr. Day's testimony also raises questions about whether her report rests on reliable methodology. There is little reason to afford weight to a methodologically flawed report from an expert who does not have either qualifying expertise or adequate case specific information on which to opine about the case.

**Page 36 - DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION**

plan does not mean the service is not provided.  (Iavenditti Decl. ¶ 6.)  Rather, a child can, and does, receive transition planning services that are not recognized by AFCARS if a caseworker does not check a box and fill out a narrative in the DHS OR-Kids electronic case file.  (*Id*.)

Ultimately, plaintiffs base their allegation of inadequate transition-age services on evidence that is either uninformed (Dr. Day's testimony) or incomplete (DHS provides transition-age services even if there is no case plan entry).  This evidence does not provide the "significant proof" required to certify a class.

> **b.    Plaintiffs have failed to prove that the State's policies and practices related to transition planning create a substantial risk of harm.**

The evidence also demonstrates that no substantial risk of harm results from the State's provision of services to children aging out.  Plaintiffs rely on the National Youth Transition Database ("NYTD")—which collects information on the outcomes of youth who have aged out of foster care, for statistics about homelessness, incarceration, substance abuse, education level, and employment rates—as a proxy for whether children are at a substantial risk of harm.  (Mot. at 44.)  But the NYTD statistics demonstrate that Oregon is performing better than or at the national averages in many categories.  For instance, nationally, the percentage of former foster children reporting referrals for substance abuse is 11%.  (Joyce Decl. Ex. 42 at 5.)  Oregon is well below that, at 6%.  (Joyce Decl. Ex. 43 at 2.)  Similarly, the number of former foster children in Oregon experiencing incarceration is well below the national average (11% versus 19% respectively).  (Joyce Decl. Ex. 43 at 2, Ex. 44 at 1-2.)  Additionally, Oregon outperforms Washington and California with respect to education services, both states that plaintiffs' experts touted as exemplary models for transition services.  (Cahill Decl. Ex. 1 ¶ 72.)

Plaintiffs have failed to show a sufficient connection between these data and DHS's allegedly deficient transition services.  In the absence of that evidence, plaintiffs have failed to show that aging-out youth are at a substantial risk of harm based on DHS's policies or practices.

6.    **Plaintiffs have failed to prove that the State has a current policy or practice of an inadequate placement array that causes a substantial risk of harm.**

a.    **The State's placement array has significantly improved and continues to do so.**

Plaintiffs have also failed to provide "significant proof" that the placement array is inadequate class-wide. That is so because the number of foster homes has been steadily increasing and to the extent that any placement shortages exist, it is not—as plaintiffs contend— a shortage of all types of placements but rather a shortage of placements needed for children with complex and/or acute needs. Even as to that category, the State's policies and practices are focused on increasing those placements.

The State has been steadily increasing its placement array. As recommended by the Secretary of State's 2018 Audit, DHS has increased the number of foster homes. In 2019, Oregon had 3,661 foster homes. (Joyce Decl. Ex. 10 at 9.) That number has steadily increased; in June 2020, Oregon had 3,802 foster homes. (*Id.*, Ex. 11 at 7, Ex. 12 at 3, Ex. 9 at 3-4.) Those added foster homes also come at a time when the number of children coming into care is dropping, which has the effect of increasing the number of foster homes even more. (*Id.*, Ex. 9 at 3.) Additionally, the State has spent—and continues to spend—considerable amounts of time, energy, and resources to improve the placement array, particularly for children with high needs. That influx of resources has paid off. The number of beds for high-needs children increased by 90 beds in 2019 alone, with more beds anticipated in 2020. (*Id.*, Ex. 3 at 1, Ex. 10 at 12.)

Additionally, plaintiffs are simply wrong that Oregon's placement array fails all foster children. To the contrary, most foster children are with relatives or in a family-like setting. As an initial matter, in 2019, a full *one third* of Oregon's foster children were in relative/kith/kin foster homes. (*Id.*, Ex. 16 at 2.) In April 2020, that number was 47%. (*Id.*, Ex. 11 at 6.) Relative foster homes are considered the most appropriate placement for children in foster care. (*See* Joyce Decl. Ex. 30 at 19 ("[r]esearch indicates that relative placements are almost always less traumatic for children and provide continuity and connection with familiar adults and surroundings."); (*Id.*, Ex. 11 at 6) ("DHS has a priority to seek relative placement for children

entering care, to maintain family and community connections.")  What is more, in May 2019, 84% (over 6,000) children were in a family-like setting.  (*Id.*, Ex. 16 at 2.)  That is precisely the kind of setting, as plaintiffs themselves note, that the State is required to provide.  42 U.S.C. § 675(5)(A); (Mot. at 21.)  With nearly 6,000 of Oregon's children in precisely the kinds of placements that plaintiffs themselves insist upon, no basis exists upon which to certify a general class.

In arguing to the contrary, plaintiffs rely on two outdated reports from 2016 to argue that the State makes placement decisions based on foster home availability, to the exclusion of the child's needs.  (*See* Mot. at 22-23 (referring to the 2016 Child and Family Services Review and 2016 Public Knowledge reports).)  That stale data argument ignores the more recent evidence on this very topic, described above.

The remaining proof that plaintiffs proffer amounts to lay opinion testimony from Amy Miller, the director of a non-profit law firm that represents youth.  Ms. Miller opines that some children are placed in inappropriate or restrictive placements.  But she does not provide any evidence, as she must, that this practice affects all the putative class members.  *See Wal-Mart*, 564 U.S. at 353.  She also opines that temporary lodging has increased since 2008.  On this point she is simply wrong—DHS's use of temporary lodging has and continues to decrease.  (Joyce Decl. Ex. 9 at 2.)  This lay opinion testimony does not provide the "significant proof" necessary to certify the class.

A final point bears emphasis.  At best, plaintiffs' evidence is cumulative of a single point: the State has a shortage of placements for children with high needs, particularly with respect to available BRS and PRTS beds.  That is not surprising, given that—at least with respect to the named plaintiffs—the children have significant behavioral issues that make consistent placements difficult.  (*See* Collins Decl. Ex. 1 at 4-6) (███████████████████████████ ███████████████████████████████████████.)  But that category of children is quite small, approximately 5%.  (Joyce Decl. Ex. 16 at 2.)  The potential impact on such a small portion of the foster care population does not warrant certification of a general class of almost 7,000 foster children.

**Page 39 - DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION**

### b. Plaintiffs have failed to provide any evidence of a substantial risk of harm caused by a purported lack of placement array.

Plaintiffs have provided no competent evidence that the State's placement array causes a substantial risk of harm to children. Dr. Puckett, for instance, offered no quantitative evidence whatsoever that children experience a substantial risk of harm resulting from the State's placement array. When asked whether his "quantitative analysis provide[d] any evidence for what the outcomes are for children who have experienced ten or more placements," he replied "No[.]" (Puckett Dep., Joyce Decl. Ex. 21 at 190:22-191:2.) Dr. Puckett continued, stating that "we can *assume* that they have a lot of problems, that their life is in turmoil. If for no other reason than because they have moved so many times." (*Id.* at 191:2-8) (emphasis added.) But an assumption, even from an expert, does not provide "significant proof" of a constitutional violation. *See Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (rejecting expert's opinion when based on assumptions not supported in the record).

Plaintiffs also unsuccessfully attempt to link the lack of adequate placements with placement instability. The evidence that plaintiffs submit on that point, Dr. Puckett's report, does not support it. Dr. Puckett's opinion rests on a slight difference between placement stability in Oregon as compared to the national average. The federal government defines placement stability as the rate of placement moves per day of foster care, which is typically calculated as placements per 1,000 days in care. On this federal measure, Dr. Puckett testified that the national average was 4.12 placements per 1,000 days, whereas children in Oregon's foster care system experience 4.28 placements per 1,000 days. (Puckett Dep., Joyce Decl. Ex. 21 at 186:2-10.) Such a small deviation does not support the argument that placement instability plagues Oregon foster youth.

The other evidence that plaintiffs offer undermines their argument. Plaintiffs point to named plaintiff Kylie and expert testimony that "no child of Kylie's tender age should be placed in a congregate care setting." (*See* Mot. at 23-24.) According to the same expert (although not mentioned in plaintiffs' motion), ████████████████████████████████████████ ████████████████████████████████████    (Collins Decl. Ex. 1 at 9 (████████████████████████



); Bennett Decl. Ex. 2 at 1

( ), 13-22 ( )

( ), 64-71 ( ).) Thus, even plaintiffs' chosen

example undermines their argument that a lack of placement options in Oregon results in harm, much less substantial harm.

Finally, although plaintiffs argue that it is the State's policies that cause a substantial risk of harm, the reality is far more complex. The State simply cannot control the number of people willing to be foster families; indeed, "the availability of foster homes, particularly those that provide the most 'home-like,' 'least-restrictive' environments, is something uniquely out of the State's control." *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 268 (5th Cir. 2018). Even with "an increase in funding, [DHS] cannot force people to volunteer." *Id.* Moreover, it is particularly challenging to find—and particularly difficult to blame DHS for not finding—foster families in less populous parts of the state with more limited access to services. *See id.* (noting several reasons why availability of placements differs by region). And, as the named plaintiffs aptly demonstrate, a child may have a difficult time adjusting to a placement even if options are plentiful. *See Connor B.*, 985 F.Supp.2d at 144 (recognizing that a robust placement array does not "resolve the ongoing placement challenges related to ensuring a child's unique fit with a prospective placement[.]"). The lack of placement array therefore cannot fairly be said to be "caused" by the State, as is required under substantive due process.

## III.    There is no class to certify for a CWA claim.

Plaintiffs have also failed to carry their burden to certify a class for violations of the CWA. In fact, plaintiffs do not even mention the CWA, its requirements, and why this Court should certify a class under the CWA. Plaintiffs' failure to provide any argument is reason enough to deny class certification of plaintiffs' putative CWA claim. *United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("Arguments made in passing and not supported by citations to the record or to case authority are generally deemed waived.") (citation omitted). The absence of

argument also does not allow the court to conduct a "rigorous analysis" to determine whether there are common questions of law. *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 980 (9th Cir. 2011).

To the extent that plaintiffs rely on their arguments related to case planning brought under the Substantive Due Process Clause—and to be clear, that would be a generous inference in plaintiffs' favor—that reliance would be misplaced. The CWA requires "the development of a case plan" and "a case review system" of that plan. 42 U.S.C. § 671(a)(16). Notably, the CWA does not have a timeframe on when case plans must be prepared; it only requires that one be developed. Thus, to the extent that plaintiffs' arguments rest on the timeframes for case plans under state administrative rule for their CWA claim, that argument fails.

Otherwise, the State's response to plaintiffs' non-argument under the CWA is the same as that under the Substantive Due process Clause, *i.e*., the State creates case plans and the juvenile court reviews them. There simply is no policy or practice of failing to provide case plans or case plan reviews.

It also bears emphasis that very few cases have addressed claims challenging the contents of a case plan under the CWA, in no small part because multiple courts hold that there is no private right of action to enforce the case plan provisions at all.[22] In one case that did review a putative CWA class, it rejected it. In *Connor B*., the First Circuit was confronted with case plan errors and found no CWA violation. *Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 61 (1st Cir. 2014).[23] The First Circuit concluded that the record did "not show a *class-wide* failure to

---

[22] *See, e.g., T.F. by Keller v. Hennepin Cnty*., No. CV 17-1826 (PAM/BRT), 2018 WL 940621, at *6 (D. Minn. Feb. 16, 2018); *M.B. by Eggemeyer v. Corsi*, No. 2:17-CV-04102-NKL, 2018 WL 327767, at *14 (W.D. Mo. Jan. 8, 2018); *John B. v. Goetz*, 626 F.3d 356, 362 (6th Cir. 2010); *D.G. ex rel. Stricklin v. Henry*, 594 F.Supp.2d 1273, 1278 (N.D. Okla. 2009); *Olivia Y. ex rel. Johnson v. Barbour*, 351 F.Supp.2d 543, 565 (S.D. Miss. 2004); *Braam ex rel. Braam v. State*, 150 Wash.2d 689, 712 (2003); *31 Foster Children*, 329 F.3d 1255, 1271-74 (11th Cir. 2003); *Carson P*., 240 F.R.D. at 544; *Whitley v. New Mexico Children, Youth & Families Dep't*, 184 F.Supp.2d 1146, 1165 (D.N.M. 2001)*; Charlie H. v. Whitman*, 83 F.Supp.2d 476, 490 n.3 (D.N.J. 2000) (specifically rejecting the notion that the CWA created a right to "safe and proper care").

[23] On appeal, the State defendants did not challenge whether the CWA creates a privately enforceable right. Thus, the First Circuit did not address that question. 774 F.3d at 61.

---

**Page 42 - DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION**

provide documentation in the form of individualized case plans[,]" where between 65-85% of children had case plans. *Id*. at 62 (emphasis in original). The fact that the case plans were not well maintained and in some cases were "entirely unavailable for review" was not enough to state a class-wide claim. *Id*. The same conclusion holds here—94% of children in foster care have case plans within two AFCARS reporting periods. (*See* p. 31, *supra*.)

Finally, none of the named plaintiffs are typical of a class of children with incomplete or incorrect case plans. Although plaintiffs express some disagreement with a handful of planning decisions, every child had a case plan. (*See* pp. 16-17, *supra*.) Accordingly, even if plaintiffs had identified a common policy, and even if such a policy could violate the CWA, it has had no adverse impact on any of the named plaintiffs.

Because plaintiffs have provided no basis upon which to certify a class under their CWA theory, this Court should decline to do so.

## IV.    Plaintiffs cannot obtain certification of an ADA subclass.

Plaintiffs' putative ADA subclass also cannot be certified, because plaintiffs have offered no evidence that the State has a policy or practice of discriminating against foster children because of their disabilities and the named plaintiffs are not typical of any such policy or practice.

### A.    Plaintiffs have failed to prove that the named plaintiffs are typical of an ADA subclass.

As with the general putative class, plaintiffs have failed to offer any detail about how these specific named plaintiffs are typical of the putative ADA subclass. Accordingly, the same analysis for typicality of the general class applies, with the following additions. First, the named subclass members cannot be typical of a class of children with inadequate case plans because the case file for each one identifies their alleged diagnoses, and no named plaintiff contends that she has an unassessed or undiagnosed disability. (*See* pp. 16-17, *supra*.) Thus, plaintiffs cannot have the "same or similar injury" as a purported class that has "been injured by the same course of conduct." *Parsons*, 754 F.3d at 685 (citation omitted).

For that same reason, the named plaintiffs cannot be typical of a class of children denied necessary services and treatment.  *See id.*  Plaintiffs' own experts have not identified any services that plaintiffs needed yet were not provided.  (*See* pp. 16-18, *supra*.)  And the named plaintiffs in the ADA subclass received substantial and frequent mental health services, as repeatedly noted by plaintiffs' experts.  (*See* pp. 16-18, *supra*.)  Because the named plaintiffs did not suffer from the allegedly unlawful practice they seek to enjoin, their claims are not typical of a purported class based on a common injury.  For those reasons, this Court should decline to certify plaintiffs' putative ADA subclass.

> **B.      Because there is no evidence that the State discriminates against children because of their disability, no ADA subclass exists to certify.**

Additionally, plaintiffs cannot satisfy the commonality burden; plaintiffs fail to present any evidence, as they must, that the State has policies or practices that discriminate against disabled children in foster care *because* of their disability.  *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010) ("the ADA prohibits discrimination *because of* disability, not inadequate treatment for disability") (emphasis added).  As a result, plaintiffs cannot obtain class certification of an ADA subclass.

Reduced to their core, plaintiffs' arguments do little more than simply repeat their arguments in support of their motion to certify a general class; in that sense, plaintiffs' disability statute claims collapse into their general class claims.  For instance, plaintiffs argue that the State systemically fails to conduct timely and adequate needs assessments for children with disabilities.  (Mot. at 34.)  That claim replicates plaintiffs' claims for the general class.  (*See* pp. 29-32, *supra*.)  What is more, plaintiffs do not argue, let alone demonstrate, that the State is discriminating against children *because* of their disability when it comes to timely assessments.  Plaintiffs offer no data, data analysis, or expert evidence supporting their claims.  For those reasons, plaintiffs' ADA subclass claim cannot be certified.


///

///


**Page 44 - DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION**

The same is true of plaintiffs' claim that the State's placement array places members of the putative ADA subclass at a disproportionate risk of harm; nothing differentiates that claim from plaintiffs' general class claim, and does nothing to prove that the State is discriminating on the basis of disability.  For example, plaintiffs contend that more should be done to "recruit and retain" *additional* therapeutic foster homes.[24]  (*See* Mot. at 35.)  But plaintiffs do not dispute that defendants operate the *existing* array of homes with "an even hand."  *Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615, 618-19, 620 (9th Cir. 2005) (Courts "will not tinker with" state programs where due to resource constraints, community-based placements are "at capacity" and the state operates the program with an "even hand," transitioning new individuals to community placements "once space open[s] up.") (quotation marks and citation omitted).

Additionally, plaintiffs point to what they characterize as a failure to provide "an appropriate number" of therapeutic foster homes and other services.  But once again, plaintiffs do not contend that such failure is because of a disability.  What is more, "the substance of services" provided is not actionable under the ADA.  *Charlie H. v. Whitman*, 83 F.Supp.2d 476, 501 (D.N.J. 2000); *see also J.B. ex rel. Hart v. Valdez*, 186 F. 3d 1280, 1290 (10th Cir. 1999) (affirmed denial of certification of nearly identical ADA claims, holding that denial of "benefits, services, or adequate care" was insufficient to state a common class question).

In the absence of any argument, let alone evidence, that the State discriminated against children because of their disabilities, plaintiffs have wholly failed to carry their burden to certify a disability subclass.

## V.    Plaintiffs' putative subclasses fail to satisfy Fed. R. C. P. 23(c)(5).

In addition to failing on their merits, because plaintiffs' three proposed subclasses (ADA, LGBTQIA+, and aging-out youth) serve no useful purpose, those subclasses should not be certified.  "When appropriate, a class action may be divided into subclasses that are each treated

---

[24] In their complaint, plaintiffs cited the regulations and case law describing the ADA's integration mandate, which bars states from conditioning the provision of government services on institutionalization.  (*See* Compl. ¶ 318 (citing *Olmstead v. L.C.*, 527 U.S. 581, 602 (1999). and 28 CFR § 35.130(d)).)  Plaintiffs' motion for class certification abandons this distinct legal theory.

as a class under this rule." FRCP 23(c)(5). Generally, the option to utilize subclasses "is designed to prevent conflicts of interest in class representation." *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005); *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1350 (9th Cir. 1980), *disapproved of on other grounds by Evans v. Jeff D.*, 475 U.S. 717 (1986) ("It is appropriate to invoke subclassification when there are or may be divergent views among class members and when the Court believes that subclasses would materially improve the presentation of all relevant considerations."); *see also* Rule 23(c) advisory committee note (subclasses are appropriate "[w]here a class is found to include subclasses divergent in interest.").

In this case, all plaintiffs—in the general class and the subclasses—seek the same things, rendering the proposed subclasses useless. They each challenge the same purported policies and practices: high caseworker caseloads, lack of placement array, failure to provide services, and inadequate case planning.[25] Plaintiffs focus their arguments for the subclasses on the differing outcomes facing different populations. For example, plaintiffs cite research showing that transition-age youth in foster care experience higher risk of negative outcomes after leaving foster care and stress that the State's purported policies have an even more harmful effect on these populations. (Mot. at 42 n.141.) However, plaintiffs are not seeking damages. Accordingly, assessing the level of the impact of the same policies on different groups of children is unnecessary. The subclasses simply do not have divergent interests, the hallmark of a subclass.

Moreover, in addition to lacking utility, the subclasses reduce the litigation's manageability. The ADA subclass, for example, is defined as all children in DHS custody "who have or will have physical, intellectual, cognitive, or mental health disabilities." (Compl. ¶ 33a.1.) Five of the ten named plaintiffs are identified as members of this subclass, each noted to have mental health or behavioral challenges and requiring services to address these conditions. (*See e.g.*, Lowry Decl. Ex. 3 at 73-75, 94, 106-08, 112-13, 125-27, 147-48, 160-63, 178, 183-85,

---

[25] Plaintiffs do identify one "policy" unique to a subclass: that DHS does not track LGBTQIA+ children in its care. However, for the reasons addressed above, that policy is not responsible for any of the harm that plaintiffs assert.

**Page 46 - DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION**

187-88.)  However, plaintiffs' experts identified many of the same issues with ███████████

named plaintiffs: ████████████████████.  (*Id.* at 24, 27, 46-47, 50, 53.)  The distinction

between these non-ADA subclass members and the ADA subclass members is thus nonexistent.

At this stage of the litigation, creating unnecessary divisions serves no purpose other than

to increase redundancies in the Court's analysis and reduce manageability of the litigation.  If, as

the case progresses, the issues suggest the utility of subclasses, the Court retains the discretion to

create subclasses at any time.  *S*ee, *e.g.*, *Standal's Patents Ltd. v. Weyerhaeuser Co.*, No. CIV.

86-219-FR, 1986 WL 582, at *4 (D. Or. Dec. 11, 1986) (because it was "unlikely that there will

be divergent views among the putative class members" and premature at class certification to

determine whether divergent views exist "for the purposes of the motion to certify as a class

action, the court will consider all defendants as one class of defendants").

## VI.   Plaintiffs cannot meet their burden to show that a single injunction can remedy the claims that plaintiffs bring.

Plaintiffs have also failed to show, as they must, that the claims of the putative class and

subclasses are remediable through a single class-wide injunction.  Plaintiffs seek to certify the

class and subclasses pursuant to Rule 23(b)(2), which authorizes class treatment when the

defendant "has acted or refused to act on grounds that apply generally to the class, so that final

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

whole."  FRCP 23(b)(2).

To satisfy Rule 23(b)(2), plaintiffs must prove that "a single injunction or declaratory

judgment [w]ould provide relief to each member of the class."  *Wal-Mart*, 564 U.S. at 360.

"[C]laims for *individualized* relief . . . do not satisfy the Rule."  *Id.* (emphasis in original).  "The

key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted

– the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of

the class members or as to none of them."  *Id.* (quotation marks and citation omitted).


///

///

**Page 47 - DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY AS CLASS ACTION**

Plaintiffs here seek injunctive relief that falls well short of satisfying Rule 23(b)(2). Plaintiffs seek, for the putative class and each putative subclass, a complex, multi-part injunction aimed at addressing perceived failures on the part of the State in multiple distinct administrative functions. (*See* Compl. ¶ 331.) On its face, the multi-facet nature of plaintiffs' requested injunction defies any common understanding of the word "indivisible." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 847 (5th Cir. 2012) (rejecting a class action in the foster care context under Rule 23(b)(2) because the district court would be forced to "craft individualized 'injunctive-type' relief for certain class members" and observing that certification is appropriate under Rule 23(b)(2) only when the complained-of conduct "is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.") (citation omitted). Plaintiffs' requested injunction literally requires DHS to assess and prepare an "individualized written case plan" for each member of the putative class and ensure that each such child receive the treatment and services identified for their particular needs. (Compl. ¶¶ 331.a.ii-iv.) This is precisely the sort of relief "specifically tailored to each class member" that is impermissible under Rule 23(b)(2). *Shook v. Bd. of Cty. Commissioners of Cty. Of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008). Indeed, plaintiffs are not seeking to enjoin defendants from engaging in a "specified set of centralized . . . policies or practices," *see B.K.*, 922 F.3d at 971, but are asking the Court to order the State to create thousands of individualized case plans.

Moreover, as discussed above, *see supra* pp. 28-41, plaintiffs have not shown that all members of the putative class and subclasses have suffered or will imminently suffer an injury that will be remedied by all components of the relief requested, such that it will "perforce affect the entire class at once." *Wal-Mart*, 564 U.S. at 361-62; *see also Lewis*, 518 U.S. at 349-50 (the distinction between the role of the courts and the political branches "would be obliterated if, to invoke intervention of the courts, no actual or imminent harm were needed, but merely the status of being subject to a governmental institution that was not organized or managed properly"). By way of example, not all members of the putative class suffer a risk of injury from an inadequate placement array. To the contrary, as of April 2020, almost one-half of Oregon's foster children are placed with relatives/kith/kin, generally viewed as the least traumatic placement option. (*See*

Joyce Decl. Ex. 11, 30 at 19 ("[r]esearch indicates that relative placements are almost always less traumatic for children and provide continuity and connection with familiar adults and surroundings").)  If nearly one-half of foster children are in the most appropriate placements, they cannot be said to have suffered an injury from an inadequate placement array that can be remedied through an injunction requiring DHS to "ensure that all children who are placed in foster care are placed in a safe home or facility."  (Compl. ¶ 331(a)(v).)

Thus, because the injunctive relief that plaintiffs seek cannot be applied to the case as a whole, plaintiffs' injunctive relief requests are not appropriate for class certification.

## VII.    Several of the named plaintiffs' next friends are inadequate.

This Court must also consider whether the plaintiffs' next friends are adequate.  Several are not.

### A.    Legal standard for determining the adequacy of next friends

A next friend must be dedicated to the child's best interests and have a significant relationship with the child.  *See*, *e.g.*, *Tinsley v. Flanagan*, No. CV-15-00185-PHX-ROS, 2016 WL 8200450, at *2 (D. Ariz. May 13, 2016) (citation omitted).  Courts consider several factors within the category of "best interests," including familiarity with the litigation, motivation to pursue it, and ability to pursue it.  *Sam M. ex rel. Elliott v. Carcieri*, 608 F.3d 77, 92 (1st Cir. 2010).  A next friend must also have a basic understanding of her responsibilities, including an obligation "to seek out sources and discover the current circumstances or the potential risk of harm faced by their assigned named plaintiff," *Carson P.*, 240 F.R.D. at 519, 521, and reviewing the factual allegations and consulting with the child to determine if it is in the child's best interest to pursue legal claims.  *Bhatia v. Corrigan*, No. C 07-2054 CW, 2007 WL 1455908, at *2 (N.D. Cal. May 16, 2007).

Next friends can be disqualified when they have potential conflicts of interest or even the appearance of possible "impropriety."  *See Tinsley*, 2016 WL 8200450, at *4 (social worker next friend was disqualified due to small risk of the "appearance of impropriety" that did not rise to an actual conflict of interest).

### B.    Ksen Murry, next friend for Bernard

Mr. Murry cannot adequately pursue a case on behalf of Bernard because Bernard has set conditions for Mr. Murry's role inconsistent with Mr. Murry's duty to have a relationship with Bernard and acquaint himself sufficiently to set forth the facts regarding Bernard's condition and interests.  Bernard will not permit Mr. Murry to contact him, acquire information about his current circumstances, or review any materials about him.  (Ksen Murry Dep. ("Murry Dep.") attached to Joyce Decl. as Ex. 18 at 33:12-14, 41:23-42:4, 43:19-44:8, 45:15-17, 47:25-48:4, 49:1-11, 54:11-13, 63:22-64:2, 75:1-8, 76:14-18, 100:6-17, 102:8-16, 118:12-18.)  Mr. Murry intends to honor the conditions set by Bernard and thus he cannot fulfill his obligation to "to seek out sources and discover the current circumstances or the potential risk of harm."  *Carson P.*, 240 F.R.D. at 519.

Further, and relatedly, Mr. Murry made no effort to communicate with members of the community who may have relevant information concerning Bernard's wellbeing (Murry Dep., Joyce Decl. Ex. 18 at 43:19-44:8); he has not expressed concerns about Bernard's placements and services to the juvenile court, Bernard's juvenile dependency attorney, DHS caseworkers, or the CRB (*id.* at 32:23-33:21); and has never reviewed Bernard's court reports, case plan, or permanency plan.  (*Id.* at 41:23-42:4.)  Accordingly, the Court should appoint a different next friend.

### C.    Michelle McAllister, next friend of Wyatt and Noah

Ms. McAllister is the next friend of Wyatt and Noah. 

. Ms. McAllister is an inadequate next friend because, by her own admission,

(Michelle McAllister Dep. ("McAllister Dep."), attached to Joyce Decl. as Ex. 45 at 159:20-22, 160:20-22); *Carson P.*, 240 F.R.D. at 518 (recent contact is a factor to consider in evaluating a next friend's adequacy).  Ms. McAllister was aware of the boys' court hearings, but she chose

not to attend and ███████████████████████████████████████████████████.
(McAllister Dep., Joyce Decl. Ex. 45 at 153:16-154:4); *see Carson P.*, 240 F.R.D. at 519
(participation and attendance at hearings are factors to consider in evaluating a next friend's
adequacy).  Without attending hearings and having regular contact, Ms. McAllister is unable to
fulfill her duty to discover the current circumstances faced by Wyatt and Noah.  The Court
should appoint a different next friend.

> ### D.    Kathleen Megill Strek, next friend of Naomi, Kylie, and Alec

Ms. Megill Strek is also an inadequate next friend because she has a conflict of interest
and does not act in Naomi's best interests.  Ms. Megill Strek is ████████████████



(Kathleen Megill Strek Dep. attached to Joyce Decl. as Ex. 46 at 82:14-24, 77:5-79:8.) ██████
████████████████████████████████████████████████████
████████████████████████████  What is more, plaintiffs
put the conditions of Naomi's placements, ████████████████, and DHS's related actions at
issue in the case (*see* Compl. ¶¶ 157, 163), and Ms. Megill Strek is ███████████████████
██████████████.  Accordingly, the Court should appoint a new next friend.

> ## CONCLUSION

No question exists that plaintiffs' circumstances present a compelling narrative.  That is,
in fact, precisely why plaintiffs' counsel selected them to be named plaintiffs in this putative
class action.  But a compelling narrative is not a substitute for the burden that plaintiffs carry
under Rule 23.  Plaintiffs have failed to carry that burden; they have not demonstrated that their
claims are common or typical of children in DHS custody or that the State has been deliberately
indifferent to them.  That is ultimately fatal to plaintiffs' request to certify this case as a class
action.  For those reasons, and the additional bases stated herein, the State respectfully requests

that this Court deny plaintiffs' motion for class certification and allow the State to continue its work improving the child welfare system.

DATED this 3rd day of August, 2020.

ELLEN ROSENBLUM
ATTORNEY GENERAL
FOR THE STATE OF OREGON

By:    *s/ Anna M. Joyce*

David B. Markowitz, OSB #742046
DavidMarkowitz@MarkowitzHerbold.com
Laura Salerno Owens, OSB #076230
LauraSalerno@MarkowitzHerbold.com
Anna M. Joyce, OSB #013112
AnnaJoyce@MarkowitzHerbold.com
Harry B. Wilson, OSB #077214
HarryWilson@MarkowitzHerbold.com
Lauren F. Blaesing, OSB #113305
LaurenBlaesing@MarkowitzHerbold.com
Telephone: (503) 295-3085
  *Special Assistant Attorneys General for Defendants*

Carla A. Scott, OSB #054725
carla.a.scott@doj.state.or.us
Sheila H. Potter, OSB #993485
sheila.potter@doj.state.or.us
  *Of Attorneys for Defendants*

1013960

## CERTIFICATE OF COMPLIANCE WITH L.R. 7-2(b)(2)

On July 22, 2020, the State filed an Unopposed Motion for Leave to File an Overlength Brief (Dkt. 107) requesting permission to extend the page limit in connection with Defendants' Opposition to Plaintiffs' Motion to Certify as Class Action from 35 pages to up to 60 pages. If Defendants' Unopposed Motion for Leave to File an Overlength Brief is granted, this brief will comply with the applicable word-count and page limitations under L.R. 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 52 pages (19,582 words), including headings, footnotes, and quotations, but excluding the caption, table of contents, table of authorities, signature block, and any certificates of counsel.

DATED this 3rd day of August, 2020.

*s/ Anna M. Joyce*
Anna M. Joyce, OSB #013112
Special Assistant Attorney General for Defendants

**CERTIFICATE OF COMPLIANCE**