**GREGORY A. CHAIMOV,** OSB #822180
gregorychaimov@dwt.com
**DAVIS WRIGHT TREMAINE LLP**
1300 SW Fifth Avenue, Suite 2300
Portland, OR 97201
Tel: (503) 241-2300

**MARCIA ROBINSON LOWRY** (*pro hac vice*)
mlowry@abetterchildhood.org
**DAWN J. POST** (*pro hac vice*)
dpost@abetterchildhood.org
**ANASTASIA BENEDETTO** (pro hac vice)
abenedetto@abetterchildhood.org
**A BETTER CHILDHOOD**
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel: (646) 795-4456

**EMILY COOPER**, OSB #182254
ecooper@droregon.org
**THOMAS STENSON**, OSB #152894
tstenson@droregon.org
**DISABILITY RIGHTS OREGON**
511 SW 10th Avenue, Suite 200
Portland, OR 97205
Tel: (503) 243 2081

**PAUL C. SOUTHWICK,** OSB #09141
paul@paulsouthwick.com
**PAUL SOUTHWICK LAW LLC**
8420 N Ivanhoe St.
Portland, OR 97203
Tel: (503) 806 9517

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| WYATT B. and NOAH F. by their next friend Michelle McAllister; KYLIE R. and ALEC R. by their next friend Kathleen Megill Strek; UNIQUE L. by her next friend Annette Smith; SIMON S. by his next friend Paul Aubry; RUTH T. by her next friend Michelle Bartov; BERNARD C. by his next friend Ksen Murry; NAOMI B. by her next friend Kathleen Megill Strek; and NORMAN N. by his next friend Tracy Gregg, individually and on behalf of all | Case No. 6:19-cv-00556-AA<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY**<br><br>**Oral Argument Requested** |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

others similarly situated,

                           Plaintiffs,

       v.

KATE BROWN, Governor of Oregon in her official capacity; FARIBORZ PAKSERESHT, Director, Oregon Department of Human Services in his official capacity; JANA MCLELLAN, Interim Director, Child Welfare in her official capacity, and OREGON DEPARTMENT OF HUMAN SERVICES,

                           Defendants.

4826-5404-5384v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon 97201 · (503) 241-2300

## TABLE OF CONTENTS

I.     **INTRODUCTION** ................................................................................................ 1

II.    **ARGUMENT** ..................................................................................................... 2

    A.    Legal Standard of Review ................................................................... 2

    B.    All of Plaintiffs' Proffered Expert Testimony and Opinion is Admissible ........... 4

        1.    Bianca D.M. Wilson, PhD Offers Reliable Expert Opinions About LGBTQ Youth in Oregon's Child Welfare System ................................... 6

        2.    Sue D. Steib, PhD, LCSW and Patricia L. Rideout, JD Provide a Reliable Expert Assessment of Recurring Themes in the Case Files of the Named Plaintiffs in the Context of Reasonable Professional Standards in Child Welfare .................................................................................... 10

        3.    Alan M. Puckett, PhD Provides Reliable Opinions on Systemic Issues Within the Oregon Child Welfare System, Supported by Documents and Data Issued by Defendants Themselves ................................... 16

        4.    Angelique Day, PhD, MSW Provides a Reliable Expert Opinion Concerning the Issues with Oregon's Transition Services ....................... 22

III.    **CONCLUSION** ................................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*B.K. v. Faust*,
  No. 15-CV-00185, 2020 U.S. Dist. LEXIS 90245 (D. Ariz. May 21, 2020) ....................3, 12

*Brand v. Comcast Corp.*,
  302 F.R.D. 201 (N.D. Ill. 2014).....................................................................................20

*Bruno v. Bozzuto's, Inc.*,
  311 F.R.D. 124 (M.D. Pa. 2015).....................................................................................21

*Cabrera v. Cordis Corp.*,
  134 F.3d 1418 (9th Cir. 1998) ..........................................................................................9

*D.G. v. Yarbrough*,
  No. 08-CV-074, 2011 U.S. Dist. LEXIS 138622 (N.D. Okla. Dec. 1, 2011)........................11

*Daubert v. Merrell Dow Pharm.*,
  43 F.3d 1311 (9th Cir. 1995) ........................................................................................8, 25

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 3 (1993)................................................................................... *passim*

*Grodzitsky v. Am. Honda Motor Co.*,
  957 F.3d 979 (9th Cir. 2020) ...........................................................................................4

*Hall v. Baxter Healthcare Corp.*,
  947 F. Supp. 1387 (D. Or. 1996) ................................................................................12, 13

*Hangarter v. Provident Life & Accident Ins. Co.*,
  373 F.3d 998 (9th Cir. 2004) ..........................................................................................22

*Henricksen v. ConocoPhillips Co.*,
  605 F. Supp. 2d 1142 (E.D. Wash. 2009) ..........................................................................9

*Kennedy v. Collagen Corp.*,
  161 F.3d 1226 (9th Cir. 1998) ...................................................................................11, 12

*Kenny A. v. Perdue*,
  No. 02-CV-1686, 2004 U.S. Dist. LEXIS 27025 (N.D. Ga. Dec. 13, 2004).....................3, 12

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)....................................................................................................2, 3

*M.D. v. Abbott*,
    152 F. Supp. 3d 684 (S.D. Tex. 2015) ...................................................................12

*M.D. v. Perry*,
    294 F.R.D. 7 (S.D. Tex. 2013)........................................................................3, 18

*McClellan v. I-Flow Corp.*,
    710 F. Supp. 2d 1092 (D. Or. 2010) .....................................................................21

*P.S. ex rel. Nelson v. The Farm, Inc.*,
    658 F. Supp. 2d 1281 (D. Kan. 2009).......................................................15, 22, 25

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) .............................................................................26

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010) *amended by* 2010 U.S. App. LEXIS 8859 (9th
    Cir. Apr. 27, 2010)................................................................................8, 11, 13

*Reed v. Lieurance*,
    863 F.3d 1196 (9th Cir. 2017) ...............................................................................2

*Sali v. Corona Reg'l Med. Ctr.*,
    909 F.3d 996 (9th Cir. 2018), *cert. dismissed*, 139 S. Ct. 1651 (2019) ...............................4, 20

*Siring v. Or. State Bd. of Higher Educ.*,
    927 F. Supp. 2d 1069 (D. Or. 2013) ....................................................................3, 13

*Tomeo v. CitiGroup, Inc.*,
    No. 13-CV-4046, 2018 U.S. Dist. LEXIS 166117 (N.D. Ill. Sep. 27, 2018) .........................20

*United States v. Laurienti*,
    611 F.3d 530 (9th Cir. 2010) .............................................................................13

*Wendell v. GlaxoSmithKline LLC*,
    858 F.3d 12276 (9th Cir. 2017) ...........................................................................24

*Williams v. Invenergy, LLC*,
    No. 13-CV-01391, 2016 U.S. Dist. LEXIS 57045 (D. Or. Apr. 28, 2016) ......................12, 13

**Rules**

Fed. R. Evid. 702 ...........................................................................................1, 2, 5, 17

4826-5404-5384v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

# I.    INTRODUCTION

Defendants are understandably unhappy with the conclusions of Plaintiffs' five well-qualified expert witnesses: Bianca D.M. Wilson, PhD; Sue D. Steib, PhD, LCW; Patricia L. Rideout, JD; Alan M. Puckett, PhD; and Angelique Day, PhD.  Each expert report submitted in support of Plaintiffs' motion for class certification paints a damning picture, illustrating Defendants' many failures to adequately care for the vulnerable Oregon children in their care and custody in accordance with reasonable, professional child welfare standards. But disliking or disagreeing with an expert report is not grounds for a *Daubert* challenge. That is, however, ultimately what Defendants' argument amounts to: mere differences of opinion, minor squabbling over out-of-context excerpts, and blatant mischaracterization of the experts' methodologies, opinions, and deposition testimony—featuring arguments that are largely improper in a motion challenging the admissibility of expert testimony.  There is nothing meritorious about any of Defendants' challenges.

Each of Plaintiffs' experts has considerable experience in child welfare, and their expert opinions offer valuable evidence in support of Plaintiffs' pending motion for class certification. To be sure, discovery in this case is far from complete.  But while the information available to Plaintiffs' experts may have been limited by that fact, a determination on class action status is not a determination on the merits.  And, as demonstrated by their expert reports and reiterated in this brief, each expert offers testimony directly connected to the issues presented in this case. Furthermore, each expert supports their expert opinions with their own extensive knowledge and experience, accepted standards and best practices, government and academic publications, and government data.  Each expert thus offers relevant and reliable expert opinion and testimony in support of class certification satisfying the standards for admissibility under Federal Rule of

Evidence 702 outlined in *Daubert* and its progeny.  Accordingly, Defendants' motion to exclude Plaintiffs' expert witnesses should be denied in full and the Court should utilize the opinions offered in the four expert reports in assessing class certification.

## II.    ARGUMENT

### A.    Legal Standard of Review

Federal Rule of Evidence 702 permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education [to] testify in the form of an opinion or otherwise." Fed. R. Evid. 702.  Expert testimony is admissible where, as here, it will help the trier of fact understand the evidence or determine a fact in issue. *Id.; see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 at 591–93 (1993).  The Court serves as a gatekeeper to ensure that the expert testimony is not just relevant, but also reliable. *Daubert,* 509 U.S. at 589 (holding that scientific testimony is admissible only if it is both relevant and reliable); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (recognizing that the court's "basic gatekeeping obligation" applies to all forms of expert testimony); *see also* Fed. R. Evid. 702(b)–(d).  When an expert includes multiple opinions in their report, a district court, in performing its gatekeeping obligation, should only exclude the inadmissible ones, admitting the remainder. *See Reed v. Lieurance*, 863 F.3d 1196, 1208–09 (9th Cir. 2017) ("While the district court may have had a proper basis to exclude portions of the expert report in its discretion, . . . the district court abused its discretion in excluding the entirety of [the expert's] testimony[.]").

In *Daubert*, the Supreme Court identified several factors to assess whether an expert opinion is reliable: (1) whether the theory or technique can be and has been tested, (2) whether the theory or technique has been peer reviewed and published, (3) the known or potential error rate of the theory or technique, (4) whether there are standards controlling the theory or technique's

Page 2 - PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

operation, and (5) whether the theory or technique enjoys general acceptance in the applicable scientific community.   509 U.S. at 592–95.   However, the list of *Daubert* factors "neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co.*, 526 U.S. at 141.   "With non-scientific experts, 'the *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable' and 'reliability depends heavily on the knowledge and experience of the expert rather than the methodology or theory behind it.'" *Siring v. Or. State Bd. of Higher Educ.*, 927 F. Supp. 2d 1069, 1072 (D. Or. 2013) (quoting *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir.2000)).   Thus, in a case like "this case, where no scientific knowledge is necessary and the witnesses' expertise is based on 'personal knowledge or experience,'" that experience is given significant weight in assessing admissibility.   *B.K. v. Faust*, No. 15-CV-00185, 2020 U.S. Dist. LEXIS 90245, at *9–10 (D. Ariz. May 21, 2020) (quoting *Kumho Tire Co.*, 526 U.S. at 150; citing Fed. R. Evid. 702).

In child welfare cases specifically, reliance on the expert's own knowledge and experience, accepted standards and best practices, and government and academic publications typically meets the *Daubert* reliability standard.   *See Kenny A. v. Perdue*, No. 02-CV-1686, 2004 U.S. Dist. LEXIS 27025, at *41–44 (N.D. Ga. Dec. 13, 2004); *see also M.D. v. Perry*, 294 F.R.D. 7, 36–37 (S.D. Tex. 2013) (highlighting the experience of the expert, her reliance on national standards, and her prior testimony in qualifying her as an expert at the class certification stage); *B.K.*, 2020 U.S. Dist. LEXIS 90245, at *10–17 (finding that the proposed experts, including those testifying about behavioral health care, data, placement practices, and named plaintiff case files were "at least minimally qualified and the disputed opinions sufficiently relevant" to consider at trial).

Page 3 - PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

Notably, the Ninth Circuit cautions District Courts against relying on inadmissibility as a basis to refuse to consider an expert opinion at the class certification stage. *See Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006–07 (9th Cir. 2018), *cert. dismissed*, 139 S. Ct. 1651 (2019). With respect to proposed expert testimony, the Circuit Court noted that "admissibility must not be dispositive. Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage." *Id.* at 1006. The Circuit Court further recognized that defects in the explanation of a methodology could be remedied. *Id.* (holding that the trial court erred by refusing to consider a declaration where the witness "extracted data without explaining his methods," an issue that could be redressed with supplemental declarations).[1] Accordingly, even if there is some defect in Plaintiffs' expert reports (there is not), the Court should consider that only in analyzing the appropriate weight to give the report when deciding to certify the classes, rather than excluding the testimony altogether.

### B.    All of Plaintiffs' Proffered Expert Testimony and Opinion is Admissible

Plaintiffs obtained five expert reports to assist the Court with class certification. All five experts provide extremely relevant and reliable expert opinions that meet the *Daubert*

---

[1]   The Ninth Circuit recently upheld a District Court decision excluding an expert opinion at the class certification stage. *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979 (9th Cir. 2020). However, the Circuit did not overrule or qualify its decision in *Sali*, and *Grodzitsky* is clearly distinguishable because there were extreme substantive flaws with the expert's opinion, rather than challenges that could be addressed with further discovery or explanation that were at issue in *Sali*. Indeed, the opinion at issue in *Grodzitsky* was based entirely on the expert's own conclusory assertions rather than on any industry standards, peer-reviewed literature, or any external information at all. *Id.* at 985–86. Here, Plaintiffs' experts all rely on well-established industry standards and government data in addition to their impressive experience to support their opinions and testimony, so plainly do not suffer from the types of egregious flaws as those at issue in *Grodzitsky*, nor do Defendants even allege the same types of defects exist in Plaintiffs' expert opinions. Accordingly, while there may be some instances where it is appropriate to exclude an expert at the class certification stage who is either completely unqualified, or relies on no external information at all, *Sali* suggests that the Court should assess the weight to be given to the opinions of Plaintiffs' expert witnesses when ruling on class certification, rather than excluding them altogether at this stage.

Page 4 - PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

requirements.   Indeed, it does not appear that Defendants challenge the relevancy of any of

Plaintiffs' experts' opinions and testimony.  After all, each of Plaintiffs' experts opines on an issue,

based on their specialized knowledge, that is directly connected to what the Court needs to decide

in this litigation, and thus "will help the trier of fact [] understand the evidence or determine" facts

in issue. Fed. R. Evid. 702. Dr. Wilson opines on LGBTQ youth in Oregon's child welfare system,

which is clearly relevant to the SGM subclass.  Dr. Steib and Ms. Rideout evaluate the Named

Plaintiffs' case files as part of an assessment of Oregon Department of Human Services ("DHS")

practices, which is relevant to both the general class and each subclass.  Dr. Puckett examines

Adoption and Foster Care Analysis and Reporting System ("AFCARS") data provided by DHS to

opine on the problems and shortcomings of Oregon's foster care system, which is similarly very

relevant to the general class and each subclass.  Finally, Dr. Day opines on DHS's actions and

failures to act affecting youth ages 14 and older, which is relevant to the aging-out subclass.

Turning to the reliability prong of this Court's gatekeeping function, it is telling that

Defendants do not challenge any of Plaintiffs' experts' qualifications to offer opinions about the

various subject-matters on which they opine.  Nor could they.  As outlined more fully below, every

single one of Plaintiffs' expert witnesses has extensive experience with child welfare and is

extremely accomplished in the field.  Those with more specialized knowledge, such as Dr. Wilson

and Dr. Day, have demonstrated their additional expertise through first-hand experience and

publications on the topics on which they opine.

At best, Defendants' *Daubert* challenges consist of trivial nitpicking over small excerpts

of the experts' reports and testimony. At worst, Defendants completely misconstrue the experts'

opinions and testimony.  Many of Defendants' arguments are not *Daubert* challenges at all, and

4826-5404-5384v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

would be more appropriate (though still meritless) as challenges to the *weight* each expert opinion should receive, not as challenges to their overall admissibility. Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596.

Ultimately, each expert report is based on and supported by the types of information regularly accepted as reliable in child welfare cases, such as extensive experience in the child welfare field, widely-accepted industry standards, publications, and government data. Each expert utilized these appropriate information sources to develop opinions about their respective issues. Accordingly, all of Plaintiffs' extremely relevant experts' opinions are backed by a reliable methodology, as required by *Daubert*, and the Court should deny Defendants' motion in full.

### 1. Bianca D.M. Wilson, PhD Offers Reliable Expert Opinions About LGBTQ Youth in Oregon's Child Welfare System

Dr. Wilson, who holds a PhD in Psychology, is a Senior Scholar of Public Policy at The Williams Institute, an academic research center at UCLA School of Law that "conducts independent research on sexual orientation and gender identity law and public policy." (Decl. of Marcia Robinson Lowry ("Lowry Decl."), Ex. 1 ("Wilson Expert Report") at 1, Appendix A). UCLA School of Law Williams Institute, https://williamsinstitute.law.ucla.edu/ (last visited Aug. 17, 2020). Dr. Wilson has spent the past eight-plus years focused on conducting "research on the role of sexual orientation, gender identify, and gender expression (SOGIE) in the demographics and experiences of youth in foster care," and she is well-published on this topic. (Wilson Expert Report at 3, Appendix A). Moreover, she conducted the "first of several studies that now demonstrate how pervasive LGBTQ-related disparities are in foster care," which is the precise

Page 6 - PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

topic of her expert opinion and testimony. (Wilson Expert Report at 4–5).

Defendants assert that Dr. Wilson's testimony is unreliable because it "contradicts" her peer-reviewed study by extrapolating from its findings to offer an opinion about the number of Oregon LGBTQ youth in foster care. It plainly does not. Dr. Wilson conducted the first-of-its-kind study to determine how pervasive LGBTQ-related disparities are in foster care, using interviews with randomly sampled youth ages 12-21 living in foster care in Los Angeles County (the "Los Angeles Study"). (Wilson Expert Report at 4–5). Defendants make much of the fact that the Los Angeles Study notes "more research is needed to understand the experiences of foster youth in other locations and to assess the usefulness of the methodology and generalizability of the results beyond Los Angeles County." (Blaesing Decl. Ex. 1 at 5, ECF No. 115-1). However, Defendants ignore the two subsequent randomized studies Dr. Wilson points to in her report—one nationwide and one across the state of California—which demonstrated similar findings of disproportionality and experiential disparities for LGBTQ youth in foster care. (Wilson Expert Report at 5–6). Dr. Wilson expressly indicates that what she has learned about the disproportionality and disparities with LGBTQ youth in the child welfare system is based both on her own, *and* other scholars' research.[2] (Wilson Expert Report at 5–6). Dr. Wilson also relies on DHS's own admissions and data and the federal Administration of Children & Families

---

[2] Even if Dr. Wilson developed an expert opinion about the overrepresentation of LGBTQ youth in Oregon's foster care based solely on the Los Angeles Study, her expert report findings would not *contradict* that the Los Angeles Study, as Defendants claim. Defendants seem to think that indicating that more research is needed on a topic, or recognizing a study's limitations, is the same as stating the study *cannot* be applied to other contexts under any circumstances. But obviously that does not logically follow. Indeed, Dr. Wilson explained that the findings from the Los Angeles Study "were *generalizable* to the Los Angeles foster care population, and *indicative* of child welfare departments nationwide." (Wilson Expert Report at 5 (emphasis added)). This is completely consistent with the findings of the Los Angeles Study.

Page 7 - PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon 97201 · (503) 241-2300

recognition that the evidence of LGBTQ disproportionality and disparities in the child welfare system is known and undisputed. (Wilson Expert Report at 6).

Thus, there is no "contradiction" between the findings of the Los Angeles Study and Dr. Wilson's expert opinion herein. Instead her opinion clearly "grow[s] naturally and directly out of research [she has] conducted independent of th[is] litigation." *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*"). Dr. Wilson's opinion that "a significant proportion of youth in foster care are LGBTQ, approximately 19.1% (13.4% are LGBQ and 5.6% are transgender)," and that "there is a far higher proportion of youth who are LGBTQ in the foster care system than outside of it" is derived directly from her own research. (Wilson Expert Report at 6).

Defendants curiously try to point to the limited data about the number of LGBTQ youth in Oregon foster care as a reason to exclude Dr. Wilson's expert opinion about the prevalence of such youth in out-of-home care. However, the very fact that Defendants have a policy against gathering reliable and consistent data concerning the SGM population is why Dr. Wilson's expert opinion regarding the likely prevalence of the sub-population in DHS care is necessary.[3] (*See* Lowry Decl. Ex. 10 ("Andresen SGM Dep.") 19:24–20:9; *see also* Lowry Decl. Ex. 2 ("Wilson Dep.") 58:11– 59:15). An expert opinion need not be "conclusive" to be relevant and reliable. *See Primiano v.*

---

[3] Dr. Wilson also thoroughly explains the issues with Oregon's data collection on SGM youth, as well as why it is important and feasible to collect this data as support for her opinion. In particular, Dr. Wilson highlights the inaccuracy of a DHS report claiming only 2% of youth in care are LGBTQ—as she explains, that 2% figure represents only the very limited documentation by caseworkers from pre-existing case files on a data point the workers are required to include. (Wilson Expert Report at 7; Lowry Decl. Ex. 10 ("Andresen SGM Dep.") 19:24–20:9). Even Defendants' 30(b)(6) witness, Lacey Andresen, agreed that the 2% number "[would] be a floor and not a ceiling on the number of SGM children in Oregon's foster care system," acknowledging that DHS had no reason to doubt estimates that "approximately 22.8 percent of children in out-of-home care identified as LGBQ." (Andresen SGM Dep. 23:2–6, 95:4–15).

Page 8 - PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

*Cook*, 598 F.3d 558, 565–66 (9th Cir. 2010) *amended by* 2010 U.S. App. LEXIS 8859 (9th Cir. Apr. 27, 2010) (recognizing that properly admitted medical expert testimony "need not be conclusive because medical knowledge is often uncertain") (internal quotation marks and citations omitted). Unlike the cases cited by Defendants, Dr. Wilson is not making a completely speculative assumption. *Cf. Cabrera v. Cordis Corp.*, 134 F.3d 1418 (9th Cir. 1998); *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142 (E.D. Wash. 2009). To the contrary, Dr. Wilson points to many other sources, including peer-reviewed research and Oregon's own limited data, that support her expert opinions, lending credence to the reliability of her expert opinion and testimony. (*See generally*, Wilson Expert Report).

Finally, while Defendants extensively critique Dr. Wilson's extrapolation of "the *number* of LGBTQIA+ youth in the foster care system," (Defs.' Mot. to Exclude at 8, ECF No. 114 (emphasis added)), this critique is largely irrelevant because Defendants do not dispute that the SGM class meets the numerosity requirements. (*See generally*, Defs.' Opp. to Pls.' Mot. to Certify, ECF No. 118 (raising only commonality, typicality, and adequacy challenges)). Furthermore, Defendants' Motion to Exclude makes no mention of Dr. Wilson's opinion that the subpopulation of LGBTQ youth in foster care "share[] unique and distinguishing experiences as sexual and gender minorities" which is "why it is critical that LGBTQ youth are placed in affirming homes and placements." (Wilson Expert Report at 9–10). Indeed, Defendants do not identify a single opinion of Dr. Wilson's relating to a disputed fact in this litigation to which they object, such as whether other states (unlike Oregon) collect data on SGM youth, whether SGM youth are more likely to be mistreated in foster care, are overrepresented in foster care, experience greater placement instability, endure reduced likelihood of achieving permanency, or that increasing

SGM-affirming placements would improve outcomes for SGM youth.  (*See* Wilson Expert Report at 7–13).  Accordingly, whether the number of LGBTQ youth in the SGM subclass is the unlikely "floor" of 2% identified by Oregon, or the approximately 20% suggested by both Dr. Wilson and national survey results acknowledged by Defendants' 30(b)(6) witness at her deposition, (*see* Andresen Dep. 20:10–23:19), Dr. Wilson's opinions that those youth have common experiences and needs is relevant to the motion for class certification.

Thus, Dr. Wilson's methodology in assessing the disproportionality and disparities experienced by Oregon's LGBTQ foster youth is reliable because it is based on her own independent research conducted prior to and outside of this litigation and is supported by all the current peer-reviewed and government research on the subject, as well as Defendants' own admissions and data.  Accordingly, Defendants' motion to exclude Dr. Wilson's expert opinion and testimony should be denied.

### 2. Sue D. Steib, PhD, LCSW and Patricia L. Rideout, JD Provide a Reliable Expert Assessment of Recurring Themes in the Case Files of the Named Plaintiffs in the Context of Reasonable Professional Standards in Child Welfare

Dr. Sue Steib and Ms. Patricia Rideout have a combined seventy-five-plus years of experience in the child welfare field.  (Lowry Decl. Ex. 3 ("Expert Opinion of Steib and Rideout") at 2; CV of Sue Duvall Steib, PhD, LCSW, Lowry Decl. Ex 3 at 227–232; CV of Patricia L. Rideout, JD, Lowry Decl., Ex. 3 at 232–234).  Dr. Steib, who holds both an MSW and a PhD in social work, spent thirty-one years in Louisiana's child welfare system (including serving as the Child Welfare Program Director), and subsequently worked with systems in various states to provide support and improve outcomes for the children and families they serve.  (Expert Opinion of Steib and Rideout at 2–3; CV of Sue Duvall Steib, PhD, LCSW, Lowry Decl. Ex 3 at 227–232).

Page 10 - PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

Ms. Rideout, who holds a JD from Stanford University Law School, has served as Deputy Director for a child welfare agency in Cuyahoga County, Ohio, and spent many years with the Annie E. Casey Foundation supporting reform of child welfare systems.  (Expert Opinion of Steib and Rideout at 2; CV of Patricia L. Rideout, JD, Lowry Decl., Ex. 3 at 232–234).  Both experts are widely published in the field of child welfare and are remarkably qualified to provide expert opinion and testimony regarding Oregon DHS practices, based on a case file review of the Named Plaintiffs.  (CV of Sue Duvall Steib, PhD, LCSW, Lowry Decl. Ex 3 at 227–232; CV of Patricia L. Rideout, JD, Lowry Decl., Ex. 3 at 232–234; *see also* Expert Opinion of Steib and Rideout). Notably, Dr. Steib has previously been qualified as an expert witness in a foster care class action in federal court.[4]  *See D.G. v. Yarbrough*, No. 08-CV-074, 2011 U.S. Dist. LEXIS 138622, at *38–39 (N.D. Okla. Dec. 1, 2011).

Dr. Steib and Ms. Rideout reviewed the Named Plaintiffs' case files to distill the children's experiences for the Court and develop opinions, based on their review, about whether DHS practice in the case files comported with acceptable professional standards and whether the cases suggest that there are systemic problems in the DHS system.[5]  Dr. Steib and Ms. Rideout relied on their experience and reasonable professional standards in conducting this review, which is proper because *Daubert* requires using the "methodology of the kind traditionally used by" experts in the field at issue, whatever that methodology may be.  *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1229–30 (9th Cir. 1998); *see also Primiano*, 598 F.3d at 567 (admitting testimony by expert who

---

[4]  In this case, Dr. Steib testified on behalf of the State of Oklahoma.

[5]  Defendants suggest that these case studies are "unrepresentative."  (Mot. at 10).  However, that is an argument for Defendants' opposition to Plaintiffs' motion for class certification—it is not a *Daubert* challenge rendering Dr. Steib and Ms. Rideout's expert report inadmissible.

compared what plaintiff experienced against a background of peer-reviewed literature because that was the ordinary methodology in the field).  In the child welfare context, district courts faced with *Daubert* challenges in child welfare cases consistently deem child welfare expert opinions based on case file reviews admissible.  *See, e.g., M.D. v. Abbott*, 152 F. Supp. 3d 684, 712–13 (S.D. Tex. 2015); *B.K.*, U.S. Dist. LEXIS 90245, at *15–17; *Kenny A.*, 2004 U.S. Dist. LEXIS 27025, at *36–44.

        Thus, Defendants' main challenge to the reliability of Dr. Steib and Ms. Rideout's expert opinion and testimony, that their opinion is based on case studies, is meritless.  (Defs.' Mot. to Exclude 9, ECF No. 114).  Defendants ignore the relevant child welfare case law and instead cite cases involving experts opining on hard science, such as medical tort actions alleging defendants caused plaintiffs' illness and disease.  In those cases, courts have determined that the scientific expert testimony on causation does not survive *Daubert* because the relied-upon case reports do not prove causation under scientific standards.  *See Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1407–11 (D. Or. 1996) (excluding, in litigation alleging breast implant leakage caused atypical connective tissue disease, an immunology expert who opined that silicone is capable of causing the plaintiffs' symptoms in part because the relied-upon case reports lacked controls) (citing four additional cases, all concerning expert testimony regarding scientific causation in tort actions); *Williams v. Invenergy, LLC*, No. 13-CV-01391, 2016 U.S. Dist. LEXIS 57045, at *44 (D. Or. Apr. 28, 2016) (excluding testimony by a proffered expert who was not a medical professional or epidemiologist, but who offered an opinion that the outputs produced by wind turbines produce adverse health effects in humans, because his causation opinion was based only on case studies and was therefore not "scientifically reliable").  *Cf. Kennedy*, 161 F.3d at 1229–30

Page 12 - PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

(permitting expert testimony despite a lack of epidemiological studies demonstrating the required causal connection).

Notably, both *Hall* and *Williams* excluded the expert testimony at issue "because case reports *lack controls*." *Hall*, 947 F. Supp. at 1411 (emphasis added); *Williams*, 2016 U.S. Dist. LEXIS 57045, at *44 (quoting *Hall*). Herein lies the problem with relying solely on tort case law involving scientific causation experts to discredit child welfare experts Dr. Steib and Ms. Rideout: there is no ethical "control group" of children that could create the type of scientific causal connection deemed necessary in the tort cases cited by Defendants. In any event, a scientific control group experiment is simply not required for the opinions of Dr. Steib and Ms. Rideout, because they do not offer opinions based on hard scientific knowledge.

Defendants also complain that Dr. Steib and Ms. Rideout did not "appl[y] any industry standards to reach their conclusions" and instead leaned on their experience in the field. (Defs.' Mot to Exclude 9–10, ECF No. 114). This is an extreme misinterpretation of the methodology used by Dr. Steib and Ms. Rideout, as well as of the law on admissibility of expert witness opinions. Dr. Steib and Ms. Rideout certainly relied on their experience in the field, which is completely appropriate as it is their deep experience that makes them experts in child welfare. *See, e.g., United States v. Laurienti*, 611 F.3d 530, 548 (9th Cir. 2010) (determining that an expert was qualified even though "his opinions were not supported by any methodology other than his own work experience"); *Primiano*, at 567 (recognizing that physician expert's opinion was relevant and reliable due to his "background and experience, and his explanation of his opinion"); *Siring*, 927 F. Supp. 2d at 1072–76 (finding that the expert's "experience, training, and education provide a sufficient foundation of reliability").

Page 13 - PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

However, in the case of Dr. Steib and Ms. Rideout, it is not only their extensive experience that informs the expert opinions.  As the expert report further explains (a point which is ignored by Defendants), Dr. Steib and Ms. Rideout "sought to objectively assess Oregon DHS practice in light of [their] understanding of *reasonable professional standards in child welfare*."  (Expert Opinion of Steib and Rideout at 2 (emphasis added)).    Thus, it is clear that Dr. Steib and Ms. Rideout did apply industry standards to reach their conclusions.

Defendants' apparent suggestion that there can be no industry standards if they are not written down in a specific document is simply incorrect.  (*See* Defs.' Mot. to Exclude at 9–10, ECF No. 114).  Dr. Steib explained in her deposition that based on her more than 45-years of experience in the field, she has "a good understanding of what it is that public child welfare in this country is charged to do.  [She] think[s] those standards are reflected in, for example, the federal standards for the Child and Family Services Review, and as [they] state here, they pertain, primarily, to children's safety, permanency, and well-being."  (Lowry Decl., Ex. 4 ("Steib Dep.") 135:5–12).  Similarly, Ms. Rideout, when asked about how she knew the child welfare standard for children whose behaviors can't be managed in traditional foster care  was "[f]amily care with specially trained and supported caregivers (typically known as therapeutic or specialized foster care)," she explained it was what "virtually any experienced child welfare professional would agree" was appropriate, recognized by federal child welfare law, and "is widely and deeply documented in all literature on foster care for kids."  (Lowry Decl., Ex. 5 ("Rideout Dep.") 153:7–155:11).  She further explained, "reasonable professional standards are ways of doing this work that are generally accepted by all of us as what we are aiming for as the appropriate way to do this work, and there are plenty of books written about them."  (Rideout Dep. 169:12–17; *see also id.*

Page 14 - PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

168:14–172:24).  As their deposition testimony makes clear, Dr. Steib and Ms. Rideout applied the reasonable professional standards in child welfare informed both by their considerable experience in the field and extensive published literature, to develop their expert opinion.

Furthermore, Defendants' complaint that Dr. Steib and Ms. Rideout do not rely on any "federal" standards is both incorrect and misses the point.  First, both referenced various federal child welfare standards or requirements at their depositions, and explained how the relied-upon reasonable professional standards are accepted nationwide and published widely.  (*See* Steib Dep. 79:23–80:9, 134:24–137:16; Rideout Dep. 153:7–155:11).   Furthermore, assessing Oregon's actions and failures to act in the light of "reasonable professional standards" is relevant to the constitutional issues in this case.  Accordingly, it is irrelevant whether Dr. Steib and Ms. Rideout relied on any purported "Oregon-specific" standards.[6]  The reasonable professional standards in the child welfare field applied by Dr. Steib and Ms. Rideout are the appropriate benchmark to assess Defendants' constitutional violations of the children in their care.

Critically, nowhere do Defendants assert that the reasonable professional standards applied by Dr. Steib and Ms. Rideout are incorrect or not well-established in the child welfare field.  Thus, calling them "subjective standards" is a misnomer—both Dr. Steib and Ms. Rideout explain how

---

[6]  In the Background section of their brief, Defendants point to a few pieces of Oregon-specific information about which Dr. Steib and Ms. Rideout were unfamiliar.  First, these purported issues may go towards the weight that should be afforded to their opinion and testimony but should not affect their admissibility.  Further, such criticisms ignore that data points like the number of children in care and the average caseload change often.  And critically, any unfamiliarity with specific points of Oregon's child welfare system does not prevent Dr. Steib and Ms. Rideout from opining on reasonable professional standards in the field of child welfare, about which they are clearly experts.  *See P.S. ex rel. Nelson v. The Farm, Inc.*, 658 F. Supp. 2d 1281, 1289–1292 (D. Kan. 2009) (rejecting objections to an expert's opinions because he was familiar with the California child welfare system, rather than Kansas, and to another who was familiar with public child welfare systems, rather than a privately-operated facility).

Page 15 - PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

widely-accepted the applicable reasonable professional standards are, and not even Defendants' own child welfare expert disputes them. (*See generally* Expert Witness Report, ECF No. 144-1). Accordingly, the expert opinion and testimony of Dr. Steib and Ms. Rideout, applying well-established industry standards to the case files of the Named Plaintiffs, is reliable under *Daubert*.

> **3.  Alan M. Puckett, PhD Provides Reliable Opinions on Systemic Issues Within the Oregon Child Welfare System, Supported by Documents and Data Issued by Defendants Themselves**

Dr. Alan Puckett holds both a PhD in Social Welfare and a MS in Social Work from the University of Wisconsin, (*see* Lowry Decl., Ex. 6 ("Puckett Expert Report"), Appendix A), and possesses "professional experience totaling nearly 30 years in public and private child welfare agencies, children's mental health and juvenile justice organizations, and in related research and consulting work." (*See* Puckett Expert Report at 1). For over ten years, Dr. Puckett served as a systems improvement analyst and advisor for Casey Family Programs, a national foundation focused on foster care and child welfare. (*See* Puckett Expert Report, Appendix A). At Casey Family Programs, Dr. Puckett led "assessments of child welfare organizations with [a] focus on policy, workforce issues, and improving outcomes for children and families," and wrote reports aimed at "agency leaders, policymakers and the public." (Puckett Expert Report, Appendix A). Dr. Puckett currently serves as a child welfare consultant at his own consulting firm, A. Puckett Consulting, where he conducts "[o]rganizational analysis…to optimize policy and practice for best child and family outcomes," with an "[i]n-depth focus on workforce issues, safety and risk assessments and evidence-based interventions." (Puckett Expert Report, Appendix A).

Dr. Puckett is not only a child welfare expert, but also—unlike Defendants' rebutting "expert," Dr. Kevin Cahill—has extensive experience analyzing child welfare data. For instance,

4826-5404-5384v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

in 2017, Dr. Puckett co-authored a paper on child maltreatment, described as an "Exploration of Data from the NCANDS [National Child Abuse and Neglect Data System] Child File." (*See id*). Another paper authored by Dr. Puckett examining the "Individual and Contextual Contributors to Child Maltreatment Report" is described as an "Analysis of Data From the Illinois Families Study." (*See id*). His current role as a child welfare consultant focuses on "evidence-based interventions." (*See id*). During his deposition, too, Dr. Puckett confirmed that his work at Casey Family Programs involved analyzing "data from various sources" including "the Federal AFCARS [Adoption and Foster Care Analysis and Reporting System]" database. (*See* Lowry Decl. Ex. 7 ("Puckett Dep.") 15:07–08). Dr. Puckett further testified that at Casey Family Programs, "I would sometimes be involved in asking: How can we get [at] this question, this piece of information? Is it possible to do that through this database or not?" (Puckett Dep.15:13–15), and that in assessing a system and providing recommendations for improvement, he would look at "[s]tate data that would be similar or identical to AFCARS data." (Puckett Dep. 16:21–22). Dr. Puckett's educational background and extensive professional experience as an analyst, advisor, and consultant in child welfare issues—not to mention his significant expertise in interpreting AFCARS data—qualifies him as an "expert by knowledge, skill, experience, training, or education," *see* Fed. R. Evid. 702, to opine on the safety and efficacy of Oregon's child welfare practices.

Defendants' challenge to Dr. Puckett's expert report, to be sure, is not to Dr. Puckett's qualifications as a child welfare expert. Nor is it actually to the reliability of Dr. Puckett's methodology. Dr. Puckett's expert report is supported by citations to authorities such as government-issued reports and policy assessments, including reports issued by Oregon DHS itself.

Page 17 - PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

(*See, e.g.,* Puckett Expert Report at 2 ("Caseload and Workload Issues for Caseworkers and Supervisors"); *see also* Puckett Dep. 67:23–68:03 (testifying that "the Oregon Secretary of State's report" and "the program improvement plan from Oregon dated August 30, 2018 . . . suggest that some caseworkers are swamped")). Dr. Puckett's conclusions are likewise based on Adoption and Foster Care Analysis and Reporting System ("AFCARS") data "provided by Oregon Department of Human Services," (Puckett Expert Report at 1), a reporting system with which he has great familiarity. Courts granting class certification in child welfare cases have recognized and accepted child welfare experts with similar qualifications, reaching conclusions based on similar sources. *See, e.g., M.D.*, 294 F.R.D. at 36 (accepting expert witness with doctorate in special education and other child welfare experience who "reviewed numerous documents produced by DFPS [and] datasets").

Critically, Defendants do not appear to be arguing that the data they themselves provided to the federal government for AFCARS purposes is incomplete or unreliable. As Dr. Puckett testified, states "are required by law to report to the AFCARS system, assuming they take federal IV-E funding for their state child welfare system, which they all do." (Puckett Dep. 28:11–14). Dr. Puckett did note that "one limitation you may encounter…with any large administrative data set" such as AFCARS data, "is missing data. There's just simply some information that jurisdictions fail…to include." (Puckett Dep. 30:20–31:02). But absent DHS' assertion otherwise, there is no reason to doubt the reliability of the underlying AFCARS data used by Dr. Puckett to reach his conclusions. (*See* Puckett Dep. 152:24–45 (testifying that "if there's a question about 'Is this data accurate?'[,] that's an Oregon DHS question")).

What Defendants seem to be challenging, therefore, is not Dr. Puckett's credentials, the

4826-5404-5384v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

reliability of his methodology, or the reliability of the underlying data.  Rather, Defendants make vague allusions to "calculations" performed by Plaintiffs' counsel's paralegal, Jared Hirsch, that they contend, in conclusory fashion, "does not result in a reliable methodology." (Defs.' Mot to Exclude at 10, ECF No. 114).  As demonstrated by Mr. Hirsch's affidavit, attached hereto as Exhibit 11 to the Declaration of Marcia Robinson Lowry ("Hirsh Affidavit"), the word "calculations" is a misnomer—none of Mr. Hirsch's actions with regard to the underlying AFCARS data resulted in manipulation or modification of that underlying data.  (*See* Hirsh Aff. ¶¶ 5–10).  Because many of the data points submitted to AFCARS are sensitive data points pertaining to children and their families, the AFCARS data Defendants produced is not publicly available.  (*See* Hirsh Aff. ¶ 8).  As such, the quantitative Oregon AFCARS data that forms the basis of many of Dr. Puckett's expert opinions is not something that he could simply retrieve independently.  Mr. Hirsch was therefore responsible for organizing the quantitative Oregon AFCARS data for Dr. Puckett's use and ultimate analysis.  (*See* Hirsh Aff. ¶¶ 5–10).  Dr. Puckett's expert report makes no secret of that fact.  (*See* Puckett Expert Report at 1 (stating "[q]uantitative analyses" of AFCARS data "provided by Oregon Department of Human Services…were conducted by Jared Hirsch of ABC with Dr. Puckett's review")).  Moreover, Mr. Hirsch's actions in organizing the quantitative Oregon AFCARS data is laid out fully in Appendix B to Dr. Puckett's expert report, with step-by-step explanations and illustrative charts.  (*See* Puckett Expert Report, Appendix B; Hirsh Aff. ¶ 10).  In short, Dr. Puckett's expert report is appropriately straightforward and abundantly transparent regarding the involvement of Plaintiffs' counsel's paralegal in organizing the underlying quantitative data provided by Oregon DHS and analyzed by Dr. Puckett.

Page 19 - PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

Experts routinely review and make use of information organized by counsel.  *See, e.g., Tomeo v. CitiGroup, Inc.,* No. 13-CV-4046, 2018 U.S. Dist. LEXIS 166117, at *18 (N.D. Ill. Sep. 27, 2018) (rejecting challenge to reliability of expert reports where "the Court does not see evidence that [paralegal] performed tasks that [expert] should have performed, or that [expert] misled [defendants] with his testimony about her assistance"); *Brand v. Comcast Corp.*, 302 F.R.D. 201, 215 (N.D. Ill. 2014) ("given [the expert's] background and the time he spent reviewing Navigant's analysis . . . [r]ather than [the expert] acting as a 'mouthpiece' for Navigant, it is apparent from the record that Navigant assisted [the expert]."). This is not the "gotcha" Defendants seem to think it is.  And such organization of information is not suddenly made unreliable when performed by a paralegal.  In fact, the Ninth Circuit recently reversed a district court's denial of class certification where the district court excluded as inadmissible "Excel spreadsheets" prepared by plaintiffs' counsel's paralegal.  *See Sali.*, 909 F.3d at 1003.  The lower court had excluded the evidence, arguing that the paralegal "cannot authenticate the manipulated Excel Spreadsheets" and that "manipulation and analysis of raw data to reach cumulative conclusions is the technical or specialized work of an expert witness."  *Id.*  But the Ninth Circuit, in reversing, pointed out that defendant "did not dispute the authenticity of the payroll data underlying Ruiz's analysis, nor did it directly dispute the accuracy of his calculations. . . . [T]he district court abused its discretion." *Id.* at 1006.

Here, similarly, Defendants do not appear to dispute the authenticity of the underlying Oregon AFCARS data that forms the basis of Dr. Puckett's conclusions, and which Mr. Hirsch quantitatively organized.  After all, that data is reported to the federal government by Defendants themselves.  And at no point in Defendants' brief do they appear to take issue with the specific,

4826-5404-5384v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

step-by-step explanations of that quantitative organization contained in Appendix B.  Instead, Defendants rely on casting vague aspersions on Mr. Hirsch and conclusory statements about his "unreliability"—as they must, because Defendants chose not to notice him for deposition. Deposing Mr. Hirsch, however, would only confirm what his affidavit and Dr. Puckett's own expert report makes clear: that Mr. Hirsch's quantitative organization of the underlying Oregon AFCARS data was performed reliably, transparently, and with more than adequate explanations.

None of the cases summoned by Defendants to support their allegations of litigation bias are convincing, or even relevant.  Defendants cite *McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092 (D. Or. 2010), for instance, a case where—in Defendants' words—"testimony of the plaintiffs' expert was unreliable due to litigation bias where the plaintiffs' counsel provided the expert with the data for the expert's study."  (Defs.' Mot to Exclude at 10, ECF No. 114).  But there, "the patient data for the study was provided by [plaintiff's counsel]," who "obtained the patient data from…a surgeon…who entered into settlement agreements with patients who were represented by [plaintiff's counsel.]"  *McClellan* at 1121. On the other hand, as evidenced by Mr. Hirsch's affidavit—and as Defendants themselves are well-aware—the AFCARS data underlying Dr. Puckett's expert report was not "provided" by Plaintiffs' paralegal, and was not "obtained" by a third-party.  The AFCARS data, in fact, was "provided" by Defendants during discovery, and consists of data that Defendants themselves collect and submit to the federal government.  (Hirsh Aff. ¶¶ 6–8).  Defendants also point to *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 137 (M.D. Pa. 2015) for the proposition "garbage in, garbage out."  But obviously that proposition does not apply either—unless Defendants mean to say their own AFCARS data is the "garbage in."  While Defendants may not like Dr. Puckett's findings, the truth is Defendants' data does not need

Page 21 - PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

manipulation or modification by Plaintiffs' counsel to illustrate DHS' failings.

In any event, to the extent that Defendants believe that the AFCARS data reviewed by Dr. Puckett was somehow biased or invalid, that is an argument that goes to the "weight" the Court should assign to Dr. Puckett's opinion, not to its admissibility.[7]  *See Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004) (noting that arguments relating to the selection of documents reviewed by the expert does not go to the reliability of the expert's methodology but instead the weight of his testimony).  And to the extent that Defendants complain Dr. Puckett did not review additional, later data: that, too, is an argument that goes to the "weight" accorded by the Court—it does not simply render Dr. Puckett's opinion inadmissible.  *See  P.S. ex rel. Nelson v. The Farm, Inc.*, 658 F. Supp. 2d 1281, 1292 (D. Kan. 2009) (noting that the argument that an expert did not review enough documents, including more recent treatment records, does not provide a basis for excluding the expert's opinion).  Accordingly, Dr. Puckett's expert opinion and testimony, including his conclusions regarding AFCARS data provided by Defendants themselves and organized reliably and transparently by Mr. Hirsch, is both reliable and admissible. The Court should thus deny Defendants' motion to exclude Dr. Puckett's testimony.

4.    **Angelique Day, PhD, MSW Provides a Reliable Expert Opinion Concerning the Issues with Oregon's Transition Services**

The last of Plaintiffs' experts, Dr. Angelique Day, holds both an MSW and PhD (with a dissertation on adolescent foster youth), and has been working in the field of social work for nearly twenty years.  (*See* Lowry Decl. Ex. 9 ("Day Expert Report"), Appendix B).  Dr. Day has considerable experience with policies related to transition-aged foster youth, including researching

---

[7]  As discussed, such an argument would be ludicrous because this is data *Defendants* are required to produce to the federal government.

4826-5404-5384v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

and drafting bills in an effort to improve outcomes for that group of foster youth. (Day Expert Report at 2–4). Furthermore, she has "written many, many publications that provide policy and practice recommendation to improve outcomes for aging-out youth." (Lowry Decl. Ex. 10 ("Day Dep.") 54:15–17; *see also* Day Expert Report, Appendix B). Dr. Day, relying on her extensive experience in the field and reasonable professional standards, reviewed data and publicly-available literature to inform her relevant and reliable "opinion concerning Oregon's policies and practices for the provision of transition services to youth 14 and older in legal custody of the Oregon Department of Human Services," known as "transition-aged" youth.[8] (Day Expert Report at 1).

The first issue raised by Defendants is that Dr. Day acknowledged that her expert report itself would not qualify as something that could be published in a peer-reviewed journal. (Defs.' Mot. to Exclude at 11, ECF No. 114). As an initial matter, even Defendants acknowledge that the inability to publish an expert report is not dispositive. (*Id.* (citing *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1235–36 (9th Cir. 2017)). More importantly, however, Defendants conveniently ignore Dr. Day's explanation as to *why* the report, as it exists now, would not be published. She explained:

> A. Well, first, when we do publications, we don't include introduction of ourselves or our previous experience. So that's atypical for a publication.
>
> Q. I'm focusing on the substantive part of it.
>
> A. On the substantive part of it. First off, peer-reviewed publications really require a deeper analytic -- analytical policy analysis ·or original

---

[8] Dr. Day uses the term "transition-aged" to describe youth 14 and older in legal custody of DHS, and notes that "aging out," which she also uses, "is defined as a child leaving state care without having been connected with a permanent family." (Day Expert Report at 1 n.2; *see also* Day Dep. 109:7–110:10). Plaintiffs define the "aging out" subclass as "Children who are or will be 14 years old and older, who are eligible for transition services and lack an appropriate reunification or other permanency plan." (Class Action Compl. ¶ 33(b), ECF No. 1). To be clear, "transition-aged" and "aging out" youth describe the same sub-population of foster children in Oregon.

Page 23 - PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

research.  As you can see, I did not do my own analysis in terms of the
data.· So that would be an impediment to publishing.

　　　And then I did not do a deep analytical assessment of Oregon
laws and how that -- and how that was applied.  That was not my role.

　　　Although I have done policy analysis in the past, I've never done
it specifically to -- to the State of Oregon as it relates to aging out.

Q.  So your report was more about commenting on the data that you
had available to you rather than your own original research or a deeper
dive into that?

A.  That is correct.  Although, I would say one thing I added to the
report was recommendations for best practices in other states to address
those areas and recommendations from other states is absolutely
something that we would do if we were doing a peer-reviewed
publication that would appear in a discussion section.· Although, in and
of itself, does not warrant a publication without the rest of it.

Q.  And that was because the concept of best practices or -- permeates
the whole project for you?

A.  Absolutely.  And in terms of how I do my work in -- and how I've
adopted the professorial role that to me, it's not just about identifying
the problem.   That doesn't help.

(Day Dep.  82:17–83:25).  This explanation, that she would need to do her own data analysis or a

deeper dive into the policy analysis to publish the report in a peer-reviewed journal, does not render

Dr. Day's expert opinion inadmissible.  Even the case cited by Defendants recognizes that the

district court should not "conflate[] the standards for publication in a peer-reviewed journal with

the standards for admitting expert testimony in a courtroom" and that needing to use a "'more

rigorous' standard" or "new data" to render an expert opinion publishable in a peer-reviewed

journal does not affect the reliability of a clearly-qualified expert's opinion.  *Wendell*, 858 F.3d at

1235–36.  Thus, a reliable opinion by an expert offered at a high level, rather than the "deep dive"

into a topic required to publish in a peer-reviewed journal, is still an appropriate expert opinion.

Moreover, Dr. Day's expert report plainly flows directly out of her nearly 50 peer-reviewed

4826-5404-5384v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300

publications on adolescent foster-youth, supporting the reliability of her opinion and testimony.[9] (*See* Day Expert Report, Appendix B). *See Daubert II*, 43 F.3d at 1317.

Defendants contend that what "tips the scale" is Dr. Day's "self-professed ignorance of the topic on which she is offering expert testimony." (Defs.' Mot. to Exclude at 11, ECF No. 114). This again is a vast distortion of Dr. Day's deposition testimony. While Dr. Day did not claim to be an expert on Oregon laws, she is an uncontested "expert in the area of adolescent foster youth, and matters pertaining to aging out youth in particular." (Day Expert Report at 4). This is exactly the topic on which she offers an opinion. Like Dr. Steib and Ms. Rideout, Dr. Day reliably uses her experience and industry standards to assess Oregon data. The purported lack of prior familiarity with Oregon does not affect her ability to offer an opinion on transition-aged youth in Oregon. Her extensive familiarity with other foster care systems, like Michigan's, together with her overwhelmingly impressive background on transition-aged youth, is more than sufficient. *See P.S. ex rel. Nelson*, 658 F. Supp. 2d at 1289–1292 (D. Kan. 2009) (rejecting objections to an expert's opinions because he was familiar with the California child welfare system, rather than Kansas, and to another who was familiar with public child welfare systems, rather than a privately-operated facility).

Furthermore, Dr. Day explained why she does not need to know the language of specific Oregon policies or law—her opinion appropriately focuses on *outcomes* for transition-age youth in Oregon.[10] Of course, her focus on outcomes is the next point challenged by Defendants, but

---

[9]  This number does include the numerous other book chapters, nonjuried publications, professional reports, policy briefs, training manuals, or presentations listed in Dr. Day's impressive CV. (*See* Day Expert Report, Appendix B).

[10]  Notably, the policies and practices of a public entity in the context of class certification are not merely written agency policies, but include the *de facto* practices and unwritten policies, including

Page 25 - PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

they again ignore Dr. Day's explanation as to *why* this was the proper way to develop an expert opinion on how Oregon's policies affect transition-age youth:

> Q. So if I understand correctly, then, the report that you made in this case was without the benefit of knowing any of the Oregon laws that govern foster care youth who are aging out?
>
> A. Yes. It's important that I relied on the -- the child well-being outcomes for aging-out youth. That is Oregon-specific. And that as someone who has worked in the policy world that we know, a policy is only as good as how well it's implemented.
> So what I was interested in seeing is what are the results? What are the outcomes that kids are experiencing? Not necessarily what rules coverage the practice here. We just want to know -- how are the kids doing? That was the lens that I took.

(Day Dep. 92:10–23; *see also id.* 115:16–22).

Notably, Dr. Day explained that when she conducted her literature review, she attempted to find publicly-available Oregon policies and practices regarding transition-age youth, but found none. (Day Dep. 96:25–97:19, 101:10–20). Moreover, when Defendants presented Dr. Day with apparent actions by and recent policies of Oregon DHS, she consistently explained "just because you have a policy doesn't necessarily mean it's being implemented," (Day Dep. 115:21–22), and continued to emphasize the need to consider the outcomes for transition-aged youth.[11] (*See, e.g.* Day Dep. 127:12–129:5, 202:6–203:24, 256:14–260:12). And Defendants' contention that a focus on outcomes does not establish the proper "connection," includes a misleading citation to a case

---

as they relate to outcomes. *See, e.g., Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) (generally rejecting Arizona's claim that "written policies are the only statewide policies and practices" and upholding the certification of a class of plaintiffs who are exposed to 10 policies and practices, not all of which were documented). This further supports that Dr. Day's opinion need not rely on written policies or law.

[11] As noted by counsel, most of the documents Defendants showed Dr. Day at her deposition were produced to Plaintiffs *after* her report was complete. (*See* Day Dep. 162:10–13, 178:2-7, 256:14–257:3). Defendants do not contend that Dr. Day should have been shown these documents, and critically, nothing Defendants presented at her deposition led Dr. Day to change her opinion in any way. (*See* Day Dep. 127:12–129:5, 160:11–164:13, 181:6–23, 202:6–203:24, 256:14–260:12).

4826-5404-5384v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon 97201 · (503) 241-2300

addressing the commonality prong of class certification, rather than one challenging the admissibility of an expert opinion. (*See* Defs.' Mot. to Exclude at 11 (citations omitted)). There is nothing about assessing what the outcomes for youth in Defendants' care shows that is unreliable or inappropriate.

Finally, Defendants contend that the amount of time Dr. Day had to complete her expert report is a reason to exclude her testimony. That Dr. Day would have *liked* additional time to polish her report does not in any way render it inadmissible. None of the *Daubert* factors contemplate the length of time to conduct an expert report. Critically, Dr. Day did not testify that she felt she had insufficient time to properly develop an opinion about Oregon's transition services to youth age 14 and older, nor did she testify that her methodology or report was impacted by the amount of time she was provided. (*See* Day Dep. 60:12–20). Accordingly, Defendants' *Daubert* challenge of Dr. Day should fail because she provides relevant and reliable expert opinion and testimony with respect to Oregon's transition-age youth.

### III.    CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Exclude in full and admit the expert opinions of all of Plaintiffs' experts.

DATED this 17th day of August, 2020.

**DAVIS WRIGHT TREMAINE LLP**

By: *s/ Gregory A. Chaimov*
Gregory A. Chaimov, OSB #822180
gregorychaimov@dwt.com
1300 SW Fifth Avenue, Ste. 2400
Portland, OR 97201
Tel: (503) 241-2300

Page 27 - PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

**A BETTER CHILDHOOD**

Marcia Robinson Lowry (*pro hac vice*)
mlowry@abetterchildhood.org
Dawn J. Post (*pro hac vice*)
dpost@abetterchildhood.org
Anastasia Benedetto (*pro hac vice*)
abenedetto@abetterchildhood.org
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel: (646) 795-4456

**DISABILITY RIGHTS OREGON**

Emily Cooper, OSB #182254
ecooper@droregon.org
Thomas Stenson, OSB #152894
tstenson@droregon.org
511 SW 10th Avenue, Suite 200
Portland OR 97205
Tel: (503) 243 2081

Paul C. Southwick, OSB #09141
paul@paulsouthwick.com
**PAUL SOUTHWICK LAW LLC**
8420 N Ivanhoe St.
Portland, OR 97203
Tel: (503) 806 9517

*Attorneys for Plaintiffs*

4826-5404-5384v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue · Suite 2400
Portland, Oregon  97201 · (503) 241-2300