IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

|  |  |
|---|---|
| WYATT B. and NOAH F. by their next friend Michelle McAllister; KYLIE R. and ALEC R. by their next friend Kathleen Megill Strek; UNIQUE L. by her next friend Annette Smith; SIMON S. by his next friend Paul Aubry; RUTH T. by her next friend Michelle Bartov; BERNARD C. by his next friend Ksen Murry; NAOMI B. by her next friend Kathleen Megill Strek; and NORMAN N. by his next friend Tracy Gregg, individually and on behalf of all other similarly situated, | Civ. No. 6:19-cv-00556-AA |
| Plaintiffs, | **OPINION & ORDER** |
| v. | |
| KATE BROWN; FAIRBORZ PAKSERESHT; MARILYN JONES; OREGON DEPARTMENT OF HUMAN SERVICES, | |
| Defendants. | |

AIKEN, District Judge.

This class action comes before the Court on Defendants' Motions to Dismiss or to Make More Definite and Certain. ECF No. 31. For the reasons set forth below, the Motion is GRANTED in part and DENIED in part.

## LEGAL STANDARD

To survive a motion to dismiss under the federal pleading standards, the complaint must include a short and plain statement of the claim and "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* The court is not required to accept legal conclusions, unsupported by alleged facts, as true. *Id.*

## BACKGROUND

### A. The Parties

The Oregon Department of Human Services ("DHS") is an agency of the State of Oregon which has responsibility for the Child Welfare Agency ("Child Welfare"), a subdivision of DHS. Compl. ¶ 26. Child Welfare acts as DHS's agent in protecting the safety and welfare of children. *Id.* at ¶ 28.

Kate Brown is the Governor of Oregon. Compl. ¶ 25. Fariborz Pakseresht is the Director of DHS and is responsible for DHS policies, practices, and operations, and for ensuring that DHS complies with all applicable federal and state laws. *Id.* at ¶ 26. Marilyn Jones was the Director of Child Welfare and responsible for Child

Welfare's policies, practices, and operations and for ensuring that Child Welfare complies with all applicable federal and state laws. *Id.* at ¶ 27.[1]

The named Plaintiffs are youths in the custody of DHS and are housed, variously, in foster homes or in facilities contracted for by DHS. Compl. ¶¶ 17-24. Plaintiffs bring claims on behalf of themselves and on behalf of a class consisting of all children for whom DHS has or will have legal responsibility and who are or will be in the legal and physical custody of DHS (the "general class"). Compl. ¶ 33(a). In addition, Plaintiffs bring claims on behalf of three subclasses:

(1) Children who have or will have physical, intellectual, cognitive, or mental health disabilities (the "ADA subclass");

(2) Children who are or will be 14 years old and older, who are eligible for transition services and lack an appropriate reunification or other permanency plan (the "aging-out subclass"); and

(3) Children who identify as sexual or gender minorities, including lesbian, gay, bisexual, queer, transgender, intersex, gender non-conforming, and non-binary children (the "SGM subclass")[2].

## B. Plaintiff's Allegations

The Complaint alleges that Oregon's child welfare and foster care systems are dysfunctional and plagued by systemic deficiencies. These deficiencies have

---

[1] The Court notes that Rebecca Jones Gaston is the current Child Welfare Director. *See* https://www.oregon.gov/DHS/ABOUTDHS/Pages/dhs-leadership.aspx (last accessed September 22, 2021).

[2] Plaintiffs have indicated that they prefer to use the term "Sexual and Gender Minorities" or "SGM" to refer to individuals within this sub-class, rather than LGBTQ. Compl. ¶ 15(f), n.1. The Court will apply Plaintiff's preferred terminology in this Opinion.

been documented by the state and federal governments in a series of reviews and audits. Compl. ¶¶ 209-224. The problems identified in the audits have not been adequately addressed.

Plaintiffs allege that DHS fails to employ a minimally adequate number of caseworkers and that caseworkers are not provided with adequate training or support. Compl. ¶¶ 15(a), 231. Caseworkers are assigned more cases than they can manage, with little training or oversight. *Id.* at ¶ 230-31. As a result, DHS has difficulty retaining caseworkers and turnover is high. *Id.* at ¶ 232. Approximately 70% of Child Welfare employees have been on the job for less than 18 months. *Id.* at ¶ 233.

Plaintiffs allege that DHS has failed to provide adequate support, training, or financial compensation to foster parents. Compl. ¶¶ 15(g). DHS has also failed to recruit additional foster parents in general and particularly foster parents willing and able to care for children with disabilities. *Id.* at ¶¶ 15(g), 221.

Plaintiffs allege that DHS does not properly evaluate the needs of each child, which prevents caseworkers from planning appropriate placements. Compl. ¶¶ 15(b), 236. Children do not receive services required by their case plans, either because DHS fails to provide the services directly, or fails to contract for those services. Compl. ¶ 236.

When children are taken into custody, they are often left in temporary placements or are repeatedly moved between foster homes and institutions. Compl. ¶ 15(c). Children are placed in hospitals, homeless shelters, refurbished

delinquency institutions, overcrowded temporary general foster care homes, or in poorly screened child-specific kith or kin foster homes.  Compl. ¶¶ 15(d), 247. Children in DHS care experience abuse and neglect at rates much higher than national standards.  Compl. ¶¶ 251-254.

Children with disabilities are not provided with appropriate services and treatment to ensure equal access to stable, family-like foster placement in the least restrictive environment.  Compl. ¶ 15(e).  SGM children are often deprived of safe and stable placement.  Compl. ¶¶ 15(f), 222.  Children often remain in DHS custody for years and older children are not provided with support, skills, or resources necessary to survive on their own when they leave foster care.  Compl. ¶ 15(h), (i). When those children age out of the child welfare system, they frequently end up homeless.  Compl. ¶ 250.

## DISCUSSION

Plaintiffs bring claims under 42 U.S.C. § 1983 for violation of their substantive due process rights under the Fourteenth Amendment and for violation of their rights under the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 *et seq.*, as well as claims under the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794.

Defendants move to dismiss under the doctrine of *O'Shea* abstention. Defendants also move to dismiss each of Plaintiff's claims for failure to state a claim.

I.    ***O'Shea* Abstention**

In their prayer, Plaintiffs seek declaratory and injunctive relief, as well as the appointment of a neutral monitor to assess and report on Defendants' compliance with the terms of the requested injunction.  Compl. ¶¶ 330-32.  Defendants move to dismiss on the grounds that this Court should abstain from adjudicating this case under *O'Shea v. Littleton*, 414 U.S. 488 (1974).[3]  "Abstention from the exercise of federal jurisdiction is the exception, not the rule," and federal courts have a "virtually unflagging" obligation to exercise the jurisdiction given to them by Congress and the Constitution.  *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).  "Only in unusual circumstances do principles of comity in relation to state courts warrant federal court abstention."  *Tinsley v. McKay*, 156 F. Supp.3d 1024, 1030 (D. Ariz. 2015) (citing *Younger v. Harris*, 401 U.S. 37, 91 (1971)).

In *O'Shea v. Littleton*, nineteen plaintiffs challenged comprehensive racial discrimination in the administration of justice in Alexander County, Illinois, alleging that the county magistrate and judge imposed higher bail and harsher sentences on black defendants than on white defendants.  414 U.S. at 491-92.  The Supreme Court held that principles of equity, comity, and federalism precluded equitable intervention because the plaintiffs sought "an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of

---

[3] There is some lingering uncertainty over whether motions seeking abstention should be considered as facial challenges to subject matter jurisdiction under Rule 12(b)(1) or as motions to dismiss for failure to state a claim under Rule 12(b)(6).  *Courthouse News Serv. v. Planet*, 750 F.3d 776, 779-80 (9th Cir. 2014).  When, as here, the motion is presented as one for failure to state a claim, the Ninth Circuit has endorsed resolving the motion under the Rule 12(b)(6) standard.  *Id.*  The Court shall therefore resolve the motion on the terms proposed by Defendants in their Motion to Dismiss.

future state criminal trials." *Id.* at 499-500. The Supreme Court noted that its earlier decision in *Younger v. Harris*, 401 U.S. 37 (1971) had established a firm rule against enjoining ongoing criminal proceedings absent exceptional circumstances and found that the *O'Shea* plaintiffs sought to "indirectly accomplish the [same] kind of interference" through an "ongoing federal audit" of state proceedings. *O'Shea*, 414 U.S. at 500.

The Ninth Circuit has held that *O'Shea* stands for "the more general proposition that [courts] should be very reluctant to grant relief that would entail heavy federal interference in such sensitive state activities as administration of the judicial system." *Courthouse News Serv. v. Planet*, 750 F.3d 776, 789-90 (9th Cir. 2014) (internal quotation marks and citation omitted, alterations normalized). "*O'Shea* compels abstention where the plaintiff seeks an 'ongoing federal audit' of the state judiciary, whether in criminal proceedings or in other respects." *Id.* at 790 (quoting *E.T. v. Cantil-Sakauye*, 682 F.3d 1121, 1124 (9th Cir. 2011) (per curiam)). Put simply, "*O'Shea* abstention is inappropriate where the requested relief may be achieved without an ongoing intrusion into the state's administration of justice, but is appropriate where the relief sought would require the federal court to monitor the substance of individual cases on an ongoing basis to administer its judgment." *Id.*

In the present case, Defendants assert that granting the requested relief would require this Court to institute continuing federal oversight of Oregon state court dependency adjudications, directly contrary to the principles of *O'Shea*. Plaintiffs

maintain that this case is not aimed at the Oregon state courts, but at the policies and practices of DHS as a state agency.

## A. Juvenile Dependency in Oregon State Courts

To understand whether the relief sought by Plaintiffs would impermissibly burden the administration of justice by the Oregon state courts, something must first be said about how those courts operate in the realm of juvenile dependency.

The juvenile courts are generally departments of the Oregon circuit courts and they are administered by circuit court judges, although in some smaller counties, juvenile court jurisdiction is vested with the county court. ORS 3.260(1); ORS 5.020; ORS 419B.100(1).

A child taken into DHS custody may not be held in shelter care for more than twenty-four hours without an order from the juvenile court after a hearing. ORS 419B.183. At that hearing, the circuit court must make certain findings, including that removal from the home is in the best interests of the child. ORS 419B.185(1)(e)(A).

Within 60 days after DHS files a petition alleging that a child is within the jurisdiction of the juvenile courts, the court must hold a hearing on the petition. ORS 419B.305(1). When the court determines that it would be in the best interest of the child and for the welfare of the child, the court may place the child in the legal custody of DHS "for care, placement and supervision." ORS 419B.337(1).

> The court may specify the particular type of care, supervision or services to be provided by the Department of Human Services to wards placed in the department's custody and to the parties or guardians of the wards, *but the actual planning and provision of such care, supervision or*

> *services is the responsibility of the department.*  The department may place the ward in a child care center authorized to accept the ward.

ORS 419B.337(2) (emphasis added).

Furthermore, if the child "has been placed in the custody of the Department of Human Services, the court shall make no commitment directly to any residential facility, but shall cause the ward to be delivered into the custody of the department at the time and placed fixed by rules of the department." ORS 419B.337(5).

"To ensure effective planning for wards, the Department of Human Services shall take into consideration recommendations and information provided by the committing court before placement in any facility." ORS 419B.343(1). Commitment of a child to DHS "does not terminate the court's continuing jurisdiction to protect the rights of the child or ward or the child or ward's parents or guardians." ORS 419B.349(1). Rather:

> Notwithstanding ORS 419B.337(5), if upon review of a placement or proposed placement of a child or ward made or to be made by the department the court determines that the placement or proposed placement is not in the best interest of the child or ward, the court may direct the department to place or maintain the child or ward in the care of the child or ward's parents, in foster care with a foster care provider who is a relative, in foster care with a foster care provider who is or has been a current caretaker for the child, in foster care with a foster care provider who is not a relative or current caretaker, in residential care, in group care or in some other specific type of residential placement, *but unless otherwise authorized by law, the court may not direct a specific placement. The actual planning and placement of the child or ward is the responsibility of the department.*

ORS 419.349(1) (emphasis added).

DHS is obliged to provide the juvenile court with regular reports, at least every six months, containing specific categories of information.  ORS 419B.440; ORS

419B.443(1). Depending on the contents of the report and the state of the case, the juvenile court may, and in many circumstances must, hold a hearing on the report. ORS 419B.449(1). After the hearing, the juvenile court must make specific findings concerning, *inter alia*, why continued care is necessary; the expected timetable for return or other permanent placement; the number of placements made; schools attended; face-to-face contacts with the assigned caseworker; visits with parents or siblings; and whether the frequency of each is in the child's best interests. ORS 419B.449(2), (3).

As summarized above, therefore, the state juvenile courts have a central, but not all-powerful, role in the juvenile dependency process. DHS retains important control and discretion concerning the planning and provision of care and services to the children in its custody.

**B. Abstention is inappropriate in this case.**

Defendants urge the Court to follow the example of *E.T. v. Cantil-Sakauye*, 682 F.3d 1121 (9th Cir. 2012), in which the Ninth Circuit affirmed dismissal on the basis of *O'Shea* abstention. In *E.T.*, the plaintiffs were a proposed class of foster children in Sacramento County, seeking to challenge the caseloads of the Sacramento County Dependency Court and the court-appointed attorneys, which the plaintiffs alleged were "so excessive as to violate federal and state constitutional and statutory provisions." *Id.* at 1122. The district court dismissed the case, citing *O'Shea*, and the Ninth Circuit affirmed, observing that "[b]ecause the question is one of adequacy of representation, potential remediation might involve examination of the

administration of a substantial number of individual cases." *Id.* at 1124.  The Ninth Circuit concluded that "the declaratory relief sought by Plaintiffs would amount to an ongoing federal audit of Sacramento County Dependency Court proceedings, requiring abstention under *O'Shea*." *Id.*

Unlike *E.T.*, Plaintiffs in this case do not challenge the functions or the caseloads of the Oregon state courts, or of court-appointed counsel.  Rather, Plaintiffs allege and challenge systemic deficiencies in DHS, including the caseloads of DHS caseworkers and the provision of services to foster children in DHS custody.  Nor does the relief sought by Plaintiffs necessarily entail examination of the administration of individual cases, as in *E.T.*  Rather, Plaintiffs seek relief on the systemic level.  *See E.T.*, 682 F.3d at 1124 (distinguishing a challenge to average court delays in *Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697 (9th Cir. 1992) from the fact-intensive and case-specific examination required to gauge adequacy of representation).  As the Ninth Circuit observed in *Courthouse News*, *O'Shea* abstention is warranted when the requested relief *requires* the federal court to monitor the substance of individual cases on an ongoing basis but is "inappropriate where the requested relief may be achieved without an ongoing intrusion into the state's administration of justice." *Courthouse News Serv.*, 750 F.3d at 790.

The present case more closely resembles *Tinsley v. McKay*, 156 F. Supp.3d 1024 (D. Ariz. 2015).  In *Tinsley* the plaintiffs challenged the actions of the state executive agencies tasked with child welfare, alleging that "structural and operational failures" violated their federal statutory and constitutional rights.  *Id.* at

1026-27. These failures included a shortage of and inaccessibility to health services; widespread failure to conduct timely investigations of reports of mistreatment in the foster care system; a shortage of family foster homes; and a "widespread failure to engage in basic child welfare practices aimed at maintaining family relationships." *Id.* at 1026. As here, the defendants urged the district court to abstain under *O'Shea*, arguing that "the injunctive relief Plaintiffs seek necessarily requires this Court to create and then monitor, for purposes of enforcement, measurable criteria for placements, visitation, permanency, health care, and other facets of foster care that juvenile court judges adjudicate, and would this constitute an ongoing federal court audit of juvenile court proceedings." *Id.* at 1042 (internal quotation marks omitted).

In order to weigh the merits of the defendants' argument, the *Tinsley* court considered the powers of the Arizona juvenile courts and their role in the state child welfare process in some detail. *Tinsley*, 156 F. Supp.3d at 1027-28. This review reveals a juvenile court system broadly similar in form and function to the Oregon juvenile courts, as described in the previous section. In both states, the juvenile court holds a preliminary hearing shortly after a child is taken into the custody of the agency. *Id.* at 1027. This is followed by a dependency hearing, in which the court determines if the child "is in need of assistance or placement either because the child has no guardian responsible for care or the guardian is unable to provide the necessary care." *Id.* As in Oregon, the Arizona juvenile court conducts periodic review hearings to "reassess the well-being of the child, monitor progress toward the child's goals, and determine if the child continues to be dependent." *Id.* The state

agency retains substantial control over the specifics of placement for children placed in their custody by the juvenile court and retains control over the licensing, training, and investigation of foster care homes. *Id.* at 1028.

Ultimately, the district court rejected the defendants' argument and held that, unlike the plaintiffs in *E.T.*, the *Tinsley* plaintiffs' claims and proposed relief were not "directly aimed at the functioning of the juvenile courts." *Tinsley*, 156 F. Supp.3d at 1043. The *Tinsley* plaintiffs had not alleged any statutory or constitutional deficiency in the procedure or administration of the Arizona juvenile courts, nor did the plaintiffs allege that the structural and systemic defects of the Arizona child welfare agencies were the fault of the juvenile courts. *Id.* at 1043-44. Rather, "the absence of proper agency organization and resources results in constitutional violation, signified by insufficient delivery of services to foster children, including instances of direct violation of juvenile court orders." *Id.* at 1044.

> The primary question under *O'Shea* is whether the proposed injunctive relief would result in an ongoing federal audit of state court proceedings. The complaint here does not. It is directed towards state agencies. Defendants express concern that the obligation of juvenile courts to oversee those agencies will result in a federal injunction which will indirectly accomplish the interference *Younger* aims to avoid. But . . . although the juvenile courts play a significant role in overseeing the care of children within the custody and care of the Arizona child welfare agencies, the courts are not involved in adjudicating and remedying the types of claims raised here.

*Tinsley*, 156 F. Supp.3d at 1044.

In this case, as in *Tinsley*, Plaintiffs claims are aimed at state agencies, specifically DHS, rather than at the Oregon juvenile courts. The substantial similarity between the juvenile court systems of Arizona and Oregon makes the

*Tinsley* decision especially persuasive. Although the Oregon juvenile courts have an important role in the child welfare system, significant aspects of that system, such as the specifics of a child's placement or the planning and provision of services, are reserved to DHS, s*ee, e.g.,* ORS 419B.337(2); ORS 419.349(1), and Plaintiff's claims are directed at those very aspects of the dependency process. As in *Tinsley*, Plaintiffs do not allege that their injuries are the result of the procedures or the administration of the juvenile court system, or that the systemic relief they seek is within the power of the Oregon juvenile courts to grant. Accordingly, the Court concludes that *O'Shea* abstention is not warranted.

To be sure, however, the relief Plaintiffs seek is expansive and there is always cause for caution whenever a federal court is asked to intrude upon the functions of a state government and so a measured approach is essential. *See, Hornes v. Flores*, 557 U.S. 433, 450 (2009) (directing courts to take a "flexible approach" to addressing widespread violation of federal law by state institutions); *Tinsley*, 156 F. Supp.3d at 1044 (considerations of "federalism and comity warrant restraint and respect when the target of a federal court injunction is a state agency."). "[P]rinciples of federalism counsel restraint in the granting of injunctive relief against state agencies," but "[j]ust as it is emphatically the province and duty of the judiciary to say what the law is, so too it is emphatically the province and duty of the judiciary to vindicate the law where it has been violated." *Melendres v. Maricopa Cnty.*, No. CV-07-2513-PHX-GMS, 2009 WL 2707241, at *5 (D. Ariz. Aug. 24, 2009) (internal citations omitted). The Court will bear these considerations in mind as this case progresses and, should

Plaintiffs prevail on their claims, it will continue to bear them in mind when it comes to crafting the scope of equitable relief.

## II.    Due Process

Plaintiffs' first claim for relief alleges violation of Plaintiffs' substantive due process rights under the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983. Title 42 U.S.C. § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). To maintain a claim under § 1983, "a plaintiff must both (1) allege the deprivation of a right secured by the federal Constitution or statutory law, and (2) allege that the deprivation was committed by a person acting under color of state law." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

"Generally, the Fourteenth Amendment's Due Process Clause does not confer any affirmative right to governmental aid and typically does not impose a duty on the state to protect individuals from third parties." *Henry A. v. Willden*, 678 F.3d 991, 998 (9th Cir. 2012) (internal quotation marks and citation omitted, alterations normalized). This general rule is subject to two important exception. "First, there is the 'special relationship' exception—when a custodial relationship exists between the plaintiff and the State such that the State assumes some responsibility for the plaintiff's safety and well-being." *Id.* And second, there is the "state-created danger exception," when "the state affirmatively places the plaintiff in danger by acting with deliberate indifference to a known and obvious danger." *Id.* If either exception

applies, a state's omission or failure to protect may give rise to liability under § 1983. *Id.*

"Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child." *Lipscomb v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992) (en banc).  In a survey of circuit court decisions, the Ninth Circuit observed that this responsibility extends to the right to be free from "the infliction of unnecessary harm," and to "adequate medical care, protection, and supervision." *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 846-47 (9th Cir. 2010) (internal quotation marks and citations omitted).

Plaintiffs allege that Defendants have violated their substantive due process rights in a variety of ways, divided according to class and sub-class.  For the general class, Plaintiffs contend Defendants violated their rights (1) to freedom from maltreatment while under the protective supervision of the state; (2) to protection from unnecessary intrusions into the child's well-being once the state has established a special relationship with the child; (3) to services necessary to prevent unreasonable risk of harm; (4) to conditions and duration of foster care reasonably related to the purpose of government custody; (5) to treatment and care consistent with the purpose and assumptions of government custody; and (6) the right not to be maintained in custody longer than is necessary to accomplish the purposes to be served by taking the child into government custody.  Compl. ¶ 306.

For the ADA subclass, Plaintiffs allege Defendants have violated their rights (1) to be free of discrimination by reason of disability; (2) to services in the most integrated setting appropriate to the person's needs; (3) to be free from unnecessary institutionalization and to be placed in the least restrictive setting; and (4) to access to an array of community-based placements and services.  Compl. ¶ 307(a).

For the SGM subclass, Plaintiffs allege that Defendants have violated their rights (1) to freedom from bias-related violence, abuse, and harassment while in state custody; (2) to freedom from systemic discrimination based on sexual orientation, gender identity, and gender expression; (3) to privacy regarding the same; (4) to medically necessary gender-affirming medical and psychological care; (5) to culturally competent reproductive health care and sexual health services; and (6) to be clothed and groomed consistent with their sexual orientations, gender expressions, and gender identities.  Compl. ¶ 307(b).

And for the aging-out subclass, Plaintiffs allege Defendants have violated their rights to resources and services to prepare them for life after the foster care system. Compl. ¶ 307(c).

Courts are not required to consider each challenged policy or practice in vacuum and courts "may properly consider how individual policies or practices interact with one another within the larger system." *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 255 (5th Cir. 2018).  In *M.D. by Stukenberg v. Abbott*, the Fifth Circuit held that the Texas child welfare agency violated the substantive due process rights of children in state custody by overburdening its caseworkers—with the attendant

problems of caseworker retention and inadequate training—because the overworked caseworkers were not able to effectively safeguard the health and well-being of children in the care and custody of the state. *M.D.* 907 F.3d at 264-65. The Fifth Circuit held "that high error rates in abuse investigations and inadequate enforcement policies place children at a substantial risk of serious harm seems painfully obvious." *Id.* at 267. Insufficient monitoring and oversight can, therefore, give rise to constitutional injury. *Id.* at 267-68.

With respect to the array of placement opportunities or the propriety of a particular type of placement, however, the Fifth Circuit rejected claims like those raised by Plaintiffs in the present case:

> Certainly, placing a child in-region, in a placement ideal for his service level and personal needs, or with his siblings when appropriate would be good practice. Plaintiffs have failed to demonstrate, however, that failing to do so in most or all circumstances puts children at a risk of harm serious enough to amount to a deprivation of their substantive due process rights. There is no responsibility to maximize foster children's personal psychological development, and children have no right to a stable environment or a right not to be moved from home to home, despite the significant literature which indicates a traumatic effect of such moves on young children. Even accepting the district court's— undoubtedly correct—finding that out-of-region placements and suboptimal placements can have negative effects on a child's psychological health, those negative effects are not constitutionally cognizable harms. Unlike severely overburdened caseworkers or inadequate investigations and placement licensing, inadequate placement array does not unacceptably increase the risk that a child will be exposed to serious physical or psychological harm.

*M.D.*, 907 F.3d at 268 (internal quotation marks and citations omitted, alterations normalized); *see also Marisol A. v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996) (finding that the Fourteenth Amendment "does not require the state to provide

children in foster care with an optimum level of care or treatment," and dismissing the plaintiffs' claims "to the extent that custodial plaintiffs allege a substantive due process right to a least restrictive, optimal placement."); *Clark K. v. Guinn*, No. 2:06-CV-1068-RCJ-RJJ, 2007 WL 1435428, at *15 (D. Nev. May 14, 2007) (holding that there is no substantive due process right to be placed in "the least restrictive placement based on the foster child's needs.").

In addition, the Fifth Circuit found that "the availability of foster homes, particularly those that provide the most 'home-like,' 'least-restrictive' environments, is something uniquely out of the State's control." *M.D.*, 907 F.3d at 268. Although the state can provide more funding and might improve recruitment efforts, it cannot force people to volunteer as foster parents. *Id.* The failure to provide a sufficient array of foster homes, or to provide homes in the least restrictive environment was not, therefore, a violation of the plaintiffs' substantive due process rights. *Id.* However, the "goal of the child welfare system is to further the best interest of the children by helping to create nurturing family environments without infringing on parental rights," and children in state custody thus are entitled to conditions of foster care that are reasonably related to this goal. *Marisol A.*, 929 F. Supp. At 676.

The weight of authority clearly demonstrates that the rights secured by the Fourteenth Amendment, though significant, are strictly limited in scope. The state must provide food, shelter, clothing, medical care, supervision and must, to the best of its ability under the circumstances, shield the children in their custody from physical and psychological harm. In this case, most of the rights asserted by

Plaintiffs fall within the scope of that guarantee. *See, e.g.,* Compl. ¶¶ 306(a) ("the right to freedom from maltreatment while under the protective supervision of the state,"); 307(b)(i) ("The right to freedom from bias-related violence, abuse and harassment while in state custody,").

The right to substantive due process does not, however, extend to placement in an optimal or least-restrictive setting, or to the availability of an array of placement options. As the Fifth Circuit observed in *M.D.*, such placements would undoubtably be better for all concerned, but they are not guaranteed under the Fourteenth Amendment. In the present case, Plaintiffs' first claim must be dismissed to the extent that it seeks to vindicate a substantive due process right to be housed in the least restrictive setting, or a right to an array of community-based placements. *See, e.g.*, Compl. ¶¶ 307(a)(iii), (iv). Relatedly, courts have held that the Fourteenth Amendment right to substantive due process does not extend to a right not to be retained in DHS custody for longer than is necessary. *Clark K.*, 2007 WL 1435428, at *15; *see also Charlie H. v. Whitman*, 83 F. Supp.2d 476, (D.N.J. 2000) ("Thus Plaintiffs do not have a substantive due process right to not remain in state custody unnecessarily," (internal quotation marks omitted)). Plaintiffs' substantive due process claim must therefore be dismissed insofar as it asserts a claim based on a right to a "duration of foster care reasonably related to the purpose of government custody," Compl. ¶ 306(d), or "the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody." *Id.* at ¶ 306(f).

Similarly, the rights asserted by the aging-out sub-class, including the "right to a connection with an adult resource who will maintain a stable, long-term relationship with the child after he or she ages out of the system," Compl. ¶ 307(c)(iii); the "right to independent living services to prepare to exist foster care successfully," *Id.* at ¶ 307(c)(i); and "the right to assistance to find lawful, suitable permanent housing that will not result in homelessness upon exit from foster care," *Id.* at ¶ 307(c)(ii), would obviously be to the benefit of the child and to society at large. The Court is cognizant of the risks to children who age out of DHS care without proper support or preparation for independent life and too often end up in the criminal justice system. The provision of services for aging-out children, like those described in the Complaint, would be a worthy goal for legislative action. But, unfortunately, they fall beyond the constitutional guarantees of the Fourteenth Amendment and must be dismissed.

The Court concludes that Plaintiffs have otherwise made out a claim for violation of their substantive due process rights and Defendants' motion is otherwise denied.

### III.    The Child Welfare Act

Plaintiffs' second cause of action is also brought under 42 U.S.C. § 1983 for violation of Plaintiffs' rights under the Adoption Assistance and Child Welfare Act of 1980 (the "CWA"), 42 U.S.C. § 670 *et seq.* Although 42 U.S.C. § 1983 is more commonly used to vindicate federal Constitutional rights against violation by state

actors, it can also be used to enforce federal statutory rights. *Henry A.*, 678 F.3d at 1005.

In this case, Plaintiffs allege Defendants' actions, and inaction, constitutes a policy, pattern, practice, and/or custom of depriving Plaintiffs of their right to (1) a written case plan that includes a plan to provide safe, appropriate, and stable placements; (2) a written case plan that ensures that the child receives safe and proper care while in foster care and implementation of that plan; (3) a written case plan that ensures provision of services to parents, children, and foster parents to facilitate reunification or, where reunification is not possible, the permanent placement of the child and implementation of that plan; and (4) a case review system in which each child has a case plan designed to achieve safe and appropriate foster care placements in the least restrictive and most family-like setting, closest to their home community.  Compl. ¶ 309.

The CWA contains "case plan provisions," codified at 42 U.S.C. §§ 671(a)(16) and 675(1).  Section 671(a)(16) provides:

> In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which…provides for the development of a case plan (as defined in section 675(1) of this title and in accordance with the requirements of section 675a of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements of described in sections 675(5) and 675a of this title with respect to each child.

42 U.S.C. § 671(a)(16).

Section 675(1) in turn "provides a detailed description of what a case plan must include, such as the child's health and educational records, a description of the child's

permanency plan, and a plan for ensuring the child's educational stability." *Henry A.*, 678 F.3d at 1006; 42 U.S.C. § 675(1).

In addition to the creation of a case plan, § 671(a)(16) also requires that a "case review system" be created. The nature of such a case review system is spelled out at some length in § 675(5) and, in relevant part, includes:

> The term "case review system" means a procedure for assuring that—
>
>> (A) each child has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child, which—
>>
>>> (i) if the child has been placed in a foster family home or child-care institution a substantial distance from the home of the parents of the child, or in a State different from the State in which such home is located, sets forth the reasons why such placement is in the best interests of the child and
>>>
>>> (ii) if the child has been placed in foster care outside the State in which the home of the parents of the child is located, requires that, periodically, but not less frequently than every 6 months, a caseworker on the staff of the agency of the State in which the home of the parents of the child is located, of the State in which the child has been placed, or of a private agency under contract with either such State, visit the child in such home or institution and submit a report on such visit to the State agency of the State in which the home of the parents of the child is located,

41 U.S.C. § 675(5)(A).

The Ninth Circuit has held that "the case plan provisions of the CWA, codified at §§ 671(a)(16) and 675(1) are enforceable through § 1983." *Henry A.*, 678 F.3d at 1008. The Ninth Circuit also held that the "case review" provision of the CWA is enforceable through an action under § 1983. *Id.* at 1008-09.

The Ninth Circuit's decision in *Henry A.* concerned the requirements of §
675(5)(D), which requires that a child's health and education records be reviewed,
updated, and provided to foster parents and foster care providers. *Id.* Although
Plaintiffs' claims in the present case concern § 675(5)(A), the Ninth Circuit's
underlying reasoning applies with equal force to that provision. Both provisions are
couched in mandatory terms and "contain detailed, concrete requirements that are
capable of judicial enforcement." *Id.* at 1009. Accordingly, the Court concludes that
the "case review system" requirement established by §§ 671(a)(16) and 675(5)(A) are
subject to enforcement under § 1983.

Defendants move to dismiss on the basis that Plaintiffs have not alleged that
the State has failed to provide a written case plan for any of the named Plaintiffs or
that it has failed to provide for review of those case plans. More to the point,
Defendants contend that there is no private right of action to enforce the contents of
the case review plan or to enforce the successful implementation of a plan.

As to the first issue, the individual Plaintiffs have alleged that they have had
multiple failed placements, which supports a reasonable inference that there has
been a breakdown in the case plan system. As to the question of implementation, the
Ninth Circuit has held that the case plan provisions of the CWA are couched in
mandatory terms and contained detailed, concrete requirements that are capable of
judicial enforcement through an action under § 1983. *Henry A.*, 678 F.3d at 1008-09.
Consistent with that guidance, the Court declines to accept Defendants' suggestion
that Plaintiffs lack a right of action to challenge either the contents of the plan or

their implementation.  Defendants' motion to dismiss Plaintiffs' claim under the CWA is therefore denied.

## IV.    ADA and Rehabilitation Act Claims

Plaintiff's third and fourth causes of actions bring related claims for violation of the anti-discrimination provisions of the Americans with Disabilities Act ("ADA"), 41 U.S.C. § 12131 *et seq.*, Compl. ¶¶ 310-20, and the Rehabilitation Act, 29 U.S.C. § 794, *Id.* at ¶¶ 321-28.  Because the applicable provisions of the ADA and the Rehabilitation Act are "co-extensive," courts typically discuss claims brought under both statutes together, focusing on the ADA.  *Sanchez v. Johnson*, 416 F.3d 1051, 1062 n.6 (9th Cir. 2005).

To remedy the persistent problem of discrimination against the disabled, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity."  42 U.S.C. § 12132; *accord* 29 U.S.C. § 794(a).  To state a claim for disability discrimination, a plaintiff must allege four elements: (1) that he or she is an individual with a disability; (2) he or she is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) that he or she was either excluded from participation or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of his disability.  *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).

The Department of Justice has promulgated regulations implementing the ADA. 42 U.S.C. § 12134(a). One such regulation is the "integration mandate," which provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

In this case, Plaintiffs in the ADA sub-class allege that they have "physical, mental, intellectual, or cognitive disabilities that qualify them as individuals with disabilities within the meaning of the ADA." Compl. ¶ 312.   Plaintiffs bring two principal claims under the ADA and the Rehabilitation Act.  First, they allege that they were excluded from fully participating in the foster care system because of their disabilities and that Defendants discriminated against Plaintiffs by denying them reasonable accommodations.  And second, that Defendants violated the integration mandate by placing them in residential facilities and institutions rather than in home-like setting in the community.

## A. Denial of Reasonable Accommodations

Plaintiffs allege that they "have physical, mental, intellectual, or cognitive disabilities that qualify them as individuals with disabilities" within the meaning of the ADA and the Rehabilitation Act and that they meet the essential eligibility requirements for the receipt of foster care services provided by DHS. Compl. ¶¶ 312, 322. Plaintiffs allege that DHS "must provide children with disabilities an equal opportunity to access foster care services as it provides to children without disabilities in its custody," and that, under 28 C.F.R. § 35.130(b)(7), Defendants "have an

affirmative duty to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." *Id.* at ¶¶ 316-17. Plaintiffs allege that the "named Plaintiffs and all members of the class have, and are at risk of being, deprived of their statutory right to access additional mental health services to make them as able as their non-disabled peers to access a stable, family-like foster placement and for appropriate placement in the most integrated setting appropriate to their needs." *Id.* at ¶ 319; *see also* ¶ 327 (alleging that Defendants "fail to give children with disabilities an equal opportunity to succeed in remaining in a family home, reunifying with their parents, finding a permanent home, receiving necessary health care, and receiving appropriate placement in the most integrated, community-based setting appropriate to their needs.").

Defendants contend that the relief Plaintiffs seek is not reasonable accommodation for their disabilities, but rather additional treatment to mitigate their disabilities and that Plaintiffs have not pleaded a claim for disability discrimination.

As noted, an organization that receives federal funds violates § 504 if it denies a qualified individual with a disability a reasonable accommodation that the individual needs to enjoy meaningful access to the benefits of public services. *Mark H. v. Hamamoto*, 620 F.3d 1090, 1097 (9th Cir. 2010). "The purpose of the ADA's reasonable accommodation requirement is to guard against the façade of 'equal treatment' when particular accommodations are necessary to level the playing field."

*McGary v. City of Portland*, 386 F.3d 1259, 1267 (9th Cir. 2004). "In the context of disability, therefore, equal treatment may not beget equality, and facially neutral policies may, in fact, be discriminatory if their effect is to keep persons with disabilities from enjoying the benefits of services that, by law, must be available to them." *Id.* (internal quotation marks and citation omitted). "Reasonable accommodation does not require an organization to make fundamental or substantial alterations to its programs," and reasonableness "depends on the individual circumstances of each case, and requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to enjoy meaningful access to the program." *Mark H.* 620 F.3d at 1098 (internal quotation marks and citation omitted, alterations normalized). However, the ADA "prohibits discrimination because of disability, not inadequate treatment for disability." *Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1022 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

In this case, the Court cannot say at the pleading stage that the relief sought by Plaintiffs is based on "inadequate treatment" of their disabilities, rather than reasonable accommodations needed to "level the playing field," and ensure that disabled children are able to access the services available to the other children in DHS care. The Court concludes that Plaintiffs have adequately pleaded their claim for disability discrimination based on a failure to provide reasonable accommodations under the ADA and the Rehabilitation Act. Defendants' motion to dismiss that claim is denied.

### B. The Integration Mandate

As previously noted, the "integration mandate" provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The "most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." *Id.* Part 35, App. B. (2011). The regulation also provides that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id.* at § 35.130(b)(7).

The Supreme Court has "applied the integration and anti-isolation principles, interpreting discrimination forbidden under the ADA to include '[u]njustified isolation of the disabled.'" *Townsend v. Quasim*, 328 F.3d 511, 516 (9th Cir. 2003) (quoting *Olmstead v. L.C.*, 527 U.S. 581, 597 (1999)). In *Olmstead*, the Supreme Court "interpreted the failure to provide Medicaid services in a community-based setting as a form of discrimination on the basis of disability." *Id.* at 516-17. Of note, the integration mandate does not concern whether services are provided, but where and how they are provided—as the Ninth Circuit summarized "where the issue is the *location* of services, not *whether* services will be provided, *Olmstead* controls." *Id.* at 517.

Defendants contend that Plaintiffs have failed to state a claim for violation of the integration mandate because they have failed to show that Plaintiffs are segregated from non-disabled children in DHS care and, relatedly, that placement in institutions is common to all children in DHS care, rather than specific to children with disabilities.

Plaintiffs allege that Defendants have violated the integration mandate by "unnecessarily placing youths with disabilities in institutional settings and denying them access to community-based treatment."  Compl. ¶ 39(d).  In the case of the named Plaintiffs Unique L., Simon S., and Ruth T. are members of the putative ADA sub-class and allege that they have been unnecessarily placed in institutional facilities and deprived of placement in the least-restrictive settings.  Compl. ¶¶ 74-93, 102-08, 115-127.  These allegations, and the reasonable inferences that may be drawn from them, are sufficient to make out a claim for disability discrimination under the integration mandate.  Defendants' motion to dismiss that claim is therefore denied.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss, ECF No. 31, is GRANTED in part and DENIED in part.  The Court declines to abstain from consideration of this case.  With respect to Defendants' Motion to Dismiss for failure to state a claim, Plaintiffs' claim for violation of their substantive due process rights is dismissed to the extent that it seeks to reach beyond the established contours of the constitutional guarantee, as discussed above, but the Court concludes that

Plaintiffs have otherwise stated a claim under the Due Process Clause of the Fourteenth Amendment. Defendants' motion is denied as to Plaintiffs' claims under the CWA, the ADA, and the Rehabilitation Act as discussed above.

It is so ORDERED and DATED this ____27th____ day of September 2021.


 /s/Ann Aiken                                              
ANN AIKEN
United States District Judge