IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

WYATT B. and NOAH F. by
their next friend Michelle
McAllister; KYLIE R. and ALEC
R. by their next friend Kathleen
Megill Strek; UNIQUE L. by her
next friend Annette Smith;
SIMON S. by his next friend Paul
Aubry; RUTH T. by her next friend
Michelle Bartov; BERNARD C. by
his next friend Ksen Murry; NAOMI B.
by her next friend Kathleen Megill
Strek; and NORMAN N. by his next
friend Tracy Gregg, individually and
on behalf of all other similarly
situated,

Civ. No. 6:19-cv-00556-AA

               Plaintiffs,

    v.

KATE BROWN; FAIRBORZ
PAKSERESHT; REBECCA JONES
GASTON; OREGON DEPARTMENT
OF HUMAN SERVICES,

               Defendants.

**OPINION & ORDER**

_____

AIKEN, District Judge.

This class action comes before the Court on (1) cross-motions to exclude expert testimony; (2) Defendant's partial motions to dismiss moot claims; and (3) Plaintiffs' motion to certify the class.  The Court resolves these motions by omnibus order as follows:

Defendants' Motion to Exclude Experts, ECF No. 114, is DENIED.  Plaintiff's Motion to Exclude Experts, ECF No. 203, is GRANTED in part and DENIED in part. Defendants' Motions to Dismiss as Moot, ECF Nos. 109, 230, 232, 252, 253, are DENIED.  Plaintiffs' Motion to Certify, ECF No. 64, is GRANTED.

## PART I: CROSS-MOTIONS TO EXCLUDE EXPERTS

This class action comes before the Court on cross-motions to exclude expert testimony.  ECF Nos. 114, 203.  The Court concludes that these motions are appropriate for resolution without oral argument.  For the reasons set forth below, Defendants' motion is DENIED and Plaintiffs' Motion is GRANTED in part and DENIED in part.

### Legal Standards

Federal Rule of Evidence 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(b).  Expert testimony is admissible pursuant to Rule 702 if it is both relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  An expert witness may provide opinion testimony if: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the

expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702(b)-(d).

The district court must "act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standard." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). However, this duty is to evaluate not the correctness of the expert's conclusion, but the principles and methodology used to generate the conclusions. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). Moreover, the inquiry into admissibility of expert opinion is a "flexible one," where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* (citing *Daubert*, 509 U.S. at 596). In other words, the Court has broad discretion and flexibility in structuring and assessing an expert's reliability. *Murray v. S. Route Mar. SA*, 870 F.3d 915, 924 (9th Cir. 2017); *see also Ellis*, 657 F.3d at 982 ("A trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability."). "The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 515 (C.D. Cal. 2012) (internal quotation marks and citations omitted).

The Ninth Circuit has approved of the application of the standard in *Daubert* to expert reports in support of or in opposition to motions for class certification. *Ellis*, 657 F.3d at 982. "On a motion for class certification, it is not necessary for the expert testimony to resolve the factual disputes going to the merits of plaintiffs' claim or

claims; instead, the testimony must be relevant to determining whether there was a common pattern and practice that could affect the class as whole." *Keegan*, 284 F.R.D. at 515 (internal quotation marks and citation omitted).

## Discussion

As noted, the parties have each filed a motion to exclude expert testimony and opinions advanced by their opponent in support or opposition to class certification. Defendants move to exclude the opinions of Bianca Wilson, Ph.D.; Sue Steib, Ph.D.; Patricia Rideout, J.D.; Alen Puckett, Ph.D; and Angelique Day, Ph.D. Plaintiffs, in turn, move to exclude the opinions of Kevin Cahill, Ph.D., and Julie Collins, M.S.W. The Court addresses each challenged expert in turn.

## I.    Dr. Wilson

Dr. Wilson has a Ph.D. in psychology and has spent the last eight years researching "the role of sexual orientation, gender identity, and gender expression (SOGIE) in the demographics and experiences of youth in foster care." Lowry Decl. Ex. 4 ("Wilson Report"), at 5. ECF No. 67-1. Among other topics, Dr. Wilson opined that "a conservative estimate would suggest there are at least 592 LGBTQ youth out of the total of 3,102 youth ages 13 and older who spent at least one day in some kind of foster family care (using the DHS report for FFY 2018)." *Id.* at 8.

Defendants move to exclude Dr. Wilson's testimony and report as unreliable. Defendants assert that Dr. Wilson improperly based her conclusions about the number of SGM children in Oregon foster care based on data from an earlier study of children in foster care in Los Angeles County. Blaesing Decl. Ex. 1. (Bianca D.M.

Wilson, Angeliki A. Kastanis, *Sexual and Gender Minority Disproportionality and Disparities in Child Welfare: A Population-Based Study*, 58 CHILDREN AND YOUTH SERVICES REVIEW 11-17 (2015)).  ECF No. 115-1.

Dr. Wilson's prior study cautions that "it is important to recognize that these estimates [of numbers of SGM youth] were derived from a study of one large urban county child welfare service department" and "more research is needed to understand the experiences of foster youth in other locations and to assess the usefulness of the methodology and generalizability of the results beyond Los Angeles County." Blaesing Decl. Ex. 1, at 5.  Defendants contend that Dr. Wilson's report contradicts the findings of her prior study by using the Los Angeles County data to extrapolate information about Oregon.  Dr. Wilson's report, however, indicates that in the years following the Los Angeles study, two more studies have been completed, "one national and one California statewide[,]" and the two studies "have demonstrated similar findings of disproportionality and disparities for LGBTQ youth in foster care."  Wilson Report, at 7.  The Court concludes that there is no disqualifying contradiction between Dr. Wilson's Report and her previous findings.

Defendants also contends that Dr. Wilson's Report lacks an empirical basis and is therefore speculative.  In her Report, Dr. Wilson discussed the findings of the Los Angeles County Study and concluded

> The findings were generalized to the Los Angeles foster care population, and indicative of child welfare departments nationwide as there is no evidence that Los Angeles, as the largest child welfare system in the country, would be significantly different from others.  If anything, given the positive LGBT policy context of California, if there is a difference

between Los Angeles and other jurisdictions, it is reasonable to expect LGBTQ youth would be faring worse in other localities.

Wilson Report, at 7.

In her deposition, Dr. Wilson testified that empirical data for comparison to other areas does not yet exist and that her conclusion was based on an "educated hypothesis" and projections based on her experience as a researcher in this field. Blaesing Decl. Ex. 2, at 7-8. ECF No. 115-2.

The Court concludes that Dr. Wilson's opinion is sufficiently supported and based on more than mere speculation. It is significant that Dr. Wilson's testimony is based on her own prior research, supported by later studies. *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1996) (*Daubert II*) ("That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science."). As the Ninth Circuit observed, a "[l]ack of certainty is not, for a qualified expert, the same thing as guesswork." *Primiano*, 598 F.3d at 565. "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry" and "it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* (internal quotation marks and citations omitted). The Court concludes that Dr. Wilson meets the necessary threshold of admissibility. Resolution of the weight due to Dr. Wilson's opinions must await further development.

## II.    Dr. Steib and Ms. Rideout

Dr. Steib has a Ph.D. in social work and a master's degree in social work. Lowry Decl. Ex. 3 ("Steib-Rideout Report"), at 9.  ECF No. 67-1.  Dr. Steib has "forty-five years of child welfare experience including direct practice, agency administration, research, and consultation," and worked for 31 years in the Louisiana child welfare system as a caseworker, casework supervisor, program administrator, and statewide Director of Child Welfare Programs.  *Id.* at 8-9.

Ms. Rideout has a juris doctorate and "over thirty years of experience in the child-welfare field, as a lawyer, national consultant, and agency administrator."  *Id.* at 8.  Ms. Rideout served as the director of Cuyahoga County Division of Children and Family Services in Cleveland, Ohio from 2011 to 2015 and as a Juvenile Court Magistrate in Toledo, Ohio.  *Id.*

Dr. Steib and Ms. Rideout reviewed the case files of the named Plaintiffs in an effort "to objectively assess Oregon DHS practice in light of our understanding of reasonable professional standards in child welfare."  Steib-Rideout Report, at 7.

> Specific areas of focus in the review were: (1) the pathway and timeliness of Oregon DHS' intervention in the family of each child; (2) the quality of the DHS assessment of each child's needs with regard to safety, permanency, and well-being; and (3) the capacity of the DHS system to provide stable placement setting and treatment matched to the needs of each child and his/her family.

*Id.*

Defendants contend that Dr. Steib and Ms. Rideout improperly relied on case studies as the basis for their conclusions.  Defendants argue that the named Plaintiffs do not form a representative sample of children in DHS care and so a report derived

from studying only those cases will not be sufficiently reliable.  In the child welfare context, courts have admitted expert testimony based on review of the named plaintiffs' case files for purposes of comparison against accepted professional standards.  *See, e.g., B.K. by Tinsley v. Faust*, No. CV-15-00185-PHX-ROS, 2020 WL 2616033, at * 5 (D. Ariz. May 22, 2020) (admitting the testimony of an expert who reviewed the named plaintiffs' case files when the expert "has decades of social work and child welfare experience," and "is qualified to provide testimony on at least the care received by B.K. and B.T. while in the Arizona child welfare system, and whether that care meets the standards of professional practice."); *Kenny A. v. Perdue*, Civil Action No. 1:02-cv-1686-MHS, 2004 WL 5503780, at *13 (N.D. Ga. Dec. 13, 2004) (rejecting a challenge to an expert report based on review of only five individual case files because "[e]ven though Ms. Smith's report by itself may be insufficient to establish class-wide constitutional violations, it will still assist the Court, in conjunction with all the other evidence presented, in understanding how services are provided in the individual setting and how individual children are harmed when appropriate services are not provided.").  Consistent with those examples, the Court declines to exclude the expert report and testimony Dr. Steib and Ms. Rideout on the basis that their report is based on review of a limited number of case files.  The value of that evidence to a class-wide inquiry goes to weight, rather than admissibility.

Defendants also contends that Dr. Steib and Ms. Rideout did not apply any objective federal or Oregon professional standards in their assessment of the case files.  The Ninth Circuit has held, however, that an expert's opinion may be based on

the expert's experience and knowledge of the industry as a whole. *United States v. Laurienti*, 611 F.3d 530, 548 (9th Cir. 2010).

In *Kenny A. v. Perdue*, a Georgia district court similarly rejected an argument that *Daubert* and its progeny require "the existence of 'generally recognized national standards' as a prerequisite to expert testimony on accepted standards in a particular field." *Kenny A.*, 2004 WL 5503780, at *12. "Taken to its logical conclusion, this argument would effectively destroy plaintiffs' substantive due process rights and permit State Defendants to operate Georgia's child welfare system in complete disregard of any professional standards, no matter how well accepted, so long as no uniform set of national standards had been formally adopted. Clearly, this is not the law." *Id.* Rather, the district court found that the plaintiffs' experts had adequately relied on a variety of sources of accepted professional standards, "including state law, regulations, and policies; federal law; standards published by the Child Welfare League of America and the Council on Accreditation for Services to Children and Families; performance indicators, outcomes, and systemic factors developed by HHS; academic publications; and their own considerable professional experience." *Id.*

In this case, Dr. Steib testified in her deposition concerning the metrics used to assess child welfare practices. *See, e.g.*, Second Lowry Decl. Ex. 4, at 14 ("And I've done this work for the better part of 50 years. I have, I think, a good understanding of what it is that public child welfare in the country is charged to do. I think those standards are reflected in, for example, the federal standards for the Child and Family Services Review, and as we state here, they pertain, primarily, to the child's

safety, permanency, and well-being. That's sort of the triad on which—around which child welfare services are supposed to concern themselves when they serve children."). ECF No. 161-1. Dr. Steib also based her assessment on the standards she knows and understands as a result of her work in the field of child welfare. *Id.* at 16.

Ms. Rideout similarly testified as to the acceptable standard of practice in child welfare based on her experience in the field, her training, and her education. Second Lowry Decl. Ex. 5, at 7-8, 15. Ms. Rideout testified that, while she was not aware of any published standard by an accrediting organization, the standards she relied on were "widely and deeply documented in all literature on foster care for kids." *Id.* at 9. Ms. Rideout testified that standards are frequently reflected in the policies and practice manuals of state agencies but that such materials would be broadly similar, reflecting a "commonality in the field," which formed part of the basis of her understanding of the professional standards. *Id.* at 13-14.

The Court concludes that Dr. Steib and Ms. Rideout have adequately set forth a basis for their expert opinions on professional standards in the area of child welfare. The Court therefore declines to exclude the testimony or opinions of Dr. Steib or Ms. Rideout.

## III.    Dr. Puckett

Dr. Puckett has a Ph.D. in social welfare, as well as a master's degree in social work. Lowry Decl. Ex. 6 ("Puckett Report"), at 21. Dr. Puckett "has held a number of positions with professional experience totaling nearly 30 years in public and

private child welfare agencies, children's mental health and juvenile justice organizations, and in related research and consulting work," including contributions to academic studies and consultation with state and local child welfare agencies in several states. *Id.* at 3.

The Puckett Report discloses in its opening paragraph that the "[q]uantitative analysis of the Adoption and Foster Care Analysis and Reporting System ('AFCARS') data provided by Oregon Department of Human Services ('DHS') were conducted by Jared Hirsch of ABC ["A Better Childhood"] with Dr. Puckett's review and constitute much of the source information on which this report is based." Puckett Report, at 3. Mr. Hirsch is a paralegal employed by A Better Childhood, which represents Plaintiffs. Second Lowry Decl. Ex. 7, at 5. The details of the quantitative analysis performed by Mr. Hirsch are included in Appendix B of the Puckett Report. Puckett Report, at 23-39. The Puckett Report affirms, however, that the "[c]ontent analysis and opinions provided in this report are solely those of the author, Alan M. Puckett." *Id.* at 3.

Defendants seek to exclude Dr. Puckett's testimony and report on the basis that Dr. Puckett "out-sourced" the "number-crunching" to Mr. Hirsch and could not independently verify the accuracy or reliability of the calculations upon which his conclusions were based.

Mr. Hirsch has supplied a declaration in which he describes his background in data analysis, particularly of large datasets, and his work as a paralegal for ABC. Second Lowry Decl. Ex. 11 ("Hirsch Decl.") ¶¶ 1-3. Mr. Hirsch affirmed that his work

as a paralegal "regularly included both quantitative and qualitative analysis of state child welfare systems, largely through data that was made publicly available through the Children's Bureau's own summaries of datasets such as AFCARS, NCANDS, and NYTD." *Id.* at ¶ 4. In the present case, Mr. Hirsch reported that Dr. Puckett would conduct the analysis of the data while Mr. Hirsch did the "data work" of "organizing and presenting the numbers in aggregate." *Id.* at ¶ 5. The Oregon AFCARS data was produced by Defendants in discovery and is not publicly available. *Id.* at ¶¶ 6-8. The specifics of Mr. Hirsch's "data work" are set forth in Appendix B of the Puckett Report, but Mr. Hirsch summarized it as follows:

> Broadly, I would define my actions with respect to the AFCARS data as organization and presentation. I utilized the Children's Bureau's simple bulletin on understanding AFCARS data elements to interpret coding and present summary statistics on the population from person-level data (~8000+ rows of data). This largely consisted of basic filtering and counting.

*Id.* at ¶ 9.

In the course of his work, Mr. Hirsch "liaised with Defendants' counsel to discuss the file and ask questions on a number of occasions," and Mr. Hirsch was present at Dr. Puckett's deposition. Hirsch Decl. ¶¶ 7, 11. Defendants have not sought to depose Mr. Hirsch about his work on the Oregon AFCARS data or the Puckett Report. *Id.* at ¶¶ 11-12.

Courts have observed that there is "nothing remarkable about a paid expert preparing a report with the assistance of staff." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 810 (7th Cir. 2013). By the same token, however, "[s]triking expert evidence due to its reliance on questionable data is not a novel course of action." *Bruno v.*

*Bozzuto's, Inc.*, 311 F.R.D. 124, 137 (M.D. Penn. 2015); *see also McClellan v. I-Flow Corp.*, 710 F. Supp.2d 1092, 1121-25 (D. Or. 2010) (excluding an expert report when the plaintiffs' counsel created the idea for the expert's study, provided the raw patient data, selected the nurse to perform the data extraction, and substantially directed the course of the expert's study with the goal of producing results tailored to support the plaintiffs' litigation).

The circumstances surrounding the Puckett Report do not support such a conclusion, however. The Court finds it significant that the data in question did not originate with Plaintiffs but was produced by Defendants in discovery and only organized by Mr. Hirsch for the purposes of Dr. Puckett's analysis. Mr. Hirsch's role in the process and the work he did are apparent on the face of the Report itself. Defendants do not appear to challenge the authenticity of the underlying data, nor do they point to any errors in the work done by Mr. Hirsch, as set forth in Appendix B of the Puckett Report. Dr. Puckett's testimony is based on that same data, as organized by Mr. Hirsch, and the Court sees no cause to exclude Dr. Puckett's testimony or opinion.

## IV.  Dr. Day

Dr. Angelique Day has a Ph.D. in interdisciplinary health sciences and a master's degree in social work. Lowry Decl. Ex. 5 ("Day Report"), at 34. Dr. Day has experience as a child protective services caseworker in Michigan and has worked for over ten years in the area of adolescent foster youth, with an emphasis on aging-out youth. *Id.* at 4-6.

Defendants seek to exclude Dr. Day's testimony and Report on the basis that Dr. Day prepared it quickly over the course of only a matter of weeks and that it is not something that could be published in a peer-reviewed journal.  At her deposition, Dr. Day testified that she "love[s] to have three months" to prepare "a document we're proud of," but that she only had had "two and a half weeks to get this turned around." Blaesing Decl. Ex. 6, at 5.  However, Dr. Day did not testify that she had insufficient time to prepare her Report, or that her methodology or conclusions were undermined by the time constraints.  The Court cannot conclude that the Day Report is unreliable simply because it was prepared quickly.

As to the question of publication, the Ninth Circuit has cautioned against "conflat[ing] the standards for publication in a peer-reviewed journal with the standards for admitting expert testimony in a courtroom." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1235 (9th Cir. 2017).  Although "one means of showing that the testimony is based on scientifically valid principles is by proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication," but "expert testimony may still be reliable and admissible without peer review and publication." *Id.* (internal quotation marks and citation omitted).  In this case, Dr. Day also testified that the Day Report is not something that could be published in a peer-reviewed journal because it did not include "a deep analytical assessment of Oregon laws" or include original research, which Dr. Day testified are normally prerequisites to publication.  Blaesing Decl. Ex. 6, at 7-8.  The Court declines to exclude Dr. Day's

testimony because the Day Report was not prepared with the standards of publication in mind and so does not meet those standards.

Defendants also seek to exclude Dr. Day's testimony and Report on the basis that she did not examine Oregon policies or practices and focused instead on outcomes. Dr. Day testified that, prior to her work on the Day Report, she had never done research on foster care youth in Oregon specifically. Blaesing Decl. Ex. 6, at 6. Dr. Day did not examine Oregon laws on aging-out foster care youth and focused instead on the outcomes because "as someone who has worked in the policy world that we know, a policy is only as good as how well it's implemented." *Id.* at 9. The Court concludes that Dr. Day's Report and opinion are sufficiently based on her own expertise and review of documents to meet standards for reliability. Dr. Day's lack of familiarity with Oregon-specific laws or policies and Defendants' challenges to her focus on "outcomes" in preference to written policies are matters for cross-examination at trial and go to the weight of the testimony, rather than its admissibility.

## V.    Dr. Cahill

Dr. Kevin Cahill has a Ph.D. in economics and a master's degree in the same field. Kolthari Decl. Ex. 1 ("Cahill Report"), at 3. ECF No. 206-1. Dr. Cahill specializes in applied econometrics and labor economics and works on project teams examining "issues relevant to public policy" and has published work "on various topics related to applied microeconomics." *Id.* In addition to his public policy research, Dr. Cahill works as an economist "on litigation-related cases involving

employment and contract disputes, discrimination, antitrust issues, and other topics that require statistical expertise, analyses involving applied micro-economics, or the assessments of economic damages." *Id.*

Plaintiffs object that Dr. Cahill lacks the necessary qualifications to be considered an expert. Dr. Cahill has limited experience in child welfare and testified that his only prior experience on the subject was a research project on "pathways through foster care" done in conjunction with Oregon Health and Science University. Post Decl. Ex. 3, at 7-10. ECF No. 204-3. The research was never submitted to an academic journal for publication and the project was not included in Dr. Cahill's CV or referenced in the Cahill Report. *Id.* at 11.

Plaintiffs also contend that the Cahill Report is not reliable because Defendants have not demonstrated that Dr. Cahill is qualified to offer expert opinions or conclusions on the AFCARS system.

With respect to the AFCARS data, Dr. Cahill testified that he relied on information provided by Dr. Paul Bellatty of the Office of Reporting, Research, Analytics and Implementation at DHS. Post Decl. Ex. 3, at 36. When pressed on the subject during his deposition, Dr. Cahill was evasive about whether he knew Dr. Bellatty to be a reliable source for such information, other than repeatedly stating Dr. Bellatty's title. *Id.* at 36-39, 41. Dr. Bellatty testified at his deposition that he had "very, very little" experience with AFCARS datasets. Post Decl. Ex. 5, at 5. Dr. Bellatty testified that he does not personally work with AFCARS data and did not have any training working with AFCARS data. *Id.* at 6. Dr. Bellatty testified that

Dr. Cahill contacted him with definitional questions related to AFCARS and Dr. Bellatty would "go and get the answer and then call him back." *Id.* at 16.  Dr. Bellatty testified "To be quite honest, I don't have a great understanding of AFCARS.  And I'm just translating what [DHS staffer] Judy says to Dr. Cahill in most of these correspondence because I don't truly understand it and don't use or rely on AFCARS data." *Id.* at 30.  Dr. Bellatty testified that Dr. Cahill knew Dr. Bellatty didn't have the answers and "would have to go to someone else who could get the answers" because "I'm pretty clear about I'm not knowledgeable about AFCARS data." *Id.*  Dr. Cahill's insistence that he relied on Dr. Bellatty as a source for information about AFCARS data, apparently by sole virtue of Dr. Bellatty's position with DHS, substantially undermines the reliability of Dr. Cahill's conclusions.

Turning to the question of qualifications, Dr. Cahill was asked to opine on "the extent to which foster children's needs are common across the State." Cahill Report, at 7.  Dr. Cahill concluded that "the needs of Oregon's foster care children are not common across the state." *Id.* at 30.  The Court concludes that Dr. Cahill, as a labor economist and statistician, is not qualified to render an opinion on the "needs of Oregon's foster care children," which is a prerequisite to an opinion on how common those needs might be.

Dr. Cahill also concluded that the named Plaintiffs were not "typical" of foster care children in Oregon based on "geography, placement setting, and number of placements."  Post Decl. Ex. 3, at 31.  When asked how he selected those factors as criteria for his assessment of whether the named Plaintiffs were typical, Dr. Cahill

was unable to articulate a basis, other than to say that the factors "seem like they might be relevant to this analysis." *Id.* at 31-32. This is insufficient to support an expert opinion as reliable.

In addition, "typicality" and "commonality" are legal conclusions in the context of a motion to certify a class. An expert witness "cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law." *Nationwide Trans. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (emphasis in original). Dr. Cahill is not an attorney and testified that he had "no legal understanding of class certification." Post Decl. Ex. 3, at 15. As noted, Dr. Cahill opines in his Report that the named Plaintiffs "are not typical of foster care children in Oregon generally," and that "the needs of Oregon's foster care children are not common across the state." Cahill Report, at 27-30. Dr. Cahill is neither qualified, nor permitted to offer such legal conclusions. The Court therefore excludes Sections IV and V of the Cahill Report.

Finally, Plaintiffs contend that the Cahill Report is improper because a significant portion of the Report is devoted to attacking the reports of Plaintiffs' experts. Dr. Cahill testified that he was retained, in part, to "review plaintiffs' expert reports and provide any opinions related to them." Post Decl. Ex. 3, at 16. As noted, Dr. Cahill is a labor economist by training with little or no expertise in child welfare systems. As discussed in the preceding sections, child welfare systems are the primary area of expertise for Plaintiffs' experts. An expert "must be qualified in the field they will testify about" and "expert in one field is not qualified to provide

opinions about a different field." *Jack v. Borg-Warner Morse TEC LLC*, CASE NO. C17-0537 JLR, 2018 WL 3819027, at *18 (W.D. Wash. Aug. 10, 2018) (citing *Lucido v. Nestle Purina Petcare Co.*, 217 F. Supp.3d 1098, 1103 (N.D. Cal. 2016)).

In his Report, Dr. Cahill does not confine his criticism of Plaintiffs' experts to matters relating to his area of training or expertise, but instead reprimands Plaintiffs' experts for engaging in what he perceives as "advocacy," which "calls into question the extent to which their role as an expert is one that is grounded in an objective review of the facts in this matter." Cahill Report at 26-27. Dr. Cahill also suggests that the conclusions of Dr. Day "border on hyperbole" and "do not fit the mold of statements made by an objective subject matter expert." *Id.* at 26.

It is "a fundamental premise of our trial system that determining the weight and credibility of witness testimony belongs to the jury who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the way of men," and "an expert witness may not usurp the jury's function to weigh evidence and make credibility determinations." *Davis v. Duran*, 277 F.R.D. 362, 370 (N.D. Ill. 2011) (internal quotation marks and citations omitted, alterations normalized). Dr. Cahill's opinions about the credibility or motives of Plaintiffs' experts are of no use to the finder of fact and the Court therefore excludes Section III of the Cahill Report.

The Court will consider the balance of the Cahill Report, insofar as it offers an assessment within the bounds of Dr. Cahill's statistical expertise.

## VI.    Ms. Collins

Julie Collins has a master's degree in social administration and policy.  Kothari Decl. Ex. 4 (the "Collins Report"), at 24.  ECF No. 206-4.  Ms. Collins has thirty-eight years of experience in child welfare, mental health, substance abuse, and managed care and is currently the vice president for practice excellence with the Child Welfare League of America ("CWLA").  *Id.* at 2, 21.  Ms. Collins and a team of staffers from the CWLA reviewed the case files of the named Plaintiffs.  *Id.* at 3-4.

In preparing her Report, Ms. Collins' team "developed a tool to review the case files to ensure consistency of the review process."  Collins Report, at 3.  This "tool" is not described in the appendices of the Collins Report and was not produced to Plaintiffs.  At her deposition, Ms. Collins testified that she and her team developed the tool, and that they "used a tool that CWLA uses as part of the consulting review in other states modified it or contextualized it . . . for the purposes of Oregon."  Kothati Decl. Ex. 5, at 8, 13.  ECF No. 206-5.  Ms. Collins did not know when the tool was finalized.  *Id.* at 13.  Ms. Collins described the tool as "the piece that was used to make sure that we were all looking at the right similar information as we reviewed."  *Id.* at 17.  The Court is otherwise left to guess at what the tool might have been.  The opacity surrounding this aspect of Ms. Collins's methodology substantially undermines the reliability of her Report.  Nevertheless, the Court is disinclined to entirely exclude the Collins Report on that basis, given Ms. Collins's uncontested expertise in the field of child welfare and that the purpose of the tool, as Ms. Collins described it, was to ensure that Ms. Collins and her team were looking at the same information.

Substantively, the Collins Report concluded that the ten files of the Named Plaintiffs were too few to constitute a representative sample of the "full number of cases of children who are in the care of the state of Oregon DHS," and that the named Plaintiffs "are not typical of most children who enter foster care." Collins Report, at 4. Plaintiffs do not challenge Ms. Collins' expertise in the arena of child welfare, but object that the Collins Report's focus on typicality and commonality amount to legal conclusions, rather than opinions based on Ms. Collins' background and experience in child welfare systems. The objection is bolstered by the opening paragraph of the Collins Report, which states that "CWLA has been asked to review the case records of the 10 named plaintiffs and render an opinion about whether they are typical of children in foster care (typicality) and whether these 10 cases demonstrate that systemwide deficiencies exist in Oregon's foster care system (commonality)," Collins Report, at 2, which strongly suggests that the Collins Report is intended to offer an opinion based on ultimately legal questions.

In her Report, Ms. Collins concludes that the ten named Plaintiffs "are not enough to be a representative sample of the full number of cases of children who are in the care of the state of Oregon DHS," and that "CWLA would never consider such a small number of cases to be representative of the practices or issues for the agency." Collins Report, at 4. Rather, "CWLA recommends doing case record reviews on 10% of the total number of relevant types of cases," and suggests that "given the complaint is regarding all children in care, CWLA would have conducted a review of 700 case files (assuming that the current number of children in care was 7000)." *Id.* Based on

the limited number of cases, Ms. Collins found that no conclusion could be reached on commonality.  *Id.*

With respect to typicality, Collins concluded that the named Plaintiff represent "some of the most challenging types of cases that a child welfare agency might have to deal with," and are "by no means representative of the most common cases." Collins Report, at 4.  Ms. Collins opined that the named Plaintiffs "would likely be the type of case that a worker might be assigned one or two times over many years," unless the caseworker specialized in such cases.  *Id.*  As a result, Ms. Collins concluded that the named Plaintiffs are not "typical of most children who enter care." *Id.* at 16.

Defendants contend that Ms. Collins was not opining on commonality and typicality as legal terms of art, but in the colloquial sense.  Given that typicality and commonality are important considerations in a motion for class certification, the suggestion that Ms. Collins was speaking colloquially about those subjects in an expert report offered in opposition to just such a motion strikes the Court as far-fetched.  However, the Court will not exclude the Collins Report in its entirety but will instead exclude those portions of the Report that go beyond Ms. Collins's established area of expertise and cross into the realm of purely legal questions.

## Conclusion

For the reasons set forth above, Defendants' Motion to Exclude Expert Testimony of Dr. Wilson, Dr. Steib, Ms. Rideout, Dr. Puckett, and Dr. Day, ECF No. 114, is DENIED.  Plaintiffs' Motion to Exclude Expert Testimony of Dr. Cahill and

Ms. Collins, ECF No. 203, is GRANTED in part and DENIED in part, as set forth above.

## PART II: MOTIONS TO DISMISS AND MOTION TO CERTIFY

Plaintiffs move to certify the proposed general class and subclasses in this action. In addition to opposing Plaintiffs' motion to certify, Defendants move to dismiss the claims of many of the Named Plaintiffs on the basis that their claims are now moot.

### Legal Standards

A class action is "'an exception to usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). A plaintiff seeking class certification must affirmatively demonstrate that the requirements of Federal Rule of Civil Procedure 23(a) and (b) are satisfied. *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542 (9th Cir. 2013).

Under Rule 23(a), the plaintiff must satisfy four prerequisites: (1) numerosity, meaning that the class is so numerous that joinder of all members is impracticable; (2) commonality, meaning that there are questions of law or fact common to the class; (3) typicality, meaning that the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) that the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

After showing that each of the Rule 23(a) prerequisites is satisfied, the party seeking class certification must then establish "through evidentiary proof at least one

of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  In this case, Plaintiffs seek class certification under Rule 23(b)(2), which requires a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart*, 564 U.S. at 350.  Instead, the court conducts a "rigorous analysis" to determine whether a plaintiff has satisfied the certification standards by a preponderance of the evidence. *Id.* at 350-51.  In conducting this analysis, the court considers the pleadings and extrinsic evidence to determine whether certification is appropriate.  *See Blackie v. Barrack*, 524 F.2d 891, 900-01 (9th Cir. 1975).  Although the analysis is not primarily focused on the merits of the plaintiff's underlying claim, there is frequently some overlap.  *Comcast Corp.*, 569 U.S. at 33-34.  The Ninth Circuit has cautioned that this analysis is not in the nature of "a mini-trial" and emphasized that a court's "inquiry on a motion for class certification is tentative, preliminary, and limited."  *Sali v. Corona Reg. Medical Center*, 909 F.3d 996, 1004 (9th Cir. 2018) (internal quotation marks and citations omitted).  While merits questions are "not irrelevant to the class certification inquiry, [they] do not preclude certification as a matter of law unless proving the answer to a common question or crafting uniform injunctive relief will be impossible."  *B.K. by Tinsley v. Snyder*, 922 F.3d 957, 973 (9th Cir. 2019).

## Background

### A. The Parties

The Oregon Department of Human Services ("DHS") is an agency of the State of Oregon which has responsibility for the Child Welfare Agency ("Child Welfare"), a subdivision of DHS. Compl. ¶ 26. Child Welfare acts as DHS's agent in protecting the safety and welfare of children. *Id.* at ¶ 28.

The named Plaintiffs are youths in the custody of DHS and are housed, variously, in foster homes or in facilities contracted for by DHS. Compl. ¶¶ 17-24. Plaintiffs bring claims on behalf of themselves and on behalf of a class consisting of all children for whom DHS has or will have legal responsibility and who are or will be in the legal and physical custody of DHS (the "General Class"). *Id.* at ¶ 33(a). In addition, Plaintiffs seek to bring claims on behalf of three subclasses:

(1) Children who have or will have physical, intellectual, cognitive, or mental health disabilities (the "ADA Subclass");

(2) Children who are or will be 14 years old and older, who are eligible for transition services and lack an appropriate reunification or other permanency plan (the "Aging-out Subclass"); and

(3) Children who identify as sexual or gender minorities, including lesbian, gay, bisexual, queer, transgender, intersex, gender non-conforming, and non-binary children (the "SGM Subclass")[1].

---

[1] Plaintiffs have indicated that they prefer to use the term "Sexual and Gender Minorities" or "SGM" to refer to individuals within this sub-class, rather than LGBTQ. Compl. ¶ 15(f), n.1. The Court will apply Plaintiffs' preferred terminology in this Opinion.

**B. DHS**

The Office of Child Welfare is one of the "five key human services programs" within DHS and is administered across the state through districts and field offices covering every county in the state. Lowry Decl. Ex. 1, at 5-6.

Reports of child abuse and neglect are screened through a DHS hotline and, after review, are referred to Child Protective Services ("CPS") caseworkers for investigation. Lowry Decl. Ex. 1, at 7. If the CPS caseworker determines that abuse or neglect has occurred, the case worker may (1) decide to close the investigation because the child is safe; (2) open the case and implement an in-home safety plan; or (3) remove the child from the home. *Id.* (citing ORS 409.050 and ORS 418.005).

"Once removed, the child enters state custody and is assigned a permanency caseworker to manage and monitor the case," and "the child may be placed back in the home with a period or caseworker monitoring, though most are placed with foster families or relatives." Lowry Decl. Ex. 1, at 7. "High needs" children may "be placed in more restrictive institutional settings or behavior rehabilitative programs." *Id.* "After leaving state custody, the child may be returned to their home, become available for adoption through foster care, or enter long-term foster care or guardianship." *Id.* In selecting the placement for a child in care, the caseworker assesses whether the placement meets the child's needs for physical and emotional safety, stability, and continuity. Lowry Decl. Ex. 7, at 67-69.

The Oregon circuit courts decide "whether and how long a child stays in state custody." Lowry Decl. Ex. 1, at 7; ORS 419B.337(1). The circuit court "may specify

the particular type of care, supervision or services to be provided by the Department of Human Services to wards placed in the department's custody and to the parents or guardians of the wards, but the actual planning and provision of such care, supervision or services is the responsibility of the department." ORS 419B.337(2); *see also* ORS 419B.337(5) ("If the ward has been placed in the custody of the Department of Human Services, the court shall make no commitment directly to any residential facility, but shall cause the ward to be delivered into the custody of the department at the time and place fixed by the rules of the department.").

The role of child welfare caseworkers in the process is essential, with different types of caseworkers covering initial screening of reports, investigations, permanency management, certification of foster homes, and managing the adoption process. Lowry Decl. Ex. 1, at 8-9. A 2018 Audit of DHS by the Oregon Secretary of State found that turnover and overtime were high for DHS caseworkers, with reported caseloads three or four times the optimal numbers. Lowry Decl. Ex. 1, at 43. The workloads exacerbated staff turnover and inhibited recruitment and, in 2016, the caseworker turnover rate was 23%. *Id.* New and inexperienced caseworkers are forced to take on full caseloads and, in 2018, approximately one third of Child Welfare staff were in their first 18 months on the job. *Id.*

DHS has struggled to recruit and retain foster homes and staffing shortages within DHs have, at times, forced foster parents to take on duties normally assigned to caseworkers. Lowry Decl. Ex. 1, at 28. The number of career foster homes in Oregon declined by 55% between 2011 and 2016 as DHS shifted to recruitment of

relative foster homes. *Id.* at 29. Limited access to foster care placements has resulted in "some of Oregon's highest need children" being "moved from place to place" and sometimes ending up "housed by DHS in hotels because there is nowhere else for them to go." *Id.* at 28.

### C. Plaintiff's Allegations

The Complaint alleges that Oregon's child welfare and foster care systems are dysfunctional and plagued by systemic deficiencies. These deficiencies have been documented by the state and federal governments in a series of reviews and audits. Compl. ¶¶ 209-224. Plaintiffs allege that the problems identified in the audits have not been adequately addressed.

Plaintiffs allege that DHS fails to employ a minimally adequate number of caseworkers and that caseworkers are not provided with adequate training or support. Compl. ¶¶ 15(a), 231. Caseworkers are assigned more cases than they can manage, with little training or oversight. *Id.* at ¶ 230-31. As a result, DHS has difficulty retaining caseworkers and turnover is high. *Id.* at ¶ 232.

Plaintiffs allege that DHS has failed to provide adequate support, training, or financial compensation to foster parents. Compl. ¶¶ 15(g). DHS has also failed to recruit additional foster parents in general and particularly foster parents willing and able to care for children with disabilities. *Id.* at ¶¶ 15(g), 221.

Plaintiffs allege that DHS does not properly evaluate the needs of each child, which prevents caseworkers from planning appropriate placements. Compl. ¶¶ 15(b), 236. Children do not receive services required by their case plans, either because

DHS fails to provide the services directly, or fails to contract for those services.  *Id.* at ¶ 236.

When children are taken into custody, they are often left in temporary placements or are repeatedly moved between foster homes and institutions.  Compl. ¶ 15(c).  Children are placed in hospitals, homeless shelters, refurbished delinquency institutions, overcrowded temporary general foster care homes, or in poorly screened child-specific kith or kin foster homes.  Compl. ¶¶ 15(d), 247.  Children in DHS care experience abuse and neglect at rates much higher than national standards.  Compl. ¶¶ 251-254.

Children with disabilities are not provided with appropriate services and treatment to ensure equal access to stable, family-like foster placement in the least restrictive environment.  Compl. ¶ 15(e).  SGM children are often deprived of safe and stable placement.  *Id.* at ¶¶ 15(f), 222.  Children often remain in DHS custody for years and older children are not provided with support, skills, or resources necessary to survive on their own when they leave foster care.  *Id.* at ¶ 15(h), (i).  When those children age out of the child welfare system, they frequently end up homeless.  *Id.* at ¶ 250.

### D. Audits and Reviews of DHS

There have been a number of reviews and audits of DHS between 2016 and 2020, conducted by federal authorities, Oregon state auditors, and independent consulting agencies.  The relevant findings of these reviews are summarized below.

### 1. **2016 CFSR Review**

In 2016, the Children's Bureau, within the U.S. Department of Health and Human Services' Administration for Children and Families, issued a Child and Family Services Review for the State of Oregon. Lowry Decl. Ex. 8 (the "CFSR"). ECF No. 67-2. The purpose of the CFSR is to enable the Children's Bureau to determine the state of child welfare services, ensure conformity with federal child welfare regulations, and "assist[ ] states in enhancing their capacity to help children and families achieve positive outcomes." CFSR, at 3.

In a series of assessments of performance outcomes, the CFSR concluded that DHS was not in substantial conformity with children receiving adequate services to meet their physical and mental health needs, CFSR, at 16-17; with staff and provider training, *id.* at 20-21; with service array and resource development, *id.* at 22-23; and with the licensing, recruitment, and retention of foster parents, *id.* at 24-26.

The CFSR noted that a "shrinking pool of foster homes has led to the inability to consistently match placement options with the needs of children entering foster care." CFSR, at 5. "Due to this shortage of foster homes, placement decisions appear to be driven, at times, by foster home availability, rather than the needs of the child." *Id.* at 5-6. For caseworkers, the CFSR found that "training is not effectively preparing staff for their duties," with most surveyed respondents reporting that "they were not well-prepared for their job duties after initial training." *Id.* at 21.

### 2. 2016 Public Knowledge Report

In 2016, Oregon Governor Kate Brown commissioned an independent review of Oregon's foster care system by Public Knowledge, LLC. Lowry Decl. Ex. 9 (the "2016 Public Knowledge Report"). ECF No. 67-2. The 2016 Public Knowledge Report was released in September 2016. Among other findings, the 2016 Public Knowledge Report concluded that there was a shortage of appropriate placements, resulting in placement decisions being driven by availability, "rather than the needs of children and youth." *Id.* at 18. The Report found that Oregon's placement capacity for high-needs children was inadequate to meet demands and was shrinking. *Id.* at 20. The consequence of this shortage was "inappropriate placements leading to negative outcomes, including safety issues." *Id.* at 23. The Report noted a lack of comprehensive statewide recruitment, retention, and support for substitute care providers, "which results in inconsistent and inadequate efforts to sustain and grow placement options of all types." *Id.* at 46.

The Report also noted the importance of placing SGM youth "with substitute caregivers who understand and support them," which "enhances their safety and overall experience in care." 2016 Public Knowledge Report, at 49. However, participants in the Report's focus groups and surveys "cited instances of LGBTQ youth in a non-supportive environment being threatened by foster parents and other youth in the home, and experiencing isolation and depression resulting in self-harm and behavioral problems." *Id.* Participants reported "a lack of LGBTQ-related

training for foster parents and DHS staff, making it difficult for these children to connect to necessary services." *Id.*

The Report highlighted issues in staffing, noting that "CPS staff workloads are a critical factor affecting the quality, accuracy, and timeliness of child safety decisions," but that survey and focus groups in Oregon "universally indicated that unreasonably high caseloads and inadequate staffing across agencies in the System are the reason key safety information falls through the cracks." 2016 Public Knowledge Report, at 45. Foster parents and youth reported that "high turnover and infrequent face-to-face contact makes it difficult for children and youth to build trust with the caseworker," making it less likely that the children in care would report safety issues. *Id.* The Report noted that national standards recommended between 12 and 15 children per child welfare caseworker, but found that DHS did not track caseloads and the "activity-based workload allocation model shows DHS caseworkers as being able to complete only 83% of the needed work." *Id.* at 64.

The 2016 Public Knowledge Report made a series of recommendations, including expanding placement options; increasing non-congregate care placement alternatives for high-needs youth; adopting data-driven decision-making processes; and increasing the staff for CPS and other DHS entities. 2016 Public Knowledge Report, at 50.

### 3. 2018 Oregon Secretary of State Audit

In January 2018, the Oregon Secretary of State issued an audit of the Oregon foster care system entitled "Foster Care in Oregon: Chronic management failures and

high caseloads jeopardize the safety of some of the state's most vulnerable children."

Lowry Decl. Ex. 1 (the "2018 Audit").  ECF No. 67-1.  The 2018 Audit summarized its

key findings as follows:

> 1. DHS and Child Welfare struggle with chronic and systemic management shortcomings that have a detrimental effect on the agency's ability to protect child safety.  Management has failed to address a work culture of blame and distrust, plan adequately for costly initiatives, address the root causes of systemic issues, use data to inform key decisions, and promote lasting improvements.  As a result, the child welfare system, which includes the foster care program, is disorganized, inconsistent, and high risk for the children it serves.
>
> 2. DHS does not have enough foster placements to meet the needs of at-risk children, due in part to a lack of a robust foster parent recruitment program.  The agency struggles to retain and support the foster homes it does have within its network.  The agency also lacks crucial data regarding how many foster placements are needed and the capacity of current foster homes, inhibiting the agency's ability to fully understand the scope of the problem.
>
> 3. A number of staffing challenges compromise the division's ability to perform essential child welfare functions.  These challenges include chronic understaffing, overwhelming workloads, high turnover, and a large proportion of inexperienced staff in need of better training, supervision, and guidance.

2018 Audit, at 3.

DHS is subject to a Federal Child and Family Services Review, done

approximately every six years, which is aimed at assessing "the overall ability of the

child welfare system to serve and protect vulnerable children."  2018 Audit, at 10.

The 2018 Audit noted that "[h]istorically, Oregon has not done well on these measures

and his gotten worse over time."  *Id.*  The 2016 Review found "inconsistent application

of procedures, across the state during the investigatory process"; a "lack of follow-up

on allegations of abuse of children in foster care"; "confusing DHS investigatory rules,

policies, and processes"; and "a lack of coordination among the multiple entities responsible for responding to allegations of abuse and neglect." *Id.*

The 2018 Audit noted a steady decline in the number of career foster homes available in the state between 2011 and 2016, as well as a contraction in the number of available beds in institutional settings.  2018 Audit, at 29-31.  As a result of the loss of placement options, the 2018 Audit found that placement decisions were being made based on availability, rather than fit, and highlighted the risks of inappropriate placements for children in DHS care.  *Id.* at 32.  The 2018 Audit also found that a lack of placement options had forced caseworkers to house children in hotels and that "hoteling" children had "transitioned from a rare emergency occurrence to an increasingly accepted practice within the agency." *Id.* at 39.

As for caseworkers, the 2018 Audit found that to meet its current needs DHS would need to increase field staff positions by 35%, requiring the hiring, training, and retention of 769 additional field staff.  2018 Audit, at 43.  The 2018 Audit also highlighted its finding that DHS worker caseloads exceeded the recommended maximums.  *Id.* at 46.  Caseworkers struggled to meet "unrealistic" demands, incurring considerable overtime work.  *Id.* at 49.  Medical leaves for stress and burnout were high, with 25% of child welfare caseworkers leaving their positions in 2016.  *Id.*  Caseworkers reported suffering intimidation and bullying by DHS management, and concerns for their personal safety while on the job.  2018 *Id.* at 53.

The 2018 Audit concluded by making 24 specific recommendations for action, covering proposed improvements to DHS management; management, recruitment,

and retention of foster care homes; and to correct chronic understaffing, "overwhelming caseloads," and high turnover. 2018 Audit, at 60-63.

### 4. 2019 Oregon Secretary of State Follow-up Report

In June 2019, the Oregon Secretary of State Audits Division released a Recommendation Follow-up Report (the "2019 Report") detailing steps taken by DHS in response to the 2018 Audit. Lowry Decl. Ex. 15. The 2019 Report found that DHS had fully implemented 8 of the 24 recommendations and that it had made progress on the remaining recommendations. *Id.* at 2.

In particular, the 2019 Report found that there had been considerable turnover in DHS management following the 2018 Audit and that the new agency management had "improved staff training, data use and caseworker assistance," as well as making stronger efforts "to identify and address the concerns of field staff." 2019 Report, at 4. The 2019 Report also noted that "DHS has taken meaningful steps toward improving its culture and addressing management practices that have hampered the agency's performance for many years." *Id.* However:

> The agency also faces continued risks. Caseloads remain high and caseworker staffing is low, as is adherence to required child safety practices in the field. A new centralized abuse reporting hotline has substantial transition issues, including inexperienced workers and dropped calls . . . The agency has a long history of poorly planned and implemented initiatives that new management must overcome.
>
> Without additional staff to reduce workload, other efforts to improve culture, field staff practices, and child safety could be compromised.

2019 Report, at 4.

With respect to the recruitment and retention of foster homes, the 2019 Report noted that DHS had taken "some steps" to remediate the issues identified in the 2018 Audit, but that "the total number of foster homes has not increased since our audit." 2019 Report, at 11.  "The ongoing lack of appropriate foster placements in Oregon is a serious risk to the safety and wellbeing of children in the foster system," and that more high-needs children "are being placed in out-of-state facilities and repurposed juvenile detention facilities than in previous years."  *Id.* at 12.  As noted in the 2018 Audit, the 2019 Report found that these placement decisions continued to be "driven, in part, by declining residential treatment options in Oregon for children with high needs."  *Id.*  The 2019 Report also noted shortfalls in available placements for children with specific needs, including "children of color, [LGBTQ+] youth, and children with advanced behavioral and medical challenges."  *Id.*

### 5.  2020 Oregon Secretary of State Audit

The Oregon Secretary of State released another audit in July 2020 entitled "Oregon Can More Effectively Use Family Services to Limit Foster Care and Keep Children Safely at Home."  Joyce Decl. Ex. 1 (the "2020 Audit").  ECF No. 129-1.  The 2020 Audit noted that the Child Welfare Office's budget had increased over four successive biennia and that DHS planned to hire additional staff to reduce caseworker workloads.   2020 Audit, at 5-6.  The overall number of children entering foster care declined in the years leading up to the 2020 Audit, despite an increase in calls to the child abuse hotline and referrals for investigation.  *Id.* at 13.

However, the 2020 Audit found that many of the previously identified issues remained. The 2020 Audit noted that 41% of children in Oregon foster care had already had three or more placements as of May 2020. 2020 Audit, at 9. "Oregon places more children into foster care, children re-enter foster care at a higher rate, and wait times for services are longer than the national average," and Oregon's maltreatment recurrence rate "was more than double the national average in 2017." *Id.* at 12. The 2020 Audit reported that "long-term outcomes for foster children are relatively poor and extend well into adulthood, particularly for those who age out of the system without a permanent home," and studies found "higher rates of imprisonment, mental health disorders, unemployment, and homelessness, among other measures." *Id.* at 9.

As with the prior audit and report, the 2020 Audit found that high caseloads and turnover rates for caseworkers were a serious issue. 2020 Audit, at 20. Despite increases in staffing for DHS, the number of caseworkers still fell below national standards and DHS did not have accurate caseload data. *Id.* Although DHS hired 327 new caseworkers between February 2019 and February 2020, those gains were offset by 62 promotions and 137 caseworkers leaving the agency, reducing the net gain to only 128 new caseworkers in the field. *Id.*

### E. The Named Plaintiffs

There are ten Named Plaintiffs in this case: Wyatt B., Noah F., Kylie R., Alec R., Unique L., Simon S., Ruth T., Bernard C., Naomi B., and Norman N.

### 1.  Wyatt B. and Noah F.

Wyatt B. and Noah F. are half-brothers.  Stieb-Rideout Report, at 17.  Wyatt was born premature and suffers from a heart condition, which is controlled by medication.  *Id.* at 20.  Wyatt and Noah entered DHS care in September 2018, following numerous hotline reports alleging domestic violence, drug use, and neglect by their parents.  *Id.* at 20-22.

Between September 2018 and October 2018, Wyatt and Noah experienced "multiple moves, apparently due to DHS's lack of sufficient foster families and inability to identify a suitable relative caregiver."  Stieb-Rideout Report, at 23-24.  The brothers were returned home for trial reunification on October 4, 2018, but were returned to DHS care on November 26, 2018 after their mother failed to adhere to conditions of their return.  *Id.* at 24.  Since entering out-of-home DHS care in November 2018, Noah experienced 8 different placements and Wyatt experienced 16 different placements.  *Id.* at 18.  Records for Noah and Wyatt's placements indicate "sketchy and inconsistent" communication between and among the caseworkers and caregivers.  *Id.* at 37-38.  "No written instructions for the children's medical care were provided and the foster mother in their third placement mistakenly understood that Wyatt's heart medications were to be given to Noah."  *Id.* at 38.  The misunderstanding was not discovered until the children were moved two weeks later.  *Id.*

Wyatt and Noah are members of the proposed General Class.

### 2. Kylie R. and Alec. R.

Kylie R. and Alec R. are siblings who first came to DHS attention in May 2010 when a police officer made a hotline report that Alec, then only a few months old, had been left alone in a car by his grandmother. Stieb-Rideout Report, at 41. DHS received multiple reports concerning Alec and Kylie in 2018 and the children were taken into DHS custody in January 2019. *Id.* at 44. At the time they entered DHS care, both children tested positive for methamphetamine and each had a severe case of head lice. *Id.* Kylie and Alec had six separate placements between January 18, 2019 and February 22, 2019. *Id.* at 44-45. Kylie exhibited concerning outbursts while in foster care and, while in the care of the sixth foster home, Kylie was taken to the emergency room due to repeatedly banging her head against a door jamb. *Id.* at 46. Following this incident, Kylie was sent to a subacute treatment facility in Portland, while Alec remained with the foster family. *Id.* at 47-48. In late February, the CASA advocate assigned to Kylie and Alec made a formal complaint concerning their placement with the sixth foster home, which was not equipped to provide the level of care Kylie required, and asserted that "the foster parent had received 'no historical information about the children' and 'did not even know their last names' when they had had to take Kylie to the emergency room." *Id.* at 48. This assertion was disputed by DHS, but it was later revealed that the foster parents were not informed that the children had tested positive for methamphetamine when they entered care and that this information had similarly not been disclosed to the children's pediatrician. *Id.* at 51.

Kylie and Alec are members of the proposed General Class.

### 3. Unique L.

Unique L. was taken into DHS custody in 2009 as an infant and was in foster care from the age of six weeks to nine months, although she was later reunited with her mother. Stieb-Rideout Report, at 65, 72. In February 2016, DHS petitioned for custody of Unique and her siblings, although it did not initially take physical custody of the children and instead pursued an in-home safety plan while they remained with their mother. *Id.* at 69. Unique was placed in the Jasper Mountain SAFE Center for crisis assessment and stabilization in July 2016 after she assaulted her younger sisters. *Id.* at 77. Unique returned home but was removed for three additional crisis stays at SAFE in July and August 2016. *Id.* at 77-78. After being discharged from SAFE in August 2016, Unique was placed at a TFC foster home in Southern Oregon, some three hours from her family. *Id.* at 78. Unique was returned to her mother's care in May 2018, but conflict with her mother resulted in Unique being taken to a SAFE crisis center only days later. *Id.* at 80-81. Unique was moved to a foster home and then to a TFC overseen by Oregon Community Programs. *Id.* at 81. Unique displayed violent and destructive behavioral outbursts while in care, which resulted in her being transported to the hospital and then to a SAFE center. *Id.* at 82. The nature of these outbursts required the repeated use of holds on Unique. *Id.* Unique was transferred to a subacute crisis center in August 2018 and diagnosed with PTSD. *Id.* at 82-83. Upon discharge, DHS was unable to locate a long-term residential care placement for Unique in Oregon and she was ultimately placed at an out-of-state

facility in Montana in November 2018. *Id.* at 83. DHS became concerned by the Montana facility's use of chemical restraints, in the form of injectable Benadryl and Vistaril, on children in its care, including Unique, and abruptly returned Unique to Oregon in April 2019, where she was housed at a residential facility in Portland. *Id.* at 84-85. Between 2016 and 2019, Unique experienced 10 placements while in DHS care, 5 of which were residential treatment facilities. *Id.* at 62.

Unique is a member of the proposed General Class and of the proposed ADA Subclass.

### 4. Simon S.

Simon S. first came to DHS attention following reports by school staff expressing concerns of potential abuse in 2011. Stieb-Rideout Report, at 94. DHS took custody of Simon and his younger sister in February 2012 "based on neglect in that the parents were unable to prevent the succession of injuries which Simon had incurred." *Id.* Simon experienced significant behavioral problems at the time of the initial interventions and was enrolled in special education services based on emotional disturbance. *Id.* Simon was placed in relative foster care from February 2012 through August 2012 before being moved to a residential treatment facility. *Id.* at 93. Simon was returned to his family in December 2012. *Id.* at 95.

DHS received multiple reports of abuse and in 2014 and early 2015 and Simon returned to DHS custody in June 2015. Stieb-Rideout Report, at 96-97. Simon was eventually placed in a SAFE center where he received mental health treatment and was ready for discharge in late 2018, but DHS determined that it was not appropriate

for Simon to return home and no suitable placement could be found for him. *Id.* at 98. Simon was placed with his grandmother in March 2019, but she was unable to manage his behavioral issues and, at the time of the motion, Simon was living in a hotel with his father. *Id.* at 99.

Simon has experienced three separate episodes of time in foster care—from February to December of 2012; from June of 2015 through April of 2016; and from December of 2017 through the date of the motion. Stieb-Rideout Report, at 93-94.

Simon is a member of the proposed General Class and the proposed ADA Subclass.

### 5. Ruth T.

Ruth T. first came to DHS's attention when she was three years old due to her mother experiencing a mental health crisis. Stieb-Rideout Report, at 112-13. DHS was sporadically involved with Ruth's family between 2009 and 2015, after which contact became more frequent. *Id.* at 114. Ruth experienced behavioral issues and, by 2016, she was only attending school part time due to her behavior. *Id.* Ruth was diagnosed with oppositional defiant disorder ("ODD") and attention deficit hyperactivity disorder ("ADHD"). *Id.* at 118. Ruth and her brother were taken into DHS care in 2017 after their mother passed away from a drug overdose. *Id.* at 120-21.

Ruth was initially placed with her maternal grandparents in April 2017 but was removed from that placement after accusing her grandmother of abuse. Stieb-Rideout Report, at 129-31. Ruth was then placed in an unrelated foster home before

being removed less than a month later at the request of the foster parents based on her behavior. *Id.* at 132. Ruth was placed in a "hotel diversion" bed with a family in Eugene, Oregon but was removed when Ruth threatened the foster mother and another child with scissors and attacked another child. *Id.* Ruth was moved to Creekside Residential Care, an Oregon shelter facility that had been converted from a juvenile detention center to a residential treatment center. *Id.* Ruth's behavioral issues persisted while at Creekside and escalated to the point of law enforcement intervention and Creekside issued a thirty-day notice for her removal to DHS. *Id.* at 133. DHS was unable to find an appropriate placement for Ruth in Oregon and Ruth was placed at a residential treatment facility in Iowa which specialized in treating teenaged girls with trauma and behavioral issues. *Id.* Ruth continued to experience behavioral issues while at the Iowa facility, including threats to staff and peers. *Id.* at 134. Ruth's maternal grandparents remained engaged and supportive and, in May 2019, Ruth returned to Oregon and was placed in the care of her grandparents. *Id.* at 112.

Ruth is a member of the proposed General Class and the proposed ADA subclass.

### 6. Bernard C.

Bernard C. is a transgender youth who came to DHS attention early in his life. Stieb-Rideout Report, at 146. Bernard's family was the subject of 45 hotline reports to DHS between 2000 and 2013. *Id.* At the age of three, Bernard was placed in the care of his maternal great-grandparents, and he remained in their care until his

great-grandmother passed away when Bernard was nine years old.  *Id.* at 147.  At that point, Bernard returned to his mother's care, despite his mother's parental rights having been terminated some years earlier.  *Id.* at 147, 153.  Bernard re-entered DHS custody in 2013 at the age of ten.  *Id.* at 147.  By the age of twelve or thirteen, Bernard identified as male.  *Id.* at 148.

By the age of thirteen, Bernard was diagnosed with major depressive disorder, PTSD, reactive attachment disorder, social anxiety disorder, and emerging borderline traits.  Stieb-Rideout Report, at 148.  At the time of the motion, Bernard had experienced 19 placements of varying types.  *Id.*  In March 2016, when Bernard was twelve years old, he was placed at Creekside, an Oregon shelter facility that had been converted from a juvenile detention center to a treatment facility.  *Id.* at 159.  Creekside was an all-girls facility and Bernard, who was then alternating between identifying as male and identifying as female, struggled with the placement.  *Id.* at 159-60.

In May 2016, Bernard was placed at White Shield/Wildflowers, a girls' residential facility.  Stieb-Rideout Report, at 160.  Bernard made his gender identity known on his first day at the facility and in June 2016, Bernard filed a grievance because staff failed to refer to him as male.  *Id.*  Bernard's mental health "appears to have deteriorated greatly by this time," and he expressed suicidal ideation.  *Id.* at 160-61.  Staff noted that Bernard was unable to access transgender-related services due to "insurance barriers."  *Id.* at 161.

In February 2017, Bernard was placed at a specialized foster home for transgender youth in Grants Pass but was removed from the placement two weeks later when he made unfounded allegations of abuse against his foster mother. Stieb-Rideout Report, at 163. After several subsequent short-term placements, DHS placed Bernard at a "very LGBTQ-capable foster home," in March 2017 (Bernard's fifteenth placement since entering care in November 2013) and Bernard was able to access gender-affirming medical treatment. *Id.* In May 2017, DHS took steps to legally change Bernard's name and gender. *Id.* at 164.

Bernard's foster parents were transferred out of state and Bernard, concerned about leaving Oregon, declined to join them. Stieb-Rideout Report, at 164. Bernard was placed in another foster home in July 2017. *Id.* Following an incident at school in January 2018, Bernard was briefly hospitalized and spent three weeks in the care of the Perry Center. *Id.* at 165. In July 2018, Bernard's caseworker made efforts to locate a therapeutic or residential program for Bernard in Oregon but was unable to find a placement for Bernard. *Id.* at 166. Bernard was eventually placed at Robinswood, a temporary shelter with a "partial hospitalization" program. *Id.* Bernard was eventually admitted to a therapeutic placement through Boys and Girls Aid in December 2018. *Id.* at 167.

Between November 2013 the filing of the motion, Bernard had 21 placements and attended 10 different school. Stieb-Rideout Report, at 167.

Bernard is a member of the proposed General Class, the proposed ADA Subclass, the proposed SGM Subclass, and the proposed Aging-Out Subclass.

### 7. Naomi B.

Naomi B. entered DHS care in November 2018 after running away from home and being hospitalized. Stieb-Rideout Report, at 179-80. Initially, DHS unsuccessfully sought a therapeutic foster home for Naomi, and she was eventually placed at a youth shelter in late November 2018. *Id.* at 181. Naomi moved from the shelter to the Creekside treatment facility in December 2018. *Id.* at 182. Naomi was returned to the youth shelter, but repeatedly ran away in December 2018 and January 2019. *Id.* at 183. In late January 2019, Naomi was placed with the Youth Inspiration Program ("YIP") in Klamath Falls. *Id.* YIP was a facility "designed for delinquent youth." *Id.* at 179. Naomi was not on probation or parole and was at YIP "only because DHS has no other place to house her" while waiting approval for her to move to Idaho with her mother. *Id.* at 184. YIP used procedures such as lockdowns and strip searches even for child welfare residents like Naomi. *Id.* at 185-86.

Naomi ran away from YIP in late January 2019 and was found the next day. Stieb-Rideout Report, at 184. Naomi's treatment plan included upgrading to a crisis safety agreement after Naomi engaged in acts of self-harm. *Id.* Naomi's child welfare attorney raised complaints about conditions at YIP, which led DHS to inspect the facility and remove Naomi and all other DHS wards from YIP in late March 2019. *Id.* at 185-86.

Naomi was returned to the youth shelter but ran away in April 2019 and remained on her own for several days. Stieb-Rideout Report, at 186. Naomi was placed with a foster family, but again ran away in a matter of days. Stieb and Rideout

Report, at 186.  Another foster home placement was found for Naomi in Polk County, beginning on April 22, 2019 but Naomi ran away on May 6, 2019.  *Id.*  Naomi returned to the Polk County foster home but ran away again days later and the foster parents declined to take her back when she returned on her own.  *Id.*

Naomi returned to the youth shelter in Corvallis but ran away repeatedly. Stieb-Rideout Report, at 187.  During this period, Naomi was briefly hospitalized on a mental health hold.  *Id.*  In April 2019, DHS's request to place Naomi with her mother in Idaho was denied based on concerns about Naomi's mother.  *Id.*  Naomi was admitted a psychiatric residential treatment facility in May 2019.  *Id.* at 188. During seven months, Naomi moved approximately 16 times, including 4 emergency hospitalizations, and 7 stays in youth shelters.  *Id.* at 179.

Naomi was, at one point, prescribed anti-psychotic medication to treat hallucinations and intrusive thoughts.  Stieb-Rideout Report, at 184.  Naomi has been diagnosed with major depression, anxiety disorder, and PTSD.  *Id.* at 185.

Naomi is a member of the proposed General Class, the proposed ADA Subclass, and the proposed Aging-Out Subclass.

### 8.  Norman N.

Norman has had four separate periods of time in DHS care, although one of those periods lasted less than one week.  Stieb-Rideout Report, at 192-94, 203.  DHS was involved with Norman's siblings prior to Norman's birth and, after Norman was born, DHS received 28 reports concerning Norman or his siblings.  *Id.* at 195. Norman initially entered DHS Custody in January 2006.  *Id.*  During his time in care,

Norman experienced numerous placements including multiple placements in residential treatment facilities and with foster families. *Id.* at 192-94.

Norman showed progress while placed in a SAFE facility in 2013 and that he would benefit from a therapeutic foster care placement as the only child, rather than placement in a group home or institutional setting, which would lead to regression. Stieb-Rideout Report, at 208. Norman was discharged from the SAFE facility in June 2013, without any plan for placement. *Id.* at 209. Norman's therapist objected, noting that "it appeared that the decision to move him before firm transition plans were made was related to funding more than to Norman's mental health needs." *Id.* Norman's caseworker made dedicated efforts to secure placement for Norman but was unable to find a place for him. *Id.* at 209-10. Ultimately, Norman was placed with a regular foster home in August 2013, because "there were no beds available through therapeutic foster care programs and [Norman] was too young for most residential programs." *Id.* at 210. In the following months, Norman went through a series of foster home placements that terminated when Norman engaged in destructive and threatening behavior. *Id.* Norman was eventually hospitalized for a psychiatric assessment, but when he was ready for discharge on September 15, 2013, his DHS caseworker told hospital staff that DHS had no placement available for him and that he would be sleeping on an office couch if discharged. *Id.* at 210-11. The hospital agreed to keep him temporarily and the next day, DHS was able to locate a placement at a psychiatric residential facility. *Id.* at 211. A series of unsuccessful placements followed, and DHS sought to place Norman in a specialized treatment

facility in Idaho in 2017. *Id.* at 215. Norman's behavioral issues continued at the Idaho facility, resulting in criminal charges and Norman's discharge from the facility in June 2018. *Id.* at 216. On return to Oregon, Norman was placed in St. Mary's Home for Boys in July 2018. *Id.* While there, Norman's mother returned from out of state and engaged in treatment with Norman. *Id.* at 216-17. In July 2019, Norman was discharged from St. Mary's and was living with his mother. *Id.* at 217.

Norman has been consistently diagnosed with PTSD and ADHD, although there have been diagnoses indicating other potential mental health issues. Stieb-Rideout Report, at 203.

Norman is a member of the proposed General Class, the proposed ADA Subclass, and the proposed Aging-Out Subclass.

## **Motions to Dismiss as Moot**

Since the filing of this case, the circumstances of many of the named Plaintiffs have changed. In the case of brothers Wyatt B. and Noah F., these changes are happy ones—they have been permanently adopted and are no longer in the care of DHS. Wilson Decl., ECF No. 269. Plaintiffs Naomi B., Kylie R., Alec R., Norman N., and Ruth T., Unique L., and Simon S. have likewise left DHS care, generally through being reunited with a parent or other guardian. Blaesing Decl., ECF No. 110; Blaesing Decl., ECF No. 231. In addition, Plaintiffs Norman N., Naomi B., and Ruth T. have aged out of DHS care. Blaesing Decl. Ex. 5, at 2, ECF No. 110-5; Bennett Decl., ECF No. 185; Bennett Decl., ECF No. 222.

Defendants assert that the changed circumstances of these named Plaintiffs render their claims moot and subject to dismissal. The doctrine of standing addresses whether party invoking federal court jurisdiction has "[t]he requisite personal interest" in the outcome of the case "at the commencement of the litigation." *Blair v. Shanahan*, 38 F.3d 1514, 1519 (9th Cir. 1994) (internal quotation marks and citation omitted). The doctrine of mootness addresses whether a party's personal interest "continue[s] throughout [the litigation's] existence." *Id.* (internal quotation marks and citations omitted). In other words, "mootness [is] 'the doctrine of standing set in a time frame.'" *Id.* at 1518-19 (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)).

The doctrine of mootness requires that "an actual, ongoing controversy exist at all stages of federal court proceedings." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011). "Whether the dispute between the parties was very much alive when the suit was filed . . . cannot substitute for the actual case or controversy that an exercise of this [c]ourt's jurisdiction requires." *Id.* (internal quotation marks and citation omitted). A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome" of the litigation. *Powell v. McCormack*, 395 U.S. 486, 496 (1969). In a class action, the class claim "is not automatically moot because the named representative's claim is moot." *Kuahulu v. Emps. Ins. of Wausau*, 557 F.2d 1334, 1336 (9th Cir. 1977). "If the district court certifies a class before the plaintiff's claim becomes moot, 'mooting the putative class representative's claim will not moot the class action.'" *Slayman v. FedEx Ground*

*Package Sys., Inc.*, 765 F.3d 1033, 1048 (9th Cir. 2014) (quoting *Pitts*, 653 F.3d at 1090).

There is an exception to the normal rule of mootness, discussed above, for claims that "are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *Pitts*, 653 F.3d at 1090. "The 'inherently transitory' rationale was developed to address circumstances in which the challenged conduct was effectively unreviewable, because no plaintiff possessed a personal stake in the suit long enough for litigation to run its course." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 76 (2013).

Inherently transitory claims "will certainly repeat as to the class, either because '[t]he individual could nonetheless suffer repeated [harm]' or because 'it is certain that other persons similarly situated' will have the same complaint." *Pitts*, 653 F.3d at 1090 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975)). "Such claims are 'capable of repetition, yet evading review,' and thus do not become moot." *Slayman*, 765 F.3d at 1048 (quoting *Pitts*, 653 F.3d at 1090). In these cases, the district court may apply the "relation back" approach and certify the class even after the named plaintiff's claim becomes moot. *Pitts*, 653 F.3d at 1090; *see also Cnty. v. Riverside v. McLaughlin*, 500 U.S. 44, 51-52 (1991) (holding that even though the class was not certified until after the named plaintiffs' claims had become moot," the district court still had jurisdiction because the class claim was inherently transitory); *Sosna v. Iowa*, 419 U.S. 393, 401 (1975) (holding that the controversy "remains very

much alive for the class of persons [the named plaintiff] has been certified to represent" even if it was "no longer alive as to" the named plaintiff); *Wade v. Kirkland*, 118 F.3d 667, 670 (9th Cir. 1997) (noting that if the named plaintiff's claim is inherently transitory, then "the action qualifies for an exception to mootness *even if* there is no indication that [the named plaintiff] or other current class members may again be subject to the acts that gave rise to the claim.") (emphasis in original).

In this case, the Court is satisfied that the claims of the challenged Plaintiffs are inherently transitory. It is the nature of foster care systems that children will be in the care of the state for variable and sometimes unpredictable lengths of time, or even pass in and out of the system. On an even more fundamental level, concerning in particular the proposed Aging-out Subclass, children grow up. At a certain point, they will age out of the care of foster system. These changes in circumstances may happen before the Court has an opportunity to rule on the motion to certify the class. The injuries claimed by the challenged Plaintiffs are repeatable to the class, if not necessarily to the named Plaintiffs themselves, and the Court concludes that Plaintiff has shown that the injuries claimed by the named Plaintiffs are certain to recur on other similarly situated individuals. The Court therefore declines to dismiss the challenged named Plaintiffs' claims as constitutionally moot.

Defendants also contend that the challenged Plaintiffs should be dismissed under the doctrine of prudential mootness. "Prudential mootness is a discretionary doctrine that courts employ when a case is not moot under Article III of the U.S. Constitution, but prudence suggests the court should treat the case as moot." *Coos*

*Cnty. of Oregon v. Bernhardt*, Civ. No. 6:19-cv-00576-MC, 2020 WL 1430379, at *2 (D. Or. Mar. 23, 2020) (internal quotation marks and citation omitted).   Although, as Defendants point out, there are district court opinions from within this Circuit applying the doctrine of prudential mootness, the Ninth Circuit has made clear that it has "not adopted prudential mootness *per se*." *Maldanado v. Lynch*, 786 F.3d 1155, 1161 n.5 (9th Cir. 2015).   In *Maldanado*, the Ninth Circuit noted that "some of our sister circuits have adopted the prudential mootness doctrine," but that, in this Circuit, "we have applied prudential mootness only in the bankruptcy context when there are no assets left to distribute." *Id.* (citing *Hunt v. Imperial Merchant Servs., Inc.* 560 F.3d 1137, 1142 (9th Cir. 2009) and *Deutsche Bank Nat'l Trust Co. v. F.D.I.C.*, 744 F.3d 1124, 1135 (9th Cir. 2014)).   The implication of *Maldanado* is that dismissal based on prudential mootness is disfavored in the Ninth Circuit, but even it were not a disfavored doctrine, the Court would decline to exercise its discretion to dismiss under prudential mootness because Plaintiffs' case falls within an established exception to ordinary mootness, as discussed above.

In sum, the Court declines to dismiss the challenged Plaintiffs under the grounds of mootness, either constitutional or prudential.

### **Class Certification**

### I.    **Motion to Certify**

As discussed above, to prevail on a motion to certify a class, the plaintiffs must show that the proposed class meets the standards for (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *Gen. Tel. Co. of the*

*Nw., Inc. v. E.E.O.C.*, 446 U.S. 318, 330 (1980). Here, Plaintiffs seek to certify a General Class consisting of all children in Oregon foster care, as well as three Sub-Classes—the ADA Subclass, the SGM Subclass, and the Aging-Out Subclass.

Defendants challenge use of subclasses. Def. Resp. 45-47. Federal Rule of Civil Procedure 23 provides that "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(5). Defendants assert that the subclasses seek the same thing as the General Class and so the proposed subclasses are unnecesary. Defendants urge that the subclasses be collapsed into the General Class. The Court concludes, however, that the use of subclasses is appropriate in the present case, subject to the limitations discussed below.

### A. Numerosity

Rule 23 requires a party seeking class certification to show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). As the Supreme Court has explained, this "numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw., Inc.*, 446 U.S. at 330. "While thus eschewing any bright-line rules, the Court did go on to state that a class with only 15 members would be too small to meet the numerosity requirement." *A.B. v. Hawaii State Dept. of Educ.*, 30 F.4th 828, 835 (9th Cir. 2022) (internal quotation marks and citation omitted). "In addition to class size, courts consider other factors to determine whether joinder is impracticable, including the ease of identifying and contacting class members; the

geographical spread of class members; and the ability and willingness of individual members to bring claims, as affected by their financial resources, and their fear of retaliation in light of an ongoing relationship with the defendant." *J.N. v. Oregon Dep't of Educ.*, 338 F.R.D. 256, 264 (D. Or. 2021) (internal quotation marks and citations omitted, alterations normalized).

With respect to the proposed General Class, there are approximately 8,000 children in foster care with DHS. Day Report, at 3. There are thousands of children in Oregon foster care who fall within the proposed ADA Sub-Class. Puckett Report, at 11-12. There are at least 900 youth in foster care with DHS who meet the standards for the proposed Aging-out Subclass. Day Report, at 3. There are approximately 400 youth who fall within the proposed SGM Subclass. Wilson Report, at 8. Defendants do not challenge that the General Class or any of the Subclasses meet the numerosity requirement.

The Court concludes that the proposed General Class and all three proposed Subclasses meet the standard for numerosity.

### B. Commonality

The commonality requirement of Rule 23(a)(2) requires plaintiffs seeking class certification to show that their claims "depend upon a common contention" that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. "Plaintiffs need not show, however, that every question in the case, or even a preponderance of questions, is capable of class

wide resolution.  So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)."  *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (internal quotation marks and citation omitted, alterations normalized).  "[I]n all class actions, commonality cannot be determined without a precise understanding of the nature of the underlying claims."  *Id.* at 676.  "To assess whether the putative class members share a common question, the answer to which will resolve an issue that is central to the validity of each one of the class members' claim, [courts] must identify the elements of the class members' case-in-chief."  *B.K.*, 922 F.3d at 968 (internal quotation marks and citation omitted, alterations normalized).

"[C]lass certification is proper when class members seek to enjoin state defendants from violating their rights through statewide policies and practices of uniform application."  *J.N.*, 338 F.R.D. at 266 (citing *Parsons*, 754 F.3d at 678; *B.K.*, 922 F.3d at 968, 976-78).  In such cases, commonality exists because the statewide policies and procedures are "the 'glue' that holds the class together," such that their legality can be properly litigated in a class setting.  *B.K.*, 922 F.3d at 969.  "[E]ither each of the policies and practices is unlawful as to every [class member] or it is not," and "[t]hat inquiry does not require [the court] to determine the effect of those policies and practices upon any individual class member (or class members) or to undertake any other kind of individualized determination."  *Parsons*, 754 F.3d at 678.

When the class claims are statutory, plaintiffs can allege a common question based on statewide policies or practices that violate a relevant statute in two ways.

First, they can allege that every class member is subjected to the same statewide policy or practice that is "facially invalid, such as by directly contravening" the relevant statute. *B.K.*, 922 F.3d at 976-77. Or, alternatively, they can allege that a statewide policy or practice "expose[s] every [class member] to a significant risk of an imminent future" harm. *Id.* at 977. Under the second theory, plaintiffs may challenge the "violation before it has taken place," meaning plaintiffs do not need to show that each potential class member personally suffered a violation, "so long as the requisite 'significant risk' exists, so commonality may exist based on a finding that all class members are subjected to the same risk." *Id.*

Here, Plaintiffs assert that their claims satisfy the commonality requirement because, as in *B.K.* and *Parsons*, Plaintiffs challenge statewide policies and practices that place all members of the General Class and each of the Sub-Classes at substantial risk of harm and that, as a result, their claims are capable of resolution by a single action.

In *B.K.*, the plaintiff sought to "press two due process claims on behalf of the General Class." *B.K.*, 922 F.3d at 968. "Due process requires the state to provide children in its care reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child." *Id.* (internal quotation marks and citation omitted). "To prevail on a claim for failure to meet this duty, a plaintiff must prove that state officials acted with such deliberate indifference to the plaintiffs' liberty interest that their actions 'shock the conscience.'" *Id.* (quoting *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 844 (9th Cir. 2010)). This, in turn, requires

proof of (1) "an objectively substantial risk of harm," and (2) "the official's subjective awareness of that risk." *Id.* Subjective awareness may be proven by showing "(1) that the official was aware of facts form which an inference of risk may be drawn and that the official made that inference, (2) that the official was aware of facts from which an inference of risk may be drawn and that any reasonable official would have been compelled to draw that inference, or (3) that the risk of harm is obvious." *Id.*

Defendants assert that Plaintiffs have not demonstrated significant proof that that the state engages in any of the challenged policies with deliberate indifference and that the state has, in fact, been actively working to improve the conditions for children in care, and Defendants provide specific examples of improvement. Def. Resp. 23.

However, as Plaintiffs point out in their Reply brief, Defendants' argument conflates the requirements of commonality and typicality with a "mini-trial" on the merits. The Ninth Circuit has held that district courts err if they deny class certification based on a premature assessment of the merits of the case, "rather than focusing on whether the questions presented, whether meritorious or not, were common to the members of the putative class." *Stockwell v. City and Cnty. of San Francisco*, 749 F.3d 1107, 1113-14 (9th Cir. 2014). "Whether any of these common questions are ultimately resolved in favor of either side is immaterial at this class certification state, where we determine whether any answer that the questions could produce will drive resolution of the class' claims." *Jimenez v. Allstate Ins. Co.*, 765

F.3d 1161, 1166 n.5 (9th Cir. 2014).  Here, the focus is properly on the commonality and typicality of the claims and not on the merits of the claims themselves.

### 1. The General Class

Plaintiffs identify a number of statewide policies and practices which they allege are common to the General Class and capable of resolution in a single stroke. These alleged policies fall broadly into three general categories: (1) that Defendants have failed to provide an adequate array of appropriate placements; (2) that Defendants have failed to undertake appropriate case planning; and (3) that DHS caseworkers are chronically understaffed and assigned large caseloads.

Defendants dispute that these policies exist, but the Ninth Circuit has held that expert reports, detailed allegations in the complaint, internal documents, and the declarations of the named plaintiffs are more than sufficient to establish the existence of challenged policies at the certification stage. *Parsons*, 754 F.3d at 683. In addition, Plaintiffs allege the existence of unwritten policies or practices that operate contrary to the written policies of DHS.  Challenges to existence of "alleged informal 'policy-to-violate-the policy,'" are more "appropriately made at trial or at the summary judgment stage," as they go to the merits of the claim.  *Jimenez*, 765 F.3d at 1166 n.5.

Here, Plaintiffs have submitted expert reports detailing common DHS policy and practice failures based on a review of the Named Plaintiffs' case files; public audits and reports, including audits done by the Oregon Secretary of State; internal

DHS documents; and other materials sufficient to establish the existence of the alleged policies and practices at the certification stage.

### a. Inadequate array of appropriate placements

Plaintiffs allege that there is a severe lack of foster homes which results in children being placed in inappropriate placements, including congregate care facilities. This has also resulted in a lack of stability for placements with children often undergoing multiple placements. Plaintiffs allege that the lack of foster homes is a result of DHS's failure to prioritize the recruitment and retention of foster care providers and that DHS's written policies are at odds with its practice.

As of March 31, 2019, there were 7,260 children in Oregon foster care. Puckett Report, at 5. 32% of those children were in foster care with relatives; 40% were in non-relative foster care; 12% were in "Trial Home Visit" status, meaning that they were living with their parents or caregivers while DHS retained custody; 9% were in pre-adoptive homes; more than 5% were in group homes or institutional congregate care settings; and the remainder were in supervised independent living placements or were listed as runaways. *Id.*

As discussed in the background section, the lack of sufficient appropriate placements is a recurring feature of both internal and external audits and reviews of the Oregon foster care system. Those reports cited an urgent need for additional placements and pointed to the problem of inappropriate placements and placement instability.

Placement instability, or "excessive moves or placement changes while children and youth are in foster care," can be "jarring and disruptive to children's emotional health and may leave them anxious, fearful and unable to form and benefit from potential supportive relationships." Puckett Report, at 12. Dr. Puckett found that, of the 8,719 children who spent at least a day in Oregon foster care between October 1, 2018 and March 31, 2019, 36% experienced three or more placements and 61 of those children experienced 20 or more placements. *Id.* One child had been in 40 different placements. *Id.* Dr. Puckett attributed the issue to "the state's well-documented difficulty recruiting and retaining qualified home providers in geographic areas throughout the state," at the levels necessary to meet the numbers of children taken into care. *Id.* at 13. Dr. Puckett also noted that, in his experience, a lack of appropriate placements can result in children being placed in "inappropriately restrictive settings," such as group homes or institutional care settings. *Id.* The use of such settings on an emergency basis is "often unsustainable" and can "snowball" into successive short-term placements, with the problems attendant to such instability. *Id.*

Defendants assert that Plaintiffs have failed to show a class-wide deficiency in adequate placements. Def. Resp. 38. Defendant contend that the number of placements have been steadily increasing and, to the extent that a shortage exists, it is in the area of homes for children with complex or acute needs, like the Named Plaintiffs. Defendants argue that Plaintiffs do not provide evidence that there is a lack of appropriate placements that affect all putative class members and that

Plaintiffs have failed to show evidence of a substantial risk of harm associated with the alleged lack of placements.  Def. Resp. 39-40.

Those arguments are belied by Oregon Secretary of State Audits, which identify a lack of appropriate placements as a recurring problem for the Oregon foster care system and discuss the negative effects of placement instability and short-term emergency placement practices.  The need for more foster care homes in Oregon and the need to ensure that sufficient resources and support exist for those homes are discussed at length in the 2018 Audit, along with recommendations for remedying the problem.    In its response to the 2018 Audit, DHS agreed with the recommendations.  Lowry Decl. Ex. 1, at 72-79.

The Court concludes that Plaintiffs have made a sufficient showing of a class-wide deficiency in the availability of appropriate placement.

**b. Lack of appropriate case planning**

Plaintiffs allege that children in care are not given appropriate case plans and that DHS's practices are at odds with their written policies.   Plaintiffs contend that a substantial number of children in DHS care do not have their needs assessed and that up to 10% of children in care have no established case plan goal listed in their AFCARS data file.  Puckett Report, at 10.

Defendants respond that case planning is a highly individualized process and so the appropriateness of case plans is not an issue that is suitable to class-wide resolution and should be reserved to the state's juvenile court system.  Def. Resp. 29-

32.  And even if there is a delay in preparing a case plan, Plaintiffs have not shown that the delay exposes the children to a substantial risk of harm.  Def. Resp. 32-33.

While the propriety of a particular case plan is certainly an individualized matter, the nature of Plaintiffs' claim is that case plans are not being prepared in a timely fashion.  DHS's 2019 Annual Progress and Service Report indicated serious deficiencies in the timely preparation of case plans for most cases.  Lowry Decl. Ex. 17, at 80.  Dr. Puckett likewise found multiple instances of untimely case plans or case planes with goals "inappropriate to the facts of the case," and that these failures have implications for identifying proper placements for children in care or for the timely provision of services.  Puckett Report, at 10-11.

On this record, the Court concludes that Plaintiffs have demonstrated commonality for a lack of adequate case planning in the proposed General Class.

### c.  High caseloads and chronic understaffing

Caseworkers are assigned primary responsibility for the children in DHS care, but Plaintiffs allege that caseworkers are chronically overworked and understaffed as a result of Defendants' hiring, training, and retention policies and practices. Puckett Report, at 4-5.  Plaintiffs assert that caseloads exceed recommended levels and that caseworkers struggle to have meaningful meetings with the children in care. This causes high turnover among caseworkers and new caseworkers are required to take on full caseloads though they have not completed their training period.  Because of the central role caseworkers occupy in the child welfare process, Plaintiffs argue

that the problems of understaffing, overwork, and high turnover rates have significant consequences for children in care, including child safety.

Defendants respond that Plaintiffs have failed to show a "current" policy or practice of chronic understaffing and high caseloads.    Def. Resp. 34.    DHS substantially expanded its hiring in response to the 2018 Audit.    However, high caseloads and staff turnover, with the attendant problems of overwork and inadequate training, are a recurring feature of the audits and reviews of DHS. Understaffing and high caseloads remained a matter of concern in the 2020 Audit, which noted that the high rate of caseworker turnover substantially eroded the gains made in hiring new caseworkers.

On this record, the Court concludes that Plaintiffs have made a sufficient showing of commonality with respect to the issues of high caseloads and chronic understaffing as they relate to the proposed General Class.

## 2. The ADA Subclass

With respect to the ADA Subclass, Plaintiffs allege that the following statewide policies and practices are capable of resolution on a classwide basis:

(1) whether Defendants have deprived the ADA Subclass of necessary and appropriate services and treatment to make them able to access an array of community-based placements and services to ensure access to the least restrictive environment.

(2) whether Defendants have a practice of placing youth with disabilities in institutional settings and denying them access to community-based treatment; and

(3) whether Defendants have a practice of failing to build and maintain an adequate infrastructure of mental health providers and other therapeutic service providers capable of meeting the needs of the ADA Subclass.

Plaintiffs maintain that, despite DHS's written policies complying with state and federal law, DHS's practices fall short. As of March 31, 2019, DHS records show that approximately 6% of children in Oregon foster care have a diagnosed disability, but national studies have found that over 30% of children in child welfare programs have one or more disabilities." Puckett Report, at 11-12. Plaintiffs' experts attribute the discrepancy to "Oregon's apparent failure to consistently complete required clinical assessments on a timely basis," which makes it "likely that DHS is failing to identify and provide appropriate services." *Id*. at 12. As the audits repeatedly recognized, placement decisions are often made based on availability, rather than on the needs of the child. Children with disabilities are overrepresented in congregate care settings, experience more placements on average compared to the general population of children in care, and spend more time in care. Puckett Report, at 33, 35-36, 38-39.

Defendants respond that Plaintiffs have failed to provide evidence that the state has any policy or practice that discriminates against children because of their disabilities. Def. Resp. 44. Defendants contend that Plaintiffs' ADA claim essentially collapses into the claims for the General Class in that they argue for a lack of adequate placements, not that the existing placements are not distributed evenly. This is not, however, a challenge to Plaintiffs' showing of the existence of a common

policy or practice but is instead a premature challenge to the merits of Plaintiffs' claims. In the present case, the Court concludes that the proposed ADA Subclass is sufficiently distinct and does not collapse into the proposed General Class.

"[I]n almost every case involving a challenge under Title II of the ADA and/or Section 504 of the Rehabilitation Act to discriminatory governmental policies and practices, courts have certified a class." *Lane v. Kitzhaber*, 283 F.R.D. 587, 595 (D. Or. 2012). Here, Plaintiffs have made a sufficient showing of statewide policies and practices that expose the members of the proposed ADA Subclass to a substantial risk of harm. The Court concludes that Plaintiffs have demonstrated commonality with respect to the proposed ADA Subclass.

### 3. The SGM Subclass

For the SGM Subclass, Plaintiffs allege that Defendants have denied SGM youth the appropriate services and placements to prevent them from experiencing a higher-than-average number of foster care placements; a higher likelihood of living in a congregate care setting; and a higher incidence of violence and harassment from foster parents and peers.

Plaintiffs have presented evidence that SGM youth are overrepresented in child welfare systems, at nearly double the rate of SGM in the general population. Wilson Report, at 7. While in care, SGM youth experience higher rates of homelessness, more placements, higher rates of psychological distress, and have a greater likelihood of victimization. *Id.* at 7-8. SGM youth are, as a group, particularly "vulnerable to bias and rejection from peers, parents, and other important adults,"

and "consistently report higher rates of bullying, feeling unsafe in school, and suicidality." *Id.* at 11-12. SGM youth in foster care "have been shown to experience poor treatment within child welfare settings at higher rates than non-LGBTQ youth," and, in addition to direct reports of poor treatment, have been "found to have higher amounts of psychological distress, more placements, and experienced homelessness and victimization at the hands of peers and staff." *Id.* at 12.

Plaintiffs allege that, despite DHS's statements of respect and support for the needs of SGM children in foster care, Defendants do not know how many SGM children are in care. DHS data is based on an assumption that only 2% of children in care are SGM, Lowry Decl. Ex. 12, at 7, but Plaintiffs argue that the accurate figure is approximately 19.1%. Wilson Report, at 8. This translates into 592 SGM youth out of a total of 3,102 youth ages 13 or older who "spent at least one day in some kind of foster care," based on a 2018 DHS report. *Id.* Plaintiffs allege that DHS has a policy of not asking a child in care whether they identify as a sexual or gender minority and the decision not to identify SGM children has consequences for finding appropriate placements among the already-small number of SGM-friendly foster homes.

The 2018 Audit also noted limited availability of SGM-friendly foster homes, with only "a handful of scattered efforts" to recruit additional SGM-friendly foster placement options. 2018 Audit, at 33. Children interviewed for the 2018 Audit reported "not feeling respected or listened to and attributed this to an organizational

culture at DHS which is unwelcoming and unequipped to work with LGBTQ+ youth." *Id.*

Defendants respond that SGM individuals experience increased levels of bullying, violence, and discrimination whether they are in the care of DHS or not and that Plaintiffs "cannot litigate society's bigotry as a whole in a class action against the State." Def. Resp. 24-25. Defendants maintain that DHS has robust policies in place to ensure fair treatment of SGM children in foster care, with an entire chapter of the Child Welfare Procedure Manual devoted to the subject and that DHS provides appropriate care and services for any child who identifies as SGM. Def. Resp. 25-26.

The Court is not called upon, however, to litigate societal bigotries, but to determine whether Plaintiffs have made a sufficient showing of a subclass-wide policy or practice that exposes members of the class to a significant risk of harm. The Court concludes that Plaintiffs have met that burden on this record.

### 4. The Aging-out Subclass

For the Aging-out Subclass, Plaintiffs allege two policies giving rise to claims amenable to classwide resolution: (1) the denial of resources necessary to learn to live independently and provide them with the necessary training, skills, and assistance to secure housing upon discharge from care; and (2) the lack of support and caseworker resources to ensure that children receive transition planning for children aging out of care.

"As of 2019, nearly a quarter of transition-aged youth are placed in non-family settings such as institutions and group homes," and Plaintiffs contend that they have

presented evidence that such placements are correlated with "worse life outcomes." Day Report, at 11-12. Many such placements are considered as emergency or temporary placements and children in those temporary placements "can be moved several times per month or year," and "[e]ach move adds another layer of trauma and stress for a young person and increases the likelihood that they will experience educational, therapeutic, and/or social disruptions that ultimately impede their ability to successfully transition to adulthood." *Id.* at 13.

The national rate of permanency is twice the rate of permanency in Oregon. Day Report, at 16. "[O]nly 21% of transition-aged youth achieved permanency in Oregon in 2018," and "only 28% of children aged 15-17 achieved permanency within two years of entering state care," and that percentage declines sharply the longer a child spends in foster care. *Id.* at 15-16. Plaintiffs' experts attribute this deficiency to "outdated policies that do not include youth in the transition planning process, understaffing, limited training and supervision support for caseworkers, and a lack of emphasis on connecting youth with supportive adults before they leave care." *Id.* at 21.

In 2013, 76.9% of transition-aged children had a completed transition plan within one year, but by 2017, that rate had dropped to 38%. Day Report, at 17. Despite DHS's goal of providing mentoring services to 25% of transition-aged youth, only 8% of transition-aged youth received such services in 2017. *Id.* at 18.

Defendants respond that Plaintiffs cannot show a current policy of failing to provide transitional services to members of the proposed Aging-Out Subclass. Def.

Resp. 35-37. Defendants emphasize the substantial services available to aging-out children and point out that Plaintiffs' expert Dr. Day is not familiar with Oregon's services for aging-out youth. Defendants assert that a lack of documentation concerning the provision of aging-out services in AFCARS does not mean that those services were not provided. Further, Defendants contend that Plaintiffs cannot show that there is substantial harm associated with the failure because Oregon outperforms the national averages when it comes to outcomes for aging-out youth. This is, however, an argument addressed to the merits of the claim, rather than one aimed at the existence of a common policy or practice.

Of note, the Court has dismissed the due process claims brought by the proposed Aging-Out Subclass with respect to connection to an adult resource, independent living services, and assistance in finding permanent housing. Those dismissed claims are, plainly, not part of the Court's analysis. However, with respect to the remaining claims, the Court concludes that Plaintiffs have made a sufficient showing of statewide policies and practices which expose the members of the proposed Aging-Out Subclass to a substantial risk of harm and the Court therefore finds that Plaintiffs have made the necessary showing of commonality.

### C. Typicality

"To establish typicality, as required by Rule 23(a)(3), plaintiffs must show that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" *A.B.*, 30 F.4th at 839 (quoting Fed. R. Civ. P. 23(a)(3)). "The test of typicality is whether other members have the same or similar injury, whether

the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks and citation omitted).    The representative plaintiffs' claims should be "reasonably coextensive" with those of the absent class members but "they need not be substantially identical." *B.K.*, 922 F.3d at 969-70.    "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon*, 976 F.2d at 508.    This is a "permissive" standard. *Castillo v. Bank of Am., N.A.*, 980 F.3d 723, 729 (9th Cir. 2020).    "Because the considerations underlying the two requirements [commonality and typicality] overlap considerably, the Supreme Court has noted that the commonality and typicality requirements of Rule 23(a) tend to merge." *A.B.*, 30 F.4th at 839 (internal quotation marks and citation omitted, alterations normalized).

Plaintiffs maintain that, in the context of Plaintiffs' legal theory, the injury suffered by each of the Named Plaintiffs is the same—the exposure to a substantial risk of harm by DHS policies and practices.    None of the injuries suffered by the Named Plaintiffs are unique in that respect.

Defendants assert that the Named Plaintiffs are not typical because they are not statistically representative of the children in foster care and that they represent the most challenging type of cases that come before child welfare agencies.  Def. Resp. 15-16.  This is not, however, the nature of the typicality inquiry in the context of Rule 23.  "Typicality" refers, as previously noted, to whether the claims and defenses of the

representative parties are typical, or "reasonably co-extensive" with those of the absent class members. *Castillo*, 980 F.3d at 729. It does not require that the claims or defenses be "substantially identical," nor does it require that the Named Plaintiffs be factually identical to the absent members of the class or that they be, as Defendants suggest, statistically representative of the proposed class. For example, Defendants' arguments that the Named Plaintiffs are too few in number, or that they are not geographically representative of the children in DHS care are irrelevant for purposes of determining whether their claims and defenses are "typical" of the class when, as here, the Named Plaintiffs are seeking to challenge statewide policies and procedures.

Similarly, Defendants' arguments concerning whether the individual Named Plaintiffs have suffered harm from the challenged policies or whether the majority of children in DHS care suffer from those policies is not determinative of the typicality inquiry. The Ninth Circuit has observed that there is a difference between a claim that a plaintiff has "already suffered harm and a claim that he has been exposed to a substantial risk of serious harm." *Parsons*, 754 F.3d at 677. In this case, Plaintiffs have based their claims on the substantial risk of harm stemming from the challenged policies and practices and there is no requirement that the Named Plaintiffs demonstrate that they have each individually be harmed by those policies.

With respect to the challenged policies, Defendants assert that each of the Named Plaintiffs has a case plan and so they cannot be typical of an alleged failure to provide a case plan; that they cannot be typical of a failure due to high caseloads

or understaffing because the Named Plaintiffs received good care from their caseworkers; and that they cannot be typical of inadequate placement options due to the challenging nature of their cases.

In the case of Plaintiff Bernard C., Defendants assert that he cannot be typical of the SGM subclass because he was not harmed by a failure of DHS to identify him as SGM and to provide specialized services accordingly. Likewise, Defendants argue that Plaintiffs Naomi B., Norman N., Bernard C., and Ruth cannot be typical of the Aging-Out Subclass because they have received transition services and referrals for independent living skills.

And in the case of the proposed ADA Subclass, Defendants contend that each of the Named Plaintiffs has an adequate case plan and that none assert a lack of assessment or diagnosis for disability. Further, that Plaintiffs' experts have not identified any disability-related services that the Named Plaintiffs needed but did not receive.

Defendants focus on the specific facts of the Named Plaintiffs' cases, rather than on whether their *claims* are typical of the absent class members. As the Ninth Circuit has observed, there is a difference "between a claim that an inmate has already suffered harm and a claim that he has been exposed to a substantial risk of harm," and the "correct issue for consideration" is whether the defendants "were subjectively aware of a serious *risk* of substantial harm," rather than whether the plaintiff has already suffered the harm in question. *Parsons*, 754 F.3d at 677 (internal quotation marks and citation omitted, emphasis in original). The "remedy for unsafe

conditions need not await a tragic event." *Id.* (internal quotation marks and citation omitted).

Here, Plaintiffs do not seek to certify a class that has already suffered specific categories of harm, such as "all youth who were denied a timely case plan" or "all youth who were harmed by chronic understaffing," but instead seek to certify a General Class of all children in Oregon foster care based on their common exposure to the substantial risk of harm as a result of the challenged policies and practices. Plaintiffs have demonstrated that the challenged policies and practices exist and that they expose children in foster care to harm. As such, the Named Plaintiffs' claims are typical of those of the proposed General Class. The claims of the proposed Subclasses—ADA, SGM, and Aging-out—are similarly based on statewide policies and practices and Plaintiffs have made a sufficient showing that the challenged policies exist and that the policies exposed both the Named Plaintiffs and the absent class members to a substantial risk of harm.

Accordingly, the Court concludes that Plaintiffs have made a sufficient showing of typicality as to the proposed General Class and all three proposed Subclasses.

### D. Adequacy of Representation

Plaintiffs in putative class actions must also show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy turns on two questions: (1) whether "the named plaintiffs and their counsel have any conflicts of interest with other class members," and (2)

whether the named plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the class[.]"  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Wal-Mart*, 564 U.S. at 338.  "The adequacy requirement is based on principles of constitutional due process; accordingly, a court cannot bind absent class members if class representation is inadequate."  *J.N.*, 338 F.R.D. at 273 (citing *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940)).  Where there are multiple proposed class representatives, a court need only find that one is an adequate class representative.  *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 961 (9th Cir. 2009).

Here, Plaintiffs do not seek monetary relief and are focused instead on declaratory and injunctive relief.  The Named Plaintiffs do not have any demonstrated conflicts of interest with the other class members and Plaintiffs have demonstrated that they will prosecute this action vigorously on behalf of the class. The Court therefore concludes that Plaintiffs are adequate class representatives.[2]

### E. Rule 23(b)(2)

Certification under Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  This Rule is satisfied where plaintiffs have

---

[2] Defendants contend that several of the Named Plaintiffs' next friends are inadequate.  Def. Resp. 49.  This is an issue separate and distinct from the Named Plaintiffs' adequacy for purposes of Rule 23(a).  The Court will invite the parties to submit briefing on the adequacy of the next friends of the Named Plaintiffs and will resolve that issue separately from the question of class certification resolved by this Order.

described the general contours of an injunction that (1) "would provide relief to the whole class," (2) "that is more specific than a bare injunction to follow the law," and (3) that can be given greater substance and specificity at an appropriate stage in the litigation through fact-finding, negotiations, and expert testimony." *B.K.*, 922 F.3d at 972.

> The key to the (b)(2) class is the *indivisible* nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful *only* as to all of the class members or as to none of them . . . In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.

*Wal-Mart*, 564 U.S. at 360 (emphasis added, internal quotation marks and citation omitted).

The Rule 23(b)(2) "inquiry does not require an examination of the viability or bases of the class members' claims for relief . . . and does not require a finding that all members of the class have suffered identical injuries." *Parsons*, 754 F.3d at 688. "The fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2)." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010). Rule 23(b)(2)'s requirements "are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons*, 754 F.3d at 688.

The Ninth Circuit has found Rule 23(b)(2) met in civil rights actions brought by foster children challenging statewide child welfare policies and practices. *B.K.*, 922 F.3d at 971.

Plaintiffs assert that the General Class and each Subclass requests an "indivisible" injunction, rather than relief that would entitle each individual class member to receive their own injunction, which satisfies the requirements of Rule 23(b)(2), as set forth in *B.K.*, 922 F.3d at 971.

Defendants dispute the suitability of the claims to class-wide resolution, arguing that Plaintiffs are in effect seeking thousands of individualized determinations. The Court concludes, however, that Plaintiffs are not asking for individualized determinations as part of this litigation but are instead challenging Defendants' systemic failure to perform the determinations as part of the child welfare process and seek to remedy that failure through class-wide injunctive relief. The Court concludes that Plaintiffs have met the requirements of Rule 23(b)(2).

## II.    Appointment of Class Counsel

Rule 23(g) provides that "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). In appointing counsel, the court must consider: (1) "the work counsel has done in identifying or investigating potential claims in the action;" (2) "the counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (3) counsel's knowledge of the applicable law; (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). Courts may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B); *see also* Fed. R. Civ. P. 23(g)(4) ("Class counsel must fairly and adequately represent the interests of the class."). "Adequate

representation is usually presumed in the absence of contrary evidence." *Californians for Disability Rights, Inc. v. California Dep't of Transp.*, 249 F.R.D. 334, 349 (N.D. Cal. 2008).

The proposed class counsel in this case consists of attorneys from A Better Childhood, Davis Wright Tremaine, and Disability Rights Oregon. Stensen Decl. ECF No. 66. Counsel have more than demonstrated their ability, experience, and knowledge in matters related to the complex areas of litigation implicated by this case, including class actions, foster care litigation, disability rights, and constitutional rights litigation. The Court concludes that the proposed class counsel will fairly and adequately represent the interests of the proposed class and subclasses and so will grant the proposed request to appoint class counsel.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Exclude Experts, ECF No. 114, is DENIED.  Plaintiff's Motion to Exclude Experts, ECF No. 203, is GRANTED in part and DENIED in part.  Defendants' Motions to Dismiss as Moot, ECF Nos. 109, 230, 232, 252, 253, are DENIED.

Plaintiffs' Motion to Certify, ECF No. 64, is GRANTED.  This action shall proceed as a class action with one General Class and three Subclass: the ADA Subclass, the SGM Subclass, and the Aging-out Subclass.

Membership in the General Class is as follows: All children for whom the Oregon Department of Human Services ("DHS") has or will have legal responsibility and who are or will be in the legal or physical custody of DHS.  The following Named Plaintiffs are appointed as Class Representatives for the General Class: Wyatt B., Noah F., Kylie R., Alec R., Unique L., Simon S., Ruth T., Bernard C., Naomi B., and Norman N.

Membership in the ADA Subclass is as follows: All members in the General Class who have or will have physical, intellectual, cognitive, or mental health disabilities.  The following Named Plaintiffs are appointed as Class Representatives for the ADA Subclass: Bernard C., Naomi B., Unique L., Ruth T., Norman N., and Simon S.

Membership in the SGM Subclass is as follows: All members of the General Class who identify as sexual or gender minorities, including lesbian, gay, bisexual, queer, transgender, intersex, gender non-conforming, and non-binary children.

Named Plaintiff Bernard C. is appointed as Class Representative for the SGM Subclass.

Membership in the Aging-Out Subclass is as follows: All members of the General Class who are or will be 14 years old or older, who are eligible for transition services and lack an appropriate reunification or permanency plan. The following Named Plaintiffs are appointed as Class Representatives for the Aging-Out Subclass: Bernard C., Naomi B., Norman N.

The Court appoints attorneys from A Better Childhood, attorneys from Disability Rights Oregon, and the law firm Davis Wright Tremaine LLP as co-counsel for the certified General Class and each of the three certified Subclasses.

It is so ORDERED and DATED this ____17th____ day of August 2022.

_/s/Ann Aiken_____
ANN AIKEN
United States District Judge