Steven Rizzo, OSB 840853
Mary D. Skjelset, OSB 075840
Rizzo Bosworth Eraut, PC
1300 SW Sixth Avenue, Suite 330
Portland, OR 97201
Tel: (503) 229-1819
Fax: (503) 229-0630
srizzo@rizzopc.com
mskjelset@rizzopc.com

ATTORNEYS FOR PLAINTIFFS

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| WYATT B. and NOAH F. by their next friend Michelle McAllister; KYLIE R. and ALEC R. by their next friend Kathleen Megill Strek; UNIQUE L. by her next friend Annette Smith; SIMON S. by his next friend Paul Aubry; RUTH T. by her next friend Michelle Bartov; BERNARD C. by his next friend Ksen Murry; NAOMI B. by her next friend Kathleen Megill Strek; and NORMAN N. by his next friend Tracy Gregg, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>TINA KOTEK, Governor of Oregon in her official capacity; FARIBORZ PAKSERESHT, Director, Oregon Department of Human Services in his official capacity; APRILLE FLINT-GERNER, Director, Child Welfare in her official capacity; and OREGON DEPARTMENT OF HUMAN SERVICES,<br><br>    Defendants. | CASE NO. 6:19-cv-00556-AA<br><br><br>DECLARATION OF STEVEN RIZZO IN SUPPORT OF MOTION TO EXCLUDE STACEY L. MOSS |

1 – DECLARATION OF STEVEN RIZZO IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE STACEY L. MOSS



I, Mr. Steven Rizzo, declare as follows:

1. On behalf of Plaintiffs in the above-captioned matter, I have personal knowledge and make this Declaration in support of Plaintiffs' Motion to Exclude Stacey L. Moss

2. Attached as Exhibit 1 is a true and accurate copy of relevant pages from the March 18, 2024 deposition of Stacey L. Moss.

3. Attached as Exhibit 2 is a true and accurate copy of the Public Knowledge LLC home webpage.

4. Attached as Exhibit 3 is a true and accurate copy of Public Knowledge LLC Programs webpage.

5. Attached as Exhibit 4 is a true and accurate copy of the September 13, 2016 Oregon Department of Human Services Child Safety in Substitute Care Independent Review.

6. Attached as Exhibit 5 is a true and accurate copy of the Expert Witness Contract between Public Knowledge, Markowitz Herbold PC, and the Oregon Department of Administrative Services.

7. Attached as Exhibit 6 is a true and accurate copy of a Markowitz Herbold PC Legal Standards Memo, which is undated and unsubscribed.

8. Attached as Exhibit 7 is a true and accurate copy of the September 17, 2021 correspondence sent by Public Knowledge LLC Program Manager Allison Olson to Mr. Vivek Kothari and attached Assessment Methodology / Protocols for Markowitz Herbold PC.

9. Attached as Exhibit 8 is a true and accurate copy of the December 15, 2023 Oregon Child Welfare Draft Assessment Findings Report to Markowitz Herbold PC.

10. Attached as Exhibit 9 is a true and accurate copy of Stacey Moss's curriculum vitae.

11. Attached as Exhibit 10 is a true and accurate copy of the National Association of Counsel for Children Standards for Child Welfare Law Attorney Specialty Certification.

2 – DECLARATION OF STEVEN RIZZO IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE STACEY L. MOSS


RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

12. Attached as Exhibit 11 is a true and accurate copy of the cover page of the This is Me podcast webpage prepared by Stacey Moss.

13. Attached as Exhibit 12 is a true and accurate copy of the January 8, 2020 GLI Group's announcement acquiring Public Knowledge LLC.

14. Attached as exhibit 13 is a true and accurate copy of Public Knowledge LLC's March 1, 2024 Supplemental Assessment of Services for Youth Aging out of Foster Care for Markowitz Herbold.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: April 9, 2024

RIZZO BOSWORTH ERAUT PC

By: /s/ Steven Rizzo

3 – DECLARATION OF STEVEN RIZZO IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE STACEY L. MOSS



```
 1
 2                    UNITED STATES DISTRICT COURT
 3                      DISTRICT OF OREGON
 4                       EUGENE DIVISION
 5   WYATT B. and NOAH F. by their      )
     next friend Michelle McAllister;   )
 6   KYLIE R. and ALEC R. by their      )
     next friend Kathleen Megill        )
 7   Strek; UNIQUE L. by her next       )
     friend Annette Smith; SIMON S. by  )
 8   his next friend Paul Aubry;        )
     RUTH T. by her next friend         )
 9   Michelle Bartov; BERNARD C. by     )
     his next friend Ksen Murry; NAOMI  )
10   B. by her next friend Kathleen     )
     Megill Strek; and NORMAN N. by     )
11   his next friend Tracy Gregg,       )
     individually and on behalf of all  )
12   others similarly situated,         )
                        Plaintiffs,     )
13            vs.                       )  No. 6:19-cv-00556-AA
     TINA KOTEK, Governor of Oregon in  )
14   her official capacity; FARIBORZ    )
     PAKSERESHT, Director, Oregon       )
15   Department of Human Services in    )
     his official capacity; APRILLE     )
16   FLINT-GERNER, Director, Child      )
     Welfare in her official capacity;  )
17   and OREGON DEPARTMENT OF HUMAN     )
     SERVICES,                          )
18                        Defendants.   )
19
20                  VIDEO-RECORDED DEPOSITION
21                            OF
22                      STACEY L. MOSS
23   DATE TAKEN:  March 18, 2024
     TIME:        9:00 a.m.
24   PLACE:       1455 S.W. Broadway, Suite 1900
                  Portland, Oregon
25
        COURT REPORTER:  Teresa L. Rider, CRR, RPR, CCR, CSR


                                            Page 1
```

```
 1          A.   Zachary Kastelic.

 2          Q.   How do you spell the last name?

 3          A.   I don't actually know the spelling.  I can look

 4     it up, but I don't know it off the top of my head.  It's

 5     with a K.                                          09:27:22

 6          Q.   Okay.  And in Cheyenne or --

 7          A.   No.  Actually, he's in Kansas City, Missouri.

 8          Q.   With what firm, do you know?

 9          A.   He's inside general counsel for GLI Capital

10     Group, which is the investment holding company that owns  09:27:35

11     PublicKnowledge.

12          Q.   Gaming Labs, International?

13          A.   No.  It's GLI Capital Group.  Gaming Labs is

14     one company that they own.

15          Q.   So GLI is the holding company?           09:27:47

16          A.   Uh-huh.

17          Q.   We'll talk about that in a bit.

18               Have you ever had your deposition taken before?

19          A.   Not in a very long time, no.

20          Q.   When were you deposed previously?        09:27:59

21          A.   In a couple of family law cases early on in my

22     career when I was practicing and representing kids and

23     doing family law.

24          Q.   And why were you deposed as in what type of

25     case?                                              09:28:16
```

Page 7

```
1          A.  It was in a divorce case based on my work as a

2      guardian ad litem in an underlying abuse and neglect

3      case.

4          Q.  Have you ever testified as an expert witness?

5          A.  I have not.                                  09:28:28

6          Q.  So you've never testified as an expert witness

7      in a court of law; is that right?

8          A.  Correct.

9          Q.  And same thing, you've never testified or been

10     sworn as a witness in front of a legislative body?      09:28:41

11         A.  We have reported to legislature but not sworn

12     in, no.

13         Q.  Same thing with a municipal or other public

14     body?

15         A.  Correct.                                        09:28:54

16         Q.  And I want to just ask you some background

17     questions.

18             Are you married?

19         A.  No, I am not.

20         Q.  Are you divorced?                              09:29:02

21         A.  Yes.

22         Q.  And what was your husband's name?

23         A.  Matthew Obrecht.

24         Q.  O-b-r-e-c-h-t?

25         A.  Correct.                                        09:29:14
```

Page 8

```
 1          Q.  Is he a lawyer?

 2          A.  He is.

 3          Q.  And where does he practice?

 4          A.  He runs the legislative service office for the

 5     State of Wyoming.                                    09:29:25

 6          Q.  So anyone from Wyoming, I always ask, do you

 7     know Jerry Spence?

 8          A.  I do.

 9          Q.  Did your husband have an internship or a

10     clerkship with his firm at any time?                 09:29:35

11          A.  With Jerry Spence's firm?

12          Q.  Uh-huh.

13          A.  No.

14          Q.  Too bad.

15              So how do you know Jerry Spence or how did you   09:29:41

16     know?

17              MR. KOTHARI:  Object, relevance.

18              THE WITNESS:  He's well known, and I actually

19     worked for the Trial Lawyer's Group.  I interned with the

20     Trial Lawyer's Group that he ran.                    09:29:56

21     BY MR. RIZZO:

22          Q.  I see from your CV in the report you have kids.

23     What are their ages?

24          A.  I have three kids:  a daughter who's five; a

25     son who's 13; and my oldest son who is 16.           09:30:09
```

Page 9

1      Q.  Have you had any experience with your family

2    vis-à-vis the foster care system?

3      A.  No.

4      Q.  Have you ever fostered any children?

5      A.  No.                                        09:30:24

6      Q.  And where did you go to school to get your

7    undergraduate?

8      A.  I graduated from the University of Northern

9    Colorado in Greeley, Colorado.

10     Q.  And what was your area of focus?            09:30:37

11     A.  Bachelor of Arts in sociology with a minor in

12   legal studies.

13     Q.  Did you take any classes or have coursework in

14   child psychology?

15     A.  No.                                         09:30:50

16     Q.  How about in any type of a science, science

17   methods?

18     A.  Statistical courses.

19     Q.  Tell me about those.  What statistical courses?

20     A.  I don't recall, unfortunately, it's been a    09:31:02

21   while.

22     Q.  I had, for example, Intro to Statistics.

23         Did you go beyond that?

24     A.  Yes.  I had multiple statistics courses, but I

25   don't recall.                                      09:31:14

                                              Page 10

```
 1          Q.  In your work at PublicKnowledge, do you

 2     regularly deal with or compute statistical information?

 3          A.  I definitely work with our data team.  I have a

 4     data team, but I do work with them and help provide

 5     leadership to them in data, especially around childcare.   09:31:33

 6          Q.  I'm talking about applying statistical methods

 7     to a study.

 8             Do you do that?

 9          A.  Yes, with our team.

10          Q.  Tell me about that.                              09:31:45

11          A.  Yeah.  So we do assessment work in lots of

12     different states, and so -- and we use data for that

13     work.

14          Q.  Okay.  Well, for example, do you compute

15     confidence intervals with respect to the state that       09:31:59

16     you're talking about?

17          A.  No, that's other people.

18          Q.  Other people at PublicKnowledge?

19          A.  Correct.

20          Q.  Who is in charge of that at PublicKnowledge?     09:32:07

21          A.  We have a team that does that.  We're a pretty

22     flat organization so there's no kind of middle management

23     between me and that team.

24          Q.  Who is the leader of that?

25          A.  It's a group of people.                          09:32:21
```

Page 11

```
1          Q.   Who's, like, the most responsible person?

2          A.   The one applicable to this work is Susan Smith.

3     She assisted and has been involved recently.

4          Q.   And what is Susan Smith's background?

5          A.   She's a researcher.  She is a doctorate        09:32:36

6     researcher, spent 16-plus years at Casey doing data work

7     and running the data time.

8          Q.   What is Casey?

9          A.   Casey Family.

10         Q.   C-a-s-e-y?                                      09:32:54

11         A.   Yes.

12         Q.   Did you take any courses in social work?

13         A.   Sociology and related, but, no, not that I can

14    recall.

15         Q.   And you don't have a degree in statistics or   09:33:08

16    statistical analysis, right?

17         A.   I do not.

18         Q.   How about did you take any classes in survey

19    research methods?

20         A.   I do not recall.                                09:33:20

21         Q.   And when did you graduate from University of

22    Northern Colorado?

23         A.   2002.

24         Q.   And then you went to law school when?

25         A.   I started in 2003 and graduated in 2006.        09:33:31
```

Page 12

```
 1        Q.  And did you have a particular area of focus?

 2        A.  No.  I was focused on family law, public

 3   defense, child welfare, but it was a general law degree.

 4        Q.  I got a little low on ink here.

 5        (Last answer read.)                        09:34:10

 6   BY MR. RIZZO:

 7        Q.  What courses did you take in law school dealing

 8   with family law and child welfare?

 9        A.  We had a family law course that I took.  There

10   was one on domestic violence and there was also one on    09:34:34

11   children and the law.  And then I also ran our clinic

12   that focused on domestic violence, child welfare and

13   family law.

14        Q.  And then did you go into private practice

15   following graduation?                                      09:34:56

16        A.  I did.

17        Q.  And where did you go to work?

18        A.  In Laramie, Wyoming, for Corthell & King.

19   Corthell, which starts with a C, and King.

20        Q.  And what was that firm's practice, mainly?       09:35:06

21        A.  Very general law.  Mine focused on family law

22   and child welfare, but I did some other work, as well.

23        Q.  What work in child welfare -- I looked back

24   through some of your biographical materials -- what work

25   did you do in child welfare in the Corthell firm?         09:35:25
```

Page 13

```
 1          A.   There I represented both parents and children

 2     in juvenile court.

 3          Q.   Cases?

 4          A.   Both abuse and negligent and juvenile.

 5          Q.   We call that dependency here in Oregon.        09:35:38

 6               So you had both criminal or quasi-criminal with

 7     respect to delinquency?

 8          A.   Yes, quasi.  It was in our juvenile court

 9     still.

10          Q.   How long did you do that type of work while you  09:35:50

11     were at that firm?

12          A.   I'm relying on memory here, but I think I was

13     there for less than a year before I went to the Attorney

14     General's office.

15          Q.   For the state of Wyoming?                       09:36:01

16          A.   Correct.

17          Q.   I did a little background.  It looks like you

18     were associated with three appeals in the state of

19     Wyoming.

20          A.   Uh-huh.  I think more than that.  But at the    09:36:10

21     time, I was at the Attorney General's office, yes.

22          Q.   I just got through that through Lexus Nexus.

23     One of them was KH v Wyoming Department of Family

24     Services.

25               Do you recall that?                             09:36:24
```

Page 14

```
 1        A.  I do not.

 2        Q.  All I know at the moment it was a TPR involving

 3   mother in 2007.

 4        A.  Uh-huh.

 5        Q.  That's termination of parental rights?        09:36:32

 6        A.  Correct.

 7        Q.  You were representing the State to terminate

 8   mother's rights?

 9        A.  Correct.  I was on the team that did TPR work

10   for the State.                                         09:36:43

11        Q.  And do you remember anything about that case,

12   like, the impact on the family or the child?

13        A.  I do not.

14        Q.  Then I see you were involved with JA v State,

15   otherwise known as In Re: DSB, in 2008, do you remember 09:36:57

16   that?

17        A.  No.

18        Q.  It looked like it was an adjudicatory hearing

19   regarding the timeliness of the filing of a neglect

20   petition.                                              09:37:08

21        Bring anything back?

22        A.  It does not.

23        Q.  Do you remember what side you were on at that

24   time?

25        A.  When I was there, I was representing the       09:37:12
```

Page 15

1    there sometimes will be a delay or I may not hear about

2    it.

3        Q.   So in other words, there would be times where

4    there was abuse or neglect, but you were not informed.

5        A.   Correct.  And maybe not timely, either.        09:40:53

6        Q.   And did that impact, at least from time to

7    time, your ability to represent the stated interests of

8    the children?

9        A.   It would depend probably on the client.  Most

10   of the time, I was in conversations with those clients,   09:41:06

11   so I was getting information from them, as well.

12       Q.   Was that type of information, for example,

13   whether a child's abused or neglected in care, was that

14   important for you to know what the necessary services and

15   treatment plan would be?                                  09:41:31

16       A.   Definitely part of understanding my client,

17   yes.

18       Q.   I see that you had a -- I'll move through this

19   in chrono.  I just want to park for a minute.

20            I see what you have is a child welfare law      09:41:48

21   expert credential.  Can you explain to me what that is?

22       A.   It's from the National Association of Counsel

23   for Children, NACC, and it's an extra certification.  You

24   go through training.  You show evidence of actually

25   practicing in child welfare law and then you take an      09:42:06

                                                   Page 19

```
 1    exam.  And if you pass it, you get that certification.

 2    And then it's recertified, I believe, every four or five

 3    years.  I don't remember the exact timing.

 4        Q.  And do you continue to renew your

 5    certification?                                       09:42:23

 6        A.  I do.

 7        Q.  And each time you renew, do you have to take

 8    the test again?

 9        A.  No.

10        Q.  So once you qualify, you're able to renew.    09:42:29

11        A.  You have to show training, work in child

12    welfare, substantive work in child welfare in order to

13    continue to keep that certification.

14        Q.  So what would be your substantive work in child

15    welfare law?                                         09:42:45

16        A.  The work that I'm doing at PublicKnowledge over

17    the last 11 years.  That's been what it is for the last

18    11 years.

19        Q.  So you can work for a management consulting

20    firm that deals with child welfare issues and still    09:42:56

21    maintain your certification?

22        A.  You can show policy work that -- policy,

23    training, right, work in the field.  It's not necessarily

24    direct representation that does qualify.

25        Q.  And if I understood it, for purposes of that   09:43:13
```

Page 20

```
 1         Q.  In connection with one of these reports you had

 2    written for the court?

 3         A.  Correct.

 4         Q.  Beyond that, beyond the issuance of those

 5    opinions that were required, I presume by Wyoming      09:44:56

 6    procedure, have you ever given an opinion in a court of

 7    law on a legal standard?

 8         A.  No.

 9         Q.  Have you ever appeared a federal civil rights

10    case?                                                  09:45:13

11         A.  I have not.

12         Q.  Have you ever appeared in federal court?

13         A.  No.

14         Q.  Are you a member of any federal bar

15    association, like, for the District of Wyoming, for    09:45:24

16    example?

17         A.  I am not.

18         Q.  Are you a member of any federal legal society?

19         A.  No.

20         Q.  And I take it then, based on what I just asked 09:45:33

21    you, you never litigated a substantive due process claim

22    under the 14th Amendment, right?

23         A.  No.

24         Q.  So therefore, I take it you're not claiming to

25    be an expert on 14th Amendment substantive due process. 09:45:48
```

Page 22

```
 1          A.  I am not.

 2          Q.  Have you ever litigated an American With

 3     Disabilities Act case or claim?

 4          A.  Not that I can recall.

 5          Q.  Have you ever litigated a claim under the Child   09:46:06

 6     Welfare Act?

 7          A.  In --

 8          Q.  Federal?

 9          A.  No.

10          Q.  You were about to say state.                      09:46:17

11          A.  In state or federal, yes.

12          Q.  So under the Wyoming Child Welfare Law, did

13     that adopt or was it substantially similar to the federal

14     law?

15          A.  It's similar to the ACS.                          09:46:29

16          Q.  And in what ways?

17          A.  I could not recall at the moment.

18          Q.  Have you ever litigated under -- a claim under

19     the Adoption and Safe Families Act?

20          A.  No.                                               09:46:45

21          Q.  Do you claim to be a legal expert in that, in

22     ASFA?

23          A.  I understand ASFA and have trained on ASFA

24     multiple times, but not in a court context.  I've not

25     litigated in a court context in ASFA.                      09:46:58
```

Page 23

```
1          Q.  So in this case, are you claiming to be an
2     expert in this area?
3          MR. KOTHARI:  Objection, calls for a legal
4     conclusion.
5     BY MR. RIZZO:                                      09:47:07
6          Q.  You can answer.
7          A.  Yeah.  Again, it's a law that I know well and
8     train on.  That's about all I can say.
9          Q.  I'm going to have to ask you if you can just
10    try to give me a yes or no.                         09:47:16
11         MR. KOTHARI:  Objection, I don't think that
12    that is required.  The witness is allowed however she
13    wants.
14    BY MR. RIZZO:
15         Q.  That's fine, but my question stands.        09:47:24
16         Are you claiming to be a legal expert in this
17    case for purposes of the Child Welfare Act?
18         MR. KOTHARI:  The same objections.
19         THE WITNESS:  I thought you were asking about
20    ASFA.  I'm confused now on your question.            09:47:37
21    BY MR. RIZZO:
22         Q.  Let's go to ASFA.  Are you claiming to be a
23    legal expert to give opinions with respect to the
24    application of that law for purposes of this case?
25         A.  No.                                         09:47:48
```

Page 24

Exhibit 1
Page 15 of 52

```
 1          Q.  Have you ever been employed as a public policy

 2     analyst?

 3          A.  No.

 4          Q.  Have you ever worked for a child welfare

 5     agency?                                              09:48:01

 6          A.  I've represented them.  I was their attorney in

 7     Wyoming when I worked for the Attorney General's office.

 8          Q.  Have you ever been a caseworker?

 9          A.  No.  I've represented them, but I have not done

10     that.                                                09:48:20

11          Q.  And you've never been a certifier of homes,

12     correct?

13          A.  Correct.

14          Q.  And you've never been a CPS, Child Protective

15     Services, type investigator?                         09:48:29

16          A.  Represented them, but I have not done their

17     job.

18          Q.  Have you ever written any child welfare

19     policies?

20          A.  I have.                                     09:48:37

21          Q.  Well, tell me about that.  What's your

22     experience?

23          A.  I've written them both in Wyoming at the

24     Attorney General's office.  Part of my representation of

25     the Department of Family Services was helping them write  09:48:47
```

Page 25

```
 1   their policy and review their policy every time that they

 2   changed it as well as input into any legislation we

 3   reviewed and gave our opinions on any legislative

 4   policies.

 5          And then also at PublicKnowledge over the last    09:49:01

 6   11 years, we've helped multiple states and I've helped

 7   multiple states write and review and revise policies.

 8       Q.  Did the DHS ask you to write or review any of

 9   its policies and procedures?

10          MR. KOTHARI:  Objection, vague.                   09:49:18

11          THE WITNESS:  Which?

12   BY MR. RIZZO:

13       Q.  This DHS, the department.

14       A.  Oregon?

15       Q.  Right.                                           09:49:23

16       A.  No.  I did review them as part of the 2016

17   independent assessment.

18       Q.  But, I mean, in connection with this lawsuit,

19   you weren't asked to review or revise any of the DHS's

20   policies, right?                                         09:49:37

21       A.  We reviewed them.  I was not asked to revise

22   them.

23       Q.  Are you a member of any federal or state board

24   or commission regarding child welfare?

25       A.  No.                                              09:49:52
```

Page 26

1          Q.   And I take it you've never done any lobbying

2     with respect to PublicKnowledge.

3          A.   Not with PublicKnowledge, no.

4          Q.   With other organizations?

5          A.   I wouldn't call it lobbying.  When I was at the    09:50:05

6     GAL program, I worked often with the legislature to try

7     to affect our laws around our agency.

8          Q.   I saw, too, that you have a certification in

9     PMP, which I understand to be Project Management

10    Professional.                                               09:50:23

11         A.   Correct.

12         Q.   Can you give me some explanation of what that

13    is.

14         A.   Yeah.  That's from the Project Management

15    Institute, and similar to the child welfare law            09:50:31

16    specialist, you have to show training in project

17    management, actual practice in project management and

18    then you study and take an exam in order to receive it.

19         Q.   And when's the last time you took that exam?

20         A.   The year that I got the certification, which      09:50:48

21    would have been somewhere around 2013, '14.  And then you

22    have to be recertified every, I believe, every three

23    years.

24         Q.   And under that certification, what does a

25    Project Management Professional do?  In other words, what  09:51:09

Page 27

1    are your certified to do?

2        A.  You're certified to actually act as a project

3    manager, which is watching scope, budget and timelines

4    for projects.  You're looking at project management,

5    people management, risk management, data, schedules, some    09:51:28

6    examples.

7        Q.  It sounds like a general contractor in a way.

8        A.  I wouldn't -- I wouldn't phrase it that way,

9    but you're actually just executing on a plan,

10    essentially, and setting that plan, as well.    09:51:45

11        Q.  So you're basically managing a group of people

12    who are committed to one common purpose.

13        A.  To achieve a project, yeah.

14        Q.  And outcome, right, in your world?

15        A.  Yeah.    09:51:58

16        Q.  And how many projects have you managed?

17        A.  Over 50.  I don't know the exact number off the

18    top of my head.

19        Q.  All with PublicKnowledge?

20        A.  No.  I managed projects before PublicKnowledge,    09:52:12

21    as well.

22        Q.  Where?

23        A.  At the Attorney General's office and at the GAL

24    program.

25        Q.  You also have, I'm going to call it a    09:52:21

Page 28

```
1     1      Q.  What have you trained on with respect to CQI?

2     2      A.  I do our training internally around CQI and

3     3  implementation science, and then I've also done it -- I

4     4  did it for approximately five years for the Capacity

5     5  Building Center for Courts, and then trained on it for

      09:55:15

6     6  new workers and agency staff when I was at the Attorney

7     7  General's office, as well.

8     8      Q.  Do you read or subscribe to any professional

9     9  journals or publications?

10    0      A.  I read lots.  Not off the top of my head.  But,

      09:55:34

11    1  yes, I read lots around the areas that I practice in.

12    2      Q.  Can you name any of the publications?

13    3      A.  Yeah.  I'm looking at things that are coming

14    4  from the Capacity Building Centers, the Child Welfare

15    5  League of America and things that I'm seeing, you know,

      09:55:53

16    6  online.

17    7      Q.  Can you give me, for example, like a

18    8  professional journal that you subscribe to?

19    9      A.  No.

20    0      Q.  Do you recognize the Child Maltreatment Journal, have

      09:56:02

21    1  you heard of that?

22    2      A.  I have not.

23    3      Q.  How about the Journal of Child Abuse and

24    4  Neglect, do you recognize that as authoritative

25    5  publication?                                          09:56:19

                                                        Page 31
```

```
 1          A.  Not off the top of my head.

 2          Q.  I saw in, looks like, 2006, you wrote the High

 3      Times Law Review article.

 4          A.  Yes.

 5          Q.  Have you published any other articles since      09:56:30

 6      then?

 7          A.  There are others listed in there, as well, yes,

 8      a lot of articles in my CV around other topics.

 9          Q.  And what are those?

10          A.  I cannot remember off the top of my head.        09:56:45

11          Q.  What were the topics, how about that?

12          A.  There's one that I wrote with Donna Playton,

13      actually maybe two with Donna Playton, around family law

14      or domestic violence, yeah.  And then the other ones were

15      likely about GAL work in Wyoming.                        09:57:01

16          Q.  And do you know how recent your last

17      publication was in that regard?

18          A.  Probably 2010 to 2013, yeah, but I don't

19      recall.

20          Q.  If they were there in the document we were       09:57:21

21      provided, I missed them so that's why I'm asking you if

22      you had any others.

23              So in connection with this deposition, what

24      materials have you reviewed?  Let's say you got here on

25      Thursday.  What have you reviewed in terms of getting     09:57:39
```

Page 32

```
 1          A.  No, just a part of getting to know the firm.  I

 2     was out here as a different project and had met him while

 3     I was here.

 4          Q.  And what about in 2016, what did that deal

 5     with?                                                10:01:17

 6          A.  I met him at the beginning of our work as we

 7     began the assessment for our 2016 work with the

 8     legislature.

 9          Q.  And what do you recall about that meeting?

10          A.  I don't remember much, other than meeting him,   10:01:28

11     yeah.

12              MR. RIZZO:  I'm striking a note with pens

13     today.

14              (Last answer read.)

15     BY MR. RIZZO:                                        10:01:59

16          Q.  Do you remember anything that he said at the

17     time?

18          A.  I don't.

19          Q.  Do you know whether any of the allegations in

20     the complaint pertain to the Adoption and Safe Families   10:02:20

21     Act of 1997?

22          A.  I don't.

23          Q.  You said you have -- you're very familiar with

24     that area of law.

25              Does that law, if you know, pertain to the   10:02:35
```

Page 36

1    child's right to have placement in the least restrictive,

2    most family-like home?

3        A.  Yes.

4        Q.  And also that the child has a right, a federal

5    right, to all reasonable efforts to achieve permanency?    10:02:50

6        A.  Yes.  ASFA talks about reasonable efforts.

7        Q.  So as you sit here today, you don't recall any

8    specific allegations in the complaint.

9        A.  It was part of what we used to, you know,

10    figure out what our research areas and research topics    10:03:16

11    were, and we did that work back in 2019, so it's not

12    fresh in my head right now.

13        Q.  Who, in terms of performing the work or setting

14    out to perform the work that you just mentioned, who was

15    most responsible at PublicKnowledge for understanding the    10:03:38

16    law that was applicable to the claims alleged in the

17    case?

18        A.  We were actually focused on our assessment

19    methodology and conducting the assessment, not on the

20    laws in the complaint.    10:03:55

21            We looked at the complaint to understand what

22    was of concern and get to those research topics.

23        Q.  All right.  So you were not -- you were not

24    focused on, for example, whether or not proof of the

25    allegations constitutes deliberate indifference, right?    10:04:10

                                                        Page 37

1          A.   Again, we're looking at our assessment

2     methodology and completing the assessment, not the

3     lawsuit.

4          Q.   So whether there was deliberate indifference or

5     whether there is deliberate indifference, or whether it's          10:04:27

6     far from deliberate indifference, you formed no opinion

7     on that?

8          A.   I used that language, actually, in my executive

9     summary because that language was in the complaint

10    multiple times and was far from what we found when we          10:04:39

11    concluded the assessment.

12         Q.   Okay.  So despite what we talked about, you

13    said you were not an expert in 14th Amendment substantive

14    due process, are you now giving an opinion on deliberate

15    indifference?          10:04:57

16             MR. KOTHARI:   Objection, misstates testimony.

17    BY MR. RIZZO:

18         Q.   You can answer.

19         A.   Yeah.  I am relying on that my understanding of

20    that common language of deliberate indifference, not on          10:05:05

21    the legal standard or due process laws.

22         Q.   So when you say far from being deliberately

23    indifferent, that was penned in the executive summary --

24         A.   It was.

25         Q.   You were using deliberate indifference in some          10:05:20

Page 38

1    type of common, ordinary usage, but not in the specific

2    legal context of this case?

3        A.  Correct.

4        Q.  Well, with respect to that common, in your mind

5    about the common usage, what did you think deliberate        10:05:37

6    indifference meant?

7        A.  Believing that there's, you know, something

8    there and then ignoring and not acting, right?  So the

9    common language, English language of those words.

10       Q.  So we've marked as Exhibit 2 you'll see in that     10:06:08

11   top book.  There should be two tabs.  Tab 2 --

12           MR. KOTHARI:  Steve, one point of clarification

13   here.  At the bottom of what you are referring to as

14   Exhibit 2, it says Exhibit 1.

15           MR. RIZZO:  Yeah.  There's two tabs.  You've        10:06:36

16   just got to keep reading.

17           MR. KOTHARI:  On that tab 2, it says Exhibit 1,

18   at least on my copy.

19           MR. RIZZO:  Can we take a little break?

20           THE VIDEOGRAPHER:  We are now off the record at     10:06:50

21   10:06 a.m.

22           (Off the record.)

23           THE VIDEOGRAPHER:  We are back on the record at

24   10:11 a.m.

25   BY MR. RIZZO:                                               10:12:04

                                                    Page 39

1        Q.   So I'm showing you what's been marked as

2    Exhibit 2, and I think you recognized that as the

3    PublicKnowledge 2016 report and the cover letter.

4        A.   I do.

5        Q.   So if I understand this, this letter is written    10:12:19

6    to Governor Brown on September 13 of 2016.

7        A.   It is.

8        Q.   And it concerns PublicKnowledge's work that was

9    conducted between approximately February and September of

10   2016.                                                      10:12:42

11       A.   Correct.

12       Q.   And that coincides with one of your meetings

13   with Fariborz, you called it.

14       A.   Correct.

15       Q.   Okay.  And that letter, Exhibit 2, page 1 of --    10:12:51

16   could you read in the third paragraph?

17       A.   The one that starts, over the past?

18       Q.   Correct.

19       A.   Yes.

20            Over the past decade a number of reports and       10:13:11

21   reviews have revealed problems in Oregon's Child

22   Substitute Care System and suggested remedies.  Little

23   has been done to address the problems or implement the

24   proposed solutions.  The time to act is now.  All

25   participants in this independent review expressed a        10:13:28

                                                   Page  40

```
 1     genuine desire to remedy the situation.  There is broad

 2     awareness of the problems and momentum in the State to

 3     fix this system.

 4          Q.  And that letter was written by Melissa Davis?

 5          A.  Correct.                                    10:13:43

 6          Q.  And she was the project manager?

 7          A.  She was.

 8          Q.  Okay.  And she did the things, I take it, that

 9     you described for me a few moments ago about what a

10     Project Management Professional does?                10:13:52

11          A.  Yes, in 2016.

12          Q.  Would you call her, then, the leader of the

13     project at that time?

14          A.  She was the project manager on the team, yes.

15          Q.  The paragraph above that indicates that:      10:14:02

16     PublicKnowledge was honored to have been selected to

17     conduct an independent review of child and youth safety

18     in Oregon's Child Substitute Care System; is that right?

19          A.  Correct.

20          Q.  And that was copied to Mr. Clyde Saiki,       10:14:30

21     S-a-i-k-i?

22          A.  Yes.

23          Q.  He was is the director at that time?

24          A.  It looks that way, yes.

25          Q.  Did you meet him?                            10:14:48
```

Page 41

1    the four findings in that area, yes.

2        Q.  Okay.  And that table is entitled Oregon Child

3    Safety and Substitute Care Independent Review Findings,

4    right?

5        A.  Yes.                                      10:16:12

6        Q.  And above that, it says:  At the request of

7    Governor Brown, PK -- that's how PublicKnowledge is

8    abbreviated?

9        A.  Yes.

10       Q.  And I may use that from time to time, which is  10:16:24

11   why I'm saying that.

12       A.  Yes.

13       Q.  It says:  PK conducted an independent review of

14   Oregon's Child Substitute Care System over those eight

15   months that I mentioned.                          10:16:35

16       A.  Correct.

17       Q.  It says that:  Throughout this review, we

18   focused on viewing the system from the perspective of

19   children and youth living in substitute care, right?

20       A.  Correct.                                  10:16:48

21       Q.  And it reads that:  Although many aspects of

22   the system merit deep examination, we focused on two

23   areas closest to the experience of children and youth in

24   care:  Where they live, placements, and what happens when

25   they experience abuse in care, response to abuse; is that  10:17:05

                                              Page 43

```
 1    right?

 2         A.  Correct.

 3         Q.  And in terms of the findings, the independent

 4    review findings, the first one read that:  Space

 5    availability drives placement decisions, rather than the    10:17:22

 6    needs of children and youth.  Right?

 7         A.  Correct.

 8         Q.  Finding two was that:  Oregon's placement

 9    capacity for children with high needs is shrinking.

10         A.  Correct.                                           10:17:34

11         Q.  Three was:  Substitute care providers are not

12    adequately trained or supported to safely care for

13    children and youth with high needs placed with them.

14    Right?

15         A.  Correct.                                           10:17:44

16         Q.  Four was:  The urgency to find placements

17    compromises certification and licensing standards.

18         A.  Correct.

19         Q.  And then relatedly there is a set of findings

20    pertaining to safe and swift response to abuse in care.     10:17:57

21             Do you see that?

22         A.  I do.

23         Q.  And to move this along, the finding Roman

24    Numeral VII indicates that:  The current process of abuse

25    in care is rated untrustworthy by youth and other          10:18:17
```

Page  44

```
 1   reporters.  Right?

 2        A.  Abuse in care reporting is rated, but, yes.

 3        Q.  Correct.  I'm sorry.  Abuse in care reporting

 4   is rated untrustworthy by youth and other reporters.

 5        Finding 8 is:  There is little or no follow up    10:18:34

 6   on abuse and care investigations.

 7        A.  Correct.

 8        Q.  No. 9 was that:  Information that could

 9   mitigate safety concerns is not effectively shared

10   between entities.                                       10:18:46

11        A.  Efficiently, yes.

12        Q.  And you would agree that each one of those

13   findings is a substantial risk of harm to a child in

14   care?

15        MR. KOTHARI:  Objection, calls for a legal         10:18:56

16   conclusion.

17        THE WITNESS:  Those are findings from the

18   assessment.  We were not connecting them to any of the

19   language that you just said.

20   BY MR. RIZZO:                                           10:19:07

21        Q.  But I'm asking you as a child welfare law

22   specialist, these findings create a substantial risk of

23   harm for children in care, right?

24        MR. KOTHARI:  Objection, calls for a legal

25   conclusion.                                             10:19:20
```

Page 45

1   BY MR. RIZZO:

2       Q.  I'm not asking you for a legal conclusion, I'm

3   just asking for your answer.

4           MR. KOTHARI:  Same objection.

5           THE WITNESS:  The team, myself included, had      10:19:27

6   concerns about the findings and what harm that the

7   children could be at risk of, yes.

8   BY MR. RIZZO:

9       Q.  So these findings suggest or indicate risk of

10  harm to kids, right, in care?                            10:19:39

11      A.  Risk of harm, yes.

12          MR. KOTHARI:  Same objection, calls for a legal

13  conclusion.

14  BY MR. RIZZO:

15      Q.  At the very bottom of that page, page 4, there   10:19:55

16  is reference that:  The State needs to have a transparent

17  process for responding to abuse in care that puts the

18  child first and is based on standardized protocols for

19  screening and response; is that right?

20      A.  Correct.                                         10:20:11

21      Q.  And you believe that, correct?

22      A.  Correct.

23      Q.  You believed all of these findings, I take it,

24  correct?

25      A.  Yes.                                             10:20:19

                                                    Page 46

1    review phase; is that right?

2        A.  Correct.

3        Q.  Is that the normal process for PublicKnowledge

4    in conducting one of these --

5        A.  It's a way.  That is a way of getting us to our    10:23:04

6    initial questions, the top of our process.  There's

7    multiple ways for getting there, but that is a way that

8    we use routinely.

9        Q.  And then based on that, the team developed a

10   set of criteria for selecting the set of focus areas.    10:23:20

11       A.  Correct.

12       Q.  And then if you go to page 76 under

13   contributors and sources.

14           Do you see that?

15       A.  Yes.    10:23:55

16       Q.  So that reads that:  The child safety and

17   substitute care independent review drew on the knowledge,

18   experiences and perceptions of hundreds of Oregonians

19   around the state.

20           Do you see that?    10:24:09

21       A.  I do.

22       Q.  And as we work our way down, you can see that

23   there was the external advisory committee --

24       A.  Yes.

25       Q.  -- right?  And that included stakeholders from    10:24:20

Page 48

```
 1    Confederated Tribes of Warm Springs, the Oregon State

 2    legislators, right?

 3         A.  Yes.

 4         Q.  Foster Care Alumni through the Oregon Foster

 5    Care Youth Connection?                              10:24:39

 6         A.  Yes.

 7         Q.  And included a member of the Child Welfare

 8    League of America?

 9         A.  Correct.

10         Q.  And it also included Mr. Eldon Rosenthal,   10:24:46

11    attorney?

12         A.  Yes.

13         Q.  Do you recognize that name?

14         A.  I recognize the name, yes, as being part of

15    that external committee.                           10:24:57

16         Q.  Do you remember whether he was a renowned civil

17    rights lawyer for children?

18         A.  I don't remember the context of -- no.  We

19    didn't choose who was part of that external advisory

20    committee.                                         10:25:10

21         Q.  You worked with that committee, however.

22         A.  Correct, that was part of our contract was

23    working with them.

24         Q.  And then you worked with the DHS internal

25    resource committee, correct?                       10:25:21
```

                                                    Page 49

```
 1        A.  Correct.

 2        Q.  And then on page 78, there were key informant

 3   interviews with respect to the initial assessment, Phase

 4   2, correct?

 5        A.  Correct.                                 10:25:40

 6        Q.  And that included, for example, attorneys, the

 7   Governor's office, judges, foster parents, CASA, and as

 8   we mentioned, the Foster Youth and Alumni, right?

 9        A.  I'm looking, give me a second.  I don't

10   remember.  Yes, that looks correct.                10:26:01

11        Q.  And then on page 79, there's a list of other

12   contributors; is that right?

13        A.  Correct.

14        Q.  And that included, for example, the Oregon

15   Alliance of Children's Programs, Children's First For    10:26:25

16   Oregon, and Morrison Child and Family Services.

17            Do you see that?

18        A.  Yes.

19        Q.  So would you agree that all of these people had

20   lived experience with the child welfare system?          10:26:43

21            MR. KOTHARI:  Objection, vague as to all these

22   people.

23   BY MR. RIZZO:

24        Q.  The people we just spent a few minutes

25   covering, did they have lived experience?               10:26:54
```

Page 50

```
 1          A.  No.

 2          Q.  She had a master's in public affairs, right?

 3          A.  I believe so.

 4          Q.  She's no longer with PublicKnowledge.

 5          A.  She is not.                              10:31:36

 6          Q.  Why did she leave?

 7          A.  She had another job opportunity with a family

 8     business.

 9          Q.  So this may be easier for Thomas or for you,

10     but if you go to Exhibit 4, it should be on page 142,   10:31:53

11     Binder 1.

12          A.  Tell me again which one.

13          Q.  Page 142.

14             And then before I ask you a question on that,

15     did you understand that connection with the 2016 work   10:32:46

16     that PublicKnowledge received that assignment through a

17     competitive bidding process with the State of Oregon?

18          A.  We did.  I was part of the competitive bid,

19     yes.

20          Q.  So if I'm lucky, page 142 should be the expert  10:33:03

21     witness contract.

22          A.  Yes.

23          Q.  Now, it looks like you signed that document, is

24     that right, on June 25th of 2020?

25          A.  Sorry.  I'm trying to find it.                  10:33:45
```

Page 55

```
 1    she was 145?

 2        A.  Yes.

 3        Q.  And I see Ms. Breedlove was also involved

 4    there.

 5        A.  Correct.                                    10:38:50

 6        Q.  I want you to turn to page 166.

 7        A.  Yes.

 8        Q.  That's a document on a Markowitz Herbold paper

 9    and it's entitled Legal Standards.

10        A.  Correct.                                    10:39:23

11        Q.  Have you ever seen this, it's undated, but have

12    you ever seen this document?

13        A.  I have.

14        Q.  When did you review it?

15        A.  I don't remember the exact time frame, but it's  10:39:33

16    been a few years since I've reviewed it.

17        Q.  And do you know which of the Markowitz

18    attorneys prepared it?

19        A.  I do not.

20        Q.  The header on page 2 reads, Legal Standards for  10:39:48

21    PublicKnowledge.

22            Was that your understanding of what the law was

23    based on this two-and-a-quarter-page document?

24            MR. KOTHARI:  Objection, misstates testimony.

25            THE WITNESS:  Yeah.  Again, this was a document  10:40:11
```

Page 60

1          A.  Yes.

2          Q.  And obviously, you're here as the expert

3     witness.  Is it your opinion that the PublicKnowledge

4     2023 report is a thorough independent review as is stated

5     here?                                              10:55:49

6          A.  Yes.

7          Q.  You wouldn't do anything differently?

8          A.  No.

9          Q.  I want you to go to page 2558, page 60 of the

10    document.                                          10:56:46

11         A.  Yes.

12         Q.  So there there's a series of -- called them the

13    Definitions for Terms Used.

14         A.  I'm sorry.  I'm trying to find the beginning.

15         Q.  I should have done that for you.  I think     10:57:15

16    that's on page -- Appendix A, that starts on page 2540.

17         A.  This is P, terms, this is the beginning of the

18    list that ended up in our final report, as well.

19         Q.  It says:  These definitions clarify the meaning

20    of operative terms included in the research questions,   10:57:35

21    inquiry questions and throughout the methodology.  Right?

22         A.  Yes.

23         Q.  And then PublicKnowledge defined the word, I'm

24    going to spell it first, and then I will enunciate it in

25    two ways, P-R-O-G-R-E-S-S.  Okay?                   10:57:57

Page 71

```
 1          A.   Uh-huh.

 2          Q.   So he's the conundrum.   In terms of

 3     pronunciation, did it mean progress, like progress from

 4     the journey from day to night or progress?

 5          A.   I am not sure what you're asking me.   I          10:58:17

 6     apologize.

 7          Q.   The word progress appears.   If you think about

 8     it, there's at least two ways to go, to progress; i.e. a

 9     journey.

10          A.   Uh-huh.                                          10:58:30

11          Q.   Or progress, something you can measure or

12     account for.

13          A.   I think it's actually both.   We're looking at

14     progress over time toward something, yeah.

15          Q.   So PublicKnowledge defines the word, and I'll    10:58:46

16     use the pronunciation of progress, as the actions child

17     welfare has made to implement recommendations or address

18     concerns through identifiable and credible strategies and

19     processes, right?

20          A.   Yes.                                             10:59:04

21          Q.   Why doesn't or didn't PublicKnowledge use the

22     Merriam Webster's Third International Dictionary?

23          A.   Progress has a lot of meanings in child welfare

24     around implementation science, CQI, and so this was part

25     of a definition that we were applying to this assessment   10:59:22
```

                                                    Page 72

```
 1   with the knowledge and background of what it means in

 2   child welfare.

 3       Q.  So in the world of contracts, it's a term of

 4   art, is that how you're describing this word, the use of

 5   this word?                                           10:59:40

 6       A.  I wouldn't use that language, no.

 7       Q.  Well, how does a reader like myself or the

 8   Governor or the Court, Judge Aiken, how is she to

 9   understand specifically what the genesis or the standard

10   that was used to define this word?                    11:00:00

11       A.  That's why we give a definition there, so that

12   it's clear what we mean when we say progress in the

13   report.  That's the definition of that key term.

14       Q.  So PublicKnowledge defines progress for itself.

15       A.  We define progress based on the Child Welfare  11:00:16

16   System and how it's used generally, yes.

17       Q.  And the definition is not based on a recognized

18   or an applicable standard.

19           MR. KOTHARI:  Objection, misstates testimony.

20   BY MR. RIZZO:                                         11:00:30

21       Q.  Is that right?

22       A.  Yeah, it is based on both the general

23   understanding of the word plus its application in child

24   welfare.

25       Q.  What standard am I to measure it against or is  11:00:39
```

Page 73

1    has said multiple times that she does not answer that

2    specific question that you're asking.

3         THE WITNESS:  Same answer.

4    BY MR. RIZZO:

5         Q.  You can't?                              11:01:46

6         A.  Again, we're relying on how progress is

7    measured by the federal, by the federal government and

8    states and implementation science and CQI in child

9    welfare.

10        Q.  What federal, state, CQI or other standard did   11:01:59

11   you use in part or in whole to define this word?

12        A.  It's just how it's used in child welfare,

13   right?  So, for example, in the CFSR and the PIP states

14   have to show progress towards a goal.  They set a goal

15   and then they have a PIP that shows progress towards it.   11:02:20

16        Q.  So two parameters, then:  One a goal, and then

17   movement toward the goal.  So there's a way to measure

18   it, right?

19        A.  In the CFSR, yes.

20        Q.  But here there's no reference to goal or        11:02:41

21   outcome or a metric, correct?

22        A.  Correct.  That's the definition that we have of

23   progress.

24        Q.  And then PublicKnowledge self-defines the word

25   improve and I think that's on 2554, second word down.     11:03:04

                                                      Page 75

```
 1                 (Last question read.)

 2            MR. KOTHARI:  Same objection.

 3            THE WITNESS:  Same answer, too.  It's based in

 4      child welfare and what we measure in child welfare.

 5      BY MR. RIZZO:

 6          Q.  The point is when these are self-defined terms,

 7      it is always PublicKnowledge that makes the conclusion or

 8      comes to an opinion one way or the other whether an act

 9      or event or an action is progress or is improvement,

10      right?                                              11:06:55

11            MR. KOTHARI:  Objection, this is Ms. Moss'

12      report, same objection to that question.

13            THE WITNESS:  I'm making those conclusions,

14      again, based on identifiable criteria and data in the

15      field.                                              11:07:11

16      BY MR. RIZZO:

17          Q.  Has PublicKnowledge ever submitted this

18      methodology, this usage of several defined terms for peer

19      review by any of your peers, other national and

20      international management consulting firms?           11:07:33

21          A.  I would not agree with the self-identified

22      language that you said.

23              But I'll answer the question, no, it's not been

24      submitted for any journals.

25          Q.  By self-defined, I mean it's not based on a    11:07:44
```

Page 78

1    dictionary definition.

2         A.  It's based on it, yeah, but it is, again, it's

3    usage in child welfare.

4         Q.  With respect to the word progress, again, back

5    on page 2558 --                                      11:08:10

6         A.  Yes.

7         Q.  -- can you identify -- or can you cite me to

8    any identifiable and credible strategy or process as used

9    in that definition?

10        A.  Those are actually pointing to the things that  11:08:31

11   we're using to track that, so those would be in the

12   report.  Anything that is identifiable and credible

13   strategies and processes, those are what we're looking

14   for when we're measuring progress.

15        Q.  So these are not PublicKnowledge's identifiable  11:08:51

16   and credible strategies and processes.  These are the

17   client's credible strategies and processes.

18        A.  No, our methodology within the report.

19        Q.  So can you tell me -- for example, can you give

20   me an example of one of the credible strategies that    11:09:13

21   PublicKnowledge applied in this report?

22            MR. KOTHARI:  Objection, again, this is Ms.

23   Moss' report.

24            THE WITNESS:  Yeah.  Within the report, we

25   walked through all the strategies, and also in that     11:09:26

                                                    Page 79

```
 1          Q.  So I want to give you some examples.  If you go

 2      to Exhibit 1, page 1.

 3          A.  Is it in this binder.

 4          Q.  No, it's Exhibit 1.  It should be this one

 5      (indicating), the easier one.                        11:46:01

 6          A.  Okay.  What page?

 7          Q.  It's page 8.  It's under the executive summary.

 8          A.  Yes.

 9          Q.  Did you write the executive summary?

10          A.  I did write the executive summary.           11:46:18

11          Q.  So you have there toward the bottom, you say in

12      the 11:  Research areas PK found that child welfare has

13      made significant progress in four.

14          A.  Yes.

15          Q.  So the significant progress, that's entirely   11:46:33

16      your opinion; is that right?

17          A.  We worked on it as a team and came up with that

18      as a team, but, yes, this is my report.

19          Q.  And it's your opinion?

20          A.  Based on everything that's in the report,      11:46:46

21      correct.

22          Q.  And then on page 9, for example, under the

23      data-driven decision-making and quality of services

24      offered row, you say that:  Since 2016, Oregon has made

25      consistent progress to improve data-driven             11:47:05
```

Page 92

```
 1    management consulting field would include Deloitte, is

 2    that right, D-e-l-o-i-t-t-e?

 3         A.  That is one.

 4             MR. KOTHARI:  Object to form.

 5    BY MR. RIZZO:                                      11:57:32

 6         Q.  Would McKenzie & Company also be one of your

 7    competitors?

 8         A.  Those are larger firms, but, yes.

 9             MR. KOTHARI:  Same objection.

10    BY MR. RIZZO:                                      11:57:41

11         Q.  I want you to go back to Exhibit 4 at page 242.

12    Okay?  With any luck, it should be the same.

13             So as I understand Exhibit 4, 242, that's a

14    document from your web page, the PublicKnowledge web

15    page.                                              11:58:07

16         A.  Yes.

17         Q.  And that says that essentially PublicKnowledge

18    is a national management consulting firm; is that right?

19         A.  Yes.  I believe now it says it's a

20    multi-national, because we operate in Canada, as well.  11:58:20

21         Q.  I saw that.  There's reference to

22    international.  That's what it is, it's basically Canada?

23         A.  Yes, multi-national, U.S. and Canada.

24         Q.  The other part of page 242, it says:  We

25    expertly blend the science of systems, programs and    11:59:05

                                                      Page 101
```

1    people to achieve continued improvements long after our

2    engagements end; is that right?

3         A.  Yes.

4         Q.  If you go to page 246, that's another

5    PublicKnowledge-generated document?                     11:59:32

6         A.  Yes.

7         Q.  On page 249, there's a reference to

8    implementation planning and science.

9              Do you see that?

10        A.  Yes.                                            12:00:19

11        Q.  And I think the final sentence, it says:  We

12   help our clients plan for implementation and execute

13   these plans using the best available evidence in

14   implementation science.

15             Do you see that?                               12:00:33

16        A.  Yes.

17        Q.  What is implementation science?

18        A.  It's the way that research has based how you

19   correctly implement.  It's a process that's followed,

20   very similar to and in the same field as change          12:00:46

21   management and CQI.

22        Q.  So let me see if you agree with a related

23   definition from the National Institute of Health.  Would

24   you say that implementation science is, for example:  The

25   scientific study of methods to promote the systematic     12:01:03

                                                 Page 102

1    period --

2         A.  Anything older than six months.

3         Q.  Is gone?

4         A.  Yes.

5         Q.  Where are your notes and memoranda that you      13:44:38

6    compiled in preparation and in connection with writing

7    the report?

8         A.  I don't have notes outside of the report.

9         Q.  So you made no notes or memoranda in connection

10   with any of your work in regard to the preparation and      13:45:01

11   finalization of the 2023 report; is that right?

12        A.  Correct.

13        Q.  Is that your normal practice to take no notes

14   or create no memoranda in your normal and ordinary

15   duties?                                                     13:45:16

16        A.  Yeah.  This wasn't different, so, no.

17        Q.  Were you ever instructed to save emails in

18   connection with the 2023 report?

19        A.  No.

20        Q.  Did you directly supervise any of the work      13:45:39

21   performed by each of the team members?

22        A.  Yes.

23        Q.  Who did you directly supervise in that work?

24        A.  Allison Ward directly, week-to-week, but I'm

25   supervising everyone on the team.                          13:46:04

Page 128

```
 1          A.  That would have been working on the final

 2     report.

 3          Q.  In working through the hours, and these are

 4     merely approximations, it looked like in 2020, you had 20

 5     hours roughly split, about 19 in assessment methodology    13:52:37

 6     and one to project management --

 7          A.  Yes.

 8          Q.  -- does that square?

 9              And then Ms. Olson Ward had 204 hours and Julie

10     Breedlove 132 plus or minus hours.                         13:52:54

11          A.  That looks correct.

12          Q.  And then in 2021, you had approximately three

13     and a half hours for project management.

14          A.  Of billed time, yes.

15          Q.  Right.  So what happened in 2021 to where you     13:53:11

16     weren't particularly involved in this project?

17          A.  I wouldn't agree with that, that I wasn't

18     involved.

19          Q.  Well, explain to me why you only had three and

20     a half hours or so?                                        13:53:27

21          A.  Yeah.  So beginning of 2020, I took over in the

22     role I'm in now as the president of the company, which

23     meant I'm no longer a billable employee, so my time is

24     tracked differently.  And I don't actually bill all my

25     time on projects, especially if it's in a supervisory     13:53:42
```

Page 133

```
 1    reality.
 2          Q.  And I understand that was a conclusion.
 3              But did you examine that, beyond labeling it as
 4    there's often confusion or whatever, did you examine it?
 5          A.  Examine it in what way?                    14:34:58
 6          Q.  Try to find out why there was a disconnect.
 7    For example, did you go back and ask workers?
 8          A.  We did not talk to workers directly.
 9          Q.  Did you conduct another survey?
10          A.  No.                                        14:35:12
11          Q.  You just understood there was a disconnect and
12    the disconnect was because that's the way implementation
13    works.
14              MR. KOTHARI:  Objection.
15    BY MR. RIZZO:                                        14:35:22
16          Q.  Is that right?
17              MR. KOTHARI:  Objection, misstates testimony.
18    BY MR. RIZZO:
19          Q.  You can answer.
20          A.  There's a disconnect often between perception  14:35:27
21    and data, especially where they are in the implementation
22    process.
23          Q.  Are you claiming that the 2023 report was an
24    implementation study that purported to measure changes or
25    outcomes in response to planned interventions in DHS?   14:35:56
```

                                                       Page 161

```
 1          A.  No.  We were looking at progress over time

 2    between 2016 and now and whether or not it had an impact

 3    on children in the system.

 4          Q.  2016 and December 2023, you mean, right?

 5          A.  Yes.                                      14:36:17

 6              THE VIDEOGRAPHER:  Going off the record at 2:36

 7    p.m.

 8              (Off the record.)

 9              THE VIDEOGRAPHER:  Back on the record at 2:54

10    p.m.                                                14:54:13

11              MR. RIZZO:  So for the record, we're going to

12    ask that PublicKnowledge place a litigation hold on any

13    communications and suspend your records retention policy

14    for the pendency of this case until we take up these

15    issues with the court.                              14:54:38

16              We're making the same request, although I think

17    it goes without saying, for the Markowitz firm, because

18    that firm is now in possession of the remaining facts

19    that were communicated in one or more of the email

20    exchanges between the parties.                      14:54:51

21    BY MR. RIZZO:

22          Q.  The public knowledge report Exhibit 1, are you

23    in Exhibit 1 again?

24          A.  Yes.

25          Q.  In the Executive Summary provision at page 12,  14:55:17
```

Page 162

1    the final paragraph, there's a reference which says:

2    This assessment was conducted with the lens of

3    implementation science which shows that progress and

4    improvement should be slow and plan-full.

5         And you wrote that, right?                      14:55:58

6         A.  Yes.

7         Q.  But this report is not an implementation

8    science study, correct?

9         A.  Correct.

10        Q.  Why did you write that then?                14:56:13

11        A.  Because we are using that to understand the

12   timing of when things will start to show in outcome data.

13        Q.  But you didn't define any outcomes, correct?

14        A.  No.  We have data throughout that's part of the

15   outcomes throughout the report.                       14:56:30

16        Q.  But you don't have any specific outcome or goal

17   and the time it's going to take to reach that goal and

18   how that progress will be measured along the way,

19   correct?

20        MR. KOTHARI:  Objection, compound.              14:56:45

21   BY MR. RIZZO:

22        Q.  Am I correct?

23        A.  I'm confused by the question.

24        (Last question read.)

25        MR. KOTHARI:  Same objection.                   14:57:04

                                                    Page 163

```
 1              THE WITNESS:  Yeah.  That's part of what we're

 2      looking at, whether or not child welfare is doing that.

 3      BY MR. RIZZO:

 4          Q.  Can you answer my question.

 5              MR. KOTHARI:  Objection, asked and answered.   14:57:13

 6              THE WITNESS:  Yeah, same.

 7      BY MR. RIZZO:

 8          Q.  We're clear you did not define a specific

 9      outcome for any measure, correct, in the report?

10          A.  I'm sorry.  I'm not sure what you're asking.   14:57:27

11          Q.  You did not define a specific date or a target

12      date by which any measure would be reached or achieved,

13      right?

14          A.  No.

15          Q.  And you didn't define how long it was going to   14:57:40

16      take DHS to reach or achieve any specific goal or

17      outcome, correct?

18          A.  We were looking at their time frame and seeing

19      whether it was reasonable with the lens of implementation

20      science.                                               14:57:56

21          Q.  You did not define that or project -- you

22      didn't have a project chart to reach a defined outcome or

23      goal, correct?

24          A.  What do you mean by progress chart?

25          Q.  An experiment that tells me when it begins,     14:58:07
```

                                                        Page 164

```
1                         CERTIFICATE
2     STATE OF OREGON      )
3                          ) ss
4     COUNTY OF MULTNOMAH  )
5
6            I, Teresa L. Rider, CRR, RPR, CCR, CSR, hereby
7     certify that said witness personally appeared before me
8     at the time and place set forth in the caption hereof;
9     that at said time and place I reported in stenotype all
10    testimony adduced and other oral proceedings had in the
11    forgoing matter; that thereafter my notes were
12    transcribed through computer-aided transcription, under
13    my direction; and that the foregoing pages constitute a
14    full, true and accurate record of all such testimony
15    adduced and oral proceedings had, and the whole thereof.
16           I further certify review of the transcript was
17    requested.
18           Witness my hand at Portland, Oregon, this 26th
19    day of March 2024.
20
21
22
23                       Teresa L. Rider
24                       Oregon CSR No. 12-0421
25                       Expires 3-31-26
```

                                                 Page 237

We are a national management consulting firm that exists to help clients solve tough problems and thrive in complex situations. We expertly blend the science of systems, programs, and people to achieve continued improvements long after our engagements end.

## What We Do

### Systems

We build consensus and commitment to help your team plan, procure, and implement transformational technology projects.

(/consulting-services/strategic-technology-partner/)

### Programs

We integrate people, processes, systems, and structures to improve delivery of products or services through evaluation, procurement, and innovation.

(/consulting-services/programs)

### People

We develop high-impact leaders, teams, and individuals to inspire change.

(/consulting-services/leadership-consulting/)

### Learning

We build custom learning and training solutions for organizations of all sizes.

(/consulting-services/learning)

Exhibit 2
Page 1 of 2

# About Us

For more than 30 years we have helped our clients achieve their goals by truly understanding their needs as a foundation to our problem-solving process. No two challenges or organizations are the same. So why should you settle for a one-size-fits-all solution? Complex problems require unique solutions. We are not tied down by a single model or methodology. Our models and methodologies are tailored to achieve your desired outcomes. We are nimble. Adaptable. Collaborative. Blending ingenuity and expertise to curate a creative and structured approach. Innovative, evidence-based solutions, specific to your unique problems. Your catalyst for positive outcomes. Driving you forward. To wherever you need to go.

Get to know us (/about-us)

Exhibit 2
Page 2 of 2

# Programs

We improve the delivery of projects and services through procurement, evaluation, and innovation



# Evaluate

## Assessments

We perform independent program evaluations, organizational reviews, readiness assessments, risk assessments, and needs assessments. Our assessments provide an understanding of root causes, strengths, barriers, and a realistic path forward to meet a specific challenge or to begin planning for a specific initiative. Needs assessments and feasibility studies to support alternative comparisons are especially useful when your path forward is unclear.

## Evaluation

We use industry-leading data tools to give accurate insight into government agencies and their programs. We collect, clean, secure, and manage data from multiple sources to create real-time data dashboards. Effective and predictive analytics results in key performance indicators and metrics that allow you to make informed decisions for your organization.

## Research

To support your decision making, we augment our existing inventories and methodologies. We conduct research to address your priorities. Our nationwide work brings a wide range of best practices to our research efforts. We provide alternatives and options to help you make decisions that are based on timely, strategic, and relevant information.

## Data Analytics

We use industry-leading data tools and techniques to give accurate and predictive insight into projects. We collect, clean, secure, and manage data on program effectiveness, project management performance, implementation readiness, software quality, performance baselines, improvements resulting from project implementation, and more. We also perform data analytics across portfolios of projects to identify organizational and vendor trends and provide actionable awareness of issues. And most importantly, we use this data to make better investments in the program and individual outcomes.



# Procure

## Alternatives Analysis and Procurement Strategy Development

An alternatives analysis starts with defensible information regarding costs, associated timelines, and resources needed to achieve your objectives. Our proprietary approach consists of a facilitated process that builds consensus, improves buy-in, and results in clear recommendations. The goal is to obtain a quantifiable score that objectively supports the funding and realization of your project while considering the multiple quality factors.

## Requirements Development

We believe more than half of system errors originate in requirements or are present before system design begins. These defects often result from omitted requirements or user misunderstanding. Our consultants combine extensive requirements research, facilitation experience, and documentation expertise to develop accurate, understandable requirements, which results in fewer defects downstream.

## State and Federal Funding Requests

Exhibit 3
Page 2 of 6

2/6

We develop the business case or funding request documentation you need for state and federal funding approval. Our consultants understand the program areas and approval requirements in state budgets. We can also assist in drafting grant applications for project or program funding.

## Requests for Proposals or Requests for Quotes

You have decided to go outside of your agency to acquire a vendor for an outsourced system, service, or project. This can be an exciting time, but also risky. We write requests for proposals or requests for quotes to meet your needs and ensure bidders understand those needs. We help with vendor identification and communication to generate attention and competition so that you acquire the product that best meets your needs and budget.

## Evaluation and Evaluation Strategy

You released a procurement and have all the responses. How do you choose the right vendor? The risks during evaluation and selection can quickly undo even the best procurement plans. We help you avoid the gaming and protests that can result from inadequate evaluation and cost scoring. We have a proven approach that begins with a proposal evaluation plan and includes the development of custom scoring sheets for submitted proposals and oral presentations.



# Innovate

## Capacity Building

Organizations are increasingly asked to do more with less. We help organizations deal with staffing shortages and decreasing resources by developing and strengthening the skills, instincts, abilities, processes, and resources you have so you can thrive in complex environments. This could include the development of new service models, a reduction in low-value activities, or a return to core mission work.

Exhibit 3
Page 3 of 6

3/6

## Implementation Planning and Science

The implementation process itself is critical to ensuring that improvement initiatives are executed with fidelity, that the groundwork and planning to support the initiative are in place, and that the process of implementation occurs at a pace that allows for monitoring and adjustments along the way. We help our clients plan for implementation and execute these plans using the best available evidence in implementation science.

## Applicable Training

Training is an iterative process that begins with a needs assessment and development of learning objectives, leading to content delivery and evaluation of the learning transfer. Developing the workforce should go beyond traditional classroom training to focus on the practical application of new information, receipt of feedback, and opportunities to practice new learning until confidence and mastery are sustained. Whether it is an individual tool, a full learning program, or a coaching initiative, Public Knowledge emphasizes these principles to promote learning and skill development. This approach includes the latest research on adult learning, distance learning, and building competency in staff.

## Business Process Redesign

Whether you need to improve core business processes or support the implementation of a new system, we help you identify, plan, and implement process improvements and changes. We use a collaborative approach to map your current (as-is) processes, identify an ideal future state for the program's delivery of products or services (to-be), and complete a gap analysis between the two. A business process redesign effort will reveal the changes needed for the integration of people, processes, systems, or structures, leading to more efficient product or service delivery.

## Policy and Regulation Drafting and Analysis

Policy and regulation drafting requires careful research, review, and analysis of federal, state, or agency rules against a research question or new initiative. Our approach to drafting rules, policies, and procedures saves your staff time and helps streamline and clarify existing regulations. We can also train your staff on state and federal requirements or how to draft their own regulations.

## Communication

Effective communication underlies everything you do. We have seen projects and initiatives succeed or fail based on the agency's or program's communication strategy. We understand how messages flow in

Exhibit 3
Page 4 of 6    4/6

public sector organizations, including opportunities and limitations. We develop practical, useful communication plans and help you implement them, whether it be for a short-term project, a system transformation, a program redesign, or a large-scale organizational change.

## Learning Services

Education drives progress and growth. PK Learning Services creates custom learning tailored to your organization's needs to help your team thrive. Our consultive approach to developing training ensures we turn your biggest challenge into an innovative solution. The robust Learning Management Framework we use makes implementing our learning services simple. Every custom eLearning course includes a dedicated Success Manager to track learner progress, real-time reporting, and a user-friendly portal.

# Visit with one of our experts

# Alli Anderson, PMP

Programs Practice Director

P: (307) 314-3405
E: aanderson@pubknow.com

# Elizabeth Black, MSW

Regional Vice President

P: (501) 217-1620
E: eblack@pubknow.com

# Learn from our Program Subject Matter Experts

# [Explore our ideas.](#)

[Knowledge sharing helping to solve your program problems.](#)

[(https://pubknow.com/category/programs/)](https://pubknow.com/category/programs/)

# Public Knowledge

1911 SW Campus Drive #457
Federal Way, WA 98023


September 13, 2016

Governor Kate Brown
Office of the Governor
900 Court Street NE, 160
Salem, OR 97301

*Child Safety in Substitute Care Independent Review*

Dear Governor Brown,

I am pleased to submit to you the Final Assessment & Review Report for the Child Safety in Substitute Care Independent Review.

Public Knowledge, LLC (PK) is honored to have been selected to conduct an independent review of child and youth safety in Oregon's child substitute care system. We conducted our review between February and September of 2016.

Over the past decade, a number of reports and reviews have revealed problems in Oregon's child substitute care system and suggested remedies. Little has been done to address the problems or implement the proposed solutions. The time to act is now. All participants in this independent review expressed a genuine desire to remedy the situation. There is broad awareness of the problems, and momentum in the state to fix the System.

We commend you for initiating this independent review and hope our findings and recommendations help move the state toward lasting solutions for Oregon children and youth. If you have any questions or require clarification, please contact me at (541) 206-4341.

Sincerely,

Melissa Davis
Project Manager


Cc:   Clyde Saiki, Director
      Oregon Department of Human Services
      500 Summer Street NE
      Salem, OR 9730

Exhibit 4
Page 1 of 84

# Oregon Department of Human Services Child Safety in Substitute Care Independent Review

# Deliverable 3.4 Final Assessment & Review Report

September 13, 2016



1911 SW Campus Drive, #457
Federal Way, WA 98023

Contact: Melissa Davis
mdavis@pubknow.com
(541) 206-4341
www.pubknow.com

Exhibit 4
Page 2 of 84

**Public**Knowledge

# Table of Contents

**1. INTRODUCTION** ................................................................................... **4**

1.1. SCOPE OF THE INDEPENDENT REVIEW ................................................ 5
1.2. RATES OF HARM IN CARE BY PLACEMENT TYPE ................................. 8
1.3. METHODOLOGY OVERVIEW ............................................................... 10
1.4. KEY TERMS USED IN THIS REPORT .................................................... 11
1.5. ENTITIES REFERENCED IN THIS REPORT ............................................ 14

**2. FINDINGS AND CONCLUSIONS** ..................................................... **15**

2.1. SAFE AND APPROPRIATE PLACEMENTS: MORE APPROPRIATE PLACEMENTS COULD PREVENT ABUSE OF CHILDREN AND YOUTH IN SUBSTITUTE CARE ............................. 16
2.2. SAFE AND SWIFT RESPONSE TO ABUSE: A COORDINATED RESPONSE TO ABUSE IN CARE COULD LEAD TO EARLIER INTERVENTION AND PREVENTION OF FUTURE ABUSE. ........................................ 28

**3. RELATED BARRIERS** ...................................................................... **41**

3.1. DATA DRIVEN DECISION MAKING ...................................................... 41
3.2. UNREASONABLE WORKLOAD ............................................................. 42
3.3. RECRUITMENT AND RETENTION OF PROVIDERS ................................. 44
3.4. MINORITY GROUPS AND DISPROPORTIONALITY IN THE SYSTEM ......... 45

**4. RECOMMENDATIONS** ...................................................................... **48**

4.1. IMPLEMENTATION RESOURCES ......................................................... 48
4.2. SAFE AND APPROPRIATE PLACEMENTS ............................................. 49
4.3. SAFE AND SWIFT RESPONSE TO ABUSE IN CARE ................................ 55
4.4. FOUNDATIONAL RECOMMENDATIONS ................................................ 60

**5. METHODOLOGY** ............................................................................... **66**

5.1. THREE PHASED APPROACH ............................................................... 66
5.2. GUIDING PRINCIPLES ....................................................................... 71
5.3. INDEPENDENT REVIEW CONSTRAINTS .............................................. 72

**6. CONTRIBUTORS AND SOURCES** ................................................... **74**

6.1. CONTRIBUTORS TO THE INDEPENDENT REVIEW ............................... 74
6.2. DOCUMENTATION REVIEWED ........................................................... 78

Exhibit 4
Page 3 of 84

# Executive Summary

At the request of Governor Kate Brown, Public Knowledge, LLC (PK) conducted an independent review of Oregon's child substitute care system (System) over eight months (between February and September of 2016). Throughout this review, we focused on viewing the System from the perspective of children and youth living in substitute care. Although many aspects of the System merit deep examination, we focused on the two areas closest to the experience of children and youth in care: where they live (placements) and what happens when they experience abuse in care (response to abuse).

## FINDINGS

The graphic below summarizes the nine major findings from this review.

| Oregon Child Safety in Substitute Care Independent Review Findings | |
|---|---|
| Safe and Appropriate Placements | Safe and Swift Response to Abuse in Care |
| More appropriate placements could prevent abuse of children and youth in substitute care.<br><br>• FINDING I - Space availability drives placement decisions, rather than the needs of children and youth.<br>• FINDING II - Oregon's placement capacity for children with high needs is shrinking.<br>• FINDING III - Substitute care providers are not adequately trained or supported to safely care for children and youth with high needs placed with them.<br>• FINDING IV - The urgency to find placements compromises certification and licensing standards. | A coordinated response to abuse in care could lead to earlier intervention and prevention of future abuse.<br><br>• FINDING V - Oregon's response to allegations of abuse in care is confusing and involves too many uncoordinated elements.<br>• FINDING VI - The CPS abuse in care reporting, screening, and investigation process is localized and may result in inconsistent responses to harm in care.<br>• FINDING VII - The current process of abuse in care reporting is rated untrustworthy by youth and other reporters.<br>• FINDING VIII - There is little to no follow-up on abuse in care investigations.<br>• FINDING IX - Information that could mitigate safety concerns is not efficiently shared between entities. |

The quantitative and qualitative data collected and analyzed during this review show that the state's most acute problem is not having enough of the appropriate substitute care providers available at the moment when a child or youth needs to be placed in out of home care. Having the right provider for the right child or youth at the right time could reduce the risk of harm in care. Nonetheless, national data and standards tell us that even if Oregon were to invest in significantly increasing the number of high quality substitute care providers, there will always be a risk that something bad will happen in a placement. The state needs to have a transparent process for responding to abuse in care that puts the child first and is based on standardized protocols for screening and response.

Exhibit 4
Page 4 of 84

**Public**Knowledge

Underlying both of these areas however, is the less tangible but even more critical reality that the culture of DHS and Oregon's substitute care system needs to change. Over the past decade, a number of reports and reviews have revealed problems and suggested remedies. Yet little has been done to address the problems or implement those remedies.

## THE PATH FORWARD

This review found little that has not already been discussed. We do not offer a "silver bullet" that will fix the problems in the System. What can make this review different from its predecessors is how the state, as a whole, responds to the recommendations suggested in the report.

The graphic below shows how implementation of our recommendations will lead to a future state that prioritizes child and youth safety in care: more appropriate placements could prevent abuse of children and youth in care, and a coordinated response to abuse in care could lead to earlier intervention and prevention of future abuse. In order to make needed changes, the culture of the System, including DHS, the legislature, the provider community, and advocates must prioritize the safety of children and youth who have been removed from their families and placed in the care of the state.

| Oregon Child Safety in Substitute Care Independent Review Recommendations | | Foundational Recommendations to Address Barriers |
|---|---|---|
| Safe and Appropriate Placements | Safe and Swift Response to Abuse in Care | |
| More appropriate placements could prevent abuse of children and youth in substitute care. | A coordinated response to abuse in care could lead to earlier intervention and prevention of future abuse. | These recommendations are foundational to the system and any change efforts. If these areas are not addressed, the other recommendations will have little to no traction. |
| • Increase provider rates for all provider types<br>• Adopt an assessment tool to determine level of care and need, for use before placement decisions<br>• Develop Oregon's Continuum of Care and Availability<br>• Build out alternatives to congregate care for children and youth with high needs | • Redesign the Process of Responding to Allegations of Abuse in Substitute Care<br>• Centralize hotline operations<br>• Standardize screening protocols<br>• Adopt a standard protocol for "closed at screening" | • Change the Culture of Oregon DHS<br>• Focus the Whole DHS Agency and Child Welfare Workforce on Safety<br>• Adopt Data Driven Decision Making Processes<br>• Increase Staffing Resources for CPS and Other DHS Entities |

Exhibit 4
Page 5 of 84

# PublicKnowledge

## 1.  Introduction

Oregon's children and youth experience more maltreatment in care than the national average (National AFCARS Data, 2013). Recent high profile lawsuits involving abuse of children and youth in substitute care have sparked multiple responses including new legislation. The state has paid out over $31 million in settlements and awards in lawsuits where children and youth were abused by caregivers in foster homes and residential facilities in the last five years (excluding low dollar awards and sealed cases). The frontline caregivers - from caseworkers to foster parents and institutional staff - are suffering from overwork and turnover, inadequate training and support, and low morale; yet they are expected to shoulder much of the responsibility for ensuring children and youth are safe in care. Policymakers and leadership do not have good data on what is happening in the system, so solutions have been informed by single incidents and crisis response. From the perspective of children and youth in care, policy makers, legislators, the media, caregivers, DHS, and the public, the child substitute care system (System) is failing.

Over the past decade, a number of reports and reviews have revealed problems in the System and suggested remedies. Little has been done to address the problems or implement those remedies. Responses have been mostly focused on reframing the problem to deflect blame, comply with regulation, engage in required federal planning, or preserve the existing System.

Public Knowledge, LLC (PK) conducted an independent review of Oregon's child substitute care system over eight months (between February and September of 2016). Throughout this independent review, we viewed the System from the perspective of children and youth in care. Actions taken in response to this review, future breakdowns in the System, or directives from policymakers need to do the same: put the children and youth in care first and implement solutions focusing on their safety.

This independent review found little that has not already been discussed. We do not offer a "silver bullet" that will fix the problems in the System. What can make this review different from its predecessors is how the state, as a whole, responds to the report. The media, legislators, and department leaders need to focus on the work of changing the culture of the System and DHS. The culture must prioritize the safety of children and youth who have been removed from their families and placed in the care of the state.

The time to act is now. There is gathering realization in the state that the problems children and youth face in substitute care are systemic and need more than a quick fix. All participants in this independent review expressed a genuine desire to remedy the situation, and there is momentum in the state. Most importantly, the longer the state waits to implement impactful,

Exhibit 4
Page 6 of 84

**Public**Knowledge

systemic change, the greater the likelihood that abuse of children and youth in care will continue.

This report documents findings, conclusions, and recommendations from our independent review of the System.

## 1.1.   Scope of the Independent Review

An independent review is an assessment of a policy, program, or system by an independent third party. In response to recent breakdowns in the System that led to abuses of children and youth in foster care, Governor Brown directed DHS to secure an independent, third-party contractor to provide DHS with recommendations to facilitate and support improvements necessary to ensure the care and safety of children served in the out of home care system.[1] PK was selected through a competitive procurement process to conduct the Child Safety in Substitute Care Independent Review.

The purpose of the independent review was to assess the operations, management practices, communication patterns, and accountability mechanisms related to providing 24/7 out-of-home care for children and youth who are under the custody of Oregon DHS ("substitute care").

The methodology for the Child Safety in Substitute Care Independent Review was designed to continually narrow the scope as the review progressed through three phases: Project Initiation, Initial Assessment, and Comprehensive Review. By Phase III, we focused our inquiry on those areas of the System closest to the direct experience of children and youth living in substitute care: *where they live and what happens when they experience abuse in care*. Figure 1 shows the review's focus areas.

---

[1] Oregon Department of Administrative Services. Opportunity Notice #DASPS-2534-15 for Department of Human Services Child Foster Care Service System. December 2015.

Exhibit 4
Page 7 of 84

Public**Knowledge**

Introduction

*Figure 1: Phase III Scope*



Each element of the System surrounding the child, youth, or young adult is integral to supporting their experience in substitute care. Those areas within the green shaded box were the areas of focus for PK during Phase III of this review. Areas outside the box are potential areas for future inquiry, and DHS and other stakeholders are currently addressing many of them. That work is captured in a separate work plan managed by DHS.

The independent review focused narrowly on the experience of children and youth currently in substitute care settings. Maintaining the boundaries of this scope has been a challenge throughout the project because substitute care is only one small part of a spectrum of child welfare services whose primary goal is to keep children and youth safe at home with their families[2] or move them to permanency quickly.

---

[2] Oregon Safety Model; Strengthening, Preserving, and Reunifying Families; and Oregon's Differential Response model.

Exhibit 4
Page 8 of 84

# PublicKnowledge

To be included in the scope of the independent review, an area of review had to meet all of the following criteria:

1. **Impact on child and youth safety in care**. Safety is considered from the child and youth perspective and through an equity lens to eliminate disproportionality and disparate treatment. Though permanency and well being are two other elements of the child welfare model, this review focused on child and youth safety in care.

2. **Children and youth who are already in substitute care**. Initial placement decisions, such as the original order taking the child or youth into state custody, were not included.

   Figure 2 below shows the breakdown of children and youth by substitute care placement type over five years.

*Figure 2: Count of Children in Foster Care (Total Served during Period) by Placement Type 2011-2015 (Public ROM)*



Most children and youth in substitute care in Oregon are in non-relative or relative foster homes.

3. **Children and youth who are in the custody of the Child Welfare Services Division of DHS**. This includes children and youth involved in the Developmentally Disabled system or the Juvenile Justice system, only if they are also under the custody of Child Welfare.

Exhibit 4
Page 9 of 84

**Public**Knowledge

4. **Substitute care settings associated with substantiated harm in care**. We included all care settings for children and youth where harm in care has been substantiated in the last five years.[3]

## 1.2.  Rates of Harm in Care by Placement Type

This section describes what DHS data shows about the placement types where abuse in care is occurring. Oregon currently has a disjointed data enterprise for tracking information about abuse of children and youth in substitute care. The data depends on multiple programs and systems that do not interface. While OR-KIDS, the DHS data system, has reporting capabilities, it does not have advanced reports set up on the data requested for this review. We could not verify the reliability of the data shown in this section, but include it here as part of the overall context regarding the placement types where children and youth may experience higher risks of abuse in care.

The number of individual children and youth in care with substantiated reports or allegations of abuse has been relatively stable, between 93 and 106 for the last four years. See Figure 3.

*Figure 3: Count of Unique Children by Calendar Year with Substantiated Allegations of Abuse in Substitute Care (PK Data Request from DHS, 2016)*



According to data from DHS, substantiated allegations of abuse in care occur more often in non-relative foster homes than other types of placements. Figure 4 shows the substantiated cases of abuse per year and by provider type.

---

[3] Five years is the length of time since the 2011 Child and Family Services Review and corresponding Program Improvement Plan was implemented.

Exhibit 4
Page 10 of 84

# PublicKnowledge

*Figure 4: Substantiations by Calendar Year and by Provider Type (PK Data Request from DHS, 2016)*



The independent review team reviewed all lawsuits filed against DHS in the last five years that ended in an award or settlement of $50,000 or more. The findings of this review corroborate the data obtained from DHS. Of these 23 cases, two involved biological families, two involved a Child Caring Agency (CCA), and the remaining 19 involved DHS certified foster homes.

Several key informants who contributed to the Initial Assessment phase of the review reported that children and youth are abused in the CCA residential facilities ("institutions" [4]) more often than the foster homes certified by DHS (both institutional and proctor foster homes contracting with CCAs). This led to much of the focus and conversations with the review team to be on the topic of licensing and oversight of CCAs. Although abuse is occurring in these placement types at a higher rate compared to the total population of children and youth in the placement type, the data in Figure 4 above shows a significantly lower number of children or youth experiencing substantiated abuse in CCAs than in DHS foster homes. Additionally, data obtained from DHS shows that more children and youth in care are abused in a DHS certified foster home than a proctor foster home overseen by a CCA. Figure 5 shows the difference by substantiated reports of abuse. (Note that Figure 5 shows substantiated abuse by report, while Figure 4 shows substantiated abuse by child in care.)

---

[4] The DHS data sets we analyzed use the term "institutions" to refer to residential treatment facilities run by CCAs. We use the term "institution" in this section as it relates to the data, but use "residential facility" throughout the report.

Exhibit 4
Page 11 of 84

# PublicKnowledge

*Figure 5: Substantiated Reports of Abuse in Foster Home Care by Certification Type (PK Data Request from DHS, 2016)*



Qualitative data collected for this review shows that both DHS certified and CCA proctor foster parents need more skills and ongoing support to serve the children and youth with high needs in their care.

## 1.3.   Methodology Overview

The methodology guiding this independent review was designed to obtain a broad view of the gaps and opportunities within the child substitute care system, and then narrow the focus to the most critical problems for deeper examination. The review progressed through three phases: Project Initiation, Initial Assessment, and Comprehensive Review. Figure 6 shows the high level approach model for this review.

Exhibit 4
Page 12 of 84

**Public**Knowledge

Figure 6: Overall Approach Model



A detailed description of the methodology can be found in Section 5 Review Methodology.

## 1.4.   Key Terms Used in this Report

| Term | Definition |
|---|---|
| Behavioral Rehabilitation Services (BRS) | "Behavioral Rehabilitation Services (BRS) is a program that provides services and placement related activities to the BRS client to address their debilitating psychosocial, emotional, and behavioral disorders in a community placement utilizing either a residential care model or therapeutic foster care model" (OAR 410-170-0020). Note: Child Caring Agencies (CCAs) can also be licensed to provide BRS services and many are, but they are not synonymous. |
| Child Caring Agency (CCA) | Any licensed agency, private school, or private organization (including institutions and group homes) providing day treatment for children with emotional disturbances; adoption placement services; residential care, including foster care or residential treatment for children; residential care in combination with academic education and therapeutic care, including but not limited to treatment for emotional, behavioral, or mental health disturbances; outdoor youth programs; and other similar services for children. A child caring agency does not include residential facilities or foster care homes certified or licensed by the DHS for children receiving developmental disability services (ORS 418.205). Child Caring Agencies are licensed by the |

Exhibit 4
Page 13 of 84

**Public**Knowledge

| Term | Definition |
|------|-----------|
| | Department of Human Services, Office of Licensing and Regulatory Oversight, and some contract with proctor foster homes (also known as professional foster homes). |
| | See Figure 7 for a graphical depiction of the contractual relationship of CCAs to DHS and other licensed or certified substitute care providers. |
| **Critical Incident** | CCAs are required to notify a DHS licensing coordinator if a critical event occurs: "A significant event occurring in the operation of a child-caring agency that is considered likely to cause complaints, generate concerns, or come to the attention of the media, law enforcement agencies, first responders, Child Protective Services, or other regulatory agencies" (OAR 413-215-0091). |
| | DHS Certified Foster Homes are required to notify the certifier or certifier's supervisor if a critical event occurs, including: Any circumstance "that could reasonably affect the safety, health, or well being of a child or young adult in the home of the certified family…any change in the physical health, mental health, or medication of a member of the household…any suicidal ideation, significant behavior change, or significant injury or illness to a child or young adult" among other events that could affect the safety of a child or youth in care (OAR 413-200-0383). |
| **DHS Certified Foster Home** | A foster family home or relative foster home certified directly by DHS. A foster home maintained by a "certified family" caring for a child under the age of 21 years unattended by the child's parent or guardian, providing the child with care, food, and lodging (ORS 418.625(1)(3), OAR 413-200-0260(8)). |
| | See Figure 7 for a graphical depiction of the relationship of certified foster homes to DHS and other licensed or certified substitute care providers. |
| **Foster Care** | A temporary living arrangement for children who need a safe place to live when their parents or guardians cannot safely take care of them. Types of foster care include relative foster care, in which a child is placed with a relative; child-specific foster care in which an individual or family becomes certified to care for a specific child, usually known to them in their community; and general foster care in which children are placed in with non-relatives. Foster care includes placement in a certified relative or foster family home or other child caring institution or facility (http://www.oregon.gov/DHS/Children/fostercare/Pages/index.aspx). |
| **High Needs** | High needs is defined as: children and youth with behavioral or physical health issues. In the context of this report, children and youth with high needs require "intensive" authorized levels of care, which dictates the amount of payments for care; challenging diagnoses, behaviors, and other characteristics where placements break down frequently and require new placements frequently.[5] |
| **Institution** | A licensed child care facility operated by a public or private agency and providing 24-hour care and/or treatment for children who require separation from their own homes and group living experience. The data included in this report uses "institution", which refers both to the Oregon CCA definition, plus hospital-like settings and Psychiatric Residential Treatment Facilities (from federal definition and ROM). When the term residential is used in the data, it refers to just the DHS licensed residential programs through CCAs. See "Child Caring Agency." |
| **Proctor Foster Home** | A foster home certified by a CCA (SB1515 Section 1(8)). A proctor foster home must meet minimum standards as established by rules adopted by DHS or the Oregon Youth Authority (OYA) (OAR 413-215-0313). Proctor foster homes also receive a pass through certification |

---

[5] There is no universal definition of "high needs" pertaining to child welfare. This definition was adapted from: The Stephen Group. "Meeting the Needs of High Needs Children in the Texas Child Welfare System". November 2015, p.11. www.dfps.state.tx.us/About_DFPS/Reports_and_Presentations/CPS/documents/2015/2015-12-03_Stephen_Group_High_Needs_Assessment.pdf.

Exhibit 4
Page 14 of 84

**Public**Knowledge

| Term | Definition |
|------|-----------|
| | from DHS. These are also referred to as "professional foster homes" in the data and literature. |
| | See Figure 7 for a graphical depiction of the relationship of proctor foster homes to DHS and other licensed or certified substitute care providers. |
| **Residential Facility** | See definition for Institution above. |
| | Throughout this report we use the term "residential facility" or "residential program" unless we are referring to the data obtained from DHS, which primarily uses the term "institution." |
| **Substantiated Allegation of Abuse** | A substantiated allegation means there is reasonable cause to believe that child abuse occurred (OAR 413-015-0115 (51)). Substantiated or "founded" allegations of abuse trigger notifications to identified parties certification review by the Department. |
| **Substitute Care** | The out-of-home placement of a child or young adult who is supervised by DHS or other agency, including placement in a certified relative or foster family home or other child caring institution or facility (ORS 419A.004). |

Figure 7 below shows DHS's licensing and certification responsibilities for substitute care providers. This graphic is provided as a reference because these terms are often confused. We use the terms in the graphic below throughout the report. The entities shown in Figure 7 are described in more detail in section 1.5 below.

*Figure 7: DHS Licensed and Certified Substitute Care Providers*



- DHS certifies foster family homes, both relative and non-relative. Certifiers housed in DHS district offices perform this function.

- DHS certifies crisis shelters and group homes.

- DHS, through the Office of Licensing and Regulatory Oversight (OLRO), licenses Child Caring Agencies (CCAs).

Exhibit 4
Page 15 of 84

**Public**Knowledge

- Licensed CCAs oversee and run residential programs for children and youth with needs that cannot be met by general foster homes. CCAs also certify and oversee proctor foster homes. DHS provides a pass through certification for those proctor foster homes certified by CCAs.

## 1.5.   Entities Referenced in this Report

| Entity | Description[6] |
|---|---|
| Child Welfare | Child Welfare is a continuum of services designed to ensure that children are safe at home and that families have the necessary support to care for their children successfully. In Oregon, Child Welfare includes Adoption services, Child Protective Services, Foster Care, and the Independent Living Program. |
| CPS | Child Protective Services. CPS responds to child abuse reports. CPS-trained caseworkers across the state listen to reports of abuse, assess the situations, and prepare safety plans to assist children and families. |
| CPS Hotlines | Child Protective Services Hotlines. There is a phone number anyone can call to report abuse of any child or adult to DHS. The hotlines are mostly decentralized, staffed by district offices. |
| DHS | Department of Human Services. DHS is Oregon's principal agency for helping Oregonians achieve wellbeing and independence through opportunities that protect, empower, respect choice, and preserve dignity, especially for those who are least able to help themselves. Divisions include: Assistance, Children & Youth, Seniors & People with Disabilities, and other services. |
| OHA | Oregon Health Authority. OHA is the agency that oversees and administers Medicaid and other public health programs in Oregon such as the Oregon Health Plan, Healthy Kids, the Oregon State Hospital, and other programs. |
| OAAPI | Office of Adult Abuse Prevention and Investigations. OAAPI is part of DHS and is responsible for coordinating and conducting abuse investigations and providing protective services statewide to reports of neglect and abuse of vulnerable adults including: adults over the age of 65; adults with physical disabilities; adults with developmental disabilities; adults with mental illness; and children receiving residential treatment services. |
| OLRO | Office of Licensing and Regulatory Oversight. OLRO is part of DHS and is responsible for licensing or registering regulatory and corrective action functions for long term care facilities and agencies including children's residential care agencies, foster care agencies, adoption agencies, assisted living facilities, and other such facilities and agencies. |

---

[6] These descriptions were taken from the DHS and OHA websites on September 04, 2016.

Exhibit 4
Page 16 of 84

PublicKnowledge

# 2.  Findings and Conclusions

The report findings are categorized by the two areas of focus for the review: safe and appropriate placements and safe and swift response to abuse in care. Findings are summarized in Figure 8 below.

*Figure 8: Findings Summary*

| Oregon Child Safety in Substitute Care Independent Review Findings | |
|---|---|
| Safe and Appropriate Placements | Safe and Swift Response to Abuse in Care |
| More appropriate placements could prevent abuse of children and youth in foster care. | A coordinated response to abuse in care could lead to earlier intervention and prevention of future abuse. |
| • FINDING I - Space availability drives placement decisions, rather than the needs of children and youth.<br>• FINDING II - Oregon's placement capacity for children with high needs is shrinking.<br>• FINDING III - Substitute care providers are not adequately trained or supported to safely care for children and youth with high needs placed with them.<br>• FINDING IV - The urgency to find placements compromises certification and licensing standards. | • FINDING V - Oregon's response to allegations of abuse in care is confusing and involves too many uncoordinated elements.<br>• FINDING VI - The CPS abuse in care reporting, screening, and investigation process is localized and may result in inconsistent responses to harm in care.<br>• FINDING VII - The current process of abuse in care reporting is rated untrustworthy by youth and other reporters.<br>• FINDING VIII - There is little to no follow-up on abuse in care investigations.<br>• FINDING IX - Information that could mitigate safety concerns is not efficiently shared between entities. |

Exhibit 4
Page 17 of 84

**Public**Knowledge

## 2.1.   Safe and Appropriate Placements: More Appropriate Placements Could Prevent Abuse of Children and Youth in Substitute Care

Abuse in care often stems from placing children and youth with caregivers who are over capacity, not qualified to meet their needs, or not supported. Data collected for this review shows that inappropriate placements may result from a scarcity of placement options, fewer placement options for high needs youth, and inadequate training or support for foster parents caring for foster children and youth with high needs.

> "The Department at times struggles with appropriate placement matching due to the complexities of children's needs and the limited number of providers. Although there may be certified homes, there are times when homes are not available for children with complex behavioral or health care needs"
>
> *- Oregon Child and Family Services Plan, 2015, p. 50*

### 2.1.1. Finding I - Space availability drives placement decisions, rather than the needs of children and youth.

Appropriate placements for children and youth in substitute care are not consistently available, sometimes forcing DHS staff to place them with providers who cannot meet their needs. A CFSR Statewide Assessment identified lack of resources as a driving factor in placement decisions, stating that, "Waiting lists for needed services often result in children getting served by the first available resource rather than the most appropriate resource" (CFSR Statewide Assessment, 2007, p. 128).

#### DIFFICULTY FINDING PLACEMENTS



*Figure 9: Word Cloud from open-ended responses, Question: What happens if there is no available foster home with proper training to take in a high needs child or youth? (Caseworker & Supervisor Survey Results)*

Focus group and survey results highlight the difficulty caseworkers have finding appropriate placements for children and youth. Figure 9 shows the most frequently used words used in response to the open ended question "what happens when there is no available foster home with proper training to take in a high needs child or youth?" During the timeframe of this review, news articles reported issues of space availability: "DHS

Exhibit 4
Page 18 of 84

**Public**Knowledge

officials told FOX 12 that on average, six foster children a week state-wide spend at least one night in a hotel or child welfare office" ("Crisis' in Oregon Foster Care System," August 8, 2016). DHS staff told reviewers that although the media is currently highlighting this problem, caseworkers have been spending nights in DHS offices with unplaced children and youth, lodging them in hotel rooms, and begging providers to take them for years. A 2011 Sensitive Review Committee Report found that, "Planful foster care placements to ensure stability often does not occur, primarily because of limited capacity and limited access to specialized training for foster parents and relative caregivers" (Sensitive Review Committee Report, 2011, p. 5).

## ASSESSMENT TOOLS

Appropriate placements are dependent on a complete assessment of a child and family's needs and strengths, as well as timely family finding for appropriate relative placement options. Oregon does not use an assessment tool prior to placement to determine the needs of children and youth, and therefore cannot proactively match children or youth to the qualifications of caregivers. Nor does the state use an assessment tool to identify the level of care provided by the pool of caregivers. Therefore, no data is available to show need and availability for each placement level or type.

The Department recognizes the importance and role of assessment as evidenced throughout Oregon's child welfare rules and regulations,[7] the DHS Child Welfare Manual, and articulated in the 2007 Children's Wrap Around Initiative, but the consistent application of policies and procedures is not evident. It appears that due to the scarcity of placements, DHS is not able to adequately put this policy into practice.

Oregon uses the Child and Adolescent Needs and Strengths (CANS) Assessment once a child or youth is placed in substitute care, but only to determine payment rates and service plans. There is no level of care assessment conducted prior to placement.

> "Level of care is not used to help find the right placement. Only after the child is placed is the personal care assessment done. And usually this is about a month after being placed."
>
> *- Foster Parent Survey Respondent*

DHS foster home certifiers reported in a focus group that DHS is not currently capable of matching children's needs with qualified foster home placements to meet those needs, due to limited availability of qualified foster home placements. According to review participants, this can lead to higher risk of abuse in care.

---

[7] See Oregon Administrative Rules (OAR) 413-070-0600 and 413-070-0625.

Exhibit 4
Page 19 of 84

**Public**Knowledge                                    Findings and Conclusions

- 67% of foster parents surveyed said the needs of foster children and youth are not matched to providers' qualifications.

- Over 60% of attorneys and judges surveyed note that abuse in foster care is sometimes or very often related to a child or youth being placed in the wrong level of care for their needs. See Figure 10.

*Figure 10: When abuse occurs in foster care, how often is the abuse related to a child or youth being placed in the wrong level of care for their needs? (Attorney and Juvenile Judge Survey Results)*



### 2.1.2. Finding II - Oregon's placement capacity for children and youth with high needs is shrinking.

High needs is defined as: children and youth with behavioral or physical health issues. In the context of this report, children and youth with high needs require "intensive" authorized levels of care, which dictates the amount of payments for care; challenging diagnoses, behaviors, and other characteristics where placements break down frequently and require new placements frequently.

According to the 2016 CFSR Statewide Assessment Instrument, "While there is no way to capture the number of children in regular foster care who should be in a higher level of treatment care, stakeholder reports indicate that across the state children who meet criteria for BRS placement are living within the regular foster care system" (CFSR Statewide Assessment Instrument, 2016, p. 23).

PLACEMENT CAPACITY

Oregon's placement capacity, especially for children and youth with high needs is inadequate to meet the demand. Multiple recent reports and reviews have found this to be the case:

Exhibit 4
Page 20 of 84

**Public**Knowledge                                                    Findings and Conclusions

- "[DHS] Child Welfare may not be adequately assessing the capacity of programs to provide services for high-needs children and the appropriateness of those services" (CIRT Review 2012-2014, p. 2).

- "Children with multiple handicapping conditions are difficult to place and provide with comprehensive services" (CFSR Statewide Assessment, 2007, p. 128).

Residential bed capacity for children and youth with high needs appears to be steadily declining, decreasing 12% just over the past year (PK Data Request from DHS, 2016).[8] There are limited step down placement options for those high needs youth who truly need intensive out of home care. It appears that Oregon has not historically focused on building out intensive therapeutic foster care (TFC) services for those children and youth in need of residential services. Instead, these children and youth are put in foster homes not trained or equipped to handle their needs.

88% of attorneys and judges surveyed see placements that exceed providers' capacity, and 65% have seen caregivers not having sufficient training to care for the needs of foster children and youth in their care.

The need for intensive placement settings (e.g., residential treatment or therapeutic foster care) remains higher than Oregon can meet with in-state resources. While the number of children and youth in BRS placements is decreasing, the number placed in an out-of-state psychiatric residential treatment facility is increasing. In 2015, 3.6% of children served in BRS placements were placed out of state, up from 0.3% in 2012, and none in the years before that. See Figure 11. Sending children and youth out of state for services removes them from their community and support system and is expensive for the state.

---

[8] Some review participants believe that this decrease may be a positive sign that problem providers are leaving the System.

Exhibit 4
Page 21 of 84

**Public**Knowledge

Findings and Conclusions

*Figure 11: Number of Children in BRS Placements and Number of Children Placed Out of State (PK Data Request from DHS, 2016)*



While survey respondents and focus group participants reported "high" or "very high" demand for all levels of substitute care in Oregon, they rated the need for BRS placements the highest (this includes foster parents, DHS caseworkers and supervisors, staff of CCAs, Citizen Review Board (CRB) staff, CASAs, and OLRO licensing coordinators). Participants CRB focus group reported that many TFC and group homes in Oregon have closed in recent years, leaving children and youth with significant needs without options because, "they can't be placed in normal homes …there isn't a place for them" (CRB Focus Group Results).

More than half of the foster parents surveyed reported that they care for children and youth with high needs all the time or often. See Figure 12.

Exhibit 4
Page 22 of 84

**Public**Knowledge

*Figure 12: "How frequently do you care for high needs children or youth? (Foster Parents Survey Results)*



Scarcity of placements for children and youth with high needs can force inappropriate placements leading to negative outcomes, including safety issues. Participants in a CRB focus group reported that when a child or youth with severe behavioral issues who should be placed in a residential facility is placed with an untrained family, it puts everyone at risk. Problems also arise when children or youth with complex needs are placed in institutional settings that cannot meet their therapeutic needs. According to a recent report from a Juvenile Justice Mental Health Task Force: "A lack of psychiatric services, residential beds, and crisis placements has led to youth being held in less than ideal settings, such as detention or in hospitals. These settings are ill equipped to help youth with significant needs, many of whom have suffered abuse, neglect, and trauma. These settings can exacerbate underlying trauma, are expensive, and are not conducive to producing positive outcomes" (Juvenile Justice Mental Health Task Force Report and Recommendations, 2016, p. 1).

## 2.1.3. Finding III - Substitute care providers are not adequately trained or supported to safely care for children and youth with high needs placed with them.

DHS is placing children and youth with high needs with caregivers who do not have the skills or training to care for them. Both DHS certified foster parents and representatives of licensed CCAs report in surveys being asked to care for children and youth whom they do not have the right skills or training to serve. See Figure 13.

Exhibit 4
Page 23 of 84

**Public**Knowledge

*Figure 13: How often has DHS requested you take in children or youth with needs you are not certified to care for? (Foster Parents & CCA Survey Results)*



Foster parent focus group participants indicated almost unanimously that they do not have the training to safely care for the needs of children and youth being placed in their homes. Foster parents who work with CCA's reported more and better training than the DHS foster parents in focus groups. Survey results from of both CCAs and DHS certified foster parents mirror the focus group results:

- 50% of child caring agencies surveyed report the children and youth placed in their care need a higher level of care than they are able to provide.

- Over 50% of foster parents surveyed report frequently caring for children or youth with high needs. In addition, over 50% of respondents report receiving no specialized training to care for children and youth with high needs. Based on survey comments, the delivery of specialized training also appears to be inconsistent across the state. Some respondents indicated that they must self-educate, and others indicated that their county offices provide regular opportunities for training. See Figure 14.

Exhibit 4
Page 24 of 84

**Public**Knowledge

Findings and Conclusions

Figure 14: Did you receive specialized training to care for high needs children or youth placed with you? (Foster Parents Survey Results)



Participants in the review reported that foster parents typically get the support, information, and training they need to care for high needs kids from places outside of DHS. Some examples include Casey Family Programs, local mental health agencies, or the Internet.

The most recent CFSR Self Assessment corroborates the data collected from this review in its findings for why foster children and youth experience multiple moves within the System: "foster parents who are not equipped to meet the special needs of the child, may lack available child care, may be filled beyond capacity, or may lack local resources to meet the level of support needed for the child" (CFSR Statewide Assessment Instrument, 2016, p. 23).

### Trauma Informed Care

Review participants and substitute care system stakeholders agree that the state needs to infuse trauma informed care throughout the System. Focus group participants noted deficiencies in the trauma informed training and support provided to foster parents, staff of licensed CCAs, and the DHS staff who support them:

• Foster parents report that there is not enough trauma informed training, transitional therapy, or preparation for issues around separation and loss – on both the part of the children and youth they serve, and themselves.

• Foster parents say that when they call a caseworker for support for a child or youth with high needs, the caseworker does not have the right training to offer solutions.

• Foster parents, residential staff, and caseworkers need support, not just training. The work they are doing is difficult and can trigger trauma responses.

Exhibit 4
Page 25 of 84

**Public**Knowledge

## Provider Burnout

Focus group participants described the implications of not preparing caregivers to serve children and youth with high needs: when children and youth with high needs are in settings that do not have the skills to safely address their needs, there is more turnover within the System because those children and youth typically end up in multiple placements.

Inadequate training and lack of respite options for DHS certified foster parents also leads to poor decision making, burnout, and foster homes leaving the System. Focus group participants report that when foster parents don't receive the support they need to care for children and youth with high needs, they leave, placing increased burden and stress on those who stay.

### 2.1.4. Finding IV - The urgency to find placements compromises certification and licensing standards.

DHS caseworkers ask substitute care providers (both licensed CCA providers and DHS certified foster homes) to take in children and youth in excess of the foster home's certified or licensed capacity, with some regularity. Over 90% of caseworker and supervisor survey respondents reported that in their work they had observed "the placement exceeding the provider's capacity." Almost 90% of attorneys and judges surveyed for this review reported that they see placements exceeding the provider's capacity occurring in their practice. See Figure 15.



*Figure 15: From your experience, which of the following foster care placement situations do you see occurring in your practice? (Attorney and Juvenile Judges Survey Results)*



Over half of the DHS certified foster homes and CCAs surveyed report being asked to take in more children or youth than they are certified to care for. See Figure 16. According to foster

Exhibit 4
Page 26 of 84

**Public**Knowledge

Findings and Conclusions

parents focus group participants, this issue is exacerbated in rural areas where there are fewer foster homes.

*Figure 16: How often has DHS requested you take in more children or youth than you are certified or licensed to care for? (Foster Parents and Child Caring Agencies Survey Results*



More than half responded that they are asked to take in more children or youth than they are certified or licensed to care for.

According to focus groups, placing children and youth in substitute care placements that exceed the licensing and certification capacity or qualifications compromises the caregivers' ability to safely oversee all the children and youth in their care. Focus group participants reported that a compromised ability to safely supervise the youth in their care could lead to abuse, often between children or youth in the placement. And, exceeding capacity can lead to higher stress and increase the risk of caregivers making poor decisions, which could lead to abuse or allegations of abuse.

### FOSTER HOME CERTIFICATION, EXCEPTION PROCESS

Focus group respondents reported that DHS foster home certifiers are being pushed to certify more homes more quickly. Desire to increase the availability of placements of all types may be resulting in DHS certifying foster homes that otherwise would not meet certification requirements.

Our review of high settlement or award lawsuits against DHS revealed that a number of exceptions occurred during the certification of the DHS certified foster homes (which constituted 19 of the 23 lawsuits we reviewed), including: placing an exceedingly high number of children in one home, placing high needs children in homes not qualified to care for those needs, not taking into account past criminal history of foster parents that could affect their suitability for certification, and not adequately considering prior incidences of neglect by foster parents.

Exhibit 4
Page 27 of 84

**Public**Knowledge

Certifiers in a focus group cited weakness in DHS policy and procedure leading to the certification of foster homes that do not meet the technical threshold for denial, but should be denied. Certifiers report that the criteria for review of foster homes do not provide enough reasons for denial, even when a certifier believes there is enough evidence to deny. They report that oftentimes these are the foster homes that become problematic down the road.

Review participants are mixed on whether certifiers have enough or too much discretion when certifying foster homes. Certifiers report they cannot use discretion when they believe they should deny an applicant. Other participants say there is too much local discretion and inadequate standardization of the certification process.

Certifiers estimate that exceptions to certification requirements are used in a majority of new homes opened, mostly for relatives providing emergency foster care. Some focus group participants reported the perception that in rural areas of the state, relative caregivers are "given more leeway" because there are fewer available foster homes.

While emergency certifications and the use of the exception process introduces some risk, certifiers and other review participants also cite the exception process in Oregon as a strength of the System. The exception process enables more relative caregivers to be certified, which is often in the best interest of the child or youth being removed from their home, a preferred placement option to non-relative care.

According to the 2015 CFSR Statewide Assessment Instrument, 46% of children entering care during the 2014 federal fiscal year were eventually placed with a relative, and children were either placed with a relative or there was concerted effort to place them with a relative in 90% of cases (p. 34). In 2011, Casey Family Programs reported that 21% of Oregon's children and youth were in relative foster care placements (Data Snapshot on Foster Placement, 2011, p.3).

### CONCLUSIONS FOR CHILD AND YOUTH SAFETY IN CARE

Review participants indicated that the risks of abuse and other safety issues are elevated if children or youth are placed with a substitute care provider unable to meet their needs.

We heard from almost all assessment participants that demand for all placement types is high and the availability of them is low. Because Oregon does not use an assessment tool prior to placement, nor does the state assess providers for what they can provide, it is not possible to fully understand the gap between need and capacity. This puts all foster children and youth at risk of being placed inappropriately, which can lead to safety concerns.

Exhibit 4
Page 28 of 84

**Public**Knowledge

If a substitute care provider is caring for more children or youth than certified, licensed, or qualified for, safety risks increase for all residents in the placement setting, including other youth and the caregivers.

Children and youth with high needs face even higher safety risks related to inappropriate placements. A child or youth with high needs, combined with a caregiver with limited skills to safely meet his or her needs, may increase the likelihood that abuse will occur in that placement setting. Due to the limited and decreasing number of qualified appropriate placements for children and youth with high needs (such as residential placements), typical foster care homes are increasingly being asked to take them in, but with limited skills and support to do so safely.

Exhibit 4
Page 29 of 84

**Public**Knowledge

## 2.2.   Safe and Swift Response to Abuse: A coordinated response to abuse in care could lead to earlier intervention and prevention of future abuse.

### 2.2.1. Finding V – Oregon's response to allegations of abuse in care is confusing and involves too many uncoordinated elements.

There are a number of DHS entities, people, statutes, rules, policies, and processes involved in interpreting and applying abuse in care definitions, associated investigation procedures, and rules for critical incident reporting. This has created a confusing and uncoordinated system of response to allegations of abuse in care. See Figure 17.

*Figure 17: As-Is Map of Current Response to Reports of Abuse in Substitute Care*



Several administrative bodies have responsibility and authority when a potential instance of abuse in care is reported: Child Protective Services (CPS) hotlines in each DHS district or Office of Adult Abuse Prevention and Investigations (OAAPI) determine whether an allegation meets the criteria for CPS assessment/investigation, then the CPS or OAAPI worker determines whether it is founded; the Office of Licensing and Regulatory Oversight (OLRO) or CPS enforces licensing or provider support implications; DHS district caseworkers follow up on the child's needs, including placement changes, notification of the child's advocacy circle (e.g., CASA, attorney, therapist, etc.), and updates the case plan as needed.

The review team was unable to find a single individual within this system who understands the entire process of responding to allegations of abuse in care for all provider types. **This means**

Exhibit 4
Page 30 of 84

**Public**Knowledge

that when a child or youth is abused in substitute care, no single individual has a handle on what should be done, by whom, and by when.

## TWO DEFINITIONS OF ABUSE FOR FOSTER HOMES

Oregon defines abuse in a foster home differently based on the entity that certifies the home (DHS certified foster home or a CCA proctor foster home). The rules and statutes that define abuse in a CCA are defined in greater detail because of the unique vulnerabilities of children served and the nature of a residential setting. Yet, this definition also applies to the CCA proctor foster homes, but not to the DHS certified foster homes (DHS Foster Homes: ORS 419B.005, CCA Foster Homes: ORS 418.205).

## INVESTIGATIONS OF ABUSE IN CARE

When allegations of abuse in care are reported to the CPS hotline, the screener notes whether the alleged abuse occurred in a DHS certified foster home, or a CCA proctor foster home, and sends the latter reports to OAAPI for screening and investigation (OAR 407-045-0870). The variance in investigation processes between residential facilities and foster home settings may be appropriate due to key differences between the settings (for example residential facilities employ paid clinical and line staff, and the setting by nature is not a home-like setting). However, the same rules that govern OAAPI investigations of CCA residential facilities also apply to investigations of abuse allegations that occur in CCA proctor foster homes. A child or youth could experience the same abuse in a CCA proctor foster home and a DHS certified foster home, but the definition of abuse is different, the agency investigating that abuse would be different, and therefore the subsequent response would vary.

Our review of OAAPI investigator training materials revealed that they receive child-specific training, but their primary charge is adult abuse. A review participant noted that the OAAPI investigators are unable to attend the introductory training for caseworkers to understand the child welfare system and court system within which they are navigating.

Related concerns expressed by focus group and survey participants include:

- There is a perception among some review participants that the heightened focus on abuse in care, stemming from recent media coverage and legislative attention, has increased the amount and intensity of investigations of allegations of abuse done by OAAPI. This impacts both CCA residential facilities and CCA proctor foster homes, but not DHS certified foster homes.

Exhibit 4
Page 31 of 84

**Public**Knowledge

- There is a perception among some review participants that SB 1515, which went into effect on July 1, 2016, has increased expectations for OAAPI investigators and OLRO staff. Some focus group and survey respondents report that OAAPI investigators and OLRO staff are not adequately trained, resourced, and supported to fairly and competently implement the new expectations.

## INCIDENT REPORTING VS. ABUSE ALLEGATIONS

Incident reporting is sometimes confused with abuse reporting and often is reported both ways, leading to confusion, redundancy, and potential under or over reporting of actual abuse. This creates a situation that overwhelms DHS, OLRO, OAAPI, and providers. The approach to responding to a critical incident vs. an allegation of abuse is often the same. The criteria for what constitutes a critical incident vs. abuse or neglect is not clear (outside of the definition of abuse and neglect contained in policy language), or is not followed.

Foster parents in focus groups reported that there is no operational definition of "critical incidents" (the current definition is vague and contained in OAR 413-200-0383) and all the foster parents we spoke to use different procedures for handling them. For example:

- Some foster parents document everything in an email or phone call to a certifier or caseworker, (i.e., baby's fingernail scratched her own cheek).

- Others reported taking pictures of scratches or bruises and emailing them to a certifier with an explanation.

> Foster parents indicated that they can lose their certification if they report incidents the "wrong way," but there is no clear information about what is "the right way."
> - *Foster Parent Focus Group Participants*

- One foster parent uses a smartphone app to track every incident of physical concern that the foster child experiences.

- Another foster parent had never reported anything because she was not aware of what constituted a critical incident or the procedures for making a report.

- According to DHS foster parents, foster parent training materials say to report an incident if it is "something a mom would want to know about." This leaves the decision about what to report up to individual discretion.

- Foster parents noted that every certifier and caseworker has different expectations of what should be reported to the hotline versus what should be documented and who should be

Exhibit 4
Page 32 of 84

**Public**Knowledge

notified. One foster parent in a focus group said that there is no middle ground for incident or abuse reports. DHS either does nothing, or opens a lengthy investigation.

There is a definition in rule and policy for critical incident reporting that applies to CCAs (OAR 413-215-0091(12)). However, CCA staff noted that, in order to protect themselves, they report every unusual incident in an incident report and to the abuse hotline, often beyond what the rule requires. CCA staff further report that in the current reporting environment too many (and sometimes all) of these reported incidents are being investigated as abuse or neglect. This has overburdened the staff of the provider agencies and governmental agencies.

As a result of this lack of clarity, it appears abuse in care by both CCAs and foster homes is both under and over reported. See Figure 18.



Figure 18: How likely are you to OVER- and UNDER- report critical incidents due to uncertainty about which circumstances constitute a critical incident? (Foster Parent and Child Caring Agency Survey Results)

Over reporting of critical incidents as abuse in care could be a contributing factor to the high number of calls received by the child abuse hotline that are closed at screening. A high volume of unnecessary reports overburdens staff that must consider and dismiss a number of insignificant incidents. Individual workers' judgment about true allegations of abuse and neglect may be affected. It is clear that the system does not consistently or accurately discern which reports should be investigated. Our review of the large settlement or award lawsuits revealed that at least six involved multiple reports of abuse that were closed at screening or never fully investigated.

Exhibit 4
Page 33 of 84

**Public**Knowledge

### 2.2.2. Finding VI - The CPS abuse in care reporting, screening, and investigation process is localized and may result in inconsistent responses to harm in care.

Because the child abuse hotline is decentralized and standardized protocols are not used across districts, response to allegations of abuse may vary depending on where the report was made. Oregon has a single statewide number for reporting abuse (the child abuse hotline), but there is no standard screening protocol that supports consistent decisions across similar cases. Local variation in screening and assessment protocols makes it difficult to eliminate bias and ensure consistent safety decisions are made statewide. According to a recent review, Oregon's practice of "localizing" policies, procedures, and interventions results in inconsistent application of a statewide safety intervention model (OR Safety Model, 2013, p. 1-2). In the words of one focus group participant: the application of DHS screening policies is "as varied as the people" doing the work.

Of the 16 DHS Districts, four provided written protocols to the review team.

• Two outline the Department Rules and two supplement the Department Rules.

• District 2, which covers Multnomah County and District 4 which covers Lincoln, Benton, and Linn counties have supplemental protocols for CPS screening and assessment that provide additional detail on information sharing and coordination between and among DHS staff.

• Additionally, the District 2 protocol specifically requires the caseworker to follow up with the child if a report of abuse or neglect concerning that child was closed at screening, although it does not require the caseworker to do so within a certain timeframe.

Citizen Review Board (CRB), biological parents, and CASA focus group participants expressed discomfort and a lack of confidence with hotline screeners' ability to adequately assess calls to the hotline. Based on their experience making reports about abuse in care to the hotline, they do not believe that screeners receive sufficient training to make consistent and accurate determinations about alleged abuse in care. Fourteen years ago, a PK study found that CPS branches appear to be inconsistent in the abuse screening and assessment criteria that they apply. This appears to still be true today (PK Review, 2002, p. ix).

#### LOCAL RESPONSE

Focus group participants described situations where caseworkers may intervene at the field level to allegations of abuse and neglect rather than reporting to the hotline, thus reducing the possibility of a formal investigation being launched or consequences for certification or licensing. This practice could be a strength to build upon, if it is an attempt to handle minor

**Public**Knowledge                                        Findings and Conclusions

situations with minimal disruption to the child or youth in care. However, because standards for responding to such "minor" situations are not clear, there is no assurance that consistent safety decisions are being made. In focus groups, youth told reviewers stories about caseworkers' varied responses to reports of abuse, indicating that responses depend on whether they had a good relationship with a caseworker or how long the caseworker had been at DHS.

In some districts it appears that caseworkers are closely involved with investigations. Some focus group participants fear that because those caseworkers are intimately involved with the case, they are not able to objectively assess the situation for abuse or neglect in care.

Foster parents reported taking pictures of scratches and bruises and emailing them to the child's caseworker, but there does not appear to be a clear protocol for what the caseworker does with that information.

As noted in finding V, CPS and OAAPI have different rules, policies, and procedures regarding investigations and follow-up for allegations of abuse in care, further contributing to the inconsistencies.

### Hotline Staff Turnover

Survey data from this review corroborates the perception that CPS hotline screeners have a high turnover rate, which may exacerbate the challenges to ensuring consistency. Another consequence of high turnover rates is that historical knowledge about past allegations may be incomplete or lost altogether.

• 22% of screeners surveyed for this review were a CPS hotline screener for less than a year

• 74% have been in their role for three years or less

Multiple participants in this review reported that poor performers at DHS are often re-assigned to hotline positions. Our review team did not assess personnel files to verify the truth of this assertion, however it is significant that a number of individuals inside and outside of DHS hold this belief. Regardless of whether this is or is not common practice, the perception itself speaks to serious issues within the DHS culture as well as external perceptions of the agency.

## 2.2.3. Finding VII - The current process of abuse in care reporting is rated untrustworthy by youth and other reporters.

Youth and other reporters of abuse in foster care expressed many reasons for not trusting the process for reporting abuse in care. Reasons

> "Overall I did not trust that I could report to anyone. What I could trust in was keeping my head low so I didn't get abused often."
>
> *– Youth Survey Respondent*

Exhibit 4
Page 35 of 84

**Public**Knowledge

Findings and Conclusions

include fear of retaliation, lack of confidentiality, and lack of clarity about what happens after a report of abuse or neglect is made.

Youth in focus groups reported[9] feeling more comfortable and getting better results when reporting instances of abuse or neglect or discussing safety concerns with a trusted adult outside of DHS, including to a CASA, attorney, law enforcement, or teacher.

Surveys showed that almost 70% of youth report being comfortable reporting abuse to their caseworker. Over 60% are comfortable reporting to another adult authority figure outside DHS. Only about a quarter of them reported being comfortable using the hotline, which is the current official process for reporting abuse in care in Oregon. See Figure 19.

*Figure 19: What methods of reporting instances of abuse in care do you feel comfortable using? (Youth Survey Results)*



> Only a quarter of the youth respondents were comfortable using the hotline to report instances of abuse in care.

Youth participants in our review (from initial key informant interviews through focus groups and the youth survey) expressed confidence that the Foster Care Ombudsman listens and believes their concerns. Other (non-youth) review participants reported concerns that the Ombudsman is located within DHS, potentially creating a conflict of interest and not being truly independent from DHS leadership influence.

The attorneys and juvenile court judges surveyed for this review indicated that the most effective avenue for children or youth to raise concerns about their placement is to report it to an authority

> "As a judge I have not found reports to the hotline to be effective…DHS often codes the report as unfounded, even when a child is unsafe."
> – *Juvenile Judges Survey Respondent*

---

[9] Note there are conflicting reports from youth in this section about their comfort with reporting abuse in care to different entities. On one hand some youth say no one at DHS is trustworthy, but on the other hand a majority of youth survey respondents indicated that they are comfortable reporting abuse to their DHS caseworker. After listening to and reading about the experiences of over 100 current and former foster youth, we believe that there is value in evaluating all of this information. The seemingly conflicting reports are indicative of the confusing experiences of many foster youth, particularly when they suffer abuse in care.

Exhibit 4
Page 36 of 84

Public**Knowledge**

figure other than a caseworker. See Figure 20. 64% of attorneys and judges report the hotline is rarely or only sometimes a reliable way to have concerns heard and responded to.

*Figure 20: How effective are the following avenues for foster children or youth to raise concerns about their placements outside of making an allegation of abuse or neglect? (Attorneys and Juvenile Judge Survey Results)*



### CULTURE OF DISBELIEF

Youth in focus groups reported feeling that the System treats them as "bad" kids who did something wrong to end up in substitute care and doesn't trust them. A 2015 Critical Incident Initial Response Team Report found a potential systemic issue in "the ability of children in foster care to feel safe about expressing concerns, including concerns about a foster home" (CIRT Initial Report A.M. & R.M., 2015, p. 6).

According to results from focus groups and key informant interviews, there is a "culture of disbelief" toward children in the System and it is set up to discount the child or youth's experience. Review participants say that some workers determine the validity of a hotline call before all the facts have been gathered. They add that many DHS workers don't have the time or training to look at a situation from a neutral perspective, and children and youth often don't feel comfortable talking to certifiers and caseworkers because of their close relationships with foster parents.

Youth reported a lack of confidentiality about their safety concerns. When youth tell their caseworker about abuse or other issues occurring at the foster home, they believe the caseworker often shares the information with the foster parent. Resulting in an unsafe, retaliatory, and uncomfortable environment for the youth.

Exhibit 4
Page 37 of 84

Public**Knowledge**                                                       Findings and Conclusions

It may be for good reason that youth do not trust the hotline or DHS to respond adequately to reports of abuse. Youth are not generally considered trusted reporters of abuse within the system, according to survey respondents. The most common reason reported for not trusting youth reports was if a child or youth had made false reports in the past.

### 2.2.4. Finding VIII - There is little to no follow up on abuse in care investigations.

When a person reports abuse or neglect of a child in a DHS certified foster home using the hotline, DHS's Administrative Rule does not require follow-up to the reporter regarding the outcome of the Department's assessment and whether the allegation was closed at screening (ORS 409.185).

Follow-up is required to the person making the report when the child resides in a CCA residential facility or a CCA proctor home. These are OAAPI-regulated placements (OAR 407-045-0870(4)).

Department rules require OAAPI to notify the child or youth's biological parents or legal guardian, the caseworker, the tribe of an American Indian child, or the Oregon Youth Authority (OYA), when a report of abuse concerning a child in a DHS certified home is made, unless doing so would interfere with the investigation (OARs 407-045-0860(4) and 407-045-0870(1)). However, these parties report not consistently receiving information about reports of abuse and neglect.

Of the 16 DHS Districts, four provided written screening protocols to the review team, and of those four, only one required the caseworker to follow up with the child after a "closed at screening" allegation.

#### REPORTERS' EXPERIENCE

Focus group and survey respondents report not receiving follow up after making reports of abuse in care.

• 83% of youth in surveys say they have never received follow up. See Figure 21.

• CASAs in a focus group reported minimal follow up after making reports.

• Biological parents in a focus group reported not being consistently informed when they make reports of suspected abuse or neglect in care.

• 45% of attorney and judges survey respondents stated that the CPS hotline is not an effective avenue for foster children and youth to report concerns.

Exhibit 4
Page 38 of 84

**Public**Knowledge



*Figure 21: How have you been kept informed once a report of abuse against your foster home provider has been made? (Youth Survey Results)*

Follow up on abuse in care investigations appears to be occurring inconsistently, although the policies are clear.

### Consequences of No Follow Up

No follow up is an issue because the reporter or other members of the child's or youth's team do not know if DHS is taking any action, or if the child in question is in an unsafe situation.

> "I've made a number of hotline calls, I have no idea whether they've been investigated or whether the concerns have been responded to."
> – Attorney Survey Respondent

Youth reported instances of ongoing abuse when DHS failed to follow-up on reports of abuse. One youth reported running away from an unsafe situation before DHS would take her concerns seriously and conduct an investigation.

Foster parents reported receiving no communication during an investigation, other than that they were under investigation. They are not told what the allegation is and receive no communication from DHS during the investigation. Although there may be sound reasons for this to protect the reporter or the child or youth in question, foster parents note that lack of information and the response of moving the child to a new placement can also impact safety and well being.

## 2.2.5. Finding IX - Information that could mitigate safety concerns is not efficiently shared across the entities involved in keeping children and youth safe.

In 2015, a Critical Incidence Response Team reviewed the case of two children that were severely abused while residing in a foster home. In review, the team noted that there is a

Exhibit 4
Page 39 of 84

PublicKnowledge                                                    Findings and Conclusions

systemic issue in DHS of poor communication within and between branches on co-managed cases (CIRT Initial Report A.M. & R.M., 2015, p. 6).

DHS staff report in surveys that System-wide mechanisms do exist to share information about safety concerns, although this was also an area rated high for opportunities for improvement. Focus group participants reported that information sharing is inconsistent and there are many opportunities for information to fall through the cracks.

- 83% of caseworkers and 67% of hotline staff report there are System-wide mechanisms in place to share information.

- 70% of caseworkers and supervisors reported that improving "IT systems that store and share data" is a top solution for increasing efficiency and coordination between the entities involved in keeping children and youth safe in care (i.e., Child Welfare, CPS, OAAPI, OLRO, and others).

> One hotline screener reported using five separate data systems to manage information.
> *- CPS Hotline Staff Survey Results*

## Data Systems

Oregon currently has a disjointed data enterprise for tracking information about child and youth maltreatment in substitute care. OR-KIDS, the DHS data system, has reporting capabilities, but currently does not have advanced reports set up on the data requested for this review and surrounding child and youth safety in care. This data also is not currently shared or used for trend identification. In the absence of trustworthy data and observable trends, single incident cases and anecdotal information are driving decision-making.

Several separate data systems that do not share information and are of varying maturity levels are used across the System. There are unused fields in the OR-KIDS system that would allow a richer data analysis regarding child safety.

We heard from review participants that the data systems are further limited by staff members that do not input data accurately or in a timely manner. This might be due to training, workload constraints, or other issues. The review team experienced this firsthand: when analyzing data sets we noticed a number of "blank fields" or "unknown" data elements.

## Foster Parents

Foster parents report in focus groups that they often receive little information on a child prior to placement, including mental health history and

> "The [Safety Team] found that the lack of communication among DHS staff and/or foster parents contributed to the initial and long term abuse of children in foster care."
> *-Oregon Foster Care Safety Team Final Report, p. 4*

Exhibit 4
Page 40 of 84

Public**Knowledge**

emotional triggers. One example was the case of a newborn in which the foster parent did not receive information on the infant's birth weight, number of weeks she was born prematurely, and that she was born drug-addicted – all of which would impact the care she should have been receiving.

Foster parents report that DHS staff often does not listen to their concerns or recommendations about a foster child or youth, even though the child is living with them and the foster parent has day-to-day contact.

### CASEWORKERS

Caseworkers are required to have contact with children and youth in substitute care that are on their caseloads once per month. According to focus group and interview participants, caseworkers often fail to meet that requirement.[10]

Foster parent focus group participants indicated that caseworkers often give incomplete information about children and youth placed in their homes. This could be because they don't know the child, or they may be highlighting their strengths and downplaying their challenges in order to place them. While this may be well intentioned on the part of the caseworker, the foster parent may not know the true needs of the child, increasing the challenge of safely caring for these children or youth.

In focus groups, foster parents report little communication from caseworkers, unreturned phone calls, and often adversarial relationships with them. They report receiving little support, resources, or information from DHS workers to safely care for children and youth in their homes. Most foster parents report turning to their certifiers for support, rather than the child's caseworker.

### BIOLOGICAL PARENTS

A focus group of biological parents of children and youth in substitute care report not being believed or taken seriously by DHS. Biological parents feel they are discredited and perceived as having poor parenting skills and not having the best interest of their children in mind, and therefore, are not listened to when communicating safety concerns. They also report not being consistently informed when their children are harmed in care.

---

[10] As reported in the Statewide Assessment, as of December 2015, 87.46% of contacts with children in substitute care occurred.

Exhibit 4
Page 41 of 84

**Public**Knowledge

### 2.2.6. CONCLUSIONS FOR CHILD AND YOUTH SAFETY IN CARE

Children and youth experience abuse or neglect the same, regardless of where they live, but the response they experience may be different depending on their placement and caregiver.

Often the wrong allegations are investigated and the ones that should be investigated are screened out. For example, according to Oregon's most recent CFSR Statewide Assessment, in some cases of maltreatment in substitute care there were previous calls [about the case] that were closed at screening or assessed and had a disposition of "unable to determine" (CFSR Statewide Assessment Tool, 2016, p. 16). At least six of the lawsuits we reviewed involved multiple reports of abuse that were closed at screening or never fully investigated. This resulted in abuse escalating undetected.

Findings of abuse are siloed. Isolated communication of crucial facts can lead to safety risks. For example, many cases of abuse and neglect have occurred in provider homes that were never thoroughly assessed and scrutinized prior to certification, according to focus groups and our review of the large settlement or award lawsuits. Other cases of abuse and neglect occurred in provider homes where reports were not accurately documented and spread over several years.

The Department's complex and disjointed system puts children and youth at risk by increasing the likelihood that important facts about safety in care will be overlooked and critical decisions to protect foster children and youth will not be made. In the current system, there is no effective way to ensure that information about abused children or youth does not "fall through the cracks."

Exhibit 4
Page 42 of 84

PublicKnowledge                                                              Related Barriers

# 3.   Related Barriers

This section provides ancillary findings and information about barriers to improving the child substitute care system that arose during the review. Although technically out of scope for this review, we amassed information about these topics during the data collection activities for the review. These barriers, if not thoughtfully addressed and adequately resourced, will hinder progress toward solving the major gaps in the System described in the findings in Section 2. The three areas include data-driven decision making, unreasonable caseloads, and recruitment and retention of substitute care providers. This section also includes observations about disproportionality and minority groups within the system.

## 3.1.   Data Driven Decision Making

**ACCESSIBLE, ACCURATE, AND RELIABLE DATA COULD INFORM HOLISTIC SOLUTIONS THAT ADDRESS THE ROOT CAUSES OF HARM IN CARE.**

There are few, if any, current reports or protocols set up to share information and data about the safety of placements and providers. The data may exist in the systems, but DHS staff from Department leaders to caseworkers, are not consistently using it to identify trends and make decisions. Limited data-driven decision making leads to reactionary responses based on single incidents and crisis. In the words of one assessment participant, actors within DHS and the System as a whole always feel like they are "putting out a fire."

**IMPLICATIONS FOR CHILD AND YOUTH SAFETY IN CARE**

Legislators, DHS leadership, and staff across the System need access to reliable and current data in order to make appropriate decisions that affect the health and safety of Oregon's children and youth in substitute care. Limited data results in management by single incident cases.

**SUPPORTING EVIDENCE**

There are several separate data systems currently used by Child Welfare (ORKIDS), OLRO, and OAAPI that do not interface with one another and that are at varying maturity levels.

Oregon is currently dealing with a disjointed and outdated data enterprise system. Producing and evaluating a basic set of performance data is not a part of routine reporting and decision-making. Single incident cases and crisis response are filling this data vacuum, which in turn is driving regulatory and case decisions. These well-intended but partially informed decisions may negatively impact child and youth safety.

Exhibit 4
Page 43 of 84

**Public**Knowledge                                                      Related Barriers

Data driven decision-making is instrumental to ensure children are kept safe in care, and, "the absence of such information or presence of irrelevant, insufficient or voluminous and disorganized information results in poor decisions" (OR Safety Model, 2013, p. 14).

The case of Give Us This Day (GUTD)[11] is an example of how single incident cases may drive responses when there is a breakdown in the system. As explained in the GUTD Audit, in 2005, DHS made a formal recommendation to not renew GUTD licensing, to stop making referrals, and to remove a majority of the youth residing there. DHS took formal steps to deny renewal of their CCA license. However, DHS leadership at the time made the decision to continue GUTD licensing under a temporary action plan (Audit Report, 2016, p. 2-3) Reasons for this are many, and the state is currently engaged in lawsuits that may bring some of those reasons to light. Contributors to this review believe that political pressure, the provider's willingness to take in "hard to place kids," the state's lack of placement resources, and the state's fear of appearing racist were primary factors in this case. These factors are not necessarily representative of all the breakdowns in the System leading to children and youth being harmed in care, however this case has instigated responses at multiple levels of the System.

## 3.2.  Unreasonable Workload

**Reasonable workloads for agency staff (including CPS, OAAPI, OLRO and others) could improve child and youth safety in care.**

The Child Welfare League of America recommends a caseworker have on average 12-15 children (not cases) at any time. Only 11% of child welfare agencies across the country are meeting this standard (Workforce Issues in Child Welfare, 2009, p. 4). According to DHS staff, Oregon does not track caseloads by DHS workers. Instead, Oregon uses an activity-based workload model adopted by Oregon's 78th Legislature. The model tracks the percentage of work being completed by the workforce in a certain timeframe and relies on self-reported time studies. According to DHS staff, the numbers from February 2016 show DHS workers as completing only 83% of needed work (Feb 2016 Workload Allocation Model).

> "Caseworkers do their best, but there is just too much to do. They are very overworked."
> – CASA *Focus Group participant*

**Implications for Child and Youth Safety in Care**

---

[11] Give Us This Day (GUTD) is a former Portland CCA provider recently shut down due to abuse of youth in care and financial scandal. See: http://www.oregonlive.com/politics/index.ssf/2016/01/foster_care_scandal_deepens.html

Exhibit 4
Page 44 of 84

**Public**Knowledge

Inadequate staffing and high workloads for agency staff negatively impact timeliness in case resolution, regular face-to-face[12] time with children and youth in substitute care, and quality safety monitoring.

Focus groups and surveys universally indicated that unreasonably high caseloads and inadequate staffing across agencies in the System are the reasons key safety information falls through the cracks.

According to recent reports, high caseloads for Oregon DHS often prevent child welfare workers from spending face-to-face time with families (CFSR Annual Progress Report, 2014, p. 102). However, there is no way to ensure safety of children in substitute care without seeing them in those placements. Particularly because Oregon's children and youth experience abuse in care at higher than national rates, face-to-face contact with their caseworkers is even more critical.

A 2002 report showed that CPS staff workloads are a critical factor affecting the quality, accuracy, and timeliness of child safety decisions (PK Review, 2002, p. vii). According to review participants, this is still true today.

## SUPPORTING EVIDENCE

In the last five years, 23 lawsuits have been brought against DHS that revealed numerous violations of policies and procedure. Our review of those cases revealed: failure to adequately investigate repeated reports of abuse, failure to make contact with children to assess safety and wellbeing, failure to document and investigate observed injuries, failure to inform foster parents of foster children's behavior and health history, and failure to maintain coordination between caseworkers. All of these breakdowns could be partially attributed to high workloads and understaffing.

As reported elsewhere in this report, the proportion of children and youth in the System with high needs has increased, resulting in a workload increase across the System.

Foster parents and youth reported in focus groups and surveys that high turnover among caseworkers and infrequent face-to-face contact makes it difficult for children and youth to build trust with the caseworker. Children and youth who don't trust their caseworker may be less likely to report safety issues.

> "I have never had a caseworker answer the phone when I call."
> *–Focus Group Participant*

---

[12] As of December 2015 87% of required face-to-face contacts with children occurred (CFSR Statewide Assessment Instrument, 2016, p. 42).

Exhibit 4
Page 45 of 84

**Public**Knowledge

Focus group and survey participants across the board expressed the perception that caseloads are high, preventing caseworkers from spending the required face-to-face time with children and youth in substitute care. According to the Safety Intervention System Review, Oregon's workload situation far exceeds the outdated national standard (Oregon Safety Model, 2013, p. 1).

## 3.3.   Recruitment and Retention of Providers

**COORDINATED AND ENHANCED RECRUITMENT AND RETENTION ACTIVITIES FOR ALL SUBSTITUTE CARE PROVIDER TYPES COULD REDUCE PRESSURE TO PLACE CHILDREN AND YOUTH INAPPROPRIATELY.**

Participants in the review, from key informant interviewees, to survey and focus group participants, and to advisory committee members agree that the state is not doing enough to recruit and retain substitute care providers.

**IMPLICATIONS FOR CHILD AND YOUTH SAFETY IN CARE**

DHS does not have a comprehensive statewide recruitment, retention, and support plan for substitute care providers, which results in inconsistent and inadequate efforts to sustain and grow placement options of all types.

In the short term, this results in children and youth being shuffled between homes, hotels, and in some cases even sleeping at local DHS offices. See Finding I.

In the long term, this situation increases the likelihood of an inappropriate placement, low quality care, exceptions to certify less-qualified foster homes, or abuse and neglect.

**SUPPORTING EVIDENCE**

Multiple focus group participants agree that lack of placements of all types is a serious problem across the state, in both rural and urban areas alike.

Foster parent focus group participants reported multiple factors contributing to foster parents leaving the system, including: caring for more children than they were certified to care for, insufficient training, little support from DHS, and lack of respite care when needed. In surveys, foster parents added: lack of subsidized daycare

> "The State does not have a statewide process in place to ensure the diligent recruitment of foster homes, despite significant shortages of all types of foster homes."
> - *CFSR Executive Summary, 2008, p. 16*

(especially for relative providers), low provider payment rates, and the scheduling demands placed on foster parents who need to work to meet certification standards.

Exhibit 4
Page 46 of 84

**Public**Knowledge

DHS-certified foster parent focus group participants reported that that they were not "recruited" by DHS, but rather had reached out directly to DHS, or were recruited through friends. Others were recruited by Embrace Oregon, a faith-based partner of the foster care system.

Some localized efforts and campaigns are underway to recruit foster families, but no statewide strategy exists, nor is there a separate budget or resources dedicated to this work.

Almost a third of DHS staff surveyed indicated that *there is no entity* in charge of recruitment and retention of foster homes. DHS certifiers in a focus group reported that "everyone is in charge of recruitment and retention," which effectively means no one is responsible.

The perceptions and the climate surrounding the reasons for and implementation of SB 1515 have resulted in increased tensions between DHS licensing staff and CCA staff. Focus group participants report that the statute's expectations, particularly around the financial oversight, have changed the relationship from collaborative to authoritative. According to review participants, this has implications for recruitment and retention of licensed CCA providers.

It is not clear from looking at the data from DHS whether the supply of foster homes is decreasing or staying steady. According to the recent CFSR Self Assessment, there was a decrease of 20% of general foster homes between 2013 and 2015 (CFSR Statewide Assessment Tool, 2016, p. 118). Yet, the data we reviewed from the DHS system does not corroborate this. According to the data from DHS it appears foster home numbers are staying stable from year to year, but there is significant "churn" within Oregon's pool of foster homes: the data shows that Oregon is closing approximately 1,500 foster homes each year, and opening close to 2,000 (PK Data Request from DHS, 2016).

## 3.4.  Minority Groups and Disproportionality in the System

This section provides ancillary observations the independent review team made about the System's sensitivity to cultural and sexual minority groups within the population of children and youth in care. These are not findings because the review team was unable to draw conclusions about these areas from the data we collected. See Section 5.3 Constraints. These may be areas the state should consider exploring further during the process of addressing gaps in the System.

Exhibit 4
Page 47 of 84

Public**Knowledge**

### 3.4.1. Cultural competency issues within the System may have implications for safety in care.

Few participants in focus groups or surveys identified issues of equity or cultural competency to be significantly connected to safety in care. See Section 5.3 Constraints. However, youth, providers, and other advocates who have experienced this disconnect firsthand spoke about cultural competency and culturally sensitive placements for children and youth as factors affecting safety in care.

#### CULTURALLY COMPETENT PLACEMENTS

Cultural competency language is woven throughout the DHS child welfare policies and procedures, but policy alone cannot address implicit biases that some staff and caregivers carry with them.

Focus group participants stated that DHS does not consider race, culture, or sexual orientation or identity in placement decisions. After analyzing data from focus groups, surveys, documentation, and data systems, it appears this is true.[13] Several factors may contribute to this:

- Dearth of placement options across the board

- Gaps in data collection, training, and communications that impact the way race and culture inform policy and decision making within the System

DHS staff on the Internal Resource Committee reported that there is work being done to address implicit bias across the system. According to DHS staff, the agency offers some optional training including Undoing Racism and Lets Talk About Race. See Section 3 Recommendations for more on this type of training.

#### DISPROPORTIONALITY

This review did not include in-depth analysis of the impact of disproportionality on child safety in substitute care. However, data shows that there is disparity in the system, in terms of the proportion of children of color. Approximately 20% of children and youth in foster care are of color, while children of color make up only 11% of Oregon's overall child population (Governor's Task Force on Disproportionality in Child Welfare Final Report, 2011, p. 5).

---

[13] The notable exception to this is children placed under the Indian Child Welfare Act, or ICWA, which requires placement decisions to consider federal recognition status of tribal membership.

Exhibit 4
Page 48 of 84

**Public**Knowledge

The 2011 Governor's Task Force on Disproportionality Report provides detailed information about the disproportionality issues Oregon is currently facing. We suggest DHS use the results of the Task Force on Disproportionality Report in its work to address system gaps in the areas of safe and appropriate placements and safe and swift response to abuse in care. While most of the recommendations in the report focus on broad, institutional changes, the report also recommends specific steps to address workforce issues, such as prioritizing recruiting and retaining a diverse workforce and requiring ongoing training for child welfare workers, supervisors, and leaders focused on "implicit bias and structural racism, family engagement and inclusion, and team decision making" (Governor's Task Force on Disproportionality in Child Welfare, p. 22). Specifically, the review team suggests Oregon focus on the following recommendations to address safety in substitute care and the findings detailed in this report:

- **DHS Workforce Development.** Establish working relationships and partnerships, hiring and retention practices, and culturally responsive training.

- **Policy and Practice.** Develop an objective risk assessment tool, enhance existing foster and relative placement support, and expand the racially and culturally diverse pool of relative and non-relative foster home resources.

- **Data-Driven Decision Making.** Set targets, improve system effectiveness, and develop research-informed decision-making process (Governor's Task Force on Disproportionality in Child Welfare, p. 32).

### 3.4.2. Awareness of and services for LGBTQ children and youth in substitute care appear to be minimal.

Focus group participants, including youth, foster parents, and CASAs noted that placing lesbian, gay, bisexual, transgender or queer (LGBTQ) children and youth with substitute caregivers who understand and support them enhances their safety and overall experience in care. They cited instances of LGBTQ youth in a non-supportive environment being threatened by foster parents and other youth in the home, and experiencing isolation and depression resulting in self-harm and behavioral problems. In addition, these focus group participants discussed a lack of LGBTQ-related training for foster parents and DHS staff, making it difficult for these children and youth to connect to necessary services. One foster parent stated: "sexual minorities are invisible to DHS."

We learned from a focus group with CCA foster parents, that some agencies actively recruit for foster parents in the LGBTQ community. This could be considered as part of an overall recruitment strategy.

Exhibit 4
Page 49 of 84

# PublicKnowledge

# 4.  Recommendations

The following recommendations are provided to system stakeholders, including Oregon's Office of the Governor, Oregon DHS, and the Oregon Legislature. The recommendations are possible solutions to transform Oregon's substitute care system by leveraging strengths and addressing gaps. Estimated cost level is included, as DHS will need funding and resources to implement most, if not all, of the recommendations in this report. Figure 22 is a map showing the recommendations. The theory of change is the independent review team's estimation of the outputs of implemented recommendations and the long term desired outcomes.

*Figure 22: System Change Logic Model*

| Oregon Child Safety in Substitute Care Independent Review Recommendations | | Foundational Recommendations to Address Barriers |
|---|---|---|
| Safe and Appropriate Placements | Safe and Swift Response to Abuse in Care | |
| THEORY OF CHANGE: More appropriate placements could prevent abuse of children and youth in substitute care. | THEORY OF CHANGE: A coordinated response to abuse in care could lead to earlier intervention and prevention of future abuse. | THEORY OF CHANGE: The recommendations are foundational to the system and any change efforts. If these areas are not addressed, the other recommendations will have little to no traction. |
| • Increase provider rates for all provider types<br>• Adopt an assessment tool to determine level of care and need, for use before placement decisions<br>• Develop Oregon's Continuum of Care and Availability<br>• Build out alternatives to congregate care for children and youth with high needs | • Redesign the Process of Responding to Allegations of Abuse in Substitute Care<br>• Centralize hotline operations<br>• Standardize screening protocols<br>• Adopt a standard protocol for "closed at screening" | • Change the Culture of Oregon DHS<br>• Focus the Whole DHS Agency and Child Welfare Workforce on Safety<br>• Adopt Data Driven Decision Making Processes<br>• Increase Staffing Resources for CPS and Other DHS Entities |

## 4.1.  Implementation Resources

**THE STATE NEEDS TO FUND RESOURCES REQUIRED TO FIX THE PROBLEMS WITH OREGON'S CHILD SUBSTITUTE CARE SYSTEM.**

DHS will need funding and resources to implement most, if not all, of the recommendations in this report and others. There is momentum in the state to fix the problems with the System, but change will not happen without people dedicated to implementing solutions. Implementation of the recommendations in this report and other initiatives will be time and labor intensive, and DHS staff do not have the capacity to add this work to their regular jobs. Implementation resources will be needed to accomplish the following:

Exhibit 4
Page 50 of 84

**PublicKnowledge**

- **Resource planning**. DHS, together with the Governor and the Legislature, should prioritize the recommendations in this report and others, and develop a resource plan to staff the efforts.

- **Alternatives analysis**. The review team provided examples in this section of tools and best practices we have seen work well in other states or that are recommended by national organizations, but Oregon will need to engage in alternatives analysis upfront to determine what will work best in the context of this state.

- **Management of the change efforts**. DHS will need an implementation management team, to operationalize many of the recommendations. An implementation manager or team will need to develop an implementation plan, mange the implementation of the plan, and measure success.

- **Engagement of experts**. The state will need access to outside expertise and resources to implement some of the recommendations in this section as well as other initiatives. This could range from working with the Capacity Building Center for States to access free technical assistance and capacity building, Chapin Hall to improve the use of child welfare data, engaging policy experts to redesign the process of responding to allegations of abuse in care, and working with implementation experts to ensure the efforts gain traction and create lasting change.

## 4.2.  Safe and Appropriate Placements

Over the course of this review, the topic of quality providers and availability of providers of all types came up over and over again. Although our team did not review quantitative data that verifies a shortage of substitute care providers, review participants reported this perspective almost universally. Key to Oregon's success in reducing the number of children in substitute care who experience abuse is changing the payment model for providers, appropriately matching children and youth to the right level of care, developing a more robust continuum of care, and building out alternatives to residential care for children and youth with high needs.

### 4.2.1. Priority Recommendations

| Recommendation | Considerations, Activities, Resources, and Estimated Cost Level |
| --- | --- |
| **Increase Provider Rates for All Provider Types** | The state should review provider rates and make sure they are commensurate with the services providers are being asked to provide. Multiple stakeholders pointed to provider payment rates and methodology being a significant barrier to attracting and keeping qualified providers. Oregon should look at directing more funds towards this at every level of care. For comparison purposes, a 2012 survey outlined foster care payments across the country in terms of rates, modifiers, and models (State Child Welfare Policy Database, 2016). This may help provide support and direction for increasing rates in Oregon. In this |

Exhibit 4
Page 51 of 84

**Public**Knowledge

| Recommendation | Considerations, Activities, Resources, and Estimated Cost Level |
|---|---|
| | report, Casey Family Programs found, "The basic foster care rates in the majority of states fall below our estimate of the costs of caring for a child" (DeVooght & Blazey, 2012, p.2). |
| | In order to appropriately match children and youth to substitute care providers, Oregon should also consider changing the foster care level modifiers for payment from purely child or youth needs driven to provider skill driven as well. For instance, a child or youth who needs level 3 foster care should be placed with a level 3 provider who has specialized training and skills to handle those needs. This would also necessitate completing a level of care assessment before placement decision as often as possible (see next recommendation), while also not relying on a pre-placement that would cause more placements overall. |
| | **Initial Resources**: |
| | **Rate Fact Sheets**: http://www.childwelfarepolicy.org/maps/reimbursement_fact_sheets |
| | **Payment Rate Report**: http://www.childtrends.org/wp-content/uploads/2013/04/Foster-Care-Payment-Rate-Report.pdf |
| | **Estimated Cost Level**: [14] |
| | ☒ Cost intensive    ☐ Low cost    ☐ Cost neutral |
| **Adopt an Assessment Tool to Determine Level of Care and Need, for Use Before Placement Decisions** | Adopt and implement a front-end assessment tool to support decision making for appropriate placement. Such a tool will support caseworkers and teams to determine the intensity, duration, and restrictiveness of services before a placement is made, reducing the risk of harm in care due to inappropriate placements. There are a variety of tools that can be used (as well as states that have developed their own). The review team recommends Oregon adopt the use of CASII/ECSII for level of care determinations. These tools assist most in the initial determination of need, but also assist states to balance between individual clinical need and resources available across the state. The tool has six levels that correspond to medical need and level of care, from basic needs to 24-hour secure medically managed services. |
| | Note: "Levels of care (LOC) should be determined by the child's needs and strengths and be connected to level of funding. LOC should not determine type of placement. For example, recent research on in-home services and treatment foster care indicate that children with severe needs can be appropriately treated with effective supportive services" (Stratton, 2005). For example, a child or youth with a high level from a CASII assessment can still be maintained in a specialized foster home or relative care with the right in-home services and supports in place. |
| | **Initial Resources**: |
| | **Levels of Care**: https://www.openminds.com/wp-content/uploads/indres/010105levelsofcare.pdf |
| | **Payment Rate Report**: http://www.childtrends.org/wp-content/uploads/2013/04/Foster-Care-Payment-Rate-Report.pdf |
| | **CASII**: https://www.aacap.org/App_Themes/AACAP/docs/member_resources/practice_information/casii/CASII_infor_and_data.pdf |
| | **Estimated Cost Level**: |

---

[14] The estimated level of cost is a rough estimate based on the review team's experience with or observations on similar undertakings in other states.

Exhibit 4
Page 52 of 84

# Public**Knowledge**

| Recommendation | Considerations, Activities, Resources, and Estimated Cost Level |
|---|---|
| | ☑ Cost intensive     ☐ Low cost     ☐ Cost neutral |
| **Develop Oregon's Continuum of Care and Availability** | Planfully consider the levels of care needed and provided in the state. The continuum of care begins with in-home services so children and youth can stay safely at home, to relative foster care, to non-relative foster homes, to crisis care, to specialized or professional foster care, to therapeutic foster care, residential, and psychiatric residential treatment facilities. This should be done with a focus on continuing to keep congregate care numbers low, and reducing the state's out of state placements that have recently increased (see Figure 11). Oregon must ensure adequate availability at all levels of care, which is possible only if there is data about the level of care needs of the population and the level of care skills and abilities of the providers (using an assessment discussed above). "Simply reducing the use of congregate care without developing alternatives runs the risk that many of these youth will be thrust into environments where their caretakers may not have the skills, capacity, or training to meet their needs" (California Child Advocates for Change, 2016, p.5). See more information on efforts like this in Connecticut, Colorado, Tennessee, and Nevada. |
| | Finally, the current placement services available for children and youth involved in Oregon's substitute care system are confusing. Finding a way to simplify this continuum of care and focus on quality and quantity is critical. At this time, depending on which service the child or youth needs, different agencies, processes, and oversight are brought to bear. Some of this is necessary, but some seems to have been created by rule and unnecessary bureaucracy around the services. |
| | **Initial Resources**: |
| | Continuum of Care: https://www.childrennow.org/files/6514/6896/7658/Foster_Care_Policy_Brief_--_Developing_a_Robust_Continuum_of_Care.pdf |
| | Continuum of Care State Examples: https://www.childwelfare.gov/topics/outofhome/foster-care/achieving-continuum/#sl_examples |
| | Reducing Congregate Care: http://www.childrensrights.org/wp-content/uploads/2011/07/2011-07-25_what_works_reducing_reliance_on_congregate_care_in_tn_final-report.pdf |
| | **Estimated Cost Level**: |
| | ☑ Cost intensive     ☐ Low cost     ☐ Cost neutral |
| **Build Out Alternatives to Congregate Care for Children and Youth with High Needs** | Oregon has a relatively small population of children and youth in residential or congregate care (U.S. Department of Health and Human Services, 2015, p.14). While this is a strength of the System, it has also caused some harm, as many children and youth with high needs are being placed in lower levels of care that are not able to adequately or safely care for them. Oregon needs to build out a model of non-congregate care to serve these children and youth with high needs. There are many models across the country including some of the most successful: Therapeutic Foster Care (TFC) (including an international organization specializing in developing TFC that is based out of Oregon), Intensive Wraparound[15], and Care Management Entities. Oregon needs to choose which one(s) to establish within the state. This is for likely a very small part of the substitute care population, but they are among the neediest and most expensive to serve. Although expensive to build out and implement, these services will save money in the long term as |

---

[15] This was piloted in Oregon and some sites still use it, but it is not used statewide.

https://www.oregon.gov/oha/amh/data/scwi2013biennial-leg-report.pdf, page 4 - This Statewide Children's Wraparound Initiative report fulfills the requirement in ORS 418.985 (4). Statewide Children's Wraparound Initiative Biennial Legislative Report May 17, 2013, https://www.pdx.edu/ccf/sites/www.pdx.edu.ccf/files/Best%20Practice%20Guide%20Version%201.0.pdf

Exhibit 4
Page 53 of 84

| Recommendation | Considerations, Activities, Resources, and Estimated Cost Level |
|---|---|
| | they are less expensive to operate, produce better child outcomes than congregate care, and will result in less harm in care because children and youth will be in the appropriate placements. |
| | **Initial Resources**: |
| | Treatment Foster Care: http://www.imis100us2.com/ffta/FFTA/Learn/What_Is_Treatment_Foster_Care_/New_FFTA_Content/Learn/What_Is_Treatment_Foster_Care.aspx?hkey=b72589aa-0fa2-45ca-8586-b25939566e3b |
| | TFC Consultants: http://www.tfcoregon.com/ |
| | Statewide Wraparound Initiative: https://www.oregon.gov/oha/amh/data/scwi2013biennial-leg-report.pdf |
| | Best Practices in Wraparound: https://www.pdx.edu/ccf/sites/www.pdx.edu.ccf/files/Best%20Practice%20Guide%20Version%201.0.pdf |
| | Care Management Entities: http://www.chcs.org/resource/care-management-entities-a-primer/ |
| | **Estimated Cost Level**: |
| | ☑ Cost intensive    ☐ Low cost    ☐ Cost neutral |

## 4.2.2. Other Recommendations to Consider

Outside of the four priority areas discussed in the above section, Oregon may choose to consider other best practices and recommendations once the priority recommendations are addressed. These include:

- **Add more accountability into the foster home certification exceptions process.** Both benefits and risks related to the exceptions process were reported during the review. The exceptions process should be used to ensure relative care when appropriate, but safety requirements for non-relative care should not be subject to the exceptions process often, if at all. The review team recommends that DHS add in another level of accountability to the exception process and related rules and policies. For example, the OAR governing certifications does not require documentation for all safety-related exceptions (OAR 413-200-0274). Documentation should be completed for any exception related to a safety requirement. DHS should tighten the requirements and process to ensure District Managers are approving waivers for all safety exceptions, while still balancing the need for flexibility in the exceptions process to support relative placements. We recommend that this function remain a decentralized activity, as local staff will still see first hand the homes they are considering for certification. However, Oregon should adopt a centralized quality assurance

Exhibit 4
Page 54 of 84

**Public**Knowledge

function (such as regular audits completed by the central office) to ensure the appropriate decisions are being made at the local level.

**Initial Resources:** N/A, PK recommendation

- **Continue relative placements and use Family Finding.** While relative placement in Oregon is considered a strength of the System, there is still room to grow this placement type. Focused efforts on finding relative placement resources early in the case and getting them approved to care for children and youth should continue and increase. This will involve streamlining the process to remove unnecessary barriers to certification of relative care providers, but without compromising safety standards. We were unable to determine whether Oregon consistently works with Family Finding[16] or other similar research services to search for relative placement resources. If these services are used sporadically or only in some areas of the state, DHS should consider adopting this as standard practice.

**Initial Resources**:

Family Finding and Engagement: http://www.childrensdefense.org/library/data/promising-approaches.pdf

Relatives and Kin:
https://www.childwelfare.gov/topics/outofhome/kinship/locating/searching/

Family Finding Search Tools: http://www.familyfinding.org

- **Train and infuse trauma informed care into the System.** Review participants from across the System indicated a need and desire to infuse trauma informed care. "Providers and systems have the ability to help or potentially re-traumatize. A trauma-informed system aligns interactions among youth-serving agencies, such as the child protection systems, lawyers, juvenile judges, law enforcement, schools, and mental health providers so that they better understand how youth, families, and adults respond to trauma"(IWGYP, 2013, p.4). It is essential that the System caring for children and youth in substitute care have extensive knowledge and training in trauma and trauma informed care. Understanding and skills in this area will help to de-escalate tensions in the homes and placements and keep more children and youth safe.

---

[16] "The Family Finding model, developed by Kevin A. Campbell, offers methods and strategies to locate and engage relatives of children currently living in out-of-home care. The goal of Family Finding is to connect each child with a family, so that every child may benefit from the lifelong connections that only a family provides."

Exhibit 4
Page 55 of 84

**Public**Knowledge

**Initial Resources**:

Trauma-Informed Systems: http://www.nctsn.org/resources/topics/creating-trauma-informed-systems

Creating Trauma-Informed Systems: http://www.extension.umn.edu/family/cyfc/our-programs/ereview/docs/cmhereviewMar11.pdf

Trauma-Informed Practice: http://calswec.berkeley.edu/toolkits/child-welfare-mental-health-learning-collaborative-katie/trauma-informed-practice-tools

Child Trauma Academy: http://childtrauma.org/

- **Ensure providers have access to respite.** Respite care is a key factor in supporting and retaining foster parents, and ensuring that caregivers are able to safely care for the children and youth in their homes. Policies that allow foster parents to use their natural supports, such as neighbors, family members, and family friends, as baby-sitters and respite providers can be particularly helpful. There are many model respite care programs from Mockingbird Family Model (WA), or Circle of Support (VA), to public and private networks pooling funds and providing vouchers. It is critical that Oregon establish something to support these families when a break is needed to de-escalate.

   **Initial Resources**:

   Mockingbird Family Model: http://mockingbirdsociety.org/index.php/what-we-do/mockingbird-family-model, http://calswec.berkeley.edu/sites/default/files/uploads/effective_practices_in_foster_parent_recruitment_and_retention.pdf, page 13

   Circle of Support: http://www.nrcdr.org/_assets/files/NRCRRFAP/resources/taking-a-break-respite-guide.pdf, page 17

- **Implement exit interviews with providers leaving the system.** A relatively low cost way for DHS to get quick feedback on what works and what does not work for providers is to implement exit interviews or exit surveys to find out why a provider is ending their service.

   **Initial Resource:**

   Example survey: https://www.surveymonkey.com/r/fosterparentexitinterview

Exhibit 4
Page 56 of 84

**PublicKnowledge**

- **Focus on keeping more children and youth at home with supports in place.** Although not the focus of this report, there is no doubt that preventative work with families to keep children and youth safely at home and out of substitute care will ease the demand in the System. As a few review participants put it, "there is no reason these children and youth shouldn't be at home if we can't keep them safe." A focus on court and state intervention while the child or youth is still at home (in appropriate cases) with supports and services in place will help.

**Initial Resources:** N/A, PK recommendation

## 4.3.  Safe and Swift Response to Abuse in Care

The ability to swiftly respond to the correct abuse in care allegations and keep children and youth safe will center around stakeholders' ability to see this set of steps from the perspective of a child or youth. The entire process has to become more standardized and less complicated in order to keep critical safety information from "falling through the cracks." This includes redesigning the process of responding to allegations of abuse in care, hotline operations, screening protocols, and closed at screening decisions.

### 4.3.1. Priority Recommendations

| Recommendation | Considerations, Activities, Resources, and Estimated Cost Level |
|---|---|
| **Redesign the Process of Responding to Allegations of Abuse in Substitute Care** | A number of DHS entities, people, statutes, rules, policies, and business processes are involved in responding to abuse of children or youth in substitute care. The abuse in care definitions, associated investigation procedures, and rules for critical incident reporting, create a confusing and uncoordinated response system. The independent review team could not find a provider or DHS employee who could explain all of the details of these processes for all provider types, which means that when a child or youth is abused in care, no single individual has a handle on what should be done, by whom, and by when. It appears that this convoluted system has led to safety information "falling through the cracks," allowing abuse in care to continue in some cases. Fixing individual elements of this process, such as instituting one definition of abuse for all substitute care settings or improving training for investigators, will not fix the convoluted nature of the current system. |
| | We recommend that Oregon redesign the process, beginning with the perspective of the child or youth in care. We believe this is more than a business process redesign project. It will require an effort to rebuild the process from start to finish, including associated rules, policies, and statutes. In order to accomplish this, the current processes should be documented, focusing on understanding the current requirements, their origins, and the reasons behind the requirements so DHS knows what needs to be kept and what should be updated or replaced. Because no one person understands the system from beginning to end, skipping this step could mean something important is missed. That said, the focus should be on redesigning this process from start to finish and it should look completely different than it does today, as the current process is not working and is not child or youth driven. |
| | Elements for this effort should include: |

Exhibit 4
Page 57 of 84

# Public Knowledge

| Recommendation | Considerations, Activities, Resources, and Estimated Cost Level |
|---|---|
|  | • Document as-is processes, focusing on the current policies, rules, and statutes. Use the PK Regulatory System Maps as a high level starting place for this effort. |
|  | • Develop to-be processes. Identify and develop policies and procedures that support a future state driven by the child or youth experience. |
|  | • Engage the appropriate legislative entities to assist with clarifying existing or developing new statutory language. |
|  | • Determine changes to staffing, organizational structures, training, cost models, and data collection and reporting needed to support the new processes. |
|  | • Engage external technical assistance to advise and facilitate this effort. |
|  | • Assign appropriate DHS staff to support the effort. We recommend including a balance of DHS staff who have worked in the current system and also individuals who will think disruptively and promote change. |
|  | • Ensure representatives from all provider communities are consulted (CCA, DHS certified foster homes, CCA certified foster homes, residential programs, PRTFs, etc.). |
|  | • Treat this as a project with established goals, timelines, and assignments. |
|  | **Initial Resources**: PK Deliverable 2.2 Authority Inventory and Regulatory System Maps. The authority inventory captures many of the current statutes and rules related to the child substitute care system. The two system maps summarize the process from a regulatory standpoint for responding to allegations of abuse in DHS certified foster homes and CCA substitute care settings. |
|  | **Estimated Cost Level**: <br> ☑ Cost intensive    ☐ Low cost    ☐ Cost neutral |
| **Centralize Hotline Operations** | The review team recommends centralizing the hotline operations and standardizing training and response criteria to add consistency to screening and decision-making, standardization of processes, ease, better oversight, and clarity on responsibilities so less falls through the cracks. There are certainly pros and cons to decentralized and centralized hotline models, but the review team believes that for Oregon, there are more benefits to centralization than consequences. <br><br> Benefits to a centralized hotline include: more cases identified and more victims confirmed, a higher percentage of referrals that are screened-in (compared to decentralized models), a lower percentage of referrals screened-out (compared to decentralized), brings consistency to the way abuse and neglect calls are managed, improves the intake specialist's ability to gather information from caller, expedites the process of preparing reports and dissemination to local office for assessment, and allows local offices to spend more time working with children and families because they are no longer responsible for handling intake functions. <br><br> The review team identified model state policies and resources to help with this change, listed in the Initial Resource row below. The state should conduct an alternatives analysis to select the model most appropriate for Oregon's specific needs. <br><br> **Initial Resources**: <br><br> State policies that can be referenced as models: Florida, Colorado, Indiana, Michigan, |

Exhibit 4<br>Page 58 of 84

# PublicKnowledge

Recommendations

| Recommendation | Considerations, Activities, Resources, and Estimated Cost Level |
|---|---|
| | Utah, Idaho, and more. |
| | Answering the Call: How States Process Reports of Child Abuse and Neglect |

**Estimated Cost Level**:

    □ Cost intensive    ☒ Low cost    □ Cost neutral

| **Standardize Screening Protocols** | The best practices in screening protocols include: When an abuse report is received on a child in substitute care, "the intake process must distinguish between reports that: do not indicate maltreatment or concerns about standards of care, and require no further services; do not indicate maltreatment or concerns about standards of care, but do identify the need for further services; do not indicate maltreatment but do raise concerns about standards of care and possible licensing violations; and warrant a formal CPS investigation" (Child Welfare League of America, 2003, p.29 and p. 53). There is not currently a consistent statewide protocol or approach to screening an allegation of abuse in care. Oregon needs to adopt one. |

At the outset, all reports should be presumed to be credible: "The fact that a child or other reporter has made an erroneous report in the past should not hinder a full and cautious screening of subsequent reports" (Children's Bureau, 2013, p.30).

Standardizing screening protocols will be easier if the hotline is centralized. Some potential tools from other states that Oregon could use as examples include:

• North Carolina: Safety Assessment
• Texas: Risk Assessment Tool
• Washington: Structured Decision Making-Intake Decision Tree Guide
• Utah: SDM Safety Assessment Tool

The most recent National AFCARS data shows that children and youth in substitute care in all four of these states experience less maltreatment in care than the national average, and half or less than the percentage of children and youth experiencing maltreatment in care in Oregon (National AFCARS Data, 2013 and 2012).

**Initial Resources**:

CWLA Best Practice Guidelines:
http://work.hunter.cuny.edu/socwork/nrcfcpp/downloads/policy-issues/maltreatment-guidelines.pdf

Screening Reports: https://www.childwelfare.gov/pubPDFs/repproc.pdf

Screening Tools: All of the state tools referenced above can be found at the National Resource Center for Child Protective Services website: www.nrccps.org; Go to the Decision Making Tools Library & click on the states listed above to find the actual tool & (usually) a policy description for it.

**Estimated Cost Level**:

    □ Cost intensive    □ Low cost    ☒ Cost neutral

| **Adopt a Standard Protocol for "Closed at Screening"** | A critical aspect of standardizing screening protocols (see above) is establishing standard criteria for determining what circumstances must be met in order for an allegation to be "closed at screening." An evidence based standard risk assessment framework such as Structured Decision Making would support more consistent decisions and make the process less subjective. |

**Initial Resources**:

Exhibit 4
Page 59 of 84

**Public**Knowledge

| Recommendation | Considerations, Activities, Resources, and Estimated Cost Level |
|---|---|
| | **Structured Decision Making:** http://www.nccdglobal.org/assessment/sdm-structured-decision-making-systems/child-welfare |
| | **Safety Organized Practice:** www.cssp.org |
| | **Estimated Cost Level:** |
| | ☐ Cost intensive    ☐ Low cost    ☑ Cost neutral |

### 4.3.2. Other Recommendations to Consider

Outside of the four priority areas discussed in the above section, Oregon may choose to consider other best practices and recommendations once the priority recommendations are addressed. These include:

- **Ensure DHS has unlimited access to legal consultation representation for workers, investigators, and certifiers when making decisions regarding youth safety**. This was a recommendation from the recent Task Force on Dependency Representation. "The Oregon State Legislature should allocate funding to the Department of Human Services (DHS) to leverage federal grant and reimbursement programs to enter into a block grant (or "flat fee") agreement with the Department of Justice (DOJ) for comprehensive agency representation in dependency cases. Additionally, the Oregon State Legislature should grant position authority to DOJ for the additional attorneys and staff required to implement this model" (Oregon Task Force on Legal Representation, 2016, p.5).

**Initial Resource**:

Oregon Task Force on Legal Representation:
https://www.oregon.gov/gov/policy/Pages/LRCD.aspx

- **Ensure follow up after a report of abuse in care occurs timely and to the right individuals**. Current policy does not require DHS to notify youth or others if the report of abuse was closed at screening. If the report was not closed at screening, according to statute, DHS should be notifying attorneys, biological parents, CASAs, caseworkers and supervisors, and the Citizen Review Boards (ORS 419B.035). CWLA recommends notifying the following entities and individuals: caseworkers, foster parents, certifiers, birth/adoptive parents, child and other children in the home, law enforcement (when necessary), tribal social service workers, and the mandatory reporter (who made the initial call) of the screening decision and investigation outcome in accordance with state statutes. Current

**Exhibit 4**
**Page 60 of 84**

**PublicKnowledge**

policy does not require notification to the child or other children in the home, which is recommended in order to increase awareness of and respect for the child or youth experience in substitute care. The DHS policy should be updated to include at least the child or youth, and ensure the policy is followed.

**Initial Resource**:

CWLA Best Practice Guidelines:
http://www.hunter.cuny.edu/socwork/nrcfcpp/downloads/policy-issues/maltreatment-guidelines.pdf

- **Adopt clear protocols to ensure the information on investigations is getting to the Citizen Review Boards (CRBs) according to statute**. The review team recommends that DHS provide CPS assessment records to CRB, as required. We further recommend DHS update policy language to specifically note the requirement to inform CRBs of assessments. This simple change would increase the accountability of the investigators and DHS when abuse in care occurs.

**Initial Resources**:

Oregon Revised Statutes: http://www.oregonlaws.org/ors/419B.035 at para(d)

DHS Foster Care Certification Rules:
http://www.dhs.state.or.us/policy/childwelfare/manual_1/division_200.pdf,
page 71 para (c) sub para(C) sub para(v) )

- **Track and report on critical incident reports and abuse reports by provider type and provider so trends can be identified before a crisis**. Reports should be built to show this data at an individual provider level and an aggregate level. For example, before a worker or team choose a provider (and before a certifier or licensor conducts an unannounced visit or investigates an allegation, or re-certifies a provider), they should consult a report showing data on the number of calls screened in and out, and number of reports founded and un-founded (and the details of those issues). Leadership at the state and branch level should have regular access to a report that shows all providers and numbers of screened out reports, screened in reports, unfounded investigations, and founded investigations by each provider. This practice would promote data driven decision making and tracking trends, rather than inconsistent responses to single incident cases.

**Initial Resources:** N/A, PK recommendation

**Exhibit 4**
**Page 61 of 84**

Public**Knowledge**

## 4.4.   Foundational Recommendations

The following recommendations are out of scope for this review, but foundational to any change efforts to address gaps in Oregon's substitute care system. If these areas are not addressed, the other recommendations in this report will gain little or no traction. The lack of focus to date on the areas described in this section may explain why Oregon has received a number of reports and recommendations and launched various change efforts over the last ten years, but has seen little improvement to the safety of children and youth in the substitute care system.

The review team concludes that organizational culture change within DHS, using data to drive decision making and policy throughout the System, ensuring adequate staffing and reasonable caseloads for DHS staff, and focusing on recruitment and retention of quality providers must be prioritized in order to ensure that the solutions presented above bring about needed transformational change for the substitute care system.

### 4.4.1. Priority Recommendations

| Recommendation | Considerations, Activities, Resources, and Estimated Cost Level |
|---|---|
| **Change the Culture of Oregon DHS Through Strong Leadership, Behavior Modeling, and Organizational Change Management** | The culture of Oregon DHS has for some time been focused on reframing problems with the child substitute care system to deflect blame, comply with regulation, and preserve the existing System. DHS needs to refocus all of its people on prioritizing the safety of children and youth who are in the care of the state. Previous reviews, legislation, and internal change projects have all focused on various aspects of the System. It is time for DHS to see the System from the experience of the children and youth in substitute care and act from that perspective.
|  | Actions taken in response to this review, future breakdowns in the System, or directives from policymakers need to put the children and youth first and implement solutions focusing on their safety. (See next priority recommendation: *Focus the Whole DHS Agency and Child Welfare Workforce on Safety as the Highest Priority and Encourage any Staff Member to Speak Up with Concerns.*)
|  | The change needed at DHS is more complex than project management alone can achieve. None of the other recommendations to mend gaps in the System will successfully transform the experience of children and youth in care if the people who work at DHS do not change. DHS executives need to lead culture change and anchor it in the organization through building strong leadership skills, behavior modeling, and organizational change management.
|  | Behavior modeling in the workplace is an element of social learning theory that involves leading by example. People take cues from their managers, supervisors, and executives. The actions and decisions of DHS leaders and managers can have far reaching effects throughout the agency's workforce, and can change the culture of the agency. Behavior modeling can be instituted and enhanced through leadership development activities.
|  | Organizational culture change requires people to change their behaviors: "organizations do not change, people do" (Prosci, 2016). In a large, bureaucratic organization like DHS, this requires winning the hearts and minds of the people |

Exhibit 4
Page 62 of 84

# Public**Knowledge**

| Recommendation | Considerations, Activities, Resources, and Estimated Cost Level |
|---|---|
| | who work for the agency – and also setting up supportive processes and strict accountability measures, and eliminating barriers to change. DHS needs move from a culture of agency protectionism to one of self evaluation and continuous improvement.<br><br>Adopting evidence-based Organizational Change Management (OCM) processes and structures will help DHS implement the recommendations in this report and make the changes stick. DHS needs to charge its leaders with establishing a sense of urgency for culture change and assign OCM planning and implementation to a single person or group. OCM models we have used successfully in our work with public agencies are listed below. |
| | **Initial Resources**:<br><br>Prosci: https://www.prosci.com/change-management<br><br>Kotter's 8 Steps: https://www.mindtools.com/pages/article/newPPM_94.htm<br><br>Lewin's Change Management Model: https://www.mindtools.com/pages/article/newPPM_94.htm |
| | **Estimated Cost Level**:<br><br>☐ Cost intensive  ☒ Low cost  ☐ Cost neutral |
| **Focus the Whole DHS Agency and Child Welfare Workforce on Safety as the Highest Priority and Encourage any Staff Member to Speak Up with Concerns** | As part of an organizational culture change effort described above, DHS should adopt a "safety culture" as a means to increase safety for children and youth in substitute care. A "safety culture" creates organizational and cultural attributes focused on safety thus improving the psychological safety, stress recognition, and employee support necessary to effectively conduct child welfare work. The state of Tennessee has done extensive work in this area.<br><br>"Amidst the highly salient and vivid examples of failures of the child welfare system across the country, we find that leader actions to enable a safety culture that signify safety is a leadership priority (i.e., safety climate) and that it is psychologically safe for employees to speak up about challenging situations at work can help employees cope with their extremely difficult and intensely scrutinized work and experience lower levels of emotional exhaustion. However, we also illustrate opportunities for improvement as our data reveal that many aspects of safety culture are underdeveloped (e.g., stress recognition and safety organizing). Thus, we provide provisional evidence supportive of recent calls (Commission to Eliminate Child Abuse and Neglect Fatalities, Cull et al., 2013 and Rzepnicki et al., 2010) to strengthen safety culture within a state's child welfare agencies." |
| | **Initial Resources:**<br><br>Michael Cull, Ph.D. (TN) Improving Child Protection with Safety Science<br><br>Assessing Safety Culture in Child Welfare: Evidence from Tennessee: http://www.sciencedirect.com/science/article/pii/S0190740916300949 |
| | **Estimated Cost Level**:<br><br>☐ Cost intensive  ☐ Low cost  ☒ Cost neutral |
| **Adopt Data Driven Decision Making Processes at DHS, Focusing First on** | Nationally there are many examples of states using data to improve outcomes for youth and families in child welfare. Oregon collects data on child maltreatment in care, but does not have a culture around using the data to drive decision-making and change. Without an increased focus and reliance upon data, the system will |

Exhibit 4
Page 63 of 84

**Public**Knowledge

| Recommendation | Considerations, Activities, Resources, and Estimated Cost Level |
|---|---|
| the Safety in Care Outcomes that Need to Change | always be reactive instead of proactive. |
| | Oregon should take advantage of national expertise to assist with this effort, including a relatively low cost program from Chapin Hall, which includes tracking the state's outcome measures and comparing to other member states. According to Chapin Hall, "the Data Center provides child welfare agencies with the precision tools they need to examine the extent to which they achieve their intended outcomes, whether they receive the best return on their investments, and how they might allocate future funds toward a more cost-effective system. Our suite of analytic resources enables agencies to assess performance gaps and the investments required to close them. The result is knowledge that enables states to make informed decisions about future programming and investments, sparking a cycle of continuous quality improvement based on evidence" (Chapin Hall, 2016, https://www.childwelfare.gov/pubPDFs/case). There are currently 21 state members, including Oregon's neighbor, Washington State. Chapin Hall also provides related technical assistance. |
| | **Initial Resources**: |
| | Chapin Hall: https://www.childwelfare.gov/pubPDFs/case |
| | **Estimated Cost Level**: |
| | ☐ Cost intensive      ☑ Low cost      ☐ Cost neutral |
| Increase Staffing Resources for CPS and Other DHS Entities | CWLA recommends a caseload of 12-15 children per worker for child welfare caseworkers (Sudol, 2009). Oregon does not track caseloads like other states, but the activity-based workload allocation model shows DHS workers as being able to complete only 83% of the needed work. Until the CPS workers, OLRO licensers, CPS hotline screeners, and OAAPI investigators are adequately staffed, the system will always struggle to keep on top of child and youth safety. One example provided by review participants was that visits to facilities were only required once every six months and even this is not currently being met due to staffing issues. DHS cannot adequately do what they are required to do without the staffing to comply. |
| | **Initial Resources**: |
| | Using Data to Improve Systems: https://www.childwelfare.gov/topics/management/info-systems/using-data-to-improve-outcomes-for-children-youth-and-families/ |
| | Center for State Child Welfare Data: https://www.childwelfare.gov/pubPDFs/case |
| | CWLA Best Practice Guidelines: http://www.hunter.cuny.edu/socwork/nrcfcpp/downloads/policy |
| | Caseload and Work Management: https://www.childwelfare.gov/pubPDFs/case_work_management.pdf |
| | **Estimated Cost Level**: |
| | ☑ Cost intensive      ☐ Low cost      ☐ Cost neutral |

Exhibit 4
Page 64 of 84

**Public**Knowledge

### 4.4.2. Other Foundational Recommendations to Consider

Outside of the four priority areas discussed in the above section, Oregon may choose to consider other best practices and recommendations that will further stabilize DHS and the child substitute care system. These include:

- **DHS needs to enable a workforce culture shift and decrease staff turnover.** DHS should review best practices for improving worker recruitment and retention and adopt a strategy to increase retention by addressing some of the common barriers and issues causing workers to leave their positions. Strategies may include: increasing the quality and capacity of supervisors to train, mentor, assist, and transition caseworkers; increasing salary, opportunities for professional development, flexible schedules, supporting workers through traumatic experiences, and others. Commonly cited reasons for turnover in human services organizations – such as salaries, high caseloads, unpredictable hours, insufficient services to serve children and youth, lack of support from the Department, quality and quantity of training, negative media attention – are all occurring in Oregon right now according to review participants, so to not focus on workforce issues will ensure failure of the efforts for change (GAO, date unknown, p.3).

**Initial Resources**:

The NCWWI Workforce Development Framework: http://ncwwi.org; http://ncwwi.org/files/Retention/1-page_summary_McFadden_et_al._2015.pdf

- **DHS should focus on recruitment and retention of quality providers.** Oregon needs to develop a statewide recruiting strategy, and assign a budget and resources to implement the strategy. There is little effort on this currently, except in rare pockets of the state, which is contributing to the scarcity of providers described in Finding I. Assessment participants recommended recruitment with both faith based and non-faith based organizations, and focusing recruitment efforts in the LGBTQ community and communities of color.

**Initial Resources**:

Recruitment and Retention: http://calswec.berkeley.edu/sites/default/files/uploads/effective_practices_in_foster_parent_recruitment_and_retention.pdf

Exhibit 4
Page 65 of 84

# PublicKnowledge

- **DHS should help build support for providers at DHS, including peer support models.** Oregon should review models of provider support programs to implement such as: Mockingbird Model, Kinship Support Services Program, Foster Parent Mentor Program, or Fostering Hope Program.

  **Initial Resources**:

  Foster Parent Support Resources: http://calswec.berkeley.edu/sites/default/files/uploads/effective_practices_in_foster_parent_recruitment_and_retention.pdf, http://ncwwi.org/files/Evidence_Based_and_Trauma-Informed_Practice/Best__Evidence-Based_Practices_that_Enhance_Safety.pdf

  Support Groups: http://www.fc2success.org/knowledge-center/groups-and-support/; http://www.nacac.org/adoptalk/parent2parentnetwork.pdf

  Mockingbird Model: http://mockingbirdsociety.org/index.php/what-we-do/mockingbird-family-model, http://calswec.berkeley.edu/sites/default/files/uploads/effective_practices_in_foster_parent_recruitment_and_retention.pdf, page 13

  Kinship Support Services Program: http://www.childsworld.ca.gov/PG2891.htm

  Foster Parent Mentor Program: http://www.fosterforward.net/resources/foster-parent-resources/new-foster-parent-mentor-program

  Fostering Hope Program: http://www.fosteringhopefoundation.org/

- **Training for providers should be re-evaluated to ensure they are prepared.** Assessment participants listed skills for caring for children and youth with high needs, training on cultural competency, serving children and youth who identify as LGBTQ, and parenting skills as most important, and either too light or missing in the current training offerings. Youth in focus groups suggested training for foster parents and youth on collaborative communication and problem solving, which may reduce abuse. There are many resources and best practices on provider training models to assist Oregon when the state is ready to look at this recommendation.

  **Initial Resources**:

Exhibit 4
Page 66 of 84

**Public**Knowledge

Recruitment and Retention:
http://calswec.berkeley.edu/sites/default/files/uploads/effective_practices_in_foster_parent_recruitment_and_retention.pdf

Exhibit 4
Page 67 of 84

**Public**Knowledge

# 5.  Methodology

## 5.1.  Three Phased Approach

The Child Safety in Substitute Care Independent Review followed a three-phased approach. Each phase is briefly described below.

Throughout the review process, the review team focused on the perspective of the children and youth in substitute care. With each activity and each decision, we asked ourselves and the stakeholders involved: "how does this relate to safety in care?"

#### PHASE I – PROJECT INITIATION

The review team worked with the Governor's Office, DHS, and the External Advisory Committee to establish project management and decision making processes. During this phase, we developed a vision and defined the scope for the review. The review team also met with Internal Resource Committee members at DHS to identify individuals, documentation, system data, and other sources that would inform the review. We developed an inquiry framework showing the major elements of the system, shown in Figure 23. The statements introducing the three system domains describe the vision for child and youth safety in each area.

Exhibit 4
Page 68 of 84

**Public**Knowledge

Methodology

*Figure 23: Inquiry Framework*



**CHILD SAFETY IN SUBSTITUTE CARE INDEPENDENT REVIEW INQUIRY FRAMEWORK**

## PHASE II – INITIAL ASSESSMENT

During this phase, the review team focused on gaining a broad understanding of the child substitute care system, and the major gaps and opportunities facing the System. We developed an authority inventory of the statutes, policies, and rules governing the System; using that inventory to develop regulatory system maps for each of the three system domains depicted in the inquiry framework. We reviewed over 100 reports, audits, emails, procedures, and legislation. We analyzed an initial set of System data obtained from DHS. We conducted 15 key informant interviews and two focus groups, guided by the inquiry framework above. The result of this phase was a set of 12 overall observations and 35 potential system gaps. We reviewed these results with our External Advisory Committee and the DHS Internal Resource Committee, and developed a set of criteria for selecting a set of focus areas for the Comprehensive Review phase. While we considered a number of elements during this process, the single

**Key Informant Interviews** are qualitative interviews with people who know what is going on within a system or community. The purpose is to collect information from a wide range of people who have first hand knowledge about the system or community in which the system operates. These experts, with their particular knowledge and understanding, can provide insight into the nature of the system problems or strengths.

Exhibit 4
Page 69 of 84

**Public**Knowledge                                                          Methodology

most important consideration for selecting focus areas for Phase III was areas of the System that are closest to the direct experience of children and youth living in substitute care: *where they live and what happens when they experience abuse or neglect in care.* Figure 24 shows the focus areas for the Comprehensive Review. Once these areas were selected, the review team completed an Inquiry Protocol, which detailed the research questions, data sources, and participants for the Comprehensive Review.

*Figure 24: Comprehensive Review Focus Areas*

## CHILD SAFETY IN SUBSTITUTE CARE

 *Child, Youth, and Young Adult*



### PHASE III – COMPREHENSIVE REVIEW

During the Comprehensive Review phase, the review team used focus groups and surveys to collect in-depth qualitative data on the two selected topics: Safe and Appropriate Placements, and Safe and Swift Response to Abuse in Care. We also analyzed quantitative data obtained from DHS, and reviewed documentation related to the topics.

The review team analyzed the data and developed nine findings. We also identified three major related barriers to improving the child substitute care system. We conducted best practice research and developed recommendations for each of our findings areas as well as a set of foundational recommendations.

See Figures 25 through 30 for details related to each of our Phase III activities.

Exhibit 4
Page 70 of 84

Public**Knowledge**

*Figure 25: Focus Groups*

| Focus Group Facilitation & Analysis | Survey Distribution & Analysis | DHS Data Analysis | Report & Documentation Review | Regulatory Review | Best & Promising Practices Research |
|---|---|---|---|---|---|

**Activities & Demographics:**

Facilitated 13 focus groups and analyzed the information from the focus groups to pull overarching themes, similarities between groups, and differences between groups.

- Youth, 2 focus groups held, 17 total participants
- Foster Parents, 3 focus groups held, 22 total participants
- OLRO Licensing Coordinators, 1 focus group held, 2 total participants

- DHS Certifiers, 1 focus group held, 12 total participants
- Child Care Agencies, 1 focus group held, 13 total participants
- Citizen Review Board Staff, 1 focus group held, 10 total participants
- Court Appointed Special Advocates, 1 focus group held, 9 total participants
- Birth Parent Mentors, 1 focus group held, 10 total participants

**Summary:**

**13 Focus Groups Held, 106 Total Participants**

*Figure 26: Surveys*

| Focus Group Facilitation & Analysis | Survey Distribution & Analysis | DHS Data Analysis | Report & Documentation Review | Regulatory Review | Best & Promising Practices Research |
|---|---|---|---|---|---|

**Activities & Demographics:**

Distributed 7 surveys and analyzed the data from the surveys to pull overarching themes, similarities between groups, and differences between groups.

- Youth, snowball survey method (68 respondents)
- Foster Parents, snowball survey method (85 respondents)
- Attorneys, snowball survey method (48 respondents)
- Judges, snowball survey method (20 respondents)
- Caseworkers & Supervisors, 52% response rate (734 respondents)

- CPS Hotline Staff, 27% response rate (24 respondents)
- Child Caring Agencies, snowball survey method (13 respondents)

✓ 63% of attorney and judge respondents have been working in child welfare law for 10+ years
✓ Average number of years in care for youth respondents: 6.5
✓ 37% of youth respondents were in rural placements and 31% were in non-relative foster care
✓ 33% of caseworker & supervisor respondents have been working in child welfare 10+ years
✓ 24% of foster parent respondents live in rural areas

**Summary:**

**7 Surveys Distributed, 992 Total Participants**

*Figure 27: DHS Data*

| Focus Group Facilitation & Analysis | Survey Distribution & Analysis | DHS Data Analysis | Report & Documentation Review | Regulatory Review | Best & Promising Practices Research |
|---|---|---|---|---|---|

**Activities & Demographics:**

Requested and analyzed data from DHS on identified potential gaps. Topics included:

- Demographics of youth in substitute care
- Placement type for youth in substitute care
- Time in care
- Reports of allegations of abuse in care
- Demographics of youth subject to reports

- Provider capacity
- Level of need
- Placement stability
- Abuse in care allegations
- Resolution of abuse in care allegations
- Caseworker caseloads
- Net loss and gain of providers
- Allegations screened in and out

**Summary:**

**Data analyzed, summarized, and included with findings**

Exhibit 4
Page 71 of 84

# Public**Knowledge**

Methodology

*Figure 28: Documentation*



| Focus Group Facilitation & Analysis | Survey Distribution & Analysis | DHS Data Analysis | Report & Documentation Review | Regulatory Review | Best & Promising Practices Research |
|---|---|---|---|---|---|

**Activities & Demographics:**

Researched, reviewed, and summarized applicable sections of reports and documentation. This included:

- Child and Family Services Review Documents
- Task Force Reports
- Annual Progress Reports
- Committee Reports
- Major Litigation - past 5 years, $50,000 + award/settlement
- Program Improvement Plans
- Recruitment & Retention Plans

- Various applicable reports
- Child Welfare Data Book
- Audits
- IV-E Program Improvement Plan
- Critical Incident Report
- Workgroup Reports
- Procedure Manuals
- Training Curriculum (applicable)
- Screening Protocols

**Summary:**
**Researched, reviewed, and summarized applicable documentation and reports from 2002 - 2016**

*Figure 29: Policies & Rules*



| Focus Group Facilitation & Analysis | Survey Distribution & Analysis | DHS Data Analysis | Report & Documentation Review | Regulatory Review | Best & Promising Practices Research |
|---|---|---|---|---|---|

**Activities & Demographics:**

Researched, reviewed, and inventoried state and federal regulations applicable to the assessment scope. This included:

- 7 high-level graphic system maps for the three domains of the Child Substitute Care System,
- one-page summaries for each system map
- a full authority inventory (this table includes all the authorities used for the maps, and includes which domain it informs, the authority type, a quick summary, and the full citation)

✓ The maps were used to confirm assessment team knowledge of regulations
✓ The maps were used with initial assessment participants to confirm scope
✓ In the comprehensive assessment (phase III) the regulatory inventory was used to confirm knowledge of processes and procedures, and document gaps

**Summary:**
**7 system maps, full regulatory inventory, and detailed gaps for areas in scope**

*Figure 30: Best Practices & Recommendations*

| Focus Group Facilitation & Analysis | Survey Distribution & Analysis | DHS Data Analysis | Report & Documentation Review | Regulatory Review | Best & Promising Practices Research |
|---|---|---|---|---|---|

**Activities & Demographics:**

After identifying the assessment findings, the independent review team undertook an effort to identify recommendations and research best and promising practices from across the country.

- Identified findings
- Provided recommendations
- Researched best and promising practices
- Researched regulations in other states

**Summary:**
**Research and recommendations for all findings**

**Public**Knowledge

## 5.2.  Guiding Principles

From the beginning of the project, the independent review team used the following guiding principles to develop the findings presented in this document:

- USE A CHILD AND YOUTH-DRIVEN PERSPECTIVE. Be guided first and foremost by the child and youth experience. The goal of this review is to improve outcomes for the children and youth the System serves. These children and youth, along with their permanent family system and community network of support, are the primary consumers of the System's efforts to keep children and youth safe from harm and prepared for the future. To this end, all our actions, decisions, and solutions will be shaped by how well they promote Oregon's interest in keeping children and youth safe, stable, and nurtured while in care.

- PRACTICE A STRENGTHS-BASED APPROACH. Every deficiency or gap in the System is an opportunity for improvement. Strengths or positives in the System may be footholds for solutions. We believe it important to not only investigate the System for weaknesses and flaws, but to understand what is working, and identify the strengths within the System that the state needs to protect and sustain.

- APPLY SYSTEMS THINKING TO SEE THE WHOLE PICTURE. Multiple contributors have a part to play in improving Oregon's substitute care system. The purpose of this review is to understand System strengths, as well as gaps in the System, including internal DHS functions and culture, collaboration with partners, and fiscal accountability for the cost of care.

- BASE FINDINGS ON FACTS AND BE TRANSPARENT ABOUT OUR SOURCES. Start with facts and data where possible, and corroborate with qualitative data. Participants' qualitative experience with or perceptions of the child substitute care system is as critical as what the quantitative data shows. We will communicate how we use information provided to us.

- BUILD BUY-IN ACROSS STAKEHOLDERS. Early involvement of System stakeholders in the design of the assessment helps build support for the decisions, resources, and interventions that are needed to better serve children and youth in substitute care. Ensuring our independence and following these guiding principles will also ensure a high level of trust in the process and final recommendations.

- USE A POLICY-BASED DEFINITION OF CHILD AND YOUTH SAFETY. For the purposes of this review, child and youth safety is defined as follows:

  o CHILD & YOUTH SAFETY IS THE STATE OF BEING FREE FROM ABUSE AND NEGLECT. Abuse means any of the following: physical injury caused by other than accidental means; mental injury caused by cruelty including verbal harassment,

Exhibit 4
Page 73 of 84

**Public**Knowledge

threats, and seclusion; sexual abuse or exploitation; and abandonment. Neglect is the failure to provide the care necessary to maintain physical and mental health. Abuse and neglect are defined by Oregon Statutes in the Juvenile Chapter (419B.005), and in Child Welfare Services Chapter (418.205, definition of abuse recently added by Senate Bill 1515).

## 5.3.   Independent Review Constraints

Independent review sponsors and advisors have emphasized that this review is a first step in a long process of mending Oregon's substitute care system. The review was given a short timeframe and charged with offering the state a few priority areas to focus on first. As expected with a review of a system of this size and complexity, the review team encountered a few challenges to our data collection activities. Those are summarized in the table below. We recommend that future efforts to collect information about the child substitute care system evaluate these constraints and identify ways to mitigate them.

| Constraint | Description |
|---|---|
| **Incomplete or Unreliable System Data** | Oregon currently has a disjointed data enterprise for tracking information about child and youth maltreatment in substitute care, as there are multiple agencies and programs and systems involved. Several separate data systems that do not interface and are of varying maturity levels are used across the System. There are also fields in the OR-KIDS system that would allow a richer data analysis regarding child safety that are not currently in use.

Review participants report that the data systems are further limited by staff that do not input data accurately or in a timely manner, whether due to training, workload constraints, or other issues. We experienced this firsthand when analyzing data sets and noticing a number of "blank fields" or "unknown" data elements. This is consistent with what we have seen in data from other states' SACWIS systems.

Participants in this review have varying degrees of trust in the reliability of the data obtained from DHS. The review team analyzed data obtained from the ORKIDS, OLRO, and OAAPI systems to support this review. In addition to this data we also considered qualitative information gleaned from focus groups, surveys, and other means.

See Section 3 Related Barriers for more on this topic. |
| **Limited Participation from Culturally Diverse Communities** | The review team, guided by our External Advisory Committee, made a concerted effort to include the voices and experiences of culturally diverse stakeholders within the scope of the review. During our Initial Assessment phase, we interviewed individuals who could help us understand gaps in the System from the perspective of communities that are disproportionately represented in substitute care, including tribal and non-tribal Native American groups and the urban African American community.

Due to the limited timeframe and resources allocated to this review, we were unable to focus our qualitative data collection activities during our Comprehensive Review phase in these or other minority communities. We did not tailor questions or methodologies to the specific needs of cultural or racial minority groups, nor did we collect demographic data from focus group or survey participants. Future in depth reviews of targeted areas of the system should consider working with cultural liaisons to collect qualitative data in ways that work for minority communities.

We believe that disproportionality and a lack of culturally relevant placements may affect |

Exhibit 4
Page 74 of 84

# Public**Knowledge**

| Constraint | Description |
|---|---|
| | safety in care, but due to the focused scope of this review, we do not make conclusions about those topics (See Section 3.4 for overall observations regarding cultural competency). |
| **Nonparticipation by Some Stakeholder Groups** | Some stakeholder groups identified in PK's Inquiry Protocol for the Comprehensive Review phase or that were requested by members of the External Advisory Committee either chose not to, or were unable to participate in qualitative data collection activities. Those groups are listed below, with the reason for nonparticipation:<br><br>• **Oregon Department of Justice (DOJ) Attorneys** – We included this stakeholder group as a survey audience in our Inquiry Protocol. Due to concerns related to client-attorney privilege, the DOJ attorneys declined to participate in the survey.<br><br>• **Tort Attorneys** – Tort attorneys that have been involved in large settlement cases against DHS for abuses of children or youth in substitute care have unique insight into the gaps and issues within the System. Because many of these attorneys are involved in current litigation with the state, we were unable to conduct a focus group with this stakeholder group. However, with assistance from our External Advisory Committee members, several tort attorneys participated in a confidential survey, and their input is included in this review.<br><br>• **Rural Foster Youth** – We invited youth living in rural Jackson and Josephine Counties to participate in a focus group. However, due to summer schedules and other conflicts, we had to cancel this group due to low participation. We conducted two well-attended focus groups in the Portland and Salem areas. In lieu of an in-person focus group, the review team increased efforts to distribute a survey to youth statewide. A total of 68 youth responded to our survey. 18% reported living in a large city, 45% in a medium sized city, and 37% reported living in a rural or small town. |
| **Individual Case Files Not Reviewed** | The independent review team did not review individual case files for this project. To unequivocally understand the reasons for abuse in substitute care – or the reasons why in many cases abuse has been allowed to continue - there could be some value in reviewing files from those cases where abuse was substantiated. Due to the timeframe and resources allocated for this review, combined with the priorities of the review's External Advisory Committee, our methodology focused instead on collecting qualitative information from people involved in the System and analyzing quantitative data collected by DHS. |
| **DHS Personnel Files Not Reviewed** | The DHS Director has recently initiated an effort to analyze data from personnel files to gain a better understanding of decisions and actions taken with line workers and supervisors involved in the most serious cases of abuse in care. This information was not available during the timeframe for the independent review. |

Exhibit 4
Page 75 of 84

PublicKnowledge

# 6. Contributors and Sources

## 6.1. Contributors to the Independent Review

The Child Safety in Substitute Care Independent Review drew on the knowledge, experiences, and perceptions of hundreds of Oregonians around the state. This section lists many of those contributors, but many will remain anonymous through their participation in focus groups and surveys.

### 6.1.1. External Advisory Committee

• Caroline Cruz, Confederated Tribes Warm Springs

• Robin Donart, Maple Star Oregon

• Lene Garrett, CASA

• Senator Sara Gelser, Oregon State Legislator

• Josh Graves, Catholic Community Services

• Christine Hartmann, Oregon Foster Parent Association

• Mark McKechnie, Youth Rights & Justice

• Craig Opperman, Looking Glass

• Rep. Carla Piluso, Oregon State Legislator

• Katie Robertson, Foster Care Alumni , Oregon Foster Youth Connection

• Elden Rosenthal, Rosenthal Greene & Devlin, PC

• Clyde Saiki, DHS Director

• John Sciamanna, Child Welfare League of America

• Nicole Stapp, Foster Care Alumni and Advocate, Oregon Foster Youth Connection

• Rep. Duane Stark, Oregon State Legislator

• Kay Toran, Volunteers of America

Exhibit 4
Page 76 of 84

• Senator Jackie Winters, Oregon State Legislator

EAC Support

• Jeannine Beatrice, DHS Chief of Staff

• Addie Smith, Governor's Office, Task Force on Dependency Representation

### 6.1.2. DHS Internal Resource Committee

• Abdulrahim Audi, Social Service Specialist 1 – District 2

• Stacey Ayers, Child Protective Services Program Manager –Child Welfare

• April Barrett, Human Resources Payroll Liaison – Director's Office

• Anna Cox, Data Collection & Reporting Manager – Business Intelligence Unit

• Gene Evans, Public Affairs Director – Director's Office

• Lora Edwards, Research Analyst – Office of Adult Abuse Prevention and Investigation

• Kevin George, Child Well Being Unit Co-Program Manager – Child Welfare

• Harry Gilmore, Children's Care Licensing Unit – Office of Licensing and Regulatory Oversight

• AJ Goins, Federal Policy, Planning & Resources Co-Manager – Child Welfare

• Brooke Hall, Program and Training – Office of Adult Abuse Prevention and Investigation

• Wendy Hill, District 14 District Manager – Child Welfare

• Michelle Johnson, Classification & Recruitment Manager – Human Resources

• Nadja Jones, Tribal Affairs Director – Director's Office

• Kim Keller, District 15 Program Manager – Child Welfare

• Debbi Kraus-Dorn, Children's Residential Manager – Developmental Disabilities

• Sherril Kuhns, Federal Policy, Planning & Resources Co-Manager – Child Welfare

• Stacy Lake, Differential Response Manager – Child Welfare

Exhibit 4
Page 77 of 84

**Public**Knowledge                                  Contributors and Sources

- Nicomi Levine, Social Service Specialist 1 - District 2

- Jason Mak, Diversity & Inclusion Manager – Director's Office

- Laurie Price, Co-Program Manager – Child Well Being Unit

- Jodi Sherwood, Project Manager – Office of the Chief Operating Officer

- Barb Southard, Developmental Disabilities Licensing Manager – Office of Licensing and Regulatory Oversight

- Julie Spencer, District 5 Program Manager – Child Welfare

- Naomi Steenson, Administrator – Governor's Advocacy Office (former)

- Kalisha Stout, PEMC, Supervisor – District 2

## 6.1.3. Key Informant Interviewees (Initial Assessment Phase II)

- John Devlin, Attorney – Rosenthal Greene & Devlin, P.C.

- Group Interview: Foster Youth and Alumni – Oregon Foster Youth Connection

- Group Interview: Substitute Care Providers (CCAs) – Oregon Alliance of Children's Programs

- John Haroldson, District Attorney – Benton County District Attorneys Office

- Tom Heidt, DHS Licensing Coordinator – DHS Central, Licensing Unit

- Therese Hutchinson, Policy, Program, & Training Manager – DHS Central, Office of Adult Abuse Prevention & Investigation

- Darin Mancuso, Foster Care Ombudsman – Governor's Office/DHS

- Renee Moseley, Deputy Director – Bridge Meadows (community housing provider with foster care focus)

- Hon. Lindsay Partridge, Judge – Marion County Juvenile Court

- Holly Preslar, Attorney – Holly A. Preslar, Attorney at Law

- Mike and Lonnie Ribiero, Foster Parents – Harney County, OR

Exhibit 4
Page 78 of 84

**Public Knowledge**

- Lisa Romano, Executive Director – Oregon CASA Network

- Tawna Sanchez, Interim Executive Director – NAYA Family Programs

- Kim Scott, President & CEO – Trillium Family Services

- Angela Sherbo, Supervising Attorney – Youth, Rights, & Justice

- Ruth Taylor and Parent advisor/mentor, Facilitator & Program Director – Foster Parent Advisory Committee & Morrison Child & Family Services

- Hon. Nan Waller, Presiding Judge – Multnomah County Circuit Court

## 6.1.4. Other Contributors

The individuals listed here provided assistance and information at the request of the independent review team or the DHS Director's Office.

- Janet Arenz, Executive Director, Oregon Alliance of Children's Programs

- James Barta, Legislative Director, Children First for Oregon

- Patricia Chamberlain, Ph.D., Science Director, Oregon Social Learning Center

- Gene Evans, Public Affairs Director, DHS

- Veronica Garcia, Executive Specialist, Oregon Alliance of Children's Programs

- Leah Hall, Program Supervisor, Morrison Child and Family Services

- Megan Hassen, Juvenile Law and Policy Counsel, Oregon Judicial Department

- Justin Hopkins, Contracts and Compliance Director, Oregon Health Authority

- Laramie Lesina, Independent Living Program Manager, Kairos

- Angela Long, Program Performance and Reporting Office Administrator, DHS

- Lisa McMahon, Program Director, Oregon Foster Youth Connection

- Amy Miller, Deputy General Counsel, Office of Public Defense Services

- Marilee Ortiz, Social Service Specialist, Child Protective Services, DHS

Exhibit 4
Page 79 of 84

# PublicKnowledge

- Dawn Phillips, Chief of Staff, State Representative Duane Stark

- Adam Rodakowski, Assistant Program Manager, DHS

- John Thompson, Deputy Director, Office of Adult Abuse Prevention & Investigations, DHS

## 6.2.   Documentation Reviewed

Chambers, Molly. (2016). Youth in Linn County with a CASA who are Inappropriately Placed as of 4/18/16. Provided by S. Gelser. April 27, 2016.

Child Welfare League of America. (2003). *Best Practice Guideline*. Retrieved from http://www.hunter.cuny.edu/socwork/nrcfcpp/downloads/policy-issues/maltreatment-guidelines.pdf

Children and Youth Services Review. (2016). *Assessing Safety Culture in Child Welfare: Evidence from Tennessee.*

Department of Human Services Office of Child Welfare Programs. (2015). *Foster Home Certification*. Retrieved from http://www.dhs.state.or.us/policy/childwelfare/manual_1/division_200.pdf

Evans, Gene (email communication to S. Ayers, FW: CIRT systemic issue tracking, January 26, 2016)

George, Kevin (email communication to G. Evans, RE: FCST update – upcoming action re: former foster parent, July 18, 2012)

Governor's Task Force on Disproportionality in Child Welfare. (date unknown). *Final Report*. Retrieved from https://www.oregon.gov/DHS/DHSNEWS/CWIndependentReview/gov-taskforce-report-3-11.pdf

Juvenile Justice Mental Health Task Force Survey of Juvenile Departments. (2015). *Summary Results.*

Kaitlyn Bolduc (August 8, 2016). 'Crisis' in Oregon Foster Care System Forcing Children in Motels and Offices Instead of Homes. *Fox 12 Oregon*. Retrieved from http://www.kptv.com/story/32713348/crisis-in-oregon-foster-care-system-forcing-children-in-motels-and-offices-instead-of-homes

Kelley-Siel, Erinn (email communication to L. Day, RE: Abuse in foster care white paper, March 31, 2015)

Exhibit 4
Page 80 of 84

**Public**Knowledge                                    Contributors and Sources

Office of the Administration of Children and Families; Children's Bureau. (2014), Oregon AFCARS Assessment Review. Retrieved from http://www.acf.hhs.gov/sites/default/files/cb/or_aar_2013.pdf

Olson, Erin. "Review of Foster Care System." Letter to Governor Brown. 17 Nov. 2015. Salem, OR.

Olson, Erin. "Safety of Children in Foster Care: N.E. and E.S. v. Oregon Dep't of Human Svcs." Letter to Sen. Dembrow and Rep. Keny-Guyer. 25 Feb. 2015. Salem, OR.

Oregon Department of Human Services. (2007). *Child and Family Services Review: Statewide Assessment*. Salem, OR.

Oregon Department of Human Services. (2008). *Child and Family Services Review: Final Report: Executive Summary*. Salem, OR.

Oregon Department of Human Services (2010). *Oregon Foster Care Safety Ream Final Report Findings and Recommendations*. Salem, OR. Retrieved from https://www.oregon.gov/DHS/DHSNEWS/CWIndependentReview/foster-care-safety-team-report.pdf

Oregon Department of Human Services. (2011). *Critical Incident Response Team Summaries and Action Items 2009-2011*. Salem, OR.

Oregon Department of Human Services. (2011). *Sensitive Review Committee Report*. Salem, OR. Retrieved from https://www.oregon.gov/DHS/CHILDREN/CHILD-ABUSE/CIRT/src_report_5-11.pdf

Oregon Department of Human Services. (2012). *Sensitive Review Committee Report: Conclusions and Recommendations*. Salem, OR. Retrieved from https://www.oregon.gov/DHS/CHILDREN/CHILD-ABUSE/CIRT/Sensitive%20Review%20Committee%20Report%20-%20Conclusions%20and%20Recommendations.pdf

Oregon Department of Human Services. (2013). *Differential Response and Strengthening, Preserving, and Reunifying Family Programs*. Salem, Or. Retrieved from https://www.oregon.gov/DHS/CHILDREN/DIFFERENTIAL-RESPONSE/Documents/Differential-Response-Legislative-Presentation.pdf

Oregon Department of Human Services. (2014). *Child and Family Services Review: Annual Progress Report*. Salem, OR.

Exhibit 4
Page 81 of 84

**Public**Knowledge

Oregon Department of Human Services. (2014). *Service Equity Framework*. Salem, OR.

Oregon Department of Human Services. (2015). *2014 Child Welfare Data Book*. Salem, OR. Retrieved from https://www.oregon.gov/DHS/CHILDREN/CHILD-ABUSE/Documents/2014-data-book.pdf

Oregon Department of Human Services. (2015). *A Briefing that Summarizes our Work on a) Foster Care Safety; and b) the Action Items Associated with Recent Media*. Salem, OR.

Oregon Department of Human Services. (2015). *Child and Family Services Review: Statewide Assessment Instrument*. Salem, OR.

Oregon Department of Human Services (2015). *Critical Incident Response Ream Systemic Issues Briefing Paper*. Salem, OR.

Oregon Department of Human Services. (2015). *Critical Incident Response Team Initial Report A.M. & R.M.* Salem, OR.

Oregon Department of Human Services. (2015). *Oregon Declared CIRTS and Recommendations*. Salem, OR.

Oregon Department of Human Services. (2015). *Oregon Home Study Audit Findings*. Salem, OR.

Oregon Department of Human Services. (2015). *Title IV-E Program Improvement Plan*. Salem, OR. Retrieved from https://www.oregon.gov/DHS/DHSNEWS/CWIndependentReview/Oregon%20Title%20IV-E-qrtlyupdate-9-2015.pdf

Oregon Department of Human Services. (2016). *Audit Report: Child-Caring Agency Licensing: Give Us This Day*. Audit 15-005. Salem, OR.

Oregon Department of Human Services. (2016). *Child Welfare: Sage and Equitable Foster Care Reduction*. Salem, Or.

Oregon Department of Human Services. (date unknown). *ICWA Agreement: Statement of Work*. Retrieved from https://www.oregon.gov/DHS/DHSNEWS/CWIndependentReview/ICWA-Agreement-sow.pdf

Oregon Department of Human Services. (date unknown). *Oregon Family and Service Plan*. Salem, OR.

Exhibit 4
Page 82 of 84

**Public**Knowledge

Oregon Health Authority. (2014). *Children's Mental Health Increased Emergency Department Visits Crisis Workgroup Recommendations.* Salem, OR.

Oregon Joint Interim Task Force on Juvenile Court Dependency Proceedings. (2014). *Final Report.* Salem, OR.

Oregon Judicial Department. (2016). *Juvenile Justice Mental Health Task Force Report and Recommendations.* Salem, OR. Retrieved from http://courts.oregon.gov/OJD/docs/OSCA/JFCPD/Juvenile/JJMHTF/Finalized.Report.1.pdf

Oregon Legislative Assembly. (2016). *Senate Committee on Human Services and Early Childhood: Staff Measure Summary SB1515.* Retrieved from https://olis.leg.state.or.us/liz/2016R1/Downloads/MeasureAnalysisDocument/32742

Oregon Office of Adult Abuse and Prevention Investigations. (2016). *Give Us This Day Concern Chronology.* Salem, OR.

National Resource Center for Child Protective Services. (date unknown). *Expert Review of the Safety Intervention System: Executive Summary.* Retrieved from https://www.oregon.gov/DHS/DHSNEWS/CWIndependentReview/NRCCPS-review-SIS.pdf

National Resource Center for Child Protective Services. (date unknown). *Oregon Safety Model Review: Supervising to Safety.* Retrieved from http://www.oregon.gov/DHS/DHSNEWS/CWIndependentReview/NRCCPS-safety-model-review-Phase%20One.pdf

National Resource Center for Family-Centered Practice and Permanency Planning. (2009). Workforce Issues in Child Welfare. Retrieved from http://www.hunter.cuny.edu/socwork/nrcfcpp/info_services/Sudol_Info%20Pack_Workforce%20Issues_Aug%202009.pdf

Pacific Research & Evaluation. (2015). *Oregon Differential Response: Year One Site Visit Report.* Portland, OR. Retrieved from https://www.oregon.gov/DHS/DHSNEWS/CWIndependentReview/Final%20DR%20Year%201%20Site%20Visit%20Report-%2012%208%2015.pdf

Petitions and decrees or settlement awards for 23 lawsuits involving abuse of children or youth in DHS substitute care that settled for or ended in an award over $50,000. (2001-2016).

Public Knowledge, Inc. (2002). *Review of the Child Protective Services Intake Process.* Retrieved from http://library.state.or.us/repository/2008/200812221424531/index.pdf

Exhibit 4
Page 83 of 84

**Public**Knowledge

S. Gelser (email communication to C. Saiki, Meeting with GUTD Youth, December 23, 2016)

Statewide Children's Wraparound Initiative Steering Committee. (2007). Steering Committee report to governor ted Kulongoski. Retrieved from http://www.oregon.gov/OHA/amh/wraparound/steering1207report2gov.pdf

The Stephen Group. (2015). *Meeting the Needs of High Needs Children in the Texas Child Welfare System*. Retrieved from https://www.dfps.state.tx.us/About_DFPS/Reports_and_Presentations/CPS/documents/2015/2015-12-03_Stephen_Group_High_Needs_Assessment.pdf

Exhibit 4
Page 84 of 84

# EXPERT WITNESS CONTRACT

This contract for expert witness services ("**Contract**") is between Markowitz Herbold PC (the "**Firm**"), the Oregon Department of Administrative Services (the "**Agency**"), and Public Knowledge, LLC, a Wyoming limited liability company ("**Public Knowledge**" or the "**Contractor**").  The Oregon Department of Human Services ("**DHS**") is an intended third-party beneficiary of this Contract.  The Firm's Contract Administrator for this Contract is identified in Section 20.

**1.      Contract Term.**  This Contract is effective on June 22, 2020, and unless earlier terminated, continues through December 31, 2021.  Contract termination does not extinguish or prejudice Agency's or the Firm's right to enforce this Contract with respect to any default by Contractor that has not been cured.

**2.      Statement of Work**

**2.1. Statement of Work.**  Contractor shall provide the services and deliver all associated deliverables ("**Work Product**") described in Exhibit A, Statement of Work ("**Services**"), which is attached and incorporated into this Contract.

**3.      Consideration.**

**3.1.**  As payment in full for Services, Agency shall pay Contractor at the rates specified in Exhibit A.

**3.2.**  Agency will reimburse Contractor for reasonable and necessary travel and other expenses as provided in Exhibit A, and only to the extent permitted in the Oregon Accounting Manual, available from Statewide Accounting and Reporting Services of the Chief Financial Office, and viewable at: https://www.oregon.gov/das/Financial/Acctng/Pages/Travel.aspx

**3.3.**  The maximum amount payable to Contractor under this Contract, including all payments pursuant to Section 3.1 and any allowable expenses pursuant to section 3.2, is **$605,000**.  Contractor shall not submit invoices for, and Agency is not obligated to pay, any compensation in excess of this amount.  If this maximum amount is increased by Contract amendment, the amendment must be fully effective before Contractor performs any Services subject to the amendment.

**3.4.**  Agency is not obligated to pay Contractor for any Services unless such Services are complete, conform to the Contract specifications, and otherwise conform to the warranties and other terms of this Contract.

**3.5.**  Contractor shall submit monthly invoices to Contract Administrator for Services performed.  Contractor shall describe in each invoice all Services performed, the dates of performance, and by whom such Services were performed, and shall itemize and explain all expenses for which Contractor claims reimbursement.  Contractor shall mail or email

Wyatt_PK0000843

Exhibit 5
Page 1 of 12

invoices to Contract Administrator at the address specified in section 20.  After the Contract Administrator reviews the invoice and approves any undisputed amount for payment, the Contract Administrator will forward the invoice to Agency for payment.

**4.     Contract Documents.**  This Contract consists of the following documents, which are listed in descending order of precedence: this Contract less all exhibits, Exhibit A, Statement of Work, and Exhibit B, Insurance Requirements.  Exhibit A and Exhibit B are attached and incorporated into this Contract.

**5.     Independent Contractor; Responsibility for Taxes and Withholding.**

> **5.1.**  Contractor shall perform all Services as an independent contractor.  Contractor is not an "officer," "employee," or "agent" of the State, as those terms are used in ORS 30.265.  Contractor is responsible for determining the appropriate means and manner of performing the Services.

> **5.2.**  If a contract is currently performing work for the State or the federal government, then by signature to this Contract, Contractor represents and warrants to DHS and Agency that: Contractor's performance of Services under this Contract creates no potential or actual conflict of interest as defined by ORS 244, and no statutes, rules or regulations of the state or federal agency for which Contractor currently performs work would prohibit Contractor's performance of Services under this Contract.

> **5.3.**  Contractor shall pay all federal and state taxes applicable to compensation or payments paid to Contractor under this Contract and, unless Contractor is subject to backup withholding, Agency will not withhold from such compensation or payments any amounts to cover Contractor's federal or state tax obligations.  Contractor is not eligible for any social security, unemployment insurance or workers' compensation benefits from compensation or payments paid to Contractor under this Contract, except as a self-employed individual.

**6.     Subcontracts, Successors, and Assignments.** Contractor shall not enter into any subcontracts for any of the Services required by this Contract without Firm's prior written consent.  Firm's consent to any subcontract does not relieve Contractor of any of its duties or obligations under this Contract.  The provisions of this Contract shall be binding upon and inure to the benefit of the parties, their respective successors, and permitted assigns, if any.  Contractor shall not assign, delegate or transfer any of its rights or obligations under this Contract without Firm's prior written consent.

**7.     No Third-Party Beneficiaries.**  Except for DHS in its capacity as third-party beneficiary under this Contract, Firm, Agency, and Contractor are the only parties to this Contract and are the only parties entitled to enforce the terms of this Contract.  Nothing in this Contract gives, is intended to give, or is construed to give or provide any benefit or right not held by or made generally available to the public, whether directly, indirectly or otherwise, to third persons unless such third persons are individually identified by name herein and expressly described as intended

beneficiaries of the terms of this Contract.  The parties agree that DHS is the only intended third-party beneficiary under this Contract.

**8.      Funds Available and Authorized; Payments.**  Contractor will not be compensated by any other agency or department of the State for Services performed under this Contract.  Agency certifies that it has sufficient funds currently authorized for expenditure to finance the costs of this Contract within Agency's current biennial appropriation or limitation.  Contractor understands and agrees that Agency's payment of amounts under this Contract are contingent on Agency receiving appropriations, limitations, allotments or other expenditure authority sufficient to allow Agency, in the exercise of its reasonable administrative discretion, to continue to make payments under this Contract.  If the Oregon Legislative Assembly fails to appropriate sufficient appropriations, limitations, allotments, or other expenditure authority to Agency, Agency may terminate this Contract without penalty or liability to Agency.

**9.      Representations and Warranties.**

**9.1. Contractor's Representations and Warranties.**  Contractor represents and warrants to Firm and Agency that:

**9.1.1.**  Contractor has the power and authority to enter into and perform this Contract;

**9.1.2.**  this Contract, when executed and delivered, is a valid and binding obligation of Contractor enforceable according to its terms;

**9.1.3.**  Contractor has the skill and knowledge possessed by well-informed members of its industry, trade or profession and Contractor will apply that skill and knowledge with care and diligence to perform the Services in a professional manner and according to standards prevalent in Contractor's industry, trade or profession; and,

**9.1.4.**  Contractor is and will be at all times during the term of this Contract, qualified, professionally competent, and duly licensed to perform the Services.

**9.2. Warranties Cumulative.**  The warranties set forth in this section are in addition to, and not in lieu of, any other warranties provided.

**10.      Ownership of Work Product; Confidentiality.**

**10.1. Ownership of Work Product.**  All Work Product is the exclusive property of DHS.  Contractor hereby irrevocably assigns to DHS all of its rights, title, and interest in and to any and all of such Work Product, whether arising from copyright, patent, trademark, trade secret, or any other state or federal intellectual property law or doctrine. Contractor forever waives any and all rights relating to such Work Product, including without limitation, any and all rights arising under 17 USC § 106A or any other rights of identification of authorship or rights of approval, restriction or limitation on use or subsequent modifications.

Wyatt_PK0000845
Exhibit 5
Page 3 of 12

**10.2. Confidentiality.** Contractor will be creating Work Product and providing information to assist Agency attorneys to both prepare for and conduct litigation. Contractor acknowledges that Contractor and its employees or agents may, in the course of performing Services under this Contract, be exposed to or acquire communications that are confidential, privileged communications not intended to be disclosed to third parties.

Contractor agrees that any Work Product created by Contractor and all information of any form obtained by Contractor or its employees or agents in the performance of this Contract is deemed "**Confidential Information**" of DHS and Agency. Confidential Information does not include information which is or becomes (other than by disclosure by Contractor) publicly known.

Contractor agrees to hold such Confidential Information in strict confidence and to not copy, reproduce, sell, transfer, or otherwise dispose of, give or disclose such information for any purposes whatsoever other than the provision of Services to DHS and Agency. Contractor agrees to advise each of its employees and agents of their obligations to keep such information confidential.

11. **Indemnity.**

    **11.1. INDEMNITY.** CONTRACTOR SHALL DEFEND, SAVE, HOLD HARMLESS, AND INDEMNIFY FIRM, THE STATE OF OREGON, DHS, AGENCY, AND THEIR OFFICERS, EMPLOYEES AND AGENTS, FROM AND AGAINST ALL CLAIMS, SUITS, ACTIONS, LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES OF ANY NATURE WHATSOEVER, INCLUDING ATTORNEYS FEES, RESULTING FROM, ARISING OUT OF, OR RELATING TO THE ALLEGED NEGLIGENT OR WILLFUL ACTS, OMISSIONS, OR ANY BREACH OF THIS CONTRACT BY THE CONTRACTOR OR ITS OFFICERS, EMPLOYEES, SUBCONTRACTORS, OR AGENTS UNDER THIS CONTRACT.

    **11.2. CONTROL OF DEFENSE AND SETTLEMENT.** CONTRACTOR SHALL HAVE CONTROL OF THE DEFENSE AND SETTLEMENT OF ANY CLAIM THAT IS SUBJECT TO SECTION 11.1; HOWEVER, NEITHER CONTRACTOR NOR ANY ATTORNEY ENGAGED BY CONTRACTOR SHALL DEFEND THE CLAIM IN THE NAME OF THE STATE OF OREGON OR ANY AGENCY OF THE STATE OF OREGON, NOR PURPORT TO ACT AS LEGAL REPRESENTATIVE OF THE STATE OF OREGON OR ANY OF ITS AGENCIES, WITHOUT FIRST RECEIVING FROM THE OREGON ATTORNEY GENERAL, IN A FORM AND MANNER DETERMINED APPROPRIATE BY THE ATTORNEY GENERAL, AUTHORITY TO ACT AS LEGAL COUNSEL FOR THE STATE OF OREGON, NOR SHALL CONTRACTOR SETTLE ANY CLAIM ON BEHALF OF THE STATE OF OREGON WITHOUT THE APPROVAL OF THE ATTORNEY GENERAL. THE STATE OF OREGON MAY, AT ITS ELECTION AND EXPENSE, ASSUME ITS OWN DEFENSE AND SETTLEMENT IF THE STATE OF OREGON DETERMINES THAT CONTRACTOR IS PROHIBITED FROM DEFENDING THE STATE OF OREGON, OR IS NOT ADEQUATELY

Wyatt_PK0000846
Exhibit 5
Page 4 of 12

DEFENDING THE STATE OF OREGON'S INTERESTS, OR THAT AN IMPORTANT GOVERNMENTAL PRINCIPLE IS AT ISSUE, AND THE STATE OF OREGON DESIRES TO ASSUME ITS OWN DEFENSE.

12. **Insurance.**  Contractor shall maintain the insurance coverage specified in Exhibit B, Insurance Requirements.

13. **Termination.**

**13.1.  Termination by Agency or Firm for Convenience.**  At its sole discretion, Agency or Firm may terminate this Contract for its convenience upon fifteen (15) days written notice to Contractor.

**13.2.  Termination by Agency or Firm for Cause.**  In addition to any other rights and remedies Firm and Agency may have under this Contract, Firm and Agency may terminate this Contract, in whole or in part, immediately upon written notice to Contractor, or at such later date as Firm or Agency may establish in such notice, upon the occurrence of any of the following events:

**13.2.1.**  Funding from federal, state, or other sources is not obtained and continued at levels sufficient to pay for Contractor's Services;

**13.2.2.**  Federal or state laws, regulations, or guidelines are modified or interpreted in such a way that the performance of the Services under this Contract is prohibited, or Agency is prohibited from paying for such Services from the planned funding source;

**13.2.3.**  Contractor no longer holds a license or certificate that is required for it to perform the Services; or,

**13.2.4.**  Contractor commits any material breach or default of any covenant, warranty, obligation or certification under this Contract, fails to perform the Services in conformance with the requirements and warranties provided herein, or so fails to pursue the Services as to endanger Contractor's performance under this Contract according to its terms, and such breach, default or failure is not cured within ten (10) business days after delivery of Firm's or Agency's notice or such longer period as Firm or Agency may specify in such notice.

**13.3.  Termination by Contractor.** Contractor may terminate this Contract if Agency fails to pay Contractor any amount pursuant to the terms of this Contract, and Agency fails to cure such failure within thirty (30) days after Contractor's notice of termination for nonpayment, or such longer period as Contractor may specify in such notice.

**13.3.1.**  Contract termination pursuant to this section 13 shall be without prejudice to any obligations or liabilities of either party already accrued prior to such termination.  However, upon receiving a notice of termination under this section 13,

Contractor shall immediately cease all activities under this Contract, unless expressly directed otherwise by Firm or Agency in the notice of termination. Further, upon termination, Contractor shall deliver to Firm or Agency all documents, information, works-in-progress, Work Product, and other property that is or would be deliverables had this Contract been completed.

**14.    Records Maintenance; Access.**  Contractor shall maintain all financial records relating to this Contract according to generally accepted accounting principles.  In addition, Contractor shall maintain any other records pertinent to this Contract in such a manner as to clearly document Contractor's performance.  Contractor acknowledges and agrees that DHS, the Oregon Secretary of State's Office, the federal government, and their duly authorized representatives shall have access to such financial records and other books, documents, papers, plans, records of shipments and payments and writings of Contractor that are pertinent to this Contract, whether in paper, electronic or other form, to perform examinations and audits and make excerpts and transcripts.  Contractor shall retain and keep accessible all such financial records, books, documents, papers, plans, records of shipments and payments and writings for a minimum of six (6) years, or such longer period as may be required by applicable law, following final payment and termination of this Contract, or until the conclusion of any audit, controversy or litigation arising out of or related to this Contract, whichever date is later.

**15.    Compliance with Applicable Law.**  Contractor shall comply with all federal, state and local laws, regulations, executive orders and ordinances applicable to this Contract.

**16.    Limitation of Liabilities.**  FIRM, AGENCY, AND CONTRACTOR ARE NOT LIABLE FOR (i) ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, OR SPECIAL DAMAGES UNDER THIS CONTRACT OR (ii) ANY DAMAGE OF ANY SORT ARISING SOLELY FROM THE TERMINATION OF THIS CONTRACT IN ACCORDANCE WITH ITS TERMS.

**17.    Force Majeure.**  Agency, Firm, and Contractor are not liable for delay or default caused by fire, riot, acts of God, terrorist acts, or other acts of political sabotage, or war where such cause was beyond the reasonable control of the Agency, Firm, or Contractor, respectively. Contractor shall, however, make all reasonable efforts to remove or eliminate such a cause of delay or default and upon the cessation of the cause, diligently pursue performance of its obligations under this Contract.

**18.    Survival.**  All rights and obligations shall cease upon termination or expiration of this Contract, except for the rights and obligations set forth in sections 1, 7, 8, 9, 10, 11, 13, 14, 18, 23, and 24.

**19.    Time is of the Essence.**  Contractor agrees that time is of the essence under this Contract.

**20.    Notice.**  Except as otherwise expressly provided in this Contract, any notices between the parties that relate to this Contract must be given in writing, personal delivery, express courier, or United States Postal Service, postage prepaid, to Contractor or the Contract Administrator at the address set forth below, or to such other addresses as either party may hereafter indicate pursuant

Wyatt_PK0000848
Exhibit 5
Page 6 of 12

to this section.  Any notice so addressed and mailed is effective five (5) days after the postmark date.  Any notice given by personal delivery is effective immediately if delivery is made to the following individuals:

| CONTRACT ADMINISTRATOR: | IF TO CONTRACTOR: |
|---|---|
| Lauren Blaesing<br>Markowitz Herbold PC<br>1455 SW Broadway, Ste. 1900<br>Portland, OR  97201<br>Phone: 503-295-3085<br>LaurenBlaesing@markowitzherbold.com | Stacey Obrecht<br>Public Knowledge, LLC<br>1911 SW Campus Drive #457<br>Federal Way, WA 98023<br>Phone: 307-287-8941<br>sobrecht@pubknow.com |

**21.     Severability.**  The parties agree that if any term of this Contract is declared by a court of competent jurisdiction to be illegal or in conflict with any law, the validity of the remaining terms will not be affected, and the rights and obligations of the parties shall be construed and enforced as if this Contract did not contain the particular term held to be invalid.

**22.     Counterparts.**  This Contract may be executed in several counterparts, all of which when taken together constitute one agreement binding on all parties, notwithstanding that all parties are not signatories to the same counterpart.  Each copy of this Contract so executed constitutes an original.

**23.     Choice of Law; Designation of Forum; Federal Forum.**

**23.1. Choice of Law.**  The laws of the State of Oregon (without giving effect to its conflicts of law principles) govern all matters arising out of or relating to this Contract, including, without limitation, its validity, interpretation, construction, performance, and enforcement.

**23.2. Designation of Forum.**  Any claim, action, suit or proceeding (collectively, "Claim") between Agency (or any other agency or department of the State) and Contractor that arises from or relates to this Contract shall be brought and conducted solely and exclusively within the Circuit Court of the State of Oregon for Marion County. Contactor hereby consents to the exclusive jurisdiction of such court, waives any objection to venue, and waives any claim that such forum is an inconvenient forum.

**23.3. Federal Forum.**  Notwithstanding section 23.2, if a claim must be brought in a federal forum, then it must be brought and adjudicated solely and exclusively within the United States District Court for the District of Oregon.  This section applies to a claim brought against the State of Oregon only to the extent Congress has appropriately abrogated the State of Oregon's sovereign immunity and is not a consent by the State of Oregon to be sued in federal court.  This section is also not a waiver by the State of Oregon of any form of immunity, including but not limited to sovereign immunity and immunity based on the Eleventh Amendment to the Constitution of the United States.

Wyatt_PK0000849
Exhibit 5
Page 7 of 12

**24.    Merger Clause; Waiver.**  This Contract and attached exhibits constitute the entire agreement between the parties on the subject matter of this Contract.  There are no understandings, agreements, or representations, oral or written, regarding this Contract that are not specified in this Contract.  No waiver, consent, modification or change of terms of this Contract binds all parties unless in writing and signed by both parties and all necessary State approvals have been obtained.  Such waiver, consent, modification or change, if made, is effective only in the specific instance and for the specific purpose given.  The failure of Firm or Agency to enforce any provision of this Contract does not constitute a waiver by Firm or Agency of that or any other provision.

**25.    Consulting Expert.**  Contractor will serve as a consulting expert unless the Firm designates, in writing, that the Contractor will serve as a testifying expert.

**26.    Contractor Data and Certification.**

**26.1.    Contractor Tax Identification Information.**  Contractor shall provide Contractor's Social Security number or Contractor's federal tax ID number and the additional information set forth below.  This information is requested pursuant to ORS 305.385.  Social Security Numbers provided pursuant to this section will be used for the administration of state, federal and local tax laws.

Name (tax filing):    **Public Knowledge**
Address:    Public Knowledge, LLC
1911 SW Campus Drive #457
Federal Way, WA 98023

Citizenship, if applicable: Non-resident alien ☐Yes  ☐No

Business Designation (check one):

☐ Corporation ☐ Partnership ☐ Limited Liability Partnership

☐ Limited Partnership ☐ Sole Proprietorship ☒ Limited Liability Company

☐ Other: _____

Federal Tax ID#: ███████████

Agency may report the information given above to the Internal Revenue Service (IRS) under the name and social security number or taxpayer identification number provided.

**26.2  Certification.**  The individual signing on behalf of Contractor certifies under penalty of perjury that: (a) the number shown above is Contractor's correct taxpayer identification and the other information provided is correct; (b) Contractor is not subject to backup withholding because (i) Contractor is exempt from backup withholding, (ii) Contractor has not been notified by the IRS that Contractor is subject to backup

Wyatt_PK0000850
Exhibit 5
Page 8 of 12

withholding as a result of a failure to report all interest or dividends, or (iii) the IRS has notified Contractor that Contractor is no longer subject to backup withholding; (c) the individual is authorized to act on behalf of Contractor, has authority and knowledge regarding Contractor's payment of taxes, and to the best of the individual's knowledge, Contractor is not in violation of any Oregon Tax Laws.  For purposes of this certification, "Oregon Tax Laws" means a state tax imposed by ORS 320.005 to 320.150 (Amusement Device Taxes), 403.200 to 403.250 (Tax for Emergency Communications), 118 (Inheritance Tax), 314 (Income Tax), 316 (Personal Income Tax), 317 (Corporation Excise Tax), 318 (Corporation Income Tax), 321 (Timber and Forest Land Taxation) and 323 (Cigarettes and Tobacco Products) and any local taxes administered by the Department of Revenue under ORS 305.620.

CONTRACTOR, BY EXECUTION OF THIS CONTRACT, HEREBY ACKNOWLEDGES THAT CONTRACTOR HAS READ THIS CONTRACT, UNDERSTANDS IT, AND AGREES TO BE BOUND BY ITS TERMS AND CONDITIONS.

**Public Knowledge**

By: _____ Date: 6/25/20

**Markowitz Herbold PC**

By: _Lauren Blaesing_ Date: 06-25-2020
     Lauren Blaesing

**Approved as to Sections 3, 7 and 8 by the State of Oregon Department of Administrative Services**

By: _____ Date: 6/26/2020
Name: Brian E. DeForest
Title: CAO

**Reviewed:**

By: _____ Date: June 24, 2020
     Stephanie A. Thompson
     Senior Assistant Attorney General

Expert Witness Page **9** of **12**

**EXHIBIT A**
**STATEMENT OF WORK**
**EXPERT WITNESS CONTRACT**

**Part I.  Services.**

**A.**  Contractor shall consult with and assist Firm and Agency in providing professional assistance and strategy advice regarding records analyses as part of trial preparation of: *Wyatt, et al. v. Kate Brown, et al.,* United States District Court, Eugene Division Case No. 6:19-cv-00556-AA (the "Matter").  Contractor shall take all steps reasonably necessary to provide the Services in a professional manner.

**B.**  Contractor shall set forth in writing and deliver to Firm all of its findings and opinions if requested by Firm.

**C.**  Contractor shall make expert personnel available to Firm, DHS, and Agency at reasonable hours, upon sufficient notice, to consult with Firm, DHS, and Agency regarding the Matter. Contractor understands and agrees that the commencement date of any trial or other court proceeding in connection with the Matter may change, and that Contractor's performance of Services is not excused by any date changes.

**Part II.  Payment.**

Contractor's fees will be based upon Contractor's customary and reasonable billing rates which must not exceed the following hourly billing rates:

| | |
|---|---|
| Melissa Davis, M.P.Aff | $200.00 |
| Stacy Obrecht, JD, CWLS, PMP | $280.00 |
| Allison Olson, MS | $145.00 |
| Alli Anderson | $120.00 |
| Will Hornsby, MSW | $215.00 |
| Bonnie Hommrich, MSSW | $150.00 |
| Eliza Byrne, MSW, MGA | $140.00 |
| Julie Breedlove | $175.00 |
| Jessica Dill | $120.00 |

To reduce fees, Contractor shall assign tasks among its staff commensurate with the level of expertise required and shall use professional employees where appropriate.  Agency will not pay Contractor for secretarial or clerical services.

**Part III.  Travel and Other Expenses.**

**A.**  Agency will reimburse Contractor, within the not-to-exceed amount of this Contract, for travel only when the travel is essential to the normal discharge of Agency's responsibilities. Contractor shall conduct all travel in the most efficient and cost-effective manner resulting in the best value to Agency.  The travel must comply with all the requirements set forth in this section

Wyatt_PK0000852
Exhibit 5
Page 10 of 12

and must be for official Agency business only.  Contractor shall provide Agency with receipts for all travel expenses except meals.  All Contractor representatives will fly "coach class," unless Contractor pays the difference. All Contractor representatives will be limited to economy or compact sized rental vehicles, unless Contractor pays the difference.

**B.**  To be eligible for reimbursement, Agency must provide advance written approval of all travel to and from the State of Oregon ("**Out-of-State Travel**").  In addition to reimbursement for meals and lodging, Agency will reimburse Contractor for airfare expenses and rental vehicles related to pre-approved Out-of-State Travel only if Contractor is acting within the course and scope of its duties under this Contract and in furtherance of the Services.

Wyatt_PK0000853
Exhibit 5
Page 11 of 12

**EXHIBIT B**
**INSURANCE REQUIREMENTS**

During the term of this Contract, Contractor must maintain in force at its own expense, each insurance noted below:

(Agency must check boxes for #2, #3, & #4 as to whether insurance is required or not.)

**1. ☒ Required by Agency of contractors with one or more workers, as defined by ORS 656.027.**

**Workers' Compensation:** All employers, including Contractor, that employ subject workers, as defined in ORS 656.027, shall comply with ORS 656.017 and shall provide workers' compensation insurance coverage for those workers, unless they meet the requirement for an exemption under ORS 656. 126(2). Contractor shall require and ensure that each of its subcontractors comply with these requirements.

**2. ☐ Required by Agency ☐ Not required by Agency.**

**Professional Liability** insurance with a combined single limit, or the equivalent, of not less than ☐ $200,000 ☐ $500,000 ☐ $1,000,000 ☐ $2,000,000 each claim, incident or occurrence. This is to cover damages caused by error, omission or negligent acts related to the professional Services to be provided under this Contract.

**3. ☐ Required by Agency ☐ Not required by Agency.**

**General Liability** insurance with a combined single limit, or the equivalent, of not less than ☐$200,000 ☐$500,000 ☐$1,000,000 ☐$2,000,000 each occurrence for Bodily Injury and Property Damage. It shall include contractual liability coverage for the indemnity provided under this Contract. It shall provide that the State of Oregon, Department of Justice and their divisions, officers and employees are Additional Insureds but only with respect to the Contractor's Services to be provided under this Contract.

**4. ☒ Required by Agency ☐Not required by Agency.**

**Automobile Liability** insurance with a combined single limit, or the equivalent, of not less than ☒ Oregon Financial Responsibility Law (ORS 806.060) ☐ $200,000 ☐ $500,000 ☐ $1,000,000 each accident for Bodily Injury and Property Damage, including coverage for owned, hired or non-owned vehicles, as applicable.

**5. Notice of cancellation or change.** There shall be no cancellation, material change, reduction of limits or intent not to renew the insurance coverage(s) without 30 days prior written notice from the Contractor or its insurer(s) to Agency.

**6. Certificates of insurance.** As evidence of the insurance coverages required by this Contract, the Contractor shall furnish acceptable insurance certificates to Agency prior to commencing the work. The certificate will specify all of the parties who are Additional Insureds. Insuring companies or entities are subject to State acceptance. If requested, complete copies of insurance policies, trust agreements, etc. shall be provided to the State. The Contractor shall be financially responsible for all pertinent deductibles, self-insured retentions or self-insurance.

Wyatt_PK0000854
Exhibit 5
Page 12 of 12



## LEGAL STANDARDS

There are a handful of laws that are relevant to this case: the Due Process Clause of the U.S. Constitution, the Child Welfare Act, and the Americans with Disabilities Act.

Under the Due Process Clause, foster children have a right to "minimally adequate care and treatment appropriate to the age and circumstances of the child." Minimally adequate care includes a foster child's "basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety." The State must provide children in its custody "personal security and reasonably safe living conditions" free from an unreasonable risk of both physical and psychological harm. The Due Process Clause ensures that foster children are "free from severe psychological abuse and emotional trauma—both of which are often inextricably related to some form of physical mistreatment or deprivation." This standard does not entitle foster children to receive optimal treatment and services, nor does it afford them the right to be free from any and all psychological harm at the hands of the State.

To prove a violation of the Due Process Clause, a plaintiff must prove that state officials acted with such deliberate indifference to the plaintiffs' liberty interest that their actions "shock the conscience." That standard requires proof of two facts: (1) an objectively substantial risk of harm; and (2) the official's subjective awareness of that risk. The second part may be proven by showing: (1) that the official was aware of facts from which an inference of risk may be drawn and that the official made that inference; (2) that the official was aware of facts from which an inference of risk may be drawn and that any reasonable official would have been compelled to draw that inference; or (3) that the risk of harm is obvious. *Id.*

Demonstrating that the State acted with deliberate indifference is "a significantly high burden for plaintiffs to overcome." *Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F. 3d 872, 882 (5th Cir. 2004) (citation omitted). "To act with deliberate indifference a state actor must consciously disregard a known and excessive



Legal Standards for Public Knowledge
Page 2

risk to the victim's health and safety." *Id.* at 880 (citation omitted).  This is a degree of culpability beyond mere negligence or even gross negligence; it "must amount to an intentional choice, not merely an unintentionally negligent oversight." *James v. Harris Cnty.*, 577 F.3d 612, 617-18 (5th Cir. 2009) (citation omitted).  The State is not deliberately indifferent to a substantial risk of serious harm if, aware of the risk, it responds reasonably even if the harm ultimately was not averted.  *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

The question is whether the state officials were aware of the policies/practices that created a substantial risk of harm to the child and did nothing in response.  Where the State attempts a remedy that fails, a plaintiff cannot prove deliberate indifference.

Plaintiffs have explicitly stated that they "don't argue that Defendants need to utilize "best practices" to avoid a finding of liability on constitutional grounds.  Rather, Defendants' practices are so deficient collectively that they are re-inflicting injury on the Plaintiffs."

The Child Welfare Act ("CWA") requires that a foster child's case plan: (1) include a plan to provide safe, appropriate, and stable placements; (2) ensure that the child receives safe and proper care; and (3) ensures provision of services to parents, children, and foster parents to facilitate reunification or permanent placement elsewhere.  It also requires that the case review system assure that placements are in the least restrictive (most family-like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child.

The CWA defines "case plan" as:

- A description of the type of placement for the child;
- A plan for assuring that the child receives proper care and services are provided to the parents;
- Health and education records;



Legal Standards for Public Knowledge
Page 3

- A written description of the services to help prepare a child from foster care to adulthood;

- Steps taken to find an adoptive home; and

- A plan for ensuring educational stability.

The Americans with Disabilities Act prohibits the state from participating in or being denied the benefits of the State's services, programs, or activities. Nor can the state discriminate against children with disabilities.



# Public**Knowledge**

600 Airport Rd
Lakewood, NJ 08701-5995

September 17, 2021

Mr. Vivek Kothari
Markowitz Herbold
1455 SW Broadway, Suite 1900
Portland, OR 97201

Dear Mr. Kothari:

On behalf of the Public Knowledge team, I am pleased to submit the enclosed draft deliverable: *Assessment Methodology and Protocols* for the Oregon Child Welfare Review project. This document summarizes the information needed to conduct an independent review of Oregon's child welfare system, including the protocols for conducting interviews, focus groups, and disseminating an online survey.

We have enjoyed collaborating with your team on this deliverable and trust it meets the needs of the project. Please do not hesitate to reach out to me with any questions or comments.

Sincerely,

Allison Olson
Project Manager

Wyatt_PK0004132
Exhibit 7
Page 1 of 98

# Assessment Methodology and Protocols

For:

Oregon Child Welfare Review

Markowitz Herbold

September 17, 2021



600 Airport Rd
Lakewood, NJ 08701-5995
www.pubknow.com

**Public**Knowledge

# Table of Contents

1    Introduction                                                                                                        1

   1.1    Scope of the Independent Review                                                          1

      1.1.1    Purpose                                                                                    1

      1.1.2    Independent Review Constraints and Assumptions                      2

      1.1.3    Contact Information                                                                3

   1.2    Guiding Principles                                                                           3

   1.3    Methodology Overview                                                                     4

   1.4    Key Terms                                                                                      5

   1.5    Entities Referenced                                                                         5

2    Selection of Research Questions                                                                      6

3    Seven-Element Inquiry Protocol Overview                                                         8

4    Research Questions and Protocols                                                                   9

   4.1    Question 1: Whether CW made progress during the identified timeframe to improve safety for children under CW supervision.                                                         9

   4.2    Question 2: Whether CW made progress during the identified timeframe to improve the agency culture.                                                                                       14

   4.3    Question 3: Whether CW made progress during the identified timeframe to improve data driven decision making and quality of services.                                            16

   4.4    Question 4: Whether CW made progress during the identified timeframe to improve foster parent recruitment, retention, and the support of substitute care providers.  19

   4.5    Question 5: Whether CW made progress during the identified timeframe to improve permanence for children in substitute care.                                                      22

   4.6    Question 6: Whether CW made progress during the identified timeframe to improve permanency planning.                                                                                 25

   4.7    Question 7: Whether CW made progress during the identified timeframe to improve individualized assessments for children and families.                                       27

   4.8    Question 8: Whether CW made progress during the identified timeframe to improve service provision that meets the assessed needs of children and families.                29

PublicKnowledge

4.9    Question 9: Whether CW made progress during the identified timeframe to improve
       case planning.                                                                    32

4.10   Question 10: Whether CW made progress during the identified timeframe to
       preserve and improve connections between children in substitute care and their
       families and communities.                                                        34

4.11   Question 11: Whether CW made progress during the identified
       timeframe to improve staffing resources.                                         36

5      Methodology                                                                       38

5.1    Establish the Assessment Scope                                                    38

5.2    Establish the Inquiry Protocol                                                    39

5.3    Collect Data                                                                      39

5.4    Establish Variables and Assumptions                                              40

5.5    Analyze Data                                                                      40

5.6    Themes                                                                            41

5.7    Handling of Unexpected or Adverse Events                                          41

5.8    Report Findings                                                                   41

Appendix A: Key Terms                                                                    42

Appendix B: Entities                                                                     68

Appendix C: Survey Protocol                                                              70

Appendix D: Interview Protocol                                                           75

Appendix E: Focus Group Protocol                                                         82

# 1    Introduction

Oregon's Governor Kate Brown and Oregon Department of Human Services' (DHS) child welfare system and its leaders had a federal class action lawsuit filed against them in April 2019. The Oregon Department of Justice (DOJ) and the law firm Markowitz Herbold (MH) are representing the Governor and DHS. The state needs an independent reviewer to document the progress, if any, that DHS Child Welfare (CW) has made in improving the child welfare system since Public Knowledge completed the *Child Safety in Substitute Care Final Report* in 2016. The state asked Public Knowledge to collect information from its clients and assess that information to assist MH in providing legal advice to its clients.

Public Knowledge will conduct a thorough independent assessment of the Governor's Office and DHS' child welfare policies, procedures, leadership, and data, and document any progress CW has made to implement recommendations or address concerns through identifiable and credible strategies and processes. Our assessment team will collect and analyze primary and secondary data on the system, using findings from our 2016 *Child Safety in Substitute Care Final Report* as a baseline for many of the research questions that are derived from the legal pleadings. For the research questions that were not based on findings of the 2016 review, the baseline will be identified within the same time period. For example, Oregon completed Round 3 of the Child and Family Services Review (CFSR) in September 2016, so data will be included in this assessment that originated in the CFSR results.

## 1.1    Scope of the Independent Review

An independent review is an assessment of a policy, program, or system by an independent third party. The subject of this review is Oregon's Child Welfare system, led by the Oregon DHS and the Oregon Governor's Office.

The scope of this review includes all children under CW supervision, with particular focus on children in substitute care and those included in the subclasses in the pleadings.

### 1.1.1    Purpose

The purpose of the *Assessment Methodology and Protocols* is to ensure understanding of the strategies, tools, and techniques that the Public Knowledge independent review team will employ to conduct our independent review of Oregon's child welfare system. The *Assessment Methodology and Protocols* outlines the eleven research questions and accompanying inquiry questions that provide the framework for the assessment. The methodology and protocols include planned data sources, human participants, information sources, and methods of data analysis.

Wyatt_PK0004136
Exhibit 7
Page 5 of 98

## 1.1.2    Independent Review Constraints and Assumptions

**CONSTRAINTS**

Every independent review of a program or system faces constraints due to factors outside the control of the review team. Below are our current known constraints. We anticipate we may encounter additional constraints once we begin our review and those will be documented appropriately.

**COVID-19**. The Public Knowledge review team faces limitations related to the global pandemic. Those include:

- Restrictions and precautions around in-person gathering mean that interviews, observations, and focus groups will likely be conducted online.
- Availability of stakeholders may be impacted by changes to work environments, schedules, and stress levels. Additionally, the regular business of CW is adapting to new needs arising from the pandemic, possibly increasing workloads, and decreasing availability for participation.
- Restrictions have been placed around aspects of the child welfare system during the pandemic, affecting timeliness of family meetings, court hearings, and family visitation.

Data gathered during this time period will be identified to acknowledge impacts to trends occurring prior to the pandemic.

**Unknown trial date**. The expected trial date for this case is unknown and subject to change due to myriad factors including restrictions related to COVID-19. Collecting data is a point-in-time activity. An extended time between collecting the data and presenting the findings could lead to less timely results.

**ASSUMPTIONS**

Every review project such as this one includes assumptions that define parameters for the project to progress as timely and be as comprehensive as possible. Our review is guided by the following assumptions:

**Focus Area.** The focus of our independent assessment is the Governor and CW, including its child welfare policies, procedures, leadership, and data.

**Follow-Up from 2016.** Research questions initially assessed during our 2016 Child Safety in Substitute Care review will be re-assessed to document any progress CW has made to implement recommendations or address concerns through identifiable and credible strategies and processes. Research questions not covered in our 2016 Child Safety in Substitute Care review will be investigated to determine the extent to which key staff and leaders within CW

Wyatt_PK0004137
Exhibit 7
Page 6 of 98

are aware of the agency's performance and capacity in critical areas and are making attempts to address areas needing improvement through identifiable and credible strategies and processes.

**Data**. Participants in this review will provide requested data, reports, and other information in a timely manner.

**Access.** MH will help ensure the Public Knowledge team has access to the individuals or documents needed to gather data and inform the assessment. Key staff and leaders from the following organizations will make themselves available for interviews, focus groups, and survey participation: CW, Governor's Office, and DOJ. The MH project team and CW leadership will assist with introductions and requests for participation as needed, and CW leadership will assist with distribution lists for survey administration within the agency.

**Data Collection and Analysis.** Our team will have independence over the collection of primary data. We will collect primary data from individuals and groups within Oregon's child welfare system, which may include providers, agency staff, partners, and others as identified. Qualitative data collection and analysis will include both primary and secondary sources, and any quantitative data collection and analysis will be from secondary sources. CW representatives will assist in providing appropriate data.

**Findings.** Public Knowledge's findings will be based on facts and our judgement regarding any progress CW has made to implement recommendations or address concerns through identifiable and credible strategies and processes. Recommendations for improvement or advice are not included.

## 1.1.3    Contact Information

Questions about this document should be directed to Allison Olson at (208) 510-5161 or aolson@pubknow.com.

## 1.2    Guiding Principles

The independent review team will use the following guiding principles throughout the assessment process:

- **Measure progress by incremental effort and improvement.** Progress does not require achievement of a particular outcome or standard, but rather improvement from the baseline indicated at the outset of the identified timeframe.
- **Consider the implications for all children under CW supervision.** The scope of the assessment includes all children under CW supervision, with particular focus on children in

Wyatt_PK0004138
Exhibit 7
Page 7 of 98

substitute care. Specific consideration for each question will be given to members of each subclass referenced in the pleadings.

- **Use a child-driven perspective.** Be guided first and foremost by the child experience. The goal of this review is to recognize systemic improvements that have been made to improve the experience of children in CW supervision and keep them safe throughout the duration of their case.

- **Measure improvements in agency culture by the increased prioritization of child safety.** Leadership drives agency culture through development and implementation of its mission and vision. The agency culture will be considered through the lens of how well the agency implements its mission and vision through its commitment to prioritizing child safety in policies, rules, and procedures. Leadership messaging, communications, priorities identified in continuous quality improvement processes, and allocation of staff resources will also be evaluated. Organizational culture is a difficult concept to quantify, so progress in the agency culture will be considered through a lens of the commitment to prioritizing child safety in policies, rules, and laws.

- **Base findings on facts and be transparent about our sources.** Throughout this review, we will begin with facts and data where possible and corroborate with qualitative data. We will also include the perceptions of stakeholders as a data source to share their experiences in the child welfare system and how those perceptions influence policy and systems change. We will communicate how we use information provided to us.

- **Apply systems thinking to see the whole picture.** We have included a lengthy list of subtopics in this review to meaningfully research the overarching question of improving safety for children in foster care. We believe the topics covered by the research questions encompass the salient aspects of the child welfare system and will allow us to comprehensively assess system improvements and areas still needing attention.

## 1.3    Methodology Overview

This assessment will follow Public Knowledge's standard methodology, which includes establishing the assessment scope, establishing the inquiry protocol, collecting data, establishing variables and assumptions, analyzing data, identifying themes, handling unexpected or adverse events, and reporting of findings or conclusions. Working through this methodology will ensure the high-quality review and assessment required. A full overview of the methodology is found in Section 5 of this document and is summarized in the graphic representation of the methodology, shown in the following figure.

Wyatt_PK0004139
Exhibit 7
Page 8 of 98

**Public**Knowledge

Figure 1.1 Assessment Methodology



## 1.4    Key Terms

Key terms are used to define language that has specific meaning to the documentation reviewed and completed as part of this assessment methodology. A complete list with source references can be found in Appendix A.

## 1.5    Entities Referenced

Entities include all governmental or non-governmental groups or organizations specifically referenced in the documentation reviewed and completed as part of this assessment methodology. A complete list of entities referenced can be found in Appendix B.

Wyatt_PK0004140
Exhibit 7
Page 9 of 98

# 2    Selection of Research Questions

To develop the research questions for this assessment, we began with the overarching topic of keeping children safe while they are under the supervision of CW, whether they remain in their homes or are placed in substitute care. Following a thorough review of the pleadings, the Public Knowledge 2016 *Child Safety in Substitute Care Independent Review Final Report*, and supporting documents, we identified a broad list of topic areas, represented by the top of the hourglass in Figure 2.1 below. From these, we narrowed our focus on each aspect of the child welfare system to build the eleven research questions, represented by the narrowest part of the hourglass. We then expanded on these to develop a comprehensive set of inquiry questions, represented by the bottom of the hourglass in Figure 2.1.

Figure 2.1 Approach to Developing Research Questions



The research questions, detailed in Section 4, will evaluate the following:

1.  Safety for children under CW supervision

2.  The organizational culture of CW

3.  Data-driven decision-making and quality of services offered

4.  Foster parent recruitment, retention, and support of substitute care providers

5.  Permanence for children in substitute care

6.  Permanency planning

Wyatt_PK0004141
Exhibit 7
Page 10 of 98

**Public**Knowledge

7.  Individualized assessments for children and families

8.  Service provision based on assessed needs

9.  Case planning

10. Family connections for children in substitute care

11. CW staffing resources

Wyatt_PK0004142
Exhibit 7
Page 11 of 98

# 3    Seven-Element Inquiry Protocol Overview

The purpose of the Seven-Element Protocol is to ensure understanding of the strategies, tools, and techniques the review team will employ to conduct a comprehensive assessment. The seven elements of the protocol are included for each selected research question, below.

Figure 3.1 Seven-Element Inquiry Protocol



Wyatt_PK0004143
Exhibit 7
Page 12 of 98

# 4    Research Questions and Protocols

This section includes detailed protocols for each of the 11 research questions.

## 4.1    Question 1: Whether CW made progress during the identified timeframe to improve safety for children under CW supervision.

This question forms the basis for the review, as ensuring child safety is the primary function of the child welfare system. A significant portion of the pleadings in this case are related to the safety of children involved in child welfare, and this question illustrates the breadth and depth of considerations for keeping children safe while under CW supervision.

Table 4.1 Research Question 1 Protocol

**Whether CW made progress during the identified timeframe to improve safety for children under CW supervision.**

| Protocol Element | Detailed Description or List |
|---|---|
| Inquiry Questions | • Has CW responded to maltreatment reports within the required timeframe?<br>• How soon does CW complete face-to-face contact with children following a maltreatment report?<br>• Does CW adequately assess safety thresholds and safety concerns of children in their homes during intake, initial assessments, and safety assessments, and throughout the life of the case?<br>• Does CW adequately address safety threats and safety concerns of children in their homes?<br>• Does CW adequately assess safety threats and safety concerns of children in substitute care?<br>• Does CW adequately address safety threats and safety concerns of children in substitute care?<br>• Does CW meet federal requirements for caseworker contacts with children in substitute care?<br>• Does CW meet state requirements for caseworker contacts with children in substitute care?<br>• Does CW meet standards for quality caseworker contacts with children in substitute care?<br>• Does CW meet state requirements for caseworker contacts with parents of children in substitute care? |

Wyatt_PK0004144
Exhibit 7
Page 13 of 98

**Public**Knowledge

**Whether CW made progress during the identified timeframe to improve safety for children under CW supervision.**

- Does CW meet standards for quality caseworker contacts with parents of children in substitute care?
- Does CW effectively manage caseloads to adequately meet the needs of children and families?
- Does CW adequately address safety concerns of children in substitute care within required timeframes?
- Has the rate of maltreatment for children in substitute care decreased?
- Does CW adequately assess out-of-state facilities to determine the appropriateness of placing children?
- Does CW appropriately supervise placements of children in out-of-state facilities?
- Has CW centralized and standardized reporting, screening, and assessments statewide?
- Does CW maintain the confidentiality of reports of abuse in care?
- Did CW redesign the process of responding to allegations of abuse and neglect regarding children in substitute care?
- Is the process of responding to allegations of abuse and neglect regarding children in substitute care transparent?
- Does CW standardize the response to allegations of maltreatment for children in substitute care?
- Does CW consistently share safety information across entities?
- What is CW's policy on protecting the confidentiality of children who identify as LGBTQIA+?
- Does CW consistently distinguish between allegations of abuse and critical incidents?
- Has CW standardized the protocol for "closed at screening"?
- Does CW ensure that requirements are met when recruiting, certifying, and monitoring foster parents?
- Does CW comply with federal background check requirements during certification and oversight of substitute care providers?

Wyatt_PK0004145
Exhibit 7
Page 14 of 98

**Whether CW made progress during the identified timeframe to improve safety for children under CW supervision.**

|  |  |
|---|---|
|  | • Does CW address safety threats or safety concerns raised in a substitute care placement?<br>• Does CW have policies and procedures in place to guide staff on safety practices?<br>• Does CW provide training and coaching to staff about best practices in safety for children under CW supervision?<br>• Does CW utilize a case review process to measure progress on improving safety for children under CW supervision?<br>• Does CW have in place quality assurance processes for monitoring safety for children under CW supervision?<br>• Does CW leadership advocate for safety for children under CW supervision? |
|  Methods of Inquiry | • Interviews<br>• Focus Groups<br>• Data Analysis<br>• Document and Regulation Review<br>• Surveys |
|  Universal Participants | • Governor's Office<br>• Child Welfare (CW) Leadership<br>• Central Office<br>• District Managers<br>• Managers<br>• Supervisors<br>• Field Staff<br>• Consultants<br>• Data Representative |
|  Representative Sample of Participants | • Interviews: representatives from the Governor's office, and CW leadership and managers<br>• Focus Groups: caseworkers, supervisors, and managers from all areas of Oregon, safety consultants and central office staff representatives<br>• Survey: managers, supervisors, and field staff from all areas of Oregon |

Wyatt_PK0004146
Exhibit 7
Page 15 of 98

**Whether CW made progress during the identified timeframe to improve safety for children under CW supervision.**

| | |
|---|---|
|  Data Elements | • Average number of hours between maltreatment report and face-to-face contact<br>• % of cases meeting the required timeframes for safety<br>• % of cases with completed risk and safety assessments in compliance with requirements<br>• % of cases with recurrent maltreatment reports<br>• % of cases with recurrent maltreatment reports in the same placement<br>• Components of safety plans<br>• % of cases that meet federal requirements on caseworker contact<br>• % of cases meeting quality caseworker contact standards<br>• Average number of cases per caseworker<br>• Type of cases per caseworker<br>• Timeliness of hearings, determinations, reporting timelines<br>• Rate of maltreatment for children in substitute care<br>• Number of children placed in out-of-state facilities<br>• Out-of-state facilities used by CW<br>• Documentation of out-of-state placement supervision efforts, including children and facility<br>• Reports from out-of-state facilities<br>• Statewide regulations and policies<br>• Centralized statewide process or system<br>• Policy language around confidentiality of reports<br>• Documentation of risk or safety concerns and safety plans |
| Preliminary Data Sources | • National Child Abuse and Neglect Data System (NCANDS)<br>• Statewide Automated Child Welfare Information System (SACWIS)/Comprehensive Child Welfare Information System (CCWIS)/Results Oriented Management (ROM)<br>• Adoption and Foster Care Analysis and Reporting System (AFCARS)<br>• Child and Family Services Review (CFSR)<br>• Child and Family Services Plan (CFSP)<br>• Annual Progress and Service Report (APSR) |

Wyatt_PK0004147
Exhibit 7
Page 16 of 98

**Public**Knowledge

**Whether CW made progress during the identified timeframe to improve safety for children under CW supervision.**

| | |
|---|---|
| | • National Electronic Interstate Compact Enterprise (NEICE)<br>• Public Knowledge *2016 Child Safety in Substitute Care Independent Review Final Report*<br>• Oregon Quality Assurance Reports |
|  Types of Regulation, Documentation, and Information Sources | • Meeting Agendas and Minutes<br>• Federal Reports<br>• Oregon State Reports<br>• Oregon Non-State Reports<br>• Policies and Procedures<br>• Regulations |

Wyatt_PK0004148
Exhibit 7
Page 17 of 98

**Public**Knowledge                                    Research Questions and Protocols

## 4.2    Question 2: Whether CW made progress during the identified timeframe to improve the agency culture.

The organizational culture at CW impacts all aspects of the child welfare system, including perspectives on the importance of child safety, staff longevity, and the ways in which agency leadership models the values and mission of the agency. This question addresses concerns outlined in the pleadings regarding the influence of agency culture on the safety of children and the delivery of services to families.

Table 4.2 Research Question 2 Protocol

**Whether CW made progress during the identified timeframe to improve the agency culture.**

| | Protocol Element | Detailed Description or List |
|---|---|---|
|  | Inquiry Questions | • In what ways is safety prioritized in decision making for children in substitute care?<br>• In what ways are CW staff encouraged to speak up with safety concerns regarding children in substitute care?<br>• Do CW staff feel comfortable raising concerns?<br>• Do CW staff know how to escalate concerns about safety issues?<br>• Does CW respond according to policies and procedures to maltreatment reports from children in substitute care?<br>• Does CW communicate the importance of child safety for children in substitute care?<br>• In what ways does CW advocate for a safety culture among its workforce?<br>• Does CW use Organizational Change Management processes and structures?<br>• In what ways do CW executives model leadership skills and behaviors?<br>• Do CW' nondiscrimination policies include considerations of sexual orientation, gender identity, and gender expression (SOGIE)? |
|  | Methods of Inquiry and Data Analysis | • Document and Regulation Review<br>• Interviews<br>• Observation<br>• Focus Groups |

Wyatt_PK0004149
Exhibit 7
Page 18 of 98

**PublicKnowledge**

**Whether CW made progress during the identified timeframe to improve the agency culture.**

| | | |
|---|---|---|
| | | • Surveys |
|  | Universal Participants | • Governor's Office<br>• Child Welfare (CW) Leadership<br>• Central Office<br>• District Managers<br>• Managers<br>• Supervisors<br>• Field Staff<br>• Consultants<br>• Data Representative |
|  | Representative Sample of Participants | • Interviews: representatives from the Governor's office, and CW leadership, managers, and data staff<br>• Focus Groups: caseworkers, supervisors, and managers from all areas of Oregon, safety and adoption consultants, and central office staff representatives<br>• Survey: managers, supervisors, and field staff from all areas of Oregon |
|  | Data Elements | • Confirm safety culture language in communications, policies, procedures, and CQI processes |
|  | Preliminary Data Sources | • SACWIS/CCWIS/ROM<br>• Public Knowledge 2016 *Child Safety in Substitute Care Independent Review Final Report*<br>• CFSP<br>• Program Improvement Plan (PIP)<br>• Learning Management System (LMS) |
|  | Regulation, Documentation, and Information Sources | • Federal Reports<br>• Oregon State Reports<br>• Policies and Procedures<br>• Meeting Agendas and Notes<br>• Communications (Emails, Memos) |

Wyatt_PK0004150
Exhibit 7
Page 19 of 98

## 4.3    Question 3: Whether CW made progress during the identified timeframe to improve data driven decision making and quality of services.

Recent trends in child welfare have emphasized the importance of using data to inform and drive decision making for children and families. This question allows us to assess how CW is collecting and using data to support and inform the planning for children and families, including the use of a comprehensive continuous quality improvement process.

Table 4.3 Research Question 3 Protocol

**Whether CW made progress during the identified timeframe to improve data-driven decision-making and quality of services.**

| Protocol Element | Detailed Description or List |
|---|---|
| Inquiry Questions | • Does CW enter data accurately into OR-Kids?<br>• Does CW enter data timely into OR-Kids?<br>• Is case information entered or tracked outside of OR-Kids?<br>• How does CW identify and document children who identify as LGBTQIA+?<br>• Does CW have a Data Quality Plan?<br>• Does CW follow their Data Quality Plan?<br>• Does CW use data to inform the development of new or revised practices, policies, and procedures?<br>• Does CW have policies and procedures in place to guide staff on how to make decisions based on data?<br>• Does CW have policies and procedures in place to guide staff on improving the quality of services?<br>• Does CW have a continuous quality improvement process that includes leadership support, leadership modeling, staff and stakeholder engagement, communication, oversight, data collection, case record reviews, and use of the findings?<br>• Does CW engage in continuous quality improvement processes at the state, district, and county levels?<br>• What does the CQI process look like at each level?<br>• Does CW conduct effective evaluations of the quality of services offered by external service providers?<br>• Does CW use the evaluations of the quality of services to improve service delivery to families? |

Wyatt_PK0004151
Exhibit 7
Page 20 of 98

**Public**Knowledge

**Whether CW made progress during the identified timeframe to improve data-driven decision-making and quality of services.**

|  |  |  |
|---|---|---|
|  |  | • Does CW utilize performance-based contracting with its external service providers?<br>• Does CW provide training and coaching for staff on how to use data to drive decisions and improve quality of services?<br>• Does CW have a case review system in place to inform decision making and improve the quality of services?<br>• Does CW collaborate with service providers to share feedback from case reviews? |
|  | Methods of Inquiry and Data Analysis | • Interviews<br>• Focus Groups<br>• Surveys<br>• Data Analysis<br>• Document and Regulation Review |
|  | Universal Participants | • Child Welfare (CW) Leadership<br>• Central Office<br>• District Managers<br>• Managers<br>• Supervisors<br>• Field Staff<br>• Consultants<br>• Data Representative |
|  | Representative Sample of Participants | • Interviews: representatives from the Governor's office, CW leadership, managers, and data staff<br>• Focus Groups: caseworkers, supervisors, and managers from all areas of Oregon, and central office staff representatives<br>• Survey: managers, supervisors, and field staff from all areas of Oregon |
|  | Data Elements | • % decrease in data errors or missing data in OR-Kids<br>• List of supplemental databases<br>• Components of the Data Quality Plan<br>• Documentation of CQI processes<br>• Meeting minutes |

Wyatt_PK0004152
Exhibit 7
Page 21 of 98

**Public**Knowledge

**Whether CW made progress during the identified timeframe to improve data-driven decision-making and quality of services.**



Preliminary Data Sources

- CFSR
- Oregon Quality Assurance Reports
- SACWIS/CCWIS/ROM
- Oregon DHS CW Data Quality Plan
- CFSP
- APSR



Regulation, Documentation, and Information Sources

- Oregon State Reports
- Federal Reports
- CW Policies and Procedures
- Meeting Agendas and Notes

Wyatt_PK0004153
Exhibit 7
Page 22 of 98

## 4.4    Question 4: Whether CW made progress during the identified timeframe to improve foster parent recruitment, retention, and the support of substitute care providers.

The pleadings highlight a need for improvements in the support of substitute care providers, including both foster parents and congregate care providers, beginning with recruitment and continuing with ongoing support. This question evaluates how CW continually and consistently supports providers, including offering sufficient training, services, and ensuring appropriate matching of children to their placement providers.

Table 4.4 Research Question 4 Protocol

**Whether CW made progress during the identified timeframe to improve foster parent recruitment, retention, and the support of substitute care providers.**

| Protocol Element | Detailed Description or List |
|---|---|
| Inquiry Questions | • Does CW recruit and retain foster parents who are able to meet the identified needs of children in substitute care? <br> • Does CW recruit and retain appropriate child-specific providers, including kith and kin, to care for the number of children who need such placements? <br> • Does CW maintain an appropriate number of foster homes to house the number of children who need to be placed in substitute care? <br> • Does CW provide initial training to substitute care providers to ensure they can meet the identified needs of children? <br> • Does CW provide ongoing training to substitute care providers specific to the needs of the children for whom they are caring? <br> • Does CW adequately assess the ability of substitute care providers to ensure the appropriate care and supervision of children? <br> • Does CW provide appropriate services and support to substitute care providers to ensure children are adequately cared for and supervised? <br> • Does CW diligently recruit substitute care providers who reflect the ethnicity and race of children in substitute care? |

Wyatt_PK0004154
Exhibit 7
Page 23 of 98

**Whether CW made progress during the identified timeframe to improve foster parent recruitment, retention, and the support of substitute care providers.**

- Does CW recruit and retain substitute care providers who can care for children who identify as LGBTQIA+?
- Does CW recruit and retain substitute care providers who can care for children who are living with high needs?
- How does CW oversee the contracted placements for children living with high needs?
- Does CW track, at the state and local levels, the current capacity for substitute care providers?
- Does CW track the skills and capabilities of substitute care providers to ensure appropriate matching for children and their placement providers?
- Has CW increased reimbursement rates for substitute care providers?
- Does CW prioritize the use of the least restrictive placement?
- Does CW have or oversee a statewide recruitment, retention, and support plan for substitute care providers?
- Does CW use data to inform their statewide recruitment, retention, and support plan for substitute care providers?
- Does CW have policies and procedures for staff regarding the recruitment, retention, and support of substitute care providers?
- Does CW provide training and coaching for staff on best practices for the recruitment, retention, and the support of substitute care providers?
- Does CW utilize a case review process to identify lessons learned in the recruitment, retention, and the support of substitute care providers?
- Does CW leadership support the recruitment, retention, and support of substitute care providers?

| | |
|---|---|
|  Methods of Inquiry and Data Analysis | • Interviews<br>• Focus Groups<br>• Data Analysis<br>• Document and Regulation Review<br>• Surveys |

Wyatt_PK0004155
Exhibit 7
Page 24 of 98

**Public****Knowledge**

**Whether CW made progress during the identified timeframe to improve foster parent recruitment, retention, and the support of substitute care providers.**

| | Universal Participants | • Child Welfare (CW) Leadership<br>• Central Office<br>• District Managers<br>• Managers<br>• Supervisors<br>• Field Staff<br>• Consultants<br>• Data Representative |
|---|---|---|
| | Representative Sample of Participants | • Interviews: CW leadership, managers, and data staff<br>• Focus Groups: caseworkers, supervisors, and managers from all areas of Oregon, adoption consultants, and central office staff representatives<br>• Survey: managers, supervisors, and field staff from all areas of Oregon |
| | Data Elements | • Matching of Levels of Care (LOC) and Level of Need (LON)<br>• Population of children in substitute care<br>• Current vacancies in substitute care placements<br>• Matching of LOC and LON<br>• Demographics of children in substitute care and of substitute care providers<br>• Reimbursement rates for all provider types<br>• Proportion of children in substitute care to number of foster parents |
| | Preliminary Data Sources | • SACWIS/CCWIS/ROM<br>• CFSP<br>• APSR<br>• Oregon Quality Assurance Reports<br>• Learning Management System (LMS)<br>• CFSR |
| | Regulation, Documentation, and Information Sources | • Federal Reports<br>• Oregon State Reports<br>• Policies and Procedures<br>• Regulations |

Wyatt_PK0004156
Exhibit 7
Page 25 of 98

## 4.5    Question 5: Whether CW made progress during the identified timeframe to improve permanence for children in substitute care.

Permanence is one of the three pillars of child welfare, along with safety and well-being, and is the goal for every child in substitute care. This question addresses whether CW consistently strives for timely permanence for every child in substitute care.

Table 4.5 Research Question 5 Protocol

**Whether CW made progress during the identified timeframe to improve permanence for children in substitute care.**

| Protocol Element | Detailed Description or List |
|---|---|
| Inquiry Questions | • Does CW conduct ongoing searches for relatives of children in substitute care?<br>• Does CW frequently use temporary placements for children in substitute care?<br>• Does CW prioritize the placement of children with relatives?<br>• Does CW utilize guardianships?<br>• Has placement stability in Oregon improved?<br>• Has time to permanence improved?<br>• Does CW pursue termination of parental rights as required by federal law?<br>• Does CW adequately assess prospective adoptive parents to determine an appropriate match?<br>• Does CW collaborate with the courts to ensure timely permanency hearings?<br>• Does CW hold timely permanency reviews?<br>• In what ways does CW make concerted efforts to achieve permanence in a timely manner?<br>• Does CW change permanency plan goals in a timely manner according to state requirements?<br>• Has time to the termination of parental rights (TPR) improved?<br>• Does CW recommend placement decisions based on the identified needs and permanency plan of the child? |

Wyatt_PK0004157
Exhibit 7
Page 26 of 98

**Public**Knowledge

**Whether CW made progress during the identified timeframe to improve permanence for children in substitute care.**

|  |  |  |
|---|---|---|
|  |  | • Does CW appropriately match children to substitute care placements based on the needs of the child and the capability of the providers?<br>• Does CW meet state requirements for using the CANS to determine the Level of Need (LON) for children in care?<br>• Does CW meet state requirements for using the CANS to establish reimbursement rates for providers?<br>• Does CW follow federal requirements for placement preferences for Native American or Alaska Native children?<br>• Does CW have policies and procedures in place to facilitate improving permanence for children in substitute care?<br>• Does CW provide training and coaching to staff on best practices for improving permanence for children in substitute care?<br>• Does CW utilize a case review process to understand and improve barriers and strengths regarding permanence for children in substitute care?<br>• Does CW leadership encourage improving permanence for children in substitute care? |
|  | Methods of Inquiry and Data Analysis | • Interviews<br>• Focus Groups<br>• Data Analysis<br>• Document and Regulation Review<br>• Surveys |
|  | Universal Participants | • Child Welfare (CW) Leadership<br>• Central Office<br>• District Managers<br>• Managers<br>• Supervisors<br>• Field Staff<br>• Consultants<br>• Data Representative |
|  | Representative Sample of Participants | • Interviews: CW leadership, managers, and data staff |

Wyatt_PK0004158
Exhibit 7
Page 27 of 98

**Whether CW made progress during the identified timeframe to improve permanence for children in substitute care.**

|  |  |  |
|---|---|---|
|  |  | • Focus Groups: caseworkers, supervisors, and managers from all areas of Oregon, adoption consultants, and central office staff representatives<br>• Survey: managers, supervisors, and field staff from all areas of Oregon |
|  | Data Elements | • % decrease of children in temporary placements<br>• % of children in relative placements<br>• Placement stability rate<br>• Timeliness of permanency<br>• Timeliness of reunification<br>• Use of Trial Home Visits<br>• Timeliness of TPR filings<br>• Timeliness of TPR hearings<br>• Timelines from TPR filing to termination to adoption<br>• Disrupted adoptions<br>• Timeliness of permanency hearings and reviews<br>• Timeliness of TPR finalization<br>• LON & LOC data |
|  | Preliminary Data Sources | • SACWIS/CCWIS/ROM<br>• AFCARS<br>• NCANDS<br>• APSR<br>• Circuit Court Juvenile Dependency Statistics |
|  | Regulation, Documentation, and Information Sources | • Federal Reports<br>• Oregon State Reports<br>• Policies and Procedures<br>• Regulations |

Wyatt_PK0004159
Exhibit 7
Page 28 of 98

Public**Knowledge**

## 4.6    Question 6: Whether CW made progress during the identified timeframe to improve permanency planning.

Permanency planning is the mechanism by which CW achieves permanence for children in substitute care, and this question builds upon the previous one regarding the prioritization of permanence. Here we will evaluate the extent to which CW appropriately identifies permanency goals and urgently pursues them throughout a child's time in substitute care.

Table 4.6 Research Question 6 Protocol

**Whether CW made progress during the identified timeframe to improve permanency planning.**

| Protocol Element | Detailed Description or List |
|---|---|
| Inquiry Questions | • Does CW identify permanency goals appropriate to the needs of the child?<br>• Does CW create permanency plans based on the identified needs of the child?<br>• Does CW meet requirements for reviewing and updating permanency plans?<br>• Does CW recommend changes in placement based on the identified needs and permanency plan of the child?<br>• Does CW collaborate with families and children to identify and improve barriers regarding permanency planning?<br>• Does CW collaborate with the courts to identify and eliminate barriers regarding permanency planning?<br>• Does CW have policies and procedures in place to guide staff on permanency planning?<br>• Does CW provide training and coaching to staff on how to plan for permanency for children and families?<br>• Does CW utilize a case review process to understand and improve barriers and strengths in permanency planning?<br>• Does CW leadership advocate for improving permanency planning? |
| Methods of Inquiry and Data Analysis | • Interviews<br>• Focus Groups<br>• Surveys<br>• Document and Regulation Review |

**Public**Knowledge

**Whether CW made progress during the identified timeframe to improve permanency planning.**

| | | |
|---|---|---|
| | | • Data Analysis |
|  | Universal Participants | • Central Office<br>• District Managers<br>• Managers<br>• Supervisors<br>• Field Staff |
|  | Representative Sample of Participants | • Interviews: CW managers<br>• Focus Groups: caseworkers, supervisors, and managers from all areas of Oregon, and central office staff representatives<br>• Survey: supervisors and field staff from all areas of Oregon |
|  | Data Elements | • Policy language regarding review and updating of permanency plans |
|  | Preliminary Data Sources | • SACWIS/CCWIS/ROM<br>• CFSR<br>• APSR<br>• CFSP |
|  | Regulation, Documentation, and Information Sources | • Oregon State Reports<br>• Federal Reports<br>• Policies and Procedures<br>• Regulations<br>• Meeting Agendas and Notes |

Wyatt_PK0004161<br>Exhibit 7<br>Page 30 of 98

**Public**Knowledge                                    Research Questions and Protocols

## 4.7    Question 7: Whether CW made progress during the identified timeframe to improve individualized assessments for children and families.

Comprehensive assessments are crucial to understand the needs and strengths of children and their families, and the pleadings reference various instances where such assessments were not conducted. This question will address whether these assessments are being offered and completed consistently for all children and their families.

Table 4.7 Research Question 7 Protocol

**Whether CW made progress during the identified timeframe to improve individualized assessments for children and families.**

| Protocol Element | Detailed Description or List |
|---|---|
| Inquiry Questions | • Does CW ensure completion of safety and comprehensive assessments for all children?<br>• Does CW ensure completion of safety and comprehensive assessments for parents?<br>• Does CW ensure completion of safety and comprehensive assessments for foster parents?<br>• Does CW ensure completion of contracted assessments?<br>• Does CW have a mechanism to evaluate the provision of assessments?<br>• Does CW identify necessary services for children based on the assessment(s)?<br>• Does CW identify necessary services for parents based on the assessment(s)?<br>• Does CW identify necessary services for substitute care providers based on the assessment(s)?<br>• Does CW have policies and procedures in place for conducting individualized assessments for children and families?<br>• Does CW provide training and coaching to staff in assessing individuals, including children and families?<br>• Does CW utilize a case review process to inform and improve individualized assessments for children and families?<br>• Does CW leadership encourage individualized assessments for children and families? |

Wyatt_PK0004162
Exhibit 7
Page 31 of 98

**Public**Knowledge

---

**Whether CW made progress during the identified timeframe to improve individualized assessments for children and families.**

---

| | | |
|---|---|---|
|  Methods of Inquiry and Data Analysis | | • Interviews<br>• Focus Groups<br>• Data Analysis<br>• Document and Regulation Review |
| Universal Participants | | • Central Office<br>• District Managers<br>• Managers<br>• Supervisors<br>• Field Staff<br>• Consultants<br>• Data Representative |
| Representative Sample of Participants | | • Interviews: CW training manager and data staff<br>• Focus Groups: caseworkers, supervisors, and managers from all areas of Oregon, and central office staff representatives<br>• Survey: supervisors and field staff from all areas of Oregon |
| Data Elements | | • % of cases with completed assessments in compliance with requirements.<br>• % of cases with identified needs and services provided for each of those needs.<br>• % of cases with physical health needs assessed.<br>• % of cases with physical health needs identified. |
| Preliminary Data Sources | | • CFSR<br>• SACWIS/CCWIS/ROM |
| Regulation, Documentation, and Information Sources | | • Oregon State Reports |

Wyatt_PK0004163
Exhibit 7
Page 32 of 98

Public**Knowledge**

## 4.8    Question 8: Whether CW made progress during the identified timeframe to improve service provision that meets the assessed needs of children and families.

CW has access to a variety of services that can meet the needs of children and families and lead to improved outcomes. These services must be provided based on needs identified in the assessments discussed in the previous question. This question is focused on whether CW provides services to children and families based specifically on the needs described in those assessments.

Table 4.8 Research Question 8 Protocol

**Whether CW made progress during the identified timeframe to improve service provision that meets the assessed needs of children and families.**

| Protocol Element | Detailed Description or List |
|---|---|
| Inquiry Questions | • Does CW maintain a sufficient capacity of substitute care placements to serve children living with high needs?<br>• Does CW provide appropriate services to meet children's identified needs?<br>• Does CW provide appropriate services to meet the identified needs of children who identify as LGBTQIA+?<br>• Does CW maintain a statewide service array that ensures their ability to meet the identified needs of children and families?<br>• Does CW provide services and supports to the family throughout the duration of the case to prepare for reunification?<br>• Does CW provide in-home services to families post-reunification to prevent re-entry into substitute care?<br>• Does CW address the underlying conditions for removal before returning children to their parents' care?<br>• Does CW adequately assess independent living skills?<br>• Does CW provide services based on the assessment of a youth's independent living skills and needs?<br>• Does CW provide services necessary to parents so they can achieve case goals? |

Wyatt_PK0004164
Exhibit 7
Page 33 of 98

**Public**Knowledge

---

**Whether CW made progress during the identified timeframe to improve service provision that meets the assessed needs of children and families.**

---

- Does CW provide services necessary to parents to support them meeting their conditions for return?
- Does CW provide services to address all physical health needs of children?
- Does CW provide services to address educational needs of children?
- Does CW ensure that behavioral health services are being delivered to meet case plan goals?
- Has CW developed a continuum of care options for children in substitute care?
- In what ways does CW provide safe spaces for youth who identify as LGBTQIA+?
- In what ways does CW provide services that address sexuality, gender-based needs, and the process of coming out for LGBTQIA+ youth?
- Does CW partner with the Oregon Health Authority to identify and improve systemic barriers regarding access to services?
- Does CW partner with Oregon Coordinated Care Organizations to identify and improve systemic barriers regarding access to services?
- Does CW have policies and procedures in place to assist staff in providing services to meet the needs of children and families?
- Does CW provide training and coaching to staff on how to work with providers in delivering services to meet the needs of children and families?
- Does CW utilize a case review process to inform and improve the barriers and strengths in providing services to meet the needs of children and families?
- Does CW leadership advocate for providing services to meet the needs of children and families?
- Does CW have a mechanism to evaluate the services provided to children and families?

---

 Methods of Inquiry and Data Analysis

- Data Analysis
- Document and Regulation Review
- Focus Groups
- Surveys

---

Wyatt_PK0004165
Exhibit 7
Page 34 of 98

Public**Knowledge**

**Whether CW made progress during the identified timeframe to improve service provision that meets the assessed needs of children and families.**

| | | |
|---|---|---|
| | Universal Participants | • Governor's Office<br>• Child Welfare (CW) Leadership<br>• Central Office<br>• District Managers<br>• Managers<br>• Supervisors<br>• Field Staff<br>• Consultants<br>• Data Representative |
| | Representative Sample of Participants | • Interviews: representatives from the Governor's office, and CW leadership, managers, and data staff<br>• Focus Groups: caseworkers, supervisors, and managers from all areas of Oregon, consultants, and central office staff representatives<br>• Survey: managers, supervisors, and field staff from all areas of Oregon |
| | Data Elements | • % of cases with medical and dental services being provided<br>• % of cases with a completed independent living plan<br>• Policy language |
| | Preliminary Data Sources | • SACWIS/CCWIS/ROM<br>• CFSR<br>• NCANDS<br>• National Youth in Transition Database (NYTD) |
| | Regulation, Documentation, and Information Sources | • Federal Reports<br>• Oregon State Reports<br>• Policies and Procedures |

Wyatt_PK0004166
Exhibit 7
Page 35 of 98

## 4.9    Question 9: Whether CW made progress during the identified timeframe to improve case planning.

All children are entitled to a comprehensive case plan that guides the decision-making process throughout the period for which they are under CW supervision. To be comprehensive, this case plan must include input from the child and their family. This question examines whether case plans are inclusive and appropriate.

Table 4.9 Research Question 9 Protocol

**Whether CW made progress during the identified timeframe to improve case planning.**

| Protocol Element | Detailed Description or List |
|---|---|
| Inquiry Questions | • Does CW develop comprehensive case plans with adequate detail to meet the identified needs of the child and family?<br>• Does CW ensure that services are provided as recommended in the case plan?<br>• Does CW meet state requirements for creating case plans?<br>• Does CW meet state requirements for updating case plans?<br>• Does CW adequately involve families throughout the case planning process?<br>• Does CW adequately involve tribes throughout the case planning process?<br>• Does CW meet state requirements for completing in-home safety plans?<br>• Does CW meet state requirements for updating in-home safety plans?<br>• Does CW have policies and procedures in place that guide staff on case planning?<br>• Does CW provide training and coaching for staff on best practices in case planning?<br>• Do CW supervisors provide feedback to caseworkers on case plans?<br>• Does CW utilize case review processes for identifying and improving barriers to case planning?<br>• Does CW leadership advocate for improving case planning? |

Wyatt_PK0004167
Exhibit 7
Page 36 of 98

**Public**Knowledge

**Whether CW made progress during the identified timeframe to improve case planning.**

| | Methods of Inquiry and Data Analysis | • Interviews<br>• Focus Groups<br>• Data Analysis<br>• Surveys<br>• Document and Regulation Review |
|---|---|---|
| | Universal Participants | • Central Office<br>• District Managers<br>• Supervisors<br>• Field Staff |
| | Representative Sample of Participants | • Focus Groups: caseworkers, supervisors, and managers from all areas of Oregon, and central office staff representatives<br>• Survey: supervisors and field staff from all areas of Oregon |
| | Data Elements | • Timeliness of completion and updates of the Child Welfare Case Plan |
| | Preliminary Data Sources | • SACWIS/CCWIS/ROM<br>• APSR<br>• CFSP |
| | Regulation, Documentation, and Information Sources | • Oregon State Reports<br>• Policies and Procedures<br>• Regulations<br>• Federal Reports |

Wyatt_PK0004168
Exhibit 7
Page 37 of 98

## 4.10    Question 10: Whether CW made progress during the identified timeframe to preserve and improve connections between children in substitute care and their families and communities.

When children are removed from their families and placed into substitute care, they experience the trauma of removal and the trauma of separation from their siblings and parent(s). CW has a responsibility to maintain those connections as safely and appropriately as possible, and this question examines the extent to which CW does this consistently.

Table 4.10 Research Question 10 Protocol

**Whether CW made progress during the identified timeframe to improve connections between children in substitute care and their families.**

| Protocol Element | Detailed Description or List |
|---|---|
| Inquiry Questions | • Does CW allow for sufficient and quality family interactions between children and parents to preserve family connections?<br>• Does CW facilitate sufficient family interaction to prepare parents and children for reunification?<br>• Does CW maintain the child's connections to their community, faith, extended family, tribe, and school?<br>• Does CW facilitate contact between children and their siblings in accordance with the Family Support Services Case Plan?<br>• Does CW prioritize placing siblings together when possible and appropriate?<br>• Does CW have policies and procedures in place for staff for facilitating connections between children in substitute care and their families?<br>• Does CW have policies and procedures in place for facilitating connections to a child's community, faith, extended family, tribe, and school?<br>• Does CW have policies and procedures in place for placing sibling together or facilitating connections with siblings?<br>• Does CW provide training and coaching for staff on best practices for maintaining connections with children, their families (including siblings), and their community, faith, extended family, tribe, and school? |

Wyatt_PK0004169
Exhibit 7
Page 38 of 98

**Whether CW made progress during the identified timeframe to improve connections between children in substitute care and their families.**

| | |
|---|---|
| | • Does CW utilize a case review process that informs and improves connections with children, their families (including siblings), and their community, faith, extended family, tribe, and school?<br>• Does CW leadership encourage improving connections between children in substitute care and their families? |
| Methods of Inquiry and Data Analysis | • Interviews<br>• Focus Groups<br>• Surveys<br>• Data Analysis<br>• Document and Regulation Review |
| Universal Participants | • Central Office<br>• District Managers<br>• Supervisors<br>• Field Staff |
| Representative Sample of Participants | • Focus Groups: caseworkers, supervisors, and managers from all areas of Oregon, and central office staff representatives<br>• Survey: supervisors and field staff from all areas of Oregon |
| Data Elements | • % of cases with quality visits documented<br>• % of cases with documented reunification visits, confirmation of policy requirements<br>• % of cases with documented connections to child's community of origin (community, faith, extended family, tribe, and school)<br>• % of cases with regular visitation with siblings |
| Preliminary Data Sources | • SACWIS/CCWIS/ROM<br>• CFSR |
| Regulation, Documentation, and Information Sources | • Oregon State Reports |

Wyatt_PK0004170
Exhibit 7
Page 39 of 98

**Public**Knowledge

## 4.11   Question 11: Whether CW made progress during the identified timeframe to improve staffing resources.

The pleadings identify a concern regarding the ability of CW to maintain a workforce that is fully able to meet the needs of children and families under their supervision. This includes retaining an adequate number of staff to work with children and families as well as ensuring caseloads are manageable. This question addresses the concerns regarding resources for the child welfare workforce.

Table 4.11 Research Question 11 Protocol

**Whether CW made progress during the identified timeframe to improve staffing resources.**

| Protocol Element | Detailed Description or List |
|---|---|
| Inquiry Questions | • Does CW retain enough staff to adequately serve the children and families in CW custody?<br>• Does CW provide support to its workforce to prevent staff turnover?<br>• Does CW regulate caseloads for caseworkers to ensure they can meet the needs of children and families under their supervision?<br>• Does CW meet state requirements in recruiting qualified caseworkers?<br>• Does CW adequately train caseworkers prior to their direct work with families?<br>• Does CW adequately train caseworkers on an ongoing basis?<br>• How does CW track training provided to caseworkers?<br>• In what ways does CW provide adequate supervision to child welfare caseworkers and middle managers? |
| Methods of Inquiry and Data Analysis | • Interviews<br>• Surveys<br>• Data Analysis<br>• Focus Groups<br>• Document and Regulation Review |
| Universal Participants | • Governor's Office<br>• Child Welfare (CW) Leadership<br>• Central Office |

Wyatt_PK0004171
Exhibit 7
Page 40 of 98

**PublicKnowledge**

Research Questions and Protocols

---

**Whether CW made progress during the identified timeframe to improve staffing resources.**

| | | |
|---|---|---|
| | | • District Managers<br>• Supervisors<br>• Field Staff<br>• Consultants<br>• Data Representative |
| | Representative Sample of Participants | • Interviews: representatives from the Governor's office, and CW leadership, managers, and data staff<br>• Focus Groups: caseworkers, supervisors, and managers from all areas of Oregon, consultants, and central office staff representatives<br>• Survey: supervisors and field staff from all areas of Oregon |
| | Data Elements | • Number of children in care<br>• Number of caseworkers statewide<br>• % of staff turnover<br>• Reasons for caseworker attrition<br>• Caseworker caseload size<br>• Training completion rates |
| | Preliminary Data Sources | • SACWIS/CCWIS/ROM<br>• Learning Management System (LMS) |
| | Regulation, Documentation, and Information Sources | • Oregon State Reports<br>• Communications (Emails, Memos)<br>• Policies and Procedures<br>• Regulations |

Wyatt_PK0004172
Exhibit 7
Page 41 of 98

**Public**Knowledge

# 5    Methodology

The methodology for this review includes establishing the assessment scope, establishing the inquiry protocol, collecting data, establishing variables and assumptions, analyzing data, identifying themes, handling unexpected or adverse events, and reporting of findings or conclusions.

A summary of steps for conducting the assessment is shown in Figure 5.1 and described in the following subsections.

Figure 5.1 Assessment Methodology



## 5.1    Establish the Assessment Scope

The purpose of this assessment is to conduct a thorough independent review of the Oregon Governor's Office and CW policies, procedures, leadership, and data, and document any progress CW has made to implement recommendations or address concerns through identifiable and credible strategies and processes since the 2016 *Child Safety in Substitute Care Final Report*. In addition to documenting progress, instances will be noted where efforts have been made to improve but have not been successful enough to result in progress. This could include implementation of new interventions or initiatives that have not been in place long enough to gather substantive data regarding efficacy or success.

The scope of the review includes the child welfare system that serves all children under CW supervision, with particular focus on children in substitute care and those included in the subclasses identified in the pleadings.

Wyatt_PK0004173
Exhibit 7
Page 42 of 98

## 5.2    Establish the Inquiry Protocol

During this step the review team developed the research protocol and its components. We followed our Seven Element Inquiry Protocol model, including drafting Research Questions and Inquiry Questions, and identifying Methods of Inquiry, Universal Participants, Representative Sample of Participants, Data Elements, Data Sources, and Regulation, Documentation, and Information Sources. See Figure 3.1 in Section 3.

## 5.3    Collect Data

We will collect data through multiple methods and from various sources, listed below.

**Qualitative Data**

The assessment process will include gathering qualitative data from various sources, which may include:

- Interviews. The Public Knowledge team will conduct individual interviews with key participants to gather their perspectives on progress made since 2016. Two Public Knowledge team members will conduct interviews: one to conduct the interview according to the interview protocol and one to take notes.
- Focus Groups. Two Public Knowledge team members will conduct focus groups: one to ask questions according to the focus group protocol and one to record responses. We will record notes, aggregate the data, and identify and analyze themes.
- Surveys. The Public Knowledge team will administer online surveys to collect information from various stakeholder groups. The surveys will include both quantitative and qualitative data. We will share draft survey questions with our client to ensure that the survey methodology respects access to the survey tool, cultural sensitivity, and employs the most effective method of gathering information for each stakeholder group. The review team will use common industry standards and non-clinical human subject review guidelines for data collection activities.
- Document Review. The Public Knowledge team will review relevant documents, such as policies, procedures, and regulations to research progress made regarding establishing expectations to improve various aspects of the child welfare system.

**Quantitative Data**

The assessment will include gathering quantitative data from various sources, which may include:

- Child and Family Services Review (CFSR) Results
- Program Improvement Plan (PIP)

- OR-Kids, Oregon's child welfare case management system
- National Child Abuse and Neglect Data System (NCANDS)
- Adoption and Foster Care Analysis and Reporting System (AFCARS)
- National Electronic Interstate Compact Enterprise (NEICE)
- National Youth in Transition Database (NYTD)
- Annual Progress and Service Report (APSR)
- Child and Family Services Plan (CFSP)
- Statewide Automated Child Welfare Information System (SACWIS)
- Comprehensive Child Welfare Information System (CCWIS)
- Results Oriented Management (ROM) Project
- Program Improvement Plan (PIP)
- Learning Management System (LMS)

Data will be gathered and analyzed quarterly from quarter four of 2016 to present day.

## 5.4    Establish Variables and Assumptions

The process of data collection and analysis includes establishing variables and assumptions that may impact the outcomes of the analyses. Variables include factors that may explain discrepancy potential in data or research. For instance, data collected from federal sources is only as accurate as the data received from states. There may also be variables within the data reported from different areas of the state if differing data collection or entry methods exist. We will also make assumptions about the data, including that the data is the most current and accurate data available, and that participants will share information to inform the assessment as accurately as possible.

## 5.5    Analyze Data

We will analyze data based on best and promising practices, as well as the Public Knowledge team's child welfare experience. The data analyzed will all be directly connected to answering the research questions, and the Public Knowledge team will ensure that confidentiality is maintained, the data is presented as themes, and the data maintains cultural sensitivity.

Specifically, the analysis will combine qualitative and quantitative data to provide a comprehensive view of the progress made since 2016.

**Qualitative Data Analysis**

Qualitative data analysis will adhere to non-clinical qualitative research standards and ethics:

Wyatt_PK0004175
Exhibit 7
Page 44 of 98

- Data analysis will protect the confidentiality of all participants.
- Data will be aggregated across participants and presented as themes.
- Data collection and analysis will employ culturally competent methods and awareness, wherever possible.

Once qualitative data is collected from interviews, focus groups, surveys, and document review, we will analyze the results. The purpose of the qualitative analysis is to identify progress and improvements, uncover insights and understand the scope of the changes over the past four years. If additional topics are identified, those will also be analyzed.

**Quantitative Data Analysis**

The Public Knowledge team will analyze relevant quantitative data, in addition to trends identified in the data. We will include existing analyses from sources as available.

## 5.6     Themes

Themes and data results will be summarized and documented in relation to each of the research questions.

## 5.7     Handling of Unexpected or Adverse Events

This includes any necessary statements for circumstances or events that may impact the work being completed or data and research being evaluated. For instance, COVID-19 may impact the ability to interact with interview, focus group, and survey participants as noted in Section 1.1.2, above.

## 5.8     Report Findings

Findings will be based on qualitative and quantitative data analyses and perceptions.

**Public**Knowledge

# Appendix A: Key Terms

These definitions clarify the meaning of operative terms included in the research questions, inquiry questions, and throughout the methodology. Sources are included for reference. Where possible we used a definition from Oregon CW policy or Oregon statute. Those definitions attributed to Public Knowledge indicate that our team developed a definition based on our experience and expertise.

| Term | Definition | Source |
|------|-----------|--------|
| Abuse [Can also refer to Maltreatment or Neglect] | Abuse: (a) For purposes of screening a report of "abuse" of a child subject to ORS 419B.005, "abuse" means any of the following, except that "abuse" does not include reasonable discipline unless the discipline results in one of the conditions described in this subsection.<br><br>• Mental Injury. Any mental injury to a child, which includes only observable and substantial impairment of the child's mental or psychological ability to function caused by cruelty to the child, with due regard to the culture of the child.<br>• Neglect. (i) Negligent treatment or maltreatment of a child, including, but not limited to, the failure to provide adequate food, clothing, shelter, or medical care that is likely to endanger the health or welfare of the child.<br>(ii) Buying or selling a person under 18 years of age as described in ORS 163.537. (iii) Permitting a person under 18 years of age to enter or remain in or upon premises where methamphetamines are being manufactured. (iv) Unlawful exposure to a controlled substance, as defined in ORS 475.005, or to the unlawful manufacturing of a cannabinoid extract, as defined in ORS 475B.015, that subjects a child to a substantial risk of harm to the child's health or safety.<br>• Physical Abuse. Any assault, as defined in ORS chapter 163, of a child and any physical injury to a child which has been caused by other than accidental means, including any injury which appears to be at variance with the explanation given for the injury. | http://www.dhs.state.or.us/caf/safety model/procedure manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf#page=1814 |

Wyatt_PK0004177
Exhibit 7
Page 46 of 98

| Term | Definition | Source |
|------|-----------|--------|
| | • Sexual Abuse. (i) Rape of a child, which includes, but is not limited to, rape, sodomy, unlawful sexual penetration and incest, as described in ORS chapter 163. (ii) Sexual abuse, as described in ORS chapter 163. (iii) Sexual exploitation, including, but not limited to: (I) Contributing to the sexual delinquency of a minor, as defined in ORS chapter 163, and any other conduct which allows, employs, authorizes, permits, induces, or encourages a child to engage in the performing for people to observe or the photographing, filming, tape recording, or other exhibition which, in whole or in part, depicts sexual conduct or contact, as defined in ORS 167.002 or described in ORS 163.665 and 163.670, sexual abuse involving a child or rape of a child, but not including any conduct which is part of any investigation conducted pursuant to ORS 419B.020 or which is designed to serve educational or other legitimate purposes; and (II) Allowing, permitting, encouraging, or hiring a child to engage in prostitution as described in ORS 167.007 or a commercial sex act as defined in ORS 163.266, to purchase sex with a minor as described in ORS 163.413 or to patronize a prostitute as described in ORS 167.008.<br><br>Threat of harm to a child, which means subjecting a child to a substantial risk of harm to the child's health or welfare. (b) For purposes of screening a report of abuse of a child or young adult living in a home certified by Child Welfare or ODDS, unless the abuse alleged is familial, "abuse" means any of the following: (A) Abandonment, including desertion or willful forsaking of a child or young adult, or the withdrawal or neglect of duties and obligations owed a child or young adult by a home certified by Child Welfare or ODDS, a caregiver, or other person. (B) Financial exploitation. (i) Financial exploitation includes: (I) Wrongfully taking the assets, funds, or property belonging to or intended | |

| Term | Definition | Source |
|------|-----------|--------|
| | for the use of a child or young adult. (II) Alarming a child or young adult by conveying a threat to wrongfully take or appropriate moneys or property of the child or young adult if the child would reasonably believe that the threat conveyed would be carried out. (III) Misappropriating, misusing, or transferring without authorization any moneys from any account held jointly or singly by a child or young adult. (IV) Failing to use the income or assets of a child or young adult effectively for the support and maintenance of the child or young adult. (ii) Financial exploitation does not include age-appropriate discipline that may involve the threat to withhold, or the withholding of privileges. (C) Involuntary seclusion. Involuntary seclusion means confinement of a child or young adult alone in a room from which the child or young adult is physically prevented from leaving. (i) Involuntary seclusion includes: (I) Involuntary seclusion of a child or young adult for the convenience of a home certified by Child Welfare or ODDS or a caregiver; (II) Involuntary seclusion of a child or young adult to discipline the child or young adult; (ii) Involuntary seclusion does not include age-appropriate discipline, including but not limited to a time-out. (D) Neglect, which includes: (i) Failure to provide the care, supervision, or services necessary to maintain the physical and mental health of a child or young adult; or (ii) The failure of a home certified by Child Welfare or ODDS, a caregiver, or other person to make a reasonable effort to protect a child or young adult from abuse. (E) Physical abuse, which includes: (i) Any physical injury to a child or young adult caused by other than accidental means, or that appears to conflict with the explanation given of the injury; or (ii) Willful infliction of physical pain or injury upon a child or young adult. | |
| Accepted Professional Standards | We use the following accepted professional standards for the definitions in this document and the research questions: | Public Knowledge |

Wyatt_PK0004179
Exhibit 7
Page 48 of 98

**PublicKnowledge**                                                    Methodology

| Term | Definition | Source |
|------|-----------|--------|
| | • Oregon Department of Human Services<br>• Department of Health and Human Services, Administration for Children and Families, Children's Bureau<br>• Onsite Service Review Instrument 2016 (OSRI) from the Child and Family Service Reviews (CFSR)<br>• Child Welfare Information Gateway | |
| Address | To direct to the attention of; to take action. | Public Knowledge |
| Adequately | Meeting minimum standards or requirements. | Public Knowledge |
| Adoption | A legal or administrative process that establishes a permanent legal parent-child relationship between a child and an adult who is not already the child's legal parent and terminates the legal parent-child relationship between the adopted child and any former parent. | http://www.dhs.state.or.us/caf/safety model/procedure manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1816 [1] |
| Agency Culture | Values and behaviors that contribute to the social and psychological environment of CW, including the five CW core values of integrity, stewardship, responsibility, respect, and professionalism. | Public Knowledge (adapted from: https://www.dhs.state.or.us/tools/news/results/2006/2006_04.pdf) |
| Appropriate | Suitable or proper for the circumstances based on best practice guidelines, CW policies, or federal expectations. | Public Knowledge |
| Assess | To collect information to inform decision making about a child, youth, or family. | https://www.childwelfare.gov/topics/systemwide/assessment/overview/terms/ |

---

[1] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 3/1/2021. All references to the Child Welfare Procedure Manual refer to the version with the stated date.

Wyatt_PK0004180
Exhibit 7
Page 49 of 98

**Public**Knowledge                                                                    Methodology

| Term | Definition | Source |
|------|-----------|--------|
| Barriers | Obstacles to achieving intended outcomes. These can exist at the individual level, such as preventing or delaying permanence for a child, or at the organizational or system level, which result in policies or procedures that prevent populations of children and families receiving services to achieve intended outcomes. | Public Knowledge |
| Basic Needs | Fundamental necessities including food, water, clothing, and shelter, as well as sanitation, education, and healthcare. | Public Knowledge |
| Behavioral Rehabilitation Services (BRS) | A program that provides services and placement-related activities to the BRS client to address their debilitating psychosocial, emotional, and behavioral disorders in a community placement utilizing either a residential care model or a proctor care model.<br><br>Note: Child Caring Agencies (CCAs) can also be licensed to provide BRS services, and many are, but they are not synonymous. | https://www.oregon.gov/oha/HSD/OHP/Policies/170-0020-092120.pdf |
| Case Plan [Can also refer to the Child Welfare Case Plan, Case Planning or Individualized Service Planning] | A written, goal-oriented, and time-limited individualized plan for the child and the child's family, developed by the agency and the parents or guardians, to achieve the child's safety, permanency, and well-being. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1819 |
| Caseload [Can also refer to Case(s)] | Individuals (usually a child) for whom a social worker is responsible in a given time period, as expressed in a ratio of clients to staff members. | Public Knowledge |
| Caseworker(s) | A child welfare employee assigned primary responsibility for a child or young adult served by child welfare. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure- |

Wyatt_PK0004181
Exhibit 7
Page 50 of 98

**Public**Knowledge

| Term | Definition | Source |
|------|-----------|--------|
| | | Manual.pdf - page=1819 |
| Centralize | To bring together into one location. | Public Knowledge |
| Certification and Licensing Standards | Regulations in each state, for foster parents and providers, that ensure children are cared for in physically and developmentally safe environments. | https://www.childwelfare.gov/glossary/glossaryl/ |
| Certified Family [Can also refer to CW Certified Foster Home] | An individual or individuals who hold a current Certificate of Approval from the Department to operate a home to provide care, in the home in which the individual or individuals reside, to a child or young adult in the care or custody of the Department. | http://www.dhs.state.or.us/policy/childwelfare/manual_1/division_200.pdf |
| Child [Can also refer to Children or Youth] | A person under 18 years of age, or a person under 21 years of age if the Department of Human Services determines that the person has a mental or physical disability that warrants the continuation of assistance. | https://www.oregonlegislature.gov/bills_laws/ors/ors418.html (§418.330) |
| Child and Adolescent Needs and Strengths (CANS) Tool | The CANS is a decision-making tool to determine level of care and service planning, and to monitor service outcomes.<br><br>In Oregon, the CANS is used to determine the Level of Need (LON) for children in substitute care and to determine reimbursement rates for substitute care providers. | https://praedfoundation.org/tools/the-child-and-adolescent-needs-and-strengths-cans/ |
| Child Caring Agency (CCA) [Can also refer to Institution or Residential Facility] | Any private school, private agency, private organization or county program providing: Day treatment for children with emotional disturbances; Adoption placement services; Residential care, including but not limited to foster care or residential treatment for children; Residential care in combination with academic education and therapeutic care, including but not limited to treatment for emotional, behavioral or mental health disturbances; Outdoor youth programs; or Other | https://www.oregonlaws.org/ors/418.205 |

Wyatt_PK0004182
Exhibit 7
Page 51 of 98

| Term | Definition | Source |
| --- | --- | --- |
| | similar care or services for children. It includes the following: A shelter-care home that is not a foster home subject to ORS 418.625 to 418.645; An independent residence facility as described in ORS 418.475; A private residential boarding school; and A child-caring facility as defined in ORS 418.950. It does not include: Residential facilities or foster care homes certified or licensed by the Department of Human Services under ORS 443.400 to 443.455, 443.830 and 443.835 for children receiving developmental disability services; Any private agency or organization facilitating the provision of respite services for parents pursuant to a properly executed power of attorney under ORS 109.056. For purposes of this subparagraph, "respite services" means the voluntary assumption of short-term care and control of a minor child without compensation or reimbursement of expenses for the purpose of providing a parent in crisis with relief from the demands of ongoing care of the parent's child; A youth job development organization as defined in ORS 344.415; A shelter-care home that is a foster home subject to ORS 418.625 to 418.645; A foster home subject to ORS 418.625 to 418.645; A facility that exclusively serves individuals 18 years of age and older; or A facility that primarily serves both adults and children but requires that any child must be accompanied at all times by at least one custodial parent or guardian | |
| CPS Assessment | An investigation into a report of abuse pursuant to ORS 419B.020 or ORS 418.258 that includes activities and interventions to identify and analyze safety threats, determine if there is reasonable cause to believe abuse occurred, and assure safety through protective action plans, initial safety plans, or ongoing safety planning. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure- |

Wyatt_PK0004183
Exhibit 7
Page 52 of 98

**Public**Knowledge

| Term | Definition | Source |
|------|-----------|--------|
|  |  | Manual.pdf - page=63 |
| CPS Case Closure | The process of a CPS caseworker terminating the ongoing safety plan by ensuring all case notes are completed, the case file is in order and ready for filing, all services to the family have been closed, and completing the case closure narrative in the child welfare electronic information system. | http://www.dhs.state.or.us/caf/safety model/procedure manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=557 |
| Children in Care | Children, youth, and young adults who are in the custody and supervision of Oregon CW and living in substitute care. | Public Knowledge and Oregon CW |
| Children Living with High Needs [Can also refer to Child(ren) with Disabilities, High Needs] | Children and youth with cognitive, behavioral, and/or mental health issues. Children and young adults with high needs may require "intensive" authorized levels of care, which dictates the amount of payments for care; challenging diagnoses, behaviors, and other characteristics where placements disrupt frequently and require new placements frequently. | Oregon Department of Human Services, Office of Child Welfare |
| Children Who Identify as LGBTQIA+ | Refers to a child who identifies as Lesbian, Gay, Bisexual, Transgender, Queer, Intersex, Asexual, and includes those who may not identify with these terms and may use other words to describe themselves (LGBTQIA+). The Oregon CW Child Welfare Procedures Manual states that every person has a sexual orientation, gender identity and expression (SOGIE) and they may be congruent or completely different. Some children and young adults with diverse SOGIE may identify as lesbian, gay, bisexual or transgender, and some may be questioning their sexual orientation or gender identity (LGBTQ). Other youth may not identify with these terms and may use other words | Public Knowledge<br><br>http://www.dhs.state.or.us/caf/safety model/procedure manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1013 |

Wyatt_PK0004184
Exhibit 7
Page 53 of 98

**Public**Knowledge                                                    Methodology

| Term | Definition | Source |
|---|---|---|
| | to describe themselves including but not limited to non-binary, genderqueer, gender fluid, gender expansive, agender, gender diverse, two-spirit, queer, asexual, pansexual, etc. For this reason, there are various permutations of acronyms used in conversation and written materials to reflect diversity of SOGIE. The acronyms SOGIE or LGBTQ+ will be used. | |
| Concerted Effort | Cooperative and directive planning toward a mutually agreed upon goal. | Public Knowledge |
| Concurrent Planning | A case planning approach that involves considering all reasonable options for permanency at the earliest possible point following a child's entry into foster care and simultaneously pursuing those that will best serve the child's needs. Typically, the primary plan is reunification with the child's family of origin. This primary plan and an alternative permanency goal are pursued at the same time, with full knowledge of all case participants. Concurrent planning seeks to eliminate delays in attaining permanency for children. | https://www.child welfare.gov/glossa ry/glossaryc/ |
| Conditions for Removal | Conditions in which CW and law enforcement have established that a child is in imminent threat of severe harm and use their authority to remove a child from home. | ORS 419B.150 |
| Conditions for Return | A written statement of the specific behaviors, conditions, or circumstances that must exist within a child's home before a child can safely return and remain in the home with an in-home ongoing safety plan. | http://www.dhs.sta te.or.us/caf/safety_ model/procedure_ manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf -page=469 |
| Connections | Proximity to the child's biological family, including siblings and the child's school. Connections that should be considered include school, church, | Oregon Department of Human Services, |

Wyatt_PK0004185
Exhibit 7
Page 54 of 98

PublicKnowledge

Methodology

| Term | Definition | Source |
|------|------------|--------|
| | culture, community, and other significant people in the child's life who are important to the child's well-being. | Office of Child Welfare |
| Contacts [Can also refer to Caseworker Contacts] | Any communication between Child Welfare staff and a child, young adult, parent or guardian, foster parent or relative caregiver, provider, or other individual involved in a Child Welfare safety plan or case. "Contact" includes, but is not limited to, communication in person, by telephone, by videoconferencing, or in writing. "Contact" may occur, for instance, during a face-to-face visit; a treatment review meeting for a child, young adult, parent, or guardian; a court or Citizen Review Board hearing; or a family meeting. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1821 |
| Continuous Quality Improvement (CQI) | A strength-based process that relies on teamwork to improve processes, services and outcomes. It is an ongoing cycle of collecting data and then testing, implementing, learning from, and revising solutions. | https://www.oregon.gov/oha |
| Continuum of Care | Provides ongoing services for children in substitute care from entry to exit. The goal of this approach is to use the most appropriate and least restrictive interventions, both in and out of the home, while ensuring that safety issues and needs are addressed. | https://www.childwelfare.gov/topics/outofhome/foster-care/achieving-continuum/ |
| Courtesy Supervision [Can also refer to Cross-County Supervision or Inter-County Case Work] | Supervision provided when a child is placed outside the county or state where the presenting issue originated. Courtesy supervision is provided by a caseworker in the receiving county or state, and should address the child's ongoing safety and well-being, and the reports should include dates and locations of face-to-face contact as well as updates concerning the child's education, medical/ mental health services, and assessment of the child's living environment.<br><br>Cross-county case supervision refers to when one or more counties is providing ongoing case | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=671 |

Wyatt_PK0004186
Exhibit 7
Page 55 of 98

# PublicKnowledge

| Term | Definition | Source |
|------|-----------|--------|
| | management services for a county who holds primary jurisdiction over the case. | |
| Critical Incident | An incident that resulted in the death of a child if the Department reasonably believes the death was the result of child abuse and:<br>(a) The deceased child was in the custody of the Department at the time of the fatality; or<br>(b) The deceased child, the deceased child's sibling, or any other child living in the household with the deceased child was the subject of a CPS assessment by the Department within the 12 months preceding the fatality; or<br>(c) The child, the child's sibling, or any other child living in the household with the child had a pending child welfare or adoption case with the Department within the 12 months preceding the fatality; or<br>(d) The deceased child, the deceased child's sibling, or any other child living in the household with the deceased child was the subject of a report of abuse made to the Department or a law enforcement agency within the 12 months preceding the fatality, whether the report of abuse was closed at screening or assigned for CPS assessment.<br><br>A fatality or serious injury where child abuse or neglect is suspected; an event or situation which is highly concerning, may pose a potential liability, is of emerging public or media interest or represents an interest of security; any other incident designated by the CW Director. | https://oregon.public.law/rules/oar_413-017-0050 |
| Data Integrity and Accuracy | Validity of data over the entire life cycle. | Public Knowledge |
| Data Driven Decision Making | Decision makers using objective information to improve outcomes for the people they serve. | https://www.oregon.gov/dhs/ORRAI/Documents/Beco |

Wyatt_PK0004187
Exhibit 7
Page 56 of 98

# PublicKnowledge

| Term | Definition | Source |
|------|-----------|--------|
| | | ming-Data-Informed-Organization.pdf |
| Data Quality Plan | The comprehensive, purposeful, and iterative efforts taken by Title IV-E agencies to ensure the reliability and fitness of data for use as intended in the support of child welfare policies, goals, and practices. The agency must develop, implement, and maintain a data quality plan in a manner prescribed by the Administration for Children and Families and include it as part of Annual or Operational APDs. | https://www.acf.hhs.gov/sites/default/files/cb/ccwis_data_quality_plans_presentation.pdf |
| Diligent Relative Search | The ongoing identification and contact with a child's relatives and persons with a caregiver relationship for the purposes of establishing ongoing connections and supports for families and placing a child with his or her relatives on a temporary or permanent basis. Diligent relative search may begin as early as the CPS assessment and continues throughout provision of ongoing services. | Public Knowledge and Oregon CW |
| Effective | Producing an intended result or outcome. | Public Knowledge |
| Evaluation | Determining the quality of something. | Public Knowledge |
| Face-to-Face Contact | An in-person interaction between individuals. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1825 |
| Family Engagement | Including families in all aspects of decision making through a collaborative and partnering process of engagement. The intent of family engagement is to assist families in keeping their children safe and thriving in their communities. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child- |

Wyatt_PK0004188
Exhibit 7
Page 57 of 98

**Public**Knowledge                                                                Methodology

| Term | Definition | Source |
|------|-----------|--------|
| | | Welfare-Procedure-Manual.pdf - page=291 |
| Family Interaction | "Child-family contact" means communication between the child or young adult and family and includes, but is not limited to, visitation with the child or young adult, participation in the child or young adult's activities, and appointments, phone calls, email, and written correspondence.<br><br>• Contact between birth relatives, as defined under ORS 109.305, and the child or young adult in substitute care.  Source: OAR 413-120-0000(12)<br>• [M]aintain family relationships and cultural connections with the child or young adult in substitute care.  Source: OAR 413-070-0060(4)<br>• *See also* OAR 413-070-0072 | OAR 413-070-0000(16) |
| Federal Background Checks | A background check completed by the Background Check Unit (BCU), who provide background check services and support to all CW and Oregon Health Authority (OHA) divisions for employment purposes, for those who provide services or seek to provide services as a contractor, subcontractor, vendor or volunteer, or are employed by qualified entities that provide care and are licensed, certified, registered or otherwise regulated by CW or OHA. The checks search for crimes prosecuted at a federal level. | https://www.oregon.gov/dhs/BUSINESS-SERVICES/CHC/Pages/index.aspx |
| Foster Care | 24-hour substitute care for children placed away from their parents or guardians and for whom the Department, or another public agency, has placement and care responsibility. This includes but is not limited to placements in foster homes, foster homes of relatives, group homes, emergency shelters, residential facilities, child-care institutions, and pre-adoptive homes. A child or young adult is in foster care in accordance with this definition regardless of whether the foster care facility is licensed, and payments are made by the | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1826 |

Wyatt_PK0004189
Exhibit 7
Page 58 of 98

| Term | Definition | Source |
|------|-----------|--------|
| | Department or local agency responsible for the care of the child, whether adoption subsidy payments are being made prior to the finalization of the adoption or whether there is federal matching of any payments that are made. | |
| Foster Parent(s) | A person who operates a home that has been approved by the Department to provide care for an unrelated child or young adult placed in the home by the Department.<br>Please also refer to definition for Relative Caregiver, below. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf -page=1826 |
| Frequency of Visits | The cadence of family interaction for a child in substitute care and may be with their parents, siblings and/or relatives. | Public Knowledge and Oregon CW |
| Guardianship | A guardian is someone who is appointed by a court to protect and care for the health and well-being of an incapacitated person, or a minor child. A petition must be filed with the appropriate court, and notice given to all interested persons. | https://www.courts.oregon.gov/programs/family/guardianship-conservatorship/Pages/default.aspx |
| Identified Needs | Areas of concern or areas needing improvement that are identified through an individualized assessment process. | Public Knowledge |
| Identified Timeframe | The time between the publish date of Public Knowledge's 2016 *Child Safety in Substitute Care Independent Review Final Report* (September 12, 2016) and present day. | Public Knowledge |
| Impending Danger Safety Threat | A family behavior, condition, or circumstance that meets all five safety threshold criteria. When it is occurring, this type of threat is not immediate, obvious, or occurring at the onset of the CPS intervention. This threat is identified and | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare- |

Wyatt_PK0004190
Exhibit 7
Page 59 of 98

| Term | Definition | Source |
|------|-----------|--------|
| | understood more fully by evaluating and understanding individual and family functioning. | Procedure-Manual.pdf - page=1829 |
| Improve | A measurable change toward an accepted child welfare standard. | Public Knowledge |
| Independent Living Services | Skill-building services provided to youth aged 16 and older and in substitute care to help transition youth from foster care to independent adulthood. CW is required to provide support to youth aged 14 and older to create an independent living transition plan and build life skills. | https://www.oregon.gov/dhs/CHILDREN/FOSTERCARE/ILP/Documents/ILP-Service-Requirements.pdf |
| Initial Staff Training | Classroom, field activities, and computer-based learning required for new caseworkers within their first year of employment at CW. | http://www.cwpsalem.pdx.edu/assets/2-flow-chart.pdf |
| Investigations [Can also refer to Abuse in Care Investigations] | Assessment into a report of abuse that includes activities and interventions to identify and analyze safety threats, determine if there is reasonable cause to believe abuse occurred, and assure child safety through protective action plans, initial safety plans, or ongoing safety planning. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=63 |
| Level of Need | The type of substitute care identified for a child based on their assessed needs and strength. | Public Knowledge |
| Mental or Behavioral Health Needs | Needs identified from a state of mental, behavioral, emotional well-being, and choices and actions that affect wellness. | Public Knowledge |
| Middle Manager | A manager at a level between leadership and frontline supervisor. | Public Knowledge |
| Oregon Health Authority (OHA) | The Oregon Health Authority works to lower and contain healthcare costs, improve quality, and increase access to healthcare for Oregonians. | https://www.oregon.gov/oha/Pages/Portal-About-OHA.aspx |

Wyatt_PK0004191
Exhibit 7
Page 60 of 98

PublicKnowledge                                                                    Methodology

| Term | Definition | Source |
|------|-----------|--------|
| | The OHA provides behavioral health services to children and families throughout Oregon, including early childhood mental health, school-based mental health partnerships, intensive services, in-home services, family supports, substance use disorder programs, and youth suicide prevention programs. | https://www.oregon.gov/oha/HSD/BH-Child-Family/Pages/index.aspx |
| Organizational Change Management | A structured process that makes change happen quicker, smoother, and less painfully for leaders, staff, stakeholders, and customers. It is a structured methodology that, at its core, is helping move an organization from its current state to a new desired state. Simply put, OCM addresses the people side of change management. | Public Knowledge |
| Out-of-State Placements | When residential treatment providers and placement options in Oregon are unable to serve a child in Child Welfare's care due to the child's unique or severe treatment needs, it may be necessary to refer a child to residential treatment placements in other states. | Public Knowledge and Oregon CW |
| Parents [Can also refer to Biological Families] | The biological or adoptive mother or the legal father of the child. A legal father is a man who has adopted the child or whose paternity has been established or declared under ORS 109.070, ORS 416.400 to 416.610, or by a juvenile court. In cases involving an Indian child under the Indian Child Welfare Act (ICWA), parent means any biological parent of an Indian child, or any Indian who has lawfully adopted an Indian child, including adoptions under tribal law or custom. It does not include an unwed biological father where paternity has not been acknowledged or established. "Parent" also includes a putative father who has demonstrated a direct and significant commitment to the child by assuming or attempting to assume responsibilities normally associated with parenthood, unless a court finds that the putative father is not the legal father. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf#page=1833 |

Wyatt_PK0004192
Exhibit 7
Page 61 of 98

Public**Knowledge**

| Term | Definition | Source |
|---|---|---|
| Performance-Based Contracting | The process of determining rates paid to providers based on performance on established metrics and data points. | Public Knowledge |
| Permanency [Can also refer to Permanence, Legal Permanence, or Relational Permanence] | Stability and lifelong, reliable connections for children and young adults in substitute care. *Legal permanence refers to a child's relationship with a parenting adult that is recognized by law and that the adult is the child's birth, kin, foster, guardian, or adoptive parent. *Relational permanence refers to important long-term, stable relationships that help a child or young adult or youth feel loved and connected. | Public Knowledge and Oregon CW  https://www.aecf.org/blog/what-is-permanence/ |
| Permanency Goal | The court's determination of the permanency plan for the ward that includes whether and, if applicable, when: (A) The ward will be returned to the parent (B) The ward will be placed for adoption, and a petition for termination of parental rights will be filed (C) The ward will be referred for establishment of legal guardianship (D) The ward will be placed with a fit and willing relative (E) If the ward is 16 years of age or older, the ward will be placed in another planned permanent living arrangement | ORS 419B.476 |
| Permanency Hearings | The hearing that determines the permanency plan for the child. The permanency hearing is conducted by a juvenile court, another court of competent jurisdiction or by an authorized tribal court. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1833 |

Wyatt_PK0004193
Exhibit 7
Page 62 of 98

| Term | Definition | Source |
|---|---|---|
| Permanency Outcome | Preference of permanency plans reflected in statute:<br>• Reunification<br>• Adoption (TPR)<br>• Guardianship (durable and permanent)<br>• Fit and Willing Relative<br>• Another Permanent Planned Living Arrangement (APPLA) | ORS 419B.476(5) |
| Permanency Plan | A written course of action for achieving safe and lasting family resources for the child or young adult. Although the plan may change as more information becomes available, the goal is to develop safe and permanent resources with the parents, relatives, or other people who may assume responsibility for the child or young adult during the remaining years of dependency and be accessible and supportive to the child in adulthood. | http://www.dhs.state.or.us/caf/safety model/procedure manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1834 |
| Physical Health Needs | Medical and dental health needs identified and addressed. | Public Knowledge |
| Placement | The arrangement for the care of a child in the home of a parent, a foster home, relative foster home, non-paid relative home, or a child-caring agency or institution. It does not include the arrangement for care in an institute caring for the mentally ill, an institution primarily educational in character, or a hospital or other medical facility. | OAR 413-040-0000(54) |
| Placement Changes [Can also refer to Placement Change Decision] | Movement of a child in substitute care from one placement to another. | Public Knowledge |
| Placement Stability | Ensuring that children remain in stable out-of-home care, avoiding disruption, removal, and repeated placements that have harmful effects on child development and well-being. | https://www.childwelfare.gov/glossary/glossaryp/ |

**PublicKnowledge**                                                                 Methodology

| Term | Definition | Source |
|------|------------|--------|
| Placing | The process of removing a child from his or her family of origin or caregivers to a safe, temporary living situation. | Public Knowledge |
| Population of Children in Care | An overall demographic representation of children and youth in the custody of CW. | Public Knowledge |
| Present Danger Safety Threat | An immediate, significant, and clearly observable family behavior, condition, or circumstance occurring in the present tense, already endangering or threatening to endanger a child or, when applicable, a young adult. The family behavior, condition, or circumstance is happening now, and it is currently in the process of actively placing a child or, when applicable, a young adult in peril. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1836 |
| Proctor Foster Home | A foster home certified by a Child Caring Agency (CCA). A proctor foster home must meet minimum standards as established by rules adopted by CW or the Oregon Youth Authority. Proctor foster homes also receive a pass-through certification from CW. | http://www.dhs.state.or.us/policy/childwelfare/manual_1/division_215.pdf |
| Progress | The actions CW has made to implement recommendations or address concerns through identifiable and credible strategies and processes. | Public Knowledge |
| Provider Recruitment | A critical step in finding prospective permanent families for a child and should be tailored to the specific child. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf |
| Qualified Caseworker | Applicants for a caseworker position must meet the following requirements:<br>• A bachelor's degree in Human Services or a field related to human service; or<br>• A bachelor's degree unrelated to Human Services; and either | https://oregon.wd5.myworkdayjobs.com/en-US/SOR_External_Career_Site/job/Portland--DHS-- |

Wyatt_PK0004195
Exhibit 7
Page 64 of 98

| Term | Definition | Source |
| --- | --- | --- |
|  | • One year of Human Services related experience; or<br>• Completion of coursework equivalent to certification consistent with Oregon Caseworker Competency; or<br>• An associate degree and either<br>• Two years of Human Service-related experience; or<br>• One year of Human Services related experience and related training, coursework or certification consistent with Oregon Caseworker Competency | Webster-Street/Social-Service-Specialist-1---Protective-Services-Assessment-Worker_REQ-45998 |
| Quality | The degree to which an object or entity (such as a process, product, or service) satisfies a specified set of attributes or requirements. | Public Knowledge |
| Quality of Visits | Purposeful interactions between caseworkers and children, youth, parents, and resource parents that reflect engagement and contribute to assessment and case planning processes in order to achieve outcomes.<br><br>Oregon CW refers to frequency of visits and quality of visits together (see Frequency of Visits as defined above). For purposes of this review, we are separating out frequency of visits and quality of visits as two separate concepts. | Public Knowledge |
| Rates | Payments made to substitute care providers intended to offset some of the costs associated with caring for children. | Public Knowledge |
| Re-Entry | Of all children who enter foster care in a 12-month target period and discharged within 12 months to reunification, living with a relative(s), or guardianship, what percent re-entered foster care within 12 months of discharge. | https://library.childwelfare.gov/ |
| Relative Caregiver [Can also refer to | A person defined as a "relative" under OAR 413-070-0000 who operates a home that has been approved by the Department to provide care for a | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon- |

Wyatt_PK0004196
Exhibit 7
Page 65 of 98

Methodology

| Term | Definition | Source |
|------|-----------|--------|
| Kinship Caregiver] | related child or young adult placed in the home by the Department. | DHS-Child-Welfare-Procedure-Manual.pdf - page=1838 |
| Removal [Can also refer to Removed] | Either the physical act of a child being taken from his or her normal place of residence by court order or a voluntary placement agreement and placed in a foster care setting, or the removal of custody from the parent or relative guardian pursuant to a court order or voluntary placement agreement which permits the child to remain in a foster care setting. | http://www.dhs.state.or.us/caf/safety model/procedure manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1838 |
| Report [Can also refer to CPS Report] | An allegation of abuse that the screener evaluates to determine if it constitutes a report of abuse as defined in ORS 419B.005 or, when applicable, Oregon Laws 2017, chapter 733. | http://www.dhs.state.or.us/caf/safety model/procedure manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf#page=1839 |
| Required Timeframe | The accepted amount of time required for a given action based on policy. | Public Knowledge |
| Response Time | The time frame to initiate the CPS assessment and is determined by the urgency of the report. Urgency is determined by reported family behaviors, conditions and circumstances that represent a present or impending danger. | http://www.dhs.state.or.us/caf/safety model/procedure manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=169 |
| Reunification | Placement with a parent or guardian. | http://www.dhs.state.or.us/caf/safety model/procedure |

**Public**Knowledge

| Term | Definition | Source |
|------|-----------|--------|
| | | manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1839 |
| Risk | The extent to which key factors are present in a family situation that increases the likelihood of future maltreatment to a child or adolescent. | Public Knowledge |
| Safe [Can also refer to Safety] | The absence of present danger safety threats and impending danger safety threats. | http://www.dhs.state.or.us/caf/safety model/procedure manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1840 |
| Safety Culture | Behaviors and practices of an organization that prioritize the safety of children and families as well as the ability of individuals to speak up without fear of reprisal. | https://library.childwelfare.gov/cwig/ws/library/docs/capacity/Blob/115592.pdf?r=1&rpp=10&upp=0&w=+NATIVE(%27recno=115592%27)&m=1 |
| Safety Threat [Can include Present Danger Safety Threats or Impending Danger Safety Threats] | A Present Danger Safety Threat is an immediate, significant, and clearly observable family behavior, condition or circumstance occurring in the present tense, already endangering or threatening to endanger a child or, when applicable, young adult. The family behavior, condition, or circumstance is happening now, and it is currently in the process of actively placing a child or, when applicable, young adult in peril.<br><br>An Impending Danger Safety Threat is a family behavior, condition, or circumstance that meets all five safety threshold criteria. When it is occurring, | http://www.dhs.state.or.us/caf/safety model/procedure manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=196 |

Wyatt_PK0004198
Exhibit 7
Page 67 of 98

| Term | Definition | Source |
|------|-----------|--------|
| | this type of threat is not immediate, obvious, or occurring at the onset of the CPS intervention. This threat is identified and understood more fully by evaluating and understanding individual and family functioning. | |
| Safety Threshold | The point at which family behaviors, conditions, or circumstances are manifested in such a way that they are beyond being risk influences and have become an impending danger safety threat. In order to reach the "safety threshold" the behaviors, conditions, or circumstances must meet all of the following criteria: be imminent, be out of control, affect a vulnerable child or young adult, be specific and observable, and have potential to cause severe harm. The "safety threshold" criteria are used to determine the presence of an impending danger safety threat. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1840 |
| Screening | The process used by a screener to determine the response to information received. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1840 |
| Service Array | The range of service options that CW provides to clients. | Public Knowledge |
| Service Goal [Can also refer to Case Goal] | The observable, sustained change in behavior, condition, or circumstance, that when accomplished, achieves the desired effect. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1840 |

Wyatt_PK0004199
Exhibit 7
Page 68 of 98

**Public**Knowledge                                                    Methodology

| Term | Definition | Source |
|------|-----------|--------|
| Service Provision | The ongoing process of delivering services to clients by CW and its providers. | Public Knowledge |
| Service(s) | Assistance that the Department provides to clients. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1840 |
| Staff Turnover | The measurement of the number of employees who leave CW during an identified timeframe. | Public Knowledge |
| Substitute Care [Can also refer to Placements or Substitute Care Providers] | The out-of-home placement of a child or young adult who is in the legal or physical custody and care of the Department. | http://www.dhs.state.or.us/policy/childwelfare/manual_1/division_70.pdf |
| Supervision | The act of overseeing children and young adults in order to assure child safety. | Oregon Department of Human Services, Office of Child Welfare |
| Supervision and Oversight | The act of monitoring and directing the performance and activities of Child Protective Services (CPS) and Permanency staff, contracted providers, or others delivering services to families, children, and youth. | Public Knowledge and Oregon CW |
| Supporting | The process of providing assistance to address an identified need. | Public Knowledge |
| Temporary Placement | A short term, time-limited placement. | Public Knowledge |
| Termination of Parental Rights (TPR) | A court of competent jurisdiction has entered an order terminating the rights of the parent or parents, pursuant to ORS 419B.500 through | http://www.dhs.state.or.us/caf/safety_model/procedure_ |

Wyatt_PK0004200
Exhibit 7
Page 69 of 98

| Term | Definition | Source |
|---|---|---|
| | 419B.530 or the statutes of another state. The date of the termination order determines the effective date of the termination even if an appeal of that order has been filed according to ORS 419A.200. | manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1843 |
| Tracking | Monitoring and measuring the goals, progress, or outcomes. | Public Knowledge |
| Training [Can also refer to Training Resources] | The process of developing a skilled child welfare workforce and to achieving outcomes of safety, permanency, and well-being for children entrusted to the care of the public child welfare system. | https://www.childwelfare.gov/topics/management/training/ |
| Treating | The process of providing care and attention to emotional, behavioral, physical, or social issues or medical needs. | Public Knowledge |
| Visit | Planned, in-person contact between the child or young adult and one or more family members. | http://www.dhs.state.or.us/caf/safety model/procedure manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf - page=1844 |
| Visitation | Visitation is an interactive face-to-face contact between a child and his or her parents, siblings or other family members. When reunification is the goal, the visit and contact plan should include progressively increased parental responsibility for the daily care of the child. When reunification no longer is the goal, a visit and contact plan can help family members understand and accept the alternative permanency plan. Whatever the goal, visits strengthen and maintain family relationships, enhance a child's well-being, and affirm the importance of parents in the child's life. For the duration of Governor Brown's Stay at Home, Save | https://www.oregon.gov/dhs/CHILDREN/Documents/Protocol%20for%20Parent%20Child%20Visits.pdf |

Wyatt_PK0004201
Exhibit 7
Page 70 of 98

| Term | Definition | Source |
|------|-----------|--------|
| | Lives Order (EO 20-12), visitation takes place as provided in the Protocol for In-Person Parent/Child Visits During COVID-19. | |
| Well-Being | The physical, dental, behavioral, mental health, and educational needs of children and young adults are being identified and met. | Public Knowledge and Oregon CW |
| Workforce [Can also refer to Staffing Resources or Resources] | People employed by Child Welfare to design, deliver and oversee the child welfare agency service array. | Public Knowledge and Oregon CW |

Wyatt_PK0004202
Exhibit 7
Page 71 of 98

**Public**Knowledge

# Appendix B: Entities

| Term | Definition |
|------|-----------|
| CPS | Child Protective Services. CPS responds to child abuse reports. CPS-trained caseworkers across the state listen to reports of abuse, assess the situations, and prepare safety plans to assist children and families. |
| CPS Hotline | Anyone can report child abuse to the Oregon Child Abuse Hotline by calling 1-855-503-SAFE (7233). The Oregon Child Abuse Hotline receives calls 24 hours a day, 7 days a week, 365 days a year. This toll-free number allows anyone to report abuse of any child or adult to the Oregon Department of Human Services. Child abuse can also be reported by calling a local police department, county sheriff, county juvenile department, or Oregon State Police. |
| Child Welfare | Child Welfare is a continuum of services designed to ensure that children are safe at home and that families have the necessary support to care for their children successfully. In Oregon, Child Welfare includes Adoption services, Child Protective Services, Foster Care, and the Independent Living Program. |
| DHS [Agency] | Department of Human Services. DHS is Oregon's principal agency for helping Oregonians achieve wellbeing and independence through opportunities that protect, empower, respect choice, and preserve dignity, especially for those who are least able to help themselves. Divisions include: Assistance, Children & Youth, Seniors & People with Disabilities, and other services. |
| OCI | The Office of Continuous Improvement works in partnership with DHS programs. All work is directly requested from the field or from program. OCI and DHS staff collaborate and work together to improve current processes, create efficiencies, and implement more effective ways of delivering services, all of which directly impacts and ultimately benefits DHS clients. |
| ODDS | The Oregon Office of Developmental Disabilities Services supports individuals with disabilities and their families within their communities by promoting and providing services that are individualized, flexible, and community-focused, and that support each person's talents and abilities. |

Wyatt_PK0004203
Exhibit 7
Page 72 of 98

**Public**Knowledge

| Term | Definition |
|------|-----------|
| OHA | Oregon Health Authority. OHA is the agency that oversees and administers Medicaid and other public health programs in Oregon such as the Oregon Health Plan, Healthy Kids, the Oregon State Hospital, and other programs. |
| OTIS | Office of Training and Investigative Services is part of DHS and is responsible for training, coordinating and conducting abuse investigations and providing protective services statewide to reports of neglect and abuse of vulnerable adults including adults over the age of 65; adults with physical disabilities; adults with developmental disabilities; adults with mental illness; and children receiving residential treatment services. |
| OSOQ | Office of Safety, Oversight, and Quality (formerly OLRO). OLRO is part of DHS and is responsible for licensing or registering regulatory and corrective action functions for long term care facilities and agencies including children's residential care agencies, foster care agencies, adoption agencies, assisted living facilities, and other such facilities and agencies. |

Wyatt_PK0004204
Exhibit 7
Page 73 of 98

**PublicKnowledge**

# Appendix C: Survey Protocol

The purpose of the survey is to gather feedback widely from members of the child welfare system. A survey will allow Public Knowledge to gather qualitative data from a larger sample of individuals than is possible with interviews and focus groups.

The survey will be disseminated online to Child Welfare (CW) staff and will ask participants to indicate their role and their tenure in child welfare, and the questions they answer will be determined by their role. All questions will be closed-ended and will allow a single answer. Three options will be given, depending on the question: either Yes/I'm Not Sure/No, or Always/Sometimes/Never.

The survey will be open for a two-week window to provide participants time to share their feedback without losing interest in the process. The survey will be constructed to require users between 15-30 minutes to complete. The survey topics are based on the inquiry questions developed for each research question. Some questions are duplicated between the survey, interviews, and focus groups to ensure the collection of information from varying perspectives across the child welfare system.

Table 5.1 Survey Questions

| | Survey Question | Research Question | Role(s) |
|---|---|---|---|
| 1. | Does CW address safety threats and safety concerns of children in their homes? | 1 | • Managers<br>• Supervisors<br>• Field Staff |
| 2. | Does CW assess safety threats and safety concerns of children in substitute care? | 1 | • Managers<br>• Supervisors<br>• Field Staff |
| 3. | Does CW address safety threats and safety concerns of children in substitute care? | 1 | • Managers<br>• Supervisors<br>• Field Staff |
| 4. | Does CW maintain the confidentiality of reports of abuse in care? | 1 | • Managers<br>• Supervisors<br>• Field Staff |
| 5. | Is the process of responding to allegations of abuse and neglect regarding children in substitute care:<br>• Clear?<br>• Understandable? | 1 | • Managers<br>• Supervisors<br>• Field Staff |

Wyatt_PK0004205
Exhibit 7
Page 74 of 98

| | Survey Question | Research Question | Role(s) |
|---|---|---|---|
| 6. | Does CW standardize the response to allegations of maltreatment for children in substitute care? | 1 | • Managers<br>• Supervisors<br>• Field Staff |
| 7. | Has CW standardized the protocol for "closed at screening"? | 1 | • Managers<br>• Supervisors<br>• Field Staff |
| 8. | Does CW ensure that requirements (agency policies, legal regulations, or laws) are met when recruiting, certifying, and monitoring foster parents? | 1 | • Managers<br>• Supervisors<br>• Field Staff |
| 9. | Does CW comply with federal background check requirements during:<br>• Certification of substitute care providers?<br>• Oversight of substitute care providers? | 1 | • Supervisors<br>• Field Staff |
| 10. | Does CW leadership advocate for safety for children under CW supervision? | 1 | • Supervisors<br>• Field Staff |
| 11. | Has the organizational culture of CW improved during the tenure of Rebecca Jones Gaston? | | • Managers<br>• Supervisors<br>• Field Staff |
| 12. | Do you believe that CW leadership pursues appropriate policy changes to improve child protection? | | • Managers<br>• Supervisors<br>• Field Staff |
| 13. | Does CW respond according to policies and procedures to maltreatment reports from children in substitute care? | 2 | • Managers<br>• Supervisors<br>• Field Staff |
| 14. | Does CW engage in continuous quality improvement processes at the following levels:<br>• State?<br>• District?<br>• County? | 3 | • Managers<br>• Supervisors<br>• Field Staff |
| 15. | Does CW use the evaluations of the quality of services to improve service delivery to families? | 3 | • Managers<br>• Supervisors<br>• Field Staff |

Wyatt_PK0004206<br>Exhibit 7<br>Page 75 of 98

Public**Knowledge**

| | Survey Question | Research Question | Role(s) |
|---|---|---|---|
| 16. | Does CW provide training and coaching for staff on how to use data to drive decisions and improve quality of services? | 3 | • Supervisors<br>• Field Staff |
| 17. | Does CW recruit and retain foster parents who are able to meet the identified needs of children in foster care? | 4 | • Managers<br>• Supervisors<br>• Field Staff |
| 18. | Does CW recruit and retain appropriate child-specific providers, including kith and kin, to care for the number of children who need such placements? | 4 | • Supervisors<br>• Field Staff |
| 19. | Does CW maintain an appropriate number of foster homes to house the number of children who need to be placed in foster care? | 4 | • Supervisors<br>• Field Staff |
| 20. | Does CW conduct Diligent Recruitment (the process of recruiting, retaining, and supporting foster families that reflect the ethnicity and race of children in substitute care) of foster care providers? | 4 | • Supervisors<br>• Field Staff |
| 21. | Does CW recruit and retain substitute care providers who can care for children who identify as LGBTQIA+? | 4 | • Supervisors<br>• Field Staff |
| 22. | Does CW recruit and retain substitute care providers who can care for children who are living with high needs? | 4 | • Supervisors<br>• Field Staff |
| 23. | Does CW provide training and coaching for staff on best practices for:<br>• Recruitment of substitute care providers?<br>• Retention of substitute care providers?<br>• Support of substitute care providers? | 4 | • Supervisors<br>• Field Staff |
| 24. | Does CW leadership support the recruitment, retention, and support of substitute care providers? | 4 | • Supervisors<br>• Field Staff |
| 25. | Does CW prioritize the placement of children with relatives? | 5 | • Managers<br>• Supervisors<br>• Field Staff |
| 26. | Does CW conduct ongoing searches for relatives of children in substitute care? | 5 | • Supervisors<br>• Field Staff |

Wyatt_PK0004207<br>Exhibit 7<br>Page 76 of 98

**Public**Knowledge

| | Survey Question | Research Question | Role(s) |
|---|---|---|---|
| 27. | Does CW appropriately match children to substitute care placements based on the needs of the child and the capability of the providers? | 5 | • Supervisors<br>• Field Staff |
| 28. | Does CW provide training and coaching to staff on best practices for improving permanence for children in substitute care? | 5 | • Supervisors<br>• Field Staff |
| 29. | Does CW identify permanency goals appropriate to the needs of the child? | 6 | • Supervisors<br>• Field Staff |
| 30. | Does CW create permanency plans based on the identified needs of the child? | 6 | • Supervisors<br>• Field Staff |
| 31. | Does CW provide training and coaching to staff on how to plan for permanency for children and families? | 6 | • Supervisors<br>• Field Staff |
| 32. | Does CW leadership encourage improving permanence for children in substitute care? | 5 | • Supervisors<br>• Field Staff |
| 33. | Does CW leadership advocate for improving permanency planning? | 6 | • Supervisors<br>• Field Staff |
| 34. | Does CW provide training and coaching to staff in assessing individuals, including children and families? | 7 | • Supervisors<br>• Field Staff |
| 35. | Does CW leadership encourage individualized assessments for children and families? | 7 | • Supervisors<br>• Field Staff |
| 36. | Does CW maintain a statewide service array that ensures their ability to meet the identified needs of children and families? | 8 | • Managers<br>• Supervisors<br>• Field Staff |
| 37. | Does CW address the underlying conditions for removal before returning children to their parents' care? | 8 | • Managers<br>• Supervisors<br>• Field Staff |
| 38. | Does CW provide in-home services to families post-reunification to prevent re-entry into substitute care? | 8 | • Supervisors<br>• Field Staff |
| 39. | Does CW ensure that behavioral health services are being delivered in order to meet case plan goals? | 8 | • Supervisors<br>• Field Staff |

Wyatt_PK0004208
Exhibit 7
Page 77 of 98

**Public**Knowledge

| | Survey Question | Research Question | Role(s) |
|---|---|---|---|
| 40. | Does CW provide training and coaching to staff on how to work with providers in delivering services to meet the needs of children and families? | 8 | • Supervisors<br>• Field Staff |
| 41. | Does CW leadership advocate for providing services to meet the needs of children and families? | 8 | • Supervisors<br>• Field Staff |
| 42. | Does CW develop comprehensive case plans that meet the identified needs of the child and family? | 9 | • Supervisors<br>• Field Staff |
| 43. | Does CW provide training and coaching for staff on best practices in case planning? | 9 | • Supervisors<br>• Field Staff |
| 44. | Does CW leadership advocate for improving case planning? | 9 | • Supervisors<br>• Field Staff |
| 45. | Does CW facilitate contact between children and their siblings in accordance with the Family Support Services Case Plan? | 10 | • Supervisors<br>• Field Staff |
| 46. | Does CW train caseworkers prior to their direct work with families to prepare them for their work? | 11 | • Supervisors<br>• Field Staff |
| 47. | Does CW train caseworkers on an ongoing basis to maintain their knowledge and skills? | 11 | • Supervisors<br>• Field Staff |

Wyatt_PK0004209
Exhibit 7
Page 78 of 98

# Appendix D: Interview Protocol

The purpose of the individual interviews is to gather perspectives from Child Welfare (CW) leadership and representatives from the Governor's office on the progress that has been made throughout the child welfare system since Public Knowledge completed the Child Safety in Substitute Care Final Report in 2016. The interviews will provide input to the overall data collection and will allow the final report to reflect the perceptions of individuals within the child welfare system.

Public Knowledge plans to conduct up to 19 interviews, each of which will be scheduled for 50 minutes and will be facilitated over the phone or videoconference, depending on the preference of the interviewee. The proposed interviewees are[2]:

- Fariborz Pakseresht, DHS Director
- Rebecca Jones Gaston, Child Welfare Director
- Lacey Andresen, Child Welfare Deputy Director
- Aprille Flint-Gerner, Child Welfare Deputy Director
- Alysia Cox, CW Deputy Chief, Strategy and Innovation (also serving as the Data Representative)
- Tami Kane-Suleiman, Child Safety Manager
- Deanna Loughary, Child Safety Manager
- Stacey Loboy, Foster Care Manager
- Belit Burke, Program Policy Manager (now District Manager)
- Sherril Kuhns, Federal Policy Manager
- Kim Keller, Permanency
- Kristen Khamnohack, Hotline
- Kim Lorz, Child Welfare Training Manager
- Sarah Fox, Treatment Services Program Manager
- Chelsea Holcomb, Children's System of Care
- Lilia Teninity, Office of Developmental Disabilities Services (ODDS)
- Joel Metlen, DHS Strategic Projects Director
- Representatives from the Governor's Office: Rosa Klein, Berri Leslie

---

[2] These interviewees are based on organizational charts shared with Public Knowledge, dated December 2019. If names or position titles have changed, this list will be adjusted.

Wyatt_PK0004210
Exhibit 7
Page 79 of 98

The interviews will be facilitated by two Public Knowledge team members, one of whom will facilitate, and one will take notes. Responses to the interview questions will be aggregated and responses will not be connected to a specific interviewee.

The interview topics are based on the inquiry questions developed for each research question. The questions will be shared with interviewees prior to the scheduled interview to allow time for preparation.

The total number of interview questions for each group are as follows:

- Governor's Office Representatives: 9
- CW Leadership (including Strategy and Innovation, Children's System of Care, ODDS, and Portfolio Management): 26
- Safety Managers: 8
- Foster Care Manager (including Permanency, Hotline, and Treatment Services Manager): 19
- Policy Managers (including Permanency, Hotline, and Treatment Services Manager): 8
- Training Manager: 9
- Data Representative: 16

The comprehensive set of interview questions is listed in the table below.

Table 5.2 Interview Protocol

| | Interview Question | Research Question | Interviewee(s) |
|---|---|---|---|
| 1. | Does CW meet federal requirements for caseworker contacts with children in substitute care? | 1 | • Data Representative |
| 2. | Does CW meet state requirements for caseworker contacts with children in substitute care? | 1 | • Data Representative |
| 3. | Does CW adequately assess out-of-state facilities to determine the appropriateness of placing children? | 1 | • Governor's Office<br>• CW leadership<br>• Policy Managers |
| 4. | Has CW centralized and standardized reporting, screening, and assessments statewide? | 1 | • Safety Managers |
| 5. | Since 2016, has CW redesigned the process of responding to allegations of | 1 | • Governor's Office<br>• CW leadership |

Wyatt_PK0004211
Exhibit 7
Page 80 of 98

| Interview Question | Research Question | Interviewee(s) |
|---|---|---|
| abuse and neglect regarding children in substitute care? | | • Safety Managers<br>• Foster Care Manager |
| 6. What is CW's policy on protecting the confidentiality of children who identify as LGBTQIA+? | 1 | • CW leadership<br>• Policy Managers |
| 7. Has CW standardized the protocol for "closed at screening"? | 1 | • Safety Managers |
| 8. Does CW comply with federal background check requirements during certification and oversight of substitute care providers? | 1 | • Foster Care Manager<br>• Policy Managers |
| 9. Does CW have policies and procedures in place to guide staff on safety practices? | 1 | • Safety Managers<br>• Policy Managers |
| 10. Does CW have in place quality assurance processes for monitoring safety for children under CW supervision? | 1 | • Safety Managers<br>• Data Representative |
| 11. In what ways are CW staff encouraged to speak up with safety concerns regarding children in substitute care? | 2 | • Governor's Office<br>• CW leadership<br>• Safety Managers |
| 12. Does CW respond according to policies and procedures to maltreatment reports from children in substitute care? | 2 | • Foster Care Manager<br>• Policy Managers |
| 13. In what ways does CW advocate for a safety culture among its workforce? | 2 | • Governor's Office<br>• CW leadership<br>• Safety Managers |
| 14. Does CW use Organizational Change Management processes and structures? | 2 | • CW leadership |
| 15. In what ways do CW executives model leadership skills and behaviors? | 2 | • Governor's Office<br>• CW leadership<br>• Safety Managers<br>• Foster Care Manager<br>• Policy Managers<br>• Training Manager<br>• Data Representative |

Wyatt_PK0004212
Exhibit 7
Page 81 of 98

**Public**Knowledge

| Interview Question | Research Question | Interviewee(s) |
|---|---|---|
| 16. Do CW's nondiscrimination policies include considerations of sexual orientation, gender identity, and gender expression (SOGIE)? | 2 | • CW leadership |
| 17. Is case information entered or tracked outside of OR-Kids? | 3 | • Data Representative |
| 18. Does CW follow their Data Quality Plan? | 3 | • CW leadership<br>• Data Representative |
| 19. Does CW use data to inform the development of new or revised practices, policies, and procedures? | 3 | • CW leadership<br>• Data Representative<br>• Policy Managers |
| 20. Does CW have a continuous quality improvement process that includes leadership support, leadership modeling, staff and stakeholder engagement, communication, oversight, data collection, case record reviews, and use of the findings? | 3 | • CW leadership<br>• Data Representative |
| 21. What does the CQI process look like at each level? | 3 | • Data Representative |
| 22. Does CW utilize performance-based contracting with its external service providers? | 3 | • CW leadership |
| 23. Does CW provide training and coaching for staff on how to use data to drive decisions and improve quality of services? | 3 | • Training Manager |
| 24. Does CW have a case review system in place to inform decision making and improve the quality of services? | 3 | • Data Representative |
| 25. Does CW recruit and retain appropriate child-specific providers, including kith and kin, to care for the number of children who need such placements? | 4 | • Data Representative<br>• Foster Care Manager |

Wyatt_PK0004213
Exhibit 7
Page 82 of 98

**Public**Knowledge

| Interview Question | Research Question | Interviewee(s) |
|---|---|---|
| 26. Does CW provide appropriate services and support to substitute care providers to ensure children are adequately cared for and supervised? | 4 | • Foster Care Manager |
| 27. How does CW oversee the contracted placements for children living with high needs? | 4 | • Foster Care Manager |
| 28. Has CW increased reimbursement rates for substitute care providers? | 4 | • CW leadership<br>• Foster Care Manager |
| 29. Does CW prioritize the use of the least restrictive placement? | 4 | • CW leadership<br>• Foster Care Manager |
| 30. Does CW have or oversee a statewide recruitment, retention, and support plan for substitute care providers? | 4 | • CW leadership<br>• Foster Care Manager |
| 31. Does CW use data to inform their statewide recruitment, retention, and support plan for substitute care providers? | 4 | • Data Representative<br>• Foster Care Manager |
| 32. Does CW have policies and procedures for staff regarding the recruitment, retention, and support of substitute care providers? | 4 | • Policy Managers<br>• Foster Care Manager |
| 33. Does CW provide training and coaching for staff on best practices for the recruitment, retention, and the support of substitute care providers? | 4 | • Training Manager<br>• Foster Care Manager |
| 34. Does CW utilize a case review process to identify lessons learned in the recruitment, retention, and the support of substitute care providers? | 4 | • CW leadership<br>• Foster Care Manager |
| 35. Does CW pursue termination of parental rights as required by federal law? | 5 | • CW leadership<br>• Data Representative<br>• Foster Care Manager |

Wyatt_PK0004214
Exhibit 7
Page 83 of 98

**Public**Knowledge                                                    Methodology

| Interview Question | Research Question | Interviewee(s) |
|---|---|---|
| 36. Does CW meet state requirements with regard to using the CANS to establish reimbursement rates for providers? | 5 | • Foster Care Manager |
| 37. Does CW provide training and coaching to staff on best practices for improving permanence for children in substitute care? | 5 | • Training Manager<br>• Foster Care Manager |
| 38. Does CW provide training and coaching to staff on how to plan for permanency for children and families? | 6 | • Training Manager |
| 39. Does CW utilize a case review process to understand and improve barriers and strengths in permanency planning? | 6 | • Foster Care Manager |
| 40. Does CW have a mechanism to evaluate the provision of assessments? | 7 | • Data Representative |
| 41. Does CW provide training and coaching to staff in assessing individuals, including children and families? | 7 | • Training Manager |
| 42. Does CW maintain a statewide service array that ensures their ability to meet the identified needs of children and families? | 8 | • Governor's Office<br>• CW leadership |
| 43. Has CW developed a continuum of care options for children in substitute care? | 8 | • CW leadership<br>• Foster Care Manager |
| 44. Does CW partner with the Oregon Health Authority to identify and improve systemic barriers regarding access to services? | 8 | • Governor's Office<br>• CW leadership |
| 45. Does CW partner with Oregon Coordinated Care Organizations to identify and improve systemic barriers regarding access to services? | 8 | • Governor's Office<br>• CW leadership |
| 46. Does CW have a mechanism to evaluate the services provided to children and families? | 8 | • Data Representative |

Wyatt_PK0004215
Exhibit 7
Page 84 of 98

**Public**Knowledge

| | Interview Question | Research Question | Interviewee(s) |
|---|---|---|---|
| 47. | Does CW retain enough staff to adequately serve the children and families in CW custody? | 11 | • Governor's Office<br>• CW leadership |
| 48. | Does CW regulate caseloads for caseworkers to ensure they can meet the needs of children and families under their supervision? | 11 | • CW leadership |
| 49. | Does CW meet state requirements in recruiting qualified caseworkers? | 11 | • CW leadership |
| 50. | Does CW adequately train caseworkers prior to their direct work with families? | 11 | • CW leadership<br>• Training Manager |
| 51. | Does CW adequately train caseworkers on an ongoing basis? | 11 | • CW leadership<br>• Training Manager |
| 52. | How does CW track training provided to caseworkers? | 11 | • Data Representative<br>• Training Manager |

Wyatt_PK0004216
Exhibit 7
Page 85 of 98

# Appendix E: Focus Group Protocol

The purpose of the focus groups is to gather peer groups at varying levels of Child Welfare (CW) to share their collective experience regarding progress that has been made throughout the child welfare system since Public Knowledge completed the Child Safety in Substitute Care Final Report in 2016. Focus groups are an opportunity for staff to share their feedback with each other and with Public Knowledge to provide input into the final report.

Public Knowledge plans to conduct nine focus groups, each of which will be scheduled for 90 minutes using Zoom. The proposed focus groups will include up to 15 participants, unless noted otherwise, and include the following:

- Two focus groups of central office staff, including a mixture of managers, supervisors, and staff from the Training unit, Continuous Quality Improvement or Data section, Program Policy unit, Federal Policy unit, Field Services section, Equity section, Treatment Services section, Foster Care Services section, Child Safety section, and Permanency section.

- Two focus groups of caseworkers from districts throughout Oregon. One group will include caseworkers focused on safety services and the other group will be comprised of permanency caseworkers. Both groups will include a mixture of large and small counties, urban and rural areas, and locations across the state.

- Two focus groups of casework supervisors from districts throughout Oregon. One group will include supervisors overseeing safety services and the other group will be comprised of permanency supervisors. Both groups will include a mixture of large and small counties, urban and rural areas, and locations across the state.

- One focus group for the 16 District Managers and the District Manager for the Oregon Child Abuse Hotline.

- One focus group of the 16 Child Safety Consultants from the Child Safety section in Central Office.

- One focus group of the Permanency-Adoption section staff in Central Office.

The focus groups will be facilitated by two Public Knowledge team members, one of whom will facilitate, and one will take notes. Responses to the focus group questions will be aggregated and responses will not be connected to a specific participant. Participants will be given the option to provide answers verbally or using the chat function in Zoom, and some questions will be asked using the poll function in Zoom.

The focus group topics are based on the inquiry questions developed for each research question. The questions will be shared with participants prior to the scheduled interview to allow time for preparation.

Wyatt_PK0004217
Exhibit 7
Page 86 of 98

Table 5.3 Focus Group Protocol

| Focus Group Question | Research Question | Participant Group |
|---|---|---|
| 1. Does CW adequately assess safety thresholds and safety concerns of children in their homes during intake, initial assessments, and safety assessments, and throughout the life of the case? | 1 | • Safety caseworkers<br>• Safety casework supervisors<br>• Safety Consultants |
| 2. Does CW effectively manage caseloads to adequately meet the needs of children and families? | 1 | • Central Office<br>• Casework supervisors |
| 3. Does CW appropriately supervise placements of children in out-of-state facilities? | 1 | • Central Office |
| 4. Has CW centralized and standardized reporting, screening, and assessments statewide? | 1 | • Central Office<br>• Safety caseworkers<br>• Safety casework supervisors<br>• Safety Consultants |
| 5. Is the process of responding to allegations of abuse and neglect regarding children in substitute care transparent? | 1 | • Safety caseworkers<br>• Safety casework supervisors<br>• Safety Consultants |
| 6. Does CW consistently share safety information across entities? | 1 | • Central Office |
| 7. What is CW's policy on protecting the confidentiality of children who identify as LGBTQIA+? | 1 | • Central Office<br>• Caseworkers<br>• Casework Supervisors |
| 8. Does CW consistently distinguish between allegations of abuse and critical incidents? (Including a follow-up question of how the two are distinguished). | 1 | • Central Office<br>• Safety caseworkers<br>• Safety casework supervisors<br>• Safety Consultants |
| 9. Does CW address safety threats or safety concerns raised in a substitute care placement? | 1 | • Safety caseworkers<br>• Safety casework supervisors |

Wyatt_PK0004218
Exhibit 7
Page 87 of 98

**Public**Knowledge

| Focus Group Question | Research Question | Participant Group |
|---|---|---|
| | | • Safety Consultants |
| 10. Does CW provide training and coaching to staff about best practices in safety for children under CW supervision? | 1 | • Safety caseworkers<br>• Safety casework supervisors |
| 11. Does CW utilize a case review process to measure progress on improving safety for children under CW supervision? | 1 | • Central Office<br>• District Managers<br>• Safety caseworkers<br>• Safety casework supervisors<br>• Safety Consultants |
| 12. Does CW have in place quality assurance processes for monitoring safety for children under CW supervision? | 1 | • Central Office<br>• District Managers<br>• Safety casework supervisors |
| 13. Does CW leadership advocate safety for children under CW supervision? | 1 | • Central Office<br>• District Managers<br>• Safety caseworkers<br>• Safety casework supervisors<br>• Safety Consultants |
| 14. In what ways is safety prioritized in decision making for children in substitute care? | 2 | • Central Office<br>• District Managers<br>• Safety caseworkers<br>• Safety casework supervisors<br>• Safety Consultants |
| 15. In what ways are CW staff encouraged to speak up with safety concerns regarding children in substitute care? | 2 | • Central Office<br>• District Managers<br>• Safety caseworkers<br>• Safety casework supervisors<br>• Safety Consultants |
| 16. Do CW staff feel comfortable raising concerns? | 2 | • Central Office<br>• District Managers<br>• Caseworkers |

| Focus Group Question | Research Question | Participant Group |
|---|---|---|
| | | • Casework supervisors<br>• Safety Consultants<br>• Adoption Section Staff |
| 17. Do CW staff know how to escalate concerns about safety issues? | 2 | • Central Office<br>• District Managers<br>• Caseworkers<br>• Casework supervisors<br>• Safety Consultants<br>• Adoption Section Staff |
| 18. Does CW communicate the importance of child safety for children in substitute care? | 2 | • Central Office<br>• District Managers<br>• Caseworkers<br>• Casework supervisors |
| 19. In what ways does CW advocate for a safety culture among its workforce? | 2 | • Central Office<br>• District Managers<br>• Caseworkers<br>• Casework supervisors<br>• Safety Consultants<br>• Adoption Section Staff |
| 20. Does CW use Organizational Change Management processes and structures? | 2 | • Central Office |
| 21. In what ways do CW executives model leadership skills and behaviors? | 2 | • Central Office<br>• District Managers<br>• Caseworkers<br>• Casework supervisors<br>• Safety Consultants<br>• Adoption Section Staff |
| 22. Do CW's nondiscrimination policies include considerations of sexual orientation, gender identity, and gender expression (SOGIE)? | 2 | • Central Office<br>• District Managers<br>• Caseworkers<br>• Casework supervisors<br>• Safety Consultants<br>• Adoption Section Staff |
| 23. How does CW identify and document children who identify as LGBTQIA+? | 3 | • Central Office<br>• District Managers |

Wyatt_PK0004220
Exhibit 7
Page 89 of 98

**Public**Knowledge                                                                    Methodology

| | Focus Group Question | Research Question | Participant Group |
|---|---|---|---|
| 24. | Does CW have a continuous quality improvement process that includes leadership support, leadership modeling, staff and stakeholder engagement, communication, oversight, data collection, case record reviews, and use of the findings? | 3 | • Central Office<br>• District Managers |
| 25. | Does CW engage in continuous quality improvement processes at the state, district, and county levels? | 3 | • Central Office<br>• District Managers<br>• Casework Supervisors |
| 26. | What does the CQI process look like at each level? | 3 | • Central Office<br>• District Managers |
| 27. | Does CW conduct effective evaluations of the quality of services offered by external service providers? | 3 | • Central Office<br>• District Managers |
| 28. | Does CW use the evaluations of the quality of services to improve service delivery to families? | 3 | • Central Office<br>• District Managers<br>• Casework Supervisors |
| 29. | Does CW collaborate with service providers to share feedback from case reviews? | 3 | • District Managers<br>• Casework Supervisors |
| 30. | Does CW recruit and retain foster parents who are able to meet the identified needs of children in substitute care? | 4 | • District Managers<br>• Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 31. | Does CW recruit and retain appropriate child-specific providers, including kith and kin, to care for the number of children who need such placements? | 4 | • Central Office<br>• Permanency Caseworkers<br>• Permanency Casework Supervisors<br>• Adoption Section Staff |
| 32. | Does CW maintain an appropriate number of foster homes to house the | 4 | • Central Office<br>• Permanency Caseworkers |

Wyatt_PK0004221
Exhibit 7
Page 90 of 98

PublicKnowledge                                                    Methodology

| Focus Group Question | Research Question | Participant Group |
|---|---|---|
| number of children who need to be placed in substitute care? | | • Permanency Casework Supervisors |
| 33. Does CW adequately assess the ability of substitute care providers to ensure the appropriate care and supervision of children? | 4 | • Central Office<br>• Permanency Caseworkers<br>• Permanency Casework Supervisors<br>• Adoption Section Staff |
| 34. Does CW provide appropriate services and support to substitute care providers to ensure children are adequately cared for and supervised? | 4 | • Permanency Caseworkers<br>• Permanency Casework Supervisors<br>• Adoption Section Staff |
| 35. Does CW diligently recruit substitute care providers who reflect the ethnicity and race of children in substitute care? | 4 | • Permanency Caseworkers<br>• Permanency Casework Supervisors<br>• Adoption Section Staff |
| 36. Does CW recruit and retain substitute care providers who can care for children who identify as LGBTQIA+? | 4 | • Central Office<br>• Permanency Caseworkers<br>• Permanency Casework Supervisors<br>• Adoption Section Staff |
| 37. Does CW recruit and retain substitute care providers who can care for children who are living with high needs? | 4 | • Central Office<br>• Permanency Caseworkers<br>• Permanency Casework Supervisors<br>• Adoption Section Staff |
| 38. Does CW track, at the state and local levels, the current capacity for substitute care providers? | 4 | • Central Office<br>• District Managers<br>• Permanency Casework Supervisors |
| 39. Does CW track the skills and capabilities of substitute care | 4 | • Permanency Caseworkers |

Wyatt_PK0004222
Exhibit 7
Page 91 of 98

**PublicKnowledge**

| Focus Group Question | Research Question | Participant Group |
|---|---|---|
| providers to ensure appropriate matching for children and their placement providers? | | • Permanency Casework Supervisors<br>• Adoption Section Staff |
| 40. Does CW prioritize the use of the least restrictive placement? | 4 | • Central Office<br>• District Managers<br>• Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 41. Does CW leadership support the recruitment, retention, and support of substitute care providers? | 4 | • Central Office<br>• District Managers<br>• Caseworkers<br>• Casework Supervisors |
| 42. Does CW conduct ongoing searches for relatives of children in substitute care? | 5 | • District Managers<br>• Permanency Caseworkers<br>• Permanency Casework Supervisors<br>• Adoption Section Staff |
| 43. Does CW frequently use temporary placements for children in substitute care? | 5 | • District Managers<br>• Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 44. Does CW prioritize the placement of children with relatives? | 5 | • District Managers<br>• Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 45. Does CW adequately assess prospective adoptive parents to determine an appropriate match? | 5 | • District Managers<br>• Adoption Section Staff |
| 46. Does CW collaborate with the courts to ensure timely permanency hearings? | 5 | • Central Office<br>• District Managers<br>• Permanency Caseworkers |

Wyatt_PK0004223
Exhibit 7
Page 92 of 98

Public**Knowledge**

| Focus Group Question | Research Question | Participant Group |
|---|---|---|
| | | • Permanency Casework Supervisors |
| 47. In what ways does CW make concerted efforts to achieve permanence in a timely manner? | 5 | • Central Office<br>• District Managers<br>• Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 48. Does CW recommend placement decisions based on the identified needs and permanency plan of the child? | 5 | • Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 49. Does CW appropriately match children to substitute care placements based on the needs of the child and the capability of the providers? | 5 | • Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 50. Does CW follow federal requirements for placement preferences for Native American or Alaska Native children? | 5 | • Central Office<br>• District Managers |
| 51. Does CW utilize a case review process to understand and improve barriers and strengths regarding permanence for children in substitute care? | 5 | • Central Office<br>• District Managers |
| 52. Does CW leadership encourage improving permanence for children in substitute care? | 5 | • Central Office<br>• Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 53. Does CW identify permanency goals appropriate to the needs of the child? | 6 | • District Managers<br>• Permanency Caseworkers<br>• Permanency Casework Supervisors |

Wyatt_PK0004224
Exhibit 7
Page 93 of 98

| | Focus Group Question | Research Question | Participant Group |
|---|---|---|---|
| 54. | Does CW create permanency plans based on the identified needs of the child? | 6 | • District Managers<br>• Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 55. | Does CW recommend changes in placement based on the identified needs and permanency plan of the child? | 6 | • District Managers<br>• Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 56. | Does CW collaborate with families and children to identify and improve barriers regarding permanency planning? | 6 | • District Managers<br>• Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 57. | Does CW collaborate with the courts to identify and eliminate barriers regarding permanency planning? | 6 | • Central Office<br>• District Managers |
| 58. | Does CW utilize a case review process to understand and improve barriers and strengths in permanency planning? | 6 | • Central Office |
| 59. | Does CW leadership advocate for improving permanency planning? | 6 | • Central Office<br>• District Managers |
| 60. | Does CW identify necessary services for children based on the assessment(s)? | 7 | • Central Office<br>• District Managers |
| 61. | Does CW identify necessary services for parents based on the assessment(s)? | 7 | • Central Office<br>• District Managers |
| 62. | Does CW identify necessary services for substitute care providers based on the assessment(s)? | 7 | • Central Office<br>• District Managers<br>• Permanency Caseworkers |

Wyatt_PK0004225
Exhibit 7
Page 94 of 98

**Public**Knowledge

| Focus Group Question | Research Question | Participant Group |
|---|---|---|
| | | • Permanency Casework Supervisors |
| 63. Does CW utilize a case review process to inform and improve individualized assessments for children and families? | 7 | • Central Office<br>• District Managers |
| 64. Does CW leadership encourage individualized assessments for children and families? | 7 | • Central Office<br>• District Managers |
| 65. Does CW maintain a sufficient capacity of substitute care placements to serve children living with high needs? | 8 | • Central Office<br>• Permanency Caseworkers |
| 66. Does CW provide appropriate services to meet children's identified needs? | 8 | • Central Office<br>• District Managers |
| 67. Does CW provide appropriate services to meet the identified needs of children who identify as LGBTQIA+? | 8 | • Central Office<br>• District Managers<br>• Caseworkers<br>• Casework Supervisors |
| 68. Does CW provide services and supports to the family throughout the duration of the case to prepare for reunification? | 8 | • Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 69. Does CW address the underlying conditions for removal before returning children to their parents' care? | 8 | • Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 70. Does CW adequately assess independent living skills? | 8 | • District Managers<br>• Permanency Caseworkers |
| 71. Does CW provide services based on the assessment of a youth's independent living skills and needs? | 8 | • Permanency Caseworkers<br>• Permanency Casework Supervisors |

Wyatt_PK0004226<br>Exhibit 7<br>Page 95 of 98

| Focus Group Question | Research Question | Participant Group |
|---|---|---|
| 72. Does CW provide services necessary to parents so they can achieve case goals? | 8 | • Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 73. Does CW provide services necessary to parents in order to support them meeting their conditions for return? | 8 | • Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 74. In what ways does CW provide safe spaces for youth who identify as LGBTQIA+? | 8 | • Central Office<br>• District Managers<br>• Caseworkers<br>• Casework Supervisors<br>• Adoption Section Staff<br>• Safety Consultants |
| 75. In what ways does CW provide services that address sexuality, gender-based needs, and the process of coming out for LGBTQIA+ youth? | 8 | • Central Office<br>• District Managers<br>• Caseworkers<br>• Casework Supervisors |
| 76. Does CW utilize a case review process to inform and improve the barriers and strengths in providing services to meet the needs of children and families? | 8 | • Central Office<br>• District Managers |
| 77. Does CW ensure that services are provided as recommended in the case plan? | 9 | • District Managers<br>• Casework Supervisors |
| 78. Does CW adequately involve families throughout the case planning process? | 9 | • Caseworkers<br>• Casework Supervisors |
| 79. Does CW adequately involve tribes throughout the case planning process? | 9 | • Central Office<br>• District Managers |
| 80. Does CW provide training and coaching for staff on best practices in case planning? | 9 | • Caseworkers |

Wyatt_PK0004227
Exhibit 7
Page 96 of 98

**PublicKnowledge**

| | Focus Group Question | Research Question | Participant Group |
|---|---|---|---|
| 81. | Does CW utilize case review processes for identifying and improving barriers to case planning? | 9 | • District Managers<br>• Casework Supervisors |
| 82. | Does CW leadership advocate for improving case planning? | 9 | • Central Office<br>• District Managers |
| 83. | Does CW allow for sufficient and quality family interactions between children and parents to preserve family connections? | 10 | • Caseworkers<br>• Casework Supervisors |
| 84. | Does CW facilitate sufficient family interaction to prepare parents and children for reunification? | 10 | • Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 85. | Does CW maintain the child's connections to their community, faith, extended family, tribe, and school? | 10 | • District Managers<br>• Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 86. | Does CW facilitate contact between children and their siblings in accordance with the Family Support Services Case Plan? | 10 | • Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 87. | Does CW prioritize placing siblings together when possible and appropriate? | 10 | • Permanency Caseworkers<br>• Permanency Casework Supervisors |
| 88. | Does CW provide training and coaching for staff on best practices for maintaining connections with children, their families (including siblings), and their community, faith, extended family, tribe, and school? | 10 | • Permanency Caseworkers |
| 89. | Does CW utilize a case review process that informs and improves connections with children, their families (including | 10 | • District Managers<br>• Permanency Caseworkers |

Wyatt_PK0004228
Exhibit 7
Page 97 of 98

| Focus Group Question | Research Question | Participant Group |
|---|---|---|
| siblings), and their community, faith, extended family, tribe, and school? | | • Permanency Casework Supervisors |
| 90. Does CW leadership encourage improving connections between children in substitute care and their families? | 10 | • Central Office<br>• District Managers |
| 91. Does CW provide support to its workforce to prevent staff turnover? | 11 | • Central Office<br>• District Managers<br>• Caseworkers<br>• Casework Supervisors<br>• Safety Consultants<br>• Adoption Section Staff |
| 92. Does CW regulate caseloads for caseworkers to ensure they can meet the needs of children and families under their supervision? | 11 | • District Managers<br>• Caseworkers<br>• Casework Supervisors |
| 93. Does CW adequately train caseworkers prior to their direct work with families? | 11 | • Caseworkers |
| 94. Does CW adequately train caseworkers on an ongoing basis? | 11 | • Caseworkers |
| 95. In what ways does CW provide adequate supervision to child welfare caseworkers and middle managers? | 11 | • District Managers<br>• Casework Supervisors |

Wyatt_PK0004229
Exhibit 7
Page 98 of 98



# Oregon Child Welfare Review Draft Assessment Findings Report

**Report to**: Markowitz Herbold
**Date:** December 15, 2023



## PUBLIC KNOWLEDGE®

600 Airport Rd,
Lakewood, NJ, 08701-5995
www.pubknow.com
in/ public-knowledge-llc

Stacey Moss, President
smoss@pubknow.com
(307) 223-1461

Exhibit 8
Page 1 of 390

**PUBLIC KNOWLEDGE**®

# Table of Contents

| | | |
|---|---|---|
| 1 | Executive Summary | 1 |
| 2 | Assessment Scope | 6 |
| 2.1 | Guiding Principles | 6 |
| 2.2 | Constraints | 8 |
| 2.2.1 | COVID–19 Pandemic | 8 |
| 2.2.2 | Disconnect Between Data and Perception | 10 |
| 2.2.3 | Departure of Rebecca Jones Gaston | 10 |
| 2.2.4 | Unknown Timeframe | 11 |
| 2.2.5 | Inconsistent Policy Dates | 11 |
| 2.3 | Assumptions | 11 |
| 3 | Methodology | 12 |
| 3.1 | Inquiry Protocol | 12 |
| 3.2 | Research Questions | 13 |
| 3.3 | Data Collection | 14 |
| 3.3.1 | Interview Protocol | 14 |
| 3.3.2 | Focus Group Protocol | 14 |
| 3.3.3 | Survey Protocol | 15 |
| 3.3.4 | Document Review | 15 |
| 4 | Findings | 16 |
| 4.1 | CW made progress to improve safety for children under ODHS supervision | 16 |
| 4.1.1 | Key Themes | 16 |
| 4.1.2 | Implementation of 2016 Recommendations: Summary of Key Theme | 17 |
| 4.1.3 | Vision for Transformation: Summary of Key Theme | 23 |
| 4.1.4 | Implementation of the Oregon Child Abuse Hotline (ORCAH): Summary of Key Theme | 24 |
| 4.1.5 | New Ways to Assess Safety: Summary of Key Theme | 29 |
| 4.1.6 | Using Data to Improve Safety: Summary of Key Theme | 32 |
| 4.1.7 | Contextual Factors: Child and Family Services Review Findings | 34 |

Exhibit 8
Page 2 of 390

| | | |
|---|---|---|
| 4.2 | CW made significant progress to improve the agency culture | 35 |
| 4.2.1 | Key Themes | 35 |
| 4.2.2 | Leadership Vision: Summary of Key Theme | 36 |
| 4.2.3 | Leadership Modeling: Summary of Key Theme | 37 |
| 4.2.4 | Worker Safety: Summary of Key Theme | 39 |
| 4.3 | CW made consistent progress to improve data-driven decision-making and quality of services | 42 |
| 4.3.1 | Key Themes | 42 |
| 4.3.2 | Continuous Quality Improvement (CQI): Summary of Key Theme | 43 |
| 4.3.3 | Data Capacity: Summary of Key Theme | 44 |
| 4.3.4 | Use of Data to Improve Service Quality: Summary of Key Theme | 45 |
| 4.4 | CW made progress during the identified timeframe to improve recruitment, retention, and the support of resource parents | 46 |
| 4.4.1 | Key Themes | 47 |
| 4.4.2 | Diligent Recruitment: Summary of Key Theme | 48 |
| 4.4.3 | Resource Home Capacity: Summary of Key Theme | 50 |
| 4.4.4 | Training Supports: Summary of Key Theme | 52 |
| 4.4.5 | Placement Matching: Summary of Key Theme | 54 |
| 4.4.6 | Service Provision to Caregivers: Summary of Key Theme | 55 |
| 4.4.7 | Tracking Capacity: Summary of Key Theme | 56 |
| 4.5 | CW made progress during the identified timeframe to improve permanence for children in substitute care | 57 |
| 4.5.1 | Key Themes | 57 |
| 4.5.2 | Qualitative Evidence of Improvement: Prioritizing Permanence | 58 |
| 4.5.3 | Placement Matching: Summary of Key Theme | 60 |
| 4.5.4 | Placement Stability: Summary of Key Theme | 61 |
| 4.5.5 | Timeliness to Permanence: Summary of Key Theme | 62 |
| 4.5.6 | Temporary Lodging: Summary of Key Theme | 64 |
| 4.6 | CW made significant progress to improve permanency planning | 66 |
| 4.6.1 | Leadership Prioritization: Summary of Key Theme | 67 |

Exhibit 8
Page 3 of 390

4.6.2    Family Engagement: Summary of Key Theme                                    69

4.7    CW made progress to improve individualized assessments for children and
       families                                                                      71

       4.7.1    Key Themes                                                            72

       4.7.2    Contextual Factors: Vision for Transformation                         72

       4.7.3    Contextual Factors: Child and Family Services Review Findings         72

       4.7.4    Family Engagement: Summary of Key Theme                               73

       4.7.5    Scope of Assessments: Summary of Key Theme                            74

4.8    CW made progress to improve service provision that meets the assessed needs
       of children and families                                                      75

       4.8.1    Key Themes                                                            75

       4.8.2    Cross-System Collaboration: Summary of Key Theme                      76

       4.8.3    Process Improvements: Summary of Key Theme                            77

       4.8.4    Targeted Services: Summary of Key Theme                               79

4.9    CW made consistent progress to improve case planning processes                80

       4.9.1    Case Plan Completion: Summary of Key Theme                            81

       4.9.2    Inclusion in Case Planning: Summary of Key Theme                      82

4.10   CW made significant progress in preserving and improving connections between
       children in substitute care and their families and communities                83

       4.10.1   Key Themes                                                            84

       4.10.2   Quantitative Evidence of Improvement                                  84

       4.10.3   Family Interaction: Summary of Key Theme                              86

       4.10.4   Relative Placement: Summary of Key Theme                              90

       4.10.5   Sibling Connections: Summary of Key Theme                             92

       4.10.6   Community Connections: Summary of Key Theme                           93

4.11   CW made progress during the identified timeframe to improve staffing resources
                                                                                     95

       4.11.1   Key Themes                                                            95

       4.11.2   Staff Recruitment and Retention: Summary of Key Theme                 96

       4.11.3   Caseload Management: Summary of Key Theme                             98

Exhibit 8
Page 4 of 390

4.11.4    Training and Coaching: Summary of Key Theme                    102

Appendix A: Supplemental Evidence                                        105

1    Child Safety                                                        105

1.1    Implementation of 2016 Recommendations                           105

1.2    Implementation of the Oregon Child Abuse Hotline (ORCAH)          107

1.3    New Ways to Assess Safety                                        111

1.4    CFSR Findings                                                    113

2    Agency Culture                                                     115

2.1    Leadership Vision                                                115

2.2    Leadership Modeling                                              115

2.3    Worker Safety                                                    115

3    Data–Driven Decision–Making                                        118

3.1    Continuous Quality Improvement                                   118

3.2    Data Capacity                                                    120

4    Recruitment, Retention, and Support                               121

4.1    Diligent Recruitment                                            121

4.2    Resource Home Capacity                                          122

4.3    Training Supports                                               124

4.4    Placement Matching                                              125

5    Permanence                                                        126

5.1    Prioritization of Permanence                                    126

5.2    Placement Matching                                              128

5.3    Placement Stability                                             130

5.4    Timeliness                                                      131

5.5    Temporary Lodging                                               133

6    Permanency Planning                                               134

6.1    Leadership Prioritization of Permanency Planning                134

6.2    Family Engagement in Permanency Planning                        136

7    Individualized Assessments                                        137

Exhibit 8
Page 5 of 390

7.1   Family Engagement                                          137

7.2   Scope of Assessments                                       137

8   Service Provision                                            144

8.1   Cross–System Collaboration                                 144

8.2   Process Improvements                                       145

8.3   Targeted Services                                          146

9   Case Planning                                               149

9.1   Case Plan Completion                                       149

9.2   Inclusion in Case Planning                                 150

9.3   CFSR Data                                                  150

9.4   Vision for Transformation                                  151

10   Preserving and Improving Connections                       152

10.1   Family Interaction                                        152

10.2   Relative Placements                                       161

10.3   Sibling Connections                                       163

10.4   Community Connections                                     166

11   Staffing Resources                                         168

11.1   Staff Recruitment and Retention                          168

11.2   Caseload Management                                       168

11.3   Training and Coaching                                     169

Appendix B: Key Terms                                           171

Appendix C: Entities                                            202

Appendix D: Data Sources                                        204

Appendix E: Survey Results                                      261

Appendix F: Survey Protocol                                     262

Appendix G: Interview Protocol                                  269

Appendix H: Focus Group Protocol                                278

Appendix I: Staffing Information                                293

Appendix J: Stacey Moss CV                                      295

Exhibit 8
Page 6 of 390



Exhibit 8
Page 7 of 390

**PUBLIC KNOWLEDGE®**

# 1   Executive Summary

In 2016, Public Knowledge® (PK) was engaged by the State of Oregon to complete an independent review of the Oregon Department of Human Services (ODHS) delivery of child welfare services. Public Knowledge® presented findings and recommendations for improving Oregon's child welfare system in the 2016 *Child Safety in Substitute Care Final Report*.

For this review, PK conducted a comprehensive independent assessment of ODHS' child welfare policies, procedures, leadership, data, and improvement efforts made since 2016. The PK team collected and analyzed primary and secondary data on the Oregon Child Welfare System using findings from the 2016 *Child Safety in Substitute Care Final Report* and the Complaint as a baseline for the research questions. PK found that Oregon has made progress throughout the child welfare system since 2016. Children and families involved in the child welfare system are better off today than in 2016. Far from being deliberately indifferent, Child Welfare has consistently worked to meet the needs of children and young adults under its supervision, and is committed to continuously improving its service delivery.

> Our overall finding is that Oregon CW **has made progress** for children, young adults, and families since 2016.

PK's analysis concluded that CW has made progress for children, young adults, and families in many areas of practice since 2016. The supporting findings, outlined in the table below, demonstrate ODHS's commitment to transforming child welfare in Oregon. This assessment was filtered through 11 research questions covering the various areas of child welfare practice in Oregon. In addition to the overarching progress finding, PK produced a finding for each research question. Section 4 of this report provides additional detail on the supporting evidence for each finding and illustrates the strategies and approaches CW took to improve services and outcomes. Of the 11 research areas, PK found that CW has made significant progress in four. The findings below reflect CW's progress since 2016, while acknowledging there is more work to do in areas such as tracking the capacity of resource homes, placement stability, timeliness to permanence, statewide service provision, and staff training.

Exhibit 8
Page 8 of 390



### Table 1. Research Question Findings

| Research Question Topic | Finding |
|---|---|
| **Safety for Children Under Child Welfare Supervision** | Since 2016, **Oregon made progress** in this area by implementing multiple recommendations from the 2016 *Oregon Department of Human Services Child Safety in Substitute Care Independent Review*. CW also implemented the Vision for Transformation in 2020 with safety at the forefront. CW has made progress since 2016 in assessing safety through reporting and screening allegations, timeliness of assessments, in-home services, enhancing the safety of children in substitute care, and using data to improve safety. |
| **Organizational Culture of Child Welfare** SIGNIFICANT PROGRESS | Since 2016, **Oregon has made significant progress** in improving and prioritizing the agency culture led by the Vision for Transformation. The Executive Leadership Team infuses the Vision for Transformation's guiding principles into each aspect of child welfare practice. |
| **Data-Driven Decision-Making and Quality of Services Offered** | Since 2016, **Oregon has made consistent progress** to improve data-driven decision-making and the quality of services. Building capacity to be data-driven has been a leadership priority, evidenced by regular technology upgrades and a solid financial investment. Data-driven decision-making is a priority for national child welfare practice, and CW's focus is encouraging improvement. |
| **Resource Parent Recruitment, Retention, and Support** SIGNIFICANT PROGRESS | Since 2016, **Oregon has significantly improved** recruitment, training, and support to resource families. CW has implemented targeted recruitment to meet the needs of specific children and is collaborating across the child-serving system to increase capacity for resource homes. CW has increased service provision to resource families and improved the training based on feedback from resource parents and community members. While CW has yet to improve the ability to track the capacity of resource homes, this does not outweigh the significant progress in other areas. These improvements in practice have not yet resulted in better outcomes for children, as Oregon's placement stability data has not improved. |

Exhibit 8
Page 9 of 390



## Table 1. Research Question Findings

| Research Question Topic | Finding |
| --- | --- |
| Permanence for Children in Substitute Care | Since 2016, **Oregon Child Welfare has made progress** in improving the prioritization of permanency for children in substitute care through the Vision for Transformation and its initiatives. Despite the improvements, the data shows that it has taken longer for children and young adults to reach permanence over the past two years, due in part to delays because of COVID-19. |
| Permanency Planning SIGNIFICANT PROGRESS | **Child Welfare made significant progress** to improve permanency planning during the identified timeframe. This progress is evidenced by a shift from compliance to engagement in the work with families, the appointment of a Deputy Director with a rich history in permanency practice, the convening of a Permanency Advisory Council, the use of the CANS assessment to create data–driven permanency plans, and more timely permanency hearings. |
| Individualized Assessments for Children and Families | Since 2016, **CW has made progress** by expanding the use of existing assessments and added new assessments and policies to gather information from children, young adults, and families. The scope of the assessments CW offers allows caseworkers and supervisors to gather a comprehensive picture of each family's needs to tailor the services, permanency plan, and case plan appropriately. |
| Service Provision Based on Assessed Needs | Since 2016, **CW has improved** service provision that meets the assessed needs of children and families. It is an ongoing challenge for CW to provide the breadth and depth of services to meet the complex needs of children who are in out of home care, however, evidence from surveys, focus groups, and CFSR results indicates that there has been substantial improvement in the ability of CW to meet children's mental health needs. CW has also expanded partnerships and collaboration to expand access to services, but there is still concern that service availability is uneven throughout the state. |

Exhibit 8
Page 10 of 390

**PUBLIC KNOWLEDGE®**

### Table 1. Research Question Findings

| Research Question Topic | Finding |
|---|---|
| **Case Planning** | Since 2016, **CW has improved** completion of case plans as well as including families and tribes in the process. CW has implemented tools such as quality assurance (QA), continuous quality improvement (CQI), and the Family Report to focus on case planning and ensuring the plans are inclusive. |
| **Family and Community Connections for Children in Substitute Care** <br> `SIGNIFICANT PROGRESS` | Since 2016, **Oregon has made significant progress** in this area, framed by the Vision for Transformation and multiple new efforts to connect children to their families and communities. The Vision for Transformation underscores the importance of these connections by stating: "We all know that infants, children, adolescents, and young adults do best growing up in a family that can provide love, support, life-long learning, shared values, and important memories."[1] |
| **Child Welfare Staffing Resources** | **Oregon made progress** in improving staffing resources during the specified timeframe. CW has expanded the leadership team to prioritize equity, training, and workforce considerations and has started tracking caseload data to manage workloads. Even so, CW has had challenges in providing training for caseworkers despite increasing training and coaching resources. |

One key aspect of CW's commitment to progress and improvement is the **Vision for Transformation** which CW introduced in 2020. The Vision for Transformation outlines CW's goal to transform the Child Welfare Division into one that "supports the individual needs of families and best serves Oregon's children and young people."[2] The Vision for Transformation is framed by three guiding principles demonstrating CW's comprehensive commitment to improvement: supporting families and promoting prevention, enhancing staff and infrastructure, and enhancing the system's structure by using data with continuous quality improvement. Since launching the Vision for Transformation, CW has changed practice across the state and engaged partners, staff, stakeholders, and those with lived experience to inform this transformation. CW also built a continuous quality

---

[1] Oregon Department of Human Services. (2020). *Oregon Child Welfare Division Vision for Transformation* – https://sharedsystems.dhsoha.state.or.us/DHSForms/Served/de2445.pdf

[2] About the Vision for Transformation. https://www.oregon.gov/odhs/child-welfare-transformation/pages/default.aspx

improvement (CQI) system to inform implementation, acknowledge strengths, and identify gaps from which to improve.

Along with the progress initiated by CW, the Oregon legislature has made significant investments over the past several years to improve CW outcomes. These investments include millions of dollars for new positions to recruit resource and respite families, development of a comprehensive child welfare information system (CCWIS), staffing the Oregon Child Abuse Hotline (ORCAH), development of a mentoring program, development and implementation of child welfare training, supporting the Independent Living Program, and designing Family Preservation Services. In addition to funding for staffing, ODHS and CW received funds for programs such as KEEP (Keeping Foster and Kin Parents Supported and Trained), therapeutic foster care, increases to rates for behavioral rehabilitation services, mental health services, independent living, respite care, transportation, in-home services, and support to families and providers during the COVID-19 pandemic.

The legislature also recently approved increases for rates paid to resource families, which will go into effect in July 2024. This financial support from the legislature prioritizes the work of CW and reinforces the progress ODHS and CW have made in recent years. Child welfare agencies across the country typically operate on limited budgets, and these investments from the legislature demonstrate confidence in the direction CW has been heading in the last several years.

This assessment was conducted with the lens of implementation science, which shows that progress and improvement should be slow and planful. As explained in the Guiding Principles below, planful implementation takes time and occurs in stages.[4] The goal should be a commitment to continued improvement and a consistent evaluation of progress and continued needs. Oregon CW has made such a commitment by acknowledging their progress while simultaneously having plans in place to continue improving.

# 2  Assessment Scope

In April 2019, a federal class action lawsuit was filed against Oregon's Governor Kate Brown and the Oregon Department of Human Services child welfare system and its leaders. The state contracted with PK to assess the progress that ODHS' Child Welfare Division (CW) has made to improve the child welfare system since 2016. This assessment reviewed the policies, programs, and data for the Oregon Child Welfare System from September 2016 to present. The scope of this assessment includes all children under CW supervision, with a particular focus on children in substitute care and those in the subclasses included in the pleadings:

- Children living with high needs referred to as the "ADA sub-class" in the complaint.
- Older young adults referred to as the "aging out sub-class" in the complaint.
- Children or young adults who identify as LGBTQIA2S+ referred to as the "SGM sub-class" in the complaint.[3]

The scope of this assessment is broader than the 2016 *Child Safety in Substitute Care Final Report.* There are 11 areas of focus, represented by the 11 research questions, whereas in 2016 there were two. In 2016, the focus was on the capacity of substitute care placements to meet the needs, and CW's responses to abuse in substitute care. In contrast, this assessment includes policy and program changes across the child welfare system, especially on child safety and meeting the needs of children and families. The 2016 assessment included only children in substitute care, but this assessment incorporates all children under ODHS supervision. Despite these differences, the two assessments address similar topics including appropriate and inappropriate placement decisions, determination of needs, preparation of resource parents, recruitment of resource parents, retention and support of resource parents, communication throughout the child welfare system, addressing bias in screening and placement, the capacity of and appropriate resource home resources, and determination of appropriate providers.

## 2.1  Guiding Principles

The following principles guided this assessment. They are based on the guiding principles that also guided the 2016 assessment, with some adjustments for the broader scope of this review.

---

[3] Class Action Complaint, *Wyatt B. et al., v. Brown, et al.*, USDC, District of Oregon, Case No. 3:19-cv-00556.

- **Measure progress by incremental effort and improvement.** Progress does not require achievement of a particular outcome or standard but rather improvement from the baseline data at the start of the identified timeframe.

- **Apply the tenets of implementation science to policy and practice changes.** Using implementation science requires defining effective interventions, establishing how practice needs to change, identifying responsible parties, and pinpointing where in the system the effective interventions will be most successful. To achieve positive and sustainable outcomes interventions must be research-based, tailored to children and families' needs, implemented deliberately and in an adaptive manner, and supported by an engaged environment and intentional learning. This deliberate implementation takes time and occurs in stages, including exploration, installation, initial implementation, and full implementation.[4] CW has implemented new and improved practice across the system, and it will take time to see the full impact of those changes.

- **Consider the implications for all children under CW supervision.** The scope of the assessment includes all children under CW supervision, with a particular focus on children in substitute care. Specific consideration for each research question will be given to members of each subclass referenced in the complaint.

- **Use a child-driven perspective.** Be guided first and foremost by the child's experience. The goal of this assessment is to recognize systemic improvements made to improve the experience of children in CW supervision and keep them safe throughout the duration of their case.

- **Measure improvements in agency culture by the increased prioritization of child safety.** Leadership drives agency culture through development and implementation of its mission and vision. The agency culture was evaluated through the lens of its commitment to prioritizing child safety in policies, rules, and procedures. Leadership messaging, communications, priorities identified in continuous quality improvement processes, and allocation of staff resources were assessed. Organizational culture is difficult to quantify, so progress in the agency culture was measured by the commitment to prioritizing child safety in policies, rules, and laws.

- **Base findings on facts and be transparent about sources.** Throughout this review, PK began with facts and quantitative data where possible and corroborated with qualitative data. PK also included the perceptions of stakeholders as a data source

---

[4] National Implementation Research Network (NIRN) and Casey Family Programs. (August 2017). *Implementing Evidence-Based Child Welfare: The New York City Experience.* https://nirn.fpg.unc.edu/sites/nirn.fpg.unc.edu/files/resources/evidence-based-child-welfare-nyc.pdf (*See generally* pp. 17–18)

Exhibit 8
Page 14 of 390

about their experiences in the child welfare system and how those experiences influence policy and systems change. PK cited sources for each finding.

- **Apply systems thinking to see the whole picture.** The lengthy list of subtopics in this review allowed PK to meaningfully research the overarching question of improving safety for children in foster care. PK believes the topics covered by each research question encompass the salient aspects of the child welfare system and allowed for comprehensive assessment of system improvements and areas still needing attention. Research on implementation science shows that implementation takes three to five years, and if organizations maintain fidelity to policy and practice models are followed, improvements will be seen in the quanititative and qualitative data.

## 2.2    Constraints

### 2.2.1 COVID-19 Pandemic

The global pandemic impacted the assessment in multiple ways. The first impact required PK to hold all interviews, focus groups, and meetings virtually.

The pandemic also impacted the workforce by complicating the availability of stakeholders, adding strain associated with working remotely, and eventually adding pressure with having to return to in-person work. Although working remotely did cause stress for workers, the virtual environment also lessened their workload and allowed them to be more productive because they conducted their tasks virtually and did not spend time traveling to meetings and court hearings.[5]

Recent data cannot draw the conclusion that the pandemic increased or decreased vacancy rates[5], however, CW leadership received anecdotal evidence that workforce retention decreased during the pandemic in some areas of Oregon due in part to the statewide COVID-19 vaccine mandate that was implemented in October 2021. However, there is no exit data specifically stating that members of the workforce left due to the mandate, and the retention data shows that only a small number of staff left due to the mandate. Staff retention rates were steady prior to the vaccine requirements and up until October 2021. Staff exits in 2022 are likely part of the global Great Resignation.

Although, the vaccine mandate did have an impact in another way. ODHS staff were able to request a waiver to the vaccine mandate, and Human Resources (HR) staff were responsible for responding to the waiver requests, leaving them unable to focus on compensation, new

---

[5] Effective System Innovations. (2023). *COVID-19 Pandemic Effects on Services for Children and Young Adults*, Oregon Department of Human Services and Oregon Health Authority. https://www.oregon.gov/odhs/data/cwdata/cw-pandemic-effects-report-2023-04-06.pdf (p. 11)

hires, and other workforce recruitment efforts. CW leadership shared that some HR processes were delayed months due to the need to respond to vaccine waiver requests.

In addition to the impact to ODHS and CW staff, the pandemic restrictions caused workforce shortages in mental health, residential treatment, substance use treatment, and other services. These shortages had a broader impact on service delivery and prevented timely access for children and families. These deferred mental health assessments and services prevented children and parents from participating in required services, leading to delays in permanency outcomes.

The number of resource homes decreased by 16 percent during the pandemic, and the number of new certifications decreased by 30 percent between March 2020–March 2022.[5] Because the number of children and young adults in care has also decreased, the ratio of children and young adults to available resources continues to improve. Child welfare data shows that between December 2019 and April 2023, the number of total resource homes decreased from 4,021 to 3,026, and the number of children in care decreased from 7,136 to 4,857.[6]

Court closures during COVID–19 delayed the timeliness of hearings and, subsequently, time to permanence. Court decision–making was impacted due to the closures and reopening of local courts and the statewide inconsistency of these openings and closures following COVID–19 lockdowns. Oregon did not pass CFSR Item 6 (whether the agency made concerted efforts to achieve reunification, guardianship, adoption, or other planned permanent living arrangements) in 2016, and the delays in hearings prevented ODHS from making progress on their PIP for this item.

Due to these restrictions, initial placements and placement changes required quarantine before initial placement or change of placement. Some quarantine placements were available, and increased stipends were provided to resource parents and Behavior Rehabilitation Services (BRS) willing to care for children and young adults with COVID–19.

Depending on travel restrictions, family interaction was limited, including visits to family in different counties or states. Delaying family visits created setbacks for permanency outcomes as caseworkers were unable to assess the success of family interaction.

Unhoused families faced additional challenges as low-income housing was less accessible during the pandemic. The Children's Public Private Partnership (CP3)[7] program worked with ODHS to support families involved in the child welfare system to help children exit foster care and access affordable housing. The pilot CP3 program in Marion County began in

---

[6] ODHS Child Welfare Division Progress Report. (May 2023). https://www.oregon.gov/odhs/child-welfare-transformation/progressreports/cw-progress-report-2023-05.pdf (p. 10)

[7] Children's Public Private Partnership. www.cp3oregon.org

2020 and supported over 37 children and families. Additionally, CW partnered with Every Child, an agency dedicated to recruiting resource families, early in the pandemic to address the retention of resource parents. Every Child expanded their My NeighbOR program, which provides clothing, groceries, and educational support to families and youth involved with foster care, to families of origin in 2020.

Statewide, the state experienced a nearly 20 percent drop in the number of children out of home during the pandemic, reaching a low of 5,552. That is down from 9,745 at the start of 2006 and from a more recent 2018 peak of nearly 7,900. The number of placements has not been lower since the state began tracking the metric.

## 2.2.2 Disconnect Between Data and Perception

During this assessment, individual perceptions were gathered from interviewees and focus group participants, then compared to quantitative data. There were multiple instances where the qualitative responses did not match the quantitative data, highlighting a disconnect between impressions, perceptions, and the evidence. One example is the shared opinion that caseworkers had very high caseload numbers and their workloads were unmanageable, but the quantitative data do not agree.

This disconnect also demonstrates the lag between initial implementation and statewide adoption and is expected when implementing new initiatives, policies, or requirements. As discussed earlier in this report, implementation science shows that organizational change takes time. PK saw this in different areas of this assessment and heard from both staff and leadership that CW was progressing, but more work was needed.

## 2.2.3 Departure of Rebecca Jones Gaston

Ms. Jones Gaston led the agency from November 2019 until she left Oregon for the federal Administration for Children and Families in December 2022. Her three-year tenure exceeded the average of child welfare directors nationally, with many directors turning over every 18–24 months. Ms. Jones Gaston steered the development of the Vision for Transformation, which guided CW through an organizational culture shift and informed revisions of policy, procedure, and practice to focus on equity and workforce development. Aprille Flint-Gerner was promoted from Child Welfare Deputy Director to Child Welfare Director in July 2023. Ms. Flint-Gerner, along with Lacey Andresen, who has served as Child Welfare Deputy Director for over three years, continue to move the Vision for Transformation forward.

## 2.2.4 Unknown Timeframe

The expected trial date for this case is unknown and subject to change due to a myriad of factors, including restrictions related to COVID-19. Collecting data is a point-in-time activity, and data were current when this report was submitted.

## 2.2.5 Inconsistent Policy Dates

PK's review included a comparison of the 2016 Oregon Child Welfare Procedure Manual and the Oregon Child Welfare Procedure Manual dated October 4, 2021. This review revealed that certain appendices in the 2016 version are dated 2018, leading to an unknown error in updates by date.

## 2.3    Assumptions

- **Document Retention.** During a typical assessment, PK would not retain notes from focus groups and interviews beyond the drafting of the findings. The nature of this project and the lawsuit required the retention of those notes. These notes are working documents and prone to grammatical errors. They are also from one data point rather than themes and should not be used to make conclusions or findings.

- **Terminology.** "Child" and "young adult" are used interchangeably throughout this report. The Oregon Department of Human Services Child Welfare Procedure Manual is referred to by its full title or simply by "Procedure Manual." PK's assessment reviewed the 2016 Procedure Manual, and the version of the 2021 Procedure Manual dated October 4, 2021.

- **Baseline Data.** For the research questions that were not based on findings in the 2016 review, the baseline was set from data within the same time in 2016. For example, Oregon completed Round 3 of the Child and Family Services Review (CFSR) in September 2016, so data are included in this assessment that originated from the CFSR results.

**PUBLIC KNOWLEDGE**®

# 3   Methodology

## 3.1    Inquiry Protocol

PK's Seven–Element Inquiry Protocol, shown in the figure below, aims to ensure understanding of the strategies, tools, and techniques the review team employed to conduct this comprehensive assessment. This protocol is Public Knowledge®'s methodology for all assessments regardless of the project.

**Figure 1. Seven–Element Inquiry Protocol**





## 3.2    Research Questions

The assessment centered on the research questions, which were developed by starting with the overarching focus of keeping children safe while they are under the supervision of CW, whether they remain in their homes or are placed in substitute care. Following a thorough review of the pleadings, the Public Knowledge® *2016 Child Safety in Substitute Care Independent Review Final Report*, and supporting documents, PK identified a broad list of topical areas represented by the top of the hourglass in Figure 2, below. From there, PK narrowed the focus on each part of the child welfare system to build the 11 questions, represented by the narrowest part of the hourglass. PK then expanded on these to develop a comprehensive set of inquiry questions represented by the bottom of the hourglass.

**Figure 2. Approach to Developing Research Questions**

Public Knowledge Approach to Developing
Research Questions

**Narrow to Broad**
The process narrows the scope then broadens the depth of inquiry after the scope is defined.

*Funneling*

**Inquiry Question**
Narrowing the scope allows you to get to the actual question you are trying to answer.

*Pyramiding*

The research questions evaluated the following topic areas:

1.  Safety for children under child welfare supervision

2.  The organizational culture of child welfare

3.  Data-driven decision-making and quality of services offered

4.  Resource parent recruitment, retention, and support

5.  Permanence for children in substitute care

6.  Permanency planning

7.  Individualized assessments for children and families

8.  Service provision based on assessed needs

9.  Case planning

10. Family and community connections for children in substitute care

11. Child welfare staffing resources

The findings for each topical area are outlined in section four.

# 3.3    Data Collection

The methodological approaches were qualitative and quantitative. Data was collected from multiple sources, including child welfare staff, stakeholders, and leadership. Systemic and individual outcomes were analyzed. The data analysis included collecting and visualizing quantitative data and studying qualitative data collected during interviews, focus groups, and the online survey. This approach provides the most comprehensive data, including outcomes from the quantitative analyses provided during the interviews, focus groups, and survey responses. The analysis included data gathered from interviews, focus groups, an online survey, and the review of relevant documents.

These inputs to the assessment process allows PK to provide a comprehensive review and answer all 11 research questions.

## 3.3.1 Interview Protocol

The PK team conducted 27 individual interviews with key participants to gather their perspectives on progress made since 2016. PK interviewed management and leadership staff to gather their views on the current and recent past state of the child welfare system in Oregon. Four interviewees have interviewed twice: Rebecca Jones Gaston, Aprille Flint-Gerner, Lacey Andresen, and Kristen Khamnohack. Ms. Jones Gaston, Ms. Flint-Gerner, and Ms. Andresen were interviewed again to discuss the upcoming change in organizational structure with Ms. Jones Gaston's departure, and Ms. Khamnohack was interviewed a second time to gather additional information specific to the Oregon Child Abuse Hotline (ORCAH).

## 3.3.2 Focus Group Protocol

The PK team facilitated 11 role-based focus groups to allow members of different groups within child welfare to share their opinions and feedback. Focus groups allowed participants to share experiences with their peers, and the shared discussion encouraged engagement in the conversation. Focus group participants were invited from all areas of the state and included a mix of large, small, urban, and rural counties. The Oregon child welfare system tenure for focus group participants ranged from 4 months to 37 years.

### 3.3.3 Survey Protocol

The PK team administered an online survey to collect information from various stakeholder groups. The purpose of the survey was to gather feedback widely from members of the child welfare division. The survey allowed PK to collect qualitative data from a larger statewide sample of CW employees than was possible with interviews and focus groups.

The survey was open for three weeks to provide participants ample time to share their feedback, and several reminders were sent during that period. Approximately 1,800 child welfare staff were invited to complete the survey, and 958 people participated, producing a 53 percent response rate.

### 3.3.4 Document Review

The PK team reviewed relevant documents, including policies, procedures, statutes, data, and reports to research progress made since 2016. Appendix D is a comprehensive list of documents relied upon, considered, or provided to PK by counsel for the Defendants in this case. To formulate the findings, these supporting documents were compiled with the previous qualitative data analyses and the quantitative analyses described in the next section.

# 4    Findings

## 4.1    CW made progress to improve safety for children under ODHS supervision

**Finding: Since 2016, Oregon improved safety for children under ODHS supervision.**
ODHS implemented many recommendations from the 2016 *Oregon Department of Human Services Child Safety in Substitute Care Independent Review.* CW also began implementing the Vision for Transformation in 2020 with safety at the forefront. CW has made progress since 2016 in assessing safety through screening allegations and during in-home services, improving the timeliness of assessments, enhancing the safety of children in substitute care, and using data to improve safety.

### 4.1.1  Key Themes

**Table 2. Key Themes**

| Key Theme | Description |
|---|---|
| Implementation of Recommendations from PK's 2016 Report | CW implemented recommendations from Public Knowledge®'s 2016 Report, including redesigning the process of responding to allegations of abuse in care, implementing the centralized Oregon Child Abuse Hotline (ORCAH), developing a standard for closed at screening, and developing procedures for appropriate community involvement to mitigate safety issues for children. |
| Implementation of the Vision for Transformation | In 2020, CW implemented the Vision for Transformation, intended to completely transform the child welfare system in Oregon. The goal of the Vision for Transformation is that "all children experience safe, stable, healthy lives and grow up in the care of a loving family and community."[8] |
| Implementation of a Centralized Child Abuse Hotline | In 2019, CW launched the Oregon Child Abuse Hotline (ORCAH), centralizing all reports of abuse and neglect throughout the state. |

---

[8] Oregon Department of Human Services. (2020). *Child Welfare Division Vision for Transformation.* https://sharedsystems.dhsoha.state.or.us/DHSForms/Served/de2445.pdf

Exhibit 8
Page 23 of 390

**PUBLIC KNOWLEDGE®**

| Key Theme | Description |
|---|---|
| Implementation of New Ways to Assess Safety | Oregon improved screening through the implementation of the Structured Decision Making® Screening and Response Time Assessment Tool. Oregon still meets timeliness goals and persistently explores ways to continue improving. CW has also made progress in improving assessing safety of children under supervision of in-home services by updating procedures to encourage best practice of co-managing work between in-home and substitute care to ensure safety and increased the number of face-to-face visits that caseworkers completed with children. |
| Using Data to Improve Safety | Oregon uses quality assurance, fidelity and critical incident reviews, and data dashboards to continually improve safety assessment processes. |

## 4.1.2 Implementation of 2016 Recommendations: Summary of Key Theme

**Finding: CW implemented many recommendations from PK's 2016 Report, all of which have contributed to the improved safety practice across the state.** CW has clarified language, responsibilities, and processes to help screeners, caseworkers, and supervisors keep children safe. The implementation of the Oregon Child Abuse Hotline (ORCAH) is a significant improvement, which will be discussed later in this section.

PK's 2016 *Child Safety in Substitute Care Final Report* included nine findings[9] and associated recommendations[9] to improve child welfare practice in Oregon.

### Developing a Standard for Closed at Screening

PK's 2016 Report acknowledged that CPS abuse in care reporting, screening, and investigation process was localized and resulted in inconsistent responses to harm in care. The subsequent recommendations were to centralize hotline operations and adopt a standard protocol for "closed at screening."

---

[9] Public Knowledge®, *Oregon Department of Human Services Child Safety in Substitute Care Independent Review* (September 13, 2016) (pp. 2–3).

Exhibit 8
Page 24 of 390

**PUBLIC KNOWLEDGE**®

In April 2019, CW launched the Oregon Child Abuse Hotline (ORCAH) centralizing all reports of abuse and neglect throughout the state. More information on implementation of ORCAH is found later in this section.

In January 2021, the Oregon state legislature passed limits on what cases can be closed at screening. The resulting policy change in 2021 clarifies the criteria and process: the screener must close the report at screening when the information describes behaviors, conditions or circumstances that pose a risk to a child but do not meet the definition of abuse[10], or when the screener receives information from reporters that does not meet the statute for assessing reports of abuse or neglect.

## Developing Procedures for Appropriate Community Involvement to Mitigate Safety Issues for Children

PK's 2016 Report noted that information that could mitigate safety concerns is not efficiently shared between entities, and CW developed tandem investigation procedures and community engagement strategies to address this.

Since 2016, CW has improved sharing safety information with stakeholders. CW added tandem investigation procedures to the Procedure Manual in 2021. The purpose of a tandem investigation is to have optimum communication, coordination, and collaboration when responding to reports of child abuse involving multiple agency partners. Prior to 2021, the Procedure Manual included information about joint or tandem responses to child maltreatment only when a law enforcement response is required. Tandem investigations are now conducted when a report involves a setting in which the Office of Training, Investigations, and Safety (OTIS) is responsible for investigating.[11] The CPS worker is still responsible for all the activities necessary to complete a CPS assessment when conducting a tandem investigation.[12,13]

CW now shares data with the public for child protective services, in-home family services, foster care, adoption, and the guardianship program via the ODHS website.[14] Central office staff report there are also ongoing discussions with judges and the judicial system about how to better share information.

---

[10] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (pp. 69-70).

[11] OAR 413-015-0215

[12] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (pp. 415-418).

[13] *See generally,* OAR 413-015-0415

[14] Oregon Child Welfare Data and Reports. https://www.oregon.gov/ODHS/CHILDREN/CHILD-ABUSE/Pages/Data-Publications.aspx.

**PUBLIC KNOWLEDGE**®

## Redesigning the Process of Responding to Allegations of Abuse in Care

PK's 2016 Report found that CW's response to allegations of abuse in care was confusing and involved too many uncoordinated elements, and there was little to no follow-up on abuse in care investigations. The recommendation was to redesign the process of responding to allegations of abuse in care. The 2016 Report also included the perspective of children and young adults in care, and others, who stated that the process of abuse in care reporting was believed to be untrustworthy.

Since 2016, Oregon has made the following changes to redesign the process of responding to allegations of abuse in care, including:

- The Oregon legislature has implemented changes in responding to allegations of abuse in care by passing Senate Bill (SB) 155 in 2019. SB 155 addressed the increase in child abuse assessments and investigations[15] by dividing responsibilities for assessing and investigating reports of child abuse between CW and the Office of Training, Investigations, and Safety (OTIS). With this new legislation, some reports are directed to OTIS, lessening the burden on CW.

- The 2022 Procedure Manual includes the process to respond to reports of abuse or neglect[16], including a new section for screeners with information on how to handle reports for six different types of calls. This is an improvement over the 2016 Procedure Manual which did not include the specifics for handling different types of calls.

- In addition to redesigning the process of responding to allegations in substitute care, CW made some progress in ensuring the safety of children in substitute care and saw slight improvements since the 2016 Report in key data points like maltreatment in care, face to face visits, and quality assurance (QA) data.

- The most significant indicator of progress in this area comes from QA data which shows a 5.5 percent statewide increase from 2021 to 2022 in appropriately assessing and documenting safety in the case record. Caseworkers document the steps to confirm physical and emotional child safety in their case notes. COVID-19 impacted caseworkers' ability to confirm safe environments because caseworkers were not always able to access the home in person due to COVID-19 safety precautions. Permanency caseworkers confirmed that CW improved escalating concerns about safety issues for children in the CW custody. The Permanency Program continues to focus on supporting caseworkers in confirming safe environments at every face-to-face contact with children. Training is provided to permanency staff regarding how to assess for safety at every face-to-face contact.

---

[15] ORS 419B.020 and ORS 419B.026

[16] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (pp. 88).

The Permanency Quality Assurance Tool includes a measure on safe environment confirmation. The quality assurance data is coupled with more modest progress in key data points like maltreatment in care and face-to-face visits, both of which improved only slightly from PK's 2016 Report. Child Welfare has not seen progress in all areas, notably recurrence of maltreatment within twelve months.

Maltreatment in foster care is the federal data indicator that measures whether the agency ensures that children do not experience abuse or neglect while in care in Oregon. This indicator holds CW accountable for keeping children safe from harm while under the responsibility of the department, no matter who perpetrates the maltreatment.[17] Oregon's data show a slight improvement from the end of 2016 to mid-2022. Additional data are shared in the appendix of this report.

Caseworkers are required to visit children in substitute care monthly at a minimum.[18] Monthly visits are an opportunity for caseworkers to assess child safety and risk, including identification of safety threats, vulnerabilities, and protective capacities. As the number of children in substitute care in Oregon has decreased, the percentage of children with a face-to-face visit increased. From a workload perspective, caseworkers have more time to spend visiting children in care as there are fewer children to visit. COVID-19 did not appear to impact the numbers of face-to-face visits made in 2020. CW's performance for face-to-face visits of caseworkers remains in the 90-94 percent range, as shown in the graphic below.

---

[17] U.S. Department of Health & Human Services Administration for Children and Families. (2020). *Child Maltreatment*, 31st Year of Reporting.
https://www.acf.hhs.gov/sites/default/files/documents/cb/cm2020.pdf
[18] Children's Bureau, Child and Family Services Reviews, *Onsite Review Instrument and Instructions*. (June 2022). https://www.acf.hhs.gov/sites/default/files/documents/cb/cfsr-r4-osri-fillable.pdf

PUBLIC KNOWLEDGE®

Findings

## Figure 3. Face-to-Face Visits, Foster Care[19]



CW provided guidance to caseworkers for facilitating virtual meetings and visits[20] during the COVID-19 pandemic. CW provided additional guidance regarding in-person parent and child visits for parents and caregivers that established what to expect from all CW staff and contracted providers.[21]

Maltreatment recurrence is the federal data indicator that measures whether victims of substantiated or indicated maltreatment report another substantiated or indicated maltreatment report within 12 months of the initial victimization. CW saw a slight increase in reports of recurrence of maltreatment within 12 months since 2016, as shown below, however CW's data has one notable limitation. CW stores data on maltreatment reports made by children or young adults based on the date of the report and on the child's location on the date of the report, not the date of the maltreatment incident.[22] This means that children or young adults may report maltreatment while they are placed in care, but the maltreatment may have occurred months prior, while they were in their family home.

---

[19] Oregon Department of Human Services, Office of Reporting, Research, Analytics, and Implementation, IC.10, Face-to Face Required Contacts Completed for Children in Foster Care or In-Home, 4/11/2022.

[20] Oregon Department of Human Services, Director's Office, Equity and Multicultural Services. (April 21, 2020). *Guide for Facilitating Inclusive Virtual Meetings.*

https://sharedsystems.dhsoha.state.or.us/DHSForms/Served/de2247.pdf

[21] ≈ https://www.oregon.gov/opds/provider/Documents/Reference_13.pdf

[22] Lacey Andresen Rule 30(b)(6) Deposition Transcript. (June 15, 2023). (123:22–124:20).


**PUBLIC KNOWLEDGE**®

### Figure 4. Change in Maltreatment Recurrence from 2016–2022[23]



To address recurrence of maltreatment, CW enhanced the safety of children in substitute care by updating the Procedure Manual, ensuring children are assessed for ongoing safety at caseworker visits. It now states for out-of-home care plans, "the case management functions include both safety intervention and safety management. These functions relate to identified safety threats and confirming the child's environment is safe in substitute care."[24] The 2016 and 2021 Procedure Manuals have detailed sections for how caseworkers should develop out-of-home safety plans. The 2021 Procedure Manual included an updated chapter regarding ensuring children placed in treatment and residential placements are assessed for ongoing safety,[25] and the 2023 Procedure Manual retains the same policy.[26] The Permanency Quality Assurance Tool, mentioned previously, includes a measure on confirming safe environments. In written case notes, caseworkers document the steps to confirm physical and emotional child safety. Finally, CW now meets best practices in the following areas, all of which relate to enhancing safety and are discussed at various points in this report: targeted recruitment for the needs of children in care, training for resource parents, understanding health care needs of children in care, and caseloads for caseworkers.

Since 2016, CW began requiring that all SSA (Social Service Assistant) and SSS1 (Social Service Specialist 1) staff attend Confirming Safe Environments training as part of their core

---

[23] Results Oriented Management (ROM) Data Site, Oregon Department of Human Services, Report SA.02, 6/27/2022.

[24] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/1/2022, (p. 429).

[25] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/1/2022, (pp. 772–798).

[26] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 8/23/2023, (pp. 780–807).

PUBLIC
KNOWLEDGE®

pretraining. The training workshop is designed to assist staff in assessing the safety of substitute care placements.

**Sharing Information Between Entities**

Since 2016, CW built a community engagement website to encourage stakeholder interaction.[27] Additionally, they hold Community Connections events every other month and distribute information through a regular community newsletter. CW provides a monthly report to the Governor's Office on the Vision for Transformation as well as specific data and information on child safety. The Child Welfare Advisory Committee (CWAC)[28] counsels the agency on the development and administration of policies, programs, and practices. CWAC membership includes representatives from other state agencies; professional, civic, and private organizations; private citizens interested in service programs; and recipients of assistance or services.

CW shares data with the public regarding child protective services, in-home family services, foster care, adoption, and the guardianship program through the ODHS website.[29] Central office staff also report ongoing discussions with judges and the judicial system about how to better share information.

## 4.1.3 Vision for Transformation: Summary of Key Theme

**Finding: The implementation of the Vision for Transformation in 2020 helped reframe safety practice within the greater child welfare system.** Each aspect of the Vision for Transformation positively impacts child safety and contributes to the overall goal of the vision – all children are safe, stable, and healthy.

The Vision for Transformation, led by the Executive Leadership Team, articulates CW, public, and private partners' beliefs, values, goals, and guiding principles for transforming child welfare work in Oregon. The commitment to and implementation of the Vision for Transformation has significantly contributed to improving safety and outcomes for children throughout Oregon since its inception. The goal of the Vision for Transformation is that "all children experience safe, stable, healthy lives and grow up in the care of a loving family and community," with safety being the first pillar. The prioritization of safety shows a commitment to keeping children and young adults safe and aligns with the recommendations from the 2016 PK assessment. CW and its partners want to ensure that children are safe. The Vision for Transformation states that CW will achieve this by "assessing child safety." The first guiding principle, supporting families and promoting

---

[27] https://www.oregon.gov/odhs/child-welfare-transformation/Pages/community.aspx

[28] https://www.oregon.gov/odhs/agency/pages/cwac.aspx

[29] https://www.oregon.gov/ODHS/CHILDREN/CHILD-ABUSE/Pages/Data-Publications.aspx

prevention, includes an area of focus on responding to community concerns about child abuse and neglect. CW created a centralized hotline for screening reports of child abuse and neglect in 2019, meeting one of the goals of the Vision for Transformation and taking a solid step toward improving safety for children statewide.

Another area of focus in the Vision for Transformation is safety and fatality review and prevention. This initiative improves the safety of children and young adults by applying the lessons learned from serious injuries and child maltreatment fatalities to prevent future incidents.[30] Incorporating this CQI process into critical incidents will reduce such incidents over time and improve safety for children.

The third guiding principle of the Vision for Transformation, enhancing the system's structure by using data with continuous quality improvement, includes an area of focus of CQI and quality assurance systems for evaluation of CW's programs and initiatives. CW uses implementation science to implement ORCAH, Structured Decision Making®, and other strategies outlined in their five-year 2020–2024 Child and Family Services Plan. CW is also using data to drive decision-making, analyzing data for improvements in processes, policies, and systems, and measures progress over time to learn about improving safety for children under CW supervision in all areas of practice. Continuous quality improvement processes are in use and in practice in ORCAH – the Safety Program and Permanency Program. This use of data to drive decision-making processes aligns Oregon with federal expectations and requirements and allows them to make informed decisions for children, young adults, and families. More information about CW's CQI practice can be found in Section 4.3.

## 4.1.4  Implementation of the Oregon Child Abuse Hotline (ORCAH): Summary of Key Theme

**Finding: Oregon's implementation of Centralized Intake has improved safety for children across Oregon.** Leadership has addressed issues that have arisen during implementation and used data and their CQI process to improve practice and outcomes.

The most crucial decision in child welfare is assessing the safety of a child in response to an allegation of harm. Screening and assessment protocols have improved through three strategies: implementation of the centralized hotline, adoption of a standard protocol for closed at screening, and implementation of tools to support decision-making.

The Child Welfare Information Gateway publication *Making and Screening Reports of Child Abuse and Neglect* (2022) outlines best practices for screening and responding to reports

---

[30] Oregon Department of Human Services. (2020). *Child Welfare Division Vision for Transformation.* https://sharedsystems.dhsoha.state.or.us/DHSForms/Served/de2445.pdf



of suspected child abuse or neglect.[31] CW now meets or exceeds best practices in these four areas, which it did not in 2016:

1.  **CW now has clearly defined procedures for screening and responding to reports of suspected child abuse or neglect.** In 2022, CW implemented the Structured Decision Making® (SDM) Screening and Response Time Assessment Tool. Using SDM has helped CW meet best practices with identifying required content for reports of abuse or neglect, criteria for screening reports, investigation or assessment procedures, timeframes for completing investigations or assessments, and the classification of investigative findings. This evidence-based and research-based model identifies the pivotal points in the life of a child welfare case and uses structured assessments to improve the consistency and validity of each decision.

2.  **CW changed to the SDM Model to use modernized tools to promote the safety of children and reduce disparate outcomes.** The SDM model for child protection assists agencies and workers in meeting their goals to promote the ongoing safety and well-being of children. The full suite of tools in the SDM model includes clearly defined service standards, mechanisms for timely reassessments, methods for measuring workload, and tools for ensuring accountability and quality controls. Oregon has begun the process of exploring the full suite and has implemented one of the tools as of 2022. The Screening and Response Time Assessment Tool evaluates whether the information reported meets the statutory definition of abuse and, if so, how quickly an in-person child protection services response should occur. The tool supports this decision process by clarifying the definitions and interpretations of child abuse.

3.  **CW exceeds best practice by having a specialized unit within centralized intake to prioritize calls received from Law Enforcement.**

4.  **CW exceeds best practice by defining special procedures for handling child fatalities and substance-exposed children.** Chapter 2 of the 2021 Procedure Manual focuses on handling special circumstances at screening, including the Indian Child Welfare Act and the role of the screener (and notification to tribes), sensitive case records and conflicts of interest, child fatalities, domestic violence, substance affected infants (including Plans of Safe Care), minor parents as alleged perpetrators of child abuse or neglect, missing or runaway children or young adults with an open child protective services cases, sex trafficking victims, and requests for information on an open child welfare case. The 2023 Procedure Manual retains this language.

---

[31] Child Welfare Information Gateway. (2022). *Making and screening reports of child abuse and neglect.* U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau. https://www.childwelfare.gov/topics/systemwide/laws-policies/statutes/repproc/

Exhibit 8
Page 32 of 390



**Centralized Intake**

Centralizing intake is important because it significantly increases consistency in safety decision-making and reduces the potential for errors or inconsistencies in intake across the state. Hotline systems, or, in Oregon's case, Centralized Intake, are the first point of contact for people reporting child abuse and neglect and are the first decision-making point for screening reports of child abuse and neglect. Hotline decisions determine whether a family becomes involved in the child welfare system. Research suggests that states with centralized hotlines are more consistent and accountable in their screening decisions compared to decentralized intake systems, in which local or regional offices receive reports of child abuse and neglect.[32] Nearly all (94 percent) states with centralized intake systems had benefits that included more consistency, accuracy, and efficiency.[33]

CW's centralized intake, ORCAH, meets the best practices for intake in the following ways, none of which were met in 2016:

- **Consistent and timely response to reports of child abuse or neglect.** In 2019, Oregon implemented a centralized, statewide, 24-hour-a-day, seven days per week hotline for the screening of child abuse and neglect reports.

- **Clear policy guidance, including concrete definitions of abuse and neglect.** The 2022 Procedure Manual includes updated definitions of abuse types to aid in consistent and accurate decision-making by screeners, including mental injury, neglect, physical abuse, sexual abuse, sexual exploitation, and the threat of harm. Also, see SDM above.

- **Reliable decision-making processes to assist caseworkers in making screening decisions.** See detail about SDM above.

- **A skilled workforce.** The 2022 Procedure Manual provides additional information regarding screener, supervisor, and program manager roles and responsibilities in screening reports.[34] The 2022 Manual also outlines the screening process for information received at the hotline[35] and provides instruction on how to conduct a

---

[32] Casey Family Programs (2011). *Centralized Intake Systems*. Seattle WA: Casey Family Programs. Sourced from *Effective Hotline Elements: Supporting Accurate and Reliable Screening Decisions.* Casey Family Programs Strategy Brief, November 2017. http://www.casey.org/media/Effective-hotline-elements_strategy-brief.pdf

[33] Holland, S., Glass, L., Clearfield, E., Jenkins, J., and Stevens, C. (2014). *Answering the call: How states process reports of child abuse and neglect.* Austin, TX: Morningside Research and Consulting Inc. https://docplayer.net/24777603-Answering-the-call-how-states-process-reports-of-child-abuse-and-neglect-revised-june-23-morningside.html

[34] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/1/2022, (pp. 99–102).

[35] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/1/2022, (pp. 105–119).

Exhibit 8
Page 33 of 390

child welfare history review, make the screening decision, assign response times, close cases at screening (if appropriate), and document the report.[36] ORCAH also offers a Screening Training Academy for new screeners before taking calls and trains on various topics regarding screeners' responsibilities.

- **A stable workforce.** Since 2020, CW data show that turnover within ORCAH has decreased from nearly 5% to under 4%, while the number of full-time positions has increased from 164.5 to 204.

- **Continuous Quality Improvement (CQI).** CW has a robust internal quality assurance process to improve consistency in screening decisions, customer service, and call wait times. There is a CQI process in place that uses data to improve processes. More information about CQI can be found in Section 4.3.

## ORCAH Implementation

Transitioning from a decentralized intake process to a centralized one is a sizeable undertaking. Oregon centralized the Hotline despite the typical challenges that accompany this process, and continued implementation and adjustment during the COVID-19 pandemic, which presented its own unique set of challenges.

The implementation process takes time. CW used implementation science to plan for, implement, and adjust ORCAH practice. Process changes developed within the Implementation Science framework[37] can take up to five years to fully integrate into a child welfare system.[38] In addition, implementation requires using the CQI process to make data-driven decisions. It requires CW leadership to use data to identify the parts of the process that are working and which are not. Where the process is not working, implementation science requires necessary adjustments. This implementation process can lead to frustration amongst the staff who must adjust their work accordingly. These adjustments occurred with ORCAH implementation.

When CW began implementing ORCAH, some aspects of the practice worked well, and others did not. As expected, staff expressed frustration throughout the implementation process.[39] CW Leadership used data-driven decision-making to adjust what was not working well. For example, CW received complaints about the wait times, and CW leadership adjusted the process to allow screeners to answer calls timelier. The wait times

---

[36] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/1/2022, (pp. 119–143).

[37] National Implementation Resource Network (NIRN). (Jan 2015). *Implementation Science.* https://nirn.fpg.unc.edu/resources/implementation-science

[38] ODHS CW ORCAH Annual Report (August 2018–2019). https://www.oregon.gov/odhs/data/cwdata/cw-orcah-annual-report-2019.pdf

[39] Focus Group Discussion.

**PUBLIC KNOWLEDGE**®

are now down significantly: in 2019, average call wait times were as high as eight minutes, with nearly 25 percent abandoned calls. As of September 2022, the average wait time was less than two minutes, with some queues having an average wait time of less than one minute, with a five percent abandonment rate.[40] As of August 2023, the average wait time for all caller types (including from law enforcement, medical providers, mandatory reporters, general public, and Spanish–speaking community members) was less than one minute.[41] These shorter wait times allow for reporters of abuse and neglect to reach appropriate staff and help improve safety outcomes for children and young adults across Oregon quicker.

**Figure 5. Call Wait Times in Minutes and Call Abandonment Rate**



Despite some frustrations, safety caseworkers discussed the benefits of ORCAH, including CW partners having one point of access to report suspected child abuse or neglect. ORCAH staff report most supervisors are supportive and assist with making screening decisions. ORCAH staff believe that centralizing the hotline has made a positive impact on the safety of children and that there is improved consistency in accepting reports of abuse.

### ORCAH and CQI

An additional indicator of progress is that in October 2019, ORCAH established a continuous quality improvement (CQI) program. Trained screening quality assurance specialists review a random selection of screening reports each month, along with listening to live calls (selected at random) with a screening supervisor. ORCAH staff review requests from service delivery offices (local offices) to reconsider screening decisions to ensure decisions align with procedures. Data, including monthly and quarterly quality assurance reports, are used to determine improvements needed in training, procedures, technology,

---

[40] Oregon Child Abuse Hotline Quarterly Report (2022 – Third Quarter). (p. 5).
[41] ODHS Child Welfare Division Progress Report. (September 2023). https://www.oregon.gov/odhs/child-welfare-transformation/progressreports/cw-progress-report-2023-09.pdf

documentation, or other areas of concern. Quality assurance specialists review screening reports to determine if timeliness measures were met.[42]

The 2023 APSR reports that the Critical Incident Review Team (CIRT) participates in ORCAH's CQI process. A part of the quality assurance review includes gathering information about whether screening decisions were correct. The APSR notes that "in 2021, the findings indicated that 90 percent of ORCAH closed or assigned reports were correct, 94 percent of the response time decisions were correct, and 78 percent of cases had correct allegations,"[43] all of which show strong performance. While there is not a national standard, these data show CW's commitment to accuracy.

## 4.1.5 New Ways to Assess Safety: Summary of Key Theme

**Finding: Oregon improved the assessment of safety in several ways.** CW implemented PK's 2016 recommendation to centralize hotline operations and improved screening by implementing the Structured Decision Making® Screening and Screening and Response Time Assessment Tool. Oregon's new methods of assessing safety have led to a continuation of meeting timeliness goals and the exploration of ways to continue improving. CW has also made progress in improving assessing the safety of children under supervision of in-home services by updating procedures to encourage best practice of co-managing work between in-home and substitute care to ensure safety and increase the number of face-to-face visits that caseworkers completed with children.

### Timeliness

Responding timely to allegations of child abuse or neglect can mean life or death for children in unsafe situations. Once a report of suspected abuse or neglect has been made and an agency has screened it in, it is the agency's responsibility to respond to that report in a timely manner as designated by law, statute, and procedure.

Oregon's implementation of ORCAH and the Structured Decision Making® Screening and Response Time Assessment Tool made progress towards more timely screening of hotline reports and defines response times to accepted reports. Oregon is exploring creative solutions for ensuring timeliness of assessments, including expanding the workforce's traditional working hours beyond 9 am to 5 pm to be more inclusive of when the families need services and support.

---

[42] Oregon Department of Human Services Child Welfare Division, Annual Progress and Services Report (APSR) 2023. (June 30, 2022) (pp. 104–105).

[43] Oregon Department of Human Services Child Welfare Division, Annual Progress and Services Report (APSR) 2023. (June 30, 2022). (p. 105).

CW met the standard for assessment timeliness in 2016 and has continued to do so in 2022.[44] The 2016 Procedure Manual included CPS assessment timelines limited to within a 24-hour timeline (including within 0-2 hours and within 2-24 hours, allowing for exceptions) and within five calendar days. This meets best practices for the timeliness of child welfare assessments. The 2016 Procedure Manual allows CPS supervisors to change or extend timelines under certain guidance.[45] The 2016 Procedure Manual specifies timeframes and steps to take for making face-to-face contacts with child(ren).[46] This meets best practices for face-to-face visits with children.

CW has several initiatives in place to continue to meet timeliness goals in responding to allegations of child abuse or neglect. For example, in 2022, Safety Consultants worked with local offices to develop strategies and action plans to increase the timeliness of initial contacts and the quality of ongoing contacts to improve child safety outcomes. CW continues to promote making initial contacts within the required timeframes by sharing qualitative and quantitative data. Also in 2022, CW's Child Safety Program partnered with the Child Fatality Prevention and Review Program (CFPRP) and the University of Kentucky Center for Innovation in Population Health to complete Safe Systems Mapping.[47] The goal of using Safe Systems Mapping is to improve timeliness to initial contacts with families, promote accurate initial contact data collection, and respond to additional contacts with families to improve child safety. Furthermore, CW began participating in the National Partnership for Child Safety (NPCS). NPCS collaborates with 26 state, county, and Tribal child and family serving agencies and technical assistance advisors in support of safety science implementation.[48]

ORCAH's timeliness to assignment has increased throughout 2022. Timely assignment from ORCAH is critical because it provides CPS caseworkers more time to contact families. Screeners must make a screening decision within ten hours of receipt of the contact. Of reports that must be assigned within 10 hours, ORCAH assigned 79 percent (on average) within the required timeframe during 2021 and 87 percent between January and April

---

[44] Oregon Department of Human Services Child Welfare Division, Annual Progress and Services Report (APSR) 2023. (June 30, 2022).

[45] Oregon Department of Human Services Child Welfare Procedure Manual. (Rev. 2016). (pp. 78-80).

[46] Oregon Department of Human Services Child Welfare Procedure Manual. (Rev. 2016.) (pp. 91-92).

[47] University of Kentucky. Center for Innovation in Population Health. https://iph.uky.edu/what-we-do/safe-systems

[48] University of Kentucky. Center for Innovation in Population Health. https://cph.uky.edu/news/npcs-highlights-progress-toward-integrating-safety-science-child-welfare-systems

**PUBLIC KNOWLEDGE**®

2022. For reports with a 24-hour response, 86 percent (on average) were completed on time during 2021 compared to 90 percent during January–April 2022.[49]

## In-Home Services

Oregon made progress in improving the safety assessment of children under supervision of in-home services by updating procedures to encourage best practices of co-managing work between in-home and substitute care. This ensures safety and increases the number of face-to-face visits that caseworkers completed with children.

Child welfare agencies have a responsibility to ensure the safety of children who remain in their homes. In-home services allow children to stay with their parents, siblings, extended family members, friends, and within their schools while the child welfare agency provides supports and resources to help parents address the issues that led to abuse or neglect and ensure the children are safe. Decision-making and safety planning by the agency with the family can prevent future abuse and the unnecessary placement of children in substitute care.

One indicator of progress is in 2021 CW executive leadership, the Child Safety and Permanency Programs, and delivery Program Managers partnered to develop district-specific engagement plans that are aligned with the Vision for Transformation. CW now has a Mobile CPS Unit that helps local offices make sound safety decisions and assists offices in completing CPS assessments within the required timeframes. The Mobile CPS Unit provides new or less experienced CPS caseworkers, supervisors, and program managers with opportunities to learn how to engage families in the safety assessment process, sufficiently gather information at initial and ongoing contact with families, and analyze the information gathered to make safety determinations.[50]

CW also made progress by updating the Procedure Manual to enable co-case management. Co-case management improves safety for children because it increases opportunities for early collaboration and engagement with families to ensure safety threats are identified correctly and that safety plans are as unintrusive as possible while managing safety and promoting cross-program partnerships and perspectives.[51] The 2016 Procedure Manual did not include this capability. The Procedure Manual now clarifies that conducting

---

[49] Oregon Department of Human Services Child Welfare Division, Annual Progress and Services Report (APSR) 2023. (June 30, 2022). (p. 28).

[50] Oregon Department of Human Services Child Welfare Division, Annual Progress and Services Report (APSR) 2023. (June 30, 2022). (p. 33).

[51] Oregon Department of Human Services Child Welfare Procedure Manual. (Rev. 10/1/2022) (pp. 430–437).

assessments is more than fact-finding; it is a way to establish rapport with family members and engage them in the safety intervention process.

Additionally, Oregon also made progress by developing programs that help create more comprehensive safety plans. For example, the Child Safety Program uses group supervision for cases with infants, previously founded dispositions, or cases where children experienced recurring maltreatment. CW is using the Child Safety Program more strategically now to identify especially vulnerable children. Group supervision provides coaching and supports CPS workers, Coaching and Training Specialists, and supervisors by comprehensively gathering safety-related information and working with families to develop in-home safety plans when there is present or impending danger. Another example is the Safe & Together™ Model[52], an internationally recognized suite of tools and interventions designed to help child welfare professionals become informed about domestic violence.

**Caseworker Visits**

For in-home services cases, caseworkers must visit children in the home at least monthly. Caseworker visits with children and families provide an opportunity for ongoing assessment of safety and risk. The frequency of visits with children and families should be determined according to the circumstances of the case, including risk and safety concerns present, the age and vulnerability of the child, and the reason for the agency's involvement with the family.[53] Caseworkers improved meeting the requirements for face-to-face contact for children receiving in-home services from 60 percent in 2016 to 70 percent in 2021.

## 4.1.6  Using Data to Improve Safety: Summary of Key Theme

**Finding: Oregon improved safety assessments by using results from reviews to inform changes to safety practices.** CW uses biannual fidelity reviews, structured reviews of child fatalities or near fatalities, and data dashboards to continue improving the use of data to inform and improve safety.

Since 2016, Child Welfare has shown improved safety assessment by implementing a CQI process that includes fidelity reviews, the Critical Incident Response Team, and data dashboards.

---

[52] Safe and Together Institute. Model Overview. https://safeandtogetherinstitute.com/about-us/about-the-model/
[53] U.S. Department of Health & Human Services Administration for Children and Families. (June 2022). Child and Family Services Reviews. *Onsite Review Instrument and Instructions.* https://www.acf.hhs.gov/sites/default/files/documents/cb/cfsr-r4-osri-fillable.pdf

**PUBLIC KNOWLEDGE®**

**Fidelity Reviews**: Fidelity reviews are essential because they allow CW to update their information and processes consistently. These reviews, which are part of Oregon's Program Improvement Plan, developed following their CFSR in 2016, also allow leadership to see how decisions are made across the state, which supports consistency. CW's fidelity reviews are strong because they are conducted twice a year, the cases are pulled from a randomized sample, they use standardized language, reviewers are trained specifically to conduct the reviews, and reviewers are recruited from various stakeholders, including Tribal Affairs, the Portland State University Child Welfare Partnership, ORCAH, the CFSR team, and CPS staff. The CPS fidelity review evaluates CPS responsiveness, information gathering, safety determinations, interventions, and dispositions. The information is compiled in a series of reports:

- A statewide report provides an overview of statewide practice
- A comparison report including information about all the local offices and districts
- A district report providing information for each local office

Supervisors who participated in the fidelity review process reported learning a lot and wishing they had the time and capacity to do more. District and Program Managers for most districts also have a review process for safety data and develop goals for improvements.

In addition, the Office of Program Integrity conducts state led CFSRs and reviews each district annually. Safety Consultants participate in the CFSR team and debrief the CFSR process and findings. The Safety Consultants discuss the results of fidelity reviews and other data (such as Results Oriented Management, or ROM, reports related to the CFSR findings) and local practice to discuss differences in CFSR measures and other data. The CFSR team analyzes and discusses root cause analysis and includes all design consultants who work with the local offices. Safety Consultants explore safety practices and discuss potential interventions for improvements at the state and local levels.[54]

**Critical Incident Response Team (CIRT)**: Child welfare distinguishes reports of allegations of abuse and neglect versus critical incidents. Statute defines both allegations of abuse and critical incidents, and critical incidents are a subset of allegations of child abuse and neglect. There are specific procedures for handling critical incidents, such as a fatality or near fatality, while children are in CW custody. Separate reviews occur for critical incidents that involve the Critical Incident Response Team.[55] These reviews are viewed as opportunities for learning and for systems improvement. Oregon statute requires a CIRT on cases where a child has died due to abuse and the child and family had been involved with

---

[54] Oregon Department of Human Services Child Welfare Division, Annual Progress and Services Report (APSR). (2023). (June 30, 2022). (p. 102).
[55] Oregon Department of Human Services Child Welfare Procedure Manual. (Rev. 10/1/2022) (pp. 21–27).

Exhibit 8
Page 40 of 390

the Department within the preceding 12 months of the fatality. Beginning in 2018, Oregon began using a safety culture framework in the CIRT process.  CW has received technical assistance from the National Partnership on Child Safety Collaborative through Casey Family Programs at the University of Kentucky.

**Data Dashboards:** There are several data dashboards available to help CW manage workloads, ensure safety assessments are completed, and improve data. Caseload dashboards quantify the number of assessments, cases, or providers each caseworker is assigned. The CW executive dashboard includes information about assessment data to provide insight into child welfare practice overall.[56] More information about these dashboards can be found in Section 4.11.

Finally, as it relates to data-driven practice, Program Managers stated that child welfare leaders promote safety for children under child welfare supervision by providing training and support to staff regarding safety practices. Safety is emphasized through the agency's involvement with all families, in the home and in foster care. Leaders focus on responding to safety consistently across Oregon by continuous refinement of procedures for alignment.

## 4.1.7 Contextual Factors: Child and Family Services Review Findings

Oregon participated in Round 3 of the CFSR in 2016, and that review assessed adequacy of the three safety outcomes:

- Item 1: Were the agency's responses to all accepted child maltreatment reports initiated, and face-to-face contact with the children made, within timeframes established by the agency policies or state statutes?
- Item 2: Did the agency make concerted efforts to provide services to the family to prevent children's entry into foster care or re-entry after reunification?
- Item 3: Did the agency make concerted efforts to assess and address the risk and safety concerns related to the child(ren) in their own homes or while in foster care?

Oregon was assessed as needing improvement in all three safety areas because it failed to meet the 95 percent required national threshold for the item to be rated as a strength. Since the 2016 review, fewer than six states have met the 95 percent national threshold for these three items, so Oregon is not alone. Oregon's quantitative results are shown in the appendix. CW shows improved performance in Item 1 from 2016 to 2021. CW shows minor drops in case ratings for Item 2 and Item 3 from 2016 to 2021 (2 percent and 1 percent

---

[56] Oregon Department of Human Services Child Welfare Division, Annual Progress and Services Report (APSR). (2023). (June 30, 2022). (p. 103).



respectively). CW shows better performance in 2016 over the national performance average in 2016, which reflects all states reviewed in Round 3 of the CFSR.

While the CFSR focuses on specific data points within child welfare, PK's assessment has considered the quantitative and qualitative data contained in the CFSR and Oregon's practice. PK acknowledges that despite some slight declines in quantitative data, CW is keeping children safer and has made significant changes in statute and policy for screening, investigatory response, and supervisory policies, as well as communication protocols among the multiple offices within ODHS.[57] As mentioned previously, implementation of these policies, protocols, and statutory changes takes time, and more time is needed before CW will realize notable changes in the quantitative data.

## 4.2    CW made significant progress to improve the agency culture

**Finding: Since 2016, Oregon has made significant progress in improving and prioritizing the agency culture led by implementing the Vision for Transformation.** The Executive Leadership Team infuses the Vision for Transformation's guiding principles into each aspect of child welfare practice.

### 4.2.1 Key Themes

Table 3. Key Themes

| Key Theme | Description |
|---|---|
| Leadership Vision | In 2020, CW created the Vision for Transformation to build a CW Division that consistently supports the needs of families and serves children and young adults. One of its guiding principles is enhancing staff and infrastructure with several initiatives to improve organizational culture and develop a supported and engaged workforce. Several assessment participants credited the Vision for Transformation and current CW leadership for changes and improvements in agency culture. |
| Leadership Modeling | CW has made progress in modeling leadership skills for the workforce and shifting the organizational culture to be antiracist and equitable. According to assessment participants, child welfare executives consistently model strong leadership skills and behaviors. |

---

57 Administration for Children and Families, Children's Bureau. (2016). *Child and Family Services Reviews: Oregon Final Report.* https://www.oregon.gov/odhs/data/cwdata/cw-cfsr-final-2016.pdf

| Key Theme | Description |
|-----------|-------------|
| Worker Safety | CW has improved psychological safety for workers in multiple ways but has more work to do on improving physical safety for workers. Assessment participants cited a significant difference in CW's focus on child safety versus worker safety. |

## 4.2.2 Leadership Vision: Summary of Key Theme

**Finding: Since 2016, CW made significant improvements in this area, framed by creating the Vision for Transformation.** The goal of the Vision is to create a CW Division that consistently supports the needs of families and serves children and young adults. This Vision touches every area of CW practice and impacts policy and expectations. As part of the Vision, CW developed a more robust CQI framework to improve feedback loops and data-driven decision-making.

The 2020 Child Welfare Vision for Transformation is the roadmap for CW to transform into an organization that supports and preserves families. That is the leadership vision for the future of the CW Division. One of its guiding principles is enhancing staff and infrastructure with several initiatives to improve organizational culture and develop a supported and engaged workforce. Several assessment participants credited the Vision for Transformation and the Executive Leadership Team for the improvements in agency culture over the past three years.

When explicitly asked in the 2021 survey about the leadership of Ms. Jones Gaston, staff with more than 16 years of experience at CW were more likely than those with fewer years of experience to say that the agency culture improved during her tenure. These staff have worked with several directors during their careers at CW.

Focus group participants noted that Ms. Jones Gaston and her Executive Leadership Team brought stability and comfort that staff did not feel with previous leaders and brought hope to child welfare. There is a consistent belief that, since 2019, this Executive Leadership Team has improved staff morale, improved the practice of leading by example, and brought a focused mission to the agency.

Interviewees and focus group participants reported that the Executive Leadership Team has shifted the culture from a punitive one to a learning culture and has brought a prevention focus to child welfare. They said their work to help define the Vision for Transformation and build the Executive Leadership Team has improved agency culture.

**PUBLIC KNOWLEDGE**®

In the past two years, CW has also dedicated significant effort to building a continuous quality improvement (CQI) infrastructure that uses data to drive decision-making and performance monitoring. Please see Section 4.3 for more information on CQI. Since 2016, CW leadership has also revised the Procedure Manual to use more directive language and active voice, which results in less ambiguity regarding whose responsibility tasks are. This language change provides increased clarity, action, and a sense of accountability, which may contribute to improved organizational culture.

## 4.2.3 Leadership Modeling: Summary of Key Theme

**Finding: Since 2016, CW has made progress in modeling leadership skills for the workforce and shifting the organizational culture to be antiracist and equitable.** The CW Executive Leadership Team models various leadership skills to each level of the workforce and encourages engagement, communication, and vulnerability.

According to assessment participants, this Executive Leadership Team consistently models strong leadership skills and behaviors. This includes:

- Modeling servant leadership, in which leaders support their staff and teams
- Sharing power for efficient decision-making
- Yielding power to those with lived experience
- Practicing open communication and transparency
- Leading by example
- Coaching and mentoring
- Providing and receiving feedback
- Partnering with local communities

Participants noted that setting a clear path with the Vision for Transformation and committing to its initiatives has had a positive impact.

CW has built an Executive Leadership Team that collaborates across the division, is working toward a shared vision, and has increased confidence and security among child welfare staff. Assessment participants shared the following examples of leadership skills and behaviors modeled over the last three years:

- **They are leading by example.** This Executive Leadership Team models the behaviors and actions needed to shape the agency they are hoping to achieve. They have modeled setting a vision that aligns with the agency's core values and acting on that vision. Focus group participants described leaders as "walking the talk" by demonstrating how the workforce should show up for colleagues, children, and families while taking measured risks. Leadership has been working with managers

**PUBLIC
KNOWLEDGE®**

to build their capacity to transform the agency. They are working to create an atmosphere of equity and inclusion across CW, including how managers interact with employees, families, and tribal communities. CW created a new Deputy Director position focused on equity, training, and the workforce and built a new team in the Division. This team develops and provides training to the workforce on equity, intersectionality, and working with children and families in the LGBTQIA2S+ community. CW leaders demonstrate the behaviors, actions, and tones managers are expected to use when interacting with staff and the community. Under this Executive Team's leadership, CW has been working to create an antiracist organization and has provided managers with the tools to do that. Assessment participants noted that executives model CW's core values, they are consistent, and they show up.

- **They are shifting organizational culture.** Leaders support districts and counties by continuing to implement CQI processes and use data to drive decision-making and needed improvements in child welfare procedures, staffing, and workforce support. The team takes a holistic approach when looking at child safety. CW leaders created a project management office and have built change management processes to implement new interventions better.

- **They are engaging with community partners.** Leadership prioritizes connection with community providers, stakeholders, and community members. These connections are one of the guiding principles of the Vision for Transformation. The team has assessed whether the right people are represented in advisory groups and set new expectations for the roles of CW's multiple advisory committees and councils. This includes yielding power to those with lived experience. The feedback from committee and council members has been positive, citing that they feel more engaged and feel like they are making fundamental contributions to system improvements. According to assessment participants, leadership is engaged in both policymaking and in engaging communities, which is a better model than in the past, where leaders were engaged in one or the other.

- **They are coaching and mentoring.** CW leaders are working with the Capacity Building Center for States to launch a coaching model to increase and improve the psychological safety culture to create a learning organization to help the workforce thrive. CW plans to update its supervision model to have a coaching and reflective supervision foundation.

- **They are increasing communication and transparency.** Assessment participants noted a shift to having more open communication in recent years. CW leaders provide opportunities for staff to process their experiences and allow staff to provide feedback without consequence. Leadership prioritizes a workforce culture where concerns and issues related to worker well-being can be freely expressed.

Exhibit 8
Page 45 of 390

They are open to feedback and try and make changes when feasible. Leaders offer opportunities for staff to submit complaints, feedback, and questions. Focus group participants reported that the feedback loop as part of the CQI process is the most consistent it has been in more than 20 years. Modeling from leadership also helps Program Managers model this to their teams.

- **They listen to concerns from staff.** Some assessment participants shared that while there has always been a culture where staff could express concerns, this significantly improved with current CW leadership. Assessment participants reported that open communication about safety issues or safety concerns for children has increased since 2019. The Executive Leadership Team has prioritized and fostered a culture where staff can express concerns and issues related to child well-being and provided several avenues for staff to do so. They can discuss issues with their immediate supervisor, the Program Manager, call the child abuse hotline, or raise safety concerns to child welfare leadership if necessary. When discussing child safety, participants noted that their supervisors support them, encourage them to share safety concerns, and trust them to escalate issues when necessary. CW staff and managers report they are also encouraged to speak up with safety concerns regarding children in substitute care. Assessment participants reported that when they are analyzing a critical injury or fatality, they are encouraged to speak up and share information that they have. They noted that while this is still a work in progress, it has improved.

- **They are vulnerable and owning their mistakes.** Leaders communicate and demonstrate that making mistakes is part of growing and improving. They hold their mistakes and allow others to make mistakes. They share that it is okay for managers and staff to get something wrong or not have it quite right, and they must keep asking questions.

## 4.2.4 Worker Safety: Summary of Key Theme

**Finding: Worker safety includes both physical and psychological safety. Since 2016, CW has improved psychological safety for workers by focusing on mental health, diversity, equity, inclusion, belonging, and open communication.** CW has made some progress regarding physical safety for workers but still feel their safety is at risk at times.

### Physical Safety

CW has made some progress regarding physical safety for workers. Still, some focus group participants expressed that worker safety is one of the areas where CW has the most work

to do as an agency. Since 2016, the Procedure Manual[58] has been updated to include a new exception to meeting the initial 24-hour response timeline if worker safety is questioned and law enforcement assistance is not immediately available. However, overall policy and procedure guidance around worker safety remains limited. CW does have policy language requiring caseworkers to plan for their safety, evaluate potentially dangerous situations, and take safety precautions. Physical safety is a significant concern for many workers due to their client's mental and physical health or substance use issues. Caseworkers cited conflicting practices among branches and supervisors. There does not appear to be consistent guidance for effectively responding to child abuse reports while keeping staff safety in mind.

### Psychological Safety

Psychological safety is essential for the child welfare workforce as it positively impacts job attitudes and behaviors and strongly predicts work engagement, job satisfaction, and commitment. Psychological safety is measured at both the individual and group level, and both are positively impacted by peer support, leadership support, and organizational support.[59]

Assessment participants noted an increased recent focus on improving psychological safety but noted it is inconsistent throughout CW.

This assessment identified several improvements to CW's focus on psychological safety:

- **Increased focus on diversity, equity, and inclusion**. In 2020, CW created and hired a dedicated position within the Executive Leadership Team focused specifically on equity, training, and the workforce as part of the commitment to being an antiracist organization. Additionally, ODHS implemented Oregon Resilience in Support of Equity (RiSE)[60] in 2017 to build a positive, respectful, and growth-focused agency. RiSE is at the core of increasing safety and belonging among workers. RiSE is both a direct response to employee input and a commitment from leadership. Safety, well-being, equitable treatment, and belonging are elements of RiSE. Several assessment participants spoke about RiSE and mentioned that they have never felt so comfortable discussing race, sexual orientation, and disability as they do now at CW. They cited RiSE as the fundamental difference from previous years.

---

[58] Oregon Department of Human Services Child Welfare Procedure Manual. (Rev. 10/4/2021). (pp. 168–171).

[59] Quality Improvement Center for Workforce Development. (May 27, 2020). Psychological Safety. https://www.qic-wd.org/umbrella-summary/psychological-safety

[60] Oregon Department of Human Services. About RiSE. https://www.oregon.gov/odhs/about/pages/rise.aspx

**PUBLIC KNOWLEDGE**®

- **Focus on mental health.** CW created a Critical Incident Stress Management debrief process in July 2020 to support staff impacted by traumatic incidents. Workers are invited to participate in these support sessions after a traumatic event is reported or if a worker reaches out for support. Participants note that the focus on mental health and well-being is helpful but varies from district to district, and some report that CW doesn't do a good job recognizing the trauma that staff go through daily. Other participants noted that while mental health, self-care, and stress management are encouraged, there is no time available or practical way to conduct self-care on the job, and it becomes one more thing to do in their time away from work. Assessment participants discussed the need for CW to support staff without adding to workloads. CW may offer support groups and training, but caseworkers do not have time to do these. Some participants noted that while CW does not do an excellent job of recognizing the trauma that staff go through daily, it has started to improve over the last few years. Mental health for caseworkers has been a significant issue during COVID-19. CW offers an Employee Assistance Program that provides psychological and physical health care, working during a pandemic training, and other supports. Supervisors report that with so many staff taking personal time off for mental health, they lack resources to support the rest of the workforce.

- **Open communication.** Some assessment participants noted a shift to having more open communication. CW leaders provide opportunities for staff to talk through what they are experiencing and allow staff to provide feedback without consequence. Staff can share what is working and not working for them. Leaders offer opportunities for staff to submit complaints, feedback, and questions. Both leadership and staff discussed supervisors shifting to having open door policies for the team to discuss safety and mental health concerns and noted that it has not always been this way at CW. Current leadership prioritizes a workforce culture where problems and issues related to worker well-being can be expressed.

- **Coaching and mentoring.** As mentioned in this section, CW leaders are launching a coaching model to increase and improve the psychological safety culture to create a learning organization to help the workforce thrive.

- **Policy updates.** The 2021 CW Child Welfare Procedure Manual contains more information regarding self-care and caring for others and what specific programs may be available to resource parents and employees in the event of a child fatality. This includes recognizing grief and encouraging the use of public services.

Additional information about psychological safety can be found in Section 4.11, which discusses staff support.

Exhibit 8
Page 48 of 390



## 4.3    CW made consistent progress to improve data-driven decision-making and quality of services

**Finding: Since 2016, Oregon has made consistent progress to improve data-driven decision-making and the quality of services.** Building capacity to be data-driven has been a leadership priority, evidenced by regular technology upgrades and a solid financial investment. Data-driven decision-making is a priority for national child welfare practice, and CW's focus on this is an encouraging improvement.

### 4.3.1  Key Themes

Table 4. Key Themes

| Key Theme | Description |
|---|---|
| Continuous Quality Improvement (CQI) | CQI advances include an additional 17 staff dedicated to CQI in 2021. While data-driven decision-making is not fully integrated into daily casework practice, it is being used to make placement decisions, screening decisions, tracking critical incidents, managing caseloads, and other ways. Implementation science and continued leadership prioritization of CQI show that this integration will occur over time. |
| Data Capacity | Since 2016, CW has made substantial investments in technology, reporting, and adding new staff dedicated to continuous quality improvement. The Office of Reporting, Research, and Implementation (ORRAI) was created to consolidate reporting and focus capacity on building dashboards that support practice. Tools and reports are available and are timelier, especially for leadership. Progress is needed in building the consistent use of data across the agency. A new dashboard was constructed to track critical incidents, and staff can access better tools to identify fit between children and resource families. |
| Improving Service Quality | CW has increased its capacity to collect data and uses it to evaluate progress, monitor compliance, meet state and federal requirements, and improve services in response to the evidence. Much of this improvement has occurred since 2017. |

## 4.3.2 Continuous Quality Improvement (CQI): Summary of Key Theme

**Finding: Since 2016, CW has shown tangible evidence of improvement in this area by building a CQI Team consisting of staff dedicated to using data for continuous quality improvement.** The hiring of these 17 staff in 2020–2021 was funded by specific legislation aimed at improving the use of data by the CW agency. This CQI Team will assist CW staff in using data to make more informed decisions for children, young adults, and families.

In child welfare, the systematic use of data for performance and monitoring is called continuous quality improvement. CQI is the process of identifying, describing, and analyzing strengths and problems and then testing, implementing, learning from, and revising solutions. One of the guiding principles of the Vision for Transformation is "enhancing the structure of our system by using data with continuous quality improvement."[61]

Building CQI capacity has been an ongoing effort for CW, fueled by support in 2021 from the Oregon Legislature to provide the staff positions needed to build a CQI workforce. CW also worked with partners at Chapin Hall Center for Children at the University of Chicago to build robust CQI processes. As part of this process, CW created the CQI Workgroup to collect information on current processes, staff needs, and tribal input; and develop recommendations to build a CQI process that is flexible and responsive. This process aligns with the Vision for Transformation, informs the use of data through an equity framework, and defines the process to access and understand data.[62] The workgroup met throughout 2021 and leveraged expertise from tribal partners and those with lived experience.[63] The CQI Workgroup made recommendations concerning CQI implementation structure, CQI processes, feedback loops, and the use of data. In mid–2021, CW established a CQI Team with new full-time positions to lead the quality improvement work and provide more statewide technical support for implementing the CQI priorities.

In fall 2021, CW created a cross–program team with the Office of Reporting, Research, Analytics, and Implementation (ORRAI) to build the CQI data team that would develop a statewide CQI model. The team is working with CW to build data literacy and increase data transparency within CW and its community partners to help identify opportunities for improvement, track trends, and identify strengths.[64]

---

[61] Oregon Department of Human Services. (2020). *Oregon Child Welfare Division Vision for Transformation*. https://sharedsystems.ODHSoha.state.or.us/ODHSForms/Served/de2445.pdf

[62] ODHS Child Welfare Workgroup Charter: CW Statewide CQI Workgroup. (4/8/2021).

[63] ODHS CW Workgroup PowerPoint: Recommendations for Statewide CQI Structure. (10/19/2021).

[64] ODHS Memo: CW and ORRAI partner to create a statewide CQI model. (8/9/2021).

CW has made other concrete improvements in refining its Quality Assurance (QA) and CQI processes since 2016, such as ensuring staff throughout the division contribute to improving the CQI and case review processes. More detail about these processes can be found in the appendix. CW is partnering with Adopt USKids[65], the National Training Institute[66], and Wendy's Wonderful Kids[67] to build and repair relationships with resource parents and young adults to conduct a CQI process on their experience with the child welfare system to ensure that those with lived experience can contribute to the improvement of the child welfare system in Oregon.

### 4.3.3 Data Capacity: Summary of Key Theme

**Finding**: **Since 2016, data capacity has significantly improved.** Capacity improvements include technical enhancements to OR-Kids and expanded access to data reports via the ROM reporting interface. An ODHS Child Welfare Federal Reporting and Data website was launched in December 2021 and is accessible to external partners, the public, and staff through an interactive dashboard. These upgrades improve data accuracy and availability and encourage the child welfare workforce to use data in daily decision-making.

Data capacity has improved substantially since Oregon's State Automated Child Welfare Information System (SACWIS) was considered an area needing improvement in the 2016 CFSR and was highlighted as a need in the 2016 independent report. The Vision for Transformation emphasizes building a culture of inquiry and curiosity that leads to stronger collaboration and better problem-solving, and includes developing a system of continuous quality improvement where data is used to effectively target needs.

The ODHS Office of Reporting, Research, Analytics, and Implementation (ORRAI) was established, in part, to support ODHS' design and implementation of data-informed change.[68] In addition to supporting implementation of new initiatives, ORRAI analyzes and evaluates ODHS' programs and services to ensure they are effective and meet the needs of children and families. In 2017, ORRAI added implementation staff to strengthen the inclusion of those with lived expertise, including workers, experts, and ODHS clients, and improve the planning and coordination of implementation efforts.

---

[65] AdoptUSKids. https://www.adoptuskids.org
[66] National Center for Victims of Crime. National Training Institute (NTI). https://victimsofcrime.org/national-training-institute/
[67] Dave Thomas Foundation for Adoption, Wendy's Wonderful Kids. https://www.davethomasfoundation.org/our-programs/wendys-wonderful-kids/
[68] Office of Reporting, Research, Analytics and Implementation (ORRAI). https://www.oregon.gov/odhs/data/pages/orrai.aspx

PUBLIC
KNOWLEDGE®

Findings

CW has also implemented new processes to improve case reviews, reporting, outcomes, and services for children, young adults, and families. More information on these tools can be found in the appendix. Additionally, since 2019, there has been an increased focus on using data to tell a story and the value of various data elements in decision-making.[69] Interviewees commented that data has been used in new ways under Ms. Jones Gaston's leadership.

## 4.3.4  Use of Data to Improve Service Quality: Summary of Key Theme

**Finding: The CQI Team is helping CW use data to make more informed, comprehensive decisions for children, young adults, and families in various areas of practice.** CW uses data tracking in monitoring call wait times for the hotline, caseload tracking, tracking timeliness of initial assessments, recruitment and retention of resource families, and robust processes to integrate CQI into other areas that need monitoring and improvement are being developed.

CW has begun using data more consistently throughout the life of a case, as shown in the table below. As CW leadership continues to prioritize data-driven decision-making, relying on data at each phase of a case will become the way of working throughout the division.

### Table 5. Improvements in Use of Data

| | |
|---|---|
| **Screening** | Beginning in 2020, ORCAH implemented a data analytics tool that allows for the screener to make data-informed decisions about whether to assign a report for CPS Assessment. In 2022, CW transitioned from using data analytics to the Structured Decision Making® (SDM) Screening and Response Time Assessment Tool, which identifies the key points in the life of a child welfare case and uses structured assessments to improve the consistency and validity of each decision. |
| **Management** | Since 2016, CW implemented new tools, including developing dashboards and improving access to data, and data requests were streamlined to track themes and respond systemically to recurring requests. The 2021 survey showed that more managers than caseworkers believed that CW provided enough training and coaching on how they could use data to drive decisions and improve the quality of services. These responses show that leadership may currently be using data more than caseworkers. Caseworkers may not yet have a full understanding of the data available to them to make daily case decisions. As the CQI |

---

[69] Staff interviews and survey results.

Exhibit 8
Page 52 of 390

| | process becomes more embedded in CW practice, caseworkers will have increased access to data that will support their decision making, from placement decisions to permanency goals. |
|---|---|
| **Service Providers** | CW is also making progress in using data with external service providers. Interviewees reported that the contracts team has been working on incorporating performance standards into contracts for the past several years. One interviewee said that District Managers began to engage contractors in conversations regarding expected outcomes and quality, and some participants shared that there are not yet enough incentives for providers to make performance-based contracting effective. Momentum around performance-based contracts is building. |
| **Resource Families** | Beginning in 2018, Resource Retention and Recruitment Champions were hired and trained in each of the 16 districts to focus on the recruitment and retention of resource families. Their role is to assess the needs of children and families, local demographics, and resource parent strengths to determine the recruitment needs for their district. Each Champion has a district recruitment and retention plan, based on its local population, with targeted and measurable goals. Each district plan feeds into a statewide plan to inform efforts at the agency level. Before the pandemic, Champions aimed to increase the number of resource families by 10 percent. Champions also support local child welfare offices in certifying new resource parents and coordinate retention efforts across CPS, permanency, and certification teams. The Champions use the data from prospective and current resource parents to inform new recruitment and retention efforts. |

## 4.4    CW made progress during the identified timeframe to improve recruitment, retention, and the support of resource parents

**Finding: Since 2016, Oregon has improved recruitment of, training of, and support to resource families.** CW has implemented targeted recruitment to meet the needs of specific children and is collaborating across the child-serving system to increase capacity for resource homes. CW has increased service provision to resource families and has improved the training based on feedback received from resource parents and community members. While CW has not improved the ability to track the capacity of resource homes, this does not outweigh the significant progress in other areas. These improvements in practice have

not yet resulted in better outcomes for children, as Oregon's placement stability data has not improved.

## 4.4.1 Key Themes

**Table 6. Key Themes**

| Key Theme | Description |
|---|---|
| Diligent Recruitment | CW is focused on local, targeted recruitment, as shown by the hiring of 16 Resource Retention and Recruitment Champions, one in each district, to focus on recruitment of resource parents. These Champions use local data to drive their recruitment efforts and tailor them to the children needing care. |
| Resource Home Capacity | CW is using targeted recruitment to expand current capacity and is establishing local partnerships with county-level behavioral health providers including through the county-level system of care. CW's request to the legislature for an increase in reimbursement rates for resource parents passed in 2023 and will be effective in July 2024. |
| Training Supports | CW has retaken ownership of the resource parent training curricula and has incorporated feedback from resource parents in the development and implementation of the content. CW provides flexibility in training modality to meet resource parents' needs. |
| Placement Matching | CW uses several tools to appropriately match placements, including an assessment and home study. Oregon's policy requires matching children's needs to their caregiver's capabilities, but placement matching does not occur as consistently as the workforce desires. Oregon's placement stability is consistent but remains above the national standard. |

PUBLIC
KNOWLEDGE®

| Key Theme | Description |
|---|---|
| Service Provision to Caregivers | CW provides services and supports to resource parents to meet their needs and those of the children in their homes, and tailors these services. Oregon's formal respite program, which launched in January 2023 with newly allotted funding, has offered respite services statewide for some time. |
| Tracking Capacity | Capacity for substitute care is tracked manually through OR-Kids, which shows the number of certified homes, but does not provide needed and comprehensive information for caseworkers. |

## 4.4.2  Diligent Recruitment: Summary of Key Theme

**Finding: Since 2016, CW has prioritized best practices for diligent recruitment of resource parents who can meet the needs of children in care.** They are using data to drive decision-making and local, targeted recruitment efforts to reflect children's needs, cultures, and ethnicity in child welfare. The Vision for Transformation emphasizes the leadership support for recruiting and retaining resource parents and the consistent outreach and inclusion of community partners and voices of lived experience in this effort.

Diligent recruitment is the systematic process of recruiting, retaining, and supporting resource parents who reflect the diversity of children who need placement.[70] The diligent recruitment process is the gold standard for engaging, preparing, and retaining resource parents to develop capacity and improve outcomes for children. This requires child welfare agencies to address systemic barriers to identifying prospective resource families and then certifying, supporting, and retaining them.[71] The national resource parent recruiting campaign from Fostering CHAMPS[72], in partnership with the North American Council on Adoptable Children[73], identifies six key drivers of a comprehensive recruitment and

---

[70],2 James Bell Associates. (Aug. 2019). *Diligent Recruitment of Families for Children in the Foster Care System,Challenges and Recommendations for Policy and Practice.* Children's Bureau.
https://www.acf.hhs.gov/sites/default/files/documents/cb/diligentrecruitmentreport.pdf
[71] Administration for Children and Families, US Department of Health and Human Services.
https://www.acf.hhs.gov/sites/default/files/documents/cb/diligentrecruitmentreport.pdf
[72] CHAMPS (April 2019). *A CHAMPS Guide on Foster Parent Recruitment and Retention: Strategies for Developing a Comprehensive Program.* https://fosteringchamps.org/wp-content/uploads/2019/04/CHAMPS-Guide-on-Foster-Parent-Recruitment-and-Retention.pdf
[73] North American Council on Adoptable Children. https://nacac.org

Exhibit 8
Page 55 of 390

retention program. Oregon's resource parent recruitment and retention practices meet each key driver, as shown in the graphic below.

### Figure 6. Key Drivers of Resource Parent Recruitment and Retention Programs



**Child–Centered**
- Local Resource Retention and Recruitment Champions hired in 2018 to create targeted recruitment plans for each district.
- Vision for Transformation is trauma informed and includes building parenting skills
- CW has prioritized placement of children with relatives.



**Collaboration and Transparency**
- The Vision for Transformation focuses on preserving connections and honors lived experience.
- CW partners with local community organizations, such as Every Child and KEEP.
- CW has changed language from "foster" to "resource parents" to demonstrate the broader role the caregivers play in children's lives.



**Data–Driven and Informed by CQI**
- CW created a dedicated CQI team to implement and improve CQI efforts.
- Local Resource Retention and Recruitment Champions use data to create their plans.
- One of the guiding principles of the Vision for Transformation is focused on using data to inform practice.



**Youth and Parent Voice**
- The first guiding principle of the Vision for Transformation highlights the voices of those with lived experience and on their expertise.
- CW prioritizes partnering with community agencies and partners who deliver services and build strengths and connections.



**Leadership Within and Across Agencies**
- CW leadership and management have prioritized recruitment and retention by hiring local positions to create local plans.
- The Vision for Transformation is used by the Executive Leadership Team to drive practice and policy decisions, including recruitment and retention.



**Sustainability**
- CW leadership has prioritized the recruitment, retention, and support of resource parents by dedicating time and resources to these efforts.
- The inclusion of recruitment and retention in the Vision for Transformation demonstrates the commitment to this work moving forward.

In addition to the practices implemented in the graphic above, CW created a Resource Parent Training Manager position as part of the Equity Training and Workforce Development Team. CW now considers resource parents part of the workforce. The Resource Parent Training Manager and the team of Training Development Specialists develop transfer of learning and coaching tools to share with certifiers for ongoing development and coaching of resource parents. One of the Training Development Specialists is bilingual and supports the development of such tools in languages other than English. CW also provides statewide coaching for resource parents on good practices in caring for children.

In the past several years, Oregon has taken a progressive and innovative approach to the recruitment and retention of resource parents to better reflect and represent the population of children and young adults in care. When children and young adults can connect with their caregivers and have resource parents who are open and supportive, their placement stability and overall outcomes improve. As part of targeted recruitment and since 2016, CW has hosted recruiting events and Pride events throughout the state and

works with Basic Rights Oregon[74] to provide safe and affirming homes for children and young adults who identify as part of the LGBTQIA2S+ community. CW actively recruits same-sex couples and members of the LGTBQIA2S+ community, as well as members of faith-based communities. Certifiers address the openness and tolerance of prospective resource parents from the initial outreach to mitigate conflicts or concerns that may occur during placement and lead to placement disruption (and negatively impact placement stability) if not addressed earlier in the process.

CW leadership is also recruiting and hiring individuals who are part of the LGBTQIA2S+ community to increase diversity in the workforce, improve representation, and grow their practice with children and young adults who also identify as LGBTQIA2S+. Caseworkers engage and support children and young adults, leading to increases in disclosures of sexual orientation, gender identity, and expression (SOGIE) status. Regarding these disclosures, in May 2023, the Oregon Legislature passed and signed into law Senate Bill 209, which protects data related to SOGIE status. This protection allows CW to now gather these data without the unintentional consequence of outing a child or young adult and potentially compromising their safety, as SOGIE data were previously subject to the legal discovery process without any exceptions to the person's safety or well-being.[75]

CW recognizes the need for services tailored to meet the unique needs of children and young adults who identify as part of the LGBTQIA2S+ community. According to focus group participants, these tailored services can be challenging to access in areas of Oregon. In response, CW leadership shared that current service providers who can meet the needs of transgender youth are expanding their service area to bridge these gaps.

### 4.4.3 Resource Home Capacity: Summary of Key Theme

**Finding: Since 2016, CW has increased outreach with Treatment Services and Behavioral Rehabilitation Services to increase placement capacity for children who need higher levels of care.** This allows children with higher needs to be placed appropriately and keeps the population of general resource homes available to the children who do not have higher needs. Despite these efforts, Oregon caseworkers still perceive a shortage of resource homes, and staff have concerns about placement stability. To meet the needs of children and young adults, CW is conducting continual, targeted recruitment to find appropriate family resources, which did not occur consistently in 2016 and is a significant

---

[74] Basic Rights Oregon. www.basicrights.org

[75] Oregon Department of Human Services Child Welfare Division (June 30, 2023). Annual Progress and Services Report 2024. https://www.oregon.gov/dhs/children/Pages/data-publications.aspx

improvement. There was an adjustment to resource parents' reimbursement rates in 2017 (implemented in 2018). After CW recently advocated for another increase, the legislature approved an increase effective in July 2024.

Child welfare agencies nationwide are continually focused on expanding the capacity of resource homes and higher levels of care for the children and young adults who need them, and Oregon is no different. As mentioned in the previous section, CW's targeted recruitment effort is a significant undertaking that has shown an increased capacity in other jurisdictions.

Focus group participants shared that they believe the responsibility for increasing capacity should be shared across the child-serving system and not fall solely to CW. They shared that CW needs support and assistance from other agencies and child-caring organizations to meet this need, as children with higher behavioral or mental health needs may require placement beyond general resource homes. Children and young adults in substitute care are served by the behavioral and public health systems in addition to child welfare. The lack of consistent coordination across the child-serving system creates a barrier to retaining resource parents, as some parents cannot meet the children's needs in their homes or face too many safety risks for the rest of their family. Focus group participants shared concerns about children and young adults bouncing between resource family placements and residential care due to the lack of support for resource homes. Children sometimes need higher levels of supervision and support than some resource families can provide. PK agrees that each aspect of the child-serving system has a role to play in supporting children, young adults, and families, and ODHS is making progress in providing leadership to bridge these gaps.

- ODHS Treatment Services has worked for several years to partner with behavioral health services and providers to increase capacity and develop additional services for children and families. Many children and young adults involved with behavioral health are also involved with child welfare.

- The Oregon Youth Authority (OYA) and the Developmental Disabilities (DD) program each have certified homes and are adding placement capacity. OYA contracts out for placements when a provider is needed, and ODDS identifies providers specific to the children and young adults who need placement. CW has a responsibility to find placement options because they cannot refuse placements.

- In response to the 2020 Secretary of State's Audit, ODHS established a statewide interagency agreement with OHA in 2022 to develop roles and responsibilities for both OHA and ODHS in "measuring, maintaining, and developing service capacity in

**PUBLIC KNOWLEDGE**®

the Intensive Treatment Services service array."[76] This agreement requires both OHA and ODHS to collaborate on data collection, data analysis, and the provision of equitable access to quality services. This collaboration allows for cross-system support and partnership to allow children and families to receive high-quality services regardless of where they live in Oregon, which bridges a significant gap identified by focus group and interview participants. The interagency agreement allows children and families throughout Oregon to seamlessly receive the support and services they need, reducing barriers and obstacles to positive outcomes and permanence.

Families shoulder a financial impact when choosing to become resource families. CW recognizes the burden this can place on a family and provides multiple reimbursement levels to offset that impact. Resource parents had not received an increase in the Base Rate since 2018, and the legislature recently passed the rate increase that CW leadership requested, which will be effective July 1, 2024. Resource parents' rates will increase by an average of $241 per month.[77] In addition, the legislature increased employment-related daycare eligibility to reflect involvement with child welfare. Resource parents have received additional resources and reimbursement in certain circumstances, such as caring for children and young adults who tested positive for COVID-19.

## 4.4.4  Training Supports: Summary of Key Theme

**Finding: Since 2016, CW has revised resource parent training and has brought the development and oversight back to the agency from Portland State University.** Feedback from resource parents and the community was incorporated into the redesign of the training, and the revision of the curricula is connected to CW's CQI efforts and the Equity Training and Workforce Development Team. With these changes and technology tools, resource parents now have increased access to their training and certification information.

Training for resource parents has been redesigned and implemented in the past several years in partnership with tribes, communities, and resource families. CW has hired a training team to support the ongoing development of curricula and delivery of training. CW sought feedback from resource parents on the training content and delivery for the last five years, and based on that feedback, resource parents receive content from the National Training and Development Curriculum (NTDC) for Foster and Adoptive Parents[78] and the Resource and Adoptive Family Training (RAFT). These curricula include information

---

[76] Interagency Agreement: Oregon Health Authority, Oregon Department of Human Services Intensive Treatment Services Capacity, 2022-2025.

[77] ODHS Child Welfare 2023 Legislative Session Highlights.

[78] NTDC: https://ntdcportal.org

Exhibit 8
Page 59 of 390

resource parents need to create and support stable placements, meet complex needs, and address risk factors leading to maltreatment in care. The RAFT curriculum is offered in partnership with communities and tribes and is delivered after resource parents complete orientation and mandatory reporting training. Resource parents can also watch supplemental videos about the overview of the child welfare system and expand their parenting paradigm. This curriculum has been updated to include the expectation of resource families in creating safe and affirming homes for children and young adults.

Implementing the RAFT curriculum and technology solutions to support certification includes increasing training delivery and resource parent access to content. The technology solutions will include access to a Learning Management System (LMS) to provide resource parents entree to their certification materials and training content in a single portal, allowing them to obtain the information they need more efficiently. The RAFT curriculum is also offered in multiple methodologies to best meet resource parents' learning needs, and while a trained facilitator must deliver it, it can be provided in-person, or in a virtual or hybrid manner to allow ease of access to training content.

The training redesign is part of the expansion of the CW continuous quality improvement (CQI) infrastructure that began under the guidance of Aprille Flint-Gerner and the Equity Training and Workforce Development Team. This team is developing training and supporting the building of practice models for everyone in the child welfare workforce, including resource parents. The team is in the early stages of developing a comprehensive practice model.

The CW workforce receives training on recruiting, retaining, and supporting substitute care providers in their orientation and foundation training. They learn about prioritizing relative placements, maintaining children's connections to their communities, and the importance of permanence for children and young adults in care. The NTDC curriculum for resource parents is expanding this discussion for caseworkers. The Resource Retention and Recruitment Champions receive coaching on engaging and supporting resource parents as part of their daily responsibilities. CW staff also participated in training with Alia Innovations[79] regarding the focus on families and that a family's involvement with the child welfare system should be temporary. The work with Alia included permanency and safety supervisors, CPS and Safety Consultants, and Program Managers from 16 districts across Oregon. The participants, split into three cohorts, participate in learning circles and intensive case consultations to improve family engagement and achieve permanence. CW staff responsible for certifying resource family homes also receive specialized training on the certification process. CW staff had access to microlearnings as well, with topics including anti-racism work, navigating hard conversations, and using supportive language

---

[79] Alia: https://www.aliainnovations.org

with families. These staff were able to practice skills relating to permanence and change and can now use those skills with families and model them for their peers. Trainings and programs such as these reinforce the importance of permanency and the positive outcomes that come from genuinely supporting resource families.

## 4.4.5 Placement Matching: Summary of Key Theme

**Finding: Since 2016, CW has expanded the Child Adolescent Needs and Strengths Tool (CANS) to placement matching and determination of a level of need and supervisory requirements.** The Structured Analysis Family Evaluation (SAFE) home study tool has also been revised in the past two years to reflect the inclusivity and equity prioritized by the Vision for Transformation. These improvements in practice have not yet resulted in better outcomes for children, as Oregon's placement stability data has not improved.

Focus group participants shared that CW does track caregivers' strengths, but those strengths do not always match up with children who need placements. CW conducts a Child and Adolescent Needs and Strengths (CANS) screening for every child or young adult in ODHS custody to determine the child's level of care, supervision needs, and case planning information.[80] The information regarding the child's level of care and the caregivers' strengths and capacities allow caseworkers to make appropriate placement matches. The CANS tool was not used in this manner before 2016 and is evidence-based.

CW procedure requires caseworkers to assess the child's needs and the provider's ability before choosing a placement option to ensure an appropriate match and to reassess at each 90-day case plan review. While this requirement exists in policy, some focus group participants shared that placement matching does not occur consistently and that it can be nearly impossible to accurately match placements in crisis situations.

Placement stability data is one way to illustrate the accuracy of placement matching. When children are placed with caregivers whose skills and abilities match their needs, those placements maintain stability more than when a mismatch occurs. CW's data show that children placed with relatives experience fewer moves than those in other types of placements. These data are shown in Figure 9, in Section 4.5.4, for federal fiscal year 2023. The data show that children and young adults placed with relatives stay in that placement (with zero moves) nearly fifty percent of the time.

The national standard for placement stability for the CFSR Round 3 is less than or equal to 4.12 moves per 1,000 days of foster care (shown by the red line in the graphic below). The figure below shows Oregon's number of moves per 1,000 days in care from March 2016 –

---

[80] Oregon Department of Human Services Child Welfare Procedure Manual. (Rev. 10/4/2021) (pp. 755–766).

December 2021. Oregon's placement stability rate has remained relatively consistent over this period despite improvements in practice.

**Figure 7. Placement Stability: Number of Moves per 1,000 Days in Care**



The Structured Analysis Family Evaluation (SAFE) home study is used by CW for resource families, relative caregivers, and prospective adoptive parents to determine the efficacy for matching relative and non-relative providers. CW completed an analysis of this tool and subsequently updated the questionnaires used in the tool to focus on inclusivity and equity. CW has committed to providing training, technical assistance, and support to certifiers using the tool. Certifiers will also receive refresher training, learning labs on mitigation of risk factors and completing SAFE questionnaires, and resources for sharing this information with families.

Caseworkers and certifiers have requested a home study tool specific to relative providers, and CW is continuing to analyze practice and considering making this change.

## 4.4.6 Service Provision to Caregivers: Summary of Key Theme

**Finding: Since 2016, CW has provided services and supports to resource parents despite funding limitations.** During the beginning of the COVID-19 pandemic, CW provided cell phones and computers to resource families to facilitate attending remote court hearings and virtual school. ODHS also received funding for a formal respite program, which began in 2022, and CW has hired staff dedicated to this program to expand its use statewide. CW also partners with community organizations to provide respite activities to resource parents at the local level.

CW provides services and support to substitute care providers to ensure that children are cared for and appropriately supervised. One interviewee shared that "we definitely do what we can to provide those services," but cited funding and other resource limitations as



obstacles. Despite limitations, during the COVID-19 pandemic, CW purchased cell phones for resource parents to assist in attending remote court hearings and meetings, and computers for children and young adults to access virtual school activities. Some local agencies provided internet hotspots for families to mitigate internet connectivity barriers.

While Oregon historically has not had sufficient respite providers for resource families, ODHS recently received $14.5 million from the legislature to create a formal respite program for children at varying levels of care. CW has hired a coordinator for this program and is drafting policies and rules for this service. CW does offer respite activities for resource parents, including a parents' night out to allow resource parents time to refresh. The Response and Support Network (RSN) is currently being piloted in Multnomah and Washington Counties to provide emergent mental and behavioral health crisis needs. This program is available to resource parents 24 hours a day, 7 days a week, and services are provided immediately. This program will expand to Deschutes County next, and CW has submitted a Policy Option Package (a proposal to change the level of service or funding sources for activities authorized by the Legislature, or to propose new program activities not currently authorized.)[81] to implement statewide.

Resource parents also have access to programs such as KEEP, which offers affinity groups for parents caring for children and young adults with similar characteristics, such as toddlers, teens, children, and young adults in the LGBTQIA2S+ community, Native American, Spanish-speaking, and transracial families, and others. Caregivers can also use services and support from Every Child, an organization committed to recruiting and supporting resource families. Every Child provides services in 23 Oregon counties and continues expanding statewide.

## 4.4.7 Tracking Capacity: Summary of Key Theme

**Finding: Tracking capacity and vacancy of resource homes is inconsistent in OR-Kids and does not allow caseworkers to see the complete picture of availability and placement type to match placements accurately. While there has not been progress in tracking capacity, this does not outweigh the other improvements made for recruiting, retaining, and supporting resource parents.** Also, as data are used more consistently across CW, caseworkers and supervisors will have access to more information to allow them to track the capacity of resource homes.

The current capacity and vacancy for resource homes are tracked manually through OR-Kids, which does not capture all necessary data. OR-Kids users can see how many homes

---

[81] Oregon.gov. *How to Write an Effective Policy Option Package* How to Write an Effective Policy Option Package.

are certified but need help seeing homes that are pending certification or needing certification renewal. The number of certified homes is useful but does not allow caseworkers to track the actual capacity of homes and look at specific placement types, such as how many beds are available for a particular population, level of care, or other characteristics, such as whether gender–affirming homes exist in their community.

Further, OR–Kids may show the number of open beds, but the data still need to be completed. OR–Kids may not show which resource homes are temporarily not accepting children. Resource parents can adjust their preferences for the children they care for, but that information needs to be consistently tracked in OR–Kids. The inconsistency and inaccuracy of the data leads to caseworkers lacking faith in the information and requires additional work to locate open and appropriate placement options.

When caseworkers need to make quick placement decisions, the inability to accurately track placement capacity and the additional time it takes when the data is unavailable can lead caseworkers to turn to temporary lodging. According to some focus group participants, temporary lodging is used as an additional resource for placement rather than a last resort, as it is intended.

## 4.5    CW made progress during the identified timeframe to improve permanence for children in substitute care

Finding: Since 2016, Oregon Child Welfare has made progress in improving the prioritization of permanency for children in substitute care through the Vision for Transformation and its initiatives. Despite the improvements, the data show that it has taken longer for children and young adults to reach permanence over the past two years. Based on the available evidence, COVID–19 contributed to the delays in reaching permanence over this period.

### 4.5.1 Key Themes

Table 7. Key Themes

| Key Theme | Description |
|---|---|
| Placement Matching | CW has expanded the use of the CANS to support placement decisions and outline supervision needs. The Oregon Indian Child Welfare Act has expanded permanency options for American Indian and Alaskan Native children and young adults. |

**PUBLIC KNOWLEDGE**®

| Key Theme | Description |
|---|---|
| Placement Stability | CW has created new efforts to stabilize placement options for children and young adults and developed further training for caseworkers that highlights the importance of permanency. Oregon's placement stability remains above the national standard. |
| Timeliness | CW has prioritized timeliness to permanence through the Vision for Transformation and collaborates with court partners to address the timeliness of court hearings and decisions. Despite these efforts, the data show that it has taken longer for children and young adults to reach permanence over the past two years due in part to delays in hearings and interruptions to family time due to COVID-19. |
| Temporary Lodging | CW meets regularly with the Oregon Health Authority and the Office of Developmental Disability Services to discuss possibilities for young adults at risk of needing temporary lodging. The instances of temporary lodging are low compared to the total population of children and young adults in substitute care. |

## 4.5.2 Qualitative Evidence of Improvement: Prioritizing Permanence

Permanence for children and young adults in child welfare is the development and maintenance of permanent relationships and connections. Permanence is crucial for children and young adults to experience safety, healthy development, and well-being.

Child welfare has experienced a shift in recent years, emphasizing the importance of relational and cultural permanence and not solely legal permanence. Legal permanence is the relationship established through reunification, adoption, or guardianship. Relational permanence is an emotional attachment between children and young adults and their caregivers and family members. Cultural permanence is the continuous connection to family, traditions, age, ethnicity, language, and faith.[82] Rather than simply focusing on identifying a connection to be a legal permanent option for children in foster care, child welfare agencies, including Oregon, are recognizing the vital need for relational and cultural ties.

---

[82] National Center for Child Welfare Excellence at the Silberman School of Social Work. *What is Youth Permanency?* http://www.nccwe.org/toolkits/youth-permanency/what_is_youth_permanency.html

Exhibit 8
Page 65 of 390

**PUBLIC KNOWLEDGE**®

The beliefs outlined in the Vision for Transformation help "children and young adults have better long-term outcomes and keep the bonds and connections critical to their well-being."[83] CW's policy language around assessment, placement matching, placement preferences, family interaction, working with relatives, CANS assessments, resource parent training, and services to families all contribute to improving permanence.

Focus group participants shared that there has been a substantial culture shift around permanence, moving from waiting "to see how it goes" for children in placement to a sense of urgency around making permanency decisions.

> CW now has a "genuine focus on the fact that children don't belong in foster care... We used to have 'permanent care foster homes' and we were proud of those foster parents who agreed to raise kids and see them leave the system, but that's not the value we have anymore, and I'm so thrilled by that. We do kids such a disservice by holding kids in foster care for so long." – Interview Participant

According to ODHS' 2023 Annual Progress and Services Report (APSR)[84], CW has spent several years developing a strategy to provide support and services earlier and less intrusively to help keep children in their homes. The Family Preservation Program was implemented on March 28, 2022, in three pilot sites representing a small, medium, and large local office. The local leadership teams, community partners, and parent mentors were included in planning and preparation efforts, and community forums were convened to help develop the program training. CW hired a Family Preservation Program Manager in 2022, and CW's goal is to expand family preservation practices in 2023. Chapin Hall and Casey Family Programs provided technical assistance and support through developing and implementing the Family Preservation Program and have helped integrate CQI and lessons learned to prepare for statewide implementation.

Oregon's recognition of the need to keep children safely at home has contributed to dramatically reducing the number of children placed into substitute care, which has dropped approximately 30 percent in Oregon since 2018, as shown in the graphic below.

---

[83] Oregon Department of Human Services. (2020). *Child Welfare Division Vision for Transformation*. https://www.oregon.gov/odhs/child-welfare-transformation/pages/default.aspx

[84] Oregon Department of Human Services Child Welfare Division (June 30, 2022). Annual Progress and Services Report 2023. https://www.oregon.gov/odhs/data/pages/cw-data.aspx (*See* pp. 69–71).

PUBLIC
KNOWLEDGE®

Findings



Figure 8. Number of Children in Substitute Care 2016–2022

## 4.5.3 Placement Matching: Summary of Key Theme

**Finding: Since 2016, Oregon Child Welfare has improved efforts to appropriately match children and young adults with their placements and caregivers.** CW has expanded the use of the CANS to use the child's level of need in placement decisions. The recent passage of ORICWA has included developing permanency options and considerations for American Indian and Alaskan Native children and young adults.

Matching placements of children and young adults with appropriate caregivers contributes to permanence by increasing placement stability. Additional information on the importance of placement matching can be found in Section 4.4.

Accurately matching children and young adults with their caregivers requires the ability to track the skills and capacities of their caregivers. According to interviewees and focus group participants, CW tracks skills and capabilities and matches them to children and young adults using the CANS, as described in Section 4.4. The use of the CANS for placement matching and determining supervision levels has begun in the past several years, expanding the use of the assessment tool.

A significant area of improvement for placement matching since 2016 came with the passage of the Oregon Indian Child Welfare Act (ORICWA) in 2020, which demonstrates CW's priority to "protect the health and safety of Indian children and the stability and security of Indian tribes and families by promoting practices designed to prevent the removal of Indian children from their families and, if removal is necessary and lawful, to prioritize the placement of an Indian child with the Indian child's extended family and tribal

community."[85] Placement matching and following placement preferences are vital aspects of the federal Indian Child Welfare Act and the ORICWA. ORICWA was passed in 2020 based on a request from Oregon tribes and the disproportionate representation of American Indian and Alaska Native children in substitute care. The 2021 Procedure Manual reinforces the importance of ICWA placement preferences and provides instruction for situations where general recruitment of placement options and adoptive resources may be sought. Also, since 2016, CW requested and received money to hire regional ICWA specialists. Additionally, CW is working with Casey Family Programs on multiple interventions to improve practice. For example, CW is currently working with Casey Family Programs in three local districts to promote permanence for children and young adults who are legally free for adoption but do not have adoption as a permanency plan goal.[86] In addition to this adoption work, CW, the ODHS Tribal Affairs Unit, the Oregon ICWA Advisory Council, and Casey Family Programs are revising Casey's In-Depth Quality Review Guide to include expanded tribal definitions of permanency as culturally appropriate permanency options are a priority for the division. CW will use this to review and make permanency recommendations for children and young adults who are eligible for membership or enrollment in a federally recognized Tribal Nation. One such example of an expanded definition of permanency outlined in the 2023 APSR is Tribal Customary Adoption (TCA), which can be chosen by the child's Tribe. The completion of a TCA is coordinated among the child's Tribe, state juvenile court, and ODHS. CW developed administrative rule and training for TCA in collaboration with ODHS Tribal Affairs and the Tribal Nations and are developing additional procedures, forms, and related processes.

## 4.5.4  Placement Stability: Summary of Key Theme

**Finding: Since 2016, Oregon Child Welfare has introduced new efforts to stabilize placement options for children and young adults, including prioritizing relative placements and strengthening training for caseworkers that highlights the importance of permanence.** Placement stability has yet to improve despite practice improvements. The quantitative data show the use of temporary lodging is relatively low despite the perception among caseworkers that temporary lodging is used as a placement option rather than a placement of last resort.

The goal of placement stability is to reduce the number of times a child is moved, acknowledging that each move can be a traumatic experience for the child and family. More information on placement stability can be found in Section 4.4 of this report.

---

[85] OAR 413-115-0010. https://secure.sos.state.or.us/oard/viewSingleRule.action?ruleVrsnRsn=285052
[86] Oregon Department of Human Services Child Welfare Division (June 30, 2022). Annual Progress and Services Report 2023. https://www.oregon.gov/odhs/data/pages/cw-data.aspx (p.43).



Since 2016, CW has taken several steps to improve placement stability, including highlighting the young adult's voice and opinions on their permanency goals, prioritizing placement with relatives, and conducting ongoing searches for relatives throughout a child's involvement with child welfare. Research shows that initial relative placements lead to more stability for children and young adults, and CW's data support that. Oregon's data show that children placed with relatives experience fewer moves, as shown in the graphic, below, when compared with children who are not placed with their relatives.

**Figure 9. Number of Moves Based on Placement Type**

More information on initiatives regarding relative placements can be found in the appendix.

Focus group participants mentioned an appellate decision around guardianship that would allow caseworkers to consider permanent guardianship. The ability to offer another permanency option for children and young adults is significant, and some participants mentioned that this has not been available to some branches for over a decade.

## 4.5.5 Timeliness to Permanence: Summary of Key Theme

**Finding: Since 2016, Oregon Child Welfare has evolved, through the Vision for Transformation, into a permanency-driven organization with several projects dedicated to improving timeliness to permanence.** CW collaborates with the Juvenile Court Improvement Program to address delays in court hearings and rulings. However, the data show that for all but one of the measures, it is taking longer for children to reach

permanence, partly due to delays in hearings and interruptions to family time due to
COVID-19.

Permanence is a goal for every child or young adult placed into substitute care, and the
efforts to reach permanence in a timely manner must begin as soon as children are
removed from their homes. Achieving timely permanence requires leadership prioritization
and allows child welfare agencies to become permanency-driven organizations.[87] The
creation and implementation of the Vision for Transformation establishes Oregon CW as a
permanency-driven organization and demonstrates the sense of urgency for permanence
across the agency.

The Vision for Transformation outlines several strategic projects dedicated to increasing
timeliness to permanence, including improving reunification procedures, engaging family
members in case planning, and collaborating with the courts. The 2023 APSR describes
joint work with the Juvenile Court Improvement Program (JCIP) to reduce time to
permanence with a focus on reunification through a joint Program Improvement Plan.[88] CW
permanency leadership and JCIP staff meet quarterly to develop communication and
relationships, discuss strategies to improve timeliness and review progress and planning
for collaboration.

The Permanency Advisory Committee, which includes CW permanency staff and leadership
from each of the 16 districts, meets monthly to identify root causes of permanency-related
issues, implement efforts to improve permanency, and streamline processes to support
children and families in achieving permanence.

A significant challenge to improving timeliness to permanence since 2020 has been the
number of rescheduled or delayed permanency hearings due to COVID-19. Many local
courts were closed at the beginning of the pandemic and caused significant backlogs for
permanency hearings. The delay in holding these hearings has postponed permanency
decisions, including termination of parental rights (TPR), which allows children to be
eligible for adoption.

Federal measures of timely permanence consider that the likelihood of returning home or
being adopted varies over the duration of a child's time in substitute care. Federal CFSR
outcomes include three measures of timely permanence: rates for children in care for the
most recent 12-month period, for 13-24 months, and more than 24 months. Figure 10
below shows that a child's likelihood of permanence within a year of entering care has

---

[87] Casey Family Programs. (August 2018). Strategy Brief: What are some effective strategies for achieving
permanency? https://caseyfamilypro-wpengine.netdna-ssl.com/media/SF_Effective-strategies-for-
achieving-permanency-1.pdf
[88] Oregon Department of Human Services Child Welfare Division (June 30, 2022). Annual Progress and
Services Report 2023. https://www.oregon.gov/dhs/children/Pages/data-publications.aspx (pp. 80-81).

remained consistent since 2016, but a higher portion occurred earlier in 2022. A slight dip in permanence within the first 12 months of 2022 put the CW agency just below the Federal Standard.



**Figure 10. Rates of Permanence Within First 12 Months of Entry**

Oregon's data also show that CW met the standard of 13–23 months several times over the last four years and more so in 24+ months. Decreases in the previous two years coincided with COVID–19 restrictions and limitations on family interaction and court hearings.

## 4.5.6 Temporary Lodging: Summary of Key Theme

**Finding: CW's goal is to avoid the use of temporary lodging. Since 2016, Oregon Child Welfare has increased planning and collaboration around using temporary lodging when necessary and began tracking data in July 2018.** CW meets regularly with the Oregon Health Authority and the Office of Developmental Disability Services to discuss possibilities for young adults at risk of needing temporary lodging. The number of children and young adults using temporary lodging has decreased during 2022.

Temporary lodging is used in crisis situations when there are no placement options for a child or young adult. It consists of a stay in a hotel with a CW caseworker until a placement option can be located. According to the 2023 APSR[89], CW continually identifies children and young adults at risk of needing temporary lodging and uses prevention staffings with community partners to identify services and supports that would mitigate the need for temporary lodging.

---

[89] Oregon Department of Human Services Child Welfare Division (June 30, 2022). Annual Progress and Services Report 2023. https://www.oregon.gov/dhs/children/Pages/data–publications.aspx https://www.oregon.gov/odhs/data/pages/cw–data.aspx (*See* pp. 36, 55)



Due to these preventative conversations, many children and young adults at risk of needing temporary lodging remain in their current placements. ODHS' July 2022 Child Welfare Progress Report[90] showed that of the children and young adults identified as at risk of needing temporary lodging in the first two quarters of 2022, 74 percent were diverted due to cross-system collaboration.

Figure 11, below, shows the use of temporary lodging from 2018–2022 by month. While there have been increases during that period, the number of children or young adults with at least one day of temporary lodging during a given month has decreased over the past four years. During the same period shown in the graphic below, the number of children or young adults in care ranged from approximately 5,700 to 8,700.[91] This means that even at the highest number of children in temporary lodging (51), the percentage of children or youth in care who experienced temporary lodging was less than one percent.

### Figure 11. Number of Children or Young Adults with at Least One Day of Temporary Lodging During the Month



Despite the data showing that the number of instances of temporary lodging is low compared to the total population of children and young adults in substitute care, some interviewees and focus group participants perceived the use of temporary lodging at a higher level than desired. Participants highlighted teenagers with mental health needs as a significant contributor to temporary lodging case needs. They noted that while this often showed in more urban areas, it is a statewide issue. Discussions with CW leadership show that the numbers of adolescents and young adults in temporary lodging are not

---

[90] ODHS Child Welfare Division Progress Report. (July 2022). https://www.oregon.gov/odhs/child-welfare-transformation/progressreports/cw-progress-report-2022-07.pdf (p.8).
[91] Oregon Child Welfare Data Set, ROM Data. https://oregon.rom.socwel.ku.edu/

significantly increasing, but the young adults in temporary lodging have increasingly complex needs. These high needs restrict appropriate placement options for young adults and leave caseworkers feeling overwhelmed by the daily necessities of supervising these young adults.

Participants recognized that leadership, through the Vision for Transformation and collaboration across the child-serving system, is addressing the need for temporary lodging but noted there is still work to be done to see the additional impact. Much like other states using temporary lodging, Oregon has policies and structures occurring in silos, and there is room to improve this into a more collaborative effort. To that end, CW participates in regularly scheduled meetings with liaisons from the Oregon Health Authority (OHA) and the Office of Developmental Disability Services (ODDS) to collaborate on cases where temporary lodging is discussed and reduce placement barriers. These are crucial partnerships to reduce the use of temporary lodging. The 2023 APSR describes regular meetings between CW and ODDS to jointly identify ways to mitigate barriers to placement for children and young adults involved with both systems. The Multnomah County CW office is currently exploring partnerships to reduce these barriers and has established a workgroup with the Multnomah County DD Office.

Also, CW works with OHA to identify and access mental health services for children and young adults who may be at increased risk of needing temporary lodging. This partnership between CW and OHA has allowed Coordinated Care Organizations (CCOs) and mental health providers to address barriers to timely mental health services and simultaneously engage children and young adults who need these services. The APSR describes instances of children and young adults changing communities and having their previous mental health providers assist with transitions to new services.

## 4.6    CW made significant progress to improve permanency planning

**Finding**: **CW made significant progress to improve permanency planning during the identified timeframe.** This progress is evidenced by a shift from compliance to engagement in the work with families, the appointment of a Deputy Director with a rich history in permanency practice, the convening of a Permanency Advisory Council, the use of the CANS assessment to create data-driven permanency plans, and more timely permanency hearings.

**Table 8. Key Themes**

| Key Theme | Description |
|---|---|
| **CW Leadership has Consistently Prioritized and Elevated Permanency Planning** | CW leadership prioritized permanency planning in the Vision for Transformation, added a key leadership position with permanency planning knowledge, and shifted from focusing on compliance to the engagement of families. Additionally, CW's development of a CQI and QA framework as part of the case review process strengthens their focus on permanency planning. Finally, CW now convenes the Permanency Advisory Council, which is comprised of permanency staff and leadership from each district to discuss ways to continually improve permanency planning within the state. |
| **Families are Engaged in Creating and Updating Their Permanency Plans Using an Evidence-Based Assessment Tool** | CW has increased the engagement of families in permanency planning by encouraging the use of Family Decision Meetings. They have also expanded the use of the CANS Tool to encompass case planning and permanency planning. CW policy does not outline specific timelines for permanency plan updates, which PK would expect to see. However, the permanency plan is a component of the case plan for children in substitute care, and Oregon administrative rule does require case plans to be reviewed and updated every 90 days. However, despite missing this language for permanency plans, the timeliness of permanency hearings has improved over the last year. |

## 4.6.1 Leadership Prioritization: Summary of Key Theme

**Finding: Since 2016, CW leadership has consistently prioritized and elevated permanency planning by embedding permanency practice into the daily work.** CW has used data, through the case review process and CQI, to improve permanency planning. CW also created the Permanency Advisory Council to gather feedback from CW staff to improve permanency planning.

PUBLIC
KNOWLEDGE®

Permanency planning is how CW makes efforts to achieve permanence for every child and young adult. CW's Vision for Transformation prioritizes permanence.[92] Since 2016, CW has prioritized permanence by changing the culture around permanence, which is becoming more embedded throughout the workforce. CW has also implemented proven techniques such as the case review process, continuous quality improvement, and creation of the Permanency Advisory Council. The case review and CQI processes are iterative and ongoing, and in other states have led to continued progress and improvement in outcomes.

**CW leadership's shift to family engagement and family integrity has improved the quality of permanency planning.** Assessment participants noted that having a Deputy Director for Program and Practice, Lacey Andresen, who has dedicated her career to permanency practice, provides a great deal of support for permanency planning. Ms. Andresen was appointed to the Executive Leadership Team in February 2019. Before Ms. Andresen joined the leadership team, the agency's focus for permanency planning was on compliance. This new leadership team shifted focus to the importance of family engagement as part of permanency planning, which in turn, leads to improved outcomes according to research. This shift to family engagement has already improved the quality of the permanency plans. The consistent message from CW leadership is that children do better with their families and this value permeates the practice. CW's continued effort to engage families, to focus on race equity issues, and advocate for individualized planning and services shows. Assessment participants also recognized the link between engaging with families and improved permanency planning.

**Permanency planning is now a more formal priority within CW and is becoming engrained into the organizational culture.** Some focus group participants saw a shift within CW leadership to recognizing caseworkers as experts and supporting their services and permanency plan recommendations. Other assessment participants felt that leadership is not yet fully prioritizing permanency planning due to competing priorities and the implementation of other initiatives. Many participants shared that permanency is consistently addressed throughout the Central Office but that CW sometimes does not provide concrete support to local offices to implement improvements. Implementation science recognizes that shifting agency culture takes time to impact the entire organization and is impacted by agency resources allocated to multiple interventions and programs. The time that it takes to shift agency culture is likely responsible for the differing opinions. The progress in permanency planning can be seen through the staff's perception that their

---

[92] Oregon Department of Human Services. (2020). *Child Welfare Division Vision for Transformation*. https://sharedsystems.dhsoha.state.or.us/DHSForms/Served/de2445.pdf

Exhibit 8
Page 75 of 390

expertise is being recognized and respected, and if leadership maintains this priority, the expectation is that staff will continue to see the impact.

**CW's development of a CQI and QA framework as part of the case review process further strengthens its focus on permanency planning.** CW conducts a case review that helps staff understand barriers and capitalize on strengths in permanency planning. Additional information about the case review process can be found in Section 4.9. These case reviews are part of the overall QA and CQI system, described in Section 4.3, in which Permanency Consultants play a significant role. One aspect of CW's CQI process is convening and facilitating the Permanency Advisory Council (PAC), which is comprised of permanency staff and leadership from each district to discuss ways to continually improve permanency planning within the state. This Council includes permanency staff and leadership from all 16 districts. The PAC meets monthly to conduct root cause analyses on permanency-related issues, implement improvements to permanency practice, and find efficiencies in achieving permanence.[93] This is a best practice and has been proven to lead to better outcomes.

## 4.6.2  Family Engagement: Summary of Key Theme

Finding: Since 2016, CW has increased family engagement in permanency planning through Family Decision Meetings, the development of family plans, and the use of the CANS Tool for permanency planning.

Every child or young adult in substitute care must have a permanency plan that drives the decisions made for their placements, supervision, and services. The permanency plan determines the goal for the child and family and is reassessed throughout the duration of a family's involvement with the child welfare system. The primary plan is the family's desired outcome, and the concurrent plan is established in the event the primary plan is not achievable. Keeping permanency plans current is crucial to achieving successful permanence for children and young adults in substitute care. Permanency plans must reflect the current needs and strengths of the family to ensure the team is working toward the most appropriate goal.

CW has increased the engagement of families in permanency planning by the use of Family Decision Meetings to help the family share their needs and goals and inform the permanency and family plan. Family plans are created during Family Decision Meetings (FDM), which are used to make case plan decisions, including reunification or moving toward the concurrent plan.[94] They have also expanded the use of the CANS Tool to

---

[93] Oregon Department of Human Services Child Welfare Division, Annual Progress and Services Report (APSR) 2023. (June 30, 2022). (p.18).
[94] Oregon Department of Human Services Child Welfare Procedure Manual. (Rev. 10/4/2021). (p. 473).

**PUBLIC KNOWLEDGE**®

encompass case planning and permanency planning. CW policy does not specify the timeline required for permanency plan updates, which PK would expect to see. However, despite this missing best practice, the timeliness of permanency hearings has improved over the last year.

- **Since 2016, CW has strengthened guidance on using Family Decision Meetings for permanency planning purposes and underscored the importance of family voice in creating permanency plans.** Identifying appropriate permanency plans requires family engagement and support. As caseworkers engage the family and learn about family dynamics, they are better able to identify appropriate permanency plans for each child. Assessment participants shared that family meetings happen frequently and that the CW workforce engages families very well.

- **CW has emphasized the value of family engagement in permanency planning, but also has room to improve permanency planning practice.** Assessment participants recognized that identifying appropriate permanency plans is a priority, but it doesn't always happen. This is supported by survey results that show most staff believe that CW identifies appropriate permanency plans some or all the time when the goal is to always do so. Determining appropriate permanency plans can be challenging depending on the family's resources and support networks that can assist with reunification or relative placements. They mentioned that timeliness of concurrent planning is a systemic issue as this includes scheduling and conducting permanency hearings, which is outside of CW's control. Interviewees and focus group participants shared that agency leadership promotes the identification of appropriate permanency plans, but they were not certain how this occurs within local offices.

- **CW has increased the engagement of families in permanency planning by encouraging the use of Family Decision Meetings.** Since 2016, CW has strengthened policy language from allowing the caseworker and supervisor to determine whether to use an FDM to encouraging them to consistently share progress updates and support timely permanency planning, improving family engagement. Interviewees and focus group participants shared that the family plan includes efforts to engage the child and the family, and this has been a focus for the agency over the last three years. CW has expanded policy language since 2016 regarding descriptions and purposes for family meetings, and emphasizes the importance of holding consistent Family Decision Meetings. Holding these meetings regularly supports caseworkers in gathering updates on the family's progress and keeping permanency plans current.

- **In 2016, CW began using the Child and Adolescent Needs and Strengths (CANS) Tool for case planning and permanency planning rather than the more limited manner it was used previously.** Using the CANS in case planning allows

PUBLIC
KNOWLEDGE®

caseworkers and supervisors to use each child and family's unique needs and strengths to determine an appropriate permanency plan and assess parental capacities. This broadened use of the CANS supports data-driven permanency planning and can contribute to more stable, successful outcomes for children, young adults, and their families.

- **The timeliness of permanency hearings has improved by 4 percent over the last year.** Oregon's 2023 Annual Progress and Services Report (APSR) showed that, according to the Juvenile Court Improvement Program, timeliness of permanency hearings increased from 2020–2021, with nearly 93 percent of subsequent permanency hearings held within 365 days of the prior hearing, an increase from 89 percent in 2020. Holding permanency hearings timely supports positive outcomes for children and young adults by maintaining a sense of urgency in achieving permanence. As stated in Section 4.5, CW collaborates with the Juvenile Court Improvement Program on improving timeliness to permanence.

- **While timeliness of permanency hearings has improved, PK does not have enough data to determine whether timeliness of creation and updating permanency plans has improved or not.** Data collected during this assessment did not allow PK to determine whether permanency plans are changed and updated in a timely manner and according to state requirements. CW does provide policy guidance on specific instances when the permanency plan needs to be reviewed, but there does not appear to be specific policy guidance on a timeframe for reviewing and updating permanency plans, as stated in the beginning of Section 4.6. However, because the Procedure Manual does note that the permanency plan is part of case planning,[95] the permanency plan must be reviewed every 90 days and updated every 180 days.

## 4.7    CW made progress to improve individualized assessments for children and families

Finding: Since 2016, CW has highlighted the importance of engaging families and including them in the assessment of needs and strengths to inform their permanency plan and case plan. CW has broadened its assessment efforts by providing additional guidance to caseworkers on assessments and identifying more opportunities to assess throughout the duration of a family's involvement in the child welfare system.

---

[95] Oregon Department of Human Services Child Welfare Procedure Manual. (Rev. 10/4/202). (p. 423).



### 4.7.1 Key Themes

**Table 9. Key Themes**

| Key Theme | Description |
|---|---|
| Family Engagement | Over the past three years, CW has focused on engaging families to understand better their unique needs and strengths to tailor services to each family better. The Vision for Transformation guides this effort and highlights the need to hear the family's voice throughout the assessment process. |
| Scope of Assessments | CW has expanded the assessments provided to children, young adults, and families throughout their involvement in the child welfare system. New policy language and tools have been added to allow CW to gather as much information as possible to ensure permanency plans and case plans are comprehensive, responsive, and productive. |

## 4.7.2 Contextual Factors: Vision for Transformation

The Vision for Transformation helps CW to highlight the importance of family engagement and demonstrates the impact of that engagement on outcomes for children and families. The 2023 APSR describes how local offices have created Parent Engagement Plans to overcome obstacles to family engagement. These efforts resulted in an increase in Family Engagement Meetings and Youth Decision Meetings, which allow children and their parents to engage with their caseworkers, and additionally provides supports to create and expand their case plan and permanency plan.[96]

## 4.7.3 Contextual Factors: Child and Family Services Review Findings

The 2016 CFSR review assessed the adequacy of individualized assessments for children and families measured through Item 12, which asks whether the agency made concerted efforts to assess the needs of and provide services to children, parents, and foster parents to identify the services necessary to achieve case goals and adequately address the issues

---

[96] Oregon Department of Human Services Child Welfare Division, Annual Progress and Services Report (APSR) 2023. (June 30, 2022). https://www.oregon.gov/odhs/data/pages/cw-data.aspx (p. 71).

relevant to the agency's involvement with the family. As shown in the graphic below, CW has improved engagement with children, parents, and resource parents through the Program Improvement Plan (PIP) period of January 2018 – January 2022, following the 2016 CFSR, and is exceeding the goal set out in their PIP.[96] This shows CW's dedication to family engagement and improved performance in this area. Improved engagement of families allows CW to meet their needs more consistently, leading to better outcomes.

**Figure 12. PIP Performance on CFSR Item 12**



Item 12-Needs and Services of child, parents, and foster parents.
PIP Goal 45%

### 4.7.4  Family Engagement: Summary of Key Theme

**Finding: Since 2016, CW has prioritized family engagement as part of assessing needs, providing services, and case planning.** The Vision for Transformation focuses on engaging families and infusing their lived experience and expertise in identifying needs and services to help them reach their goals.

CW continues to make progress on system transformation, and significant efforts have been dedicated to ensuring children and families involved in the child welfare system receive individualized assessments to identify their specific trauma and needs while ensuring child safety. Procedures now guide child welfare staff to coordinate and collaborate with other professionals in assessing identified needs of families to ensure child safety and address any gaps in parenting, the well-being of children, and any other identified needs. Feedback from the focus groups, interviews, surveys, policy language, and quantitative data on assessment completion show evidence of CW's strengthened attention to authentic family engagement. There are tools in place now to support the engagement of families. According to focus groups, the assessment process creates engagement with families and provides connections that improve permanency planning.

**PUBLIC KNOWLEDGE**®

According to focus groups, previous leadership concentrated more on improving the number of assessments than on engagement quality. This has shifted, and now staff believe the current Executive Leadership Team is dedicated to authentic engagement with families to improve their access to services, as outlined in the Vision for Transformation. Focus group participants reported that their work is based on leadership's value, that children do better when they are with family, the foundation of the Vision for Transformation. CW has seen evidence of improvement in the quality of the assessments as training and supervision have reinforced family engagement.

## 4.7.5  Scope of Assessments: Summary of Key Theme

**Finding: Since 2016, CW has expanded the use of existing assessments and added new assessments and policies to gather information from children, young adults, and families.** The scope of the assessments CW offers allows caseworkers and supervisors to compile a comprehensive picture of each family's needs to appropriately tailor the services, permanency plan, and case plan.

Staff report that CW leadership encourages caseworkers to complete individualized assessments for children and families, and the Oregon Safety Model supports assessing family members individually to identify strengths. CW has increased training, discussions, and group supervision sessions regarding assessing and serving families.

Caseworkers receive training on case management and the assessment of needs and strengths during initial training and receive supervision throughout their case management duties. When surveyed, most caseworkers and supervisors agreed that CW provides assessment training and coaching and that leadership encourages individualizing assessments for children, young adults, and families.

The new caseload dashboard described in this report also uses OR-Kids data to quantify the number of assessments, cases, or providers each worker is assigned. This allows managers to understand their staff's workload and identify resource needs. The CW Executive Dashboard also includes various metrics, including foster care entries and exits, number of children in care, and data from individual and family assessments.

The number and type of assessments (shown in Section 7.2 of the Appendix) demonstrate a widespread effort since 2016 to assess and provide services to children, young adults, and families throughout Oregon. The changes from 2016 to 2021 show a commitment to clarifying requirements, timelines, and responsibilities for each type of assessment. Quantitative data show improved outcomes for children under age five for at least one assessment, Intake Nursing. Further, as shown in Figure 12 (earlier in this section), since completing the CFSR Round 3, ODHS has improved performance on Item 12, assessing and providing services to address children's, parents', and resource parents' needs, and

exceeded its PIP goal. The improvement in this item illustrates the efforts ODHS has taken to comprehensively assess the needs of children, parents, and resource parents to provide services relevant to their needs and improve outcomes for all involved.

## 4.8    CW made progress to improve service provision that meets the assessed needs of children and families

Finding: Since 2016, CW has improved service provision that meets the assessed needs of children and families. It is an ongoing challenge for CW to provide the breadth and depth of services to meet the complex needs of children in out-of-home care. The COVID-19 pandemic briefly impacted ODHS' ability to provide access to mental health and medical services[5]. However, evidence from surveys, focus groups, and CFSR results indicates that there has been substantial improvement in the ability of CW to meet children's mental health needs. CW has also expanded partnerships and collaboration to expand access to services, but there is still concern that service availability is uneven throughout the state.

### 4.8.1 Key Themes

Table 10. Key Themes

| Key Theme | Description |
|---|---|
| Cross-System Collaboration | CW participates in the Oregon System of Care Advisory Council and other ODHS areas and partners in the child-serving system. Service provision during the COVID-19 pandemic was mixed, as families with access to technology could use virtual services, but those without such access could not use remote services. |
| Process Improvements | CW expanded the use of the CANS Tool to identify and provide services that directly meet the needs identified for each child and family. CFSR results for providing services that meet mental health needs and case plan goals have improved since 2016. |
| Targeted Services | CW has prioritized meeting the needs of special populations through targeted services, including young adults, those with complex needs, and those who identify as part of the LGTBQIA2S+ community. |



## 4.8.2 Cross-System Collaboration: Summary of Key Theme

> **Finding: Since 2016, CW has participated in the System of Care Advisory Council, which is dedicated to improving services across the child-serving system and has improved partnership with ODDS and OHA to better serve families in the child welfare system.** During the COVID-19 pandemic, families with technology and internet access had virtual access to services that had not previously been available to them and was not available to families without such access.

Child Welfare is responsible for the safety, permanency, and well-being of the children and youth in its care and custody. Delivery of services to children is critical in achieving positive outcomes for Oregon children. While CW cannot direct medical or mental health services, CW must coordinate with other systems to ensure children and youth receive services for their potentially complex needs. Children and families often need services from multiple providers to meet their needs and develop their strengths.

In 2019, the Oregon legislature established the Governor's System of Care Advisory Council to "improve the effectiveness and efficacy of child-service state agencies and the continuum of care that provides services to youth."[97] The Council provides leaders with a venue to address system wide issues impacting children, youth, and families throughout the continuum of child and family serving agencies. Ms. Jones Gaston has participated in the Council along with other representatives from ODHS, including ODHS Director Fariborz Pakseresht.

Collaboration with the behavioral health system and substance abuse providers has improved over the past several years through stronger partnerships and better information sharing. Please see Section 4.5 for more information on this collaboration. ODHS leadership now convenes monthly leadership meetings with representatives from ODDS and OHA to address and resolve systemic barriers, including operational differences, training and development opportunities, and improvements or modification to data information systems.

Despite these partnerships, CW is facing limitations in capacity to provide supportive services that families need as these services are outside CW's purview. At times, the services needed by families do not exist, which is not within CW's ability to control. The COVID-19 pandemic impacted the service network significantly as providers shifted to delivering services virtually, which was a challenge for families without internet access and appropriate technology. However, permanency caseworkers state that during COVID-19, service delivery improved to support parents in meeting case plan goals. Access to virtual

---

[97] Oregon Health Authority: System of Care Advisory Council. https://www.oregon.gov/oha/HSD/BH-Child-Family/Pages/SOCAC.aspx

Exhibit 8
Page 83 of 390

services allowed for parents in rural areas of the state to access services that had previously not been available in their area.

## 4.8.3  Process Improvements: Summary of Key Theme

**Finding: Since 2016, CW has expanded the use of the CANS Tool to identify and provide services that directly meet the needs identified for each child and family.** This prioritization of appropriate service provision is demonstrated in improved CFSR results for meeting mental health needs and case plan goals from 2016 to 2021.

CW must assess the needs of and provide services to children, young adults, and families to identify the services necessary to achieve case goals and adequately address the issues relevant to the family's involvement with CW.

As discussed in Section 4.7, the CANS Tool is used to assess needs and strengths and, since 2016 has begun to be used to identify services. With consistent assessments and authentic family engagement, more needs are identified. CW provides services to meet children's needs, but as mentioned earlier in this report, staff still face limits in what services are available. Thirty percent of survey respondents reported that CW cannot maintain an adequate statewide service array.

The CFSR monitors CW's ability to meet children's and families' needs. There has been substantial improvement in rating Item 18 of the CFSR, mental health assessment and services, as a strength from 2016 to 2021, as shown in the figure below.

PUBLIC KNOWLEDGE®

Findings

**Figure 13. Mental Health Needs Met Rated as a Strength**



CW also made progress in CFSR Item 12, assessing the needs of and providing services to children, parents, and resource parents to identify the services necessary to achieve case goals, evidenced by an increase of 5 percentage points in case review findings.

**Figure 14. Child's, Parent's, and Resource Parent's Needs Met Rated as a Strength**



# PUBLIC KNOWLEDGE®

## 4.8.4 Targeted Services: Summary of Key Theme

**Finding: Since 2016, CW has focused on providing services to specific populations of children and young adults in substitute care, namely older children, those with complex needs, and those who identify as part of the LGTBQIA2S+ community.** CW has refined the delivery of independent living services and partnered with Basic Rights Oregon and the Foster Homes of Healing coalition to expand services for these populations.

Since 2016, ODHS has begun providing funding for services to children and families who cannot be supported elsewhere in the child welfare system through initiatives such as the Response and Support Network (RSN) and the Child Specific Caregiver Support (CSCS). These programs are funded under Child Welfare Treatment Services[98]:

- The RSN provides short-term clinical and non-clinical stabilization services to children, young adults, and resource families, OYA foster homes, DD foster families, and Post Adoption or Guardianship families. Services include parent mentoring, peer support, care coordination, skills training, 24-hour crisis response, and access to intensive mental health supports, and connects families to long-term supports.[99] These services are available for up to three months. The RSN, which began in March 2021, was piloted in one county and has expanded to three counties.
- The Child Specific Caregiver Support program grew out of the RSN pilot and began in May 2022. The CSCS provides individualized supports to resource parents of children with complex needs and is aimed at equipping caregivers and providing in-home stability to resource families to prevent placement disruptions.[99] The CSCS pilot is complete, and services are available in multiple counties.

Programs such as the RSN and CSCS allow children, young adults, and their families to access services quickly and in their communities, lessening obstacles to providing the individualized care that they need. These programs also support placement stability and reduce the trauma associated with new placements. During the pilot of the CSCS program, which ran from May 2022 through September 2023, 69 percent of children served remained in their placement. Contractors involved in the pilot noted multiple successes, including but not limited to helping children achieve permanence and preventing placement disruptions.[100]

The service array offered by CW must serve the needs of children in care, which includes meeting the needs of special populations like young adults and those who identify as part

---

[98] Deposition of Sara Beth Fox, September 21, 2023.

[99] Maple Star: https://www.maplestaror.org/community-services

[100] Child Specific Caregiver Supports Pilot Final Combined Data Report. (May 1, 2022 – Sept 30, 2023). (p. 12)

**PUBLIC**
**KNOWLEDGE**®

of the LGBTQIA2S+ community. In the United States in 2021, over 30 percent of children and young adults in substitute care were 13 or older[101] and, based on national research, about a third identify as LGBTQIA2S+.[102] Understanding issues of sexual orientation, gender identity, and gender expression is fundamental to meeting the needs of youth in care.

Many youth services are delivered via the Independent Living Program (ILP), which provides services to help youth aged 14 and older transition from foster care into independent adulthood. Since 2016, CW has built a tiered approach to the ILP model, allowing trauma–informed, age–appropriate, and developmentally appropriate services to be delivered to young adults. Additionally, CW is now working with Basic Rights Oregon to ensure there are safe and affirming homes for transgender children in foster care through the Foster Homes of Healing coalition.[103]

## 4.9    CW made consistent progress to improve case planning processes

**Finding: Since 2016, CW has improved completion of case plans as well as including families and tribes in the process.** CW has implemented tools such as quality assurance (QA), continuous quality improvement (CQI), and the Family Report to focus on inclusive case planning.

### Table 11. Key Themes

| Key Theme | Description |
|---|---|
| Case Plan Completion | Quantitative data show that CW has significantly improved case plan completion, partly due to process improvements in quality assurance and continuous quality improvement. |

---

[101] Annie E. Casey KIDS COUNT Data Center: https://datacenter.kidscount.org/data/tables/101–child–population–by–age–group?loc=1&loct=1#detailed/1/any/false/2048,574,1729,37,871,870,573,869,36,868/62,63,64,6,4693/419,420

[102] US Department of Health and Human Services Administration on Children, Youth, and Families. (March 2, 2022). ACYF–CB–IM–22–01 (https://www.acf.hhs.gov/sites/default/files/documents/cb/im2201.pdf), citing Cooper, K., Katsinas, A., Nezhad, S., & Wilson, B. (2014, August). Sexual and gender minority youth in foster care: Assessing disproportionality and disparities in Los Angeles, p. 37. Retrieved from http://williamsinstitute.law.ucla.edu/research/safe–schools–and–youth/lafys–aug–2014/

[103] Basic Rights Oregon, Transgender Justice. https://www.basicrights.org/transgender–justice

| Inclusion in Case Planning | Quantitative data show an increase in family engagement in case planning, partly due to improvements in quality assurance, continuous quality improvement, and the implementation of the Family Report and the Family Engagement Meeting. |

## 4.9.1 Case Plan Completion: Summary of Key Theme

**Finding: Since 2016, CW has exceeded their Program Improvement Plan goal for completion of case plans, partially due to QA and CQI efforts and the introduction of the new Family Report.** Staff receive training on case planning according to their role.

Each child or young adult in substitute care must have a case plan to direct the permanency plan and goals for the child and family. Case plans must be developed with the child or young adult and their family and must include a rationale for how the case plan goals will help achieve a safe placement in the least restrictive and most family–like setting, and outline services provided to prevent the child's removal from their family.[104] In Oregon, the case plan includes an assessment of the family's protective capacities, outcomes and priorities for necessary changes to provide safety, strategies to use with the family to create a safe environment, services to ensure safety and well–being, and progress toward outcomes.[105] Oregon Administrative Rule requires that a case plan include subsidiary plans, including the ongoing safety plan, permanency plan, and concurrent plan.[106] For more information on permanency plans, please see Section 4.6.

CW has improved completion of case plans for children and young adults, and case plans have been completed with their parents.[107] As of June 2022, 87 percent of cases have a completed case plan, which is an increase from 60 percent in December 2021.[107] These improvements are due at least in part to ongoing CQI and QA efforts, described in Section 4.4; the use of the CANS for case planning, as outlined in Section 4.6; and the new Family Report where caseworkers must engage the family to describe how the child's social, emotional, and cultural needs have been met. Local offices receive recognition for

---

[104] Child Welfare Information Gateway. (April 2018). Case Planning for Families Involved with Child Welfare Agencies. https://www.childwelfare.gov/pubPDFs/caseplanning.pdf
[105] Oregon Department of Human Services Child Welfare Procedure Manual. (Rev. 10/4/2021), (pp. 423–424).
[106] OAR 413–040–0005 to 0032. (Updated 7/1/2022).
http://www.dhs.state.or.us/policy/childwelfare/manual_1/division_40.pdf
[107] Oregon Department of Human Services Child Welfare Division. Annual Progress and Services Report 2023. (June 30,2022). https://www.oregon.gov/dhs/children/Pages/data–publications.aspx

Exhibit 8
Page 88 of 390

improving their case planning completion, and these efforts are outlined in their Family Engagement Plans.

Survey results showed that more than half of supervisors feel staff receive training and coaching on best practices in case planning. One interviewee indicated there is specific training on permanency planning related to safety plans for reunification. They also shared that adoption and guardianship program staff receive different training related to case planning.

## 4.9.2 Inclusion in Case Planning: Summary of Key Theme

**Finding: Since 2016, CW has increased inclusion of families and tribes in case planning.** Data show an increase in family engagement in case planning and can attribute the improvements to quality assurance, continuous quality improvement, and the implementation of the Family Report and the Family Engagement Meeting.

Family inclusion in case planning has improved during the Program Improvement Plan (PIP) Reporting Periods shown in the figure below. CW is exceeding its PIP goal that 59 percent of the cases are reported as strengths, which is a significant improvement throughout the Reporting Periods 11–48, which run from January 2018 – January 2022.[107]

### Figure 15. Performance on CFSR Item 13



The APSR attributes this improvement to implementing the Family Report over the last two years. The Family Report was created to engage families and gathers information about how the family was involved in case planning. The QA on the use of this report shows improvement since implementation. In addition to the QA reviews, interviews conducted as part of CW's CQI process indicate that families felt heard, respected, and involved in planning Family Engagement Meetings. CW has made significant improvement in the

completion of Family Reports, going from 12 percent timely completion in 2020 to 60 percent in December 2021.[101]

As discussed in Section 4.6, CW has improved the guidance provided to caseworkers since 2016 regarding engaging families in creating permanency plans, which are part of the overall case plan.

CW is also improving outreach to tribes as part of the case planning process, according to focus group participants. Participants noted that child welfare staff attempt to engage the applicable tribe but do not always receive the requested response. One focus group also noted that there is a genuine effort to engage tribes, but that tribes are often understaffed and may have limited resources, which can cause difficulties in engagement or coordination with CW. Another focus group participant commented they traveled across Oregon with a CPS unit, and they observed local offices collaborating and involving tribes as early as possible and developing systems in offices for early notice and partnership with tribes when responding to CPS assessments and supporting families. Another focus group participant noted that tribal involvement was an area in which child welfare was improving. The participant noted that leadership had put a good amount of focus on bringing relationships with the Tribal Affairs Office to the forefront.

## 4.10  CW made significant progress in preserving and improving connections between children in substitute care and their families and communities

**Finding: Since 2016, Oregon has made significant progress in this area, framed by the Vision for Transformation and multiple new efforts to connect children to their families and communities.** The Vision for Transformation underscores the importance of these connections by stating, "[w]e all know that infants, children, adolescents, and young adults do best growing up in a family that can provide love, support, life-long learning, shared values, and important memories."[108]

---

[108] Oregon Child Welfare Division Vision for Transformation:
https://sharedsystems.dhsoha.state.or.us/DHSForms/Served/de2445.pdf



### 4.10.1    Key Themes

**Table 12. Key Themes**

| Key Theme | Description |
|---|---|
| Family Interaction | Oregon's policy emphasizes the importance of family interaction and requires the ongoing support of families in building parenting skills. Caseworkers make significant efforts to facilitate family interaction while facing typical challenges with transportation, locations, and COVID-19 restrictions. |
| Relative Placements | Oregon prioritizes placement with and support for relatives, as shown by creating a kinship navigator program, policy language, and data demonstrating the increase in the use of relative placements over the past several years. |
| Sibling Connections | Oregon consistently demonstrates the importance of sibling connections through the involvement of siblings in planning for children's outcomes and creating a Sibling Bill of Rights in 2017 for children in substitute care. Quantitative data also illustrates the prioritization of placement with siblings. |
| Community Connections | The Vision for Transformation outlines the belief that ODHS believes that "communities often already have the wisdom and assets to provide safe, stable and healthy lives for their children,"[109] and ODHS actively seeks out the voices of lived experience when drafting new initiatives and concepts. |

### 4.10.2    Quantitative Evidence of Improvement

There is quantitative evidence of improvement in three areas: family interaction, relative placement, and sibling connections. For children who must be placed in substitute care, relatives offer the best opportunity for maintaining family and cultural continuity. Initial placement with a relative reduces moves and increases connections. More than a third of entries into substitute care result in initial relative placement, up almost five percentage points from 2016 to 2021.

---

[109] Oregon Child Welfare Division Vision for Transformation:
https://sharedsystems.dhsoha.state.or.us/DHSForms/Served/de2445.pdf

Exhibit 8
Page 91 of 390

## PUBLIC KNOWLEDGE®

### Figure 16. Initial Relative Placement



Initial Placement with Relatives as a Percentage of all Entries, 2006 to 2021

Legend: ■ Total Entries — Placed with Relative

The Federal CFSR process focuses extensively on maintaining connections and measuring conformity with multiple outcomes. Permanency Outcome 2 is centered on the continuity of family relationships and preserving connections and includes five items: placement with siblings (Item 7); visitation between parents, children, and siblings (Item 8); preserving connections (Item 9); relative placement (Item 10); and relationship with parents (Item 11). No state, including Oregon, achieved substantial conformity with Permanency Outcome 2 between 2015–2018; however, Oregon achieved better than the national averages, as shown in Table 13, below.

### Table 13. 2016 CFSR Permanency 2 Outcomes

| CFSR Item | Oregon Performance % Strength | National Performance % Strength | National Standard | Improvement Since 2016 |
|---|---|---|---|---|
| **Item 7**: Placement with siblings | 89% | 81% | 95% | More siblings placed together from 2016–2021. |
| **Item 8**: Visitation between parents, children, and siblings | 82% | 62% | 95% | Reunification within 12 months has improved, and reentry to foster care has decreased between 2016 and 2021. |

Exhibit 8
Page 92 of 390

PUBLIC KNOWLEDGE®

| CFSR Item | Oregon Performance % Strength | National Performance % Strength | National Standard | Improvement Since 2016 |
|---|---|---|---|---|
| **Item 9**: Preserving connections | 88% | 67% | 95% | Out-of-home care placements have decreased between 2016–2021, keeping more children safely in their homes. |
| **Item 10**: Relative placement | 77% | 70% | 95% | Initial placements with relatives have increased between 2016 and 2021. |
| **Item 11**: Relationship with parents | 79% | 58% | 95% | Reunification within 12 months has improved, and reentry to foster care has decreased between 2016 and 2021. |

There is, however, a disconnect between the quantitative data and the perception of the state's progress among child welfare staff. The survey results (shown in more detail in Appendix D) show mixed results in maintaining connections. This may be partially due to a lag in changing perceptions despite improved quantitative data. While child welfare staff were aligned in prioritizing relative placements, with 70 percent noting that this prioritization always occurs, fewer saw consistent efforts to facilitate sibling visits, with 46 percent stating this always happens and 52 percent saying it only happens sometimes. Only 17 percent of staff who responded felt that child welfare always diligently searched for resource parents that matched the child's race or ethnicity. The same percentage felt that providers who could care for LGBTQIA2S+ children and young adults were consistently and adequately recruited. Although the quantitative data show annual improvements, it takes more time for individual perceptions and staff to understand the changing data.

## 4.10.3    Family Interaction: Summary of Key Theme

**Finding: Oregon has enacted many of the recommended best practices for family interaction and provides support to children and their families to maintain connections while children are in substitute care.** Family interaction does not hinge on behavioral compliance and is not used as a reward; it is seen as a fundamental right for children and

Exhibit 8
Page 93 of 390



their families. The policy requires that resource parents actively support familial connections; and caregivers' certification depends, in part, on whether they consistently provide this support. ODHS caseworkers perceive differences in how policies are enacted across the state. The continued implementation and focus on the tenets of the Vision for Transformation will increase the application of family interaction policies statewide.

Child welfare best practice states that children spending time with their families is essential for healthy development and helps maintain attachment between children and their parents, reduce feelings of abandonment, and sustain a sense of belonging. When children spend time with their families, they can also strengthen cultural connections.[110] Research shows that families who spend more time together have a greater possibility of timely reunification, and those connections may also decrease children's mental health issues and behavioral concerns.[111,112]

A 2020 Casey Family Programs Strategy Brief[113] provides the following best practices regarding family time. The table below outlines how ODHS's case practice aligns with best practices, including what changes have been enacted since 2016.

**Table 14. Best Practices Related to Ensuring Adequate Family Time**

| Best Practice | 2016 Oregon Practice | 2022 Oregon Practice |
|---|---|---|
| **Family time is a right, not a privilege.** Family time is a fundamental right for children and should not be used as a bonus or reward. | • Meets best practice | • Exceeds best practice, the administrative rule was updated in July 2022, stating that children have this right to time with their families. |
| **Focus of family time.** Children should be able to spend time building connection with their parents, siblings, and extended | • Meets best practice | • Meets best practice but uses some outdated language describing "visits" |

---

[110] Casey Family Programs. (June 11, 2020). *How can frequent, quality family time promote relationships and permanency?* https://www.casey.org/family-time/

[111] McWey, L. M., Acock, A., & Porter, B. E. (2010). The impact of continued contact with biological parents upon the mental health of children in foster care. Children and Youth Services Review, 32(10), 1338–1345.

[112] Cantos, A. L., Gries, L. T., & Slis, V. (1997). Behavioral correlates of parental visiting during family foster care. Child welfare, 76(2), 309.

[113] Casey Family Programs: https://www.casey.org/family-time/

Assessment Findings Report          December 15, 2023          87

Exhibit 8
Page 94 of 390

| Best Practice | 2016 Oregon Practice | 2022 Oregon Practice |
|---|---|---|
| family, and not be focused on "visitation." | | rather than "family time." |
| **Frequency of family time.** Typically, the goal is to increase the number and duration of family time to prepare for reunification. Research shows that regular, meaningful family time enhances outcomes for children and families, including timely reunification.[114] Family time should occur within 24–48 hours of removal and should occur as often as possible. | • Meets best practice | • Exceeds best practice, noting that "frequent contact promotes timely reunification and is good for the parents and the child."[115] |
| **Involving the appropriate people.** Family time has evolved from supervised visits to quality time that promotes connections and includes many members of a child's extended family and community members. | • Meets best practice | • Continues to meet best practice |
| **Caregiver involvement.** Resource parents can help children prepare for and transition back to their homes following family time. Caregivers can provide transportation and, if appropriate, can offer coaching or support to the child's parents. | • Exceeds best practice by educating resource parents on reactions children may have to family time, benefits to family time, and prioritizing time with siblings. | • Continues to exceed best practice |

The Vision for Transformation reflects significant improvement around family connections. The initial guiding principle of the Vision for Transformation is "supporting families and promoting prevention," which is focused on building programs and services that are

---

[114] ACYF-CB-IM-20-02: https://www.acf.hhs.gov/sites/default/files/documents/cb/im2002.pdf
[115] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 433).

focused on engaging families, equity, safety, well-being, and prevention.[116] The prioritization of supporting families illustrates the leadership's commitment to these familial connections for all children. This prioritization is reflected in the strengthened guidance around scheduling and supporting family time, including determining the amount of supervision needed and incorporating technology and virtual visits when needed.

While the policy language has not changed since 2016, leadership is providing caseworkers with additional supports and guidance to meet the parents' identified needs, bolster familial connections, promote reunification, and encourage success. These policies include requirements for: parenting time to maintain, strengthen, or develop attachment between children and parents, considering the child's best interests when making placement decisions, and the development and updating of a Visit and Contact Plan to direct family interaction and ensure it is meeting the child's needs. Oregon is one of only a handful of states that incorporates emotional ties between children, their families, and caregivers into rule and procedure for the best interest determination. The requirement to create and update the Visit and Contact Plan ensures that the information is current, reflective of the family's needs and strengths, and appropriate for the case plan goals.

Additional requirements, established in 2017, include caseworkers attending three weeks of initial Essential Elements training within 60 days of their hire and before carrying child welfare cases. This training includes a module on the principles of engagement and partnership,[117] and this portion of the training demonstrates the importance of family engagement, sharing power, and how the principles of partnership support trauma-informed and culturally responsive practice. This module allows caseworkers to examine their own beliefs, values, and biases; and to use those to inform their practice with families. Participants learn to identify tools and techniques they can use to engage families and recognize community resources.

Despite the prioritization of family interaction and support and the policy requirements, some caseworkers and supervisors shared in focus groups that CW does not consistently provide sufficient and quality interactions between children and their parents due to transportation, visit settings, and time constraints. CW is making progress in mitigating these barriers by partnering with community organizations to provide transportation, creating welcoming visitation rooms, and attempting to schedule family time outside of school and work hours. Marion County is working with the Children's Public Private Partnership (CP3) to pilot a volunteer driver program to increase family interaction

---

[116] Oregon Department of Human Services. (2020). *Child Welfare Division Vision for Transformation.* https://www.oregon.gov/odhs/child-welfare-transformation/Pages/principle-1.aspx

[117] Essential Elements of Child Welfare Practice: Principles of Engagement and Partnership & Parent Panel. https://drive.google.com/file/d/13GEWfgiAGmUlyHy5yUYl73y3I3Jmomw1/view

frequency and expedite reunification in 2022.[118] Many local branches have redecorated their visitation rooms. CW has an ADA Coordinator who has begun working with branches to create a room designed for individuals and families with sensory concerns. For those districts without updated visitation rooms, many are in the process of creating more welcoming spaces for families. CW has removed cameras from visit rooms, and the leadership continually encourages local teams to consider why family interaction needs to be supervised.

## 4.10.4    Relative Placement: Summary of Key Theme

**Finding: Since 2016, ODHS has focused on one of the most powerful methods for maintaining connections with a child's family and culture by increasing the use of kinship care, now having one of the higher rates of kinship care across the country.** CW workers continually search for relatives when children are not placed with relatives. In 2020, Oregon implemented a kinship navigator program to support relative providers and connect them with necessary and appropriate services to assist in caring for children. The voice of lived experience heavily influences Oregon's development of this program and relates strongly to the Vision for Transformation's prioritization of family connections and permanence for children.

Kinship care and relative connections are crucial for children in foster care to maintain connections with their extended family and their culture and traditions. Since 2016, Oregon has prioritized kinship care and now has one of the highest rates in the country.

Oregon has prioritized family connections in multiple ways through the Vision for Transformation, including the expectation that children and young adults will be "in the care of family, friends, and neighbors whenever possible." It will "help children keep connections to their cultures, communities, and Oregon Tribal Nations." The initial guiding principle of the Vision for Transformation focuses on strengthening and preserving connections to family, culture, and community and prioritizing permanence.[119]

The consistent use of kinship care begins with leadership prioritization of relative placements, including reframing the expectations for caseworkers when making initial and subsequent placement decisions.[120] The high priority of using kinship care is reinforced by

---

[118] Children's Public Private Partnership (CP3). https://www.cp3oregon.org/programs

[119] Oregon Department of Human Services. (2020). *Child Welfare Division Vision for Transformation.* https://www.oregon.gov/dhs/CHILDREN/CWTransformation/Pages/index.aspx#principles

[120]

Casey Family Programs. (August 2018). Jurisdictional Scan: Strong Families. https://caseyfamilypro-wpengine.netdna-ssl.com/media/SF_First-placement-family-placement-1.pdf

the survey results, where 70 percent of respondents said that child welfare always prioritizes placement with relatives.

One method for supporting kinship placements and providers is through kinship navigator programs. These programs demonstrate to relative caregivers that their support is vital and that the child welfare system honors their willingness to care for their family members. Research shows that kinship navigator programs and services to kinship providers through public benefit programs have reduced the number of child maltreatment reports, substantiations of child maltreatment, substitute care placements, and child fatalities due to maltreatment.[121] Each of these measures have improved since 2017, as reports and substantiations of maltreatment, number of placements, and child fatalities due to maltreatment have all declined since 2017.[122]

Oregon began the process of creating a Kinship Navigator program in October 2018 and, in Fall 2019, awarded the Greater Oregon Behavioral Health Inc. (GOBHI) a two-year contract to build and operate the Oregon Kinship Navigator, which launched in February 2020.[123] A community provider was chosen to manage the kinship navigator program based on feedback ODHS collected from families and family advocates requesting that a non-governmental agency provide the support, outreach, and engagement.[124]

The foundation of the Oregon Kinship Navigator (OKN) is supporting families and promoting prevention, uniting the program to the first guiding principle of Oregon's Vision for Transformation. The OKN is guided by a Kinship Advisory Committee, consisting of kinship caregivers, public and private organizations, and advocates[125] to ensure that the implementation and oversight of the program are led by those with lived experience and expertise. The OKN includes all kinship families statewide, not just those already involved with the child welfare system, and allows CW to highlight prevention services. Such service provision to families before their involvement with child welfare can contribute to the continued decline of entry into substitute care in Oregon, which has been steadily declining since late 2017.

Even for young adults who cannot be placed with relatives, Oregon ensures that they maintain connections with those relatives. CW policy requires caseworkers to continually consider the inclusion of relatives in case planning, safety planning, placement, and

---

[121] Puls HT, Hall M, Anderst JD, et al. State Spending on Public Benefit Programs and Child Maltreatment. *Pediatrics*. 2021;148(5):e2021050685.

[122] 2021 Child Welfare Data Book. https://www.oregon.gov/dhs/CHILDREN/CHILD-ABUSE/Documents/2021-cw-data-book.pdf

[123] Oregon Kinship Navigator Project: https://www.oregon.gov/dhs/CHILDREN/Documents/22%20-%20Kinship%20Navigator%20Project%20III.pdf

[124] Oregon Annual Progress and Services Report 2022. (June 2021; resubmitted August 2021).

[125] Oregon Annual Progress and Services Report 2022. (June 2021; resubmitted August 2021).

ongoing support, which includes periodically reviewing CW's diligent efforts to place children with a relative (or person with a caregiver relationship) including asking whether siblings are placed together and, if not, what can be done to place them together and what is being done to maintain contact between siblings. This is important and powerful because while relative connections may not always be resources for placement or permanence, Oregon policy recognizes that children and youth still need continued connections to their families.

## 4.10.5    Sibling Connections: Summary of Key Theme

**Finding: Since 2016, CW has prioritized connections between siblings in substitute care, as shown by quantitative data and practice expectations.** The requirement of siblings to be involved with and considered as part of the case plan, case plan review, and decisions as young adults transition out of foster care demonstrates the importance of sibling connections to Oregon child welfare practice. The development of a Sibling Bill of Rights sends a strong message to young adults in substitute care that their relationships with their siblings are fundamental to their positive outcomes.

Sibling relationships can be the longest relationships that children have in their lifetimes and can provide continuity that children involved in the child welfare system may not find elsewhere. Connections to their siblings also serve as a protective factor for children in substitute care, and those connections can improve the child's and their siblings' well-being.[126] Maintaining regular connections with their family is the most critical factor in supporting a child's attachment to their parents, siblings, and other family members.

Oregon's improvement since 2016 in placing siblings together is reflected in the quantitative data, shown below.

### Table 15. Sibling Placement Data

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| **Percentage of children placed with a sibling** | 82.9% | 82.9% | 82.4% | 82.2% | 83.1% | 83.6% |
| **Percentage of children placed** | 17.1% | 17.1% | 17.6% | 17.8% | 16.9% | 16.4% |

---

[126] Child Welfare Information Gateway. (June 2019). Sibling Issues in Foster Care and Adoption. https://www.childwelfare.gov/pubPDFs/siblingissues.pdf

| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|

**apart from siblings**

Oregon is one of only a few states that has codified siblings' rights into law. This is important because prioritizing the placement of siblings together and the connections between siblings sends a message to children, families, and the child welfare workforce that sibling relationships are vital to children's success and maintaining connections. To that end, the Oregon legislature codified the Foster Children's Sibling Bill of Rights in May 2017 (and associated rules were effective January 1, 2018) to give children and young adults in foster care rights designed to protect and strengthen bonds with their siblings. Both Oregon's Foster Children's Bill of Rights and the Sibling Bill of Rights are written into statute. While many states have a bill of rights for young adults in foster care, Oregon is one of only a few states that has taken the step to create this specifically for siblings, and further spotlighted its importance by codifying it into state statute. This Sibling Bill of Rights gives children and youth in substitute care specific requirements their caseworkers must meet and information that children must receive about their siblings.

## 4.10.6   Community Connections: Summary of Key Theme

**Finding: ODHS is committed to building connections within a child's community and to creating and maintaining community resources for children and families.** The Vision for Transformation explicitly outlines expectations for keeping children with their families and within their communities; and highlights the voices of community members. ODHS amplifies the voices of those with lived experience through the Parent Advisory Council and is actively developing an updated Tribal Consultation Policy with Oregon Tribal Nations.

Maintaining the connection between children and their communities when they are placed into substitute care can mitigate some of the removal trauma. Facilitating these connections helps build protective factors for children and their families, and those protective factors mitigate risk and promote healthy development and well-being for children, young adults, and their families.[127]

Programs such as the Oregon Kinship Navigator help build protective factors as they engage families, build skills, and identify opportunities for support. In addition to helping families, building protective factors can also help agencies to build capacity and

---

[127] Child Welfare Information Gateway. (March 2020). Issue Brief: Protective Factors Approaches in Child Welfare. https://www.childwelfare.gov/pubpdfs/protective_factors.pdf

**PUBLIC KNOWLEDGE®**

collaborative partnerships.[128] This approach has demonstrated success in Oregon with a community agency to operate the kinship navigator and the inclusion of community members in the creation and oversight of the program.

The concept of building protective factors is also very evident in the Vision for Transformation, with the focus on strengthening and preserving connections to family and community by keeping kids home and in their community, when possible, as well as maintaining connections when placed in substitute care and prioritizing permanence. ODHS is also committed to engaging with the community by integrating the voices of children, young adults, parents, families, Tribal Nations, and partners to be more responsive to the needs of families. One way Oregon engages the community is through the Parent Advisory Council (PAC) of Oregon,[129] which includes parents who have been involved with child welfare, who are in recovery, and who are now community leaders. The culturally diverse Council includes members from six CW districts. The PAC meets monthly with state child welfare leadership and provides feedback to ODHS on new initiatives, concepts, and documents based on their lived experience. Since 2020, the PAC has led training, shared their stories, and answered questions for new resource families throughout Oregon. The PAC allows the voice of lived experience to further permeate the decision-making process at every level of child welfare.

Oregon is committed to collaborating with Tribal Nations to improve outcomes for American Indian and Alaskan Native children in substitute care. American Indian and Alaskan Native children are disproportionally represented in substitute care across the country and collaborating with Tribal Nations will address these outcomes for children and improve relationships between state and Tribal governments. States with strong relationships with Tribal child welfare agencies see improved outcomes for children in child welfare. ODHS is currently co-creating the Tribal Consultation Policy with OHA and the nine federally recognized tribes in Oregon. The goal of a Tribal Consultation Policy is to ensure the inclusion of the Tribes in the development of ODHS policies and programs that impact Tribes; establish communication pathways; and build trust, respect, and shared responsibility. Per Child Welfare Leadership, the ODHS Tribal Consultation Policy is in draft form and will be modeled closely after the Tribal Consultation Policy held by the Oregon Health Authority (OHA). The OHA policy notes that meaningful consultation between tribal

---

[128] Oregon Kinship Navigator:
https://oregonkinshipnavigator.org/?gclid=CjwKCAiA1MCrBhAoEiwAC2d64Rc0R_MVrfrjHI2lQRu1mU2Opn PoL7BDIsCM5Pt5SJ6W9tzxptw3wBoC7fIQAvD_BwE
[129] ODHS Community Engagement: https://www.oregon.gov/dhs/CHILDREN/Pages/community.aspx

leadership and agency leadership produces "information exchange, mutual understanding, and informed decision–making on behalf of the Tribes and the State."[130]

## 4.11  CW made progress during the identified timeframe to improve staffing resources

Finding: Oregon made progress in improving staffing resources during the specified timeframe. CW has expanded the leadership team to prioritize equity, training, and workforce considerations and has started tracking caseload data to manage workloads. Even so, CW has had challenges in providing training for caseworkers and is increasing training and coaching resources.

### 4.11.1   Key Themes

Table 16. Key Themes

| Key Theme | Description |
|---|---|
| Staff Recruitment and Retention | CW made progress in staff recruitment and retention, with support from the Governor's Office and modeling from the CW Executive Leadership Team. CW expanded the leadership by creating a Deputy Director position dedicated to equity, training, and workforce to demonstrate a commitment to this value. In the last two years, CW has seen an increase in hiring and decreased staff separations. |
| Caseload Management | CW made progress in caseload management and now tracks caseloads through an internal dashboard created in 2022. Despite the quantitative data trend, some caseworkers experience their workloads as higher than the quantitative data show. This is likely due to an increase in complex needs in the children and young adults currently in the system. |

---

[130] Oregon Health Authority Tribal Consultation and Urban Indian Health Program Confer Policy. 3/1/2018. https://www.oregon.gov/oha/documents/Tribal_Consultation_and_UIHP_Confer_Policy.pdf

| Key Theme | Description |
|---|---|
| Training and Coaching | CW progressed in training and coaching the workforce but has more room for improvement. CW has recognized that the initial training for caseworkers needs to fully prepare them for working with families and has created additional training pathways for roles and specialties. This addresses new staff training, but it is not ongoing. To address ongoing training, CW is building a coaching model and supporting supervisors in coaching their staff to the CW values. |

## 4.11.2    Staff Recruitment and Retention: Summary of Key Theme

**Finding: Since 2016, Oregon has made progress in staff recruitment and retention, with support from the Governor's Office and legislature in the form of approval for several hundred new positions and an oversight board to advise the division.** In 2020, CW created the position of Deputy Director for Equity, Training, and Workforce Development and hired Aprille Flint-Gerner to lead this effort. Since January 2021, CW has seen an increase in hiring and decreased staff separations for caseworker positions.

The Oregon Legislature approved funding for 300 new positions during the 2019 legislative session, and in July 2019, CW began a hiring surge. The increase in the number of SSS1 FTE positions from July 2016 to October 2022 is shown in the graphic below.

**Figure 17. Number of CW SSS1 FTE**



This hiring effort was driven by an executive order in April 2019 establishing an oversight board to address the crisis in Oregon's child welfare system.[131] The Governor's Office convened the Child Welfare Oversight Board to advise CW on the development and administration of child welfare policies, programs, and practices. To support the hiring surge, CW identified a Program Manager and additional employees, including an outside consultant and representatives from other agencies, to create the Child Welfare Recruitment Team. This team drafted a plan to identify candidates, developed application questions, and identified the hiring team.[132]

According to assessment participants, as part of this hiring effort, statutory requirements were lowered to attract a broader range of potential candidates. CW leadership clarified that the minimum qualifications for hiring were changed in 2018, before the hiring surge in 2019. Current job postings for entry-level social service workers require a bachelor's degree unrelated to human services and either one year of human services-related experience or completion of coursework consistent with Oregon Caseworker Competency or an associate degree with some experience and either two years of human services-related experience or one year of human services-related experience and related training, coursework, or certification consistent with Oregon Caseworker Competency.

As of the second quarter of 2022, CW had 1,143 ORCAH screeners and caseworkers and 20,717 child abuse reports.[133] Before centralizing the hotline in 2019, each district and county looked at the total number of staff to determine how many workers would screen on any given day, and there needs to be a mechanism to map those allocations across each county prior to centralization. CW made progress in hiring new caseworkers in 2019 through the hiring surge supported by the legislature, but the COVID-19 pandemic and nationwide Great Resignation likely increased turnover and departures over the past two years. However, turnover within ORCAH decreased between January 2021 and December 2022, and never rose above 8 percent.

CW created a Deputy Director for Equity, Training, and Workforce Development position and hired Aprille Flint-Gerner to fill the role in 2020. She now serves as the Child Welfare Director, but under her leadership as Deputy Director, CW began redesigning the hiring processes to put the right people in the right roles and focusing on equity so CW staff reflect the people they serve. Best practice from other states indicates this will increase the likelihood of people receiving the services they need.

---

[131] Executive Order No. 19-03: Establishing an Oversight Board to Address the Crisis in Oregon's Child Welfare System. https://www.oregon.gov/gov/eo/eo_19-03.pdf
[132] Alvarez & Marsal: Foster Care Work Plan Overview. 7/10/2019.
[133] Oregon Child Welfare Data Set, ROM Data. https://oregon.rom.socwel.ku.edu/

**PUBLIC KNOWLEDGE**®

CW is creating a pathway for development, providing learning opportunities, developing transfer of learning opportunities, and supporting middle managers and leaders. Supporting the workforce is a pivotal piece of the Vision for Transformation, as described in Oregon's Child Welfare Caseload Ratio Standards, which were created in 2021. The Standards state that "a supported, skilled, respected, and engaged workforce that reflects and embraces the communities we serve will ensure we have a network of services promoting prevention and well-being for Oregon's children and families."[134] These Standards are essential as they allow CW to monitor worker caseloads and ensure that the caseload and workload are appropriate and manageable for each caseworker. Having these Standards and these data can help supervisors and leaders ensure that caseworkers can manage their work.

In 2016, CW turnover was 23 percent,[135] and Oregon generally has a lower turnover than national averages. The national child welfare turnover rates have been between 30–40 percent annually, with an average caseworker tenure of two years.[136] Additionally, the average tenure of a child welfare director is 18–24 months,[137] and Ms. Jones Gaston held the Director position for three years.

## 4.11.3   Caseload Management: Summary of Key Theme

**Finding: Since 2016, Oregon has made progress in caseload management, most notably with the creation of the Caseload Ratio Standards.** CW now tracks caseloads via an internal dashboard created in 2021. The Governor's Office and CW leadership are providing additional resources to manage caseloads and have prioritized supporting the workforce. Some caseworkers feel that their workloads are higher than the quantitative data show, likely due to an increase in complex needs in the children and young adults in the child welfare system. CW leadership and management review caseloads and workloads weekly to monitor both for caseworkers.

A CW caseworker's caseload determines the amount of time they can spend directly with children, young adults, and families to support them in making progress toward their case plan and permanency goals. CW has caseload standards and now tracks caseloads but does not formally regulate them. In December 2021, CW developed a caseload dashboard for managers to understand staff caseloads better and determine the number of new cases

---

[134] ODHS Child Welfare Caseload Ratio Standards. (Revised 1/20/2022).

[135] Secretary of State Audit (2018): Foster Care in Oregon: Chronic management failures and high caseloads jeopardize the safety of some of the state's most vulnerable children.

[136] United States General Accounting Office. (March 2003). Child Welfare: HHS Could Play a Greater Role in Helping Child Welfare Agencies Recruit and Retain Staff. https://www.gao.gov/assets/gao-03-357.pdf

[137] Rawlings, Tom. "Leading Child Welfare Systems Past the Worst Tragedies." The Imprint. (August 15, 2019). https://imprintnews.org/opinion/leading-child-welfare-systems-past-the-worst-tragedies/36979

Exhibit 8
Page 105 of 390

staff could effectively serve. This is a significant improvement from 2016, when assessment participants shared that CW did not track caseloads for caseworkers and instead relied on self-reported time studies to estimate workloads. The dashboard was created as part of CW leadership's commitment to improving outcomes for children and families.

The caseworker dashboard pulls real-time data from OR-Kids to quantify the number of assessments, cases, or providers for each caseworker. The dashboard shows the number of assessments, cases, or providers for each caseworker to allow managers to understand their workers' current caseloads better and determine the number of new cases they can effectively carry. The data are updated in real-time and subject to change as the quality of information about staff assignments depends on information being entered timely and accurately within OR-Kids. The dashboard is organized by categories, including caseworker type, district, and county level, and can be filtered by supervisor and worker level to provide data on assigned cases. The goal for the dashboard is to eventually include human resources data, including current staffing, vacancies, rotations, and other hire statuses, to provide additional detail. This is an internal management tool to assist in assignments and work management. Child Welfare leadership will use an internal monthly and quarterly average to inform allocations, needs, and trends.

The Child Welfare League of America (CWLA) historically recommended using caseload standards to help manage caseworker workloads, and child welfare agencies in many states adopted them. CWLA provided recommended standards of 12 to 15 children per caseworker but recommended that child welfare agencies develop their specific caseload standards. However, CWLA reported that workload studies used by child welfare agencies to establish caseload standards do not account for all the variables that affect workload.

According to a 2018 CWLA report, the "field needs to move past establishing blanket caseload standards that do not take into account the complexities of workload." For these reasons, the CWLA reported it is moving away from focusing on numerical caseload standards to outcome-based workload standards and creating a methodology for managing them. This shift is represented in ODHS' Child Welfare Caseload Ratio Standards as well, stating that "an exceptional workforce that is developed and supported at all levels will result in a decrease in vacancies, an increase in retention rates, an increase in longer tenures, increased promotion, manageable caseloads, and higher workforce morale."[138] The Governor, legislature, and CW are prioritizing workforce capacity and resources.

The table below shows a statewide snapshot of average caseload data for CPS, Permanency, and Certification caseworkers from September 2023[139]. These data were pulled from the

---

[138] ODHS Child Welfare Caseload Ratio Standards. (Revised 1/20/2022).
[139] ODHS Caseload Report Dashboard. (September 30,2023).

dashboard mentioned earlier in this section that CW developed for managers and leaders to understand current caseloads. In September 2023, CW caseloads exceed best practices according to COA standards.[140] These low caseloads demonstrate ODHS' commitment to their own standards and to managing workloads for their staff. While these quantitative data do not demonstrate the complexity of each child, family, or case, the lower caseload numbers allow caseworkers to provide quality support and supervision to each child and family. CW also recognizes that hiring additional safety staff will enable new caseworkers to carry lighter caseloads, as data from Spring 2023 show that new caseworkers carried up to 11 cases, and that their caseload ratios increased with their tenure.[141]

---

[140] Council on Accreditation. (2022). Standards for public agencies: https://coanet.org/standard/pa-cfs/2/

[141] Child Welfare Division: Workforce and Respite Care Presentation. April 18, 2023. https://olis.oregonlegislature.gov/liz/2023R1/Downloads/CommitteeMeetingDocument/270889

Exhibit 8
Page 107 of 390

**PUBLIC KNOWLEDGE**®

### Table 17. Caseload Information: September 2023

| CPS Caseload | |
|---|---|
| Average Assessments Assigned to Workers | 21.9 |

| Permanency Caseload | |
|---|---|
| Average Children/Young Adults Served Assigned to Workers | 10.5 |

| Certification Caseload | |
|---|---|
| Average Resource Homes Assigned to Workers | 14.1 |

Oregon's Caseload Standards meet, and in some cases are more strict, than the national standards, as shown in the table below. For reference, a worker's caseload (or the number of children or families assigned to an individual worker) is equal to the number of Workers divided by Cases.[138]

### Table 18. Oregon Caseload Standards

| Oregon Caseload Ratio Standards | | 2022 Edition of COA Standards for Public Agencies | Meets Best Practice? |
|---|---|---|---|
| Screening | 1:561 calls | 12 active investigations at a time (Note: COA Standards include recommendations for investigations, not screening) | Unclear based on data shown above. ORCAH policy requires one screening report per hour. |
| Child Protective Services | 1:7 newly assigned assessments | No more than 8 new investigations per month | Yes |
| Permanency (in-home, substitute care, and adoption) | 1:12 children | • 15–17 families receiving ongoing in-home services <br> • 12–15 children in substitute care (and their families) <br> • 8 children in treatment foster care (and their families) | Yes |
| Certification | 1:21 homes | *Not included in COA Standards | Unclear as there is no national standard |

Exhibit 8
Page 108 of 390

As mentioned earlier in this report, participants noted that CW does not have the option to refuse to provide services and placement resources for all children and families. In some cases, CW serves families with needs that a child welfare system is not traditionally equipped to meet, and the workforce is suffering. Some young adults are a greater danger to their community than their parents are to them, but they get involved with child welfare because, as an agency, CW cannot turn children away.

## 4.11.4    Training and Coaching: Summary of Key Theme

**Finding: Since 2016, Oregon has made some progress in building a coaching model and providing coaching to staff.** CW recognized that the current initial training for caseworkers needs to fully prepare them for working with families and requires improvement. CW has initiated revisions to the Essential Elements training and have created additional training pathways for roles and specialties. CW is building a coaching model and supporting supervisors in coaching their staff to the CW values.

The child welfare workforce depends on training at various levels of their careers to stay current on state and local law, agency policy, best practices, and expectations for their work with children, young adults, and families. Child welfare agencies provide initial training to their workforce and ongoing training, depending on their specialty within child welfare.

To address ongoing professional development, CW has received approval to build a coaching infrastructure, which includes a 30-person training team to support the continued development and delivery of curriculum and training and focus on coaching and leadership. CW is adopting an adaptive leadership supervision model with a coaching and reflective supervision foundation. Supervisors will be taught to ask good questions when meeting with caseworkers and are taught prevention plan-building skills associated with appreciative inquiry and motivational interviewing.

CW uses an apprentice or coaching model for continued learning. This model recognizes the expertise of supervisors and managers and expects them to provide ongoing training and support to their staff. Some assessment participants report they would like CW to move to a more formal apprentice system where new workers are trainees for their first six months, then provide on-the-job coaching for their first few cases before they take on a full caseload. They requested that CW invest more in on-the-job training over classroom training to prepare caseworkers for the job adequately. As CW continues to implement an adaptive leadership model and supports supervisors and managers as they coach their staff, caseworkers will likely gain confidence and experience while getting to begin working with children, young adults, and families and receive on-the-job training simultaneously.

**PUBLIC KNOWLEDGE**®

Assessment participants shared that CW has work to do to ensure that the transfer of learning has happened and that values are embedded throughout the workforce. They stated that they need to get supervisors coaching on those values to entrench them in the caseworkers' practice and build caseworkers up as an integral part of the workforce. This embedding of CW values will also logically increase as the adaptive leadership coaching model is more prominent across the state.

As stated earlier, CW implemented the Essential Elements training in 2017 to provide caseworkers with three weeks of initial training and two weeks of follow-up training and resources. CW leadership reports that staff are adequately trained through this curriculum. They say that Essential Elements includes training to determine what individual children or families need, and when they see other needs, they infuse more training. Leadership is working to make sure caseworkers have a defined skillset. It will then introduce more training to help move workers along a continuum from introductory to mid-career to advanced through the additional training pathways mentioned previously in this section.

However, some caseworkers disagree and shared in focus groups that new caseworkers must be prepared to work with families. They noted that new caseworkers are often very clinical or rote and lack the smooth communication, people, and critical thinking skills to adapt to working with families, as it takes time to practice and master these skills. Central Office staff agreed and were concerned that Essential Elements does not completely prepare workers to engage with families. Participants state that the curriculum needs to be more comprehensive to prepare caseworkers for their first case focusing on permanency and more content regarding safety practices. As mentioned throughout this report, the implementation of new initiatives and practices takes time, and the adaptive leadership model is in progress. While some members of the CW workforce are understandably concerned about the existing state of training and coaching, this new model will positively impact the preparedness of caseworkers moving forward.

CW is revising the Essential Elements process to respond to the needs of their staff. These revisions for preparing caseworkers include:[142]

- An on-ramp process that begins after completing the 15-day Essential Elements course. During this, workers are introduced to their Coaching and Training Specialist, who provides direct field support, tutoring, group learning sessions, and individual guidance.
- A reduced caseload for the first month following completion of Essential Elements in which the new caseworker is only assigned one case per week. Supervisors can

---

[142] Deposition of Kim Aaron Lorz. September 12, 2023.

Exhibit 8
Page 110 of 390

**PUBLIC KNOWLEDGE**®

assess the caseload after this first month to determine whether the caseworker is prepared for additional case assignments.

- Six months of on-the-job training, including the on-ramp process and completion of the remaining Essential Elements courses regarding well-being, trauma-informed practices, family conditions, and court preparation. During these six months, caseworkers receive support from their Coaching and Training Specialist and direct supervision from their casework supervisor.

- A supervisory assessment following the on-ramp and completion of the additional courses to determine whether the caseworker needs additional support or training.

CW is also developing a training academy and will pilot it in 2024 to provide additional support to new caseworkers.

Caseworkers have additional training requirements based on their tenure and their role. More information on these requirements and curricula can be found in the appendix.

CW logs the completion of initial and ongoing training for caseworkers in WorkDay Learn, which began in 2021. CW managers can pull a report that shows which workers attended a specific training, and CW is working to provide more reports to managers. Portland State University (PSU) can also track ongoing caseworker training. The PSU reports can be uploaded into WorkDay to consolidate training information, making it simpler for managers to track completion. CW is adding new components to WorkDay each year to build the training infrastructure and manage talent throughout the division.

If called as a witness, I would offer testimony as to the matters set forth in this report. The report contains complete statements of my opinions in this case and the basis and reasons for those opinions. The conclusions are reached with a reasonable degree of professional certainty.

*Stacey Moss*

Stacey Moss
President, Public Knowledge®

# Appendix A: Supplemental Evidence

This appendix contains additional context to support the findings listed in Section 4.

# 1    Child Safety

## 1.1    Implementation of 2016 Recommendations

**Redesigning the Process of Responding to Allegations of Abuse in Care**

CW implemented changes in responding to allegations of abuse in care required by the passage of Senate Bill (SB) 155 in 2019, which addressed the increase in child abuse assessments and investigations[143]. SB 155 also divided responsibilities for assessing and investigating reports of child abuse between CW and the Office of Training, Investigations, and Safety (OTIS).

**Table 19. SB 155 Child Abuse Assessment Responsibility Changes**

| Child Welfare will assess reports of child abuse involving: | Office of Training, Investigations, and Safety (OTIS) will investigate reports of child abuse involving: |
|---|---|
| Familial alleged perpetrators | Child Caring Agencies (CCAs) |
| CW certified resource families | Childcare providers |
| Minors as alleged perpetrators | Office of Developmental Disabilities Services group or foster homes |
| Commercial Sexual Exploitation of Children | Oregon Youth Authority foster homes |
| Third party intimate partner alleged perpetrators | School or educational providers |
| Third party relative alleged perpetrators | Other third-party alleged perpetrators |

---

[143] ORS 419B.020 and 419B.026.

Exhibit 8
Page 112 of 390

# PUBLIC KNOWLEDGE®

Child Safety

The Planning Council for Health and Human Services, May 2009 "Child Safety in Foster Care" publication outlines best and evidence-based practices that enhance safety for children in foster care, listed in the table, below.[144]

**Table 20. Best Practices Related to Enhanced Safety of Children in Foster Care**

| Best Practice | 2016 Oregon Practice | 2022 Oregon Practice |
|---|---|---|
| Efforts to prevent maltreatment by a foster parent begin with a screening and assessment process (including screening and assessment tools) | Unknown | Meets best practice. |
| Develop ongoing targeted recruitment and retention campaigns to meet the needs of the population of children in foster care | Did not meet best practice | Meets best practice: See Section 4.4. |
| Foster parents must have the necessary training to meet the challenges that arise when caring for foster children, including specialized training for kinship providers | Unknown | Nearly meets best practice: See Section 4.4. |
| To ensure a child's safety in a foster care setting, parents, caregivers, agencies, and providers must understand a child's healthcare needs, as well as the services and supports required to meet those needs | Met best practice | Meets best practice: See Section 4.7. |
| Workforce issues, including training and retention, are essential aspects of preventing maltreatment in foster care. Caseworkers must have realistic workloads to have time to make required visits to children in foster care. | Did not meet best practice | Meets best practice: See Section 4.11. |

From July 2015 to June 2017, the rate of maltreatment in care rose from 14.8 to 19.7 victimizations per 100,000 days in foster care. The national threshold is 9.67, and in Oregon since June 2017, the rate has fluctuated, however it has decreased to 17.7 in July 2022, as shown in the figure below.

---

[144] Best and Evidence-Based Practices that Enhance Safety of Children in Foster Care. (May 2009). https://ncwwi.org/files/Evidence_Based_and_Trauma-Informed_Practice/Best__Evidence-Based_Practices_that_Enhance_Safety.pdf

Exhibit 8
Page 113 of 390

## PUBLIC KNOWLEDGE®

**Figure 18. Change in Maltreatment in Care from 2015 to 2021[145]**



## 1.2   Implementation of the Oregon Child Abuse Hotline (ORCAH)

**Centralized Intake**

Intake systems can be centralized or decentralized. Reports received at either local or regional offices are decentralized, while centralized systems receive reports at one centralized location.

Correct screening decisions may provide much needed assistance to families in need and can assist child welfare agencies working with families in impacting safety, permanency, and well-being for children and young adults in need. Incorrect screening decisions lead to unnecessary invasion of families' rights, burdening an overworked child welfare workforce, and losing opportunities to help children and families in critical need.

The centralized Oregon Child Abuse Hotline (ORCAH) was launched on April 4, 2019, to provide the state with constant access in reporting child abuse and provide consistency in how reports are screened.

> Oregon's vision for Centralized Intake is to "engage our communities, including mandatory reporters, and respond to reports of child abuse in a transparent way. Our vision is to do

---

[145] Results Oriented Management (ROM) Data Site, Oregon Department of Human Services, Report SA.01, 6/27/2022. https://oregon.rom.socwel.ku.edu/reports/100

PUBLIC
KNOWLEDGE®

Child Safety

so while ensuring our children and youth, in their own communities, are safe." Oregon's mission for ORCAH "is to receive reports of child abuse and provide excellent customer service with equitable and consistent decision-making to ensure safety for Oregon's Children."

The 2022 Procedure Manual includes information about the screening process for information received at the hotline, including how the screener should engage the reporter, building rapport with the reporter, information about being trauma informed while engaging reporters, interviewing and questioning techniques (including asking open versus closed ended questions, paraphrasing, giving verbal cues, reflective listening, exploration, affirming, and other techniques), the stages of the interview (introduction, exploration, and close), and screening decision-making.[146] The 2022 Procedure Manual provides instruction on how to conduct a child welfare history review, make the screening decision, assign response times, close cases at screening (if appropriate), and document the report.[147] ORCAH offers an Oregon Child Abuse Hotline Screening Training Academy for new screeners before taking calls. The Training Academy trains on topics including:

- Customer Service and Engagement
- Types of Callers and Exploring Mandatory Reporting
- Definitions of Abuse and Types of Screening
- Interviewing and Information Collection
- History Review and Safety Plans
- Screening Decision-Making and Restricted Cases
- OTIS Reports
- Trauma Informed Screening
- Assigning a Report
- Notifications
- Documentation
- CARES
- Indian Child Welfare Act for Screeners
- ORCAH Continuous Quality Assurance
- OpenScape
- ODG/OR-Kids and Technical Training

---

[146] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/1/2022, (pp. 105–119).
[147] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/1/2022, (pp. 119–143).

Exhibit 8
Page 115 of 390

**PUBLIC KNOWLEDGE®**

- Ecourt

Not included in the 2016 Procedure manual, the 2022 Procedure Manual contains a new section for screeners with information on how to handle reports for six different types of calls including:

- Potential reports of abuse
- Requests for assistance from Child Welfare that fall under Family Support Services
- Notifications to Child Welfare
- Information involving a setting screened and investigated by OTIS
- Information involving an open CPS assessment, open Child Welfare case or a Child Welfare certified resource home
- Requests for other types of community resource information or referrals

The Procedure Manual outlines the process for using the Structured Decision Making tool to determine the screening decision, which workers use along with the ORCAH Document Guide.[148]

There are mentions throughout the 2021 Procedure Manual that services provided to families should be of sufficient quality, however, there does not appear to be a procedure in policy to instruct staff how to indicate or rectify poor service quality.

Child Welfare has a few policies in place to guide staff on how to make decisions based on data. These policies seem to primarily concern both the Oregon Child Abuse Hotline and the use of the Child and Adolescent Needs and Strengths (CANS) tool.

### ORCAH Implementation

Screeners expressed implementation challenges and adjustments for ORCAH including the following listed in the table, below.

**Table 21. ORCAH Implementation Challenges and Adjustments**

| Implementation Challenges | Implementation Adjustments |
|---|---|
| Screeners shared with ORCAH managers the difficulties in completing quality intake reports in timeframes required by CW (such as completing eight reports for an eight–hour shift) and complete pending cases work is challenging (including cases that | CW adjusted timeframes to complete intake reports and numbers of intake reports required to be completed during a shift needs to be flexible and responsive to call volume, call wait times, and call abandonment rates. |

---

[148] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 8/23/2023, (p. 123).



**Table 21. ORCAH Implementation Challenges and Adjustments**

| Implementation Challenges | Implementation Adjustments |
|---|---|
| have not yet completed the entire intake process, such as all required screenings, background checks, and other requirements for completing an intake before making a screening decision). | |
| Screeners noted inconsistent decisions of supervisors and program managers on reports of child maltreatment with similar issues. | CW is conducting ongoing quality assurance reviews, training, and coaching for supervisors and program managers to assist in improvements in consistency of decision-making. COVID-19 impacted ORCAH by shifting staff from in-person to virtual within a very short timeframe (a matter of a few days). Decision-making that normally would have occurred in person had to shift to virtual. ORCAH implemented SDM® tools for screeners, supervisors, and program managers to further assist in consistency of decision-making at intake. |
| Screeners noted communication between shifts is difficult | CW implemented new communication protocols are in place to assist with communication between shifts. |
| Screeners note tools for screening reports change frequently | ORCAH is in a constant state of continuous quality improvement. ORCAH uses data driven decision-making to adjust and make improvements to change. SDM® Screening and Response Time Assessment implemented in 2022. |
| Screeners report the structure of the job changes frequently, as the protected time to finish reports is no longer in place, post-call processing time allotment changes frequently, and time for meetings and training is no longer in place | CW notes the structure of job changes to mirror call volume ebbs and flows. High call volume means job structure has to change so calls can be answered. |



Table 21. ORCAH Implementation Challenges and Adjustments

| Implementation Challenges | Implementation Adjustments |
|---|---|
| Screeners state the technology for taking the calls changes frequently | Technology updates happen frequently for hardware and software for systems. It is important to update technology to improve system bugs and failures. |
| Staff note that answering calls of reports of child maltreatment quickly does not equate to reports of those calls and information being sent to districts and counties quickly. Wait times may be down for callers but screenings, documentation, and reports take time to complete. | Caseworkers need to balance how much information is collected at screening and researching history. |

## 1.3   New Ways to Assess Safety

The most important decision in CW is to assess the safety of a child in response to an allegation of harm. Screening and assessment protocols have been improved by three strategies: implementation of the centralized hotline, adoption of a standard protocol for closed at screening, and implementation of analytics tools to support decision-making.

Survey results show perceptions of staff are that CW is ensuring children, reported to the agency and under CW supervision, are safe. Staff perception is critical as staff are carrying out the everyday activities of the agency. Staff perception shows that CW has processes, procedures, and standardize responses to accepting, screening, and assessing allegations of child abuse and ensuring safety of children under CW supervision.

Program Managers stated that child welfare leaders promote safety for children under child welfare supervision by providing training and support to staff regarding safety practices. Safety is emphasized through the agency's involvement with families, either in the home or in foster care. Leaders focus on responding to safety in a consistent way across Oregon by continuous refinement of procedures for alignment.

### Timeliness

In 2022, CW successfully met the CFSR Program Improvement Plan Item 1, Timeliness of Investigation, exceeding the 65 percent improvement goal set by the Children's Bureau. The Program Improvement Plan is a plan put in place by the Children's Bureau with ODHS for improvement of performance for CFSR items not meeting national performance. During 2021, 42,389 CPS reports were assigned to delivery offices, and 12,187 of those reports



Child Safety

were assigned as a 24-hour response outside of typical business hours. The 2023 Annual Progress and Services Report (APSR)[149] states that:

> "ORCAH is staffed and designed to screen 24/7 year-round, but delivery offices across Oregon continue to primarily work Monday through Friday, 8 am to 5 pm. CW continues to explore and evaluate strategies to best develop and train a sustainable workforce with ability to respond timely to new reports. Several districts developed alternative work schedules, but this continues to be challenging for staff. Some districts and counties have required on-call rotations. Statewide efforts are underway to evaluate workforce structure and operationalize processes to effectively respond to 24-hour response reports and ensure CPS workers make intentional, trauma-informed contacts with children and families within required timeframes."

### In-Home Services

The 2021 Child Welfare Information Gateway Issue Brief *In-home services to strengthen children and families* highlights best practices for safety assessment and management for caseworkers working with families while children remain in the home as described in the table below.[150]

**Table 22. Best Practices Related to Safety Assessment and Management for In-Home Services**

| Best Practice | 2016 Oregon Practice | 2022 Oregon Practice |
|---|---|---|
| Caseworkers use safety assessment models and tools to help assess ongoing level of safety for the child in the home and develop plans for managing threats. | Meets best practice. The Action for Child Protection Model has all the required assessments and plans to assess safety, risk, and manage risk throughout the family's involvement with child welfare services.[151] | Meets best practice as it did in 2016.[152] |

---

[149] Oregon Department of Human Services Child Welfare Division, Annual Progress and Services Report (APSR), 2023.

[150] Child Welfare Information Gateway. (2021). *In-home services to strengthen children and families.* U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau. https://www.childwelfare.gov/pubPDFs/inhome_services.pdf (pp 8–9).

[151] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 2016, (pp. 244–508).

[152] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/1/2022, (pp. 242–544).

Exhibit 8
Page 119 of 390

Table 22. Best Practices Related to Safety Assessment and Management for In-Home Services

| Best Practice | 2016 Oregon Practice | 2022 Oregon Practice |
|---|---|---|
| Risk assessments are used to assess a family's risk and protective factors to assess for future maltreatment. | Meets best practice. The Action for Child Protection Model has all the required assessments and plans to assess safety, risk, and manage risk throughout the family's involvement with child welfare services. | Meets best practice as it did in 2016. |
| Caseworkers receive training on using safety and risk assessment tools and developing safety plans. | Meets best practice. | Meets best practice. In 2022, a new Child Protective Services Toolkit was developed to support onboarding of new staff.[153] |

## 1.4    CFSR Findings

Table 23. Performance on CFSR Safety Indicators

| CFSR Item | Oregon Performance 2016 % Strength | National Performance 2016 % Strength[154] | Oregon Performance 2021 % Strength | National Threshold to be Rated as a Strength |
|---|---|---|---|---|
| Item 1: Responses initiated, face to face contact with children made within timeframes | 73% | 73% | 76% | 95% |

---

[153] Oregon Department of Human Services Child Welfare Division, Annual Progress and Services Report (APSR) 2023. (p. 32).

[154] Administration for Children and Families, Children's Bureau. Child and Family Services Reviews Aggregate Report, Round 3, Fiscal Years 2015–2018. Child and Family Services Reviews Aggregate Report (hhs.gov) (p.13).

**PUBLIC KNOWLEDGE**

Child Safety

| CFSR Item | Oregon Performance 2016 % Strength | National Performance 2016 % Strength[154] | Oregon Performance 2021 % Strength | National Threshold to be Rated as a Strength |
|---|---|---|---|---|
| Item 2: Prevent entry or re-entry into foster care | 88% | 65% | 86% | 95% |
| Item 3: Assess and address risk and safety concerns | 66% | 56% | 65% | 95% |

# 2   Agency Culture

## 2.1   Leadership Vision

Survey respondents had mixed responses regarding whether culture has improved under Ms. Jones Gaston. Fifty three percent selected "I'm not sure," and nineteen percent of respondents reported that organizational culture had not improved under Ms. Jones Gaston. Of those staff who were unsure whether the culture had improved, staff with zero to five years' tenure had the highest incidence of uncertainty. This can likely be attributed to their short tenure, leading to a lack of exposure to the CW organizational culture before Ms. Jones Gaston's arrival in November 2019.

## 2.2   Leadership Modeling

The Procedure Manual notes that using respectful and appropriate terminology around SOGIE creates a sense of safety and signals to young adults that staff honor them. The 2021 Procedure Manual does not expressly include nondiscrimination policies for SOGIE status, or for any group, but requires CW employees treat all children with respect and dignity. The Procedure Manual includes language that emphasizes the importance of supporting all children and young adults in the healthy development of these dimensions (sexual orientation and gender identity and expression) of themselves, stating that "all young adults should be treated with respect and dignity"[155] and outlines approaches to follow when working with LGBTQIA2S+ young adults. This includes information needed when seeking LGBTQIA2S+ medical and mental health services and the identification and determination of services for mental health support. The Procedure Manual notes that personal care items and supplies necessary for the health and well-being of an LGBTQ+ young adult are not considered medical supplies. If purchase of these items causes a financial strain for resource parent, ODHS branch funds should be used. This includes stand to pee devices, breast shapers, breast binders, straps and harnesses, and prosthetic devices.

Supervisors report the agency should do a better job with finding a solution to the issue of temporary lodging young adults, especially young adults with mental health changes.

## 2.3   Worker Safety

Assessment participants recognized that leaders are working to improve the agency safety culture but did cite a significant difference in CW's focus on child safety versus worker safety. Safety caseworkers report that worker safety is one area in which they feel the

---

[155] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/1/2022, (p. 1048).



organization has the most work to do. They noted that the focus on safety for children is vital, whereas worker safety can be an afterthought. Caseworkers report a perceived expectation that their safety is second to the client's comfort, triggers, or trauma. They also discussed the nuance between worker safety in the field with clients and families versus psychological safety within the workplace. Because of this nuance, participants noted a need to define worker safety and increase efforts to keep workers safe.

## Physical Safety

The physical safety of workers in CW buildings and their personal lives was a concern for some assessment participants. Some focus group participants felt that physical or emotional safety is only prioritized after an unsafe or traumatic event. Focus group participants felt that worker safety is an afterthought when case timelines are the priority.

They said CW does what it can to provide secure and safe offices, but there is a struggle to balance worker safety with public access and the need to deliver services to clients. Staff report that some facilities are insecure, and clients have broken into some. Cameras are not used in CW offices because of confidentiality concerns. Some noted they or colleagues had been threatened or stalked by parents of children in the child welfare system. The availability of personal information online is a broad threat. The public can find out information online that can lead to harassment, stalking, or threats, and felt that CW could do more to educate or train staff on privacy, protecting personal data, and how to address threats from parents.

Some focus group participants discussed feeling unsafe going to extremely dangerous locations and noted that local law enforcement does not even go to certain homes. Participants felt that workers should visit certain homes in pairs, but that it rarely happens due to staffing issues. There is inconsistency in when caseworkers are allowed to visit clients in pairs versus when caseworkers can only go out individually. In some districts, when caseworkers have overdue cases, they are not allowed to go out in pairs. Caseworkers agree that the decision about going out in pairs should be made on a case-by-case basis, according to safety concerns being assessed. CW leadership shared that while caseworkers may have responded to reports in pairs in the past, this has not been standard CW policy. To stay safe during assessments and house visits, some workers note in their shared calendars where they are going, when they expect to return, and check in with supervisors while out of the office. Some supervisors check on their staff's safety via phone call while they are in the field. Caseworkers contact law enforcement to accompany them, when appropriate but noted that there is a debate about whether to take law enforcement along on certain visits because of the negative perception of law enforcement and the trauma it may trigger for the client. Focus group participants felt that there is an expectation that their safety is second to the comfort of the children and families.



Policy requires the screener to try to gather information about worker safety concerns[156] and discusses planning for worker safety.[157] It notes that every CPS case has the potential for unexpected confrontation and suggests the worker evaluate the situation before initial contact and use effective engagement skills to de-escalate situations and engage families in difficult conversations to ensure safety. An accompanying procedure provides the CW worker questions to think about and provides information on precautions they should take such as have a phone nearby and avoiding dangerous areas at night.

If there is a concern with a resource family, staff are encouraged to discuss concerns with certifiers or the foster care coordinator. They said this is a shift, as CW has not always been a place where it feels safe to speak up or share concerns.

**Psychological Safety**

Permanency caseworkers felt the psychological and emotional safety of caseworkers is not well understood or acknowledged in the agency as staff report inconsistencies with support from managers and leaders. Caseworkers are sent mixed messages about taking time off for self-care and being given unlimited overtime to complete work tasks. Program Managers state that the agency is trying to improve safety culture, but there is historical trauma around how CW has managed changes in the system and practice.

Assessment participants mentioned hearing that CW may offer support groups for staff and provide training specific to safety of staff. CW has done a good job of allowing virtual visits during COVID-19.

The 2021 Procedure Manual includes language that screeners must consult with a supervisor on every report of a child fatality to ensure they are supported through secondary trauma and directs supervisors to be more supportive in the event of a child fatality.[158]

---

[156] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 112).

[157] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (pp. 182–183).

[158] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 157).

# PUBLIC KNOWLEDGE®

# 3   Data-Driven Decision-Making

## 3.1   Continuous Quality Improvement

Federal regulations require that state child welfare agencies use CQI.[159] CW has been working to increase its organizational change management (OCM) competencies, and building the CQI structure is a primary focus for CW. According to interviewees, the OCM and CQI work is relatively new and underdeveloped but is improving. CW implemented a project management office (PMO) to manage projects and system changes in a structured and coordinated manner and to help implement long-term change. CW is working with local jurisdictions, the CQI team, and the PMO to increase the use of data to inform their processes. Still, most staff felt that CQI processes were consistently applied across counties, district, and the state at least sometimes.[160] One interviewee stated that the level of continuous quality improvement at the district level depended on whether the district had dedicated CQI staff. This interviewee also reported an increase in dedicated district-level continuous quality improvement staff in 2021-2022 and that dedicated technical assistance was also being provided at the district level. Still, managers and caseworkers saw room for improvement in the daily use of data to make case decisions.

The level of support for CQI may vary depending on the capacity of the team in each local area showing a need for consistency across the state.[161] QA processes occur, but the frontline staff completing the work may not consistently use the results. Program Managers and district staff work very differently, with some Program Managers and district staff open to input and pushing to improve work. In contrast, other districts may struggle to implement change. Qualitative input from the survey confirmed that practice has improved, but there are still pockets where improvement efforts are less observable.

The CQI process helps CW understand what is working and what obstacles exist. According to assessment participants, the case review process is built into the agency's CQI processes and is, in part, dedicated to understanding and improving strengths for and barriers to permanence. Each CW program conducts Quality Assurance (QA) as part of the case review process, and each district may still create action plans as outputs of these processes. There are multiple QA processes that occur biweekly, but assessment participants shared that the information is not always used consistently by the workforce in decision-making.

Staff shared that different Program Managers work differently, and that some use the information to revise practice, and others struggle to implement the necessary changes.

---

[159] ACYF-CB-IM-12-07. https://www.acf.hhs.gov/sites/default/files/documents/cb/im1207.pdf
[160] Interview and survey results.
[161] Staff and Manager surveys, interviews, and focus groups.

**PUBLIC KNOWLEDGE®**

CW uses the information from the CFSR case reviews to target outcomes in local districts. Information gained from ongoing CFSR case reviews is now shared with the districts and counties, including information on how to improve outcomes. Safety and Permanency Consultants are involved in the CFSR debriefs and creation of action plans. Permanency Consultants regularly gather and analyze data on reunification and permanence and work directly with local offices to initiate change. Despite these improvements, the survey findings identify a need to better train and coach staff on how to use data for decision-making. Nearly a third of staff and managers reported that staff were never trained to use data in their work. One participant shared that their district doesn't use the information often but is open to having more workers participate in the QA and CQI process to increase the impact.

Additionally, supervisors use the 90-day staffing review tool with their direct reports to concentrate on the family's progress on the conditions for return and the expected outcomes. A 2020 ODHS strategy to improve data-based decisions was the creation of Quarterly Target Reviews (QTR) to report key metrics across all areas of the human services. Also in 2020, CW started its own QTRs to give program and District Managers the opportunity to review data as a team and discuss cross-program implications. A regular cadence and structure to these discussions allowed for better collaboration on identifying outcomes for families and understanding the impacts of decisions.[162]

One aspect of CW's CQI process includes a comprehensive file review for every provider every two years. CW also conducts quarterly onsite visits, excluding when COVID-19 restrictions prevented onsite visits.

The CQI Workgroup, mentioned earlier in this report, identified several challenges, including:

- Lack of a centralized child welfare CQI implementation structure
- Communication regarding CQI needs, including clearly articulated benchmarks, clear articulation on how CQI is related to day-to-day work, and strong feedback loops
- District offices lack sufficient infrastructure
- A need for statewide technical support
- Lack of confidence in data, limitations to data collection, inconsistent performance measures, and the need for a child welfare specific philosophy around data usage[163]

---

[162] Oregon Child Welfare Division Vision for Transformation Update (July 2022).
https://www.oregon.gov/odhs/child-welfare-transformation/Documents/2023-10-23-progress-report-2022.pdf
[163] ODHS CWI Workgroup PowerPoint: Recommendations for Statewide CQI Structure. 10/19/2021.

Exhibit 8
Page 126 of 390



## 3.2    Data Capacity

Central Office expectations and supports for increased data capacity and quality have improved as has the implementation of data–driven practices across counties. Central Office expects regional offices to use data and case review results to develop and implement improvement strategies, but the implementation of many new practices has been inconsistent.

CW now has a statewide systemic, targeted case review process called the Quarterly Target Reviews; has procured and implemented the ROM reporting tool; and has begun performance–based contracts with service providers. The ROM tool also has a public–facing site for stakeholders to track outcomes and the number of children removed over time and across counties.

CW has Data Quality Plans that support agency–wide data use for decision–making and to guide the development of the Comprehensive Child Welfare Information System (CCWIS) enhancements. Oregon has two data quality plans required as part of federal technology funding, both submitted in 2021, one focused on enhancements to OR–Kids[164] and one focused on progress towards a CCWIS.[165]

Effective data management best practice recommends that the state information system be the single source of child welfare data and that additional information is not tracked elsewhere. Reporting tools like ROM and other dashboards should source data from OR–Kids, which is CW's practice. However, the Office of Training, Investigations, and Safety (OTIS) tracks daily activities in a data system external to OR–Kids.[166] OTIS provides completed assessments to Child Welfare staff, which are then scanned and uploaded into OR–Kids. Workers may use Excel or other tools external to OR–Kids to track tasks and activities, transferring data into OR–Kids later. According to focus group participants, some ADA and equity work is also tracked externally to OR–Kids. While these accommodations may add confusion in the reporting environment, the practice of tracking information is also evidence of the workforce using data to improve their work.

---

[164] CCWIS 2021 Project One OR–Kids Advanced Planning Doc Final. 03/05/21.
[165] CCWIS 2021 Project Two Implementation Advanced Planning Doc IAPD Final 03/05/21.
[166] Staff focus groups and interviews.



# 4    Recruitment, Retention, and Support

## 4.1    Diligent Recruitment

Information collected from interviews and focus groups did not demonstrate a consensus regarding CW's current ability and capacity to recruit and retain resource parents who can meet the identified needs of children in substitute care. Some interviewees stated that there have been recent, dedicated efforts to improve recruitment and retention strategies and that these efforts are central to the redesigned CW agency, including the use of data by Resource Retention and Recruitment Champions to inform recruitment and retention strategies. Some focus group participants shared that finding placements for teens is consistently difficult and noted that the recruitment efforts are more child-specific now.

Some organizations and programs outside of the agency, such as Every Child, coordinate with ODHS to recruit and retain resource parents. Another program, called KEEP, is an evidence-based support and skill building group for resource and kinship parents of children and young adults. KEEP is available to all resource and kinship parents throughout Oregon and offers affinity groups for parents caring for children and young adults with similar characteristics.

Data show that the number of certified relative and kith providers had decreased as the number of children in care decreases. However, CW showed improvement in late 2021 regarding the initial placement of children with relatives.

Survey respondents said that CW is able to recruit and retain providers to care for children with high needs. According to interviews and focus group participants, efforts to recruit resource parents who are open and supportive to caring for children and young adults in the LGBTQIA2S+ community are not always successful, despite CW encouraging same-sex couples and other members of the LGBTQIA2S+ community to become resource parents. Some recruitment efforts with faith-based communities engage families with "big hearts but narrow minds,"[167] which can cause barriers to caring for children and young adults in the LGBTQIA2S+ community. Certifiers have also faced obstacles when children placed with their grandparents change or share their sexual orientation or gender identity to one their grandparents do not support.

Regarding recruitment of guardians, Child Welfare policy states that prospective guardians must display the ability to meet current and long-term needs of the child or young adult and are approved by caseworker and certification staff. Prospective guardians must have a current certificate of approval from ODHS or another related department, or another state

---

[167] Focus Group Discussion.

Exhibit 8
Page 128 of 390

**PUBLIC KNOWLEDGE®**

in which the potential guardian lives, as well as a home study. The home study includes considerations of how the family meets the needs of the child or young adult and will provide a lifelong commitment. The Procedure Manual now includes guidance on when guardianship is most appropriate and outlines the procedure to change a plan to Guardianship.[168]

To identify potential adoptive resources, Procedure allows caseworkers to consult with birth families to identify up to three resources who have the knowledge, skills, abilities, and commitment to raise the child or siblings and the capacity to meet current and lifelong safety, permanency, attachment, and well-being needs of the child. CW also has mechanisms outlined in Procedure to select general applicant adoptive families.

## 4.2    Resource Home Capacity

When prospective resource parents initiate the certification process, CW must be transparent about the reality of foster care without scaring them away from the process. Certifiers need people to understand how caring for children in the CW system can impact their family and their livelihood while also sharing the benefits to them and their families. This includes discussing the possibility of having reports of maltreatment brought against them by children or their families. Certifiers also must share the financial impact of fostering, as the reimbursement to families may not cover the total cost of caring for a child. Resource parents are eligible for different rates[169] depending on the child's age, placement type, and needs, as shown in the table below. Oregon Administrative Rule, which was revised in October 2020 and will be revised again when the rate increase takes effect on July 1, 2024, outlines payments provided to certified families.[170]

Table 24. Resource Parent Rate Breakdown

| Rate Type | Description | Rate |
|---|---|---|
| Base Rate | Cost of food, clothing, housing, personal incidentals, and transportation | $693–$795 per month depending on the child's age |

---

[168] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 8/23/2023, (pp. 1472–1486).

[169] Oregon ODHS Foster Care Payments and Rates website: https://www.oregon.gov/odhs/providers-partners/foster-care/pages/rates.aspx

[170] OARs 413-090-0005 to 413-090-0010. http://www.dhs.state.or.us/policy/childwelfare/manual_1/division_90.pdf

**PUBLIC KNOWLEDGE**®

Recruitment, Retention, and Support

| Rate Type | Description | Rate |
|---|---|---|
| Shelter Care | Provided to a certified family during the first 20 days of substitute care for a child or young adult in the care or custody of the Department (not made each time a child moves to a new home) | $30.66–$34.03 per day depending on the child's age |
| Enhanced Shelter Payments | Provided to a family for a child or young adult during the first 20 days of substitute care with a certified family after a child or young adult has been in placement with a Behavior Rehabilitation Service provider and there is no current level of care payment determination applicable to the child or young adult. | $54.33–$57.70 per day depending on the child's age |
| Child and Adolescent Needs and Strengths (CANS) Level of Care | Provided to an approved or certified family, a guardian, a pre-adoptive family, or an adoptive family based on the need for enhanced supervision of the child or young adult as determined by the results of the CANS screening | $240–$960 per month depending on the child's level of need |
| Personal Care Services | Assist with functional activities involving mobility, transfers, repositioning, basic personal hygiene, toileting, bowel and bladder care, nutrition, medication management and delegated nursing tasks that a child or young adult requires for his or her continued well-being | $231–$692 per month depending on the level of care needed, with the possibility of higher rates determined by ODHS |

| Rate Type | Description | Rate |
|---|---|---|
| Mileage Reimbursement | Reimbursement for transportation for a child or young adult to remain in the same school they were attending before placement in substitute care; to and from visitation when family visitation is part of the service plan; and in-state transportation by airline for children only if the cost of the air fare does not exceed all the actual costs of transporting the child by car | Current ODHS mileage reimbursement rate for CW staff |

Reimbursement rates have increased slightly for congregate care providers who are involved with the OYA and OHA, and the legislature also increased BRS rates, which take effect July 1, 2024.

# 4.3    Training Supports

CW has been in the process of redesigning the training and development for resource parents. The delivery of resource parent training previously was managed by a university partnership contract, but CW is taking ownership over this training and is implementing an NTDC national curriculum, outlined in Section 4.4. This decision was driven by demand from communities and data from incidents of allegations of maltreatment. As mentioned in Section 4.4.4, resource parents now receive training content from the NTDC and the Resource and Adoptive Family Training (RAFT). Interviewees mentioned that CW understands there is still more to improve related to onboarding and supporting resource parents.

Resource parents create a Training Plan for ongoing training to be completed during each two-year certification period. This plan is tailored by the resource parent(s) and certifier to meet the parents' interests and training needs, based on the age and gender of children in their homes, and any unique mental and medical health, educational, or developmental needs.[171] At least half of the training hours should be completed through face-to-face or interactive training, including classroom training, remote delivery, support groups, or

---

[171] ODHS Resource Parent Certification and Renewal Requirements: https://www.oregon.gov/odhs/providers-partners/foster-care/Pages/training-renewal.aspx#options

conferences. The remaining half can be completed through reading books or articles, watching videos, or listening to audio recordings.

## 4.4    Placement Matching

Child Welfare policy is very clear to "always select the least restrictive substitute care option able to meet the child's needs for safety and well-being,"[172] but this does not happen consistently. Interviewees shared that the use of the least restrictive placement must be documented in the court reports and presented to the Citizen Review Board. Others stated that caseworkers have received training on using the least restrictive placement, but that at times, caseworkers are more focused on just trying to find a placement and cannot always prioritize the least restrictive. Caseworkers also face challenges in matching placements when placing young adults who are sexually aggressive, especially those who have not been adjudicated on this behavior, as there are safety risks placing them with other children. Because they do not have formal charges, these young adults are not served by juvenile justice, leaving the child welfare system to find solutions for them.

The survey results demonstrated difficulties in placement matching, in that over half of the respondents shared that CW sometimes appropriately matches children to their caregivers. Approximately a quarter of respondents stated that matching always occurs.

Procedure requires caseworkers to choose initial and subsequent placements based on the caregiver's capacity to participate in the ongoing safety plan and meeting the child's safety and well-being needs.[173]

CW prefers for children and young adults to be placed with relatives (including kith and kin), and there is a process to temporarily certify relatives with an immediate certification. This process allows for criminal background checks to be conducted and references are collected while children are placed with a trusted relative.

---

[172] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 713).
[173] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (pp. 721–722).

Exhibit 8
Page 132 of 390


# 5 Permanence

## 5.1 Prioritization of Permanence

When asked whether CW leadership encourages or promotes improving permanence for children in substitute care, the majority of respondents felt that leadership is supportive. Interviewees and focus group participants agreed that leadership encourages improving permanence for children in care. They did recognize, however, that the workforce as a whole doesn't celebrate enough. They illustrated this by sharing that CW's goal has been to equitably reduce the number of children and young adults in substitute care, which they have done. The number of young adults in care has been trending down since the beginning of 2018, and they haven't celebrated this as a group yet.

CW prioritizes permanence in multiple ways:

- CW prioritizes the initial placement of children with relatives, as shown in Section 4.10. These data are supported by over 71 percent of survey respondents agreeing that CW prioritizes the placement of children with relatives. This initial placement preference is a core message throughout the caseworkers' Essential Elements training[174] and enhanced by ongoing trainings. During this training, which caseworkers must complete before carrying a caseload, participants learn how to monitor permanence and about the criteria for determining whether a child's permanency needs are being met, including family interaction. Participants also learn how to collaborate with community partners and tribes to achieve permanence, work with courts to follow permanency timeframes, conduct permanency planning activities (including concurrent planning), and recommend placements that promote permanence. CW has established caseworker competencies that guide their training provision, and the competencies are divided among nine skill sets, including fundamentals of placement and permanency.[175] Permanency is woven throughout the training competencies, underscoring permanency as one of the pillars of Oregon child welfare practice. More information on Essential Elements training can be found in Section 4.10.
- Beyond the placement preference of relatives, interviewees and focus group participants confirmed that CW properly promotes ongoing searches for relatives, but the use of this process is varied. For example, in some adoption cases, diligent searches occur early on, but once safety is addressed, ongoing searches are not

---

[174] Essential Elements summaries: https://www.pdx.edu/center-child-family/essential-elements-session-summaries

[175] Portland State University Center for Improvement of Child and Family Services: https://drive.google.com/file/d/1cTaysiB2Ejv4G37ZFQSOOLGrazwOUBXU/view



prioritized. According to interviewees and focus group participants, processes for relative searches differ by district, and there are currently new processes for relative engagement being implemented across the agency. These new processes may resolve the disconnect in coordinated efforts between the district offices and the central office. Some CW offices have bilingual staff to conduct search for relatives and have successfully found quality results. However, not all CW offices have this resource. According to interviewees and focus group participants, the Court Appointed Special Advocates (CASA) program conducts ongoing relative searches using Family Finding[176], and this information is shared with CW. Family dynamics were identified as a barrier to ongoing relative searches. A parent sometimes refuses to give any relative names, forcing CW to implement more creative search methods to locate relatives. When children and young adults are in temporary lodging, they are asked daily about relative placement options and must provide verbal confirmation if there are none. If a child is in any placement not with a relative, but a relative wants to be considered as a placement resource, the relative must be assessed.

- Since 2016, CW introduced a Youth Decision Making Meeting (YDM)[177] that may only occur with young adults ages 13–20, and one of the outputs of the meeting is to assist young adults in finding permanence. This opportunity for the child's team to discuss the young adult's goals, plans, dreams, and needed support further demonstrates CW's focus on prioritizing permanence for children and young adults in care. Youth Decision Meetings may occur to respond to urgent needs, to build community connections or supportive relationships, discuss how to increase time with family members, talk about goals/share accomplishments, prepare and plan for major events, preparing young adults for upcoming meetings, and creating a transition plan. This meeting is young adult–centered, and carries a motto of "nothing about us, without us." The four key values for a YDM are to be young adult-driven, strengths-based, trauma-informed, and culturally responsive.

- According to interviewees and focus group participants, there are several processes, procedures, and people involved in reviewing termination of parental rights (TPR) standings in the last few years.

- CW utilizes guardianships as an acceptable permanency plan for a child in substitute care when a child cannot be safely returned to the home of a parent.[178] The Procedure Manual continues by outlining adoption as the preferred plan; however, guardianship is an acceptable alternative plan when adoption does not best serve the interests of the child. A decision to pursue guardianship as a plan

---

176 A Family for Every Child: https://www.afamilyforeverychild.org/about-us/
177 Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 473).
178 Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 1447).

must be based on the individual safety, permanency, and well-being needs of the child. Only a child who has an approved plan of guardianship with a relative is eligible for a subsidized guardianship. There are also policies in place regarding guardianship assistance.[179]

- Assessment participants shared that the focus on permanence runs throughout their initial and ongoing training, including discussing the need for permanence and moving toward prioritizing retuning children to their family. CW facilitates Permanency Summits, which include a training component, and quarterly meetings with supervisors that also include training. There has been substantial effort in the permanency unit to develop family engagement plans and some districts have been piloting family time programs.

- According to interviewees and focus group participants, there is a strong checks and balances system in place between state office and delivery teams regarding the prioritization of children in high needs and out-of-state placements, as required.

Interviewees and focus group participants identified a need for a different certification and placement process for relatives. Risk-averse staff or certification consultants may shy away from outside-the-box or exception-required relative placements if there are some potential concerns and lack a strong search and connection resource to help them navigate the concerns more effectively. Challenges from supervisors to these determinations are not often successful. A family's history, paired with current CW policies around who can be certified, can be a significant barrier to relative placement options, leading to a tendency of CW to do more for resource parents than what is done for relatives.

## 5.2    Placement Matching

Interviewees and focus group participants had varying responses when discussing whether CW follows federal requirements for placement preferences for American Indian or Alaskan Native children. One participant mentioned that they are not always able to follow placement preferences for refugee children because there are no families available who share cultural heritage and traditions and that recruitment for those families is lacking. Participants mentioned confusion and contradiction in placement preferences, including one example where the Interstate Compact for the Placement of Children (ICPC) requirements conflict with a Tribal placement preference for an out-of-state placement that is currently occurring. Workers shared a "constant worry" that children and young adults are not safe in that placement because of logistical issues causing delays in decision-making. Others expressed fear of making the wrong decision and cited the extra

---

[179] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (pp. 1463–1472).

attention placed on ICWA cases and mentioned that the lack of leadership attention on this issue is frustrating.

Other participants mentioned working hard to include tribes as much as possible in their case practice. Some participants shared that they are often incompliant with the Indian Child Welfare Act (ICWA) placement preferences, partly due to the lack of statewide recruitment for American Indian and Alaskan Native families. Local offices may include recruitment for American Indian and Alaskan Native families as part of their targeted campaigns.

The Procedure Manual directs staff to initiate a supervision plan when a CANS screening results indicate a level of care that requires enhanced supervision or when a child with a level of care moves from one substitute care placement to another substitute care placement.[180] CW does meet state requirements for using the CANS to determine the Level of Need of children in care. There was consensus among assessment participants that the CANS is used consistently to document the strengths and needs of children and young adults, which also indicates the level of reimbursement. Please see Section 4.4 for more information on reimbursement based on CANS results.

Assessment participants shared that CW attempts to appropriately assess prospective adoptive parents to match with children, but that there can be limitations to this. As with resource parents, there is a lack of prospective adoptive parents for teens who are legally free for adoption. Adoptive resources undergo a SAFE Home Study tool as resource parents do, and they must also "understand the importance of and demonstrate the ability and willingness to sustain parenting responsibilities for a child until the child reaches adulthood."[181]

Policy improvements over the last two years have led to the elimination of the use of out-of-state facilities. Previously, out-of-state placements were intended for use only when there were no comparable services in-state. Keeping children and young adults in Oregon facilities allows CW to have oversight and input into the supervision and care provided to them. The figure below illustrates the decline of children being placed out of state since 2016, and shows that since 2021, no children have been placed out state.

---

[180] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 759).
[181] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 1553).



**Figure 19. Out of State Residential Placements**

## 5.3    Placement Stability

The federal CFSR process measures the number of placement moves per 1,000 days for children in substitute care. It is a measure calculated in the aggregate, and Oregon has consistently not met this measure since it was added as a federal performance measure in 2016. The state exceeded the national standard in the most recent period with a score of 5.5 moves, well above the federal standard.[182]

As shown in the graphic below, the overall number of children placed in substitute care decreased sharply over the last several years. While the steepest decline was in the number of children having one or two placements, this graphic illustrates that fewer children are experiencing more than two placements as well.

---

[182] See the Appendix tables for data detail.

**PUBLIC KNOWLEDGE®**



Figure 20. Number of Placements Over Time[183]

Oregon's time to permanence is below the national standard. The national standard for permanency in 12 months is 40.2 percent, and as of June 2022, CW is just under the national standard at 38.7 percent. Previous reporting periods showed Oregon meeting the national threshold.

## 5.4    Timeliness

CW has made concerted efforts to achieve permanence in a timely manner:

- Monthly staffings are held with established timelines to keep caseworkers moving forward.
- Citizen Review Boards offer insight into areas of improvement.
- CASAs assist with searches for relative placement to improve outcomes, and the Vision for Transformation has established a high-quality standard for relative searches.

There are many competing lenses regarding improvement of achieving timely permanence, which can sometimes cause a conflict between family readiness, CW expectations, court timelines, and federal timelines. The effort to achieve timely permanence is an ongoing process and requires balancing different inputs and requirements.

**Termination of Parental Rights**

Policy requires that "when a caseworker and their supervisor determine that a child is appropriate for adoption, and the parent will not voluntarily relinquish their parental rights, the caseworker shall refer the child's case to the Legal Assistance Program for consideration of petitioning the court to terminate parental rights. If the child's case is

---

[183] Oregon Child Welfare Data Set: OR.08 Number of Placements for Children in Foster Care. https://oregon.rom.socwel.ku.edu/reports

approved to pursue freeing the child for adoption and the court concurs, the legal assistance specialist and the legal assistance attorney will work with the caseworker to prepare and litigate the case."[184] Parental rights can also be terminated through voluntary relinquishment, "when ODHS has determined that adoption is an appropriate permanent plan for the child, and after approval has been given by the Central Office's legal assistance specialist and by the parent's attorney, parents may relinquish their rights for the purposes of achieving an adoption."[185] There is adequate determination and procedural language regarding TPR by Child Welfare, and they do pursue the termination of parental rights as required by federal law.

There have been impacts to the timeliness of TPRs due to COVID-19 and variances in the use of remote hearings and re-opening courts across districts.

## Collaboration with Courts

CW attempts to collaborate with the courts to ensure timely permanency hearings. Success varies by district, with typically more success in smaller districts. Courts are overwhelmed with COVID-19 impacts, and focus group participants felt that judges might be more willing to collaborate to produce better outcomes if the backlog was not so large. Interviewees and focus group participants continued by stating that beyond COVID-19 impacts, there has been improvement in the last 15 years, yet collaboration can still be a struggle and differ by jurisdiction. The differences by jurisdictions were explained through the example of how a permanency worker in one district would likely have no idea how to present a case in a different district.

Some districts have seen positive collaboration with the Juvenile Court Improvement Project (JCIP), while in other areas it continues to be a challenge. CW meets regularly with model court teams. Focus group participants felt there was a lack of respect for CW workers by courts, which makes it harder for staff to provide quality permanency plans. They feel that courts do not see CW workers as content experts, or do not take into consideration that many CW are fairly new and are still learning and building confidence. If courts are disrespectful of workers, their confidence may never get established, leading to frustration, impacts to permanency goals, and ongoing staff turnover.

Legislative changes or procedural changes that impact CW are not always well communicated with the courts, leading to inconsistent approaches to cases between CW and a local judge.

---

[184] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 1274).
[185] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 8/23/2023, (p. 1227).

Exhibit 8
Page 139 of 390

## 5.5    Temporary Lodging

Focus group participants discussed frustration in temporary lodging decisions, especially those in which the caseworkers felt the children were not appropriate candidates for temporary lodging or foster care. For example, there was mention that children have come with a referred placement and may not be appropriate for a temporary lodging or foster care placement, but a judge will order the placement anyway. This leads to CW having to appeal some of these decisions, taking additional administration time because their input was not fully heard or valued. The adversarial nature of these situations also causes ongoing damage to the relationship between the courts and child welfare agency. Interviewees and focus group participants noted the trauma impact when young adults are in temporary lodging for days, weeks, and months.

A primary challenge to the continued use of temporary lodging stems from placement facilities and the young adult's ability to reject available placement options. These licensed placement facilities can also request that a child or young adult be removed from the facility for behaviors that the facility is licensed to treat.

Participants mentioned that CW is working on an MOU to bring cross-system partners back to the table to grow mental and behavioral health programs so there is more placement capacity for children who need higher levels of care. CW lost an entire structure around Therapeutic Foster Care, which was the most appropriate structure for many of these young adults. Many challenges about placement options lie in systemic issues that are beyond CW's authority, including the availability of statewide mental health services and available beds. An additional challenge is that CW cannot be solely responsible for recruiting and retaining resource parents who can provide higher levels of care.



# 6 Permanency Planning

## 6.1 Leadership Prioritization of Permanency Planning

Assessment participants were divided in their perceptions of leadership support for permanency planning. Approximately half (54 percent) of survey respondents believe leadership advocates for improving permanency planning, while 36 percent were unsure, and 10 percent did not feel that leadership supported these efforts. There is not a consensus from assessment participants on whether CW identifies permanency goals appropriate to the child's needs, with 47 percent of survey respondents sharing that this always happens, while 51 percent felt this sometimes happens. A small percentage, 2 percent, responded that this never occurs.

The majority (61 percent) of CW staff felt that they have access to training and coaching on permanency planning with families, while 32 percent were unsure if this training was provided, and 7 percent did not believe it was. The uncertainty or belief that this training is not offered may be due to varying roles within the agency. Safety caseworkers or supervisors, for instance, may not participate in permanency planning training as this responsibility lies more with permanency caseworkers and supervisors.

The 2021 Procedure Manual contains a section on documenting the case plan,[186] of which the permanency plan is a component, and the 2023 Procedure Manual retains this policy.[187] The case plan, which describes why CW is involved and the actions and services required to change behaviors, conditions, or circumstances that led to the child being unsafe, must be developed within 60 days of placement in substitute care or within 60 days of the CPS assessment when the child remains home and in the parent's custody.[188]

Data collected during this assessment did not allow PK to determine whether permanency plan goals are changed in a timely manner and according to state requirements, however, CW does recommend placement decisions based on the identified needs and permanency plan of the child, including updating a child's CANS prior to a placement change (except in emergent situations).[189]

---

[186] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (pp. 489–501).

[187] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 8/23/2023, (pp. 499–511).

[188] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 490).

[189] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 862).



## Collaboration with Courts

Collaboration with courts is a challenge mentioned several times during this assessment. The barriers to collaboration are dependent upon the judge and on the backlog a particular court is dealing with due to COVID–19 restrictions and delays in court hearings. Courts lack the docket time needed to hear all the cases before them, and cases can be continued for months. Some judges are seen as micromanaging cases and setting unrealistic expectations for caseworkers and families to meet, further exacerbating the delays in hearings and permanency outcomes.

Caseworkers experience a power struggle with courts and feel that the compliance mindset is a barrier. In their words, courts order people to do things, which is not a collaborative process. One participant shared that the courts prevent reunification in their area of the state, and that the bullying and belittling caseworkers' experience in court leads to staff turnover issues.

The collaboration has reportedly improved over the last 15 years. It was noted that smaller jurisdictions seem to have better collaboration, and judges are often more invested in those communities. They insert themselves into the cases and may make changes differently than those in larger communities and make recommendations based on policy language. In these smaller jurisdictions, attorneys generally have smaller caseloads, allowing them more time to collaborate on cases. In some areas of the state, delays occur because judges believe the parents need more time to make changes, while others are strict about permanency timelines.

According to assessment participants, judges sometimes make case decisions contrary to the wishes of the department. According to some participants, meetings are held, plans are made, but then judges make their own decisions. While CW has rules and policies to follow, staff sometimes feel that the laws are vague enough that judges can make emotional, inconsistent rulings that cause significant frustration. One participant mentioned that sometimes young adults come into a hearing with a preferred placement, and judges make other decisions, including temporary lodging, based on their own preferences. Judges' decisions can also impact community support if they do not make rulings that include community services. This adversarial process is difficult for agency staff when they feel the placement ordered is inappropriate for the child. CW staff feel at times that the child welfare dependency program is a default for cases that don't easily fit elsewhere, and the child welfare system cannot say no to children who need services and support.

Participants pointed out an issue with the public defenders' contracts and shared that many children and parents are now being represented by attorneys from other counties. Some participants mentioned that less cases are being opened through protective



services and that more family-led safety plans are being drafted, which have been successful.

## 6.2    Family Engagement in Permanency Planning

Staff report that leadership supports seeing families as individuals, which the CW Safety Model supports, and there are now tools in place to support family engagement and recognizing strengths. They found the silver lining with COVID-19 by using technology to facilitate virtual contacts with children and to connect children to their families easier when they couldn't be together in person. Interviewees and focus group participants shared that the Family Report, which is part of the Case Plan, includes efforts to engage the child and the family, and this has been a focus for the agency over the last three years. The permanency plan and the family plan are components of the overall case plan, which are developed for every child under CW supervision.

When discussing whether CW recommends placement changes based on the child's identified needs and permanency plan, staff shared that internal communication occurs and allows them to review recommended changes. During focus groups, participants reflected on obstacles in working with juvenile court, and shared that at times, there is disagreement between the agency and the court about recommendations for placement changes.

The timeframe for initial CANS screen shifted from 14–20 days in out-of-home care in 2016 to 14–21 days in 2021.[190] There is an additional sub-section included in the 2021 policy entitled Case Planning[191], which provides specific and detailed instructions on how to use the results from the CANS in placement matching, reunification, provision of services and interventions. There is an addition to the 2021 policy that CANS rescreening may be completed if the last screen was completed more than 90 days prior to the most recent request, which was not present in the 2016 Procedure Manual.[192]

---

[190] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 757).
[191] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (pp. 762–764).
[192] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 765).



# 7    Individualized Assessments

## 7.1    Family Engagement

There is a 90-day staffing review tool that supervisors use with caseworkers during supervision to assess progress. The primary focus of the case review staffing tool is the family's progress, conditions for return, and expected outcomes. CW completes QA reviews with the certification team quarterly. Home studies, stability of placements, recurrence of maltreatment, and other data measures are reviewed. During focus groups, caseworkers stated that case reviews are often viewed as punitive and not as a learning and improvement process.

## 7.2    Scope of Assessments

The table below outlines the changes in assessments provided to children, young adults, and families from 2016 to 2021. In most cases, the requirements have been clarified and instructions have been provided. For each assessment, more information is provided to caseworkers to outline their responsibilities and timelines.

**Table 25. Assessments Provided to Children, Young Adults, and Families**

| Assessment Type | 2016 Policy | 2021 Policy[193] |
|---|---|---|
| Comprehensive Health | Medical assessment within 30 days of entering substitute care.[194] | The language was changed from "medical" to "comprehensive health"[195] assessment that must be completed by the child's primary care provider, within the same timeframe. |
| Intake Nursing | The 2016 Procedure Manual recommends following procedures to request a nursing assessment for injured, critically ill, or terminally ill children, but does not provide instructions.[196] | The language was changed to require an "intake nursing assessment" to be done by an ODHS-contracted nurse, shortly after entering substitute care.[195] This assessment has resulted in children under five being |

---

[194] 2016 Oregon Department of Human Services Child Welfare Procedure Manual, (p. 149).

[195] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 281).

[196] 2016 Oregon Department of Human Services Child Welfare Procedure Manual, (p.720).

**PUBLIC KNOWLEDGE®**

| Assessment Type | 2016 Policy | 2021 Policy[193] |
|---|---|---|
| | | identified and referred to personal care services sooner.[197] |
| Dental | Dental assessment within 30 days of entering substitute care.[198] | The timeline is the same as 2016, but for children aged one and older. |
| Mental Health | Mental health assessment within 60 days of entering substitute care.[198] | The timeline is the same as 2016, but for children aged three and older. |
| Early Intervention Screening | The 2016 Procedure Manual recommends working with parents to obtain a developmental assessment through Early Intervention/Early Childhood Services.[199] | The Procedure Manual requires this screening for children up to 2 years old within 60 calendar days of entering substitute care.[195] |
| Independent Living (IL) Planning | The 2016 Procedure Manual outlines making referrals to contracted providers for IL services,[200] and requires caseworkers to complete the Ansel–Casey Life Skills Assessment with young adults.[201] | The 2021 Procedure Manual requires caseworkers to complete an IL assessment when using the planned permanent living arrangement.[202] One focus group shared that providers complete an assessment for IL needs, but it can be cumbersome. |
| Indian Child Welfare Act (ICWA) | The 2016 Procedure Manual outlines requirements for | The 2021 Procedure Manual now includes assessing ICWA status |

---

[197] Oregon Department of Human Services Child Welfare Division, Annual Progress and Services Report (APSR) 2023, (p. 112).

[198] 2016 Oregon Department of Human Services Child Welfare Procedure Manual, (p. 149).

[199] 2016 Oregon Department of Human Services Child Welfare Procedure Manual, (p. 272).

[200] 2016 Oregon Department of Human Services Child Welfare Procedure Manual, (p. 688).

[201] 2016 Oregon Department of Human Services Child Welfare Procedure Manual, (p. 610).

[202] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 1814).

# PUBLIC KNOWLEDGE®

Individualized Assessments

| Assessment Type | 2016 Policy | 2021 Policy[193] |
| --- | --- | --- |
| | asking about and documenting American Indian heritage.[203] | as part of the Family Support Services Assessment.[204] |
| Child and Adolescent Needs and Strengths (CANS) | The 2016 Procedure Manual instructs caseworkers to refer every child entering substitute care for a CANS screening but does not specify who completes the screening.[205] | The 2021 Procedure Manual outlines expectations for using the CANS for identifying services and interventions and instructs caseworkers to discuss assessment results with service providers and families to determine what family services and interventions are appropriate.[206] The 2021 Manual requires an individual trained and certified by the department to conduct the CANS screening and instructs caseworkers to submit the CANS referral to the staff member in the branch office who coordinates referrals and sends the information to the CANS screener.[207] |
| Family Support Services | The 2016 Procedure Manual describes Family Support Services but does not include an assessment for such services. | The 2021 Procedure Manual now requires an assessment within 30 days of receiving the screening information by having face-to-face contact with parents, legal guardians, the former foster child, and the child to assess specific services needed.[208] |

---

[203] 2016 Oregon Department of Human Services Child Welfare Procedure Manual, (p. 43).

[204] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 1502).

[205] 2016 Oregon Department of Human Services Child Welfare Procedure Manual, (p. 541).

[206] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 763).

[207] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (pp. 756–757).

[208] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 1501).

| Assessment Type | 2016 Policy | 2021 Policy[193] |
|---|---|---|
| Qualified Residential Treatment Program (QRTP) | Not included, as these programs are tied to the 2018 Family First Prevention Services Act. | The 2021 Procedure Manual now outlines the process by which to approve placement in a QRTP.[209] |

The focus of the CPS assessment is the child's or young adult's safety. CW Procedure requires several types of assessments, outlined in the table below.

Table 26.  Assessment Consultation

| Provider | Role in Assessment |
|---|---|
| Medical personnel | Assess and respond to the medical needs of a child or parent and possibly document the nature and extent of abuse. |
| Mental health personnel | Assess the effects of any alleged abuse and help determine the validity of specific allegations. They may also evaluate the parent or caregiver's mental health status and its effect on the child's safety. |
| Substance abuse specialists | Evaluate parental, or caregiver substance use or misuse and its impact on the child's safety. |
| Domestic violence experts | Assist in examining the child's safety in cases where partner abuse and child abuse coexist. DV experts may also help in safety planning. |
| Multidisciplinary teams | Help CPS analyze the information for proof of abuse and the assessment of risk and safety. |
| Designated Medical Professional (DMP) | Must be consulted per ORS 419B.022–024. In cases where there is suspicion that injuries are caused by abuse, they must be addressed in the coordinated comprehensive way required by Karly's Law.[210] |
| Local or regional Child Advocacy and Intervention Centers (CAICs)[210] | Frequently used by caseworkers and law enforcement to conduct forensic interviews of children who are suspected victims of abuse. Often, medical evaluations are conducted as well, and |

---

[209] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 1197).
[210] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 223).


critical information is gathered during the evaluation processes.

The 2021 Procedure Manual also contains information on multiple types of assessments and their scope, including:

**Specific condition or behaviors.** The 2021 Procedure Manual instructs caseworkers to consult other providers when there is a specific client condition or behavior that requires additional professional assessment,[211] including:

- The child exhibits undiagnosed physical health concerns or the child's behaviors, or emotions do not appear to be age-appropriate, such as hyperactivity, excessive sadness and withdrawal, chronic nightmares, bed wetting, or aggressive behavior at home or at school.
- The parent exhibits behaviors or emotions that do not appear to be controlled. Examples are violent outbursts, extreme lethargy, depression, or frequent mood swings.
- The child or parent has a chemical dependency.

Caseworkers may also consult other providers as part of the assessment process.

**The six domains.** The 2021 Procedure Manual also states the comprehensive CPS assessment thoroughly documents information relating to the six areas, and that by gathering enough information about these six domains, caseworkers can determine whether there is impending danger:[212]

1. Extent of maltreatment

2. Circumstances surrounding the maltreatment

3. Child functioning

4. Adult functioning

5. Parenting practices

6. Disciplinary practices

**Nursing Assessments.** The 2021 Procedure Manual states Child Welfare Contracted Field Nurses will conduct nursing assessments for children and families on trial reunification cases and will include:[213]

---

[211] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 222).
[212] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 173).
[213] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 1072).

**PUBLIC KNOWLEDGE®**

- All children who enter trial reunification
- All children under age 3 on an in-home case
- Children and families with health issues at the request of the caseworker

**Specific Evaluation.** The 2021 Procedure Manual provides guidance for situations when the assessment identifies the need for specific evaluation. The referral to those specific professionals should specify the following:

- The reason for referral, including specific areas for assessment as they relate to the present or impending danger safety threats.
- The parents' knowledge about the referral and their response.
- The timeframe in which the evaluation must occur and when the agency needs the report back from the provider.
- The purpose and objectives of the evaluation.
- The specific questions the CPS worker wants answered to assist in decision-making.[214]

**Routine Medical Care.** The 2021 Procedure Manual requires caseworkers to discuss routine medical care at each monthly face to face visit with parents and children and document the updated information.[215] The Procedure Manual contains more sections on managing physical health of children, medical care management, and information regarding pregnant and parenting children in care. The Procedure Manual contains instruction on obtaining immunizations and vaccinations to ensure all children are up to date on their immunizations and vaccinations within 90 days of entering care.[216] If the parent objects to the vaccinations and immunizations, parents can obtain a court ruling. Child ages 15 and older can consent to receiving vaccinations and immunizations.

**Psychotropic Medications.** The 2021 Procedure Manual contains information about authorization for new psychotropic medication that originates from the Health and Wellness Services Program Manager or Nurse Consultant as opposed to Program Manager or designee.[217] Health and wellness services work in collaboration with the Oregon Psychiatric Access Line-Kids (OPAL-K). When concerns or questions, Health and Wellness Services may request OPAL-K consult with the health care provider regarding psychiatric services. Consent decisions made by Health and Wellness Program Manager or Nurse Consultant, and if not approving consent, must consult with OPAL-K, as they have more experience than the child welfare Program Manager or designee.

---

[214] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 223).
[215] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 869).
[216] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 866).
[217] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 875).

**Mental Health Assessments.** The 2021 Procedure Manual clarifies that a mental health assessment must have been conducted within 3 months for a new psychotropic or antipsychotic medication to be given.[217] Mental health assessment updates should be completed yearly. The 2021 Procedure Manual adds an annual review must be completed on all youth receiving psychotropics where prior procedure stated the annual review was for a child or young adult under 6 years of age or young adult with two or more prescriptions.[217]

# 8  Service Provision

## 8.1  Cross-System Collaboration

CW has a strong dependency on services over which they have no oversight and the services available to families vary by county. The systems and services in place to ensure timely and appropriate behavioral health services vary by district. This is due largely in part to the local agency's responsibility for identifying and contracting necessary services. Another dependency is local leadership's knowledge of behavioral health service array and their identification as a leadership priority.

Delivery of services to children is critical in achieving positive outcomes for children. The 2021 Procedure Manual states that successful intervention in the lives of abused and neglected children requires concurrent involvement of many different systems[218]:

- The child and family
- Child welfare
- The court
- Education
- Medical and mental health professionals
- Attorneys
- CASAs
- Other local agencies that serve children and families

The working relationships between CW and the Oregon Health Authority (OHA) and the Office of Developmental Disabilities Services (ODDS) is improving, evidenced by more formal and informal interaction. Contracted Services and systems leaders identified service gaps in their contracted services, including services that are regulated or procured by Medicaid, child caring organizations, and OHA.

Child welfare partners provide services to children and families. Service providers include the child's substitute caregiver, school, medical and mental health professionals, and other community agencies. Children with complex needs cross system boundaries and can pose a challenge to coordinating services. Caseworkers and supervisors reported some evidence of patchwork availability of services across the state. This was substantiated by focus group participants.

Meeting the behavioral health needs of children in care continues to be a struggle for CW. This is despite concerted effort to better assess, engage, and address the needs of

---

[218] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 710).

families. Staff report that there is still a lack of mental health treatment in the state for children with high needs. Finding high quality service providers that meet the individual needs of children is the most challenging part of providing care to the family, according to a focus group of state staff. CW is forced to rely on other systems to provide services such as addiction treatment programs, family violence treatment, and other behavioral health needs.

Three areas were identified as service gaps by focus group participants:

- Drug and alcohol treatment programs
- Prenatal care services
- Behavioral health treatment

## 8.2    Process Improvements

The 2021 Procedure Manual states that Oregon's child welfare system focuses on child safety and urgency of planning to meet the individual child's needs for permanency and well-being[218]. Caseworkers are responsible for[215]:

- Coordinating the systematic delivery of services to provide meaningful intervention and support
- Not increasing a child's isolation or sense of victimization
- Well-planned and coordinated service delivery increases the likelihood of achieving positive outcomes

Temporary adjustments were made to ODHS procedure to align with the temporary policy change with ODDS, which is currently experiencing pandemic-related critical workforce shortages impacting their services system. The corresponding Developmental Disabilities Services Policy Transmittal Number: DD-PT-21-087, issued on 9/29/21, reflects the broader ODDS temporary changes. The temporary change states:

> "Due to a current staffing crisis impacting the developmental disability services system, ODHS Child Welfare procedure is being temporarily changed to reflect temporary changes in ODDS policy. Policy APD-PT-14-038 is being temporarily waived to allow greater flexibility and more timely decision-making when exploring placement options for children who are in the legal custody of Child Welfare. When Child Welfare (CW) and the Community Developmental Disabilities Program (CDDP) are working together as a team to identify a placement option that best meets the child's needs, the team may choose a DD-funded foster care placement (provided the prospective

> foster provider is not a relative) without first needing to rule
> out the option of a CW-funded foster care placement with DD-
> funded In-home supports."

The 2021 Procedure Manual contains description of flex funds for providing services to families.[219] Flex funds can be used for prevention of imminent placement of a child in foster care or a child to reunify with a parent within 30-45 days. The following expenditures are acceptable uses of flex funds: housing expenses, utility payments, transportation, necessary furnishings, and bedding needed for minimum safety and well-being of family members, necessary clothing or diapers for family members, safety items, emergency food, emergency childcare or respite care, or other. The only individuals who can authorize "other" expenditures are the district manager, Program Manager, or designee with budget authority.

## 8.3    Targeted Services

According to focus group participants, CW struggles to find stable placements for youth with high medical needs and significant mental health needs. Examples identified by staff include younger children with complex needs and needing targeted services or unadjudicated youth who are sexually aggressive and have no fit in the child welfare system. There is the perception among staff that there is an increase in children with developmental delays who are not well served by child welfare or juvenile justice. This speaks to a mismatch between needs and services. Caseworkers express some frustration at not being able to always provide the services children need. This concern is also reflected in survey findings where 20 percent of staff report "Never" being able to find providers for children with high needs.

The 2021 Procedure Manual contains a description of In-Home Safety and Reunification Service (ISRS).[220] These services are intended to: provide immediate child protection, reduce time children spend in substitute care, and reduce the re-abuse or neglect of children. The service help parents in building additional problem-solving skills to eventually become self-sufficient, identifying strategies for predictable problems relating to child's behavior, child safety, depression, mood stabilization, and other adult relationships. The goal is to reduce trauma to children removed from their families because of abuse or neglect by offering family-focused services starting during the assessment phase and extending into aftercare services when children return home. Services include intervention programs in the home and community and services to support and maintain

---

[219] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (pp.1034-1035).
[220] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (pp.1040-1046).

**PUBLIC KNOWLEDGE**®

in-home placement and services in the home, community and with the resource parent, child, and biological parents to support early reunification programs. The goals are to reduce length of stay in foster care, maintain child safety at home with their parents or caregivers, reduce re-referral and re-entry rates of families into the child welfare system, and increase timeliness to permanency.

Some of the child welfare workforce perceive Oregon as experiencing an increasing trend of transgender young adults unable to access the services they need. According to focus group participants, access to services for young adults in the LGBTQIA2S+ community is a concern, especially in Eastern Oregon.

The 2021 Procedure Manual requires that services are provided to children and families with sensitivity to culture and ethnicity and states that caseworkers are responsible for coordinating referrals to services that meet the child and family's unique cultural composition.[221]

For children identified as having a high level of needs, the 2021 Procedure Manual has added language regarding certifying homes for children with intellectual or developmental disabilities to ensure communication between caseworker, certifier, and Community Developmental Disabilities Program service manager, as well as consideration for any additional safety measures.[222]

The 2021 Procedure Manual contains description of In-Home Safety and Reunification Service (ISRS).[223] These services are intended to: provide immediate child protection, reduce time children spend in substitute care, and reduce the re-abuser or neglect of children. The service help parents in building additional problem-solving skills to eventually become self-sufficient, identifying strategies for predictable problems relating to child's behavior, child safety, depression, mood stabilization, and other adult relationships. The goal is to reduce trauma to children removed from their families because of abuse or neglect by offering family-focused services starting during the assessment phase and extending into aftercare services when children return home. Services include intervention programs in the home and community and services to support and maintain in-home placement and services in the home, community and with the resource parent, child, and biological parents to support early reunification programs. The goals are to reduce length of stay in foster care, maintain child safety at home with their parents or caregivers, reduce re-referral and re-entry rates of families into the child welfare system, and increase timeliness to permanency.

---

[221] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 1024).
[222] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (pp. 836–842).
[223] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 1041).

**PUBLIC KNOWLEDGE**·

Families should be referred to ISRS for reunification when the purpose is to return the child home to a parent within the next 30–45 days, and to motivate and engage parents to improve and maintain parental protective capacities related to identified safety threats in the home.

## Reunification Supports

Procedures and processes are intended to support the timely reunification of children. When planning for a return home, caseworkers share and use the current CANS results as part of the reunification process. At the same time, caseworkers assess parental protective capacities after services are provided to the parents. Caseworkers share CANS results with the parent(s) or current guardian and child. This will help them become aware of the needs the child is exhibiting. Caseworkers also share CANS results with others involved in the reunification process, including the child's school or mental health providers. Caseworkers discuss with the family how the parental protective capacities are, or are not, suited to meet the needs of the child. Furthermore, caseworkers discuss how the parent(s) will address those needs.

For children who are reunified, in–home services are intended to support family stability by preventing maltreatment and placement. Most workers and supervisors (43 percent) believe that CW "always" provides in–home services to families to prevent re–entry, while another 54 percent feel that these services are "sometimes" provided.

# 9 Case Planning

## 9.1 Case Plan Completion

Case planning includes identifying the specific services needed to meet each child's needs. Caseworkers need to consider all information gathered during both the child safety and protective capacity assessments, and doing so helps develop a focused, systematic, time-limited plan to meet the child's needs.

The Case Plan consists of multiple inputs, including:

- **CANS Tool.** CW has used the Child and Adolescent Needs and Strengths (CANS) Tool for years to assess needs and strengths of children and young adults to determine reimbursement rates and service plans for children and young adults, but since 2016, has expanded its use. The CANS is an evidence-based, internationally recognized assessment tool implemented in child welfare jurisdictions in all 50 states and throughout the world. CW now uses the CANS to determine applicable services and complete comprehensive case plans. Since 2016, CW began using the CANS for placement matching, reunification planning, services, and interventions, which was not the case in 2016.

- **Safety Plans.** The first safety plan, an initial safety plan, is defined as "a documented set of actions or interventions sufficient to protect a child or, if applicable, a young adult from an impending danger safety threat to allow for completion of the CPS assessment."[224] The 2021 Procedure Manual also contains three separate, but almost identical, definitions for an ongoing safety plan. The first definition defines an ongoing safety plan as "a documented set of actions or interventions that manage the safety of a child or, when applicable a young adult after Child Welfare has identified one or more impending danger safety threats at the conclusion of a CPS assessment or anytime during ongoing work with a family."[225] Oregon also uses a protective action plan defined as "an immediate, same day, short-term plan, lasting a maximum of 10 calendar days sufficient to protect from a present danger safety threat."[226]

- **Permanency Plan.** The permanency plan is targeted at supporting the reunification of children with their family. Other types of case planning should occur throughout the life of a case.

---

[224] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 1863).
[225] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 1865).
[226] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 1869).

- **Family Plan.** The permanency plan includes a family plan which is "a written document developed at the [Family Decision Making Meeting] that includes family recommendations on planning for the child and may include a permanency plan, concurrent permanent plan, placement recommendations, or service recommendations. The 'family plan' also includes expectations of the parents of the child and other family members; services the Department will provide; timeliness for implementation of the plan; benefits of compliance with the plan; consequences of noncompliance with the plan; and a schedule of future meetings if appropriate. The Family Plan described in ORS 417.375(1) is incorporated into the case plan to the extent that it protects the child, builds on family strengths, and is focused on achieving permanency for the child within a reasonable time."[227]

## 9.2    Inclusion in Case Planning

The Vision for Transformation includes a focus on timeliness and family engagement, both of which strongly relate to case planning. The Family Report was recently introduced as a part of engaging the family in case planning. From late 2021 through spring 2022, the rate of timely completion of the initial Family Report, done within 60 days of placement, has increased from 37 percent to 52.6 percent complete, including two districts that have 100 percent completed timely.[228]

CFSR data show that family involvement in the case planning process has remained stable. In 2016 and 2021, cases sampled for the CFSR showed families were participating throughout the case planning process in approximately 61 percent of the cases sampled. One focus group commented that they believed families were involved in case planning.

## 9.3    CFSR Data

In Oregon's 2016 CFSR, the items in Permanency Outcome 2 needed improvement as they did not meet the 95 percent threshold required for an item to be considered a strength. For placement with siblings, 89 percent of sampled cases in Oregon were a strength,[229] compared with 81 percent of cases rated as a strength nationwide.[230] Concerning visiting with parents and siblings in foster care, 82 percent of cases were a strength, compared

---

[227] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 1858).

[228] Oregon Department of Human Services Child Welfare Division, Annual Progress and Services Report (APSR), 2023. (June 2022).

[229] Children's Bureau: Oregon 2016 CFSR Final Report. https://www.oregon.gov/DHS/CHILDREN/Documents/Oregon%20CFSR%20Round%203%20Final%20Report%202016.pdf

[230] Child and Family Services Reviews Aggregate Report, Round 3: Fiscal Years 2015–2018. Children's Bureau: https://www.cfsrportal.acf.hhs.gov/document/download/XqXpKG

with 62 percent nationwide, and 88 percent of cases were rated as a strength for preserving connections, compared with 67 percent nationwide. For relative placement, 77 percent of cases were marked as a strength, compared with 70 percent nationwide, and 79 percent of cases were rated as a strength for a relationship with parents, compared with 58 percent nationwide.

## 9.4    Vision for Transformation

Since 2016, ODHS has re-committed to engaging with the community by integrating the voices of children, young adults, parents, families, Tribal Nations, and partners to be more responsive to the needs of families and community partners. The Vision for Transformation frames the focus on strengthening and preserving connections to family and community by keeping kids home and in their community, when possible, as well as maintaining connections when placed in substitute care and prioritizing permanence. Programs such as the Oregon Kinship Navigator help build protective factors as they engage families, build skills, and identify opportunities for support.



# 10  Preserving and Improving Connections

## 10.1  Family Interaction

ODHS policy states that maintaining family contact and regular visitation is the single most important factor in supporting a child's attachments to his or her parents, siblings and other family members and can lessen both the child's and the parents' anxiety about the child being placed in substitute care.[231]

Child Welfare provides support to the family to meet the parents' identified needs, bolster familial connections, promote reunification, and encourage success. These supports include parenting time, which, like family time, is meant to maintain, strengthen, or develop attachment between children and parents, and the frequency of this time impacts both the likelihood of parental engagement in the case plan and successful reunification. Time spent between children and parents is likely to motivate parents to engage in the case planning process and increase the likelihood of reunification. CW encourages parents' participation in caregiving responsibilities and sharing the parenting role with resource parents. This can include bath time, bedtime, and mealtime; medical appointments; school activities; cultural events and faith-based activities; community functions; and time with extended family.[232] These opportunities for parents do not require a formal "visit," and resource parents are expected to continually offer opportunities for parents to learn and practice new skills. Certification requirements state that resource parents must support the child's family and facilitate connections between the child and their siblings and parents. When resource parents renew their certification, they must demonstrate that they have worked with the child's family and share what worked and what could be improved.[233]

National best practices for family time[234] are outlined in the table below, along with Oregon's practice.

**Table 27. Best Practices Related to Ensuring Adequate Family Time**

| Best Practice | 2016 Oregon Practice | 2022 Oregon Practice |
|---|---|---|
| **Family time is a right, not a privilege**: family time is a fundamental right for children and | Meets best practice:<br>• An appendix to Oregon's Procedure Manual states that "visitation should | Exceeds best practice:<br>• ODHS policy on prohibiting visits mirrors the 2016 |

---

[231] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 898).
[232] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 505).
[233] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 1579).
[234] Casey Family Programs: https://www.casey.org/family-time/



**Table 27. Best Practices Related to Ensuring Adequate Family Time**

| Best Practice | 2016 Oregon Practice | 2022 Oregon Practice |
|---|---|---|
| should not be used as a bonus or reward. | **never** be used as a reward or punishment,"[235] and that any changes in visitation arrangements should reflect the risk assessment and progress toward the child's permanency goal, not any attempts to reward or punish either the child's or parent's behavior.<br>• The 2016 policy language includes reasons to prohibit visits, including when there is reason to believe the acts or omissions of a parent or guardian would result in abuse or neglect, the child or young adult's safety cannot be managed by supervision, the visit does not meet the child or young adult's best interest, or if a court order prohibits it. The policy also clearly states that visits cannot be canceled solely due to the act or omission of a parent unrelated to the safety or | Procedure Manual language.[238]<br>• ODHS policy continues to require arrangement for "Special Visitation Considerations."[239]<br>• Oregon's administrative rule language, updated in July 2022, states that children and young adults have the right to visit with their parents, guardian, and siblings in substitute care as often as reasonably necessary to maintain and enhance their attachment.[240] |

---

[235] Oregon Procedure Manual 2016, Appendix 4.15:
http://www.dhs.state.or.us/caf/safety_model/procedure_manual/appendices/ch4–app/4–15.pdf
[238] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 899).
[239] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 903).
[240] OAR 413–070–0830: http://www.dhs.state.or.us/policy/childwelfare/manual_1/division_70.pdf

Exhibit 8
Page 160 of 390



PUBLIC KNOWLEDGE®

Preserving and Improving Connections

### Table 27. Best Practices Related to Ensuring Adequate Family Time

| Best Practice | 2016 Oregon Practice | 2022 Oregon Practice |
|---|---|---|
| | well-being of a child during that visit.[236]<br>• The 2016 Procedure Manual includes "Special Visitation Considerations," requiring visits with extended family members, including siblings, teachers, coaches, pastors, rabbis, or neighbors, to maintain children's connections to their families, culture, and communities as this is important for the child's well-being.[237] | |
| **Focus of family time:** children should be able to spend time building connection with their parents, siblings, and extended family, and not be focused on "visitation." | Meets best practice:<br>• The 2016 Procedure Manual states that maintaining family contact and regular visitation is the single most important factor in supporting a child's attachments to his or her parents, siblings and other family members and can lessen both the child's and the parents' anxiety about the child being placed in substitute care.[241] | Meets best practice:<br>• ODHS policy continues to meet best practices in that it reiterates that maintaining family contact and regular visitation is the single most important factor in supporting a child's attachments to his or her parents, siblings and other family members and can lessen both the child's and the parents' anxiety about the child being placed in substitute care.[243] |

---

[236] 2016 Oregon Procedure Manual, Chapter 4 – Services to Children, (pp. 2–3).

[237] 2016 Oregon Procedure Manual, Chapter 4 – Services to Children, (p .7).

[241] 2016 Oregon Procedure Manual, Chapter 4 – Services to Children, (p. 1).

[243] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 898).



**Table 27. Best Practices Related to Ensuring Adequate Family Time**

| Best Practice | 2016 Oregon Practice | 2022 Oregon Practice |
|---|---|---|
| | • The 2016 Procedure Manual requires the creation of a visit and contact plan when a child first enters substitute care or by the time of the first court hearing, whichever is first.<br><br>• 2016 ODHS Policy requires including "a timeframe for regular review and revision of the visit and contact plan," and states that the review must be part of the 90-day case plan review.[242]<br><br>• 2016 ODHS Policy requires documentation of family and other visitation contacts, and includes the date, time, and length of visit, the participants, activities that occurred, any missed visits and the reasons, and any visits that were interrupted or ended early, along with the reasons. | • ODHS requires the creation of a Visit and Contact Plan as part of every case plan, which is developed at the time of removal. This plan is reviewed to ensure that visits and contacts are happening as planned and that visitation and contacts conform with the ongoing safety plan. The requirement to establish this plan is a strength in that it requires focusing on sustaining connections between children and their families.<br><br>• However, the child welfare field is moving away from using the words "visitation" and "visitation plans" as they can imply that each family receives a standardized amount of time together. The Children's Bureau, in a 2020 Information Memorandum,[244] suggests a shift from "visits" to "family time" to prioritize the importance of the time that children spend with their parents, siblings, and other family members. |

---

[242] 2016 Oregon Procedure Manual, Chapter 4 – Services to Children, (p. 3).

[244] ACYF-CB-IM-20-02: https://www.acf.hhs.gov/sites/default/files/documents/cb/im2002.pdf

PUBLIC
KNOWLEDGE®

Preserving and Improving Connections

## Table 27. Best Practices Related to Ensuring Adequate Family Time

| Best Practice | 2016 Oregon Practice | 2022 Oregon Practice |
|---|---|---|
| | | • Monthly face-to-face contact notes must describe progress on the case plan, including how the child's team is supporting attachment to the child's parents, siblings, and other natural supports.[245] |
| **Frequency of family time:** typically, the goal is to increase the number and duration of family time to prepare for reunification. Research shows that regular, meaningful family time enhances outcomes for children and families, including timely reunification.[246] Family time should occur within 24-48 hours of removal and should occur as often as possible. | • Meets best practice: <br>• The 2016 Procedure Manual states that "frequent high-quality visits support parental engagement and motivation for change."[247] <br>• The 2016 requirement for the first visit is within a week of the child's placement in substitute care, preferably within the first 48 hours of entering care. | Exceeds best practice: <br>• The 2021 ODHS policy also states that "frequent high-quality visits support parental engagement and motivation for change."[243] <br>• ODHS policy continues to require that the first visit occurs within a week of the child's placement in substitute care, preferably within the first 48 hours.[248] <br>• As part of co-case management between a CPS caseworker and a permanency caseworker, the permanency caseworker reviews the Visit and Contact Plan (created by the CPS caseworker) to "ensure there is as much contact as possible with the parents |

---

[245] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 633).
[246] ACYF-CB-IM-20-02: https://www.acf.hhs.gov/sites/default/files/documents/cb/im2002.pdf
[247] 2016 Oregon Procedure Manual, Chapter 4 – Services to Children, (p. 1).
[248] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (pp. 898–899).

Exhibit 8
Page 163 of 390

**PUBLIC KNOWLEDGE**®

Preserving and Improving Connections

### Table 27. Best Practices Related to Ensuring Adequate Family Time

| Best Practice | 2016 Oregon Practice | 2022 Oregon Practice |
|---|---|---|
| | | knowing that frequent contact promotes timely reunification and is good for the parents and the child."[249] |
| **Involving the appropriate people:** family time has evolved from supervised visits to quality time that promotes connections and includes many members of a child's extended family and community members. | Meets best practice:<br>• The 2016 Procedure Manual requires involving the parents in planning for visits, and states it is important to invite the child's substitute caregivers, the child, and other relevant people (the child's attorney, CASA, therapist, or relatives) to participate in planning for parent–child contact.[250] | Meets best practice:<br>• ODHS policy continues to require involving the parents, the child, the child's caregivers, and other relevant people (the child's attorney, CASA, therapist, or relatives) to participate in planning for parent–child contact.[251] |
| **Caregiver involvement:** resource parents can help children prepare for and transition back to their homes following family time. Caregivers can provide transportation and, if appropriate, can offer coaching or support to the child's parents. | Exceeds best practice:<br>• The 2016 Procedure Manual requires that caseworkers discuss with resource parents that children may have varying reactions to time with their families and that the child may express their feelings through behaviors rather than through | Exceeds best practice:<br>• ODHS policy requires the same discussion with caseworkers about children's varying reactions to time with their families and that these reactions are normal and are not grounds for limiting visitation.[253]<br>• ODHS caseworkers continue to be responsible for |

---

[249] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 433).
[250] 2016 Oregon Procedure Manual, Chapter 4 – Services to Children, (p. 1).
[251] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 898).
[253] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (pp. 899–900).

Exhibit 8
Page 164 of 390



Preserving and Improving Connections

Table 27. Best Practices Related to Ensuring Adequate Family Time

| Best Practice | 2016 Oregon Practice | 2022 Oregon Practice |
|---|---|---|
| | words. These reactions are normal and are not grounds for limiting visitation.[252]<br>• The 2016 policy requires the caseworker to explain benefits to resource parents, including healthy attachment, strengthening of the parent–child relationship, easing the pain of separation and loss for the child, helping provide motivation for parents, and allowing parents to learn and practice new skills.[252]<br>• The 2016 policy supports resource parents in prioritizing visits between siblings when the visits are safe and in the child's best interests.[252] | explaining the benefits of frequent visitation to resource parents[253]<br>• ODHS continues to support resource parents in prioritizing visits with a child's siblings when such visits are safe and in the child's best interests.[253] |

Oregon's statutory language, updated in July 2022, states that children and young adults have the right to visit with their parent, guardian, and siblings while in substitute care, as often as reasonably necessary to maintain and enhance their attachment.[254]

ODHS policy outlines reasons to prohibit visits, including when there is reason to believe the acts or omissions of a parent or guardian would result in abuse or neglect, the child or young adult's safety cannot be managed by supervision, the visit does not meet the child or young adult's best interest, or if a court order prohibits it. Policy also clearly states that visits cannot be canceled solely due to the act or omission of a parent that is unrelated to the safety or well–being of a child during that visit.[253]

---

[252] 2016 Oregon Procedure Manual, Chapter 4 – Services to Children, (p. 3).
[254] OAR 413–070–0830: http://www.dhs.state.or.us/policy/childwelfare/manual_1/division_70.pdf



Preserving and Improving Connections

ODHS policy also requires arrangements for visits with extended family members, including siblings, teachers, coaches, pastors, rabbis, or neighbors, to maintain children's connections to their families, culture, and communities as this is important for the child's well-being.[255]

ODHS requires the creation of a Visit and Contact Plan as part of every case plan, which is developed at the time of removal. The requirement to establish this plan is a strength in that it requires focusing on sustaining connections between children and their families:

- The Plan must be reviewed every 90 days as part of the case plan review and can be reviewed more frequently. This plan is reviewed to ensure that visits and contacts are happening as planned and that visitation and contacts conform with the ongoing safety plan. This review includes examining how any changes in the parents' protective capacities impacted supervision of visits, whether the visitation plan meets the child's safety and well-being needs and if it is the least restrictive plan, what opportunities exist for the child to visit with other family members, and whether the visitation plan supports progress toward the conditions for return and achieving the case plan and permanency plan goal.

- However, the child welfare field is moving away from using the words "visitation" and "visitation plans" as they can imply that each family receives a standardized amount of time together. The Children's Bureau, in a 2020 Information Memorandum,[256] suggests a shift from "visits" to "family time" to prioritize the importance of the time that children spend with their parents, siblings, and other family members. Despite the use of the outdated "visit" language, the intention of this plan is to ensure children remain connected to their families and that their time together supports the achievement of their permanency goal.

- The Visit and Contact Plan also focuses on interactive face-to-face contact, and can be supplemented by phone calls, letters, emails, and sharing pictures and gifts.[257] Caseworkers have been creative in facilitating sibling and family interaction, using technology such as FaceTime when children cannot be in person with siblings.

- If for some reason visits do not occur between a child or young adult and their parent(s), visits between siblings should continue to occur regularly unless there is a safety risk or threat to the child or young adult's well-being.[258] The Visit and Contact Plan ensures "Siblings are able to visit one another if they are not in the same substitute care setting or if some siblings are in the parents' home."[259] Focus

---

[255] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 903).
[256] ACYF-CB-IM-20-02: https://www.acf.hhs.gov/sites/default/files/documents/cb/im2002.pdf
[257] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 898).
[258] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 899).
[259] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021. (p. 433).



Preserving and Improving Connections

group participants mentioned that facilitating contact between children and young adults placed separately can be a challenge despite their best intentions and efforts.

When parents have met the conditions for return and reunification, the caseworker must "prepare the child for the return home."[260] As part of co-case management between a CPS caseworker and a permanency caseworker, the permanency caseworker will review the Visit and Contact Plan (created by the CPS caseworker) to "ensure there is as much contact as possible with the parents knowing that frequent contact promotes timely reunification and is good for the parents and the child."[261]

CW has specific policy language focused on supporting family interaction, including considering the child's best interests. Several states, including Oregon, incorporate emotional ties between children, their families, and caregivers as part of the best interest determination. Oregon's statutes require the inclusion of the child or young adult as developmentally appropriate and the parent or guardian in identifying placement resources and requires diligent efforts to place siblings together unless joint placement is not in any of the children's best interests.[262]

CW has taken several steps to address obstacles to family interaction:

- Resource parents do not always have the resources or availability to transport children and young adults to family visits. However, some Oregon districts have volunteer supports and community organizations providing children transportation. Marion County is working with the Children's Public Private Partnership, CP3, to pilot a volunteer driver program to increase family interaction frequency and expedite reunification in 2022.[263]

- Some agencies do not have a space where families can spend time or play together, and it is a challenge for families to have meaningful interaction in an office space or conference room. However, many local branches have redecorated their visitation rooms. CW has an ADA Coordinator who has begun working with branches to create a room designed for individuals and families with sensory concerns. For those districts without updated visitation rooms, many are in the process of creating more welcoming spaces for families. CW has removed cameras from visit rooms, and the leadership continually encourages local teams to consider why family interaction needs to be supervised. These efforts and improvements to creating safe and warm spaces for families increases their ability to engage with each other and strengthen their relationships.

---

[260] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 546).
[261] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 433).
[262] OAR 413-070-0600: http://www.dhs.state.or.us/policy/childwelfare/manual_1/division_70.pdf
[263] Children's Public Private Partnership (CP3). https://www.cp3oregon.org/programs

Exhibit 8
Page 167 of 390

- Policy dictates that children are not supposed to miss school or their extracurricular activities for family interaction unless scheduling otherwise is impossible,[264] which does not leave much time to schedule those visits. One focus group participant shared that a judge in their district ordered six hours of family time per parent for each child in the family, which is difficult to schedule around school and other responsibilities.

## 10.2  Relative Placements

One of the pillars of the first guiding principle of the Vision for Transformation is a focus on strengthening and preserving connections with family and community "by keeping children and young adults safely in their own home and communities whenever possible; maintaining connections to family, culture, and community when temporary substitute care is needed; and making permanency the priority, starting with safely reunifying families."

The definition of kith is broad to include multiple options. According to the CW Procedure Manual, kith is defined as "a person not related to the child by blood or through legal means but are identified by the child or the family and are considered by the child or child's family as a relative."[265] CW has a process to complete an immediate, Temporary Certification for same day placements in crisis situations. This allows certifiers to conduct criminal background checks and check references. Some participants felt that the background check requirements are too stringent for some criminal history. They felt that the criteria should be more flexible for certain crimes due to the urgent need for placement options and the desire to place with relatives and kith.

A Chapin Hall study showed that children initially placed with relatives are the least likely to experience placement changes for their time in substitute care.[266] Another review of relative placements scanning over 100 studies concluded that children in kinship care experience improved behavioral development and mental health functioning outcomes in addition to placement stability.[267]

---

[264] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 900).
[265] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 1554).
[266] Chapin Hall. (Dec 2007). Foster Care Dynamics 2000–2005: A Report from the Multistate Foster Care Data Archive. https://fcda.chapinhall.org/wp-content/uploads/2013/10/Foster-Care-Dynamics-2000-2005.pdf
[267] Winokur, M., Holtan, A., and Batchelder, K.E. (March 2014). Kinship Care for the Safety, Permanency, and Well-Being of Children Removed from the Home for Maltreatment: A Systematic Review. https://doi.org/10.4073/csr.2014.2



Preserving and Improving Connections

Data from the Annie E. Casey Foundation[268] show that kinship placements increased from 25 to 34 percent nationally from 2007–2020, and placement in non-relative foster care decreased from 46 to 45 percent nationally. That same snapshot illustrates the increasing trend of the use of kinship care in Oregon as well, as relative foster home use went up from 32 to 34 percent from 2019 to 2020, giving Oregon one of the higher rates of kinship use in the country.

When children are placed into non-relative substitute care, CW "must continually consider ways in which relatives and persons with a caregiver relationship can be engaged in case planning, safety planning, placement, and ongoing support."[269] This includes periodically reviewing CW's diligent efforts to place children with a relative or person with a caregiver relationship, including asking whether siblings are placed together, and if not, what can be done to place them together and what is being done to maintain contact between siblings. These diligent efforts are required by the courts and are in Oregon Administrative Rule (OAR 413-070-0069) as well. During this review, caseworkers will consider whether the child or young adult has been given every possible opportunity to be reunified with an in-home safety plan, be placed with a relative or siblings, or to have ongoing connection with their family.[270]

The 90-day Child Welfare Case Plan review must include an update on the search for relatives, a review of the visitation plan, and consideration of a child or young adult's siblings.[271] The search for relatives is ongoing during the child's case, and as part of this review, caseworkers will identify relatives who have been identified and contacted, how they have responded, what connections they wish to have with the child, whether it is appropriate to contact them again, and if they are able to participate in the child's life even if they cannot serve as a placement or adoptive resource. This ongoing review is critical, as relatives' ability to engage with and potentially act as placement resources may change over time.

Kinship providers are eligible to receive a Temporary Assistance for Needy Families (TANF) grant for a child. Still, less than 12 percent of caregivers receive this[272], at least in part because providers typically have to assign the state the right to collect child support from

---

[268] The Annie E. Casey Foundation. Kids Count Data Center:
https://datacenter.kidscount.org/data/line/6247-children-in-foster-care-by-placement-type?loc=1&loct=2#2/2-8/false/574,1729,37,871,870,573,869,36,868,867/asc/2622,2621,2623,2620,2625,2624,2626/12995
[269] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 741).
[270] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 742).
[271] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (pp. 520–525).
[272] Chapin Hall. Kinship Care Leads to Better Outcomes for Children.
https://www.chapinhall.org/project/kinship-care-leads-to-better-outcomes-for-children/


the child's birth parents.[273] Many relatives hesitate to do so as this can compound the stress and trauma on the birth parents and leave kinship providers with less financial resources while caring for a child. The federal government allows states to waive that requirement for a good cause. While the Oregon Kinship Navigator website (https://oregonkinshipnavigator.org) outlines the TANF program in Oregon, it does not share information regarding a waiver to the child support requirement.

## 10.3  Sibling Connections

Children placed with their siblings or whose connections with siblings are maintained while in substitute care experience similar positive outcomes as those placed with relatives, leading to improved well-being and permanency outcomes. Children placed with siblings have more placement stability than children placed separately from any or all their siblings.[274] There is some evidence that placement with siblings improves permanency through reunification, guardianship, and adoption.

Oregon prioritizes placing sibling groups together appropriately and in their home communities when possible. When an immediate substitute care placement is necessary, caseworkers are required to determine whether siblings can be placed together, and if they cannot, arrangements must be made and documented in the Temporary Visit and Contact Plan regarding visitation with siblings.[275] ODHS policy encourages caseworkers to "act quickly" when the initial placement does not allow siblings to be placed together due to a lack of capacity in the placement resources available at the time of initial placement.[276] When choosing a placement, the procedure requires placement with relatives and keeping siblings together whenever possible (when in the best interests of the children).[277] If siblings are not able to be placed together, CW requires efforts to be made to reunite them as soon as possible, and in the interim, document routine contact and visitation in temporary visits, ongoing visits, and contact plans. When caseworkers cannot place siblings together, the procedure requires caseworkers to "document explanations of… how the placement preserves the child's connections and attachments including proximity to the child's biological family, including siblings and the child's school."[278] CW policy states

---

[273] Generations United. (2020). TOOLKIT African American Grandfamilies: Helping Children Thrive Through Connection to Family and Culture. https://www.gu.org/resources/african-american-grandfamilies-helping-children-thrive-through-connection-to-family-and-culture /.

[274] Sattler KMP, Font SA, Gershoff ET. Age-specific risk factors associated with placement instability among foster children. Child Abuse Negl. 2018 Oct;84:157–169. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7357603/

[275] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 718).

[276] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 719).

[277] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 722).

[278] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 492).



Preserving and Improving Connections

that children's separation from siblings to be placed into foster care is considered temporary.

It is generally in children's best interest to be placed together when considering adoption. In situations where siblings are separated for adoption, caseworkers must have "compelling reasons" to request permission from the CW Permanency Committee to separate siblings in need of adoptive resources, and these requests require Program Manager Approval.[279] This request must be documented in OR–Kids and include information supporting the separation, and the caseworker will be expected to present the request to the Permanency Committee.

Focus group participants shared that they attempt to place children with their siblings, but they cannot do this as often as they would like due to differing needs of the children, best interests of the children, or differing capacities of the providers. Some focus group participants mentioned that placing siblings in the same home can be a detriment to some children if they have differing levels of need. Siblings can disrupt placements more as groups than they may have individually and can cause the need for placement changes for multiple children. It can be difficult to place children together if they are not jointly placed from the initial placement, as moving children causes placement disruptions for some of them. Focus group participants mentioned that it becomes harder to bring children together once you separate children in placements. The survey reflected the difficulty in consistently placing siblings together. The 2022 survey questioned whether CW facilitates contact between siblings according to the case plan. Responses show that this happens most of the time, with 51 percent of respondents sharing that it happens sometimes and 48 percent stating that it always occurs. Less than two percent of respondents shared that sibling contact never occurs according to the plan.

The Oregon legislature codified the Foster Children's Sibling Bill of Rights[280] in May 2017 (and associated rules[281] were effective January 1, 2018) to give children and young adults in foster care rights designed to protect and strengthen bonds with their siblings.

The Foster Children's Sibling Bill of Rights includes:

- Caseworkers provide children and young adults with documentation of their rights and a verbal explanation of their rights (in an age and developmentally appropriate manner) within 60 days of being placed in substitute care and of any placement change, at least annually.

---

[279] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 1255).
[280] Oregon Foster Children's Bill of Rights:
https://sharedsystems.dhsoha.state.or.us/DHSforms/Served/de9014a.pdf
[281] Oregon Foster Children's Sibling Bill of Rights, ORS 418.608:
https://oregon.public.law/statutes/ors_418.608

- Siblings have the right to be placed together whenever safe and appropriate. When this placement does not occur, the caseworker must continue to work toward joint placement.

- Siblings have a right to have a Sibling Visit and Contact Plan and be actively engaged in the plan's development.

- Children and young adults have the right to be immediately notified of specific changes and life events of siblings in ODHS custody, including placement and placement changes, catastrophic events, and emergencies.

- Children and young adults have the right to have continued contact encouraged in any adoptive or guardianship placement when safe and appropriate.

- Children and young adults in ODHS custody may have other rights not specified and as appropriate to the child or young adult's age and developmental stage.

Caseworkers must consider a child's siblings at various points in the case process, including inviting a child's siblings "who can support the young adult's goals, answer questions, and assist with decision–making[282] to a Youth Decision Meeting (YDM). A YDM can also include a family and permanency team meeting in which the team can determine their placement preferences and discuss how the preferred placement meets the child or young adult's needs, including the need for siblings to be placed together. In addition, caseworkers are required to provide young adults with a Transitions Tool Kit when the young adult is reaching independence, and the court dismisses custody. The Transition Tool Kit includes, among other things, the location and status of the young adult's siblings and their contact information.[283] Each child's case plan must also outline whether siblings are in the same placement, and if not:[284]

- Why not? (Lack of placement resources, safety issues, different level of care needs currently?)

- What is being done to address issues that contribute to siblings being apart?

- How has Child Welfare conveyed to all involved that sibling separation should be temporary?

- What efforts are being made to reunite siblings?

- In what ways are sibling connections being maintained (siblings visit at weekly parent–child visits and every other week facilitated by foster parents, phone calls, letters, etc.)?

---

[282] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 483).
[283] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 962).
[284] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 496).

- If siblings are placed together, are there any issues that may threaten continued placement together?
- If so, what is being done to address this to preserve the sibling placement together?
- Orders of the court and the efforts ODHS is making toward meeting those orders.

The 90-Day Case Plan Review must also state whether siblings are placed together, and if so, what services are in place to address any supervision or therapeutic issues, and if they are not placed together, what efforts are underway to place them together and keep them connected. In addition, the review asks if a permanency committee has recommended that it is not in the children's best interest to be placed together, and if so, what efforts are ongoing to assess their need for connection and how that is being facilitated.[285]

## 10.4   Community Connections

CW procedure requires that placement decisions include considerations of community connections. At the first 30-day contact with a substitute caregiver, ODHS involves an assessment of whether the caregiver meets the statutory placement preferences of keeping the child or young adult near their parents and their community, keeping siblings together, and supporting the child's culture and family identity. Suppose the caregiver or placement does not meet any of these preferences (and additional caregiver criteria). In that case, the placement decision will be reevaluated, and the worker will determine whether this placement is in the child's or young adult's best interest.[286] A similar review is done during the 90-day review of the child's substitute care placement. The policy also requires that, when assessing prospective substitute care providers, one consideration is whether that person can meet the child's education needs, including the "child's needs to continue in the same school or educational placement."[287] The provider's ability also factors into the determination of the least restrictive placement. Maintaining connections to a child or family's faith is also included in CW procedure, and members of the child's faith-based community must be included in Family Engagement Meetings, Youth Decision Meetings, and assessments of parental capacity.[288]

CW engages the community through the Parent Advisory Council (PAC) of Oregon, which includes parents who have been involved with child welfare, who are in recovery, and who are now community leaders. The PAC meets monthly with state child welfare leadership and provides feedback to ODHS on new initiatives, concepts, and documents based on

---

[285] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (pp. 523–524).
[286] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 725).
[287] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 721).
[288] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (pp. 444, 451, 474, 483, 667).

their lived experience; and since 2020, has led training, shared their stories, and answered questions for new resource families throughout Oregon. The PAC allows the voice of lived experience to further permeate the decision-making process at every level of child welfare in Oregon and highlights the expertise within families. The culturally diverse Parent Advisory Council includes members from six CW districts, and shares information via a Facebook page and through a bimonthly newsletter.

Oregon statute requires "state agencies to develop and implement policy on relationships with Tribes" and "cooperation with Tribes."[289] These policies must promote communication between the state agency and Tribes and positive government-to-government relationships. ODHS is also currently revising its Tribal Consultation Policy to ensure the inclusion of the Tribes in the development of ODHS policies and programs that impact Tribes, establish communication pathways, and build trust, respect, and shared responsibility.

During the 90-Day Staffing, supervisors must review permanency goals for children to determine whether they have stability and permanence in their living situations. They must check the current placement to determine if it is stable and the most appropriate and least restrictive option for that child. Supervisors must also review tribal placement preferences and whether connections to the child's family, siblings, community, culture, and faith are being maintained. They must also consider whether visitation can be increased and if children and young adults are visiting their siblings while in this placement.[290]

---

[289] Oregon State Administrative Agencies, Relationships of State Agencies with Indian Tribes. ORS 182.162 to ORS 182.168. https://www.oregonlegislature.gov/bills_laws/ors/ors182.html
[290] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 10/4/2021, (p. 688).

Exhibit 8
Page 174 of 390

# 11 Staffing Resources

## 11.1 Staff Recruitment and Retention

Assessment participants report that high turnover is a detriment to CW. Assessment participants felt like turnover was high, but the data do not support this. They may be feeling the effects of employee absences, new employees being onboarded and not yet having a full caseload, the severity of cases in their caseload, or other COVID-19 stressors contributing to the feeling of overwhelm among staff.

## 11.2 Caseload Management

The Oregon Department of Human Services ORS 409.161 Workload Report, June 15, 2021, stated that staffing increases are not the only answer for improving outcomes. "Child Welfare is being responsive to staffing by creating management tools to inform the current state (including the Caseload Dashboard) and redesign workforce training and workforce development programs and tools to build engagement, increase retention, and provide ongoing support for the workforce."[291]

Despite the data regarding low caseload numbers, many assessment participants reported feeling overwhelmed by their workload. This may be due to the severity of the needs of the children. Staff turnover and worker absences (due to COVID-19 and other factors) may also increase the burden on some staff and contribute to the feeling of overwhelm. Additionally, assessment participants shared that too many assignments coming from ORCAH make safety management challenges. Children in care and individual cases have varying needs and degrees of severity, which means that a caseworker with five high-needs cases could have a higher workload than a caseworker with ten children in safe and stable placements. Workloads are balanced to the best of CW's ability.

In addition to information shared in Section 4.11, Oregon's Caseload Ratio Standards include standards for staff supervision, outlined in the table below.

**Table 28. Oregon Frontline Support Staff Supervision Ratio Standards**

| Frontline Support Staff Supervision Ratios | |
| --- | --- |
| Frontline Supervisor (PEMC) | 1:7 SSS1 + 1:12 SSA, PLG |
| Case Aid (SSA) | 1:7 SSS1 |
| Social Services Assistant (SSA) | 1:7 SSS1 |
| Paralegal (PLG) | 1:28 SSS1 |

[291] Oregon Department of Human Services ORS 409.161 Workload Report, 6/15/2021.

Exhibit 8
Page 175 of 390



Staffing Resources

| FRS/IV–E Specialists | 1:200 FC/Adoption cases |
| Office Support (OS2) | 1:3 SSSI |
| Office Manager (OM3) | 1:12 OS2 |

The graphic below illustrates trends of CW caseloads over the past ten years in various areas of the child welfare system.

### Figure 21. CW Caseload Trends[292]



## 11.3   Training and Coaching

Survey responses were mixed regarding the training caseworkers and supervisors receive. Most respondents felt that CW trains caseworkers to conduct assessments and case planning before working with families on an ongoing basis. Staff were evenly split on responses regarding receiving training on working with providers, with approximately 40 percent stating that this training is offered and the same percentage expressing uncertainty. Survey results show 63 percent of supervisors and caseworkers agree that child welfare provides training and coaching to staff in assessing individuals, including children and families.

In addition to Essential Elements, caseworkers have training requirements including:

- On–the–job opportunities to increase the transfer of learning

---

[292] https://www.oregon.gov/odhs/data/pages/forecasting.aspx

**PUBLIC KNOWLEDGE**®

- Curricula that must be completed within six months and one year of hire
- Topic-specific courses for certifiers and adoption workers
- Role-based training for assessment workers, screeners, permanency workers, certifiers, and adoption workers

Staff in the safety, permanency, and foster care programs attend quarterly training on safety or other specific components of their work. According to interviewees, CW wants to establish a formal learning path that encourages workers to take courses to develop skills in defined areas, such as interviewing or documentation, and increases clarity on the promotional path. CW does not want to require a mandatory learning path or a set number of courses per year. Safety Consultants conduct quarterly trainings via safety labs or train specific safety issues based on data.


# Appendix B: Key Terms

These definitions clarify the meaning of operative terms included in the research questions, inquiry questions, and throughout the methodology. Sources are included for reference. Where possible PK used a definition from Oregon CW policy or Oregon statute. Those definitions attributed to Public Knowledge® indicate that PK developed a definition based on experience and expertise.

| Term | Definition | Source |
|------|-----------|--------|
| Abuse [Can also refer to Maltreatment or Neglect] | Abuse: (a) For purposes of screening a report of "abuse" of a child subject to ORS 419B.005, "abuse" means any of the following, except that "abuse" does not include reasonable discipline unless the discipline results in one of the conditions described in this subsection.<br><br>Mental Injury. Any mental injury to a child, which includes only observable and substantial impairment of the child's mental or psychological ability to function caused by cruelty to the child, with due regard to the culture of the child.<br><br>Neglect. (i) Negligent treatment or maltreatment of a child, including, but not limited to, the failure to provide adequate food, clothing, shelter, or medical care that is likely to endanger the health or welfare of the child.<br>(ii) Buying or selling a person under 18 years of age as described in ORS 163.537. (iii) Permitting a person under 18 years of age to enter or remain in or upon premises where methamphetamines are being manufactured. (iv) Unlawful exposure to a controlled substance, as defined in ORS 475.005, or to the unlawful manufacturing of a cannabinoid extract, as defined in ORS 475B.015, that subjects a child to a substantial risk of harm to the child's health or safety.<br><br>Physical Abuse. Any assault, as defined in ORS chapter 163, of a child and any physical injury to a child which has been caused by other than | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf (pp.1944–1945) |

| Term | Definition | Source |
|------|-----------|--------|
| | accidental means, including any injury which appears to be at variance with the explanation given for the injury.<br><br>Sexual Abuse. (i) Rape of a child, which includes, but is not limited to, rape, sodomy, unlawful sexual penetration and incest, as described in ORS chapter 163. (ii) Sexual abuse, as described in ORS chapter 163. (iii) Sexual exploitation, including, but not limited to: (I) Contributing to the sexual delinquency of a minor, as defined in ORS chapter 163, and any other conduct which allows, employs, authorizes, permits, induces, or encourages a child to engage in the performing for people to observe or the photographing, filming, tape recording, or other exhibition which, in whole or in part, depicts sexual conduct or contact, as defined in ORS 167.002 or described in ORS 163.665 and 163.670, sexual abuse involving a child or rape of a child, but not including any conduct which is part of any investigation conducted pursuant to ORS 419B.020 or which is designed to serve educational or other legitimate purposes; and (II) Allowing, permitting, encouraging, or hiring a child to engage in prostitution as described in ORS 167.007 or a commercial sex act as defined in ORS 163.266, to purchase sex with a minor as described in ORS 163.413 or to patronize a prostitute as described in ORS 167.008.<br><br>Threat of harm to a child, which means subjecting a child to a substantial risk of harm to the child's health or welfare. (b) For purposes of screening a report of abuse of a child or young adult living in a home certified by Child Welfare or ODDS, unless the abuse alleged is familial, "abuse" means any of the following: (A) Abandonment, including desertion or willful forsaking of a child or young | |

**PUBLIC KNOWLEDGE**®

| Term | Definition | Source |
|------|-----------|--------|
| | adult, or the withdrawal or neglect of duties and obligations owed a child or young adult by a home certified by Child Welfare or ODDS, a caregiver, or other person. (B) Financial exploitation. (i) Financial exploitation includes: (I) Wrongfully taking the assets, funds, or property belonging to or intended for the use of a child or young adult. (II) Alarming a child or young adult by conveying a threat to wrongfully take or appropriate moneys or property of the child or young adult if the child would reasonably believe that the threat conveyed would be carried out. (III) Misappropriating, misusing, or transferring without authorization any moneys from any account held jointly or singly by a child or young adult. (IV) Failing to use the income or assets of a child or young adult effectively for the support and maintenance of the child or young adult. (ii) Financial exploitation does not include age-appropriate discipline that may involve the threat to withhold, or the withholding of privileges. (C) Involuntary seclusion. Involuntary seclusion means confinement of a child or young adult alone in a room from which the child or young adult is physically prevented from leaving. (i) Involuntary seclusion includes: (I) Involuntary seclusion of a child or young adult for the convenience of a home certified by Child Welfare or ODDS or a caregiver; (II) Involuntary seclusion of a child or young adult to discipline the child or young adult; (ii) Involuntary seclusion does not include age-appropriate discipline, including but not limited to a time-out. (D) Neglect, which includes: (i) Failure to provide the care, supervision, or services necessary to maintain the physical and mental health of a child or young adult; or (ii) The failure of a home certified by Child Welfare or ODDS, a caregiver, or | |

| Term | Definition | Source |
|------|-----------|--------|
| | other person to make a reasonable effort to protect a child or young adult from abuse. PUBLIC KNOWLEDGE® Physical abuse, which includes: (i) Any physical injury to a child or young adult caused by other than accidental means, or that appears to conflict with the explanation given of the injury; or (ii) Willful infliction of physical pain or injury upon a child or young adult. | |
| Accepted Professional Standards | PK uses the following accepted professional standards for the definitions in this document and the research questions: <br><br>• Oregon Department of Human Services <br>• Department of Health and Human Services, Administration for Children and Families, Children's Bureau <br>• Onsite Service Review Instrument 2016 (OSRI) from the Child and Family Service Reviews (CFSR) <br>• Child Welfare Information Gateway | Public Knowledge® |
| Address | To direct to the attention of; to take action. | Public Knowledge® |
| Adequately | Meeting minimum standards or requirements. | Public Knowledge® |
| Adoption | A legal or administrative process that establishes a permanent legal parent–child relationship between a child and an adult who is not already the child's legal parent and terminates the legal parent–child relationship between the adopted child and any former parent. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf (p.1946) |
| Agency Culture | Values and behaviors that contribute to the social and psychological environment of CW, including | Public Knowledge® |



| Term | Definition | Source |
|------|-----------|--------|
| | the five CW core values of integrity, stewardship, responsibility, respect, and professionalism. | |
| Appropriate | Suitable or proper for the circumstances based on best practice guidelines, CW policies, or federal expectations. | Public Knowledge® |
| Assess | To collect information to inform decision-making about a child, young adult, or family. | https://www.childwelfare.gov/topics/systemwide/assessment/overview/terms/ |
| Barriers | Obstacles to achieving intended outcomes. These can exist at the individual level, such as preventing or delaying permanence for a child, or at the organizational or system level, which result in policies or procedures that prevent populations of children and families receiving services to achieve intended outcomes. | Public Knowledge® |
| Basic Needs | Fundamental necessities including food, water, clothing, and shelter, as well as sanitation, education, and healthcare. | Public Knowledge® |
| Behavioral Rehabilitation Services (BRS) | A program that provides services and placement-related activities to the BRS client to address their debilitating psychosocial, emotional, and behavioral disorders in a community placement utilizing either a residential care model or a proctor care model. Note: Child Caring Agencies (CCAs) can also be licensed to provide BRS services, and many are, but they are not synonymous. | https://www.oregon.gov/oha/HSD/OHP/Policies/170-0020-092120.pdf  http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure- |

PUBLIC KNOWLEDGE®

| Term | Definition | Source |
|------|-----------|--------|
| | | Manual.pdf (p. 1948) |
| Case Plan [Can also refer to the Child Welfare Case Plan, Case Planning or Individualized Service Planning] | A written, goal-oriented, and time-limited individualized plan for the child and the child's family, developed by the agency and the parents or guardians, to achieve the child's safety, permanency, and well-being. The Case Plan, along with the Permanency Plan and Court Report, are part of the Family Report. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf (pp. 1949, 1961) |
| Caseload [Can also refer to Case(s)] | Individuals (usually a child) for whom a caseworker is responsible in a given time period, as expressed in a ratio of clients to staff members. | Public Knowledge® |
| Caseworker(s) | A child welfare employee assigned primary responsibility for a child or young adult served by child welfare. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf (p. 1949) |
| Centralize | To bring together into one location. | Public Knowledge® |
| Certification and Licensing Standards | Regulations in each state, for foster parents and providers, that ensure children are cared for in physically and developmentally safe environments. | https://www.childwelfare.gov/glossary/glossaryl/ |
| Certified Family [Can also refer to CW Certified | An individual or individuals who hold a current Certificate of Approval from the Department to operate a home to provide care, in the home in which the individual or individuals reside, to a | http://www.ODHS.state.or.us/policy/childwelfare/ma |

PUBLIC
KNOWLEDGE®

| Term | Definition | Source |
|------|-----------|--------|
| Resource Home] | child or young adult in the care or custody of the Department. | nual_1/division_2 00.pdf |
| Child [Can also refer to Children or Young Adult] | A person under 18 years of age, or a person under 21 years of age if the Department of Human Services determines that the person has a mental or physical disability that warrants the continuation of assistance. | ORS 418.330(1)(a) |
| Child and Adolescent Needs and Strengths (CANs) Tool | The CANS is a decision-making tool to determine level of care and service planning, and to monitor service outcomes.<br><br>In Oregon, the CANS is used to determine the Level of Need (LON) for children in substitute care and to determine reimbursement rates for substitute care providers. | https://praedfoun dation.org/tools/t he-child-and- adolescent- needs-and- strengths-cans/<br><br>http://www.dhs.st ate.or.us/caf/safe ty_model/procedu re_manual/Orego n-DHS-Child- Welfare- Procedure- Manual.pdf (p. 1948) |
| Child Caring Agency (CCA) [Can also refer to Institution or Residential Facility] | Any private school, private agency, private organization or county program providing: Day treatment for children with emotional disturbances; Adoption placement services; Residential care, including but not limited to foster care or residential treatment for children; Residential care in combination with academic education and therapeutic care, including but not limited to treatment for emotional, behavioral or mental health disturbances; Outdoor young adult programs; or Other similar care or services for children. It includes the following: A shelter-care | ORS 418.205 |

Exhibit 8
Page 184 of 390

PUBLIC
KNOWLEDGE®

| Term | Definition | Source |
|------|-----------|--------|
| | home that is not a foster home subject to ORS 418.625 to 418.645; An independent residence facility as described in ORS 418.475; A private residential boarding school; and A child-caring facility as defined in ORS 418.950. It does not include: Residential facilities or foster care homes certified or licensed by the Department of Human Services under ORS 443.400 to 443.455, 443.830 and 443.835 for children receiving developmental disability services; Any private agency or organization facilitating the provision of respite services for parents pursuant to a properly executed power of attorney under ORS 109.056. For purposes of this subparagraph, "respite services" means the voluntary assumption of short-term care and control of a minor child without compensation or reimbursement of expenses for the purpose of providing a parent in crisis with relief from the demands of ongoing care of the parent's child; A young adult job development organization as defined in ORS 344.415; A shelter-care home that is a foster home subject to ORS 418.625 to 418.645; A foster home subject to ORS 418.625 to 418.645; A facility that exclusively serves individuals 18 years of age and older; or A facility that primarily serves both adults and children but requires that any child must be accompanied at all times by at least one custodial parent or guardian. | |
| CPS Assessment | An investigation into a report of abuse pursuant to ORS 419B.020 or ORS 418.258 that includes activities and interventions to identify and analyze safety threats, determine if there is reasonable cause to believe abuse occurred, and assure safety through protective action plans, initial safety plans, or ongoing safety planning. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf (p. 65) |

Exhibit 8
Page 185 of 390

**PUBLIC KNOWLEDGE®**

| Term | Definition | Source |
|------|-----------|--------|
| CPS Case Closure | The process of a CPS caseworker terminating the ongoing safety plan by ensuring all case notes are completed, the case file is in order and ready for filing, all services to the family have been closed, and completing the case closure narrative in the child welfare electronic information system. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf (p. 573) |
| Children in Care | Children and young adults who are in the custody and supervision of Oregon CW and living in substitute care. | Public Knowledge® and Oregon CW |
| Children Living with High Needs [Can also refer to Child(ren) with Disabilities, High Needs] | Children and young adults with cognitive, behavioral, and/or mental health issues. Children and young adults with high needs may require "intensive" authorized levels of care, which dictates the amount of payments for care; challenging diagnoses, behaviors, and other characteristics where placements disrupt frequently and require new placements frequently. | Oregon Department of Human Services, Office of Child Welfare |
| Children Who Identify as LGBTQIA2S+ | Refers to a child who identifies as Lesbian, Gay, Bisexual, Transgender, Queer, Intersex, Asexual, Two-Spirit, and includes those who may not identify with these terms and may use other words to describe themselves (LGBTQIA2S+). | Public Knowledge® |
| | The Oregon CW Child Welfare Procedures Manual states that every person has a sexual orientation, gender identity and expression (SOGIE) and they may be congruent or completely different. Some children and young adults with diverse SOGIE may identify as lesbian, gay, bisexual or transgender, and some may be questioning their sexual orientation or gender identity (LGBTQ). Other young adults may not identify with these terms | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure- |

Exhibit 8
Page 186 of 390

PUBLIC
KNOWLEDGE®

| Term | Definition | Source |
|------|-----------|--------|
| | and may use other words to describe themselves including but not limited to non-binary, genderqueer, gender fluid, gender expansive, agender, gender diverse, two-spirit, queer, asexual, pansexual, etc. For this reason, there are various permutations of acronyms used in conversation and written materials to reflect diversity of SOGIE. The acronyms SOGIE or LGBTQ+ will be used. | Manual.pdf (p. 1067) |
| Concerted Effort | Cooperative and directive planning toward a mutually agreed upon goal. | Public Knowledge® |
| Concurrent Planning | A case planning approach that involves considering all reasonable options for permanency at the earliest possible point following a child's entry into foster care and simultaneously pursuing those that will best serve the child's needs. Typically, the primary plan is reunification with the child's family of origin. This primary plan and an alternative permanency goal are pursued at the same time, with full knowledge of all case participants. Concurrent planning seeks to eliminate delays in attaining permanency for children. | https://www.childwelfare.gov/glossary/glossaryc/ |
| Conditions for Removal | Conditions in which CW and law enforcement have established that a child is in imminent threat of severe harm and use their authority to remove a child from home. | ORS 419B.150 |
| Conditions for Return | A written statement of the specific behaviors, conditions, or circumstances that must exist within a child's home before a child can safely return and remain in the home with an in-home ongoing safety plan. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure- |

Exhibit 8
Page 187 of 390

PUBLIC
KNOWLEDGE®

| Term | Definition | Source |
|------|-----------|--------|
| | | Manual.pdf (p. 1951) |
| Connections | Proximity to the child's biological family, including siblings and the child's school. Connections that should be considered include school, church, culture, community, and other significant people in the child's life who are important to the child's well-being. | Oregon Department of Human Services, Office of Child Welfare |
| Contacts [Can also refer to Caseworker Contacts] | Any communication between Child Welfare staff and a child, young adult, parent or guardian, foster parent or relative caregiver, provider, or other individual involved in a Child Welfare safety plan or case. "Contact" includes, but is not limited to, communication in person, by telephone, by videoconferencing, or in writing. "Contact" may occur, for instance, during a face-to-face visit; a treatment review meeting for a child, young adult, parent, or guardian; a court or Citizen Review Board hearing; or a family meeting. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf (p. 1951) |
| Continuous Quality Improvement (CQI) | A strength-based process that relies on teamwork to improve processes, services, and outcomes. It is an ongoing cycle of collecting data and then testing, implementing, learning from, and revising solutions. | https://www.oregon.gov/odhs/child-welfare-transformation/Pages/principle-3.aspx |
| Continuum of Care | Provides ongoing services for children in substitute care from entry to exit. The goal of this approach is to use the most appropriate and least restrictive interventions, both in and out of the home, while ensuring that safety issues and needs are addressed. | https://www.childwelfare.gov/topics/outofhome/foster-care/achieving-continuum/ |
| Courtesy Supervision [Can also refer | Supervision provided when a child is placed outside the county or state where the presenting issue originated. Courtesy supervision is provided | http://www.dhs.state.or.us/caf/safety_model/procedu |

| Term | Definition | Source |
|------|-----------|--------|
| to Cross-County Supervision or Inter-County Case Work] | by a caseworker in the receiving county or state, and should address the child's ongoing safety and well-being, and the reports should include dates and locations of face-to-face contact as well as updates concerning the child's education, medical/ mental health services, and assessment of the child's living environment.<br><br>Cross-county case supervision refers to when one or more counties is providing ongoing case management services for a county who holds primary jurisdiction over the case. | re_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf (p. 707) |
| Critical Incident | An incident that resulted in the death of a child if the Department reasonably believes the death was the result of child abuse and:<br><br>(a) The deceased child was in the custody of the Department at the time of the fatality; or<br><br>(b) The deceased child, the deceased child's sibling, or any other child living in the household with the deceased child was the subject of a CPS assessment by the Department within the 12 months preceding the fatality; or<br><br>(c) The child, the child's sibling, or any other child living in the household with the child had a pending child welfare or adoption case with the Department within the 12 months preceding the fatality; or<br><br>(d) The deceased child, the deceased child's sibling, or any other child living in the household with the deceased child was the subject of a report of abuse made to the Department or a law enforcement agency within the 12 months preceding the fatality, whether the report of abuse was closed at screening or assigned for CPS assessment.<br><br>A fatality or serious injury where child abuse or neglect is suspected; an event or situation which | OAR 413-017-0059(4) |

**PUBLIC KNOWLEDGE**®

| Term | Definition | Source |
|------|-----------|--------|
| | is highly concerning, may pose a potential liability, is of emerging public or media interest or represents an interest of security; any other incident designated by the CW Director. | |
| Data Integrity and Accuracy | Validity of data over the entire life cycle. | Public Knowledge® |
| Data Driven Decision-Making | Decision makers using objective information to improve outcomes for the people they serve. | https://www.oregon.gov/odhs/child-welfare-transformation/Pages/principle-3.aspx |
| Data Quality Plan | The comprehensive, purposeful, and iterative efforts taken by Title IV-E agencies to ensure the reliability and fitness of data for use as intended in the support of child welfare policies, goals, and practices. The agency must develop, implement, and maintain a data quality plan in a manner prescribed by the Administration for Children and Families and include it as part of Annual or Operational APDs. | https://www.acf.hhs.gov/sites/default/files/documents/cb/ccwis_data_quality_plans_presentation.pdf |
| Diligent Relative Search | The ongoing identification and contact with a child's relatives and persons with a caregiver relationship for the purposes of establishing ongoing connections and supports for families and placing a child with his or her relatives on a temporary or permanent basis. Diligent relative search may begin as early as the CPS assessment and continues throughout provision of ongoing services. | Public Knowledge® and Oregon CW |
| Effective | Producing an intended result or outcome. | Public Knowledge® |

**PUBLIC KNOWLEDGE®**

Appendix B: Key Terms

| Term | Definition | Source |
|------|-----------|--------|
| Evaluation | Determining the quality of something. | Public Knowledge® |
| Face-to-Face Contact | An in-person interaction between individuals. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf (p. 1953) |
| Family Engagement | Including families in all aspects of decision-making through a collaborative and partnering process of engagement. The intent of family engagement is to assist families in keeping their children safe and thriving in their communities. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf (pp. 167, 302, 1867-1868) |
| Family Interaction | "Child-family contact" means communication between the child or young adult and family and includes, but is not limited to, visitation with the child or young adult, participation in the child's or young adult's activities, and appointments, phone calls, email, and written correspondence. Contact between birth relatives, as defined under ORS 109.305, and the child or young adult in substitute care. Source: OAR 413-120-0000(12) [M]aintain family relationships and cultural connections with the child or young adult in substitute care. Source: OAR 413-070-0060(4) See also OAR 413-070-0072 | OAR 413-070-0000(16) |

Exhibit 8
Page 191 of 390

**PUBLIC KNOWLEDGE**®

Appendix B: Key Terms

| Term | Definition | Source |
|------|-----------|--------|
| Family Report | A written, goal–oriented, and time–limited individualized plan for the child and the child's family, developed by the agency and the parents or guardians, to achieve the child's safety, permanency, and well–being. The Case Plan, along with the Permanency Plan and Court Report, are part of the Family Report. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon–DHS–Child–Welfare–Procedure–Manual.pdf (pp. 1949, 1954, 1961) |
| Federal Background Checks | A background check completed by the Background Check Unit (BCU), who provide background check services and support to all CW and Oregon Health Authority (OHA) divisions for employment purposes, for those who provide services or seek to provide services as a contractor, subcontractor, vendor or volunteer, or are employed by qualified entities that provide care and are licensed, certified, registered or otherwise regulated by CW or OHA. The checks search for crimes prosecuted at a federal level. | https://www.oregon.gov/odhs/background–checks/pages/default.aspx |
| Foster Care | 24–hour substitute care for children placed away from their parents or guardians and for whom the Department, or another public agency, has placement and care responsibility. This includes but is not limited to placements in foster homes, foster homes of relatives, group homes, emergency shelters, residential facilities, child–care institutions, and pre–adoptive homes. A child or young adult is in foster care in accordance with this definition regardless of whether the foster care facility is licensed, and payments are made by the Department or local agency responsible for the care of the child, whether adoption subsidy payments are being made prior to the finalization | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon–DHS–Child–Welfare–Procedure–Manual.pdf (p. 1955) |

Exhibit 8
Page 192 of 390

PUBLIC KNOWLEDGE®

| Term | Definition | Source |
|------|-----------|--------|
| | of the adoption or whether there is federal matching of any payments that are made. | |
| Foster Parent(s) [also known as Resource Parent] | A person who operates a home that has been approved by the Department to provide care for an unrelated child or young adult placed in the home by the Department. <br><br> Please also refer to definition for Relative Caregiver, below. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon–DHS–Child–Welfare–Procedure–Manual.pdf (pp. 1955, 1966) |
| Frequency of Visits | The cadence of family interaction for a child in substitute care and may be with their parents, siblings and/or relatives. | Public Knowledge® and Oregon CW |
| Guardian | An individual who has been granted guardianship of a child through a judgment of the court. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon–DHS–Child–Welfare–Procedure–Manual.pdf (p. 1955) |
| Guardianship | Guardianship is a strategy and permanency option that is most frequently used when relative caregivers wish to provide a permanent home for the child and maintain the child's relationships with extended family members without a termination of parental rights, as is required for an adoption. Guardianship promotes the preservation of family, community, and cultural ties and potentially reduces racial disproportionality and disparities in child welfare. | Child Welfare Information Gateway |

Exhibit 8
Page 193 of 390

**PUBLIC KNOWLEDGE®**

Appendix B: Key Terms

| Term | Definition | Source |
|------|-----------|--------|
| Identified Needs | Areas of concern or areas needing improvement that are identified through an individualized assessment process. | Public Knowledge® |
| Identified Timeframe | The time between the publish date of Public Knowledge®'s *2016 Child Safety in Substitute Care Independent Review Final Report* (September 12, 2016) and present day. | Public Knowledge® |
| Impending Danger Safety Threat | A family behavior, condition, or circumstance that meets all five safety threshold criteria. When it is occurring, this type of threat is not immediate, obvious, or occurring at the onset of the CPS intervention. This threat is identified and understood more fully by evaluating and understanding individual and family functioning. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf (p. 1957) |
| Improve | A measurable change toward an accepted child welfare standard. | Public Knowledge® |
| Independent Living Services | Skill-building services provided to young adults aged 16 and older and in substitute care to help transition young adults from foster care to independent adulthood. CW is required to provide support to young adults aged 14 and older to create an independent living transition plan and build life skills. | https://www.courts.oregon.gov/programs/jcip/EducationMaterials/2019Eyes/Assessing.pdf |
| Initial Staff Training | Classroom, field activities, and computer-based learning required for new caseworkers within their first year of employment at CW. | https://www.pdx.edu/center-child-family/essential-elements-session-summaries |
| Investigations [Can also refer to Abuse in | Assessment into a report of abuse that includes activities and interventions to identify and analyze safety threats, determine if there is reasonable | http://www.dhs.state.or.us/caf/safety_model/procedu |

Exhibit 8
Page 194 of 390

| Term | Definition | Source |
|------|-----------|--------|
| Care Investigations or CPS Assessment] | cause to believe abuse occurred, and assure child safety through protective action plans, initial safety plans, or ongoing safety planning. | re_manual/Orego n-DHS-Child- Welfare- Procedure- Manual.pdf (p. 1950) |
| Kin | Distantly related persons, including those persons who the family or child identifies, or the person self-identifies, as being related by blood, adoption, or marriage but to a degree other than those specified as relatives. | http://www.dhs.st ate.or.us/caf/safe ty_model/procedu re_manual/Orego n-DHS-Child- Welfare- Procedure- Manual.pdf (pp. 620, 1579) |
| Kith | A person not related to the child by blood or through legal means but are identified by the child or the family and are considered by the child or child's family as a relative. | http://www.dhs.st ate.or.us/caf/safe ty_model/procedu re_manual/Orego n-DHS-Child- Welfare- Procedure- Manual.pdf (pp. 620, 1579) |
| Level of Need | The measure of evidence a child is displaying a certain need or behavior and the corresponding action needed, as used in the Child and Adolescent Needs and Strengths (CANS) Tool. | Adapted from the Oregon Comprehensive Screening Tool Manual: https://oregonwr aparound.org/wp- content/uploads/ 2020/05/607Ore gonCANSCompre |

| Term | Definition | Source |
|------|-----------|--------|
| | | hensiveManual0-5_181214.pdf |
| Mental or Behavioral Health Needs | Needs identified from a state of mental, behavioral, emotional well-being, and choices and actions that affect wellness. | Public Knowledge® |
| Middle Manager | A manager at a level between leadership and frontline supervisor. | Public Knowledge® |
| Oregon Health Authority (OHA) | The Oregon Health Authority works to lower and contain healthcare costs, improve quality, and increase access to healthcare for Oregonians.<br><br>The OHA provides behavioral health services to children and families throughout Oregon, including early childhood mental health, school-based mental health partnerships, intensive services, in-home services, family supports, substance use disorder programs, and young adult suicide prevention programs. | https://www.oregon.gov/oha/Pages/Portal-About-OHA.aspx<br><br>https://www.oregon.gov/oha/HSD/BH-Child-Family/Pages/index.aspx |
| Organizational Change Management | A structured process that makes change happen quicker, smoother, and less painfully for leaders, staff, stakeholders, and customers. It is a structured methodology that, at its core, is helping move an organization from its current state to a new desired state. Simply put, OCM addresses the people side of change management. | Public Knowledge® |
| Out-of-State Placements | Placements selected when treatment providers or placement options in Oregon are unable to serve a child in Child Welfare's care due to the child's unique or severe treatment needs. These placements fall under the Interstate Compact for the Placement of Children. | Public Knowledge® and Oregon CW (ORS 417.200) |

**PUBLIC KNOWLEDGE®**

Appendix B: Key Terms

| Term | Definition | Source |
|------|-----------|--------|
| Parents [Can also refer to Biological Families] | The biological or adoptive mother or the legal father of the child. A legal father is a man who has adopted the child or whose paternity has been established or declared under ORS 109.070, ORS 416.400 to 416.610, or by a juvenile court. In cases involving an Indian child under the Indian Child Welfare Act (ICWA), parent means any biological parent of an Indian child, or any Indian who has lawfully adopted an Indian child, including adoptions under tribal law or custom. It does not include an unwed biological father where paternity has not been acknowledged or established. "Parent" also includes a putative father who has demonstrated a direct and significant commitment to the child by assuming or attempting to assume responsibilities normally associated with parenthood, unless a court finds that the putative father is not the legal father. | http://www.dhs.st ate.or.us/caf/safe ty_model/procedu re_manual/Orego n-DHS-Child- Welfare- Procedure- Manual.pdf (p. 1961) |
| Performance-Based Contracting | The process of determining rates paid to providers based on performance on established metrics and data points. | Public Knowledge® |
| Permanency [Can also refer to Permanence, Legal Permanence, or Relational Permanence] | Stability and lifelong, reliable connections for children and young adults in substitute care.<br><br>*Legal permanence refers to a child's relationship with a parenting adult that is recognized by law and that the adult is the child's birth, kin, foster, guardian, or adoptive parent.<br><br>*Relational permanence refers to important long-term, stable relationships that help a child or young adult feel loved and connected. | Public Knowledge® and Oregon CW<br><br>https://www.aecf. org/blog/what- is-permanence/ |
| Permanency Goal | The court's determination of the permanency plan for the ward that includes whether and, if applicable, when:<br><br>(A) The ward will be returned to the parent | ORS 419B.476(4) |

**PUBLIC KNOWLEDGE**®

Appendix B: Key Terms

| Term | Definition | Source |
|---|---|---|
| | (B) The ward will be placed for adoption, and a petition for termination of parental rights will be filed | |
| | (C) The ward will be referred for establishment of legal guardianship | |
| | (D) The ward will be placed with a fit and willing relative | |
| | (E) If the ward is 16 years of age or older, the ward will be placed in another planned permanent living arrangement | |
| Permanency Hearings | The hearing that determines the permanency plan for the child. The permanency hearing is conducted by a juvenile court, another court of competent jurisdiction or by an authorized tribal court. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf (p. 1961) |
| Permanency Outcome | Preference of permanency plans reflected in statute:<br><br>Reunification<br><br>Adoption (TPR)<br><br>Guardianship (durable and permanent)<br><br>Fit and Willing Relative<br><br>Another Permanent Planned Living Arrangement (APPLA) | ORS 419B.476(5) |
| Permanency Plan | A written course of action for achieving safe and lasting family resources for the child or young adult. Although the plan may change as more information becomes available, the goal is to develop safe and permanent resources with the parents, relatives, or other people who may assume responsibility for the child or young adult | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure- |

Exhibit 8
Page 198 of 390

**PUBLIC KNOWLEDGE®**

| Term | Definition | Source |
|------|-----------|--------|
| | during the remaining years of dependency and be accessible and supportive to the child in adulthood. | [Manual.pdf](#) (p. 1962) |
| Physical Health Needs | Medical and dental health needs identified and addressed. | Public Knowledge® |
| Placement | The arrangement for the care of a child in the home of a parent, a foster home, relative foster home, non-paid relative home, or a child-caring agency or institution. It does not include the arrangement for care in an institute caring for the mentally ill, an institution primarily educational in character, or a hospital or other medical facility. | [OAR 413-040-0000(55)](#) |
| Placement Changes [Can also refer to Placement Change Decision] | Movement of a child in substitute care from one placement to another. | Public Knowledge® |
| Placement Stability | Ensuring that children remain in stable out-of-home care, avoiding disruption, removal, and repeated placements that have harmful effects on child development and well-being. | [https://www.child welfare.gov/gloss ary/glossaryp/](#) |
| Placing | The process of removing a child from his or her family of origin or caregivers to a safe, temporary living situation. | Public Knowledge® |
| Population of Children in Care | An overall demographic representation of children and young adults in the custody of CW. | Public Knowledge® |
| Present Danger Safety Threat | An immediate, significant, and clearly observable family behavior, condition, or circumstance occurring in the present tense, already endangering or threatening to endanger a child or, when applicable, a young adult. The family | [http://www.ODHS .state.or.us/caf/s afety_model/proc edure_manual/Or egon-ODHS-](#) |

**PUBLIC KNOWLEDGE**®

Appendix B: Key Terms

| Term | Definition | Source |
|------|-----------|--------|
| | behavior, condition, or circumstance is happening now, and it is currently in the process of actively placing a child or, when applicable, a young adult in peril. | Child-Welfare-Procedure-Manual.pdf (p. 1963) |
| Proctor Foster Home | A foster home certified by a Child Caring Agency (CCA). A proctor foster home must meet minimum standards as established by rules adopted by CW or the Oregon Youth Authority. Proctor foster homes also receive a pass-through certification from CW. | http://www.ODHS.state.or.us/policy/childwelfare/manual_1/division_215.pdf |
| Progress | The actions CW has made to implement recommendations or address concerns through identifiable and credible strategies and processes. | Public Knowledge® |
| Provider Recruitment | A critical step in finding prospective families for a child and should be tailored to the specific child. | http://www.ODHS.state.or.us/caf/safety_model/procedure_manual/Oregon-ODHS-Child-Welfare-Procedure-Manual.pdf |
| Qualified Caseworker | Applicants for a caseworker position must meet the following requirements: <br><br>• A bachelor's degree in Human Services or a field related to human service; or <br>• A bachelor's degree unrelated to Human Services; and either <br>• One year of Human Services related experience; or <br>• Completion of coursework equivalent to certification consistent with Oregon Caseworker Competency; or <br>• An associate degree and either <br>• Two years of Human Service-related experience; or | https://apps.oregon.gov/DAS/Classification-Compensation/JobProfile/Title/SocialServiceSpecialist1/JobProfileCode/6612/Category/HumanServicesandMedical/MinimumQualifications |

**PUBLIC KNOWLEDGE**®

Appendix B: Key Terms

| Term | Definition | Source |
|------|-----------|--------|
| | • One year of Human Services related experience and related training, coursework or certification consistent with Oregon Caseworker Competency | |
| Quality | The degree to which an object or entity (such as a process, product, or service) satisfies a specified set of attributes or requirements. | Public Knowledge® |
| Quality of Visits | Purposeful interactions between caseworkers and children, young adults, parents, and resource parents that reflect engagement and contribute to assessment and case planning processes in order to achieve outcomes.<br><br>Oregon CW refers to frequency of visits and quality of visits together (see Frequency of Visits as defined above). For purposes of this review, PK separated out frequency of visits and quality of visits as two separate concepts. | Public Knowledge® |
| Rates | Payments made to substitute care providers intended to offset some of the costs associated with caring for children. | Public Knowledge® |
| Re-Entry | Of all children who enter foster care in a 12-month target period and discharged within 12 months to reunification, living with a relative(s), or guardianship, what percent re-entered foster care within 12 months of discharge. | https://capacity.childwelfare.gov/sites/default/files/media_pdf/Reentry-to-Foster-Care-508.pdf |
| Relative | A person related to the child or young adult through a parent, including a putative father, unless the relationship has been dissolved by adoption of the child, young adult, or parent. This includes:<br><br>• Blood relatives that have prefixes of grand, great, or great-great. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure- |

| Term | Definition | Source |
|---|---|---|
|  | • Half blood relatives with prefixes of grand, great, or great‑great. Individuals with one common biological parent are half‑blood relatives.<br>• Aunts/Uncles.<br>• Nieces/nephews.<br>• First Cousins and First Cousins once‑removed (a parent's cousin).<br>• The spouses of any of the above‑listed relatives.<br>• The ex‑spouses of any of the those persons listed above. if the child or young adult had a relationship with the child PRIOR to entering substitute care.<br>• Siblings, including siblings that are related through a putative father. | Manual.pdf (p. 743)<br><br>OAR 413‑070‑0000(80) |
| Relative Caregiver [Can also refer to Kinship Caregiver] | A person defined as a "relative" under OAR 413‑070‑0000 who operates a home that has been approved by the Department to provide care for a related child or young adult placed in the home by the Department. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon‑DHS‑Child‑Welfare‑Procedure‑Manual.pdf (p. 1966) |
| Removal [Can also refer to Removed] | Either the physical act of a child being taken from his or her normal place of residence by court order or a voluntary placement agreement and placed in a foster care setting, or the removal of custody from the parent or relative guardian pursuant to a court order or voluntary placement agreement which permits the child to remain in a foster care setting. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon‑DHS‑Child‑Welfare‑Procedure‑Manual.pdf (p. 1966) |

**PUBLIC KNOWLEDGE**®

| Term | Definition | Source |
|------|-----------|--------|
| Report [Can also refer to CPS Report] | An allegation of abuse that the screener evaluates to determine if it constitutes a report of abuse as defined in ORS 419B.005 or, when applicable, Oregon Laws 2017, chapter 733. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf (p. 1966) |
| Required Timeframe | The accepted amount of time required for a given action based on policy. | Public Knowledge® |
| Response Time | The time frame to initiate the CPS assessment and is determined by the urgency of the report. Urgency is determined by reported family behaviors, conditions and circumstances that represent a present or impending danger. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf (p. 1967) |
| Reunification | Placement with a parent or guardian. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf (p. 197) |
| Risk | The extent to which key factors are present in a family situation that increases the likelihood of future maltreatment to a child or adolescent. | Public Knowledge® |
| Safe [Can also refer to Safety] | The absence of present danger safety threats and impending danger safety threats. | http://www.dhs.state.or.us/caf/safe |

PUBLIC
KNOWLEDGE®

Appendix B: Key Terms

| Term | Definition | Source |
|------|-----------|--------|
| | | ty_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf (p. 1967) |
| Safety Culture | Behaviors and practices of an organization that prioritize the safety of children and families as well as the ability of individuals to speak up without fear of reprisal. | https://capacity.childwelfare.gov/sites/default/files/media_pdf/worker-safety-guide-cp-00121.pdf (p.4) |
| Safety Threat [Can include Present Danger Safety Threats or Impending Danger Safety Threats] | A Present Danger Safety Threat is an immediate, significant, and clearly observable family behavior, condition or circumstance occurring in the present tense, already endangering or threatening to endanger a child or, when applicable, young adult. The family behavior, condition, or circumstance is happening now, and it is currently in the process of actively placing a child or, when applicable, young adult in peril. An Impending Danger Safety Threat is a family behavior, condition, or circumstance that meets all five safety threshold criteria. When it is occurring, this type of threat is not immediate, obvious, or occurring at the onset of the CPS intervention. This threat is identified and understood more fully by evaluating and understanding individual and family functioning. | http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf (p. 197) OAR 413-015-0115(26) |
| Safety Threshold | The point at which family behaviors, conditions, or circumstances are manifested in such a way that they are beyond being risk influences and | http://www.dhs.state.or.us/caf/safety_model/procedu |

Exhibit 8
Page 204 of 390

| Term | Definition | Source |
|------|-----------|--------|
| | have become an impending danger safety threat. In order to reach the "safety threshold" the behaviors, conditions, or circumstances must meet all of the following criteria: be imminent, be out of control, affect a vulnerable child or young adult, be specific and observable, and have potential to cause severe harm. The "safety threshold" criteria are used to determine the presence of an impending danger safety threat. | re_manual/Orego n-DHS-Child- Welfare- Procedure- Manual.pdf (p. 1967) |
| Screening | The process used by a screener to determine the response to information received. | http://www.dhs.st ate.or.us/caf/safe ty_model/procedu re_manual/Orego n-DHS-Child- Welfare- Procedure- Manual.pdf (p. 1967) |
| Service Array | The range of service options that CW provides to clients. | Public Knowledge® |
| Service Goal [Can also refer to Case Goal] | The observable, sustained change in behavior, condition, or circumstance, that when accomplished, achieves the desired effect. | http://www.dhs.st ate.or.us/caf/safe ty_model/procedu re_manual/Orego n-DHS-Child- Welfare- Procedure- Manual.pdf# page =1840 |
| Service Provision | The ongoing process of delivering services to clients by CW and its providers. | Public Knowledge® |
| Service(s) | Assistance that the Department provides to clients. | http://www.dhs.st ate.or.us/caf/safe ty_model/procedu |

**PUBLIC KNOWLEDGE**®

| Term | Definition | Source |
|---|---|---|
| | | re_manual/Orego n-DHS-Child-Welfare-Procedure-Manual.pdf# page =1840 |
| Staff Turnover | The measurement of the number of employees who leave CW during an identified timeframe. | Public Knowledge® |
| Substitute Care [Can also refer to Placements or Substitute Care Providers] | The out-of-home placement of a child or young adult who is in the legal or physical custody and care of the Department. | http://www.ODHS .state.or.us/policy /childwelfare/ma nual_1/division_7 0.pdf |
| Supervision | The act of overseeing children and young adults in order to assure child safety. | Oregon Department of Human Services, Office of Child Welfare |
| Supervision and Oversight | The act of monitoring and directing the performance and activities of Child Protective Services (CPS) and Permanency staff, contracted providers, or others delivering services to families, children, and young adults. | Public Knowledge® and Oregon CW |
| Supporting | The process of providing assistance to address an identified need. | Public Knowledge® |
| Temporary Placement | A short term, time-limited placement. | Public Knowledge® |
| Termination of Parental Rights (TPR) | A court of competent jurisdiction has entered an order terminating the rights of the parent or parents, pursuant to ORS 419B.500 through 419B.530 or the statutes of another state. The date of the termination order determines the effective date of the termination even if an appeal | http://www.dhs.st ate.or.us/caf/safe ty_model/procedu re_manual/Orego n-DHS-Child-Welfare- |

**PUBLIC KNOWLEDGE®**

| Term | Definition | Source |
|------|-----------|--------|
| | of that order has been filed according to ORS 419A.200. Per ORS 419B.500 and ORS 418.270(4), voluntary relinquishment of parental rights is revocable until the child is physically placed in the adoptive placement. | [Procedure-Manual.pdf](Procedure-Manual.pdf) (p. 1970) |
| | | [ORS 419B.500](ORS 419B.500) |
| Tracking | Monitoring and measuring the goals, progress, or outcomes. | Public Knowledge® |
| Training [Can also refer to Training Resources] | The process of developing a skilled child welfare workforce and to achieving outcomes of safety, permanency, and well-being for children entrusted to the care of the public child welfare system. | [https://www.childwelfare.gov/topics/management/training/](https://www.childwelfare.gov/topics/management/training/) |
| Treating | The process of providing care and attention to emotional, behavioral, physical, or social issues or medical needs. | Public Knowledge® |
| Visit | Planned, in-person contact between the child or young adult and one or more family members. | [http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf](http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf) (p. 1971) |
| Visitation | Visitation is an interactive face-to-face contact between a child and his or her parents, siblings or other family members. When reunification is the goal, the visit and contact plan should include progressively increased parental responsibility for the daily care of the child. When reunification no longer is the goal, a visit and contact plan can help family members understand and accept the alternative permanency plan. Whatever the goal, | [http://www.dhs.state.or.us/caf/safety_model/procedure_manual/ch04/ch4-section26.pdf](http://www.dhs.state.or.us/caf/safety_model/procedure_manual/ch04/ch4-section26.pdf) |

| Term | Definition | Source |
|------|-----------|--------|
| | visits strengthen and maintain family relationships, enhance a child's well-being, and affirm the importance of parents in the child's life. For the duration of Governor Brown's Stay at Home, Save Lives Order (EO 20-12), visitation takes place as provided in the Protocol for In-Person Parent/Child Visits During COVID-19. | |
| Well-Being | The physical, dental, behavioral, mental health, and educational needs of children and young adults are being identified and met. | Public Knowledge® and Oregon CW |
| Workforce [Can also refer to Staffing Resources or Resources] | People employed by Child Welfare to design, deliver and oversee the child welfare agency service array. | Public Knowledge® and Oregon CW |

# PUBLIC KNOWLEDGE®

# Appendix C: Entities

| Term | Definition |
|------|-----------|
| CPS | Child Protective Services. CPS responds to child abuse reports. CPS-trained caseworkers across the state listen to reports of abuse, assess the situations, and prepare safety plans to assist children and families. |
| CPS Hotline | Anyone can report child abuse to the Oregon Child Abuse Hotline by calling 1-855-503-SAFE (7233). The Oregon Child Abuse Hotline receives calls 24 hours a day, 7 days a week, 365 days a year. This toll-free number allows anyone to report abuse of any child or adult to the Oregon Department of Human Services. Child abuse can also be reported by calling a local police department, county sheriff, county juvenile department, or Oregon State Police. |
| Child Welfare | Child Welfare is a continuum of services designed to ensure that children are safe at home and that families have the necessary support to care for their children successfully. In Oregon, Child Welfare includes Adoption services, Child Protective Services, Foster Care, Family Preservation, and the Independent Living Program. |
| ODHS [Agency] | Department of Human Services. ODHS is Oregon's principal agency for helping Oregonians achieve wellbeing and independence through opportunities that protect, empower, respect choice, and preserve dignity, especially for those who are least able to help themselves. Divisions include: Assistance, Children & Youth, Seniors & People with Disabilities, and other services. |
| OCI | The Office of Continuous Improvement works in partnership with ODHS programs. All work is directly requested from the field or from program. OCI and ODHS staff collaborate and work together to improve current processes, create efficiencies, and implement more effective ways of delivering services, all of which directly impacts and ultimately benefits ODHS clients. |
| ODDS | The Oregon Office of Developmental Disabilities Services supports individuals with disabilities and their families within their communities by promoting and providing services that are |

| Term | Definition |
|------|------------|
| | individualized, flexible, and community-focused, and that support each person's talents and abilities. |
| OHA | Oregon Health Authority. OHA is the agency that oversees and administers Medicaid and other public health programs in Oregon such as the Oregon Health Plan, Healthy Kids, the Oregon State Hospital, and other programs. |
| ORCAH | Oregon Child Abuse Hotline. The hotline was centralized in April 2019, allowing all reports of maltreatment to be reported to a single entity. |
| OTIS | Office of Training and Investigative Services is part of ODHS and is responsible for training, coordinating and conducting abuse investigations and providing protective services statewide to reports of neglect and abuse of vulnerable adults including adults over the age of 65; adults with physical disabilities; adults with developmental disabilities; adults with mental illness; and children receiving residential treatment services. |
| OSOQ | Office of Safety, Oversight, and Quality (formerly OLRO). OLRO is part of ODHS and is responsible for licensing or registering regulatory and corrective action functions for long term care facilities and agencies including children's residential care agencies, foster care agencies, adoption agencies, assisted living facilities, and other such facilities and agencies. |

**PUBLIC KNOWLEDGE®**

# Appendix D: Data Sources

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2013 | Bill of Rights Presentation – Foster Care Ombudsman | Wyatt_DHS_1784249 |
| 2014 | BRS Training resources – Practitioners Resource Guide Helping Families to Support LGBTQ youth | Wyatt_DHS_0886565 |
| 2014 | BRS Training resources – Best Practice for Serving Trans youth | Wyatt_DHS_2675657 |
| 2016 | 2016 ODHS Child Welfare Procedure Manual | To produce |
| 2016 | DHS District Map | Wyatt_DHS_0774580 |
| 2016 | Oregon CFSR Round 3 Final Report | Wyatt_DHS_0062317 |
| 2016 | 2016 HB 4080 Establishing CFCAC | Wyatt_DHS_0064311 |
| 2016 | Foster Care Ombudsman Annual Report | Wyatt_DHS_1785342 |
| 2016 | DHS Legislative Session Report | To produce |
| 2017 | Policy Transmittals | To produce |
| 2017 | ORS 418.005 | To produce |
| 2017 | Foster Care Ombudsman Annual Report (https://www.oregon.gov/odhs/about/gaofco/fco-fy17-report.pdf) | Publicly available |
| 2017 | DHS Legislative Session Report | Wyatt_DHS_2547450 |
| 2017 | 2017 Becoming a Data Informed Organization | Wyatt_DHS_0114360 |
| 2017 | Services for Children with Intellectual or Developmental Disabilities | To produce |
| 2017 | 2017 Oregon Annual Progress & Service Report (APSR) | Wyatt_DHS_0307093 |
| 2018 | Policy Transmittals | To produce |
| 2018 | CWAC Membership 2018 | To produce |
| 2018 | Crisis Care Guidance_2018_1 | To produce |
| 2018 | Year-2-Report-EveryChild | Wyatt_DHS_0057372 |
| 2018 | Foster Care Ombudsman Annual Report | Wyatt_DHS_0061203 |
| 2018 | 2018 ILP Eligibility | Wyatt_DHS_0072213 |

Exhibit 8
Page 211 of 390

# PUBLIC KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2018 | SB 413 ORS 418319 Children Placed in Foster Care Leg Report 2018 | Wyatt_DHS_0265382 |
| 2018 | DHS Legislative Session Report | To produce |
| 2018 | 2018 OAR 413 Temporary Rules (https://www.oregonlegislature.gov/citizen_engagement/Reports/2018-DHS-OAR%20413%20Temporary%20Rules.pdf) | Publicly available |
| 2018 | 2018 ORRAI Child Welfare Future Research Agenda | Wyatt_DHS_0114663 |
| 2018 | Child Maltreatment – Children's Bureau (Oregon Excerpt) | To produce |
| 2018 | Child Maltreatment – Children's Bureau | To produce |
| 2018 | Child Welfare District Listening Tour | Wyatt_DHS_0134291 |
| 2018 | Oregon CJA Performance Report & Application for 2018-2021 | Wyatt_DHS_2242505 |
| 2018 | 2018 Oregon Annual Progress & Service Report (APSR) | Wyatt_DHS_0242922 |
| 2019 | Policy Transmittals | To produce |
| 2019 | 2019 CCO Performance Report | Wyatt_DHS_2715220 |
| 2019 | 2019 A&M Communications Process | Wyatt_DHS_0133507 |
| 2019 | SB 832 Declares purpose of Critical Incident Review Teams | Wyatt_DHS_2092204 |
| 2019 | SPRF 2019 Legislative Report | Wyatt_DHS_0221635 |
| 2019 | SPRF Financials for 2019 Legislative report | Wyatt_DHS_0221645 |
| 2019 | Foster Care Ombudsman Annual Report (https://www.oregon.gov/odhs/about/gaofco/fco-fy19-report.pdf) | Publicly available |
| 2019 | 2019 APSR_ILP Discretionary Funds_youth served | To produce |
| 2019 | 2019 Oregon ILP outcomes for 2019 (for managers meeting ) | Wyatt_DHS_2689312 |
| 2019 | 2019 Oregon ILP outcomes for 2019 (shorter version) | Wyatt_DHS_4623307 |
| 2019 | 2019 TP & ILP Services-Perm Qtrly | Wyatt_DHS_1642692 |
| 2019 | SB 171 2019 Joint Plan to Develop In-State Capacity and Minimize Out-of-state Placements of Children Leg Report | Wyatt_DHS_0062551 |

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2019 | SB 171 Measure Summary | Wyatt_DHS_1983636 |
| 2019 | SB 171 | Wyatt_DHS_0510470 |
| 2019 | Senate Bill 1 – Staff Measure Summary (Ways and Means) | Publicly available |
| 2019 | Senate Bill 1 – System of Care Advisory Counsel (https://olis.oregonlegislature.gov/liz/2019R1/Downloads/MeasureDocument/SB1/Enrolled) | Publicly available |
| 2019 | Comparison of 2015–17 Programs to Governor's Budget for 2017–19 | To produce |
| 2019 | Comparison of 2017–19 Budget to the 2019–21 LAB | Wyatt_DHS_0223042 |
| 2019 | Marion County LGBTQ Foster Youth Workgroup Participant List | Wyatt_DHS_0288817 |
| 2019 | ORCAH Call Volume Q1 | Wyatt_DHS_0272900 |
| 2019 | Safety at Screening– Variables | Wyatt_DHS_3566929 |
| 2019 | 2019 Oregon Child Abuse Hotline Presentation | Wyatt_DHS_2675676 |
| 2019 | ORS Chapter 417 — Interstate Compacts on Juveniles and Children; Children and Family Services (https://www.oregonlegislature.gov/bills_laws/ors/ors417.html) | Publicly available |
| 2019 | ORS Chapter 418 — Child Welfare Services (https://www.oregonlegislature.gov/bills_laws/ors/ors418.html) | Publicly available |
| 2019 | ORS Chapter 419B — Juvenile Code Dependency (https://www.oregonlegislature.gov/bills_laws/ors/ors419b.html) | Publicly available |
| 2019 | Juvenile Dependency Overview | To produce |
| 2019 | 2019 Fairness in Machine–Learning–Generated Risk Scores via Equitable Methodology | Wyatt_DHS_0121911 |
| 2019 | DHS Highlights | Wyatt_DHS_4389657 |
| 2019 | 2019 Oregon Annual Progress & Service Report (APSR) | Wyatt_DHS_0062358 |
| 2019 | CWOB meeting materials, minutes, and bi–weekly reports | Wyatt_DHS_0133991 – Wyatt_DHS_0134778 |

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2020 | District 2 Administrative Org Chart (Portland – Multnomah County) | Wyatt_DHS_2690771 |
| 2020 | Report and Dashboard Inventory | To produce |
| 2020 | Juvenile Dependency Overview | To produce |
| 2020 | Placements – Continuum of Care Beyond Foster Care | Wyatt_DHS_0776177 |
| 2020 | 2020 Child Welfare Data Book | Wyatt_DHS_2715987 |
| 2020 | Policy Transmittals | To produce |
| 2020 | 2020–21 FYCAPTA Citizen Review Panel Report | Wyatt_DHS_2709742 |
| 2020 | COVID–19 Resources Combined | Wyatt_DHS_2709771 |
| 2020 | 2020 Annual CCO Metrics Report_FINAL | Wyatt_DHS_2715061 |
| 2020 | MOU ODHS and CRB signed | To produce |
| 2020 | 2020 DHS Child Abuse Reporting Guide | Wyatt_DHS_2159379 |
| 2020 | 2020 DHS Family Wellbeing Assessment | Wyatt_DHS_2691417 |
| 2020 | DHS Fingerprinting for Contracted Service Providers | Wyatt_DHS_3589066 |
| 2020 | DHS Guidance for Contracted Providers | Wyatt_DHS_2754640 |
| 2020 | DHS Permanency Work | Wyatt_DHS_2689369 |
| 2020 | OAR 413–017–0045 | Publicly available |
| 2020 | ORS 418.804 – ORS 418.813 CIRT | Publicly available |
| 2020 | 2020 ILP Events for Teens | To produce |
| 2020 | 2020 Budget Reduction Exercise Information Sheet | Wyatt_DHS_4397064 |
| 2020 | Legal Name and Sex Change Policy (Ch 9, Sec 7) Depo Exhibit 1024 | Wyatt_DHS_0172446 |
| 2020 | OAR 410–170–0020 BRS facilities gender–responsive approach | Publicly available |
| 2020 | OAR 410–170–0030 BRS facilities training | Publicly available |
| 2020 | OAR 413–200–0308 qualifications of certified families | Publicly available |
| 2020 | OAR 413–200–0335 standards re home environment | Publicly available |

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2020 | OAR 413–200–0352 adequate clothing for gender expression | Publicly available |
| 2020 | OAR 413–200–0358 discipline of a child or young adult | Publicly available |
| 2020 | OAR 413-215-0031 respect of children in care | Publicly available |
| 2020 | OAR 413-215-0061 licensing personnel | Publicly available |
| 2020 | OAR 413-215-0316 licensing child caring agencies | Publicly available |
| 2020 | OAR 413–215–0326 training | Publicly available |
| 2020 | OAR 2020 Chapter 413, Div 40 Case Management – Service Plans | Publicly available |
| 2020 | OAR 2020 Compilation Chapter 413 DHS Child Welfare Programs | Publicly available |
| 2020 | OAR 413–053–000 – 070 re Strengthening, Preserving and Reunifying Families | Publicly available |
| 2020 | ORS 418–575 to 418–598 | Publicly available |
| 2020 | Oregon DHS Leadership Team website | To produce |
| 2020 | SSS Engagement Survey Reporting Examples | To produce |
| 2020 | 2020 Oregon Annual Progress & Service Report (APSR) | Wyatt_DHS_0218737 |
| 2021 | Policy Transmittals | To produce |
| 2021 | FCCRC FP Version English | Wyatt_DHS_2711566 |
| 2021 | FCCRC Process Map | Wyatt_DHS_2711561 |
| 2021 | MV–FC Transportation Pandemic Statement _LR_BD | Wyatt_DHS_2709481 |
| 2021 | FCCRC FP Version English | Wyatt_DHS_2709487 |
| 2021 | FAQ FCCRC –V1 | Wyatt_DHS_2709676 |
| 2021 | On ramp Tracking Checklists Combined | Wyatt_DHS_2709628 |
| 2021 | Training Workforce Plan 2021 | Wyatt_DHS_2709674 |
| 2021 | Comprehensive Plan to Prevent Child Maltx Fatalities | Wyatt_DHS_2709944 |
| 2021 | SOC Barrier Process | Wyatt_DHS_2709589 |
| 2021 | ELD Title IV –B2 FFY20 Report | Wyatt_DHS_2709690 |

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2021 | Safe Systems Improvement Tool | Wyatt_DHS_2709530 |
| 2021 | NPCS Charter | Wyatt_DHS_2710079 |
| 2021 | Virtual Hearing Practice in Child Welfare Perceptions from the Field | Wyatt_DHS_2710090 |
| 2021 | Oregon Study Responses | Wyatt_DHS_2709651 |
| 2021 | Training Matrix, May 2019 | Wyatt_DHS_2709555 |
| 2021 | OCWP– COVID 90 days Plan– Treatment Services–FINAL 90 day | Wyatt_DHS_2710111 |
| 2021 | Oregon Executive Summary | Wyatt_DHS_2704232 |
| 2021 | Oregon Training Assessment Report to Oregon Final | Wyatt_DHS_2704110 |
| 2021 | APSR Caseworker Ongoing Professional Development Project Plan | Wyatt_DHS_2710313 |
| 2021 | 38–OR Work Plan | Wyatt_DHS_2710169 |
| 2021 | D–Chafee Attch3 – Oregon ETV 2020 awards | Wyatt_DHS_2710300 |
| 2021 | 2020–2021 Specs (DHS Custody) | Wyatt_DHS_2715056 |
| 2021 | Leg Funding | Wyatt_DHS_2697244 |
| 2021 | ORCAH Annual Report 2021 | Wyatt_DHS_2959916 |
| 2021 | 2020 – 2024 FCP Statewide Strategic plan_ 2021 updates | Wyatt_DHS_2716610 |
| 2021 | D3 Polk–Yamhill CQI Charts Apr–21 | To produce |
| 2022 | District 10 Org Chart | Wyatt_DHS_2722753 |
| 2022 | District 11 Org Chart | Wyatt_DHS_2722772 |
| 2022 | District 12 Org Chart | Wyatt_DHS_2722785 |
| 2022 | District 13 Org Chart | Wyatt_DHS_2722797 |
| 2022 | District 14 Org Chart | Wyatt_DHS_2722805 |
| 2022 | District 15 Org Chart | Wyatt_DHS_2722817 |
| 2022 | District 16 Org Chart | Wyatt_DHS_2722837 |
| 2022 | District 2 Org Chart | Wyatt_DHS_2722487 |
| 2022 | District 3 Org Chart | Wyatt_DHS_2722556 |



| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2022 | District 4 Org Chart | Wyatt_DHS_2722601 |
| 2022 | District 5 Org Chart | Wyatt_DHS_2722624 |
| 2022 | District 6 Org Chart | Wyatt_DHS_2722675 |
| 2022 | District 7 Org Chart | Wyatt_DHS_2722694 |
| 2022 | District 8 Org Chart | Wyatt_DHS_2722710 |
| 2022 | District 9 Org Chart | Wyatt_DHS_2722745 |
| 2022 | ODHS Org Chart | Wyatt_DHS_2723184 |
| 2022 | ORCAH Org Chart | Wyatt_DHS_2722978 |
| 2022 | CFSR Quick Reference List | Wyatt_DHS_2721734 |
| 2022 | Explanation of Items Measured in CFSR reviews 2022 | Wyatt_DHS_2721541 |
| 2022 | ORCAH Annual Report 2022 | Wyatt_DHS_4564326 |
| 2022 | 1149 cheat sheet safety plan lecture activity | To produce |
| 2022 | CISM flyer v3 | To produce |
| 2022 | Scheduling CISM for critical incidents outline draft | To produce |
| 2023 | 2023 – Legislative Session Highlights Overview | Wyatt_DHS_4562335 |
| 2023 | 2024 APSR State Checklist PI–23–01docx | Wyatt_DHS_4467220 |
| 2023 | 02 Vision for Transformation | Wyatt_DHS_4466159 |
| 2023 | 03 Sibling Bill of Rights | Wyatt_DHS_4466029 |
| 2023 | 05 Ch 5 Sec 26 | Wyatt_DHS_4467003 |
| 2023 | 06 ODE Annual Report Card (2021–2022) | Wyatt_DHS_4466358 |
| 2023 | 07 Item 3 attachment – Communicating effectively with People Who Have SUD AUD | Wyatt_DHS_4466702 |
| 2023 | 08 ADA Resources for Child Welfare Staff | Wyatt_DHS_4466242 |
| 2023 | 09 Textured Tending– Final | Wyatt_DHS_4466928 |
| 2023 | 10 Workforce Safety and Well–Being Procedure | Wyatt_DHS_4466931 |
| 2023 | 11 NPCS SSIT Reference Guide | Wyatt_DHS_4466248 |
| 2023 | 13 OR Children's ITS Rate Study Report_FINAL2 | Wyatt_DHS_4466491 |

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2023 | 14 PRTF Capacity Memo | Wyatt_DHS_4466031 |
| 2023 | 15 Children's Intensive Treatment Services Rate Study February 2023 | Wyatt_DHS_4466473 |
| 2023 | 16 Joint JCIP–ODHS Safety Questions Project Update | Wyatt_DHS_4466886 |
| 2023 | 17 CBCS Work Plan | Wyatt_DHS_4467256 |
| 2023 | 18 All Certification Specific Tools | Wyatt_DHS_4466888 |
| 2023 | 19 Yamhill SDDR | Wyatt_DHS_4467258 |
| 2023 | 20 ORCAH Quarterly Report 2023 First Quarter | Wyatt_DHS_4466587 |
| 2023 | 21 OTP FOCUS Protocol for One Time Payments for Start | Wyatt_DHS_4467287 |
| 2023 | 22a Prevention Plan | Wyatt_DHS_4467602 |
| 2023 | 22b 68 pgs | Wyatt_DHS_4467740 |
| 2023 | 22c | Wyatt_DHS_4467808 |
| 2023 | 23 CFPRP Vision for Transformation | Wyatt_DHS_4466569 |
| 2023 | 24 Safe Sleep for Oregon's Infants | Wyatt_DHS_4466516 |
| 2023 | 25 Fatality Protocol | Wyatt_DHS_4466231 |
| 2023 | 26 NPCS Resource Guide 2023 | Wyatt_DHS_4466443 |
| 2023 | 27 ELD – Title IV–B2 Family Preservation and Family Support Services 2022 report | Wyatt_DHS_4466639 |
| 2023 | 28 OR_2022FULL_NYTD_Served | Wyatt_DHS_4466570 |
| 2023 | 29 Driver Ed Poster_Flyer | Wyatt_DHS_4466355 |
| 2023 | 30 SB 209 | Wyatt_DHS_4466646 |
| 2023 | 31 2021–22 Chafee Graduation Report | Wyatt_DHS_4466644 |
| 2023 | 32 ODHS OJD HB 4214 and SB 562 ORICWA Report September 2022 | Wyatt_DHS_4466311 |
| 2023 | 33 CAPTA Coordinator Activities Summary | Wyatt_DHS_4466561 |
| 2023 | 37 Oregon Statewide Maternal, Infant, & Early Childhood Home Visiting Program 2020 Needs Assessment | Wyatt_DHS_4466062 |

PUBLIC
KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|---|---|---|
| 2023 | 38 2023 Recruitment & Retention Bundled Material | Wyatt_DHS_4466673 |
| 2023 | 39 June–2023–RR–Action–Plan–Summary | Wyatt_DHS_4466824 |
| 2023 | 40 May–2023–Statewide–Recap–Report–Summary | Wyatt_DHS_4466776 |
| 2023 | 43 Training Workforce Plan 2023 | Wyatt_DHS_4467599 |
| 2023 | 45 SSS1 12 Month Training Plan | Wyatt_DHS_4466245 |
| 2023 | 46 PEMC 12 Month Training Plan | Wyatt_DHS_4466239 |
| 2023 | CRB Packets – Where to Find What Information | To produce |
| 2023 | Essential Elements Session Summaries – Portland State University | To produce |
| 2023 | Social Service Specialist 1 Professional Development Portland State University | To produce |
| 2023 | 2023_Q2_HB2333xls | To produce |
| 2023 | CW Procedure Manual – Ch 6 Adoption, Guardianship and Other Perm Plans | To produce |
| 2023 | SOCAC Legislative Report and Recommendations | Wyatt_DHS_4665757 |
| 2023 | Jan to Sept 2023 Caseload dashboard screenshots | Wyatt_DHS_4665889 |
| 2023 | Temp Lodging Infographic | Wyatt_DHS_4665939 |
| 2023 | CW RSN Equity framework | To produce |
| 2023 | Fact Sheet: RSN program description 2023 | To produce |
| 2023 | Treatment Services supports families of children with complex needs | To produce |
| 1/1/2006 | Oregon Foster Parent Bill of Rights | Wyatt_DHS_0061258 |
| 7/13/2011 | CWAC Bylaws | Wyatt_DHS_0271299 |
| 3/4/2015 | 2015 Abuse Hotline Screen Position Description | Wyatt_DHS_0047885 |
| 7/6/2015 | Initial Safety Plan Template Mapping | To produce |
| 1/17/2016 | A.R. v. State Interim Settlement Agreement | To produce |
| 3/24/2016 | ILP OR-Kids Reference Guide | Wyatt_DHS_0046947 |
| 3/25/2016 | CFSR Statewide Assessment | Wyatt_DHS_0815362 |

**PUBLIC KNOWLEDGE**®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 5/10/2016 | 2016-05-10 SB 1515 Staff Message | Wyatt_DHS_0716643 |
| 5/25/2016 | 2016-05-25 SB 1515 Changes to licensing on-site review schedule and process | Wyatt_DHS_0063378 |
| 6/28/2016 | 2016-06-28 SB 1515 DHS Director's Message, Rules Advisory Committee | Wyatt_DHS_0063383 |
| 7/20/2016 | 2016-07-20 Stakeholder Meetings on SB 1515 | Wyatt_DHS_0063400 |
| 10/13/2016 | DHS Director Clyde Saiki letter to Gov Brown identifying improvements | To produce |
| 11/3/2016 | cca-reporting-requirements | Wyatt_DHS_0063452 |
| 12/5/2016 | cirt-xl-initial-final-report | Publicly available |
| 12/13/2016 | gj-cirt-initial | Publicly available |
| 1/9/2017 | Flow Caseworker Training Redesign | Wyatt_DHS_0267376 |
| 1/24/2017 | NE Initial Report | Publicly available |
| 1/24/2017 | H H Initial and Final Report | Publicly available |
| 2/2/2017 | Child Safety Implementation Plan Schedule | To produce |
| 2/13/2017 | Implementation Plan V1 UCYSIP-021317 | Wyatt_DHS_2162775 |
| 2/23/2017 | DHS Director Clyde Saiki letter to Gov Brown | To produce |
| 2/28/2017 | Unified Youth Safety Implementation Plan for Oregon 022817 | Wyatt_DHS_0134128 |
| 3/3/2017 | Proposed Steering Team Charter | To produce |
| 3/3/2017 | Unified Child and Youth Safety Implementation Plan, Steering Team Presentation | Wyatt_DHS_0240593 |
| 3/7/2017 | Attachment B new applicant OOSP | Wyatt_DHS_0063110 |
| 3/15/2017 | CWAC Agenda | Wyatt_DHS_0313359 |
| 3/15/2017 | CWAC Minutes | To produce |
| 3/16/2017 | HB 2216 Passes | To produce |
| 3/27/2017 | Child Welfare Caseworker Competencies | Wyatt_DHS_0061231 |
| 3/28/2017 | steering-team-charter | Wyatt_DHS_2163799 |
| 4/6/2017 | Out of State Polices and Procedures Checklist | Wyatt_DHS_0289178 |

Exhibit 8
Page 220 of 390

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 4/17/2017 | KA CIRT Initial and Final Report | Publicly available |
| 5/1/2017 | D10 PIP Charts May–17 | To produce |
| 5/10/2017 | Steering Team Presentation–5–10–17 | Wyatt_DHS_1955333 |
| 5/16/2017 | child–safety–reflections | Wyatt_DHS_0229420 |
| 5/17/2017 | CWAC Agenda | To produce |
| 5/17/2017 | CWAC Minutes | To produce |
| 5/23/2017 | Stakeholder–one pager | Wyatt_DHS_0801994 |
| 6/22/2017 | Letter to Governor re ODHS updates | To produce |
| 6/29/2017 | Child Safety Plan Overview | To produce |
| 7/1/2017 | Overview Caseworker Training Redesign | Wyatt_DHS_0061848 |
| 7/1/2017 | D12 PIP Charts Jul–17 | To produce |
| 7/1/2017 | D13 PIP Charts Jul–17 | Wyatt_DHS_0229358 |
| 7/6/2017 | projects–status–reports | Wyatt_DHS_0062616 |
| 7/18/2017 | project–plan–schedule | Wyatt_DHS_0192007 |
| 7/18/2017 | workgroup–membership | Wyatt_DHS_0062662 |
| 7/19/2017 | CWAC Minutes | Wyatt_DHS_2165057 |
| 7/19/2017 | CWAC–Agenda–7–19–17 | To produce |
| 7/19/2017 | CB CIRT Initial – Final Report | Publicly available |
| 7/21/2017 | Steering–team–pp–07–21–17 | Wyatt_DHS_2165292 |
| 8/10/2017 | CW–Directors–Message | Wyatt_DHS_0062855 |
| 8/23/2017 | Out of State Physical Plant Checklist | Wyatt_DHS_0063120 |
| 8/23/2017 | Out of State Residential Checklist | Wyatt_DHS_0289170 |
| 9/1/2017 | CW Action Plan Work Schedule | Wyatt_DHS_2574634 |
| 9/6/2017 | September 2017 Status Reports | Wyatt_DHS_0062614 |
| 9/18/2017 | CFCAC Minutes 91817 | Wyatt_DHS_0064307 |
| 9/18/2017 | DHS Updates to Governor Brown | Wyatt_DHS_0815360 |
| 9/18/2017 | DHS Updates to Governor Brown 91817 | Wyatt_DHS_0815360 |

**PUBLIC KNOWLEDGE®**

| DATE | Description | BATES NO. / DKT NO. |
|---|---|---|
| 9/19/2017 | September 2017 Steering Team Presentation | Wyatt_DHS_1716804 |
| 9/27/2017 | 2017–09–27 CWAC–Agenda | Wyatt_DHS_0801975 |
| 9/27/2017 | CWAC–Minutes–9–27–17 | To produce |
| 10/1/2017 | D1 PIP Charts Oct–17 | Wyatt_DHS_1412549 |
| 10/1/2017 | D14 PIP Charts Oct–17 | To produce |
| 11/6/2017 | 10 Priority Projects – November Status Reports | Wyatt_DHS_0062616 |
| 11/8/2017 | 2017 Child Welfare Research Priorities | Wyatt_DHS_0047823 |
| 11/9/2017 | 2017–11–09 CAPECO ILP Program Review Report– 1192017 | Wyatt_DHS_0135266 |
| 11/15/2017 | Steering Team Presentation – Nov 15, 2017 | Wyatt_DHS_0238895 |
| 11/20/2017 | CFCAC Minutes 112017 | Wyatt_DHS_0064256 |
| 12/5/2017 | CW–Directors–Message | Wyatt_DHS_0062854 |
| Jan–18 | ILP Referral Form CF 0080 | Wyatt_DHS_0880688 |
| 1/17/2018 | CWAC–Agenda | To produce |
| 1/17/2018 | CWAC–Minutes–1–17–18 | To produce |
| 1/19/2018 | Project Status Reports January 19, 2018 | Wyatt_DHS_0062618 |
| 1/22/2018 | CFCAC Minutes 12218 | Wyatt_DHS_0064226 |
| 1/29/2018 | SOS Audit of Child Welfare DHS | Wyatt_DHS_0059767 |
| 1/29/2018 | 2018 SOS Audit Response from DHS | Wyatt_DHS_0059767 |
| 1/31/2018 | Steering Team Presentation, January 31, 2018 | Wyatt_DHS_0241104 |
| 1/31/2018 | Steering Team Roster | To produce |
| 2/7/2018 | KEEP Standard Curriculum by Week | Wyatt_DHS_0061028 |
| 3/6/2018 | DHS & OHA Continuum of Care – Proposed Systemic Solutions | Wyatt_DHS_0062755 |
| 3/8/2018 | DHS Director Letter to Governor Brown 030818 | Wyatt_DHS_0242759 |
| 3/9/2018 | DHS Updates to Governor Brown | Wyatt_DHS_0063469 |
| 3/9/2018 | Director Update, Kate Brown | Wyatt_DHS_0063469 |
| 3/14/2018 | CWAC–Agenda–3–14–18 | To produce |
| 3/14/2018 | CWAC–Minutes–3–14–18 | To produce |

**PUBLIC KNOWLEDGE**®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 3/14/2018 | 2017 DHS Summary Scorecard Q4 2017 | To produce |
| 3/15/2018 | 2018–03 March Child Welfare Progress Report | Wyatt_DHS_0134170 |
| 3/19/2018 | CFCAC Minutes 31918 | Wyatt_DHS_0064269 |
| 3/26/2018 | Project–Status–Reports–April | Wyatt_DHS_0062620 |
| 4/5/2018 | Child–Safety–Plan–Steering–Team–Deck–April–2018 | Wyatt_DHS_0239691 |
| 4/16/2018 | 2018–04 April Child Welfare Progress Report | Wyatt_DHS_0245445 |
| 5/1/2018 | USCP–Governance | Wyatt_DHS_1955332 |
| 5/1/2018 | D10 PIP Charts May–18 | Wyatt_DHS_2697816 |
| 5/3/2018 | 2018–05 ORRAI Methodology– Write Up | Wyatt_DHS_0114339 |
| 5/21/2018 | CFCAC Minutes 52118 | Wyatt_DHS_0064273 |
| 5/21/2018 | Caregiver–Presentation–Handouts | Wyatt_DHS_2230333 |
| 6/7/2018 | SH CIRT Initial and Final Report | Publicly available |
| 6/15/2018 | Task A Project Charter | Wyatt_DHS_0062596 |
| 6/18/2018 | CW Field Staff Engagement v12–Final | Wyatt_DHS_0224308 |
| 6/19/2018 | Project G – Membership List – Centralized Hotline | Wyatt_DHS_0062943 |
| 6/19/2018 | Enhancing Community Engagement Workgroup | Wyatt_DHS_0062605 |
| 6/21/2018 | CW–Directors–Message | Wyatt_DHS_0062868 |
| 6/27/2018 | RH–CIRT–Final–Report | Publicly available |
| 6/27/2018 | Project–Status–Report–June–2018 | Wyatt_DHS_0252401 |
| 6/28/2018 | Unified Child and Youth Safety Implementation Plan, Steering Team Presentation | Wyatt_DHS_2630598 |
| 7/1/2018 | D12 PIP Charts Jul–18 | Wyatt_DHS_2697832 |
| 7/1/2018 | D13 PIP Charts Jul–18 | Wyatt_DHS_2697836 |
| 7/16/2018 | CFCAC Minutes 71618 | Wyatt_DHS_0064290 |
| 7/18/2018 | CWAC Agenda | To produce |
| 7/21/2018 | Comments to ACYF Re Decisions for Clearinghouse on Evidence Based Practices for FFPSA | Wyatt_DHS_0261023 |

# PUBLIC KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 7/24/2018 | Statewide Hotline Analysis | Wyatt_DHS_0122713 |
| 7/27/2018 | Temporary Lodging Placement Approval Protocol | Wyatt_DHS_1927590 |
| 8/1/2018 | CW Field Staff EE Round 1-Summary Report Wave1 | Wyatt_DHS_2184253 |
| 8/1/2018 | D11 PIP Charts Aug-18 | Wyatt_DHS_2697844 |
| 8/3/2018 | CW-Directors-Message | Wyatt_DHS_0062857 |
| 8/23/2018 | Marilyn Jones Temp Lodging update re Settlement Agreement Implementation Strategic Plan | Wyatt_DHS_1901566 |
| 8/30/2018 | 2017 Oregon CFSR Round 3 Program Improvement Plan (PIP) resubmitted | Wyatt_DHS_0264378 |
| 9/1/2018 | Centralized-Hotline-Transition-Plan | Wyatt_DHS_0062851 |
| 9/1/2018 | Continuum-Of-Care-Transition-Plan | Wyatt_DHS_0062752 |
| 9/1/2018 | Coordinated-Response-To-Abuse-Transition-Plan | Wyatt_DHS_0062819 |
| 9/1/2018 | Enhancing-Com-Engagement-Transition-Plan | Wyatt_DHS_0062605 |
| 9/1/2018 | Fidelity-Transition-Plan | Wyatt_DHS_0062721 |
| 9/1/2018 | Recruitment-And-Retention-Of-Caseworkers | Wyatt_DHS_0062679 |
| 9/1/2018 | Supervisor-Training-Transition-Plan | Wyatt_DHS_0062706 |
| 9/1/2018 | Task A – Enhancing Community Engagement Overview | Wyatt_DHS_0062648 |
| 9/12/2018 | Governor's Children's Cabinet Agenda | Wyatt_DHS_2578607 |
| 9/12/2018 | Governor's Child Welfare Policy Agenda | Wyatt_DHS_0875663 |
| 9/17/2018 | AR Notice 1 Substantial Noncompliance of SA | Wyatt_DHS_2630760 |
| 10/1/2018 | D1 PIP Charts Oct-18 | Wyatt_DHS_0186980 |
| 10/1/2018 | D14 PIP Charts Oct-18 | Wyatt_DHS_2265734 |
| 10/2/2018 | T-D-CIRT-Final-Report | Publicly available |
| 10/2/2018 | October-Steering-Team-Meeting-Handouts | Wyatt_DHS_2170193 |
| 10/5/2018 | JJ-Public-Report | Publicly available |
| 10/8/2018 | Temporary Lodging Placement Approval Protocol | Wyatt_DHS_0777466 |
| 10/15/2018 | CFCAC Minutes 101518 | Wyatt_DHS_0064246 |

PUBLIC KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|---|---|---|
| 10/17/2018 | DOJ Letter to Oregon Law Center re substantial compliance | Wyatt_DHS_2630706 |
| 10/18/2018 | LS–SS–CIRT–Final–Report | Publicly available |
| 10/23/2018 | Child Welfare Fundamentals Map | Wyatt_DHS_0276016 |
| 10/23/2018 | Unified Plan-Steering Team Meeting Notes | To produce |
| 10/26/2018 | T–C–CIRT–Public–Report | Publicly available |
| 11/1/2018 | JK–CIRT–Public–Report | Publicly available |
| 11/1/2018 | S–S–CIRT–Final–Report | Publicly available |
| 11/7/2018 | OHA Behavioral Health Capacity and Access Ask | Wyatt_DHS_0780827 |
| 11/9/2018 | CW Field Staff EE Wave2–Summary Report Wave2 | Wyatt_DHS_2184284 |
| 11/16/2018 | NA–CIRT–Final–Report | Publicly available |
| 11/19/2018 | CFCAC Minutes 111918 | Wyatt_DHS_0064249 |
| 12/4/2018 | pa–CIRT–public–report | Publicly available |
| 12/7/2018 | Caregiver Support Development Workgroup Proposal | Wyatt_DHS_0063066 |
| 12/11/2018 | District 2 Child Welfare Org Chart (Portland – Multnomah County) | Wyatt_DHS_0169174 |
| 12/13/2018 | PA CIRT–Status–Report | Publicly available |
| 12/18/2018 | BP CIRT Public Report | Publicly available |
| 12/18/2018 | December–Handouts–Steering–Team | Wyatt_DHS_0780640 |
| 12/18/2018 | Unified Plan-Steering Team Meeting Notes | To produce |
| 12/27/2018 | AV–CIRT–Public–Report | Publicly available |
| 1/18/2019 | 2019–21 Biennium DHS Ways & Means Documents | Publicly available |
| 1/18/2019 | Hotline–Project–Closing–Summary | Wyatt_DHS_0062863 |
| 1/22/2019 | Closing Document ORCAH Incoming Calls (updated June 2020) | Wyatt_DHS_2675666 |
| 1/24/2019 | JJ–CIRT–Status–Report | Publicly available |
| 1/24/2019 | A_Threshold_of_Fairness_ | Wyatt_DHS_0124402 |
| 1/28/2019 | CFCAC Minutes 12819 | Wyatt_DHS_0064229 |

PUBLIC
KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2/1/2019 | S–G–CIRT Public–Report | Publicly available |
| 2/1/2019 | CW Field Staff EE Wave3–Summary Report Wave3 | Wyatt_DHS_2184307 |
| 2/5/2019 | CM–CIRT–Public–Report | Publicly available |
| 2/5/2019 | Memorandum re Caregiver Support and Retention Workgroup | Wyatt_DHS_0188031 |
| 2/11/2019 | EH CIRT Public Report | Publicly available |
| 2/11/2019 | RY–CIRT–Public–Report | Publicly available |
| 2/18/2019 | Presentation Temp Lodging and OOS Res Placements by Jason Wallin at ORRAIpptx | Wyatt_DHS_1902397 |
| 2/18/2019 | Presentation Temp Lodging and OOS Res Placements by Jason Wallin at ORRAI | Wyatt_DHS_0880198 |
| 2/19/2019 | Child Care Family First | Wyatt_DHS_0063188 |
| 2/19/2019 | ILP Family First | Wyatt_DHS_0063190 |
| 3/7/2019 | Steering–Team–Handouts–2019–03–07 | Wyatt_DHS_0216600 |
| 3/7/2019 | Unified Plan–Steering Team Meeting Notes | To produce |
| 3/12/2019 | 2019 Q1 Letter to Director Jones | Wyatt_DHS_1922390 |
| 3/25/2019 | RB–CIRT–Public–Report | Publicly available |
| 3/26/2019 | DB–CIRT–Public–Report | Publicly available |
| 4/5/2019 | Hotline–Weekly–Update–4–5–19 | Wyatt_DHS_0062867 |
| 4/8/2019 | DB CIRT Public Report | Publicly available |
| 4/8/2019 | LM–CIRT–Status–Report | Publicly available |
| 4/8/2019 | OOS Placement Data | Wyatt_DHS_0062545 |
| 4/10/2019 | Oregon DHS Announces Plan to Serve Youth in Oregon | Wyatt_DHS_0787137 |
| 4/16/2019 | Class Action Complaint | DKT 1 |
| 4/18/2019 | OR Executive Order 19–03 Creating CWOB (https://www.oregon.gov/gov/eo/eo_19–03.pdf) | Publicly available |
| 4/18/2019 | Press Release Governor Brown Creates Child Welfare Oversight Board (https://www.pressreleasepoint.com/governor–brown–creates– | Publicly available |

| DATE | Description | BATES NO. / DKT NO. |
|---|---|---|
| | child-welfare-oversight-board-address-immediate-issues-child-welfare) | |
| 4/18/2019 | 2019-03 Governor's Executive Order to Address the Crisis in OR's Child Welfare System | Wyatt_DHS_0057587 |
| 4/19/2019 | DHS Update on CW Placements – SHS | Wyatt_DHS_0000019 |
| 4/19/2019 | OOS Placement Data | Wyatt_DHS_0062546 |
| 4/25/2019 | Senator Gelser written questions re detention in OLIS – SHS | Wyatt_DHS_0000118 |
| 4/25/2019 | Press Release Governor Brown Appoints Members of Child Welfare Oversight Board (https://www.pressreleasepoint.com/governor-brown-appoints-members-child-welfare-oversight-board) | Publicly available |
| 4/26/2019 | CWOB Member Bios | Wyatt_DHS_0134100 |
| 4/26/2019 | OOS Placement Data | Wyatt_DHS_0062547 |
| 4/29/2019 | The 1149 Guide | To produce |
| 4/29/2019 | Prevention Services Programs (Family First) | Wyatt_DHS_1428018 |
| 4/30/2019 | Written testimony out of state placements Red Rock – SHS | Wyatt_DHS_0000121 |
| 4/30/2019 | 2019 Q2 CFSR Progress Report | Wyatt_DHS_1489662 |
| 5/1/2019 | D10 PIP Charts May-19 | Wyatt_DHS_1983557 |
| 5/2/2019 | DHS Update on CW Placement Facilities– SHS | Wyatt_DHS_0000001 |
| 5/3/2019 | OOS Placement Data | Wyatt_DHS_0062586 |
| 5/7/2019 | PSU Oregon Youth Policy Project – Final Report | Wyatt_DHS_0217848 |
| 5/7/2019 | DHS Update on Out of State Placements – SHS | Wyatt_DHS_0000042 |
| 5/7/2019 | PSU Oregon Youth Policy Project Report | Wyatt_DHS_0217848 |
| 5/10/2019 | Red Rock Academy Response – SHS | Wyatt_DHS_0000115 |
| 5/10/2019 | OOS Placement Data | Wyatt_DHS_0062590 |
| 5/13/2019 | OOS Placement Data | Wyatt_DHS_0054482 |
| 5/14/2019 | DHS Family First Presentation | Wyatt_DHS_0223686 |

PUBLIC
KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|---|---|---|
| 5/14/2019 | DHS Update on Out of State placements – SHS | Wyatt_DHS_0000050 |
| 5/14/2019 | NP CIRT Public Report | Publicly available |
| 5/14/2019 | Family First PP re Placementspptx | Wyatt_DHS_0223686 |
| 5/15/2019 | CW Field Staff EE Wave4–Summary Report | Wyatt_DHS_2184307 |
| 5/16/2019 | Legislative Response Matrix – Master (Incl embedded files) | Wyatt_DHS_0000056 |
| 5/16/2019 | Legislative Response Matrix – Master 5162019 – Out of State Questions Pt 1xlsb | Wyatt_DHS_0000075 |
| 5/16/2019 | G2Governor's Update | Wyatt_DHS_0134800 |
| 5/16/2019 | B–B– CIRT Public–Report | Publicly available |
| 5/16/2019 | ZHF CIRT Public Report | Publicly available |
| 5/17/2019 | OOS Placement Data | Wyatt_DHS_0062591 |
| 5/20/2019 | CFCAC Agenda 52019 | Wyatt_DHS_0064224 |
| 5/24/2019 | 2019–05 May | Wyatt_DHS_0030945 |
| 5/24/2019 | CV CIRT Public Report | Publicly available |
| 5/24/2019 | OOS Placement Data | Wyatt_DHS_0062592 |
| 5/29/2019 | KP CIRT Public Report | Publicly available |
| 5/30/2019 | EB CIRT Status Report | Publicly available |
| 5/30/2019 | MH CIRT Public Report | Publicly available |
| 6/6/2019 | Steering–Team–Handouts | Wyatt_DHS_0061130 |
| 6/7/2019 | OOS Placement Data | Wyatt_DHS_0062582 |
| 6/11/2019 | G6Governor's Update | Wyatt_DHS_0134828 |
| 6/12/2019 | AP CIRT Public Report | Publicly available |
| 6/14/2019 | OOS Placement Data | Wyatt_DHS_0062583 |
| 6/18/2019 | G7Governor's Update | Wyatt_DHS_0133083 |
| 6/18/2019 | G7aWorkforce–Oregon Governor's Workforce Update | Wyatt_DHS_0134802 |
| 6/19/2019 | Cap21–Care Coordination Meeting Notes | Wyatt_DHS_0133383 |
| 6/21/2019 | OOS Placement Data | Wyatt_DHS_0062584 |

Exhibit 8
Page 228 of 390

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 6/22/2019 | gf–cirt–public–report | Publicly available |
| 6/25/2019 | G8Governor's Update | Wyatt_DHS_0134837 |
| 6/27/2019 | Cap34–Workstream Charter_Care Coordination | Wyatt_DHS_0133419 |
| 6/27/2019 | 02 Cap35–SwitchingCCOcoverage | Wyatt_DHS_0133422 |
| 6/28/2019 | OOS Placement Data | Wyatt_DHS_0062585 |
| 6/29/2019 | Senate Bill 171 C – Summary re Family First | Wyatt_DHS_1983636 |
| 7/1/2019 | AC–CIRT–Status–Report | Publicly available |
| 7/1/2019 | CP–CIRT–Status–Report | Publicly available |
| 7/1/2019 | D12 PIP Charts Jul–19 | Wyatt_DHS_1987478 |
| 7/1/2019 | D13 PIP Charts Jul–19 | Wyatt_DHS_1987498 |
| 7/2/2019 | G9Governor's Update | Wyatt_DHS_0134845 |
| 7/5/2019 | OOS Placement Data | Wyatt_DHS_0062578 |
| 7/8/2019 | Cap25–IDD Restrictive Intervention Call with CW | Wyatt_DHS_0133392 |
| 7/10/2019 | Cap9–Update_710DMMeetingFosterCareUpdate | Wyatt_DHS_0133274 |
| 7/12/2019 | OOS Placement Data | Wyatt_DHS_0062579 |
| 7/15/2019 | G10aCapacity–Applications Received Tracker | Wyatt_DHS_0134821 |
| 7/15/2019 | DHS Platform For Success_Research 715 | Wyatt_DHS_0114761 |
| 7/15/2019 | TA Decker completes the Temp Lodging work plan | Wyatt_DHS_1745911 |
| 7/16/2019 | Multi–Agency Behavior Rehabilitation Services (BRS) Guide | Wyatt_DHS_0056857 |
| 7/16/2019 | G10Governor's Update | Wyatt_DHS_0134858 |
| 7/16/2019 | A Policy Meeting w Leadership Next Steps | Wyatt_DHS_0188798 |
| 7/16/2019 | Background info Trans and Non–binary licensing  workgroup | Wyatt_DHS_0190109 |
| 7/16/2019 | Transgender and Nonbinary Youth Workgroup – current BRS rule | Wyatt_DHS_0890302 |
| 7/16/2019 | Application for License – Private Child Caring Agency OOSP | Wyatt_DHS_0289206 |
| 7/19/2019 | District 6 Child Welfare Org Chart (Douglas County) | Wyatt_DHS_2690748 |

Exhibit 8
Page 229 of 390

| DATE | Description | BATES NO. / DKT NO. |
|---|---|---|
| 7/19/2019 | OOS Placement Data | Wyatt_DHS_0062580 |
| 7/22/2019 | REVISED_OOST Res Procedure [draft]–7 (1) | Wyatt_DHS_0289163 |
| 7/25/2019 | Defendants' Motion to Dismiss or, in the Alternative, to Make More Definite and Certain | DKT 31 |
| 7/26/2019 | Placement Data | Wyatt_DHS_0062581 |
| 7/29/2019 | LM–CIRT–Public–Report | Publicly available |
| 7/30/2019 | SPRF 2019 Legislative Report (https://www.oregonlegislature.gov/citizen_engagement/Reports/2019–DHS–Strengthening%20Preserving%20and%20Reunifying%20Families%20Programs.pdf) | Publicly available |
| 7/31/2019 | G11 Governor's Update | Wyatt_DHS_0135075 |
| 7/31/2019 | MEMO CW Oversight Board | Wyatt_DHS_1920044 |
| Aug–19 | BRS Referral Form CF 1055 | Wyatt_DHS_4645387 |
| 8/1/2019 | OTIS OOS Oversight Procedure | Wyatt_DHS_0289199 |
| 8/1/2019 | Out of State Residential review tool | Wyatt_DHS_0675013 |
| 8/1/2019 | D11 PIP Charts Aug–19 | Wyatt_DHS_1988568 |
| 8/2/2019 | OOS Placement Data | Wyatt_DHS_0062548 |
| 8/5/2019 | G12bComms–Communications Overview Deck | Wyatt_DHS_0134868 |
| 8/6/2019 | G12 Governor's Update | Wyatt_DHS_0135083 |
| 8/6/2019 | AS CIRT Public Report | Publicly available |
| 8/7/2019 | Cap7–Correspondance_fpt–letter–to–oregon–governor–foster–parents–v1pt1 | Wyatt_DHS_0133265 |
| 8/8/2019 | Child Welfare Required Training Checklist | Wyatt_DHS_1911283 |
| 8/8/2019 | Plaintiffs' Response to Defendants' Motion to Dismiss | DKT 35 |
| 8/9/2019 | DHS Platform for Success– Reserach P2 | Wyatt_DHS_0114821 |
| 8/9/2019 | OOS Placement Data | Wyatt_DHS_0062549 |
| 8/11/2019 | Cap13– [DRAFT] Continuum of Care Graphic | Wyatt_DHS_0133303 |
| 8/13/2019 | A&M PMO Status Update Deck v5 | Wyatt_DHS_0774374 |



| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 8/13/2019 | G13Governor's Update | Wyatt_DHS_0134874 |
| 8/13/2019 | Train10-[DRAFT] Training Map | Wyatt_DHS_0133646 |
| 8/13/2019 | OOSP Contact Info Form | Wyatt_DHS_0063115 |
| 8/13/2019 | OOSP Suitability Questionnaire | Wyatt_DHS_0063160 |
| 8/14/2019 | BRIEF1-AM Legislative Briefing | Wyatt_DHS_0133048 |
| 8/15/2019 | CW Field Staff EE Wave5-Summary Report | Wyatt_DHS_2184307 |
| 8/16/2019 | OOS Placement Data | Wyatt_DHS_0062550 |
| 8/19/2019 | 2019-08-19 DW CIRT Public Report | Publicly available |
| 8/19/2019 | DHS Central and Shared Services Organizational Structure - Detailed | Wyatt_DHS_0140429 |
| 8/20/2019 | [Final Edits] Cap32-SB1 and Legislative Investments | Wyatt_DHS_0133413 |
| 8/20/2019 | G14Governor's Update | Wyatt_DHS_0774387 |
| 8/21/2019 | Meeting Leadership Council notes PRIDE ERG | Wyatt_DHS_0189166 |
| 8/22/2019 | Reply in Support of Defendants' Motion to Dismiss | DKT 45 |
| 8/23/2019 | EG CIRT Public Report | Publicly available |
| 8/27/2019 | G15Governor's Update | Wyatt_DHS_0134894 |
| 8/27/2019 | G15bData-Overdue Assessments Dashboard | Wyatt_DHS_0134904 |
| 9/6/2019 | za-cirt-public-report | Publicly available |
| 9/10/2019 | G16Governor's Update | Wyatt_DHS_0134908 |
| 9/10/2019 | G16a Data-OOS Dashboard | Wyatt_DHS_0134906 |
| 9/10/2019 | G16c Workforce Summary Surge Hire Updates | Wyatt_DHS_0134918 |
| 9/10/2019 | G17aCapacity-[DRAFT] Adaptive Leadership Expected Behaviors | Wyatt_DHS_0134926 |
| 9/10/2019 | Public Records Update | Wyatt_DHS_0134686 |
| 9/10/2019 | Summary - Surge Hire Updates 910 | Wyatt_DHS_0133598 |
| 9/10/2019 | OOS Dashboard | Wyatt_DHS_0059507 |
| 9/13/2019 | Reunification and Achieving Permanency (Marion County Pilot) | Wyatt_DHS_0126673 |



| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 9/16/2019 | A&M Legislative Briefing | Wyatt_DHS_2565094 |
| 9/16/2019 | BRIEF2–AM Legislative Briefing | Wyatt_DHS_0133059 |
| 9/17/2019 | Memo – Family First Implementation & Policy Work Group | Wyatt_DHS_0056476 |
| 9/19/2019 | ORCAH Statewide Conference Call | Wyatt_DHS_0724773 |
| 9/20/2019 | OOS Dashboard | Wyatt_DHS_0133538 |
| 9/24/2019 | BRIEF3–AM Labor Briefing | Wyatt_DHS_0795389 |
| 9/24/2019 | G18Governor's Update | Wyatt_DHS_0134961 |
| 9/26/2019 | 2019–07 Governor's Amend Executive Order | Wyatt_DHS_0115055 |
| 9/30/2019 | OOSYouthData20190930 | Wyatt_DHS_2630610 |
| 10/1/2019 | Attachment A – Initial Licensing Required Documents for Out of State Providers | Wyatt_DHS_0063109 |
| 10/1/2019 | D1 PIP Charts Oct–19 | Wyatt_DHS_0290067 |
| 10/2/2019 | Train 7–Pretraining Activities | Wyatt_DHS_0133635 |
| 10/2/2019 | Predictive Analytics to Support Screening & Reunification Decisions | Wyatt_DHS_0127486 |
| 10/3/2019 | Social Service Assistant On–Ramp Checklist | Wyatt_DHS_2186512 |
| 10/3/2019 | Train 5–On–Ramps by Position | Wyatt_DHS_0133627 |
| 10/3/2019 | State of Oregon Child Safety Plan – Project G– Oregon Child Abuse Hotline | Wyatt_DHS_0062959 |
| 10/3/2019 | Out of State Placement Exception Request | Wyatt_DHS_0063118 |
| 10/7/2019 | DHS Organizational Chart | Wyatt_DHS_0140442 |
| 10/8/2019 | A&M 12 Mo Training Plan re new hires | Wyatt_DHS_2099152 |
| 10/8/2019 | Train 4–12 Mo Training Plan | Wyatt_DHS_0133623 |
| 10/11/2019 | Pre training Activities | Wyatt_DHS_2699334 |
| 10/13/2019 | NCCD– Meeting Slidespptx | Wyatt_DHS_0127395 |
| 10/14/2019 | G19a Data– OOS Dashboard | Wyatt_DHS_0134982 |
| 10/14/2019 | G19b Data– Open Assessments Dashboard | Wyatt_DHS_0134980 |
| 10/14/2019 | G19d Data– SSS1 Dashboard | Wyatt_DHS_0134985 |

# PUBLIC KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 10/14/2019 | G19e Data–Statewide All Dashboard | Wyatt_DHS_0134985 |
| 10/14/2019 | OOS Dashboard | Wyatt_DHS_0133568 |
| 10/15/2019 | Comms3–AM Initiative Key Accomplishments for Communications | Wyatt_DHS_0133517 |
| 10/15/2019 | G19 Governor's Update | Wyatt_DHS_0134991 |
| 10/16/2019 | CW Policymaking Process | Wyatt_DHS_4209219 |
| 10/17/2019 | ORRAI, Creating a Data–Informed Child Welfare System PP | Wyatt_DHS_4397708 |
| 10/21/2019 | Train 6 –On Ramps by Position | Wyatt_DHS_0133630 |
| 10/22/2019 | G20 Governor's Update | Wyatt_DHS_0135049 |
| 10/22/2019 | G20aORCAH– Care Card Rollout Materials | Wyatt_DHS_0135000 |
| 10/22/2019 | G20b Capacity– DM and CCO Meeting Summary | Wyatt_DHS_0135036 |
| 10/22/2019 | G20cData– OOS Dashboard | Wyatt_DHS_0135045 |
| 10/22/2019 | G20d Data–Open Assessments Dashboard | Wyatt_DHS_0135034 |
| 10/22/2019 | 2019–10–22 CP CIRT Public Report | Publicly available |
| 10/22/2019 | OOS Dashboard | Wyatt_DHS_0133578 |
| 10/24/2019 | Training On ramp Combined | Wyatt_DHS_2709632 |
| 10/25/2019 | OR Executive Order No 19–08 (https://www.oregon.gov/gov/eo/eo_19–08.pdf) | Publicly available |
| 10/25/2019 | G21c Data–OOS Dashboard_10–25 | Wyatt_DHS_0135058 |
| 10/25/2019 | G21dData–Open Assessments Dashboard | Wyatt_DHS_0135060 |
| 10/25/2019 | OOS Dashboard | Wyatt_DHS_1560755 |
| 10/27/2019 | 27X8QRC70B9–cirt–public–report | Publicly available |
| 10/29/2019 | A& M PMO Status Update_60 G21Governor's Update | Wyatt_DHS_0135065 |
| 10/29/2019 | G21bWorkforce–Surge Hire Process Data and Waterfall | Wyatt_DHS_0135063 |
| 10/31/2019 | 2019 Q4 CFSR Progress Report | Wyatt_DHS_0894784 |
| 10/31/2019 | 2019–21 DHS Legislatively Adopted Budget | Publicly available |
| 10/31/2019 | 2019–21 Oregon Legislatively Adopted Budget Detailed Analysis | Publicly available |



| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 10/31/2019 | OOSYouthData20191031 | Wyatt_DHS_2630611 |
| 11/1/2019 | ORRAI Status Report, Nov 2019 | Wyatt_DHS_1492608 |
| 11/5/2019 | District Manager Team Meeting Agenda | Wyatt_DHS_0226055 |
| 11/12/2019 | 2019-11-12 84B851G16E CIRT Final Report | Publicly available |
| 11/12/2019 | CW Field Staff EE Wave 6-Summary Report | To produce |
| 11/14/2019 | OOS Dashboard | To produce |
| 11/15/2019 | D2GTOVKP4K CIRT Final Report | Publicly available |
| 11/15/2019 | EB CIRT Public Report | Publicly available |
| 11/21/2019 | 045TVVIMJR CIRT Final Report | Publicly available |
| 11/30/2019 | OOSYouthData20191130 | Wyatt_DHS_2630612 |
| 12/2/2019 | 8T2MMRJSIM CIRT Final Report | Publicly available |
| 12/4/2019 | Child Welfare LOA's - Signed | Wyatt_DHS_2673719 |
| 12/4/2019 | GKB Children's Cabinet 2020 Plan | Wyatt_DHS_0170403 |
| 12/4/2019 | OOS Dashboard | Wyatt_DHS_0226777 |
| 12/5/2019 | Press Release Governor Brown Commends CWOB | Wyatt_DHS_0140549 |
| 12/9/2019 | BRS Rate Increase Letter | Wyatt_DHS_0798194 |
| 12/9/2019 | Request for Funding SPRF Letter | Wyatt_DHS_0170281 |
| 12/9/2019 | Motion to Certify the Class Oral Argument requested Filed by All Plaintiffs | DKT 64 |
| 12/9/2019 | Positions Related to Gov Brown's Exec Order on CW Letter | Wyatt_DHS_0227059 |
| 12/10/2019 | DHS Organizational Chart | Wyatt_DHS_0140551 |
| 12/10/2019 | OOS Dashboard | To produce |
| 12/12/2019 | MHSMVDU48T CIRT Final Report | Publicly available |
| 12/17/2019 | A&M Closing Transition Deck vFINAL | Wyatt_DHS_0798340 |
| 12/26/2019 | ISBLEKXAKG CIRT Final Report | Publicly available |
| 12/31/2019 | CW Policymaking Flowchart | To produce |
| 12/31/2019 | CW Policy Worksheet 12-31-19docx | Wyatt_DHS_1944133 |

Exhibit 8
Page 234 of 390

# PUBLIC KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 12/31/2019 | OOS Youth Data | Wyatt_DHS_2630613 |
| 1/7/2020 | OHA–DHS Memo to Gov re PRTS capacity | Wyatt_DHS_0170414 |
| 1/7/2020 | OHA DHS PRTS Capacity Memo | Wyatt_DHS_0170414 |
| 1/14/2020 | Rebecca Jones Gaston Update to House Committee – includes budget request | Wyatt_DHS_0170374 |
| 1/15/2020 | PP Psychiatric Residential Treatment Capacity – Children's Cabinet | Wyatt_DHS_0170418 |
| 1/15/2020 | Agenda – Children Cabinet | Wyatt_DHS_0170299 |
| 1/15/2020 | Children's Cabinet CW Update–current draft | Wyatt_DHS_0170311 |
| 1/15/2020 | PP Psychiatric Residential Treatment Capacity | Wyatt_DHS_0170418 |
| 1/15/2020 | Child Welfare Improvements Overview ATT C | Wyatt_DHS_0170519 |
| 1/15/2020 | Child Welfare Improvements Overview | Wyatt_DHS_2788453 |
| 1/15/2020 | PP PRTS Children's Cabinet | Wyatt_DHS_0170418 |
| 1/17/2020 | AR84612OB4 CIRT Final Report | Publicly available |
| 1/17/2020 | HXA64P1R37 CIRT Final Report | Publicly available |
| 1/17/2020 | LGUA06TIP4 CIRT Final Report | Publicly available |
| 1/22/2020 | SOGIE Policy (Ch 5, Sec 41) updated January 2020 | Wyatt_DHS_0171619 |
| 1/23/2020 | Personal Care Assessment 0–24 Months | Wyatt_DHS_0181041 |
| 1/23/2020 | Personal Care Assessments Children & Youth 24 Months or Older | Wyatt_DHS_0181028 |
| 1/30/2020 | In–Home Nursing Assessment | Wyatt_DHS_0181035 |
| 1/30/2020 | Intake Nursing Assessment | Wyatt_DHS_0181046 |
| 1/31/2020 | 2020 Q5 OR PIP Progress Report | Wyatt_DHS_2688859 |
| 1/31/2020 | QPUPTE05OJ0 CIRT Final Report | Publicly available |
| 1/31/2020 | OOSYouthData20200131 | Wyatt_DHS_2630614 |
| 2/3/2020 | CW Field Staff EE Wave 7–Summary Report | To produce |
| 2/4/2020 | Comprehensive Portfolio Progress Report | Wyatt_DHS_0181052 |

PUBLIC
KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2/20/2020 | OAR 413–053–000 –070 re Strengthening, Preserving and Reunifying Families | Publicly available |
| 2/20/2020 | WHO DOES WHAT AT CENTRAL OFFICE– Updated | Wyatt_DHS_1911296 |
| 2/29/2020 | OOSYouthData20200229 | Wyatt_DHS_2630615 |
| 3/2/2020 | Comprehensive Portfolio Progress Report | Wyatt_DHS_2688066 |
| 3/4/2020 | 2020–03–04 2Z6MF2JXPN CIRT Final Report | Publicly available |
| 3/8/2020 | OR Executive Order 20–03 (https://www.oregon.gov/gov/eo/eo_20–03.pdf) | Publicly available |
| 3/10/2020 | 2020–03–10 VTEGJV6MJK CIRT Final Report | Publicly available |
| 3/12/2020 | OR Executive Order 20–05 https://www.oregon.gov/gov/eo/eo_20–05.pdf | Publicly available |
| 3/13/2020 | TLWZ8NL2YG CIRT Final Report | Publicly available |
| 3/16/2020 | DHS CW FAQs and Guidance 3162020 Child Welfare | To produce |
| 3/16/2020 | CT – DCF memo to all staff (COVID–19 Guidance from CW) | To produce |
| 3/18/2020 | Overview of State Agencies of Child Welfare Services Response to COVID–19 | To produce |
| 3/19/2020 | OR Executive Order 20–09 (https://www.oregon.gov/gov/eo/eo_20–09.pdf) | Publicly available |
| 3/19/2020 | OR Executive Order 20–10 (https://www.oregon.gov/gov/eo/eo_20–10.pdf) | Publicly available |
| 3/20/2020 | Proposal for suspending or modifying visitation family contact in juvenile dependency matters | To produce |
| 3/20/2020 | 0QUOOFBXEB CIRT Final Report | Publicly available |
| 3/22/2020 | OR Executive Order 20–11 (https://www.oregon.gov/gov/eo/eo_20–11.pdf) | Publicly available |
| 3/22/2020 | DHS – Every Child and DHS Launch My Neighbor | To produce |
| 3/23/2020 | SEIU Concerns from Workers Tracker | Wyatt_DHS_2716859 |
| 3/23/2020 | Gov News – Stay Home | To produce |
| 3/23/2020 | Gov–COVID–19–Joint–Task–Force–Initial–Report | To produce |

**PUBLIC KNOWLEDGE**®

| DATE | Description | BATES NO. / DKT NO. |
|---|---|---|
| 3/23/2020 | OR Executive Order 20-12 | Wyatt_DHS_2691429 |
| 3/24/2020 | Director Letter Re Visitation | Wyatt_DHS_2691437 |
| 3/24/2020 | Video Message from Oregon's Child Welfare Director Rebecca Jones Gaston (https://www.youtube.com/watch?app=desktop&fbclid=IwAR3D FPNjnOuN4xYGnDA3D3VOx880A9mJ3dA8V3tTknQaudVpzPbJPu N8HiM&feature=youtu.be&v=SoqIsY7TzAg) | Publicly available |
| 3/26/2020 | ZKRMYB3RXF CIRT Final Report | Publicly available |
| 3/30/2020 | DHS Email Re Child Welfare – Visitation Guidelines and Updates | To produce |
| 3/30/2020 | DHS Letter – Visitation Guidelines and Updates | To produce |
| 3/30/2020 | COVID-19 Recommendations for Certification Work | Wyatt_DHS_2760883 |
| 3/30/2020 | CPS safety (COVID-19 Guidance from CW) | To produce |
| 3/30/2020 | PC Payment COVID-19 | To produce |
| 3/30/2020 | Copy of Child Welfare COVID-19 Activity Tracker | To produce |
| 3/30/2020 | Copy of COVID-19 Communication Plans | To produce |
| 3/30/2020 | Copy of Laptop Names tracking | To produce |
| 3/30/2020 | DHS Letter – Visitation Guidelines and Updates | Wyatt_DHS_2691437 |
| 3/31/2020 | OR.08 Number of Placements for Children in Foster Care, March 1, 2020 – March 31, 2020 | To produce |
| 3/31/2020 | OOS Youth Data | Wyatt_DHS_2630616 |
| 4/1/2020 | Comprehensive Portfolio Progress Report | Wyatt_DHS_2688073 |
| 4/1/2020 | OR Executive Order 20-13 (https://www.oregon.gov/gov/eo/eo_20-13.pdf) | Publicly available |
| 4/2/2020 | DHS Email_FW_ Updated Visitation Info | To produce |
| 4/3/2020 | FW_ Visitation Guidelines update from Child Welfare Director Rebecca Jones Gaston | To produce |
| 4/3/2020 | DHS Revised Program-Guidance-Visitation | Wyatt_DHS_2691460 |
| 4/6/2020 | OHA Treatment Guidelines | Wyatt_DHS_2691462 |

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 4/7/2020 | OR Executive Order 20-14 (https://www.oregon.gov/gov/eo/eo_20-14.pdf) | Publicly available |
| 4/7/2020 | OR Executive Order 20-15 (https://www.oregon.gov/gov/eo/eo_20-15.pdf) | Publicly available |
| 4/7/2020 | 7EYWTLOIFC CIRT Final Report | Publicly available |
| 4/9/2020 | KAEX624LSI CIRT Final Report | Publicly available |
| 4/10/2020 | CW Engagement Survey – Infographic Waves1-7 041020 | Wyatt_DHS_3966396 |
| 4/15/2020 | OR Executive Order 20-16 (https://www.oregon.gov/gov/eo/eo_20-16.pdf) | Publicly available |
| 4/15/2020 | OR Executive Order 20-30 (https://www.oregon.gov/gov/eo/eo_20-30.pdf) | Publicly available |
| 4/17/2020 | C4YU8W2ABJ CIRT Final Report | Publicly available |
| 4/21/2020 | CW Engagement Survey v214 Final Relaunch | Wyatt_DHS_3003273 |
| 4/23/2020 | ODOJ Email re DHS Website | Publicly available |
| 4/29/2020 | DHS Website re COVID-19 | Publicly available |
| 4/29/2020 | DHS Website_Abuse Prevention | Publicly available |
| 4/29/2020 | DHS Website_Guides & Resources | Publicly available |
| 4/29/2020 | DHS Website_Partner Orgs & Addl Resources | Wyatt_DHS_2691465 |
| 4/29/2020 | DHS Website_Supporting Former Youth | Publicly available |
| 4/29/2020 | DHS Website_Supporting_1 | Publicly available |
| 4/29/2020 | DHS Website_Supporting_2 | Publicly available |
| 4/29/2020 | DHS Website_Supporting_3 | Publicly available |
| 4/29/2020 | DHS Website_Visitation | Publicly available |
| 4/30/2020 | 2020 Q6 OR PIP Progress Report | Wyatt_DHS_2688957 |
| 4/30/2020 | OOS Youth Data | Wyatt_DHS_2630617 |
| 5/1/2020 | Comprehensive Portfolio Progress Report | Wyatt_DHS_2688081 |
| 5/1/2020 | 0HGWT3F5G CIRT Final Report | Publicly available |
| 5/1/2020 | D10 PIP Charts May-20 | Wyatt_DHS_3567897 |

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 5/11/2020 | Gov News – State Budget | To produce |
| 5/11/2020 | Gov News – State Budget | Wyatt_DHS_4397107 |
| 5/11/2020 | CW Field Staff EE Wave 8–Summary Report | To produce |
| 5/12/2020 | DHS Information Sheet 2020 Budget Reduction Exercise | Wyatt_DHS_4649032 |
| 5/13/2020 | DHS CW Vision for Transformation – Final | Wyatt_DHS_2630618 |
| 5/13/2020 | KVRHCUQ7FH CIRT Final Report | Publicly available |
| 5/14/2020 | OR Executive Order 20–25 (https://www.oregon.gov/gov/eo/eo_20–25.pdf) | Publicly available |
| 5/18/2020 | FCP Strategic Plan | Wyatt_DHS_2696471 |
| 5/18/2020 | YH6EYJI108 Final CIRT Report | Publicly available |
| 5/26/2020 | X00QOXOB04 CIRT Final Report | Publicly available |
| 5/27/2020 | DHS Child Welfare Presentation | Wyatt_DHS_4505361 |
| 5/27/2020 | DHS Budget Reduction Exercise | Wyatt_DHS_4397064 |
| 5/31/2020 | OOSYouthData20200531 | Wyatt_DHS_3604006 |
| 6/1/2020 | Comprehensive Portfolio Progress Report | Wyatt_DHS_2688089 |
| 6/1/2020 | Revised SEIU Novel Coronavirus LOA_Signed | Wyatt_DHS_2675622 |
| 6/1/2020 | SOGIE Policy (Ch 5, Sec 41) updated June 2020 | Wyatt_DHS_2673813 |
| 6/1/2020 | Resource Management Director's Report re Compliance | Wyatt_DHS_3623007 |
| 6/2/2020 | DHS CW– Staff QRG in office visits FINAL 6120 | Wyatt_DHS_2691468 |
| 6/2/2020 | DHS CW– Visit guide one for parents foster parents FINAL 6120 | Wyatt_DHS_2691469 |
| 6/2/2020 | DHW CW_Oregon DHS Guidance for Parent Child visitsFINAL6120 | Wyatt_DHS_2691472 |
| 6/2/2020 | SOCAC–Bylaws | Wyatt_DHS_2675628 |
| 6/2/2020 | SOCAC Membership (https://www.oregon.gov/oha/HSD/BH–Child–Family/SOCAC/Membership.pdf) | Publicly available |
| 6/3/2020 | Updated Parent Child Visitation Guidelines during COVID–19 | Wyatt_DHS_2691491 |

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 6/3/2020 | Senate_DHS Budget Reduction Exercise | Wyatt_DHS_4397105 |
| 6/3/2020 | DHS CW Program Update Senate Human Services Presentation | Wyatt_DHS_2999946 |
| 6/9/2020 | ORCAH Project Story board | Wyatt_DHS_2675659 |
| 6/11/2020 | CW Org Chart | Wyatt_DHS_2688607 |
| 6/12/2020 | OR Executive Order 20-28 (https://www.oregon.gov/gov/eo/eo_20-28.pdf) | Publicly available |
| 6/12/2020 | 87DK98F1DR CIRT Final Report | Publicly available |
| 6/15/2020 | DHS Opening – Social Service Specialist CPS | To produce |
| 6/24/2020 | OR Executive Order 20-29 (https://www.oregon.gov/gov/eo/eo_20-29.pdf) | Publicly available |
| 6/25/2020 | Oregon-COVID-19-Projections | To produce |
| 6/26/2020 | 0TOU6ULKGF CIRT Final Report | Publicly available |
| 6/28/2020 | DHS Telecommuting Survey Report | Wyatt_DHS_2691494 |
| 6/30/2020 | Every Child 2020 Q1 Report | Wyatt_DHS_3202943 |
| 6/30/2020 | OOS Youth Data 20200630 | Wyatt_DHS_3145323 |
| 7/1/2020 | Comprehensive Portfolio Progress Report | Wyatt_DHS_2688097 |
| 7/1/2020 | CIRT Final Report | Publicly available |
| 7/1/2020 | DHS CW_Update re out-of-state placements | To produce |
| 7/1/2020 | D12 PIP Charts Jul-20 | Wyatt_DHS_2699760 |
| 7/1/2020 | D13 PIP Charts Jul-20 | Wyatt_DHS_1987498 |
| 7/6/2020 | CIRT Status Report | To produce |
| 7/14/2020 | Agenda SCAC | Wyatt_DHS_2763985 |
| 7/22/2020 | OR Q7 KEEP Report | Wyatt_DHS_2688109 |
| 7/31/2020 | CP3 Marion County Gaps and Resources Report | Wyatt_DHS_2729671 |
| 8/1/2020 | D11 PIP Charts Aug-20 | Wyatt_DHS_2703955 |
| 8/31/2020 | OR CFSR PIP renegotiation approval letter final | Wyatt_DHS_2689176 |
| 9/3/2020 | Response Letter to Sen Wyden re Safety at Screening tool | Wyatt_DHS_3007680 |

# PUBLIC KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 9/10/2020 | FINAL – Family Report Rollout SSS1 | Wyatt_DHS_2690565 |
| 9/10/2020 | OCWP– COVID 90–day Plan– Treatment Services– FINAL | Wyatt_DHS_2717673 |
| 9/15/2020 | DHS CW Vision for Transformation | Wyatt_DHS_2630618 |
| 9/28/2020 | FINAL – Content Guide Family Report | Wyatt_DHS_2690544 |
| 9/28/2020 | FINAL – Family Report Rollout SUPERVISOR AND MAPS | Wyatt_DHS_2690591 |
| 9/30/2020 | 2021 APSR (submitted Sept 30, 2020) | Wyatt_DHS_2690337 |
| 9/30/2020 | 2021 APSR Report Attachments (multiple documents) | Wyatt_DHS_2689318 – Wyatt_DHS_2690280 |
| 10/1/2020 | Audit protocol | Wyatt_DHS_2709678 |
| 10/1/2020 | One–pager– CW Staff Support_Clean | To produce |
| 10/1/2020 | D1 PIP Charts Oct–20 | Wyatt_DHS_2704053 |
| 10/22/2020 | Guidance for Helpers in a Virtual Environment | Wyatt_DHS_2718588 |
| 10/26/2020 | COVID–19 Resources Combined | Wyatt_DHS_2717333 |
| 10/29/2020 | Child Caring Agency COVID–19 Outbreak Response Process | Wyatt_DHS_2727833 |
| Nov–20 | District 13 Child Welfare Org Chart (Wallowa, Union, Baker Counties) | Wyatt_DHS_2690749 |
| 11/3/2020 | Child Welfare Treatment Services Capacity Overview 2020– FINAL | Wyatt_DHS_2716941 |
| 11/6/2020 | Oregon's Family First Title IV–E Prevention Plan Final | Wyatt_DHS_2690698 |
| 11/18/2020 | Oregon DHS Protocol for Parent Child visits–FINAL | Wyatt_DHS_2713786 |
| 11/24/2020 | Chafee Attachment – ORFY16–20 NYTD Data Snapshot | Wyatt_DHS_2709583 |
| 12/11/2020 | CW COOP Final | Wyatt_DHS_2709790 |
| 12/14/2020 | ORCAH COOP | Wyatt_DHS_2709876 |
| 12/18/2020 | COVID Impact on Foster Parents | Wyatt_DHS_2691901 |
| 12/21/2020 | CW COOP Final | Wyatt_DHS_2717352 |
| 1/11/2021 | FAQ FCCRC – V1 | Wyatt_DHS_2711559 |
| 1/29/2021 | Every Child Year 4 Report 2020 | Wyatt_DHS_2715636 |



| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2/1/2021 | First Quarter NOP Period Report | Wyatt_DHS_2721484 |
| 2/12/2021 | 12 Month Training Plans Combined | Wyatt_DHS_2709621 |
| 3/2/2021 | DRAFT Braided Funding Map | Wyatt_DHS_2711565 |
| 3/5/2021 | 2021 Project One OR–Kids Advanced Planning Doc Final | Wyatt_DHS_2711321 |
| 3/5/2021 | 2021 Project Two Implementation Advanced Planning Doc IAPD Final | Wyatt_DHS_2711270 |
| 4/8/2021 | CQI Workgroup Charter | Wyatt_DHS_2711371 |
| 4/12/2021 | Second Quarter NOP Report | Wyatt_DHS_2721514 |
| 4/25/2021 | System of Care Barrier Review Process Draft | Wyatt_DHS_2709688 |
| 4/28/2021 | OR FY 2020 Data MCV VIH FFP Rate Reduction letter | Wyatt_DHS_2696638 |
| 5/1/2021 | D10 CQI Charts May–21 | Wyatt_DHS_2709616 |
| 5/5/2021 | Chafee Graduation Report | Wyatt_DHS_2709526 |
| 5/10/2021 | CW Updates & ORCAH presentation | Wyatt_DHS_2696662 |
| 5/18/2021 | Mask Wearing Requirements in Child Caring Agencies | Wyatt_DHS_2726992 |
| 5/27/2021 | Oregon FY22 CFS–101s | Wyatt_DHS_2709588 |
| 5/27/2021 | Oregon FY22 CFS–101s–signed | Wyatt_DHS_2709585 |
| 6/15/2021 | ODHS Workload Report ORS 409.161 | Wyatt_DHS_2715679 |
| 6/22/2021 | OR Executive Summary | Wyatt_DHS_2710225 |
| 7/1/2021 | D12 CFSR Charts Jul–21 | Wyatt_DHS_2710587 |
| 7/1/2021 | D13 CFSR Charts Jul–21 | Wyatt_DHS_2710549 |
| 7/6/2021 | 2021–23 Child Welfare Budget Priorities | Wyatt_DHS_2697240 |
| 7/19/2021 | Third Quarter NOP Report | Wyatt_DHS_2721553 |
| Aug–21 | 2022 APSR (resubmitted Aug 2021) | Wyatt_DHS_2710406 |
| 8/1/2021 | D11 CFSR Charts Aug–21 | Wyatt_DHS_2721571 |
| 8/2/2021 | Protocol for Parent Child Visits | Wyatt_DHS_2715791 |
| 8/9/2021 | CW and ORRAI partner to create a state CQI model_Announcement | Wyatt_DHS_2715835 |



| DATE | Description | BATES NO. / DKT NO. |
|---|---|---|
| 8/10/2021 | CW Training Unit Butler Plan | Wyatt_DHS_2710310 |
| 8/24/2021 | Temporary Administrative Order CWP_19–2021 | To produce |
| 8/27/2021 | Mandatory vaccines do not apply to resource parents resource families | Wyatt_DHS_2715846 |
| 8/30/2021 | COVID–19 Vaccine Mandate Information | Wyatt_DHS_2727018 |
| 9/20/2021 | AR 1895 CORR Response to 082021 Substantial Noncompliance Letter | Wyatt_DHS_2715937 |
| 9/23/2021 | BRS Vaccination Memo REVISED | Wyatt_DHS_2715985 |
| 9/25/2021 | Project Charter CQI | Wyatt_DHS_2711377 |
| 9/30/2021 | Temporary Administrative Order CWP_20–2021 | To produce |
| 9/30/2021 | 7246 Oregon FY2022 APSR State Approval Letter– 9–2021 signed | Wyatt_DHS_2711208 |
| 9/30/2021 | 7246 Oregon FY2022 CFS–101s–signed | Wyatt_DHS_2711205 |
| 9/30/2021 | Correction ODHS Partner Newsletter Be prepared COVID–19 resources and more | Wyatt_DHS_2716388 |
| 10/1/2021 | Temporary Administrative Order CWP_21–2021 | To produce |
| 10/1/2021 | Children's System Plan Document – Signed Final | Wyatt_DHS_2711571 |
| 10/1/2021 | D1 CFSR Charts Oct–21 | Wyatt_DHS_2721692 |
| 10/1/2021 | D14 CFSR Charts Oct–21 | Wyatt_DHS_2721697 |
| 10/8/2021 | cwig– podcast transcript– episode 68 | To produce |
| 10/13/2021 | Fourth Quarter NOP Report | Wyatt_DHS_2721620 |
| 10/19/2021 | CQI Update | Wyatt_DHS_2711385 |
| 12/7/2021 | FCCRC Steering Dec | Wyatt_DHS_2711656 |
| 1/3/2022 | Worker Caseload – DRAFT | Wyatt_DHS_2729186 |
| 1/15/2022 | Fifth Quarter NOP Period Report | Wyatt_DHS_2721880 |
| 1/18/2022 | Child Welfare Presentation Childrens Cabinet_FINAL | Wyatt_DHS_2717821 |
| 1/19/2022 | Project Charter Template draft | To produce |
| 1/21/2022 | CW PMO 2021 Annual Progress Report Key Initiatives – final | Wyatt_DHS_2720911 |

**PUBLIC KNOWLEDGE**®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 1/31/2022 | CP3 Douglas County Gaps and Resources Report | Wyatt_DHS_2729655 |
| 2/1/2022 | Worker Caseload – DRAFT | Wyatt_DHS_2729189 |
| 2/2/2022 | ODHS Child Welfare Equity Quarterly Report Oct – Dec 2021 | Wyatt_DHS_2721038 |
| 2/2/2022 | New Release re Lowest Foster Care Numbers in 16 years | Wyatt_DHS_4418867 |
| 2/2/2022 | PRTF Capacity Memo | Wyatt_DHS_2721076 |
| 2/3/2022 | Oregon Caseload Ratio Standards | Wyatt_DHS_2721405 |
| 2/3/2022 | Caseload Ratio Standards 2022-02-03 | Wyatt_DHS_2721405 |
| 2/9/2022 | D16 CFSR Data and Debrief documents for Monday meeting.msg | Wyatt_DHS_2721958 |
| 3/1/2022 | Worker Caseload – DRAFT | Wyatt_DHS_2729192 |
| 3/2/2022 | CPS Tool Kit Plan | To produce |
| 3/15/2022 | Jones-Gaston, Rebecca deposition transcript (1 of 2) | Deposition Transcript |
| 4/1/2022 | Worker Caseload – DRAFT | Wyatt_DHS_2729195 |
| 4/6/2022 | District 1 Org Chart | Wyatt_DHS_2722471 |
| 4/7/2022 | CW Central Office Org Chart | Wyatt_DHS_2722864 |
| 4/11/2022 | DB Adoption Disruptions 2015 to 2020 | To produce |
| 4/11/2022 | F2F FC + IH Children 2016 to 2021 | To produce |
| 4/11/2022 | Initial Family Report 2016 to 2021 | To produce |
| 4/11/2022 | Planning Meeting | To produce |
| 4/13/2022 | Family Report every 180 Days 2016 to 2021 | To produce |
| 4/14/2022 | Sixth Quarter NOP Period Report | Wyatt_DHS_2723163 |
| 4/18/2022 | OR-DHS-Child-Welfare-Procedure-Manual | Wyatt_DHS_2723222 |
| 4/27/2022 | Email from MH legal team re Wyatt v Brown – JCIP dashboard | To produce |
| 4/28/2022 | Ongoing Safety Plan Content Guide | To produce |
| 5/2/2022 | CH 4, SEC 18 Managing Child Safety in and Out of Home, Missing Children – Child Welfare Procedure Manual | To produce |
| 5/10/2022 | Email from MH legal team re Wyatt v Brown – OR Project | To produce |

Exhibit 8
Page 244 of 390

# PUBLIC KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 5/25/2022 | Email from MH legal team re last OOS kids data | To produce |
| 5/31/2022 | Youth in Self-Selected Environment by quarter and age of youth since the service was created | To produce |
| 6/2/2022 | Jan 2016 to Mar 2022 CV01 F2F FED Under 18 PDF v2 | To produce |
| 6/2/2022 | Jan 2016 to Mar 2022 CV02 F2F FED Under 18 PDF v2 | To produce |
| 6/2/2022 | Jan 2016 to Mar 2022 CV01 and CV02 F2F FED Under 18 Source v2 Excel | To produce |
| 6/3/2022 | Email from K Keller to A Cox re FW- Disruption Docs | To produce |
| 6/3/2022 | Clarifications around Self-Selected Environment (SSE) in OR-Kids | To produce |
| 6/8/2022 | Worker Caseload Dashboard Presentation - DRAFT | To produce |
| 6/14/2022 | Temp Lodging Staffing Data Excel | To produce |
| 6/28/2022 | Jones-Gaston, Rebecca deposition transcript (2 of 2) | Deposition Transcript |
| 7/1/2022 | OAR 413-40 Case Management - Service Plans (http://www.dhs.state.or.us/policy/childwelfare/manual_1/division_40.pdf) | Publicly available |
| 1/31/2023 | 12 2022 Annual QRTP Report_Final | Wyatt_DHS_4467018 |
| 4/6/2023 | ODHS-stands-with-lgbtq-community | Wyatt_DHS_2784351 |
| 4/17/2023 | Re SB 209 Supporting LGBTQIA2S+ youth in foster care | Wyatt_DHS_2784578 |
| 4/18/2023 | ODHS v Bates_Decl J Bates Appendix with training materials | Wyatt_DHS_2784376 |
| 4/18/2023 | ODHS v Bates_Decl J Bates ISO Pltf's Motion for Prelim Injunction | Wyatt_DHS_2784354 |
| 4/18/2023 | ODHS Child Welfare Workforce and Respite Care | Wyatt_DHS_2784580 |
| 5/31/2023 | BRS Rate Increases - OYA OHA ODHS | Wyatt_DHS_4663318 |
| 6/15/2023 | 30(b)(6) Andresen, Lacey deposition transcript | Deposition Transcript |
| 6/29/2023 | 41 ODHS CW Administration COMPLETE | Wyatt_DHS_4467289 |
| 6/29/2023 | 42 ODHS CW Oregon Child Abuse Hotline ORCAH COMPLETE | Wyatt_DHS_4467474 |

PUBLIC
KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 6/30/2023 | 2024 APSR Submission | Wyatt_DHS_4467023 |
| 7/13/2023 | Center Square_Oregon's Department of Justice forms new division focused on children | To produce |
| 7/24/2023 | Legislative Session 2023 – CW Highlights on Letterhead | Wyatt_DHS_4564313 |
| 8/21/2023 | 2024 APSR Resubmission, August 2023 | Wyatt_DHS_4663459 |
| 8/23/2023 | Email from MH legal team re APSR reporting period | To produce |
| 8/23/2023 | Oregon DHS Child Welfare Procedure Manual Rev | Wyatt_DHS_4663658 |
| 8/29/2023 | Allen, Nancy deposition transcript | Deposition Transcript |
| Sep-23 | Legal Standards (MH work product) | To produce |
| 9/5/2023 | CQI– ELT Status Report | Wyatt_DHS_4665723 |
| 9/7/2023 | Marshall, Glenda deposition transcript | Deposition Transcript |
| 9/11/2023 | Loughary, Deena deposition transcript | Deposition Transcript |
| 9/12/2023 | Lorz, Kim Aaron deposition transcript | Deposition Transcript |
| 9/12/2023 | Flint–Gerner, Aprille deposition transcript | Deposition Transcript |
| 9/13/2023 | Gray (Keller), Kimberly deposition transcript | Deposition Transcript |
| 9/15/2023 | Pakseresht, Fariborz deposition transcript | Deposition Transcript |
| 9/18/2023 | Temp Lodging – RCH Presentation Final | Wyatt_DHS_4665951 |
| 9/21/2023 | Fox, Sara deposition transcript | Deposition Transcript |
| 10/2/2023 | Temporary Lodging_Progress Report | Wyatt_DHS_4666002 |
| 10/3/2023 | SOCAC meeting slides | Wyatt_DHS_4665863 |
| 10/5/2023 | FOCUS Child Specific Caregiver Supports (CSCS) – one page info | To produce |
| 10/9/2023 | RSN's alignment with the Vision for Transformation | To produce |
| 10/23/2023 | Vision for Transformation 2022 Progress Report | Wyatt_DHS_4666015 |
| 2015–04 | Oregon (Small) Foster Children's Bill of Rights | Wyatt_DHS_0072085 |
| 2015–2019 | CFSP Final Report for FY's 2015–2019 | Wyatt_DHS_0062138 |
| 2015–2019 | 2015–2019 ILP 5–Year Plan | Wyatt_DHS_0305916 |

Exhibit 8
Page 246 of 390

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2015–2019 | 2015–2019 NYTD Data Snapshot (https://www.oregon.gov/odhs/data/cwdata/cw-ilp-nytd-snapshot-2015-2019-oregon.pdf) | Publicly available |
| 2016–11 | D9 CQI Charts Nov–16 | To produce |
| 2016 Q3 | CFSR Statewide Review Ratings | Wyatt_DHS_0276885 |
| 2016 Q4 | 2016 CQI charts D1 | To produce |
| 2016 Q4 | 2016 CQI charts D14 | To produce |
| 2016–11 | D15 CQI Charts Nov–16 | To produce |
| 2016–12 | D16 CQI charts Dec–16 | Wyatt_DHS_1710848 |
| 2016–2017 | 2016–2017 ILP Annual Report Summary Page–APSR–Attachment–15 | Wyatt_DHS_0135537 |
| 2017–08 | D11 PIP Charts Aug–17 | To produce |
| 2017 February–March | D5 PIP charts Feb–Mar–17 | To produce |
| 2017–07 | D6 PIP charts Jul–17 | Wyatt_DHS_1609518 |
| 2017–06 | D8 Grants Pass PIP Charts Jun–17 | To produce |
| 2017–06 | D8 Medford PIP charts Jun–17 | To produce |
| 2017–05 | PIP Charts D7 May 2017 | To produce |
| 2017–11 | D9 PIP Charts Nov–17 | To produce |
| 2017 Q1 | D2 Gresham Chart | Wyatt_DHS_1765203 |
| 2017 Q1 | D2 Midtown Chart | Wyatt_DHS_2225338 |
| 2017 Q2 | D3 Marion Chart | Wyatt_DHS_0278676 |
| 2017 Q2 | D3 Polk–Yamhill Chart | Wyatt_DHS_1921047 |
| 2017 Q3 | D13 Chart | Wyatt_DHS_0229358 |
| 2017 Q3 | D2 Alberta Chart | Wyatt_DHS_1765667 |
| 2017 Q3 | D4 Chart | Wyatt_DHS_0183033 |
| 2017 Q3 | D6 Chart | Wyatt_DHS_1609518 |

PUBLIC KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2017 Q3 | CFSR Statewide Review Ratings PIP Feb–Jun 2017 | Wyatt_DHS_0294223 |
| 2017 Q4 | D1 Chart | Wyatt_DHS_1412549 |
| 2017 Q4 | D16 Chart | Wyatt_DHS_1413176 |
| 2017–01 | D2 Gresham CQI charts Jan–17 | Wyatt_DHS_1765203 |
| 2017–01 | D2 Midtown CQI charts Jan–17 | Wyatt_DHS_2225338 |
| 2017–01 | CW–Outcomes–Scorecard | Wyatt_DHS_0056496 |
| 2017–01–18 to 2018–11–14 | State of Oregon Advisory – Child Welfare Advisory Committee (CWAC) | To produce |
| 2017–02 | CW–Outcomes–Scorecard | Wyatt_DHS_0056484 |
| 2017–03 | CW–Outcomes Scorecard | Wyatt_DHS_0056490 |
| 2017–04 | D3 Marion PIP charts Apr17 | Wyatt_DHS_0278676 |
| 2017–04 | D3 Polk–Yamhill PIP Charts Apr17 | Wyatt_DHS_1921047 |
| 2017–04 | D4 PIP Charts Aug–17 | Wyatt_DHS_0183033 |
| 2017–04 | CW–Outcomes–Scorecard | Wyatt_DHS_0056502 |
| 2017–04 | 2016 Child Welfare Data Book | Wyatt_DHS_1567477 |
| 2017–05 | CW–Outcomes–Scorecard | Wyatt_DHS_0056508 |
| 2017–06 | CW–Outcomes–Scorecard | Wyatt_DHS_0056514 |
| 2017–07 | Oregon Foster Children's Bill of Rights | Wyatt_DHS_2269955 |
| 2017–07 | CW–Outcomes–Scorecard | Wyatt_DHS_0056520 |
| 2017–08 | Mandatory–Materials–DHS–Children & Youth in Care | Wyatt_DHS_2271845 |
| 2017–08 | CW–Outcomes–Scorecard | Wyatt_DHS_0056526 |
| 2017–09 | D2 Alberta PIP charts Sept–17 | Wyatt_DHS_1765667 |
| 2017–09 | D2 East Multnomah PIP charts Sept–17 | To produce |
| 2017–09 | CW–Outcomes–Scorecard | Wyatt_DHS_0056532 |
| 2017–10 | 2017 ORRAI Child Welfare Research Agenda | Wyatt_DHS_0047799 |
| 2017–10 | CW–Outcomes–Scorecard | Wyatt_DHS_0056538 |

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2017–11 | 2017–11 NAYA ILP Review Report | Wyatt_DHS_0135300 |
| 2017–11 | D15 N Clackamas PIP Charts Nov–17 | To produce |
| 2017–11 | D15 Oregon City PIP Charts Nov–17 | To produce |
| 2017–11 | CW–Outcomes–Scorecard | Wyatt_DHS_0056544 |
| 2017–12 | Oregon Foster Children's Sibling Bill of Rights | Wyatt_DHS_0889031 |
| 2017–12 | 2017–12 NAFY ILP Review Report | Wyatt_DHS_0135431 |
| 2017–12 | D16 PIP Charts Dec17 | Wyatt_DHS_1413176 |
| 2017–12 | CW–Outcomes–Scorecard | Wyatt_DHS_0056550 |
| 2017–2018 | 2017–2018 Oregon Independent Living Program Review – Statewide Review Findings | Wyatt_DHS_0135652 |
| 2018– 08 to 2019–08 | ORCAH Annual Report | Wyatt_DHS_1948650 |
| 2018 February– March | D5 PIP Charts Feb–Mar 2018 | Wyatt_DHS_2697796 |
| 2018 July | D6 PIP Charts Jul–18 | Wyatt_DHS_1420603 |
| 2018 May | D7 PIP Charts May–18 | Wyatt_DHS_2697811 |
| 2018 Q1 | D2 Gresham Chart | Wyatt_DHS_2697788 |
| 2018 Q1 | D2 Midtown Chart | Wyatt_DHS_2697792 |
| 2018 Q1 | D5 Chart | Wyatt_DHS_2697796 |
| 2018 Q1 | 2018 Q1 CFSR Progress Report | Wyatt_DHS_1391297 |
| 2018 Q1 | CFSR Statewide Review Ratings | Wyatt_DHS_0229498 |
| 2018 Q2 | D10 Chart | Wyatt_DHS_2697816 |
| 2018 Q2 | D3 Marion Chart | Wyatt_DHS_0283268 |
| 2018 Q2 | D3 Polk–Yamhill Chart | Wyatt_DHS_0186385 |
| 2018 Q2 | D7 Chart | Wyatt_DHS_2697811 |
| 2018 Q2 | D8 Grants Pass Chart | Wyatt_DHS_1420607 |
| 2018 Q2 | D8 Medford | Wyatt_DHS_2697820 |

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2018 Q3 | D11 Chart | Wyatt_DHS_1420648 |
| 2018 Q3 | D12 Chart | Wyatt_DHS_1420595 |
| 2018 Q3 | D13 Chart | Wyatt_DHS_1420599 |
| 2018 Q3 | D2 Alberta Chart | Wyatt_DHS_1420703 |
| 2018 Q3 | D2 East Multnomah Chart | Wyatt_DHS_1420707 |
| 2018 Q3 | D4 Chart | Wyatt_DHS_1420652 |
| 2018 Q3 | D6 Chart | Wyatt_DHS_1420603 |
| 2018 Q4 | D1 Chart | Wyatt_DHS_0186980 |
| 2018 Q4 | D14 Chart | Wyatt_DHS_1420745 |
| 2018 Q4 | D15 Chart | Wyatt_DHS_0187931 |
| 2018 Q4 | D16 Chart | Wyatt_DHS_1420882 |
| 2018 Q4 | D9 Chart | Wyatt_DHS_1420779 |
| 2018–01 | D2 Gresham PIP Charts Jan–18 | Wyatt_DHS_2697788 |
| 2018–01 | D2 Midtown PIP Charts Jan–18 | Wyatt_DHS_2697792 |
| 2018–01 | CW–Outcomes–Scorecard | Wyatt_DHS_0056556 |
| 2018–02 | 2017 Child Welfare Data Book | Wyatt_DHS_0135720 |
| 2018–02 | Child Welfare Vision for the Future & Related Materials (Meeting with Gov & Liesl Wendt) | Wyatt_DHS_0242188 |
| 2018–02 | A.R. v. State Settlement Agreement | Wyatt_DHS_4602645 |
| 2018–02 | CW Outcomes Scorecard | Wyatt_DHS_0056562 |
| 2018–03 | Family First Bill Summary | Wyatt_DHS_2122488 |
| 2018–03 | Equity, Diversity and Inclusion Assessment of DHS | To produce |
| 2018–03 | CW Outcomes Scorecard | Wyatt_DHS_0056568 |
| 2018–04 | DHS Settlement Agreement Summary – Temporary Stays for Foster Children & Young Adults | Wyatt_DHS_0213062 |
| 2018–04 | Timeline–J United Child & Youth Safety Implementation Plan | Wyatt_DHS_0063105 |
| 2018–04 | D3 Marion PIP Charts Apr–18 | Wyatt_DHS_0283268 |

PUBLIC
KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2018-04 | D3 Polk-Yamhill PIP Charts Apr-18 | Wyatt_DHS_0186385 |
| 2018-04 | CW Outcomes Scorecard | Wyatt_DHS_0056574 |
| 2018-04 | ORRAI Status Report | Wyatt_DHS_0114725 |
| 2018-05 | 2018-05 May Child Welfare Progress Report | Wyatt_DHS_0030827 |
| 2018-05 | Professional Services Contract – Liesl Wendt | Wyatt_DHS_0775754 |
| 2018-05 | Timeline-A United Child & Youth Safety Implementation Plan | Wyatt_DHS_0062656 |
| 2018-05 | CW Outcomes Scorecard | Wyatt_DHS_0056580 |
| 2018-05 | ORRAI Status Report | Wyatt_DHS_0047650 |
| 2018-06 | 2018-06 June | Wyatt_DHS_0030833 |
| 2018-06 | ORRAI Status Report | Wyatt_DHS_0047656 |
| 2018-06 | Children and Youth With Specialized Needs Workgroup issues recommendations | Wyatt_DHS_0134311 |
| 2018-06 | Temp Lodging Stakeholder Interview Summary | Wyatt_DHS_0213538 |
| 2018-06 | Project Status Summary | Wyatt_DHS_0063077 |
| 2018-06 | D8 Grants Pass PIP Charts Jun-18 | Wyatt_DHS_1420607 |
| 2018-06 | D8 Medford PIP Charts Jun-18 | Wyatt_DHS_2697820 |
| 2018-06 | CW Outcomes Scorecard | Wyatt_DHS_0056590 |
| 2018-07 | 2018-07 July | Wyatt_DHS_0030840 |
| 2018-07 | ORRAI Status Report | Wyatt_DHS_0047663 |
| 2018-07 | Plan for Addressing Temp Lodging Emergency Use | Wyatt_DHS_2012278 |
| 2018-07 | CW Outcomes Scorecard | Wyatt_DHS_0056596 |
| 2018-08 | OHA & DHS Continuum of Care Partner Feedback Report | Wyatt_DHS_0062775 |
| 2018-08 | 2018-08 Aug CW Monthly Progress Report | Wyatt_DHS_0030848 |
| 2018-08 | ORRAI Status Report | Wyatt_DHS_0047670 |
| 2018-08 | D4 PIP Charts Aug-18 | Wyatt_DHS_1420652 |
| 2018-08 | CW Outcomes Scorecard | Wyatt_DHS_0056602 |
| 2018-09 | 2018-09 Sept CW Monthly Progress Report | Wyatt_DHS_0030859 |

Exhibit 8
Page 251 of 390

**PUBLIC KNOWLEDGE**®

Appendix D: Data Sources

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2018–09 | Centralized Hotline Transition Plan | Wyatt_DHS_0062851 |
| 2018–09 | ORRAI Status Report | Wyatt_DHS_0047678 |
| 2018–09 | Project Transition Plan Part 1 | Wyatt_DHS_0063034 |
| 2018–09 | Project Transition Plan Part 2 | Wyatt_DHS_0063029 |
| 2018–09 | D2 Alberta PIP Charts Sep–18 | Wyatt_DHS_1420703 |
| 2018–09 | D2 East PIP Charts Sep–18 | Wyatt_DHS_1420707 |
| 2018–10 | 2018–10 Oct CW Monthly Progress Report | Wyatt_DHS_0030869 |
| 2018–10 | CHAT News Fall 2018 ENGLISH | Wyatt_DHS_0061277 |
| 2018–10 | ORRAI Status Report | Wyatt_DHS_0047686 |
| 2018–10 | Hotline–Newsletter | Wyatt_DHS_0062860 |
| 2018–11 | 2018–11 Nov CW Monthly Progress Report | Wyatt_DHS_0030881 |
| 2018–11 | ORRAI Status Report | Wyatt_DHS_0047694 |
| 2018–11 | 2018–11 Research Implementation basic road map | Wyatt_DHS_0122068 |
| 2018–11 | Caregiver Training Redesign Charter | Wyatt_DHS_0063037 |
| 2018–11 | Final Temporary Lodging Root Cause Report | Wyatt_DHS_0782792 |
| 2018–11 | Temp Lodging Status Update Assessment and Recommendations | Wyatt_DHS_1901546 |
| 2018–11 | D15 PIP Charts Nov–18 | Wyatt_DHS_0187931 |
| 2018–11 | D9 PIP Charts Nov18 | Wyatt_DHS_1420779 |
| 2018–11 | November Oregon Child Abuse Hotline Newsletter | Wyatt_DHS_0062869 |
| 2018–12 | D16 PIP Charts Dec–18 | Wyatt_DHS_2722107 |
| 2018–12 | 2018–12 Dec CW Monthly Progress Report | Wyatt_DHS_0030890 |
| 2018–12 | ORRAI Status Report | Wyatt_DHS_0047702 |
| 2018–12 | Caregiver Support Development Closing | Wyatt_DHS_0063099 |
| 2018–12 | D16 PIP Charts Dec–18 | Wyatt_DHS_1420882 |
| 2018–2019 | 2018–2019 Project–A–CW–Listening–Tour–Report | Wyatt_DHS_0062622 |
| 2018–2019 | P.R.I.D.E. ERG Annual Report (FY 2018–2019) | Wyatt_DHS_0894334 |

| DATE | Description | BATES NO. / DKT NO. |
|---|---|---|
| 2018–2019 | Oregon Child Abuse Hotline – Centralization Timeline | Wyatt_DHS_0062942 |
| 2019 February– March | D5 PIP Charts Feb–Mar19 | Wyatt_DHS_0708916 |
| 2019 January – 2020 April | Child Welfare Policy and Rule Releases_ recent changes | To produce |
| 2019 July | D6 PIP Charts Jul–19 | Wyatt_DHS_1987516 |
| 2019 May | D7 Coos Curry PIP charts May–19 | Wyatt_DHS_1983367 |
| 2019 Q1 | D2 Gresham Chart | Wyatt_DHS_1980226 |
| 2019 Q1 | D2 Midtown Chart | Wyatt_DHS_1422619 |
| 2019 Q1 | D5 Chart | Wyatt_DHS_0708916 |
| 2019 Q2 | D3 Chart | Wyatt_DHS_1982312 |
| 2019 Q2 | D3 Marion Chart | Wyatt_DHS_1982317 |
| 2019 Q2 | D3 Polk–Yamhill Chart | Wyatt_DHS_1982347 |
| 2019 Q2 | D7 Chart | Wyatt_DHS_1983367 |
| 2019 Q2 | D8 Grants Pass Chart | Wyatt_DHS_0712603 |
| 2019 Q2 | D8 Medford Chart | Wyatt_DHS_1431551 |
| 2019 Q2 | D10 Chart | Wyatt_DHS_1431607 |
| 2019 Q2 | D10 Chart | Wyatt_DHS_1983557 |
| 2019 Q2 | CFSR Statewide Review Ratings PIP Feb 2018–Mar 2019 | Wyatt_DHS_1981461 |
| 2019 Q3 | D2 Alberta Chart | Wyatt_DHS_1436053 |
| 2019 Q3 | D2 East Multnomah Chart | Wyatt_DHS_1436058 |
| 2019 Q3 | D4 Chart | Wyatt_DHS_0894878 |
| 2019 Q3 | D6 Chart | Wyatt_DHS_1987516 |
| 2019 Q3 | D11 Chart | Wyatt_DHS_1988568 |
| 2019 Q3 | D12 Chart | Wyatt_DHS_1987478 |
| 2019 Q3 | D13 Chart | Wyatt_DHS_1987498 |



| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2019 Q3 | 2019 Q3 CFSR Progress Report | Wyatt_DHS_0218981 |
| 2019 Q3 | SB 1515 DHS Substantiated Investigation Quarterly Report | Wyatt_DHS_2507699 |
| 2019 Q4 | D1 Chart | Wyatt_DHS_0290067 |
| 2019 Q4 | D9 Chart | Wyatt_DHS_1780097 |
| 2019 Q4 | D14 Chart | Wyatt_DHS_1780052 |
| 2019 Q4 | D15 Chart | Wyatt_DHS_0190465 |
| 2019 Q4 | D16 Chart | Wyatt_DHS_2699478 |
| 2019 Q4 | 2019 Q4 CFSR Ratings | Wyatt_DHS_0894878 |
| 2019 Q4 | SB 1515 DHS Substantiated Investigation Quarterly Report | Wyatt_DHS_2994122 |
| 2019 Q4 | CFSR Statewide Review Ratings Dec 2018–Nov 2019 | Wyatt_DHS_1990071 |
| 2019-01 | 2019-01 Jan Child Welfare Progress Report | Wyatt_DHS_0030902 |
| 2019-01 | CHAT News Winter 2019 ENGLISH | Wyatt_DHS_0061287 |
| 2019-01 | ORRAI Status Report | Wyatt_DHS_0047710 |
| 2019-01 | 2019-01 Using Predictive Analytics – Handout | Wyatt_DHS_0114379 |
| 2019-01 | D2 Gresham PIP Charts Jan–19 | Wyatt_DHS_1980226 |
| 2019-01 | D2 Midtown PIP Charts Jan–19 | Wyatt_DHS_1422619 |
| 2019-01 | Every Child Bi-Annual–Report | Wyatt_DHS_2845746 |
| 2019-02 | 2019-02 Feb Child Welfare Progress Report | Wyatt_DHS_0030915 |
| 2019-02 | 2019-02 ILP Family First | Wyatt_DHS_0063190 |
| 2019-02 | ORRAI Status Report | Wyatt_DHS_0047719 |
| 2019-02 | Temporary Lodging Placement Tracker Protocol | Wyatt_DHS_0060312 |
| 2019-02 | January–February Oregon Child Abuse Hotline Newsletter | Wyatt_DHS_0062876 |
| 2019-03 | 2019-03 March Child Welfare Progress Report | Wyatt_DHS_0030925 |
| 2019-03 | ORRAI Status Report | Wyatt_DHS_0047728 |
| 2019-03 | Caregiver Training Redesign Closing | Wyatt_DHS_0063102 |
| 2019-04 | 2019-04 April Child Welfare Progress Report | Wyatt_DHS_0030933 |

Exhibit 8
Page 254 of 390

PUBLIC
KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2019–04 | CHAT_News Spring 2019 ENGLISH | Wyatt_DHS_0061260 |
| 2019–04 | CHAT News Fall 2019 ENGLISH | To produce |
| 2019–04 | SOGIE Policy DRAFT | Wyatt_DHS_0170499 |
| 2019–04 | ORRAI Status Report | Wyatt_DHS_0047737 |
| 2019–04 | 2019–04 Longitudinal–Dataset Infographic Pg1 v2040119 | Wyatt_DHS_0124654 |
| 2019–04 | ORRAI Safety After Substantiated Allegation | Wyatt_DHS_0275957 |
| 2019–04 | DHS Internal Assessment | Wyatt_DHS_0219520 |
| 2019–04 | ORCAH Monthly Assignment and Workload Data April 2019 | Wyatt_DHS_2205523 |
| 2019–04 | 60–Day Action Plan Summary – Serving Youth in Oregon | Wyatt_DHS_0062543 |
| 2019–04 | D3 Marion PIP Charts Apr–19 | Wyatt_DHS_1982317 |
| 2019–04 | D3 Polk Yamhill PIP Charts Apr–19 | Wyatt_DHS_1982347 |
| 2019–04 | April Oregon Child Abuse Hotline Newsletter | Wyatt_DHS_0062867 |
| 2019–04 | ORCAH Monthly Assignment and Workload Data | Wyatt_DHS_0895440 |
| 2019–05 | Identifying Capacity Needs for Children within the Oregon Child Welfare System | Wyatt_DHS_0047768 |
| 2019–05 | 2018 Child Welfare Data Book | Wyatt_DHS_0063474 |
| 2019–05 | 2019–05 Identifying Capacity Needs for Children within the Oregon Child Welfare System | Wyatt_DHS_0047768 |
| 2019–05 | Child Welfare Closing Report for the 60–Day Action Plan | Wyatt_DHS_0062542 |
| 2019–06 | 2020–2024 CFSP All Attachments (https://www.oregon.gov/odhs/data/cwdata/cw–cfsp–2020–2024.pdf) | Publicly available |
| 2019–06 | 2020–2024 CFSP | Wyatt_DHS_1289653 |
| 2019–06 | 2019–06 June Child Welfare Progress Report | Wyatt_DHS_2207500 |
| 2019–06 | ORRAI Status Report | Wyatt_DHS_0047737 |
| 2019–06 | Multi–Agency Behavior Rehabilitation Services (BRS) Guide | Wyatt_DHS_0056857 |
| 2019–06 | D8– Grants Pass PIP Charts June–19 | Wyatt_DHS_0712603 |

PUBLIC KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2019–06 | D8– Medford PIP Charts June–19 | Wyatt_DHS_1431551 |
| 2019–06 | CW Outcomes Scorecard by County | To produce |
| 2019–06 | SOS Audit Recommendation Follow-up Report | Wyatt_DHS_1323886 |
| 2019–07 | BRS–Non–BRS–Programs–Map | Wyatt_DHS_0063541 |
| 2019–07 | 2019–07 July Child Welfare Progress Report | Wyatt_DHS_2206651 |
| 2019–07 | CWOB Training Slide | Wyatt_DHS_0134683 |
| 2019–07 | Surge Hire Documents for CWOB Meeting July 17 | Wyatt_DHS_1950790 |
| 2019–07 | 2019–07 CW–Community–Partnerships | Wyatt_DHS_0114670 |
| 2019–07 | 2019–07 Recruit Retain Foster Parents Market Segmentation | Wyatt_DHS_0114802 |
| 2019–07 | CW–Community–Partnerships | Wyatt_DHS_0114670 |
| 2019–07 | Race and Racism resources for caregivers | To produce |
| 2019–07 | Safety at Reunification Research Brief | Wyatt_DHS_0126066 |
| 2019–07 | DHS Platform For Success Research | Wyatt_DHS_2259321 |
| 2019–07 | Safety-at-Screening-Research-Brief-v1 | Wyatt_DHS_0132915 |
| 2019–08 | 2019–08 August Child Welfare Progress Report | Wyatt_DHS_0057562 |
| 2019–08 | 2019–09 September Child Welfare Progress Report | Wyatt_DHS_0057571 |
| 2019–08 | ORRAI Status Report | Wyatt_DHS_0047747 |
| 2019–08 | Joint Plan to Develop In–State Capacity and Minimize OOS Placements of Children Leg Report | Wyatt_DHS_0062551 |
| 2019–08 | D4 PIP Charts Aug–19 | Wyatt_DHS_0894878 |
| 2019–08 | Oregon Child Abuse Hotline Annual Report from 2018–2019 | Wyatt_DHS_1948650 |
| 2019–08 to 2020–12 | ORCAH Annual Report | Wyatt_DHS_2694352 |
| 2019–09 | G18b Data–2019 Sept CW Monthly Report | Wyatt_DHS_0134945 |
| 2019–09 | Family First Readiness Assessment, Planning and Initial Implementation | Wyatt_DHS_0793950 |
| 2019–09 | ORRAI Status Report | Wyatt_DHS_0795758 |

Exhibit 8
Page 256 of 390



| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2019–09 | 2019–09 CP3 Achieving Permanency – ORRAI Project Status Report | Wyatt_DHS_0126910 |
| 2019–09 | ORRAI Reforming OR's Child–Welfare System | To produce |
| 2019–09 | D2 Alberta PIP Charts Sep–19 | Wyatt_DHS_1436053 |
| 2019–09 | D2 East PIP Charts Sep–19 | Wyatt_DHS_1436058 |
| 2019–09 | Child Welfare Training Plan Overview | Wyatt_DHS_0134025 |
| 2019–09 | Balance Scorecard Pre–Rollout re Hotline Calls | Wyatt_DHS_2431668 |
| 2019–09 | Family First – Senate Human Services | Wyatt_DHS_0056465 |
| 2019–10 | CP3 Achieving Permanency – ORRAI Project Status Report | Wyatt_DHS_1435942 |
| 2019–10 | CP3 Summary of Preliminary Learnings (Marion County Pilot) | Wyatt_DHS_0128436 |
| 2019–10 | 2019–10 October Child Welfare Progress Report | Wyatt_DHS_0115286 |
| 2019–10 | Child Welfare Organizational Structure | Wyatt_DHS_0130491 |
| 2019–10 | Cap29–Pilot Concept Facilitated Rapid Access and Holistic Mental Health Services in BRS | Wyatt_DHS_0133401 |
| 2019–10 | Cap33–WorkstreamCharter_FacilitatedMHandSARapidAccessinBRS8–10–19WS | Wyatt_DHS_0133415 |
| 2019–10 | Temporary Lodging Update Mid–Point Progress DRAFT | Wyatt_DHS_1906608 |
| 2019–10 | D14 PIP Charts Oct–19 | Wyatt_DHS_2265734 |
| 2019–10 | CW041 Staff Engagement Survey – Retention Status Report | Wyatt_DHS_0224322 |
| 2019–11 | 2019–11 November | Wyatt_DHS_0140522 |
| 2019–11 | ORRAI Status Report | Wyatt_DHS_1492608 |
| 2019–11 | D15 PIP Charts Nov–19 | Wyatt_DHS_0190465 |
| 2019–11 | D9 PIP Charts Nov–19 | Wyatt_DHS_1780097 |
| 2019–11 | Draft Oregon's Title IV–E Prevention Plan (not submitted to feds yet) | Wyatt_DHS_1745489 |
| 2019–12 | D16 PIP Charts Dec–19 | Wyatt_DHS_2722102 |



| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2019–12 | 2019–12 December Child Welfare Progress Report | Wyatt_DHS_0170331 |
| 2019–12 | Child Welfare Organizational Structure | Wyatt_DHS_0130491 |
| 2019–12 | ORRAI Status Report | Wyatt_DHS_2673724 |
| 2019–12 | D16 PIP Charts Dec–19 | Wyatt_DHS_2699478 |
| 2019–12 | CW Outcomes Scorecard by County | To produce |
| 2019–2020 | P.R.I.D.E. ERG Annual Report (FY 2019–2020) | Wyatt_DHS_2836500 |
| 2019–2020 | 2019–2020 Annual Planning Document (APD) Submission for the OR–Kids Application | Wyatt_DHS_0114884 |
| 2019–2020 | ORCAH Annual Report | Wyatt_DHS_2694352 |
| 2019–2021 | 2019–21 Biennium Budget Major Actions | Wyatt_DHS_0223054 |
| 2019–2021 | 2019–21 Biennium Budget Overview | Wyatt_DHS_0223062 |
| 2019–2021 | 2019–21 DHS Budget Wrap–up | Wyatt_DHS_0790191 |
| 2020 February–March | D5 PIP Charts Feb–Mar 2020 | Wyatt_DHS_2699537 |
| 2020–07 | D6 PIP Charts Jul–20 | Wyatt_DHS_3063017 |
| 2020–5 | D7 PIP Charts May–20 | Wyatt_DHS_2699627 |
| 2020 Q1 | D2 Gresham Chart | Wyatt_DHS_2699505 |
| 2020 Q1 | D2 Midtown Chart | Wyatt_DHS_2699531 |
| 2020 Q1 | D5 Chart | Wyatt_DHS_2703929 |
| 2020 Q2 | D3 Marion Chart | Wyatt_DHS_2699602 |
| 2020 Q2 | D3 Polk–Yamhill Chart | Wyatt_DHS_2699590 |
| 2020 Q2 | D7 Chart | Wyatt_DHS_2699627 |
| 2020 Q2 | D8 Grants Pass Chart | Wyatt_DHS_2699684 |
| 2020 Q2 | D8 Medford Chart | Wyatt_DHS_2699689 |
| 2020 Q2 | D10 Chart | Wyatt_DHS_2699632 |
| 2020 Q3 | D2 Alberta Chart | Wyatt_DHS_2703983 |
| 2020 Q3 | D2 East Multnomah Chart | Wyatt_DHS_2704025 |

PUBLIC
KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2020 Q3 | D4 Chart | Wyatt_DHS_2699537 |
| 2020 Q3 | D6 Chart | Wyatt_DHS_2699745 |
| 2020 Q3 | D11 Chart | Wyatt_DHS_2703955 |
| 2020 Q3 | D12 Chart | Wyatt_DHS_2699760 |
| 2020 Q3 | D13 Chart | Wyatt_DHS_2699742 |
| 2020 Q4 | D1 Chart | Wyatt_DHS_2704053 |
| 2020 Q4 | D9 Chart | Wyatt_DHS_2704253 |
| 2020 Q4 | D14 Chart | Wyatt_DHS_2704058 |
| 2020 Q4 | D15 Chart | Wyatt_DHS_2704105 |
| 2020 Q4 | D16 Chart | Wyatt_DHS_2704263 |
| 2020 Q7 | 2020 Q7 CFSR Progress Report | Wyatt_DHS_2688751 |
| 2020-01 | CCWIS Technology Roadmap | Wyatt_DHS_2689911 |
| 2020-01 | 2020-01 January Child Welfare Progress Report | Wyatt_DHS_0181013 |
| 2020-01 | CHAT News Winter 2020 ENGLISH | To produce |
| 2020-01 | 2020-01 Oregon Foster Youth Connection – ILP Participation Makes a Difference for Oregon Foster Youth | Wyatt_DHS_0181051 |
| 2020-01 | D2 Gresham PIP Charts Jan-20 | Wyatt_DHS_2699505 |
| 2020-01 | D2 Midtown PIP Charts Jan-20 | Wyatt_DHS_1422619 |
| 2020-01 | SSA & SSS1 Pretraining Activities | Wyatt_DHS_0223326 |
| 2020-02 | IFF Combined | Wyatt_DHS_2709638 |
| 2020-02 | 2020-02 February Child Welfare Progress Report | Wyatt_DHS_1901090 |
| 2020-02 | Oregon DHS Phase IV  Transition Requirements Summary | Wyatt_DHS_0133082 |
| 2020-02 | SOS OR-Kids Audit and Response | Wyatt_DHS_0180979 |
| 2020-03 | In-Home Safety Plan Example | To produce |
| 2020-03 | 2020-03 March Child Welfare Progress Report | Wyatt_DHS_1901102 |
| 2020-03 | ORRAI Status Report | Wyatt_DHS_2673741 |

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2020–03 | CM.02 Placement Type (of those in care) – report run from public ROM website | To produce |
| 2020–03 | CW Outcomes Scorecard by County | To produce |
| 2020–04 | 2020–04 April Child Welfare Progress Report | Wyatt_DHS_2675636 |
| 2020–04 | CHAT News Spring 2020 ENGLISH | To produce |
| 2020–04 | CW Engagement Survey Wave 8 Highlights–Apr20DRAFT v1 | Wyatt_DHS_4567190 |
| 2020–04 | ORRAI Status Report | Wyatt_DHS_2673762 |
| 2020–04 | CV01 Caseworker Face-to-Face Contact–of mos child in care entire month | To produce |
| 2020–04 | KEEP Oregon Implementation Report April | Wyatt_DHS_2689327 |
| 2020–04 | OR.01 Child Abuse Neglect Reports Per Investigation, by Screening Decision – report run from public ROM website | To produce |
| 2020–04 | D3 Marion PIP Charts Apr–20 | Wyatt_DHS_2699602 |
| 2020–04 | D3 Polk Yamhill PIP Charts Apr–20 | Wyatt_DHS_2699590 |
| 2020–04 | Court Operations (CJO 20–006) | Wyatt_DHS_2754654 |
| 2020–04 | DHS Facilitating Inclusive Virtual Meetings | Wyatt_DHS_2691445 |
| 2020–04 | ODHS Maintaining Contact with Children in our Community Website | Publicly available |
| 2020–04 | DHS Certification Work | Wyatt_DHS_2807382 |
| 2020–04 | DHS Child Safety Work | Wyatt_DHS_3082446 |
| 2020–05 | Fidelity Report D1 FINAL | Wyatt_DHS_3049378 |
| 2020–05 | Fidelity Report D10 FINAL | Wyatt_DHS_3050086 |
| 2020–05 | Fidelity Report D11 FINAL | Wyatt_DHS_3049697 |
| 2020–05 | Fidelity Report D12 FINAL | Wyatt_DHS_3049952 |
| 2020–05 | Fidelity Report D13 FINAL | Wyatt_DHS_3050998 |
| 2020–05 | Fidelity Report D14 FINAL | Wyatt_DHS_3051027 |
| 2020–05 | Fidelity Report D15 FINAL | Wyatt_DHS_3050309 |
| 2020–05 | Fidelity Report D16 FINAL | Wyatt_DHS_3050056 |

PUBLIC KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|---|---|---|
| 2020–05 | Fidelity Report D2 FINAL | Wyatt_DHS_3049407 |
| 2020–05 | Fidelity Report D3 FINAL | Wyatt_DHS_3049439 |
| 2020–05 | Fidelity Report D4 FINAL | Wyatt_DHS_3049786 |
| 2020–05 | Fidelity Report D5 FINAL | Wyatt_DHS_3050387 |
| 2020–05 | Fidelity Report D6 FINAL | Wyatt_DHS_3050151 |
| 2020–05 | Fidelity Report D7 FINAL | Wyatt_DHS_3050704 |
| 2020–05 | Fidelity Report D8 FINAL | Wyatt_DHS_3050808 |
| 2020–05 | Fidelity Report D9 FINAL | Wyatt_DHS_3050729 |
| 2020–05 | 2020–05 May Child Welfare Progress Report | Wyatt_DHS_2675647 |
| 2020–05 | SEIU Dashboard Monthly Personnel and Position Data Report – Draft V2 | Wyatt_DHS_2675737 |
| 2020–05 | Cap28– Legislative Update SB 171 WS | Wyatt_DHS_0133397 |
| 2020–06 | 2020–06 June Child Welfare Progress Report | Wyatt_DHS_2696501 |
| 2020–06 | 2019 Child Welfare Data Book | Wyatt_DHS_2675692 |
| 2020–06 | CW Engagement Survey Project Update– v1 | To produce |
| 2020–06 | D8 Grants Pass PIP Charts Jun20 | Wyatt_DHS_2699684 |
| 2020–06 | D8 Medford PIP Charts Jun20 | Wyatt_DHS_2699689 |
| 2020–06 | QRTP Provider Map | Wyatt_DHS_2675791 |
| 2020–06 | Oregon–DHS–Child–Welfare–Procedure–Manual | Wyatt_DHS_2673813 |
| 2020–06 | OR SOS Audit 2020–21 and Response | Wyatt_DHS_2948839 |
| 2020–07 | Child Welfare Project Portfolio Report | Wyatt_DHS_2688097 |
| 2020–07 | 2020–07 July Child Welfare Progress Report | Wyatt_DHS_2688104 |
| 2020–07 | CHAT News Summer 2019 ENGLISH | Wyatt_DHS_0061268 |
| 2020–07 | KEEP OR Quarterly Report July 2020 | Wyatt_DHS_2688109 |
| 2020–08 | August 2020 Education Guidance | Wyatt_DHS_2699715 |
| 2020–08 | 2020–08 CW Monthly Progress Report | Wyatt_DHS_2689004 |
| 2020–08 | ORRAI Status Report | Wyatt_DHS_2689151 |

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2020-08 | D4 PIP Charts Aug-20 | Wyatt_DHS_2703929 |
| 2020-09 | CW Monthly Progress Report, Sept 2020 | Wyatt_DHS_2689239 |
| 2020-09 | ORRAI Update, Sept 2020 | Wyatt_DHS_2845697 |
| 2020-09 | ODHS Executive Summary 2020 – Reporting Recommendations | Wyatt_DHS_2711237 |
| 2020-09 | Education Tool kit for RPs | Wyatt_DHS_2709093 |
| 2020-09 | September 2020 Foster Plus Report | Wyatt_DHS_2703925 |
| 2020-09 | ORRAI Status Report | Wyatt_DHS_2690480 |
| 2020-09 | D2 Alberta PIP Charts Sep-20 | Wyatt_DHS_2703983 |
| 2020-09 | D2 East PIP Charts Sep-20 | Wyatt_DHS_2704025 |
| 2020-10 | CW Monthly Progress Report, Oct 2020 | Wyatt_DHS_2690475 |
| 2020-10 | D14 PIP Charts Oct-20 | Wyatt_DHS_3063003 |
| 2020-11 | Presentation to Childrens Cabinet re Family First Title IV-E Prevention Plan | Wyatt_DHS_2690750 |
| 2020-11 | Vision for Transformation | Wyatt_DHS_2709455 |
| 2020-11 | D9 Debrief Summary Document | Wyatt_DHS_2721468 |
| 2020-11 | D9 PIP Charts | Wyatt_DHS_2721477 |
| 2020-11 | D15 PIP Charts Nov-20 | Wyatt_DHS_2704105 |
| 2020-11 | D9 PIP Charts Nov-20 | Wyatt_DHS_2721477 |
| 2020-11 | Q8 OR PIP Final Progress Report | Wyatt_DHS_2690783 |
| 2020-12 | D16 PIP Charts Dec-20 | Wyatt_DHS_2722097 |
| 2020-12 | D16 PIP Charts Dec-20 | Wyatt_DHS_2704263 |
| 2021 July | D6 CFSR Charts Jul-21 | Wyatt_DHS_2710544 |
| 2021 March | D5 PIP Charts Mar-21 | Wyatt_DHS_2709488 |
| 2021 May | D7 CQI Charts May-21 | Wyatt_DHS_2709646 |
| 2021 Q1 | D2 Gresham Chart | Wyatt_DHS_2709323 |
| 2021 Q1 | D2 Midtown Chart | Wyatt_DHS_2709382 |
| 2021 Q1 | D5 Chart | Wyatt_DHS_2709488 |

**PUBLIC KNOWLEDGE**

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2021 Q2 | D3 Marion Chart | Wyatt_DHS_2709590 |
| 2021 Q2 | D7 Chart | Wyatt_DHS_2709646 |
| 2021 Q2 | D8 Grants Pass Chart | Wyatt_DHS_2710220 |
| 2021 Q2 | D8 Medford Chart | Wyatt_DHS_2710240 |
| 2021 Q2 | D10 Chart | Wyatt_DHS_2709616 |
| 2021 Q3 | D2 Alberta Chart | Wyatt_DHS_2721633 |
| 2021 Q3 | D6 Chart | Wyatt_DHS_2710544 |
| 2021 Q3 | D11 Chart | Wyatt_DHS_2721571 |
| 2021 Q3 | D12 Chart | Wyatt_DHS_2710587 |
| 2021 Q3 | D13 Chart | Wyatt_DHS_2710549 |
| 2021 Q4 | D1 Chart | Wyatt_DHS_2721692 |
| 2021 Q4 | D9 Chart | Wyatt_DHS_2721822 |
| 2021 Q4 | D14 Chart | Wyatt_DHS_2721697 |
| 2021 Q4 | D15 Chart | Wyatt_DHS_2721872 |
| 2021 Q4 | D16 Chart | Wyatt_DHS_2721961 |
| 2021–01 | Every Child Q1 2021 Bi–Annual Report | Wyatt_DHS_2697151 |
| 2021–01 | D2 Gresham PIP Charts Jan–21 | Wyatt_DHS_2709323 |
| 2021–01 | D2 Midtown PIP Charts Jan–21 | Wyatt_DHS_2709382 |
| 2021–03 | ODHS Back to School Guidance Update March 2021 | Wyatt_DHS_2709450 |
| 2021–04 | Barriers during COVID for foster care letter | Wyatt_DHS_2716952 |
| 2021–04 | D3 Marion CFSR Charts Apr21 Updated 41122 | Wyatt_DHS_2709590 |
| 2021–04 | D4 CFSR Charts Aug21 Updated 41122 | Wyatt_DHS_2729883 |
| 2021–05 | Fidelity Statewide Report | Wyatt_DHS_3227252 |
| 2021–05 | Fidelity Comparison Report | Wyatt_DHS_3227285 |
| 2021–06 | D8 Grants Pass Charts Jun–21 | Wyatt_DHS_2710220 |
| 2021–06 | D8 Medford Charts Jun–21 | Wyatt_DHS_2710240 |
| 2021–07 | Champion Team Statewide Monthly Report Final | Wyatt_DHS_2715802 |

**PUBLIC KNOWLEDGE**®

| DATE | Description | BATES NO. / DKT NO. |
|---|---|---|
| 2021–08 | Statewide Retention Recruitment Summaries Aug 2021 | Wyatt_DHS_2710344 |
| 2021–08 | D11 CFSR Charts Aug–21pdf | Wyatt_DHS_2721571 |
| 2021–08 | District 11 Debrief Summary Document | Wyatt_DHS_2721560 |
| 2021–09 | Alberta Debrief Summary Document | Wyatt_DHS_2721650 |
| 2021–09 | D2 Alberta CFSR Charts | Wyatt_DHS_2721633 |
| 2021–09 | D2 Alberta CFSR Charts Sep–21 | Wyatt_DHS_2721633 |
| 2021–09 | D2 East CFSR Charts Sep–21 | To produce |
| 2021–10 | D1 CFSR Charts Oct–21pdf | Wyatt_DHS_2721692 |
| 2021–10 | District 1 2021 Debrief Summary Document | Wyatt_DHS_2721711 |
| 2021–10 | D14 CFSR Charts Oct–21pdf | Wyatt_DHS_2721697 |
| 2021–10 | District 14 2021 Debrief Summary Document | Wyatt_DHS_2721702 |
| 2021–11 | Fidelity Statewide Report | Wyatt_DHS_3227923 |
| 2021–11 | Fidelity Comparison Report | Wyatt_DHS_3227857 |
| 2021–11 | D9 CFSR Charts | Wyatt_DHS_2721822 |
| 2021–11 | District 9 2021 Debrief Summary Document | Wyatt_DHS_2721827 |
| 2021–11 | D15 CFSR Charts Nov–21pdf | Wyatt_DHS_2721872 |
| 2021–11 | District 15 2021 Debrief Summary | Wyatt_DHS_2721836 |
| 2021–11 | D15 CFSR Charts Nov–21 | Wyatt_DHS_2721872 |
| 2021–11 | D9 CFSR Charts Nov–21 | Wyatt_DHS_2721822 |
| 2021–12 | Temporary Lodging draft dashboard | Wyatt_DHS_2711656 |
| 2021–12 | D16 2021 Debrief Summary Document | Wyatt_DHS_2722056 |
| 2021–12 | D16 2021 Debrief Summary Document | Wyatt_DHS_2721966 |
| 2021–12 | D16 CFSR Charts | Wyatt_DHS_2721961 |
| 2021–12 | D16 CFSR Charts Dec–21 | Wyatt_DHS_2721961 |
| 2021–12 | CW Monthly Progress Report, Dec 2021 | Wyatt_DHS_2716739 |
| 2021–2022 | CCWIS Automated Function Checklist 2021–22 | Wyatt_DHS_2711268 |

PUBLIC
KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2022 February– March | D5 CFSR Charts Feb–Mar22 | Wyatt_DHS_2729888 |
| 2022 Q1 | CFSR Review Ratings 2016 vs 2021 Chart | Wyatt_DHS_2729837 |
| 2022 Q1 | CFSR Review Ratings 2016 vs 2021 | Wyatt_DHS_2729838 |
| 2022–01 | ODHS News – Program division leadership updates | To produce |
| 2022–01 | D2 Gresham CFSR Charts | Wyatt_DHS_2722205 |
| 2022–01 | D2 Midtown CFSR Charts Jan–22docx | Wyatt_DHS_2722272 |
| 2022–01 | Midtown Debrief Document | Wyatt_DHS_2722259 |
| 2022–01 | D2 Gresham CFSR Charts Jan–22 | Wyatt_DHS_2722205 |
| 2022–01 | D2 Midtown CFSR Charts Jan–22 | Wyatt_DHS_2729868 |
| 2022–01 | CW Monthly Progress Report, Jan 2022 | Wyatt_DHS_2721125 |
| 2022–01 | DHS CW Vision for Transformation 2021 Year in Review | Wyatt_DHS_2952753 |
| 2022–01 | Resource Family Retention and Recruitment Statewide Recap Report Jan 2022 | Wyatt_DHS_2721293 |
| 2022–01 | OHA Res Youth Program Testing Guidance | Wyatt_DHS_2727249 |
| 2022–02 | CW Monthly Report for February 2022 | Wyatt_DHS_2781206 |
| 2022–02 | Gresham Debrief Summary Document | Wyatt_DHS_2722208 |
| 2022–02 | D5 CFSR Charts Feb–Mar22 | Wyatt_DHS_2729888 |
| 2022–02 | Oregon DHS Child Welfare Procedure Manual | Wyatt_DHS_2718760 |
| 2022–03 | Child Protective Services Supervisor Toolkit Draft v1 | To produce |
| 2022–03 | CW Monthly Progress Report, March 2022 | Wyatt_DHS_2722460 |
| 2022–04 | CW Monthly Progress Report, April 2022 | Wyatt_DHS_2729630 |
| 2022–04 | D3 Marion CFSR Charts | Wyatt_DHS_2966419 |
| 2022–04 | D3 Polk–Yamhill CFSR Charts | Wyatt_DHS_2730085 |
| 2022–04 | CW Monthly Progress Report, April 2022 | Wyatt_DHS_2729630 |
| 2022–04 | D3 Marion CFSR Charts Apr–22 | Wyatt_DHS_2730090 |

# PUBLIC KNOWLEDGE®

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| 2022–04 | D3 Polk–Yamhill CFSR Charts Apr–22 | Wyatt_DHS_2730085 |
| 2022–05 | Spring 2022 ORCAH Newsletter (https://sharedsystems.dhsoha.state.or.us/DHSForms/Served/de4271.pdf) | Publicly available |
| 2022–05 | CW Monthly Progress Report, May 2022 | Wyatt_DHS_2730154 |
| 2022–08 | 2022 Training Matrix Redesign | Wyatt_DHS_4564347 |
| 2022–12 | CW Monthly Progress Report, Dec 2022 | Wyatt_DHS_4564523 |
| 2022–23 | 34 FY CAPTA Citizen Review Panel Report | Wyatt_DHS_4466603 |
| 2023–01 | CW Monthly Progress Report, Jan 2023 | Wyatt_DHS_4564543 |
| 2023–02 | CW Monthly Progress Report, Feb 2023 | Wyatt_DHS_4564563 |
| 2023–03 | CW Monthly Progress Report, March 2023 | Wyatt_DHS_4564585 |
| 2023–04 | CW Monthly Progress Report, April 2023 | Wyatt_DHS_4564607 |
| 2023–05 | CW Monthly Progress Report, May 2023 | Wyatt_DHS_4564629 |
| 2023–06 | CW Monthly Progress Report, June 2023 | Wyatt_DHS_4564651 |
| 2023–08 | CW Monthly Progress Report, August 2023 | Wyatt_DHS_4665916 |
| 2023–09 | CW Monthly Progress Report, September 2023 | Wyatt_DHS_4665979 |
| 2023–10 | CW Monthly Progress Report, October 2023 | Wyatt_DHS_4666015 |
| May 2022–Sept 2023 | Child Specific Caregiver Supports Pilot Final Combined Data Report | To produce |
| NA | OAR 413–120–0800 to 413–120–0880 Disruption | Publicly available |
| NA | OAR 413–130–0020 Post Adoption Services | Publicly available |
| NA | ORS 418.270 Surrender of Child to CCA, consent to adoption | Publicly available |
| NA | Web – State of Oregon_ Policy Offices – Child Foster Care Advisory Commission (https://www.oregon.gov/gov/policies/Pages/child–foster–care–advisory–commission.aspx) | Publicly available |
| NA | ORS 418/575 to 418.598 re SPRF | Wyatt_DHS_2502746 |

**PUBLIC KNOWLEDGE**

| DATE | Description | BATES NO. / DKT NO. |
|------|-------------|---------------------|
| NA | About DHS – Foster Care Ombudsman (https://www.oregon.gov/odhs/about/pages/foster-care-ombuds.aspx#:~:text=Foster%20Care%20Ombuds,of%20the%20Governor's%20Advocacy%20Office.) | Publicly available |
| NA | About DHS – Governor's Advocacy Office (https://www.oregon.gov/odhs/about/Pages/gao.aspx) | Publicly available |
| NA | An Overview of DHS Teen Services Booklet | To produce |

# Appendix E: Survey Results

# Q1 How long have you worked at DHS?

Answered: 958   Skipped: 0



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| 0-2 years | 26.10% | 250 |
| 3-5 years | 24.74% | 237 |
| 6-10 years | 18.48% | 177 |
| 11-15 years | 11.27% | 108 |
| 16-20 years | 7.52% | 72 |
| Over 20 years | 11.90% | 114 |
| TOTAL | | 958 |

Exhibit 8
Page 269 of 390

## Q2 What district do you work in?

Answered: 958   Skipped: 0



Exhibit 8
Page 270 of 390

| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| 1 | 4.91% | 47 |
| 2 | 11.48% | 110 |
| 3 | 9.08% | 87 |
| 4 | 5.95% | 57 |
| 5 | 11.17% | 107 |
| 6 | 5.85% | 56 |
| 7 | 4.07% | 39 |
| 8 | 7.93% | 76 |
| 9 | 1.57% | 15 |
| 10 | 3.97% | 38 |
| 11 | 3.55% | 34 |
| 12 | 3.24% | 31 |
| 13 | 1.88% | 18 |
| 14 | 2.92% | 28 |
| 15 | 5.01% | 48 |
| 16 | 7.72% | 74 |
| Central Office | 9.71% | 93 |
| TOTAL | | 958 |

Exhibit 8
Page 271 of 390

# Q3 What is your role at DHS?

Answered: 958  Skipped: 0



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Manager | 6.58% | 63 |
| Supervisor | 8.77% | 84 |
| Field Staff | 74.22% | 711 |
| Central Office | 6.16% | 59 |
| Consultant | 4.28% | 41 |
| TOTAL | | 958 |

Exhibit 8
Page 272 of 390

# Q4 Does CW address safety threats and safety concerns of children in their homes?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 71.48% | 396 |
| Sometimes | 28.34% | 157 |
| Never | 0.18% | 1 |
| TOTAL | | 554 |

Exhibit 8
Page 273 of 390

# Q5 Does CW assess safety threats and safety concerns of children in substitute care?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 72.38% | 401 |
| Sometimes | 27.08% | 150 |
| Never | 0.54% | 3 |
| TOTAL | | 554 |

Exhibit 8
Page 274 of 390

# Q6 Does CW address safety threats and safety concerns of children in substitute care?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 69.49% | 385 |
| Sometimes | 29.96% | 166 |
| Never | 0.54% | 3 |
| TOTAL | | 554 |

Exhibit 8
Page 275 of 390

# Q7 Does CW maintain the confidentiality of reports of abuse in care?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 77.98% | 432 |
| Sometimes | 21.12% | 117 |
| Never | 0.90% | 5 |
| TOTAL | | 554 |

Exhibit 8
Page 276 of 390

# Q8 Is the process of responding to allegations of abuse and neglect regarding children in substitute care clear?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 66.25% | 367 |
| I'm not sure | 23.65% | 131 |
| No | 10.11% | 56 |
| TOTAL | | 554 |

Exhibit 8
Page 277 of 390

# Q9 Is the process of responding to allegations of abuse and neglect regarding children in substitute care understandable:

Answered: 554    Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 69.68% | 386 |
| I'm not sure | 22.20% | 123 |
| No | 8.12% | 45 |
| TOTAL | | 554 |

Exhibit 8
Page 278 of 390

# Q10 Does CW standardize the response to allegations of maltreatment for children in substitute care?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 49.82% | 276 |
| I'm not sure | 36.46% | 202 |
| No | 13.72% | 76 |
| TOTAL | | 554 |

Exhibit 8
Page 279 of 390

# Q11 Has CW standardized the protocol for "closed at screening"?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 27.44% | 152 |
| I'm not sure | 52.35% | 290 |
| No | 20.22% | 112 |
| TOTAL | | 554 |

Exhibit 8
Page 280 of 390

# Q12 Does CW ensure that requirements (agency policies, legal regulations, or laws) are met when recruiting, certifying, and monitoring foster parents?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 62.64% | 347 |
| Sometimes | 36.82% | 204 |
| Never | 0.54% | 3 |
| TOTAL | | 554 |

Exhibit 8
Page 281 of 390

# Q13 Does CW comply with federal background check requirements during certification of substitute care providers?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 86.82% | 481 |
| Sometimes | 12.82% | 71 |
| Never | 0.36% | 2 |
| TOTAL | | 554 |

Exhibit 8
Page 282 of 390

# Q14 Does CW comply with federal background check requirements during oversight of substitute care providers?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 80.14% | 444 |
| Sometimes | 19.31% | 107 |
| Never | 0.54% | 3 |
| TOTAL | | 554 |

Exhibit 8
Page 283 of 390

# Q15 Does CW leadership advocate for safety for children under CW supervision?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 73.10% | 405 |
| Sometimes | 25.99% | 144 |
| Never | 0.90% | 5 |
| TOTAL | | 554 |

Exhibit 8
Page 284 of 390

# Q16 Has the organizational culture of CW improved during the tenure of Rebecca Jones Gaston?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 27.98% | 155 |
| I'm not sure | 53.25% | 295 |
| No | 18.77% | 104 |
| TOTAL | | 554 |

Exhibit 8
Page 285 of 390

## Q17 Do you believe that CW leadership pursues appropriate policy changes to improve child protection?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 30.32% | 168 |
| Sometimes | 64.80% | 359 |
| Never | 4.87% | 27 |
| TOTAL | | 554 |

Exhibit 8
Page 286 of 390

# Q18 Does CW respond according to policies and procedures to maltreatment reports from children in substitute care?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 62.27% | 345 |
| Sometimes | 37.18% | 206 |
| Never | 0.54% | 3 |
| TOTAL | | 554 |

Exhibit 8
Page 287 of 390

# Q19 Does CW engage in continuous quality improvement processes at the state level?



Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 38.81% | 215 |
| Sometimes | 57.04% | 316 |
| Never | 4.15% | 23 |
| TOTAL | | 554 |

Exhibit 8
Page 288 of 390

# Q20 Does CW engage in continuous quality improvement processes at the district level?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 38.99% | 216 |
| Sometimes | 54.15% | 300 |
| Never | 6.86% | 38 |
| TOTAL | | 554 |

Exhibit 8
Page 289 of 390

# Q21 Does CW engage in continuous quality improvement processes at the county level?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 37.00% | 205 |
| Sometimes | 54.87% | 304 |
| Never | 8.12% | 45 |
| TOTAL | | 554 |

Exhibit 8
Page 290 of 390

# Q22 Does CW use the evaluations of the quality of services to improve service delivery to families?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 30.32% | 168 |
| Sometimes | 59.39% | 329 |
| Never | 10.29% | 57 |
| TOTAL | | 554 |

Exhibit 8
Page 291 of 390



# Q23 Does CW provide training and coaching for staff on how to use data to drive decisions and improve quality of services?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 32.13% | 178 |
| I'm not sure | 36.82% | 204 |
| No | 31.05% | 172 |
| TOTAL | | 554 |

Exhibit 8
Page 292 of 390

# Q24 Does CW recruit and retain foster parents who are able to meet the identified needs of children in foster care?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 20.40% | 113 |
| Sometimes | 74.19% | 411 |
| Never | 5.42% | 30 |
| TOTAL | | 554 |

Exhibit 8
Page 293 of 390

## Q25 Does CW recruit and retain appropriate child-specific providers, including kith and kin, to care for the number of children who need such placements?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 31.77% | 176 |
| Sometimes | 64.98% | 360 |
| Never | 3.25% | 18 |
| TOTAL | | 554 |

Exhibit 8
Page 294 of 390

## Q26 Does CW maintain an appropriate number of foster homes to house the number of children who need to be placed in foster care?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 8.66% | 48 |
| Sometimes | 47.83% | 265 |
| Never | 43.50% | 241 |
| TOTAL | | 554 |

Exhibit 8
Page 295 of 390

# Q27 Does CW conduct Diligent Recruitment (the process of recruiting, retaining, and supporting foster families that reflect the ethnicity and race of children in substitute care) of foster care providers?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 18.59% | 103 |
| I'm not sure | 56.14% | 311 |
| No | 25.27% | 140 |
| TOTAL | | 554 |

Exhibit 8
Page 296 of 390

# Q28 Does CW recruit and retain substitute care providers who can care for children who identify as LGBTQIA+?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 17.15% | 95 |
| Sometimes | 73.10% | 405 |
| Never | 9.75% | 54 |
| TOTAL | | 554 |

Exhibit 8
Page 297 of 390

# Q29 Does CW recruit and retain substitute care providers who can care for children who are living with high needs?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 15.88% | 88 |
| Sometimes | 70.76% | 392 |
| Never | 13.36% | 74 |
| TOTAL | | 554 |

Exhibit 8
Page 298 of 390

# Q30 Does CW provide training and coaching for staff on best practices for recruitment of substitute care providers?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 23.10% | 128 |
| I'm not sure | 57.58% | 319 |
| No | 19.31% | 107 |
| TOTAL | | 554 |

Exhibit 8
Page 299 of 390

# Q31 Does CW provide training and coaching for staff on best practices for retention of substitute care providers?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 26.35% | 146 |
| I'm not sure | 50.36% | 279 |
| No | 23.29% | 129 |
| TOTAL | | 554 |

Exhibit 8
Page 300 of 390

# Q32 Does CW provide training and coaching for staff on best practices for support of substitute care providers?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 31.59% | 175 |
| I'm not sure | 46.57% | 258 |
| No | 21.84% | 121 |
| TOTAL | | 554 |

Exhibit 8
Page 301 of 390

# Q33 Does CW leadership support the recruitment, retention, and support of substitute care providers?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 39.17% | 217 |
| I'm not sure | 45.85% | 254 |
| No | 14.98% | 83 |
| TOTAL | | 554 |

Exhibit 8
Page 302 of 390

# Q34 Does CW prioritize the placement of children with relatives?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 71.30% | 395 |
| Sometimes | 28.16% | 156 |
| Never | 0.54% | 3 |
| TOTAL | | 554 |

Exhibit 8
Page 303 of 390

# Q35 Does CW conduct ongoing searches for relatives of children in substitute care?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 62.45% | 346 |
| Sometimes | 36.64% | 203 |
| Never | 0.90% | 5 |
| TOTAL | | 554 |

Exhibit 8
Page 304 of 390

# Q36 Does CW appropriately match children to substitute care placements based on the needs of the child and the capability of the providers?



Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 23.47% | 130 |
| Sometimes | 66.97% | 371 |
| Never | 9.57% | 53 |
| TOTAL | | 554 |

Exhibit 8
Page 305 of 390

# Q37 Does CW provide training and coaching to staff on best practices for improving permanence for children in substitute care?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 46.21% | 256 |
| I'm not sure | 41.16% | 228 |
| No | 12.64% | 70 |
| TOTAL | | 554 |

Exhibit 8
Page 306 of 390

# Q38 Does CW identify permanency goals appropriate to the needs of the child?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 47.11% | 261 |
| Sometimes | 51.08% | 283 |
| Never | 1.81% | 10 |
| TOTAL | | 554 |

Exhibit 8
Page 307 of 390

# Q39 Does CW create permanency plans based on the identified needs of the child?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 47.47% | 263 |
| Sometimes | 51.26% | 284 |
| Never | 1.26% | 7 |
| TOTAL | | 554 |

Exhibit 8
Page 308 of 390

# Q40 Does CW provide training and coaching to staff on how to plan for permanency for children and families?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 60.65% | 336 |
| I'm not sure | 32.31% | 179 |
| No | 7.04% | 39 |
| TOTAL | | 554 |

Exhibit 8
Page 309 of 390

# Q41 Does CW leadership encourage improving permanence for children in substitute care?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 61.01% | 338 |
| I'm not sure | 31.95% | 177 |
| No | 7.04% | 39 |
| TOTAL | | 554 |

Exhibit 8
Page 310 of 390

## Q42 Does CW leadership advocate for improving permanency planning?



Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 54.33% | 301 |
| I'm not sure | 36.10% | 200 |
| No | 9.57% | 53 |
| TOTAL | | 554 |

Exhibit 8
Page 311 of 390

# Q43 Does CW provide training and coaching to staff in assessing individuals, including children and families?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 63.18% | 350 |
| I'm not sure | 27.44% | 152 |
| No | 9.39% | 52 |
| TOTAL | | 554 |

Exhibit 8
Page 312 of 390

# Q44 Does CW leadership encourage individualized assessments for children and families?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 52.89% | 293 |
| Sometimes | 42.42% | 235 |
| Never | 4.69% | 26 |
| TOTAL | | 554 |

Exhibit 8
Page 313 of 390

# Q45 Does CW maintain a statewide service array that ensures their ability to meet the identified needs of children and families?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 29.60% | 164 |
| I'm not sure | 40.25% | 223 |
| No | 30.14% | 167 |
| TOTAL | | 554 |

Exhibit 8
Page 314 of 390

## Q46 Does CW address the underlying conditions for removal before returning children to their parents' care?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 47.29% | 262 |
| Sometimes | 49.28% | 273 |
| Never | 3.43% | 19 |
| TOTAL | | 554 |

Exhibit 8
Page 315 of 390

## Q47 Does CW provide in-home services to families post-reunification to prevent re-entry into substitute care?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 43.14% | 239 |
| Sometimes | 53.97% | 299 |
| Never | 2.89% | 16 |
| TOTAL | | 554 |

Exhibit 8
Page 316 of 390

# Q48 Does CW ensure that behavioral health services are being delivered in order to meet case plan goals?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 36.82% | 204 |
| Sometimes | 60.29% | 334 |
| Never | 2.89% | 16 |
| TOTAL | | 554 |

Exhibit 8
Page 317 of 390

# Q49 Does CW provide training and coaching to staff on how to work with providers in delivering services to meet the needs of children and families?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 41.16% | 228 |
| I'm not sure | 40.97% | 227 |
| No | 17.87% | 99 |
| TOTAL | | 554 |

Exhibit 8
Page 318 of 390

# Q50 Does CW leadership advocate for providing services to meet the needs of children and families?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 64.80% | 359 |
| I'm not sure | 27.98% | 155 |
| No | 7.22% | 40 |
| TOTAL | | 554 |

Exhibit 8
Page 319 of 390

# Q51 Does CW develop comprehensive case plans that meet the identified needs of the child and family?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 46.39% | 257 |
| Sometimes | 51.44% | 285 |
| Never | 2.17% | 12 |
| TOTAL | | 554 |

Exhibit 8
Page 320 of 390

# Q52 Does CW provide training and coaching for staff on best practices in case planning?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 59.57% | 330 |
| I'm not sure | 28.34% | 157 |
| No | 12.09% | 67 |
| TOTAL | | 554 |

Exhibit 8
Page 321 of 390

# Q53 Does CW leadership advocate for improving case planning?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 61.19% | 339 |
| I'm not sure | 30.14% | 167 |
| No | 8.66% | 48 |
| TOTAL | | 554 |

Exhibit 8
Page 322 of 390

# Q54 Does CW facilitate contact between children and their siblings in accordance with the Family Support Services Case Plan?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 47.47% | 263 |
| Sometimes | 51.08% | 283 |
| Never | 1.44% | 8 |
| TOTAL | | 554 |

Exhibit 8
Page 323 of 390

# Q55 Does CW train caseworkers prior to their direct work with families to prepare them for their work?

Answered: 554   Skipped: 404



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 44.22% | 245 |
| Sometimes | 45.13% | 250 |
| Never | 10.65% | 59 |
| TOTAL | | 554 |

Exhibit 8
Page 324 of 390

# Q56 Does CW train caseworkers on an ongoing basis to maintain their knowledge and skills?

Answered: 552   Skipped: 406



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 58.51% | 323 |
| I'm not sure | 19.02% | 105 |
| No | 22.46% | 124 |
| TOTAL | | 552 |

Exhibit 8
Page 325 of 390

## Q57 Does CW address safety threats and safety concerns of children in their homes?

Answered: 126   Skipped: 832



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 49.21% | 62 |
| Sometimes | 50.79% | 64 |
| Never | 0.00% | 0 |
| TOTAL | | 126 |

Exhibit 8
Page 326 of 390

# Q58 Does CW assess safety threats and safety concerns of children in substitute care?

Answered: 126   Skipped: 832



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 53.97% | 68 |
| Sometimes | 46.03% | 58 |
| Never | 0.00% | 0 |
| TOTAL | | 126 |

Exhibit 8
Page 327 of 390

# Q59 Does CW address safety threats and safety concerns of children in substitute care?

Answered: 126   Skipped: 832



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 48.41% | 61 |
| Sometimes | 51.59% | 65 |
| Never | 0.00% | 0 |
| TOTAL | | 126 |

Exhibit 8
Page 328 of 390

# Q60 Does CW maintain the confidentiality of reports of abuse in care?

Answered: 126   Skipped: 832



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 70.63% | 89 |
| Sometimes | 28.57% | 36 |
| Never | 0.79% | 1 |
| TOTAL | | 126 |

Exhibit 8
Page 329 of 390

# Q61 Is the process of responding to allegations of abuse and neglect regarding children in substitute care clear?

Answered: 127   Skipped: 831



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 63.78% | 81 |
| I'm not sure | 25.98% | 33 |
| No | 10.24% | 13 |
| TOTAL | | 127 |

Exhibit 8
Page 330 of 390

# Q62 Is the process of responding to allegations of abuse and neglect regarding children in substitute care understandable?

Answered: 127   Skipped: 831



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 70.08% | 89 |
| I'm not sure | 20.47% | 26 |
| No | 9.45% | 12 |
| TOTAL | | 127 |

Exhibit 8
Page 331 of 390

# Q63 Does CW standardize the response to allegations of maltreatment for children in substitute care?

Answered: 127   Skipped: 831



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 53.54% | 68 |
| I'm not sure | 27.56% | 35 |
| No | 18.90% | 24 |
| TOTAL | | 127 |

Exhibit 8
Page 332 of 390

# Q64 Has CW standardized the protocol for "closed at screening"?

Answered: 127   Skipped: 831



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 37.01% | 47 |
| I'm not sure | 43.31% | 55 |
| No | 19.69% | 25 |
| TOTAL | | 127 |

Exhibit 8
Page 333 of 390

# Q65 Does CW ensure that requirements (agency policies, legal regulations, or laws) are met when recruiting, certifying, and monitoring foster parents?

Answered: 125   Skipped: 833



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 42.40% | 53 |
| Sometimes | 54.40% | 68 |
| Never | 3.20% | 4 |
| TOTAL | | 125 |

Exhibit 8
Page 334 of 390

# Q66 Has the organizational culture of CW improved during the tenure of Rebecca Jones Gaston?

Answered: 125    Skipped: 833



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 46.40% | 58 |
| I'm not sure | 37.60% | 47 |
| No | 16.00% | 20 |
| TOTAL | | 125 |

Exhibit 8
Page 335 of 390

# Q67 Do you believe that CW leadership pursues appropriate policy changes to improve child protection?

Answered: 126   Skipped: 832



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 30.16% | 38 |
| Sometimes | 69.05% | 87 |
| Never | 0.79% | 1 |
| TOTAL | | 126 |

Exhibit 8
Page 336 of 390

# Q68 Does CW respond according to policies and procedures to maltreatment reports from children in substitute care?

Answered: 125   Skipped: 833



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 48.80% | 61 |
| Sometimes | 50.40% | 63 |
| Never | 0.80% | 1 |
| TOTAL | | 125 |

Exhibit 8
Page 337 of 390

# Q69 Does CW engage in continuous quality improvement processes at the state level?

Answered: 125   Skipped: 833



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 34.40% | 43 |
| Sometimes | 61.60% | 77 |
| Never | 4.00% | 5 |
| TOTAL | | 125 |

Exhibit 8
Page 338 of 390

# Q70 Does CW engage in continuous quality improvement processes at the district level?

Answered: 126   Skipped: 832



| ANSWER CHOICES | RESPONSES | |
| --- | --- | --- |
| Always | 30.95% | 39 |
| Sometimes | 65.87% | 83 |
| Never | 3.17% | 4 |
| TOTAL | | 126 |

Exhibit 8
Page 339 of 390

# Q71 Does CW engage in continuous quality improvement processes at the county level?

Answered: 126   Skipped: 832



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 26.19% | 33 |
| Sometimes | 70.63% | 89 |
| Never | 3.17% | 4 |
| TOTAL | | 126 |

Exhibit 8
Page 340 of 390

## Q72 Does CW use the evaluations of the quality of services to improve service delivery to families?

Answered: 126   Skipped: 832



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 14.29% | 18 |
| Sometimes | 80.16% | 101 |
| Never | 5.56% | 7 |
| TOTAL | | 126 |

Exhibit 8
Page 341 of 390

# Q73 Does CW recruit and retain foster parents who are able to meet the identified needs of children in foster care?

Answered: 126   Skipped: 832



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 11.11% | 14 |
| Sometimes | 84.13% | 106 |
| Never | 4.76% | 6 |
| TOTAL | | 126 |

Exhibit 8
Page 342 of 390

## Q74 Does CW prioritize the placement of children with relatives?

Answered: 126   Skipped: 832



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 57.94% | 73 |
| Sometimes | 41.27% | 52 |
| Never | 0.79% | 1 |
| TOTAL | | 126 |

Exhibit 8
Page 343 of 390

# Q75 Does CW maintain a statewide service array that ensures their ability to meet the identified needs of children and families?

Answered: 126   Skipped: 832



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes | 19.84% | 25 |
| I'm not sure | 29.37% | 37 |
| No | 50.79% | 64 |
| TOTAL | | 126 |

Exhibit 8
Page 344 of 390

## Q76 Does CW address the underlying conditions for removal before returning children to their parents' care?

Answered: 126   Skipped: 832



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Always | 24.60% | 31 |
| Sometimes | 73.81% | 93 |
| Never | 1.59% | 2 |
| TOTAL | | 126 |

Exhibit 8
Page 345 of 390


# Appendix F: Survey Protocol

The survey was disseminated online to caseworkers (identified in the survey as field staff), supervisors, managers, consultants, and Central Office staff. The survey asked participants to identify their tenure and role in child welfare, and the remaining survey questions were determined by their role. All questions were closed-ended and allowed a single answer. Three options were given, depending on the question: either Yes/I'm Not Sure/No, or Always/Sometimes/Never.

The survey took between 15-30 minutes to complete. The survey questions were based on the inquiry questions developed for each research question. Some questions were duplicated between the survey, interviews, and focus groups to ensure the collection of information from varying perspectives across the child welfare system.

| | Survey Question | Research Question | Role(s) |
|---|---|---|---|
| 1. | Does CW address safety threats and safety concerns of children in their homes? | 1 | Central Office Consultants Managers Supervisors Caseworkers |
| 2. | Does CW assess safety threats and safety concerns of children in substitute care? | 1 | Central Office Consultants Managers Supervisors Caseworkers |
| 3. | Does CW address safety threats and safety concerns of children in substitute care? | 1 | Central Office Consultants Managers Supervisors Caseworkers |
| 4. | Does CW maintain the confidentiality of reports of abuse in care? | 1 | Central Office Consultants Managers |

**PUBLIC KNOWLEDGE**°

Appendix F: Survey Protocol

| | Survey Question | Research Question | Role(s) |
|---|---|---|---|
| | | | Supervisors<br>Caseworkers |
| 5. | Is the process of responding to allegations of abuse and neglect regarding children in substitute care:<br>Clear?<br>Understandable? | 1 | Central Office<br>Consultants<br>Managers<br>Supervisors<br>Caseworkers |
| 6. | Does CW standardize the response to allegations of maltreatment for children in substitute care? | 1 | Central Office<br>Consultants<br>Managers<br>Supervisors<br>Caseworkers |
| 7. | Has CW standardized the protocol for "closed at screening"? | 1 | Central Office<br>Consultants<br>Managers<br>Supervisors<br>Caseworkers |
| 8. | Does CW ensure that requirements (agency policies, legal regulations, or laws) are met when recruiting, certifying, and monitoring foster parents? | 1 | Central Office<br>Consultants<br>Managers<br>Supervisors<br>Caseworkers |
| 9. | Does CW comply with federal background check requirements during:<br>Certification of substitute care providers?<br>Oversight of substitute care providers? | 1 | Supervisors<br>Caseworkers |
| 10. | Does CW leadership advocate for safety for children under CW supervision? | 1 | Supervisors<br>Caseworkers |

Exhibit 8
Page 347 of 390

| Survey Question | Research Question | Role(s) |
|---|---|---|
| 11. Has the organizational culture of CW improved during the tenure of Rebecca Jones Gaston? | 2 | Central Office Consultants Managers Supervisors Caseworkers |
| 12. Do you believe that CW leadership pursues appropriate policy changes to improve child protection? | 2 | Central Office Consultants Managers Supervisors Caseworkers |
| 13. Does CW respond according to policies and procedures to maltreatment reports from children in substitute care? | 2 | Central Office Consultants Managers Supervisors Caseworkers |
| 14. Does CW engage in continuous quality improvement processes at the following levels: State? District? County? | 3 | Central Office Consultants Managers Supervisors Caseworkers |
| 15. Does CW use the evaluations of the quality of services to improve service delivery to families? | 3 | Central Office Consultants Managers Supervisors Caseworkers |
| 16. Does CW provide training and coaching for staff on how to use data to drive decisions and improve quality of services? | 3 | Supervisors Caseworkers |

PUBLIC
KNOWLEDGE®

| Survey Question | Research Question | Role(s) |
|---|---|---|
| 17. Does CW recruit and retain foster parents who are able to meet the identified needs of children in foster care? | 4 | Central Office Consultants Managers Supervisors Caseworkers |
| 18. Does CW recruit and retain appropriate child-specific providers, including kith and kin, to care for the number of children who need such placements? | 4 | Supervisors Caseworkers |
| 19. Does CW maintain an appropriate number of foster homes to house the number of children who need to be placed in foster care? | 4 | Supervisors Caseworkers |
| 20. Does CW conduct Diligent Recruitment (the process of recruiting, retaining, and supporting foster families that reflect the ethnicity and race of children in substitute care) of foster care providers? | 4 | Supervisors Caseworkers |
| 21. Does CW recruit and retain substitute care providers who can care for children who identify as LGBTQIA2S+? | 4 | Supervisors Caseworkers |
| 22. Does CW recruit and retain substitute care providers who can care for children who are living with high needs? | 4 | Supervisors Caseworkers |
| 23. Does CW provide training and coaching for staff on best practices for: Recruitment of substitute care providers? Retention of substitute care providers? Support of substitute care providers? | 4 | Supervisors Caseworkers |

Exhibit 8
Page 349 of 390

PUBLIC
KNOWLEDGE®

Appendix F: Survey Protocol

| | Survey Question | Research Question | Role(s) |
|---|---|---|---|
| 24. | Does CW leadership support the recruitment, retention, and support of substitute care providers? | 4 | Supervisors Caseworkers |
| 25. | Does CW prioritize the placement of children with relatives? | 5 | Central Office Consultants Managers Supervisors Caseworkers |
| 26. | Does CW conduct ongoing searches for relatives of children in substitute care? | 5 | Supervisors Caseworkers |
| 27. | Does CW appropriately match children to substitute care placements based on the needs of the child and the capability of the providers? | 5 | Supervisors Caseworkers |
| 28. | Does CW provide training and coaching to staff on best practices for improving permanence for children in substitute care? | 5 | Supervisors Caseworkers |
| 29. | Does CW identify permanency goals appropriate to the needs of the child? | 6 | Supervisors Caseworkers |
| 30. | Does CW create permanency plans based on the identified needs of the child? | 6 | Supervisors Caseworkers |
| 31. | Does CW provide training and coaching to staff on how to plan for permanency for children and families? | 6 | Supervisors Caseworkers |
| 32. | Does CW leadership encourage improving permanence for children in substitute care? | 5 | Supervisors Caseworkers |
| 33. | Does CW leadership advocate for improving permanency planning? | 6 | Supervisors Caseworkers |

Exhibit 8
Page 350 of 390

Appendix F: Survey Protocol

| Survey Question | Research Question | Role(s) |
|---|---|---|
| 34. Does CW provide training and coaching to staff in assessing individuals, including children and families? | 7 | Supervisors Caseworkers |
| 35. Does CW leadership encourage individualized assessments for children and families? | 7 | Supervisors Caseworkers |
| 36. Does CW maintain a statewide service array that ensures their ability to meet the identified needs of children and families? | 8 | Central Office Consultants Managers Supervisors Caseworkers |
| 37. Does CW address the underlying conditions for removal before returning children to their parents' care? | 8 | Central Office Consultants Managers Supervisors Caseworkers |
| 38. Does CW provide in-home services to families post-reunification to prevent re-entry into substitute care? | 8 | Supervisors Caseworkers |
| 39. Does CW ensure that behavioral health services are being delivered in order to meet case plan goals? | 8 | Supervisors Caseworkers |
| 40. Does CW provide training and coaching to staff on how to work with providers in delivering services to meet the needs of children and families? | 8 | Supervisors Caseworkers |
| 41. Does CW leadership advocate for providing services to meet the needs of children and families? | 8 | Supervisors Caseworkers |

Exhibit 8
Page 351 of 390

| Survey Question | Research Question | Role(s) |
|---|---|---|
| 42. Does CW develop comprehensive case plans that meet the identified needs of the child and family? | 9 | Supervisors Caseworkers |
| 43. Does CW provide training and coaching for staff on best practices in case planning? | 9 | Supervisors Caseworkers |
| 44. Does CW leadership advocate for improving case planning? | 9 | Supervisors Caseworkers |
| 45. Does CW facilitate contact between children and their siblings in accordance with the Family Support Services Case Plan? | 10 | Supervisors Caseworkers |
| 46. Does CW train caseworkers prior to their direct work with families to prepare them for their work? | 11 | Supervisors Caseworkers |
| 47. Does CW train caseworkers on an ongoing basis to maintain their knowledge and skills? | 11 | Supervisors Caseworkers |

# Appendix G: Interview Protocol

The purpose of the individual interviews was to gather perspectives from Child Welfare (CW) leadership and representatives from the Governor's office on the progress that has been made throughout the child welfare system since Public Knowledge® completed the Child Safety in Substitute Care Final Report in 2016. The interviews provided perceptions of individuals within the child welfare system.

Public Knowledge® conducted 27 interviews, each of which were scheduled for 50 minutes and were facilitated over videoconference.

The interviewees were:

- Fariborz Pakseresht, ODHS Director
- Liesl Wendt, ODHS Deputy Director
- Rebecca Jones Gaston, Child Welfare Director (now former Child Welfare Director)
- Lacey Andresen, Child Welfare Deputy Director for Program and Practice
- Aprille Flint-Gerner, Child Welfare Deputy Director (now Child Welfare Director)
- Alysia Cox, CW Deputy Chief of Strategy and Innovation (also serving as the Data Representative)
- Tami Kane-Suleiman, Program Manager for Child Fatality Prevention and Review Program
- Deena Loughary, Child Safety Program Manager
- Stacey Loboy, Foster Care and Youth Transitions Program Manager
- Belit Burke, District Manager
- Sherril Kuhns, Federal Policy and Resources Manager
- Kim Keller, Child Permanency Manager
- Kristen Khamnohack, ORCAH Screening Program Manager
- Hannah Lene, ORCAH Supervisor
- Kirby Crawford, ORCAH Manager
- Kim Lorz, Training and Workforce Development Manager
- Sarah Fox, Treatment Services Program Manager
- Steve Allen, OHA Behavioral Health Director
- Dana Hittle, OHA Interim State Medical Director
- Lilia Teninty, Office of Developmental Disabilities Services (ODDS) Director
- Joel Metlen, Human Services Strategic Projects Director, Child Welfare Strategic Initiatives Director

- Rosa Klein, Governor's Office Policy Advisor
- Berri Leslie, Oregon Governor's Deputy Chief of Staff

The comprehensive set of interview questions is listed in the table below. This includes questions that were added to the protocol to interview the ORCAH staff as well as the follow-up interviews with the Executive Leadership Team and the ORCAH Screening Program Manager.

| | Interview Question | Research Question | Interviewee(s) |
|---|---|---|---|
| 1. | Does CW meet federal requirements for caseworker contacts with children in substitute care? | 1 | Data Representative |
| 2. | Does CW meet state requirements for caseworker contacts with children in substitute care? | 1 | Data Representative |
| 3. | Does CW adequately assess out-of-state facilities to determine the appropriateness of placing children? | 1 | Governor's Office<br>CW Leadership<br>Policy Managers |
| 4. | Has CW centralized and standardized reporting, screening, and assessments statewide? | 1 | Safety Managers |
| 5. | Since 2016, has CW redesigned the process of responding to allegations of abuse and neglect regarding children in substitute care? | 1 | Governor's Office<br>CW Leadership<br>Safety Managers<br>Foster Care Manager |
| 6. | What is CW's policy on protecting the confidentiality of children who identify as LGBTQIA2S+? | 1 | CW Leadership<br>Policy Managers |
| 7. | Has CW standardized the protocol for "closed at screening"? | 1 | Safety Managers |

| Interview Question | Research Question | Interviewee(s) |
|---|---|---|
| 8. Does CW comply with federal background check requirements during certification and oversight of substitute care providers? | 1 | Foster Care Manager Policy Managers |
| 9. Does CW have policies and procedures in place to guide staff on safety practices? | 1 | Safety Managers Policy Managers |
| 10. Does CW have in place quality assurance processes for monitoring safety for children under CW supervision? | 1 | Safety Managers Data Representative |
| 11. What is ORCAH's biggest accomplishment since centralization of intake? | 1 | ORCAH Staff |
| 12. What are your top complaints from mandated reporters? | 1 | ORCAH Staff |
| 13. Are caseworkers using the new pathway to report maltreatment, or are they still consistently calling the hotline? | 1 | ORCAH Staff |
| 14. What improvements have you made to policies and procedures that benefit your staff, local staff, and mandated reporters? | 1 | ORCAH Staff |
| 15. Has ORCAH positively contributed to the safety of children and young adults in substitute care? | 1 | ORCAH Staff |
| 16. What have been your biggest challenges with COVID-19? | 1 | ORCAH Staff |
| 17. How does ORCAH address or prioritize backlogged cases? | 1 | ORCAH Staff |
| 18. What processes are in place to assign backlogged cases? | 1 | ORCAH Staff |

# PUBLIC KNOWLEDGE®

| Interview Question | Research Question | Interviewee(s) |
|---|---|---|
| 19. What has been the most significant change in your tenure? | 1 | CW Leadership |
| 20. What has been the most significant accomplishment for CW in your tenure? | 1 | CW Leadership |
| 21. What is the most significant issue facing child welfare in Oregon? | 1 | CW Leadership |
| 22. What has been the most persistent challenge in child welfare during your tenure in Oregon? | 1 | CW Leadership |
| 23. How is the process of sharing screened reports between ORCAH and local law enforcement handled at the local level? | 1 | CW Leadership |
| 24. In what ways are CW staff encouraged to speak up with safety concerns regarding children in substitute care? | 2 | Governor's Office<br>CW Leadership<br>Safety Managers |
| 25. Does CW respond according to policies and procedures to maltreatment reports from children in substitute care? | 2 | Foster Care Manager<br>Policy Managers |
| 26. In what ways does CW advocate for a safety culture among its workforce? | 2 | Governor's Office<br>CW Leadership<br>Safety Managers |
| 27. Does CW use Organizational Change Management processes and structures? | 2 | CW Leadership |
| 28. In what ways do CW executives model leadership skills and behaviors? | 2 | Governor's Office<br>CW Leadership<br>Safety Managers<br>Foster Care Manager<br>Policy Managers<br>Training Manager |

| Interview Question | Research Question | Interviewee(s) |
|---|---|---|
| | | Data Representative |
| 29. Do CW's nondiscrimination policies include considerations of sexual orientation, gender identity, and gender expression (SOGIE)? | 2 | CW Leadership |
| 30. What are the primary challenges ORCAH staff, managers, and leaders are dealing with now? | 2 | ORCAH Staff |
| 31. What are your top primary complaints you receive from District and County staff? | 2 | ORCAH Staff |
| 32. How has leadership supported ORCAH? | 2 | ORCAH Staff |
| 33. How do you handle complaints about ORCAH? | 2 | ORCAH Staff |
| 34. How do you communicate your improvements in ORCAH to county staff and mandated reporters (such as improvements in call wait times)? | 2 | ORCAH Staff |
| 35. How has the organizational culture shifted during your tenure? | 2 | CW Leadership |
| 36. Is case information entered or tracked outside of OR–Kids? | 3 | Data Representative |
| 37. Does CW follow their Data Quality Plan? | 3 | CW Leadership Data Representative |
| 38. Does CW use data to inform the development of new or revised practices, policies, and procedures? | 3 | CW Leadership Data Representative Policy Managers |
| 39. Does CW have a continuous quality improvement process that includes leadership support, leadership modeling, staff and stakeholder engagement, communication, | 3 | CW Leadership Data Representative |

| Interview Question | Research Question | Interviewee(s) |
|---|---|---|
| oversight, data collection, case record reviews, and use of the findings? | | |
| 40. What does the CQI process look like at each level? | 3 | Data Representative |
| 41. Does CW utilize performance-based contracting with its external service providers? | 3 | CW Leadership |
| 42. Does CW provide training and coaching for staff on how to use data to drive decisions and improve quality of services? | 3 | Training Manager |
| 43. Does CW have a case review system in place to inform decision-making and improve the quality of services? | 3 | Data Representative |
| 44. How do you use data and continuous quality improvement processes to make changes? | 3 | ORCAH Staff |
| 45. Does CW recruit and retain appropriate child-specific providers, including kith and kin, to care for the number of children who need such placements? | 4 | Data Representative Foster Care Manager |
| 46. Does CW provide appropriate services and support to substitute care providers to ensure children are adequately cared for and supervised? | 4 | Foster Care Manager |
| 47. How does CW oversee the contracted placements for children living with high needs? | 4 | Foster Care Manager |
| 48. Has CW increased reimbursement rates for substitute care providers? | 4 | CW Leadership Foster Care Manager |

**PUBLIC KNOWLEDGE**®

| Interview Question | Research Question | Interviewee(s) |
|---|---|---|
| 49. Does CW prioritize the use of the least restrictive placement? | 4 | CW Leadership<br>Foster Care Manager |
| 50. Does CW have or oversee a statewide recruitment, retention, and support plan for substitute care providers? | 4 | CW Leadership<br>Foster Care Manager |
| 51. Does CW use data to inform their statewide recruitment, retention, and support plan for substitute care providers? | 4 | Data Representative<br>Foster Care Manager |
| 52. Does CW have policies and procedures for staff regarding the recruitment, retention, and support of substitute care providers? | 4 | Policy Managers<br>Foster Care Manager |
| 53. Does CW provide training and coaching for staff on best practices for the recruitment, retention, and the support of substitute care providers? | 4 | Training Manager<br>Foster Care Manager |
| 54. Does CW utilize a case review process to identify lessons learned in the recruitment, retention, and the support of substitute care providers? | 4 | CW Leadership<br>Foster Care Manager |
| 55. Does CW pursue termination of parental rights as required by federal law? | 5 | CW Leadership<br>Data Representative<br>Foster Care Manager |
| 56. Does CW meet state requirements with regard to using the CANS to establish reimbursement rates for providers? | 5 | Foster Care Manager |
| 57. Does CW provide training and coaching to staff on best practices for improving permanence for children in substitute care? | 5 | Training Manager<br>Foster Care Manager |

PUBLIC
KNOWLEDGE®

| Interview Question | Research Question | Interviewee(s) |
|---|---|---|
| 58. What efforts led to decreasing the number of children in substitute care? | 5 | CW Leadership |
| 59. Does CW provide training and coaching to staff on how to plan for permanency for children and families? | 6 | Training Manager |
| 60. Does CW utilize a case review process to understand and improve barriers and strengths in permanency planning? | 6 | Foster Care Manager |
| 61. Does CW have a mechanism to evaluate the provision of assessments? | 7 | Data Representative |
| 62. Does CW provide training and coaching to staff in assessing individuals, including children and families? | 7 | Training Manager |
| 63. Does CW maintain a statewide service array that ensures their ability to meet the identified needs of children and families? | 8 | Governor's Office CW Leadership |
| 64. Has CW developed a continuum of care options for children in substitute care? | 8 | CW Leadership Foster Care Manager |
| 65. Does CW partner with the Oregon Health Authority to identify and improve systemic barriers regarding access to services? | 8 | Governor's Office CW Leadership |
| 66. Does CW partner with Oregon Coordinated Care Organizations to identify and improve systemic barriers regarding access to services? | 8 | Governor's Office CW Leadership |
| 67. Does CW have a mechanism to evaluate the services provided to children and families? | 8 | Data Representative |
| 68. What was the process of developing the self-selected environments policy? | 8 | CW Leadership |

**PUBLIC KNOWLEDGE**®

| Interview Question | Research Question | Interviewee(s) |
|---|---|---|
| 69. What data are collected for self–selected environments? How are they monitored? How are risk factors for trafficking addressed? | 8 | CW Leadership |
| 70. Does CW retain enough staff to adequately serve the children and families in CW custody? | 11 | Governor's Office CW Leadership |
| 71. Does CW regulate caseloads for caseworkers to ensure they can meet the needs of children and families under their supervision? | 11 | CW Leadership |
| 72. Does CW meet state requirements in recruiting qualified caseworkers? | 11 | CW Leadership |
| 73. Does CW adequately train caseworkers prior to their direct work with families? | 11 | CW Leadership Training Manager |
| 74. Does CW adequately train caseworkers on an ongoing basis? | 11 | CW Leadership Training Manager |
| 75. How does CW track training provided to caseworkers? | 11 | Data Representative Training Manager |
| 76. Do you (and your staff) have the tools, training, and supports needed to make good screening decisions? | 11 | ORCAH Staff |

# Appendix H: Focus Group Protocol

The purpose of the focus groups was to gather peer groups at varying levels of the child welfare agency to share their collective experience regarding progress that has been made throughout the child welfare system since Public Knowledge® completed the *Child Safety in Substitute Care Final Report* in 2016. The focus groups were an opportunity for staff to share their feedback with each other and with PK to provide input into the final report.

Public Knowledge® conducted eleven focus groups, each of which were scheduled for 90 minutes on Zoom. The focus groups included the following participants:

- Two focus groups of central office staff, including staff from Permanency, Federal Policy and Resources, Project Management, Treatment Services Unit, and Workforce Development.
- Two focus groups of caseworkers from districts throughout Oregon. One group will include caseworkers focused on safety services and the other group will be comprised of permanency caseworkers. Caseworkers were invited from a mixture of large and small counties, urban and rural areas, and locations across the state.
- Two focus groups of casework supervisors from districts throughout Oregon. One group will include supervisors overseeing safety services and the other group will be comprised of permanency supervisors. Supervisors were invited from a mixture of large and small counties, urban and rural areas, and locations across the state.
- One focus group of Program Managers from around the state.
- One focus group of Child Safety Consultants from Central Office.
- One focus group of Permanency Consultants from Central Office.
- One focus group of ORCAH screeners from around the state.

The roles included in the focus groups changed from PK's initial methodology to concentrate discussions with the CW staff most involved in and impacted by the changes within the agency relevant to this review. Instead of conducting a focus group with District Managers and Adoption Staff, PK facilitated a group with Program Managers and another with Permanency Consultants. Program Managers oversee each district and work closely with supervisors and caseworkers, and Permanency Consultants are able to share the perceptions of permanence from a central office perspective. Based on feedback received regarding the implementation of ORCAH, PK added a focus group dedicated to ORCAH screeners to hear their feedback on the implementation process and the impact of centralization on child safety.

**PUBLIC KNOWLEDGE®**

The focus groups were facilitated by two Public Knowledge® team members, one of whom facilitated, and one took notes. Responses to the focus group questions were aggregated and responses were not connected to a specific participant.

The focus group questions were based on the inquiry questions developed for each research question. Due to time constraints and rich discussions, every focus group did not address every question assigned to them.

| | Focus Group Question | Research Question | Participant Group |
|---|---|---|---|
| 1. | Does CW adequately assess safety thresholds and safety concerns of children in their homes during intake, initial assessments, and safety assessments, and throughout the life of the case? | 1 | Safety Caseworkers<br>Safety Casework Supervisors<br>Safety Consultants |
| 2. | Does CW effectively manage caseloads to adequately meet the needs of children and families? | 1 | Central Office<br>Casework Supervisors |
| 3. | Does CW adequately supervise placements of children in out-of-state facilities? | 1 | Central Office<br>Program Managers |
| 4. | Has CW centralized and standardized reporting, screening, and assessments statewide? | 1 | Central Office<br>Safety Caseworkers<br>Safety Casework Supervisors<br>Safety Consultants |
| 5. | Is the process of responding to allegations of abuse and neglect regarding children in substitute care transparent? | 1 | Safety Caseworkers<br>Safety Casework Supervisors<br>Safety Consultants |
| 6. | Does CW consistently share safety information across entities? | 1 | Central Office<br>Program Managers |
| 7. | What is CW's policy on protecting the confidentiality of children who identify as LGBTQIA2S+? | 1 | Central Office<br>Caseworkers<br>Casework Supervisors |

PUBLIC
KNOWLEDGE®

| | Focus Group Question | Research Question | Participant Group |
|---|---|---|---|
| 8. | Does CW consistently distinguish between allegations of abuse and critical incidents? (Including a follow-up question of how the two are distinguished). | 1 | Central Office<br>Safety Caseworkers<br>Safety Casework Supervisors<br>Safety Consultants |
| 9. | Does CW address safety threats or safety concerns raised in a substitute care placement? | 1 | Safety Caseworkers<br>Safety Casework Supervisors<br>Safety Consultants |
| 10. | Does CW provide training and coaching to staff about best practices in safety for children under CW supervision? | 1 | Safety Caseworkers<br>Safety Casework Supervisors |
| 11. | Does CW utilize a case review process to measure progress on improving safety for children under CW supervision? | 1 | Central Office<br>Program Managers<br>Safety Caseworkers<br>Safety Casework Supervisors<br>Safety Consultants |
| 12. | Does CW have in place quality assurance processes for monitoring safety for children under CW supervision? | 1 | Central Office<br>Program Managers<br>Safety Casework Supervisors |
| 13. | Does CW leadership promote safety for children under CW supervision? | 1 | Central Office<br>Program Managers<br>Safety Caseworkers<br>Safety Casework Supervisors<br>Safety Consultants |

Exhibit 8
Page 364 of 390

PUBLIC
KNOWLEDGE®

| | Focus Group Question | Research Question | Participant Group |
|---|---|---|---|
| 14. | Has ORCAH positively contributed to the safety of children and young adults in Oregon? | 1 | ORCAH Screeners |
| 15. | How are cases assigned as they come in through the hotline? Are the number of assignments manageable? | 1 | ORCAH Screeners |
| 16. | In what ways is safety prioritized in decision-making for children in substitute care? | 2 | Central Office<br>Program Managers<br>Safety Caseworkers<br>Safety Casework Supervisors<br>Safety Consultants |
| 17. | In what ways are CW staff encouraged to speak up with safety concerns regarding children in substitute care? | 2 | Central Office<br>Program Managers<br>Safety Caseworkers<br>Safety Casework Supervisors<br>Safety Consultants |
| 18. | Do CW staff feel comfortable raising concerns? | 2 | Central Office<br>Program Managers<br>Caseworkers<br>Casework Supervisors<br>Safety Consultants<br>Permanency Consultants |
| 19. | Do CW staff know how to escalate concerns about safety issues? | 2 | Central Office<br>Program Managers<br>Caseworkers<br>Casework Supervisors<br>Safety Consultants<br>Permanency Consultants |

Exhibit 8
Page 365 of 390

**PUBLIC KNOWLEDGE**®

Appendix H: Focus Group Protocol

| | Focus Group Question | Research Question | Participant Group |
|---|---|---|---|
| 20. | Does CW communicate the importance of child safety for children in substitute care? | 2 | Central Office<br>Program Managers<br>Caseworkers<br>Casework supervisors |
| 21. | In what ways does CW promote a safety culture among its workforce? | 2 | Central Office<br>Program Managers<br>Caseworkers<br>Casework Supervisors<br>Safety Consultants<br>Permanency Consultants |
| 22. | Does CW use Organizational Change Management processes and structures? | 2 | Central Office<br>Program Managers |
| 23. | In what ways do CW executives model leadership skills and behaviors? | 2 | Central Office<br>Program Managers<br>Caseworkers<br>Casework Supervisors<br>Safety Consultants<br>Permanency Consultants |
| 24. | Do CW's nondiscrimination policies include considerations of sexual orientation, gender identity, and gender expression (SOGIE)? | 2 | Central Office<br>Program Managers<br>Caseworkers<br>Casework Supervisors<br>Safety Consultants<br>Permanency Consultants |
| 25. | How has the structure of your daily work changed in the last 6 months? | 2 | ORCAH Screeners |
| 26. | Do you have the tools, training, and support you need to make appropriate screening decisions? | 2 | ORCAH Screeners |

Exhibit 8
Page 366 of 390

**PUBLIC KNOWLEDGE®**

Appendix H: Focus Group Protocol

| | Focus Group Question | Research Question | Participant Group |
|---|---|---|---|
| 27. | What are the primary complaints you receive from reporters? | 2 | ORCAH Screeners |
| 28. | Do you feel supported by management and leadership? | 2 | ORCAH Screeners |
| 29. | What have your biggest challenges been with COVID-19? | 2 | ORCAH Screeners |
| 30. | Is there an override for county staff to bypass waiting on a hotline call? | 2 | ORCAH Screeners |
| 31. | How does CW identify and document children who identify as LGBTQIA2S+? | 3 | Central Office Program Managers |
| 32. | Does CW have a continuous quality improvement process that includes leadership support, leadership modeling, staff and stakeholder engagement, communication, oversight, data collection, case record reviews, and use of the findings? | 3 | Central Office Program Managers |
| 33. | Does CW engage in continuous quality improvement processes at the state, district, and county levels? | 3 | Central Office Program Managers Casework Supervisors |
| 34. | What does the CQI process look like at each level? | 3 | Central Office Program Managers |
| 35. | Does CW conduct effective evaluations of the quality of services offered by external service providers? | 3 | Central Office Program Managers |
| 36. | Does CW use the evaluations of the quality of services to improve service delivery to families? | 3 | Central Office Program Managers Casework Supervisors |

Exhibit 8
Page 367 of 390

**PUBLIC KNOWLEDGE**®

Appendix H: Focus Group Protocol

| | Focus Group Question | Research Question | Participant Group |
|---|---|---|---|
| 37. | Does CW collaborate with service providers to share feedback from case reviews? | 3 | Program Managers<br>Casework Supervisors |
| 38. | Does CW recruit and retain foster parents who are able to meet the identified needs of children in substitute care? | 4 | Program Managers<br>Permanency Caseworkers<br>Permanency Casework Supervisors |
| 39. | Does CW recruit and retain appropriate child-specific providers, including kith and kin, to care for the number of children who need such placements? | 4 | Central Office<br>Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |
| 40. | Does CW maintain an appropriate number of foster homes to house the number of children who need to be placed in substitute care? | 4 | Central Office<br>Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |
| 41. | Does CW adequately assess the ability of substitute care providers to ensure the appropriate care and supervision of children? | 4 | Central Office<br>Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |
| 42. | Does CW provide appropriate services and support to substitute care providers to ensure children are adequately cared for and supervised? | 4 | Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |
| 43. | Does CW diligently recruit substitute care providers who reflect the ethnicity and race of children in substitute care? | 4 | Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |

Exhibit 8<br>Page 368 of 390

PUBLIC
KNOWLEDGE®

| | Focus Group Question | Research Question | Participant Group |
|---|---|---|---|
| 44. | Does CW recruit and retain substitute care providers who can care for children who identify as LGBTQIA2S+? | 4 | Central Office<br>Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |
| 45. | Does CW recruit and retain substitute care providers who can care for children who are living with high needs? | 4 | Central Office<br>Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |
| 46. | Does CW track, at the state and local levels, the current capacity for substitute care providers? | 4 | Central Office<br>Program Managers<br>Permanency Consultants<br>Permanency Casework Supervisors |
| 47. | Does CW track the skills and capabilities of substitute care providers to ensure appropriate matching for children and their placement providers? | 4 | Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |
| 48. | Does CW prioritize the use of the least restrictive placement? | 4 | Central Office<br>Program Managers<br>Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |
| 49. | Does CW leadership promote the recruitment, retention, and support of substitute care providers? | 4 | Central Office<br>Program Managers<br>Caseworkers<br>Casework Supervisors |

Exhibit 8
Page 369 of 390

PUBLIC
KNOWLEDGE®

| | Focus Group Question | Research Question | Participant Group |
|---|---|---|---|
| | | | Permanency Consultants |
| 50. | Does CW conduct ongoing searches for relatives of children in substitute care? | 5 | Program Managers<br>Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |
| 51. | Does CW frequently use temporary placements for children in substitute care? | 5 | Program Managers<br>Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |
| 52. | Does CW prioritize the placement of children with relatives? | 5 | Program Managers<br>Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |
| 53. | Does CW adequately assess prospective adoptive parents to determine an appropriate match? | 5 | Program Managers<br>Permanency Consultants |
| 54. | Does CW collaborate with the courts to ensure timely permanency hearings? | 5 | Central Office<br>Program Managers<br>Permanency Caseworkers<br>Permanency Casework Supervisors |
| 55. | In what ways does CW make concerted efforts to achieve permanence in a timely manner? | 5 | Central Office<br>Program Managers<br>Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |

Exhibit 8
Page 370 of 390

PUBLIC
KNOWLEDGE®

| | Focus Group Question | Research Question | Participant Group |
|---|---|---|---|
| 56. | Does CW recommend placement decisions based on the identified needs and permanency plan of the child? | 5 | Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |
| 57. | Does CW appropriately match children to substitute care placements based on the needs of the child and the capability of the providers? | 5 | Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |
| 58. | Does CW follow federal requirements for placement preferences for Native American or Alaska Native children? | 5 | Central Office<br>Program Managers<br>Permanency Consultants |
| 59. | Does CW utilize a case review process to understand and improve barriers and strengths regarding permanence for children in substitute care? | 5 | Central Office<br>Program Managers |
| 60. | Does CW leadership encourage improving permanence for children in substitute care? | 5 | Central Office<br>Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |
| 61. | Does CW identify permanency goals appropriate to the needs of the child? | 6 | Program Managers<br>Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |
| 62. | Does CW create permanency plans based on the identified needs of the child? | 6 | Program Managers<br>Permanency Caseworkers<br>Permanency Casework Supervisors |

Exhibit 8
Page 371 of 390

**PUBLIC KNOWLEDGE**®

| | Focus Group Question | Research Question | Participant Group |
|---|---|---|---|
| 63. | Does CW recommend changes in placement based on the identified needs and permanency plan of the child? | 6 | Program Managers<br>Permanency Caseworkers<br>Permanency Casework Supervisors |
| 64. | Does CW collaborate with families and children to identify and improve barriers regarding permanency planning? | 6 | Program Managers<br>Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |
| 65. | Does CW collaborate with the courts to identify and eliminate barriers regarding permanency planning? | 6 | Central Office<br>Program Managers<br>Permanency Consultants |
| 66. | Does CW utilize a case review process to understand and improve barriers and strengths in permanency planning? | 6 | Central Office<br>Permanency Consultants |
| 67. | Does CW leadership promote improving permanency planning? | 6 | Central Office<br>Program Managers<br>Permanency Consultants |
| 68. | Does CW identify necessary services for children based on the assessment(s)? | 7 | Central Office<br>Program Managers |
| 69. | Does CW identify necessary services for parents based on the assessment(s)? | 7 | Central Office<br>Program Managers |
| 70. | Does CW identify necessary services for substitute care providers based on the assessment(s)? | 7 | Central Office<br>Program Managers<br>Permanency Caseworkers<br>Permanency Casework Supervisors |

Exhibit 8
Page 372 of 390

PUBLIC KNOWLEDGE®

| | Focus Group Question | Research Question | Participant Group |
|---|---|---|---|
| 71. | Does CW utilize a case review process to inform and improve individualized assessments for children and families? | 7 | Central Office<br>Program Managers |
| 72. | Does CW leadership promote individualized assessments for children and families? | 7 | Central Office<br>Program Managers |
| 73. | Does CW maintain a sufficient capacity of substitute care placements to serve children living with high needs? | 8 | Central Office<br>Permanency Caseworkers |
| 74. | Does CW provide appropriate services to meet children's identified needs? | 8 | Central Office<br>Program Managers |
| 75. | Does CW provide appropriate services to meet the identified needs of children who identify as LGBTQIA2S+? | 8 | Central Office<br>Program Managers<br>Caseworkers<br>Casework Supervisors |
| 76. | Does CW provide services and supports to the family throughout the duration of the case to prepare for reunification? | 8 | Permanency Caseworkers<br>Permanency Casework Supervisors |
| 77. | Does CW address the underlying conditions for removal before returning children to their parents' care? | 8 | Permanency Caseworkers<br>Permanency Casework Supervisors |
| 78. | Does CW adequately assess independent living skills? | 8 | Program Managers<br>Permanency Caseworkers<br>Permanency Consultants |
| 79. | Does CW provide services based on the assessment of a young adult's independent living skills and needs? | 8 | Permanency Caseworkers<br>Permanency Casework Supervisors |
| 80. | Does CW provide services necessary to parents so they can achieve case goals? | 8 | Permanency Caseworkers |

**PUBLIC KNOWLEDGE**®

Appendix H: Focus Group Protocol

| | Focus Group Question | Research Question | Participant Group |
|---|---|---|---|
| | | | Permanency Casework Supervisors |
| 81. | Does CW provide services necessary to parents in order to support them meeting their conditions for return? | 8 | Permanency Caseworkers<br>Permanency Casework Supervisors |
| 82. | In what ways does CW provide safe spaces for young adults who identify as LGBTQIA2S+? | 8 | Central Office<br>Program Managers<br>Caseworkers<br>Casework Supervisors<br>Safety Consultants<br>Permanency Consultants |
| 83. | In what ways does CW provide services that address sexuality, gender-based needs, and the process of coming out for LGBTQIA2S+ young adults? | 8 | Central Office<br>Program Managers<br>Caseworkers<br>Casework Supervisors |
| 84. | Does CW utilize a case review process to inform and improve the barriers and strengths in providing services to meet the needs of children and families? | 8 | Central Office<br>Program Managers |
| 85. | Does CW ensure that services are provided as recommended in the case plan? | 9 | Program Managers<br>Casework Supervisors |
| 86. | Does CW adequately involve families throughout the case planning process? | 9 | Caseworkers<br>Casework Supervisors |
| 87. | Does CW adequately involve tribes throughout the case planning process? | 9 | Central Office<br>Program Managers |
| 88. | Does CW provide training and coaching for staff on best practices in case planning? | 9 | Caseworkers |

Exhibit 8
Page 374 of 390

PUBLIC
KNOWLEDGE®

| | Focus Group Question | Research Question | Participant Group |
|---|---|---|---|
| 89. | Does CW utilize case review processes for identifying and improving barriers to case planning? | 9 | Program Managers<br>Casework Supervisors<br>Permanency Consultants |
| 90. | Does CW leadership promote improving case planning? | 9 | Central Office<br>Program Managers |
| 91. | Does CW allow for sufficient and quality family interactions between children and parents to preserve family connections? | 10 | Caseworkers<br>Casework Supervisors |
| 92. | Does CW facilitate sufficient family interaction to prepare parents and children for reunification? | 10 | Permanency Caseworkers<br>Permanency Casework Supervisors |
| 93. | Does CW maintain the child's connections to their community, faith, extended family, tribe, and school? | 10 | Program Managers<br>Permanency Caseworkers<br>Permanency Casework Supervisors |
| 94. | Does CW facilitate contact between children and their siblings in accordance with the Family Support Services Case Plan? | 10 | Permanency Caseworkers<br>Permanency Casework Supervisors<br>Permanency Consultants |
| 95. | Does CW prioritize placing siblings together when possible and appropriate? | 10 | Permanency Caseworkers<br>Permanency Casework Supervisors |
| 96. | Does CW provide training and coaching for staff on best practices for maintaining connections with children, their families (including siblings), and their community, faith, extended family, tribe, and school? | 10 | Permanency Caseworkers |
| 97. | Does CW utilize a case review process that informs and improves connections with children, their families (including siblings), | 10 | Program Managers<br>Permanency Caseworkers |

Exhibit 8
Page 375 of 390

PUBLIC
KNOWLEDGE®

| | Focus Group Question | Research Question | Participant Group |
|---|---|---|---|
| | and their community, faith, extended family, tribe, and school? | | Permanency Casework Supervisors |
| 98. | Does CW leadership promote improving connections between children in substitute care and their families? | 10 | Central Office Program Managers |
| 99. | Does CW provide support to its workforce to prevent staff turnover? | 11 | Central Office Program Managers Caseworkers Casework Supervisors Safety Consultants Permanency Consultants |
| 100. | Does CW regulate caseloads for caseworkers to ensure they can meet the needs of children and families under their supervision? | 11 | Program Managers Caseworkers Casework Supervisors |
| 101. | Does CW adequately train caseworkers prior to their direct work with families? | 11 | Caseworkers |
| 102. | Does CW adequately train caseworkers on an ongoing basis? | 11 | Caseworkers |
| 103. | In what ways does CW provide adequate supervision to child welfare caseworkers and middle managers? | 11 | Program Managers Casework Supervisors |

Exhibit 8
Page 376 of 390

# Appendix I: Staffing Information

### Stacey Moss: Expert Witness

Stacey Moss is the President and CEO of Public Knowledge® and is serving as the Expert Witness. Stacey is responsible for providing overall direction and leadership for Public Knowledge®, with 20 years of experience working within governmental agencies, educational institutions, and non-profit organizations. She also has extensive experience in training development and implementation; leadership assessments and coaching; organizational change management; and organizational development. Stacey received her Juris Doctorate from the University of Wyoming and is a certified child welfare law specialist (CWLS) and Project Management Institute (PMI) project management professional (PMP).

Stacey has spent her career in the child welfare industry. Starting as an attorney representing parents and children in juvenile court proceedings. Then, representing the child welfare agency in many policy and rule promulgation, general advice, and court proceedings. Then running a state agency of attorneys ad litem for children and youth in child welfare proceedings. And finally, the last 10+ years at Public Knowledge® doing consulting work nationally on child welfare and other related systems work. Stacey was the Policy and Regulatory Lead on the 2016 PK project to produce the 2016 *Child Safety in Substitute Care Final Report*.

Stacey has authored or published seven publications in the ten years preceding the submission of this report, all of which are listed on her resume in Appendix J. She has not testified in another case in the four years preceding the submission of this report.

### Allison Olson Ward: Project Manager

Since 2022, Allison has been the Learning Practice Director at Public Knowledge® and is the Project Manager for this effort. Allison is responsible for growing the learning service line at PK as well as for building client relationships, project management, data analyses, research, and drafting deliverables. She has 19 years of experience working with state and local child welfare agencies and juvenile court systems and direct experience working with youth and families experiencing the child welfare system.

Allison has been pivotal in diverse projects throughout her career, including redesigning caseworker training, assisting in implementing Comprehensive Child Welfare Information Systems (CCWIS) and improving Adult Protective Services (APS) systems. Her responsibilities span project planning, management, curriculum design, stakeholder engagement, and quality assurance. Allison excels in organizational change management. As a certified Project Management Professional (PMP), Allison's adept at overseeing intricate projects. Her experience highlights her ability to lead teams, align objectives, and facilitate change

**PUBLIC KNOWLEDGE®**

management while maintaining effective stakeholder communication. Allison received her Master's Degree in Counseling from the University of Wisconsin–Madison, and is a Certified ToP Facilitator, and a certified Project Management Practitioner.

## Statement of Compensation

The Public Knowledge® Project Team includes the following staff with associated hourly rates.

### Table 29. PK Team

| Team Member | Hourly Rate |
|---|---|
| Stacey Moss | $280 |
| Allison Olson Ward | $180 |
| Susan Smith | $220 |
| Julie Breedlove | $175 |

# Appendix J: Stacey Moss CV

## Stacey Moss, JD, CWLS, PMP
### President and CEO

## Professional Summary



Stacey is the President and CEO of Public Knowledge® and has over 20 years of experience working within governmental agencies, educational institutions, and nonprofit organizations. Stacey received her Bachelor of Arts from the University of Northern Colorado, and her Juris Doctorate from the University of Wyoming. She holds a Certified Child Welfare Law Specialist (CWLS) certification and a Project Management Professional (PMP) certification. Stacey brings expertise and knowledge to every project, but focuses her consulting in child welfare, Medicaid, and leadership.

### Key Qualifications

- Legal Expertise: Extensive experience as an attorney, including roles as a Deputy Director and Chief Financial Officer of the Wyoming Guardians Ad Litem Program, providing legal advice to Wyoming state agencies, and practicing family law and child welfare law.

- Teaching and Training: Served as an Adjunct Professor of Law, educating students in legal writing and appellate advocacy. Conducted trainings throughout the US on various topics, demonstrating a commitment to knowledge dissemination.

- Research and Publications: Published multiple legal handbooks and articles on child welfare, juvenile court systems, and various legal issues. Contributed significantly to the field through insightful research and informative publications.

- Effective Presenter: Delivered presentations at numerous conferences, workshops, and training events, showcasing excellent communication and public speaking skills. Has created and delivered more than 75 trainings and presentations.

Exhibit 8
Page 380 of 390

## Stacey Moss, JD, CWLS, PMP
### President and CEO

- Collaboration and Teamwork: Demonstrated ability to work effectively within diverse teams, promoting joint program planning and fostering effective team dynamics.
- Community Engagement: Active involvement in various community projects and volunteer work, including serving as a Big Brothers Big Sisters Project Manager and participating in Americorps National Civilian Community Corps.
- Child Welfare Law Specialist: Recognized as a Child Welfare Law Specialist by the National Association of Counsel for Children, highlighting specialized expertise in child welfare law.

## Work Experience

**Public Knowledge,** President and CEO

1/2013 – Present

Stacey is the President and CEO of Public Knowledge, LLC. Prior to serving as the President, she was our CEO, Professional Practice Officer, Marketing Director, and a Management Consultant. Consulting practice focuses on the health and child welfare industries, and our program and people services.

**Wyoming Office of the Public Defender, Guardians Ad Litem Program,** Deputy Director, Director, Chief Financial Officer

7/2008 – 2/2013

Stacey served as the Deputy Director of the Office of the State Public Defender and acting Director and Chief Financial Officer of the Wyoming Guardians Ad Litem Program. She trained, supervised, and managed all attorneys throughout Wyoming in child welfare and juvenile justice case proceedings. Trained Program administrative staff; gave final approval on all program expenditures and revenue; and tracked and maintained Program budget.

**University of Wyoming College of Law,** Adjunct Professor of Law

1/2008 – 6/2009

Stacey taught legal writing and appellate advocacy as an adjunct professor of law.

Exhibit 8
Page 381 of 390

## Stacey Moss, JD, CWLS, PMP
### President and CEO

**Wyoming Attorney General's Office,** Assistant Attorney General to the Departments of Family Services, Transportation, and Health

4/2007 – 6/2008

Stacey provided day-to-day legal advice to Wyoming state agencies. She represented the Department of Family Services (DFS), Wyoming Department of Transportation, and the Wyoming Department of Health. Stacey reviewed and made recommendations to DFS for legislation, rules, and policy; and trained DFS management, employees, and caseworkers. Stacey completed a mini-CFSR in preparation for the federal I-VE Review. She also concluded rule revisions and advice to the Substitute Care and Day Care Licensing Division and successfully represented the Department of Transportation in administrative hearings on license suspensions.

**Corthell and King, P.C.,** Associate Attorney

6/2006 – 3/2007

Stacey practiced law in a general practice law firm, focused primarily on family law and child welfare law, including representing parents and children in juvenile court.

**Wyoming Domestic Violence Legal Clinic at the University of Wyoming College of Law,** Student Director

5/2005 – 5/2006

Stacey supervised and trained the student attorneys in the legal clinic at the law school. The clinic provided holistic legal representation to victims of domestic violence under the supervision of a faculty attorney.

**University of Wyoming Engineering Department Wyoming Technology Transfer Center,** Research Assistant and Trainer

1/2004 – 5/2006

Stacey worked for the Wyoming Technology Transfer Center researching the legal establishment of rural roads in Wyoming, from territorial days until present. She also conducted trainings throughout Wyoming and wrote a comprehensive reference guide on this issue for Wyoming road personnel and attorneys.

**Jubin & Zerga Law Firm,** Investigator

4/2003 – 8/2003

Exhibit 8
Page 382 of 390

## Stacey Moss, JD, CWLS, PMP
### President and CEO

| | |
|---|---|
| **Americorps National Civilian Community Corps,** Corps Member | 12/2002 – 4/2003 |
| **Henderson, Taylor, & Rapp Law Firm,** Investigator | 7/2002 – 12/2002 |
| **Colorado State Public Defender,** Investigator | 8/2001 – 6/2002 |
| **Big Brothers Big Sisters of Hastings,** Project Manager | 11/2000 – 5/2001 |

### Education

| | |
|---|---|
| Juris Doctorate, University of Wyoming College of Law | 2006 |
| Bachelor of Arts: Sociology, Minor in Legal Studies, University of Northern Colorado | 2002 |

### Certifications and Training

| | |
|---|---|
| Organizational Mindfulness, Institute for Organizational Science and Mindfulness (IOSM) | 2023 |
| Leadership Institute, Classic Leadership Institute | 2019 |
| Hogan and Team Hogan Assessments Certification, Meta Skills Hogan Assessment Systems | 2016 |
| Project Management Professional (PMP), Project Management Institute (PMI) | 2015 |
| Technology of Participation® (ToP) Strategic Planning and Environmental Scanning Methods, Institute of Cultural Affairs (ICA) | 2014 |
| Technology of Participation® (ToP) Group Facilitation Methods, Institute of Cultural Affairs (ICA) | 2013 |
| Child Welfare Law Specialist, National Association of Counsel for Children | 2012 |

Exhibit 8
Page 383 of 390

## Stacey Moss, JD, CWLS, PMP
### President and CEO

Employment Law Certification, Mountain States Employment Council                    2010

## Publications

Publisher and Advisory Board Member for the Family Integrity and Justice Works Quarterly (2002, 4 editions), published by Public Knowledge®

Juvenile Court Law Update (2004–2018), published by the Wyoming Supreme Court Children's Justice Project, a yearly publication

A Handbook for Educators: Navigating Wyoming's Juvenile Court System (2015), published by the Wyoming Supreme Court Children's Justice Project

Skills-Based Handbook for Guardians Ad Litem in Wyoming's Juvenile Courts (2013), published by the Wyoming Supreme Court Children's Justice Project (original publication 2013, updated multiple times)

Minor Consent Laws in Wyoming: Protecting a Minor's Right to Confidential Medical Care (2012), published by the Wyoming Lawyer

Wyoming Foster and Relative Caregivers Handbook – published by the Wyoming Department of Family Services (original publication 2012, multiple updated publications and revisions since)

How a Child Enters the Juvenile Court System – a Handbook for Foster and Relative Caregivers (2011), published by the Wyoming Supreme Court Children's Justice Project (multiple updated publications and revisions since)

Wyoming's Hidden Children and the Attorneys that Represent Them (2011), published by the Wyoming Lawyer

MDT (Multidisciplinary Team) Meetings Handbook (2011), published with the Wyoming Supreme Court Children's Justice Project

Your Rights: A Guide to Juvenile Court in Wyoming for Children and Youth (2009), published by the Wyoming Supreme Court Children's Justice Project (multiple updated publications and revisions since)

Exhibit 8
Page 384 of 390

## Stacey Moss, JD, CWLS, PMP
### President and CEO

New Rules for Guardian Ad Litem Program (2008), published by the Wyoming Lawyer

Current Termination of Parental Rights Statute: An Incentive to Avoid the Court System (2008), published by the Wyoming Lawyer

Wyoming Women and the Law Handbook (2007), published by Wyoming Women's Council (Co-authored with Dona Playton)

High Times in Wyoming: Reflecting the State's Values by Eliminating Barriers and Creating Opportunities for Women in the Equality State, 7 Wyo. L.R. 295 (2007) (Co-authored with Dona Playton)

Legal Establishment of County Roads in Wyoming (2006), published by the Wyoming Technology Transfer Center and the Mountain Plains Consortium

Case Note - Punitive Damage Determinations: A Jury's Factual Inquiry or a Court's Mathematical Leash, State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003), 5 Wyo. L.R. 637 (2005)

## Presentations

| | |
|---|---|
| Winning on Purpose, Public Knowledge® SPARK Summit | 04/2023 |
| Faculty, Mississippi Child Welfare Regional Conferences, 4 regions | Q1 2023 |
| Management Consulting, the Market, and Core Management Consulting Skills; Public Knowledge® SPARK Summit | 10/2022 |
| Team Effectiveness and Decision Making, Public Knowledge® SPARK Summit | 10/2021 |
| Diversity Orientation, Public Knowledge® SPARK Summit | 04/2021 |
| Faculty, Judicial Academy on Reasonable Efforts, Region 4 | 5/2020 |
| Faculty, Judicial Academy on Reasonable Efforts, Regions 9 and 10 | 1/2020 |
| Faculty, CQI Workshops on Multiple Topics, Capacity Building Center for Courts, multiple dates and locations | 2014 – 2019 |

Exhibit 8
Page 385 of 390

## Stacey Moss, JD, CWLS, PMP
### President and CEO

| | |
|---|---|
| 5 Behavioral Principles of Highly Effective Teams, Public Knowledge All-Staff Training | 10/2019 |
| Faculty, Judicial Academy on Reasonable Efforts, Region 4 | 9/2019 |
| Developing Training for Adult Learners, 42nd National Child Welfare Law Conference, co-presented with Andy Yost and Allison Olson | 8/2019 |
| Procurement for Government Sector, Public Knowledge | 7/2019 |
| Child Welfare and CCWIS Systems Overview, Public Knowledge Training | 6/2019 |
| How Qualitative Data and Exploring Stakeholder Perception Can Help Your System Reform Efforts or Stall Them, American Association of Health and Human Services Attorneys (AAHHSA) Conference, co-presented with Melissa Davis | 8/2018 |
| Mock Permanency and Shelter Care Hearing Training Videos (online training videos), Wyoming Supreme Court Children's Justice Project | 2017 |
| Two Sides to Every Technology Project: Bridging the Communication Gap Between IT and Program Staff, National Staff Development and Training Association (NSDTA) Conference, co-presented with Melissa Davis | 10/2017 |
| A How to Guide for Institutionalizing Joint Program Planning, Children's Bureau CIP Grantee Meeting | 8/2017 |
| Planning and Managing the Change from One "Big-Bang" Vendor to Multiple Modular Vendors, Medicaid Enterprise Services Conference (MESC), co-presented with Jesse Springer | 8/2017 |
| How Qualitative Data and Exploring Stakeholder Perception Can Help Your System Reform Efforts or Stall Them, 17th ABA National Conference on Children & the Law: Strengthening Our Advocacy for Results (SOAR), co-presented with Melissa Davis | 4/2017 |
| Juvenile Court Training Modules (online training modules, recorded with handouts and video), Wyoming Supreme Court Children's Justice Project | 2017 |

Exhibit 8
Page 386 of 390

## Stacey Moss, JD, CWLS, PMP
### President and CEO

| | |
|---|---|
| 5 Behavioral Principles of Highly Effective Teams, Public Knowledge All-Staff Training | 10/2016 |
| Finding the 25th Hour, Public Knowledge® Knowledge Share | 11/2016 |
| Supporting Joint Program Planning & Improvement, Children's Bureau CIP Grantee Meeting | 8/2016 |
| A New Strategy to Acquire an MMIS as Services Not Systems, Medicaid Enterprise Services Conference (MESC), co-presented with Jim Plane and Teri Green | 8/2015 |
| Power of Persuasion, Public Knowledge Knowledge Share | 4/2015 |
| Google Tips and Tricks for Consultants, Public Knowledge Knowledge Share | 1/2015 |
| Multiple Child Welfare Topics, Wyoming Children's Justice Conference | 6/2014 |
| Wyoming Juvenile Court 101 Training, multiple locations and dates | 2008-2014 |
| Balancing Work Life and Family Life Panel, Women's Law Summit | 4/2014 |
| Multidisciplinary Teams, Wyoming Supreme Court Children's Justice Project, co-presented with Eydie Trautwein and Debra Dugan-Doty | 2013 |
| Multiple Child Welfare Topics, Wyoming Children's Justice Conference | 6/2013 |
| Guardians ad Litem in Rural Wyoming | 10/2012 |
| Multiple Child Welfare Topics, Wyoming Children's Justice Conference | 6/2012 |
| Child Abuse and Neglect Laws, Juvenile Courts and the History of the Child in the US, sponsored by the Court Appointed Special Advocates | 5/2012 |
| 2012 Session Update, sponsored by the Wyoming Guardians Ad Litem Program | 3/2012 |

Exhibit 8
Page 387 of 390

## Stacey Moss, JD, CWLS, PMP
### President and CEO

| | |
|---|---|
| Child Abuse and Neglect Laws, Juvenile Courts and the History of the Child in the US, sponsored by the Court Appointed Special Advocates | 2/2012 |
| Wyoming Guardians Ad Litem Program for Law Students, taught class at Children and the Law course at University of Wyoming College of Law | 1/2012 |
| Federal Law 101 for Foster and Relative Caregivers, sponsored by the Wyoming Supreme Court Children's Justice Project | 11/2011 |
| The Law, The Courts, and The Child, sponsored by the Court Appointed Special Advocates | 10/2011 |
| Role of a GAL in Wyoming, Juvenile Court Rules and Anatomy of an Abuse/Neglect Proceeding, sponsored by the University of Wyoming College of Law Legal Services and DV Legal Assistance Project Clinics | 10/2011 |
| Online Training Drill – Timelines and Reasonable Efforts Training for Foster and Relative Caregivers, sponsored by the Wyoming Supreme Court Children's Justice Project (completed September 2011) | 9/2011 |
| Online Training Drill – Juvenile Court Hearings and MDTs for Foster and Relative Caregivers, sponsored by the Wyoming Supreme Court Children's Justice Project (completed August 2011) | 8/2011 |
| Online Training Drill – The Role of a GAL in Wyoming, sponsored by the Wyoming Supreme Court Children's Justice Project (completed July 2011) | 7/2011 |
| Resources for GALs in Wyoming, sponsored by the Wyoming Children's Justice Conference | 6/2011 |
| Fostering Connections & Health Reform: What It Means to Children in Juvenile Court, (co-presented with Meredith Asay, Heather Babbitt and Eydie Trautwein) sponsored by the Wyoming Children's Justice Conference | 6/2011 |
| Juvenile Caselaw & Session Update 2011, sponsored by the Wyoming Children's Justice Conference | 6/2011 |

Exhibit 8
Page 388 of 390

## Stacey Moss, JD, CWLS, PMP
### President and CEO

| | |
|---|---|
| Termination of Parental Rights Law in Wyoming (co-presented with Sue Chatfield), sponsored by the Wyoming Trial Lawyers Association | 1/2011 |
| An Overview of the Uniform Child Custody Jurisdiction and Enforcement Act and its Relation to Family Law and Guardian Ad Litem Practice (co-prepared and co-presented with Dona Playton) (prepared materials for training, but was not able to present with co-presenter), sponsored by the Wyoming State Bar | 9/2010 |
| Title 14 Actions and Community Based Resources (co-presented with Eydie Trautwein), sponsored by the Wyoming Department of Health Mental Health and Substance Abuse Division | 8/2010 |
| The Nuts and Bolts of Representing Children in Wyoming Juvenile Court, sponsored by the Wyoming Guardians Ad Litem Program | 6/2010 |
| Engaging Incarcerated Parents in Juvenile Court, sponsored by the Wyoming Children's Justice Conference | 6/2010 |
| Overview of State Laws in Child Welfare/Permanency, sponsored by the Wyoming Supreme Court Children's Justice Project | 2/2010 |
| Title 14 Actions and Community Based Resources (co-prepared and co-presented with Eydie Trautwein), sponsored by the Governor's Roundtable on Children's Mental Health and Starfish Awards | 2/2010 |
| Overview of Federal Laws in Child Welfare/Permanency, sponsored by the Wyoming Supreme Court Children's Justice Project | 2/2010 |
| The Role of a Guardian Ad Litem in Wyoming, sponsored by the Laramie County Bar Association | 11/2009 |
| The Nuts and Bolts of Representing Children in Wyoming Juvenile Court, sponsored by the Wyoming Guardians Ad Litem Program | 9/2009 |

Exhibit 8
Page 389 of 390

## Stacey Moss, JD, CWLS, PMP
### President and CEO

| | |
|---|---|
| The Wyoming Guardians Ad Litem Program – Attorneys Representing Children in Juvenile Court, sponsored by the University of Wyoming College of Law for Law Week | 9/2009 |
| Multiple trainings for the Wyoming Court Appointed Special Advocates (CASA), topics include, but are not limited to:  Federal Child Welfare Law, State Child Welfare Law, the Court System, Burden and Standard of Proof, Evidence and Court Practice, Juvenile Court Process, Working with Incarcerated Parents, Termination of Parental Rights Law, etc. | 2008– 2015 |
| Multiple Trainings for many audiences around the state, including the law school clinics each year, on the Guardians Ad Litem Program and the Role of a Guardian Ad Litem in Wyoming, sponsored by the Wyoming Guardians Ad Litem Program | 2008– 2013 |
| Multiple trainings on legal issues for caseworkers at the Department of Family Services, sponsored by the Department of Family Services, including CORE training, permanency, TPR, foster care placements, etc. | 2007– 2008 |
| Multiple trainings around the State of Wyoming on the Legal Establishment of County Roads, sponsored by the Wyoming Technology Transfer Center | 2006 |

Exhibit 8
Page 390 of 390

# Stacey Moss, JD, CWLS, PMP
## President and CEO

## Professional Summary



Stacey is the President and CEO of Public Knowledge® and has over 20 years of experience working within governmental agencies, educational institutions, and nonprofit organizations. Stacey received her Bachelor of Arts from the University of Northern Colorado, and her Juris Doctorate from the University of Wyoming. She holds a Certified Child Welfare Law Specialist (CWLS) certification and a Project Management Professional (PMP) certification. Stacey brings expertise and knowledge to every project, but focuses her consulting in child welfare, Medicaid, and leadership.

### Key Qualifications

- Legal Expertise: Extensive experience as an attorney, including roles as a Deputy Director and Chief Financial Officer of the Wyoming Guardians Ad Litem Program, providing legal advice to Wyoming state agencies, and practicing family law and child welfare law.

- Teaching and Training: Served as an Adjunct Professor of Law, educating students in legal writing and appellate advocacy. Conducted trainings throughout the US on various topics, demonstrating a commitment to knowledge dissemination.

- Research and Publications: Published multiple legal handbooks and articles on child welfare, juvenile court systems, and various legal issues. Contributed significantly to the field through insightful research and informative publications.

- Effective Presenter: Delivered presentations at numerous conferences, workshops, and training events, showcasing excellent communication and public speaking skills. Has created and delivered more than 75 trainings and presentations.

Exhibit 9
Page 1 of 11

## Stacey Moss, JD, CWLS, PMP
### President and CEO

- Collaboration and Teamwork: Demonstrated ability to work effectively within diverse teams, promoting joint program planning and fostering effective team dynamics.
- Community Engagement: Active involvement in various community projects and volunteer work, including serving as a Big Brothers Big Sisters Project Manager and participating in Americorps National Civilian Community Corps.
- Child Welfare Law Specialist: Recognized as a Child Welfare Law Specialist by the National Association of Counsel for Children, highlighting specialized expertise in child welfare law.

## Work Experience

**Public Knowledge,** President and CEO                                          1/2013 – Present

Stacey is the President and CEO of Public Knowledge, LLC. Prior to serving as the President, she was our CEO, Professional Practice Officer, Marketing Director, and a Management Consultant. Consulting practice focuses on the health and child welfare industries, and our program and people services.

**Wyoming Office of the Public Defender, Guardians Ad Litem Program,**          7/2008 – 2/2013
Deputy Director, Director, Chief Financial Officer

Stacey served as the Deputy Director of the Office of the State Public Defender and acting Director and Chief Financial Officer of the Wyoming Guardians Ad Litem Program. She trained, supervised, and managed all attorneys throughout Wyoming in child welfare and juvenile justice case proceedings. Trained Program administrative staff; gave final approval on all program expenditures and revenue; and tracked and maintained Program budget.

**University of Wyoming College of Law,** Adjunct Professor of Law              1/2008 – 6/2009
Stacey taught legal writing and appellate advocacy as an adjunct professor of law.

Exhibit 9
Page 2 of 11

## Stacey Moss, JD, CWLS, PMP
### President and CEO

**Wyoming Attorney General's Office,** Assistant Attorney General to the Departments of Family Services, Transportation, and Health

4/2007 – 6/2008

Stacey provided day-to-day legal advice to Wyoming state agencies. She represented the Department of Family Services (DFS), Wyoming Department of Transportation, and the Wyoming Department of Health. Stacey reviewed and made recommendations to DFS for legislation, rules, and policy; and trained DFS management, employees, and caseworkers. Stacey completed a mini-CFSR in preparation for the federal I-VE Review. She also concluded rule revisions and advice to the Substitute Care and Day Care Licensing Division and successfully represented the Department of Transportation in administrative hearings on license suspensions.

**Corthell and King, P.C.,** Associate Attorney

6/2006 – 3/2007

Stacey practiced law in a general practice law firm, focused primarily on family law and child welfare law, including representing parents and children in juvenile court.

**Wyoming Domestic Violence Legal Clinic at the University of Wyoming College of Law,** Student Director

5/2005 – 5/2006

Stacey supervised and trained the student attorneys in the legal clinic at the law school. The clinic provided holistic legal representation to victims of domestic violence under the supervision of a faculty attorney.

**University of Wyoming Engineering Department Wyoming Technology Transfer Center,** Research Assistant and Trainer

1/2004 – 5/2006

Stacey worked for the Wyoming Technology Transfer Center researching the legal establishment of rural roads in Wyoming, from territorial days until present. She also conducted trainings throughout Wyoming and wrote a comprehensive reference guide on this issue for Wyoming road personnel and attorneys.

**Jubin & Zerga Law Firm,** Investigator

4/2003 – 8/2003

Exhibit 9
Page 3 of 11

## Stacey Moss, JD, CWLS, PMP
### President and CEO

| | |
|---|---|
| **Americorps National Civilian Community Corps,** Corps Member | 12/2002 – 4/2003 |
| **Henderson, Taylor, & Rapp Law Firm,** Investigator | 7/2002 – 12/2002 |
| **Colorado State Public Defender,** Investigator | 8/2001 – 6/2002 |
| **Big Brothers Big Sisters of Hastings,** Project Manager | 11/2000 – 5/2001 |

### Education

| | |
|---|---|
| Juris Doctorate, University of Wyoming College of Law | 2006 |
| Bachelor of Arts: Sociology, Minor in Legal Studies, University of Northern Colorado | 2002 |

### Certifications and Training

| | |
|---|---|
| Organizational Mindfulness, Institute for Organizational Science and Mindfulness (IOSM) | 2023 |
| Leadership Institute, Classic Leadership Institute | 2019 |
| Hogan and Team Hogan Assessments Certification, Meta Skills Hogan Assessment Systems | 2016 |
| Project Management Professional (PMP), Project Management Institute (PMI) | 2015 |
| Technology of Participation® (ToP) Strategic Planning and Environmental Scanning Methods, Institute of Cultural Affairs (ICA) | 2014 |
| Technology of Participation® (ToP) Group Facilitation Methods, Institute of Cultural Affairs (ICA) | 2013 |
| Child Welfare Law Specialist, National Association of Counsel for Children | 2012 |

Exhibit 9
Page 4 of 11

## Stacey Moss, JD, CWLS, PMP
### President and CEO

Employment Law Certification, Mountain States Employment Council                2010

## Publications

Publisher and Advisory Board Member for the Family Integrity and Justice Works Quarterly (2002, 4 editions), published by Public Knowledge®

Juvenile Court Law Update (2004–2018), published by the Wyoming Supreme Court Children's Justice Project, a yearly publication

A Handbook for Educators: Navigating Wyoming's Juvenile Court System (2015), published by the Wyoming Supreme Court Children's Justice Project

Skills-Based Handbook for Guardians Ad Litem in Wyoming's Juvenile Courts (2013), published by the Wyoming Supreme Court Children's Justice Project (original publication 2013, updated multiple times)

Minor Consent Laws in Wyoming: Protecting a Minor's Right to Confidential Medical Care (2012), published by the Wyoming Lawyer

Wyoming Foster and Relative Caregivers Handbook – published by the Wyoming Department of Family Services (original publication 2012, multiple updated publications and revisions since)

How a Child Enters the Juvenile Court System – a Handbook for Foster and Relative Caregivers (2011), published by the Wyoming Supreme Court Children's Justice Project (multiple updated publications and revisions since)

Wyoming's Hidden Children and the Attorneys that Represent Them (2011), published by the Wyoming Lawyer

MDT (Multidisciplinary Team) Meetings Handbook (2011), published with the Wyoming Supreme Court Children's Justice Project

Your Rights: A Guide to Juvenile Court in Wyoming for Children and Youth (2009), published by the Wyoming Supreme Court Children's Justice Project (multiple updated publications and revisions since)

Exhibit 9
Page 5 of 11

## Stacey Moss, JD, CWLS, PMP
### President and CEO

New Rules for Guardian Ad Litem Program (2008), published by the Wyoming Lawyer

Current Termination of Parental Rights Statute: An Incentive to Avoid the Court System (2008), published by the Wyoming Lawyer

Wyoming Women and the Law Handbook (2007), published by Wyoming Women's Council (Co-authored with Dona Playton)

High Times in Wyoming: Reflecting the State's Values by Eliminating Barriers and Creating Opportunities for Women in the Equality State, 7 Wyo. L.R. 295 (2007) (Co-authored with Dona Playton)

Legal Establishment of County Roads in Wyoming (2006), published by the Wyoming Technology Transfer Center and the Mountain Plains Consortium

Case Note – Punitive Damage Determinations: A Jury's Factual Inquiry or a Court's Mathematical Leash, State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003), 5 Wyo. L.R. 637 (2005)

## Presentations

| | |
|---|---|
| Winning on Purpose, Public Knowledge® SPARK Summit | 04/2023 |
| Faculty, Mississippi Child Welfare Regional Conferences, 4 regions | Q1 2023 |
| Management Consulting, the Market, and Core Management Consulting Skills; Public Knowledge® SPARK Summit | 10/2022 |
| Team Effectiveness and Decision Making, Public Knowledge® SPARK Summit | 10/2021 |
| Diversity Orientation, Public Knowledge® SPARK Summit | 04/2021 |
| Faculty, Judicial Academy on Reasonable Efforts, Region 4 | 5/2020 |
| Faculty, Judicial Academy on Reasonable Efforts, Regions 9 and 10 | 1/2020 |
| Faculty, CQI Workshops on Multiple Topics, Capacity Building Center for Courts, multiple dates and locations | 2014 – 2019 |

Exhibit 9
Page 6 of 11

## Stacey Moss, JD, CWLS, PMP
### President and CEO

| | |
|---|---|
| 5 Behavioral Principles of Highly Effective Teams, Public Knowledge All-Staff Training | 10/2019 |
| Faculty, Judicial Academy on Reasonable Efforts, Region 4 | 9/2019 |
| Developing Training for Adult Learners, 42nd National Child Welfare Law Conference, co-presented with Andy Yost and Allison Olson | 8/2019 |
| Procurement for Government Sector, Public Knowledge | 7/2019 |
| Child Welfare and CCWIS Systems Overview, Public Knowledge Training | 6/2019 |
| How Qualitative Data and Exploring Stakeholder Perception Can Help Your System Reform Efforts or Stall Them, American Association of Health and Human Services Attorneys (AAHHSA) Conference, co-presented with Melissa Davis | 8/2018 |
| Mock Permanency and Shelter Care Hearing Training Videos (online training videos), Wyoming Supreme Court Children's Justice Project | 2017 |
| Two Sides to Every Technology Project: Bridging the Communication Gap Between IT and Program Staff, National Staff Development and Training Association (NSDTA) Conference, co-presented with Melissa Davis | 10/2017 |
| A How to Guide for Institutionalizing Joint Program Planning, Children's Bureau CIP Grantee Meeting | 8/2017 |
| Planning and Managing the Change from One "Big-Bang" Vendor to Multiple Modular Vendors, Medicaid Enterprise Services Conference (MESC), co-presented with Jesse Springer | 8/2017 |
| How Qualitative Data and Exploring Stakeholder Perception Can Help Your System Reform Efforts or Stall Them, 17th ABA National Conference on Children & the Law: Strengthening Our Advocacy for Results (SOAR), co-presented with Melissa Davis | 4/2017 |
| Juvenile Court Training Modules (online training modules, recorded with handouts and video), Wyoming Supreme Court Children's Justice Project | 2017 |

Exhibit 9
Page 7 of 11

| Stacey Moss, JD, CWLS, PMP |
| --- |
| President and CEO |

| | |
| --- | --- |
| 5 Behavioral Principles of Highly Effective Teams, Public Knowledge All-Staff Training | 10/2016 |
| Finding the 25th Hour, Public Knowledge® Knowledge Share | 11/2016 |
| Supporting Joint Program Planning & Improvement, Children's Bureau CIP Grantee Meeting | 8/2016 |
| A New Strategy to Acquire an MMIS as Services Not Systems, Medicaid Enterprise Services Conference (MESC), co-presented with Jim Plane and Teri Green | 8/2015 |
| Power of Persuasion, Public Knowledge Knowledge Share | 4/2015 |
| Google Tips and Tricks for Consultants, Public Knowledge Knowledge Share | 1/2015 |
| Multiple Child Welfare Topics, Wyoming Children's Justice Conference | 6/2014 |
| Wyoming Juvenile Court 101 Training, multiple locations and dates | 2008–2014 |
| Balancing Work Life and Family Life Panel, Women's Law Summit | 4/2014 |
| Multidisciplinary Teams, Wyoming Supreme Court Children's Justice Project, co-presented with Eydie Trautwein and Debra Dugan-Doty | 2013 |
| Multiple Child Welfare Topics, Wyoming Children's Justice Conference | 6/2013 |
| Guardians ad Litem in Rural Wyoming | 10/2012 |
| Multiple Child Welfare Topics, Wyoming Children's Justice Conference | 6/2012 |
| Child Abuse and Neglect Laws, Juvenile Courts and the History of the Child in the US, sponsored by the Court Appointed Special Advocates | 5/2012 |
| 2012 Session Update, sponsored by the Wyoming Guardians Ad Litem Program | 3/2012 |

Exhibit 9
Page 8 of 11

| **Stacey Moss, JD, CWLS, PMP** | |
| --- | --- |
| President and CEO | |
| Child Abuse and Neglect Laws, Juvenile Courts and the History of the Child in the US, sponsored by the Court Appointed Special Advocates | 2/2012 |
| Wyoming Guardians Ad Litem Program for Law Students, taught class at Children and the Law course at University of Wyoming College of Law | 1/2012 |
| Federal Law 101 for Foster and Relative Caregivers, sponsored by the Wyoming Supreme Court Children's Justice Project | 11/2011 |
| The Law, The Courts, and The Child, sponsored by the Court Appointed Special Advocates | 10/2011 |
| Role of a GAL in Wyoming, Juvenile Court Rules and Anatomy of an Abuse/Neglect Proceeding, sponsored by the University of Wyoming College of Law Legal Services and DV Legal Assistance Project Clinics | 10/2011 |
| Online Training Drill – Timelines and Reasonable Efforts Training for Foster and Relative Caregivers, sponsored by the Wyoming Supreme Court Children's Justice Project (completed September 2011) | 9/2011 |
| Online Training Drill – Juvenile Court Hearings and MDTs for Foster and Relative Caregivers, sponsored by the Wyoming Supreme Court Children's Justice Project (completed August 2011) | 8/2011 |
| Online Training Drill – The Role of a GAL in Wyoming, sponsored by the Wyoming Supreme Court Children's Justice Project (completed July 2011) | 7/2011 |
| Resources for GALs in Wyoming, sponsored by the Wyoming Children's Justice Conference | 6/2011 |
| Fostering Connections & Health Reform: What It Means to Children in Juvenile Court, (co-presented with Meredith Asay, Heather Babbitt and Eydie Trautwein) sponsored by the Wyoming Children's Justice Conference | 6/2011 |
| Juvenile Caselaw & Session Update 2011, sponsored by the Wyoming Children's Justice Conference | 6/2011 |

Exhibit 9
Page 9 of 11

## Stacey Moss, JD, CWLS, PMP
### President and CEO

| | |
|---|---|
| Termination of Parental Rights Law in Wyoming (co-presented with Sue Chatfield), sponsored by the Wyoming Trial Lawyers Association | 1/2011 |
| An Overview of the Uniform Child Custody Jurisdiction and Enforcement Act and its Relation to Family Law and Guardian Ad Litem Practice (co-prepared and co-presented with Dona Playton) (prepared materials for training, but was not able to present with co-presenter), sponsored by the Wyoming State Bar | 9/2010 |
| Title 14 Actions and Community Based Resources (co-presented with Eydie Trautwein), sponsored by the Wyoming Department of Health Mental Health and Substance Abuse Division | 8/2010 |
| The Nuts and Bolts of Representing Children in Wyoming Juvenile Court, sponsored by the Wyoming Guardians Ad Litem Program | 6/2010 |
| Engaging Incarcerated Parents in Juvenile Court, sponsored by the Wyoming Children's Justice Conference | 6/2010 |
| Overview of State Laws in Child Welfare/Permanency, sponsored by the Wyoming Supreme Court Children's Justice Project | 2/2010 |
| Title 14 Actions and Community Based Resources (co-prepared and co-presented with Eydie Trautwein), sponsored by the Governor's Roundtable on Children's Mental Health and Starfish Awards | 2/2010 |
| Overview of Federal Laws in Child Welfare/Permanency, sponsored by the Wyoming Supreme Court Children's Justice Project | 2/2010 |
| The Role of a Guardian Ad Litem in Wyoming, sponsored by the Laramie County Bar Association | 11/2009 |
| The Nuts and Bolts of Representing Children in Wyoming Juvenile Court, sponsored by the Wyoming Guardians Ad Litem Program | 9/2009 |

Exhibit 9
Page 10 of 11

## Stacey Moss, JD, CWLS, PMP
### President and CEO

| | |
|---|---|
| The Wyoming Guardians Ad Litem Program – Attorneys Representing Children in Juvenile Court, sponsored by the University of Wyoming College of Law for Law Week | 9/2009 |
| Multiple trainings for the Wyoming Court Appointed Special Advocates (CASA), topics include, but are not limited to:  Federal Child Welfare Law, State Child Welfare Law, the Court System, Burden and Standard of Proof, Evidence and Court Practice, Juvenile Court Process, Working with Incarcerated Parents, Termination of Parental Rights Law, etc. | 2008–2015 |
| Multiple Trainings for many audiences around the state, including the law school clinics each year, on the Guardians Ad Litem Program and the Role of a Guardian Ad Litem in Wyoming, sponsored by the Wyoming Guardians Ad Litem Program | 2008–2013 |
| Multiple trainings on legal issues for caseworkers at the Department of Family Services, sponsored by the Department of Family Services, including CORE training, permanency, TPR, foster care placements, etc. | 2007–2008 |
| Multiple trainings around the State of Wyoming on the Legal Establishment of County Roads, sponsored by the Wyoming Technology Transfer Center | 2006 |

Exhibit 9
Page 11 of 11



# National Association of Counsel for Children
### NACC Standards for Child Welfare Law Attorney Specialty Certification

| | | |
|---|---|---|
| *Section 1* | *General Principles* | |
| *Section 2* | *Standards for Certification* | |
| | Part 1 | Good Standing and Period of Practice |
| | Part 2 | Substantial Involvement |
| | Part 3 | Educational Experience |
| | Part 4 | Peer Review |
| | Part 5 | Examination |
| | Part 6 | Writing Sample |
| | Part 7 | Disclosure of Conduct |
| *Section 3* | *Recertification Standards* | |
| | Part 1 | Good Standing and Period of Practice |
| | Part 2 | Substantial Involvement |
| | Part 3 | Educational Experience |
| | Part 4 | Peer Review |
| | Part 5 | Disclosure of Conduct |
| | Part 6 | Examination and Writing Sample |
| *Section 4* | *Annual Reporting* | |
| *Section 5* | *Application Review* | |
| *Section 6* | *Denial or Revocation of Certification: Reconsideration and Appeal* | |

_____

### Section 1        General Principles

1.1    Certification is individual, voluntary, and open to all who qualify.

1.2    These standards shall not in any way limit the right of the certified child welfare law attorney to practice law in all fields.

1.3    These standards shall not be interpreted to require a lawyer to obtain a certificate in child welfare law before he or she can practice in the field.

1.4    Certification shall be for five years, after which time the certificate cannot be used unless the lawyer is recertified. Certification may be revoked at any time for violations of these Standards.

1.5    Application for certification will be made to the National Association of Counsel for Children (NACC), on the forms supplied, and accompanied by the appropriate fee.

Last revised 8/2014

Exhibit 10
Page 1 of 7

1.6    Applicant must complete all requirements, including the examination, within two years of application. If the certification process is not satisfactorily completed within the two-year period, the applicant must reapply and re-submit all required fees. An application can be denied at any time within the two year application period for failure to successfully meet the requirements for certification.

1.7    A certificate will be issued upon a showing by the applicant, and by the NACC Certification Committee's own investigation, that the applicant complies with the Certification Standards.

1.8    All applications and other information submitted to the NACC shall be privileged and confidential, except as compelled by law and, except that the NACC Certification Committee may reveal the fact of an application for the purpose of verifying information submitted by the applicant, and for the purpose of making such inquiries with respect to the character and professional reputation of the applicant as may be authorized by the Standards.

1.9    The NACC does not discriminate against any lawyer seeking certification on the basis of race, nationality, religion, gender, sexual orientation, disability, or age.

1.10    The NACC is dedicated to the identification of lawyers who possess an enhanced level of skill and expertise in child welfare law, and have demonstrated integrity and dedication to the interests of their clients.

1.11    Membership in the NACC is not a requirement for certification.

### *Section 2*    *Standards for Certification*

**Part 1  Good Standing and Period of Practice**

2.1    **Good Standing.**  The applicant shall furnish evidence of his or her good standing in the state of his or her admission, or if admitted in more than one state, in the state of his or her principal practice.

2.1.1    **Period of Practice.**  Immediately preceding application, the applicant must have spent three (3) years **involved** in the practice of child welfare law.

**Part 2  Substantial Involvement**

2.2    **Substantial Involvement.**  The applicant must make a satisfactory showing of substantial involvement relevant to child welfare law, with at least thirty (30) percent of his or her time involved in child welfare law during the three (3) years preceding the filing of the application.

2.2.1    **Evidence of Substantial Involvement.**  Evidence of substantial involvement *may* be shown by the following activity over the three (3) year period preceding application.  (The following are sample criteria for substantial involvement.  Although applicants meeting each of these criteria would clearly satisfy this requirement, applicants are not required to meet all of these criteria. Additionally**,** applicants may submit other activities as evidence of substantial involvement.):

- Participation in 45 child welfare matters during the three years preceding the filing of the application
- Direct or cross examination of 25 lay witnesses
- Direct or cross examination of 10 expert witnesses

- Referral of 25 child welfare matters to collateral systems, such as the education system, mental health system, criminal, immigration, or other system, which demonstrates applicant's knowledge of and appreciation for representing the whole client
- Making 25 visits to the community, such as a home visit to a client, foster parent, family resource, the case address, field office, or scene of the crime
- Consultation with a non-legal expert on some aspect of child welfare, child development, or medical or related issues in 10 cases
- Consultation with a non-legal professional on some aspect related to the representation of the client's interests in 20 cases
- Collection of relevant information from outside sources in 45 child welfare matters
- Participation in 10 negotiated settlements
- Participation in 5 appellate or writ matters

Participation in special education advocacy, child benefits, criminal child abuse, domestic violence, adoption / guardianship, juvenile delinquency, and divorce and custody matters will be considered.

2.2.3   **Verification.**  Applicants are required to verify by sworn statement under penalty of perjury in the application process that the evidence of substantial involvement indicated is true and accurate.

2.2.4   **Waiver for Judges, Magistrates, Supervisors, Directors, Law Professors, and Policy Advocates**.  The requirements of this section may be waived for any person who has served as a dependency court judge, magistrate, supervisor, director, law faculty, or policy representative for three years at any time during the last five years. Applicants using this waiver are required to provide detailed information about their service.

**Part 3  Educational Experience**

2.3   **Educational Experience.**  The applicant must demonstrate substantial participation in continuing legal education relevant to child welfare law in the three-year period immediately preceding application.  Topics deemed relevant to child welfare law include but are not limited to substantive and procedural law, trial practice, alternative dispute resolution, child abuse and neglect, child development, and family dynamics and relationships:

a.   By attendance at not less than thirty-six hours in programs of continuing legal education, including in-house staff trainings, acceptable to the NACC Certification Committee.  Pre-approval of trainings with the NACC is not required; and / or

b.   By equivalent participation through, but not limited to, the following means, acceptable to the NACC Certification Committee (Pre-approval is not required):

1.   Teaching courses or seminars in child welfare law;
2.   Participation as panelist, speaker, or workshop leader, at educational or professional conferences in child welfare law;
3.   Authorship of books or of articles published in professional journals in child welfare law.

**Part 4  Peer Review**

2.4   **Peer Review.**  The applicant shall submit with application the names of no less than five (4 attorneys, 1 judge) and no more than eight (6 attorneys, 2 judges) references.  These references shall be substantially involved in child welfare, and familiar with the applicant's work.

References satisfactory to the NACC must be received from at least one judge / magistrate and four attorneys who can attest to the applicant's competence in child welfare law. A reference from an individual who has served as opposing counsel is encouraged. References may not be provided by persons related to the applicant or by those who are engaged in the legal practice with the applicant.

2.4.1    **Collection of References by NACC.** NACC will solicit confidential statements from all persons listed as references and may solicit confidential statements of reference from other persons, familiar with the applicant's practice, not specifically named by the applicant. All reference statements received will be reviewed by the NACC to assess whether the applicant has demonstrated an appropriate level of skill and expertise.

**Part 5  Examination**

2.5    **Examination.** The applicant must pass the NACC Child Welfare Law written competency examination. The examination may be taken any time during the application period. Exam results have no bearing on the Application Review (Section 5) or Petition of Reconsideration/Appeal process (Section 6). An applicant may pass the exam, but denied certification if other standards have not been met.

2.5.1    **Examination Review.** An applicant who fails to pass the examination may, within two (2) months after the results have been announced, review his or her examination in such a place as the NACC may designate. If an applicant chooses to review his or her examination, he or she forfeits his or her right to re-take the examination. An applicant who passes the examination shall not be entitled to review his or her examination.

**Part 6  Writing Sample**

2.6    **Writing Sample.** The applicant shall submit a copy of a trial court memorandum, appellate brief, article, or a writing sample demonstrating legal analysis in the field of child welfare law. This should be a substantial writing sample, stating facts and arguing law, submitted or drafted no more than three years before the date of application.

**Part 7  Disclosure of Conduct**

2.7    **Disclosure of Conduct.** In order to assist the evaluation of whether the applicant possesses an appropriate level of skill and expertise and has demonstrated integrity and dedication to the interests of clients, the applicant shall, to the extent known, disclose to the NACC as soon as permitted by law:

(a)    The filing of any criminal charges against the applicant together with all details;

(b)    The filing or submission of any allegation of unethical or inappropriate professional conduct with any court, grievance committee or disciplinary board or body together with all details;

(c)    The assertion of any claim of professional negligence or professional liability, whether or not suit has been filed.

2.7.1    **Findings.** The National Association of Counsel for Children shall determine, in accordance with these Standards, whether action should be deferred pending receipt of additional information. The NACC will take into consideration any findings made by other bodies concerning such conduct, but is not bound by any such findings and will make its own independent assessment concerning how such conduct bears on whether an attorney is qualified to obtain or maintain certification.

2.7.2    **Failure to Disclose.**    The failure of an applicant to disclose such conduct is a material misrepresentation and may be cause for rejecting an application, or for suspending a certification. The applicant shall have a continuing duty to disclose such maters to the NACC.

*Section 3        Recertification Standards*

**Part 1  Good Standing and Period of Practice**
3.1    **Good Standing and Period of Practice.**    The applicant must satisfy the good standing and period of practice requirements of certification set forth in Section 2, Part 1 of these standards.

**Part 2  Substantial Involvement**
3.2    **Substantial Involvement.**    The applicant must satisfy the substantial involvement requirements of certification set forth in Section 2, Part 2 of these standards.

**Part 3  Educational Experience**
3.3    **Educational Experience.**    The applicant must show that he or she participated in and completed at least thirty-six hours of educational activity, as set forth in Section 2 Part 3 of these standards, during the five years preceding recertification.

**Part 4  Peer Review**
3.4    **References.**    The applicant shall submit with application the names of no less than five (4 attorneys, 1 judge) and no more than eight (6 attorneys, 2 judges) references.  These references shall be substantially involved in child welfare law, and familiar with the applicant's practice. References satisfactory to the NACC must be received from at least one judge who can attest to the applicant's competence in child welfare law. References may not be provided by persons related to the applicant or by those who are engaged in the legal practice with the applicant.

3.4.1    **Collection of Peer Review Statements.**    NACC will solicit confidential statements from all persons listed as references and may solicit confidential statements of reference from other persons, familiar with the applicant's practice, not specifically named by the applicant.  All reference statements received will be reviewed by the NACC to assess whether the applicant has demonstrated an enhanced level of skill and expertise.

**Part 5  Disclosure of Conduct**
3.5    **Disclosure of Conduct.**    The applicant shall comply with Section 2 Part 7 of these standards in the same manner as an applicant for certification.

**Part 6  Examination and Writing Sample**
3.6    **Examination and Writing Sample.**    Applicants for recertification shall NOT be required to take a written examination or provide a writing sample.

*Section 4        Annual Reporting*

4.1    **Annual Reporting.**    Annually, certified attorneys will be required to submit a Disclosure of Conduct and annual dues.  The certified attorney's annual dues and Disclosure of Conduct must be current before an application for recertification will be granted.

*Section 5        Application Review*

5.1    **Application Review.**    Applications for certification and recertification shall be reviewed by the NACC Certification Committee, a majority of the members of which shall be lawyers who have

substantial involvement in the area of child welfare law.  The NACC Certification Committee consists of 10 members, five of whom shall be designated even numbered reviewers and five of whom shall be designated odd numbered reviewers.  Each Applicant will be assigned a registration number and reviewers will rotate applications so that a five member panel reviews each application.

*Section 6*        *Denial or Revocation of Certification: Reconsideration and Appeal*

6.1      **Denial of Certification.**  An applicant for certification may be denied for failure to comply with any of these standards.

6.1.1    **Denial of Recertification.** An application for recertification may be denied for failure to comply with any of these standards.

6.1.2    **Revocation.**  An existing certification may be revoked for failure to demonstrate maintenance of an enhanced level of skill and experience and integrity and dedication to the interests of clients as required for certification or for failure to maintain compliance with the financial responsibility requirements (payment of certification fees).

6.1.3    **Reconsideration and Appeal.**  Decisions of the NACC Certification Committee are subject to reconsideration by the NACC Certification Committee, and thereafter, appeal to the NACC Board of Directors.  An attorney who is refused certification for any reason, or who is refused recertification or whose certification is revoked may pursue review under the following reconsideration and appeal procedures of the NACC.

6.1.4    **Petitions for Reconsideration.**  After written notice has been sent by the NACC Certification Committee that an application for certification or re-certification has been denied, or a certificate has been revoked or suspended, the applicant may petition the committee for reconsideration. Such petition must be received by the committee within 30 days of the date that the notice was sent by the Certification Committee. The petition may be informal, but shall be in writing and adequately identify the determination for which reconsideration is requested, the date of mailing of such determination, the reasons the determination should be altered, and the relief requested.

6.1.5    **Reconsideration by NACC Certification Committee.**  Petitions for reconsideration shall be reviewed by the same 5 member section of the committee which reviewed the original application.  The reviewers shall decide whether to grant the requested relief after considering the applicant's petition and any additional information obtained.  The applicant shall be advised of the Certification Committee's decision by written notice mailed within 15 days after the decision has been made.

6.1.6    **Appeal.**  Reconsideration decisions of the Certification Committee may be appealed to the NACC Board of Directors.  The five members of the Certification Committee who reviewed the initial application and petition for reconsideration shall not be allowed to sit in review of the appeal. The appeal shall be in writing and shall be received by the Board of Directors within 30 days after written notice of the reconsideration decision. The Board shall decide whether to grant the requested relief after considering the applicant's petition and any additional information obtained. The applicant shall be advised of the Board's decision by written notice mailed within 15 days after the decision has been made.

6.1.7    **Appeals Final**.  Appeal decisions of the NACC Board of Directors are final.  Exhaustion of this right shall be a condition precedent to judicial review.

6.1.8    **Hearings.** Although there is no right to a hearing on a petition for reconsideration or appeal, the committee or board may, in its discretion, grant the petitioner an in person or telephone hearing.

6.1.9    **Reapplication Waiting Period.**  A lawyer who is refused certification or recertification, or whose certification is revoked, may not apply for certification until one year after the date of such refusal, denial or revocation.

6.1.10    **Suspension of License.**  Suspension of license to practice law shall operate as an automatic revocation of certification.

6.1.11    **Premature Publication.**  A lawyer who publicizes a certification or application for certification prior to its being granted or continues to publish certification after it has been revoked or suspended, may be barred from certification.

_____

###



2/2/24, 2:28 PM

This is Me Podcast Featuring Guest, Stacey Obrecht - Shortgo

YOU ARE READING
**This Is Me Podcast Featuring Guest, Stacey Obrecht**

⇄ SHARE

Home    Community    Business    Government    Features    Community    About    Subscribe

# This Is Me Podcast Featuring Guest, Stacey Obrecht

Brandi Nash   POSTED ON JUNE 24, 2020

♡ 2

f **Share On Facebook**    🐦 **Tweet It**    📌    G＋    ✉



## Stacey Obrecht is a wife, mother of four, and CEO at Public Knowledge, LLC.

Stacey thrives on challenges! We are sure the word "no" is not in her vocabulary. She finds creative ways to solve problems, often by finding connections between seemingly unrelated things. An empathetic extrovert, she thrives on making lasting relationships with her clients and ensuring their projects are successful. Prior to becoming the Chief Executive Officer, Stacey served as Public Knowledge's Professional Practice Officer, and she has played a key role in the firm's growth over the last seven years. She has 20 years of project management experience and served as the Marketing Director at Public Knowledge for four years before becoming an Officer. She is also a licensed attorney, certified Child Welfare Law Specialist, and certified Project Management Professional. She currently serves as a national expert on child welfare and juvenile courts and has led key planning and procurement projects for the firm.

"

*I realized that sharing the things that are real about life, that are hard, that aren't pretty, that are messy, and don't make us feel great about ourselves, is*

### POPULAR POSTS

**Can Your Charitable Donations Claim Tax Deductions?**

**Unions Had Historically High Strikes And Historically Low Participation In 2023**

**Coca Cola Cowboy (A Tip Of The Hat To Free Enterprise In Cheyenne Wyoming)**

**Capitol North Historic District Officially Expands**

**Norovirus Making The Rounds In Wyoming Again**

**Cheyenne Unites For 7th Annual Valentine's Day Cookie Drive For Airmen**

**Suspect Arrested Following Domestic Disturbance**

[                    ] 🔍

### RECENT POSTS

Can your Charitable Donations claim Tax Deductions?

Unions had Historically High Strikes and Historically Low Participation in 2023

Coca Cola Cowboy (a tip of the hat to free enterprise in Cheyenne Wyoming)

Capitol North Historic District officially expands

Norovirus Making the Rounds in Wyoming Again

Cheyenne Unites for 7th Annual Valentine's Day Cookie Drive for Airmen

Suspect Arrested Following Domestic Disturbance

Exhibit 11
Page 1 of 4



YOU ARE READING
**This Is Me Podcast Featuring Guest, Stacey Obrecht**

☐ SHARE

Home    Community    Business    Government    Features    Community    About    Subscribe

Stacey's son, Evan, was diagnosed with Type 1 Diabetes (T1D) at the age of five in November 2015.  Stacey is passionate about reaching parents of newly diagnosed children, finding ways to support anyone connected to T1D, and giving back to the wonderful organizations and people that help move research forward and care for those with T1D each and every day.

VISIT STACEY

"

*What Type 1 brought me and brought our family was a very quick, forced focus on what's most important and to really cherish the small things. -Stacey Obrecht*



*Brandi Nash, Stacey Obrecht and Amie Siemens*

This is Me Podcast is hosted by Brandi Lea Nash and Amie Lou Siemens and is based in Cheyenne, Wyoming. The show was inspired by the thought that women can change their lives and change the lives of others by sharing their stories. They believe that you can turn your struggle into your story. The show is a fun and heart-warming combination of living in the Rocky Mountain Region and phenomenal women sharing their stories. The show is available on SoundCloud, iTunes, and Spotify.

THIS IS ME    LISTEN NOW

Do you have a story to share? Email info@thisismepodcast.com

*This episode was recorded prior to the COVID-19 outbreak.



 Share On Facebook     Tweet It        Google+    

Exhibit 11
Page 2 of 4

2/2/24, 2:28 PM                                This is Me Podcast Featuring Guest, Stacey Obrecht - Shortgo



YOU ARE READING
This Is Me Podcast Featuring Guest, Stacey Obrecht

⌖ SHARE

Home        Community        Business        Government        Features        Community        About        Subscribe

TRENDING NOW



### Can your Charitable Donations claim Tax Deductions?

Shortgo    *JANUARY 31, 2024*



### Unions had Historically High Strikes and Historically Low Participation in 2023

Sydney O'Brien    *JANUARY 31, 2024*

YOU MAY ALSO LIKE



### Capitol Ceremony To Recognize 20th Anniversary Of 9/11

*SEPTEMBER 3, 2021*



### LCCC Welcomes High School Teachers To Weld Works

*JULY 9, 2021*



### Walmart Celebrates Grand Re-Opening At Livingston Avenue Location

*JULY 7, 2021*



**READ NEXT**

CPD Officers Awarded Medal Of Valor, Meritorious Service





NEWSLETTER

Receive SHORTGO Weekly Digests to receive greater Cheyenne area community news in real-time.

⌃

Exhibit 11
Page 3 of 4

2/2/24, 2:28 PM                    This is Me Podcast Featuring Guest, Stacey Obrecht - Shortgo



Copyright © 2017 Shortgo. Made in Wyoming. All rights reserved.

Exhibit 11
Page 4 of 4

# The GLI® Group Acquires Public Knowledge to Expand Government Consulting Services

Jan 8, 2020

LAKEWOOD, N.J., Jan. 8, 2020 /PRNewswire/ — The GLI® Group has acquired Public Knowledge, LLC, a management consulting firm to government agencies. The acquisition will expand and complement GLI's government consulting services.

Public Knowledge is a national management consulting firm that helps government agencies solve challenging and difficult problems and thrives in complex environments. They do this by providing planning, procurement, and implementation services primarily to health and human services agencies.

Public Knowledge will continue to operate under their brand name, and customers can expect a "business-as-usual" approach while also being able to leverage the GLI Group's reputation for world-class customer service and exemplary culture of social responsibility.

> GLI President and CEO James Maida said, "The GLI Group has completed multiple strategic acquisitions that strengthen our reach in three key areas: Testing and Certification, IT Security, and Government Consulting Services. Recent acquisitions such as SeNet, NMi, and Bulletproof further enhanced our global gaming and cybersecurity offerings. Now, the acquisition of Public Knowledge complements and provides additional bandwidth to our government consulting business."

Public Knowledge CFO Kristin Sparks said, "We are very excited about the infrastructure and efficiencies that a large organization like the GLI Group will bring to Public Knowledge."

Stacey Obrecht, Public Knowledge Professional Practice Officer, added, "Public Knowledge has seen consistent growth over the last six years because our current clients ask for more support. We are proud of our long-term client partnerships and look forward to the ability to scale faster to meet our clients' needs with support from the GLI Group."

View Original Press Release (https://www.prnewswire.com/news-releases/the-gli-group-acquires-public-knowledge-to-expand-government-consulting-services-300983681.html)

Exhibit 12
Page 1 of 3

**About The GLI Group:**
The GLI Group is a leading Assurance, Testing, Inspections and Certifications (ATIC) organization of complementary businesses operating globally in three primary industries: Global Gaming, IT Security and Government Consultation Services. The GLI Group includes more than 1,400 employees worldwide.

For more information, visit www.gaminglabs.com (https://c212.net/c/link/?t=0&l=en&o=2686087-1&h=2333073206&u=http%3A%2F%2Fwww.gaminglabs.com%2F&a=www.gaminglabs.com) .

***Contact:***
Christie Eickelman, Vice President of Global Marketing
+1 (702) 914-2220 or c.eickelman@gaminglabs.com (mailto:c.eickelman@gaminglabs.com)

# Stephanie Meisner-Maggard

Marketing Director

P: (307) 631-9591
E: smeisner@pubknow.com

# Similar Press Releases

## Poverty is Not Neglect: Spring Issue of the FIJ Quarterly Emphasizes How Mandatory Reporting is Ruining the Child Welfare System

The publishing of the newest FIJ Quarterly takes a critical stance on how mandatory reporting confuses poverty with neglect and abuse.

Apr 26, 2022
(https://pubknow.com/media-center/fij-quarterly-takes-on-mandatory-reporting/)

Exhibit 12
Page 2 of 3

# SLI's Quality Management System Earns ISO 9001:2015 Certification

A new milestone was achieved recently when SLI Global Solution's (SLI) efforts to bring its Quality Management System (QMS) forward to the most current standard successfully passed an outside audit by Orion Registrar.

Sep 29, 2017 (https://pubknow.com/media-center/slis-quality-management-system-earns-iso-90012015-certification/)

# SLI Government Solutions celebrates Child Support Awareness Month with #SupportChildSupport

SLI Government Solutions celebrates Child Support Awareness Month with #SupportChildSupport

Aug 4, 2020 (https://pubknow.com/media-center/sli-government-solutions-celebrates-child-support-awareness-month-with-supportchildsupport/)

# Supplemental Assessment of Services for Youth Aging Out of Foster Care

For:

Markowitz Herbold

March 1, 2024



PUBLIC KNOWLEDGE®

600 Airport Rd
Lakewood, NJ 08701–5995
www.pubknow.com

info@pubknow.com
(800) 776–4229

Exhibit 13
Page 1 of 26

# Table of Contents

1   Executive Summary                                                                                    1

    1.1   Responses to Dr. Day's Conclusions                                         2

2   Methodology                                                                                          5

    2.1   Research Questions                                                         5

    2.2   Data Collection and Analysis                                               5

        2.2.1   Interview Protocol                                                 5

        2.2.2   Document Review                                                    5

3   Findings                                                                                             7

    3.1   Oregon CW improved policy language regarding independent living services.    7

    3.2   Oregon CW expanded its service array for independent living services.        8

    3.3   Oregon CW continues to assess the independent living needs of young adults
transitioning out of foster care.                                               10

    3.4   Oregon CW improved its delivery of independent living services.              15

Appendix A: Interview Protocol                                                                          22

Appendix B: Facts and Data                                                                              24

Exhibit 13
Page 2 of 26

# 1    Executive Summary

Public Knowledge® (PK) conducted a comprehensive, independent assessment of the Oregon Department of Human Services (ODHS) Child Welfare Division (CW) in 2023 to examine improvements that had been made in CW's policies, procedures, and service delivery since 2016. The results were published in the *Oregon Child Welfare Review Assessment Findings Report* which is referenced and incorporated here. Using the assessment methodology established in that report, PK found that Oregon CW has made progress in providing independent living (IL) services to young adults since 2016 and has done so without external monitoring.

Four research questions guided this assessment of Oregon's Independent Living Program (ILP). The research questions and their findings are included in Table 1 below. The support for and more detail about these findings can be found in the subsequent sections. The scope of this assessment, including guiding principles and constraints, mirrors that of PK's *Oregon Child Welfare Review Assessment Findings Report.*

### Table 1. PK Findings on Independent Living Services

| Research Question Topic | Finding |
| --- | --- |
| Did Oregon CW enhance policy language regarding independent living services? | Since 2016, Oregon CW has improved policy language for Supervised Independent Living (SIL) and the rights of young adults in foster care. |
| Did Oregon CW expand its service array for independent living services? | Since 2016, CW has expanded its service array by developing the Tiered ILP Model, which provides age-appropriate and developmentally appropriate IL services. |
| Did Oregon CW improve its assessment of the independent living needs of young adults transitioning out of foster care? | Since 2016, CW has improved its assessment of the needs of older youth by continued use of the Transition Readiness Discussion Guide and the Youth Assessment Summary to assess independent living needs appropriately. |
| Did Oregon CW improve its delivery of independent living services? | Since 2016, CW has improved IL service delivery by restructuring the IL program, including surveying young adults about the efficacy of their IL services, and adding staff dedicated to the program. CW now also conducts performance-based contracting with IL providers, a national best practice. |

During this assessment process, PK identified several areas in which Oregon CW is continuing to improve IL services, including the provision of housing, meeting IL needs for youth with complex needs, and reducing caseloads for caseworkers serving young adults.

## 1.1    Responses to Dr. Day's Conclusions

PK reviewed the report written by Dr. Angelique Day in the lawsuit *Wyatt B. et al v. Kotek et al* and found many of Dr. Day's conclusions are inaccurate, as described in Table 2 below.[1]

### Table 2. Responses to Dr. Day's Report

| Dr. Day Conclusion | Dr. Day Report Page | PK Response | PK 2023 Report Section |
|---|---|---|---|
| Oregon needs to build additional infrastructure to address the unique needs of this growing population in their state. | 3 | This has occurred. CW has expanded infrastructure for IL services through the Tiered ILP Model. The population of young adults in foster care in Oregon has decreased. | 3.2 |
| DHS has not made reasonable efforts to reconnect youth with kin. | 4 | This is inaccurate. Oregon demonstrated an increase in initial relative placements for children and young adults. Initial relative placements have increased consistently and significantly since 2007. | 3.3 |
| 60 percent of young adults in Oregon aged out of foster care without being connected to a permanent family. | 4 | This is an inaccurate assumption. This data point does not account for relational permanency, or connections and bonds with a permanent family. It assumes that young adults aging out of care do not have these connections. | 3.4 |
| CW has not changed their policy to require a mental | 11 | This is not entirely accurate. Children and young adults in foster care must be referred for screening using the | 3.3 |

---

[1] Dr. Angelique Day Expert Witness Report. December 15, 2023.

**PUBLIC
KNOWLEDGE**®

**Table 2. Responses to Dr. Day's Report**

| Dr. Day Conclusion | Dr. Day Report Page | PK Response | PK 2023 Report Section |
|---|---|---|---|
| health assessment within 60 days of entering care. | | Child and Adolescent Needs and Strengths (CANS) Tool between the 14th and 21st day in out–of–home care. | |
| CW has not created individualized case plans in a timely manner and CW is not reporting whether case plans are being created timely. | 14 | This is inaccurate. CW has shown an increase in timely completions of case plans since the full implementation of the Family Plan. Oregon CW exceeded the goal of including children and families in the case planning process. | 3.3 |
| The use of temporary lodging increased from 2019 to 2023. | 17 | This is inaccurate. Oregon data shows that the percentage of young adults in temporary lodging was less than one percent of the total number of children and young adults in foster care. | 3.3 |
| There is no evidence of collaboration across the child–serving system. | 17 | This is inaccurate. The 2023 Annual Progress and Services Report describes many cross–system collaborative efforts across child–serving systems currently underway, including but not limited to the Public Housing Authority, Oregon Health Authority, Tribal Affairs, Oregon Foster Youth Connection, the education system, and others.[2] | 3.3 |
| Avoiding placing young adults out of state would | 17 | This data is available. No children or young adults have been placed out | 3.3 |

---

[2] Oregon Department of Human Services Child Welfare Division. Annual Progress and Services Report 2023. (June 30, 2022). https://www.oregon.gov/dhs/children/Pages/data–publications.aspx

Exhibit 13
Page 5 of 26

**PUBLIC KNOWLEDGE**·

**Table 2. Responses to Dr. Day's Report**

| Dr. Day Conclusion | Dr. Day Report Page | PK Response | PK 2023 Report Section |
|---|---|---|---|
| be a "major improvement" if data could be provided to show this was the case. | | of state since June 2020. The improvement has been made. | |
| DHS had previously made minimal effort to locate, support, or train resource families. | 18 | This is inaccurate. CW hired sixteen Resource Family Retention and Recruitment Champions to recruit resource parents. Since 2016, CW has diligently recruited resource parents and created a position for a Resource Parent Training Manager. CW has revised training for resource parents since 2016 in partnership with and based on feedback from Tribes, communities, and resource families. | 3.4 |
| Oregon refers young adults to independent living service providers at age 16. | 27 | This is inaccurate. In keeping with federal requirements, Oregon begins working with young adults at age 14 to create a developmentally appropriate transition plan. | 3.1 |

PUBLIC KNOWLEDGE®

# 2    Methodology

The methodology for this assessment follows the same inquiry protocol as PK's *Oregon Child Welfare Review Assessment Findings Report*. The research questions and data reviewed specific to this topic are outlined below.

## 2.1    Research Questions

The research questions for this assessment focused on young adults transitioning out of foster care and how the scope of IL services provided to this population has changed since 2016. The research questions that guided this assessment are:

1. Did Oregon CW enhance policy language regarding independent living services?

2. Did Oregon CW expand its service array for independent living services?

3. Did Oregon CW improve its assessment of the independent living needs of young adults transitioning out of foster care?

4. Did Oregon CW improve its delivery of independent living services for young adults transitioning out of foster care?

## 2.2    Data Collection and Analysis

The methodological approach included qualitative and quantitative data collection and analysis. Qualitative data was collected from Child Welfare leadership. The data analysis included collecting and visualizing quantitative data and studying qualitative data collected during interviews. The analysis included data gathered from two interviews, a policy review, the Annual Progress and Services Review (APSR), a deposition transcript review, and relevant quantitative data.

### 2.2.1 Interview Protocol

The PK team interviewed Lacey Andresen, Deputy Director of Child Welfare Program and Practice, and Kelly Brezinski, the ILP and Youth Transitions Program Manager, to discuss the improvements in providing independent living services since 2016. The protocol for the interviews is shared in Appendix A of this report.

### 2.2.2 Document Review

The PK team reviewed the following documentation as part of this assessment:

- The policy outlined in the ODHS Child Welfare Procedure Manual[3] regarding independent living and transition services and supports for young adults under CW supervision.
- The Expert Witness Report written by Dr. Angelique Day, dated December 15, 2023.
- Transcript of Rosemary Iavenditti Rule 30(b)(6) Deposition on October 2, 2019.
- Transcript of Kim Lorz Deposition on September 12, 2023.
- Transcript of Dr. Angelique Day Expert Witness Deposition on February 14, 2024.

**Appendix D** is a comprehensive list of documents considered or provided to PK by counsel for the Defendants in this case.

---

[3] Oregon Department of Human Services Child Welfare Procedure Manual. Revised 1/9/2024. https://www.oregon.gov/odhs/rules-policy/Documents/cw-procedure-manual.pdf; Oregon DHS Child Welfare Procedure Manual, Rev 08/23/2023 (Wyatt_DHS_4663658); Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 6/1/2020 (Wyatt_DHS_2673813).

**PUBLIC KNOWLEDGE®**

# 3   Findings

## 3.1   Oregon CW improved policy language regarding independent living services.

Oregon CW's policy language and service array for Supervised Independent Living (SIL) arrangements have expanded since 2016. These arrangements are designed to help young adults in ODHS custody become self-sufficient adults.[4] CW has added the Transitional Living Program – Basic, and the Transitional Living Program – Plus, both of which are described in section 4.2, below.

Additionally, as mentioned in PK's *Oregon Child Welfare Review Assessment Findings Report,* Oregon drafted the Foster Children's Bill of Rights in 2017, which includes the right to[5]:

- Be provided with age-appropriate educational opportunities and schooling to prepare young adults for adult life.
- Have the opportunity to participate in activities that interest young adults.
- Make choices about classes and schools as allowed by law.
- Receive age-appropriate information and assistance when enrolling in college or vocational education.

These commitments were codified into Oregon law in 2018, which made Oregon one of only a few states that had codified such rights into law. This codification demonstrates the commitment CW has made to preparing young adults to successfully transition into adulthood, along with CW's prioritization of sibling connections and placing siblings together.

Dr. Day stated in her report[6] that Oregon's policy in 2019 was to refer young adults to independent living service providers at age 16. This is incorrect. In keeping with federal requirements, Oregon begins working with young adults at age 14[7] to create a developmentally appropriate transition plan and provide the necessary services and

---

[4] *See* Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 1/9/2024 (p. 868) https://www.oregon.gov/odhs/rules-policy/Documents/cw-procedure-manual.pdf; *see also* Oregon DHS Child Welfare Procedure Manual, Rev 8/23/2023 (Wyatt_DHS_4663658).

[5] Oregon Foster Children's Bill of Rights: https://sharedsystems.dhsoha.state.or.us/DHSforms/Served/de9014a.pdf

[6] Dr. Angelique Day Expert Witness Report. December 15, 2023 (p. 27).

[7] Rosemary Iavenditti Rule 30(b)(6) Deposition Transcript at 57:21–59:12, 107:25–108:5, 152:7–17 (October 2, 2019).



Findings

supports for them to reach their goals.[8] The 2023 APSR also explained that CW provides services to youth beginning at age 14.[9] The 2023 APSR is publicly available and was produced to plaintiffs on May 22, 2023.[10]

## 3.2    Oregon CW expanded its service array for independent living services.

As stated in PK's *Oregon Child Welfare Review Assessment Findings Report,* CW facilitates the Independent Living Program (ILP), which provides services to help young adults aged 14 and older transition from foster care into independent adulthood. In her report, Dr. Day states that "Oregon is in need of building additional infrastructure to address the unique needs of this growing population in their state."[1] CW <u>has</u> expanded infrastructure for IL services through the Tiered ILP Model, <u>and</u> the population of young adults in foster care in Oregon has decreased by 13%, as shown below.

**Figure 1. Population of Transition Age Youth from 2019–2022[11]**



Since 2016, CW has built a tiered approach to the ILP model, allowing trauma-informed, age-appropriate, and developmentally appropriate services to be delivered to young adults.

---

[8] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 1/9/2024, (p. 964).

[9] Oregon Department of Human Services Child Welfare Division. Annual Progress and Services Report 2023 (p.139). (June 30, 2022). https://www.oregon.gov/dhs/children/Pages/data-publications.aspx.

[10] 2023 APSR, submitted on June 30, 2022, resubmitted 8/12/22 (Wyatt_DHS_3194411); 5/22/23 Letter from defendants to plaintiffs re document production.

[11] Results Oriented Management (ROM) Data Site, Oregon Department of Human Services.

**PUBLIC KNOWLEDGE**®

The tiers are laid out as shown in the graphic below.[12] This graphic illustrates the commitment CW has made to address the unique needs and skills of young adults in care to support their transition to successful adulthood, while addressing considerations of normalcy for children and young adults in foster care. ILP services include financial management, assistance with applications for job and secondary education, and housing services. According to leadership, CW has open contracts throughout the entire state of Oregon so that all young adults have access to IL services.

**Figure 2. CW Tiered ILP Model**

| Tier 1: Independent Living Prep | Tier 2: Independent Living Basic | Tier 2A: Independent Living Plus | Tier 3: Independent Living Supports |
|---|---|---|---|
| ·Ages 14-15 (and 16 if needed to gain a basic awareness of IL skills) <br> ·Group setting <br> ·Focus is on soft skills needed to be successful in Tier 2 <br> ·Values participation and support of the caregiver and caseworker | ·Ages 16-20 <br> ·Monthly one-on-one meetings and quarterly group sessions <br> ·Focus is on tangible skills needed in adulthood <br> ·Transition planning is a key component and guides service provision <br> ·Skill building is individualized | ·Ages 16-20 <br> ·Face-to-face individual sessions twice monthly for up to two hours <br> ·Focus is on building the youth's self-determination skills, including goal setting, problem solving, and stress management through a training curriculum that includes accommodations for special needs | ·Ages 21-23 <br> ·Face-to-face individual sessions at least every two months and additional monthly check-ins in the young adult's preferred method <br> ·Focus on supporting young adults exiting foster care or no longer in care to transition to interdependent community living <br> ·Similar to but less formal than Tier 2 |

In addition to creating this tiered model for IL services, since 2016, CW added two Supervised Independent Living (SIL) arrangements to supplement housing costs for young adults in CW custody. Each type of SIL placement is intended to work with the Independent Living Skill Building Program to support young adults in learning and practicing self-sufficiency skills while they continue their education or employment.[4] The two new programs, the Transitional Living Program – Basic and the Transitional Living Program – Plus, both begin at age 18 and last at least 12 months, and have more flexibility than the two existing SIL arrangements. The productive hours, which are hours dedicated to completing secondary education or another educational program, vocational education, a program designed to promote or remove barriers to employment, or part or full-time

---

[12] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 1/9/2024, (pp. 977–978); *See also* Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 6/1/2020 (pp. 12, 798–808, 871–928, 1069–1099) (Wyatt_DHS_2673813).

Exhibit 13 <br> Page 11 of 26

**PUBLIC KNOWLEDGE**®

employment, required for the two Transitional Living Programs are tailored to fit the young adult's needs,[13] allowing for flexibility and individualized service delivery.

Since 2016, CW has also added a Comprehensive Transition Plan Meeting that may be part of the Youth Decision Meeting, which was outlined in PK's *Oregon Child Welfare Review Assessment Findings Report*. The Comprehensive Transition Plan (CTP) addresses topics including personal growth and social development, family support and healthy relationships, health education and risk prevention, education, employment and career preparation, money management, transportation, life skills, housing, and home management. The CTP also outlines what a young adult needs to successfully transition to adulthood, including transition goals, action steps, services, and supports.[14]

## 3.3   Oregon CW continues to assess the independent living needs of young adults transitioning out of foster care.

PK considered several areas of assessment for young adults in foster care, including the assessment of their independent living skills and mental and behavioral health needs, case planning, and placement setting. The following sections include responses to Dr. Day's report and our analysis of each topic with support for our finding.

### Independent Living Skills Assessment

CW policy requires caseworkers to complete the Transition Readiness Discussion Guide and the Youth Assessment Summary to evaluate the young adult's knowledge, skills, and abilities. These tools allow caseworkers to engage the young adult, observe their mental health status, and understand trauma factors that impact their engagement in IL services.[8] The tools also identify their stage for IL services, whether that be awareness, learning, or doing, as shown in the table below.[15] These stages give caseworkers and young adults the current status of what the young adult knows about IL services, what IL skills they already have, and how they are applying those skills.

---

[13] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 1/9/2024, (pp. 869–870); *See also* Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 6/1/2020 (pp. 12, 798–808) (Wyatt_DHS_2673813).

[14] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 1/9/2024, (pp. 963–964); *See also* Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 6/1/2020 (pp. 875–888) (Wyatt_DHS_2673813).

[15] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 1/9/2024, (pp. 964–966); *See also* Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 6/1/2020 (pp. 876 877) (Wyatt_DHS_2673813).

Exhibit 13
Page 12 of 26



## Table 3. IL Skill Development Stages[15]

|  | Stage I: Awareness | Stage II: Learning | Stage III: Doing |
|---|---|---|---|
| First Circle | Young adult has minimal information about the topic area. | Young adult has started gaining knowledge and developing new skills in this area. | Young adult has started applying some skills in real–life settings or activities, with support. |
| Second Circle | Young adult has basic information about this topic area and some understanding of why the topic is important. | Young adult has basic knowledge and skills in this area and needs further opportunities to practice and strengthen most skills. | Young adult is regularly applying some skills in real–life settings and activities, with limited support. |
| Third Circle | Young adult has solid information about this topic and understands why it is important but has not started developing knowledge or skills. | Young adult has solid knowledge and skills in this area but has not started applying these in real–life settings or activities. | Young adult is consistently applying many skills in real–life settings and activities, with limited support. Young adults may stay in this stage for as long as the ILP provider monitors their application of skills. |

The caseworker updates the Youth Assessment Summary every six months as part of the young adult's Comprehensive Transition Plan, and at that review, the young adult may move up in stages (or circles within stages) based on their progress. This initial staging and ongoing review of the young adult's knowledge and skills supports the caseworker and ILP provider in tailoring the services to the young adult's specific needs and strengths.

Very little research has been conducted to specify or validate effective models for improving the transition trajectories of youth exiting care.[16] Youth may choose not to participate in assessments or services based on assessment results for many reasons,

---

[16] Powers, L. E., Fullerton, A., Schmidt, J., Geenen, S., Oberweiser–Kennedy, M., Dohn, J., Nelson, M., Iavanditti, R., Blakeslee, J., Research Consortium to Increase the Success of Youth in Foster Care (2018). *Perspectives of Youth in Foster Care on Essential Ingredients for Promoting Self–determination and Successful Transition to Adult Life: My Life Model.* Child Youth Serv Rev., 86, 277–286. https://doi.org/10.1016/j.childyouth.2018.02.007

**PUBLIC KNOWLEDGE**®

including having interests in after school activities such as sports or clubs, lacking interest in career development activities like their peers, and not having time to participate due to school and current job commitments.

## Mental and Behavioral Health Assessment

Dr. Day states in her report that CW policy requires a mental health assessment within 60 days of entering care.  Dr. Day overlooks that CW's procedure reflects that children and young adults in foster care are referred for initial screening using the Child and Adolescent Needs and Strengths (CANS) Tool between the 14th and 21st day in out-of-home care.[17] The CANS screens, in part, for emotional, behavioral, and mental health needs. Dr. Day states that the percentage of timely mental health assessments within 60 days dropped in 2020. This data was not cited and cannot be verified but decline of these assessments in 2020 is likely due to the COVID-19 pandemic. However, publicly available data[18] show that the percentage of children who received age appropriate mental, physical, and dental health assessments within 60 days of entering care improved in 2021 (88.1%) and 2022 (88.3%).

Dr. Day also cited the 2022 APSR stating there was no data to assess the effectiveness of various pilot programs aimed at providing crisis mental health and psychiatric support to youth in out-of-home care. However, the current 2024 APSR contains this data. It shows that as of February 2022, 46 individuals, including 29 children, were stabilized in their placement and the programs CW implemented helped to prevent disruption.[19] This report is publicly available and was produced to plaintiffs on July 20, 2023.[20]

Dr. Day also relied on old data in concluding that CW made no progress on improving timely mental health assessments for children.[21] More recent data shows that 87.3% of children receive physical, dental, and mental health assessments within 60 days of enrollment in coordinated care organizations.[22] This data is publicly available and was produced to plaintiffs on July 20, 2023.[23]

---

[17] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 1/9/2024, (p. 780); *See also* Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 6/1/2020 (pp. 716–717).

[18] Workbook: 2022 CCO Performance Metrics Data (state.or.us)

[19] Oregon Department of Human Services Child Welfare Division. Annual Progress and Services Report 2024. (June 30, 2023). https://www.oregon.gov/dhs/children/Pages/data-publications.aspx.

[20] 2024 APSR, submitted on June 30, 2023 (Wyatt_DHS_4467023); 7/20/23 Letter from defendants to plaintiffs re document production.

[21] Dr. Angelique Day Expert Witness Report. December 15, 2023 (p. 20).

[22] See footnote 19, 2024 APSR (p.192).

[23] See footnote 20.

**PUBLIC KNOWLEDGE**

## Case Planning

In her report, Dr. Day states that CW has not created individualized case plans in a timely manner and that CW is not reporting whether case plans are being created timely. This is inaccurate, relying largely on the 2022 APSR. The 2023 APSR states, however, that CW has shown an increase in timely completions of case plans since the full implementation of the Family Report.[24] PK's *Oregon Child Welfare Review Assessment Findings Report* states that as of June 2022, 87% of cases have a completed case plan, which is an increase from 60% in December 2021. Dr. Day also did not consider relevant data from the 2024 APSR that showed that after implementing the Family Plan (i.e. Family Report), CW saw an increase in the timely completion of case plans (58.2% in 2022) and that this is a measure that local offices and Permanency Program Managers monitor in real time to improve performance.[25] Again, the 2023 and 2024 APSRs containing this information are publicly available to Dr. Day and were produced to plaintiffs.[26] Further, Oregon CW exceeded the goal of including children and families in the case planning process, as shown in Figure 15 of PK's *Oregon Child Welfare Review Assessment Findings Report.*

Dr. Day also found that there was a "lack of data" to evaluate the efficacy of interventions such as the Family Report and Early Transfer Protocol from the 2022 APSR. The 2023 APSR notes, however, that CW saw notable improvements due to the two initiatives.[27] This data was publicly available and produced to plaintiffs on May 22, 2023.[28] Further, CW's Monthly Progress reports that are publicly available and produced to plaintiffs also demonstrate that the Family Report and Early Transfer Protocol are showing improvements.[29]

CW policy requires caseworkers to review the Child Welfare Case Plan at least every 90 days and make appropriate updates[30], and provides a guide for supervisors on the 90–Day Review.[31]

---

[24] See footnote 10, 2023 APSR (pp. 37–38).

[25] See footnotes 19–20, 2024 APSR (pp. 45–46).

[26] See footnotes 10, 19–20, 2023 and 2024 APSRs.

[27] See footnote 10, 2023 APSR (pp. 38–39).

[28] See footnote 10.

[29] See, e.g., Child Welfare Monthly Progress Reports. These reports were publicly available to Dr. Day (https://www.oregon.gov/odhs/child-welfare-transformation/pages/progress-reports.aspx) and produced to plaintiffs: December 2022 (Wyatt_DHS_4564523); January 2023 (Wyatt_DHS_4564543); February 2023 (Wyatt_DHS_4564563); March 2023 (Wyatt_DHS_4564585); April 2023 (Wyatt_DHS_4564607); May 2023 (Wyatt_DHS_4564629); June 2023 (Wyatt_DHS_4564651); and July 2023 (Wyatt_DHS_4564465).

[30] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 1/9/2024, (p. 539).

[31] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 1/9/2024, (pp. 712–714).

PUBLIC
KNOWLEDGE®

**Placement Setting**

Dr. Day's report states that the use of temporary lodging increased from 2019 to 2023, and the data shown in PK's *Oregon Child Welfare Review Assessment Findings Report* shows this is inaccurate. Figure 11, titled "Number of Children or Young Adults with at Least One Day of Temporary Lodging During the Month", shows that the percentage of young adults in temporary lodging was less than one percent of the total number of children and young adults in foster care. Dr. Day's analyses rely extensively on percentages, failing to note that the raw number of children placed out of home in Oregon declined by 25% from 2019 to 2023. While there were nearly ten thousand Oregon children out of home in 2019 (9,721 children), the numeric count was down to 7,334 in 2023.[32] This is true even if a constant percentage of the children in group settings over time would result in 25% fewer children in these settings. A percentage is two numbers, a numerator over a denominator. A change in percentage happens when either the numerator or denominator changes. Dr. Day assumes the difference from 2019 to 2023 is a change in the numerator (children who experienced temporary lodging), but there has also been a large decline in the denominator (children in care). Trends in Oregon are more positive than Dr. Day indicates, because Dr. Day is only looking at percentage change (which controls for changes in the population of kids out of home) instead of noting the more dramatic reduction in the raw number. Raw numbers more accurately represent the experience of children in Oregon's care. As noted in Figure 8, titled "Number of Children in Substitute Care 2016–2022" in PK's *Oregon Child Welfare Review Assessment Findings Report*, there was a 30% reduction in the number of children placed out of home from 2018 to 2022.

Dr. Day also references cross-system collaboration regarding residential placements and temporary lodging and states that she has not seen evidence of this collaboration. This cross-system collaboration does exist. As shown in the *Oregon Child Welfare Review Assessment Findings Report*, of the children and young adults identified as at risk of needing temporary lodging in the first two quarters of 2022, 74% were diverted due to cross-system collaboration.[33]

In her report, Dr. Day noted that not placing young adults out of state would be a "major improvement" if data could be provided to show this was the case. Figure 19 of the *Oregon Child Welfare Review Assessment Findings Report* illustrates that no children or young adults have been placed out of state since 2020. Further, other publicly available data confirms CW's policy change. The July 2022 Oregon CW Division Vision for Transformation

---

[32] ROM reports Oregon. (2024, February 20). https://oregon.rom.socwel.ku.edu/reports/6104

[33] ODHS Child Welfare Division Progress Report, July 2022 (p.8). https://www.oregon.gov/odhs/child-welfare-transformation/progressreports/cw-progress-report-2022-07.pdf.

Exhibit 13
Page 16 of 26

**PUBLIC KNOWLEDGE®**

Findings

Update, which was publicly available when Dr. Day issued her report, shows that since June 2020, no children in CW custody have been placed out of state.[34]

In that same section of her report, Dr. Day discusses Oregon's effort to increase the use of kinship placements. Oregon demonstrated an increase in initial relative placements for children and young adults, as shown in Figure 16 of the *Oregon Child Welfare Review Assessment Findings Report.* This graphic shows that initial relative placements have increased consistently and significantly since 2007.

Dr. Day's report also relied on outdated data regarding whether young adults receive individualized assessments and appropriate placements. As the 2023 APSR explains, CW uses multiple tools to aid caseworkers, parents, and resource families in identifying a child's ongoing needs and ensure they are met. The 2023 APSR further notes that CW continues to identify children at risk of temporary lodging and utilizes prevention staffings to collaborate with community partners to identify additional services, supports, and resources that help prevent temporary lodging. As a result, most children at risk of entering temporary lodging remain in their placement.[35] Further, as noted previously, CW policy provides that children and young adults in foster care are referred to a CANS screening between the 14th and 21st day in out-of-home care.[36]

## 3.4 Oregon CW improved its delivery of independent living services.

In assessing service delivery for young adults in foster care, PK analyzed information regarding IL services, family connections, resource parent support, recruitment and retention, and permanency planning. The following sections include responses to Dr. Day's report and our analysis of each topic with support for our finding.

### Service Delivery

As previously mentioned in this report, since 2016, CW introduced a Tiered ILP Model to better assess and meet the needs of young adults transitioning out of foster care. Oregon can now provide a higher percentage of young adults IL services than they could in 2016.

---

[34] Oregon Child Welfare Division Vision for Transformation Update. (July 2022) (p.11). https://www.oregon.gov/odhs/child-welfare-transformation/Documents/2022-07-30-progress-report-2021.pdf

[35] See footnote 10, 2023 APSR (p.35-36); Temp Lodging Staffing Data, 6/14/2022 (Wyatt_PK0002985).

[36] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 1/9/2024, (p. 780); OAR 413-015-0465.

Oregon's NYTD data[37] show that 1,863 young adults received IL services in 2017, which is 24% of the 7,758 children and young adults in care,[38] and 1,469 young adults received IL services in 2021, which is 27% of the 5,269 children and young adults in care. CW also hired a new Assistant Program Manager in 2023 to oversee the IL program. This manager assessed CW's utilization for IL services and rewrote the state contracts to connect to the tiered model. The contracts are now performance-based, and as part of that agreement, CW surveys young adults who are using these programs to evaluate their efficacy. This survey process provides young adults with a significant voice in their service delivery and gives them an opportunity to give feedback on how their IL services are structured and delivered. This reinforces CW's commitment to youth and family voices. This ongoing evaluation also connects to the robust CQI and QA process that CW has built and expanded since 2016, which is described in PK's *Oregon Child Welfare Review Assessment Findings Report*.

Dr. Day's report also notes that she was unable to determine if the department was successful in increasing its staffing and support for caseworkers based on a lack of available data. This information exists and was available for Dr. Day's consideration after plaintiffs specifically asked about a staffing surge during depositions. For example, in his September 12, 2023 deposition, Kim Lorz testified that CW had a hiring "surge" of caseworkers at least three years before Dr. Day authored her report.[39] Also, in 2022 and 2023, the Oregon legislature approved a number of investments in the state's human services workforce, including 99 central office staff positions to support the CW program and 202 CPS caseworkers and support staff to engage with families and assess potential safety risks.[40]

Additionally, since 2016, CW has made specific investments in staff dedicated to its Independent Living Program. For example, CW added four full-time employees and an Assistant Program Manager to the Independent Living Program. One of the full-time employees added is a young person with lived experience, who supports CW in tailoring services to the needs of young adults transitioning out of foster care. Expanding staff dedicated to ILP helps CW allocate additional resources to IL services and to supporting

---

[37] NYTD Oregon Data Snapshot FY 2017-2021. https://www.oregon.gov/odhs/data/cwdata/cw-ilp-nytd-snapshot-2017-2021-oregon.pdf

[38] Figure 8. *PK Oregon Child Welfare Review Assessment Findings Report.*

[39] Kim Lorz Day Expert Witness Testimony. February 14, 2024 (100:22-101:3); *see also* "Oregon DHS Posts 300+ Jobs ion Child Welfare, Protective Services" (July 28, 2019): https://www.corvallisadvocate.com/2019/oregon-dhs-posts-300-jobs-in-child-welfare-protective-services/

[40] 2022 ODHS Legislative Summary. https://www.oregon.gov/odhs/about/legislativeinformation/2022-end-of-session-report-final.pdf; 2023 ODHS Legislative Summary. https://www.oregon.gov/odhs/about/legislativeinformation/2023-end-of-session-report-final.pdf.

**PUBLIC KNOWLEDGE**

young adults as they transition to adulthood, which addresses a concern shared by Permanency Consultants during focus groups in 2022 that the IL program wasn't resourced well.

Oregon's NYTD data[41] shows an increase in many areas of IL service delivery, including the Independent Living Needs Assessment, which increased from 33 to 52 percent from 2018–2022, and career preparation rose from 39 to 53 percent. Financial services such as budget and financial management increased from 24 to 49 percent. While one service (mentoring) did decrease over this timeframe, the rest of IL services offered showed increased service delivery. In addition, ODHS has a dedicated webpage for children transitioning out of foster care which offers information and resources regarding employment, financial assistance, health care, and other supports.[42]

Dr. Day also failed to rely on more recent data when discussing CW tracking of caseworker training. The 2023 APSR explains that CW is transitioning to Workday Learning to offer new training opportunities and requirements and consolidate training records.[43]

**Family Connections**

Oregon's Vision for Transformation, which was implemented in 2020, focuses on connections to family for children and young adults in foster care. Further, as described in Section 4.10 of PK's *Oregon Child Welfare Review Assessment Findings Report,* Oregon has greatly improved its focus on family connections by increasing services to facilitate Family Time, prioritizing relative placements, establishing a Foster Child Bill of Rights, establishing a Sibling Bill of Rights, and increasing community connections. Oregon's CFSR data, as shown in Table 13 of PK's *Oregon Child Welfare Review Assessment Findings Report,* shows an increase in placements with siblings, increases in placement with relatives, and improvement in reunification within 12 months. All indicating a vast improvement in family connections.

In making her conclusions, Dr. Day did not consider updated and relevant data about CW's priority in maintaining family connections. For example, the 2023 APSR specifically discusses the Oregon Kinship Navigator (OKN) Program, which provides services and support for children cared for by relatives or close non-related families in Oregon.[44] CW also has a publicly available website dedicated to OKN.[45] Further, the CW Oregon

---

[41] NYTD Services Data Snapshot. FY 2018–2022.
https://www.acf.hhs.gov/sites/default/files/documents/cb/nytd-services-or-2022.pdf
[42] Resources for Youth Transitioning out of Foster Care. https://www.oregon.gov/odhs/foster-care-transition/Pages/resources.aspx?wp6942=l:25#g_76dae720_6362_4736_a9c5_573a2367594f .
[43] See footnote 10, 2023 APSR (Wyatt_DHS_3194411).
[44] See footnote 10.
[45] https://oregonkinshipnavigator.org/

**PUBLIC KNOWLEDGE**

Procedural Manual contains policy language describing in detail transition planning for older youth.[46] This version of the procedure manual is publicly available and was produced to plaintiffs on November 2, 2023.[47] The 2021 and 2022 CW Data Books also describe in detail ILP services available to youth.[48] The annual Data Books are publicly available and the 2021 CW Data Book was produced to plaintiffs on January 18, 2023.[49] CW also maintains a publicly available website describing "Resources for Youth Transitioning out of Foster Care."[50]

Dr. Day also relied on outdated 2016 CSFR data when assessing whether CW adequately maintained youths' connections with family members. Oregon began prioritizing kinship care in 2016 and now has one of the highest rates in the country, as described in Section 4.10.4 of PK's *Oregon Child Welfare Review Assessment Findings Report*.

**Recruitment and Retention**

Dr. Day noted in her report that DHS had previously made minimal effort to locate, support, or train resource families.[51] This is inaccurate. CW hired 16 Resource Family Retention Champions ("Champions") to assist with recruitment of resource parents. Since 2021, the Champions team has put out a monthly statewide summary report regarding efforts to recruit and retain resource families and outlining the education and training provided to resource families. These monthly reports have been produced to plaintiffs, including but not limited to the May 2023 report, which was an attachment to the 2024 APSR and was produced on July 20, 2023.[52] As described by the 2024 APSR, these Champions work to recruit and develop a diverse pool of resource families using data and customer service-focused strategies for a community-wide, family-centered approach to caring for children and young people in their communities.[53]

---

[46] Oregon Department of Human Services Child Welfare Procedure Manual, Rev. 8/23/2023, (Wyatt_DHS_4663658). (p. 1140–1189).
http://www.dhs.state.or.us/caf/safety_model/procedure_manual/Oregon-DHS-Child-Welfare-Procedure-Manual.pdf
[47] 11/2/23 Letter from defendants to plaintiffs re document production.
[48] 2021 Child Welfare Data Book, https://www.oregon.gov/odhs/data/cwdata/cw-data-book-2021.pdf (p.18–19).
[49] 2021 Child Welfare Data Book (Wyatt_DHS_2733259); 1/18/2023 Letter from defendants to plaintiffs re document production.
[50] https://www.oregon.gov/odhs/foster-care-transition/Pages/resources.aspx
[51] Dr. Angelique Day Expert Witness Report. December 15, 2023.
[52] May 2023 Resource Family Retention and Recruitment Statewide Recap Report (Wyatt_DHS_4466776); 7/20/23 Letter from defendants to plaintiffs re document production.
[53] See footnotes 19–20, 2024 APSR (pp. 86–87, 99).

**PUBLIC KNOWLEDGE**®

Since 2016, CW has implemented diligent recruitment for resource parents and created a position for a Resource Parent Training Manager, as stated in Section 4.4.2 of PK's *Oregon Child Welfare Review Assessment Findings Report.* Additionally, CW has revised training for resource parents since 2016 in partnership with and based on feedback from Tribes, communities, and resource families, as shown in Section 4.4.4 of the report.

## Resource Parent Support

Since 2016, CW has begun providing guidance on independent living to resource parents caring for young adults. This information serves to support resource parents as they help these young adults successfully transition to adulthood and reinforces the external services young adults are receiving. As noted above, CW has also implemented the use of Champions, who use data-driven strategies to actively support and train resource families.

Dr. Day stated in her testimony on February 14, 2024 that she wasn't given materials on post-licensure support services Oregon offers for resource parents.[54] CW offers several post-certification (Oregon uses the terminology certification versus licensure) services to resource parents, including KEEP®, which is an evidence-based support and skill enhancement program promoting child well-being and preventing placement breakdowns.[55] Participation provides resource parents up to 24 credit hours of ongoing training towards certification renewal. Oregon offers Kinship Navigator Program, which is a statewide resource for grandparents raising grandchildren and other relative caregivers. The Oregon Kinship Navigator Program has a website (https://oregonkinshipnavigator.org/) that offers resources, a service finder, information on legal services, and support groups for kinship resource parents. Other post-certification support services include the following:

- 211info

- Every Child Oregon

- Oregon Foster Parent Association (OFPA)

- Oregon Post Adoption Resource Center (ORPARC)

- Shoulder to Shoulder Conference

- And other national organizations

---

[54] Dr. Angelique Day Expert Witness Testimony. February 14, 2024 (24:19–22).
[55] See footnotes 19–20, 2024 APSR (p. 86).

Exhibit 13
Page 21 of 26

**PUBLIC KNOWLEDGE®**

Findings

All information regarding post-certification resources can be found on Oregon's support groups and organizations website.[56]

Dr. Day also failed to include in her report CW's efforts to improve its ability to track foster parent and caseworker training.[57] The 2024 APSR explains that CW is transitioning to Workday Learning to improve tracking consistency.[58]

Dr. Day also said she would need additional information to determine if kinship caregivers are trained on kinship specific material offered in the National Training and Development Curriculum (NTDC). However, the 2023 APSR explains that CW has implemented Resource and Adoptive Family Training (RAFT) modeled after Spaulding's National Training and Development Curriculum (NTDC) that has been adapted to meet Oregon's language, process, and content needs, and includes said content.[59] CW also has a dedicated webpage for families to access this content.[60]

**Permanency Planning**

Dr. Day states in her report that 60 percent of young adults in Oregon aged out of foster care without being connected to a permanent family. This data point does not account for relational permanency, or connections and bonds with a permanent family, and assumes that young adults aging out of care do not have these connections. Permanency data provides quantitative information and cannot imply qualitative conclusions.

Oregon CW's focus on and commitment to permanency planning is evident in CW's Vision for Transformation, which was introduced in 2020. The Vision for Transformation, as described in PK's *Oregon Child Welfare Review Assessment Findings Report,* is focused on improving outcomes for children and young adults and maintaining bonds and connections critical to their well-being.[61] The Vision for Transformation also prioritizes permanency planning, which has been embedded throughout Oregon child welfare practice. One of the ways CW is operationalizing this focus is by establishing a member of the Executive Leadership Team who has a history of permanency planning focus, as described in section 4.6.1 of PK's *Oregon Child Welfare Review Assessment Findings Report.*

---

[56] Support Groups and Organizations: https://www.oregon.gov/odhs/providers-partners/foster-care/Pages/groups.aspx
[57] Dr. Angelique Day Expert Witness Report. December 15, 2023, (p. 30).
[58] See footnotes 19-20, 2024 APSR (p. 110).
[59] See footnote 10, 2023 APSR (pp. 93-94).
[60] Resource and Adoptive Family Training (RAFT): https://www.oregon.gov/odhs/providers-partners/foster-care/pages/training-certification.aspx
[61] Oregon Department of Human Services. (2020). *Child Welfare Division Vision for Transformation.* https://www.oregon.gov/odhs/child-welfare-transformation/pages/default.aspx

Exhibit 13
Page 22 of 26

## Continuous Quality Improvement

Dr. Day states in her report that she recommends continued monitoring of CW.[62] CW is not under a consent decree for children aging out of care and is not currently being monitored, and still has made significant documented improvements as noted in PK's *Oregon Child Welfare Review Assessment Findings Report.* Section 3.1 of PK's *Oregon Child Welfare Review Assessment Findings Report* describes CW's continuous quality improvement (CQI) processes. Dr. Day stated in her deposition on February 14, 2024 that she did not know if quality assurance efforts went beyond evaluating federal requirements.[63] In the publicly available 2023 Annual Progress and Services Report, evaluation efforts are described for Oregon's Kinship Navigator Program, KEEP®, other program evaluations, as well as a full description of the Quality Assurance Program in CW.[64]

Dr. Day said in her testimony on February 14, 2024 that states should always try to implement a new program or intervention with an evaluation component.[65] CW uses established CQI and quality assurance processes as well as identifying program goals, outcomes, and established measures of progress when implementing new interventions. Dr. Day stated in her testimony on February 14, 2024 that nothing in writing shows that any of the programs CW is implementing has an evaluation component.[66] The 2023 and 2024 APSRs provide several examples of evaluations of programs CW is currently engaged in, including the Kinship Navigator Program, MyLife, KEEP, Family Support and Connections grant, the Behavioral Health Treatment Foster Care pilot, Equity, Training and Workforce Development program, as well as other programs.

If called as a witness, I would offer testimony as to the matters set forth in this report. The report contains complete statements of my opinions in this case and the basis and reasons for those opinions. The conclusions are reached with a reasonable degree of professional certainty.

Stacey Moss

President, Public Knowledge®

---

[62] Dr. Angelique Day Expert Witness Report. December 15, 2023.
[63] Dr. Angelique Day Expert Witness Testimony. February 14, 2024 (68:1–6).
[64] 2023 APSR. (June 30,2022). https://www.oregon.gov/dhs/children/Pages/data–publications.aspx
[65] Dr. Angelique Day Expert Witness Testimony. February 14, 2024 (166:12–13).
[66] Dr. Angelique Day Expert Witness Testimony. February 14, 2024 (169:18–20).



# Appendix A: Interview Protocol

The purpose of individual interviews was to gather perspectives from leadership and management staff on CW's progress since 2016 regarding independent living services for young adults transitioning out of foster care.

PK conducted interviews with Lacey Andresen and Kelly Brezinski over videoconference. The interview questions are listed in the table below.

| | Interview Question | Research Question |
|---|---|---|
| 1. | How has CW's independent living policy changed since 2016? | 1 |
| 2. | How does the independent living program provide normalcy for children and young adults in foster care? | 1 |
| 3. | Does the independent living program have the resources it needs? | 2 |
| 4. | Are independent living services provided consistently across Oregon? | 2 |
| 5 | What assessments are conducted to determine the need for independent living skills for young adults? | 3 |
| 6. | Does the Oregon CANS include questions regarding independent living? | 3 |
| 7. | Has CW increased resources or added positions to the independent living program since 2016? | 4 |
| 8. | Can you describe the tiered independent living program? | 4 |
| 9. | What independent living services are provided to young adults in foster care in Oregon? | 4 |
| 10. | What data are collected to track independent living assessment and service provision? | 3,4 |
| 11. | What does Oregon CW do well in terms of independent living service provision? | 4 |



**PUBLIC KNOWLEDGE**

| Interview Question | Research Question |
|---|---|
| 12. How could Oregon CW strengthen its independent living service provision? | 4 |
| 13. Do you have anything else to add? | NA |



# Appendix B: Facts and Data

| Date | Description | Bates No. |
|------|-------------|-----------|
| 6/1/20 | Oregon Department of Human Services Child Welfare Procedure Manual (Rev. 6/1/2020) | Wyatt_DHS_2673813 |
| 2022 | 2022 CCO Performance Metrics Data<br>Workbook: 2022 CCO Performance Metrics Data (state.or.us) | Publicly available |
| 5/2023 | Resource Family Retention and Recruitment Statewide Recap Report | Wyatt_DHS_4466776 |
| 1/18/23 | Letter from defendants to plaintiffs re defendants' 53rd supplemental production | NA |
| 5/22/23 | Letter from defendants to plaintiffs re defendants' 61st supplemental production | NA |
| 7/20/23 | Letter from defendants to plaintiffs re defendants' 63rd supplemental production | NA |
| 11/20/23 | Letter from defendants to plaintiffs re defendants' 70th supplemental production | NA |
| 7/21/23 | ILP Policy Transmittal CW–PT–23–010 (https://www.oregon.gov/odhs/transmittals/cwtransmittals/pt23010.pdf) | Publicly available |
| 12/15/23 | Documents cited in Dr. Angelique Day's Expert Witness Report, dated December 15, 2023 | Multiple |

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| WYATT B., et al, | CASE NO. 6:19-cv-00556-AA |
| Plaintiff, | |
| v. | **CERTIFICATE OF SERVICE** |
| TINA KOTEK, et al , | |
| Defendants. | |

      I am employed by the law firm of Rizzo Bosworth Eraut PC in Portland, Oregon.  I am over the age of eighteen years and not a party to the subject cause.  My business address is 1300 SW Sixth Avenue, Suite 330, Portland, OR 97201.

      On the date below, I caused to be served on all parties in this action by transmitting a true copy thereof: **Declaration of Steven Rizzo in Support of Motion to Exclude Stacey L. Moss**

**VIA ECF**

| | |
|---|---|
| Lauren Blaesing | Carla Scott |
| Harry B. Wilson | Sheila H. Potter |
| Adele Ridenour | Elleanor Chin |
| David B. Markowitz | Oregon Department of Justice |
| Laura Salerno Owens | Trial Division |
| Vivek Kothari | 100 SW Market Street |
| Markowitz Herbold PC | Portland, OR 97201 |
| 1455 SW Broadway | Ph: 971-673-1880 |
| Ste. 1990 | Email: carla.a.scott@doj.state.or.us |
| Portland, OR. 97201 | Email: sheila.potter@doj.state.or.us |
| Ph: 503-295-3085 | Email: elleanor.chin@doj.state.or.us |
| Email: laurenblaesing@markowitzherbold.com | |
| Email: harrywilson@markowitzherbold.com | |
| Email: adeleridenour@markowitzherbold.com | |
| Email: davidmarkowitz@markowitzherbold.com | |
| Email: laurasalerno@markowitzherbold.com | |
| Email: vivekkothari@markowitzherbold.com | |

*Of Attorneys for Defendant Oregon Department of Human Services*

Dated this 9th day of April, 2024.

        *s/ Cheridan Carr*
        Cheridan Carr
        Paralegal

1- Certificate of Service