**P. ANDREW McSTAY, JR.**, OSB 033997
andymcstay@dwt.com
**WILLIAM D. MINER**, OSB 043636
billminer@dwt.com
**DAVIS WRIGHT TREMAINE LLP**
560 SW Tenth Avenue, Suite 700
Portland, OR 97205
Telephone: (503) 241-2300

**MARCIA ROBINSON LOWRY** (*pro hac vice*)
mlowry@abetterchildhood.org
**ANASTASIA BENEDETTO** (*pro hac vice*)
abenedetto@abetterchildhood.org
**A BETTER CHILDHOOD**
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel: (646) 795-4456

*Attorneys for Plaintiffs*
*Additional Counsel of Record Listed on*
*Signature Page*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF OREGON
# EUGENE DIVISION

| | |
|---|---|
| WYATT B., *et al.*,<br><br>　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>TINA KOTEK, *et al.*,<br><br>　　　　　　　Defendants. | Case No. 6:19-cv-00556<br><br>**PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY OF JIM DIMAS AND UMA AHLUWALIA AT TRIAL**<br><br>**Oral Argument Requested** |

Page 1 - PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY OF JIM DIMAS AND UMA AHLUWALIA AT TRIAL

4870-3679-8645v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

## LR 7-1 CERTIFICATION

The parties conferred by telephone regarding this motion. Defendants oppose it.

## PRELIMINARY STATEMENT

Defendants offered two different witnesses with two different expert reports, Uma Ahluwalia and Jim Dimas, each seeking to provide the expert opinion that class action litigation simply is not effective in improving foster care outcomes. The proposed testimony includes no appropriate methodology and does nothing to control for state-by-state or case-by-case variation. The ultimate opinions essentially reflect nothing more than the personal opinions of two people who have observed state child welfare systems subject to consent decrees. In the end, the expert opinions do not help the Court by helping it craft better orders more effective at improving child welfare systems. Instead, they simply urge the Court that there is no productive way to enforce the law. These opinions do not relate to a substantive question of law at issue at trial and are not helpful to the Court.

## ARGUMENT

### I. Legal Standard of Review

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides that "a witness qualified as an expert by knowledge, skill, experience, training, or education" may offer expert testimony if "the testimony is based upon sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. Rule 702 "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify," and accordingly, as the gatekeeper for expert testimony, this Court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v.*

Page 2 - PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY OF JIM DIMAS AND UMA AHLUWALIA AT TRIAL
4870-3679-8645v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

*Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 2795 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The burden is on the party offering the expert testimony to prove its admissibility. *Daubert*, 509 U.S. at 592 n.10.

The requirement that expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue," *see* FED. R. EVID. 702, "goes primarily to relevance." *Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* at 591-92; *see also In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 743 (3d Cir. 1994) (an expert's testimony "will be excluded if it is not scientific knowledge *for purposes of the case*") (emphasis in original).

Moreover, "an expert witness cannot give an opinion as to her *legal conclusion*, *i.e.*, an opinion on an ultimate issue of law." *Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1058, (9th Cir. 2008) (emphasis in original). "This is because opinion testimony that is couched as a legal conclusion or that merely tells the factfinder what result to reach is not helpful to the finder of fact." *Sancom, Inc. v. Qwest Communs. Corp.*, 683 F. Supp. 2d 1043, 1052 (D.S.D. 2010); *see also Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1052 (9th Cir. 2012) (holding "matters of law are inappropriate subjects for expert testimony" and affirming the district court's exclusion of an expert report.

**II.     Neither Jim Dimas Nor Uma Ahluwalia Should Be Permitted to Testify About the Futility of Enforcing Child Welfare Law.**

The reports submitted by Mr. Dimas and Ms. Ahluwalia are neither relevant nor reliable. Ms. Ahluwalia is a former director of state social service agencies that were subject to child welfare consent decrees, and Mr. Dimas served on a single occasion as a monitor for a state under a consent decree. Both reports come to the same baseless and irrelevant conclusion: consent decrees and

Page 3 - PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY OF JIM DIMAS AND UMA AHLUWALIA AT TRIAL

4870-3679-8645v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

settlement agreements will not result in positive change for Oregon's child welfare system.

Whether or not consent decrees and settlement agreements are generally useful tools in protecting the rights of children in foster care has no relevance to the questions currently before the Court. Similarly, Mr. Dimas and Ms. Ahluwalia's conclusions are unreliable because both readily admit that they did not review Plaintiffs' requested relief or Oregon's child welfare system. *See, e.g.*, Exhibit A (Ahluwalia Dep. 22:16-18; 59:3-9; 65:15-18); Exhibit B (Dimas Dep. 67:1-18; 101:23-102:1).[1] Instead, both rely entirely on the inaccurate assumption that Plaintiffs' requested relief is similar to the handful of consent decrees provided by Defendants. These conclusions based on incorrect premises, and drawn without any review of Oregon's system, lack reliability, are not helpful to the Court, and should be excluded.

Mr. Dimas and Ms. Ahluwalia also provide irrelevant opinions on the cost of litigation and the cost of compliance with consent decrees, in addition to opining that the relief sought by Plaintiffs stifles the innovation and flexibility of child welfare agencies. For a wide variety of reasons, discussed below, the testimony should also not be heard.

### a. The proposed testimony would not assist the Court because it does not address any question before the Court.

An expert opinion must be in some way helpful to the court. FED. R. EVID. 702(a). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). Both Mr. Dimas and Ms. Ahluwalia provide the Court with the same unhelpful conclusion—consent decrees and child welfare litigation are neither useful nor appropriate tools. However, this case is scheduled for trial,

---

[1] All exhibits in support of this motion are attached to the Declaration of P. Andrew McStay, Jr., filed concurrently.

Page 4 - PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY OF JIM DIMAS AND UMA AHLUWALIA AT TRIAL

4870-3679-8645v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

and as such, the efficacy of a consent decree or settlement agreement is entirely irrelevant to any issues currently before the Court. Regardless of Defendants' experts' opinions on the passage of the Adoption Assistance and Child Welfare Act, the Americans with Disabilities Act, or the Rehabilitation Act, or for the ratification of the Fourteenth Amendment, the Defendants are not allowed to ignore, and the Court may not refuse to enforce, those laws.

In addition to being irrelevant, neither Mr. Dimas nor Ms. Ahluwalia offer helpful testimony. Had the witnesses turned their hand to trying to identify relief that might be both effective and allowed for the innovation and flexibility that the witnesses find desirable, there might have been some utility to these opinions.[2] The wealth of academic work on this very topic focuses on that exact purpose. For instance, a recent comprehensive review of child welfare litigation found that, out of thirteen state child welfare systems subject to civil litigation surveyed, seven cases achieved significant successes on most or all core outcomes.[3] Child welfare litigation and related children's service litigation is certainly not perfect, but few investigators in the field take the dire view of Ms. Ahluwalia or Mr. Dimas.[4] Even investigators who take an often

---

[2] Mr. Dimas expressly disclaims offering any opinion on what sort of relief might be appropriate in this case. Ex. B (Dimas Dep. 101:23-102:1).

[3] Alvarez, Ariel, *Nine Key Factors in Extended Litigation-Based Reform of State Child Welfare Agencies*, 116 Children & Youth Servs. R. 105 (Sept. 2020) *at* https://www.sciencedirect.com/science/article/abs/pii/S019074092030013X (finding that nine factors helped determine the success of court-directed improvements—1) well defined settlement terms; 2) court appointed monitors; 3) transition from adversarial to collaborative mode; 4) case practice model or principles-based reform; 5) support from executive leadership; 6) support from state government and legislature; 7) building institutional capacity; 8) independence of child welfare agency; and 9) incremental reform plan).

[4] Lenore Behar, *Using Litigation to Improve Child Mental Health Services: Promises and Pitfalls*, 30 Adm. Pol. Mental Health 199 (Jan. 2003) available at https://pubmed.ncbi.nlm.nih.gov/12854676/ (finding that litigation to improve mental health care for children had a "spotty" record, but that litigation in Hawaii and North Carolina had been

Page 5 - PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY OF JIM DIMAS AND UMA AHLUWALIA AT TRIAL

4870-3679-8645v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

pessimistic view of court-based reform of child welfare programs acknowledge that "[w]ithout [litigation] many systems and the children they serve would be in much greater dire straits."[5] Mr. Dimas's and Ms. Ahluwalia's pessimism is hard to square with a decade of epidemiological evidence showing that being in a state subject to a class action lawsuit or settlement was "associated with a 21% and 23% lower risk of mortality, respectively" among children in those states."[6]

Neither Mr. Dimas nor Ms. Ahluwalia engage with or cite to the major research on this topic done by academics that identifies the promising practices within class action litigation and the sometimes-laudable effects of class action litigation. The opinions instead take the position, not only that *past* litigation has been bad, but that virtually any effort to improve child welfare through litigation is entirely futile. The only useful things courts can do, according to these witnesses, is get out of the way. Even if the Court found such broad-brush opinions reliable, they are of no assistance to the Court on any issue of law.

Similarly misplaced in both expert opinions is an extensive discussion of the costs of

---

effective); Oppenheim et al. Reforming Mental Health Services for Children in Foster Care: The Role of Child Welfare Class Action Lawsuits and Systems of Care, 93 J. Contemporary Soc. Servs. 287, 289 (2012) available at https://journals.sagepub.com/doi/10.1606/1044-3894.4239 (conducting a survey of ten consent decrees and seven implementation plans, finding that each was structured around appropriate "system of care core values and principles").

[5] Angela Moe & Jessica Church, *Separation, Visitation and Reunifification: Michigan Child Welfare Reform and Its Implications for Siblings*, 42 J. of Sociology & Social Welfare 135, 142 (Dec. 2015) at https://scholarworks.wmich.edu/cgi/viewcontent.cgi?article=3940&context=jssw (acknowledging that "court-involved reform is an expensive and timely process with no guarantee of eventual success," but also that litigation "has been the primary means to" redress problems in deficient systems).

[6] Lee *et al.*, *Child Welfare System-Level Factors Associated with All-Cause Mortality Among Children in Foster Care in the United States, 2009-2018*, Child Maltreatment (2023) at https://journals.sagepub.com/doi/abs/10.1177/10775595231177313.

Page 6 - PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY OF JIM DIMAS AND UMA AHLUWALIA AT TRIAL

4870-3679-8645v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

litigation. Ex. C (Ahluwalia Report at 11); Ex. D (Dimas Report at 8). First, the Court will no doubt appreciate the profound irony of one expert being paid $200 an hour and a whole team of experts being paid $485, $475, $385, and $205 per hour to explain to a judge that litigation is expensive.[7] Second, the Court should note that Oregon chose to spend more than $18 million dollars—and counting—in litigation costs on this matter. Finally, the opinion of the experts that litigation is expensive—aside from being obvious—is irrelevant. The $18 million spent by Oregon is already spent. The court has no power to order Oregon to stop spending money on lawyers, or to somehow turn back time and order the Plaintiffs never to file the case in the first place. An expert opinion that litigation is expensive is extremely unhelpful to the Court.

   b. **The methodology of the Dimas and Ahluwalia opinions ignores all state-by-state distinctions and all case-by-case distinctions.**

Both opinions purport to assess whether state child welfare systems under consent decrees do better or worse than states not under consent decrees.[8] Both take the same absurd position as the heart of their methodology: all states are the same, and the only relevant difference is whether or not a child welfare consent decree is in place. Mississippi, to Mr. Dimas and Ms. Ahluwalia, is the same as Massachusetts in all ways except that Mississippi is under a consent decree, and

---

[7] Both experts' work did not come cheap. Mr. Dimas billed just under $87,000 for work from March 2022 through September 2023. Ex. B (Dimas Dep. 82:24-83:8). That amount included 140 hours of "feverishly working" assistants researching background on the "history of child welfare, the history of federal reform efforts, the history of philanthropic reform efforts, the history of legal efforts"—the bulk of which was not included in the final report. *Id.* at 83:24-84:14. Ms. Ahluwalia and her team billed just over $75,000 between February 2020 and November 2023. McStay Decl. ¶ 6.

[8] Ex. C (Ahluwalia Report at 10) (reviewed consent decrees in Mississippi, Arizona, Florida, Georgia, Kansas, Maryland, South Carolina, Michigan, New Jersey, Oklahoma, Washington D.C.); Ex. D (Dimas Report, Appx B) (reviewed consent decrees in same states, plus New York, West Virginia, Texas, Oregon).

Page 7 - PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY OF JIM DIMAS AND UMA AHLUWALIA AT TRIAL

4870-3679-8645v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

Massachusetts is not. Neither, for example, considers or controls for the fact that Mississippi has a 27.7% child poverty rate, as compared to a 12.6% child poverty rate in Massachusetts?[9] Neither report attempts to grapple with any of the real and important differences between states. Mr. Dimas's basic premise for his report, that "data from the most recently completed round of Federal Child and Family Services Reviews (CFSR), reveals that the states that exited monitoring under a consent decree still failed to perform at a level comparable to states that have never been in consent decrees," fails to take even the most rudimentary controls for the other differences between states. Ex. D (Dimas Report at 2). The Court can readily conclude that child welfare suits are not randomly distributed across the nation. Instead, lawyers are more likely to file cases in states with demonstrated problems, and lawsuits that fail to show serious issues will be dismissed or fail at trial. Mr. Dimas never addresses that fundamental dissimilarity between states successfully sued for legal violations in their systems and states either never sued or unsuccessfully sued for legal violations in their systems.

Indeed, Mr. Dimas' core approach illustrates the emptiness of both reports' conclusions: claiming that child welfare litigation is ineffective without actually attempting to gauge whether any individual child welfare system improved over time. Mr. Dimas simply compared consent decree and non-consent decree jurisdictions against the most recent round of the CFSR data to see whether a system met or fell below a static federal average. In his deposition, he admitted that he did not try to determine whether any child welfare system *improved* on any of the CFSR metrics during the time it was under a consent decree:

> Q: So you are not attempting to measure improved outcomes with this chart or this exercise.

---

[9] U.S. Census Bureau, Current Population Survey, Annual Social and Economic Supplement.

Page 8 - PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY OF JIM DIMAS AND UMA AHLUWALIA AT TRIAL

4870-3679-8645v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

> A: It compares the performance of states to the national average which is an important and relevant benchmark.
>
> Q: Did you make any attempt in the context of this report to track the performance of a jurisdiction over time on the national standards?
>
> A: No. Mostly because the national data indicators workbook has been a work-in-progress and earlier versions of it were substantively different from the current version.

Ex. B (Dimas Dep 120:16-121:2).

Mr. Dimas further conceded that a given system might well improve performance on a national standard while under a consent decree:

> Q: I mean, isn't it possible that a state could have had really poor performance on a metric, entered a consent decree, improved that performance dramatically but still not be meeting the national average?
>
> A: That's possible.
>
> Q: *Would you view that as improvement?*
>
> A: *Well, I would, but that was not the question I was addressing.*

Ex. B (Dimas Dep. 121:25-122:8) (emphasis added).

Failing to control for an obvious distinction between two comparison groups is a massive, obvious error. The reports also fail to consider or control for differences between one piece of litigation and another. Outcomes vary greatly depending on the relief sought, the judge or the special master presiding, or the quality of the attorneys for either side. Instead, the state settlements, court orders, and consent decrees are all lumped together. Mr. Dimas identifies this monolithic approach in saying "consent decrees impose rules, timelines, and expectations that may seem technically achievable but turn out to be inflexible and poorly aligned with what we know about effective change management in large complex organizations." Ex. D (Dimas Report at 4.) He opines without citation that exiting a consent decree "typically includes a few dozen 'outcome

Page 9 - PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY OF JIM DIMAS AND UMA AHLUWALIA AT TRIAL

4870-3679-8645v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

measures' and hundreds of 'process measures.'" *Id*. at 13. Ms. Ahluwalia apparently shares this opinion, discussing consent decrees as a "top down approach that combines hundreds of metrics with a court appointed monitor to enforce compliance." Ex. C (Ahluwalia Report at 10).

The experts' broad generalization has no support, even in the materials they reviewed. The Arizona settlement, which both claimed to have reviewed, does not have hundreds of process measures.[10] Depending on how one counts, the metrics number around 35, and virtually all are directed at substantive outcomes, with little if any process. Moreover, much of the settlement is built around Arizona's "12 Arizona Principles," and in many places the settlement sets general goals while allowing the agency to develop its own metrics, such as the first element, requiring the agency to "a scorecard to monitor and inform behavioral health" following several defined principles. Several other settlements identified by Mr. Dimas and Ms. Ahluwalia as settlements that they read do not conform to the caricature presented in their reports.[11] Most of Mr. Dimas's concerns seem peculiar to his own negative experience in Georgia, where he describes 31 outcome

---

[10] *B.K. v.* Snyder, Settlement Agreement, 2:15-cv-00185-ROS (D. Ariz. Aug. 31, 2020) *at* https://clearinghouse.net/doc/137840/

[11] Other settlement agreements reviewed by Mr. Dimas and Ms. Ahluwalia do not resemble his description of long lists of "process" benchmarks. *See, e.g., D.G. v. Yarbrough*, Settlement Agreement, 4:08-cv-00074 (N.D. Okla. Jan. 9, 2012) (requiring that Oklahoma devise a child welfare plan with "specific strategies to improve the child welfare system," "specific structural and/or organizational changes" to encourage better outcomes in 15 defined "Performance Areas," including the incidence of abuse and neglect in care, the number of placements, frequency of visitation, etc.) *available at* https://digitalprairie.ok.gov/digital/collection/stgovpub/id/26020/; *H.G. v. Carroll*, Settlement Agreement, 4:18-cv-00100 (N.D. Fla. Mar. 11, 2019) (success under settlement agreement primarily oriented around success on six outcome benchmarks: reducing moves for foster youth; safe, stable housing; adequate mental and behavioral health services; and eliminating three negative placement practices—hoteling, shift care, and exceeding licensed capacity) *available at* https://www.childrensrights.org/wp-content/uploads/1970/01/Exhibit-A-Settlement-Agreement-Filed-and-Stamped.pdf.

Page 10 - PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY OF JIM DIMAS AND UMA AHLUWALIA AT TRIAL

4870-3679-8645v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

measures and 220 process measures. *Id.* at 13. He merely lumps a variety of wildly different settlements, orders, and consent decrees together, and made no effort to analyze the underlying conditions that led to any given consent decree, as the following deposition testimony epitomizes:

> Q:  Is it possible that states that are in consent decrees for longer than ten years simply were worse and needed to be in consent decrees longer?
>
> A:  I suppose that's possible.

Ex. B (Dimas Dep. 125:21-25).

Both Mr. Dimas and Ms. Ahluwalia decry the many states engaged in "years of monitoring" without successfully exiting a consent decree. Ex. C (Ahluwalia Report at 11); Ex. D. (Dimas Report at 6-7). The conclusory assumption that child welfare settlements should be easy to exit in these two expert reports pairs interestingly with the assertion in the Defendants' much-touted Public Knowledge report that "deliberate implementation takes time and occurs in stages, including exploration, installation, initial implementation, and full implementation." Defendants' collective expert reports indicate on one hand that the Court must be patient with the limited or nonexistent progress that Oregon has shown in many vital areas in eight years since 2016 because change takes time, but that court orders and consent decrees are obviously defective if states cannot easily exit from them in a few years. The Court does not need to entertain such a paradox.

Ms. Ahluwalia's opinion requires a high level of speculation about the ultimate relief in this case. Defendants instructed Ms. Ahluwalia to assume that the relief granted will resemble the supposed monolith of consent decrees across the county. Ex. C (Ahluwalia Report at 2). Aside from the earlier discussion about the complex array of agreements and orders, no evidence is introduced to show that Plaintiffs seek relief resembling any of those settlements cited in either report. The outcome Ms. Ahluwalia was instructed to assume is simply a strawman designed to

Page 11 - PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY OF JIM DIMAS AND UMA AHLUWALIA AT TRIAL

4870-3679-8645v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

generate the opinion she propounds. Ms. Ahluwalia concludes in her report that "Plaintiffs' requested relief will not help create a modern state-of-the-art child welfare system in Oregon." *Id.* at 12. But during her deposition, Ms. Ahluwalia was clear that she did not review any Oregon-specific data. Ex. A (Ahluwalia Dep. 22:16-18; 59:3-9; 62:7-13; 65:15-18). At the end of the day, Ms. Ahluwalia relies on Defendants' inaccurate assumption Plaintiffs' requested relief in this case is similar to the eleven settlement agreements she reviews. Ex. A (Ahluwalia Dep. 62:1-13). She then baselessly concludes that such a consent decree would not be effective in Oregon, despite never having reviewed Oregon's system or data. In any event, the only relevance of Ms. Ahluwalia's report would be at trial, in which case the scope of any final order would be the *Court's* choice, not Plaintiffs'. The Court can and will craft an order that makes sense to it, regardless of any terms Plaintiffs might suggest. The entire report is an exercise in unbounded supposition and guesswork.

Contrary to Ms. Ahluwalia's insinuations, Plaintiffs generally support prevention, diversion, coalitions with other agencies, wraparound services, and lifting up the voices of people with lived experience. Ex. C (Ahluwalia Report at 6-9). Many of her comments contrast interestingly with the actual realities of this case. Plaintiffs, not Defendants, have taken steps to ensure that the voices of foster youth and their allies are heard. Defendants have, by contrast, provided a 300-page document (the Public Knowledge Report) relying exclusively on the opinions of state employees and contractors. Plaintiffs' Complaint, which Ms. Ahluwalia says she read, specifically raised concerns about the lack of wraparound services in Oregon and the lack of "community-based support services" leading to the inability of youth to "remain in their own homes." ECF 1, ¶298. That same complaint similarly expresses concerns about the disconnect between child welfare and the Oregon Health Authority's Medicaid program. *Id.* ¶295. Ms.

Page 12 -  PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY OF JIM DIMAS AND UMA AHLUWALIA AT TRIAL

4870-3679-8645v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main • (503) 778-5299 fax

Ahluwalia's construction of an imaginary remedial order did not incorporate even the plain language of the complaint.

Mr. Dimas goes even further in painting child welfare litigation with a negative brush. Not only does such litigation not fix the problems it was designed to fix, in his opinion, it fails to fix problems it was never designed to fix, nor could it fix. He complains that consent decrees do not fix unemployment, poverty, crime, domestic violence, racism, "sensationalistic media coverage," or staff turnover. Ex. D (Dimas Report at 10-12). These hyperbolic criticisms are not paired with any assertion (and certainly no evidence) that child welfare systems, operating in the absence of consent decrees, are particularly good at single-handedly eliminating unemployment, negative media coverage, racism, poverty, or crime.

Last, neither Mr. Dimas nor Ms. Ahluwalia take any pains to show the other core element of their claims: that, but for court intervention, child welfare agencies actually do innovate, create excellent outcomes, and transform themselves into dynamic agents of change. They generally assert that consent decrees stifle this practice, but provide no citation or explanation for why the Court should expect this as a routine outcome from a child welfare program unencumbered by litigation. For instance, Ms. Ahluwalia speculates that a child welfare system not under court supervision would have done better at innovating during the COVID-19 pandemic than one under court supervision, but does not attempt to examine any evidence on this point. Ex. C (Ahluwalia Report at 12). In fact, several pieces of evidence cited underscore that such innovation and transformation is likely an exception rather than the rule in child welfare, with or without court supervision. Mr. Dimas points out a *general* statistic—not one specific to child welfare systems under consent decrees—that 48% of child welfare directors leave their jobs within two years. Ex. D (Dimas Report at 12 & 18). This turnover "makes excellence and a consistent strategic direction

Page 13 - PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY OF JIM DIMAS AND UMA AHLUWALIA AT TRIAL

4870-3679-8645v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

hard to maintain." *Id*. at 12. If the high rate of turnover among child welfare leadership—a trend which has repeated over and over in Oregon even in the absence of a system-wide consent decree—prevents an agency from maintaining a "consistent strategic direction," then the Court should reasonably expect that few child welfare agencies will routinely create the kind of innovative, transformative change discussed, even while not under court supervision. Tellingly, neither expert identifies a single state engaged in that transformative work, nor does either of them opine that such outcomes are particularly likely to occur spontaneously in a system that otherwise violates legal standards so seriously that they could otherwise be subject to court supervision.

Ultimately, despite their lengthy and costly reports to the contrary, both Mr. Dimas and Ms. Ahluwalia conceded in their depositions that it is possible for consent decrees or settlement agreements to facilitate positive change in a child welfare system in certain circumstances. Ex. A (Ahluwalia Dep. 63:24-64:3); Ex. B (Dimas Dep. 104:4-21). These concessions undermining the fundamental premise of both reports further show why they are of no value to the Court's consideration of this case.

## CONCLUSION

Mr. Dimas and Ms. Ahluwalia have provided their personal opinions, not expert opinions. They do not engage with the substantial academic literature on the question of the efficacy of child welfare litigation, because the literature demonstrates the success, at least in certain circumstances, of child welfare litigation in keeping children safe and reforming difficult systems. Instead, they operate on the basis of vague generalizations, ignoring settlements and consent decrees that do not conform to their monolithic view that each settlement document has hundreds of metrics. They merely guess about any relief that might ensue in this case.

Page 14 - PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY OF JIM DIMAS AND UMA AHLUWALIA AT TRIAL

4870-3679-8645v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

More importantly, their pessimistic view of child welfare litigation is unhelpful to the Court. The testimony does not respond to any relevant question before the Court. If Plaintiffs show that Oregon is not meeting its legal responsibilities, the Court must enforce the law.

DATED this 9th day of April, 2024.

**DAVIS WRIGHT TREMAINE LLP**

By: *s/ P. Andrew McStay, Jr.*
P. Andrew McStay, Jr. OSB 033997
andymcstay@dwt.com
William D. Miner, OSB 043636
billminer@dwt.com
560 SW Tenth Avenue, Suite 700
Portland, OR 97205
Tel: (503) 241-2300

**A BETTER CHILDHOOD**

Marcia Robinson Lowry (*pro hac vice*)
mlowry@abetterchildhood.org
Anastasia Benedetto (*pro hac vice*)
abenedetto@abetterchildhood.org
Jonathan Borle (*pro hac vice*)
jborle@abetterchildhood.org
Lindsay Gus (*pro hac vice*)
lgus@abetterchildhood.org
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel: (646) 795-4456

**DISABILITY RIGHTS OREGON**

Emily Cooper, OSB 182254
ecooper@droregon.org
Thomas Stenson, OSB 152894
tstenson@droregon.org
511 SW Tenth Avenue, Suite 200
Portland OR 97205
Tel: (503) 243-2081

**RIZZO BOSWORTH ERAUT, PC**

Steven Rizzo, OSB 840853
srizzo@rizzopc.com
Mary D. Skjelset, OSB 075840

Page 15 - PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY OF JIM DIMAS AND UMA AHLUWALIA AT TRIAL

4870-3679-8645v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

mskjelset@rizzopc.com
1300 SW Sixth Avenue, Suite 330
Portland, OR 97201
Tel: (503) 229-1819

Attorneys for Plaintiffs

Page 16 - PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY OF JIM DIMAS AND UMA AHLUWALIA AT TRIAL

4870-3679-8645v.2 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax