**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Lauren F. Blaesing, OSB #113305**
LaurenBlaesing@MarkowitzHerbold.com
**Vivek A. Kothari, OSB #182089**
VivekKothari@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR  97201
Telephone: (503) 295-3085
*Special Assistant Attorneys General for Defendants*
*Additional Counsel of Record Listed on Signature Page*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| WYATT B. and NOAH F. by their next friend Michelle McAllister; KYLIE R. and ALEC R. by their next friend Kathleen Megill Strek; UNIQUE L. by her next friend Annette Smith; SIMON S. by his next friend Paul Aubry; RUTH T. by her next friend Michelle Bartov; BERNARD C. by his next friend Ksen Murry; NAOMI B. by her next friend Kathleen Megill Strek; and NORMAN N. by his next friend Tracy Gregg, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>  v.<br><br>TINA KOTEK, Governor of Oregon in her official capacity; FARIBORZ PAKSERESHT, Director, Oregon Department of Human Services in his official capacity; APRILLE FLINT-GERNER, Director, Child Welfare in her official capacity; and OREGON DEPARTMENT OF HUMAN SERVICES,<br><br>       Defendants. | Case No. 6:19-cv-00556-AA<br><br>**DEFENDANTS' TRIAL MEMORANDUM** |

**DEFENDANTS' TRIAL MEMORANDUM**

## TABLE OF CONTENTS

**Page**

ESTIMATED TIME FOR TRIAL ........................................................................1

STATEMENT OF THE CASE ...........................................................................1

DISCUSSION ...................................................................................................9

    I.     Procedural background. .......................................................................9

    II.    Issues to be decided at trial. .............................................................11

          A.    Plaintiffs' Substantive Due Process Claim: ...........................12

          B.    Plaintiffs' Adoption Assistance and Child Welfare Act ("AACWA") Claim: ...........................................................12

          C.    Plaintiffs' ADA and Rehabilitation Act Claims: ....................12

          D.    The scope of "common questions" that must be decided related to plaintiffs' substantive due process claim. ..................................13

               1.    This Court's analysis of the "common questions" asserted by the General Class. ...................................................13

               2.    This Court's analysis of "common questions" asserted by the SGM subclass. ...................................................15

               3.    This Court's analysis of "common questions" asserted by the aging-out subclass. ................................................15

          E.    The scope of "common questions" that must be decided regarding plaintiffs' AACWA claim. .........................................17

          F.    The scope of the issues that must be decided regarding plaintiffs' ADA and Rehabilitation Act claims. ........................17

    III.   Legal argument. ...............................................................................18

          A.    Plaintiffs lack standing to seek injunctive relief. ...................18

               1.    Plaintiffs cannot prove actual or imminent injury. ......19

                    a.    To meet their burden, plaintiffs must prove that their injuries are caused by officially sanctioned policies or practices. .........................................19

                    b.    Plaintiffs cannot meet their burden to prove actual and imminent, concrete and particularized injury in this case. .............................................................21

               2.    Plaintiffs cannot prove that their injuries are likely to be redressed by a favorable decision. ................................22

                      a.    Plaintiffs cannot prove that the relief they seek is "substantially likely" to redress their injuries. .................23

|  |  | i. | Child Welfare is currently subject to a metrics-based settlement agreement, and that approach has not worked. | 24 |

|  |  | ii. | Plaintiffs' counsel has litigated similar lawsuits across the country, and the lawsuits have repeatedly failed to improve child welfare systems. | 25 |

|  | b. | Plaintiffs' requested relief is beyond the power of this Court to award. |  | 29 |

B. Plaintiffs cannot prove at trial that defendants are deliberately indifferent to the rights of children in foster care. ..... 33

    1. The scope of the Substantive Due Process Clause ..... 34

        a. There is no substantive due process right to state protection from abuse when a child is at home with their parents. ..... 34

        b. Plaintiffs' expansive view of the Substantive Due Process Clause is contrary to *DeShaney*, and ignoring *DeShaney* would do more harm than good. ..... 36

    2. Plaintiffs must prove both subjective and objective elements of deliberate indifference. ..... 38

        a. To satisfy the objective element, plaintiffs must prove that defendants' actions cause an unreasonable risk of serious harm. ..... 38

        b. To satisfy the subjective element, plaintiffs must show that defendants are aware of, and consciously disregarded that risk. ..... 39

    3. Plaintiffs cannot meet their burden on either element at trial. ..... 40

        a. Plaintiffs' own experts cannot identify any child who was unconstitutionally denied care and treatment. ..... 40

        b. Evidence at trial will show that defendants have made significant improvements to the child welfare system. ..... 41

            i. Oregon has invested millions of dollars in its child welfare system. ..... 41

            ii. Defendants' approach to system improvement is working. ..... 43

        c.     Comparing Oregon's performance on the federally reported maltreatment in care rate to the "national performance" does not establish deliberate indifference. .......................................................................47

             i.     Oregon's definition of child abuse is one of the broadest in the country. ...................................48

             ii.    Oregon's maltreatment in care rate often includes incidents based on the date the report was made, not the date the abuse actually occurred. ...................................51

             iii.   Oregon's rate of maltreatment in care includes children who are on trial home visits. ...................................................................52

             iv.   Oregon's significant progress in improving its child welfare system precludes a finding of deliberate indifference. .......................54

C.     This Court cannot enter an injunction against defendants for failing to comply with 42 U.S.C. § 671(a)(16). ...................................................57

     1.     Congress delegated authority to monitor state child welfare programs' compliance with the AACWA to the Secretary of Health and Human Services. ...................................................58

     2.     In July 2022, the Secretary determined that Oregon was in conformity with the case plan requirements of the AACWA. ...............................................................................61

        a.     Defendants worked with community partners to develop a case planning tool called the "Family Report." ...............................................................62

        b.     Defendants developed a standardized policy for transferring cases between CPS and permanency caseworkers. ...............................................................63

        c.     Plaintiffs' claim under 42 U.S.C. § 671(a)(16) fails because the Children's Bureau determined that Oregon was in substantial conformity with 42 U.S.C. § 671(a)(16). .............................................65

D.     Plaintiffs cannot prove their ADA and Rehabilitation Act claims at trial. .....................................................................................................66

     1.     The ADA does not mandate that states build or maintain an "adequate" infrastructure of mental health services, and plaintiffs cannot identify a specific service that defendants refuse to provide in a community-based setting. .........................67

2.      Plaintiffs cannot prove the elements of their ADA claim, as
        established by *Olmstead*. .................................................................69

3.      Plaintiffs' requested relief is inappropriate because courts
        should ordinarily not interfere with a state's scheme to
        reduce rates of institutionalization. ................................................72

E.    Plaintiffs cannot show that the requirements of injunctive relief are
      met in this case. ...................................................................................74

1.      Plaintiffs cannot show that other legal remedies are
        inadequate. ......................................................................................75

2.      Plaintiffs' proposed injunction disserves the public interest. ........78

CONCLUSION ...........................................................................................................81

# TABLE OF AUTHORITIES

Page(s)

## Cases

*31 Foster Children v. Bush*,
  329 F.3d 1255 (11th Cir. 2003) ................................................................. 57

*A.H.R. v. Washington State Health Care Auth.*,
  469 F. Supp. 3d 1018 (W.D. Wash. 2016).................................................. 70

*Alexander v. Choate*,
  469 U.S. 287 (1985)..................................................................................... 67

*Allen v. FamilyCare, Inc.*,
  812 F. App'x 413 (9th Cir. 2020) ............................................................... 66

*Anderson v. Warner*,
  451 F.3d 1063 (9th Cir. 2006) .................................................................... 38

*Angela R. by Hesselbein v. Clinton*,
  999 F.2d 320 (8th Cir. 1993) ...................................................................... 78

*Bates v. Pakseresht*,
  No. 2:23-cv-00474-AN, 2023 WL 7546002 (D. Or. Nov. 14, 2023) ....... 46

*Belgau v. Inslee*,
  975 F.3d 940 (9th Cir. 2020) ...................................................................... 11

*Bennett v. Spear*,
  520 U.S. 154 (1997)............................................................................... 18, 23

*Cassie M. ex rel. Irons v. Chafee*,
  16 F. Supp. 3d 33 (D.R.I. 2014).................................................................. 50

*Clapper v. Amnesty Int'l*,
  568 U.S. 398 (2013)..................................................................................... 19

*Clark v. Coye*,
  60 F.3d 600 (9th Cir. 1995) ........................................................................ 75

*Connor B. ex rel. Vigurs v. Patrick*,
  774 F.3d 45 (1st Cir. 2014) .......................................................... 21, 47, 78, 79

*Connor B. ex rel. Vigurs*,
  985 F. Supp. 2d ............................................................................................ 65

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008)............................................................................................ 19

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
   489 U.S. 189 (1989).......................................................................... 34, 35, 36, 52

*Dice v. City of Grand Coulee*,
   No. 11-CV-296-JLQ, 2012 WL 4793718 (E.D. Wash. Oct. 9, 2012) ................................. 8, 40

*Disability Rts. California v. Cnty. of Alameda*,
   Case No. 20-cv-05256-CRB, 2021 WL 212900 (N.D. Cal. Jan. 21, 2021)...................... 68, 69

*eBay v. MercExchange, LLC*,
   547 U.S. 388 (2006).................................................................................... 74, 79

*Farmer v. Brennan*,
   511 U.S. 825 (1994)............................................................................................ 40

*Friar v. Jackson*,
   No. 2:22-cv-00304-AA, 2023 WL 8773194 (D. Or. Dec. 19, 2023)........................... 38, 39, 56

*Gomez v. Vernon*,
   255 F.3d 1118 (9th Cir. 2001) ................................................................................ 29

*Henry A. v. Wilden*,
   678 F.3d 991 (9th Cir. 2012) .................................................................................. 38

*Horne v. Flores*,
   557 U.S. 433 (2009)............................................................................................ 79

*Jonathan R. v. Justice*,
   No. 3:19-cv-00710, 2023 WL 184960 (S.D.W. Va. Jan. 13, 2023) ........................................ 66

*LaDuke v. Nelson*,
   762 F.2d 1318 (9th Cir. 1985) .......................................................................... 21, 54

*LaShawn A v. Kelly*,
   887 F. Supp. 297 (D.D.C. 1995) .......................................................................... 25

*LaShawn A. ex rel. Moore v. Fent*,
   701 F. Supp. 2d 84 (2010) ................................................................................ 25, 26

*Lewis v. Casey*,
   518 U.S. 343 (1996)...................................................... 19, 20, 21, 30, 31, 33, 75

*Lipscomb v. Simmons*,
   962 F.2d 1374 (9th Cir. 1992) ......................................................................... 39, 53

*London v. Directors of the Dewitt Pub. Sch.*,
   194 F.3d 873 (8th Cir. 1999) ............................................................................ 8, 40

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .............................................................................................. 18

*M.D. by Stukenberg v. Abbott*,
   907 F.3d 237 (5th Cir. 2018) ..................................................................... 54, 55, 80

*M.S. v. Brown*,
   902 F.3d 1076 (9th Cir. 2018) ....................................................................... 23, 29

*Mayweathers v. Terhune*,
   136 F. Supp. 2d 1152 (E.D. Cal. 2001).......................................................... 14, 16

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*,
   457 U.S. 423 (1982) .............................................................................................. 77

*Miles v. Wesley*,
   801 F.3d 1060 (9th Cir. 2015) .............................................................................. 10

*Milliken v. Bradley*,
   418 U.S. 717 (1974).............................................................................................. 28

*Missouri v. Jenkins*,
   515 U.S. 70 (1995)................................................................................................ 79

*Murguia v. Langdon*,
   61 F.4th 1096 (9th Cir. 2023) .............................................................................. 52

*O'Shea v. Littleton*,
   414 U.S. 488 (1974).......................................................................................... 10, 28

*Olmstead v. L.C. ex rel. Zimring*,
   527 U.S. 581 (1999)........................................................ 67, 68, 69, 70, 72, 74

*Patel v. Kent Sch. Dist.*,
   648 F.3d 965 (9th Cir. 2011) .............................................................................. 52

*Republic of Marshall Islands v. United States*,
   865 F.3d 1187 (9th Cir. 2017) ............................................................................ 29

*Rizzo v. Goode*,
    423 U.S. 362 (1976)......................................................... 8, 20, 21, 22, 29, 30, 40, 54, 75

*Sam M. ex rel. Elliott v. Chafee*,
    800 F. Supp. 2d 363 (D.R.I. 2011)........................................................... 77

*Sanchez v. Johnson*,
    416 F.3d 1051 (9th Cir. 2005) ................................................... 67, 72, 73, 74

*Simmons v. Navajo Cnty., Ariz.*,
    609 F.3d 1011 (9th Cir. 2010) ................................................................ 67

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)........................................................................... 19

*State of Vermont Dep't of Soc. & Rehab. Servs. v. U.S. Dep't of Health & Hum. Servs.*,
    798 F.2d 57 (2d Cir. 1986).................................................................... 58

*Sup. Ct of Virginia v. Consumers Union of U.S., Inc.*,
    446 U.S. 719 (1980)........................................................................... 28

*Swain v. Junior*,
    958 F.3d 1081 (11th Cir. 2020) .............................................................. 56

*Tamas v. Dep't of Soc. & Health Servs.*,
    630 F.3d 833 (9th Cir. 2010) ...................................................... 8, 38, 39, 41

*Townsend v. Quasim*,
    163 F. Supp. 2d 1281 (W.D. Wash. 2001)................................................... 71

*Townsend v. Quasim*,
    328 F.3d 511 (9th Cir. 2003) ...................................................... 70, 71, 72

*United States v. Mississippi*,
    82 F.4th 387 (5th Cir. 2023) ...................................................... 30, 31, 32, 43

*United States v. New York City Hous. Auth.*,
    347 F. Supp. 3d 182 (S.D.N.Y. 2018)........................................................ 58

*Valentine v. Collier*,
    956 F.3d 797 (5th Cir. 2020) ................................................................. 56

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)........................................................................... 22

*Wilson v. Seiter*,
   501 U.S. 294 (1991) ................................................................................................ 20, 21

*Wooten v. Campbell*,
   49 F.3d 696 (11th Cir. 1995) ........................................................................................ 53

*Wyatt B. by McAllister v. Brown*,
   Civ. No. 6:19-cv-00556-AA, 2021 WL 4434011 (D. Or. Sept. 27, 2021) ............................... 39

## **Statutes**

28 U.S.C. § 1292(b) ........................................................................................................ 10

42 U.S.C. § 12131(2) ...................................................................................................... 71

42 U.S.C. § 1320a-2a(4)(A) ............................................................................................ 60

42 U.S.C. § 1320a-2a(a) ............................................................................................. 59, 66

42 U.S.C. § 5101 ............................................................................................................. 49

42 U.S.C. § 670 ............................................................................................................... 58

42 U.S.C. § 671 ............................................................................................................... 59

42 U.S.C. § 671(a) ...................................................................................................... 58, 66

42 U.S.C. § 671(a)(16) ................................................................................... 57, 59, 61, 65, 66

42 U.S.C. § 675 ............................................................................................................... 57

42 U.S.C. § 675(1) .......................................................................................................... 59

42 U.S.C. § 675(1)(B) ..................................................................................................... 57

42 U.S.C. § 675(5) .......................................................................................................... 59

42 U.S.C. § 675(5)(A) ..................................................................................................... 57

42 U.S.C. § 675a ............................................................................................................. 59

42 U.S.C. §§ 675(D) and (E) .......................................................................................... 57

CAPTA Reauthorization Act of 2010 (P.L. 111-320) ..................................................... 49

Justice for Victims of Trafficking Act of 2015,
   Pub. L. No. 114-22, 129 Stat.227 (May 29, 2015) ........................................................... 49

ORS 419B.005(1)(a) .................................................................................................. 50

ORS 419B.195 ......................................................................................................... 77

ORS 419B.205 ......................................................................................................... 77

ORS 419B.337(2) ..................................................................................................... 76

ORS 419B.343(1) ..................................................................................................... 76

ORS 419B.349 ......................................................................................................... 76

ORS 419B.351 ......................................................................................................... 76

ORS 419B.352 ......................................................................................................... 76

ORS 419B.440-443 ................................................................................................... 76

ORS 419B.449 ......................................................................................................... 76

ORS 419B.449(1) ..................................................................................................... 76

ORS 419B.476(2)(a) ................................................................................................. 76

ORS 419B.476(2)(b)-(c) ........................................................................................... 77

ORS 419B.476(3) ..................................................................................................... 77

ORS 419B.476(4)(c) ................................................................................................. 77

**Rules**

FRCP 19 .................................................................................................................. 28

FRCP 23(c)(1)(B) .................................................................................................... 11

FRCP 52(a)(4) ......................................................................................................... 32

**Regulations**

45 C.F.R. § 1355.20 ............................................................................................ 59, 61

45 C.F.R. § 1355.32(b)(1)(i) ..................................................................................... 59

45 C.F.R. § 1355.32(b)(2) .................................................................................. 59, 60, 61

45 C.F.R. § 1355.35(c) ................................................................................ 60

45 C.F.R. § 1355.36(b)(7) ........................................................................... 60

45 C.F.R. § 1355.36(e) ........................................................................... 60, 66

45 C.F.R. § 1356.60 ..................................................................................... 53

OAR 413-200-0352(1)(d) ....................................................................... 45, 46

OAR 413-215-0031 ..................................................................................... 45

**Other Authorities**

DOJ, *The ADA, Title II Technical Assistance Manual* § II-9.2000 (1994 Supp.) ........................ 68

Donald L. Horowitz, *Decreeing Organizational Change: Judicial Supervision of Public Institutions*, 1983 Duke L.J. 1265 .............................................................. 78

Matthew I. Fraidin, *Stories Told and Untold: Confidentiality Laws and the Master Narrative of Child Welfare*, 63 Me. L. Rev. 1 (2010) ................................................... 37

May 10, 1979 House Committee Report on AACWA ................................. 58

Tanya A. Cooper, *Racial Bias in American Foster Care: The National Debate*, 97 Marq. L. Rev. 215 (2013) ............................................................................................. 37, 80

Vivek Sankaran & Christopher Church, *Rethinking Foster Care: Why Our Current Approach to Child Welfare has Failed*, 73 SMU L. Rev. Forum 123 (2020) ................................. 26

**ESTIMATED TIME FOR TRIAL**

The Court requested that the parties include in their trial memoranda a total estimated time for trial.  (*See* Dkt. 334.)  Defendants, Governor Tina Kotek, Fariborz Pakseresht, Aprille Flint-Gerner, and the Oregon Department of Human Services ("ODHS") estimate that their case will take approximately 80 hours, 70 of which will be witness testimony.  Defendants understand that plaintiffs will need approximately one week to present their case.

**STATEMENT OF THE CASE**

The best way to improve outcomes for children is to prevent them from entering foster care.  Preventing children from entering foster care, however, requires a systemic mindset shift that litigation is ill-equipped to bring about.  The shift must be grown in organic partnerships between the communities the child welfare system engages with; it cannot be established by court order or decree.  Defendants know this and are doing the work to build a modern child welfare agency that focuses on safely keeping families together, not tearing them apart.

The families the Child Welfare Division of ODHS ("Child Welfare") serves often have complex needs, including substance use disorder, mental health needs, lack of access to housing, behavioral health challenges, lack of job stability, food insecurity, and interpersonal violence.  Historically, foster care systems attempted to address those challenges by removing children from their homes, moving quickly to terminate parental rights, and adopting children into new families.  This old model is rooted in archaic ideas about the roles of parents, resource parents, children, and government.

While Child Welfare is building an agency for the future, plaintiffs' arguments make it clear that they are wedded to the old model.  Plaintiffs view the parents of children in foster care, their communities, child welfare providers, and resource families as potential perpetrators of child abuse that must be closely watched, and they view children as potential victims that must

be "saved" from those potential perpetrators.  To "save" the children, plaintiffs believe the role of the government is to surveil and police families and their communities.  It is no surprise, given their confined views of the roles of each actor in the child welfare system, that plaintiffs' proposed remedy in this case is aimed at creating a bigger foster care surveillance system that can "save" more children.

Child Welfare fundamentally disagrees with that rigid, antiquated view.  The surveillance and punishment approach to child welfare has been tried for decades.  It does not work.  Like other government policing systems, the surveillance and punishment approach perpetuates disproportionate outcomes for BIPOC children and families.  Unlike plaintiffs' approach, defendants' vision for Oregon's child welfare system is more nuanced and flexible; it recognizes that children, families, and communities are better served by providing social services long before safety risks develop; and it recognizes that punitive child welfare systems create barriers to building trust between providers and the communities Child Welfare serves.  While plaintiffs are attempting to use litigation to create a bigger foster care system, defendants are building a system focused on prevention.

Even while this litigation has progressed, defendants' efforts are paying off.  There are dramatically fewer children in foster care in Oregon today than there were just five years ago.  Child Welfare is keeping families together and providing them more services to ensure that children can grow up safely in their families and communities of origin.

And where Child Welfare must remove a child from their family of origin, Child Welfare does so carefully, humanely, and compassionately.  Plaintiffs' own experts will testify at trial that Oregon's caseworkers performed their jobs conscientiously; children in out-of-home care are provided adequate food, shelter, clothing, and medical care; and children are not routinely

placed in physical danger.  The problem with foster care is not that defendants are deliberately

indifferent to children's constitutional rights.  They are not.  The problem is that, even if the state

provides children in foster care with food, clothing, shelter, medical and mental health care, and

safety, children need more than that:  they need love and connection with a parent; ideally, their

own parents.  Plaintiffs allege in their Complaint that the state "has been, and continues to be a

constitutionally inadequate parent."  (Compl. (Dkt. 1) ¶ 1.)  But the state is not a parent.

Children need the love and connection they receive from their own family.  The best approach is

one that addresses the root causes of why children are separated from their parents and put in

foster care in the first place, so that families can stay together safely.

When Governor Kate Brown took office in 2015, improving outcomes for children in

foster care and their families was a central priority of her administration.  Governor Brown

commissioned Public Knowledge, a management consulting firm with expertise in child welfare

systems, to conduct a review of Oregon's foster care system.  Public Knowledge published its

final report in 2016, and in the report, acknowledged that all participants in its independent

review of Oregon's foster care system genuinely desired to improve the system.  However,

systemic change takes time.  None of Public Knowledge's recommendations were "a quick fix."

Nonetheless, Public Knowledge expressed hope, based on the desire of leadership to improve the

system, that Oregon had the momentum to implement systemic, lasting change.

Public Knowledge made several specific policy recommendations, and Oregon began

work toward implementing them right away.  In fact, before plaintiffs filed this lawsuit,

Governor Brown and ODHS had already made several major steps toward improving the system:

among other things, Governor Brown and ODHS secured funding for an increase of the resource

parent reimbursement rates and an increase in Behavioral Rehabilitation Services provider rates.

Governor Brown and Child Welfare also advocated for additional funding and positions to

implement a new statewide training program for resource families and to hire a specialized team

dedicated specifically to recruiting, retaining, and supporting resource families.  Additionally,

before plaintiffs filed their complaint, Child Welfare announced a plan to end the practice of

placing children out of state.  Child Welfare also accomplished a major task from Public

Knowledge's recommendations to improve child safety:  Child Welfare centralized the Oregon

Child Abuse Hotline ("ORCAH").  Prior to centralization of the hotline, child abuse screening

and assignments were done in 15 different locations across the state.  Centralizing the hotline

took months of planning and problem solving, hiring and training new ORCAH staff, and

working through intricate technical requirements.  ODHS and the hotline's leadership team

worked tirelessly to centralize the hotline out of a strong desire to improve safety and outcomes

for children in this state.

ODHS also recruited new leadership for Child Welfare with decades of expertise and

experience:  Rebecca Jones Gaston and Aprille Flint-Gerner.  Rebecca Jones Gaston is an expert,

innovator, and leader in child welfare; she has extensive experience, including her work at a

nationally recognized child welfare practice institute, successful leadership of the child welfare

system in Maryland, frontline service as a caseworker, and lived experience in the foster care

system.  Similarly, Aprille Flint-Gerner came to Oregon with decades of experience, with a

particular expertise in recruitment, training, and retention of child welfare workforce and

building system capacity for equitable system change.  Under Rebecca Jones Gaston's

leadership, in 2020 Child Welfare created and adopted the Vision for Transformation in

collaboration with the provider community, other state agencies, juvenile courts, Oregon's nine

Tribes, and the communities Child Welfare serves.  Guided by the Vision for Transformation,

Child Welfare aims to provide families with the services they need to stay together, safely.  The Vision for Transformation embodies both a bottom-up and top-down approach, giving the communities most impacted by the child welfare system a bigger voice in the system's future, while Child Welfare leadership works to build a system responsive to those communities' needs. The Vision for Transformation also acknowledges the importance of a well-supported workforce and the value of utilizing data to inform decision-making.

Under Rebecca Jones Gaston's leadership, Oregon became recognized as a national leader in child welfare reform.  Among other things, Oregon was one of the first states in the country to have its Family First Prevention Services Act state plan approved.  Oregon also developed a nationally-recognized continuous quality improvement ("CQI") program.  Based on Oregon's significant improvements to its child welfare system under the Vision for Transformation, Rebecca Jones Gaston was appointed by President Biden as the Commissioner of the Administration on Children, Youth and Families.  Likewise, current Child Welfare Director Aprille Flint-Gerner, with the help of her executive leadership team, has continued to improve the child welfare system under Governor Tina Kotek's administration.  In addition to Child Welfare's leadership, defendants routinely work with national leaders in the child welfare space including Chapin Hall, Casey Family Programs, Evident Change, ICF, K Implementation, and others.

To be sure, Oregon must and will continue to improve its child welfare system.  But the system cannot be meaningfully improved through an injunction or an outside monitor unfamiliar with Oregon's system.  Instead, what Oregonians need from their child protection agency is what is set forth in the Vision for Transformation:  an agency that functions "based on a belief that children do best growing up in a family and on values related to honoring and supporting cultural

wisdom, building community resilience and voice, and ensuring the self-determination of [Oregon's] communities of color."  Aprille Flint-Gerner will explain at trial that the Vision for Transformation embodies the modern direction of child welfare, where the government approaches its most under-served communities with humility and respect and gives them a seat at the table.  Through the Vision for Transformation and the leadership of Ms. Flint-Gerner, Child Welfare has built relationships with Oregon's communities, Legislature, Tribes, and courts, creating a holistic and compassionate system centered on community.  A court-ordered injunction represents the opposite approach:  it mandates change from the top down, in litigation between lawyers and decided by judges, with little community input, if at all.

In fact, court orders, consent decrees, or institutional reform injunctions fail to improve outcomes for children in foster care.  Such top-down approaches collapse complicated questions about a child's family and upbringing into overly simplified, rigid numeric metrics.  These rigid metrics invite child welfare experts, lawyers, special masters, monitors, and judges to substitute their own beliefs about what children and their communities need for the judgment of the child's parents and those communities.  Court decrees do not contemplate or mitigate the deep and lasting trauma caused by the forced separation of a family.  Court decrees also allow unintended biases around race, culture, class, identity, or disability status to permeate decision-making.  The class in this case is made up of children in foster care, but deafeningly absent are the parents of those children, Oregon's nine Tribes, and other caregivers in children's communities.  Evidence will show at trial that plaintiffs' approach differs starkly from the Vision for Transformation, which makes parents, Tribal leaders, and other community partners part of the solution.

But plaintiffs face an even more difficult problem.  For the Court to impose any remedy, plaintiffs must prove that Oregon is causing widespread, unconstitutional injury to children.

Plaintiffs cannot make this showing. To begin, plaintiffs cannot prove at trial that they have

Article III standing to bring their claims because they cannot prove that their proposed solution

will remedy the problems they allege exist. In addition, at trial, plaintiffs must prove that (1)

defendants' actions create an unreasonable or substantial risk of serious harm and that (2)

defendants are subjectively deliberately indifferent to that risk. Plaintiffs cannot satisfy either

element.

As to the first element—that defendants' actions create an unreasonable or substantial

risk of harm—the risk of harm must also be constitutionally cognizable. This Court has already

explained that many of plaintiffs' allegations in this case fall beyond the scope of the Substantive

Due Process Clause:

> "Certainly, placing a child in-region, in a placement ideal
> for his service level and personal needs, or with his siblings when
> appropriate would be good practice. Plaintiffs have failed to
> demonstrate, however, that failing to do so in most or all
> circumstances puts children at risk of harm serious enough to
> amount to a deprivation of their substantive due process rights.
> There is no responsibility to maximize foster children's personal
> psychological development, and children have no right to a stable
> environment or a right not to be moved from home to home,
> despite the significant literature which indicates a traumatic effect
> of such moves on young children. [Even though] out-of-region
> placements and suboptimal placements can have negative effects
> on a child's psychological health, those negative effects are not
> constitutionally cognizable harms. Unlike severely overburdened
> caseworkers or inadequate investigations and placement licensing,
> inadequate placement array does not unacceptably increase the risk
> that a child will be exposed to serious physical or psychological
> harm."

(Op. & Order (Dkt. 215) at 18 (internal quotation omitted).) This Court also explained that

plaintiffs' substantive due process claim "must be dismissed to the extent that it seeks to

vindicate a substantive due process right to be housed in the least-restrictive setting, or to an

array of community-based placements." (*Id.* at 20.) This Court explained that plaintiffs'

substantive due process claim must also be dismissed insofar as it asserts a claim based on a right to not be in foster care longer than necessary. (*Id.* at 20.) Finally, this Court dismissed "the rights asserted by the aging-out subclass," such as the right to "independent living services." (*Id.* at 21.)

To satisfy their burden of proving the second element—that defendants are subjectively deliberately indifferent to the rights of children in foster care—plaintiffs must show more than a difference of opinion on policy choices by the State or even gross negligence. Instead, defendants' conduct must "shock[] the conscience." *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 844 (9th Cir. 2010). A Substantive Due Process Clause cause of action is not an invitation for plaintiffs or this Court to second-guess Oregon's policy choices, and "federal courts must be constantly mindful of . . . the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs." *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976). Section 1983 substantive due process claims are "properly reserved" for the "truly egregious and extraordinary cases," not cases where the defendants' actions are motivated by "good faith effort." *London v. Directors of the Dewitt Pub. Sch.*, 194 F.3d 873, 876-77 (8th Cir. 1999); *see also Dice v. City of Grand Coulee*, No. 11-CV-296-JLQ, 2012 WL 4793718, at *8 (E.D. Wash. Oct. 9, 2012) (citing *London* and noting that, to meet their burden on a substantive due process claim, a plaintiff must prove that the defendants' conduct is "in fact motivated by ill will"). Defendants are implementing the Vision for Transformation with nothing but good faith and a genuine, strong desire to improve outcomes for children. Evidence at trial will show defendants' dedication to implementing the Vision for Transformation has already led to improvements in many areas.

Institutional, multi-system reform takes time, and there is still more work to be done. At trial, plaintiffs will argue that federal court intervention is needed because defendants have not yet accomplished every desired improvement. But no state can transform its system overnight, especially while also navigating the impacts of a global pandemic. The standard in this case is not strict liability—plaintiffs cannot prevail by proving that the system still has flaws or that defendants did not prioritize the agency's efforts in the order plaintiffs think best. Instead, plaintiffs must prove that defendants are *deliberately indifferent* to the needs of children. They cannot do so.

## DISCUSSION

### I.    Procedural background.

Plaintiffs filed their Class Action Complaint on April 16, 2019, relying on the experiences of ten named plaintiffs and on audits that were conducted with the goal of improving outcomes for children. (*See generally* Compl., Dkt. 1.) Plaintiffs named as defendants ODHS, Governor Kate Brown, the Director of ODHS, and the Director of Child Welfare, in their official capacities ("defendants" or the "State"). Plaintiffs brought the Complaint on behalf of a general class of all children "in the legal and physical custody" of ODHS, and three subclasses: the Americans with Disabilities Act ("ADA") subclass, made up of children "who have or will have physical, intellectual, cognitive, or mental health disabilities," the "SGM" subclass, made up of children "who identify as sexual or gender minorities, including lesbian, gay, bisexual, queer, transgender, intersex, gender non-conforming and non-binary children," and the "aging-out" subclass, made up of children "who are or will be 14 years of older, who are eligible for transition services and lack an appropriate reunification or other permanency plan." (*Id.* ¶ 33.)

Defendants moved to dismiss plaintiffs' claims (Dkt. 31), and this Court granted in part and denied in part the State's motion. (Dkt. 215.) In ruling on defendants' motion to dismiss,

the Court has significantly narrowed the scope of the case.  (Dkt 215.)  First, the Court dismissed

plaintiffs' substantive due process claims to the extent that they seek to vindicate a substantive

due process right to be housed in the least restrictive setting, or a right to an array of community-

based placements.  (Dkt. 215 at 20.)  Second, the Court dismissed plaintiffs' substantive due

process claims insofar as they assert claims based on a right to a "duration of foster care

reasonably related to the purpose of government custody," or "the right not to be maintained in

custody longer than is necessary to accomplish the purpose to be served by taking a child into

government custody."  (*Id.*)  Third, the Court dismissed plaintiffs' substantive due process claims

on behalf of the aging-out subclass, concluding that the rights alleged by that class fell outside

constitutional guarantees of substantive due process.  (Dkt. 215 at 21.)  Plaintiffs' remaining

theories, and this Court's class certification order, are discussed in more detail below.

Defendants also argued in their motion to dismiss that this Court should abstain from

hearing plaintiffs' claims under *Miles v. Wesley*, 801 F.3d 1060, 1063 (9th Cir. 2015), and

*O'Shea v. Littleton*, 414 U.S. 488, 499 (1974).  This Court declined to abstain, and defendants

moved to certify this Court's Opinion & Order for interlocutory appeal under 28 U.S.C. §

1292(b).  (Dkts. 227, 240.)  Defendants noted that there was a circuit split on whether courts

should abstain from hearing the type of claims plaintiffs bring in this case (Dkt. 240 at 4), and

therefore substantial grounds for difference of opinion exists on the question.  This Court denied

defendants' motion.  (Dkt. 282.)

Since the Complaint was filed, nine of the ten named plaintiffs have left ODHS custody,

and the remaining class representative is an adult who remains in ODHS's legal custody

voluntarily.  Prior to class certification, defendants moved to dismiss the claims of the named

plaintiffs as moot.  (Dkts. 109, 230, 253.)  Defendants argued that the named plaintiffs' claims

are not "inherently transitory" because, among other things, plaintiffs could not show that "there is a reasonable expectation that the named plaintiffs could themselves suffer repeated harm or it is certain that other persons similarly situated will have the same complaint." *Belgau v. Inslee*, 975 F.3d 940, 949 (9th Cir. 2020) (internal quotation omitted) (Dkt. 253 at 7.)  This Court denied defendants' motions, explaining that the "Court is satisfied that the claims of the challenged Plaintiffs are inherently transitory."  (Dkt. 275 at 52.)

Plaintiffs have engaged in extensive discovery in this case.  In response to plaintiffs' nineteen requests for production, consisting of over 320 individual requests, defendants have produced over 720,000 documents amounting to over six million pages.  Defendants are producing more documents every week.  (*See* Min. of Proceedings (Dkt. 345).)  Defendants have collected and produced over six years' worth of emails from more than 40 state custodians and produced customized data reports in response to over 100 of plaintiffs' requests.

This Court certified the case as a class action on August 17, 2022.  (Dkt. 275.)  As explained below, although this Court's class certification order did not explicitly explain how each "common question" relates to each of plaintiffs' claims for relief, read together, this Court's opinions and orders on defendants' motion to dismiss (Dkt. 215) and plaintiffs' motion to certify the class (Dkt. 275) set forth the issues that must be decided at trial.

## II.    Issues to be decided at trial.

This Court's class certification order defines the scope of issues that must be decided at trial.  *See* FRCP 23(c)(1)(B) ("An order that certifies a class action must define the class and the class claims, issues, or defenses . . . .").  However, this Court's class certification order did not explain how each "common question" relates to the elements of each of plaintiffs' claims for relief.  Accordingly, the discussion below summarizes this Court's prior rulings, including its class certification order, to outline the issues that must be decided at trial.

Those issues are:

**A.      Plaintiffs' Substantive Due Process Claim:**

- Whether defendants are deliberately indifferent in failing to address issues of understaffing and high caseloads (Dkt. 275 at 64); and

- Whether defendants are deliberately indifferent to the SGM subclass' interest in access to appropriate services and placements to prevent them from experiencing (1) higher than average placement instability, (2) higher likelihood of placement in congregate care, and (3) higher incidence of violence.  (Dkt. 275 at 66.)[1]

**B.      Plaintiffs' Adoption Assistance and Child Welfare Act ("AACWA") Claim:**

- Whether defendants violated the AACWA in failing to provide the General Class with timely case plans.  (Dkt. 275 at 63.)

**C.      Plaintiffs' ADA and Rehabilitation Act Claims:**

- Whether defendants violated the ADA in failing to provide "necessary and appropriate services and treatment to make them able to access an array of community-based placements and services to ensure access to the least restrictive environment," (Dkt. 275 at 64);

---

[1] This Court also certified the question of whether defendants are failing to provide sufficient "support and caseworker resources to ensure that children receive transition planning for children aging out of care."  (Dkt. 275 at 68-70.)  But this Court dismissed the substantive due process rights asserted by the aging-out subclass—the Court explained that the "rights asserted by the aging-out subclass . . . fall beyond the constitutional guarantees of the Fourteenth Amendment and must be dismissed."  (Dkt. 215 at 21.)  As explained in more detail below, the law of the case doctrine applies to this Court's prior ruling dismissing the claims of the aging-out subclass.

- Whether defendants violated the ADA by "placing youth with disabilities in institutional settings and denying them access to community-based treatment," (Dkt. 275 at 64); and

- Whether defendants violated the ADA because they have a "practice of failing to build and maintain an adequate infrastructure of mental health providers and other therapeutic service providers capable of meeting the needs of the ADA subclass." (Dkt. 275 at 65.)

**D.    The scope of "common questions" that must be decided related to plaintiffs' substantive due process claim.**

**1.    This Court's analysis of the "common questions" asserted by the General Class.**

As explained above, this Court narrowed plaintiffs' substantive due process claim in its ruling on defendants' motion to dismiss and dismissed several aspects of that claim. (Dkt. 215 at 15-21.) In its class certification order, the Court ruled that a narrow set of "common questions" were appropriate for certification: (1) whether defendants "have failed to provide an adequate array of appropriate placements;" (2) whether defendants "have failed to undertake appropriate case planning;" and (3) whether "caseworkers are chronically understaffed and assigned large caseloads." (Dkt. 275 at 59.)

The Court did not explain how those "common questions" certified as capable of class-wide resolution are related to plaintiffs' legal claims for relief. However, because plaintiffs' AACWA claim is the claim in this case that relates to case planning, defendants understand the second question certified as to the General Class to be a common question related to the AACWA claim. Accordingly, as relevant to plaintiffs' substantive due process claims, the questions this Court certified are the first and third questions above. (Dkt. 275 at 62-64.)

However, the first question this Court certified for class-wide resolution—whether defendants "have failed to provide an adequate array of placements," relates to a portion of plaintiffs' substantive due process claim that this Court has already dismissed.  In its Opinion granting in part and denying in part defendants' motion to dismiss, the Court explained that the "right to substantive due process does not . . . extend to placement in an optimal or least-restrictive setting, or to the availability of an array of placement options."  (Dkt. 215 at 20.)  The Court did not revisit or reconsider its ruling on defendants' motion to dismiss in issuing the Opinion and Order on Plaintiffs' Motion for Class Certification, and the doctrine of the law of the case applies.  *See Mayweathers v. Terhune*, 136 F. Supp. 2d 1152, 1153-54 (E.D. Cal. 2001) (noting a change in controlling authority or a need to correct a clearly erroneous decision which would work manifest injustice could justify revisiting a prior ruling).  Based on the Court's clear prior ruling that there is no substantive due process right "to placement in an optimal or least-restrictive setting, or to the availability of an array of placement options," this Court should reject plaintiffs' attempt to reinsert that issue into the case as it relates to their substantive due process claim.  To the extent that plaintiffs assert a right to an array of placement options, those rights are relevant only to plaintiffs' ADA and Rehabilitation Act claims, discussed below.

Accordingly, reading this Court's ruling on defendants' motion to dismiss (Dkt. 215) in conjunction with its class certification order (Dkt. 275), the only common question certified as to the General Class is the third question above:  whether defendants are deliberately indifferent to the rights of the General Class for failing to address chronic understaffing and high caseloads. (Dkt. 275 at 63-64.)

**2.**    **This Court's analysis of "common questions" asserted by the SGM subclass.**

The Court denied defendants' motion to dismiss the SGM subclass' substantive due process claims (Dkt. 215 at 19-20), and this Court concluded that class certification was appropriate as to the SGM subclass.  (Dkt. 275 at 68.)  Although this Court did not expressly state which claims the SGM subclass' "common questions" relate to, the only claim the SGM subclass asserts in the Complaint is a substantive due process claim.  (*See* Dkt. 1 ¶¶ 307(b)(i)-(vi).)

Therefore, the common question that must be resolved at trial regarding the SGM subclass' substantive due process claims is whether defendants acted with deliberate indifference to the SGM subclass' interest in access to affirming placements[2] to prevent them from experiencing (1) higher than average placement instability, (2) higher likelihood of placement in congregate care, and (3) higher incidence of violence.

**3.**    **This Court's analysis of "common questions" asserted by the aging-out subclass.**

The Court dismissed the aging-out subclass' substantive due process claims.  (Dkt. 215 at 21 ("The provision of services for aging-out children… fall beyond the constitutional guarantees of the Fourteenth Amendment and must be dismissed.").)  In its Opinion and Order on defendants' motion to dismiss, the Court specifically cited each of the aging-out subclass' three enumerated substantive due process claims and dismissed each one.  (*Id.*)

---

[2] Although this Court certified, as to the SGM subclass, access to "appropriate placements" (Dkt. 275 at 67-68), the Court specifically dismissed plaintiffs' substantive due process claim to the extent that it alleged that plaintiffs were entitled to access to a sufficient placement "array."  (Dkt. 215 at 20.)  Accordingly, defendants understand the phrase "appropriate" placements as to the SGM subclass to refer to *affirming* placements, rather than an "array of placements" generally.

In its class certification order, however, the Court described that the aging-out subclass brought two categories of claims:

> "(1) the denial of resources necessary to learn to live independently and provide them with the necessary training, skills, and assistance to secure housing upon discharge from care, and (2) the lack of support and caseworker resources to ensure that children receive transition planning for children aging out of care."

(Dkt. 275 at 68.)  Later in this Court's class certification order, the Court explained that it had "dismissed the due process claims brought by the proposed Aging-Out Subclass with respect to connection to an adult resource, independent living services, and assistance in finding permanent housing," but noted that the aging-out subclass would be certified on its "remaining claims." (Dkt. 275 at 70.)  Thus, while the Court recognized that it had previously dismissed all of the substantive due process claims asserted by the aging-out subclass, the Court nevertheless certified the "common question" of whether defendants have failed to provide sufficient support and caseworker resources to ensure that the aging-out subclass receives adequate transition planning for children aging out of care.

Defendants maintain that the substantive due process rights asserted by the aging-out subclass have been dismissed, and there are no grounds justifying departure from the law of the case.  *See Mayweathers*, 136 F. Supp. 2d at 1153-54 (noting a change in controlling authority or a need to correct a clearly erroneous decision which would work manifest injustice could justify revisiting a prior ruling).  Because this Court has already correctly ruled that the *rights* asserted by the aging-out subclass fall beyond the scope of the Substantive Due Process Clause, there is no corresponding substantive due process *duty* to ensure caseworkers have "sufficient" support and resources to provide aging-out services.  Accordingly, the question of whether defendants have failed to provide sufficient support and caseworker resources to ensure that the aging-out

subclass receives adequate transition planning for children aging out of care is not a question that must be decided at trial.

**E.    The scope of "common questions" that must be decided regarding plaintiffs' AACWA claim.**

This Court denied defendants' motion to dismiss plaintiffs' claim under the AACWA. (Dkt. 215 at 24-25.)  However, in the class certification order, this Court explained that "the propriety of a particular case plan is certainly an individualized matter."  (Dkt. 275 at 63.) Accordingly, questions regarding the appropriateness of children's case plans are not at issue at trial because they are individualized questions that were not certified for resolution on a class-wide basis.

Instead, this Court explained in its class certification order that the nature of plaintiffs' class claim is that "case plans are not being prepared in a timely fashion."  (Dkt. 275 at 63.) Thus, the "common question" that must be decided at trial is whether defendants violated the Child Welfare Act by failing to provide the General Class with timely case plans.

**F.    The scope of the issues that must be decided regarding plaintiffs' ADA and Rehabilitation Act claims.**

This Court denied defendants' motion to dismiss plaintiffs' ADA and Rehabilitation Act claims.  (Dkt. 215 at 28.)  In this Court's class certification order, the Court described three common questions relating to the ADA subclass:

> (1) whether defendants have deprived the ADA subclass of necessary and appropriate services and treatment to make them able to access an array of community-based placements and services to ensure access to the least restrictive environment;
>
> (2) whether defendants have a practice of placing children and young adults with disabilities in institutional settings and denying them access to community-based treatment; and
>
> (3) whether defendants have practices of failing to build and maintain an adequate infrastructure of mental health providers and other therapeutic service providers capable of meeting the needs of the ADA subclass.

(Dkt. 275 at 64-65.)  Although this Court did not expressly explain that those questions were related to plaintiffs' ADA claim, defendants understand that the ADA subclass is the class which asserts the ADA claim.  Accordingly, those are the issues that must be addressed at trial related to plaintiffs' ADA and Rehabilitation Act claims.

## III.    Legal argument.[3]

### A.    Plaintiffs lack standing to seek injunctive relief.

At trial, plaintiffs must prove that they have standing to pursue their requested relief. Standing is an "essential and unchanging" requirement of Article III.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  Plaintiffs "bear[] the burden" of establishing each element of standing.  *Id.* at 561.  To satisfy the requirements of Article III, plaintiffs must prove three elements.  First, plaintiffs must prove an "injury in fact," which is an invasion of a legally protected interest that is both (a) "concrete and particularized," and (b) "actual or imminent, not conjectural or hypothetical."  *Id.* at 560.  Plaintiffs must also show that the injury is "fairly . . . trace[able] to the challenged action of the defendant," rather than the result of "the independent action of some third party not before the court."  *Id.*  Finally, plaintiffs must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.* at 561.

For each claim for relief, plaintiffs must prove all three elements, supported by evidence "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Bennett v. Spear,* 520 U.S. 154, 167-68 (1997).  Thus, while general factual allegations might be sufficient

---

[3] Defendants discuss evidence plaintiffs will likely rely on at trial because this Court has not yet ruled on any *Daubert* motions or motions *in limine*.  Defendants do not concede that any of plaintiffs' evidence is admissible.

at the pleadings stage, at trial, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (cleaned up). As explained below, plaintiffs cannot meet their burden here.

### 1.    Plaintiffs cannot prove actual or imminent injury.

To prove that they have standing, plaintiffs must prove that they suffered an actual or imminent injury. "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). The Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact," and that "allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) (emphasis in original). Even showing an "objectively reasonable likelihood" of future injury is insufficient to show that injury is certainly impending. *Id.* at 410.

### a.    To meet their burden, plaintiffs must prove that their injuries are caused by officially sanctioned policies or practices.

In *Lewis v. Casey*, 518 U.S. 343, 349 (1996), the United States Supreme Court explained what type of showing is required to establish standing in a class action seeking systemic relief. The Court explained that "the success of [the plaintiffs'] systemic challenge was dependent on their ability to show widespread actual injury." *Id.* The Court explained that it "is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; *it is not the role of courts, but that of the political branches, to shape the institutions of government in such a fashion as to comply with the laws and the Constitution.*" *Id.* (emphasis added). "Of course," the Court explained, "those two roles briefly and partially coincide when a court, in granting relief against actual harm that has been suffered,

or that will imminently be suffered." *Id.* But the distinction between political branches of government and the courts "would be obliterated if, to invoke intervention of the courts, no actual or imminent harm were needed, *but merely the status of being subject to a governmental institution that was not organized or managed properly*." *Id.* at 350 (emphasis added). In *Lewis*, because the District Court had failed to identify "anything more than isolated instances of actual injury," the record was insufficient to support a finding of a systemic violation. *Id.* at 349; *see also Wilson v. Seiter*, 501 U.S. 294, 305 (1991) (explaining that "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists").

Similarly, in *Rizzo v. Goode*, 423 U.S. 362, 375 (1976), the Court clarified that a plaintiff cannot prove that an injury is both concrete and particularized, and actual or imminent by relying on statistics or isolated incidents alone. In *Rizzo*, the plaintiffs attempted to prove class-wide injury by showing that an "unacceptably high" number of incidents had occurred and arguing that "when a pattern of frequent police violations of rights is shown, the law is clear that injunctive relief may be granted." *Id.* (internal quotation omitted). The Court disagreed, explaining that the plaintiffs' "invocation of the word 'pattern'" was insufficient where "the defendants were not causally linked to it." *Id.* To prove class-wide injury, the "focus [is] not simply on the number of violations which occurred but on the common thread running through them . . . flowing from a deliberate plan by the named defendants" to violate plaintiffs' rights. *Id.* The Court rejected the plaintiffs' theory of liability, which is that an institutional reform injunction was appropriate based on the named defendants' "failure to act in the face of a statistical pattern." *Id.* at 376. "Such reasoning," the Court explained, "blurs accepted usages and meanings in the English language in a way which would be quite inconsistent with the words

Congress chose in § 1983.  We have never subscribed to these amorphous propositions, and we decline to do so now."  *Id.*

Accordingly, to meet their burden at trial, plaintiffs must also show more than "isolated instances of actual injury."  *Lewis*, 518 U.S. at 349.  Instead, plaintiffs must show that the instances of actual injury are caused by the deliberate actions of the named defendants.  *Rizzo*, 423 U.S. at 375.  In other words, plaintiffs must show that the defendants "engaged in a pattern of *officially sanctioned behavior* . . . violative of the plaintiffs' constitutional rights."  *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985) (emphasis added).

> **b.    Plaintiffs cannot meet their burden to prove actual and imminent, concrete and particularized injury in this case.**

Plaintiffs cannot meet their burden to prove their alleged injuries are both concrete and particularized, and actual or imminent in this case.  First, plaintiffs assert, broadly, that defendants have unconstitutionally failed to provide a "range of appropriate placements and necessary services" for children in foster care.  (Dkt. 1 ¶ 6.)  But the Supreme Court has expressly rejected claims like the ones plaintiffs assert here, explaining that "[n]othing so amorphous as 'overall conditions'" of custody can give rise to a constitutionally cognizable claim for relief.  *Wilson*, 501 U.S. at 305.  At trial, plaintiffs cannot prove class-wide, constitutionally or statutorily cognizable injury.

Second, plaintiffs cannot prove that the class has suffered, or will imminently suffer, class-wide harm.  *See Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 57 (1st Cir. 2014) (explaining that "class-wide liability" is "a needed precursor to any [injunctive] relief").  Plaintiffs' experts will explain that they reviewed the randomly selected case files of 95 children and found no instance of a child being denied adequate food, shelter, clothing, housing, or medical care.  Instead, they found that caseworkers performed their jobs conscientiously and

kept up with required documentation.  Plaintiffs' experts will explain at trial that they found "no evidence" that children in foster care were routinely exposed to physical danger.

Third, plaintiffs will not dispute at trial that Child Welfare's officially sanctioned policies and procedures—those set out in Child Welfare's policy manual—are constitutionally sound. (Def. Ex. 1060.)  Instead, plaintiffs allege that Child Welfare's "practices" are constitutionally deficient, and at trial plaintiffs will rely primarily on evidence of isolated incidents of harm and publicly reported statistics on issues such as the length of time children spend in foster care.  The Supreme Court has repeatedly rejected that "trial by formula" approach, which relies on statistical analysis instead of an analysis of whether an official policy or practice causes class-wide constitutional harm.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (rejecting the "novel project," where a "sample set of class members would be selected," and liability would be determined based on that sample); *Rizzo*, 423 U.S. at 376 (Article III's case and controversy requirement was not satisfied where the plaintiffs' theory of liability was the "failure to act in the face of a statistical pattern").  Plaintiffs cannot identify any "officially sanctioned" policy or practice that is unconstitutional or causes widespread, class-wide constitutional violations,[4] and therefore, plaintiffs lack Article III standing to assert their claims.

### 2. Plaintiffs cannot prove that their injuries are likely to be redressed by a favorable decision.

In addition to proving actual or imminent class-wide injury, plaintiffs must also prove at trial that the specific relief they seek will redress their asserted injuries.  That question is

---

[4] As explained in more detail below, plaintiffs argue that, in certain randomly selected case files they reviewed, they determined that children were abused by their parents after they were returned home to their parents' physical custody.  Plaintiffs cannot show that those harms were caused by an "officially sanctioned" policy, and moreover, those claims cannot form the basis for Article III standing because there is no substantive due process right to government protection while children are at home with their parents.

different than the question of whether a substantive right exists. As the Ninth Circuit has explained, "not all meritorious legal claims are redressable in federal court." *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018). To establish redressability, plaintiffs must prove two elements. First, plaintiffs must prove, by a preponderance of the evidence, that it is "likely," not merely "speculative," that a favorable decision by this Court will redress their injury. *Id.*; *see also Bennett*, 520 U.S. 154, 167–68 (discussing the burden of proof to establish standing). In other words, although plaintiffs need not prove that a favorable decision is guaranteed to redress plaintiffs' injury, they must still prove that there is a "substantial likelihood" that the relief they seek will redress their injury. *M.S.*, 902 F.3d at 1083. Second, plaintiffs must also prove that their requested relief is within the scope of an Article III court's power to award. *Id.* For the reasons explained below, plaintiffs cannot prove either element of redressability at trial.

> a.    **Plaintiffs cannot prove that the relief they seek is "substantially likely" to redress their injuries.**

Plaintiffs cannot prove that the relief they seek is substantially likely to redress their injuries. In this case, plaintiffs do not assert that any officially sanctioned Child Welfare policies violate substantive due process. (Def. Ex. 1060.) Nor have they identified any policy that violates the AACWA or ADA. Instead, plaintiffs broadly assert the constitutional and statutory right to a child welfare system that provides sufficient services to create positive outcomes for children in foster care. Evidence at trial will show that defendants share that goal and have worked diligently to expand services for children and improve outcomes. However, to prove redressability, plaintiffs must prove more than that problems exist, plaintiffs must prove that it is substantially likely that the specific remedy they seek will redress their injuries. They cannot do so.

### i.   Child Welfare is currently subject to a metrics-based settlement agreement, and that approach has not worked.

First, plaintiffs cannot prove that their proposed relief—which focuses on the outcome, not the practice change necessary to bring about the outcome—is substantially likely to redress their injuries.  Court-ordered injunctions or consent decrees that require state agencies to meet certain metrics, rather than by requiring the agency to make specific practice changes, do not work.  Metrics-based injunctions do not account for factors that are outside the control of defendants and the court, such as the number of health care providers in the state, the practices of state juvenile courts, overall state budgets, and local government policies.  Injunctions that make child welfare agencies accountable for reaching metrics that are determined by factors outside the agency's control trap the agency in cycles of litigation that degrade its performance, stifle innovation, and destroy employee morale.

For example, plaintiffs' experts will testify at trial that the "frequent use of placements of less than one month strongly suggests a system that is struggling to provide an array of placement resources that meets the needs of children it serves," and that "[t]emporary placement typically exposes children to a succession of new and changing caregivers," among other disruptions.  But plaintiffs' experts will be unable identify any specific Child Welfare policy or practice change that will alleviate the need for temporary placements, and plaintiffs cannot prove that a court order requiring Child Welfare to eliminate the use of temporary placements is substantially likely to redress the problem.  Indeed, in another federal lawsuit against ODHS concerning the use of temporary lodging (children and young adults staying in hotels while waiting for an appropriate placement) in foster care, a court-appointed special master, Dr. Marty Beyer, issued a final report concluding that within Child Welfare, the "process of preventing children/youth from staying in hotels is carefully managed."  (Def. Ex. 1095.)  Despite carefully

managing the process, Child Welfare remained out of compliance with the settlement agreement, which required that ODHS eliminate the use of temporary lodging.

Dr. Beyer will testify at trial that solving the problem of placement stability in foster care will require changes by other state and federal agencies, including expanded Medicaid funding, special education, and other developmental services and placements that are responsive to children and young adults experiencing intellectual and developmental disabilities. Dr. Beyer will explain that the metrics-based approach outlined in the litigation settlement has been extremely costly and ineffective. Because the settlement metrics focused only on the downstream result (temporary lodging), rather than upstream causes of the problem (the lack of a broad variety of social services), the settlement was unsuccessful at solving the problem. Moreover, the metrics-based approach has drained vital ODHS resources and has been exhausting for ODHS staff working tirelessly to comply with the requirements of the settlement.

> ### ii. Plaintiffs' counsel has litigated similar lawsuits across the country, and the lawsuits have repeatedly failed to improve child welfare systems.

Second, plaintiffs cannot prove that their requested relief is substantially likely to redress their injuries because their requested relief has repeatedly failed to improve child welfare systems. For example, plaintiffs' counsel litigated a similar class-action lawsuit against Washington, D.C. decades ago and, following trial and months of negotiations between the parties, in 1991, the court entered a system-wide, court-ordered reform plan. *See LaShawn A v. Kelly*, 887 F. Supp. 297, 298-99 (D.D.C. 1995) (describing procedural history). Four years and two mayoral administrations after the court entered an injunction against the City, problems persisted in the foster care system, so the court began entering sanctions against the government. *Id.* Nearly twenty years later, problems remained, and the District Court was still presiding over contempt proceedings. *LaShawn A. ex rel. Moore v. Fent*, 701 F. Supp. 2d 84, 116 (2010). In

2010—over two decades after the plaintiffs filed their complaint, the District Court again held

the City in contempt, explaining that "[e]xtensive litigation on these [contempt] motions has

changed little," because, despite "diligent and thoughtful efforts," the defendants had "yet to

deliver a fully satisfactory child welfare system."  *Id.*  In other words, litigation did not end after

trial, it just shifted from liability-litigation to contempt-litigation.  Nonetheless, problems

persisted in D.C.'s child welfare system.

Defendants' expert, Jim Dimas, will testify at trial that Washington, D.C. exited federal

oversight in 2022—over 30 years after the plaintiffs filed their complaint.  When D.C. exited

federal oversight, the Director of the Washington, D.C. Child and Family Services Agency

explained that there was a "cloud" over the agency after working for years under federal

oversight, and that the lawsuit had required an inordinate amount of time and money, and it

created barriers to keeping the agency motivated and focused on the bigger picture.  The Director

explained that the lawsuit did not, and could not, "include the critical elements of a 21st-century,

high performing child welfare agency," and it was "not a winning strategy."  (December 15,

2023 Jim Dimas Expert Report at 8.)

Others who have studied the effectiveness of litigation as a method of improving state

child welfare systems have determined that court-ordered solutions simply do not work.  For

example, the Child Welfare League of America—a nationally recognized expert in Child

Welfare agency workforce development—has stated that, "given the expense and time-

consuming nature of litigation, systemic transformation and improvement would best occur in

other ways, administratively and legislatively, without the need for such lawsuits."  (*Id.*)  *See

also* Vivek Sankaran & Christopher Church, *Rethinking Foster Care:  Why Our Current

Approach to Child Welfare has Failed*, 73 SMU L. Rev. Forum 123, 132 (2020) (arguing that a

focus on upstream prevention is the only method to solve problems in child welfare, and pointing out that "[d]espite ongoing policy, litigation, and financial incentives to reduce congregate placements, at any given time, approximately one out of every ten children in foster care still lives in one").

In fact, the data shows that litigation is ineffective at effectuating systemic change in foster care. Child and Family Services Reviews, which, as explained in more detail below, are audits of state child welfare systems conducted by the federal Children's Bureau, indicate that states operating under consent decrees for more than ten years *performed the worst* on the audits, compared to the national average.

Defendants' testifying expert, Jim Dimas, served as a court-appointed monitor over a child welfare consent decree, and he will testify at trial that the consent decree was not effective. He will explain, just like Dr. Beyer explained in her report on Oregon's child welfare system, that litigation cannot alter the root causes underlying why children need the services that child welfare provides and cannot alter some of the fundamental challenges facing child welfare systems, such as the effects of sensationalistic media coverage on caseloads and workforces and the turnover endemic to a high-stress occupation in a highly politicized environment. Mr. Dimas, like Dr. Beyer, concluded that the best way to improve outcomes for children is to provide preventative services, but litigation cannot mandate preventative services because the protections of a consent decree are reserved to members of the certified class: typically, children who have already been removed from their families and placed in state custody. Importantly, litigation cannot solve institutional racism or ensure BIPOC communities have an equal access to opportunity. Plaintiffs' own experts will testify that consent decrees and court orders have not always been successful at improving child welfare systems.

At trial, plaintiffs must prove, by the preponderance of the evidence, that their requested relief is substantially likely to redress their asserted injuries. They will be unable to do so because their own experts will testify that "the use of consent decrees or court orders to drive system change has not always proved successful." Plaintiffs' experts will explain that plaintiffs' requested relief has "the potential to support positive change," only if the Court's "order ensures that critical human services systems that intersect with child welfare fully collaborate on necessary activities to promote improvement." Plaintiffs' experts will explain that "ancillary public and private systems," "funding bodies," and "juvenile courts and judiciary" must "become involved and support progress under the decree or court order."

The scope of relief that plaintiffs' experts will discuss at trial is unheard of. This Court cannot enter a mandatory injunction against Oregon's juvenile courts or the Oregon Legislature requiring them to "fully collaborate on necessary activities" for a number of reasons, including the fact that the Oregon Judicial Department and the Oregon Legislature are not parties to this case. *See, e.g.*, FRCP 19 ("A person . . . must be joined as a party if . . . in that person's absence, the court cannot accord complete relief among existing parties"); *Sup. Ct of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 732 (1980) ("Congress did not intend § 1983 to abrogate the common-law immunity of state legislators," which is "equally applicable to § 1983 actions seeking declaratory or injunctive relief."); *O'Shea*, 414 U.S. at 500 (a "federal court should not intervene to establish the basis for future intervention that would be so intrusive and unworkable" such as undertaking an "ongoing audit" of state court proceedings). Nor does plaintiffs' naming of Governor Kotek as a defendant authorize this Court to enjoin other state agencies, even if plaintiffs assert that those agencies are necessary to redress their injury. *See Milliken v. Bradley*, 418 U.S. 717, 722, 741 (1974) (despite the fact that the Governor of

Michigan was named as a defendant and school districts are state agencies, remedial order could not cross school district boundary lines because the other school districts were not parties to the case). As explained in more detail below, if the only injunction that has "the potential to support positive change," is one that this Court does not have the power to order, plaintiffs cannot prove the redressability element of Article III standing.

> **b.** **Plaintiffs' requested relief is beyond the power of this Court to award.**

As noted, to prove redressability, plaintiffs not only have to prove that their requested relief is substantially likely to redress their injuries, plaintiffs' requested relief must also be within this Court's power to award. "[E]ven where a plaintiff requests relief that would redress her claimed injury, there is no redressability if a federal court lacks the power to issue such relief." *M.S.*, 902 F.3d at 1083; *see also Republic of Marshall Islands v. United States*, 865 F.3d 1187, 1199 (9th Cir. 2017) ("Redressability requires an analysis of whether the court has the power to right or to prevent the claimed injury." (internal quotation omitted)).

It is beyond the power of an Article III court to order, design, supervise, or implement a remedial scheme that requires the court to oversee the complex policy decisions of a state agency. *See*, *e.g.*, *Rizzo*, 423 U.S. at 380 (courts must consider federalism principles when injunctive relief is sought "against those in charge of an executive branch of an agency of state or local governments"); *M.S.*, 902 F.3d at 1086 (because the plaintiff's requested declaratory judgment was "incompatible with democratic principles embedded in the structure of the Constitution, as well as the principle that equitable remedies must be tailored to fit the nature of the constitutional violations alleged," the plaintiff could not establish redressability); *Gomez v. Vernon*, 255 F.3d 1118, 1128 (9th Cir. 2001) (explaining that federal courts must give state

agencies "the widest latitude in the dispatch of [their] own internal affairs" (quoting *Rizzo*, 423 U.S. at 378-379)).

Plaintiffs' requested injunction is like those reversed in *Lewis*, 518 U.S. at 362, and recently in *United States v. Mississippi*, 82 F.4th 387 (5th Cir. 2023), because it exceeds the scope of a federal court's power. In *Lewis*, a class of inmates brought suit alleging that the Arizona Department of Corrections ("ADOC") was depriving them of access to the courts and counsel. *Lewis*, 518 U.S. at 346. Following a trial, the District Court identified a "variety of shortcomings" of the state agency "in matters ranging from the training of library staff, to updating of legal materials, to the availability of photocopying services." *Id.* at 346. Based on those shortcomings, the District Court concluded that the state's law library "system fails to comply with constitutional standards." *Id.* at 346. After finding that the state's law library was failing constitutional standards, the District Court appointed a special master, who was a law professor, "to investigate and report about the appropriate relief" to ensure meaningful access to the courts. *Id.* at 347 (internal quotation omitted.) After eight months of investigation, and "some degree of consultation" with both parties, the special master proposed a 25-page injunctive order that mandated "sweeping changes designed to ensure that ADOC would provide meaningful access to the Courts for all present and future prisoners." *Id.* at 347.

The Supreme Court reversed. *Id.* at 362. The Court explained that the injunction was "inordinately—indeed, wildly—intrusive." *Id.* at 342. The Court explained that it was inappropriate for the trial court to use the "name of the Constitution" to become "enmeshed in the minutiae" of state prison operations. *Id.* at 362 (citation omitted). By inserting itself in the detailed workings of the state's prison operations, the trial court failed to give "adequate consideration" to the views of the state authorities. *Id.* at 362. Rather than "dictating precisely

what course the State should follow," the Supreme Court made clear that a court should allow a state agency to "devis[e] a Constitutionally sound program." *Id.* at 362 (cleaned up). This approach ensures that the district court "respect[s] the limits on its role by not thrusting itself" into administration of the state agency, but rather permits the state agency "to exercise wide discretion within the bounds of constitutional requirements." *Id.* at 363 (cleaned up).

In *Mississippi*, 82 F.4th 387, the District Court followed a similar process as the District Court in *Lewis*. The District Court in *Mississippi* determined that the state's mental health care system violated the ADA because of a lack of community-based mental health services and "appointed a special master to assist the court and the parties in attempting to reach a settlement"—a process that lasted two years. *Id.* at 390. The District Court ultimately entered a decree dictating "the quantity of community-based services to be provided," and "how they should be implemented." *Id.* at 399. The order required the state to "fund certain programs and set[] minimum staffing levels." *Id.* It required the state to expand certain services, such as providing funding for additional housing vouchers. *Id.* It also required that the state "attempt to divert" individuals with disabilities who were civilly committed to the state hospital to community placements, essentially requiring "Mississippi to defer to the federal government's outside professionals instead of the patient's treating physicians." *Id.* The order also required the state to implement new measures when discharging patients from state hospitals. *Id.* at 400.

The Fifth Circuit reversed. *Id.* at 400-01. The court explained that the "order has a broad mission with an elusive target," and would not terminate until the state had "maintained [substantial compliance] with every paragraph of the order for one year, as determined by the court." *Id.* at 400. The "utterly vague language" could "commit the District Court to the near-perpetual oversight of an already-complex state-run mental health system." *Id.* The order

impermissibly required "the district court, with its monitor, to play a role essentially indistinguishable from the role ordinarily played by executive officials," contrary to basic principles of federalism and comity. *Id.* at 401. The "sweeping" injunction, the court explained, was "intrusive and unworkable" and "requires far more than what might have been required to comply with [the ADA]." *Id.*

At trial, plaintiffs will ask this Court to impermissibly assume a role "ordinarily played by executive officials." Plaintiffs ask the Court to order ODHS to "contract with an appropriate outside entity" to "complete a needs assessment of the state's provision of foster care placement and services no later than six months after judgment." (Dkt. 1 ¶ 331(a)(i).) It is a core function of state executive officials to examine a state agency's provision of services and to identify priority for improvement. In fact, it is difficult to imagine a more important and central executive function of a Governor and her agency leadership than agency strategy and operating decisions.

Plaintiffs' other requested relief is also impermissible. Plaintiffs request that the Court appoint a monitor to "approve[]" a statewide plan for "recruiting and retaining foster and adoptive homes." (Dkt. 1 ¶ 331(a)(vii).)[5] It is the role of state executive officials to craft a plan to carry out agency functions, not a federal court.[6] Moreover, evidence at trial will show that Child Welfare has a plan for recruiting and retaining resource homes. Plaintiffs will not assert at

---

[5] The fact that plaintiffs request a special master, and not the Court, to approve the statewide plan does not change the analysis. *See* FRCP 52(a)(4) ("A master's findings, to the extent adopted by the court, must be considered the court's findings.").

[6] Plaintiffs' request is inappropriate for another reason: it is plaintiffs' burden at trial to prove that constitutional deficiencies exist and that they are caused by defendants' actions that can be remedied by a court order. If plaintiffs can prove that constitutional deficiencies exist, there should be no need for a separate process to conduct a "complete needs assessment of the state's provision of foster care placement and services."

trial that the plan itself is unconstitutional, and neither plaintiffs nor their experts have proposed any specific changes to the plan.  Again, where there is no dispute that a state agency's policies are constitutional, it is not the role of a federal court—or a court-appointed monitor—to ensure that a state agency effectively carries out those policy choices.

Plaintiffs also request that ODHS "ensure that all children who are placed in foster care are placed in a safe home or facility and are adequately monitored," (Dkt. 1 ¶ 331(a)(v)), but evidence at trial will show that ODHS has policies in place for doing so.  Plaintiffs do not allege that any of ODHS's policies regarding certification of resource homes or monitoring children's safety violate the Constitution; instead, plaintiffs will attempt to prove at trial that the Governor and agency leadership are not effectively ensuring that each of their employees properly carry out those policies.  It is difficult to imagine how this Court can require that ODHS "ensure" that ODHS's policies are carried out effectively without becoming impermissibly "enmeshed in the minutiae" of agency operations.  *Lewis*, 518 U.S. at 362.  At trial, plaintiffs cannot propose a remedy that is substantially likely to redress their injuries and is within an Article III court's power to award.

> **B.      Plaintiffs cannot prove at trial that defendants are deliberately indifferent to the rights of children in foster care.**

The scope of the Substantive Due Process Clause is narrower than plaintiffs assert, and plaintiffs cannot prevail at trial on their broad, novel theories of liability.  As explained above, in this Court's class certification order, the Court identified a number of issues that were capable of class-wide resolution.  For the General Class, the Court certified the question of whether "DHS caseworkers are chronically understaffed and assigned large caseloads."  (Dkt. 275 at 59.)  For the SGM subclass, the Court certified the following question:  whether defendants "have denied SGM Youth the appropriate services and placements to prevent them from experiencing a higher-

than-average number of foster care placements; a higher likelihood of living in a congregate care setting; and a higher incidence of violence and harassment from foster parents and peers." (Dkt. 275 at 66.)

Despite this Court's rulings identifying the "common questions," at trial, plaintiffs will assert theories of liability that go far beyond not only what plaintiffs alleged in their Complaint, but also that go far beyond the scope of the Substantive Due Process Clause. Moreover, for the theories of liability that this Court has certified for class-wide resolution, plaintiffs cannot prove at trial that defendants are deliberately indifferent to plaintiffs' substantive due process rights.

### 1.    The scope of the Substantive Due Process Clause.

At trial, plaintiffs will ask this Court to find that defendants have violated the Substantive Due Process Clause for failing to remove children from their parents' homes, for returning children to their homes when those homes were unsafe, and for failing to prevent abuse that occurred while children were at home with their parents. Those claims are beyond the scope of the Substantive Due Process Clause. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200-01 (1989). Moreover, as explained in more detail below, entertaining such claims detracts from the prevention focus of the Vision for Transformation and will do more harm for children and families than good.

### a.    There is no substantive due process right to state protection from abuse when a child is at home with their parents.

There is no affirmative right to state protection from abuse while a child is at home with their parents. In *DeShaney*, a child who had been the victim of abuse committed by the child's father filed a lawsuit against the Winnebago County Department of Social Services ("DSS") alleging that the county had violated his substantive due process rights under the Fourteenth Amendment. *Id.* at 191. The plaintiff's stepmother had reported to the police that the plaintiff's

father had abused the plaintiff and, as a result, a caseworker from DSS investigated the abuse. *Id.* at 192.  The plaintiff's father denied that any abuse occurred, and DSS did not pursue the investigation further.  *Id.*  Later, the plaintiff was hospitalized under circumstances indicating abuse, and the examining physician reported suspected child abuse to DSS.  *Id.*  This time, DSS obtained an order granting DSS temporary custody from the juvenile court.  *Id.*  However, DSS ultimately determined that the plaintiff could return home under a voluntary safety agreement with the plaintiff's father.  *Id.*

Under the safety agreement, upon the plaintiff's return home to his father, a DSS caseworker continued to provide services to the family.  During monthly visits, the caseworker observed a number of suspicious injuries to plaintiff along with other violations of the safety agreement, but DSS did not remove the plaintiff from his father's care.  *Id.* at 192-93. Tragically, the plaintiff's father abused the plaintiff so severely that he fell into a life-threatening coma and needed emergency brain surgery.  *Id.*  The plaintiff alleged that the county, DSS, and various individual employees at DSS violated the plaintiff's substantive due process rights for "failing to protect him against a risk of violence at his father's hand of which they knew or should have known."  *Id.* at 193.

The Supreme Court held that the plaintiff could not bring a cause of action against the defendants for failure to protect the plaintiff from his own parent.  *Id.* at 202.  The Court explained that the purpose of the Substantive Due Process Clause is "to protect people from the State, not to ensure that the State protected them from each other.  The Framers were content to leave the extent of governmental obligation in the latter area to the democratic processes."  *Id.* at 196.  Accordingly, there is no "affirmative right to governmental aid," and "[if] the Due Process Clause does not require the State to provide its citizens with particular protective services, it

follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." *Id.* at 196-97.

Applying the law to the plaintiff's case, the Court explained:

> "Petitioners concede that the harms Joshua suffered occurred *not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor.* While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. *That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety having once offered him shelter.*"

*Id.* at 201 (emphasis added). The Court concluded that, although "Judges and lawyers, like other humans, are moved by a natural sympathy . . . to find a way for Joshua and his mother to receive adequate compensation," the Court cautioned against "yielding to that impulse." *Id.* at 202-203. The Court explained that, although the state failed to protect Joshua from his father, if the state had unjustifiably interfered with the father's relationship with Joshua, the state "would likely have been met with charges of improperly intruding into the parent-child relationship, charges based on the same Due Process Clause that forms the basis for the present charge of failure to provide adequate protection." *Id.* at 203.

### b. Plaintiffs' expansive view of the Substantive Due Process Clause is contrary to *DeShaney*, and ignoring *DeShaney* would do more harm than good.

Here, this Court should reject plaintiffs' invitation to scrutinize defendants' decisions concerning whether to remove children from their homes, when to return children to their homes, and for failing to protect children from their own parents. Just like in *DeShaney*, where the plaintiff had been involved with Child Protective Services and had even spent time in the state's

custody, plaintiffs here cannot challenge those decisions under the Substantive Due Process Clause.

As a policy matter, defendants strive every day to ensure the safety of all children in this state. However, defendants fundamentally disagree with plaintiffs that removing children and permanently adopting children into new families is the solution; defendants will testify at trial that preventing the need for removal in the first place is better policy. Accordingly, defendants are implementing a preventative approach under the Vision for Transformation.

Defendants will testify at trial about the disparate impact that over-policing and surveillance of BIPOC communities have had in this state, and they will explain that child welfare has historically been a part of that pattern. The "master narrative of child welfare, in which removing children from their homes is the natural protective response against parents seen as uncontrollably predatory" is powerful. Matthew I. Fraidin, *Stories Told and Untold: Confidentiality Laws and the Master Narrative of Child Welfare*, 63 Me. L. Rev. 1, 13 (2010). Nonetheless, "[w]ithout understanding the cultural mores of a family's tribe or community, agencies, lawyers, and judges make unfair generalities about Native American and African American families." Tanya A. Cooper, *Racial Bias in American Foster Care: The National Debate*, 97 Marq. L. Rev. 215, 249 (2013). The Vision for Transformation aims to reverse those patterns to create a more equitable system.

As set forth by the Vision for Transformation, the best way to improve outcomes for children is to keep them from entering foster care in the first place. Entering an injunction against defendants for failing to remove children from their families or for allowing children to return home is counter to that principle. The decision to separate a family is a serious, complex, and difficult one, and the placement of children in stranger foster care should only be utilized

when no other options exist.  This Court should reject plaintiffs' attempt to put their thumb on

the scale in favor of separating families and keeping them separated, because doing so will serve

only to exacerbate the very racial inequities that defendants are trying to remedy through the

Vision for Transformation.

<strong>2.    Plaintiffs must prove both subjective and objective elements of deliberate indifference.</strong>

For plaintiffs' factual theories that fall within the scope of the Substantive Due Process

Clause, plaintiffs must prove defendants are deliberately indifferent to the rights of children in

their care.  "A deliberate indifference claim requires proof of objective and subjective elements."

*Friar v. Jackson*, No. 2:22-cv-00304-AA, 2023 WL 8773194, at *1 (D. Or. Dec. 19, 2023); *see*

*also Henry A. v. Wilden*, 678 F.3d 991, 1001 (9th Cir. 2012) ("The proper standard for

determining whether a foster child's due process rights have been violated is 'deliberate

indifference,' the same standard applied to substantive due process claims by prisoners.");

*Tamas*, 630 F.3d at 845 ("[The] analysis is identical to the subjective deliberate indifference

component that we have articulated in prisoner cases and includes by implication the objective

component requiring the existence of a substantial risk of serious harm.").

<strong>a.    To satisfy the objective element, plaintiffs must prove that defendants' actions cause an unreasonable risk of serious harm.</strong>

To satisfy the objective element, plaintiffs must prove at trial that defendants' actions

create "an unreasonable or substantial risk of serious harm."  *Friar*, 2023 WL 8773194, at *1.  In

other words, not just any risk of harm qualifies as "unreasonable" or "substantial" in the

constitutional sense.  *See Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006) (to maintain a

claim under § 1983, a plaintiff must provide the "deprivation of a right secured by the federal

Constitution . . .").  As this Court explained in its prior ruling in this case, children in foster care

have a right to "reasonable safety and minimally adequate care and treatment appropriate to the

age and circumstances of the child." (Dkt. 215 at 16); *see also Wyatt B. by McAllister v. Brown*,

Civ. No. 6:19-cv-00556-AA, 2021 WL 4434011, at *7 (D. Or. Sept. 27, 2021) (quoting *Lipscomb*

*v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992) (en banc)).

This Court has already ruled that many of the rights plaintiffs assert in this case are not

rights protected under the Substantive Due Process Clause, so plaintiffs cannot satisfy the

objective element on those grounds. As this Court explained, "[t]he weight of authority clearly

demonstrates that the rights secured by the Fourteenth Amendment, though significant, are

strictly limited in scope. The state must provide food, shelter, clothing, medical care, supervision

and must, to the best of its ability under the circumstances, shield the children in their custody

from physical and psychological harm." (Dkt. 215 at 19.) Accordingly, this Court dismissed

plaintiffs' claims to the extent they assert the right to an array of placement options, the right to

be placed in a community based or least-restrictive setting, the right to a short length of time in

foster care, the right to placement stability, and the rights asserted by the aging-out subclass to

independent living services. (Dkt. 215 at 18-21.) This Court should reject plaintiffs' attempt to

reinsert those claims into this case.

> **b.** **To satisfy the subjective element, plaintiffs must show that defendants are aware of, and consciously disregarded that risk.**

To satisfy the subjective element, plaintiffs must show that defendants exposed plaintiffs

to the risk of harm "with deliberate indifference." *Friar*, 2023 WL 8773194, at *1. To prove

deliberate indifference, plaintiffs must show more than gross negligence; the defendants' conduct

must "shock[] the conscience." *Tamas*, 630 F.3d at 844. The deliberate indifference standard

should not be used to second-guess state policy choices, and "federal courts must be constantly

mindful of . . . the well-established rule that the Government has traditionally been granted the

widest latitude in the dispatch of its own internal affairs." *Rizzo*, 423 U.S. at 378-79.  Section

1983 substantive due process claims are "properly reserved" for the "truly egregious and

extraordinary case," not cases where the defendants' actions are motivated by "good faith effort."

*London*, 194 F.3d at 876-77; *see also Dice*, 2012 WL 4793718, at *8 (citing *London* and noting

that, to prove a substantive due process claim, a plaintiff must prove that the defendants' conduct

is "in fact motivated by ill will").

Because they seek injunctive relief, plaintiffs must present evidence of defendants'

"*current* attitudes and conduct."  *Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (emphasis

added).  Thus, to prevail at trial, plaintiffs must prove that defendants "were at the time the suit

was filed, and are at the time of [trial], knowingly and unreasonably disregarding an objectively

intolerable risk of harm, and that they will continue to do so."  *Id.* at 846.  This is a very high

burden.

### 3.       Plaintiffs cannot meet their burden on either element at trial.

Plaintiffs will be unable to meet their burden on either element at trial.  First, plaintiffs

cannot meet their burden on the first element because they will not be able to show class-wide

deprivations of "reasonable safety and minimally adequate care and treatment."  (Dkt. 215 at 16.)

Second, they cannot identify any policies or practices that "shock the conscience."  Instead,

evidence will show that defendants have made improvements to the child welfare system.

### a.       Plaintiffs' own experts cannot identify any child who was unconstitutionally denied care and treatment.

At trial, plaintiffs cannot satisfy the first element of their claim, that children in foster

care are at unreasonable or substantial risk of serious harm.  Plaintiffs' experts, Steib and

Rideout, will testify at trial that Oregon's child welfare system is not "in crisis," and instead

will testify that caseworkers routinely meet with children, keep up with their documentation

requirements, and perform their jobs conscientiously. Plaintiffs' experts will explain that, when they conducted their case file review, they did not see any evidence of Child Welfare failing to provide children with adequate food, shelter, clothing, or medical care. They will also testify that they were unable to identify any evidence that children in out-of-home care in Oregon were routinely exposed to physical danger.

Similarly, as to the named plaintiffs, defendants' testifying expert, Dr. Sarah Vinson, will explain that the care and services they received "met the standard of care reflected in the community" (December 15, 2023 Expert Report of Dr. Sarah Vinson at 45), and ODHS either provided or attempted to provide each of the named plaintiffs with the treatment recommended by mental health and medical providers. Plaintiffs cannot show at trial that Child Welfare's provision of services to children "shocks the conscience." *Tamas*, 630 F.3d at 844.

### b. Evidence at trial will show that defendants have made significant improvements to the child welfare system.

To the contrary, evidence at trial will show that ODHS has made multiple, steady improvements to its child welfare programs. Similarly, evidence at trial will demonstrate that Oregon has made systemic improvements both in terms of child welfare program funding and strategic programmatic change.

### i. Oregon has invested millions of dollars in its child welfare system.

First, since the 2016 Public Knowledge report was published, Oregon has invested millions of dollars in its child welfare system. Those investments include:

- In the 2017 legislative session, increasing the base foster care rate by approximately 14% and securing a rate increase for Behavioral Rehabilitation Services ("BRS") providers of approximately 16%.

- In the 2019 legislative session:  (1) creating the System of Care Advisory Council under Senate Bill 1; (2) securing funding to pay for therapeutic foster care home recruitment, training, and support ($8.5 million); (3) securing funding for the Emergency Board to help increase capacity for non-Medicaid in-home services under the Family First Prevention Act ($4 million); (4) securing funding to expand the Keeping Foster and Kin Parents Supported and Trained program statewide ($7.8 million); (5) securing funding for a team dedicated to recruiting and retaining foster families ($3.8 million and 17 positions); (6) securing funding for centralizing the Child Abuse Hotline ($8.9 million and 38.5 positions); and (7) securing funding for additional staff for the ODHS Office of Reporting, Analytics and Implementation ("ORRAI") who are dedicated to child welfare research and planning work related to ODHS's primary child welfare operations application, OR-Kids ($7.5 million and 9 positions).

- In the 2021 legislative session:  (1) securing funding for residential services for young adults ages 17-25 in Oregon, including young adults in foster care ($9.2 million to add four 5-bed residential treatment homes and one 10-bed secure residential treatment facility); (2) securing funding for a Child Welfare training unit to enhance the agency's ability to design, deliver, evaluate, and oversee training received by Child Welfare staff ($4 million and 16.72 positions); (3) securing funding for a Child Welfare respite care program ($13.7 million); (4) securing funding for the Oregon Health Authority to support assessment, stabilization, and long-term treatment planning through interdisciplinary assessment teams for children and young adults with behavioral health needs

($5.7 million); (5) securing funding to increase BRS fee-for-service rates by approximately 6.5%; (6) securing funding for infrastructure around the Family First Preservation and Prevention Program ($6.1 million and 25.52 positions); and (7) securing funding for one full-time position to support the Governor's Child Foster Care Advisory Commission.

- In the 2023 legislative session: (1) securing funding and authority for Child Welfare to hire 200 new Social Service Specialist 1 ("SSS1") caseworkers ($9.2 million); (2) securing funding to increase the reimbursement rate for resource families ($23 million); and (3) securing funding to increase the reimbursement rate for BRS services ($10.2 million).

(Def. Ex. 1109.)

Given the investments that defendants have advocated for and received, plaintiffs cannot prove at trial that defendants are disregarding any needs for improvement. Moreover, considering the recent, significant investments in the child welfare system, injunctive relief is inappropriate. *See United States*, 82 F.4th at 400-01 (reversing institutional reform injunction and explaining that "[i]t is important to note that this injunction was entered despite Mississippi's having spent over ten million dollars" to improve its behavioral health system).

### ii. Defendants' approach to system improvement is working.

Second, evidence at trial will also show that, in addition to those investments in the child-serving system, Child Welfare has made improvements—in many cases, significant improvements—in several areas. At trial, this Court will hear testimony from Child Welfare leadership, employees, and community partners who will explain to the Court what Child Welfare is doing to improve child welfare practice and outcomes for children in foster care. Their testimony will reveal expertise and passion for their work, excitement about their current

projects, lessons learned from challenges, and hope for the direction Child Welfare is trending. Their testimony will also reveal that Child Welfare makes decisions in collaboration with the communities it serves and practices an anti-racist, "bottom up" approach to system transformation.

Defendants' approach to system improvement is working. For example, evidence at trial will show that Oregon has made significant progress in improving and prioritizing agency culture and improving staff morale. Defendants have made progress in building up its workforce, including by working with a national consulting firm, Alvarez and Marshal, to hire additional caseworkers. As discussed in more detail below, the agency has made improvements in managing caseworkers' caseloads under the Vision for Transformation. Defendants have made improvements to caseworker training, have streamlined processes, and created tools for caseworkers to help them effectively do their jobs. Additionally, staff morale and performance have improved considerably, and the data supports defendants' observations: previously, staff turnover at Child Welfare outpaced agency hiring, but now, hiring at Child Welfare outpaces separations. (Def. Exs. 1014, 1015.)

The evidence at trial will also show that defendants have made improvements in recruiting and retaining resource parents. Among other improvements, defendants hired a team to focus specifically on recruiting and retaining resource parents. Defendants have improved efforts to focus on kinship placements, so children can stay in their communities with caretakers the child already knows. Defendants have revamped resource parent training to ensure that resource parents have the tools and capacity to provide trauma-informed care to the children in the state's custody. Defendants have also created a statewide respite care program for resource

parents, and evidence at trial will show that the number of respite providers more than doubled in the first year of the program.  (Def. Ex. 1097.)

The evidence will further show that defendants have made children safer in foster care. Among other things, ODHS no longer places children in out-of-state facilities and has centralized ORCAH.  Defendants created a Structured Decision Making tool for ORCAH screeners to help prioritize children's safety and make accurate decisions.  Defendants advocated for, and received, funding and authority to hire 200 additional positions to support Child Protective Services ("CPS") work, which will result in improved quality and timeliness of CPS investigations.  Defendants also developed a nationally-recognized continuous quality improvement program, which analyzes quantitative and qualitative data, fidelity to Oregon's practice model, and analyzes areas for improvement.

Defendants have also made specific improvements aimed at improving the safety and well-being of the SGM subclass.  For example, the agency has also developed administrative rules setting forth certification standards for resource homes that ensure SGM children and young adults are placed in affirming and supporting homes.  OAR 413-200-0352(1)(d) provides that a resource parent must provide clothing that is "age-appropriate and meets the needs of the cultural and gender identity and gender expression of the child or young adult."  Similarly, under OAR 413-215-0031, a Child Caring Agency

> "must respect the race, spiritual beliefs, sexual orientation, gender identity and gender expression, disabilities, national origin, and cultural identities of a child in care, and provide opportunities to enhance the positive self-concept and understanding of the child in care.  The child-caring agency must ensure that written materials are made available in other languages as necessary, or as indicated by the demographic environment or the population served by the program."

Additionally, ODHS advocated for Senate Bill 209 in the 2023 legislative session, which protects SGM children and young adults' sexual orientation, gender identity, and gender expression information.  The bill will allow the agency to collect data on SGM children and young adults in its care without the risk that the information will be disclosed in discovery in the children's juvenile cases.  (Def. Ex. 1022 at 894.)

Finally, the Oregon Foster Children's Bill of Rights, which was created by ODHS based on statutory language changes, informs children and young adults in the agency's care that they have the right to "[c]lean and appropriate clothes that fit [them] and correspond to a gender identity of [their] choice," to "be allowed to dress and groom [themselves] according to [their] culture, identity and within good hygiene standards for [their] health," and to "determine and express [their] gender and sexual identity for [themselves]."  (OAR § 413-200-0352(1)(d); Def. Ex. 1063.)  In fact, in this case, plaintiffs assert that defendants are not protective enough of SGM children in their care, but in *Bates v. Pakseresht*, No. 2:23-cv-00474-AN, 2023 WL 7546002 (D. Or. Nov. 14, 2023), defendants are being sued for denying an applicant based on their stated inability to affirm all children regardless of their sexual orientation, gender identity, or expression.

Evidence at trial will also show that Oregon has made significant improvement in many other areas, including case planning, and improving data-driven decision-making.  For example, in 2022, Child Welfare implemented a statewide CQI program that has received national recognition for its focus on practice improvements and its emphasis on centering the community's voice in the CQI process.  That defendants accomplished all the above—and more—absolutely refutes plaintiffs' claim that defendants are deliberately indifferent to the needs of children in foster care.

Plaintiffs' experts will nonetheless testify at trial that Oregon's "system" is "struggling to provide an array of placement resources that meets the needs of children it serves." That is insufficient to prove deliberate indifference. This Court has already dismissed plaintiffs' substantive due process claim to the extent it seeks an array of placement options. (Dkt. 215 at 20.) Moreover, defendants' testifying expert, Dr. Sarah Vinson, will testify at trial that across the country, "there are critical access challenges to children's mental health services." (December 15, 2023 Vinson Report at 44.) Although, as a policy matter, defendants, along with other state agencies, Coordinated Care Organizations, the Legislature, and other system partners are working to expand access, that policy matter is beyond the scope of the Substantive Due Process Clause.

Defendants do not deny that improving Oregon's entire behavioral health system is a worthy policy goal, but the fact that plaintiffs desire more or different improvements in the system does not amount to a constitutional violation. As worthy a goal as expanding the behavioral healthcare system in Oregon may be, plaintiffs cannot meet their burden to show that defendants are deliberately indifferent in this case because defendants have made efforts to expand available services, including the additional investments in those services outlined above. (Def. Ex. 1135.) *See Connor B. ex rel. Vigurs*, 774 F.3d at 55 (the fact that "there may be deficiencies yet to be fully addressed does not establish that there has been a constitutionally cognizable increased risk of class-wide harm").

### c.    Comparing Oregon's performance on the federally reported maltreatment in care rate to the "national performance" does not establish deliberate indifference.

Because plaintiffs' experts could not identify any child who has been denied minimally adequate care and treatment, and because Oregon is currently meeting its caseload ratio standards, at trial, plaintiffs will likely attempt to prove deliberate indifference by comparing

certain statistical measures to what plaintiffs call the "national standard."  They will likely ask this Court to find that defendants are deliberately indifferent to all areas where they assert Oregon has performed "worse" than the "national standard."  For example, Oregon publicly reports on its Federal Performance Measures Dashboard the following measures:[7]

| Performance Measure | National Performance | Oregon's Performance |
|---|---|---|
| Re-entry to foster Care | 5.6% or less | 10.7% |
| Permanency of all children in care for 12 months | 35.2% or greater | 37.7% |
| Permanency in 12 months for children in care 12-23 months | 43.80% or greater | 50.0% |
| Permanency in 12 months for children in care 24+ months | 37.30% or greater | 47.1% |
| Recurrence of maltreatment | 9.7% or less | 10.9% |
| Maltreatment in foster care rate per 100,000 days in care | 9.07 or less per 100,000 | 16.4 |
| Placement stability – moves per 1,000 days in care | 4.48 or less per 1,000 days | 5.4 |

Oregon's dashboard shows that Oregon's rate of "maltreatment in care" is almost double the national rate.  However, for the reasons explained below, the comparison is not proof of deliberate indifference in this case because the rate does not show whether actual abuse occurs more often in Oregon.

> i.  **Oregon's definition of child abuse is one of the broadest in the country.**

Comparing Oregon's rate of maltreatment in care to national performance does not indicate that more children are abused in ODHS custody than in other states' child welfare

---

[7] https://www.oregon.gov/odhs/data/pages/cw-dashboard-fpm.aspx#dashboard (last visited March 19, 2024).

systems, because Oregon's definition of child abuse is one of the broadest in the country.

Accordingly, Oregon responds to and tracks a wider array of reportable incidents than other

states.

Whether an incident of maltreatment counts toward a state's rate of maltreatment in care

depends on how each state defines child abuse, and there is no standard definition of child abuse.

*See* Children's Bureau, Definitions of Child Abuse and Neglect (2022) ("State civil laws define

the conduct, acts, and omissions that constitute abuse or neglect that must be reported to child

protective agencies.") (Def. Ex. 1062 at 2.)  Federal law, through the federal Child Abuse

Prevention Act ("CAPTA"), sets a floor for what states must include in their state law definition,

but it does not prevent states from expanding that definition.  Under CAPTA, child abuse is

defined as:

> "*at a minimum*, any recent act or failure to act on the part of a
> parent or caretaker, which results in death, serious physical or
> emotional harm, sexual abuse or exploitation, or an act or failure to
> act which presents an imminent risk of serious harm."

CAPTA Reauthorization Act of 2010 (P.L. 111-320), 42 U.S.C. § 5101, Note (§3) (emphasis

added).  Under CAPTA's minimum definition, states must include incidents of abuse committed

"on the part of a parent or caretaker," but states are not required to include incidents of abuse

committed by third parties.[8]  *Id.*  Oregon is one of only 12 states that includes manufacturing a

controlled substance in the presence of a child or on premises occupied by a child in its

definition of child abuse.  (Def. Ex. 1062 at 4.)  Twenty-seven states, the District of Columbia,

Guam, and Puerto Rico exclude from their definition of child abuse instances of neglect that are

---

[8] There is a narrow exception to the caregiver rule in instances of sex trafficking.  *See* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22, 129 Stat. 227 (May 29, 2015).

caused by the financial inability to provide for a child, and Oregon does not. (*Id.*) Oregon also applies a broad definition of "threat of harm," which also impacts Oregon's maltreatment in care statistics.

Perhaps the most important difference in Oregon law, however, is that Oregon is the only state in the country that does not limit its definition of child abuse to incidents of abuse committed by someone in a caretaker role. (Def. Ex. 1062.) Oregon's child abuse statute covers instances of any "third-party" abuse—including abuse committed by a child's friends, romantic partners, or classmates. *See* ORS 419B.005(1)(a). All such instances count toward Oregon's maltreatment in care rate when committed against a child for whom Oregon receives Title IV-E funding. For example, when plaintiffs' experts reviewed 95 randomly-selected case files, plaintiffs' experts noted that two incidents of maltreatment in care "did not appear to meet the definition of Maltreatment in Care" because they involved incidents of abuse committed by third parties—a stranger and a classmate at school. But those instances counted because the state received Title IV-E funding for the child at issue in those cases, and Oregon state law required Child Welfare to investigate the incidents. Evidence at trial will show that when "third party" instances of abuse are excluded from Oregon's maltreatment in care rate, Oregon's rate drops to 13.69. (Def. Ex. 1098.)

The fact the Oregon defines "abuse" more broadly than most other states, and therefore counts more incidents of abuse, is not proof of deliberate indifference. It means that Oregon is simply casting a wider net for its data collection. *See Cassie M. ex rel. Irons v. Chafee*, 16 F. Supp. 3d 33, 55-56 (D.R.I. 2014), *rev'd on other grounds*, 784 F.3d 825 (1st Cir. 2015) (in a foster care class action brought by A Better Childhood, plaintiffs' expert's "simplified analysis"

that compared Rhode Island's maltreatment in care rate to other states' rates was "conceptually flawed" because it failed to consider Rhode Island's broad mandatory reporting requirement).

> ii. **Oregon's maltreatment in care rate often includes incidents based on the date the report was made, not the date the abuse actually occurred.**

Additionally, Oregon's maltreatment in care rate does not support a finding of deliberate indifference because whether an incident of abuse counts toward Oregon's maltreatment in care rate depends on the date the report was made, not on the date the maltreatment actually occurred. Thus, if a child comes into care and reports an incident of abuse that occurred prior to entering care, that incident is counted toward Oregon's maltreatment in care rate. Evidence at trial will show that this is not an uncommon occurrence. Not only are historic incidents of abuse not probative of deliberate indifference, historical reports of abuse also indicate that children feel safe enough in their placements to disclose their history. Child Welfare should not be found deliberately indifferent to the safety of children in its care by supporting children to report past abuse.

Defendants have known about this data limitation and recently began exploring the data in more detail through Child Welfare's CQI program. As part of Child Welfare's CQI process, community partners, resource parents, and Tribes participate in analyzing each District's data on a rolling basis during debrief meetings. During those CQI debrief meetings, Child Welfare and its partners evaluate maltreatment in care by looking beyond Oregon's maltreatment in care rate. To explore where child maltreatment was occurring, the CQI program began disaggregating the data, breaking down each instance of maltreatment in care in each random case file sample by perpetrator category (resource parent, third parties, and familial abuse); dates entered in OR-Kids data fields, abuse type, and other factors. Then, the CQI team checked that information against the case notes in each child's case file. Through that process, they learned that caseworkers at

ORCAH were entering the report date, not the incident date, in the OR-Kids field that ORRAI uses to calculate the maltreatment in care rate. The CQI team is currently working on training caseworkers at ORCAH on how to enter the correct data.

### iii. Oregon's rate of maltreatment in care includes children who are on trial home visits.

Finally, Oregon's maltreatment in care rate also includes children who are no longer in the state's physical custody because they have returned home to live with their parents. As plaintiffs' experts will testify at trial, "[m]any children are going home to the parents from whom they were removed . . . [w]hile there, incidents of founded abuse/neglect occur and are characterized as instances of harm occurring while a child is 'in care.'" "In reality," plaintiffs' experts will explain at trial, "the child has returned to their parents, and in a sense, only the lack of a resumption of legal custody by the parent distinguishes the situation from an official reunification." Accordingly, plaintiffs' experts will explain at trial that maltreatment in care that occurs during a trial home visit is not indicative of "harm to children who are in true 'out-of-home' care."

Plaintiffs' experts' testimony at trial—that instances of abuse that occur after children have returned home to live with their parents is not probative of children's safety while they are in the state's custody—aligns with the law. *DeShaney*, 489 U.S. at 200-01. In cases involving trial home visits, a child has returned home to live with their parents. When a child is living at home with their parents, there is no "custody" triggering duties under the Substantive Due Process Clause. *See, e.g.*, *Murguia v. Langdon*, 61 F.4th 1096, 1110 (9th Cir. 2023) ("Regardless of whether any Defendant had 'custody' in some sense of the word, the facts of this case simply do not resemble those in which courts have found a custodial relationship for the purposes of imposing 1983 liability."); *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir.

2011) ("In the case of a minor child, custody does not exist until the state has so restrained the child's liberty that the parents cannot care for the child's basic needs."); *Lipscomb By & Through DeFehr*, 962 F.2d at 1379 ("The word 'custody' is not a talisman . . . custody cases such as *Deshaney* and *Youngberg* stand for the proposition that the government has an affirmative obligation to facilitate the exercise of constitutional rights by those in its custody only when the circumstances of the custodial relationship directly prevent individual exercise of those rights."); *Wooten v. Campbell*, 49 F.3d 696, 699 (11th Cir. 1995) (holding that the Substantive Due Process Clause is not "implicated where a public agency is awarded legal custody of a child, but does not control that child's physical custody except to arrange a court-ordered visitation with the non-custodial parent").

As explained in more detail below, plaintiffs cannot prove at trial that children *in the state's physical custody*—which is what this case is about—experience unconstitutionally high levels of abuse.  Evidence at trial will show that, when "third party" abuse and incidents of abuse that occurred during a trial home visit are excluded from Oregon's maltreatment in care rate, Oregon's rate drops to 10.78, which is near the federal standard.  Moreover, plaintiffs' experts will testify at trial that, in their review of the 95 randomly-selected case files, they found that "almost all maltreatment in care experienced by children in [the] sample occurred during a trial home visit."  To prove that abuse of children experiencing foster care is widespread, plaintiffs will rely on Oregon's maltreatment in care rate, but Oregon is required to include children who are on trial home visits in their federal reporting to the Children's Bureau, not because the state has an affirmative constitutional duty to provide services to those children, but because Oregon receives Title IV-E funding for those children.  *See, e.g.*, 45 C.F.R. § 1356.60; Children's Bureau, Title IV-E, Administrative Functions/Costs, Allowable Costs-Foster Care Maintenance

Payments Program (setting forth costs eligible for reimbursement).  Oregon uses trial home visits regularly in cases where children are returned home to their parents to maximize federal funding support.

<blockquote><b>iv.    Oregon's significant progress in improving its child welfare<br>system precludes a finding of deliberate indifference.</b></blockquote>

Plaintiffs cannot prove at trial that children in the state's physical custody experience unconstitutionally high levels of abuse.  *See Rizzo*, 423 U.S. at 375-76 (explaining that the "failure to act in the face of a statistical pattern" is not an actionable theory of liability under § 1983).  Nor will plaintiffs be able to show that there is an "officially sanctioned" policy or practice that causes class-wide violations of children's constitutional rights.  *LaDuke*, 762 F.2d at 1324.  Instead, evidence at trial will show that defendants have policies and procedures in place to prevent abuse, that such abuse is rare, and, moreover, defendants are not deliberately indifferent to the risk that does exist.  For example, evidence at trial will show that defendants have implemented policy and practice changes that make children safer in foster care.  Among other things, Child Welfare's improved caseworker caseloads allow caseworkers to spend more time on their work—more time thoroughly investigating abuse allegations, more time interviewing potential resource families, and more time knowing the details of a child experiencing foster care's experience with a resource family.

Those significant improvements in Oregon's system look nothing like the lack of progress in *M.D. by Stukenberg v. Abbott*, 907 F.3d 237 (5th Cir. 2018).  There, the Fifth Circuit affirmed a finding of deliberate indifference where the record showed that the "combination of unmanageable caseloads and high caseworker turnover" created a "cycle of crisis" that allowed children to "fall through the cracks."  *Id.* at 258.  In *M.D.*, the Texas Department of Family and Protective Services had not "conducted a workload study to determine how many cases a

caseworker can safely manage." *Id.* at 256.  Moreover, agency leadership had no reliable data on

"how many children, on average, caseworkers are responsible for." *Id.*  Even by the agency's

own charitable estimates, most caseworkers' caseloads exceed the maximum recommended by

professional standards, such as the Child Welfare League of America. *Id.* at 256-57.  The Court

noted that national experts, such as the Child Welfare League of America, recommend an

average caseload range of 12 to 15 children. *Id.*  Evidence in *M.D.* showed that "nearly half of

[the agency's] caseworkers carr[ied] caseloads of 21 children or more, 22% of caseworkers

carried caseloads of 26 children or more, and nearly 10% carr[ied] caseloads of 31 children or

more. *Id.* at 244.

      Here, by contrast, defendants have developed caseload ratio standards for Child

Welfare's caseworkers based on a data-informed analysis of staff workloads and national best

practice standards set out by the Child Welfare League of America.  Child Welfare's caseload

ratios are based on the type of work caseworkers perform, and the agency has established

caseload ratios of 1 caseworker to 7 assigned assessments per month for CPS investigators, 1

caseworker to 12 children being served for permanency caseworkers, and 1 caseworker to 21

resource homes for certification workers.  After defendants developed caseload ratio standards,

defendants asked the Legislature in 2023 for funding and position authority to hire more CPS

caseworkers, and that ask was successful.  Defendants also built caseload tracking dashboards

for ODHS leadership, managers, and supervisors to use to effectively manage staff caseloads.

Child Welfare caseworker caseload data tracking for statewide averages reflects that Oregon is

currently meeting its caseload ratio standards and has been consistently for over a year.  (2018-

2024 Child Welfare Monthly Progress Reports, Def. Exs. 1009-1015.)  And, importantly, Oregon

is retaining its workforce:  caseworker hiring has outpaced separations for years.  (*Id.*)

Plaintiffs cannot overcome the differences between this case and *M.D.* by simply comparing Oregon's performance on federal measures to national performance.[9]  As noted, plaintiffs must prove that defendants are subjectively deliberately indifferent to the risk of abuse to children in their care.  *Friar*, 2023 WL 8773194, at *1.  Comparing Oregon's performance to national performance does not demonstrate that defendants subjectively believe that the efforts they are making to improve outcomes for children are inadequate.  *See Valentine v. Collier*, 956 F.3d 797, 802-03 (5th Cir. 2020) (holding that the trial court erred by treating ineffective measures as dispositive of the defendants' mental state, explaining that plaintiffs were required to present evidence that defendants "subjectively believe that the measures they are taking are inadequate"); *Swain v. Junior*, 958 F.3d 1081, 1089 (11th Cir. 2020) (the district court erred by treating "the increase in COVID-19 infections as proof that the defendants deliberately disregarded an intolerable risk" and "[i]n doing so, [the district court] likely violated the admonition that resultant harm does not establish a liable state of mind").  Plaintiffs cannot rely on statistics alone at trial.

---

[9] Similarly, defendants anticipate that plaintiffs will argue that the rates of overdue safety assessment report completion prove deliberate indifference, but evidence at trial will show that plaintiffs are incorrect.  First, plaintiffs cannot show that failure to comply with an Oregon administrative paperwork deadline creates a substantial risk of harm to children in ODHS's physical custody.  Second, plaintiffs cannot show that defendants have knowingly and unreasonably disregarded the rates of overdue CPS assessments.  Instead, evidence will show that defendants have taken steps to improve the CPS assessment process, including by advocating for, and receiving, 200 additional positions from the Legislature to support CPS work.

C.    **This Court cannot enter an injunction against defendants for failing to comply with 42 U.S.C. § 671(a)(16).[10]**

Plaintiffs allege that defendants have violated the class's right to a written case plan and a case review system under 42 U.S.C. 671(a)(16).[11]  (Dkt. 1 ¶¶ 308-09.)  In this Court's class certification order, the Court explained that "the propriety of a particular case plan is certainly an individualized matter, the nature of Plaintiffs' claim is that case plans are not being prepared in a timely fashion."  (Dkt. 275 at 63.)  Accordingly, although the AACWA is an extremely broad statute that regulates almost every aspect of a state's child welfare system, this case is about whether defendants are in compliance with the AACWA's timely case plan requirement.

As explained below, plaintiffs cannot prevail at trial for two reasons.  First, Congress has delegated the authority to oversee compliance with the AACWA to the Children's Bureau, so entering an injunction to enforce the AACWA violates principles of separation of powers.  Second, the Children's Bureau determined that ODHS was in conformity with the AACWA's case planning requirements as recently as July of 2022.

---

[10] Defendants asserted in their motion to dismiss that there is no private right of action under the AACWA to challenge the agency actions challenged in this case, but this Court rejected that argument.  (*See* Dkt. 215 at 24-25.)  Defendants maintain that plaintiffs may not bring this case as a private cause of action under the AACWA.

[11] Plaintiffs also cite 42 U.S.C. § 675(1)(B) and 42 U.S.C. § 675(5)(A) in their Complaint.  (Dkt. 1 ¶¶ 308-09.)  42 U.S.C. § 675 is the definitions section and defines terms within 42 U.S.C. § 671(a)(16), but it is 42 U.S.C. § 671(a)(16) that creates substantive obligations for state child welfare agencies under the AACWA.  *See 31 Foster Children v. Bush*, 329 F.3d 1255, 1271 (11th Cir. 2003) ("Because §§ 675(D) and (E) are definitional in nature, they alone cannot and do not supply a basis for conferring rights enforceable under 1983.").  To the extent that the AACWA creates enforceable rights, it is under 42 U.S.C. 671(a)(16), which sets out the substantive obligations of state foster care agencies.

1.      **Congress delegated authority to monitor state child welfare programs' compliance with the AACWA to the Secretary of Health and Human Services.**

An injunction under the AACWA would not serve the public interest because such an injunction would be inconsistent with Congressional intent. Congress expressly delegated authority to enforce systemic compliance with the AACWA to the Secretary of Health and Human Services (the "Secretary"), a cabinet-level official of the executive branch. *See United States v. New York City Hous. Auth.*, 347 F. Supp. 3d 182, 208 (S.D.N.Y. 2018) (refusing to enter consent decree where the proposed decree would "bring about an unwarranted—and as far as this Court is aware—unprecedented—judicial usurpation of responsibilities that Congress has expressly entrusted to HUD, a Cabinet-level department of the Executive"). As explained below, the Secretary (through the Children's Bureau) conducts thorough audits of state child welfare systems, and Congress did not intend to create an additional layer of enforcement in the form of continuous federal court oversight. *See* May 10, 1979 House Committee Report on AACWA at 56 ("It is not the Committee's intent to take over adoption assistance programs from the States with this new authority, but to complement and allow for the expansion of existing State efforts.").

In 1980, Congress enacted the AACWA, or Title IV-E of the Social Security Act, to provide "fiscal incentives to encourage a more active and systemic monitoring of children in the foster care system." *State of Vermont Dep't of Soc. & Rehab. Servs. v. U.S. Dep't of Health & Hum. Servs.*, 798 F.2d 57, 59 (2d Cir. 1986); *see also* 42 U.S.C. § 670. States are eligible for reimbursement of certain expenses incurred in administering their foster care programs by satisfying certain requirements. As relevant here, the AACWA requires states to create a state plan for administering its foster care system and submit the plan to the Secretary for approval. 42 U.S.C. § 671(a). A state plan must "provide for the development of a case plan" as defined in

section 42 U.S.C. § 675(1), and provide "for a case review system which meets the requirements described in [42 U.S.C. § 675(5) and 42 U.S.C. § 675a]."  42 U.S.C. § 671(a)(16).

The AACWA requires the Secretary to review state foster care programs to determine whether they are in "substantial conformity" with the state plan requirements set out in 42 U.S.C. § 671.  42 U.S.C. § 1320a-2a(a).  The reviews are called "Child and Family Services Reviews" ("CFSR").  The goal of the reviews is, in part, to "assist states in enhancing their capacity to help children and families achieve positive outcomes."  *See* Def. Ex. 1050 (available at https://www.acf.hhs.gov/sites/default/files/documents/cb/cfsr_general_factsheet.pdf).

The Secretary reviews a state's substantial conformity with the state plan requirements every five years.  45 C.F.R. § 1355.32(b)(1)(i).  The review consists of two components, a statewide assessment and an on-site review.  45 C.F.R. § 1355.20.  During the statewide assessment phase, the Children's Bureau prepares a data profile of the state's child welfare system—including both foster care and in-home services populations.  (Def. Ex. 1050 at 2.) Following the statewide assessment, a joint federal-state team conducts onsite reviews, which include case file review, interviews with children and families engaged in the state's child welfare system, and interviews with community partners, including courts, resources families, caseworkers, and service providers.  (*Id.*)

Following the statewide assessment and onsite review, the Secretary is required to make an initial determination regarding whether the state is in substantial conformity.  45 C.F.R. § 1355.32(b)(2).  The standard for substantial conformity is set deliberately high—no state has ever been found in substantial conformity after the Secretary's initial determination.  (Def. Ex. 1050 at 1; Ex. 1171.)  The legislative history of the AACWA shows that the purpose of the CFSR process is to encourage states to make program improvements—not by comparing

different states against each other, but by comparing a state's own data to itself over time.  (*See* State Efforts to Comply With Federal Child Welfare Reviews:  Hearing on H.R. 9 Before the Subcomm. On Human Resources of the Comm. on Ways and Means, 108th Cong. (2004) (statement of Child Welfare League of America.)[12]

The CFSR process encourages improvement by requiring child welfare agencies to develop a Program Improvement Plan ("PIP").  Specifically, if, after the initial determination, a state is not in substantial conformity, the Secretary must "afford the State an opportunity to adopt and implement a corrective action plan . . . designed to end the failure to so conform."  42 U.S.C. § 1320a-2a(4)(A).  Consistent with that requirement, the regulations require states to "develop and implement a program improvement plan."  45 C.F.R. § 1355.32(b)(2).  The Secretary must approve a state's PIP and evaluate the state's performance under its plan during a specified time period (the "PIP period").  *See* 45 C.F.R. § 1355.35(c), (e).  The Secretary makes it "final determination of nonconformity" after the end of the PIP period.  45 C.F.R. § 1355.36(e).  If a state fails to "correct the areas of nonconformity through the successful completion" of its PIP, the Secretary withholds federal funding.  45 C.F.R. § 1355.36(b)(7), (e).

Because Congress expressly delegated the authority to enforce the AACWA to the Secretary, entering an injunction against Child Welfare to enforce the very same Act violates principles of separation of powers and does not serve the public interest.  Therefore, at trial, this Court should reject plaintiffs' AACWA claim.

---

[12] Testimony available at https://www.cwla.org/testimony-submitted-to-the-subcommittee-on-human-resources-of-the-committee-on-ways-and-means-u-s-house-of-representatives-for-the-hearing-on-state-efforts-to-comply-with-federal-child-welfare-review/, last accessed on April 8, 2024.

     **2.**     **In July 2022, the Secretary determined that Oregon was in conformity with the case plan requirements of the AACWA.**

Plaintiffs cannot prevail at trial because the Secretary determined that Oregon was in substantial conformity with the case plan requirements of the AACWA as recently as July of 2022. The Secretary's finding reflects Oregon's participation in and compliance with the regulatory process the statute contemplates.

In 2016, following Oregon's statewide assessment and an on-site review under 45 C.F.R. § 1355.20, the Secretary (through the Children's Bureau), made the initial determination that Oregon was not in substantial conformity with 42 U.S.C. § 671(a)(16). (Def. Ex. 1052 at 18) ("Oregon is not in substantial conformity with the systemic factor of Case Review System.") Because the Children's Bureau made the initial determination that Oregon was not in substantial conformity with the case review system requirement under 42 U.S.C. § 671(a)(16), Oregon was required to develop and implement a PIP. 45 C.F.R. § 1355.32(b)(2); *see also* (Def. Ex. 1057.) The Children's Bureau approved Oregon's PIP on October 3, 2018, with an effective date of September 1, 2018. (*Id.*)

Approximately seven months after the effective date of Oregon's PIP plan approval, plaintiffs filed this lawsuit. (*See generally* Class Action Compl., Dkt. 1 at 1.) Plaintiffs allege that, although Oregon had developed a PIP, "[t]he state ha[d] failed to follow up on those promises." (*Id.* ¶ 219.) But, at the time the lawsuit was filed, the PIP period had just begun. Indeed, at the time the Complaint was filed, Oregon had only submitted its first quarterly report informing the Children's Bureau of the progress it had made implementing its PIP. (Def. Ex. 1054 at 1-43.) As explained below, Oregon did follow through on its promises and is continuing to do so.

a.   **Defendants worked with community partners to develop a case planning tool called the "Family Report."**

During Oregon's CFSR process, defendants examined ways to improve case planning, specifically through engagement with children and families to assess their needs.  (Def. Ex. 1053 at 15.)  Defendants worked closely with the Permanency Advisory Committee ("PAC") and the Oregon Foster Youth Connection to develop a Family Report.  (Def. Ex.1020.); *see also* Decl. of Lacey Andresen in Supp. of Defs.' Opp'n to Pls.' Mot. to Certify as Class Action ("Andresen Decl.") (Dkt. 152)  ¶¶ 7-8.)  Defendants learned that they could support caseworkers by providing tools to encourage higher-quality face-to-face contact and documentation of that contact.  (Def. Ex. 1053 at 15.)  Accordingly, as part of its PIP, Oregon developed the Family Report.  (Def. Ex. 1054 at 99.)  The Family Report was developed in collaboration with the PAC and the Oregon Foster Youth Connection.  (Def. Ex. 1020 at 4-5.)

The Family Report replaced the OR-Kids Permanency Plan page.  (Def. Ex. 1018 at 167.) The Family Report simplified the process for caseworkers to enter information into OR-Kids. (*Id.*)  Prior to implementing the Family Report, caseworkers were required to create two separate documents to complete a case plan.  (Def. Ex. 1019 at 18.)  Largely due to the state's technology platform, in OR-Kids, under the prior system, the permanency plan would not be considered complete until the CPS assessment was completed even if a case plan had been developed by a permanency caseworker.  (*Id.*)  Defendants developed the Family Report to support the development of appropriate case plans in a timely manner and to reduce the workload of duplicating information in two separate documents.  (Def. Ex. 1020 at 25.)

Defendants implemented the Family Report over a five-week period beginning in October 2020.  (Def. Ex. 1020 at 25.)  The Family Report supports consistent and timely review of visitation plans between a child and their parents and supports caseworkers in ensuring the

appropriate level of supervision is provided, depending on the unique needs of each family. (*Id.* at 28.)  The Family Report contains a section on family engagement in an effort to support intentional, trauma-informed engagement with parents, children, and resources parents, which in turn supports caseworkers in ensuring that Child Welfare can assess and meet their unique needs. (*Id.* at 32.)

> **b.    Defendants developed a standardized policy for transferring cases between CPS and permanency caseworkers.**

Child Welfare has implemented a process specifically to address timely case planning. During the CFSR review process, defendants also learned that the transfer process between CPS and permanency caseworkers was a barrier to completing case plans within 60 days of entry into foster care. (Def. Ex. 1053 at 15.)  Historically, there had been no statewide policy regarding the transfer process and what work should be completed at the time of transfer. (*Id.*)  Instead, each local office had created their own transfer protocols, which had various degrees of success. (*Id.*) Sometimes, due to the transfer process, workers reported that they had to start over with certain paperwork, which delayed timely completion of the case plan. (*Id.*)

Defendants addressed the problem by developing and implementing the Early Transfer Protocol.  Like the Family Report, the Early Transfer Protocol was also developed in collaboration with the PAC and the Oregon Foster Youth Connection. (Def. Ex. 1020 at 4.)  The Early Transfer Protocol provides that a permanency caseworker is assigned as a secondary worker on a case within 48 hours of the filing of a petition for removal. (Def. Ex. 1004 at 439.) Within five days of the permanency worker being assigned, the CPS caseworker and permanency caseworker must have a preparation meeting. (*Id.*)  The purpose of the preparation meeting is to initiate co-management of the case to support reunification as quickly and safely as possible. (*Id.* at 439-440.)  Defendants also developed a checklist of items that the caseworkers must

discuss at the meeting. (*Id.* at 440.) Within 30 days of assignment to a CPS caseworker, the permanency caseworker and a supervisor must have an Agreement Meeting to ensure that the CPS and permanency workers agree on the "identified safety threats, ongoing safety plan, conditions for return, visits and contract, legal issues and any other case planning information." (*Id.* at 441.) The CPS caseworker continues to manage the case until the Family Engagement Meeting. (*Id.* at 440-441, 484.) After the Family Engagement Meeting, the case is transferred to the permanency worker. (*Id.* at 441.) By engaging both CPS and permanency caseworkers in all early stages of the case, defendants improved case transfers between CPS and permanency workers, enabling earlier completion of case plans.

By March 31, 2019, defendants had implemented the Early Transfer Protocol in three pilot sites—Districts 5, 6, and 11. (Def. Ex. 1054 at 99.) By implementing pilot programs first, the agency was able to gather data and feedback, make adjustments based on its findings, and improve the program before implementing the program statewide. (*Id.*) Utilizing pilot implementation means that change occurs at a slower—and more intentional—pace than plaintiffs may prefer (*see* Dkt. 1 ¶ 219), but utilizing pilot implementation is consistent with national best practice. For example, the Children's Bureau Capacity Building Center for States recommends the use of pilot programs to build capacity in child welfare programs before "large-scale implementation of a new practice, service, policy, strategy, program, or practice model," because doing so allows agencies to "identify possible roadblocks, assess the target population's reactions, and make needed adjustments for smoother implementation." Capacity Building Center for States, https://capacity.childwelfare.gov/states/resources/conduct-pilot-testing-video-6 (last visited April 10, 2024).

Following the pilot program, defendants implemented the Early Transfer Protocol statewide in January 2020.  (Def. Ex. 1019 at 27.)  Currently, the Early Transfer Protocol remains Child Welfare policy.  (Def. Ex. 1004 at 440-41.)

> **c.**   **Plaintiffs' claim under 42 U.S.C. § 671(a)(16) fails because the Children's Bureau determined that Oregon was in substantial conformity with 42 U.S.C. § 671(a)(16).**

Since the rollout of the Early Transfer Protocol and Family Report, Child Welfare staff have become better at integrating the new policies into their practices.  (Def. Ex. 1021 at 38.)  As staff have become more comfortable integrating the new policies into practice, the agency has seen notable improvements in the timely completion of initial case plans.  (*Id.*)  In October 2021, 37% of initial case plans were completed within 60 days of placement, and by March 2022, 52.6% of case plans were completed on time.  (*Id.*)  By the end of 2022, the timeliness of case plans had increased to 58.2%.  (Def. Ex. 1021 at 46.)  In February 2024, the number had improved to 74.6%.  (Def. Ex. 1015 at 27.)

Plaintiffs will also be unable to show that children are denied services because their case plans have not been marked "complete."  Instead, evidence at trial will show that children receive services regardless of whether there is a delay in completing a child's case plan.  For example, children receive services even if there are pending criminal charges against a parent or if the juvenile court has not yet reached a decision on whether to assert jurisdiction over the child, although in those circumstances a case plan may not be considered complete.  (*Id.*)  A case plan may also be considered incomplete if a supervisor has not approved it, even though the plan exists, is being overseen by a juvenile court, and is being used to deliver services.  (*Id.*)  *See Connor B. ex rel. Vigurs*, 985 F. Supp. 2d at 166 (rejecting the plaintiffs' AACWA claim regarding case plans because, "[w]ithout more . . . mere gaps in record keeping hardly constitute grave statutory error").

Ultimately, on July 14, 2022, the Children's Bureau made its final decision on Oregon's substantial conformity with the case review system requirement under 42 U.S.C. § 671(a)(16). The Children's Bureau explicitly determined that "the state has demonstrated successful completion of all PIP required strategies and PIP measurement goals" for the "Case Review System" requirement.  (Def. Ex. 1057 at 2); *see also* 45 C.F.R. § 1355.36(e) (the Children's Bureau makes a "final determination of nonconformity in writing . . . after the relevant completion date" of an agency's PIP).

The AACWA expressly requires state child welfare agencies to "substantially conform" with 42 U.S.C. § 671(a)(16).  42 U.S.C. § 1320a-2a(a); *see also Jonathan R. v. Justice*, No. 3:19-cv-00710, 2023 WL 184960, at *13 (S.D.W. Va. Jan. 13, 2023) ("Importantly, the State is not required to be perfect; it need only 'substantially conform' to § 671(a)'s requirements.").  After a thorough review and oversight through its PIP period, the Children's Bureau determined Oregon substantially conformed with 42 U.S.C. § 671(a)(16).  Accordingly, plaintiffs cannot prove that defendants committed a class-wide violation of 42 U.S.C. § 671(a)(16).  *See Allen v. FamilyCare, Inc.*, 812 F. App'x 413, 417 (9th Cir. 2020) (where CMS had already determined that state agency's rates were "actuarily sound," there was no dispute of material fact regarding whether the state agency's rates were "actuarily sound").

### D.    Plaintiffs cannot prove their ADA and Rehabilitation Act claims at trial.

Plaintiffs cannot prove their ADA and Rehabilitation Act claims at trial for several reasons.  First, plaintiffs' theory of liability—and the questions plaintiffs asked this Court to certify as capable of class-wide resolution—are not cognizable theories of liability under the ADA.  Specifically, in this case, plaintiffs invoke the ADA as a route to challenge the adequacy of the mental and behavioral health infrastructure for children throughout the state.  As explained in more detail below, however, the law is clear that the ADA does not impose a duty on states to

build out an "appropriate" level of mental health infrastructure in the state.  Second, plaintiffs

cannot prove the elements of their ADA claim at trial.  The elements of plaintiffs' ADA claim, as

established by *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), are set forth below.

Finally, plaintiffs cannot prevail at trial because courts generally may not "tinker with [a state]

scheme" to reduce the rates of institutionalization.  *Sanchez v. Johnson*, 416 F.3d 1051, 1068

(9th Cir. 2005).

> **1.      The ADA does not mandate that states build or maintain an
> "adequate" infrastructure of mental health services, and plaintiffs
> cannot identify a specific service that defendants refuse to provide in a
> community-based setting.**

Plaintiffs have not identified any specific service that defendants are refusing to provide

in a community-based setting, and they cannot identify any specific service at trial.  Instead, at

trial, plaintiffs will assert that defendants have violated the ADA because Oregon does not

provide the ADA subclass with "necessary and appropriate services and treatment to make them

able to access an array of community-based placements and services to ensure access to the

least-restrictive environment."  (*See* Dkt. 275 at 66 (certifying plaintiffs' proposed "common

questions" for the ADA subclass).)  Plaintiffs also will assert that "Defendants have a practice of

failing to build and maintain an adequate infrastructure of mental health providers and other

therapeutic services providers capable of meeting the needs of the ADA subclass."  (*Id.* at 64-

65.)  While defendants share the policy goal of expanding mental health services to children,

those policy goals are not cognizable theories of liability under the ADA.

The law is clear that the ADA does not impose on states a duty to create an "adequate"

mental health infrastructure.  *See Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir.

2010) ("the ADA prohibits discrimination because of disability, not inadequate treatment for

disability") (emphasis added); *see also Alexander v. Choate*, 469 U.S. 287, 303 (1985) (holding

that the Rehabilitation Act did not require that the state Medicaid program permit disabled individuals more days of inpatient treatment than non-disabled individuals); DOJ, *The ADA, Title II Technical Assistance Manual* § II-9.2000 (1994 Supp.) (available at https://perma.cc/359G-7UHQ) ("[T]he ADA generally does not require a State or local government entity to provide additional services for individuals with disabilities that are not provided for individuals without disabilities.") (available at https://perma.cc/359G-7UHQ)).  *Olmstead* itself made clear that the ADA does not "impose[] on the States a 'standard of care' for whatever medical services they render," nor does it "*require[] States to provide a certain level of benefits to individuals with disabilities*."  *Olmstead*, 527 U.S. at 603 n.14.

Plaintiffs' theory in this case is similar to the theory asserted by Disability Rights California ("DRC") and rejected by the court in *Disability Rts. California v. Cnty. of Alameda*, Case No. 20-cv-05256-CRB, 2021 WL 212900 (N.D. Cal. Jan. 21, 2021).  There, DRC alleged that Alameda County violated the integration mandate by failing to "provide[] sufficient intensive community-based mental health services to" disabled individuals within the county.  *Id.* at *2.  DRC alleged that defendants could provide a reasonable accommodation by expanding "community-based" or "integrated" services.  *Id.*  DRC sought a declaratory judgment and an injunction to remedy the asserted violations of the ADA.  *Id.*  The District Court rejected plaintiffs' claims.

The court explained that "unjustified isolation" under *Olmstead* "does not mean isolation that could be avoided if a state or public entity simply provided more or better services."  *Id.* at *8.  The court explained that the county's "failure to develop sufficiently individualized treatment . . . does not constitute disability discrimination because it relates to whether [the government] provides a service, not where [the government] provides that service."  *Id.* at *10.

Because the plaintiffs challenged the sufficiency of the county's mental health service array, the county's claim "amount[ed] to an assertion that [the county's] services are not up to the DRC's preferred 'standard of care.'" *Id.* (quoting *Olmstead*, 527 U.S. at 603 n.14). The court also noted that DRC had failed to "establish any direct discrimination because they neither identify a *specific service* currently provided in an institutional setting nor argue that such a service should be provided in a more integrated setting." *Id.* (emphasis added). Instead, DRC broadly asserted that the failure to provide better mental health services "leads to worse mental health outcomes for Constituents." *Id.* at *10. The court rejected that argument, explaining that "worse outcomes are not equivalent to discrimination." *Id.*

Here too, plaintiffs have not identified any *specific* service that defendants are not providing in a community setting. Instead, they assert broadly that defendants have violated the ADA by failing to provide an array of community-based mental health services and they seek an injunction requiring defendants to expand mental health services for children throughout the state. That is not what the law requires. At trial, plaintiffs must specifically identify the service that defendants are refusing to provide in a community-based setting. They will be unable to do so. Moreover, as explained below, even if plaintiffs do identify a specific service, plaintiffs must prove each element set out under *Olmstead*.

### 2.    Plaintiffs cannot prove the elements of their ADA claim, as established by *Olmstead*.

Even if plaintiffs identify a specific service that defendants are refusing to provide in a community-based setting, plaintiffs must then prove the elements set out under *Olmstead*. To prove an *Olmstead* violation, a plaintiff must show (in addition to proving that the plaintiff is an individual with a disability) that (1) "the State's treatment professionals have determined that

community placement[13] is appropriate; (2) "the transfer from institutional care to a less restrictive setting is not opposed by the affected individual"; and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Olmstead*, 527 U.S. at 587.

*Townsend v. Quasim* illustrates how courts within the Ninth Circuit have applied *Olmstead*. 328 F.3d 511, 517 (9th Cir. 2003). In *Townsend*, the plaintiff, who had undergone a bilateral amputation, had been receiving assistance in his home performing tasks like preparing meals, performing housework, bathing, and dressing. *Id.* at 514. The service was funded through Medicaid. *Id.* However, the plaintiff's income level changed, and based on his increased income, the state of Washington informed him that he no longer qualified for in-home services. *Id.* To receive the services, the plaintiff would have to move into a nursing home or risk losing his access to services. *Id.*

The plaintiff filed a lawsuit against Washington on behalf of a class of similarly-situated Medicaid recipients seeking to enjoin the state from enforcing the requirement that he move to a nursing home "as a condition of receiving needed, available Medicaid services." *Id.* at 515. Like the plaintiffs in this case, the plaintiff in *Townsend* asserted two theories of liability under the ADA: first, the plaintiff alleged that the Washington Department of Social and Health Services ("DSHS") violated the ADA "by discriminating on the basis of disability" and second, the plaintiff alleged that Washington's denial of community-based care "contravene[ed] the principles expressed in *Olmstead*." *Id.*

---

[13] Whether a certain setting is a "community-based" setting requires the court to "engage in a fact-based, individualized inquiry." *A.H.R. v. Washington State Health Care Auth.*, 469 F. Supp. 3d 1018, 1045 (W.D. Wash. 2016).

The District Court granted summary judgment on behalf of DSHS on both theories.  As to the plaintiffs' discrimination theory, the District Court held that DSHS did not discriminate on the basis of disability because the denial of services was based on the plaintiff's increase in income, not his disability.  *Id.*  As to the plaintiff's *Olmstead* theory, the District Court concluded that "requiring the state to provide long term care in community-based settings as well as nursing homes would mean developing and funding a new program of services for the disabled."  *Id.* The plaintiff appealed the District Court's decision granting DSHS's motion for summary judgment against the *Olmstead* theory, and the Ninth Circuit reversed.[14]

The Ninth Circuit explained that there was no dispute that the plaintiff would benefit from—and would prefer—to receive his care through the community-based program instead of moving into a nursing home.  *Id.* at 516.  But, the Ninth Circuit explained, the issue was that DSHS "does not allow [the plaintiff] to receive the services for which he is qualified in a community-based, rather than nursing home, setting."  *Id.* at 517.  The plaintiff was not "demanding a separate service" not already provided, the plaintiff was challenging his ability to receive a service that the state already provides in a community setting.  *Id.*  In other words, "where the issue is the location of the services, not whether the services will be provided, *Olmstead* controls."  *Id.*  Because the plaintiff had established that the state had conditioned the receipt of a specific service on institutionalization, the plaintiff was entitled to relief unless the

---

[14] The plaintiff did not appeal the District Court's decision granting summary judgment against his discrimination theory.  *Townsend*, 328 F.3d at 517.  The District Court noted that 42 U.S.C. § 12131(2) expressly defines "qualified individual with a disability" means an individual who, among other things, "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  *Townsend v. Quasim*, 163 F. Supp. 2d 1281, 1284 (W.D. Wash. 2001).  Because the plaintiff was denied community-based services because of his income level, not because of his disability, the plaintiff failed to prove that the state had discriminated on the basis of disability.  *Id.*

relief "would fundamentally alter the nature of the services it currently dispenses to medically needy Medicaid recipients in Washington." *Id.* at 518.

In sum, at trial, plaintiffs must identify a specific service that defendants are refusing to provide in a community-based setting and, as to that service, plaintiffs must prove that: (1) plaintiffs have a disability, as defined by the ADA; (2) the state's treatment professionals have determined that community placement is appropriate for the ADA subclass; (3) the transfer from institutional care to a less restrictive setting is not opposed by the ADA subclass; and (4) the placement can be reasonably accommodated, taking into account the resources available to the state and the needs of others with mental disabilities. *Olmstead*, 527 U.S. at 587. Plaintiffs cannot meet their burden on each of those elements at trial.

### 3. Plaintiffs' requested relief is inappropriate because courts should ordinarily not interfere with a state's scheme to reduce rates of institutionalization.

Defendants are already implementing a plan to reduce rates of institutionalization for children in foster care, and plaintiffs' requested relief is inappropriate because it would fundamentally alter and distract from that plan. In determining whether a plaintiffs' requested relief would "fundamentally alter" a state's plan, "the District Court must consider, in view of the resources available to the State, not only the cost of providing community-based care to the litigants, but also the range of services the State provides others with mental disabilities, and the State's obligation to mete out those services equitably." *Olmstead*, 527 U.S. at 597.

The Ninth Circuit has explained that, where the "state's commitment to the deinstitutionalization . . . is genuine, comprehensive, and reasonable," courts should not disrupt the state's current policies and practices. *Sanchez*, 416 F.3d, at 1067. In *Sanchez*, the Ninth Circuit held that court intervention was inappropriate where the state had applied for an increase in the size of its Medicaid waiver program, state expenditures for community-based treatment

had consistently increased, and the state's institutionalized population had decreased over the prior four years. *Id.*

Here too, all those factors are present. First, defendants have been strategically expanding opportunities to draw down federal funding for preventative and community-based services. For example, the evidence will show that defendants are committed to preventing the need to come into foster care and the need for congregate placements. The evidence will also show that Oregon was one of the first states in the country to have its Family First Prevention Services Act state plan approved by the Secretary of Health and Human Services, which allows the state to receive additional Title IV-E funding for services to prevent entry into foster care. Additionally, defendants are working with other state agencies and community partners to eliminate the list of "qualified" diagnoses to receive funding for children's mental health services through Medicaid, which will improve the availability of community-based services in Oregon. Defendants are also working on a project to make BRS services—which can be provided in residential or community-based settings as appropriate to the child's specific needs—accessible through Medicaid.

Second, defendants have advocated for, and received, significant increases in funding for community-based services for children in foster care. Evidence at trial will show that the Oregon Legislature has been a supportive partner of defendants' efforts under the Vision for Transformation and has increased funding for an array of community-based placements and behavioral health services by millions of dollars. Although the agency did not always receive all of the requested funding from the Oregon Legislature, the Oregon Legislature is tasked with balancing the funding needs of hundreds of state programs that serve millions of Oregonians, and

is permitted to exercise its judgment to "mete out those services equitably." *Olmstead*, 527 U.S. at 597.

Finally, defendants have a genuine commitment to reducing the rate of institutionalization and have delivered results on that commitment. Child Welfare has the lowest rates of congregate placements in the country. (Def. Ex. 1158.) As defendants continue to implement the Vision for Transformation and provide services to prevent the need for children to enter foster care, the number children placed in congregate settings will continue to decrease. Defendants have also improved their ability to track treatment capacity using data, and defendants are currently meeting their treatment capacity goals. Finally, evidence at trial will show that the majority of children with disabilities in ODHS care—approximately 82%—are placed in community-based settings, not in institutional or congregate settings. (Def. Ex. 1159.) Although the state mental health service array for children in this state has gaps, defendants have steadily and effectively implemented solutions and are continuing to do so. Under *Sanchez*, it is inappropriate to "tinker" with defendants' plan to expand those services.

### E. Plaintiffs cannot show that the requirements of injunctive relief are met in this case.

At trial, plaintiffs cannot show that their requested injunction is appropriate. "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay v. MercExchange, LLC*, 547 U.S. 388, 392 (2006). Specifically, a plaintiff must demonstrate: (1) the plaintiff suffered an irreparable injury; (2) remedies available at law are inadequate; (3) the plaintiff's remedy is warranted considering the balance of hardships between the parties; and (4) the public interest would not be disserved by the injunction. *Id.*

Additionally, an injunction must be narrowly tailored to remedy a specific constitutional violation.  *See, e.g.*, *Lewis*, 518 U.S. at 357 (a court is not permitted to use "one particular inadequacy in government administration" as a hook to "remedy *all* inadequacies in that administration").  An injunction is not narrowly tailored if it "require[s] more of state officials than is necessary to assure their compliance with federal law."  *Clark v. Coye*, 60 F.3d 600, 603-04 (9th Cir. 1995).  The Constitution does not guarantee outcomes, and poor performance on an outcome metric is insufficient alone to establish a constitutional violation.  *See Lewis*, 518 U.S. at 349 (the Constitution does not guarantee an effective system).  Instead, the Constitution guarantees that state officials act in good faith to ensure that children are provided minimally adequate care.  *See Rizzo*, 423 U.S. at 378 (substantive due process claims do not provide a hook to second-guess decision of state officials that were made in good faith and within the realm of reason).

Accordingly, plaintiffs must demonstrate specific constitutional or statutory deficiencies before the Court can determine whether plaintiffs can satisfy the elements giving rise to injunctive relief.  As explained above, plaintiffs cannot prove actual or imminent injury, and they similarly cannot prove that the class suffered an irreparable injury.  Additionally, plaintiffs cannot prove at trial that other legal remedies are inadequate and the public interest would not be disserved by plaintiffs' proposed permanent injunction.

### 1.    Plaintiffs cannot show that other legal remedies are inadequate.

Plaintiffs cannot show that other legal remedies are inadequate because numerous matters within plaintiffs' requested relief are within the scope of Oregon's state juvenile court's authority.  For example, plaintiffs' requested relief would require defendants to create an "individualized written case plan for treatment, services, and supports," which contains "a plan

for reunification with the child's parents, for adoption, or for another permanent, family-like setting" for each member of the General Class. (Dkt. 1 ¶ 331.a.iii.)

Under state law, Oregon's juvenile courts have exclusive jurisdiction over the child, and are statutorily required to provide ongoing review (and modification as appropriate) of the permanency, treatment, and case plans for children in foster care. Specifically, under state law, the juvenile court exercises complete authority to review placement decisions affecting children in ODHS custody. *See* ORS 419B.349; ORS 419B.449(1); ORS 419B.351. Moreover, the juvenile court with jurisdiction over the child must regularly review and approve a child's plan for reunification, for adoption, or other permanency, as well as order, review, and modify plans for treatment, services, and supports, and finally, evaluate ODHS's efforts to effectuate those plans. ORS 419B.440-443, ORS 419B.449.

For example, under ORS 419B.337(2), a juvenile court "may specify the particular type of care, supervision, or services to be provided by the Department of Human Services to wards placed in the department's custody and to the parents or guardians of the wards," while it is ODHS's responsibility to plan and provide those services. A juvenile court may also direct ODHS to conduct a mental health exam and provide mental health treatment and services. ORS 419B.352. Under ORS 419B.343(1), ODHS must "take into consideration recommendations and information provided by the committing court before placement in any facility." The juvenile court must hold permanency hearings to determine whether ODHS has made reasonable efforts (or, in Oregon Indian Child Welfare Act cases, active efforts) to reunify the family and whether the child's parent has made sufficient progress for the child to safely return home. ORS 419B.476(2)(a). Similarly, if a child's case plan is something other than reunification, juvenile courts must determine whether ODHS made reasonable efforts to place the child in a permanent

placement in a timely manner.  ORS 419B.476(2)(b)-(c).  A juvenile court also makes the ultimate decision regarding the length of time a child spends in care; for example, even if the agency has already made reasonable efforts to achieve reunification, if a juvenile court determines that "further efforts" will make it possible for a child to safety return home within a reasonable time, the court can order the parents to participate in those services.  ORS 419B.476(4)(c).  Oregon law also specifically charges the juvenile court with overseeing "the comprehensive plan for a child's transition to successful adulthood," including evaluating whether the child's transition plan is "adequate to ensure the ward's transition to successful adulthood" and whether ODHS has "offered appropriate services pursuant to the plan."  ORS 419B.476(3).

Every parent and child has a right to representation by an attorney in juvenile court, and the state will pay for an attorney for a child if the family cannot afford to hire one.  *See* ORS 419B.205 (appointment of counsel for parent or guardian); ORS 419B.195 (appointment of counsel for child).  Because a child's attorney may raise concerns that fall within the juvenile court's jurisdiction and oversight authority in juvenile court, plaintiffs cannot prove that there is an inadequate remedy at law.  *See Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 435-36 (1982) (a federal plaintiff has an adequate legal remedy if the plaintiff has an "adequate opportunity" to raise constitutional concerns in a state court proceeding); *Sam M. ex rel. Elliott v. Chafee*, 800 F. Supp. 2d 363, 382 (D.R.I. 2011) ("since increasing the number of adoptions, and decreasing the rate of institutionalization, the number of placements per child, and the length of time in care depend on determinations and orders withing the jurisdiction of the Family Court, abstention under *Younger* is appropriate with respect to those requested remedies").

Although this Court declined to abstain from hearing this case, this Court noted that it was appropriate to consider the scope of the juvenile court's authority "when it comes to crafting the scope of equitable relief." (Dkt. 215 at 14-15.) Those equitable considerations should weigh heavily in this Court's analysis. A juvenile court evaluates a specific child's circumstances in a way that a class-action is not designed to do. A juvenile court case also includes a child's parents, who are also each entitled to an attorney, and are necessary parties to any court case involving the child's family. Additionally, juvenile cases may involve a child's sibling or siblings, who may have their own separately-appointed attorney. Further, juvenile cases may include other legal parties, such as a Tribe, if the Oregon Indian Child Welfare Act applies, a Court Appointed Special Advocate ("CASA") advocating for the child's best interests, or a court-authorized intervenor. By contrast, here, the class-members' parents, siblings, Tribes, or other parties are *not* parties and have no say in the outcome of this case.

### 2.    Plaintiffs' proposed injunction disserves the public interest.

Evidence at trial will demonstrate that the public interest will be disserved by the injunction plaintiffs seek in this case. There are several reasons that the injunction plaintiffs will seek in this case will do more harm than good for Oregon's children and families.

First, Child Welfare has made concrete, good faith improvements. Substituting this Court's judgment, or the judgment of a special master appointed by this Court, for that of Oregon's state officials will not serve the public interest. *See Connor B.*, 774 F.3d at 57 ("To grant injunctive relief notwithstanding [the Massachusetts' Child Welfare agency's] concrete, good faith improvements is precisely the kind of substitution of judicial judgment for professional judgment that *Youngberg* prohibits."); *Angela R. by Hesselbein v. Clinton*, 999 F.2d 320, 326 (8th Cir. 1993) ("Federal courts operate according to institutional rules and procedures that are poorly suited to the management of state agencies." (quoting Donald L. Horowitz,

*Decreeing Organizational Change: Judicial Supervision of Public Institutions*, 1983 Duke L.J.

1265, 1303-05)); *Missouri v. Jenkins*, 515 U.S. 70, 99 (1995) (explaining that long-term consent

decrees do not serve the public interest because "[e]ach additional program ordered by the

District Court—and financed by the State . . . the greater [the School District's] reliance on

continued supervision by the District Court").

      In *Connor B.*, for example, injunctive relief was inappropriate despite the fact that

"defendants have allowed some deficiencies to persist as to some problems after identifying

them." *Connor,* 774 F.3d at 56. A state is permitted to exercise its own professional judgment

"in ordering improvements over time, or in deciding which deficiencies to address first." *Id.* at

57. Specifically, a "state is not required to choose between attacking every aspect of a problem

or not attacking the problem at all." *Id.* (internal quotation omitted.) Because the state had made

some improvements, the requirements under *eBay* were not met. *Id.*; *see also Horne v. Flores*,

557 U.S. 433, 448 (2009) (explaining that "[f]ederalism concerns are heightened" when relief

would "dictate[] state or local budget priorities"). Here too, it is not appropriate to enter an

injunction to interfere with the state's decisions to prioritize foundational projects before

beginning with others. The public will be better served if Oregon's state officials are permitted

to focus on continuing their work and implementing the Vision for Transformation without

interference.

      Second, because the class in this case is comprised of children who are already in foster

care, any relief this Court orders will be focused on downstream effects, not the upstream

preventative services that are actually necessary to improve outcomes. Moreover, the nature of

an injunction is a top-down decree: Oregon must comply with its terms or plaintiffs will seek

enforcement proceedings and sanctions. That process does not leave room for necessary

community feedback or flexibility Oregon's families need from their child welfare system. Finally, because this class is made up of children in foster care, plaintiffs' requested relief does not leave room for the rights of those children's parents.  In fact, plaintiffs' experts criticize defendants for not giving up on parents fast enough to pursue termination of parental rights —an approach contrary to the Vision for Transformation and rooted in structural racism.

Indeed, Children's Rights, a public interest law firm dedicated to litigating children experiencing foster care's rights and founded by plaintiffs' counsel, Marcia Lowry, has explained that the pressure put on states to accelerate timeliness to permanency has destroyed families and perpetuated systemic racism.  Specifically, Children's Rights explained that the timelines to permanency established under the Adoption Assistance and Safe Families Act ("AFSA") "make it easier for children to be taken from their families . . . . AFSA has contributed to the destruction and devaluation of hundreds and thousands of families, disproportionately Black and Indigenous families."  (Children's Rights, https://www.childrensrights.org/news-voices/a-fact-our-child-welfare-system-punishes-poverty-hurts-children-and-destroys-families (last accessed April 10, 2024); *see also* Tanya A. Cooper, *Racial Bias in American Foster Care: The National Debate*, 97 Marq. L. Rev. 215, 233 (2013) ("Unconscious racism is embedded in our civic institutions; and the foster care system is vulnerable as one such institution controlled and influenced by those in power.  Those in power in turn may unwittingly discriminate against people of color, which history demonstrates.").  Nonetheless, plaintiffs seek to enforce that same rigid timeline and metric-focused framework in this case.

Third, plaintiffs' proposed injunction will require significant time and resources on purely administrative and documentation tasks—time and resources that could be spent serving children and families.  In *M.D.*, for example, since monitoring of Texas's child welfare system

began in August 2019, the court-appointed monitor's fees have amounted to more than $58,000,000. (Def. Ex. 1085.) That is a significant amount of money and resources to invest in a "solution" whose efficacy is, *at best*, speculative. In fact, evidence at trial will demonstrate that the best way to improve outcomes for children in foster care is by keeping them out of foster care in the first place, not by requiring agency leadership to dedicate time and resources to defending contempt proceedings and imposing sanctions on dedicated state employees while they navigate incredibly difficult, complex family and community circumstances and work to implement long term structural changes.

A federal court injunction simply will not address prevention or diversion of children out of the foster care system, but that is what Oregon needs. Under the Vision for Transformation, that is where Oregon is heading, and the public would be substantially better off if this Court allowed defendants to continue those efforts without distraction.

## CONCLUSION

Plaintiffs seek through this lawsuit to substitute their judgment and policy goals for those of Oregon's state officials, and this Court should reject that attempt. It is inappropriate to use litigation as a route to second guess the good faith leadership of defendants, and plaintiffs' requested relief is beyond the scope of an Article III court's power.

Not only will plaintiffs be unable to prove that their requested remedy is substantially likely to redress their injuries, evidence at trial will show that defendants are not deliberately indifferent to the needs of children in foster care. The opposite is true: Child Welfare is a national leader in child welfare reform and has received recognition as such. Defendants have substantially improved Oregon's foster care system despite the distraction of this litigation. Defendants do not need the threat of contempt proceedings or an outside monitor to ensure continued progress—and in fact, plaintiffs' requested relief will not serve Oregonians because it

will divert resources to an expensive and burdensome monitoring process that has not worked in other states. Oregon needs defendants' continued leadership, with their focus on up-stream prevention and preservation efforts, not an injunction that locks the state into outdated ways of thinking about foster care and children's well-being.

Defendants request that this Court reject all of plaintiffs' claims with prejudice and enter judgment in favor of defendants. Plaintiffs will not acknowledge that defendants have improved Oregon's child welfare system, not because there have been no improvements, but because litigation is adversarial in nature: the improvements help children in foster care, but harm plaintiffs' legal case. There are other more collaborative, productive, equitable, and cost-effective ways for A Better Childhood and Disability Rights Oregon (nonprofits supposedly dedicated to improving children's access to services) to work in partnership with Oregon to improve outcomes for children. This lawsuit is not the answer.

DATED: April 12, 2024.　　　ELLEN ROSENBLUM
　　　　　　　　　　　　　　ATTORNEY GENERAL
　　　　　　　　　　　　　　FOR THE STATE OF OREGON


　　　　　　　　　　　　　　*s/ Lauren F. Blaesing*
　　　　　　　　　　　　　　David B. Markowitz, OSB #742046
　　　　　　　　　　　　　　DavidMarkowitz@MarkowitzHerbold.com
　　　　　　　　　　　　　　Laura Salerno Owens, OSB #076230
　　　　　　　　　　　　　　LauraSalerno@MarkowitzHerbold.com
　　　　　　　　　　　　　　Harry B. Wilson, OSB #077214
　　　　　　　　　　　　　　HarryWilson@MarkowitzHerbold.com
　　　　　　　　　　　　　　Lauren F. Blaesing, OSB #113305
　　　　　　　　　　　　　　LaurenBlaesing@MarkowitzHerbold.com
　　　　　　　　　　　　　　Vivek A. Kothari, OSB #182089
　　　　　　　　　　　　　　VivekKothari@MarkowitzHerbold.com
　　　　　　　　　　　　　　*Special Assistant Attorneys General for Defendants*

Adele J. Ridenour, OSB #061556
AdeleRidenour@MarkowitzHerbold.com
*Of Attorneys for Defendants*

Carla A. Scott, OSB #054725
carla.a.scott@doj.state.or.us
Sheila H. Potter, OSB #993485
sheila.potter@doj.state.or.us
*Of Attorneys for Defendants*