**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Lauren F. Blaesing, OSB #113305**
LaurenBlaesing@MarkowitzHerbold.com
**Vivek A. Kothari, OSB #182089**
VivekKothari@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085
*Special Assistant Attorneys General for Defendants*
*Additional Counsel of Record Listed on Signature Page*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| WYATT B. and NOAH F. by their next friend Michelle McAllister; KYLIE R. and ALEC R. by their next friend Kathleen Megill Strek; UNIQUE L. by her next friend Annette Smith; SIMON S. by his next friend Paul Aubry; RUTH T. by her next friend Michelle Bartov; BERNARD C. by his next friend Ksen Murry; NAOMI B. by her next friend Kathleen Megill Strek; and NORMAN N. by his next friend Tracy Gregg, individually and on behalf of all others similarly situated, | Case No. 6:19-cv-00556-AA **DEFENDANTS' LAY WITNESS STATEMENTS** |
| Plaintiffs, | |
| v. | |
| TINA KOTEK, Governor of Oregon in her official capacity; FARIBORZ PAKSERESHT, Director, Oregon Department of Human Services in his official capacity; APRILLE FLINT-GERNER, Director, Child Welfare in her official capacity; and OREGON DEPARTMENT OF HUMAN SERVICES, | |
| Defendants. | |

**DEFENDANTS' LAY WITNESS STATEMENTS**

## TABLE OF CONTENTS

Lacey Andresen . ........................................................................................................... 1

Heidi Beaubriand, RN, BSN ........................................................................................ 26

Lisa Bender. .................................................................................................................. 39

Dr. Marty Beyer. .......................................................................................................... 48

Heather Collee. ............................................................................................................. 53

Rachel Currans-Henry. ................................................................................................. 58

Aprille Flint-Gerner. ..................................................................................................... 65

Sara B. Fox ................................................................................................................... 94

Anthony Gasbarro ...................................................................................................... 108

Jennifer Holman. ......................................................................................................... 113

Dr. Ajit Jetmalani. ...................................................................................................... 122

Rebecca Jones Gaston ................................................................................................ 131

Tami J. Kane-Suleiman .............................................................................................. 132

Kristen Khamnohack. ................................................................................................. 144

Duane Kowalski. ......................................................................................................... 154

Jeremy LeCoure. ......................................................................................................... 160

Kim Lorz ..................................................................................................................... 161

Deena Loughary .......................................................................................................... 172

Kimberly Montgomery. .............................................................................................. 188

Marisa Moon ............................................................................................................... 191

Fariborz Pakseresht .................................................................................................... 201

Melanie Parent. ........................................................................................................... 218

Jennifer Ricks. ............................................................................................................ 226

Oscar Sweeten-Lopez. ................................................................................................ 240

Judge Nan Waller. ....................................................................................................... 243

Anna Williams. ........................................................................................................... 249

**DEFINED TERMS**

| Abbreviation | Term |
|---|---|
| 2016 PK Report | 2016 Public Knowledge report |
| 2023 PK Report | 2023 Moss/Public Knowledge report |
| A&M | Alvarez & Marsal |
| ACF | Administration of Children and Families |
| ADA | Americans with Disability Act |
| AFCARS | Adoption and Foster Care Analysis and Reporting System |
| BRS | Behavior Rehabilitative Services |
| CANS | Child and Adolescent Needs and Strengths |
| CAPTA | Child Abuse Prevention and Treatment Act |
| CARA | Comprehensive Addition & Recovery Act |
| CCAs | Child-caring agencies |
| CCOs | Coordinated Care Organizations |
| CFPRP | Child Fatality Prevention and Review Program |
| CFSR | Child and Family Services Review |
| Child Welfare | Child Welfare Division of ODHS |
| CIRT | Critical Incident Review Team |
| CPS | Child Protective Services |
| CQI | Continuing Quality Improvement |
| CRB | Citizen Review Board |
| CTP | Comprehensive Transition Plan |
| CWOB | Child Welfare Oversight Board |
| DAS | Department of Administrative Services |
| District 2 | Multnomah County |
| ERG | Employee Resource Group |
| FFPSA | Family First Prevention Services Act |
| FOCUS | Focused Opportunities for Children Utilizing Services |
| foster children and young adults | Children and young adults experiencing foster care |
| foster kids | Young people experiencing foster care |
| FTE | Full-time equivalent |
| GCC or the Cabinet | Governor's Children's Cabinet |
| ICWA | Indian Child Welfare Act |
| IDD | Intellectual and Developmental Disabilities |
| ILP | Independent Living Housing Subsidy Program and the Independent Living Program |

| Abbreviation | Term |
|---|---|
| KEEP | Keeping Foster and Kin Parents Supported and Trained |
| LIFE | Leveraging Intensive Family Engagement |
| MAPS | Mentoring, Assisting, Promoting Success (position type within Child Welfare) |
| MIC rate | Maltreatment in Care Rate |
| NTDC | National Training and Development Curriculum |
| ODDS | Office of Developmental Disabilities Services |
| ODE | Oregon Department of Education |
| ODHS | Oregon Department of Human Services |
| OHA | Oregon Health Authority |
| OPAL-K | Oregon Psychiatric Access Line, for kids |
| ORCAH | Oregon's Child Abuse Hotline |
| ORICWA | Oregon Indian Child Welfare Act |
| OR-Kids | ODHS's core child welfare services database application; Oregon's version of a CCWIS (Comprehensive Child Welfare Information System) |
| ORRAI | Office of Research Reporting Analytics and Implementation |
| OTIS | Office of Training Investigations and Safety |
| OYA | Oregon Youth Authority |
| PAC | Parent Advisory Council |
| POP | Policy Option Package |
| PRIDE | People Respecting Individual Differences Everywhere |
| PRTF | Psychiatric Residential Treatment Facility |
| PSU | Portland State University |
| QMHP | Qualified Mental Health Professional |
| QPR | Question, Persuade, Refer |
| RAFT | Resource and Adoptive Family Training |
| SDDR | Service Delivery Data Report |
| SDM Tool | Structured Decision Making© Screening and Response Time Assessment Tool |
| Self Sufficiency Division | Self-Sufficiency Division of ODHS |
| SNAP | Food benefits for families and individuals |
| SOCAC | System of Care Advisory Council |

| Abbreviation | Term |
| --- | --- |
| SOGIE | Sexual orientation, gender identity and expression |
| SSIT | Safe Systems Improvement Tool |
| the EO | Governor Brown's Executive Order 19-03, dated April 18, 2019 |

Defendants will call Child Welfare caseworkers and other employees and service providers to respond to any inaccurate testimony regarding care or services provided to children in the care of Child Welfare. The parties are submitting witness statements before this Court rules on the parties' motions *in limine* and *Daubert* motions. By identifying witnesses who will discuss evidence plaintiffs will present at trial, defendants do not concede that the evidence is admissible.

## I.    Lacey Andresen (6 hours direct testimony).

### A.    Professional background.

Ms. Andresen is the Deputy Director of Program and Practice for the Child Welfare Division of ODHS. Ms. Andresen will testify about her two decades of service to children and families working for Child Welfare. She will testify about her first-hand experience working with children, families, resource parents, juvenile courts, advocates, and community partners while serving in various positions at the local and statewide level.

After obtaining both bachelor's and master's degrees in Social Work from PSU, Ms. Andresen started with Child Welfare as a permanency caseworker in Marion County 20 years ago. She continued to work in Marion County as a supervisor of eight permanency caseworkers. Ms. Andresen will testify about her subsequent experience in program areas related to improving permanency for children and families. She served as the consultant overseeing a grant project designed to expand recruitment and retention of resource parents through partnerships and permanency planning. She was the Title IV-E Waiver Program Manager and designed and implemented a specific intervention aimed at enhancing timely permanency and well-being for children in foster care. She also served as the Child Permanency Program Manager where she oversaw statutory change implementation, policy, procedure, and training around three primary areas of practice in child welfare: reunification, planning for

permanency, and providing post-permanency supports to adoptive families and families serving as guardians of children placed through Child Welfare.

**B.    Role as Deputy Director of Child Welfare.**

Since February 1, 2020, Ms. Andresen has served as Deputy Director of Program and Practice.  In that role she oversees the lead program managers in each of nine areas of practice across Child Welfare and works to direct implementation of statute, rule, procedure, policy, and practice statewide.  The following program areas report to her: child abuse screening, child safety, permanency, foster care, treatment services, resource management (including temporary lodging prevention), health and well-being, system integration, and family preservation.  The district managers for all 16 Child Welfare districts also consult with her to address Child Welfare practice issues.  She also represents ODHS at multiple statewide groups, described in more detail below, and regularly communicates with and provides testimony to the Legislature.

Ms. Andresen regularly interfaces with other divisions of ODHS, such as the Self Sufficiency Division and the ODDS and other ODHS shared services, including ORRAI and Government Relations.

**C.    Child-serving system.**

Ms. Andresen will testify about the scope and complexity of Oregon's child-serving system, of which Child Welfare is only one component.  In her role, Ms. Andresen regularly interacts with the multiple branches and divisions of state government, community partners, and advocacy organizations involved in policy making, funding, advocacy, and regulation of the child welfare system including:

- The Legislature, particularly the House and Senate Committees on Human Services, Ways and Means, and the Legislative Fiscal Office;

- The Governor's Office, including the Foster Care Ombuds within the Governor's Advocacy Office, the Governor's Child Foster Care Advisory Commission, the

Child Welfare Advisory Committee, and the Governor's Children's Cabinet (2017 – 2022);

- Nine Tribes of Oregon;

- Unions, such as SEIU, which represent Child Welfare staff;

- The OHA, particularly Child and Family Behavioral Health, and the SOCAC;

- The OYA;

- The Oregon Judicial Department, including the statewide juvenile dependency court and juvenile justice court systems, members of the Juvenile Court Improvement Project, and the CRB;

- Legal counsel for parties to juvenile dependency proceedings, including attorneys for ODHS at the Oregon Department of Justice Child Advocacy and Protection Division, attorneys representing children and young adults in ODHS's custody, attorneys for biological parents of children and young adults in ODHS's custody, Court Appointed Special Advocates, and related consortiums and advocacy groups such as Disability Rights Oregon and Youth Rights & Justice;

- Individual providers and related trade organizations such as Oregon Alliance; and

- Additional system partners and advocacy groups including people with lived experience with Oregon's child welfare system including former foster children and young adults, biological parents, and resource parents.

Ms. Andresen will testify about her and Child Welfare's regular work with system partners across Oregon's complex and diverse child-serving system, and the challenges of operating Child Welfare in this landscape.

**D.    Identifying and addressing barriers within Child Welfare.**

Ms. Andresen will describe Child Welfare's process of addressing various system barriers impacting its work, including those as identified in the 2016 PK Report of safety of children in substitute care and the Oregon Secretary of State's 2018 audit and 2019 follow-up report. Ms. Andresen will testify that in the years following the commission and issuance of these reports, Child Welfare has identified a need for major investment in its own staffing and program infrastructure to help navigate many of the barriers to its work. In partnership with the

**Page 3 –    DEFENDANTS' LAY WITNESS STATEMENTS – LACEY ANDRESEN**

Governor and Oregon Legislature, Child Welfare heavily invested in building out its staff and infrastructure in response to issues identified in the 2016 PK Report and the Oregon Secretary of State's 2018 audit and follow-up report, including through the creation of a centralized abuse hotline, developing a suite of dashboards to monitor, measure, and analyze the work of Child Welfare, and providing additional resources to improve training for resource families, such as through expansion of the KEEP Program. The KEEP Program is an evidence-based support and skill enhancement program for resource and kinship parents aimed at increasing child well-being and preventing placement disruption. As a result of these and other efforts, Child Welfare has seen a reduction in caller wait times to report abuse, a decrease in caseworker caseloads, thereby allowing caseworkers to spend more time with the children, young adults and families they serve, and better supported resource families, which in turn helps with the overall well-being of the children and young adults cared for by such resource families. These are just a handful of the many improvements to Child Welfare's practices that Ms. Andresen will testify to from a lens of then (2016) to now (2024) as it relates to Child Welfare.

       **E.**    **Vision for Transformation.**

Ms. Andresen will testify about the creation of Child Welfare's Vision for Transformation in 2020, and how system partners from across the state collaborated in its development for setting a new, bottom-up strategic direction for Child Welfare. The Vision for Transformation was developed with the goal of giving the communities Child Welfare serves a bigger voice in the future direction of the agency. She will testify about how the Vision for Transformation is rooted in ameliorating systemic structural racism in child welfare, focusing on upstream prevention services for families and children to avoid the trauma of separation, and improving delivery of services to children in Child Welfare's care and custody. The Vision for Transformation has three guiding principles: (1) supporting families and promoting prevention;

(2) enhancing Child Welfare's staff and infrastructure; and (3) using data with continuous quality improvement. Ms. Andresen will explain how the Vision for Transformation is the compass for Child Welfare's policy and practice work at the statewide and district levels and has set the course for Child Welfare's long-term system change.

Ms. Andresen will testify about how using the Vision for Transformation has already influenced changes to Child Welfare's practices and outcomes. For example, she will explain that the number of children in ODHS's custody has dramatically decreased since 2016. Additionally, she will testify about how the Vision for Transformation has been implemented through creation of the new Family Preservation Program (launched in 2023) and the launch of a statewide CQI program (launched in September 2022).

Ms. Andresen will testify that the agency develops practice and policy consistent with its values, and those values now live in the Vision For Transformation. For example, Child Welfare developed a Racial Equity and Social Justice tool, which allows the agency to consciously consider equity when developing all new policies, rules, procedures, and plans. The tool is meant to slow down the process of policy and procedure implementation, in recognition of the historical harm that well intended, but hasty implementation has caused, and allow space for community input and feedback. Using the Racial Equity and Social Justice tool, the agency aims to resolve any potential disparate impacts of new policies, rules, procedures, and plans.

**F.    Family prevention and child abuse prevention.**

Ms. Andresen will testify about Child Welfare's upstream partnerships to assist in the prevention of child abuse and thus prevent children and families coming into the child welfare system. For example, she will testify that ODHS was recently awarded a $9 million grant from the Doris Duke Foundation in recognition of ODHS's demonstrated innovation in system transformation focused on prevention and family preservation. The grant will further expand

Child Welfare and Self Sufficiency Program's upstream services and direct economic supports to families considered at-risk of child welfare involvement.

Ms. Andresen will testify that Oregon was one of the first states in the nation (and the fastest) to have its FFPSA plan approved by the U.S. Department of Health and Human Services, Administration for Children and Families in 2021.  Under this new federal legislation led by Oregon's Senator Ron Wyden, state systems with approved plans and sufficiently built-out infrastructure for service delivery can draw down Title IV-E funds for certain evidence-based prevention services to serve children in their homes, to manage their safety while remaining in their parent or caregiver's home.  Children and young adults will be eligible to receive these services either (1) without juvenile dependency court involvement or (2) when the court is involved and Child Welfare has temporary custody or jurisdiction of the child or young adult. This new funding stream will expand the state systems' ability to fund and provide prevention-focused services, rather than only serving children and their families after separation and foster care entry.

Ms. Andresen will testify about Child Welfare's path to get its FFPSA plan approved, which includes partnership with Chapin Hall at the University of Chicago and securing passage and funding from the Oregon Legislature in 2021 for a POP to establish a new Family Preservation Program within Child Welfare.

Child Welfare's Family Preservation Program Director, Jennifer Holman, reports to Ms. Andresen.  In addition to Ms. Holman's testimony and the testimony of Lisa Bender, Assistant Deputy Director of Child Welfare, Ms. Andresen will testify about the creation of the Family Preservation program, in partnership between Child Welfare and the Self Sufficiency Division within ODHS, and how it has been launched through a phased roll-out using continuous

quality improvement principles.  Phase One launched in 2022 in Klamath and Douglas counties and one branch in Multnomah County.  Phase Two launched in 2023 in another branch in Multnomah County and in Washington, Polk, Coos, Curry, Jackson, and Josephine counties.  Full rollout is anticipated by 2027, based on current progress.

Ms. Andresen will explain the importance of children spending time with their families.  She will describe the various efforts that Child Welfare makes to promote and emphasize family time.  She will also testify about the Foster Children Sibling's Bill of Rights.

**G.    Child safety.**

Child Welfare's Child Safety Program Director, Deena Loughary, reports to Ms. Andresen.  In addition to Ms. Loughary's testimony, Ms. Andresen will testify about improvements made to child safety over the last several years.  She will testify about how Child Welfare has implemented recommendations from the 2016 PK Report and the Oregon Secretary of State's 2018 audit and 2019 follow-up report.  For example, Ms. Andresen will testify about the centralization of the child abuse hotline and how Child Welfare has implemented the SDM Tool, in partnership with Evident Change, to improve consistency of assignment of allegations of abuse for assessment by CPS.  She will describe the impact of SB155 which divided responsibility for assessing and investigating reports of child abuse between Child Welfare and OTIS.

She will testify about how Child Welfare has been working to address the continued challenge of large workloads for CPS caseworkers.  Ms. Andresen will testify about the impact of the legislative changes to what cases could be closed at screening.  Ms. Andresen will testify to several statutory and regulatory changes that have increased the number of assigned CPS assessments.  This has increased the workload on CPS caseworkers, who also must coordinate

with law enforcement on assessments, and is a factor in why Child Welfare has not met its internal goals for timeliness of CPS assessments over the last several years.

Ms. Andresen will explain Child Welfare's work to continuously analyze statewide and district-specific data regarding overdue CPS assessments and work with individual districts to address their overdue assessment rates. She will testify that the Child Welfare leadership team continues to assess the efficacy and efficiency of the Oregon Safety Model and the OR-Kids information system and where changes to the model can positively impact outcomes for families and impact CPS caseworker workloads. Ms. Andresen will describe the OR-Kids system and explain how it is used.

She will testify about Child Welfare's POP to the Legislature in 2023 to fund additional CPS caseworker positions. In addition, Child Welfare is working with the Legislature, including through the implementation of HB 4086, passed in March 2024, to examine Oregon's broad statutory definitions of abuse and determine future statutory changes to appropriately modify what allegations must be investigated, and who should or should not be investigated for child abuse.

Ms. Andresen will also discuss improvements to the resource home certification process and the Structured Analysis Family Evaluation Home Study and the development of policy to assess any certification or safety concerns that arise in a certified resource home. For example, Ms. Andresen will testify about the certification quality assurance review process, which assesses fidelity to the agency's certification standards and policies related to the Structured Analysis Family Evaluation Home Study. During the review process, a random sample of all resource family home types are reviewed on a rotating basis for each district or site's CQI cycle and information. CQI consultants review the findings with branches or districts during debrief

meetings and help develop action plans for improvement. Ms. Andresen will also discuss the policy changes that provide direction on how to assess certification and safety concerns in certified resource homes.

Ms. Andresen will testify about specific data that reflects improvement in safety of children that Child Welfare serves. She will explain the data dashboards used by Child Welfare leadership and local leaders to make better informed decisions. She will explain why plaintiffs' allegations that ODHS has a longstanding practice of "withholding" information concerning reports of alleged abuse in care is incorrect. Ms. Andresen will explain how the discovery process works in juvenile court cases and how reports of alleged abuse are disclosed to children's attorneys and other parties as required by statute. She will testify about specific outcome data that shows Child Welfare's results, including that Child Welfare has increased timeliness to permanency without a corresponding increase in the number of children subject to re-abuse.

### H.    Case planning.

Ms. Andresen will testify about the improvements Child Welfare has made in the permanency case planning process for children and young adults in ODHS's care and custody. Under the Administration for Children and Family's Title IV-E waiver, Child Welfare designed a case planning model aimed at identifying children and their families at time of entry who were at risk of longer stays in foster care, which would help the agency provide preventative services early. The practice is called LIFE. The federal government, through Title IV-E, funded the program in certain counties, and Child Welfare used the program as a pilot to learn more about case planning and services that prevent long stays in foster care. The LIFE program was designed in 2014 and implementation began in 2015.

Ms. Andresen will discuss what it means to utilize pilot implementation of new programs and how utilizing pilot implementation allows for better policy development and implementation and aligns with the principles of quality implementation science.  For example, Child Welfare learned lessons from the Title IV-E waiver demonstration sites that aided in the later development of the Family Report and provided a template for family meetings.  The development of the practice was the first time parents with lived experience worked alongside Child Welfare in the design and implementation of a practice change.  Ms. Andresen will testify that the agency has expanded community engagement in the development of agency policy and practice, for example, the agency has supported the continued development of the Permanency Advisory Council.  The agency has continued to support the Permanency Advisory Committee/Council which includes Child Welfare permanency staff and leadership from all 16 state districts and meets monthly to identify the root causes of permanency-related issues, implement improvements and innovations, and streamline processes to support children, young adults, and families in achieving permanency.

Ms. Andresen will testify about the creation and implementation of the Early Transfer Protocol for children first coming into ODHS's care.  The protocol ensures that the CPS worker (involved with removing a child from their home) works in partnership with the permanency caseworker (assigned once the juvenile court takes temporary custody and places children in foster care) to create the child's initial case plan.

She will testify about the previously cumbersome and duplicative process that caseworkers had to undertake in the OR-Kids database to create both federally and state required case plans and the juvenile court required "Court Reports" for jurisdiction and disposition hearings.  As a solution, Child Welfare created the "Family Report," generated from the OR-

Kids database.  The Family Report contains all the information to satisfy federal and state requirements for a case plan, all the requirements of the juvenile court to take jurisdiction and determine disposition, and exists in OR-Kids so that relevant information can be reported to AFCARS.  The planning and work for this solution pre-dated this lawsuit.  Ms. Andresen will testify that statewide implementation of the Family Report during 2020 and 2021, has since dramatically improved the timeliness of initial case plans, as reflected in Child Welfare's monthly data reporting.  As a result of implementing the Family Report, Ms. Andresen will explain that on average 75% of initial case plans are now being timely completed by caseworkers—a significant increase from timeliness of initial case plans prior to implementation of the Family Report.  The Family Report also has provided a better road map for parents/caregivers and children on how to successfully achieve reunification or another form of legal permanency.

Ms. Andresen also will testify about what happens to a child's case plan after it is created, how it is reviewed and modified in juvenile court proceedings and becomes a living document that is further modified as part of the child's permanency planning.  Supervisors review the Family Reports (formerly separate case plans and court reports), provide edits and comments, and approve them.  She will explain the requirement that case plans are reviewed quarterly and updated at a minimum every six months, unless certain events happen that require that it be updated sooner (for example, new legal parentage established or new sibling being born).

Ms. Andresen also will testify about robust qualitative review of the substance of children's case plans.  Every six months, children's cases are reviewed by either the county juvenile court or CRB for a full judicial review.  The review and findings are broader than only

reviewing the child's case plan but does require reviewing the case plan.  In counties where CRBs conduct the case reviews, the CRB's findings are shared with the Child Welfare caseworker, supervisor, the juvenile court, and as applicable, CASA.  In addition, ODHS conducts quarterly qualitative case reviews of children's permanency files (lower case "cfsr") on a rotating schedule that looks at different districts each quarter and provides qualitative and quantitative feedback.

Child Welfare also has created tools to improve quality engagement with families.  For example, the agency created four guides for caseworkers: a guide for face-to-face meetings with children; face-to-face meetings with resource parents; face-to-face meetings with families of origin; and a tool for supervisors to conduct their 90-day staffing on each case.  The tools are used statewide, and they help support each district in quality case planning and providing timely services to children and families.  During the CQI process, the agency has learned that performance on quality engagement is going up on cfsr reviews across the state.

## I.    Placements.

Ms. Andresen will testify about Child Welfare's expansive definitions for relatives of children entering foster care.  The agency includes kith (people not blood related but defined by the family as relatives) to provide more legal opportunity for a child's physical and/or emotional family to be valued and engaged in case planning, including preference for placement in foster care if needed, and prioritized in permanent planning when needed.

She will explain the varied types of placements that exist for children in Child Welfare's care and custody.  She also will testify about the challenges that the agency and individual caseworkers navigate to identify appropriate placements for children with complex needs, as well as the barriers to placing children with complex needs in available placements.

Ms. Andresen will testify that Child Welfare assesses each resource family's skills, abilities, and needs, which informs the agency on which children and young adults may be successful in the resource family's home. All children and young adults who come into ODHS's care already have families and communities, so the first place that Child Welfare looks for an appropriate placement is within the child or young adult's own family and community.

Ms. Andresen will testify that the agency actively analyzes its placement capacity, but the number of resource homes is not the only factor the agency considers, because the agency's first priority is focusing on kinship placements if such a placement is appropriate and available, and kinship placements are child specific. Ms. Andresen will explain how the Oregon Kinship Navigator helps achieve those goals.

Ms. Andresen also will testify about CCAs, what they are, how they are licensed and regulated, and what services they provide. Sara Fox, the Treatment Services Program Manager, reports to Ms. Andresen. CCAs are defined by statute, ORS 418.205, and the statutory definition of a CCA applies to many services across many agencies, such as ODDS. Ms. Andresen will testify that some CCAs offer family-based residential services, such as Maple Star and Greater Oregon Behavioral Health, Inc. Ms. Andresen will testify that a very small percentage of children in care are in congregate care, and that Oregon has one of the lowest uses of congregate care in the country. (All congregate care facilities are licensed CCAs but not all CCAs are congregate settings.) Ms. Andresen will testify that even if an assessment determines that a child or young adult is eligible for BRS, providers can (and do) deny children and young adults admission to the placement for a host of reasons, including concerns regarding the child or young adult's past history of aggressive behaviors for fear of liability. Treatment Services looks carefully at these denials to better understand why providers are denying referrals and to build

out facilities within Child Welfare's delegation to ensure sufficient placement capacity for children and young adults requiring enhanced levels of care.  Ms. Andresen will testify that there is capacity available in BRS, ODDS placements, and treatment foster care settings currently, and the continued challenge of placing some children and young adults in those settings.

Ms. Andresen will testify that the Treatment Services team at Child Welfare develops and oversees services for children needing higher levels of care that are in placements other than child welfare certified resource homes.  She will explain that Treatment Services also coordinates with OHA, ODDS, and OYA in building capacity for the entire child-serving system.  For example, Looking Glass is co-funded by OHA and ODHS.

Ms. Andresen will testify that the only children and young adults in ODHS's care who do not have a placement are those who are staying in "temporary lodging," a term that refers to a child staying in a hotel room with Child Welfare staff while waiting for space and admission in appropriate placements.  The population of children in temporary lodging is a very small percentage of all children in ODHS's care.  Child Welfare has been working diligently since 2016 to avoid and end the use of temporary lodging.  ODHS settled a related lawsuit in 2018, the *A.R.* settlement.  Pursuant to the *A.R.* settlement, the agency reduced the use of temporary lodging.  However, progress has leveled out due to factors outside the agency's control, such as the passage of SB 710 in 2021 (prohibiting CCAs from using physical restraints and seclusions when children are being internally or outwardly aggressive), significant resignations and turnover in the provider workforce, and the COVID-19 pandemic.  Child Welfare has made significant efforts to end temporary lodging and worked creatively to problem solve when barriers arose.  For example, the vast majority of children (approximately 75%) who are

identified as being at risk of entering temporary lodging do not end up in temporary lodging because of the agency's preventative efforts.

Ms. Andresen will explain that a court-appointed special master in the *A.R.* settlement determined that there was nothing else Child Welfare *alone* can do. Instead, ending temporary lodging will require multi-system, upstream efforts in coordination with all three branches of state government. Ms. Andresen will testify that the agency has learned lessons from the *A.R.* settlement, including that litigation and hard metrics are an ineffective strategy to change a state agency that must navigate complicated family, social, systemic, and political challenges.

Finally, Ms. Andresen will discuss Child Welfare's efforts to end the practice of out-of-state placements. Starting with concerns raised in 2019, with regard to certain out-of-state placements, Child Welfare worked swiftly and diligently to return all children and young adults previously placed in an out-of-state facility back to Oregon. As of June of 2020, all children and young adults previously placed out-of-state have returned back to Oregon.

### J.      Placement matching and moves.

Ms. Andresen's testimony will address how children are placed in resource homes or CCAs. For all children coming into care, Child Welfare first tries to identify a child-specific placement with an adult relative or other person already known to the child. As part of the CPS assessment and creating an in-home safety plan, the CPS caseworker identifies potential substitute caregivers who could care for the child if the juvenile court takes temporary custody. There is a temporary certification process that the relative or caregiver who is already known to the child can quickly apply to become the resource parent for that child.

If there is not currently a child-specific placement available for a new child coming into care, the district certification team, in conjunction with the CPS caseworker, will identify a placement for the child. Most Child Welfare district offices have a "placement desk" consisting

of one or more staff who are part of the certification team that will work with the CPS caseworker to review the child's information and then review available placements in the district to find a match.  In the meantime, Child Welfare branch support staff, called Relative Search Coordinators, will continue to search for a relative caregiver or person previously known to the child to serve as a placement.  Additionally, in some districts, Child Welfare is piloting permanency caseworkers to also conduct relative searches.

In the situations where a resource family decides that a child can no longer stay with them, there are several routes to identifying the next placement for a child.  The child's permanency caseworker will problem solve with the resource parent to determine if more resources and services can be provided for support for the child to remain in the home.  The permanency caseworker works with the current resource parent or placement to determine a timeline for how soon the child needs a new placement.  The permanency caseworker will also work with their supervisor to evaluate why the resource parent is asking for a child to be removed and coordinate with the placement desk to find a new placement.  The permanency caseworker will also work with the Regional Resource Coordinator to determine if the child needs to be assessed for a higher level of care.  If the child has complex needs and an assigned wraparound team, the permanency caseworker will also coordinate with them to determine what additional needs and supports could help the child stay in their placement or what the next right placement is for that child.

**K.    Services for children and young adults with complex needs and/or disabilities.**

Ms. Andresen will testify about how Child Welfare assesses the needs of children in its care that have complex needs and/or disabilities and refers them for needed services.  When children enter foster care, Child Welfare requests medical records, educational records, and

records from any other treatment or service the child was participating in prior to entering care. Since 2018, children receive a nursing assessment within approximately five days of entering care. The nurses evaluate children for physical and mental health needs, make recommendations, and may refer a child for additional services. ODHS consistently utilizes CANS assessments. Every child receives a CANS assessment, whether performed by a community provider or a Child Welfare contracted nurse. Children may also receive a Qualified Residential Treatment Program assessment if recommended by a nurse and in consultation with the child's caseworker and supervisor, with support from a regional resource consultant. The agency identifies children's mental, developmental, or behavioral health needs through those assessments, and often the Oregon Department of Education will have already identified a child as having a disability. All children coming into ODHS's care are also required to receive a medical evaluation and mental health assessment. Child Welfare refers children to CCOs and medical and mental health providers but cannot control the timing of when children receive the examinations and assessments due to provider availability and waitlists.

Another witness in this matter, Heidi Beaubriand, Program Manager for the Child Welfare Health & Wellness Services Program, and who reports to Ms. Andresen, will testify about the assessments in further details, including challenges associated with Child Welfare timely receiving medical evaluations and mental health assessments due to differing timelines, waitlists for providers to complete the assessments, and other unique barriers impacting timeliness of such assessments.

Ms. Andresen will testify that caseworkers document children's disabilities and services they need in case notes in OR-Kids, and that just because a child is not identified as having an

intellectual or physical disability does not mean that the child is not being provided needed assessments and services. A child's disability status is also documented in the Court Report.

**L.      LGBTQIA2S+ children and young adults in care.**

Ms. Andresen will testify that children in foster care have rights outlined in the Foster Children's Bill of Rights. The Foster Children's Bill of Rights expressly states that children and young adults in foster care have the right to express their gender and sexual identity for themselves and have the right to dress and groom themselves in accordance with their culture and identities. Ms. Andresen will testify that the Foster Children's Bill of Rights is included in the content of RAFT resource parent training and the essential elements in caseworker training. She will explain that it is required to be posted in all resource homes and CCAs.

Ms. Andresen will testify that Child Welfare championed SB 209 in the 2023 legislative session, which permits the agency to protect the privacy of data related to a children or young adults' SOGIE identity from discovery in juvenile court proceedings. Since SB 209 was passed, data collection efforts are underway, including building data tracking capacity in OR-Kids. Ms. Andresen will testify that caseworkers can now document a child's SOGIE information in case notes without the risk that the information will be disclosed in discovery to a child's family of origin or other party to a juvenile dependence proceeding.

Ms. Andresen will testify that the agency continues to improve certification practice around assessing a family's capacity to be affirming of children and young adults in care. Ms. Andresen will testify that the inability of a prospective or current resource parent to be affirming is a reason for denial or revocation of certification. Ms. Andresen will testify that the agency does, in fact, deny certification if a potential resource family cannot be affirming, and one such denial is currently the subject of *Bates v. Pakseresht*, another lawsuit in the District of

Oregon.  Ms. Andresen will testify that resource parent training makes clear that the expectation of the agency is that resource parents are affirming of a child's complete identity.

Ms. Andresen will testify that Child Welfare developed an affinity group through KEEP for resource parents who are serving children who identify as LGBTQIA2S+.  She will explain that there is a staff position on the Child Welfare equity team who helps consult on affirming placements.  Ms. Andresen will explain that there is a section in the Child Welfare Procedure Manual setting forth practice and procedure for meeting the needs of children and affirming identities.

Ms. Andresen will testify about the PRIDE ERG within Child Welfare and its work. PRIDE is comprised of ODHS staff across the state who are dedicated to improving the quality of life for LGBTQIA2S+ identified clients, families, and employees.

**M.      Transition age children and young adults.**

Ms. Andresen will testify about Child Welfare's expansion of services, resources, and funding for older children and young adults who are preparing to exit ODHS's care.

For older children ages 14 and older, their permanency caseworkers help them identify life skills and planning for independence when they turn 18, although young adults can choose to stay in ODHS's care until they turn 21 to continue to receive services.  Child Welfare has a child and young adult transition team that administers ILP contracts, answers questions from caseworkers and young adults, and administers Chaffee grants to help current and former foster children and young adults with postsecondary education, training, and housing.  Child Welfare also contracts with ILPs to provide training and skill building for transition-age young adults in foster care to prepare them for independence.

Child Welfare recently improved the agency's contracting structure and increased funding and initiatives to improve permanency for older young adults in foster care, in

collaboration with national experts Alia and Casey Family Programs. Ms. Andresen will explain that, under the updated contracting structure, ILPs are now on a fee-for-service model which means they must describe what services they provided and their compensation is based on the amount of services they provided. Previously, Child Welfare used a flat-rate contract structure, where a provider would get paid the same amount regardless of the amount of services they provided.

Child Welfare also increased funding for ILP services through investments from the Legislature in the 2019 and 2020 legislative sessions. She will explain that ODHS also established scholarships for young adults who are or were in foster care in Oregon to attend college in Oregon. The program formerly served only children who were aging out of foster care, and now it covers children who were adopted out of foster care.

Ms. Andresen will testify about FosterClub, a national group with a chapter in Oregon. Child Welfare pays for young adults to participate, and participation includes conferences and developing community connections.

### N.    CIRT and the CFPRP.

Ms. Andresen will testify that in 2020, Child Welfare created a new program known as the CFPRP, which is led by Ms. Tami Kane-Suleiman, former Program Manager of Child Safety. Child Welfare transitioned the work of the critical incident review team—which reviews child fatalities of children and young adults known to Child Welfare (as defined by statute)—from the larger Child Safety Program to its own specific program. Although still relatively new, the CFPRP has already contributed to the reduction of child fatalities involving infants due to unsafe sleep environments through a combination of educational supports to caseworkers, caregivers, physicians, and community partners who interact with families with infants, and implementing

system safety tools to ensure safe sleep environments as part of Child Welfare's work with families.

### O.    Caseworker caseloads and workforce morale.

Ms. Andresen will testify about Child Welfare's creation and publication of Oregon's Caseload Ratio Standards in 2022. She will also testify about the development of the caseload dashboard in 2022, which is a dynamic, real-time data tool that calculates on any given day the statewide, district, and branch caseload averages for CPS, permanency, and certification caseworkers across the state. This data tool allows Child Welfare leadership, District Managers, program managers, and supervisors to access real-time data about how many cases caseworkers are assigned to them in order to balance workloads and determine how to utilize assigned FTE to ensure timely assessments and services for children and to reduce staff burnout. Child Welfare also reports its monthly statewide caseload averages in the monthly report it publishes. Since Child Welfare began publishing the data in the monthly report in June 2023, Oregon's statewide caseload averages have been consistently meeting or below Oregon Caseload Ratio Standards. Child Welfare leadership utilizes the caseload ratio standard as a learning tool, and anticipates continued updates and edits based on lessons learned.

Ms. Andresen will testify about improvements to Child Welfare workforce morale. She will also testify about her collaborative leadership style and explain how she attempts to build buy-in and support from her teams and staff. Ms. Andresen will also explain that she utilizes her relationships and experience to problem solve. Ms. Andresen will testify about the impact of the COVID-19 pandemic of Child Welfare's workforce and her observations on how Child Welfare leadership and staff were flexible and able to pivot where necessary to continue providing child services during an unprecedented global pandemic. Ms. Andresen will also discuss processes for ensuring caseworker safety.

**Page 21 –    DEFENDANTS' LAY WITNESS STATEMENTS – LACEY ANDRESEN**

P.    **Resource parent recruitment.**

Ms. Andresen will testify about Child Welfare's ongoing and expanded efforts to recruit and retain resource homes across the state. Resource home capacity is tracked and monitored by individual Child Welfare districts. Each district's certification staff maintains documentation of which resource homes are currently accepting children and their capacity. The need for more or particular types of resource homes varies by district.

Accordingly, Child Welfare sought and received legislative investment in 2019 and, in 2020, hired a team of specialized staff dedicated to resource parent recruitment and retention, with one specialist assigned to each of the 16 Child Welfare districts across the state. Oregon is unique in having these dedicated positions to focus on resource family recruitment and retention.

Child Welfare has improved utilizing data to inform resource parent recruiting. For example, each district has a targeted plan based on the district's demographics and needs for recruiting potential resource parents and supporting existing resource parents to retain them. Although Child Welfare is always looking to recruit more resource homes, the agency assesses every child coming into care for existing potential caregivers known to them so the number of general resource homes needed is a constantly changing dynamic quantity. She will also testify about training supports for resource parents that have been redesigned as part of Child Welfare's continuous quality improvement infrastructure.

Ms. Andresen will testify about Child Welfare's partnership with The Contingent, which operates a program called EveryChild. EveryChild was founded in 2012, and Child Welfare began contracting with EveryChild in 2016. EveryChild does recruitment to target potential resource parents, provides support for resource parents, staffs the 1-800 recruitment number, does retention work, and plans events, toy drives, and holiday packages for children and resource parents. EveryChild quickly pivoted and adapted to the challenges of the COVID-19 pandemic

when it launched the MyNeighbor program to connect resource parents and foster children with donors and volunteers.  EveryChild also provides mentorship for resource parents (connecting experienced resource parents with newer resource parents).  The partnership has grown over time, and now the model is duplicated in other states such as Indiana.  Ms. Andresen will testify that through Child Welfare's successful collaboration and partnership with EveryChild, the agency has received feedback from communities that resource parents feel better supported, which also helps ensure better placement stability and the improved outcomes for the children and young adults placed with such families.

Q.    **Federal reporting, oversight, and transparency.**

Ms. Andresen will testify about existing federal oversight of Child Welfare through extensive and thorough reporting that Child Welfare is required to submit to the Children's Bureau, within the U.S. Department of Health and Human Services, Office for Administration for Children and Families.  Most significantly, Child Welfare creates a five-year plan called the Child and Family Services Plan that outlines the performance, practices, and implementation changes the agency expects to see for the next five years.  Child Welfare's progress is reported yearly in the Annual Program Services Review report.  For accountability, the federal government requires an extensive review of Child Welfare's case practices, outcomes, and systemic measures every five to seven years called the CFSR.  For any CFSR measures Child Welfare is not meeting, the Children's Bureau requires Child Welfare to enter into a Program Improvement Plan, and the agency reports on its performance every quarter for a period of two or more years.  The federal government also audits Child Welfare's use of Title IV-E funds.

ODHS also launched in December 2021, a public facing dashboard that displays Child Welfare's performance on several federal outcomes.  The measures include: maltreatment in foster care; recurrence of maltreatment; re-entry to foster care; permanency in 12 months;

permanency in 12 to 23 months; permanency in 24+ months; and placement stability.

Ms. Andresen will explain how the maltreatment in care rate is calculated and why plaintiffs are incorrect when they allege that the actual victimization rate is worse than the reported rate.

Child Welfare has been providing monthly progress reports to the Governor since March of 2018. The reports describe key metrics about the agency's performance and work to implement the Vision for Transformation. These reports are posted online and available for the public to view. The reports were originally requested by former Governor Brown, and Governor Brown and her staff used the reports to ask questions to Child Welfare leadership about areas of practice improvement.

### R.    Data informed decision making.

Ms. Andresen will testify about improvements that Child Welfare has made to its access to data and use of data in agency decision making. Under the leadership of former Child Welfare Director, Rebecca Jones Gaston, ODHS created robust internal data dashboards based on real-time data that is updated daily on key measures, including: number of children in care; entries and exits; caseworker caseloads; timeliness of CPS safety assessments; timeliness of initial case plans; timeliness to permanency; length of time in care; and current population demographics. Child Welfare's executive leadership team regularly consults these dashboards and they are accessible to District Managers, Program Managers, and other Child Welfare leadership across the state.

Ms. Andresen will describe how plaintiffs' desired relief in this case of imposing a rigid set of metrics, along with a court-appointed monitor, will stymie the real progress Child Welfare has made in realizing the Vision for Transformation and potentially harm the agency's ability to best serve children, young adults, and their families. Plaintiffs' desired relief will force Child Welfare to pivot away from efforts to support families and reduce the number of children in care

**Page 24 –    DEFENDANTS' LAY WITNESS STATEMENTS – LACEY ANDRESEN**

to instead focus the agency's attention on trying to achieve plaintiffs' desired metrics, which are not tied to Oregon's unique set of circumstances or barriers impacting the work of Child Welfare. Furthermore, the proposed injunction is primarily focused on children and young adults once they have entered care. Ms. Andresen will explain how plaintiffs' desired relief will stifle the agency's ability to be innovative and divert precious resources away from serving children, young adults, and their families to pay instead for court-appointed monitors for years and even decades to come.

      **S.**      **CQI.**

      Ms. Andresen will testify about the CQI work that Child Welfare is doing and how Child Welfare leadership is collaborating with district offices and community partners to carry out this work.

      The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission. Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

II.    **Heidi Beaubriand, RN, BSN (3 hours direct testimony).**

    A.    **Professional background.**

Ms. Beaubriand is the Program Manager for the Child Welfare Health and Wellness Services program for ODHS. She has over 30 years of progressive experience in pre-hospital, ambulatory, hospital, community, and correctional healthcare. She has extensive professional experience in policy and procedure development, staffing and staff development, crisis management, patient care coordination, utilization and risk management, as well as program restructuring experience. Ms. Beaubriand became a nurse in 1991 and earned her Bachelor of Science in Nursing from Kaplan University in 2011. She is a registered nurse licensed to practice in Oregon and is certified as an adolescent and pediatric sexual assault nurse examiner. Prior to coming to Oregon, Ms. Beaubriand worked as a nurse in various healthcare settings in Arizona, including as the Regional Clinical Coordinator for the Northern Arizona Center Against Sexual Assault.

Ms. Beaubriand has worked for Child Welfare for over 11 years, initially as a Nurse Consultant for the Foster Care program from 2012-2016. In this role, she served as a clinical resource to delivery staff for medical and behavioral health issues of children and young adults in foster care and oversaw the Personal Care Program and contract nursing staff. In 2016, Ms. Beaubriand created the Health and Wellness Services program for Child Welfare.

    B.    **Child Welfare's Health and Wellness Services program.**

Ms. Beaubriand manages the Health and Wellness Services program, a robust nursing services program to serve children and young adults who are in the care and custody of ODHS. The program is currently staffed by 48 nurses throughout the state, including eight licensed practical nurses (LPNs) who serve as Healthcare Coordinators. Ms. Beaubriand's responsibilities include oversight of nursing services, the psychotropic oversight team, medical

access team, and CANS team.  She is also responsible for implementing training, rules, procedures, and case consultations regarding the provision of medical and mental health services to Oregon foster children.  In addition to the services provided to children and young adults who are in the custody of ODHS, the Health and Wellness Services program provides in-home nursing services to children, young adults, and families who may be struggling and need resources and education to reduce the risk of abuse and neglect.  Ms. Beaubriand reports directly to the Child Welfare Deputy Director, Lacey Andresen.

Ms. Beaubriand will describe her personal and professional experiences spanning nearly a decade working with children and young adults who have a wide variety of sexual orientations, gender identities and expressions ("SOGIE").  She has been involved in developing and implementing policy and procedure changes at ODHS regarding LGBTQIA2S+ foster children and young adults.  Ms. Beaubriand will testify to specific examples regarding the work she has done with this population and her commitment to providing trauma-informed service provisions to foster children and young adults.

**C.    Required medical, mental health assessments, and screenings for children and young adults entering substitute care.**

Ms. Beaubriand will testify that each child or young adult placed in substitute care should receive the following assessments and screenings:

- An intake nursing assessment by an ODHS-contracted nurse, shortly after entering care;
- A comprehensive health assessment by the child or young adult's primary healthcare provider, within 30 calendar days of entering care;
- A dental assessment for children age one and older, within 30 calendar days of entering care;
- A CANS screening, within 60 calendar days of entering care; and

- A mental-health assessment for children age three and older, within 60 calendar days of entering care.

Ms. Beaubriand will testify that the Health and Wellness Services program is responsible for monitoring on a statewide level whether children and young adults in substitute care are receiving the applicable age-appropriate assessments and screenings within the required timeframes. The nurses and screeners Ms. Beaubriand oversees conduct the Intake Nursing Assessments and CANS screenings. These nurses are typically the first healthcare professionals who children and young adults see upon entering substitute care. Ms. Beaubriand will explain how her department monitors and tracks the required assessments, the steps the nurses take including working directly with children, young adults, and families, as well as data sharing and coordination the OHA and CCOs. She will describe the role of OHA and CCOs in the provision of medical and mental health services to children in ODHS custody and the related reporting requirements.

1. **Intake nursing assessments, personal care assessments, and in-home nursing assessments.**

Ms. Beaubriand will testify that children receive a comprehensive intake nursing assessment shortly after coming into foster care. Ms. Beaubriand's department ensures that all children entering foster care have age-appropriate nursing assessments. The purpose of the intake assessment is to evaluate the child's immediate health needs, provide child-specific health education and training to the resource family or caregiver, make community referrals as needed, and ensure any additional required assessment are completed. When a child or young adult enters substitute care, a worker at the local branch enters the child or young adult's initial placement into OR-Kids and the child is automatically added to an internal report managed by the Health and Wellness Services program. A referral for the initial assessment then goes out

within 24 hours, and a nurse has three days to make contact with the resource family to make an appointment for the intake nursing assessment. Ms. Beaubriand will testify about what the intake nursing assessment entails. The completed nursing assessments are provided to the child or young adult's caseworker and certifier of the resource home, and the assessment is filed in the child or young adult's OR-Kids electronic records.

Ms. Beaubriand will testify that, if during the intake assessment, a nurse identifies a child or young adult with an impairment that impacts the child or young adult's ability to perform activities of daily living, that child will also receive a Personal Care Assessment to address additional care needs and supports including nursing supervision in the resource home. A branch representative may also refer a child for a Personal Care Assessment if they observe medical or mental health issues that are serious enough to impact the child or young adult's activities of daily living. A child or young adult who is eligible for Personal Care Services has a physical, mental, or developmental condition requiring additional care and assistance in one or more domains of activities of daily living[1]. Following the Personal Care Assessment, an ODHS resource nurse will develop a Personal Care Services Plan including details about each service the child or young adult will need, the qualified provider who provides the services, as well as who is authorized to perform the delegated nursing tasks. Ms. Beaubriand's nurse manager reviews for completeness and approves the Personal Care Services Assessment and the Personal Care Services Plan.

---

[1] A child or young adult who is placed in a foster care placement may qualify for Personal Care Services. The following exceptions apply: children or young adults who are placed in either an Oregon Developmental Disability Services or Behavioral Rehabilitation Services paid placement, children or young adults who move out of the state of Oregon, or children or young adults who have completed the adoption finalization process do not qualify for this program.

The Health and Wellness Services program expanded the in-home nursing assessment to support trial reunifications in 2018. Since then, nurses have also been making home visits to help children and young adults who are leaving foster care to safely reunite with their families. Ms. Beaubriand will testify that the in-home nursing assessment acknowledges that the transition of a child or young adult returning home from foster care can be difficult for both child and parent. Accordingly, the nurses visit the families and assess them for home safety and any immediate health concerns for the family. In addition, the nurses provide education and materials to help families through a Wellness Toolkit. The nurses often provide referrals to community services that can help support the health and well-being of the family.

Ms. Beaubriand that Child Welfare recognizes the sensitive nature around collecting SOGIE information, which requires a trauma-informed approach as well as confidentiality and age considerations. Such an approach means that a child may, for example, be allowed to refuse a portion of the intake nursing assessment or choose not to disclosure their SOGIE. There may also be instances where a nurse conducting an assessment determines that asking a child about their SOGIE may not be possible or appropriate, like if the child is non-verbal or medically fragile.

The nursing intake forms have been updated in response to the passage of Senate Bill 209 during the 2023 Legislative session. Ms. Beaubriand will testify about changes to how SOGIE information must be documented in the nursing forms due to changes in confidentiality requirements. Notwithstanding these changes, there is immediate action by nurses to provide resources and services if a child or young adult discloses their SOGIE during the intake process. Ms. Beaubriand will testify that the nursing intake process designed to affirm and support the SOGIE of young people began years ago and was not in response to this lawsuit.

## 2.    Comprehensive physical health and dental assessments.

Ms. Beaubriand will testify that each child or young adult entering substitute care must receive a comprehensive health assessment by the child or young adult's primary healthcare provider within 30 calendar days, and that children ages one and older must also receive a dental assessment in the same timeframe.  Children and young adults in substitute care are enrolled in the Oregon Health Plan (Medicaid) and receive physical and dental health services from a network of healthcare providers contracted through CCOs.

Ms. Beaubriand will testify about the mechanisms and timeframes OHA and CCOs receive notice of children and young adults when they enter substitute care.  For example, OHA receives notice once the child or young adult is enrolled in Medicaid.  Since January 2024, all foster children are enrolled in Medicaid within a few days of entering care.  This is an improvement from a historically longer turnaround.  OHA is working to achieve next day enrollment in Medicaid by Summer 2024.  Typically, CCOs reach out to the resource families to schedule medical and dental assessments.  However, the timeliness of medical and dental assessments is impacted by the availability of CCO-contracted providers and geographic location.  This is particularly true regarding dental assessments, as there are limited dental providers in the state, especially in rural areas.  Healthcare Coordinator nurses track progress of medical and dental assessments on a comprehensive chart.  Ms. Beaubriand will testify that Child Welfare has no control over when and how CCOs schedule dental, physical, and mental health assessments, nor does Child Welfare have control over the availability of outside medical providers.  Nevertheless, Ms. Beaubriand will testify that the Health and Wellness Services program makes every effort to find and connect children with appropriate services and supports.

Ms. Beaubriand will testify that she has had countless consultations over the years with LGBTQIA2S+-identifying young people, especially trans children, who want to start hormone

therapy, or need personal care supplies to support their gender identity, and she and her team have found creative solutions to get these young people what they need, even in rural settings with few resources or specialized providers.

### 3.    CANS screenings.

Ms. Beaubriand will testify that ODHS must refer children for their initial CANS screening within 21 days of entering substitute care, and those screenings must occur within 60 days of entering care.  Resource nurses who are trained and certified through ODHS to complete CANS provide most CANS screenings throughout the state, and the remaining are done by contracted screeners managed by Ms. Beaubriand.  Average turnaround time for CANS screenings conducted by the internal RN CANS screeners from referral to completion is now 26 days.  Previously, Child Welfare made use of community screeners who are trained and certified through the Praed Foundation.  However, turnaround time for CANS screenings was much longer.  Now, nurses within the Health and Wellness Services program have been able to significantly improve the timeliness and quality of CANS screenings.

Ms. Beaubriand will explain that CANS assessments cover seven domains of child needs, family dynamics and history, and historical and current functioning, and that each domain receives a score of 0-3.  CANS scores are used to determine each child or young adult's supervision needs.  Because the CANS is an important tool for the service delivery system, screeners have been trained to use it as a mental health screening tool.  Ms. Beaubriand will describe how the information contained in CANS assessments may also be used for case planning activities such as placement matching, reunification planning, and identifying the service and intervention needs of the child or young adult.  She will explain that CANS screenings are updated annually, or when the child or young adult's behavior or needs increase.

####    4.    Mental health assessments.

Ms. Beaubriand will testify that ODHS requires a mental health assessment for children aged three and older, within 60 calendar days of entering substitute care.  Ms. Beaubriand will testify about the role the Health and Wellness Services program plays in monitoring that these assessments are happening timely.  Child Welfare is responsible for making timely referrals and Ms. Beaubriand will testify that these referrals are happening on time.  However, like medical and dental providers, Child Welfare is not able to guarantee that a community mental health provider will be able to schedule the appointment in time.

####    5.    Psychotropic medication oversight.

Ms. Beaubriand will testify about the role of the Health and Wellness Services program has in overseeing the administration of psychotropic medication to foster children and young adults.  The Health and Wellness Services program is responsible for performing psychotropic medication annual reviews and Ms. Beaubriand or her nurse consultant must provide authorization prior to any new prescription for psychotropic medication.  Ms. Beaubriand's department also works with OPAL-K when there is an issue with medication that requires consultation with a child psychiatrist.  OPAL-K is a service of Oregon Health & Science University which provides free, same-day child psychiatric phone consultations to primary care providers in Oregon.

####    D.    Metrics measuring completion and timeliness of medical, mental health assessments, and screenings.

Ms. Beaubriand will testify about how ODHS—and other partners—track and report on whether the required medical, mental health assessments, and screenings are happening timely. She will also explain historic barriers to quantifying the rate to which children and young adults are receiving assessments and screening in the allotted timeframes.

On an individual level, caseworkers and other members of a child or young adult's care team rely on and incorporate these assessments into case planning, service provision, and placement decisions.

Ms. Beaubriand will describe the process of data sharing between ODHS, OHA, and CCOs. In 2017, the Oregon Legislature passed House Bill 3372, stating that OHA would become the reporting organization for ODHS's measure of timely medical and mental health assessments following out-of-home placement. OHA combines the administrative (billing) claims data from CCOs[2] and placement data from OR-Kids to report on the timeliness of the required assessments for children in ODHS custody.

Ms. Beaubriand will detail how the CCO metric reported by OHA is based on a different timeframe than the ODHS policy set by administrative rule. ODHS policy requires physical and dental assessments within 30 days of foster care placement and mental health assessments within 60 days of foster care placement. However, the current CCO measure allows 60 days for all three types of assessments, and this timeline is based on the date ODHS *notifies* CCOs that a child or young adult entered care. Because CCOs measure compliance at the 60-day mark (based on a date of enrollment in Medicaid) by lumping all assessments together, the Health and Wellness Services program also does internal tracking to monitor the processes that Child Welfare is responsible for.

Recently, there has been inter-agency efforts to try to bring the CCO metric and ODHS requirements into alignment for more accurate reporting. Ms. Beaubriand is part of a workgroup with OHA to address this issue and has been able to provide greater oversight of the reports of

---

[2] The Oregon Medicaid Management Information System contains administrative data about Oregon Health Plan member eligibility, claims, and documentation of office visits, diagnoses, treatment, etc.

children coming into foster care.  The Health and Wellness Services program now has a real-time report reflecting when a placement is entered (into OR-Kids) for a new child or young adult coming into care.  Capturing the exact date a child or young adult is placed in substitute care is essential to identify what date the child or young adult must receive the required assessments by. This placement entry (into OR-Kids) also triggers a nursing referral.  Ms. Beaubriand's department tracks the date of entry into care, date of placement entry, date of nursing referral, the date a nurse makes contact with the resource parent or caregiver, date assessment happened, and any follow up visits.

Ms. Beaubriand will testify that the percentage of children and young adults who receive timely medical and mental health assessments has been increasing since 2016, notwithstanding the impacts of the COVID-19 pandemic.  She will discuss how the Health and Wellness Services program reacted efficiently and flexibly to the challenges presented by COVID-19, including specific examples of nurses employing creative solutions to service provisions.  She will also describe the enduring effects of the pandemic on the overall healthcare system, including the activities of the Health and Wellness Services program and other state agencies.  Ms. Beaubriand will testify that in 2021 and 2022, data shows that over 88% of children and young adults in substitute care are receiving age-appropriate medical and mental health assessments within 60 days of ODHS notifying the CCO of a child or young adult entering care.  If children are not being assessed timely, it is in most cases, due to provider availability.

While ODHS does not create and staff third-party medical and mental health service providers, there are several healthcare programs across the state that specifically provide services to foster children and young adults, including working directly with children's caseworkers and coordination between different state agencies.  For example, Every Step clinics in Multnomah,

Washington, and Clackamas counties, employ a team of professionals who understand the unique challenges foster children face and, among other services, provide transitional support for young adults aging out of foster care and trauma workshops for resource parents.

     **E.**     **The Vision for Transformation's alignment with best practices in nursing and impact on the Health and Wellness Services program.**

Ms. Beaubriand will testify that Child Welfare's Vision for Transformation aligns with the ideals and practices that advance wellbeing. Specifically, the Vision for Transformation promotes children and young adults holistically and prioritizes the health, wellbeing, and safety of children and young adults. It also centers culturally responsive programs and services that honor diversity and enhance equity for the children and families ODHS serves, including for LGBTQIA2S+ young people. Through the Vision for Transformation, ODHS has solidified its focus on family preservation, which focuses ODHS on its ability to ensure that families receive tailored services to prevent intensive child welfare involvement when safely possible. As an example, in April 2023, Health and Wellness Services in partnership with CPS, introduced Family Care Nurse Home Visiting Program to serve families with infants with CPS involvement, as well as In-home Family Preservation cases regardless of the children's age. The Health and Wellness Services program is committed to the Vision for Transformation and to serve children, young adults, and families by providing trauma-informed nursing services and healthcare coordination that is inclusive of people we serve.

     **F.**     **Collecting SOGIE data for children and young adults in care.**

Ms. Beaubriand will testify that her department collects SOGIE information to inform and guide service delivery. Ms. Beaubriand will explain that affirming someone's sexual orientation and gender identity on an individual level is not only trauma-informed but is important to service delivery and the wellbeing of the child or young adult. Ms. Beaubriand will

testify that knowing SOGIE information for the population of children and young adults in care is also important, but that there are considerations around confidentiality and safety to consider, as well as approaching data collection from a trauma-informed lens.

With the passage of Senate Bill 209 further clarifying the confidentiality of SOGIE information for foster children and young adults, Child Welfare is actively working toward collecting SOGIE data. Ms. Beaubriand is on the Core Team and the procedure workgroup for Senate Bill 209 implementation. There has been increased training for caseworkers, and a team within Child Welfare is working to develop the processes to collect SOGIE information for the young people in the agency's care. Child Welfare is focused on collecting data in a trauma-informed way, while preserving confidentiality and keeping children and young adults safe.

### G.     SOGIE policies and procedures.

Ms. Beaubriand will testify about her role in developing Child Welfare's policy regarding supporting and providing services for children with diverse SOGIEs. Work on the written policy began in 2017 after the Oregon Health Plan (Oregon's Medicaid and Children's Health Insurance Program) began covering gender affirming healthcare. She will explain how the policy was created in collaboration with various community partners including a Multnomah County Juvenile Court Workgroup, Child Welfare Treatment Services, and Oregon Foster Youth Connection. This policy, which first went live in January 2020, is outlined in the Child Welfare Procedure Manual, Chapter 5, Section 41.

The policy recognizes that every person has a SOGIE and the importance of supporting all children and young adults in the healthy development of the various dimensions of themselves. To that end, the policy refers to the Oregon Foster Children's Bill of Rights and reiterates the rights contained therein. The policy outlines how Child Welfare workers must affirm the SOGIE of the children and young adults, use LGBTQIA2S+ inclusive language, and

focus on support, acceptance, and advocacy of LGBTQIA2S+ children and young adults in care. The policy notes that caseworkers must identify necessary services and resources, as well as the personal supplies necessary for well-being.  For example, the policy outlines the procedures and information needed when seeking LGBTQIA2S+ specific medical and mental health services for children and young adults in care, including hormone therapy to suppress puberty or to assist with masculinizing or feminizing the body, as well as gender-affirming surgery.  The policy also identifies the process for a legal name change, change of sex designation, and even provides guidance for supporting sexual and gender minority children who experience family of origin rejection.

Ms. Beaubriand will testify that this work was and continues to be supported by Child Welfare leadership in policy, practice, and in the spirit of the Vision for Transformation. Ms. Beaubriand will testify that the development of the SOGIE policy and procedures was not in response to this lawsuit.  She will explain that while more work must be done to enhance the provision of services to children and families, she sees Child Welfare staff and leaders discuss and express concern and a desire to understand and address SOGIE issues, which has led to important work of improving policies with regard to LGBTQIA2S+ children and young adults in their care.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

### III.    Lisa Bender (2 hours direct testimony).

#### A.    Personal and educational background.

Ms. Bender is the Assistant Deputy Director of Child Welfare Program and Practice at Child Welfare.  Ms. Bender has over two decades of experience providing child welfare, juvenile justice, and preventative services to children and families.  Her career began in Iowa, where she is from, and she will testify that she graduated with a Bachelor of Arts degree in Social Work in 2003 from the University of Iowa.  During and after obtaining her undergraduate degree, she held several direct case management positions, working alongside both child welfare workers and juvenile court officers, including roles as a youth worker in residential substance use disorder for adolescents, a case manager for a gender-specific day treatment program, and the assistant program director for a juvenile justice prevention program.  During graduate school, Ms. Bender worked primarily in academia, completing multiple teaching and research assistantships for the University of Iowa's School of Social Work, where she earned her master's degree in Social Work in 2006.

#### B.    Career prior to joining ODHS.

After she received her master's degree, Ms. Bender accepted a position as a Social Worker with the Hawkeye Area Community Action Program, where she provided case management for a Transitional Housing Program.  In that role, Ms. Bender will explain that she conducted home visits, made referrals, developed and implemented case plans with families experiencing houselessness, and collaborated with service providers and Iowa's Department of Human Services, child welfare, among other things.  Ms. Bender was eventually promoted to Program Manager during her time at Hawkeye Area Community Action Program, where she worked until 2010.

Ms. Bender will testify that she then began work in 2010 as the CAPTA Manager for the Iowa Department of Human Services, Division of Adult Child and Family Services, Bureau of Child Welfare, where she was the state liaison to the federal Children's Bureau for Iowa.  In this role she was involved in many activities, including but not limited to, managing grants and contracts, facilitating the statewide multidisciplinary teams and coordinating with county and regional multidisciplinary teams, representing Iowa Department of Human Services in the state's child fatality review board, preparing case reviews of all fatalities with current or prior child welfare experience, and reviewing proposed legislation, among other work.

In 2016, she accepted a new role in the Bureau of Child Welfare as Prevention Program Manager.  In that role, she was able to focus primarily on her passion: prevention and early intervention.  In that role, Ms. Bender managed state and federal funding for services designed to prevent child maltreatment and adolescent pregnancy, including implementation of new evidence-based programs, fidelity monitoring, and evaluation, among other things.  Ms. Bender will testify that she worked for Iowa Department of Human Services as a Program Manager in the Adult Child and Family Services Division, Bureau of Child Welfare, for over 10 years before she moved to Oregon in June 2021.

### C.    Work at ODHS.

Ms. Bender will testify that she sought a job at ODHS because of Oregon's reputation as a progressive, public-service oriented state with a strong commitment to equity.  Her first role at Child Welfare was Program Manager at the Gateway Child Welfare Branch in Multnomah County.  In her role as Child Welfare Program Manager, she provided management and operations support for a number of program areas touching all branches in Multnomah County, including resource parent retention and recruitment, resource parent training, out-of-home placement coordination and eligibility determination (*i.e.*, Title IV-E, medical, etc.), helping

families involved in family treatment court, and the after-hours child safety program, which coordinated 24/7 response to child protective cases outside of regular business hours for Multnomah County.  She will testify about Child Welfare's certification process, including steps taken to determine the suitability and safety of potential resource families.

Ms. Bender will testify about how the Vision for Transformation was being implemented in Multnomah County in 2021 and 2022.  For example, Multnomah County launched a Family Preservation Pilot in the Alberta neighborhood in northeast Portland.  The pilot was aimed at supporting families to maintain child safety at home to prevent entry into foster care. Multnomah County also expanded the Family Involvement team, which provides additional support for parents in substance use disorder treatment programs.

In June 2022, Ms. Bender started a new position as the Statewide Respite Care Coordinator at the central office of Child Welfare.

### D.    Development of statewide respite care program.

Ms. Bender will testify that Oregon developed a new statewide respite care program in 2022, and the program was initially launched on January 1, 2023.  Before the development of a statewide respite care program, it fell on a resource family to identify a person in their social circle or community who could provide respite services, and that person would go through a background check process to provide respite services to that family.  Alternatively, Ms. Bender will explain that other resource families in the community would provide respite services if available.

Under Oregon's new statewide respite care program, Oregon is recruiting, training, and vetting dedicated respite providers across the state.  Ms. Bender will explain that the benefit of having a statewide coordinated program is that local branches now have additional supportive services to offer resource parents in need of respite services.  Ms. Bender will also testify about

the process for becoming certified as a respite provider.  Every certified respite provider must go through a background check, interview process, and a full safety and home environment assessment.  This assessment also requires a provider to acknowledge their understanding of various ODHS policies and rules related to safety, discipline, and confidentiality.  Ms. Bender will also explain the requirements for training to become certified as a respite provider. Applicants must participate in training, which covers things such as an overview of the respite care program, research on the potential benefits of respite, trauma-informed parenting, logistics, what to do in an emergency, confidentiality, and mandatory reporter training.  At the end of the training, there is a knowledge check to ensure applicants understood the materials.  Child Welfare provides ongoing management of respite providers, which includes conducting ongoing home visits at least once every 180 days, among other things.

Ms. Bender will testify about improvements to the way respite providers are paid under the statewide respite care program, with funds going directly to providers as opposed to a reimbursement to the resource parent, putting them in the middle of payments.  Ms. Bender will testify that resource and recruitment staff refer families who are interested in providing respite services to the certified respite program, among other recruitment methods.  Ms. Bender will also testify to how the certified respite program can be a valuable opportunity for families who may be considering certification as a resource parent in the future, allowing them to gain additional experience with children and young adults in care.

Ms. Bender will testify that one risk factor for maltreatment includes caregivers who are highly stressed; this is particularly common in caregivers of children and young adults with complex needs.  Ms. Bender will explain that it is important to provide support to resource families caring for these children and young adults, including breaks when they need them.

Ms. Bender will also testify that the respite care program provides children and young adults with another trusted adult in their lives. Additionally, the respite care program provides children and young adults with a connection with an adult outside of the child's parents, caregivers, or resource family who could still be an important connection and provide meaningful mentorship for a child or young adult.

Ms. Bender will testify that Child Welfare launched phase two of the statewide respite care program expansion project in February 2024, by expanding to provide respite services to a child or young adult's family of origin (*i.e.*, parents, guardians, or other caregivers) when the children return home, which helps support successful reunification and provides a continuity of connection through fostering informal connections and mentorship. Respite providers also often act as a support factor when parents are reunifying, by offering parents a break with a safe adult and by having another caring adult in their child or young adult's life. Ms. Bender will testify that phase three of the certified respite program expansion is anticipated to launch in 2025, and will expand certified respite even further to include families involved in family preservation services where safety is being managed in the home without a child or young person being placed into foster care.

### E.    Child Welfare program and practice.

Ms. Bender will testify that she began her current role as Assistant Deputy Director of Child Welfare Program and Practice at Child Welfare in May 2023. In her role as Assistant Deputy Director of Child Welfare Program and Practice, she assists Deputy Director Lacey Andresen and Director Aprille Flint-Gerner in overseeing the activity of the Child Welfare program and implementing the Vision for Transformation.

Ms. Bender will testify about Child Welfare's work to implement the Vision for Transformation. She will explain how she and her team utilize implementation roadmaps, which

exist on an internal project-management dashboard called Smartsheet that allows Ms. Bender and her team to track the status of ongoing projects across the Child Welfare division. Ms. Bender and her team can see the status of various projects and how they are progressing, enabling them to get ahead of potential barriers or challenges to implementation.

Ms. Bender will testify that each yearly quarter she and her team agree on a focus area for program and practice implementation.  For example, the focus for the first quarter of 2024 was scoring all program projects and initiatives for both feasibility and impact (using 5 sub-measures for each).  Additionally, the focus for the second quarter of 2024 will be improving community and Tribal engagement in projects and initiatives.  Ms. Bender will testify that setting a focus each quarter means that staff analyze their program through a particular lens, evaluating program goals and how to reach those goals.

Ms. Bender and the Program Manager over the Project Management Office meet every quarter with each of the lead Program Managers and key staff, 19 programs in total.  This includes core programs such as Screening, Safety, Permanency, Foster Care, Treatment Services, as well as more operational and workforce support teams such as Training, CQI, Contracts, OR-Kids (the state's child welfare information system), among others.  During the meetings, they strategize about ongoing projects, goals, status, and barriers or risks to the implementation of current projects and initiatives.  Ms. Bender will explain that they also discuss prioritization of projects and ways to measure progress and outcomes.

For example, when legislation passed in the 2023 legislative session allowing the Oregon Child Abuse Hotline ("ORCAH") to accept reports of abuse electronically, the bill did not come with additional financial support to cover the costs of building out a public-facing portal. Ms. Bender will testify about how this barrier was brought to the attention of the Child Welfare

executive leadership team, who then assigned a project manager to work through various options with ORCAH.  Child Welfare has since identified internal support and determined the portal could be added to the existing comprehensive multi-year plan for technology projects. Ms. Bender will also testify about other projects she supports in her role as Program Manager over the Project Management Office, including work toward implementing SB 209 (2023), which protects the confidentiality of SOGIE data.

Ms. Bender co-chairs the Family First Prevention Design Team committee with Duane Kowalski, who identifies as Native American as part of the Delaware Tribe of Indians, and as a person with lived experience with the foster care system as a parent.  Ms. Bender will explain that half of the Family First Prevention implementation committee is Child Welfare staff, and the other half is community partners and individuals with lived experience.  The team is charged with the design of the state's first amendment to their Title IV-E Prevention Services Plan. Ms. Bender will discuss how a focus on equity has been at the center of Child Welfare's implementation of Family First.  For example, when the Family First Prevention Act was first passed, the clearinghouse for evidence-based programs under Family First did not include programs that were created in partnership or collaboration with Tribes.  Ms. Bender will testify that the communities Child Welfare serves can sometimes be skeptical of clearinghouse lists of evidence-based practices, because too often those practices were not developed in partnership with these communities and therefore may not be responsive to their needs.  Ms. Bender will testify that there are now evidence-based programs developed with Tribes on the clearinghouse and how—to support the Tribes in drawing down federal funding—an amendment to the state's plan is necessary.  For example, Child Welfare and the ODHS Office of Tribal Affairs, in partnership with the nine Tribes of Oregon, have supported expanded training in the Family

Spirit model in multiple sites across Oregon. Family Spirit is an evidence-based program designed, implemented, and evaluated through a partnership between Johns Hopkins Center for Indigenous Health and the Navajo, White Mountain Apache, and San Carlos Apache Tribal communities.

Ms. Bender will also testify about her work on recent legislation that passed the Oregon Legislature, HB 4086 (2019). HB 4086 directs ODHS to commission a study on the scope of child abuse investigations in Oregon. Ms. Bender will discuss how ODHS is different from other states for several reasons, including that the Oregon definition of child abuse is much broader than the federal Child Abuse Prevention Act ("CAPTA") definition's minimum requirements. Unlike the CAPTA definition, Oregon's definition applies to third parties who are not responsible for the care of the child. By contrast, other states limit the scope of their child abuse definition to parents, guardians, foster parents, or other caregivers responsible for the child's welfare. Ms. Bender will explain that investigating instances of third-party abuse is typically a task handled by law enforcement in other states, but in Oregon, CPS caseworkers must be involved in all criminal investigations involving a child or young adult victim because Oregon law requires a finding at the conclusion of a child abuse investigation, and law enforcement does not issue findings. The broad definition of child abuse adds to CPS caseworkers' workload and in some cases presents a barrier to timely completion of safety assessments because the District Attorney's office may ask Child Welfare to not finalize their report until the criminal investigation is complete. Ms. Bender will also testify that investigating all instances of third-party abuse increases state surveillance of the communities Child Welfare serves. Ms. Bender will testify that she is hopeful an impartial study of Oregon's law will

further improve the Child Welfare system in our state and support more equitable outcomes for children and families disproportionately represented in the Child Welfare system.

**F.        Agency culture around the use of data as a tool.**

Ms. Bender will also testify that Child Welfare has made improvements in the use of data to measure the efficacy of program implementation.  Ms. Bender will explain at trial that a court ordered monitor is not necessary for several reasons.  First, a monitor is not necessary because there are many different oversight structures that already exist in Child Welfare, such as the federal CFSR process and other federal reporting requirements, the Oregon Secretary of State's office, the SOCAC, Oregon juvenile courts and CRBs, and the Oregon Legislature.  Second, a monitor is not necessary because Child Welfare routinely works with outside experts in child welfare or human services, including Chapin Hall, Casey Family Programs, EveryChild, and others.  Ms. Bender will explain that Child Welfare has worked to develop a culture of enthusiasm and curiosity toward assessments and data.  The agency does not view data through a compliance lens, which is not helpful in bringing about positive change or improvements; the agency views data through a curiosity lens, as a tool for improvement and system analysis.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

IV.    **Dr. Marty Beyer (2 hours direct testimony).**

A.    **Background.**

Dr. Beyer will testify about the report she prepared while serving as Special Master in *CASA for Children Inc. v. Oregon*, Case No. 3:16-cv-01895. That report discusses the complex and difficult work of keeping children and young adults with high acuity needs out of temporary lodging. As a part of her work in *CASA*, Dr. Beyer became familiar with the challenges facing parts of Oregon's systems of care and developed recommendations for how to address those challenges.

1.    ***Casa for Children Inc. v. Oregon* procedural history.**

In 2016, the Oregon Law Center and Youth, Rights & Justice filed a class action complaint against ODHS over the use of hotels to house children and young adults in substitute care who could not access existing placements, referred to as temporary lodging. The plaintiffs filed the lawsuit in the Portland Division of the United States District Court for the District of Oregon and the case was assigned to Magistrate Judge Youlee You. That lawsuit was dismissed in 2018 after the parties entered into a settlement agreement. The settlement agreement limits the use of temporary lodging only when there are no other safe, appropriate alternatives and ODHS had exhausted all placement options, including available services and supports, for the child or young adult. The parties also agreed to a schedule for reducing the number of children and young adults experiencing temporary lodging over the course of several years.

Judge McShane presides over ODHS's compliance with the settlement agreement as an arbitrator. In January 2020, Judge McShane found that ODHS was in substantial noncompliance with the settlement agreement. Judge McShane ordered ODHS to hire a dedicated Resource Management Director to authorize each instance of temporary lodging and document the steps taken to avoid it to comply with the agreed-on reductions by September 2021.

### 2.    Appointment as Special Master.

In July 2023, Judge McShane found that ODHS was again in substantial noncompliance with the settlement agreement and that "additional steps" were required to assist ODHS in achieving substantial compliance.  Specifically, Judge McShane found that it did "not appear that ODHS kn[ew] how to wind down temporary lodging on its own" and that an "outside expert" needed to be appointed "as a special master to make specific recommendations" to Judge McShane.  Judge McShane appointed—at the plaintiffs' recommendation—Dr. Beyer as Special Master and ordered ODHS to enter into a one-year contract with Dr. Beyer.  Judge McShane further ordered Dr. Beyer to spend the first three months gathering information and formulating recommendations to Judge McShane that would become the basis of a court order to bring ODHS back into substantial compliance with the agreement.  The following nine months would be spent monitoring and reporting on progress in response to the order.  The parties agreed that Dr. Beyer would complete a report with recommendations by November 30, 2023.

Dr. Beyer was well qualified to serve as Special Master.  She is a clinical psychologist who has spent the majority of her career as an independent consultant in foster care and juvenile justice systems, with the goal of improving services, particularly mental health.  She has designed extensive, intensive home-based services for children in foster care with high mental health needs.

### B.    The Special Master's report.

### 1.    Investigation.

Dr. Beyer investigated Oregon's systems of care infrastructure to learn about Child Welfare's use of temporary lodging.  Dr. Beyer observed 28 children staffings, participated in two overnight observations in hotels in different cities with different children, and conducted 110

individual interviews.  Interviewees included individuals and groups from the following: ODHS Child Welfare, ODHS Developmental Disabilities, ODHS leadership, OHA, CCOs, the Department of Education, System of Care, providers, lawyers, Court Appointed Special Advocates, resource parents, parents, children and young adults, Ombuds, FACT, Disability Rights Oregon, Oregon Alliance, a county juvenile court judge, a juvenile law attorney, a CRB, a legislator, and the Governor's staff.  She also had direct access to Child Welfare's temporary lodging team to understand their efforts at preventing temporary lodging.

## 2.    Findings and recommendations of the report.

Dr. Beyer will testify about her 32-page report, which included 15 recommendations, that she submitted to Judge McShane on November 30, 2023, which was later finalized in late February 2024.  Dr. Beyer will testify that ODHS's "process of preventing children/youth from staying in hotels is carefully managed."  The department has made significant investments — approximately $8 million between 2021 and 2023—to prevent children and young adults from staying in hotels through "creative solutions."  Further, the solution to the issue of temporary lodging will require work from entities beyond Child Welfare.  As she noted in the report, the "majority of the recommendations in [her] report address interagency changes far upstream from TL."

Dr. Beyer will also testify that her report found that the metrics created by the settlement agreement were unhelpful to achieving ODHS's objective of winding down temporary lodging. Many ODHS employees across the state became metrics-focused, narrowly concentrating on keeping each child and young adult out of a hotel or protecting them when they were in a hotel. This approach proved extremely costly financially as well as exhausting for ODHS staff working overtime in hotels in addition to their regular jobs.  Child Welfare's preoccupation with the

settlement agreement metrics became an obstacle to finding effective solutions before children and young adults become difficult to place.

### 3. The Special Master's conclusion.

Dr. Beyer will testify as to the following conclusions she reached in her report to Judge McShane that the work to end temporary lodging use lies largely outside of Child Welfare:

"To end Temporary Lodging and ensure that every child and youth in foster care has a stable placement that meets their needs requires changes by other agencies in concert with ODHS. The lack of mental health services for thousands of traumatized children and youth is a much-publicized crisis in Oregon that must be alleviated by OHA and the CCOs expediting access to Medicaid. Whole child care requires dramatically different entry to services so local interagency child- and family-centered teams can ensure stability and school success for our most vulnerable children and youth."

"While OHA, the CCOs and DOE make changes to provide services to meet the needs of children and youth in foster care, this report is offered as a guide to prevention of placement instability by ODHS through arranging intensive support for resource families and kin caregivers, expanding therapeutic homes and contracting with trauma therapists and other professionals to address delayed development. Providers, OHA and BRS must collaborate to answer the question of whether meeting the needs of children and youth requires increasing or re-designing group care beds. It is also urgent to tailor supports to each child by providing small staffed homes, therapeutic independent living programs and short-term transition homes with staff skilled in coaching children and youth when they feel emotionally unsafe."

**C.       Responses to the Special Master's report.**

In March 2024, Judge McShane issued an order in response to the Special Master's report.  Judge McShane concluded that he did "not have the broad authority to enforce the implementation of many of the recommendations outlined in that comprehensive report, it is clear that fixing the problem will take the concerted effort of both the executive and legislative branches of state government."  He also lauded the "commendable strides [ODHS had made] in implementing oversight of temporary lodging" and ordered ODHS to "deliver copies of the Final Report of the Special Master to Governor Tina Kotek, all elected members of the Oregon legislature, and all Oregon department heads of the agencies referenced in the report."

Judge McShane ordered the department to "continue to supply statistical reports to [Judge McShane] and the Plaintiff until the termination date of the Agreement," which he had previously extended through December 31, 2026.  He further ordered Dr. Beyer to continue her work with ODHS, consulting on strategies to implement the goals outlined in her report. Although the plaintiffs did not lodge objections to Dr. Beyer's report, they have indicated that they do not anticipate further judicial involvement related to the settlement agreement.  Judge McShane maintains jurisdiction and supervision over Child Welfare as it relates to the department's use of temporary lodging for children and young adults.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

V.    **Heather Collee (1 hour direct testimony).**

A.    **Professional background.**

Ms. Collee will testify about her role as the ADA and Equity Coordinator within ODHS, Child Welfare.  Ms. Collee joined the ODHS in 2001.  She worked as a caseworker in Marion County for approximately five years before becoming a supervisor for six years.  She later transitioned to the Central Office as the Strengthening Preserving Reunifying Family Coordinator for In Home Safety Reunification and Support Services before starting her current position as the ADA Equity Coordinator in June 2020.

B.    **ADA and Equity Coordinator duties.**

Ms. Collee creates, assembles, and disseminates resources to ODHS staff to better serve clients with disabilities.  She creates and updates training materials related to disabilities as well as guides for staff that explain how to communicate effectively with individuals who are experiencing a disability.  For example, one such guide provides strategies for communicating effectively with people who experience an intellectual or developmental disability.  She also maintains a SharePoint site with videos, articles, and links to services, webinars, and programs that are available statewide to which all caseworkers have access.  Ms. Collee gives presentations upon request throughout the state to all ODHS staff on disability-related topics, including compliance with the ADA.  Ms. Collee tracks the number of staff who have completed the course "Applying the ADA to you work with children and families."

Ms. Collee also consults with individual caseworkers if they need help identifying resources or services for a child, young adult, or parent with a disability.  For example, a rural part of the state may not have a provider who specializes in a specific type of psychological or medical evaluation.  Child Welfare can pay for a provider to travel and conduct an evaluation. She has consulted with a caseworker regarding a deaf, nonverbal autistic child whose parents

needed additional support because the child was physically harming himself. She consulted with the caseworker and connected the family to the director of the Autism Society of Oregon. She also suggested the use of an ASL interpreter and provided a list of additional resources that her office maintains.

Ms. Collee will testify that the process for a child, family of origin, or resource parent to request an accommodation or modification begins with engaging the caseworker who assesses the needs, supports, and barriers the individual faces and what accommodation or modification may address those issues. For children, the request can come from the child, the family of origin, child's resource parent, the caseworker, or the child's attorney or CASA. If the caseworker, supervisor, and program manager conclude a request is unreasonable, they must staff the request with Ms. Collee, who ultimately approves or denies the request. In her time as ADA and Equity Coordinator, she has never denied a request for an accommodation or modification. She will testify that each local office has an administrative fund they can use to pay for accommodations.

### C.    ADA Steering Committee Lead.

In her position, she also serves as the Committee Lead for the ADA Steering Committee, coordinating meetings and adding relevant agenda topics, as well as recruiting diverse participation from partners and constituents. The Committee is charged with enhancing Child Welfare's engagement with internal and external community partners as it implements and sustains best practices.

The Committee's work focuses on three areas. First, the Committee works to ensure that safety decisions are made based on an assessment of a person's individual ability to safely parent or be in a caregiving role, regardless of any real or perceived disability. Second, the Committee strives to create a culture that ensures equitable access to services and that reasonable

modifications or accommodations are provided so that families with disabilities thrive.  Third, the Committee seeks to empower individuals to ask for reasonable accommodations and/or modifications in order to meaningfully participate in their involvement with Child Welfare including how to report if they feel their rights are not being met.

Ms. Collee will testify that, through her work on the Committee, she has helped review and update ODHS's rules, policies, and procedures to improve how the department communicates with parents, caregivers, family members, and children or young adults who experience a disability.  ODHS recently updated its Rules relating to ADA compliance, resulting in an update of the Child Welfare Procedure Manual, which Ms. Collee participated in.

The Manual requires ODHS to provide reasonable accommodations/modifications to afford a qualified individual with a disability an equal opportunity to participate in, and receive the benefits of available services, programs, or activities.  A qualified individual with a disability is any person who:

- Has a physical or mental impairment which substantially limits one or more of such person's major life activities;

- Has a record of such an impairment; or

- Is regarded as having such an impairment.

*ODHS Procedure Manual*, Chapter 1 § 7 Rights of Individuals with Disabilities.  Caseworkers may offer support or assistance to individuals with a disability in the form of reasonable modifications.  Reasonable modifications include but are not limited to:

- Modification of programs, deadlines, rules, policies, and practices;

- Removal of communication, or transportation barriers;

- Provision of auxiliary aids and services necessary for a person with a disability to obtain public services;

- Access to supports to allow meaningful participation in programs and services; and

- Consideration of supports the individual with a disability already utilizes.

*Id.*

Ms. Collee will also testify about her other work on the Committee.  ODHS recently built sensory rooms in offices that provide family connection time in each district.  These sensory rooms allow for parent/child time for children or young adutls who are either sensory seeking or sensory avoiding, which focuses on different sensory output types: sight, smell, hearing, taste, and touch.  Those rooms have specialized lighting, sounds, tactile objects, toys for fidgeting, and other things to help with different disabilities.  For example, an autistic nonverbal child may have an adverse reaction to a different or unfamiliar environment.  These sensory rooms contain certain objects—*e.g.*, special chairs, lighting, toys that are interactive—that can help a child or young adult process the new environment, resulting in more meaningful family connection time and interactions with caseworkers in the ODHS office.

The Committee also works with community partners, such as people with lived experience in disability-related communities, and other cross-ODHS agencies such as the ODDS, Aging and People with Disabilities, and Vocational Rehabilitation to create guides for improved practice.  Ms. Collee's Committee work also includes an ongoing review of rules, policies, and procedures.

Ms. Collee will also testify in response to any incorrect information presented by plaintiffs' experts and other witnesses relating to her work area.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the

right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other

evidence raise matters defendants did not reasonably anticipate.

**VI.**    **Rachel Currans-Henry (2 hours direct testimony).**

    **A.**    **Professional background.**

Ms. Currans-Henry will testify to her long career in public service and state government. She spent more than a decade working for the State of Wisconsin's Department of Health Services before coming to Oregon. Ms. Currans-Henry began working in Wisconsin's Medicaid program, disability and elderly services, and pharmacy services. She moved into legislative work and administration in 2009 and 2010, she became the Deputy Director, and later Director of the Bureau of Benefits Management. She held that position until December 2018, when she left Wisconsin for Oregon. As Director of the Bureau of Benefits Management, Ms. Currans-Henry oversaw teams administering coverage and delivery of services for 1.2 million Wisconsin residents, 45,000 health care providers, and 15 health plans with a 70% managed care delivery model with health homes. She led complex, multi-partner reforms, including the implementation of an expanded managed care system for adults and a foster care health home delivery model, with multiple executive agencies, counties, consumer advocates, and private health care partners.

Ms. Currans-Henry came to Oregon in January 2019 to become the Deputy Director for the Center for Evidence-Based Policy at Oregon Health & Science University. She held that position until June 2020, when she became the Director of the Health and Human Services Branch of the State of Oregon's COVID-19 Response and Recovery Unit. She worked under both the ODHS and the OHA. In that position, Ms. Currans-Henry built relationships with leaders of both agencies and learned how the OHA and ODHS collaborate and work together.

Ms. Currans-Henry became the Strategic Initiatives Administrator for ODHS's division for Aging and People with Disabilities in December 2021. In January 2023, she joined the Governor's Office as Governor Tina Kotek's Health and Human Services Advisor. Ms. Currans-Henry currently serves in that position.

**Page 58 –**    **DEFENDANTS' LAY WITNESS STATEMENTS – RACHEL CURRANS-HENRY**

**B.      Ms. Currans-Henry will testify that Governor Kotek continues to support and advocate for reforms to Child Welfare.**

Ms. Currans-Henry will testify that Governor Kotek and her administration are supportive of and familiar with the reforms and improvements that Child Welfare has made since 2018 and will support the agency's continued work toward further improvements.

**1.      Child Welfare's Vision for Transformation.**

Governor Kotek supports Child Welfare's Vision for Transformation.  The Vision for Transformation is a three-pronged strategic framework for reforming the foster care system adopted in 2021, and crafted by the Child Welfare leadership team, including former Child Welfare Director Rebecca Jones-Gaston and current Director Aprille Flint-Gerner, and informed by a series of conversations with partners and the community that Child Welfare serves.  It relies on three guiding principles, which are:

1.  Supporting families and promoting prevention of both child abuse and removal of children from their families;

2.  Enhancing staff and infrastructure; and

3.  Using data for continuous quality improvement.

The first principle—prevention—focuses on safely supporting families while children are still at home, recognizing that removal from one's family is not the only mechanism to keep a child safe.  It also seeks to reduce the risk of harm to children who do come into care by prioritizing reunification with their parents and creating permanency plans tailored to an individual child's needs.  The second principle, which focuses on staffing and infrastructure, seeks to maintain a skilled and competent Child Welfare workforce that reflects the communities it serves.  The third principle of the Vision for Transformation focuses on the use of data to support continuous quality improvement to inform the best decision making possible for Child Welfare.

**Page 59 –      DEFENDANTS' LAY WITNESS STATEMENTS – RACHEL CURRANS-HENRY**

Governor Kotek and Ms. Currans-Henry both fully support the Vision for Transformation and believe it provides the correct framework and flexibility for Child Welfare to continue to improve. Ms. Currans-Henry will testify that Governor Kotek particularly supports Child Welfare's efforts toward prevention. Ms. Currans-Henry meets at least once a month with Ms. Flint-Gerner to discuss the agency's activities and progress toward its goals, as well as the support Child Welfare needs from the Governor's Office. In addition to these monthly meetings, Child Welfare publishes monthly progress reports that began under Governor Brown in 2018.

### 2.    The SOCAC.

Ms. Currans-Henry relies on the SOCAC to help manage future improvements to Oregon's child-and-family-serving system, which includes other state agencies in addition to Child Welfare. She is not a member of SOCAC, but she meets weekly with SOCAC Executive Director Anna Williams, who updates Ms. Currans-Henry on SOCAC's work. Ms. Currans-Henry and Ms. Williams coordinate and plan regarding how to best collaborate in order to implement Governor Kotek's vision for serving Oregon's most vulnerable children and families through the work of SOCAC. They discuss what systemic changes are needed and how and when to best address them. Ms. Currans-Henry knows the SOCAC team well and plays an oversight role to the council, on behalf of the Governor.

SOCAC's purpose is to help identify improvements for the child-and-family-serving system. It works to bring system partners together to discuss policy strengths and weaknesses, strategy, and plans for future improvements and reforms. SOCAC uses workgroups and subcommittees to research policies and strategic plans for specific policies the council is working on. The council has 25 members—all but one appointed by the Governor—who then coordinate with agency leaders who work with SOCAC to advance these plans through legislation or agency

budgets.  Ms. Williams works with Ms. Currans-Henry on these agency proposals, which Ms. Currans-Henry and Governor Kotek ultimately approve.

Governor Kotek's administration has encouraged SOCAC to collaborate as much as possible with the OHA and ODHS, which provide the majority of services to children in the foster care system, and Governor Kotek's administration is highly supportive of SOCAC's leadership and recommendations.

> **3.    Governor Kotek's administration has embraced an agency-led approach to improving Child Welfare.**

Ms. Currans-Henry will testify that Governor Kotek's administration has embraced an agency-led approach to continuing reform of Child Welfare.  Rather than issuing executive orders or sponsoring legislation, Governor Kotek and Ms. Currans-Henry have encouraged OHA, ODHS, the OYA, and other agencies to work together on proposing budget allocations or legislation.

Ms. Currans-Henry also worked with SOCAC and ODHS to support legislation that they proposed during the 2024 legislative session.  ODHS and SOCAC proposed and advocated for House Bill 4086.  House Bill 4086, which passed, directed ODHS to commission a study, in coordination with SOCAC, to examine the scope of child abuse investigations.  The study must identify the scope of investigations in Oregon currently, identify gaps or duplication in the work, and identify best practices for trauma-informed investigations, including definitions of child abuse, due process, investigations, and the use of multidisciplinary teams.  The purpose of this study is to "narrow the door" to CPS investigations by identifying allegations that are best investigated through other processes or entities and identifying means to make the CPS investigation process more efficient and family-focused.

The Governor's Office facilitates cross-agency collaboration. Multiple agencies often play a role in how the State serves children in foster care and whether a child needs to enter foster care. No one agency can solve the problems the child-and-family-serving system faces, nor can agencies solve them by working in silos.

### C.    Ms. Currans-Henry will testify that Governor Kotek supported major investments in Child Welfare for the 2023-25 biennium.

Agencies submit their requested budgets to the Governor's Office in advance of every long session of the Oregon Legislature, which take place in odd-numbered years. The Governor considers agencies' recommended budgets and makes a recommendation to the Legislature. The Legislature is responsible for adopting a biennial budget, and it may or may not adopt the Governor's recommendations. The budget process begins well in advance of the legislative session, which begins in January of every odd-numbered year. When putting together a recommended budget, the Governor must consider competing interests and a finite pool of money across dozens of state agencies and three branches of government. No agency— including Child Welfare—receives all of the funding it requests, but even where Child Welfare does not receive all of its requested funding, budget allocations to other agencies still have a positive impact on Child Welfare and the families it serves.

Governor Kotek took office in January 2023, the same month that the 2023 legislative session began. However, the Governor had in place a transition team to work with agencies for at least two months before she took office. She was therefore familiar with the agencies' budget requests before she submitted her recommended budget to the Legislature.

In 2023, Governor Kotek recommended, and the Legislature approved, $9.2 million to hire 200 additional Child Welfare CPS caseworker positions. Governor Kotek also

recommended, and the Legislature approved, $27 million to fund an increase in the reimbursement rate for resource families.

The Legislature also approved $10.2 million to increase the reimbursement rate for Behavioral Rehabilitation Services, which provide specialized treatment programs for children and young adults.  That allocation was made through a legislatively-mandated process rather than the typical Governor-approved budget process.

Ms. Currans-Henry will testify that in January 2024, Governor Kotek announced a partnership with CCOs to help fund behavioral health projects focused on children and young adults.  The Governor had asked Oregon's 16 CCOs, which are regionally based Medicaid insurers, to reinvest $25 million of their profits into community projects.  Medicaid insurers are paid taxpayer dollars from the state and federal government to pay for health and dental care for nearly 1.5 million people on the Oregon Health Plan, which serves low-income Oregonians.  The insurers are allowed to pocket any surplus money after they have met their obligations. Following Governor Kotek's request, the CCOs agreed to put a one-time allotment toward four projects across the state to help address the gaps in behavioral health care coverage for young people, including Oregon's foster children.  The CCOs, their providers, and OHA all signed an agreement to that effect.

Ms. Currans-Henry will testify that Governor Kotek will continue to support investments in Oregon's child-and-family-serving system, with the goal of improving outcomes for children and families across Oregon.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the

right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other

evidence raise matters defendants did not reasonably anticipate.

**VII.    Aprille Flint-Gerner (6 hours direct testimony).**

**A.    Ms. Flint-Gerner's background.**

Ms. Flint-Gerner will testify to her long career in human services and child welfare in particular.  She began her career in child welfare in 1998 in Contra Costa County, California, as one of the first aftercare education specialists in the country serving transition-aged young adults.  Between 2000 and 2007, Ms. Flint-Gerner was serving children with severe behavioral health needs within the children's system of care in San Francisco.  In 2007, Ms. Flint-Gerner started as a permanency caseworker in San Mateo County, California, after she completed her Master's Degree in Social Work at San Jose State University.  She did that work for four years.  As a caseworker, she investigated allegations of child abuse, worked to help families achieve permanency, attended court hearings, wrote court reports, provided services to families, facilitated family meetings, made referrals to community resources for families, taught parenting classes, and spent a lot of time with foster children.  Her experience as a child welfare caseworker provided her first-hand knowledge of the child welfare system and the children, young adults, and families she serves—experience she draws upon today as the Director of Child Welfare for the State of Oregon.

Ms. Flint-Gerner began working as a consultant for the Child and Family Policy Institute of California ("the Institute") in 2011, and continued doing that work (in concert with other work) until moving to Oregon in March 2020.  She continued as a consultant for the Institute even while she held other full-time positions.  The Institute is a public policy non-profit focused on improving child-serving systems.  It works with human services agencies to support their services to children, families, and adults, with a focus on correcting systemic inequities that have historically plagued those systems.

Ms. Flint-Gerner worked for the Institute as a community engagement liaison. Her role required her to bring community members to the table in order to create a practice model for child welfare in the State of California. She worked with community and system partners to identify barriers to implementation of that practice model, called the Child Welfare Child and Family Practice Model. The Child Welfare Child and Family Practice Model comprised 23 specific practice behaviors. It articulated how caseworkers, supervisors, and leaders should be orienting themselves to serve the community the way the community wishes to be served.

Ms. Flint-Gerner later began working for the California State at Fresno State University through the Bay Area Academy. The Bay Area Academy is a workforce development organization created to support the learning and organizational improvement needs of public child welfare service agencies. Ms. Flint-Gerner first consulted for the California State Foundation and was then hired as a full-time employee in mid-2016. She oversaw large scale training projects in child welfare, and managed a team that was responsible for the development and delivery of training to child welfare agencies. She was responsible for the recruitment, development, and contract management of approximately 250 contract trainers who provided training for the Bay Area counties (Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, Santa Clara, Solano, and Sonoma), which represent some of the largest child welfare jurisdictions in California, with a combined population of more than twice the population of Oregon.

Between Fall of 2018 and March 2020, Ms. Flint-Gerner worked for the University of Nevada in Las Vegas as its training and workforce development manager. She managed the workforce development team and led the statewide development and implementation of Nevada's coaching model for child welfare caseworkers. She also trained recruits and new hires

into the child welfare workforce and participated in evaluation activities related to their development.

Ms. Flint-Gerner joined ODHS on March 16, 2020, as the Deputy Director for Equity Training and Workforce Development for Child Welfare. She had already planned to move to Oregon with her family, and she knew then Child Welfare Director Rebecca Jones Gaston, whom she had previously worked with. In January 2023, following President Biden appointing Ms. Jones Gaston as head of the federal Administration for Children and Families, Ms. Flint-Gerner became the Interim Child Welfare Director. She was appointed as the permanent Child Welfare Director in July 2023. Molly Miller replaced Ms. Flint-Gerner as Deputy Director for Equity Training and Workforce Development in March 2024.

She will testify about her leadership style, including her efforts to model teaming and adaptive leadership, sharing power, partnering with communities, yielding power to those with lived experience, being accountable, and practicing transparency.

> **B.      Ms. Flint-Gerner will testify that the Vision for Transformation provides a durable and flexible framework for improvements to Child Welfare.**

Ms. Flint-Gerner will testify that, in her role as Deputy Director, she reported directly to Ms. Jones Gaston during the latter's tenure as Director of Child Welfare. She worked closely with Ms. Jones Gaston and was intimately involved in the creation of the Vision for Transformation. The Vision for Transformation is a framework for improving Oregon's child welfare program and producing better outcomes for children, young adults, and families by focusing on safely keeping children with their families and shrinking the size of the foster care system. The ultimate goal of the Vision of Transformation is to create a system where foster care is not necessary because children and families receive enough support early on so that

children do not need to experience the traumas of family separation in order to live safely in their communities.

The Vision for Transformation relies on three guiding principles, which are:

      4.      Supporting families and promoting prevention;

      5.      Enhancing staff and infrastructure; and

      6.      Using data for continuous quality improvement.

      **1.      Prevention prioritizes families and communities.**

The first principle—prevention—focuses on safely supporting families while children are still in the home because removal is not always the only mechanism to keep a child safe. This principle looks to provide support, such as housing stabilization, economic supports, and substance abuse disorder treatment, to allow children and young adults to safely remain with their families and communities whenever possible, rather than entering foster care in the first place, and it aims to do so in a way that focuses on culturally appropriate services for the family. Prevention also includes community education and resources outside of the nuclear family unit.

One reason the Vision for Transformation focuses on family preservation and bringing in community resources outside of the nuclear family unit is to respond to centuries of racist practices embedded in Oregon's child welfare system. Oregon—like all child welfare systems— historically engaged in practices that resulted in disproportionately high numbers of Black, Native American, and Latino children entering foster care and then being provided inequitable or culturally inappropriate services. The Vision for Transformation seeks to remedy inequitable treatment of children in the foster care system, largely by reducing the number of children who need to enter care in the first place (*i.e.*, keeping children with their families and providing wrap-around services to serve children at home) and creating safer and more individually and culturally responsive system for the children who do enter care.

**Page 68 –    DEFENDANTS' LAY WITNESS STATEMENTS – APRILLE FLINT-GERNER**

When primary prevention is not possible, the first principle focuses on serving that child safely at home.  When in-home safety is not possible, the principle focuses on keeping children with their Tribe, family, and known community, and keeping them safe in resource homes.  It prioritizes thorough and complete certification of resource families and close relationships between children, their caseworkers, and their family network.  When any concerns arise in a resource home, this principle prioritizes swift CPS intervention and responsive action, if necessary.

The prevention and preservation principle also focuses on achieving permanency for the child—whether reunification or otherwise—in a timely manner that minimizes trauma to the child and the family.  The prevention and preservation principle requires ODHS to involve the family, including the child or young adult when age appropriate, in assessing and managing safety in the most trauma-responsive ways that result in better outcomes for the children in care.

The prevention and preservation principle is crucial to addressing the historic inequities in the child welfare system.  Although resource and foster family care are a valued part of child serving systems when children cannot remain with their families of origin, separation happens as a last resort and it has contributed to systematic oppression of communities of color and other traditionally marginalized communities.  A prevention system really focuses on getting families timely access to critical supports that can help them build safety around their children before abuse or neglect can occur.  Focusing on culturally appropriate supports to families allows the entire family system to thrive on its own terms, rather than simply taking children and placing them into a system that may not serve them well.

### 2.    Developing the Child Welfare workforce.

The second principle, which focuses on equity, staffing, workforce development, and infrastructure, seeks to maintain a confident and competent Child Welfare workforce that is

highly skilled and qualified while at the same time reflecting the communities it serves.  The equity and workforce development principle focuses on reforming training, recruitment, hiring, and onboarding staff and improving the culture within Child Welfare to, in turn, boost staff morale and retention.  The equity and workforce development principle reinforces the prevention and preservation principle by improving training for caseworkers to effectively support families and to provide culturally responsive services.  This principle also focuses on implementation of an equity framework for Child Welfare to address the racist and oppressive practices that have led to disparate outcomes for children in many groups, including children of color, children with disabilities, and children whose sexual and gender/identity expressions are in the minority.

### 3.    Use of data to drive improvement.

The third principle of the Vision for Transformation focuses on the use of data to support CQI in order to inform the best decision making possible for Child Welfare.  This principle seeks to gather data to inform Child Welfare's areas of focus and to guide its goals and outcomes, and to measure progress toward those goals.  This principle also seeks to collect data that shows, for example, how the foster care system is operating, which children and families are most heavily represented, which demographics are seeing the most or least success, and where gaps in services are.

As part of this effort, Child Welfare has created a CQI program and team to create data models and to interpret the data they collect.  Oregon has improved significantly in its ability to collect and monitor data that show how children and young adults in substitute care and in Child Welfare's custody are faring.  The CQI program extracts, aggregates, and anonymizes real time case data from OR-Kids which it then pushes out to community partners, resource parents, and Tribes, who analyze each district's data on a rolling basis during debrief meetings.  Child Welfare uses this data to analyze its performance in real time and to inform decisions as part of

the CQI program, particularly with respect to maltreatment in care and timely case planning activities.  During the 2021 legislative session, the Oregon Legislature invested in infrastructure to create Child Welfare's CQI program.  The program was fully staffed by the end of 2022 and began its CQI work in 2023 in pilot sites throughout the state.

For Child Welfare, data is not the final answer, but it can be an indicator that there is something to pay more attention to or ask more questions about.  There is always context to data that is important to understand, and it is not the final arbiter of whether Child Welfare is achieving its goals and good outcomes for children, young adults, and families.  It also helps the system to identify signs of success, areas of strength, and progress.

Over the last few years, Child Welfare has developed several internal dashboards that contain data such as caseload ratios and treatment services bed capacities.  Ms. Flint-Gerner and her Deputy Director, Lacey Andresen, review these dashboards at least monthly.  This real-time data allows Child Welfare to adjust its goals and areas of focus, maintaining flexibility and responsiveness that responds to the reality of the foster care system and dynamic factors within it.

4.    **The Vision for Transformation's integration of prevention, investment, and improvement.**

The Vision for Transformation's principles tie together and support each other, creating an interconnected, self-reinforcing framework.  For example, data collection helps inform what in-home, prevention-focused services are needed in specific communities, and which of Oregon's 16 Child Welfare districts have particular hiring needs.

The Vision for Transformation's principles are broad enough to encompass many challenges Child Welfare will continue to face.  It is not a rigid set of goals or metrics but instead a three-pronged approach that allows for flexibility.  This flexibility allows Child Welfare to

adapt to changing or unforeseen circumstances, such as the 2009 recession, the COVID-19 pandemic, or the current fentanyl crisis.  Children's and families' needs do not remain static, and while principles like prevention and the need for high quality staff remain the same, the circumstances of adhering to those principles will and should evolve.  As Director of Child Welfare, Ms. Flint-Gerner will continue working within the principles of the Vision for Transformation, even as Child Welfare evolves.  Because the Vision for Transformation is a framework that informs Child Welfare's strategic planning, it will continue to guide the Child Welfare Division without binding it to specific problems that existed at a static point in time.

When Ms. Flint-Gerner started at ODHS, she observed Child Welfare's strong motivation to improve, which was driven in part by the 2016 PK Report and the 2018 Secretary of State audit.  The Vision for Transformation grew out of that desire to transform the system.  The Vision for Transformation is the result of conversations with Child Welfare employees and the community that Child Welfare serves.  ODHS met with Oregon Tribes and community members with lived experience in order to draft the Vision for Transformation.  The Vision for Transformation also reflects national child welfare best practices that have been shown to produce long-term improvements in child welfare systems.

Ms. Flint-Gerner and Ms. Jones Gaston had done similar work in other places, and these were not new concepts to them and were not new from a national perspective, although they were new to Oregon's child welfare system.  The Vision for Transformation was a product of the community and the child-serving system working together in order to allow Oregon to be able to focus on implementing lasting change.  The Vision for Transformation will need to evolve as data continues to inform the next set of priorities for Child Welfare.  The Vision for Transformation's principles are broad enough that how they work now may be different than

how they are used in the future—it is nimble enough to drill down and define what needs to be done next to be in alignment with the principles, even if the needs of Child Welfare change over time.

**C.    Child Welfare has the largest staff of any division in ODHS.**

Ms. Flint-Gerner will testify that Child Welfare currently has approximately 3,900 filled positions, of nearly 10,000 individuals employed by ODHS.  In addition to the caseworkers and support staff who work most closely with children and families, the Child Welfare leadership team plays an essential role in moving the Vision for Transformation forward.  For example, Deputy Director Lacey Andresen, Treatment Services Program Manager Sara Fox, Training Program Manager Kim Lorz, CQI Manager Jennifer Ricks, Safety Program Manager Deena Loughary, and Family Preservation Program Manager Jennifer Holman all play particularly integral roles.  And Child Welfare works closely with other partners, including the ODDS within ODHS, the Governor's Office, the Oregon Legislature, the OHA, the OYA, CCOs, school districts, juvenile court systems, non-profit consultants, federal regulators, and others.

Ms. Flint-Gerner will discuss the details of some of those partnerships throughout her testimony.

**D.    Child Welfare has made improvements since her arrival in Oregon.**

Ms. Flint-Gerner will testify that implementation science—the study of how systems respond to evidence-based practices and policies in real-world situations—holds that implementation efforts, like those of the Vision for Transformation, typically take years to produce long-term outcomes.  Although this is true, the agency has already made—and Ms. Flint-Gerner has observed—significant improvements in Oregon's child welfare system during her four years working with ODHS, including many that were the result of her work as Deputy

Director for Equity, Training, and Workforce Development. Those improvements and successes include the following areas of growth.

### 1.    The safety of foster children in Oregon has improved significantly.

Ms. Flint-Gerner will testify that Child Welfare's improvements have made children safer. Since she joined Child Welfare in 2020, it has hired hundreds of additional caseworkers and adopted caseload ratios of 1:7 for "CPS caseworkers, 1:12 for permanency caseworkers, and 1:21 for certification caseworkers. Lower caseloads allow each worker to spend more time on their work—more time thoroughly investigating abuse allegations, more time interviewing potential resource families, and more time knowing the details of a foster child's experience with a resource family. More attention and more thorough work leads to better, safer outcomes for children.

Child Welfare has implemented a workforce development program for Child Welfare staff that focuses on keeping children and young adults safe, and it has implemented new training and recruitment efforts for resource parents. (Resource parent training is discussed further below.)

Child Welfare no longer places children in out-of-state residential facilities. It has prioritized placing children of color, children with disabilities, and LGBTQIA2S+ children with culturally appropriate resource families who are more able to care for those children's physical, mental, emotional health, and safety. For example, Child Welfare has adopted a policy that all foster children who are members of Oregon Tribes are now placed in Tribally approved resource homes. With OHA, Child Welfare is also implementing a Tribal Consultation Policy to ensure the inclusion of the Tribes in the development of ODHS policies and programs that impact Tribes, establish communication pathways, and build trust, respect, and shared responsibility.

Oregon also requires that all resource parents commit to affirming a child's SOGIE as a

prerequisite to becoming a resource parent, a position ODHS is currently defending in litigation.[3]

a)      CPS processes and resources are improving.

Child Welfare has made many improvements to its CPS investigation process and is in

the process of making more.  It has created a mobile CPS unit, which provides flexibility and

improves responsiveness because the mobile unit is deployed or can provide extra support in

districts where help is needed.  In addition, in the 2023 legislative session, the Legislature

authorized approximately 200 additional CPS positions, funded for the latter half of the 2023-

2025 biennium.  Child Welfare will be hiring the positions in late 2024 through 2025.  As more

people are hired into those new positions, Child Welfare anticipates the time for completing CPS

assessments will continue to decrease.

The ORCAH has implemented new tools and processes informed by national experts and

is collaborating with partners statewide to evaluate the effectiveness of the tool.  The

consolidation and process improvements by ORCAH since 2019 lead to higher quality, more

timely, and more consistent screening.  As a result, children throughout the state are safer.

Child Welfare is also working to "narrow the door" into CPS investigations.  Currently,

too many actions give rise to unfounded child abuse investigations that more appropriately

belong in the criminal justice system or other child well-being systems.  To that end, ODHS and

SOCAC proposed and advocated for House Bill 4086 in the 2024 legislative session.  House Bill

4086, which passed, allows ODHS to commission a study, in coordination with SOCAC, to

examine the scope of child abuse investigations.  The study must identify the scope of

---

[3] *Jessica Bates v. Fariborz Pakseresht, et al.*, U.S. District Court for Oregon (Pendleton) Case No. 2:23-cv-00474-AN.

investigations in Oregon currently, identify gaps or duplication in the work, and identify best practices for trauma-informed investigations, including definitions of child abuse, due process, investigations, and the use of multidisciplinary teams.

      **b)**     **Oregon specific factors affecting maltreatment in care statistics**

Statistics without context can be misleading. Oregon's statistics are impacted by its unusually protective child-serving system, in several ways.

Oregon has greatly reduced the number of children in substitute care. In 2018, 7,691 children were in care, and in February 2024, 4,615 were. But this means that the children who do come into care are often the children who experience the most complex family and community dynamics before entering care. Oregon reports as "maltreatment in care" any report of abuse received while a child is in care, regardless of who allegedly committed the abuse and when it allegedly occurred. As a practical matter, this means that "maltreatment in care" statistics include many allegations of abuse that occurred while the child was still in their home of origin. This statistic is inflated if it is misunderstood to reflect only maltreatment the child experiences while in foster care, as opposed to abuse the child *reports* while in foster care, which may be historical.

Likewise, Oregon's definitions of child abuse inflate the numbers of abuse investigations above where they would be if reported in other states. Oregon's definitions, which are one of the most expansive in the United States, includes physical punishments that cause pain, even if they do not result in an injury to the child, threats of harm, and apply to third-party perpetrators of abuse. This definition is considerably more expansive than definitions used in other states and leads to more incidents of founded and unfounded abuse.

Children are rarely abused in foster care and far more often by their own parents and third parties. However, in rare cases where children experience abuse in resource homes, Child

Welfare takes swift and appropriate action to remove the child to a safe environment and ensure resource families face appropriate consequences.

Similarly, the number of "overdue" CPS assessments do not necessarily reflect the work being done. The date that an assessment is "completed" is often the date that the assessment is entered into OR-Kids, and CPS caseworkers sometimes finish documenting their assessment after it is actually complete and the work to implement any action items has already begun. The clerical act of entering or updating information in OR-Kids does not necessarily reflect the timeline on which the work is being done.

Often, the official form is the final portion of the assessment, and key portions such as service matching and safety checks are completed well in advance of when the final assessment paperwork is finalized. The casework of keeping children safe is happening, even when a form has not been completely filled out in OR-Kids. In other words, the safety assessment reflects both a process and a document.

### 2. Oregon was one of the first states in the country to qualify for the Federal Family First program.

Ms. Flint-Gerner will testify that Oregon was one of the first states in the nation (and the fastest) to have its FFPSA plan approved by the U.S. Department of Health and Human Services, Administration for Children and Families in 2021. Under this new federal legislation led by Oregon's Senator Ron Wyden, state systems with approved plans and sufficiently built-out infrastructure for service delivery can draw down Title IV-E funds for certain evidence-based prevention services to serve children in their homes, to manage their safety while remaining in their parent or caregiver's home. Children and young adults will be eligible to receive these services either (1) without juvenile dependency court involvement or (2) when the court is involved and Child Welfare has temporary custody or jurisdiction of the child or young adult.

This new funding stream expands the state systems' ability to fund and provide prevention-focused services, rather than only serving children and their families after separation and foster care entry.

One of Ms. Flint-Gerner's primary goals for 2025 is to maximize access to Title IV-E funding for prevention programs. Access to the Family First program has provided Child Welfare additional funding that is crucial for the implementation of the Vision for Transformation's principles.

### 3. Ms. Flint-Gerner will testify that, as Deputy Director of Child Welfare, she made significant improvements to training and hiring for caseworkers.

Ms. Flint-Gerner will testify that Child Welfare has implemented a number of key steps to build and develop its workforce. Soon after issuing the EO regarding Child Welfare, Governor Brown hired A&M, a consulting firm, to evaluate Child Welfare and provide recommendations for improvement. One of A&M's recommendation was for Child Welfare to hire a Deputy Director for Equity, Training, and Workforce Development—the position Ms. Flint-Gerner was hired to fill. Child Welfare is also working with national organizations to build expertise in workforce development and training. For example, Child Welfare collaborated with Capacity Building Center for States to create infrastructure and a coaching model for staff.

As a Deputy Director of Child Welfare, Ms. Flint-Gerner was responsible for overseeing training for the Child Welfare Division's employees. She implemented improved training and hiring policies for Child Welfare staff, including improving recruitment efforts and focusing hiring on highly qualified and skilled caseworkers. Child Welfare staff began receiving specialized training that focused on specific populations of foster children. As one example, Child Welfare staff began receiving training focused on working with children who have

disabilities that qualify under the Americans with Disabilities Act. She will testify that this training continues to be mandatory for all Child Welfare staff.

Child Welfare has about 35 newly funded positions to build out its workforce development program. As Deputy Director, she created approximately four new teams: (1) a resource parent and family training team; (2) a workforce development specialist team who creates training plans and curriculum for districts; (3) a training operations team; and (4) an equity team. Ms. Flint-Gerner also engaged the Butler Institute for Families from the University of Denver to conduct an assessment of caseworker training. She subsequently created a position to focus on supervisors and leadership development. Child Welfare now tracks staff's completed training through the Workday Learning Management System.

Child Welfare has hired a significant number of staff during Ms. Flint-Gerner's tenure with ODHS. The Oregon Legislature funded an additional 202 positions for Child Welfare, through July 1, 2025, which is covered in greater detail below.

The leadership of Child Welfare and the morale of its staff have also improved. Ms. Flint-Gerner and Ms. Jones Gaston have built practice models that clearly articulate the roles, expectations, and behaviors of everyone working in the Child Welfare system in previous jurisdictions. Staff are hopeful about the progress made by the Vision for Transformation and are being included in the initial stages of development of Oregon's new practice model. The culture of Child Welfare previously, as noted in the 2018 Secretary of State audit, was one of fear and blame. Ms. Flint-Gerner is working to change that culture to one of adaptive leadership that prioritizes communication with staff and the community and that allows for both accountability and support. Her leadership has emphasized transparency, two-way

communication with staff, equity, and the culture of Child Welfare and the morale of its workforce has improved accordingly.

**4.    The CQI program will significantly improve Child Welfare over the course of the next several years.**

The statewide CQI program is inspired by the federal CFSR process.  Through the statewide CQI program, each Child Welfare district cycles through the CQI program once per year, and each month a different district or districts will begin their CQI cycle on a rotating basis, and some larger districts may be split into branches.  The first step in the CQI process is selection of random case files.  CQI consultants create a list of random case numbers to ensure that cases represent work under a variety of supervisors.  After cases are randomly identified, CQI consultants review cases for eligibility—active and current cases that have been open for approximately six months are eligible, including ICWA cases.  The sample size for the number of cases pulled depends on the size of each district, approximately eight to 15 cases are pulled for each district.  After cases are identified, the CQI program notifies the branch offices which cases were pulled.

The next step of the CQI process involves case file reviews.  Child Welfare recruits partner reviewers from local district staff.  There is a process to ensure that reviewers never review their own casework.  The reviewers assess cases for fidelity to the Child Welfare practice model and determine whether information is documented correctly in the proper places.  The review findings are then sent to CQI consultants, who review and analyze the results.  CQI consultants also summarize the reviewers' findings and compare the results with the rest of the state.

Next, the CQI program holds debrief sessions with the district or branch undergoing the review.  The debrief sessions include CQI consultants, program managers, and supervisors at the

program managers' discretion.  The debrief sessions also include community partners, such as

individuals with lived experience, providers within the community, Tribal representatives, and

resource parents.  Together, the groups discuss the results of the case file review and analyze

areas where improvements are needed.  After reviewing the results in the debrief sessions, the

groups select a lead measure and a lag measure to focus on for six months and develop an action

plan for improving in that area.  After six months, the action plans are reviewed again and

adjusted as needed.

This process, which began only in the past two years and includes both data collection

and collaboration with communities, will greatly improve Child Welfare.  Like the Vision for

Transformation, the CQI program is flexible and allows for evolution of an ever-improving Child

Welfare system.

> **5.  Child Welfare has reduced the number of children in temporary
> lodging.**

Ms. Flint-Gerner will testify that Child Welfare has reduced the number of children in

temporary lodging since she began at Child Welfare in 2020.  Temporary lodging is a complex

issue that requires the involvement of additional state divisions, agencies, courts, and the Oregon

Legislature.  OHA, the Office of Developmental Disability Services, juvenile dependency courts,

juvenile justice courts, and attorneys representing children and their parents all play a role in a

child or young adult's entry into temporary lodging, and the number of children experiencing it

is not solely within the purview of Child Welfare alone.

Ms. Flint-Gerner will also be prepared to testify regarding entities that contract with

Child Welfare, and Child Welfare's actions taken in response to concerns about those

contractors.

6.    **Child Welfare has improved its efforts to provide equitable services to foster young adults.**

Ms. Flint-Gerner will testify that Child Welfare has placed a consistent emphasis on improving equity for the children, young adults, and families served by the system.  She was hired for her national-level equity work and creation of equity frameworks.  Part of her role as Deputy Director was to create and lead an equity team, which was the only of its kind within ODHS.

Equity principles inform the majority of the changes Child Welfare has made since 2020 and all three guiding principles of the Vision for Transformation are informed by principles of equity.  Child Welfare has worked to provide equitable services to children, young adults and families, has increased its hiring of racially diverse staff who are more representative of the children in the foster system, one-third of whom belong to a racial minority, and Child Welfare has used data collection to track outcomes among racially diverse children and families.

Child Welfare workers are trained to consider a child or young adult's SOGIE as a part of case planning.  Although Child Welfare has been talking to children about their SOGIE since before 2020, it sponsored Senate Bill 209 that passed during the 2023 legislative session to provide confidentiality for SOGIE information of children in care.  This change will allow the agency to collect better data on this population to improve service provisions, without the risk that the information is inadvertently discoverable by others.  Because the safety of an individual child is always paramount, Child Welfare has been careful about how it asks for this information, but it does so and has done for several years.  Just as a child's race informs their placement, so does their SOGIE, and Child Welfare prioritizes providing children with services that are appropriate to their SOGIE, their race, as well as other personal or cultural traits of the child.

Child Welfare will continue to tailor placements to children's individual characteristics and to prioritize equitable services and placements.  Child Welfare has worked with Oregon's Tribes to improve rates of children who come into care by focusing on prevention.  When they do come into care, in most instances they are placed in Tribally approved, culturally affirming resource homes and offered culturally appropriate services.

> **7.    Child Welfare has improved its internal policies and practices in multiple ways.**

Ms. Flint-Gerner will testify that Child Welfare has improved many of its policies and practices during her tenure with the agency.  Individuals who provide substitute care are now referred to as "resource parents" rather than "foster parents" to emphasize that they are providing a resource to the child's family of origin, rather than functioning as a replacement for them.  Child Welfare has brought the training of resource parents in-house, rather than using Portland State University as a vendor, as it previously did.  This model provides Child Welfare better control over whether resource parents are provided a curriculum that is consistent with the Vision for Transformation.  Child Welfare has implemented a new training called RAFT, which is a 27-hour curriculum that educates resource families on how to provide trauma-informed, culturally appropriate care to the children they foster.  This curriculum is research- and community-informed and reflects national-level standards of care for resource families.

RAFT was built off the federal pilot program, the NTDC, which piloted new curricula for resource parents in seven states.  The NTDC was the model for RAFT, and it was created in partnership with experts, resource families, Tribes, and people with lived experience.  Child Welfare took what was standardized and created supplemental training specific to Oregon and worked to create robust content around disproportionality and equity.  Ms. Flint-Gerner led pilot testing throughout the state to get feedback and to adapt the NTDC curriculum to Oregon, which

required laying Oregon's priorities, language, and the Vision for Transformation on top of the existing curriculum. RAFT is delivered in person and through online courses.

The decline in the number of children in foster care and the improved caseload ratios for caseworkers, as well as increased recruitment of resource families and better training, means that Child Welfare's ability to place children in safe, appropriate resource families has improved significantly since 2019. Initial placements with a child's relatives also increased significantly between 2016 and 2023. Child Welfare has improved or resolved nearly all issues raised in the 2016 PK Report, the 2018 Secretary of State audit, and the 2019 audit update.

**E.    Ms. Flint-Gerner will testify that she sought and received major funding investments from the Oregon Legislature in 2023 for Child Welfare.**

Ms. Flint-Gerner will testify that the 2023 budget cycle was the first one she participated in as Director of Child Welfare. In 2023, the Governor recommended and the Legislature approved, $9.2 million to hire 202 new Child Welfare positions. The Governor also recommended and the Legislature approved, $27 million to fund the increase in the reimbursement rate for resource families. The Legislature also approved $10.2 million to increase the reimbursement rate for BRS.

The Governor has also recommended funding for programs through agencies other than Child Welfare, which also benefit Child Welfare and children in foster care. The child-serving system is interconnected, and it includes services such as housing and mental health treatment, which may not be specifically earmarked for Child Welfare but do serve children in foster care.

**F.    Ms. Flint-Gerner will testify that Child Welfare has worked collaboratively with the Governor's Office and will continue to do so.**

Ms. Flint-Gerner will testify that, in addition to working closely with the Governor's Office on budget proposals, she has collaborated consistently with the Governor's Office on improving Child Welfare. She served in Governor Brown's Children's Cabinet, which was a

collection of partners, advocates, and statewide leaders who advised the Governor on improvements to child-serving systems.  Ms. Flint-Gerner will testify to the presentations she made to the Cabinet.  The Cabinet remained in place until the end of 2022 when Governor Brown left office in January 2023.

Ms. Flint-Gerner also participates in the SOCAC, which advises the child-serving system and the Governor on supporting the entire child-serving system within multiple state agencies. She is also responsible for the monthly child welfare progress reports, which are published on ODHS's website.

Ms. Flint-Gerner has built a collaborative working relationship with Governor Kotek's office, and she feels that Governor Kotek's administration supports Child Welfare's continued improvement and trajectory through further implementation of the Vision for Transformation.

### G.    Child Welfare has worked collaboratively with community partners and state agencies to improve the entire child and family serving system.

Ms. Flint-Gerner will testify that Child Welfare is just one part of the broader child-serving system and that it works collaboratively with other agencies, divisions of ODHS, and community partners to continuously improve its delivery of services to children and families in the system.  In addition to the Legislature and SOCAC, Child Welfare works closely with OHA, which oversees the delivery of Medicaid services to foster children through Oregon's regional CCOs.  These services include behavioral health services, which are crucial for a significant subset of children in foster care, particularly those who are at risk of temporary lodging.  Child Welfare's relationship with OHA is vital to its success.

Not only do other state agencies and community partners assist Child Welfare in providing services to Oregon's children, but they also provide accountability to the system. Child Welfare does not operate in a vacuum.  Agencies such as OHA and OYA provide feedback

and input to Child Welfare, and Child Welfare has to answer questions before the Legislature when it seeks funding or to pass a bill.  As demonstrated in 2018 and 2019, Child Welfare is accountable to the Secretary of State's Office.  Child Welfare is already accountable to the juvenile dependency court system, many agencies, and other partners who provide checks on the system and its performance.  Some players in that system can also create new forms of accountability, as seen by the creation of SOCAC and the Governor's monthly progress reports, as some examples.

Ms. Flint-Gerner serves on the 21-member legislatively mandated Child Welfare Advisory Committee, which advises ODHS on Child Welfare budgets and legislative concepts, as well as the statewide Parent Advisory Committee and the ICWA Advisory Committee, who all provide direction, input, and feedback from parents with lived experience and the nine Tribes of Oregon on system improvements and accountability.  In her role as deputy director, she previously participated on the Governor's Child Foster Care Advisory Committee, which advises the Governor's Office.  Ms. Flint-Gerner also works closely with the Self Sufficiency Division of ODHS and with ODDS, also within ODHS.

In addition to these state-level partners, Child Welfare also collaborates with national-level partners, Casey Family Programs, national experts in child welfare best practices and innovation, and leverages their expertise to create a safer, more equitable system for Oregon families.  The Family First implementation effort and RAFT curriculum are two examples of this.  Because Ms. Flint-Gerner has worked in other states and has connections nationwide, including Ms. Jones Gaston, she has access to broader perspectives and knowledge bases that help inform her leadership of Child Welfare in Oregon.

Most recently, Oregon received a national level grant from the Doris Duke Foundation. Only four states received this coveted grant, and Oregon was one of them. The award of the grant recognized Oregon as a leader in child welfare reforms and acknowledged its consistent and significant progress in reducing the number of children in care, choosing it as one of four state level programs to be a potential model for scalable reforms elsewhere. This three year grant is to allow ODHS to build upon its work developing innovative models to address the needs of children and families before child safety becomes an issue. This work supports the prevention and preservation principle in the Vision for Transformation by developing anti-poverty and family support programs for family and child well-being and safety across Oregon. This anti-poverty work addresses the racial disproportionality and disparity among Oregon's children who enter foster care that the Vision for Transformation seeks to mitigate.

**H.    Ms. Flint-Gerner will testify about existing oversight structures and the work Child Welfare already does with outside experts.**

There are many different oversight structures that already exist in Child Welfare. For example, the Children's Bureau conducts CFSR audits of state child welfare programs. The audits are extensive, and in any area where a state has not been found in substantial conformity with the Adoption Assistance and Child Welfare Act, the state must enter a program improvement plan and often must continue reporting on progress through a period called the "non-overlapping" period. In 2022, following Child Welfare's program improvement plan and non-overlapping period, the Children's Bureau determined that Child Welfare was in substantial conformity with all but two outcome metrics. Oregon was proud to have met the majority of its outcome metrics, and it was held accountable for the two outcome metrics it did not meet. In all other areas, including Child Welfare's case review system, Child Welfare was found in substantial conformity and was not penalized.

Ms. Flint-Gerner will testify that the agency is currently heading into another round of federal audits (CFSR Round 4). Ms. Flint-Gerner will explain that the agency has built a culture of openness toward assessments and participates enthusiastically in the federal oversight process.

The federal government also has other periodic reporting requirements, including the Annual Progress and Service Reviews, which is an annual report, and the Child and Family Services Plan, which is a five-year plan that must be submitted to the federal government every five years. The agency is working on submitting an updated Child and Family Services Plan, which will cover years 2024 through 2029.

Ms. Flint-Gerner will also discuss other existing oversight structures, such as the Oregon Secretary of State's office, Oregon Legislature, SOCAC, and other public reporting and transparency projects the agency has implemented, such as public dashboards and updates to the agency's CQI program, which now includes community members and Tribes. Ms. Flint-Gerner will testify about how the Oregon juvenile courts and the Citizen Review Board provide oversight over each individual child welfare case.

Ms. Flint-Gerner will also testify about the outside experts and consultants that currently work with Child Welfare. For example, Child Welfare already works with EveryChild, Chapin Hall, Casey Family Programs, and others. Ms. Flint-Gerner will explain that the agency has a culture of openness toward hiring outside consultants with specific subject-matter expertise when addressing improvements in specific subject areas. For example, Ms. Flint-Gerner will explain that Chapin Hall helped develop the new statewide CQI program, while EveryChild (The Contingent) helps recruit, retain, and support resource families.

Ms. Flint-Gerner leverages her extensive experience and expertise in the field to connect Oregon with the right consultant or technical assistance needed for particular projects. For

example, to implement and fully honor the spirit of the Oregon Indian Child Welfare Act ("ORICWA"), Ms. Flint-Gerner hired Sylvia Deporto, a former Child Welfare Director and facilitator who Ms. Flint-Gerner had worked with during her time in California. Ms. Deporto is currently working on a full assessment of the agency's implementation of ORICWA. Ms. Deporto's assessment included interviews with Tribal Affairs staff, Tribes, caseworkers, and local leadership (district and program managers). Ms. Deporto will make recommendations around how to better coordinate with regional ICWA specialists, how to clarify roles between Tribal Affairs and Child Welfare, and technology enhancements to OR-Kids that could better support ORICWA search processes, among other recommendations.

I.    **Plaintiffs' requested remedy of a court-entered injunction does not allow for the kinds of reforms that Child Welfare needs.**

Injunctions do not allow for the kind of flexibility that the Vision for Transformation affords and that Child Welfare needs. Ms. Flint-Gerner disagrees with the philosophy behind consent decrees and permanent injunctions, with which she is familiar from past litigation in other jurisdictions and nearly 30 years of working in the field of child welfare. Consent decrees and permanent injunctions require adherence to rigid, inflexible metrics that often set agencies up for failure. Meeting a specific metric that has been determined by a third party is often impossible because state agencies do not have perfect control over outcomes. They cannot control the actions or policies of other state agencies or the Legislature, and they cannot control major events outside of the child welfare system, such as the COVID-19 pandemic or the fentanyl crisis. The cost of monitoring consent decrees is exorbitant, and it becomes even higher when an agency is out of compliance and is forced to justify that lack of compliance before a court, even when its "non compliance" has to do with factors entirely outside its control.

The injunction that plaintiffs seek would appoint an outside monitor to oversee Child Welfare's compliance with the injunction. That monitor would effectively replace Ms. Flint-Gerner as the head of Child Welfare. ODHS's and Ms. Flint-Gerner's discretion would be severely limited with respect to Child Welfare's goals, strategic planning, and trajectory. Those decisions would largely be in the hands of a monitor who is not accountable to the people of Oregon or the democratic processes that shape the executive branch of government.

### 1. Injunctions, monitoring, and inflexible metrics lead to inequitable outcomes and divert resources.

Inflexible metrics also have the unintended consequence of forcing inequitable outcomes. The Vision for Transformation was crafted with the goal of correcting long-standing inequities in Oregon's child welfare system. Oregon itself began as a whites-only state, through a series of Black exclusionary laws that were designed to discourage, or outright bar, Black Americans from living in the state, owning property, and making contracts. These laws, while no longer in place today, did exactly what they were intended to do: establish Oregon as a majority-white state. This history continues to have an impact today, and it is especially visible in the child welfare arena. While Oregon's population is approximately 87% white (and 13% people of color), the population of children in the care of ODHS disproportionally comprises children of color, who make up more than 30% of the children in foster care.

It is essential to understand the history of racism and white supremacy within the child welfare system in order to identify the ways that racism continues to be embedded in policy and practice. Creating an equitable system that works better for children and families requires creative ideas and progressive action, rather than the same cookie-cutter reforms that aim to grow the system rather than address root causes with a cross-agency, multi-system approach.

But this old fashioned cookie-cutter approach is exactly what plaintiffs' proposed metrics seek to impose, and it will inevitably result in ongoing inequities.

For example, forcing a child welfare agency to adhere to rigid metrics regarding permanency typically leads the agency to over prioritize adoption because it is often a faster and more straightforward process than reunification with the family of origin. Adoption also reduces the likelihood of a child's reentry into the foster care system, which allows the agency to meet another metric often set by consent decrees or permanent injunctions. But the consequence of emphasizing adoption is that a disproportionate number of Black, Native American, and other children of color are permanently separated from their family of origin and communities. Children of color are over represented in the foster care system, and white families are over represented among the pool of adoptive parents. The result is that too many children of color are removed from their families of origin and placed in white households. Hard metrics lead to these racist outcomes frequently because consent decrees and injunctions treat children like statistics. And not only do rigid timelines to permanency lead to racist outcomes, but they fail to take into account what is actually best for the child and their family by failing to recognize that fast is not necessarily best. Child Welfare should be allowed to employ thoughtful, flexible, culturally appropriate practices that address individual children's needs, and injunctions do not allow for this.

But the reforms Child Welfare have already implemented *do* allow for this. While some advocates see reform as rescuing children who have been thrown into a river, Oregon's focus on family preservation is an effort to keep children from being thrown into the river in the first place. The goal of family preservation work is to enhance families' abilities to care for their children so that children can safely remain with their families and in their communities.

**Page 91 – DEFENDANTS' LAY WITNESS STATEMENTS – APRILLE FLINT-GERNER**

Oregon's reforms are informed by input from the communities that Child Welfare serves because data that show kids' physical, mental health, and performance in school improve when children remain in their families and communities.

### 2. Plaintiffs' proposed remedies would not make children more safer.

The "remedies" proposed by plaintiffs would not help make children safer, given that arbitrary metrics are not a solution to these problems, nor is a monitor who does not know Oregon's child welfare system an adequate replacement for knowledgeable, responsive Child Welfare leaders who know the system and its children.

Injunctions also rob agencies of their ability to exercise judgment and adapt to evolving needs and challenges. Child Welfare is run by smart, caring people who are highly educated in child development, social work, public policy, and psychology, among other fields. They are working diligently to build a more responsive, bottom-up Child Welfare system that works in coordination with the communities Child Welfare interacts with, and an injunction does nothing but frustrate this effort.

### 3. Injunctions are undemocratic solutions to a problem that is being solved through the democratically responsive executive branch

A monitor is even further removed from the community than Child Welfare already is, and it undercuts the democratic process that Child Welfare is striving to build. Injunctions also prevent Child Welfare's highly trained employees from exercising their judgment, privately enforced metrics for decisions made on the ground by people with experience and knowledge, operating within the complicated workings of government. Ms. Flint-Gerner believes in the ability of the government to manage itself and to remain responsive to the public, and consent decrees and permanent injunctions interfere with the social and democratic function of state agencies.

Child Welfare is on the right path, and it has improved consistently since Ms. Flint-Gerner joined Child Welfare in 2020.  She believes that Child Welfare will continue to improve and that its leaders are dedicated to ongoing improvement of the foster care system.

### 4.    Monitoring is expensive and diverts limited resources.

The costs associated with monitoring are high.  Since 2012, Oklahoma has spent over $10 million on monitoring.  Since 2019, Texas has spent over $55 million on monitoring alone.  Spending millions on monitoring would limit the amount and quality of services that ODHS could provide to Oregon's children and families.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission. Defendants reserve the right to elicit additional testimony from this witness in the event the court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

**VIII.    Sara B. Fox (2.0 hours of direct testimony).**

Ms. Fox will provide testimony regarding her long-standing work with children in the state of Oregon and 11 year career with Oregon's Department of Human Services ("ODHS"), Child Welfare.  She is expected to testify about several topics surrounding her role as the Program Manager for Treatment Services, including a description of her personal background and an explanation of the various programs Treatment Services works to develop and administer on behalf of children in foster care.  She will also testify regarding various external factors impacting Treatment Services' work, and that, despite such barriers, Treatment Services has managed to expand BRS programming and other supports on behalf of children in foster care. Finally, Ms. Fox will explain Treatment Services' role in implementing Child Welfare's Vision for Transformation and the many ways in which she and her team seek to improve outcomes for children in foster care each and every day.

**A.    Personal background and role as Program Manager of Treatment Services.**

Ms. Fox holds a Bachelor's degree in Psychology and Human Services, which she obtained from Corban University in 2013.  Prior to working for Child Welfare, Ms. Fox spent eight years working for an Oregon non-profit BRS program, Christian Community Placement Center.  By the end of her eight years with Christian Community Placement Center, she was serving in the role of Director of Administration.  During three of the years she worked at Christian Community Placement Center, Ms. Fox also served as a therapeutic foster parent. Ms. Fox's love of social work, and in particular her interaction with the children she encountered at Christian Community Placement Center, ultimately led her to seek a role with Child Welfare.

Ms. Fox will share that she joined Child Welfare in May of 2013, first as a permanency caseworker and then subsequently as a program analyst in Treatment Services.  In late 2018, she was promoted to Assistant Program Manager of Treatment Services.  In early 2019, she was

again promoted, this time to overall Program Manager for Treatment Services, a position she still holds today.  As Program Manager, Ms. Fox oversees four separate teams within Treatment Services: (a) the Program Analyst unit; (b) the Residential Resource Consultants; (c) the Focused Opportunities for Children Utilizing Services ("FOCUS") team; and (d) the Logistics Team.  Ms. Fox will explain the role of each of these four teams as it relates to her department and her staff's role in providing various services to foster children and young adults within the care of Child Welfare.

> **B.    The work of Treatment Services.**

Ms. Fox will testify regarding the roles of each of the four teams she supervises within Treatment Services.  The Program Analyst Unit, for example, works to administer contracts and ensure compliance and technical training for the various CCAs that provide BRS programming and other trauma-response services to children in the care of Child Welfare.  This same unit also helps to develop rules which govern the services provided by such CCAs.

The Residential Resource Consultants team helps to educate and support caseworkers and supervisors in understanding and navigating the referral process for Oregon foster children and young adults to receive enhanced levels of care, such as BRS.

The FOCUS team develops and funds services that are within the delegation of Child Welfare and which support specific foster children whose needs are not otherwise met by other systems.  Finally, Ms. Fox will explain the role of the Logistics Team.  This team supports statewide service and placement entry, invoicing, and certifications for every CCA, including individual proctor foster families certified by CCAs that contract with Treatment Services.  The Logistics Team ensures each of these functions is properly established for each CCA within Child Welfare's internal database known as OR-Kids.

C.      **Programs and services administered by Treatment Services.**

Treatment Services provides supportive services and placements for children and young adults in foster care with specialized needs.  This includes administering BRS programs, including Proctor Foster Care and Qualified Residential Treatment Programs, shelter care, and the FOCUS program's services.  Ms. Fox will testify regarding each type of care or placement.

BRS is a different level of service than general resource parent or resource family, the purpose of which is to remediate a foster child's debilitating psychosocial, emotional, and behavioral disorders by providing services such as behavioral intervention, counseling, and skills training.  BRS programs consist of several levels of care, which, in general, consist of two types of settings: familial care, known as Proctor Foster Care; and congregate care, primarily known as Qualified Residential Treatment Programs.

Proctor Foster Care is an out-of-home, familial care setting meaning outside of the child or young adult's biological parent/caregiver's home—which is certified by a licensed CCA that contracts with Child Welfare.  Within that setting, the Proctor Foster Care parent/caregiver receives enhanced training and support, including access to 24/7 on-call crisis response and embedded monthly respite to support both the child/young adult, as well as themselves.  A Qualified Residential Treatment Program is a comprehensive residential licensed CCA program that provides intensive individually focused services, training, and support to children or young adults experiencing emotional, medical, or behavioral difficulties.  Ms. Fox will explain that the OHA has delegated to Child Welfare the authority to administer BRS programming, which is also dependent on the child or young adult meeting certain Medicaid and medical eligibility requirements.

The FOCUS program, as noted above, provides consultation and services to foster children and young adults whose treatment needs are unique and complex.  As reflected in its

name, the FOCUS program is "focused" on the individualized needs of specific children and young adults within the care of Child Welfare.  For example, the FOCUS program may provide skills training, mentoring, enhanced respite, and other service supports to help an individual child or young adult who is exhibiting emerging problematic sexual behavior.  The FOCUS program also provides child-specific caregiver support and works with local CCOs to provide a Response Support Network.

Shelter Care is a licensed CCA that provides short-term placements, in a non-BRS and non-Qualified Residential Treatment Program residential setting, and which is aimed primarily at supporting young adults in the care of Child Welfare who are suffering from placement instability.  As a short-term placement, shelter care is only available for 60 days, but it allows young adults who are suffering from placement instability to remain in their communities.  Ms. Fox will explain that all of the presently offered shelter care placements which Treatment Services contracts with are non-BRS licensed CCAs.  These placements are used only in unique situations, such as when a young adult is not interested in engaging in treatment but will agree to placement in a shelter.

In addition, Ms. Fox will discuss what is known as "enhanced transition living programs," which are both congregate and individualized residential settings that serve a unique population of young adults requiring higher levels of care and who are soon to transition out of foster care.  The purpose of these programs is to help young adults with skill-building and behavioral health services to prepare for their exit from foster care.

Finally, Ms. Fox will describe what is known as a PRTF, and Treatment Services' role in assisting Oregon's foster children with accessing such services.  PRTF refers to non-hospital facility settings with 24-hour psychiatric care that treat children and adolescents who require a

residential environment for assessment and treatment that take place in a licensed CCA.  Some of the active psychiatric treatments provided at PRTF facilities include medication management, group therapy, and individual and family therapy.  Unlike BRS programs, which Child Welfare develops and administers, OHA retains control over the licensing and development of facilities that provide PRTF in Oregon.

> **D.** **Medicaid eligibility referral process and access to BRS programs.**

Ms. Fox will testify regarding the Medicaid eligibility referral process required for children and young adults in foster care to access BRS programming.  The process begins with the child or young adult's permanency caseworker identifying that the child or young adult may benefit from BRS and preparing what is known as a "1055 referral form."  The child's caseworker fills out this referral form and then gathers other supplemental information to support the child's Medicaid eligibility to receive such services.  Thereafter, the caseworker submits the form to a regional Residential Resource Consultants member within Ms. Fox's Treatment Services Team.  The Residential Resource Consultants team member will then take the caseworker's referral form, review it for accuracy and completeness, and submit a request for a QMHP to perform an assessment to determine whether the child meets the eligibility requirements to qualify for the proposed BRS program.

If the QMHP determines the child is medically eligible and meets all other criteria necessary to receive BRS programming, a Residential Resource Consultants member will contact an appropriate CCA to determine placement availability.  Once the Residential Resource Consultants member identifies a placement, the child's permanency caseworker takes over to coordinate intake paperwork and the signing of any necessary consent forms to place the child with a CCA.  The child's permanency caseworker thereafter participates in ongoing treatment

planning for the child, and works to ensure aftercare placement, resources, and transition services are made available.

Importantly, although the child's permanency caseworker may recommend a referral to a particular program or service, the caseworker is not responsible for determining the child's medical or other eligibility to access BRS programs.  Treatment Services contracts with the third-party QMHPs to perform such assessments, but controls neither the timing nor the outcome of these assessments.  Through no fault of the caseworker or the Residential Resource Consultants, children and young adults awaiting a QMHP assessment can experience delays based simply on the fact that a QMHP is not immediately available to schedule the child or young adult's assessment.  Furthermore, a QMHP may deny a requested referral based upon their independent assessment of the child or young adult's condition and medical needs.  Child Welfare does not control either of these issues.  Notwithstanding, Ms. Fox will testify that Treatment Services has taken steps to improve the accessibility of QMHP assessments by delegating its primary contract to a provider who can deliver a 24-hour turnaround in making their assessment upon request.

> **E.  External factors which serve as barriers to children in substitute care accessing enhanced levels of care.**

In addition to the delay or denial of services arising from third-party QMHPs, Ms. Fox will testify that various other factors outside the control of Child Welfare serve as barriers to Oregon children and young adults in substitute care receiving enhanced levels of care.  These external factors include everything from the independent operations of CCAs and their workforce, to insufficient legislative funding of various levels of service and care, to the fact that the most enhanced level of care, PRTF, is not administered by Child Welfare but rather OHA.  Despite these barriers, Ms. Fox will testify that Treatment Services is continuously working to

support all Oregon foster children and young adults in obtaining care which serves their individualized needs.

### 1. The COVID-19 pandemic dramatically impacted the availability of CCAs and their capacity.

Ms. Fox will explain that the COVID-19 pandemic had a dramatic impact on the number of qualified and available CCAs in Oregon. Many CCAs could not financially stay afloat or outright closed during the pandemic. Others suffered a dramatic loss of workforce, resulting in less placement availability due to insufficient staffing. For example, Ms. Fox will share that the Salvation Army Whiteshield facility, which provided BRS residential services to children and young adults identifying as female and with an emphasis on serving pregnant and parenting teenagers, closed in 2020. As well, in 2021, the Boys & Girls Aid Seneca House, another BRS residential home supporting children and young adults identifying as female, closed. Ms. Fox will also testify that Treatment Services had to reduce the capacity of several Proctor Foster programs due to fewer proctor foster families being willing to accept children and young adults into their homes during the pandemic. These closures and reductions were all in addition to the many PRTF facilities which also closed, and which again are contracted with and administered by OHA. Despite the reduction in the number and capacity of CCAs and their workforce, Treatment Services has continued to build out services for children in the care of Child Welfare.

In both 2020 and 2021, Treatment Services and Child Welfare advocated for financial relief and short-term aid to help address some of the recent closures and reductions in capacity impacting children and young adults in Child Welfare. Ms. Fox will testify that in 2020 all the way through June of 2022, Treatment Services and Child Welfare advocated and received from then-Governor Brown emergency COVID-19 funding to support all non-BRS CCAs and shelter placements in dealing with increased costs to support children and young adults during the

pandemic.  This included increased pay for staff overtime to supervise children and young adults in quarantine.  In 2021, Treatment Services also distributed $15 million in workforce grants to BRS and non-BRS CCAs, as well as enhanced transition living programs.  These efforts were all in addition to Child Welfare's investments in its own workforce to assist with workforce retention within Child Welfare during the pandemic.

Furthermore, during the 2023 long legislative session, Treatment Services, Child Welfare, and several others submitted a study to the Oregon Legislature recommending a change in the methodology for reimbursements to CCAs.  This study was commissioned in response to Oregon House Bill 4012 (2022).  Upon reviewing this commissioned study, the Oregon Legislature approved funding for two of the study's three recommendations, resulting in a dramatic increase in the rate of reimbursement for BRS CCA staff and assistance with the development of CCA's depleted workforce due to the COVID-19 pandemic.  These rate increases went into effect July 1, 2023.

### 2.    CCAs themselves sometimes serve as barriers.

In addition to challenges presented by the COVID-19 pandemic, Ms. Fox will testify that CCAs themselves can serve as barriers to children and young adults receiving enhanced services and support.  CCAs are independent organizations and as such, they retain the right to deny a requested referral to their care for one or more reasons.  For example, a foster child may have a history of extreme aggression or past physical violence towards others.  Under this scenario, a CCA may review the child's past behavioral issues and seek to decline Treatment Services' referral—fearing an increased risk of liability to its own organization due, at least in part, to recent legislative changes that may result in increased abuse findings against CCA staff.  When

this occurs, the Treatment Services team continues its efforts to find a suitable placement or program for the child to attend.

Ms. Fox will share that she and her team remain relentless in their pursuit of available options and programs to best serve a child or young adult's interim and future needs. Furthermore, the Program Analyst team has begun reviewing every CCA denial for referrals to BRS programs. This is part of a continued effort by Treatment Services to try and increase the utilization of BRS programs and services for children and young adults in the care of Child Welfare.

### 3.    OHA governs the development of PRTF services and facilities.

Ms. Fox will testify, as noted above, that OHA retains control over the licensing and development of available PRTF beds and facilities in Oregon. Thus, Child Welfare does not have direct control over whether or not there is sufficient capacity of available PRTF beds to service Oregon foster children and young adults. Ms. Fox will explain that while she is aware of a recognized gap in available PRTF capacity, Treatment Services has nonetheless worked to expand the availability of PRTF beds for children and young adults in foster care through unique partnerships with CCOs that provide such services.

For example, in 2023, Treatment Services expanded its contract with Looking Glass Regional Crisis Center, a CCA that provides PRTF to young adults in foster care. This expansion provides prioritization of 18 PRTF beds for Oregon young adults in foster care. The project was so successful that in 2024, Treatment Services is looking to contract with Looking Glass Regional Crisis Center for the creation of an additional 14 PRTF beds solely dedicated to young adults in foster care.

Similarly, Treatment Services has worked with a CCA known as Madrona Recovery to provide an additional three co-occurring PRTF and substance use disorder beds dedicated to

young adults ages 13-17.  These beds became open and operational on March 1, 2024, and are

the first co-occurring in-patient treatment beds for children and young adults in Oregon.  Thus,

Treatment Services' work is expanding care not only for children and young adults in foster care

but all Oregon children.

>    **4.      The development of additional BRS, service array, and placements is impacted by legislative funding.**

Ms. Fox will testify that, not surprisingly, the development and creation of additional

BRS programming, service array, and placements within the delegation of Child Welfare, is

impacted by Oregon legislative decisions and funding.  She will share that it can be challenging

for Treatment Services to expand the available service array and systems of care for Oregon's

foster children and young adults without additional legislative funding and resources.  Despite

the challenges posed by such budgetary constraints, Ms. Fox will testify that her team remains

creative in its efforts to expand available capacity.

For example, Treatment Services has looked for ways to develop or expand child-specific

caregiver support in select counties.  These are intensive individualized supports, provided to

caregivers of children with complex needs who historically would be placed in higher levels of

care.  Caregivers are provided in-home and community-based services directly associated with

their child's specific needs in an effort to stabilize placements, reduce disruptions, and keep

children at home.  Treatment Services has also invested in Foster Plus Oregon, which is a

collaboration of all Child Welfare contracted Proctor Foster CCAs.  The Foster Plus Oregon

initiative launched in 2016, with the purpose of allowing Child Welfare contracted Proctor Foster

CCAs to share and collaborate together regarding recruitment and retention of proctor foster

families.  Finally, Ms. Fox will explain the work that Treatment Services has done around

expanding respite care for children in foster care.  As a result of this work, there are now 13 CCAs who have expanded their service array to include respite care.

### F.    Child Welfare has met its target of service development of 6.5% of Oregon's foster children and young adult population.

Ms. Fox will testify that in 2019, Child Welfare's ORRAI issued a capacity summary report targeting an increase in service development for Treatment Services of approximately 6.5% of Oregon's foster children and young adult population.  The purpose of the ORRAI capacity summary report was to determine not only Child Welfare's current but future needs for BRS and non-BRS (*e.g.*, short-term shelter care) placements to service children and young adults in the care of Child Welfare.  Ms. Fox will testify that since 2019, and with the exception of one brief month in October 2023, Treatment Services has continued to meet ORRAI's 6.5% target of service development of both new BRS and non-BRS system buffer placements.  This demonstrates that Treatment Services is not only meeting current but also projected future needs of children and young adults as it relates to programs administered by Treatment Services.

### G.    Child Welfare has increased its collaboration and communication with outside agencies.

Ms. Fox will testify that Treatment Services engages in ongoing discussions with OHA surrounding the development and expansion of PRTF and other mental health services impacting children and young adults, as well as with OYA, surrounding the availability and development of BRS programming.  For example, she participates in a bi-weekly meeting with OHA Child and Family Behavioral Health division to discuss expansion of PRTF in Oregon.  She also meets monthly with members of OHA Executive Leadership to discuss shared initiatives related to behavioral health.  Finally, she will testify that in the last two years Treatment Services, OHA, and OYA have met weekly to discuss BRS quality enhancements for children and young adults in Oregon.

**H.**    **Treatment Services' participation in the Principles to Outcome Driven Practice.**

Ms. Fox will testify that as of 2024, Treatment Services has partnered with the Building Bridges Initiative to sponsor the Principles to Outcome Driven Practice program study. In conjunction with various experts from the University of Kentucky and Chapin Hall—a nationally recognized organization dedicated to addressing challenges facing children, young adults, and families in the United States and beyond—Treatment Services is engaging in a 24-month independent study of a portion of Oregon's residential service array. As part of this study, researchers from the University of Kentucky will review five CCAs in Oregon, four of which contract with Treatment Services, for the purpose of evaluating the child-caring agency's programming and determining the success of these child-caring agency's implementation of best practice models. As this initiative is just starting, Ms. Fox will explain the program generally and its intended benefits to foster care children in Oregon as it relates to the improvement of residential care.

**I.**    **Treatment Services' implementation of Child Welfare's Vision for Transformation.**

Consistent with Guiding Principle No. 1 (Supporting Families and Promoting Prevention) of Child Welfare's Vision for Transformation, Treatment Services has been intentional in looking at ways to innovate and enhance its service delivery for children and their families that engage with Oregon's foster care system. One recent example of this has been the expansion of the Response & Support Network in Clackamas County in late 2023. As Ms. Fox will explain, Treatment Services developed the Response & Support Network as a pilot program braided funding approach between Child Welfare and CareOregon. The goal of the program is to support children where they live, usually in resource homes, for a brief period of time—up to 90 days—while there is a need and until the child can be connected to other ongoing services which

**Page 105 –    DEFENDANTS' LAY WITNESS STATEMENTS – SARA B. FOX**

they require.  The expansion of the Response & Support Network pilot program to Clackamas in 2023 was built off the success of the program as launched in Multnomah County in 2021, and later in Washington County in 2022.  As a result of this now tri-county program, Treatment Services has seen improved stabilization for children in foster care.  The program has also resulted in reduced disruption of care, which in turn enhances the overall health and well-being of the children involved.

Ms. Fox will acknowledge that her team does not carry as much of a role in implementing the Vision for Transformation's Guiding Principle No. 2 (Enhancing Our Staff and Infrastructure) because the work of Treatment Services is more focused on developing external partnerships to service the medical needs of children in foster care.  That said, Ms. Fox works to support professional development and improve education and opportunities for her Treatment Services team members, and in that way, is helping to fulfill Guiding Principle No. 2.  Treatment Services involves a dedicated team of talented professionals, all of whom are highly invested in ensuring that children and young adults in Oregon foster care receive the medical and other support they need.  Ms. Fox will share that she and her fellow colleagues put their heart and soul into helping these children and young adults, not because it's their job, but because they care deeply about the well-being of these children and young adults.

Finally, as to Guiding Principle No. 3 (Enhancing the Structure of Our System Using Data with Continuous Quality Improvement), Ms. Fox will testify that Treatment Services analyzes data provided by ORRAI, and particularly surrounding the utilization of its contracts with child caring agencies, to help anticipate future capacity needs for Oregon's foster children and young adults.  Ms. Fox will explain that currently, BRS utilization sits at less than 60%. Notwithstanding this underutilization, Treatment Services continues to look for ways to expand

and increase available BRS programming for children and young adults in foster care. These efforts benefit all Oregon children and young adults in need of enhanced levels of care offered through BRS programs, provided they meet the required eligibility criteria.

Finally, Treatment Services also tracks various data using Child Welfare's internal BRS dashboard system to review placement stability and maintain an eye toward future needs for purposes of developing additional BRS programming, service array, and placements to serve the needs of children and young adults in foster care.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission. Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

IX.    **Anthony Gasbarro (2.0 hours direct testimony).**

A.    **His professional history with Child Welfare.**

Mr. Gasbarro is a permanency caseworker in the Teen Unit of Child Welfare's District 2, Multnomah County's East Branch.  He obtained his bachelor's degree from PSU in 2010 and his master's degree from the University of Massachusetts Boston in 2013.  Mr. Gasbarro started his career in social work in November 2012 when he became a research assistant for PSU's Center for Improvement of Child and Family Services.

Mr. Gasbarro joined Child Welfare in February 2014 as a discovery clerk, reviewing and redacting confidential information in case files produced as part of tort claims against ODHS. He also worked as an office specialist working on the agency's response to various discovery and public records requests.  Mr. Gasbarro started his position as a teen permanency caseworker in June 2016.  He has served in this role ever since, working with young adults in ODHS's care between the ages of 12 and 21.

B.    **His work as a permanency caseworker for young adults in ODHS's care.**

As a permanency caseworker in the Teen Unit, most of the young adults Mr. Gasbarro works with did not enter ODHS's care on his caseload.  Instead, their cases were transferred from another caseworker once the young adults reached the age of 12.  Mr. Gasbarro sometimes, but not often, receives a new case directly from CPS after there has been a removal of the young adult from their home.  Mr. Gasbarro also works on voluntary placement cases in which young adults are placed in ODHS's care at the request of their biological parents.  Regardless of how they are assigned to his caseload, Mr. Gasbarro works hard to: (1) provide the young adults he serves with resources and support; (2) ensure their safety; and (3) help them achieve permanency.

Mr. Gasbarro is constantly assessing whether the young adults in his care are receiving the services that meet their needs, especially their mental and behavioral health needs.  Because a clinical diagnosis is necessary to access higher levels of care and services, Mr. Gasbarro will explain the importance he places on seeking a psychological evaluation in a timely manner for the young adults he serves.  Whenever Mr. Gasbarro is assigned to a new case, he determines whether it is appropriate to recommend a new psychological evaluation for the young adult and, if so, quickly proceeds with a plan to have such evaluation performed.  Mr. Gasbarro will testify about young adults who were able to obtain the services that meet their mental and behavioral health needs after his careful assessment and planning.

With respect to safety, Mr. Gasbarro is actively looking for signs of issues or problems with young adults he works with, especially because some of them may not be able to express concerns fully or openly on their own.  From his experience, Mr. Gasbarro understands the signs of safety issues he needs to look for, and he promptly reports any issues to the Oregon Child Abuse Hotline ("ORCAH").

Mr. Gasbarro also works with young adults to achieve permanency in a way that is helpful to them.  Given that he works with a population of young adults that are more likely to exhibit behavioral symptoms than younger children, Mr. Gasbarro will testify that finding resource homes for the young adults in his caseload can be challenging.  However, he continues to work with the young adults and their communities to find suitable permanent placements.  For example, Mr. Gasbarro will testify about a young adult who exited ODHS's care after being adopted by people in her community.  This successful adoption was possible because Mr. Gasbarro put in great efforts to work with the young adult and others in her community to find potential adoptive parents.  He will explain that the Permanency Quality Assurance tool

helps ensure a safe environment during caseworker face-to-face contact with a child through quality documentation of a face-to-face case note.

Mr. Gasbarro also understands that every young adult is different and approaches each of the young adults he encounters with respect, empathy, and focus. His goal is to help each of the young adults in his caseload exit foster care as an independent adult or enter into a safe and appropriate placement to the extent assistance is needed after exiting foster care. He works hard every day to achieve that goal for each of the young adults he serves.

### C. Mr. Gasbarro will testify about the improvements he has seen during his tenure with Child Welfare.

Mr. Gasbarro has seen great improvements in his caseload in the past eight years. When he first started, he had up to 27 young adults in his caseload and now has an average of 12. Also, in 2022, his unit became fully staffed for the first time since he joined his unit in 2016. Having a lighter caseload allows Mr. Gasbarro to better serve the young adults in his care because he can be more present and focus on their individual needs.

Mr. Gasbarro observed that in the past few years, Child Welfare has greatly improved its practice of placing children with their family members or natural supports. It has been much easier for Mr. Gasbarro to contact family members or relatives of the young adults who are at risk of placement disruptions. In fact, most of the placements on his caseload in the past few years have been with the young adults' family members or relatives.

Mr. Gasbarro is also seeing improvements in the process for obtaining psychological evaluations for young adults in care. In the past year, the process for requesting and receiving psychological evaluations for the children and young adults served in District 2 has become much more streamlined due to the OHA's pilot program called "Expedited Assessment Services for Youth." After Mr. Gasbarro submits a referral for a young adult on a designated provider's

website, a psychologist meets the young adult to complete the evaluation within 7 to 10 days.
The psychologist determines the need for additional tests and coordinates them, helping
Mr. Gasbarro with the appropriate next steps in the young adult's care. Further, the psychologist
can refer the young adult to the local IDD office, so that they can access the services that meet
their needs. Because young adults with high-level needs cannot access appropriate services
without a clinical diagnosis, being able to quickly receive evaluations has helped the young
adults on Mr. Gasbarro's caseload tremendously.

> **D.    Resources available from or through Child Welfare to young adults
> transitioning out of foster care.**

Lastly, Mr. Gasbarro will testify that there are many resources young adults in foster care
may access when preparing to transition out of care, including the ILP. There are also resources
available to young adults who have just transitioned out of foster care, including ILP, education
and training vouchers, tuition waivers to schools within the Oregon university system, housing
vouchers, and SNAP benefits. Mr. Gasbarro will testify regarding one young adult who
successfully built an independent life after receiving training through ILP.

Mr. Gasbarro develops a CTP for each young adult he works with when they turn 14
years old. A CTP is a written plan that addresses the young adult's plans for, among others,
personal growth and social development, education, employment and career preparation, life
skills (such as money management and transportation), and housing management. Mr. Gasbarro
updates the CTP as the young adult grows up, and the CTP serves as the roadmap for the young
adult's transition process. Approximately a year before their scheduled exit, Mr. Gasbarro starts
preparing the young adult with their transition out of foster care, to make sure the goals outlined
in the CTP have been or will be met. He begins by having intentional conversations with the
young adult and their provider (if one is involved) about a plan for the young adult's transition.

**Page 111 –   DEFENDANTS' LAY WITNESS STATEMENTS – ANTHONY GASBARRO**

In doing so, Mr. Gasbarro makes sure they understand they will have access to various resources after exiting ODHS's care.  Mr. Gasbarro will testify about young adults who utilized various resources offered by and through Child Welfare during and after their transition out of foster care.

One valuable resource Mr. Gasbarro has seen in the past few years is housing vouchers issued through the Family Unification Program.  Although the program is funded by the federal government, young adults can access these vouchers only through an ODHS referral.  Once preliminarily approved, Mr. Gasbarro works with housing providers to submit appropriate paperwork on behalf of the young adult preparing to transition out of foster care.  This program pays for the young adult's housing for 32 months or longer, depending upon the circumstances.  Mr. Gasbarro has seen young adults who were able to focus on their education after they left foster care because they did not have to work to pay for housing with the help received through the Family Unification Program.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

X.    **Jennifer Holman (2 hours direct testimony).**

   A.    **Her professional history and current role with Child Welfare.**

Jennifer Holman is the Family Preservation Manager for the Self Sufficiency Divisions. Ms. Holman started working for Child Welfare in 2007 as a caseworker and worked in that capacity for eight years, both in CPS and permanency.  In 2015, Ms. Holman became a permanency consultant, serving several counties across the state for approximately three years. In 2018, Ms. Holman became the Reunification Program Manager, the first in Child Welfare's history, supervising 14 permanency consultants across the state focused on getting children out of substitute care and reunited with their families quickly and safely.

In June 2022, Ms. Holman became the agency's inaugural Family Preservation Manager. Ms. Holman manages ODHS's Family Preservation Unit statewide, which is a collaborative approach by Child Welfare and Self Sufficiency Divisions that focuses on developing practice and supportive services and resources for families at risk of entering the child welfare system, with the goal of preventing intensive Child Welfare involvement.

   B.    **Oregon's progress towards a prevention-oriented system.**

ODHS began developing the Family Preservation approach in June 2021, and launched Family Preservation demonstration sites across the state in April 2022, putting Child Welfare's Vision for Transformation into action by refocusing on and prioritizing serving families in their homes and communities.  Ms. Holman will testify that Oregon had been heading towards a prevention-oriented approach for several years before Family Preservation came into place.  In July 2015, Oregon implemented its Title IV-E Waiver Demonstration Project, which developed the LIFE model.  Ms. Holman implemented and managed LIFE as Child Welfare's Reunification Program Manager.  LIFE is a values-based model designed to reduce the time to permanency of children who are likely to have long-term stays in foster care.  LIFE has been successful in

**Page 113 –    DEFENDANTS' LAY WITNESS STATEMENTS – JENNIFER HOLMAN**

promoting parent and child engagement, facilitating case progress, and encouraging relative placements because it provided parents, children, relatives, and communities with opportunities for input, choice, and participation in decision making.  LIFE services facilitated timely progress of Child Welfare cases by improving decision making and case planning, increasing support for caseworkers, and promoting engagement among caseworkers and other providers.  The positive outcomes of LIFE acted as a catalyst for Child Welfare's shift towards a more family centered, holistic, and prevention-oriented system.  Ms. Holman will testify about specific examples that illustrate the positive outcomes of LIFE.

In February 2018, the federal government enacted the FFPSA, acknowledging the importance of keeping families together.  Under FFPSA, states, territories, and Tribes can spend Title IV-E dollars directly on specific evidence-based services focused on the prevention of child abuse and neglect, with the goal of keeping families together and out of the child welfare system. To leverage FFPSA and provide increased access to prevention-focused support to Oregon's children and families, Oregon submitted its Family First Prevention Plan in December 2020.  On April 1, 2021, Oregon's Title IV-E Prevention Plan was approved by the United States Children's Bureau.  Child Welfare engaged a diverse array of internal and external partners during the planning and implementation of FFPSA, moving closer to a community-based safety and support model for families and children.

Child Welfare desired to develop a plan that will continue the work of supporting and strengthening families in Oregon that started long before the submission of a formal FFPSA. FFPSA funds four specific types of evidence-based prevention activities: in-home parenting programs, mental health services, substance abuse prevention and treatment, and kinship navigator services.  While these services are tremendously valuable, evidence-based providers

are required to have documentation, research studies, and to practice the model to fidelity, all of which are difficult and expensive for small programs, community organizations, or culturally-specific services to accomplish.  In February 2021, Child Welfare's executive leadership asked Deena Loughary (current CPS Program Manager), Kim Keller (current Child Permanency Manager), and Ms. Holman to develop family preservation units in select sites around Oregon. Child Welfare collaborated with the nine Oregon Tribes, parents and young adults with lived experience, other state agencies, federal partners, legislative and judicial partners, and field staff to develop the initial design and a theory of change for what ultimately became the Family Preservation Program.  Child Welfare wanted to be intentional and thoughtful in developing the Family Preservation Program because the agency, including Ms. Holman, saw real transformational opportunities that can be realized.

ODHS prepared a POP for the 2021 Legislative Session to create a centralized team of staff who would develop and implement preservation and prevention services for families in Oregon.  Child Welfare sought to develop, implement, and modify a comprehensive and coordinated preservation approach to serving families.  The Oregon Legislature approved a limited version of the POP, and Child Welfare started developing Family Preservation.  Family Preservation was launched on March 28, 2022, in three demonstration sites, with Ms. Holman managing the program without any staff at first.  She officially became the Manager in June 2022.

### C.    Ms. Holman will testify about the work of Family Preservation.

Family Preservation is a partnership between Child Welfare and Self Sufficiency Division.  ODHS recognizes that children's safety comes from stability in families, and Family Preservation seeks to provide support that will result in a family's financial and emotional stability, while addressing challenges around child safety.  To this end, economic support is a

significant factor, if not the most important one, that prevents a family's entry into foster care or shortens the length of time in foster care. Self Sufficiency Division can connect families to TANF (cash assistance for families), SNAP, TADVS (financial assistance for survivors of domestic violence), job programs, family support and connections, and other community-based organizations. Also, families are more willing to engage with Family Preservation to access the resources they need because Self Sufficiency Division does not have the stigma that Child Welfare has, and Self Sufficiency Division can provide ongoing support before, during, and after Child Welfare involvement. Working with Self Sufficiency Division, Child Welfare can better understand family dynamics and plan a trauma informed, intentional approach with the family. With an on-going awareness of how the family's experience may affect how they perceive practices and services, Family Preservation can minimize the potential to re-traumatize or trigger harmful behaviors in the family.

ODHS is taking a phased approach to implement and evaluate Family Preservation so that the agency can understand what works best and quickly make necessary adjustments before implementing any statewide changes. Family Preservation started in three demonstration sites in March 2022: Alberta Branch in Multnomah County, Douglas County, and Klamath County ("Cohort 1"). In July 2023, Child Welfare launched five more demonstration sites: Polk County, Gresham Branch in Multnomah County, Coos/Curry Counties, Jackson/Josephine Counties, and Washington County. Ms. Holman will testify that Child Welfare's goal is to have a statewide phased rollout by the end of 2027. Child Welfare continues working with families, people with lived experience, community partners, and service providers to further develop Family Preservation.

**Page 116 –   DEFENDANTS' LAY WITNESS STATEMENTS – JENNIFER HOLMAN**

Ms. Holman will testify that currently all families in the demonstration sites with an in-home Child Welfare case (where safety is being managed with children remaining in the home), except those in trial home visits, are Family Preservation cases. Calls received by the Oregon Child Abuse Hotline ("ORCAH") are assigned to the local office and assessed by a CPS worker in partnership with a Self-Sufficiency Family Coach. If, during the course of the assessment, a family is determined to meet certain in-home criteria, it becomes a Family Preservation case. The in-home criteria are: (1) there is a home-like setting where parents and child can live; (2) there are no barriers in the home to allowing safety service providers and activities to occur; (3) at least one parent is willing to cooperate with an in-home safety plan; and (4) the necessary resources are available to implement the in-home safety plan. The scope of Family Preservation is expected to become broader in 2025 to include trial home visits and cases where children have experienced foster care and been reunified with families, with the goal of ultimately including all families with children experiencing interactions with Child Welfare.

During a Family Preservation case, Child Welfare and Self Sufficiency Division work together to support and stabilize the family. The family has access to all services and support available from Self Sufficiency Division and Child Welfare. Family Preservation can make a big difference in keeping a family together. For example, a child's school can communicate with the Family Coach rather than calling ORCAH about the child's need for food and clothes. Family Preservation can connect a family to preventative resources, such as food, medical care, financial assistance, and in-home change services for parents focused on lasting behavior changes related to safety concerns. Once stable, the family can focus on addressing the issues that led to instability and safety concerns, such as substance use.

Family Preservation faces some challenges, which are to be expected for a progressive and innovative program. One of the challenges is funding. Oregon, like any other state, has a finite pool of resources that must be shared between different demographics with different types of needs. But Ms. Holman is confident that Family Preservation will continue to show very positive outcomes for families as more demonstration sites are launched, making its value more evident to the Legislature.

Another challenge for Family Preservation is rooted in the stigma and trauma associated with Child Welfare and the foster care system in general. Historical systems in Oregon have harmed and marginalized communities, some much more than others. This harm has made it difficult for marginalized communities to be heard, or express their needs, for the fear of being separated. However, Family Preservation continues to support districts in reaching out to their communities, so that ODHS and the communities can work together to combat the racial and ethnic disparities among the families served by the agency. Collaboration with community partners and families is the most important aspect of building and implementing Family Preservation. Family Preservation will continue to work with its community partners and families to dismantle the barriers of systematic racism in child welfare.

**D.    Family Preservation is putting the Vision for Transformation into practice.**

ODHS launched the Vision for Transformation as a roadmap to build a Child Welfare division that will prevent children and young adults from experiencing placements away from their families, friends, and communities by stabilizing and strengthening families. Accordingly, the Vision for Transformation's Guiding Principle 1 is "supporting families and promoting prevention." Family Prevention is putting the Guiding Principle 1 into practice by providing earlier, less intrusive support for parents and families that allow children to remain safely and

healthy at home in their communities.  Ms. Holman will testify about the positive outcomes of Family Preservation, using specific examples.

Family Preservation has been actualizing Guiding Principle 1 in demonstrable ways.  In Family Preservation demonstration sites, the percentage of families involved with Child Welfare being served in-home is increasing.  In April 2022, an average of 7% of families in Cohort 1 were served in-home, but by October 2023, 17.2% of Cohort 1 families were being served in-home.  Also, in the Klamath site, more families are being served in-home than separated with children in foster care, and Native American children are no longer overrepresented in foster care.  In the Alberta Branch of Multnomah County, 94% of children served in-home have remained in-home, and the number of non-court involved in-home cases has increased. Ms. Holman will also testify that families spend a much shorter time involved with Child Welfare when working with Family Preservation.  On average, in-home cases are open for eight months, which is much shorter than foster care cases, and a re-engagement rate for an in-home case is also lower than a foster care case.

Family Preservation also allows ODHS to address disproportionality and inequities in foster care more effectively.  Oregon is comprised of diverse cultural and ethnic groups, including nine Tribal nations.  A surveillance-driven, one-size-fits-all approach to foster care, rooted in systemic racism deeply embedded in Oregon's history, has led to the inequities and overrepresentation of African American and Native American children in the system.  Family Preservation's inclusive, equitable, and culturally appropriate programs are helping dismantle these inequities.  For example, the Family Support and Connection program expanded the ability to fund culturally specific support for families.  Family Preservation is also working with Tribal nations to build programs that are value based and culturally responsive.  Family Preservation

engaged directly with the Tribes in the Klamath County and asked how Family Preservation can help prevent their children from entering foster care.  Family Preservation implemented the Tribes' recommendations, and Native American children are no longer overrepresented in foster care in the Klamath County.

Through Family Preservation, family and community engagement has increased both in quality and quantity in demonstration sites.  Family Preservation caseworkers in demonstration sites are seeing families weekly, for the first 60 days, and then bi-monthly after that, instead of once a month as required by the federal standard.  Communities are also coming together to offer and solidify plans.  Family Preservation is supporting work to repair the harm that was done to communities by Child Welfare, and this repairing of relationships has been incredibly valuable as communities can provide immediate assistance to families that ODHS may not be able to give.

Family Preservation demonstration sites have allowed the agency to establish the foundational elements required to keep families together: cross-program relationships and establishing structures for those relationships; community engagement and being held accountable to the community; engaging the entire family, not just one member who may be eligible for public assistance; and trauma-informed, value-based support and services.  Family Preservation's phased method also allows Child Welfare to be innovative in its approach because Family Preservation can try other processes that may be different from the current statewide procedures.  For example, in a demonstration site, a call made to ORCAH and closed at screening gets referred out to Self Sufficiency Division, so that family coaches can reach out to the family and offer support and services, with the goal of avoiding Child Welfare's involvement in the future.  With Family Preservation, Child Welfare is transforming itself from a regulation-

centered, removal-focused system to being part of an anti-racist, family-centered, trauma-responsive web of support for families.

**E.    Oregon is a frontrunner in the nation's trend towards a prevention-focused approach to child welfare.**

In March 2024, the Doris Duke Foundation selected Oregon and three other jurisdictions to be part of a three year, $33 million initiative to test and build upon Oregon's Family Preservation approach.  The Doris Duke Foundation's Opportunities for Prevention and Transformation Initiative, or Opt-in for Families, will provide ODHS and its community partners with technical assistance to continue the work of connecting families at risk of child welfare involvements with needed material and community supports.  The Doris Duke Foundation recognized Oregon's demonstrated leadership and commitment to innovative models that reduce the need for surveillance-based involvement.  As part of Opt-in for Families, ODHS will implement a pilot program to route reports made to ORCAH that are not considered child abuse to Self Sufficiency Division and community-based organizations.  Many of the calls made to ORCAH are not found to constitute abuse, but they indicate serious economic needs and other hardships that can result in increased risk to the safety and well-being of the children.  This initiative will provide support and resources to those families with serious economic needs and hardships, so that children can stay safely with family in their communities.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

XI.    **Dr. Ajit Jetmalani (2 hours direct testimony).**

Defendants intend to subpoena Dr. Ajit Jetmalani to testify at trial in this matter in a fact witness capacity.  Dr. Jetmalani is the current Director of the Division of Child and Adolescent Psychiatry at OHSU, where he regularly sees patients at OHSU's Doernbecher Children's Hospital.  He is also a former member of the CWOB and the GCC as convened under former Oregon Governor Brown.  Defendants anticipate Dr. Jetmalani to testify consistent with the information and topics as set out below.

Dr. Jetmalani is anticipated to testify regarding his memory of and involvement with the CWOB, GCC, and as a consultant to the ODHS, Child Welfare, and OHA, including regarding: (1) the implementation of health policies and programs to improve care for children, young adults, and their families in Oregon, including efforts he has observed Child Welfare make to improve its systems of care; and (2) his personal observations and opinions regarding system barriers external to Child Welfare which impact the agency's work.

### A.    Professional background.

Dr. Jetmalani holds a Bachelor of Science degree in Biology from Willamette University. He received his medical degree from OHSU in 1983 and his psychiatry training at the University of California San Francisco and Child Psychiatry Fellowship at the Yale Child Study Center.  He has worked in Oregon with children, young adults, and their families at all levels of care for the past 35 years under a trauma-informed, strengths-based lens.  Prior to joining OHSU's faculty in 2007, Dr. Jetmalani was a practicing physician in the field of child and adolescent psychiatry and education and had been working in the Portland area since 1988.  In August of 2009, he was awarded the Joseph Professorship in Child and Adolescent Psychiatry Education.

For the past 17 years he has served as a consultant to both the ODHS and OHA and helped analyze and recommend various strategies for improving systems of care impacting

children, young adults, and their families in Oregon.  He has served on numerous child related committees, including the Children's System Advisory Committee, Juvenile Justice Mental Health Task Force, Youth and Specialized Needs Committee, and the ODHS Unified Child and Youth Safety Implementation Plan Steering Committee, as well as the former CWOB and GCC.

> **B.    The CWOB and GCC.**

In 2019 Governor Brown appointed Dr. Jetmalani to serve on the CWOB.  Established that same year under the EO, Governor Brown created the CWOB with the purpose of convening a diverse group of voices from various organizations and agencies within Oregon's child-serving system to review, discuss, and propose recommendations to reform Child Welfare in the wake of a myriad of difficult issues facing the agency.  The CWOB included representatives from ODHS, Child Welfare, OHA, members of Oregon's judicial branch, and physicians such as Dr. Jetmalani from OHSU.

At the time the CWOB was established, Child Welfare was in the process of returning 80+ foster children and young adults to Oregon who had previously been placed in out-of-state residential facilities due to a lack of available placements equipped to deliver certain services as required by such children.  The CWOB devoted a significant amount of time to strategizing how to best support these children and young adults upon their return, especially given the substantial decline and unavailability of appropriate and supportive placements and services for such children within their own home state, and which had led to their out-of-state placement originally.  Contemporaneous with returning these children to Oregon, Child Welfare was experiencing a surge in caseworker workloads and an increase in the need for and use of temporary lodging.  Dr. Jetmalani is anticipated to testify that these various challenges were brought on by years of decline in medical services and supports impacting low-income families

in Oregon; and as Dr. Jetmalani understood it, the Legislature's failure to adequately fund and support the operations of Child Welfare, despite agency requests for help.

Ultimately, each of the children and young adults previously placed out-of-state for treatment were able to return to Oregon. However, it took a coalition of various agencies and community partners coming together to develop appropriate placements for these children and young adults' return to Oregon, and to improve Child Welfare's ability to care for such children upon their return. During his time on the CWOB, Dr. Jetmalani observed the implementation of various improvements impacting the work of Child Welfare, including a large effort to increase the number of caseworkers within the agency through surge hiring and improved training and supports for caseworkers, as well as efforts to expand the available service array for children and young adults requiring enhanced medical care.

At the end of 2019, the CWOB was dissolved. However, three board members, including Dr. Jetmalani, joined the GCC, an existing body which met every other month to explore pathways toward prosperity for children and families living in poverty in Oregon. Dr. Jetmalani is expected to testify that the state of Child Welfare and efforts to reform its practices and policies became a regular agenda item in such meetings. The GCC also discussed various ways ODHS and Child Welfare could help prevent abuse and neglect from occurring, including through focused support around mental health and substance use issues for caregivers. The GCC also discussed various initiatives designed to meet the needs of parents and children related to behavioral health, housing, early childhood and education.

### C. Child Welfare has made a number of systemic changes and improvements to its systems.

In his role on the CWOB, GCC, and as an independent consultant to Child Welfare and OHA, Dr. Jetmalani has observed ODHS and Child Welfare implement policy, leadership, and

program changes which have improved the operations of Child Welfare and helped to better the

lives of children, young adults, and their families in Oregon.  He is expected to testify to several

examples of ODHS and Child Welfare's efforts to improve the state of Oregon's child welfare

system and the continuum of care for children, young adults, and their families.

> **1.     During the pandemic, Child Welfare staff worked diligently to ensure the safety of children, young adults, and their families at great personal peril.**

Defendants anticipate that Dr. Jetmalani will testify regarding Child Welfare's efforts to

keep children and young adults safe in the midst of the COVID-19 pandemic, including at great

personal peril to agency staff.  He is anticipated to testify that many child caring agencies,

facilities, and programs were forced to reduce their capacity during the pandemic or in some

cases outright close.  Children and young adults faced increased isolation, depression, and the

need for mental health services.  Despite these challenges, ODHS and Child Welfare staff

worked diligently to ensure the needs of the children and young adults in the care of Child

Welfare continued to be met, including through facilitating visitations with kin, the delivery of

personal protective equipment to congregate care facilities servicing children and young adults,

and ensuring appropriate staffing for children and young adults exposed to COVID-19 in the

event they needed to isolate.

> **2.     Diversification of the ODHS and Child Welfare workforce, including at all levels of its leadership.**

Dr. Jetmalani is also anticipated to testify that Child Welfare has intentionally rebuilt the

strength of its workforce, including at all leadership levels, in a way that staffs the agency with

individuals who are trauma-informed, approach the work of Child Welfare from an equity lens,

and who bring, in many cases, their own lived experience of living within the foster care system.

The result has been an increase in staff and leadership who are best able to identify with the

children, young adults, and families they serve, and who can, because of the efforts to recruit and

retain such a diverse workforce, better serve children, young adults, and their families in Oregon.

> **3.    ODHS and Child Welfare have worked to ensure the appropriate use of psychotropic prescriptions for children and youth in foster care.**

Dr. Jetmalani is anticipated to testify that ODHS and Child Welfare have worked, along

with other agencies and community partners, to ensure the appropriate use of psychotropic

pharmaceutical prescriptions for children and adolescents in foster care.  Dr. Jetmalani will

explain the trajectory of the use of psychotropic drugs and a 2003 federal study finding that

foster children and young adults were, at the time, being disproportionately prescribed such

drugs in comparison to their non-foster care peers.  Dr. Jetmalani will explain that through a

series of legislative changes and the implementation of a series of new checks and balances

within ODHS and Child Welfare's systems, including a process to review all new psychiatric

medication prescriptions for children and adolescents in foster care, as well as the creation and

funding of what is known as the OPAL-K, he has seen a dramatic decrease in the use and

prescription of psychotropic drug prescriptions for children and adolescents in foster care.

> **4.    Child Welfare has developed its own pathways to increase the number of available psychiatric beds for children and young adults in Oregon.**

Dr. Jetmalani is anticipated to testify that Child Welfare has developed creative pathways

to increase the number of available PRTF to service the needs of children and adolescents in its

care, despite that the development and creation of new PRTF beds remains in the delegation of

OHA, not Child Welfare.  For example, in 2023, Child Welfare's Treatment Services Program

expanded its contract with Looking Glass Regional Crisis Center, a child-caring agency that

provides PRTF to young adults in foster care.  This expansion provided prioritization of 18

PRTF beds for Oregon young adults in foster care.  The project was so successful that the

Treatment Services Program is now looking to contract with Looking Glass for an additional 14 PRTF beds solely dedicated to young adults in foster care.

As well, Child Welfare's Treatment Services Program has worked with Madrona Recovery to provide an additional three co-occurring PRTF and substance use disorder beds dedicated to young adults ages 13-17.

> **5.    Child Welfare has worked with OHSU to develop practices that improve outcomes for children and adolescents in crisis.**

Dr. Jetmalani is expected to discuss Child Welfare's work with OHSU to develop practices to improve outcomes for children and adolescents in crisis.  For example, Child Welfare worked with Dr. Jetmalani and others at OHSU to develop a coping toolkit to help adolescents with emotion regulation while in temporary lodging.  As well, Child Welfare has worked to implement clinical support in assessing psychiatric needs of children and adolescents within its care, starting with its largest district, District 2, which recently hired one of Dr. Jetmalani's colleagues at OHSU, Dr. Karen Bos, to provide weekly (up to eight hours) clinical support.  Dr. Bos is now also able to help Child Welfare, through this role, in developing upstream strategies for identifying children and adolescents experiencing a high risk of displacement and increased need for psychiatric care.  Likewise, District 2 has developed its own crisis team, built upon the Mobile Response & Stabilization Services model to try and help adolescents in crisis in their homes, where possible, and preventing the need for out-of-home care.

> **6.    Child Welfare has centralized and expanded their abuse hotline.**

Finally, Dr. Jetmalani is expected to testify regarding his knowledge of improvements Child Welfare has made to its screening process related to alleged cases of physical abuse,

neglect or threats of harm as a result of Child Welfare transitioning to a centralized abuse hotline known as the Oregon Child Abuse Reporting Hotline ("ORCAH").

**D.    External barriers to the work of Child Welfare.**

Dr. Jetmalani is anticipated to testify that Child Welfare alone cannot fix problems in Oregon's mental health system for children and adolescents.  He is expected to explain that there are many challenges and barriers external to Child Welfare which impact the agency's work.  For example, the COVID-19 pandemic caused many providers to dramatically reduce their capacity, or in some cases, close their doors altogether.  Whether from financial impacts or the loss of an available workforce, there are fewer facilities available today than were present before the pandemic to treat children and adolescents in crisis.  Of the facilities which managed to stay open during the pandemic, many continue to operate under reduced capacities and are hesitant to accept certain referrals, particularly of children or adolescents prone to physical violence or other aggressions, out of fear of increased liability and harm to their staff.  This lack of additional resources has a direct impact on placement stability for children and young adults in foster care, as well as the increased need for temporary lodging while these same children and young adults await enhanced levels of care.  Defendants anticipate Dr. Jetmalani to share his perspective on the impact of the COVID-19 pandemic on psychiatric treatment, BRS and other mental health programs and placement capacity for children and young adults in Oregon.

Dr. Jetmalani is also anticipated to testify regarding his participation in The Safety Workgroup, a temporary workgroup of the SOCAC, and the recommendations he and others within that workgroup proposed to address challenges young adults with aggressive behaviors face in accessing a full continuum of services.  Dr. Jetmalani is expected to testify that before 2003, OHA used to contract directly with residential providers to ensure the availability of mental health beds for children and young adults, whether or not such beds were in use.  This

process allowed for stability and predictability in staffing and services.  However, now facilities must negotiate separate payment contracts with 15 different coordinated care agencies ("CCOs") that administer the Oregon Health Plan and reimburse providers.  This process generally results in facilities only getting paid when their beds are in use.  This unpredictability of funding, combined with facility closures, workforce loss, and other factors has meant a pullback from the mental health industry in providing care to children, young adults, and their families.

Likewise, Oregon has seen a dramatic increase in mental illness, addiction and substance use disorders, including from opioids and fentanyl, well above national rates.  This escalation of substance use disorders and mental illness in Oregon adults and children has only heightened the need for more behavioral health services in Oregon.  Substance use disorders in adults in particular drive adverse outcomes for children living in drug affected families. The state has simply not kept pace with the need for services and that is a problem involving state policy, funding, and services driven by all members of Oregon's agencies and systems, not just Child Welfare.

> **E.    The leadership and staff within Child Welfare constantly strive to improve outcomes for Oregon children, adolescents, and their families.**

While there is always room for improvement in any agency's work, Dr. Jetmalani is anticipated to testify that, in his opinion and observation, Child Welfare is not deliberately indifferent to the needs of children and adolescents in its care.  Child Welfare is comprised of thousands of passionate civil servants.  These are individuals who show up each and every day with the singular goal of working to improve outcomes for Oregon's children, adolescents, and their families.  Defendants anticipate that Dr. Jetmalani will share his personal experiences and observations of the passion and dedication of Child Welfare's staff and leadership at work.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

**XII.    Rebecca Jones Gaston (2 hours 45 minutes appearing by video deposition).**

Defendants will present videotaped testimony of Rebecca Jones Gaston via her

perpetuation deposition, taken on June 28, 2022, and her discovery deposition, taken on

March 15, 2022.  Specifically, defendants will provide the following testimony:

June 28, 2022 Deposition

Designation Page:Line
5:7-49:6
64:14-67:24
67:25-73:6

March 15, 2022 Deposition

Designation Page:Line
46:20-50:8
55:24-57:23
91:22-94:14
109:10-109:22
125:3-127:5
161:3-161:17
166:10-170:16
171:3-173:6
191:11-195:14
197:23-198:14
204:4-205:5
206:4-210:6
213:13-217:7
234:21-236:4
239:20-241:12
241:16-245:9
247:20-250:8
253:5-258:18
262:4-263:24
269:7-269:15
275:10-278:4

The foregoing witness statement is merely a summary of the testimony defendants

anticipate offering from this witness as of the date of this submission.  Defendants reserve the

right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other

evidence raise matters defendants did not reasonably anticipate.

**Page 131 –    DEFENDANTS' LAY WITNESS STATEMENTS – REBECCA JONES
            GASTON**

**XIII.   Tami J. Kane-Suleiman (2 hours of direct testimony).**

Ms. Kane-Suleiman is the current Program Manager of the CFPRP within Oregon's Department of Human Services ("ODHS"), Child Welfare.  In her role as Program Manager, she reports directly to Child Welfare's Director, Aprille Flint-Gerner.  However, by statute, the work of the CIRT, which falls within CFPRP's program, is directed and reviewed by the ODHS Director, Fariborz Pakseresht.  Ms. Kane-Suleiman will provide testimony on several topics related to her role at Child Welfare, including the work her program is doing to reduce child fatalities in Oregon and improve Child Welfare's systems and practices in a manner that ensures reduced fatalities and maltreatment.

**A.    Personal background and work history.**

Ms. Kane-Suleiman has worked in various roles for Child Welfare over the past 24 years. She will testify regarding various changes she has seen to the internal culture and substantive work of Child Welfare over her career, including (1) the increased focus on preventing abuse as opposed to immediate removal without looking at other available options that still keep children or young adults safe in their home, (2) improving safety culture in a way that allows for transparency and accountability, and (3) encouraging frank discussions to identify areas for improvement with Child Welfare's actions, policies, and procedures.

Ms. Kane-Suleiman holds a Bachelor of Arts in Management and Organizational Leadership from George Fox University and obtained a Master of Social Work from PSU in 2005.  Ms. Kane-Suleiman will testify that she joined Child Welfare in 2000, originally as a CPS caseworker.  She has been with Child Welfare continuously since that date, holding a number of positions, including as a CPS Supervisor, Permanency Supervisor, CPS Program Coordinator, Assistant CPS Program Manager, and Program Manager for the Child Safety Program, which oversees all of CPS.

In 2020, Ms. Kane-Suleiman transitioned into her current role as Program Manager for CFPRP.  Ms. Kane-Suleiman will testify that, in 2019, Child Welfare moved to separate the work of the CIRT from that of the Child Safety Program, as part of ongoing discussions with A&M, a consulting firm.  In 2019, while serving as the Program Manager for Child Safety, Ms. Kane-Suleiman prepared a proposal to formalize this separation, as a way to elevate the importance of reviewing child fatalities that qualify as critical incidents, identify prevention opportunities, and to help ensure transparency and system accountability in Child Welfare's actions, practices, and procedures.  Prior to the creation of the CFPRP program, the work of the CIRT was performed within the Child Safety Program.

The CIRT is a major part of CFPRP's role within Child Welfare.  The CIRT reviews child fatalities that qualify as "critical incidents" under Oregon law,[4] as detailed more below, and also has the discretion to conduct internal reviews, including fatalities and serious injuries that do not otherwise qualify as critical incidents.[5]  Ms. Kane-Suleiman will explain that the CIRT team aims to increase child safety by: (1) rapidly drawing lessons from a critical incident to improve local and statewide systems as administered by ODHS; (2) increasing ODHS's accountability to the public; (3) evaluating and learning from cases designated as critical incidents; (4) ensuring timely responses by ODHS with respect to a critical incident and recommendations that result from critical incident reviews; and (5) increasing ODHS's ability to address and recommend necessary changes to systems.  Even with the best laws, rules, Child Welfare practice models and procedures, we still need our health care providers, public health, education, local educational

---

[4] ORS 418.804-816; OAR 413-017-0045.

[5] OAR 413-017-0095.

agency, Early Learning, our neighbors, our communities to work together to eliminate child abuse and neglect fatalities. We cannot do it alone.

    **B.**      **The work of the CFPRP and the CIRT.**

As the Program Manager of CFPRP, Ms. Kane-Suleiman manages a total of 12 personnel, including various coordinators whose work involves CIRT reviews, system improvement (including activity described in Part C below), and application of the CARA. Ms. Kane-Suleiman will testify regarding the roles of these various personnel and the overall work of CFPRP.

Ms. Kane-Suleiman will explain that CFPRP undertakes a CIRT review when Child Welfare identifies when a child fatality meets Oregon's statutory definition of a "critical incident" and the ODHS Director authorizes an investigation into such fatality. A critical incident is a situation in which ODHS and/or law enforcement reasonably believes the death of an Oregon child was the result of child abuse and the child was in the custody of Child Welfare at the time of their death; or they, their sibling, or any other child living in the household with the deceased child was: (1) the subject of a CPS assessment within 12 months preceding their death; (2) had a pending Child Welfare or adoption case with ODHS within the 12 months preceding their death; or (3) the subject of a report of child abuse made to ODHS or law enforcement within the 12 months preceding their death, regardless of whether the report of abuse was closed at screening without an investigation.

Once a CIRT has been convened, a CIRT coordinator conducts an in-depth review of the circumstances surrounding the critical incident and history leading up to the deceased child's fatality. There are short timelines required under which a CIRT must be convened, and for the initial review and any follow-up meetings. The entire process is to be completed in 100 days, with CFPRP issuing a final public report and recommendations within that 100-day timeframe.

**Page 134 –**    **DEFENDANTS' LAY WITNESS STATEMENTS – TAMI J. KANE-SULEIMAN**

During the initial review process, the team gathers and reviews critical documents, including historical case records related to the deceased child or young adult and their family, and holds voluntary meetings with key personnel from Child Welfare and community partners. Ms. Kane-Suleiman will also testify as to the generation and use of Sensitive Issue Reports as it relates to critical incidents and the work of the CFPRP.

After gathering initial information, a CIRT coordinator next convenes an initial meeting to introduce the ODHS Director (or deputy), Child Welfare Director (or deputy), ODHS communications personnel, ODHS legal counsel, relevant CPS caseworkers, supervisors, program managers, and district managers to the circumstances surrounding the critical incident and CIRT review process, and to honor the deceased child. Following this initial meeting, the CIRT coordinator continues to gather records and other information relevant to the care, living situation, and death of the child. This is done in an effort to determine actions taken or not taken by Child Welfare or law enforcement in response to the critical incident or to the events leading up to the critical incident.[6]

Approximately 60 to 70 days within the review process, the review team holds a follow-up meeting with the ODHS Director (or deputy), ODHS communications personnel, Child Welfare Director (or deputy), and various program managers, including managers from CPS, Permanency, Reunification, and Workforce Training and Development. Depending on the circumstances and facts of the case, the review team will also invite the Oregon Child Abuse Hotline ("ORCAH") screening manager, local program and district managers, CPS and/or permanency supervisors, caseworkers involved for the child, and relevant community partners,

---

[6] ORS 418.813(3)(k); ORS 418.813(5)(d).

such as the OHA, county mental health providers, school officials, and/or designated medical professionals.

At the follow-up meeting, the CIRT coordinator facilitates a discussion regarding the CPS assessment related to the child fatality. Relevant program consultants also provide feedback related to the practice of screening, assessment, permanency, and certification as may be relevant to the case. In rare cases, a CIRT may be convened where there has not been a CPS assessment opened related to the child fatality. As Ms. Kane-Suleiman will explain, this usually only occurs when the incident was closed at the time of the ORCAH screening. Regardless of whether a CPS assessment was opened or not related to the child fatality, the CIRT review team continues its process to make recommendations for local and/or statewide system improvements to Child Welfare or law enforcement activities, and those recommendations, along with relevant case history, are compiled into a final public report as issued by CFPRP. CFPRP, along with other programs thereafter work to implement proposed recommendations from the report as they relate to system practices and procedures within Child Welfare.

As Ms. Kane-Suleiman will testify, in 2017 and again in 2019, the Oregon Legislature broadened and expanded the definition of what constitutes a "critical incident." As a consequence of these legislative changes, Child Welfare saw an increase in the number of CIRT reviews convened under the broadened definition of "critical incidents." Thus, an increase in the number of CIRT reviews, especially from 2019 forward, does not necessarily correlate with an overall increase in fatalities of children or young adults in the care of Child Welfare. Rather, the broadened definition of a critical incident now means more potential scenarios may qualify as a critical incident and may now trigger the convening of a CIRT.

C.    **Child Welfare has undertaken several efforts to decrease the rate of child fatalities for children both in and outside its custody.**

Ms. Kane-Suleiman will testify that Child Welfare, and in particular CFPRP, has undertaken several efforts to decrease the rate of child fatalities in Oregon, which benefits children in the custody of Child Welfare and beyond.

1.    **Work under the Child Abuse Prevention and Treatment Act.**

CFPRP administers a portion of the federal funding associated with the CAPTA.  As part of this work, CFPRP has undertaken efforts to implement CARA, which mandates state child welfare agencies and families serving professionals to complete a "Plan of Care" in circumstances involving infants with pre-natal substance exposure.

One of the ways in which CFPRP facilitates administering these funds involves providing funding to local child welfare branches to support caregivers suffering from substance use disorders to engage in treatment and to ensure an affected family's concrete needs are met.  The goal of the Plan of Care is to ensure infants and their families are connected to supportive services in their communities.  A Plan of Care for an infant and family has the potential to avert a crisis response at birth, keep infants with their families, and provide needed support and services after hospital discharge.

2.    **Safe Sleep for infants in Oregon.**

Another work stream CFPRP has pushed forward since its launch in 2020 is the implementation of infant safety staffings and improved guidelines for CPS caseworkers regarding the vulnerability of infants (defined as children from birth up to 12 months).  Although the exact staffing structure varies around the state, CFPRP has encouraged districts to expand the number of people who get involved and come together to plan for a caseworker's initial contact when a CPS assessment involves a home with an infant.  Caseworkers are now able to utilize

resources, such as well-being nurses, to better assess potential abuse and other harms involving infants.

Ms. Kane-Suleiman will testify that she and her team found a disproportionate number of critical incidents involving infant fatalities due to unsafe sleep environments.  As a result, CFPRP developed a number of educational supports for parents/caregivers, caseworkers, and others in an effort to improve Safe Sleep environments for infants in Oregon.  For example, CFPRP, in partnership with other Safe Sleep experts, developed a self-study Safe Sleep training for all CPS, permanency, certification, and adoption staff around the issue of Safe Sleep.  The program has also created a version of the self-study Safe Sleep training for community partners and family-serving professionals, including resource parents, medical professionals, and staff of Women Infants, & Children programs, and has partnered closely with OHA and other state agencies to ensure Child Welfare and partners are using a shared language around the issue of Safe Sleep.

CFPRP also continues to educate caseworkers and district staff regarding the importance of slowing down their work when their assessments involve infants.  This ensures that a caseworker implements a Safe Sleep checklist, the infant has a Safe Sleep environment, and the caseworker has taken sufficient time to assess the circumstances in the home.  Ms. Kane-Suleiman will acknowledge that gathering a larger body of resources to pre-plan for an initial contact by a caseworker can be difficult, especially if there is a 24- or 72-hour response deadline associated with the case, but that districts are creative in trying to best support caseworkers despite such tight deadlines.

In addition to providing educational supports and resources, the CFPRP program has also implemented a requirement for ORCAH screeners to write in the subject line of their CPS

referrals a note which states "Infant." This way the district or branch receiving the assignment can easily and immediately see that the case involves a child with heightened vulnerability.

CFPRP has also used CARA funding to buy bassinets and Safe Sleep bundles so that caseworkers can go out to their initial case contacts with a bassinet in-hand and ready to provide to families with emergent needs. Ms. Kane-Suleiman will explain that her team knows from past history that having bassinets readily available (without delays caused by ordering once the need presents itself) can help save lives—which is why she and her team have worked to make these supports available. The program has become so popular that CFPRP has already purchased nearly 2,200 bassinets since 2020 for families in need.

Finally, CFPRP has also created a Safe Sleep checklist tool for caseworkers to review and follow as they complete their CPS assessments. This checklist consists of various questions a caseworker should discuss with a parent/caregiver when performing a CPS assessment with infants in the home. The checklist also includes "infant safe sleep conversation guidance," to assist caseworkers in discussing safe sleep with parents/caregivers. Since implementing this checklist tool in 2020, CFPRP has tracked data indicating that caseworkers and other Child Welfare staff from across the state have completed nearly 10,000 checklists. As a result of these and other tools and trainings developed by CFPRP, Child Welfare has seen a dramatic decrease in the number of critical incidents involving unsafe sleep in Oregon, including child fatalities while an open assessment remains pending. From 2022 to 2023, the number of infant fatality CIRTs related to unsafe sleep environments dropped from 14 to 6, a 42% decrease.

### 3.    Suicide prevention.

The CFPRP program has also invested heavily in suicide prevention efforts directed to children and families in Oregon. Ms. Kane-Suleiman will testify that CFPRP has worked closely with OHA to implement and lead trainings for all ODHS staff known as QPR. QPR is an

evidence-based suicide prevention training, developed originally in Michigan through the QPR Institute, and which is now mandatory for all ODHS staff since July of 2020. CFPRP facilitates this training quarterly for Child Welfare staff and computer-based training is available for all other divisions in ODHS. At the time this programming was implemented, Oregon was only the second state in the country to bring this training and tools to child welfare. Currently, CFPRP's suicide prevention coordinator is working on a new training called "Youth Save," which is also an evidence-based skills training that involves training surrounding more intervention tactics as it relates to suicide prevention. Ms. Kane-Suleiman will explain that CFPRP is developing this new program specifically to help caseworkers (both assigned permanency workers and others) in contact with children with mental health struggles, suicide ideation, and in particular those with suicide ideation currently residing in temporary lodging. CFPRP's goal is to implement this training starting in the Fall of 2024.

### 4.    Addressing the impacts of fentanyl.

Ms. Kane-Suleiman will explain all of the work her program has been doing to address fentanyl and other substance use disorders and addictions and their impacts on children, young adults, and their families in Oregon. She will talk about the guidance her program has provided to caseworkers and others within Child Welfare related to safety planning and substance use. She will testify about CFPRP's meaningful prevention and intervention efforts to ensure that all ODHS staff—in particular Child Welfare caseworkers and those involved in addiction recovery—carry and know how to use Naloxone, a medicine that rapidly reverses an opioid overdose. As with much of its other programming, CFPRP partners with OHA to bring in experts to help caseworkers and families handle and navigate challenging issues related to substance use. Ms. Kane-Suleiman will talk about the work CFPRP is undertaking to partner

with schools and other community organizations to get out important messaging to children and young adults about the dangers of substance use and where to access resources for help.

### 5.    Impacts on Child Welfare policy and practices from the work of CFPRP and the CIRT reviews.

Ms. Kane-Suleiman will testify that prior to the creation of CFPRP and separation of its work from the Child Safety Program, historically Child Welfare's CIRT reviews were considered punitive by caseworkers and other Child Welfare staff involved in examining the circumstances leading up to a critical incident.  Starting in 2019, that changed.  After attending a conference out-of-state related to safety culture associated with the CIRT process, Ms. Kane-Suleiman urged leadership in Child Welfare to support the state's CIRT review model to be more in line with modern practice, noting that decisions related to personnel matters and discipline need to be separate from the learning for which CIRT reviews are intended.  Improving the CIRT process is just one of the ways for Child Welfare to achieve systemic change of its systems and policies to lead to better outcomes for children in Oregon.  As a result, CIRT reviews in particular and the work of CFPRP generally reflect more robust practices to better look at system-wide accountability.

### 6.    Trainings around chronic neglect, anti-racism, and bias.

Ms. Kane-Suleiman will testify that as her program got off the ground and started analyzing data related to child fatalities, as well as recurrence of maltreatment and re-entry, her team noticed that many cases involved issues of chronic neglect.  As a result of analyzing this data, CFPRP developed and now leads an advanced optional two-day course for caseworkers and Child Welfare staff addressing chronic neglect.

This course incorporates in particular anti-racism practice and addressing personal bias. Ms. Kane-Suleiman will talk about the tools her program has developed to help, as best as

possible, eliminate bias in the work of Child Welfare and in Child Welfare caseworker interactions with families as part of services targeted to address systemic manifestations of inequity.

### 7. Use of the Safe Systems Improvement Tool.

Safe Systems analysis is a critical extension of Oregon's child fatality review process. The SSIT is within the CANS tool and supports organizational learning and an improvement approach focused on human interaction and complex systems. Ms. Kane-Suleiman will testify that Child Welfare has been working to implement SSIT in its critical incident review process since 2019. Through application of SSIT, CFPRP has been able to gather critical information from CIRT reviews to better understand what families needed, what they received, and what the assigned caseworker may have needed, all in an effort to better understand the challenges which contributed to a tragic outcome, as well as to help create a greater understanding of necessary system improvements.

### D. External barriers to Child Welfare's work.

Ms. Kane-Suleiman will testify that there are external barriers that impact the work of CFPRP. For example, by law, a CIRT review must also look at the actions and inactions of law enforcement leading up to a critical incident. Neither Child Welfare specifically, nor ODHS as an Oregon executive agency, have the authority to institute change within law enforcement agencies, even if the CIRT assessment determines there were critical misses by law enforcement.

Likewise, Oregon faces statewide challenges in substance abuse and behavioral/mental health treatment options. Oregon lacks sufficient substance use treatment for young adults as well as treatment programs that will accept parents with their young children. There are simply not enough detox and treatment providers—which OHA holds the authority to certify and license—to treat children and young adults in crisis as a result of substance use disorders. The

same is true of Psychiatric Residential Treatment Facilities (PRTFs), which, again, OHA holds the authority to certify and license, not Child Welfare. These are just a handful of various external barriers and factors that impact the lives of children and young adults in the care of Child Welfare. Everyday Ms. Kane-Suleiman and her team work tirelessly to overcome these barriers in an effort to improve the lives of children and young adults in Oregon, and to improve on the very intensive work undertaken by the dedicated staff of Child Welfare.

**E.      No correlation between overdue CPS assessments and critical incidents.**

Based upon her review of Child Welfare's most recent data from 2022-2023, Ms. Kane-Suleiman will testify that she has not found a direct correlation between child fatalities that constitute critical incidents, and CPS still having an open and overdue assessment associated with such child. For example, in 2022, Child Welfare had convened 30 CIRTs. However, at the time, only nine of those critical incidents involved cases were there was an overdue assessment, which is just 30% of the total of all CIRTS convened for 2022. In 2023, there were 23 CIRTs convened. Seven of those CIRTS occurred while an open assessment was pending (30%), and of those with an open assessment, only one was overdue at the time the CIRT, meaning just 4% of the total of all CIRTS in 2023. And in 2024, there have been just three CIRTs convened to date. None have coincided with an open or overdue CPS assessment.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission. Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

**XIV.   Kristen Khamnohack (2 hours direct testimony).**

Kristen Khamnohack serves as Screening Program Manager and Administrator of the Oregon Child Abuse Hotline ("ORCAH").  She will testify about (1) Child Welfare's transition to a centralized hotline that screens calls of alleged reports of child abuse or neglect around the clock; (2) a structured decision making screening tool implemented by ORCAH that ensures consistency of screening decisions; (3) ORCAH's creation of a CQI program to use data and quality assurance to improve service delivery continuously; (4) the robust training and coaching of ORCAH workforce provided by ORCAH's training program; and (5) screening procedures.

**A.      Professional background.**

Ms. Khamnohack received her bachelor's degree in Family & Human Services from the University of Oregon in 2003.  She completed a one-year internship with Child Welfare in Lane County during her undergraduate studies.  At the time of Ms. Khamnohack's graduation, the agency had a hiring freeze, so she worked for the Oregon Child Development Coalition for 10 months.  She ultimately accepted a CPS caseworker position in Washington County in March 2004.  She spent approximately four years in that position and became a lead for the county in assessing allegations and assisting with child protective service screenings.

In 2008, Ms. Khamnohack moved to a position in the Child Welfare Central Office that focused on improving practice and delivering Oregon Safety Model training.  She and a team of nine Central Office staff traveled throughout the state to implement a new safety/practice model. The team also provided training and coaching for staff to improve their understanding of safety decision making.

Ms. Khamnohack held various other roles in Child Welfare's Central Office and Columbia County until she returned to Washington County in 2016 as interim Child Welfare Program Manager, overseeing the Hillsboro Child Welfare office as Branch Manager.  At the

**Page 144 –   DEFENDANTS' LAY WITNESS STATEMENTS – KRISTEN
                         KHAMNOHACK**

end of 2016, she took a permanent position as Program Manager in Clackamas County. During her time there, she oversaw the Clackamas County child abuse hotline. She moved to her current position, Screening Program Manager and Administrator of ORCAH, when the new position was created in 2018 as part of the consolidation of ODHS's child abuse and neglect reporting response from district based to ORCAH's centralized model.

**B.    Implementing the hotline.**

Ms. Khamnohack led ORCAH's implementation. She has been in her role for nearly six years and oversees the administration of a centralized child abuse reporting hotline that takes calls around the clock throughout Oregon.

Child Welfare charged Ms. Khamnohack with building ORCAH from the ground up. This involved absorbing 15 regional child abuse hotlines, transitioning both the workforce and the calls received statewide, and merging each hotline into a single call reporting system. Before the creation of ORCAH, each District Office maintained its own hotlines from 8:00 am to 5:00 pm, with only District 2, operating a continuous hotline. This decentralized system led to inconsistent screening decisions. April 4, 2024, marked the fifth anniversary of ORCAH going live statewide. This means that children, young adults, and families have access to a continuous hotline statewide that applies uniform screening criteria.

Child Welfare chose to centralize the hotline and improve screening decisions in 2016 because of recommendations from Public Knowledge's 2016 report. That report found that the decentralized hotlines lacked standardized protocols, leading to inconsistent responses to allegations of abuse depending on where the report was made. At that time, Child Welfare created an advisory committee and seven subcommittees to develop plans for implementing a

centralized hotline.  Child Welfare hired Ms. Khamnohack in June 2018 to execute that implementation plan.

In August 2018, local districts started to transition their hotlines to the centralized hotline. Over eight months, 15 regional hotlines were folded into ORCAH's centralized hotline using a phased implementation model.  This required not only transitioning the workforce and workload into the new centralized system but doing so while also hiring and training new screeners.  As each office prepared for the transition, screening staff in those offices decided whether they would transfer to another position in their local office or whether they wanted to transfer to Portland to continue as a screener with the centralized hotline.  Ms. Khamnohack asked her team at the Clackamas County hotline to become the first unit to move to the centralized hotline.

Approximately 30% of the regional hotline screening workforce transferred to the centralized hotline based out of Portland, which initially resulted in longer than anticipated wait times when ORCAH first went live for the entire state in April 2019.  During the summer of 2019, however, ORCAH began to build the foundation that has led to its current successes.  Over the next three years, which included transitioning to remote work during COVID-19, ORCAH overcame multiple challenges, but the overall trajectory marched toward improvement.

ORCAH established benchmarks for service levels based on recommendations from national call center experts that all calls should be answered at a rate of 80% within four minutes. In 2022, ORCAH's service levels—the percentage of calls answered in under four minutes— exceeded the benchmark answering 88% of calls in under four minutes.  In 2023, ORCAH's service levels improved to 91%.  The 2023 numbers show continued improvements on a variety of metrics.  ORCAH also introduced structured decision making at screening, robust CQI and

quality assurance programs, performance management expectations, and a rigorous training program.

Centralizing the hotline was an iterative process, and Ms. Khamnohack continuously sought out best practices. Child Welfare partnered with Casey Family Programs for peer-to-peer engagement with other national leaders who had centralized child abuse hotlines in other states. Ms. Khamnohack and her team visited Florida's centralized hotline in December 2018, which has been operating for more than 30 years. Florida's program included a training model and a CQI program that screened for both child abuse and elder abuse. Ms. Khamnohack also studied national best practices from Casey Family Programs, and contracted with Action for Child Protection, a national organization that assists child welfare agencies, to develop training and coaching programs for screeners.

Child Welfare also worked with Action for Child Protection to implement the Oregon Safety Model. That model works to identify safety threats, develop safety plans, understand family conditions, determine conditions for a return to parents, determine how to keep children and young adults safe at home, and determine expected outcomes or goals for families to achieve in order to close the case.

Oregon adopted and implemented this model over time. Staff had previously received training on how to identify safety threats, develop and monitor safety plans, and how to work with different community-based organizations and providers. Prior to centralizing the hotline, the model started at CPS and went through case closure. After centralizing the hotline, ORCAH began to infuse some of the safety model's concepts into data collection within screening. This included incorporating the six domains for information collection at screening and adopting definitions for response times associated with present, impending, or no-danger language. The

six domains include extent of abuse, circumstances surrounding the abuse, adult functioning, child functioning, parenting practices, and disciplinary practices.

Ms. Khamnohack testified at the Oregon Legislature to request funding for additional positions to implement the centralized hotline. She authored two POP: 119 Centralized Screening, 19-21, and CW08 Oregon Child Abuse Hotline, 21-23. The POPs requested additional positions for screeners, supervisors, office and administrative staff for operation technical support, operations and policy analysts, managers, and a training and development specialist. The 21-23 POP also requested additional funding for ORCAH CQI and training programs that were not previously funded. ORCAH received partial funding from the legislature for POPs 119 and CW08.

ORCAH presently has a staff of over 240 employees. Ms. Khamnohack oversees four program managers, each in charge of their own programs for screening, hiring and training, as well as a CQI program. The screening program managers supervise the 23 screening supervisors and approximately 140.5 screener positions. The hiring and training program manager oversees a hiring and training supervisor and six trainers. And the CQI Program Manager oversees a CQI supervisor and six CQI quality assurance specialists. She also oversees a screening program consultant, screening program coordinator, training development specialist, and business operations manager who oversees administrative staff.

### C.    ORCAH continues to improve.

#### 1.    Decrease in wait times at the hotline.

Shorter wait times are important for child safety. ORCAH's 2023 Child Abuse Hotline Annual Report shows that 91% of calls were answered in under four minutes, which is 11% higher than the 80% benchmark. That same report shows that the average call received by

ORCAH in 2023 was answered in under two minutes.  Shorter wait times mean that allegations of abuse are screened in a prompt, thorough, and consistent manner.

ORCAH is using CQI to continue to improve its practices.  ORCAH has prioritized the three following performance areas to monitor using CQI:

- Contribute to Child Welfare's mission of ensuring child safety in a manner that promotes equitable service delivery;

- Provide consistency in equitable decision making in alignment with statute and policy; and

- Provide timely customer service that meets the needs of children and families while also being trauma-informed and considering cultural context.

In 2022, after a CQI review resulted in the implementation of structured decision making tools, ORCAH established key performance indicators to measure and evaluate how effectively it is meeting its performance priorities.

Ms. Khamnohack attributes much of this success to the implementation of a CQI program and performance management expectations for screeners, which includes the ability to track all screening activities in real time.  ORCAH uses OpenScape, a call center software that manages all incoming contacts to the hotline.  OpenScape refers contacts to screeners through a structured process and manages incoming workload, business administrative tasks, and workforce.  This software allows ORCAH to benefit from workforce optimization.  Screeners must complete a set number of contacts (either calls through the hotline or police reports that are cross-reported to ORCAH for screening) per shift and OpenScape optimizes how that work is assigned in real time.  Performance management expectations allow ORCAH to manage incoming contacts with available and trained screeners to ensure child and young adult safety and timely assign "screened in" reports to CPS for investigation.

### 2.    Structured decision making.

ORCAH has implemented a SDM Tool to ensure consistency in screening reports of alleged abuse or neglect.  Creating an SDM Tool is a national best practice.  The SDM Tool was designed by Evident Change, a nonprofit that uses data and research to improve systems, at the recommendation of Casey Family Programs.  From July 2021 to August 2022, ORCAH partnered with ODHS, OTIS, nine Tribes of Oregon, the Tribal Affairs Office, PSU, the Child Welfare Race and Equity leadership team, parent mentors, community organizations, family services programs, mental health providers, Child Welfare executive leadership, program managers, and supervisors to solicit feedback on the Tool.

In 2022, the new SDM Tool launched.  The SDM Tool assists screeners in identifying required information to collect from reports of alleged abuse or neglect and provides criteria for screening reports.  This evidence- and research-based Tool helps Child Welfare meet best practices by using structured decision tools to improve the consistency and validity of each decision.  The SDM Tool ensures that screening decisions across ORCAH staff are consistent.

### 3.    CQI Program.

In October 2019, ORCAH established its own CQI program.  Quality assurance specialists, who receive special training, review a random selection of screening reports each month, along with listening to live calls (selected at random) with a screening supervisor.  ORCAH staff also review requests from service delivery offices (local offices) and community reporters to reconsider screening decisions to ensure decisions align with procedures.  Data, including monthly and quarterly quality assurance reports, are used to determine improvements needed in procedure, training, coaching, technology, documentation, or other areas of concern.  Quality assurance specialists review screening reports to determine if timeliness measures were

met.  ORCAH currently has one supervisor and six quality assurance specialists who review screening decisions and practice.

### 4.    Training.

ORCAH has invested heavily in training.  It started the Screening Training Academy in 2019, and has conducted 23 academies over the last five years.  The training includes multiple phases and varies in length based upon the individual screener's competency.

The Academy begins with two weeks of onboarding.  Screeners receive orientation and technology training, required child welfare training, and web-based training.  Screeners then attend three weeks of classroom training that includes subject matter information and practice application delivered by coaching and training specialists and screening program consultants where screeners learn practice and application.

Screeners then participate in three to four weeks of post-academy coaching, where they apply their learning, listen to live calls, and document mock reports that are evaluated by a coach or screening consultant.  New screeners also receive additional advanced training on subjects like domestic violence, substance use, mental health, suicidal ideation, child development, and children and young adults with special needs.  Once a worker has demonstrated a level of competence, they begin to take calls on their own with a coach in 1:1 or 1:3 sessions.  A screener competency evaluation is conducted through post-academy coaching, where the training team evaluates the person's readiness to transfer to a unit.  Competency evaluations determine readiness, meaning some screeners stay in coaching longer, based on their ability to take independent calls.

A screener's first three months are spent with a training team where they receive further training and skill development.  The screener then transfers to one of 16 different schedules that

occur over 24/7 cycles, with one supervisor and a team of six to eight peers, and transitions to a shift schedule.

All ORCAH staff continue to receive advanced, ongoing training by the same specialists and consultants from the Screening Program, including program and practice changes and advanced subjects such as disability, context of culture at screening, and understanding family conditions. The CQI process identifies and recommends subjects for staff to receive training. For example, staff have received training on current ICWA search and documentation policies. Staff are also preparing for training on removing bias and conscious decision making based on a CIRT review recommendation in the fall of 2023.

### 5. Screening procedures.

Ms. Khamnohack will also testify about the process of screening calls that come into the centralized hotline. When a screener answers a call, they interview the contact to gather information about demographics, the extent of suspected abuse, circumstances surrounding the suspected abuse, and child vulnerability. The questions asked in the screening process are based on the extensive training and coaching that screeners receive in collecting information. After screeners have documented all relevant information in the ORCAH Documentation Guide, a modernized screening report platform connected to OR-Kids, they identify the subject(s) of a report and review relevant child welfare history, including other information already in ODHS systems and court records. With the assistance of the SDM Tool to ensure decisions are consistent, the screener then makes the determination whether the report meets the criteria to assign for an assessment by CPS or to designate as "closed at screening."

In cases where the screener makes an assignment, the screener assigns a response time of 24-hours, 72-hours, or 10-business days for the CPS investigator to make face-to-face contact

with the child or young adult based on the application of the information in the abuse report to the SDM Tool. For children and young adults already in Child Welfare's custody and placed in substitute care, all caseworkers and their supervisors assigned to the case receive a notification and are required to promptly initiate an internal out-of-home-care staffing with permanency and CPS personnel. At this staffing, both CPS and permanency caseworkers and supervisors meet to discuss any concerns noted in the report and to develop a plan to keep the child or young adult safe.

She will describe the impact of SB155, which divided responsibility for assessing and investigating reports of child abuse between Child Welfare and OTIS.

### D.  Conclusion.

In just over five years, Oregon has centralized its hotline, resulting in sustained average wait times of under two minutes. To accomplish this, Child Welfare converted 15 regional hotlines with inconsistent practices to a centralized hub with a staff of more than 240, including 140 screeners who take calls so that the hotline is staffed by trained screeners 24/7. ORCAH's success is also a result of a commitment to embracing structured decision making and using robust CQI and quality assurance practices as well as a self-sufficient training model that also embraces those principles.

Ms. Khamnohack will also testify in response to any incorrect information presented by plaintiffs' experts and other witnesses relating to her work area.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission. Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

**XV.    Duane Kowalski (1 hour direct testimony).**

    **A.    Professional background.**

Mr. Kowalski is a peer mentor with Morrison Child & Family Services in Portland.  He has served in that role since 2014.  At Morrison, Mr. Kowalski works with parents—most often with fathers—who are involved in the child welfare system.  He assists them in finding housing, employment, services, he offers support during court appearances, and with substance abuse recovery.  Mr. Kowalski also facilitates support groups for fathers, some of which meet in recovery centers.  Prior to joining Morrison, Mr. Kowalski worked as a peer support specialist for the Iron Tribe Network, a Clackamas County non-profit that provides peer support, housing, and family reunification services to parents involved in the child welfare system.  Mr. Kowalski has been in long-term recovery from substance use disorder for 31 years, and he is an unregistered member of the Delaware Tribe of Indians.

    **B.    Mr. Kowalski's lived experience with Child Welfare.**

Mr. Kowalski has been involved with Child Welfare twice during his adulthood.  He is the parent of five children: four girls and a boy, who is the middle child.  The two oldest children, both girls, were removed from his and his first ex-wife's custody in 1995.  The children were one and three years old.  They were living with Mr. Kowalski's ex-wife at the time they were removed.  She struggled with alcohol and drug abuse and would abandon the children for days at a time, leaving them with a babysitter.  This resulted in Child Welfare removing the children.  They were placed with Mr. Kowalski's parents because Mr. Kowalski was homeless at the time.  Although he was three years sober at the time, he did not have a permanent address, and his lack of stability and resulting inability to protect his children from their mother precluded him retaining custody of his girls.  It took three years for them to return to his custody.

Mr. Kowalski's two youngest children, also both girls, were removed from his custody for two weeks in 2012. They were eight and nine at the time and had been living with their mother, Mr. Kowalski's second ex-wife. She had been sober when she and Mr. Kowalski were married, but she relapsed after their divorce, and Child Welfare removed the children on the basis of neglect. Mr. Kowalski's ex-wife was incarcerated after that removal, achieved sobriety while in prison, and has remained sober for 11 years. Mr. Kowalski did not learn of the children's removal from Child Welfare. Instead, a friend informed him that they had been removed, and he had to contact Child Welfare through the child abuse hotline, for lack of a clear avenue to contact Child Welfare. He ultimately worked with the agency to regain custody of his daughters. They remained in his home until they were adults.

During that removal, as brief as it was, Mr. Kowalski's older daughter formed a strong connection with their resource mother. Mr. Kowalski's daughter is non-binary and used they/them pronouns even at the age of nine. Her resource mother was invested in supporting them in that identity and provided her phone number to Mr. Kowalski's daughter when they left foster care. They have stayed in touch to this day, with foster care having provided Mr. Kowalski's daughter a friend and advocate from the age of nine to 22.

Finally, Mr. Kowalski is currently involved with Child Welfare as a guardian to his eight year old grandson. Mr. Kowalski's daughter (the younger of the two removed from their mother in 1995) has struggled with substance use disorder and has been a victim to domestic violence, and Child Welfare removed her son in 2019 because she was unable to keep him safe. Mr. Kowalski was initially denied certification as a guardian because of his history with Child Welfare, but he worked with the juvenile court to approve the placement, relying in part on his relationship with the judge that Mr. Kowalski had built through years of being a parent advocate

in juvenile dependency proceedings. Mr. Kowalski's daughter now lives with him and her grandson, which has allowed his grandson to remain with his family in a stable home environment and provides support for his daughter in her ongoing recovery and treatment.

   **C.    Child Welfare has significantly improved since his first involvement with the agency.**

   Mr. Kowalski has witnessed significant improvements to ODHS since his first experience with it. Its focus has shifted to a more positive, strength-based approach that is geared toward supporting parents rather than punishing them. During his first Child Welfare involvement, he did not receive any services. Child Welfare and its community partners did not offer any services for fathers. He was told that he needed to do a parenting class, but Child Welfare could not tell him where to go, leaving him to find his own class. He did so, and when he arrived, he was the only father sitting in the room. That parenting class was tailored only to mothers.

   Today, there are multiple parenting classes that Mr. Kowalski is aware of that are tailored to fathers. One includes an anger management component, and another has a hands-on parenting focus. Mr. Kowalski sees the increased positivity in Child Welfare through these classes and other services. The culture of Child Welfare has changed from punishment to helping support parents become better parents and reunify with their children. Rather than focusing on how parents are falling short, Child Welfare focuses on how parents can learn to do better.

   Mr. Kowalski also sees that Child Welfare has become more collaborative with the communities it serves. Parents' voices are being implemented throughout the system, as are other partners' perspectives. Mr. Kowalski has become a vocal participant in partnering with Child Welfare, and he credits leaders including Lisa Bender, Lacey Andresen, Aprille Flint-Gerner, and Molly Miller (whom Mr. Kowalski has known since she was a caseworker) with changing the culture of Child Welfare for the better.

**D.    Mr. Kowalski's participation in multiple Child Welfare committees and workgroups.**

Mr. Kowalski is involved in several Child Welfare workgroups and committees, and he plays an integral role in providing parent and community input to Child Welfare.

**1.    Parent Advisory Council.**

Mr. Kowalski serves on Child Welfare's PAC and has for approximately two years. The PAC is composed of parents who have had at least one child welfare case, are now in recovery, and are in good standing in their communities. The PAC meets monthly with Child Welfare's executive team leaders (Ms. Flint-Gerner, Ms. Andresen, Ms. Bender, and the new addition to that team, Ms. Miller) to provide the perspective of parents who have experienced Child Welfare. It is supported by Morrison Child & Family Services, where Mr. Kowalski is employed. PAC members are routinely asked to provide feedback on new concepts, program initiatives, and documents from the lens of parents' lived expertise, and identify concepts and areas of practice that they want to collaborate on together.

The PAC has approximately 15 members, not including Child Welfare leaders who attend meetings. It provides parents an opportunity to give feedback to Child Welfare and to hear from other committees and workgroups, such as the one for incarcerated parents. The PAC includes parents from all over the state and many counties. In addition to monthly meetings with Child Welfare, there are monthly conference calls among the PAC members, and calls with Child Welfare leaders to provide updates and talk through questions.

Currently, the PAC and Child Welfare are collaborating on a legislative concept for the '25-27 long session to codify the values of family preservation, including parents' rights. The incarcerated parent work group is currently drafting amendments to the procedure manual in collaboration with Child Welfare and is gathering information on contact information for prisons

and jails in Oregon.  The PAC works together with Child Welfare, although policy implementation is ultimately up to Child Welfare.

### 2.     Service Equity Council.

Mr. Kowalski serves on Child Welfare's Service Equity Council.  Service Equity Councils were started with the state's unified equity framework.  About 18 months ago, the ODHS assigned equity coordinators to multiple departments.  The Service Equity Council is a new group that has been meeting for about six months as a steering committee.  It is now opening itself for applications for members to sit permanently on the council.

Mr. Kowalski was asked to join the council because he is known within Child Welfare as a fierce advocate for fathers and the lack of equity and services for fathers.  For example, in Oregon, there are over 315 substance use disorder treatment beds for mothers to bring children with them to inpatient treatment.  There are only nine such beds for fathers with children because fathers are overlooked in the system.

Mr. Kowalski serves as a parent mentor.  He will describe what he does in that role.  As a parent mentor, Mr. Kowalski also runs a fathers' support group inside Volunteers with America Men's Treatment Center, and he brings this perspective to the equity council.

### 3.     Family First Design Team.

Mr. Kowalski also serves on Child Welfare's Family First Design Team.  The team is tasked with evolving the Family First programming within ODHS.  New culturally-specific programs have been added to the clearinghouse list for Family First Title IV-E funding, including Family Spirit, a native-designed, implemented, and evaluated program with evidence.  ODHS has been working with the nine Tribes of Oregon to start training Tribal staff in the model so that they can draw federal funds because currently, only programs on the clearinghouse list can be funded under Title IV-E.  ODHS assembled the Family First Design Team to design an

amendment to the original Family First funding proposal by the end of 2024 or January 2025. Half of the group includes people who have lived experience with Child Welfare.  Mr. Kowalski, who is a co-chair of the group with Ms. Bender, has that lived experience and was asked to join in order to bring his specific experience as a father in the Child Welfare system.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

**XVI.  Jeremy LeCoure (.5 hours direct testimony).**

Jeremy LeCoure will testify at trial about his position as a report analyst at ORRAI.  Prior to his position as a report analyst, Mr. LeCoure worked as a research analyst in ORRAI for 12 years.  Prior to his position at ORRAI, Mr. LeCoure worked in the direct pay unit at ODHS.

Mr. LeCoure will testify about his work building and maintaining Child Welfare dashboards, such as the caseworker caseload dashboard and the public Federal Performance Measure dashboard.  Mr. LeCoure will describe the data fields that are included in the dashboards.  Additionally, Mr. LeCoure will testify about the process he followed in creating Exhibit 1098.  He will explain how the MIC rate on the federal dashboard is calculated, including what information is included in the numerator, what information is included in the denominator, and that the ratio is expressed as a rate per 100,000 days in care.  He will explain how he applied the same formula in creating Exhibit 1098, but made exclusions to both the numerator and the denominator based on definitions of certain data fields.  Mr. LeCoure will explain what information is included in each data field, where the information comes from, and how the MIC rate is calculated using each data field.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

**XVII.  Kim Lorz (2.0 hours direct testimony).**

Mr. Lorz is the Senior Training and Workforce Development Manager ("Training Manager") for Child Welfare.  He will testify concerning the great strides Child Welfare has made in the last five years in providing training to caseworkers and to resource parents, and he will testify about the current plans for expanding that training in the near future.  The significant expansion in training resources available to caseworkers and resource parents was made possible because of the support of the Legislature, the Governor, and leaders in ODHS.

**A.    Mr. Kim Lorz's professional history in training and at Child Welfare.**

Mr. Lorz will testify that he has been developing and providing training for many years at Child Welfare and for the U.S. military.  Both prior to, and while working at Child Welfare, Mr. Lorz developed and provided training in the U.S. Army on the ground in Iraq, and he trained soldiers headed to Afghanistan.  He was a non-commissioned officer (a sergeant).  He served in the U.S. Army and Oregon National Guard for 25 years.  He retired from the military at the end of March 2024.

Mr. Lorz will testify that he started working at Child Welfare in 2008.  During his first ten years, he served in various permanency, certification, and protective services capacities in between military deployments.  Mr. Lorz also backfilled for his program manager where he gained connections to the central office, including a rotation in 2018 as a supervisor trainer for approximately one year.  Mr. Lorz will testify to the following more recent employment history relevant to training:

1.    He was a Child Welfare Supervisor and Training Specialist from January 2018 to August 2018.  Mr. Lorz ensured that supervisors had access to appropriate training that allowed them to carry out their duties in conformance with Child Welfare policies.  He tracked attendance on the training and provided follow up materials to attendees.

**Page 161 –   DEFENDANTS' LAY WITNESS STATEMENTS – KIM LORZ**

2.       Mr. Lorz was a Child Welfare Operations and Policy Analyst (a.k.a. Field Operations Consultant) from August 2018 to January 2020.  He joined a team charged with creating training materials in preparation for a "surge" hire in fall 2019.  The team was referred to as the "Tiger Team," and he was part of the training subgroup.  Tiger Teams were developed by A&M under the Governor's executive order to identify improvements that Child Welfare could make.  The Tiger Team's role for training was to analyze the then-current training system and identify improvements to support Child Welfare staff.  The Tiger Team worked closely with A&M to revamp training in preparation for the surge hiring.  Mr. Lorz consulted with national organizations (*e.g.*, the Annie E. Casey Foundation and Casey Family Programs, which both focus on child welfare) and leaders from child welfare agencies throughout the country.  Mr. Lorz advocated for mandating that new caseworkers complete their training before receiving a caseload, which is a child welfare best practice and now in place.  One of Mr. Lorz's duties as a Field Operations Consultant was as a coordinator for MAPS field specialists.  He trained MAPS specialists, hosted monthly discussions for them, planned quarterly trainings, and answered any questions they had about their position.

3.       Mr. Lorz is currently the Senior Training and Workforce Development Manager for Child Welfare for Equity Training and Workforce Development, a position he began in January 2020.  His role is to coordinate resources to design, deliver, evaluate, and administer training and training delivery methods for 3,400 staff and 6,000 resource parents.  In short, he leads training for Child Welfare to ensure that all Child Welfare staff have the requisite competencies to be able to do their jobs, that new employees receive the training so that they feel comfortable and competent to do their jobs and do not leave due to lack of training, and that resource parents have training to be successful supporting children and young adults.

**B.    Mr. Lorz will testify concerning the recent history of training for caseworkers and resource parents, and that the Legislature, the Governor's Office, and ODHS leadership fully supported efforts to expand training.**

Mr. Lorz will testify that as the Training Manager for Child Welfare, he oversees equity and workforce development to design, implement, and oversee all training and professional development activities that support Child Welfare staff in the delivery of Child Welfare practice. He oversees three separate training teams, and those teams develop and deliver curricula in the following areas:  (1) for resource parents; (2) for workforce staff, including administrators and supervisors; and (3) for operations, which focuses on best practices.  Mr. Lorz also supervises three coordinators for equity training who are assigned to the Operations Team (group (3) in the prior sentence).  He will testify, at a high level, as to what those three teams do and the training they provide.

Mr. Lorz will testify that, as recommended by A&M, the Training Manager role now reports to the Child Welfare Division Deputy Director for Equity, Training and Workforce Development.  The 3 training teams that report to Mr. Lorz have expanded to 35 people.

The creation, funding, and hiring of these training teams began before his hiring.  The Governor directed the expansion of Child Welfare's caseworker training infrastructure through the EO, and the expansion was supported by A&M and its recommendations.  Numerous groups and individuals supported the expansion of the training programs, including ODHS and Child Welfare leadership and the Legislature.  In the 2021 legislative session, ODHS secured funding for Child Welfare to enhance the agency's ability to design, deliver, evaluate, and oversee training received by Child Welfare staff through a POP for approximately $4 million and 19 positions.  Most of the current 35 staff were hired for the new positions created from the POP, and the rest are positions re-assigned from other units.  The need for this training team and internal capabilities developed from A&M's recommendations, the Butler Institute's assessment

of Child Welfare's training program, and through Mr. Lorz's discussions with national

organizations such as the Casey Family Programs.

      Mr. Lorz also oversees Child Welfare's relationship with PSU, which provides classroom

training for all new Child Welfare caseworkers.  With Child Welfare leadership's support, Mr.

Lorz and Marty Lowrey, Director of Workforce Development (the partner at PSU), have a strong

relationship.  PSU is, and has been for years, a partner with Child Welfare in providing

classroom training to new caseworkers.  There is an intergovernmental agreement between Child

Welfare and PSU for PSU to provide training to Child Welfare caseworkers.  Under the

intergovernmental agreement (a "parent" contract) there are several work orders ("children"

contracts) for PSU to provide specific courses.  Those work orders specify the classes, class size,

and amount of times per year that the class is offered.  Ms. Lowrey leads a team of over 20 staff

at PSU who focus on training and strengthening the Child Welfare workforce.  Prior to 2020,

PSU and Child Welfare had a strained relationship.  Mr. Lorz and Ms. Lowrey worked closely to

rebuild the relationship to be a more collaborative partnership.  Working together, they

incorporated the Vision for Transformation into training, and they have added required courses

concerning safe sleeping, working with families experiencing disabilities, and working with

families with members with intersectional identities, and they work together to add additional

courses, which Mr. Lorz will also testify about, as described below.

      Mr. Lorz will testify that, historically, Child Welfare was well-known nationally for

innovations in training, but that Child Welfare faced challenges in making those new training

programs sustainable over the long term or in making them applicable statewide.  With the

support of the Legislature and the executive branch over the last five years, that has changed and

Child Welfare has expanded support and resources, such as Coaching and Training Specialists

**Page 164 –   DEFENDANTS' LAY WITNESS STATEMENTS – KIM LORZ**

and an internal training team, to make training sustainable over the long term and applicable statewide.

Mr. Lorz will testify that in addition to the new hires and expanded budget described above, there is additional support in the form of input and guidance from the wider child-serving and child welfare community into training needs via an advisory board. The Child Welfare Training Advisory Committee has changed over the last few years and now it is the Training Advisory Board. It now fulfills several tasks. It reviews potential training changes and changes in curricula, and it also discusses potential future trainings. It is focused on statewide training and changes to training requirements, such as whether certain training content needs to be reviewed, updated, or removed from the existing curriculum. It now has broader membership so that there are more voices at the table discussing those topics. It is comprised of staff from the Child Welfare training team, other employees from across the child welfare system, community partners, and, as needed, subject matter experts on whatever topic is being addressed.

In summary, over the past four years, the Child Welfare training team has simultaneously (1) maintained the existing training programs and trained caseworkers and resources parents, and (2) hired a new training team, identified new and additional training needs, created the training methods and modes (for example, classroom training, on-the-job training, and pre-recorded video training), and created the new content. The above is the context for the following topics which Mr. Lorz will testify about, which address the investments and improvements that Child Welfare has made in training and delivery of training, and the continuous improvements in assessing where Child Welfare can improve their training and training delivery methods for caseworkers and resource parents.

### C.    The training currently given to caseworkers.

Mr. Lorz will testify concerning changes in available training since 2020.  Previously, Child Welfare primarily delivered training locally.  Newly hired Child Welfare workers would receive on-the-job training from their supervisors and experienced workers in their branch office, in addition to formal classroom training at PSU.

Now, there is a centralized internal Child Welfare training team that develops and delivers additional content for new workers, which relieves some of the training workload for the supervisors and co-workers of new employees.  Nine training development specialists focus on trainings for Child Welfare staff, and an operations team builds best practices and standards for all training in Child Welfare.  Additional training and support opportunities are provided to program areas within Child Welfare's central office, including the permanency program, safety program, and foster care program.  In 2018, Child Welfare created a new position: Coaching and Training Specialist (previously called MAPS).  The Coaching and Training Specialists provide training to new and developing caseworkers at the branch level, which provides additional relief for supervisors and other branch staff members to focus on hands-on training.  In addition, Mr. Lorz will testify that the revamped caseworker training was the result of, among other efforts: (1) hiring an internal training team (described above); (2) implementing a coaching model; and (3) partnering with the Consortium for Children to provide SAFE Home Study training.

Concerning new caseworkers, Mr. Lorz will testify both about the minimum educational and experience requirements for a new caseworker and about the 12-month training program. Mr. Lorz will testify that before a new caseworker, *i.e.*, a Social Service Specialist 1, begins to carry a caseload, the new caseworker goes through an extensive training program.  Before attending classroom training, they spend three weeks in a branch to gain familiarity with the job, including shadowing experienced workers.  They also have to complete online classes before

they can attend the classroom training.  Then, the new caseworker attends a 15-day class called

"Essential Elements of Child Welfare Practice" at PSU.[7]  The new worker then returns to the

branch office and works with a Coaching and Training Specialist for more on-the-job training,

which includes having that specialist work with the new caseworker in the field.  There is also

on-ramp training (the "Social Service Specialist 1 On-Ramp"), which includes 8 key tasks, each

with 6 steps, that new caseworkers must accomplish during training.  New caseworkers are

trained, observed, and given feedback, and then field supervisors and/or training specialists

determine whether they have completed each task.

Before a new caseworker can receive their own first case, caseworkers must complete

both the Essential Elements of Child Welfare Practice described above and Steps 1-4 of all 8 on-

ramp tasks.  Then, a new caseworker should receive no more than 1 case per week for the first 4

weeks.  After that, the rate of assigning cases to the new caseworker is at the supervisor's

discretion.  When the new caseworker takes a full caseload depends on multiple variables:  best

practice is for workers to receive new cases as they come in.  The rate at which they grow into a

full caseload depends on how many active cases there are in the office.  Another variable is when

an existing caseworker leaves the agency and their caseload needs to be distributed amongst

other caseworkers in that unit.

Mr. Lorz will testify that the Coaching and Training Specialists provide new caseworkers

direct support during the 12-month training program; they go out into the field with new

caseworkers and provide support including writing labs, individual guidance, individual tutoring,

---

[7] Mr. Lorz will testify that he has received direct positive feedback from specialists who
have gone through this program.  They praised the interactive nature of the training that included
discussions, activities, both individual and small group work, and that the training did not follow
a typical training of a lecture with a PowerPoint.

**Page 167 –    DEFENDANTS' LAY WITNESS STATEMENTS – KIM LORZ**

group learnings, and formal instruction.  Mr. Lorz will testify that he has routinely heard

feedback from caseworkers, supervisors, and program managers in the field that they rely very

heavily on Coaching and Training Specialists.  Prior to deploying Coaching and Training

Specialists, the supervisor or the most experienced caseworkers in the unit were responsible for

providing the on-the-job training in addition to maintaining their own caseload.  Coaching and

Training Specialists provide caseworkers a direct line to a coach who is focused on developing

their skills and/or enhancing their competencies, allowing supervisors and other staff to focus on

their caseloads.

    During this initial 6-month training, new caseworkers must complete four other courses

(provided through PSU): Well-Being Needs for Children; Trauma Informed Practices &

Strategies; Family Conditions; and Preparing and Presenting for Success in Court.  While all of

that training is occurring, the new caseworker's supervisor is also providing direct supervision

and feedback and evaluating the new employee's training needs.  Once all of those training tasks

and programs are complete, the supervisor assesses the progress of the new caseworker and the

need for any additional support or training.  The total training program for a new caseworker is

designed to last 12 months, but it can be adjusted to meet the needs of the new caseworker.

    Mr. Lorz will testify as to the high-level goals and competencies for the caseworker

training classes, including the Trauma Informed Practices and Strategies and the Americans With

Disabilities Act course, as well as training classes for new resource parents concerning Trauma-

Related Behaviors and Safe Home Environments.

    Mr. Lorz will also testify different program areas (*e.g.*, safety, permanency, and foster

care programs) offer additional training resources for all caseworkers through quarterly

meetings.  Supervisors provide on-going training (*e.g.*, unit meetings, group supervision,

individual coaching).  There is also a dedicated Equity Coordinator focused on workforce well-being to assist staff in handling trauma experienced through their work.  Further, there is training specific to identifying, responding to, documenting, and reporting abuse; Safety Program Consultants provide training to their assigned districts as needed on this topic, and the Coaching and Training Specialists provide training at their branch offices as needed.  This can take the form of presentations, discussions, writing labs, and other training.  In addition, external organizations provide seminars and webinars for Child Welfare staff, and Child Welfare shares resources from National Child Welfare Workforce Institute/Child Welfare Information Gateway to offer additional training.

**D.    Mr. Lorz will testify concerning the future training offerings his office is developing.**

Mr. Lorz will testify training offerings currently in development or being updated include:

- Diversity, Equity & Inclusion 101;

- Federal ICWA and OICWA;

- Non-Violent Crisis Intervention (with trauma);

- OR-Kids Training; and

- SAFE Home Study refresher.

Additionally, Child Welfare is partnering with the Soul Focused Group and Oregon Tribes to engage in a workshop that teaches participants how to apply Human Connection Technology to transform the division and disempowerment caused by negative subconscious programming.

The Child Welfare training team also is working with local Child Welfare districts to establish a Training Team comprised of local leadership and staff who are responsible for developing and/or delivering training.  This group will be responsible for identifying local

training needs and responding to them by seeking out Child Welfare's developing new content or activities that will support staff.

Further, Child Welfare, in partnership with Self-Sufficiency, is implementing a Coaching Model for managers and staff with a consulting/advising role. Coaching supports transfer of learning from training to practice, implementation of evidence-based practices, skill building, problem solving, and modeling behaviors.

Child Welfare recently partnered with the Office of Health, Safety, and Employee Well-being to implement mandatory statewide de-escalation training for all Child Welfare staff. This is an investment in support of children and young adults with high-acuity needs.

### E.      Resource parent training.

Mr. Lorz will testify that Child Welfare's new training team is also focused on enhanced training for resource parents. Child Welfare is developing training delivery systems that are available to resource parents virtually and on-demand. Child Welfare has developed training for, among other topics, safe sleeping, families experiencing disabilities, and working with families with intersectional identities.

He will testify about the new RAFT launched statewide in 2022. Child Welfare adapted RAFT from the NTDC. NTDC is a national curriculum written in close collaboration with individuals with lived experience of child welfare services and was piloted (virtually) from fall 2020 through summer 2022. Mr. Lorz will testify about the training offerings available for resource parents and their general content.

### F.      Conclusion.

Mr. Lorz will testify that Child Welfare has made great progress in providing training to caseworkers and resource parents over the last four years and, with the investments already made in training staff and resources, there will be additional progress. These new training offerings

**Page 170 –    DEFENDANTS' LAY WITNESS STATEMENTS – KIM LORZ**

and plans improve the ability of both caseworkers and resource parents to help children and young adults in the foster care system and also improve the ability of Child Welfare to retain employees because they are and feel more qualified to perform their jobs.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

**XVIII. Deena Loughary (3 hours of direct testimony).**

Ms. Loughary will provide testimony regarding her 24 year career with ODHS, Child Welfare. Her testimony will cover several topics related to her role as Program Manager of the Child Safety Program, as well as the work of CPS, which Child Safety oversees. Ms. Loughary's testimony will include information regarding: (a) her personal background and career with Child Welfare; (b) CPS assessments and various timelines associated with the same; (c) external barriers which impact CPS and Child Safety's work; (d) improvements Child Welfare has made to its policies and practices to improve outcomes for families and the work of CPS and Child Safety; (e) data relating to Child Welfare's timeliness to complete CPS assessments, Oregon's maltreatment in care, and rate of recurrence of maltreatment; and (f) her observations of the attitudes of her colleagues and peers within Child Welfare when it comes to the work of the agency and the children and families they serve.

**A.    Professional background and role as Program Manager for the Child Safety Program.**

Ms. Loughary is the current Program Manager of Child Safety, a statewide position she has held since 2019. Currently, she is also serving as the interim District Manager for Child Welfare's District 4 (Linn/Benton/Lincoln Counties). As District Manager, Ms. Loughary oversees all of Child Welfare's operations for District 4.

Ms. Loughary holds a Bachelor's degree in Liberal Studies with an emphasis in Psychology and Sociology. She received her degree from Eastern Oregon University in 1999. Following graduation, Ms. Loughary applied for and received a position with Child Welfare as a CPS caseworker. Ms. Loughary has been continuously employed[8] with Child Welfare since

---

[8] Ms. Loughary took a brief several months long break from her work at Child Welfare, starting in February of 2010, but she returned to work in 2011.

November 1999, holding a number of positions of increasing responsibility during that time, including as a: (1) consultant educator and trainer - previously classified as a "Social Service Specialist 2" or "SSS2" position;[9] (2) CPS supervisor; (3) manager of the Umatilla/Morrow and Marion County child abuse hotlines, prior to Child Welfare's centralization of that system; and (5) Program Manager for Child Welfare's Benton, Linn, and Lincoln County district offices.

In her current role as Program Manager for Child Safety, Ms. Loughary oversees the statewide administration of CPS.  This includes overseeing a team of 15 consultants, seven coordinators, two assistant program managers, as well as the entirety of the nine-person Mobile CPS Unit.  Ms. Loughary also oversees the development and operation of Oregon's Family Treatment Court, which she does in partnership with the Oregon Judicial Department.  Finally, and in addition to her Program Management duties, Ms. Loughary is heavily involved in strategic planning for CPS and serves on various advisory boards and task force groups whose work interfaces with families and CPS, including the Child Abuse Multidisciplinary Intervention Fund Advisory and the Oregon Children's Justice Act taskforce.

**B.    The work of the Child Safety Program and CPS.**

Ms. Loughary will testify regarding the work of the Child Safety Program and her fellow team members.  As noted above, the Child Safety Program includes 15 consultants.  These consultants are tasked with ensuring CPS caseworkers (several hundred caseworkers across 16 regional district offices) follow best practices as well as the overall fidelity of Child Welfare's CPS practice model in partnership with local leadership.  These same consultants also staff some of the most complicated CPS cases, including those involving child fatalities or allegations of serious physical injury.  Ms. Loughary will also explain the work of Child Safety's seven

---

[9] Now referred to as a Coaching and Training Specialist.

coordinators, who support Child Welfare's regional districts with the implementation of legislation surrounding child safety, including the application of CPS procedures and administrative rules. Each of these coordinators holds a different area of emphasis. For example, there are coordinators specifically dedicated toward allegations involving substance use disorders, domestic and sexual violence, child sexual exploitation, and coordinators specializing in rule writing and implementation. Child Safety's two assistant program managers report to Ms. Loughary and directly supervise both the program's 15 consultants and the Mobile CPS Unit, as well as Child Welfare workers assigned to Family Treatment Court.

Finally, Ms. Loughary will explain the work of the Mobile CPS Unit, which consists of seven CPS caseworkers, one case aide, and one CPS supervisor. The purpose of the Mobile CPS Unit is to temporarily support a particular branch or district within Child Welfare in completing new or overdue CPS assessments due to recent turnover, vacancies, or other circumstances.

In addition to her oversight of various personnel within the Child Safety Program, Ms. Loughary participates in the work of the CFPRP's CIRT. CIRT reviews child fatalities that qualify as "critical incidents" under Oregon law. A critical incident is a situation in which ODHS reasonably believes the death of an Oregon child was the result of child abuse and the child was in the custody of Child Welfare at the time of their death, or the deceased child, their sibling, or any other child living in the household with the deceased child: (1) was the subject of a CPS assessment within 12 months preceding the child's death; (2) had a pending Child Welfare or adoption case with ODHS within the 12 months preceding the child's death; or (3) was the subject of a report of child abuse made to ODHS within 12 months preceding the child's death.

Child fatalities are incredibly tragic. Ms. Loughary will testify that, just as physicians review fatalities to improve patient care, the CIRT review team examines the circumstances

surrounding a critical incident to ensure that CPS continues to do everything it can with regard to its policies and procedures to prevent such tragedies in the future.

**C.    The different stages and timelines associated with a CPS caseworker's initial CPS assessment.**

Ms. Loughary will testify about the difficult and hard work Oregon's CPS caseworkers perform each and every day to help keep Oregon children safe.  She will also explain the applicable timelines for CPS caseworkers and supervisors to complete CPS assessments, including the 60-calendar day deadline for CPS caseworkers to complete a CPS assessment and electronically submit such assessment for review by a CPS supervisor under OAR 413-015-0475(2).  Ms. Loughary will also testify as to the generation and use of Sensitive Issue Reports as it relates to the work of the Child Safety Program, as well as to certain notification processes which occur when there has been an allegation of abuse involving a child or young adult in care.

**1.    ORCAH initial screening and timeline for response.**

Ms. Loughary will explain that the work of CPS starts with an assignment from ORCAH. ORCAH is a centralized hotline where mandatory and non-mandatory reporters may submit information regarding an alleged incident of child abuse for assessment.  ORCAH gathers information received through this centralized hotline and screens it to determine whether the allegations fall within Oregon's statutory definitions of child abuse.  Notably, Oregon's definition of child abuse is much broader than other states and includes not just allegations of physical abuse, but also neglect and threats of harm.  Furthermore, Oregon does not limit its definitions and application of child abuse laws to incidents of abuse committed by someone in a caretaker role.  Oregon's mandatory child reporting statute also captures a wider category of reporters than many other states.

If an ORCAH screener determines that information submitted to the Hotline meets Oregon's statutory definition of child abuse, the screener next assigns the case to CPS in regional districts for further assessment. As part of this process, the ORCAH screener will determine an initial timeline for CPS response. Ms. Loughary will testify that Oregon currently has three response deadlines for CPS caseworkers: 24-hours, 72-hours, and 10-days. ORCAH screeners assign a response timeline using a Structured Decision Making tool, which times are further explained in Child Welfare's manual. She will also testify regarding the timeliness of CPS caseworkers meeting these initial response timelines and other information as reflected in the May 2022 CPS Assessment Fidelity Review Statewide Report.

2.     **CPS assessments.**

Once a case has been assigned to CPS, a CPS caseworker has 60-calendar days to complete a comprehensive CPS assessment and electronically submit that CPS assessment through Child Welfare's centralized operations application OR-Kids for review by a CPS supervisor. This comprehensive assessment includes an initial face-to-face interview (or encounter, if the child is non-verbal) of the subject child, their siblings[10], if any, caregivers, and all other persons residing in the home. Following these initial face-to-face interviews, the CPS caseworker will interview collateral contacts, such as the child's teachers, physicians, law enforcement (where involved), and other persons who may have information relevant to the caseworker's inquiries.

---

[10] This general description of the CPS assessment process refers to a single "subject child." However, multiple siblings in a single household may be the subject of a single CPS assessment. If there are multiple families living in a single household, a CPS caseworker may prepare more than one assessment.

Ms. Loughary will explain that each CPS assessment presents a unique set of facts and circumstances.  There is no standard amount of time or number of interviews a CPS caseworker must conduct to complete their assessment.  Caseworkers are instructed to conduct as many interviews, including the subject child, their family members, and collateral contacts, as is necessary to gain a comprehensive understanding of the child's family situation, living conditions, and day-to-day life.  A caseworker may also seek out other information, such as medical history or educational records, to aid in the decision making related to the CPS assessment.

After gathering sufficient information, the CPS caseworker will make a determination as to whether there is reasonable cause to believe the alleged abuse is "founded," "unfounded," or "unable to be determined," as those terms are defined in the Child Welfare manual.  In addition, and regardless of their decision related to whether or not abuse occurred, the caseworker will make a separate determination as to whether or not the child is safe.

If a caseworker determines that an allegation of abuse is unfounded and that child is safe, the CPS case is closed.  If the caseworker is unable to determine that an allegation of abuse occurred but finds that the child is nevertheless safe, the case is also closed.  In either case, if a caseworker identifies that the child is unsafe, the caseworker must next determine whether an in-home safety plan can be implemented.  In line with Child Welfare's Vision for Transformation, CPS prioritizes the preservation of families and keeping children with their communities, provided that to do so does not negatively impact the child's safety.

If a caseworker determines a child's safety cannot be appropriately managed within the familial environment or despite community or other support, then the caseworker may need to take steps to take protective custody of the child and file a juvenile dependency petition in order

to transition the child to substitute care.  During this process and pending adjudication of the petition, a permanency caseworker may be assigned to the case or that may occur after wardship is granted.  In either case, one or both of the CPS and permanency caseworkers will coordinate with the child, their parent(s)/caregiver(s), and various other parties, such as attorneys (if appointed) and medical professionals, about the process of moving the child into substitute care, as well as the timelines and requirements for any potential reunification.

Ms. Loughary will also explain that CPS assessments for children already in ODHS's custody and placed with resource families are subject to the same 24-hour, 72-hour, and 10-day timelines for a caseworker to complete their initial response, as well as the 60-day timeline for the caseworker to complete their CPS assessment.  However, CPS assessments involving children in resource families receive a different level and type of staffing associated with such assessments.  First, many districts and Child Welfare branches have what is known as an "out of home" CPS unit, which is dedicated to CPS assessments of children in the care of Child Welfare and living with a resource caregiver.  Second, and regardless of whether a district or local branch has a dedicated "out of home" unit, multiple people, not just an assigned CPS caseworker, will be involved to discuss and plan a CPS caseworker's initial contact with the child and their caregiver.  This staffing typically involves the child's permanency caseworker, a representative from certification, and the assigned CPS caseworker and supervisor.  The idea behind these additional resources is to combine a larger set of eyes to review the allegations of abuse involving resource caregivers, as well as to emphasize cross-program collaboration and communication.

Finally, Ms. Loughary will explain that, in general, ORCAH assigns allegations of child abuse involving a child in the care of a child-caring agency ("CCA") or of an ODHS employee,

**Page 178 –   DEFENDANTS' LAY WITNESS STATEMENTS – DEENA LOUGHARY**

such as an employee staffing temporary lodging (typically a Child Welfare caseworker) to the OTIS for assessment, not CPS. This ensures that the licensing and safety of the CCAs, which Child Welfare contracts with are properly examined and that CPS caseworkers are not being asked to examine allegations of abuse from within their own workforce, which again helps to ensure overall fidelity of Child Welfare practices and procedures. There are times when CPS will also work in tandem with OTIS to conduct an abuse assessment, for example, where there has been an allegation of abuse by a teacher against a student, and a contemporaneous allegation of abuse by that same adult teacher as a parent against their child. Under that circumstance, OTIS will assess the allegations of abuse associated with the teacher-student and CPS will assess the allegations of abuse involving the teacher/parent-child.

### 3.    Juvenile dependency petitions.

Ms. Loughary will testify that when a CPS caseworker determines that a child is unsafe in the process of conducting their assessment, the CPS caseworker, in conjunction with the caseworker's CPS Supervisor, will work with the Child Advocacy & Protection Division of Oregon's Department of Justice to file a juvenile dependency petition. Following the filing of this petition, all parties, including Child Welfare as represented by the Department of Justice, the child, the parent/caregiver, and each of their respective attorneys, appear at what is called a "shelter hearing." At this hearing, a state court judge makes findings and a determination as to: (a) custody of the child; and (b) whether ODHS has made reasonable efforts to prevent removal of the child have been made.[11] If the case involves children subject to the ICWA, the procedure follows a different track and enhanced findings are required.

---

[11] Where the family is subject to the ICWA, additional procedural requirements apply and both Child Welfare and the juvenile court follow that process.

During the shelter hearing, the judge exercises their statutory oversight authority with respect to children found to be dependent and can reject Child Welfare's recommendations, including a recommendation to remove the child from their home or a recommendation to proceed with an in-home safety plan. Following the shelter hearing and throughout various stages of the dependency proceeding, Child Welfare continues to update the parties and court on the child's progress and status, for example, regarding any placement relocations. The court typically holds periodic review hearings where it may make findings or order various changes to the child's plan, including, for example, that Child Welfare can no longer manage the child's safety plan in-home or that a parent/caregiver shall be granted placement or visitation. Thus, the juvenile court, not Child Welfare, holds jurisdiction over a child's legal and physical placement and custody, although Child Welfare has the opportunity to present its viewpoint and recommendations.

**D.    Child Welfare's efforts to improve its policies and practices.**

Having been with the agency for 24 years, Ms. Loughary has observed a number of changes, both internal and external, that have improved the work of Child Welfare as it relates to child protective services.

**1.    Caseworker caseload dashboard.**

With the implementation of an online dashboard system in 2023, Child Welfare's central office, Program Managers, District Managers, CPS Supervisors, and caseworkers are now able to track, in real time, caseworker caseloads and timeliness of assessments, among other data points. Ms. Loughary will testify that this dashboard has allowed for better accountability among CPS caseworkers and supervisors and has provided valuable insight as to where additional resources, such as the Mobile CPS Unit, are best utilized. As a result, Child Welfare has successfully met

Oregon's caseload ratio for CPS caseworkers during the last half of 2023, and the first quarter of 2024.

Ms. Loughary will also explain that Child Welfare does not have "primary" and "secondary" caseloads for its CPS caseworkers.  Rather, a primary caseworker is assigned who is the primary person to make any decisions related to the case, along with one or more personnel who are designated as a "secondary."  Secondary personnel have been known to include anyone from a supervisor, to a program manager, to a courtesy caseworker, to sometimes even an administrative assistant.  Ms. Loughary will explain that sometimes a CPS caseworker will be assigned as a secondary personnel on a matter in OR-Kids where there is already a permanency caseworker involved as the case "primary."  However, even where that occurs, both the permanency caseworker listed as "primary" as well as the most recent CPS caseworker listed as "secondary" will have that case count toward their respective caseloads for purposes of assessing Child Welfare's caseload ratios.

### 2.      Mobile CPS Unit.

The creation of the Mobile CPS Unit team in 2020, has helped districts and branches within Child Welfare which are continuing to struggle to complete new and overdue assessments due to vacancies.  The Mobile CPS Unit offers temporary support to alleviate a further backlog of overdue assessments and to help prioritize safety while responding flexibly to staffing needs statewide.

### 3.      CPS resource page.

In 2021, Child Welfare developed what is known as its CPS resource page.  This is an internal website for CPS caseworkers to refer to and which includes numerous resources regarding CPS assessments, including helpful guidelines for caseworkers and supervisors related to dispositions and the decision-making points associated with assessments.  The Child Safety

Program continuously updates and evaluates the resource page, in collaboration with other programs, to improve CPS practice and procedure. The goal of the resource webpage is to support CPS caseworkers in their work, which Ms. Loughary will confirm, further helps with worker retention.

### 4.    Improvements around reducing child fatalities.

In conjunction with the CFPRP, Child Safety has undertaken several initiatives to educate caseworkers, parents/caregivers and community partners on issues related to substance abuse disorders and Safe Sleep practices for infants, among other issues to help protect Oregon children and young adults. Ms. Loughary will provide testimony that since implementing these practices and educational supports, child fatalities attributed to abuse, including child fatalities attributed to abuse where CPS has an open assessment, have decreased.

### 5.    Increased funding to hire CPS caseworkers.

Ms. Loughary will testify generally regarding POP 118, which ODHS proposed and advocated for adoption by the Oregon legislature during the 2023 long session. Following this advocacy, Child Welfare secured $9.2 million in funding to hire an additional 200 new CPS caseworker positions (50.5 FTE in late 2024 and 2025). Ms. Loughary will testify that she expects additional support and improvement around timely completion of CPS assessments with the addition of this future funded workforce.

### 6.    Centralized child abuse reporting and screening process.

In 2019, Child Welfare centralized the system for screening reports of alleged child abuse with ORCAH. ORCAH has improved consistency and a reduction in community bias with regard to the way calls are screened and assignments issued to CPS caseworkers. In addition, call wait times for mandatory and non-mandatory reports have been reduced, and Child Safety is

better able to make evidence-based decisions about where to send its resources to best prevent abuse before it occurs.

### 7.    Providing support to prevent abuse from occurring.

Ms. Loughary will testify that over the course of her career, she has seen a dramatic reduction in the number of children entering Oregon's substitute care system.  Child Welfare has done a tremendous amount of work on the front-end to support families and reduce some of the common triggers associated with recurrence of abuse.  When Ms. Loughary first started as a CPS caseworker, Child Welfare was much more prone to removing children from the home if the parent/caregiver was suffering from substance use issues.  After removal was complete, the caseworker would then reach out to help the parent/caregiver to discuss treatment and, if successful, reunification.  Now, and consistent with Child Welfare's Vision for Transformation, there is a greater emphasis on supporting parents while trying to keep children with their families.  Caseworkers now look to provide support to parents/caregivers to receive treatment closer to the point of initial contact with the family and intervention by Child Welfare, all while ensuring an appropriate safety plan is in place to protect the child.  As a result, more families are able to stay together safely, less children are placed into substitute care, and community trust of Child Welfare and its involvement in the lives of families is strengthened.

### 8.    Increased support for caseworkers.

Ms. Loughary will testify that Child Welfare has undertaken efforts to be more intentional around safety culture and protecting and supporting the well-being of its workforce, including CPS caseworkers.  This and other efforts are part of an ongoing focus of Child Welfare to help improve overall retention of those working within CPS.

E.    **Oregon's data relating to timeliness of CPS initial contacts and assessments, maltreatment in care, and rate of recurrence of maltreatment is misleading.**

Ms. Loughary will testify that Oregon's specific metrics relating to timeliness of CPS assessments, maltreatment in care, and rate of recurrence of maltreatment are misleading.

1.    **Assessment metrics do not always accurately reflect timing of actual contact with families.**

A CPS caseworker's timeline to initiate contact begins when an ORCAH screener assigns a case out to CPS for assessment.  Ms. Loughary will explain that there are times when caseworkers have timely completed their initial contact, *i.e.*, within the stated 24-hour, 72-hour, or 10-day timeline, but if a worker submits their report in OR-Kids even minutes after the 24-hour, 72-hour, or 10-day response as timed from the ORCAH screener's assignment, the assessment itself reflects as "untimely."  Thus, the initial contact is deemed untimely, even where the caseworker completed the actual contact in the assigned window and documented it accordingly.

Likewise, a caseworker may complete their CPS assessment within 60 days, but if it is not approved by their supervisor and finalized in OR-Kids 60 days from when ORCAH issued the assignment, the report is deemed untimely.  Ms. Loughary will share that, on average, as many as 500 completed CPS assessments can be awaiting sign-off by a CPS supervisor.  CPS supervisors are trained to prioritize founded assessments over unfounded ones.  Thus, if a supervisor has two assessments, one involving a founded case of abuse and the other an unfounded one, the CPS supervisor will prioritize the assessment with a founded disposition, regardless of which case is closer to the 60-day deadline.  The result is a better safety model for Oregon children, but a negative outcome for CPS's specific metric surrounding timeliness to complete assessments.

Finally, although the number of assessments open more than 60 days has been on the rise, most recently since September 2023, Ms. Loughary will testify that Child Welfare has had periods where timely assessments have outpaced those which were untimely. Child Welfare also continues to look for ways to decrease its backlog of overdue assessments. These efforts include the recent work with Child Welfare's online dashboard, the deployment of the Mobile CPS Unit, and future hiring made possible by the Oregon legislature's adoption of POP 118.

In addition, Child Safety is always looking for ways to decrease both turnover and vacancy rates of caseworkers. Child Safety continues to work with local districts and branches to ensure their caseworkers are well supported and not overloaded, which also helps with overall retention. And by increasing retention, Child Welfare can build upon institutional knowledge and efficiency, which thereby increases the ability of CPS caseworkers to timely complete their work.

## 2. Maltreatment in care metrics can be misleading because of differences in Oregon's system from that of other states.

Ms. Loughary will testify that the data surrounding Child Welfare's maltreatment in care and rate of recurrence of maltreatment is equally misleading. Maltreatment in foster care is defined under the federal measure as the rate of victimization per 100,000 days of foster care for all children in care during a 12-month target period. Recurrence of maltreatment is likewise defined as the percent of children who were victims of another founded maltreatment allegation within 12 months of the agency's initial report of all children who were victims of a founded report of maltreatment during a 12-month target period. However, because Oregon has a broad definition and application of abuse laws, including instances of neglect, threats of harm, and third-party abuse, all such instances factor into Child Welfare's data related to maltreatment in care and the rate of recurrence of maltreatment.

**Page 185 –   DEFENDANTS' LAY WITNESS STATEMENTS – DEENA LOUGHARY**

Furthermore, Ms. Loughary will explain that it is not uncommon for children to report historical abuse while in substitute care, often because the child suddenly feels comfortable opening up and sharing their experience or past trauma having been removed from their abusive situation.  CPS assesses and documents these reports of historical abuse from the point the abuse is reported, just like a prior allegation which led the child to enter substitute care.  Thus, the corresponding data related to maltreatment in care and recurrence of maltreatment includes these historical cases of abuse, despite the fact the actual abuse may have happened months or years prior to the child entering substitute care.

And because both maltreatment in care and recurrence of maltreatment are timed within a 12-month period, it can take at least a full year for a report of historical abuse to drop off Child Welfare's reporting data.  Notwithstanding these challenges associated with the manner in which maltreatment in care and recurrence of maltreatment are currently calculated, Ms. Loughary will testify that Oregon's rate associated with recurrence of maltreatment has continued to decrease - nearing the federal standard of 9.10%.

**F.    The dedicated professionals within CPS, the Child Safety Program, and all of Child Welfare.**

Lastly, Ms. Loughary will share her observation and perspective regarding the dedication and attitudes of all those who work alongside her in the Child Safety Program and in Child Welfare generally.  She will testify that the work of CPS, Child Safety, and her fellow Child Welfare colleagues is hard, sometimes heartbreaking.  It can be physically and mentally exhausting and yet each day she and her colleagues show up.  In Ms. Loughary's opinion and personal observation, neither she nor any of her fellow colleagues are indifferent to the needs of children and young adults in the care of Child Welfare.  Far from it.  She and her fellow

colleagues at Child Welfare do this work not for glory or lucrative salaries, but because they care about Oregon's children and young adults and wish to better their communities.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission. Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

### XIX.    Kimberly Montgomery (1.0 hour direct testimony).

Kimberly Montgomery will testify about her experiences in the role as a resource parent for Oregon foster children.  Ms. Montgomery and her husband have two biological children and have served as resource parents at their home in Albany, Oregon from October 2019 to the present.  They found the ODHS foster care program through their own initiative, contacted ODHS, and applied and were accepted to serve as resource parents.  ODHS provides substantial training up front.  Ms. Montgomery and her husband now host 5 to 7 foster children at a time for a total of about 20 children since 2019, including several children with significant behavioral issues.

They currently have 5 foster children, ranging in age from 5 years old to 20 years old.  One of those children is not actually in the state foster care system because he was over 18 years old when he was identified as needing to leave his family setting.  He is housed with his younger brother to keep them together.  One of the foster children required significant in-home support from ODHS.  ODHS now provides a one-on-one staff through the entity Kids Northwest.  The staffer stays with this child during her waking hours at home.  The child also has behavioral support at school through the school district.

Ms. Montgomery and her husband are going through the process to adopt one of the children.  Ms. Montgomery will testify that ODHS has been very supportive for all of the foster children in her care, including providing access to medical and mental health support, resources and skills to help LGBTQIA2S+ children, and aging out support.  She will provide examples.  She will also provide examples of ODHS support for the kids in her home, such as occasionally providing beds and clothing.

ODHS pays the family based on a published schedule that accounts for age and CANS level of each of the foster children.  In addition, it now has a new program that reimburses

resource parents for certain respite costs, such as childcare while the parents are on vacation. The Montgomerys have been able to avail themselves to respite reimbursement from time-to-time.  Ms. Montgomery works for an independent nonprofit agency called Every Child that recruits and works to retain foster families and provide support and encouragement for them. This includes supplementing foster families with funds for activities (such as extra-curricular school programs), meals, children's household furnishings, and dispute resolution support.  In her role, Ms. Montgomery is an outspoken advocate for the foster care program.

ODHS caseworkers are effective at providing support, such as getting medical appointments (which might otherwise be subject to a long waiting list) and working with wrap-around services.  Ms. Montgomery has had a number of different caseworkers and most have been responsive and helpful.  She will provide some specific examples to support this testimony.

Fostering children is not always easy.  Ms. Montgomery will testify about some of the challenges of looking after children with significant behavioral issues.  Fortunately, ODHS has provided regular training, such as KEEP training and parent group support.  Some of the children have been in Ms. Montgomery's care to prevent them from experiencing temporary lodging.  She will testify about the tension that comes with staff from state agencies being in her home for various purposes.

Ms. Montgomery will testify that, in her experience as a resource parent, she has found that ODHS typically manages to do a good job balancing appropriate agency oversight with her family's need for appropriate independence and privacy.  The frequency and intrusiveness of interactions with ODHS is highly dependent on the needs of particular children, the length of time a resource parent has fostered children, and the individual caseworker.  Ms. Montgomery has had some challenging children, for whom ODHS has been very involved.  Other children

require less attention from ODHS.  Because Ms. Montgomery has been a long-term successful resource parent, she believes the trust and goodwill she has developed with caseworkers results in less intrusion from ODHS.

ODHS encourages resource parents to build strong relationships with the children's biological parents and family members when it is safe to do so.  Ms. Montgomery will testify about her first-hand experiences interacting with biological parents and helping the children stay connected when possible.  She has to juggle a lot of demands on her time, but still manages to arrange video visits and other healthy interactions.  Ms. Montgomery will testify about her efforts to build community, not just with biological parents, but with caseworkers as well.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

XX.    **Marisa Moon (2 hours direct testimony).**

    A.    **Personal background, work history, and current position within Child Welfare.**

Ms. Moon is the Senior Child Welfare Operations Manager for District 2 within the ODHS, Child Welfare.  Ms. Moon will testify regarding her role as the Senior Child Welfare Operations Manager for District 2, personal background and career with Child Welfare, and various work which she and her District are doing, or which she has observed be operationalized in her District to improve outcomes for the children, young adults, and families served by her District.

Ms. Moon obtained her bachelor's degree in Child and Family Studies in 2008 and her master's degree in Social Work in 2011, both from PSU.  She is a licensed clinical social worker.  Ms. Moon began her career in social work in 2009, working at LifeWorks NW, a behavior and mental health service provider in Portland, and worked as a clinical supervisor for LifeWorks NW until August 2014.  Ms. Moon then moved to the United Kingdom and began working as the Manager of the City and County of Cardiff's Children's Services in May 2015.  In her role with the City of Cardiff's Children Services, Ms. Moon oversaw child protection and permanency caseworkers.  In June of 2018, Ms. Moon joined Barnardo's, a child welfare service provider in Cardiff, United Kingdom, and worked as the Assistant Director for Children's Services.  In April 2020, Ms. Moon returned to Portland, and joined Youth Progress and managed the organization's BRS programs.

In December of 2021, Ms. Moon transitioned to working with Child Welfare, becoming the Program Manager for District 2's Gresham Branch.  In January 2023, Ms. Moon became the Senior Interim Child Welfare Operations Manager for the entirety of District 2.  Ms. Moon's position is unique to District 2, the largest district in the state.  In other districts, Program

Managers report directly to the District Manager, but in District 2, Program Managers report to Ms. Moon, and she likewise reports to the District Manager.  In her current position, Ms. Moon oversees the day-to-day operations of Child Welfare for all of Multnomah County.

**B.    District 2 constantly seeks to improve its service to children and young adults in the care of Child Welfare.**

**1.    Prevention-focused approach.**

Ms. Moon will testify about the ways District 2 is putting Child Welfare's Vision for Transformation into practice by providing support, resources, and services that are designed to stabilize families.  Two branches in District 2, Alberta and Gresham, were selected as demonstration sites for Family Preservation, Child Welfare's collaborative approach with Self Sufficiency Programs, a separate division within the agency that provides assistance for low-income individuals and families to promote family stability.  ODHS is taking a phased approach to implement and evaluate Family Preservation, so that the agency can understand what works best and quickly make the necessary adjustments before implementing any statewide changes, and currently has eight demonstration sites.  As a result of the work of these two Family Preservation sites, the district is seeing positive outcomes for children and young adults in providing earlier, less intrusive support for their parents and families.  For example, in 2023, in the Alberta site, 94% of children whose family received support from Family Preservation remained in their home and 20 Family Preservation cases were closed with no re-entry into Child Welfare.  Ms. Moon will testify about other examples from District 2 that illustrate the positive outcomes of Family Preservation.

**2.    Efforts to improve timeliness of CPS assessments.**

District 2 has made significant improvements in reducing the number of overdue CPS assessments since Ms. Moon joined ODHS in December 2021.  As a preliminary matter, Oregon

has a high volume of CPS assessments partly because the state recognizes a much broader scope of child abuse than many other states. Oregon's definition of child abuse covers instances of third-party abuse—including abuse committed by a child's friend, romantic partner, or classmate. It also includes threat of harm, not just physical abuse and neglect. This broad definition of abuse contributes to a higher number of child abuse reports, and consequently, a higher number of CPS assessments assigned at screening.

Notwithstanding a large volume of CPS assessments, District 2's caseworkers prioritize their work based on the immediacy and severity of the harm involved. In other words, between an older case involving a report of past injuries and a more recent case involving a present, direct threat of harm, District 2's CPS caseworkers prioritize the case involving the more present, direct threat of harm. Furthermore, while a CPS assessment is being completed, the caseworker works to remove any reported or identified safety concerns. This way the child is protected while the CPS assessment is in progress.

Ms. Moon will also testify to various practices and procedures District 2 employs to help its caseworkers complete and catch up on overdue assessments. For example, District 2 utilizes mobile CPS units to help branches that are behind with completing CPS assessments. District 2 also looks critically at where new assignments are coming in to manage an appropriate number of case assignments across the district. With these efforts, District 2 has been able to reduce the number of overdue CPS assessments in every branch, for example, East Branch reduced their overdue assessments by 89.5% and Gresham Branch by 47% between January 2022 and January 2023. District leadership is continuing to work toward 100% compliance with the 60-day CPS assessment completion requirement.

**Page 193 –   DEFENDANTS' LAY WITNESS STATEMENTS – MARISA MOON**

### 3.    Addressing high-risk CPS cases.

Ms. Moon will also testify that District 2 has undertaken several efforts to address serious safety issues involving children (such as domestic violence, infant safe sleep, commercial sexual exploitation of children, and increased risks of child abuse for children under the age of five) in a more robust and effective manner.  To this end, District 2 launched Safety and Sustainability Staffings in December 2021.  If a family meets certain high-risk criteria, CPS supervisors can schedule a Safety and Sustainability Staffings meeting to address the family's CPS assessment prior to the CPS caseworker making an initial contract with the family.  During a Safety and Sustainability Staffings, CPS caseworkers, their supervisors, a safety consultant, and other specialized consultants (*i.e.*, the ICWA, domestic violence) work together to determine the next steps in the family's assessment.  If the CPS caseworker is considering a legal action to remove the child, the Safety and Sustainability Staffings would also include an Assistant Attorney General from the Oregon Department of Justice.  The primary purpose of a Safety and Sustainability Staffings is to provide a variety of perspectives and expertise, so that a CPS caseworker can approach any issues which may develop in the case objectively and without feeling isolated in making complex safety decisions.

During a Safety and Sustainability Staffings, a family that meets an even higher set of risk criteria (such as serious injury, permanent impairment, or death of a child) may be referred for a different specialized staffing called a High Risk Staffings.  A High Risk Staffings is another collaborative consultation process designed to provide CPS caseworkers with adequate support for difficult cases.  During a High Risk Staffings, CPS and permanency caseworkers, their supervisors, CPS and permanency consultants, an Oregon Department of Justice Assistant Attorney General, and other experts (*i.e.*, the Tribal Affairs Unit, alcohol and drug services,

domestic violence) determine a course of action, along with community providers and the family.

CPS caseworkers implement the recommendations from Safety and Sustainability Staffings and High Risk Staffings to ensure the safety of the children with the involved families. While the ultimate decision regarding the child's safety and placement rests with the juvenile court, the Safety and Sustainability Staffings and High Risk Staffings models allow District 2 CPS caseworkers to present the course of action designed to serve the best interests of the child that incorporates input from families, communities, and subject matter experts. Ms. Moon will testify that the Safety and Sustainability Staffings and High Risk Staffings models have led to positive safety outcomes and improved practices for the children served in District 2, with specific examples of those positive outcomes and improved practices.

Because of its size, the successful policies and practices developed in District 2 are often implemented elsewhere within Child Welfare. The Safety and Sustainability Staffings and High Risk Staffings models employed by District 2 are part of the innovations which Child Welfare is likely to implement elsewhere in being able to manage high-risk families with a community-focused lens.

### 4. High-acuity mental and behavioral health needs.

Ms. Moon will also testify about District 2's efforts to improve support for children and young adults with significant mental health needs. District 2 recognizes that children and young adults with high mental health needs may fall between service array gaps, which in rare circumstances can result in a child or young adult residing in temporary lodging while waiting for a placement. In June 2023, District 2 launched a new Psychiatric Consultant Protocol, which allows caseworkers to seek clinical consultation from a psychiatrist when a child needs support from a mental health, behavioral health, or substance use provider. Caseworkers can now seek a

psychiatric consult at any point in a case, and this new protocol has helped caseworkers, as well as the children and young adults in their caseloads and better understand next steps, which also helps reduce the possibility of placement disruptions.  Ms. Moon will testify about specific examples of the positive outcomes that resulted from the new Psychiatric Protocol.

### C.    District 2 seeks to ensure the well-being of caseworkers to better serve the district's children in care.

District 2 has made many improvements in supporting the well-being of caseworkers and the children they serve since Ms. Moon joined Child Welfare.  For example, caseloads for permanency caseworkers have gone down significantly, partly because the number of children in foster care has gone down across the state, but also because District 2 intentionally sought to address caseworker caseloads by focusing on worker retention.  Lighter caseloads in turn allows caseworkers to improve the quality of their service to the children in care.

District 2 has also sought to help caseworkers through its intentional approach in assigning CPS cases.  Due to its large size, District 2 uses a CPS case assignment formula that is different from the rest of the state.  Under its formula, CPS caseworkers who are on protected leave (including parental leave and the Family and Medical Leave Act leave), or whose tenure with ODHS is less than eight weeks, are excluded from the pool of available workers.  While program managers and supervisors seek to assign the same number of cases to each worker, they are not assigned randomly.  Supervisors look at a caseworker's caseload both quantitively and qualitatively, taking the worker's skills, experience, and current caseload into consideration when making assignments.  For example, if a caseworker was recently assigned to a case involving a child fatality, the district looks carefully at incoming future assignments to ensure the caseworker is not being asked to take on additional cases involving serious injuries or fatalities.

This is all done in an effort to be trauma-informed and to protect the caseworker's mental health, which in turn has an impact on the quality of the caseworker's work and retention.

District 2 also seeks to ensure the safety of its caseworkers.  Because their work often involves interacting with individuals who are physically aggressive, in an extremely emotional state, or both, caseworkers are exposed to risks of physical and emotional injuries.  Ms. Moon will testify about District 2's efforts to improve the safety of its caseworkers as the safety of caseworkers has a direct impact on the quality of service provided to children in care.  For example, District 2 launched a program called "Safety Staffing" in 2023 to support caseworkers who experienced a safety incident.  This program has been tremendously successful and is another example of how the District is making sure to improve retention of its workforce.  She will also testify about the Permanency Quality Assurance tool which helps ensure a safe environment during caseworker face-to-face contact with a child through quality documentation of a face-to-face case note.

Likewise, District 2 continues to develop tools its caseworkers can utilize to help them avoid isolation and feeling overwhelmed with their work.  Safety and Sustainability Staffings and High Risk Staffings are examples of these tools.  CPS caseworkers can approach complex safety problems with the help of their supervisors, District leadership, and specialized consultants from the Central Office.  Not only do caseworkers receive practical advice, but also mental support knowing that they are not alone in responding to these emotionally trying cases.  These tools, along with others, help with retention of caseworkers, which positively impacts the quality of services District 2 can provide to children in care.

D. **District 2 is tracking and utilizing data to make informed decisions for the children in care.**

Ms. Moon will testify that District 2 has significantly improved its data literacy since she joined Child Welfare. District 2 has its own CQI team, launched in early 2021, which compiles and presents child welfare-related data for District leadership in a way that allows them to make informed decisions. District 2's CQI team often partners with the statewide CQI team but remains independent in its service to the district.

Ms. Moon receives daily, weekly, and monthly updates from District 2's CQI team that display various types of data points, including those for timeliness of assessments or case plans, caseworker caseloads, retention of resource families, and children in care. From a review of these updates, Ms. Moon can see where each branch of District 2 stands on various metrics compared to other districts in the state or to the federal standard. Utilizing data effectively has allowed District 2 to implement changes that target specific needs. For example, after reviewing the data regarding child fatalities within the District between July 2019 and November 2022, District 2 learned that it was underassessing the impact of domestic violence on child safety. Sixty percent of the family conflicts that resulted in a child's death between July 2019 and November 2022, were incidents of domestic violence, which was much higher than expected. This led District 2 to create Safety and Sustainability Staffings and High Risk Staffings so that the District's CPS caseworkers can respond to complex safety problems more effectively.

Further, by reviewing the data provided by District 2's CQI team, Ms. Moon and her colleagues are better able to assess the effectiveness of various programs within the District, including the Family Preservation approach. While the Gresham Branch was already using a family-focused, prevention-oriented approach years before it became a demonstration site, District 2 can now collect data coming from its Branch as a Family Preservation site to analyze

**Page 198 –   DEFENDANTS' LAY WITNESS STATEMENTS – MARISA MOON**

positive outcomes, as well as unintended consequences to the Branch's adoption of the Family Preservation approach.  Using these data points, District 2 has been able to make informed decisions regarding how best to implement preventative resources and support that will help children stay with their families.

>   **E.**     **District 2 is actively collaborating with other agencies and community partners to better serve the children in care.**

Ms. Moon will testify that collaboration with community partners is the most important factor that prevents a child's entry into foster care and shortens the length of their stay in foster care.  From their Family Preservation sites, District 2 is seeing data that shows children reunite with their families faster with quality community engagement.  To that end, District 2 has many community initiatives to support children, parents, and families with their financial, educational, and mental health needs.  District 2 is also collaborating with community partners to better support young adults with high-acuity mental health, behavioral health, or substance abuse needs, as well as with OHSU child psychiatric physicians and hospitals' emergency departments to support young adults with high mental health needs.

Additionally, inter-agency, cross-system collaborations are essential in addressing the service gaps for children and young adults with high-acuity mental or behavioral health needs. Children and young adults in Child Welfare's care sometimes fall into the service array gaps that Child Welfare cannot address, because Child Welfare is inappropriately considered the catch-all safety net for all children and young adults in the state.  District 2 is collaborating with Multnomah County's IDD Services Division and OHA to build better communications as children in ODHS's care are also served by ODDS, OHA, or both at the same time.  OHA can provide mental health services, and ODDS (through local IDD offices and services) can provide supported access to services for intellectual and developmental disabilities.

**Page 199 –    DEFENDANTS' LAY WITNESS STATEMENTS – MARISA MOON**

Lastly, District 2 is collaborating with the Department of Community Justice, to effectively address the overlapping community and family safety issues between the Department of Community Justice and Child Welfare.  The Department of Community Justice, the department within Multnomah County that operates the county's juvenile detention center, often requests the court order a youth into Child Welfare's custody, without providing an opportunity for District 2 to assess whether there is an appropriate placement in advance.  District 2 is working to improve communications with the Department of Community Justice to allow for more timely and relevant conversations to occur, so that District 2 can better assess the most appropriate setting for the youth, and ensure services are provided to meet their needs.

**F.        Primary and Secondary Designations.**

Ms. Moon will testify that Child Welfare does not have "primary" and "secondary" caseloads for its CPS, permanency, and certification caseworkers.  Rather, a primary caseworker is assigned who is the primary person to make any decisions related to the case, along with one or more personnel who are designated as a "secondary."  Secondary personnel have been known to include anyone from a supervisor, to a program manager, to a courtesy caseworker, to sometimes even an administrative assistant.  At District 2, many "secondary" personnel can be listed and associated with a case even though their involvement has ended and simply because they have not been removed from the matter in OR-Kids.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

**Page 200 –    DEFENDANTS' LAY WITNESS STATEMENTS – MARISA MOON**

**XXI.   Fariborz Pakseresht (5 hours direct testimony).**

**A.    Professional background.**

Governor Kate Brown appointed Mr. Pakseresht as the Director of the ODHS in September 2017.  He served as the Director of the OYA from 2012 to 2017 and had worked for OYA since 2008.  Prior to his nine years with OYA, Mr. Pakseresht worked for ODHS from 2001 to 2008 in a variety of capacities, including administrator of facilities, deputy chief administrative officer, chief administrative officer, and special assistant to the director of organizational transformation.  The latter is the position he held when he transferred to OYA.

Mr. Pakseresht has worked for the State of Oregon for 33 years.  He began his career in state government at the Department of General Services, which later merged with another agency to become the current DAS.  He worked for DAS until joining ODHS.

Mr. Pakseresht's long career in state agency leadership includes significant experience with organizational transformation.  At OYA, he led an agency-wide reform called the Youth Reformation System that focused on data-informed youth development rather than a punitive approach.  The reform focused on developmentally appropriate services for children and young adults, and it resulted in lower recidivism rates for children and young adults in the juvenile justice system, as well as fewer incidents, fights, and assaults within OYA facilities.  OYA used in-depth data analytics to examine children and young adults' trajectories and to determine what support systems they needed, with the goal of reducing the probability of children and young adults entering the adult criminal system.  The reforms reduced the number of children and young adults sent to the Oregon Department of Corrections from 45 to five a year.

In 2013, the Council of Juvenile Corrections Administrators honored Mr. Pakseresht with the Outstanding Administrator Award for his leadership and contributions in the field of juvenile justice.  He currently serves on three national policy advisory bodies: the Leadership Council for

**Page 201 –   DEFENDANTS' LAY WITNESS STATEMENTS – FARIBORZ PAKSERESHT**

American Public Human Services Association, the Deloitte Global Innovators Council, and the Advisory Committee for Center for Public Sector AI.

Mr. Pakseresht's three decades of experience in state government administration has informed his perspective on how agencies improve internal processes and external outcomes, and they do not improve by solely adhering to hard metrics. An agency improves by using data to inform flexible approaches that focus on the human beings served by that agency and by working collaboratively internally and with other players within state government and the broader community.

> **B.**    **Both ODHS and the Governor's Office have been working to reform the child welfare system for years.**

As Director of ODHS, Mr. Pakseresht works closely with the Governor's Office and worked closely with Governor Kate Brown after his appointment in September 2017, through the end of her term in office in January 2023. He and Governor Brown began working together many years ago with the Oregon Legislature and with other state agencies to reform the juvenile justice and child welfare systems.

> **1.**    **Reforms to the child welfare system predated his tenure as director of ODHS, and ODHS entered a program improvement plan in 2018.**

Reforms to the Child Welfare Division of ODHS began in 2016, before Mr. Pakseresht assumed leadership over ODHS. He is familiar with the 2016 PK Report and 2016 CFSR that identified problems within the child welfare system, but he was still with OYA at the time those reports were issued and reviewed the 2016 PK Report after joining ODHS. The 2016 PK Report provided two primary conclusions: (1) that more appropriate placements could prevent abuse of foster children and young adults; and (2) a coordinated response to abuse in the foster care system could lead to earlier intervention and prevention. The report made four recommendations:

1.      Change the culture of ODHS;

2.      Focus ODHS and the Child Welfare Division on safety;

3.      Adopt data-driven decision-making processes; and

4.      Increase staffing resources for CPS and Child Welfare.

Public Knowledge made more specific sub-recommendations as well, including centralizing the Oregon Central Abuse Hotline and increasing provider reimbursement rates for resource parents. The 2023 Moss/PK Report shows that Child Welfare has improved on nearly every area and more, assessed by the 2016 PK Report. Mr. Pakseresht agrees with that assessment. Even by 2019, Child Welfare had improved on most of the areas identified in the 2016 PK report.

In particular, the 2023 Moss/PK Report shows that permanency has improved significantly since 2016. Children are not staying in foster care as long and the exit-to-entry ratio has improved dramatically, which shows that Child Welfare is implementing appropriate permanency plans for families that are successfully keeping children from reentering state care. Caseworkers are focused on spending more time with children and families and working on their individual paths to permanency. ODHS and the SOCAC are now focusing on CPS assessments. Agency leadership and SOCAC agree that the governing statutes and Oregon Administrative Rules require more CPS investigations than are necessary, and they will be examining ways of reducing numbers of excessive or unnecessary investigations.

Mr. Pakseresht reviewed the 2018 Secretary of State audit of Child Welfare at the time it was issued, although the audit process began in 2017, before he became the Director of ODHS, and was completed one month later. Because of this timing, he had little-to-no involvement with the audit process. The audit contained 24 recommendations, similar to those in the 2016 PK

Report.  Those recommendations led to Child Welfare creating a program improvement plan to implement the changes identified in the audit and the 2016 PK Report.

The Secretary of State issued a follow-up audit in June 2019 that found that Child Welfare had made significant improvements on eight of the 24 recommendations and had made at least some progress in several other areas.  The audit clearly identified that Child Welfare's efforts at improvement were moving the agency in the right direction, and while some work was still necessary, the necessary improvements were largely underway.

> ## 2.    Executive Order 19-03 initiated a series of reforms to the child welfare system.

Mr. Pakseresht will testify regarding the history of oversight of Child Welfare in Oregon since 2019.  Governor Brown issued the EO in April 2019.  Mr. Pakseresht was familiar with the EO at the time it was issued.  The EO exercised Governor Brown's authority over ODHS in order to address what Mr. Pakseresht believes to be Governor Brown's perception of a crisis in that moment in time in Oregon's child welfare system.  The EO created a CWOBto address these and other systemic issues.  The EO also directed the Governor's Office to procure a crisis management team to implement the EO's directives, which included, among other things, a surge in hiring to bring on more caseworkers.

The EO directed the CWOB and crisis management team to develop recommendations related to, among other topics:

- Ending out-of-state placements for children and young adults in care;

- Ensuring that accurate and timely data is available to improve operations and processes; building capacity for therapeutic and general foster care, as well as for a continuum of care in behavioral health services for foster children and young adults that is trauma-informed, accessible, and family and child-focused; and

- Developing adequate in-home capacity for children and young adults of color, children and young adults with intellectual and developmental disabilities, and LGBTQIA2S+ children and young adults.

**Page 204 –    DEFENDANTS' LAY WITNESS STATEMENTS – FARIBORZ PAKSERESHT**

In the subsequent years, Child Welfare has addressed most of these issues.  ODHS and the Child Welfare Division have made significant progress towards transforming Oregon's child-serving system, including the following:

- Creating and implementing the Vision for Transformation;

- Securing federal approval of Oregon's "Family First" Title IV-E Prevention Plan;

- Centralizing the child abuse reporting hotline;

- Overseeing the implementation of strategies to reduce the number of overdue CPS safety assessments;

- Ending out-of-state residential placements for children and young adults in the custody of Child Welfare as of June 2020;

- Improving retention and recruitment efforts for caseworkers and staff (despite pandemic workforce challenges, hiring and promotions in Child Welfare outpaced separations during 2023);

- Reducing the number of children and young adults that are removed from their homes (there were 7,691 children and young adults in care in 2018 and 4,615 in February 2024);

- Adopting caseworker caseload ratio standards of 1:7 new assessments per month for CPS caseworkers, 1:12 children on caseloads for permanency caseworkers, and 1:21 cases for certification caseworkers;

- Strengthening collaboration and consultation with Oregon Tribal Nations;

- Increasing public reporting, including developing the Child Welfare Federal Performance Measures Dashboard and publishing monthly Child Welfare progress reports; and

- Revising and launching statewide mandatory training for prospective resource parents and adoptive families.

Mr. Pakseresht was not a member of the CWOB but attended the meetings.  The Board was initially focused on out-of-state foster care placements, which have since ended.  The Oversight Board made regular progress reports to the Governor and the Director of the OHA.

The Oversight Board's focus was broader than Child Welfare alone, and it was focused on Oregon's larger, multi-agency child-serving systems.

The Oversight Board had a significant positive impact. At the time Governor Brown created the Oversight Board, Child Welfare was under tremendous scrutiny from the Oregon Legislature and media. How well Child Welfare performs correlates directly with how well staff perform, which correlates directly with their morale—and morale was low in early 2019. The Oversight Board gave an opportunity for staff to be heard on a regular, biweekly basis, and it allowed staff to feel that they were being listened to, supported, and taken seriously. Morale—and performance—improved considerably because staff no longer felt that they were being constantly criticized. Prior to the Oversight Board's inception, hiring in Child Welfare struggled to keep pace with turnover—with turnover sometimes exceeding hiring—and after the Oversight Board's conclusion at the end of 2019, the opposite was consistently true.

The Oversight Board also brought to the surface a shared understanding that child welfare is interagency work that requires participation from many partners, including those in mental health, education, housing, behavioral health, CCOs and other medical providers, and others. All of these partners have an impact on policy improvements, and coordination among them began to improve under the Oversight Board, which has led to better policies over time. Improved collaboration does not always lead to better outcomes because all of the players in the system have to deal with factors outside of their control, and those can impede progress sometimes. But improved collaboration has led to better policies around substance use, mental health, and behavioral health, and it takes some time for treatment capacity to increase and for the system to show better results.

Governor Brown's EO also established a state of emergency for the Child Welfare

Division.  The state of emergency allowed ODHS to make direct appointments, execute

emergency procurements, and adopt or suspend temporary administrative rules.  The EO was in

effect through December 31, 2019.

### 3.    Mr. Pakseresht was familiar with the results of the A&M report and took steps to implement its recommendations.

Governor Brown hired A&M as a crisis management consultant pursuant to the EO.

A&M addressed timelines for certain processes to reform Child Welfare, and its

recommendations assisted in a hiring surge of more than 300 employees into Child Welfare.

Between March and September 2019, based on A&M's advice, out-of-state residential

placements for foster children and young adults decreased by 57%.  Since July 2020, no children

in ODHS's custody have been placed in out-of-state residential facilities.  During 2019, A&M

assisted ODHS in reducing its 500 public records requests backlog to zero.  It helped ODHS

implement training and onboarding for its greatly increased staff, and to improve the efficiency

of the newly centralized child abuse hotline.  Since Mr. Pakseresht began leading ODHS, Child

Welfare has added hundreds of staff and implemented standardized caseload ratios.

### 4.    The Oregon Legislature created the SOCAC in 2019.

The Oregon Legislature created the SOCAC in 2019.  The Legislature created SOCAC

through the passage of Senate Bill 1 at the recommendation of the Children and Youth with

Specialized Needs Workgroup, which was convened in 2018 at the request of Governor Kate

Brown, then-Chief Justice of the Oregon Supreme Court Martha Walters, and Senate President

Peter Courtney.  The workgroup, which included 35 members, was tasked with addressing the

fact that at the time, Oregon's system for serving children and young adults with specialized

needs did not support intervention and treatment at adequate levels or with cultural

**Page 207 –    DEFENDANTS' LAY WITNESS STATEMENTS – FARIBORZ
                PAKSERESHT**

responsiveness, nor did it adequately serve this group when they are in crisis and after they have stabilized, in large part because the system lacked cross-system collaboration, flexibility, and responsiveness.

During the 2019 Legislative session, the workgroup proposed Senate Bill 1 and Senate Bill 221, which allocated $6.6 million for in-home behavioral health services. Senate Bill 1 went through several amendments before the Senate and Joint Committees on Human Services but ultimately passed unanimously in the Oregon House and Senate. The purpose of SOCAC is to develop and maintain both a state system for care policy and a comprehensive, long-range plan for coordinated system of care and to advise the Legislature and the Governor, as well as the Directors of OHA, OYA, and ODHS on policies and budget allocations to improve the child-serving system of care. One of ODHS's policy team members sits on SOCAC.

SOCAC is extremely important to the child-serving system. It is necessary to have all system partners at the same table because reforming the system requires understanding the trajectory that children and young adults travel and to identify gaps in the system so that children and young adults do not fall through the cracks. It takes multiple system partners to understand how to keep a child or young adult out of the juvenile justice system or how to help them transition into healthy and productive adulthood, for example, and this multi-faceted perspective is what SOCAC brings to the table. SOCAC also has significant credibility with the Legislature and the Governor's Office, who pay attention to its recommendations since it is the only place where all of these perspectives come together.

### 5.   Child Welfare has reduced the number of children in temporary lodging.

Mr. Pakseresht will testify that Child Welfare has reduced the number of children in temporary lodging. There are typically about 14-17 children and young adults in temporary

lodging per day at any given time, where there were about 50 when Mr. Pakseresht started at ODHS in 2017, plus up to 80 in out-of-state residential facilities. In January 2024, 28 children and young adults spent at least one night in temporary lodging – just 0.6% of the children and young adults in foster care that month. Mr. Pakseresht was involved in the settlement related to temporary lodging that arose from the *A.R.* lawsuit against ODHS, and he has been involved in the efforts to implement the settlement agreement. The ODDS, OHA, juvenile dependency courts, juvenile justice courts, and attorneys representing children and their parents all play a role in a child or young adult's entry into temporary lodging, and the number of children and young adults experiencing it is not solely within the purview of Child Welfare alone.

It is also complicated by factors such as the lasting effects of the COVID-19 pandemic, which seems to have led to behavioral health problems in children as young as 10, which has not been typical in the past and presents new challenges that the system must account for. Mr. Pakseresht will also be prepared to testify regarding entities that contract with Child Welfare, and Child Welfare's actions taken in response to concerns about those contractors.

### C.    ODHS successfully sought and obtained increased funding for Child Welfare from the Oregon Legislature.

State agencies each create biennial budget proposals that they submit to the Governor's Office as a request, and Mr. Pakseresht will testify about the process of proposing and obtaining legislative funding for Child Welfare. The Governor's Office reviews those agency requests individually and as a group, and creates a Governor's Recommended Budget that is submitted to the Oregon Legislature for its consideration. Agencies' individual requests are not submitted to the Legislature. Mr. Pakseresht has submitted an ODHS budget request to Governor Brown and Governor Kotek in every biennium that he has been head of ODHS. Governor Brown and Governor Kotek submitted a Governor's Recommended Budget to the Oregon Legislature during

every long session, which occur in odd-numbered years, and all of their recommended biennial budgets have included increased funding for Child Welfare.  Mr. Pakseresht has testified before the Legislature in support of Governor Brown's and Governor Kotek's budgets as they related to ODHS.  Many of the Child Welfare specific initiatives in the Governors' Recommended Budgets were successfully funded by the Legislature.

Successful initiatives set forth in the Governor's 2017-2019 Recommended Budget included securing an approximately 14% increase in the base foster care reimbursement rate and securing an approximately 16% rate increase for BRS providers.

Successful initiatives set forth in the Governor's 2019-2021 Recommended Budget included:

- Securing $8.5 million total[12], including $3.5 million from the general fund, to pay for therapeutic foster care home recruitment, training, and support;

- Securing $4 million for the Emergency Board to help increase capacity for non-Medicaid in-home services under the Family First Prevention Act;

- Securing $7.8 million, including $3.1 million from the general fund, to expand the KEEP program statewide;

- Securing $3.8 million for a team of 17 FTE caseworker positions dedicated to recruiting and retaining foster families; securing $8.9 million for 38.51 FTE to centralize and run the Oregon Child Abuse Hotline; and

- Securing $7.5 million for nine additional FTE for the ODHS Office of Reporting, Analytics and Implementation who support child welfare research and planning work related to the OR-Kids system.

Successful initiatives set forth in the Governor's 2021-2023 Recommended Budget included:

---

[12] All funding requests are inclusive of federal funds and the state general fund.

**Page 210 –    DEFENDANTS' LAY WITNESS STATEMENTS – FARIBORZ PAKSERESHT**

- Securing $9.2 million to add four, five-bed residential treatment homes, and one 10-bed secure residential treatment facility for residential services for young adults ages 17-25 in Oregon, including young adults in foster care;

- Securing $4 million for a Child Welfare training unit that includes 16.72 FTE—for a total of 19 positions—to enhance the agency's ability to design, deliver, evaluate, and oversee training received by Child Welfare staff;

- Securing $13.7 million for a Child Welfare respite care program;

- Securing $5.7 million for OHA to support assessment, stabilization, and long-term treatment planning through interdisciplinary assessment teams for children and young adults with behavioral health needs;

- Securing funding to increase BRS fee-for-service rates by approximately 6.5%; securing $6.1 million for 25.52 FTE—29 positions—for the Family First Preservation and Prevention Program, which included funding for a CQI manager to lead the CQI team and build a CQI model; and

- Securing funding for one full time position (.88 FTE) to support the Governor's Child Foster Care Advisory Commission.

In the 2023-25 budget, the first budget cycle under Governor Kotek, the Governor recommended and the Legislature approved, $9.2 million to hire 202 new Child Welfare positions (51 FTE).  The Governor also recommended and the Legislature approved, $27 million to fund an increase in the reimbursement rate for resource families.

The Legislature also approved $10.2 million to increase the reimbursement rate for BRS. That allocation was made through a legislatively-mandated process rather than the typical Governor-approved budget process.

Governor Brown's Recommended Budgets also included many initiatives and funding requests for Child Welfare and related programs that the Legislature did not adopt.  Both ODHS and the Governor's Office worked to persuade the Legislature to provide this funding, but as with the budget process for any agency or program, the decision whether to provide the requested funding ultimately belongs to the Legislature, and it is rare to receive all funding that the Recommended Budget seeks.

**Page 211 –   DEFENDANTS' LAY WITNESS STATEMENTS – FARIBORZ PAKSERESHT**

The Governor has also recommended funding for programs through agencies other than Child Welfare, which also will benefit Child Welfare and children in foster care. The child-serving system is interconnected, and it includes services such as housing and mental health treatment, which may not be specifically earmarked for Child Welfare but do serve children in foster care.

**D.    Mr. Pakseresht hired Rebecca Jones Gaston as the Director of Child Welfare after conducting a national search to fill the position.**

Mr. Pakseresht hired Rebecca Jones Gaston as Director of Child Welfare in 2019. Casey Family Programs, a national non-profit focused on improving the foster care system, identified Ms. Jones Gaston through Casey's own national connections. Mr. Pakseresht intended to leave as small a gap as possible between former Child Welfare Director Marilyn Jones and her replacement because he felt that speculation and a gap in leadership often lead to an organization becoming destabilized. Ms. Jones left the agency in August 2019, and Ms. Jones Gaston started November 1, 2019.

Ms. Jones Gaston participated in 18 interviews in Oregon prior to her hire. Those included interviews with Governor Brown, Tribal leaders, legislators, internal panels, and child advocates. She had a strong presence and was at ease in conversation with anyone: the Governor, the Legislature, large crowds, and caseworkers. Casey Family Programs highly recommended Ms. Jones Gaston. All of Ms. Jones Gaston's recommendations were very favorable, and she was willing to come to Oregon. Not many people wanted to be Oregon's Child Welfare Director at that time. Turnover in the position had been quite high, with six different Child Welfare directors in less than two years.

Hiring an out-of-state candidate was a balance to consider, but Ms. Jones Gaston had the necessary expertise. She had been a director of child and adult services, knew the practice, the

business, the industry, and had also worked with nonprofits that helped improve child welfare. She had both levels of experience and had run an organization similar to what she was walking into, plus her recommendations through Casey, all combined to make her the right choice. Mr. Pakseresht felt that the interview process confirmed this, as everyone who spoke to Ms. Jones Gaston was universally excited about bringing her on board.

Ms. Jones Gaston was a particularly good choice to lead Child Welfare during a low point at the agency. It was a difficult experience for the organization to have so many changes in Child Welfare's top leadership over such a short period and be under scrutiny by the Legislature and the media. All of it impacted morale within Child Welfare, which was at its lowest when Ms. Jones Gaston came on board. Among the many positive changes she made while leading Child Welfare, improving morale was among the most significant. She led Child Welfare through the difficult period of the COVID-19 pandemic, which required a dramatic shift in Child Welfare's focus and workflow. The COVID-19 pandemic began in March 2020, just four months after Ms. Gaston began at Child Welfare. It consumed much of Child Welfare's focus for the year that followed, but Ms. Gaston still managed to do the work to create and roll out the Vision for Transformation in 2021. She met with community members and Child Welfare employees alike in order to do so over the course of 2020 and 2021.

In 2022, Ms. Jones Gaston was appointed by President Biden as the Commissioner of the ACF in the U.S. Department of Health and Human Services. She was confirmed in December of 2022.

Mr. Pakseresht appointed Aprille Flint-Gerner as Interim Child Welfare Director effective January 1, 2023. Ms. Flint-Gerner served as Child Welfare Division Deputy Director for Equity, Training and Workforce Development under Director Jones Gaston. With over 25

years of public service in child welfare, Ms. Flint-Gerner has continued the transformation which begun under Ms. Jones Gaston's leadership. Her strong commitment to equity and inclusion and experience in system change and improving outcomes for marginalized communities has maintained the momentum in better serving the needs of children, families, and communities. Mr. Pakseresht appointed Ms. Flint-Gerner as Oregon's permanent Child Welfare Director in July 2023, and her continued outstanding leadership has led Child Welfare towards further improvements in the better part of a year since her appointment. Mr. Pakseresht continues to believe that Ms. Flint-Gerner is the correct choice to lead Child Welfare. Her calm, thoughtful, informed decision making is the right fit to lead Child Welfare into the next phases of implementing the Vision for Transformation, and her determined approach to leadership will leave her undeterred by potential obstacles and setbacks as the agency moves forward.

**E. Improvements to Child Welfare are ongoing.**

Mr. Pakseresht will testify about ODHS's continued progress toward improving Child Welfare and outcomes for foster children in Oregon. Child Welfare has adopted the Vision for Transformation, a three-pronged strategic framework for reforming the foster care system. It relies on three guiding principles, which are:

1. Supporting families and preventing child abuse and neglect;

2. Enhancing staff and infrastructure; and

3. Using data for continuous quality improvement.

The first principle—prevention—focuses on safely supporting families while children and young adults are still in the home because removal is not always the only mechanism to keep a child or young adult safe. The second principle, which focuses on staffing and infrastructure, seeks to maintain a confident and competent Child Welfare workforce that is highly skilled and qualified while at the same time reflecting the communities it serves. The third principle of the

**Page 214 – DEFENDANTS' LAY WITNESS STATEMENTS – FARIBORZ PAKSERESHT**

Vision for Transformation focuses on the use of data to support continuous quality improvement in order to inform the best decision making possible for Child Welfare.

One of the reasons Mr. Pakseresht chose to hire Ms. Jones Gaston was that Maryland, where she was director of child welfare, was among the first in the country to submit its Family First plan, and Oregon was struggling to put its plan together. Ms. Jones Gaston put that in place in Oregon in a very short period of time. Later, she developed the Vision for Transformation with family preservation at the forefront—aligned with Family First—and early intervention so that fewer children and young adults would come into the child welfare system. Ms. Jones Gaston agreed that Child Welfare was interfering in the lives of too many families unnecessarily. Data shows that keeping families together improves outcomes in the child welfare system. It provides better supports for children and families and reduces caseloads, which allows caseworkers to better serve the children and young adults who do come into foster care. The Vision for Transformation, over time, will lead to fewer children and young adults entering Oregon's foster care system, and will improve outcomes for children, young adults, and families. It will continue to transform the foster care system under the leadership of Ms. Flint-Gerner, who has been with Child Welfare for more than four years. She and Lacey Andresen, the Deputy Director of Child Welfare, have provided notable stability to the agency over the past four years.

Mr. Pakseresht believes his three decades of public service in leadership positions across several Oregon state agencies has taught him valuable lessons about organizational transformation and change management. The deepest level of change in organizations occurs through a shift in mindsets and helping staff see and understand the point of change. Supporting structures and sufficient resources need to be in place along with a supportive work environment with a balance of empowerment and accountability. Setting realistic goals and realistic, flexible

metrics, and having a clear understanding of strategies and actions that lead to achieving them is the best path to sustainable outcomes. It is extremely challenging to create this type of environment under a consent decree or permanent injunction which generally leads to fear and anxiety by staff. Fear is the number one enemy of progress.

Mr. Pakseresht believes while metrics are necessary for setting goals and outcomes, solely focusing on metrics can be counterproductive to transformation, lead to a reactive compliance mindset, and can stifle creativity and innovation.

There are valuable lessons learned through the *CASA* settlement related to temporary lodging, which can be avoided in this case. Dr. Marty Beyer, the Special Master recently appointed in the *CASA* settlement articulated this point in her final report to U.S. District Judge Michael McShane:

> "The settlement agreement established metrics ODHS was ordered to achieve rather than the process for the state to provide stable homes for children. Many ODHS employees across the state became metrics-focused, narrowly concentrating on keeping each child/youth out of a hotel or protecting them when they were in a hotel. This approach has been extremely costly financially as well as exhausting for ODHS staff working overtime in hotels in addition to their regular jobs. The CW preoccupation with the settlement agreement metrics has gotten in the way of effective solutions before children/youth become unplaceable. As OHA, CCOs and providers collaborate with CW and DD to increase stable therapeutic settings that do not rely on ODHS staff on overtime, the focus should shift away from metrics. Nevertheless, regular reporting on TL Prevention and temporary housing of children/youth when it cannot be prevented is necessary."

Mr. Pakseresht agrees with this statement and its explanation of how metrics adopted through an injunction or other court order can be counterproductive to the continued improvement of Child Welfare, and he intends to continue adopting a more flexible, nimble approach to improving the system. Child Welfare, under the inspired leadership of Ms. Flint-Gerner, has the necessary skills, staff, and tools to continue improving the program by fully

implementing the Child Welfare Vision for Transformation, leading to better outcomes for children, young adults, and families.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

**XXII.  Melanie Parent (2 hours direct testimony).**

    **A.    Professional background.**

Ms. Parent will testify that she is a Foster Care Coordinator at the Child Welfare for the ODHS and that she has held this position since June 2013.  Ms. Parent earned her Bachelor of Arts in Psychology and Social Work in 1995 from Miami University in Ohio.  She completed her Master of Social Work in 2000 from PSU in Oregon.  Ms. Parent is a Licensed Clinical Social Worker in Oregon since 2004.  She has worked at Child Welfare since 1996, first as a permanency caseworker, then as a legal assistance worker, a resource developer, an adoption worker, a Consultation Education Training worker, and a legal assistance specialist.

Ms. Parent will explain that as a Foster Care Coordinator, she provides support to the field, including delivering training and developing policy and practice regarding foster care standards and the responsibilities for ODHS staff and resource families.  She performs operations and policy analysis, and her work focuses on the certification and assessment of prospective resource parents and relative caregivers.  She is also involved in the implementation of tools and resources to support safety, health, and the well-being of children and young adults in ODHS care.

    **B.    LGBTQIA2S+ training, initiatives, and committees.**

Ms. Parent will testify that she has been involved in developing policies, practices, procedures, and trainings regarding LGBTQIA2S+ children and young adults in care since at least 2014.  For example, she developed a presentation regarding SOGIE that she and others presented at certification quarterlies around the state.  As another example, when the ODHS Caregiver Training unit requested additional support for trainers regarding SOGIE content in April 2021, Ms. Parent and other ODHS staff consulted with the Human Rights Campaign's "master trainers" from other states and provided the requested support to ODHS trainers.

Ms. Parent has been a member of the PRIDE ERG (previously the LGBTQ Statewide Collaboration Team) since its inception, and she has previously served on the Leadership Council. She has continued to explore issues that LGBTQIA2S+ children and young adults face through trainings, presentations, procedures, and committees. This work is supported by Child Welfare leadership in policy, practice, and in the spirit of the Vision for Transformation. Her work with LGBTQIA2S+ children and young adults was not in response to this lawsuit.

Ms. Parent will testify that she has worked with a variety of agency partners to support LGBTQIA2S+ children and young adults. Ms. Parent is involved in the OYA LGBTQIA2S+ External Advisory Committee, which convenes a group of community partners on a quarterly basis to provide input on OYA's service delivery system. She participated in the Marion County Juvenile Court LGBTQ+ Committee, which meets on a regular basis to collaborate with other local community partners to improve system response to the unique needs of LGBTQIA2S+ individuals accessed through the juvenile court system in both dependency and delinquency channels. Ms. Parent was on the LGBTQIA2S+ Committee of the Child Welfare Racial Equity Leadership Team, which focused on a variety of efforts, to move Child Welfare forward with respect to improving service delivery to LGBTQIA2S+ individuals receiving services from ODHS.

Ms. Parent will testify that she has also participated in committees to identify gaps in training for ODHS staff regarding LGBTQIA2S+ children and young adults, through PRIDE ERG. Ms. Parent has been involved in identifying what trainings are available, what information different constituencies (*e.g.*, resource parents or case service staff) want and need, and what they may not have ease of access to. She has been involved in formal processes, creating content for caseworker training, working with PSU's Child Welfare Partnership, or in more informal

ways such as giving feedback and having discussions with ODHS certifiers, who work directly

with resource parents, and within Child Welfare about serving children and young adults with a

diverse set of needs.  She has also prepared trainings for staff on talking to resource families

about SOGIE, co-presenting with Heather Collee who addressed topics relating to individuals

with disabilities.  Ms. Parent has also presented to juvenile court judges regarding ODHS's

statewide efforts to meet the needs of LGBTQIA2S+ children and young adults.

Following the Oregon Health Plan beginning to cover medically necessary transgender

healthcare, in 2016, Ms. Parent organized a training event and consultation with TransActive

regarding trans healthcare for children and young adults in ODHS custody.  This led to

discussions within Child Welfare and those discussions, in part, led to updates to the Child

Welfare Procedure Manual in Chapter 5, Section 41, regarding supporting and providing services

to children and young adults with diverse SOGIE, including gender affirming healthcare.

Through the PRIDE ERG, Ms. Parent participated in discussions with ODHS about improving

policy and procedures regarding supporting gender identity and expression for children and

young adults in care and agency approvals for gender affirming care.

In 2020, Ms. Parent convened a workgroup with interested PRIDE ERG members to

improve visibility of ODHS caseworkers welcoming LGBTQIA2S+ applicants to become

caregivers.  This work slowed during the COVID-19 pandemic, but similar work was picked up

in 2021 by Child Welfare's Retention and Recruitment Champions.  Culturally responsive

recruitment materials were revamped by the Champions, who are focused on the retention and

recruitment of resource families.[13]

---

[13] Retention and Recruitment Champions are trained and coached to recruit families from
communities that reflects the demographics of where a child or young adult is from.  Targeted recruitment
of resource families is intentional and aimed at decreasing the disproportionate services that exist within
the state's children and family serving system, but most importantly, to reach the goal of ensuring that a

### C.    The Vision for Transformation and its impact.

Ms. Parent will testify that ODHS implemented the Vision for Transformation in 2020, and that it reflects Child Welfare's commitment to prevent unnecessary family separation whenever safe and possible to do so.  But also, when removal from a family's home is necessary, the work behind the Vision for Transformation provides that children, young adults, and families are supported in ways aimed at avoiding poor outcomes and helping them thrive.  The Vision for Transformation has supported Ms. Parent's work to enhance practice and procedure around serving LGBTQIA2S+ children and young adults.  The Vision for Transformation centers on equity and diversity, including LGBTQIA2S+ children and young adults, and echoes Child Welfare's focus on engagement with the people it serves.  The Vision for Transformation also advances Child Welfare's efforts around enhanced training and staff development, which can be seen in the additional tools and trainings that have been provided to staff regarding LGBTQIA2S+ young people.  The Vision for Transformation also centers data-informed practice, reinforcing Child Welfare's work to be able to collect SOGIE data in a trauma-informed way.

### D.    ODHS's efforts around SOGIE data collection.

Ms. Parent will testify that throughout 2019, she collaborated with PRIDE ERG members at the Marion County branch regarding a proposal from Marion County Juvenile Court LGBTQ+ Committee to offer specific case consultation to support LGBTQIA2S+ young adults, which involved collecting SOGIE information.  This initiative stalled due to discovery and disclosure laws, leading in part to Child Welfare's advocacy for Senate Bill 209 during the 2023 Oregon

---

child or young adult is placed in a home that is reflective of the community the child or young adult is from as well as aligning with the needs and values of that child or young adult.

Legislative session.  Senate Bill 209 has further clarified the confidentiality of foster children's records regarding SOGIE information.

Ms. Parent will testify that she is on the Core Team and the procedure workgroup for implementation of SB 209, assisting with and remaining involved in the rollout of the legislation. Child Welfare is currently researching how to collect additional elements in the agency's data system within OR-Kids, and is developing procedure, forms, and trainings regarding collection of SOGIE data.  Child Welfare is focused on collecting data in a trauma-informed way, while maintaining confidentiality and keeping children and young adults safe.  Collecting SOGIE information is sensitive by nature and requires age considerations and a trauma-informed approach.  Such an approach means that a child or young adult may be allowed to decline to provide information about their SOGIE.

### E.   Changes in ODHS policy and procedures regarding supporting and providing services for children and young adults and their SOGIE.

Ms. Parent will testify that Child Welfare staff discuss and are concerned with SOGIE issues and the agency has been working to improve policies and procedures with regard to LGBTQIA2S+ children and young adults for many years.  Throughout 2017, Ms. Parent helped prepare the LGBTQIA2S+-affirming procedures that are now outlined in the Child Welfare Procedure Manual.  Ms. Parent will testify about her contribution to the development of Chapter 5, Section 41.  Development of the procedures took years and involved collaboration with the Health and Wellness Services program and getting feedback from national experts and community partners, including the Multnomah County Juvenile Court Workgroup regarding LGBTQIA2S+ youth, Treatment Services program, and Oregon Foster Youth Connection. Ms. Parent also participated in ongoing discussions between Treatment Services, Licensing, Office of Equity and Multicultural Services, and the Health and Wellbeing Services program

regarding licensing changes around supporting diverse sexual orientation and gender identities that were tied to the new policies.

In January 2020, the SOGIE policy described in Chapter 5, Section 41, of the Child Welfare Procedure Manual went live.  This Section refers to the Oregon Foster Children Bill of Rights and reiterates the rights contained therein.  Section 41 also outlines how Child Welfare workers must affirm the SOGIE of children, use LGBTQIA2S+-inclusive language, and generally support, accept, and advocate for LGBTQIA2S+ children and young adults.  The procedure notes that caseworkers must identify necessary services and resources, as well as personal supplies necessary for wellbeing, and that medical care can include hormone therapy and gender affirming surgeries.  The procedure also provides guidance for supporting LGBTQIA2S+ children who may experience biological family rejection.  Overall, the procedures in Section 41 focus on the caseworker assessing each child and young adult and each situation as unique.

Ms. Parent will testify that she serves on the Affirming Placement Committee, convened by the Child Welfare Treatment Services program.  The Affirming Placement Committee is made up of individuals from various organizations and focuses on improving the experiences of LGBTQIA2S+-identifying foster children who reside outside of family-based foster care settings.  The Committee aims to improve how children and young adults in those settings receive holistic care and services that affirm their SOGIE.

Ms. Parent will testify that throughout her time as a Foster Care Coordinator, Child Welfare has consistently been working to improve the training content for caregivers of LGBTQIA2S+ children, which is now contained in RAFT and previously contained in Foundations.  Ms. Parent will testify that beginning in 2019, she helped develop content for the

**Page 223 –    DEFENDANTS' LAY WITNESS STATEMENTS – MELANIE PARENT**

Child Welfare Procedure Manual, Chapter 8, for certifiers to help assess and expand caregiver's skills related to the certification standard requiring resource providers to respect, accept, and support SOGIE, race, ethnicity, and culture of the population they serve. Chapter 8 rolled out in August 2022. Child Welfare offers a resource directory on an internal website with additional resources to help kids and families who want to learn more or require more resources relating to SOGIE.

### F.    SOGIE affirming resource parents.

Ms. Parent will testify that certification for resource parents requires that the provider respect a foster child's SOGIE. Child Welfare provides all resource parents training on the right to self-determination regarding sexual orientation and gender identity.

The process to become a resource parent starts with receiving orientation information and application as well as completion of RAFT, the initial training for resource and adoptive families. The resource parent applicant must also go through the Home Study process, which involves interviews, home inspections, and background checks.

The RAFT training emphasizes that caregivers must support the sexual and gender identities of children and young adults in their care. The training outlines ways to create a welcoming and affirming home for children and young adults including using pronouns the child or young adult chooses, not assuming the child or young adult's SOGIE, celebrating diversity, being willing to listen and talk about anything, supporting choices for self-expression, allowing children and young adults to participate in activities of their choosing, and encouragement of additional self-education about LGBTQIA2S+ issues and resources.

In order to remain certified, every two years, resource families must apply for renewal of their certificate and are reassessed by Child Welfare certifiers to determine if they meet the

current certification requirements, which include any new policies or requirements implemented since their prior assessment for certification.

Ms. Parent will testify that ODHS takes pride in the policies and practices around recruiting affirming placements for and supporting LGBTQIA2S+ children, young adults, and resource parents.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

**XXIII. Jennifer Ricks (4 hours direct testimony).**

    **A.    Background and professional experience.**

Jennifer Ricks graduated with a degree in Philosophy from Oregon State University. After college she began working at an alcohol and drug treatment center that served men in Multnomah County who were either formerly incarcerated or at risk of incarceration.  In that position, she learned about the impacts of substance abuse disorder on communities.  Ms. Ricks then took a position as an alcohol and drug outreach worker through Volunteers of America.  In that role, Ms. Ricks was placed in a child welfare office in Portland as a community partner; while there, Ms. Ricks became interested in becoming a caseworker.  She was eventually encouraged to apply for a position as a permanency caseworker in Marion County.  She started working for Child Welfare as a caseworker on August 1, 2001.

Ms. Ricks worked as a permanency caseworker in Marion County for two and a half years until she transferred to work as a caseworker in Beaverton.  The move was a positive one for Ms. Ricks, Ms. Ricks's family lived in the Portland area, so she had been commuting to Marion County for work.  After working for approximately two years as a permanency caseworker in Beaverton, Ms. Ricks was promoted to a position as a Consultant, Educator, and Trainer for approximately one and a half years.  In 2007, Ms. Ricks was working on her master's degree in Social Work from PSU and became a Child Welfare supervisor.  Ms. Ricks successfully obtained her master's degree, and she worked as a Certification and Adoptions supervisor for almost 10 years.

Following her role as supervisor, Ms. Ricks held other roles within Child Welfare.  For example, Ms. Ricks was asked to create a mobile certification and training team and implement the certification SAFE Home Study review process in 2017 and 2018.  Ms. Ricks formed the team, managed the team, and implemented the projects into Child Welfare practice.  Following

this, Ms. Ricks became the manager of several federal review programs (including the federal CFSR, a position with the Office of Program Integrity, which is under the ODHS umbrella but is not directly within the Child Welfare division.  Ms. Ricks served in that position for four years, until 2022.  During that time, Ms. Ricks also travelled to the Washington, D.C. area to be trained as a reviewer of other states' child welfare programs.  She is certified as a federal reviewer and she is in the reviewer pool for CFSR Round 4.

In May 2021, Ms. Ricks was asked to participate in the workgroup for formation of the statewide CQI program.  Then, in 2022, as the program moved into the implementation phase, Ms. Ricks was hired into her current role as CQI Program Manager.

Ms. Ricks will testify about her role as CQI Program Manager and the day-to-day support and supervision she provides to the CQI Team.  The CQI team is made up of eight CQI analysts (three OPA3 positions and five OPA2 positions).  One position is a dedicated Tribal Relations CQI analyst.  The analysts are assigned CQI sites and work on other CQI projects such as the Data Literacy program and Learning Collaboratives.  In her role as CQI Program Manager, Ms. Ricks ensures that there is no model drift or implementation drift and that the CQI program is conducted consistently throughout the state.  Ms. Ricks also participates on the CQI Core Team, which meets once a week and includes Chapin Hall.  In its work with Chapin Hall, Child Welfare analyzes the design and expansion of the CQI program to ensure that the program accomplishes what it is intended to.  Ms. Ricks also participates in local branch office CQI meetings as her availability allows.  Ms. Ricks facilitates all CQI introduction meetings with District Managers and Program Managers, and as her availability allows, attends CQI kickoff meetings, strategy, and quarterly meetings for each CQI site.  CQI meetings include Child

Welfare staff and members of the community, so the CQI program is an essential program for developing partnerships with the communities Child Welfare serves.

    **B.**    **Guiding Principle Three of the Vision for Transformation and the development of a statewide CQI Program.**

    Ms. Ricks will testify about how her work as CQI Program Manager is connected to Guiding Principle Three of the Child Welfare Vision for Transformation.  Under Guiding Principle Three, the agency seeks to implement data-informed practices supported by CQI.  The CQI program allows the agency to evaluate policy and procedure to ensure fidelity to practice models and identify areas for improvement.  As part of Guiding Principle Three, ODHS has made efforts to build a culture around championing the use of data, including by ensuring that managers and staff understand the value of data, have access to data, and understand how to use it effectively in decision making and in their day-to-day work.  Guiding Principle Three recognizes that viewing data through the lens of compliance alone contributes to a culture of worry, stress, and risk aversion among staff, which ultimately does not promote better outcomes for children because it can lead to poor morale, staff turnover, and lack of confidence.  By contrast, viewing data through the CQI lens empowers staff to think creatively, to problem solve, identify paths to improvement, and approach their work as an important piece of the larger child welfare system.  Guiding Principle Three also aims to encourage staff to view data through an equity lens, which helps ODHS understand how to improve outcomes for all families the agency serves in an equitable way.

    In Ms. Ricks's role as CQI Program Manager, she participated in the development of the statewide CQI program as part of the agency's CQI Workgroup.  The workgroup included a Tribal representative, Child Welfare staff and managers, community partners (including a parent mentor with lived experience as a family of origin parent in the child welfare system and a Tribal

representative), and a member from the ODHS Office of Equity and Cultural Services.  Child

Welfare also developed the CQI Program with the support of Chapin Hall and Casey Family

Programs.  Chapin Hall is a consulting organization that provides technical assistance to state

and local governments in implementing data-informed solutions in the field of child and family

social services.  Casey Family Programs, a national child welfare consulting firm that works in

partnership with state, federal, and Tribal partners to improve child welfare, foster care, and

prevention services.

During the CQI Workgroup, one continuous quality improvement need identified was the

need to build data literacy competency among ODHS staff.  Accordingly, to build a culture

around championing the use of data, Ms. Ricks will explain that she is implementing a Data

Literacy program for agency staff.  The Data Literacy program includes two tracks: one for those

who already have a more advanced understanding of Child Welfare data; and one for those who

are just beginning to learn about Child Welfare data.  Some of the lessons in the Data Literacy

program include topics such as understanding the difference between lead and lag measures for

child welfare practice performance, understanding the difference between quantitative and

qualitative data, and a better understanding of data quality.

Ms. Ricks will also testify that Child Welfare developed CQI learning collaboratives.

Learning collaboratives are half-day learning sessions organized around a selected lead measure,

where staff can share what they are working on in a particular area, what has worked, and what

lessons they have learned.  For example, the learning collaborative topic during the first quarter

of 2024 was ensuring monthly face-to-face contact with parents.  Children do best growing up in

a family, and ideally their own family.  Thus, one of the best ways to improve outcomes for

children is to provide services to their parents so that they are equipped to safely parent.  The

lead measure of face-to-face contacts is a quantitative and qualitative measure.  The quantitative lead measure looks at whether meetings with parents are occurring at least monthly using data from OR-Kids.  The qualitative lead measure looks at the quality of the contact between a caseworker and a parent.  The lead measure provides Child Welfare insight into whether caseworkers are facing barriers to meeting the agency's performance goals—in this case making contact with parents—so that the agency can identify solutions, allowing for a better provision of services to parents.  The first quarter of 2024 Learning Collaborative focused on the quantitative aspect of the lead measure, which is a measure using data from OR-Kids.

Ms. Ricks will also testify about early successes of the Learning Collaborative.  For example, at the Learning Collaborative for the first quarter of 2024, District 12 shared that they had started a successful program to purchase cell phones for parents with the caseworker's phone number, the District's phone number, and the phone numbers for other community resources pre-programmed into the phone.  District 12 also set up voicemail accounts for the parents and ensured that the phones had minutes so the parents could make calls.  Previously, the District identified that caseworkers were struggling to reach parents who did not have cell phones.  Identifying that barrier not only helped improve contact between caseworkers and parents, but also led to other benefits such as allowing a parent to connect to the Self Sufficiency Program workers, other community resources, and legal services.  When parents are better able to contact their caseworkers and other service providers, families can be reunified more quickly.  Following the learning collaborative, another district began exploring how they could implement a similar program.

In July 2024, the Learning Collaborative will focus on the lead measure of ongoing safety plan accuracy and sufficiency.  The measure looks at the quality of ongoing safety plans.

Ongoing safety plans are plans that caseworkers create with a child or young adult's family, service providers, and other natural support within families to manage out of control behavior that impacts the child or young adult's safety.

####        C.        The statewide CQI Program.

The statewide CQI program is aligned with the federal CFSR process.  Through the statewide CQI program, each Child Welfare district cycles through the CQI process once per year, and each month a different district or districts will begin their CQI cycle on a rotating basis, and some larger districts may be split into different sites.

A CQI cycle begins with the "CFSR" process.  The process is called the "CFSR" process because it is a process aligned with the federal CFSR process, but Child Welfare voluntarily implements the process as a constant cycle, even outside of official CFSR review process by the federal Children's Bureau (described in more detail below).  To avoid confusion, Ms. Ricks will differentiate between the federal CFSR process and the internal "statewide" CFSR process.  During the statewide CFSR process, the first step is selection of random case files.  Case files are randomly selected using the federal sampling criteria to ensure that cases represent work under a variety of supervisors.  After cases are randomly selected, cases are reviewed for eligibility— active and current cases that have been open for approximately six months are eligible, including ICWA cases.  The sample size for the number of cases pulled depends on the size of each district, approximately eight to 15 cases are pulled for each district.  After cases are identified, the branches are notified of which cases were pulled.

The next step of the statewide CFSR process involves case file reviews.  Child Welfare recruits partner reviewers from local district staff, central office staff, Tribal partners, legal partners, and other community partners.  There is a process to ensure that reviewers never review their own casework.  The reviewers also interview participants such as resource families, the

**Page 231 –    DEFENDANTS' LAY WITNESS STATEMENTS – JENNIFER RICKS**

child or young adult, the child or young adult's parents, and other key case participants to gather feedback. The statewide CFSR data is qualitative data.

The statewide CFSR review findings are then sent to CQI consultants, who review and analyze the results and work closely with the statewide CFSR review team to identify trends. Local branch offices also receive the findings along with detailed case narratives so that the branches can address specific case practices with workers. CQI consultants also summarize the reviewers' findings and compare the results with the rest of the state. In addition to considering data from the statewide CFSR review process, CQI consultants also consider fidelity to the Child Welfare practice model and determine whether information is documented correctly in the proper places, the sufficiency of information gathered for an assessment, whether the agency accurately identified a safety threat, whether the agency accurately identified a child or young adult's high needs, and the accuracy and sufficiency of ongoing safety plans. The CQI analysts compile the information in a report called a SDDR. The SDDR includes more data than just the statewide CFSR qualitative data. The SDDR also includes quantitative data, service delivery data, community metrics, and disproportionality and disparity data.

Next, the CQI program takes the district's or the site's results from the statewide CFSR process and holds a CQI kickoff meeting. The CQI kickoff meeting includes staff, program managers, district managers, community partners, people with lived experience, Tribal representatives, and others. Together, the group discusses the SDDR and analyzes areas where improvements are needed. After reviewing and discussing the SDDR, the group—by consensus—selects a lead measure and a lag measure to focus on for the remainder of the CQI cycle.

Following the selection of the lead measure, a strategy team made up of community partners and Child Welfare employees whose work intersects with the selected lead measure conducts a root cause analysis of the lead measure and develops an Action Plan.  During the root cause analysis, the strategy team brainstorms contributing factors affecting the lead measure and identifies actions the site could implement to improve the lead measure to best serve their own community.  Following the root cause analysis, the strategy team develops an action plan for improving the selected lead measure.  CQI analysts meet with local branch office management monthly to provide support for CQI work, and there are quarterly check-ins to review Action Plans for progress and update the Action Plan if necessary.

Ms. Ricks will explain that the statewide CQI program was implemented in 2022, and during these early years of implementation,  Child Welfare has continued to learn lessons about ways to improve the CQI program.  For example, based on participant feedback, Ms. Ricks learned that voting on which area to focus on might not allow for adequate space for everyone's voice to be heard.  Accordingly, Child Welfare made adjustments, and now the debriefing groups—including the community members participating in the process—must reach consensus on which areas each district or branch should focus on improving and what action plan the district or branch should take during the remainder of the CQI cycle.  Now that ODHS has built a solid foundation for its statewide CQI program, Child Welfare can begin to move up the hierarchy of improvements and focus on more nuanced pieces of the program.

Ms. Ricks will also testify about some of the success stories in areas where particular branches have made improvements through the CQI program.  For example, the Midtown Branch in Portland chose to focus on the lead measure of Accurate and Sufficient Ongoing Safety Plans in 2023.  The branch developed a plan for how to improve their progress on the

measure and implemented the plan.  The plan addressed questions such as what the branch would measure to analyze progress, how the branch would know the plan was working, and how the branch would ensure that families were impacted equitably.  The plan was successful in improving performance on the measure: between September 2022 and July 2023, the percentage of accurate and sufficient ongoing safety plans doubled from 25% to 50%.  District 12 selected a different lead measure during its CQI cycle, choosing to implement an Action Plan aimed at improving the quality of face-to-face contacts with parents.  Between July 2022 and June 2023, the quality of face-to-face contacts with parents increased from 25% to over 40%.

Ms. Ricks will testify that consultants and experts in the field of child welfare, such as Chapin Hall and the Child Welfare League of America have spotlighted Oregon's statewide CQI program as a model for system transformation.  For example, the Child Welfare League of America spotlighted the agency's CQI program development at its National Conference in 2022 in a presentation about how Oregon was using CQI to transform its child welfare system.  As recently as March 2024, Child Welfare was asked to speak about the Child Welfare CQI program at California's statewide CQI conference.

### D.    Federal CFSR process.

Ms. Ricks will testify about the federal CFSR process by the Children's Bureau to implement and enforce the Adoption Assistance and Child Welfare Act and its subsequent amendment, the Adoption and Safe Families Act.  The CFSR process is an extensive federal review of state child welfare systems conducted by the Children's Bureau.  There have been three rounds of reviews, and Oregon is just beginning its review for CFSR Round 4.  Ms. Ricks will testify about each aspect of the CFSR review process, which includes a statewide assessment, an onsite review, a PIP and PIP quarterly reporting period, and the non-overlapping period.  Ms. Ricks will explain that the statewide assessment and onsite review involves a review

of the entire child and family serving system, not just Child Welfare's performance.  Ms. Ricks

will explain that, if a state is not in substantial conformity with the Adoption Assistance and

Child Welfare Act after the statewide assessment and onsite review, the state must enter into a

PIP.  Ms. Ricks will explain that no state has ever been found in substantial conformity after

completing a statewide assessment and onsite review, so every state always must complete a PIP.

      Ms. Ricks will testify that Oregon has the capacity to conduct a state-led review in

partnership with the Children's Bureau, which the Children's Bureau encourages.  Child Welfare

is excited to undergo its CFSR Round 4 review because it anticipates that the audit will reflect

the improvements it has made in a number of areas, including on-going and sustained

improvements under its CQI program.

         **E.**      **Explanation of lead and lag measures.**

      Ms. Ricks will explain at trial what lead and lag measures are, how they are measured,

and how they are used in child welfare as a tool for program improvement.  Ms. Ricks will

testify about the definitions for each lead and lag measure included in both the statewide CQI

process and the federal CFSR process.  The federal CFSR process includes a review of seven

"Outcome Measures" and four "Systemic Factors."  Some outcome measures have associated lag

measures, for example, Outcome Measure 3 (Permanency Outcome 1) provides that children

"have permanency and stability in their living situations," and the associated lag measures are (1)

Permanency in 12 months for children entering foster care; (2) permanency in 12 months for

children in care 12-23 months; (3) permanency in 12 months for children in care 24 months or

more; (4) re-entry to foster care in 12 months; and (5) placement stability.  Each lag measure is

reported on Oregon's Federal Performance Measure dashboard, which is publicly available.

      Each of the seven outcomes and lag measures, in turn, has associated lead measures.  For

example, for Outcome Measure 4 (Permanency Outcome 2), which measures the continuity of

family relationships and connections between children and their families, the lead measures look at how often Child Welfare makes efforts to ensure that siblings in foster care are placed together and how often the agency makes efforts to place the child with relatives when appropriate. Ms. Ricks will testify about each of the 18 lead measures, and the outcomes they are associated with.

Ms. Ricks will also discuss Oregon's strong performance on certain CFSR outcome measures statewide. For example, Safety Outcome 2 analyzes whether the state provided services to a family to protect children in their homes to prevent removal or reentry into foster care. Statewide, for all cases reviewed, the state provided quality services to prevent removal or reentry in 85.71% of cases. Similarly, Permanency Outcome 2 analyzes the continuity of family relationships and preserved connections for children and young adults. Statewide, for all cases reviewed, the state received an overall strength rating of 95.4%.

Ms. Ricks will also discuss the systemic factors, which analyze things such as whether the state has a functioning statewide information system, case review system, quality assurance system, and staff and provider training. In addition to the 18 lead measures above, there are 10 "items" that relate to each systemic factor. For example, for the fourth systemic factor—staff and provider training—related items evaluate whether provider staff are provided training and whether resource parents are provided training.

Similarly, Ms. Ricks will explain that Oregon's statewide CQI program also uses lead and lag measures associated with various service points during the life cycle of a family's involvement with Child Welfare, but Oregon's statewide review process evaluates additional lead measures that the federal CFSR process does not review. For example, Child Welfare's CQI program also evaluates lag measures such as the recurrence of maltreatment or maltreatment

in care.  In both the federal CFSR review process and the statewide CQI process, evaluating

whether a caseworker made monthly face-to-face contact with a child or young adult in care is a

lead measure related to maltreatment in care.  However, Oregon also evaluates the lead measure

of whether needs assessments and services are provided to resource families as an additional lead

measure to the lag measure of maltreatment in care.  Ms. Ricks will explain how each lead and

lag measure are related to various service points, how they are measured, and how the CQI

program uses the measures as a tool for improvement.

Ms. Ricks will also explain how outside variables affect certain measures.  For example,

the length of time a child spends in foster care is greatly impacted by the Oregon juvenile court

orders and rulings in each individual child's case.  Ms. Ricks will explain how, as a part of the

federal CFSR statewide assessment, Child Welfare has engaged juvenile courts in evaluating

those measures, including by arranging focus groups with Juvenile Court Judges and attorneys

who practice in the area.  Child Welfare also works in partnership with the Juvenile Court

Improvement Program to improve juvenile dependency hearing quality, timeliness and quality of

permanency, engagement of parties involved in the child welfare system, compliance with

ICWA and Tribal collaboration, and safety decision making.  The Juvenile Court Improvement

Program also has a representative on Child Welfare's CQI Advisory Committee, which has

several external members who review all CQI Action Plans created by CQI sites.

Ms. Ricks will also explain how different measures are interrelated.  For example, the

length of time a child or young adult spends in care is related to their re-entry into care.  If a

child welfare program over-indexes compliance with the length of time in care measure, then it

could result in either moving too quickly to terminate parental rights (which may violate a

parent's legal rights and leads to disparate outcomes for BIPOC communities) or if the state

sends children and young adults home to their parents before they are ready, it could result in a corresponding jump in the rate children and young adults re-entry into foster care. Ms. Ricks will explain that Oregon has improved on the timeliness to permanency measure and data indicates that Child Welfare is doing a good job at providing services to families to support timely reunification.

      **F.**     **Explanation of Oregon's Maltreatment in Care Rate.**

Ms. Ricks will testify about how Oregon's MIC rate is calculated and what information it captures. The MIC rate is calculated as a rate per 100,000 days in care as mandated by the federal government. To express the rate as a rate per 100,000 days in foster care, the numerator divided by the denominator is multiplied by 100,000 to intentionally produce larger numbers that are easier to understand. In other words, the MIC rate should not be compared to a percentage. Maltreatment in care is incredibly rare, which is why the rate must be multiplied by 100,000 so that the numbers are big enough to understand.

Ms. Ricks will also explain how the MIC rate is intended to capture maltreatment of children and young adults for whom the state receives Title IV-E funding, and the state receives Title IV-E funding for children and young adults being served in-home on trial reunifications. Therefore, instances of abuse against a child while the child is living at home with their parents is included in the maltreatment in care rate.

Ms. Ricks will also explain that whether an incident of maltreatment counts toward Oregon's MIC rate depends on whether the incident meets Oregon's definition of child abuse, and Oregon has one of the broadest definitions of child abuse in the country. For example, ODHS does not limit its jurisdiction to instances of abuse committed by a caretaker or a person responsible for a child, ODHS is required by law to investigate instances of abuse committed by third parties. Thus, things such as intimate partner violence between teenagers count towards

Oregon's MIC rate, as well as other instances of abuse committed by third parties against children and young adults, even if those third parties are not responsible for the care of the child or young adult.

Ms. Ricks will explain that, during the statewide CQI program, community partners such as Tribal representatives, providers, and resource parents are in the room evaluating each district's performance.  Ms. Ricks will explain that, as a result of questions and concerns from resource parents and certification caseworkers during those meetings, Ms. Ricks and the CQI program began disaggregating Oregon's MIC cases to understand more fully why Oregon's MIC rate is high.  Ms. Ricks will testify about what it means to disaggregate data on MIC cases and she will describe the process of how CQI team disaggregated the data, which included reviewing screening reports and assessment narratives to determine what happened in the case.  During the process of disaggregating the data, the CQI team discovered that caseworkers were often entering into OR-Kids the date that a report of maltreatment was made in the place where the date the incident of maltreatment occurred should have been entered.  Ms. Ricks will testify that she is working with ORCAH managers to correct the data-input process, and ORCAH is reminding screeners how to correct this practice.  Ms. Ricks will expect Oregon's MIC rate to drop once caseworkers are consistently entering the correct dates into the OR-Kids system.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

**XXIV. Oscar Sweeten-Lopez (1 hour direct testimony).**

    **A.    Professional background.**

Oscar Sweeten-Lopez is the Executive Director of The Contingent.  He holds an undergraduate degree from the University of Oregon (majoring in Spanish and Political Science), and earned a post-graduate certificate in Nonprofit Management from PSU.  Mr. Sweeten-Lopez joined The Contingent in September 2022.  Prior to his current role, he oversaw the Dell Scholars Program in Austin, Texas for 18 years.  The Dell program provides low-income, college-bound, and enrolled students with wrap around and social service support to help them succeed in college.

    **B.    The Contingent's partnership with ODHS for the "Every Child" initiative.**

The Contingent is an Oregon public benefit nonprofit corporation based in Portland.  It was formed in 2009, and it focuses on multicultural leadership development and mobilizing community around social welfare issues.  The Contingent operates an initiative called "Every Child," that is committed to supporting foster care programs in Oregon and other states.  The Contingent operates the Every Child initiative through a grant contract with the ODHS.  Under the grant contract, The Contingent's Every Child initiative performs marketing and other services to recruit prospective and retain current resource (foster) parents throughout Oregon.  Its base is in Portland, and it partners with other organizations it licenses throughout the state to carry out the Every Child initiative.  Through these licensed partnerships, The Contingent can provide at least a subset of its services where needed in Oregon.

    **C.    Every Child's work to support resource parents and children in foster care.**

Mr. Sweeten-Lopez will testify about some of Every Child's marketing and retention initiatives.  For example, during the COVID-19 pandemic, Every Child launched a "My Neighbor" program to connect resource parents who needed items for children and young adults

**Page 240 –  DEFENDANTS' LAY WITNESS STATEMENTS – OSCAR SWEETEN-**
                    **LOPEZ**

in their care with people who are willing to donate items (*e.g.*, a tablet for a child for online school, books, games, food, and furniture).  Every Child also supports kinship/relative providers with its services.  Every Child has established a program called "the Neighborhood," where they recruit community volunteers and assemble teams of approximately six people to "adopt" a resource family for whom they provide backup assistance needed by the family, such as transportation, yard work, and occasional meal support.  Every Child also recruits experienced resource families to provide peer mentoring to newly licensed resource families.  Every Child's "Foster Parents Night Out" program provides respite coverage for resource parents to take an occasional break.

### D.    Every Child's assistance to ODHS in recruiting new resource parents.

Mr. Sweeten-Lopez will testify about Every Child's marketing efforts, including digital advertising and outreach to local community organizations.  Most recently, they have been focusing on analyzing State data that helps them identify the characteristics that good resource parents have in common to help them focus their recruitment efforts.  In addition, they use data to identify gaps to help them target their recruitment efforts.  For example, their analysis revealed a shortage of Spanish speaking resource parents in Washington County.  This enabled them to step up Spanish speaking advertisements in that county.  Since the contract with ODHS started, Every Child has generated numerous inquiries from potential resource parents, many of whom have become resource parents.  It passes all leads to ODHS, which remains responsible for completing the recruitment process including all necessary certification requirements.

ODHS has been receptive to innovative ideas brought forward by The Contingent and works with them to support improvements.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the

right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other

evidence raise matters defendants did not reasonably anticipate.

**XXV.  Judge Nan Waller (2.5 hours appearing by video deposition).**

      **A.  Professional background.**

The Honorable Nan Waller will testify to her experience on the Cabinet and the CWOB, as well as her decades long experience on the bench in Oregon's juvenile court system.

She was appointed to the Multnomah County Circuit Court in 2001 by Governor Kitzhaber.  She served as the Chief Family Law Judge for five years and as Presiding Judge for six years until 2017.  Prior to her appointment, Judge Waller worked halftime as a Multnomah County Circuit Court Referee for 12 years.  During her time as a Multnomah County Circuit Court Referee and during her time as chief family court judge, she had a significant number of juvenile cases on her docket.

When she became Presiding Judge, she retained a number of juvenile cases as well, but she was not involved to the same level of intensity with the child welfare system as she had been previously.  She is a member of the Oregon Judicial Department's Law and Policy Workgroup and co-chairs the Chief Justice's Behavioral Health Advisory Committee.  In 2018, Judge Waller became the Mental Health Court Judge, the position she currently holds, where she manages the Aid and Assist docket and the Mental Health Court docket for the court.  Judge Waller now focuses her time on behavioral health issues, and accordingly, her testimony will be limited to the time period she was involved in the child welfare system.

Judge Waller has served on committees relating to the child welfare system since 1989. She serves on the board of Lines for Life.  Judge Waller serves on the OHA *Mink* Restoration Time Limits Workgroup, the Competency Workgroup of the Conference of Chief Justices, Conference of State Court Administrator's Behavioral Health Committee, and OJD's Commitment to Change Workgroup.  She serves on Multnomah County Circuit Court's Diversity, Equity, and Inclusion Committee.  She previously served on the Cabinet and the

CWOB.  She was on the SOCAC and was previously involved with the Oregon Judicial

Department's Juvenile Court Improvement Project.  Judge Waller served on the Child Welfare

Advisory Committee at the state and local levels.

      **B.**      **Judge Waller's role on the Cabinet and the CWOB.**

      Judge Waller will testify that she was appointed to the CWOB in 2019 by Governor Kate

Brown.  The CWOB was created by executive order signed by the governor to address the crisis

at that time in Oregon's child welfare system.  Governor Brown chaired the CWOB and was

heavily involved in its efforts.  During Judge Waller's time on the CWOB, the board met every

other week to discuss current issues in the child welfare system.  Judge Waller will explain that

the CWOB discussed issues, had debates, and tried to come to a consensus before making

recommendations to the Governor, ODHS, and Child Welfare.  The CWOB was not a rubber

stamp and included individuals from diverse backgrounds and various partner organizations and

agencies who work with ODHS and Child Welfare including OHA, Casey Family Programs, and

OHSU.  During her time on the CWOB, Judge Waller saw improvements in Child Welfare and

substantial work done to bring large systems together to work together towards creative

solutions.  Judge Waller witnessed a large effort to increase the number of caseworkers through

surge hiring and to improve the training and support that caseworkers were getting.  Governor

Brown was able to use her executive authority to pull in other state departments to help with the

hiring surge.

      Judge Waller, following the dissolution of the CWOB at the end of 2019, was appointed

to the Cabinet by Governor Brown.  During Judge Waller's time on the Children's Cabinet, the

Cabinet focused on preventing abuse and neglect before it happened, in part by focusing on

parental issues such as addiction and mental health that contribute to greater risk for children.

The Children's Cabinet was unique in including partners who were not usually included, but

could have an impact and were committed to making changes, including OHA and OHSU.  The Children's Cabinet focused on making changes to meet the needs of parents and children in areas such as behavioral health, housing, and education and this has continued to be a focus of Child Welfare.

### C.    Changes in Child Welfare during her involvement.

Judge Waller will testify that there was a focus on the child welfare system when Governor Brown assumed office.  In 2019, Judge Waller believed Child Welfare was going in the right direction with a focus on safely limiting the number of children and young adults coming into care and the children that are in care, reducing the number of placements, and providing children and young adults with the appropriate level of services.  She will explain that there was an investment in wraparound services and a general focus from Child Welfare on prevention of abuse.  The child abuse hotline call center was centralized and wait times for hotline calls was reduced.  Judge Waller recalls that the Child Welfare dashboard was an achievement at the time and showcased a lot of effort.

Judge Waller previously co-authored an op-ed regarding concerns about temporary lodging children in 2016 with an update in 2019, but since that time there has been an effort to increase the number of resource homes and placement capacity, and decrease the number of entrances.  Judge Waller will testify there are still likely not enough residential care beds for children and young adults in foster care, but this is connected not just to Child Welfare, but also OHA, and behavioral health workforce issues, which are replete throughout Oregon, both for children and adults.  Oregon is facing a behavioral health crisis both for adults and children, which is not in the control of Child Welfare, and is mirrored in other jurisdictions across the country.  Child Welfare cannot create these placements without other agencies' work.

Judge Waller will testify regarding her experience with and respect for Rebecca Jones Gaston. Ms. Jones Gaston was very committed to the well-being of children, and she did not shy away from looking at the issues Child Welfare faced. Ms. Jones Gaston focused on safety and child well-being to guide improvements to the child welfare system.

Judge Waller will testify that Governor Brown was very committed to children in the child welfare system, even before she became governor. Judge Waller first met Governor Brown when she was representing children in front of her as an attorney in juvenile cases. Governor Brown made children's issues a focus of her time as Governor.

      **D.**      **The child welfare landscape in Oregon.**

Judge Waller will testify that Child Welfare is one piece of a larger system affecting the well-being of children. She will explain that Child Welfare works with the judiciary, the legislative branch, and other agencies (such as OHA), and organizations.

Judge Waller will testify that at hearings regarding children and young adults taken into out-of-home care, the juvenile judge listens to all recommendations from the parties, including Child Welfare, before making a decision. A juvenile court must hold a series of hearings as prescribed by Oregon law when a child or young adult is taken into ODHS custody, initially to establish jurisdiction and wardship. Once the juvenile court establishes jurisdiction and wardship over the child or young adult, the court makes certain recommendations for ODHS's initial plan and may order a specific type of placement for the child or young adult. Once ODHS has created the plan for care or treatment of the child or young adult, it must provide a copy of the plan and timetable for its implementation to the juvenile court for review and approval. The court has authority to specify a type of placement and can make findings if the evidence is present that a placement is not appropriate.

Every six months, ODHS must file reports and the court must facilitate a complete judicial review.  The information provided to the juvenile court containing specific information about the child or young adult, the agency's efforts to return the child or young adult home, services provided to the family, and a proposed timetable for permanent resolution of the child or young adult's legal status, with a hearing accompanying the agency's report in most circumstances.  Additionally, the juvenile court must conduct a permanency hearing at specified intervals where the court reviews the child or young adult's permanency plan, evaluates ODHS's efforts to advance that plan, hears arguments from all legal parties, including the child or young adult's parents and/or siblings, and orders changes to the plan itself or to ODHS's execution of the plan.  The juvenile court is charged with evaluating the adequacy of and ordering changes to each child or young adult's placement, permanency plan, medical and mental health treatment, and services provided during the entirety of the time a child or young adult is in ODHS's custody.

Legislative actions can also impact Child Welfare.  Child Welfare does not operate in a vacuum, with community members, agencies, and organizations providing partnerships.  She will explain that judges and lawyers are involved who provide checks and balances in reviewing cases on a regular basis.  Decisions such as placement decisions do not rest solely on Child Welfare's recommendations.  Improving Child Welfare is always going to be a work in progress and there is always room for improvement.

Due to Judge Waller's family circumstances, it's very unlikely she will be able to appear live for trial testimony.  In the event Judge Waller's family circumstances prevent her from testifying at trial, we designate the following excerpts from her deposition transcript:

- 12:16-20:12

**Page 247 –    DEFENDANTS' LAY WITNESS STATEMENTS – JUDGE NAN WALLER**

- 21:4-25:9

- 30:5-32:3

- 34:17-36:14

- 37:8-38:9

- 45:12-46:13

- 47:9-50:10

- 54:22-56:21

- 68:7-70:12

- 84:9-87:17

- 91:19-92:8

- 99:22-100:11

- 104:19-105:15

- 107:14-108:6

- 114:18-120:22

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission. Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

**XXVI. Anna Williams (2 hours direct testimony).**

      **A.      Professional background.**

      Ms. Williams is the Executive Director of the Governor's SOCAC.  She began working in Human Services at Haven, based out of Wasco County, which focuses on helping victims of domestic and sexual assault.  In that role, she partnered with the ODHS to train staff regarding trauma-informed practices.

      In 2018, voters of Oregon's 52nd District, which includes the population centers of Hood River, The Dalles, and Mt. Hood, elected Ms. Williams to a seat in the Oregon House of Representatives where she served as chair of the Health & Human Services Committee, among other assignments.  While in the Legislature, she continued to serve as an adjunct professor at Simmons University, teaching courses on internal agency policy and the origin of policy systems.  Ms. Williams left the legislature to become executive director of SOCAC in August 2022.

      **B.      SOCAC's purpose and structure.**

      SOCAC is charged with creating a statewide strategic plan to align and improve efficiency for state systems that serve children in the following areas: public health, public education, primary and pediatric care, child welfare, behavioral care, child protective services, and juvenile justice.  SOCAC's purpose is to improve the effectiveness and efficacy of state and local systems of care that provide services to children and youth ages zero to 25 and their families.  SOCAC provides a centralized and impartial forum for statewide policy development, planning, and funding strategy recommendations.

      One of SOCAC's goals is to foster a sense of shared responsibility across the multiple agencies that deliver care to children.  Senate Bill 1 established SOCAC in 2019.  That bill mandates SOCAC's members include representatives from ODHS, the OYA, the OHA, the

ODE, CCOs, an entity that offers commercial insurance, agencies that provide services and supports to children/young adults and their families, organizations that advocate for children/young adults and their families, the public with lived experience, a federally recognized Tribe, a county juvenile department director, and a county mental health director, among others. Most members are appointed by the governor and serve four-year terms.  Senate Bill 4 passed in 2021, authorizing SOCAC to appoint an executive director and make recommendations on state agency budgets.

Upon Ms. Williams' appointment in 2022, SOCAC became an independent executive branch agency.  As a result, SOCAC advises the legislature on where they should direct funding and oversight as it relates to agencies, CCOs, and community partners who deliver services to children.

The system of care model has been adopted by most states, with the goal of building an iterative, collaborative structure to break down systemic barriers.  SOCAC does not address individual cases.  SOCAC addresses issues when they see patterns facing treatment teams across the state.  In Oregon, this begins with a Wraparound Team of community-based mental health services who meet with the child/young adult, family, and other service providers to discuss the child/young adult and family's needs and how to facilitate access to services.  Wraparound Program Rules are governed by OAR 309-019-0326.  Providers in this context can range from a person trained in peer support (which requires 40 hours of training and a background check) to help navigate services or provide personal support, a qualified mental health associate (with a higher level of skills training for behavioral management), a qualified health professional (to diagnose or provide therapy), a psychiatrist (who oversees team, prescribes medications as needed), a residential/foster care service provider, and/or a school counselor.

One of SOCAC's goals is to break down systemic barriers between direct service providers, agencies, and community partners.  This multi-sectoral approach attempts to secure commitments for services from these other partners when a problem is identified as occurring frequently in one system.  For example, SOCAC recently convinced OHA to reexamine administrative rules related to Wraparound services because their current ruleset was more restrictive than necessary and left out individuals who should otherwise be eligible.  The goal is to have all agency partners hear what others are working on and encourage dialogue, understand the experiences of families in navigating different situations, find out what other agencies are working on to solve the issue, and consider how each agency can develop its own programs.

### C.    Child Welfare faces complex problems they cannot solve alone.

The delivery of care is complex.  Child Welfare faces a number of difficult problems locating appropriate placements that require cooperation from and coordination with external partners.  For example, Ms. Williams will testify that a single agency alone cannot solve all issues regarding access to treatment and services that may lead to a child or young adult's potential placement in temporary lodging.  One of the factors why children and young adults experience temporary lodging while awaiting a placement is that the number of providers willing to accept children and young adults with high acuity needs has shrunk as a result of Senate Bill 710 (passed in 2021 and discussed below).  Yet, Child Welfare has a legal obligation to all children and young adults in its custody, including those with high acuity needs.

Other agencies, like OHA and ODE, have a large role to play in delivering treatment and services to children.  Children and young adults often end up in Child Welfare custody because services were not made available to them earlier "upstream," which refers to preventive interventions such as affordable housing, access to safe and supportive adults, and other

preventive measures.  For example, many community-based mental health providers can take referral services for children and young adults but do not have the staff to provide services to children and young adults.  As a result, children and young adults do not always receive appropriate mental health services.

For example, a struggling child or young adult can be referred for services by a school counselor, but the provider might refuse to provide treatment because they do not provide mental health services to children or young adults.  The child or young adult's mental health conditions—left untreated through no fault of the child or young adult—worsen to a point where they come to the attention of Child Welfare when they are mandated to investigate after an allegation of abuse or neglect.  Situations like these require a multisystem response focused on upstream, preventative interventions.  These situations also provide nuance and insight to the significant challenges Child Welfare faces relating to temporary lodging.  One of SOCAC's goals is to get ahead of this curve.

Another challenge Child Welfare faces in the temporary lodging space stems from the agency's responsibility to take children and young adults into custody in a variety of circumstances.  A child or young adult can enter Child Welfare custody when a child or young adult is abandoned or abused, when a child or young adult has safe parents who refuse to parent their child or young adult due to lack of access to appropriate resources, or when a child or young adult exhibits severe delinquent behavior for which the juvenile justice system lacks placements or is unwilling to address.  Other community partners, such as OHA, OYA, and Juvenile Justice, do not always have the same legal responsibility to children and young adults that Child Welfare does.  While providers can decline to accept a child or young adult with high acuity needs or a history of violent or aggressive behaviors, Child Welfare is nevertheless legally

obligated to place children and young adults in its care.  Because other system partners have the ability to say "no," it is typically Child Welfare that ultimately takes responsibility for children and young adults with high acuity needs whose needs would better be served by other systems. These children and young adults have often been dismissed from or denied access to care facilities, which makes locating placements and services even more difficult.

Providers are often siloed and will not accept children and young adults with overlapping issues.  A high number of children and young adults at risk of temporary lodging often experience developmental delays, disability, substance use disorder, and/or a mental health diagnosis (*e.g.*, severe ADHD, anxiety).  Many providers of residential services for children and young adults say they do not have capacity to serve a child or young adult with multiple needs because that specific provider only focuses on one.  Children and young adults may be declined placement because the child or young adult's complete set of needs are outside a provider's specialty, which is focused on a limited scope of needs.  Even if no placement that can address both of those needs exists in Oregon, Child Welfare remains responsible for finding an appropriate placement, often on short notice.

This results in children and young adults with multiple unmet needs that have not been addressed upstream by other entities with responsibility for children and young adults who ultimately come into contact with Child Welfare that upstream providers could not or refused to address.

Oregon law also exacerbates temporary lodging issues.  During her time in the legislature, Ms. Williams observed that lawmakers often have knee-jerk responses to sensationalized news stories and fail to take the time to understand why a particular problem occurred.

Senate Bill 710 is one such example.  That law is incredibly prescriptive, hard to follow, and does not provide for exceptions that may be necessary to effectively manage dangerous behavior in emergency situations.  The result is that the use of a prohibited restraint may be deemed abusive, putting that provider's livelihood at risk.  As a result, many behavioral health providers have gone out of business or stopped working with children and young adults with a history of aggression, leaving Child Welfare with even fewer placement options.  With the exception of emergency medical providers in most circumstances, other agencies and providers have the option to turn children in need away—Child Welfare is the primary child-caring system in Oregon that cannot.  In May 2023, SOCAC recommended expanding the permissible use of restraints when necessary for a child or young adult's safety and care.

The state's multiple definitions of child abuse also present difficult challenges to ODHS and providers because they are long and complex.  When Child Welfare investigates suspected abuse, the decision tree is complicated, with a significant amount of specific caveats that were created in reaction to high-profile events.  The law is so overbearing that when Child Welfare needs to make an exception, who gets to make that decision, and how is unclear.  In the most recent legislative session, SOCAC partnered with ODHS to successfully lobby for the passage of HB-4086 to address these issues.  HB-4086 will provide some clarity around these issues.

**D.    Oregon's Medicaid funding structure also presents challenges for Child Welfare.**

Medicaid funding has historically created challenges for OHA.  Behavioral Rehabilitation Services ("BRS")—an intensive, live-in behavioral management facility—was previously only accessible through Child Welfare or juvenile justice custody.  SOCAC worked with OHA to create ways to fund parts of BRS facilities through Medicaid so children who needed BRS

services could receive them through Medicaid and not just Child Welfare or juvenile justice.  But this work is in its infancy.

Oregon has many highly specialized mental and behavioral health services that, under Oregon's current Medicaid waiver, can only be accessed through one "technical" door.  Once a child or young adult has gone through that door, they cannot come back out and go through a different door.  They can only keep going down the long mental health hallway until they get to the end.  Each provider and service has a different door, which may or may not be accessible as the child's needs change because access is dependent on how the child entered the hallway.

Part of the complication stems from how the federal government administers Medicaid.  SOCAC, in partnership with state agencies and the Oregon Legislature, is working on an update to Oregon's Medicaid waiver to eliminate the list of "qualified" diagnoses to receive funding.  Once Oregon's new waiver is approved by CMS, any child under the age of 19 will have access to any medically necessary service.  This should lead to Medicaid no longer denying access to services.  At the state level, this will involve channeling some Medicaid funding to Child Welfare so that children and young adults can be eligible for services upstream without an open Child Welfare case.

     **E.**    **Child Welfare is actively working to solve problems creatively and deliver preventive services to children and young adults upstream.**

Ms. Williams will testify that Child Welfare's Vision for Transformation focuses on prevention and works to eliminate implicit bias in the system is transforming Child Welfare for the better.  Child Welfare is a committed, innovative partner, and a leader in this state at working to get children/young adults and their families the resources they need upstream.  Lawsuits are

distracting from that important work.  Finally, Child Welfare's current leaders are the right leaders for this moment and have already begun the division's transformation.

Ms. Williams will testify that she believes the Vision for Transformation has Child Welfare on the right path.  The Vision for Transformation's focus on delivering services to children/young adults and their families upstream aligns with SOCAC's work to break down barriers and encourage collaboration among state agencies and community partners. Ms. Williams also lauds Child Welfare's Vision for Transformation's focus on eliminating implicit bias in the system, which has historically led to racial disparities impacting families of color.

Child Welfare has done significant work on this already.  For example, they have implemented a tool to account for bias in making screening decisions at the hotline—*e.g.*, does the report meet the statutory definition of abuse or would the reporter parent differently?  Much of her knowledge of the Vision for Transformation comes from her time as chair of the Health & Human Services Committee where she heard testimony from Child Welfare leadership about the initiative.  She looks forward to Child Welfare's current leadership getting to work on Phase 2 of eliminating bias from the system: examining how bias plays into what is documented and tracked in investigations so that different investigators see the same things regardless of how or where they grew up.

Differentiating between parenting styles around abuse is tremendously difficult.  So too is the preventive work Child Welfare has simultaneously committed to in trying to provide assistance upstream—*e.g.*, providing children/young adults and their families housing security and employment support, providing children/young adults struggling with substance and mental health issues the treatment they need.  Those deeper, nuanced questions are much harder to build

a systemic answer to when a portion of the agency's bandwidth is consumed with responding to system lawsuits.

SOCAC has several standing committees.  One committee, the State Agency Standing Committee, crafts policy recommendations for its respective agencies and coordinates information, barriers, and communication with the local System of Care Executive Councils. That committee encourages collaboration and data sharing among agencies that work with ODHS to deliver services to children and young adults.

Ms. Williams will testify that ODHS—and Child Welfare specifically—is the best partner in that cross-systems work related to the State Agency Standing Committee.  Child Welfare's Director Aprille Flint-Gerner is open to collaboration.  SOCAC can legally ask any agency that delivers services to children to supply staff time and provide information regarding budgets or upcoming legislation.  Child Welfare regularly responds immediately and provides additional information and context voluntarily.  Other agencies often review requests through a narrow and legalistic lens.

Child Welfare also has been the moving force behind some of SOCAC's most innovative pilot programs delivering services to children and young adults upstream before abuse and neglect issues might put the family on Child Welfare's purview.  Child Welfare partnered with Multnomah County Juvenile Justice, District 2, the Multnomah County Wraparound Team, Portland Opportunities Industrialization Center + Rosemary Anderson High School, the Multnomah County Courts, ODE, and Department of Justice on a project related to children, young adults, and gun violence.  Child Welfare provided the bulk of the funding and collaboratively planned the project.  The project offers Wraparound services to a population that has historically been ineligible: children and young adults at risk for gun violence.  The group

identified children and young adults present at gun violence incidents, related to someone involved in gun violence, or adjudicated in court as a young adult.  They reached out to families to offer a team to help navigate the different services available to support the child/young adult and their family.  If the family agrees to participate, the team comes together in a meeting with different service providers (peer support, substance abuse, counselors) with the family and asks the family their story and what would help solve the problem.  The family provides information, and the various providers inform the family what they can do to help and put together a plan in one document.  This project has been primarily paid for through Child Welfare prevention dollars from the FFPSA.  This Title IV-E money is primarily for evidenced-based services, but there is a funding source for promising practices, like this one, which attempts to develop an evidence-based service.

This is part of the Vision for Transformation's prevention efforts and is an example of Child Welfare and other partners proactively working together to meet families upstream to prevent Child Welfare's involvement further downstream.  The project's genesis began when a Child Welfare representative heard a need presented by a family member during a SOCAC meeting in October 2023, and asked to connect.  Child Welfare co-developed and co-designed the project and implemented the project in less than six months.  This is an agency that is doing the work instead of just saying it would at a public meeting and never following up.  A six-month turnaround like that is nearly unheard of in state government.

Ms. Williams will testify that responding to lawsuits is slowing down Child Welfare's ability to implement the Vision for Transformation.  For example, instead of building a path for workers to provide preventive rather than crisis services, Child Welfare leadership has to devote time to testifying about temporary lodging in the Legislature.

**Page 258 –   DEFENDANTS' LAY WITNESS STATEMENTS – ANNA WILLIAMS**

Ms. Williams believes that the current Child Welfare Director, Aprille Flint-Gerner, is the right person to lead the division and implement the Vision for Transformation.  Ms. Williams believes that Ms. Flint-Gerner has a clear vision and knows how to do the work to improve the system.  Losing Ms. Flint-Gerner as a result of these lawsuits would be devastating.  Ms. Flint-Gerner is excellent at this work with the right combination of brain, heart, and soul for this job.  A monitor would consume Ms. Flint-Gerner's time, undermine her work publicly, and make it more difficult for her to transform Child Welfare.  Finally, Ms. Williams finds it offensive that plaintiffs are seeking a monitor to oversee Ms. Flint-Gerner.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

DATED: April 19, 2024.             ELLEN ROSENBLUM
                                   ATTORNEY GENERAL
                                   FOR THE STATE OF OREGON


                                   *s/ Lauren F. Blaesing*
                                   David B. Markowitz, OSB #742046
                                   DavidMarkowitz@MarkowitzHerbold.com
                                   Laura Salerno Owens, OSB #076230
                                   LauraSalerno@MarkowitzHerbold.com
                                   Harry B. Wilson, OSB #077214
                                   HarryWilson@MarkowitzHerbold.com
                                   Lauren F. Blaesing, OSB #113305
                                   LaurenBlaesing@MarkowitzHerbold.com
                                   Vivek A. Kothari, OSB #182089
                                   VivekKothari@MarkowitzHerbold.com
                                   *Special Assistant Attorneys General for Defendants*

                                   Adele J. Ridenour, OSB #061556
                                   AdeleRidenour@MarkowitzHerbold.com
                                   *Of Attorneys for Defendants*

Carla A. Scott, OSB #054725
carla.a.scott@doj.state.or.us
Sheila H. Potter, OSB #993485
sheila.potter@doj.state.or.us
*Of Attorneys for Defendants*

2127609