**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Lauren F. Blaesing, OSB #113305**
LaurenBlaesing@MarkowitzHerbold.com
**Vivek A. Kothari, OSB #182089**
VivekKothari@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085
*Special Assistant Attorneys General for Defendants*
*Additional Counsel of Record Listed on Signature Page*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| WYATT B. and NOAH F. by their next friend Michelle McAllister; KYLIE R. and ALEC R. by their next friend Kathleen Megill Strek; UNIQUE L. by her next friend Annette Smith; SIMON S. by his next friend Paul Aubry; RUTH T. by her next friend Michelle Bartov; BERNARD C. by his next friend Ksen Murry; NAOMI B. by her next friend Kathleen Megill Strek; and NORMAN N. by his next friend Tracy Gregg, individually and on behalf of all others similarly situated,<br><br>                  Plaintiffs,<br><br>    v.<br><br>TINA KOTEK, Governor of Oregon in her official capacity; FARIBORZ PAKSERESHT, Director, Oregon Department of Human Services in his official capacity; APRILLE FLINT-GERNER, Director, Child Welfare in her official capacity; and OREGON DEPARTMENT OF HUMAN SERVICES,<br><br>                  Defendants. | Case No. 6:19-cv-00556-AA<br><br>**DEFENDANTS' EXPERT WITNESS STATEMENTS** |

**DEFENDANTS' EXPERT WITNESS STATEMENTS**

**TABLE OF CONTENTS**

DEFENDANTS' EXPERT WITNESSES ................................................................................ 1

    Uma Ahluwalia (1 hour direct testimony) ................................................................ 1

    Jim Dimas (2 hours direct testimony) ...................................................................... 3

    Dr. Bowen McBeath (0.5 hours direct testimony) ................................................... 5

    Stacey Moss (10 hours direct testimony) ................................................................. 6

    Dr. Cynthia Richter-Jackson (3 hours direct testimony) ....................................... 10

    Dr. Sarah Vinson (2 hours direct testimony) ........................................................ 14

PLAINTIFFS' EXPERT WITNESSES ................................................................................ 19

    Dr. Angelique Day ( 1 hour direct testimony). ..................................................... 19

    Patricia Rideout, JD (30 minutes direct testimony) .............................................. 24

    Dr. Sue Steib (30 minutes direct testimony) ......................................................... 28

**DEFINED TERMS**

| Abbreviation | Term |
|---|---|
| 2016 PK Report | 2016 Public Knowledge report |
| CANS | Child and Adolescent Needs and Strengths |
| CFSR | Child and Family Services Review |
| Child Welfare | Child Welfare Division of ODHS |
| CQI | Continuing Quality Improvement |
| ILP | Independent Living Housing Subsidy Program and the Independent Living Program |
| ODHS | Oregon Department of Human Services |

<u>**DEFENDANTS' EXPERT WITNESSES**</u>

**I.     Uma Ahluwalia (1 hour direct testimony)**

Ms. Ahluwalia will testify in accordance with the December 15, 2023 report attached as

Exhibit 1 and her deposition of March 19, 2024.

Ms. Ahluwalia served as director of the Montgomery County, Maryland Department of

Health and Human Services for 12 years.  Currently, Ms. Ahluwalia is the Managing Principal of

Health Management Associates, where she works with public-sector clients to support system

initiatives and analytic and strategic efforts.

Ms. Ahluwalia will testify that plaintiffs' requested relief will not help create a modern,

state-of-the-art child welfare system in Oregon for these reasons:

- Plaintiffs' requested relief will not help Child Welfare keep up with the evolutions in the field;

- Compliance with consent decrees[1] is expensive;

- Because consent decrees stay in place for decades, they contain benchmarks that quickly become inconsistent with current standardized federal or national benchmarks or measures;

- The requested relief stifles innovation and limits flexibility; and

- The health and behavioral health services array for children and young adults with intellectual and developmental disabilities, serious emotional disorders, and co-occurring diagnoses often require a multi-sectoral multi-agency policy, financing, and service delivery response.  Holding Child Welfare accountable for ensuring the availability of a behavioral health service array without coordinating with Medicaid and other services results in Child Welfare using its limited dollars to build out a services array that does not meet the needs.

---

[1] Ms. Ahluwalia will explain that, for purposes of evaluating the effect of a consent decree or court order on an agency, the difference between a consent decree and a court-ordered injunction is largely immaterial.  Although the process leading up to the court order is different, both are ultimately adopted by court order and enforceable by contempt.  Ms. Ahluwalia's testimony focuses on what happens after the court order creating legal obligations is entered.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission. Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

II.    **Jim Dimas (2 hours direct testimony)**

Mr. Dimas will testify in accordance with the December 15, 2023 report attached as Exhibit 2 and his deposition of March 13, 2024.

Mr. Dimas served as a court-appointed monitor for a child welfare class action lawsuit in Georgia, *Kenny A. v. Purdue*, 1:02-cv-01686, for 10 years. After that, he served as the Secretary of Illinois' Department of Human Services.

Based on his experience as a monitor, he will testify that litigation and its related interventions like consent decrees, settlement agreements, and injunctions are born of positive intent—to improve the outcomes for children and young adults served by child welfare agencies. Unfortunately, litigation and its related interventions do not have their desired impact. The underlying causes of the problems they seek to remedy—institutional racism, multi-generational poverty, the social determinants of health and poverty—cannot be remedied by any consent decree.

At the same time, litigation and its related interventions regularly produce unintended consequences that hobble child welfare agencies from improving outcomes for children and young adults in their care. In their attempt to mandate better results, consent decrees[2] often impose rigid rules, timelines, and expectations that turn out to be inflexible and poorly aligned with what we know about effective change management in large complex organizations. Moreover, due to the lengthy duration of most consent decrees, their requirements often grow

---

[2] Mr. Dimas will explain that he examined consent decrees, settlements, and court-ordered injunctions in reaching his conclusions. Mr. Dimas's testimony is about the effect of legal obligations imposed on child welfare agencies. Mr. Dimas will explain that, regardless of whether those legal obligations arise out of a settlement contract or a consent decree or court-ordered injunction enforceable by contempt—they are still legal obligations that channel behavior and effect child welfare policy, practice, culture, and outcomes.

**Page 1 –     DEFENDANTS' EXPERT WITNESS STATEMENTS - JIM DIMAS**

outmoded and misaligned with current thinking about best practices.  The costs of a consent decree outweigh any limited, situation specific benefits.

He will explain that consent decrees are particularly difficult to administer because of the adversarial nature of litigation.  A court-ordered injunction poses the same—if not greater—issues as a consent decree.  Mr. Dimas will testify about what the right remedy would be instead of an injunction, or alternatively, how to structure the injunction so that it does the least amount of harm.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

III.    **Dr. Bowen McBeath (0.5 hour direct testimony)**

Dr. McBeath will testify in accordance with his March 1, 2024 report attached as Exhibit 3 and his deposition of April 19, 2024.[3]

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission. Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

---

[3] This deposition will take place after this Statement has been submitted to the Court.

**Page 1 –** **DEFENDANTS' EXPERT WITNESS STATEMENTS - DR. BOWEN MCBEATH**

IV.    **Stacey Moss (10 hours direct testimony)**

Ms. Moss will testify in accordance with the December 15, 2023 report attached as

Exhibit 4, the March 1, 2024 rebuttal report attached as Exhibit 5, and her deposition of March

18, 2024.

Ms. Moss is the CEO and President of Public Knowledge.  Since graduating from law

school, Ms. Moss has spent her career in child welfare.  Ms. Moss has personally consulted on

child welfare projects in fourteen states while at Public Knowledge.  For example, Public

Knowledge and Ms. Moss have worked with the North Carolina Department of Health and

Human Services since 2020 to improve child welfare services to families and, from 2017 to

2019, Public Knowledge and Ms. Moss provided support to the Oklahoma Department of

Human Services while that agency underwent an organizational change regarding benefits across

multiple programs, including child welfare.  Public Knowledge and Ms. Moss have, since 2009,

assisted the Mississippi Department of Child Protection Services with implementing a statewide

model of child welfare practice and a statewide settlement agreement.

Ms. Moss and Public Knowledge also have experience with Oregon's system.  In 2018,

for example, Public Knowledge and Ms. Moss conducted an assessment and alternatives analysis

for the Court Appointed Special Advocates program in Oregon.

In 2016, the State of Oregon asked Public Knowledge to complete an independent review

of ODHS's delivery of child welfare services.  Ms. Moss served as the Policy and Regulatory

Lead for the 2016 PK Report which criticized child welfare and offered several

recommendations to improve the agency.

As a part of this case, the State of Oregon invited Ms. Moss and Public Knowledge to

again evaluate Child Welfare.  Ms. Moss and her Public Knowledge team conducted a

comprehensive independent assessment of ODHS's child welfare policies, procedures, leadership, data, and improvement efforts made since 2016.

Ms. Moss concluded that children, young adults, and families are better off today in the Oregon's system than they were in 2016. This table summarizes her findings:

| Research Question Topic | Finding |
|---|---|
| **Safety for Children Under Child Welfare Supervision** | Since 2016, **Oregon made progress** in this area by implementing multiple recommendations from the 2016 *Oregon Department of Human Services Child Safety in Substitute Care Independent Review*. Child Welfare also implemented the Vision for Transformation in 2020, with safety at the forefront. Child Welfare has made progress since 2016, in assessing safety through reporting and screening allegations, timeliness of assessments, in-home services, enhancing the safety of children in substitute care, and using data to improve safety. |
| **Organizational Culture of Child Welfare** `SIGNIFICANT PROGRESS` | Since 2016, **Oregon has made significant progress** in improving and prioritizing the agency culture led by the Vision for Transformation. The Executive Leadership Team infuses the Vision for Transformation's guiding principles into each aspect of child welfare practice. |
| **Data-Driven Decision-Making and Quality of Services Offered** | Since 2016, **Oregon has made consistent progress** to improve data-driven decision making and the quality of services. Building capacity to be data driven has been a leadership priority, evidenced by regular technology upgrades, and a solid financial investment. Data-driven decision-making is a priority for national child welfare practice, and Child Welfare's focus is encouraging improvement. |
| **Resource Parent Recruitment, Retention, and Support** `SIGNIFICANT PROGRESS` | Since 2016, **Oregon has significantly improved** recruitment, training, and support to resource families. Child Welfare has implemented targeted recruitment to meet the needs of specific children and is collaborating across the child-serving system to increase capacity for resource homes. Child Welfare has increased service provision to resource families and improved the training based on feedback from resource parents and community members. While Child Welfare has yet to improve the ability to track the capacity of resource homes, this does not outweigh the significant progress in other areas. These improvements in practice have not yet resulted in better outcomes for children, as Oregon's placement stability data has not improved. |
| **Permanence for Children in Substitute Care** | Since 2016, **Child Welfare has made progress** in improving the prioritization of permanency for children in substitute care through the Vision for Transformation and its initiatives. Despite the improvements, |

| Research Question Topic | Finding |
|---|---|
| | the data shows that it has taken longer for children and young adults to reach permanence over the past two years, due in part to delays because of COVID-19. |
| **Permanency Planning**<br><br>SIGNIFICANT PROGRESS | **Child Welfare made significant progress** to improve permanency planning during the identified timeframe.  This progress is evidenced by a shift from compliance to engagement in the work with families, the appointment of a Deputy Director with a rich history in permanency practice, the convening of a Permanency Advisory Council, the use of the CANS assessment to create data-driven permanency plans, and more timely permanency hearings. |
| **Individualized Assessments for Children and Families** | Since 2016, **Child Welfare has made progress** by expanding the use of existing assessments and added new assessments and policies to gather information from children, young adults, and families.  The scope of the assessments Child Welfare offers allows caseworkers and supervisors to gather a comprehensive picture of each family's needs to tailor the services, permanency plan, and case plan appropriately. |
| **Service Provision Based on Assessed Needs** | Since 2016, **Child Welfare has improved** service provision that meets the assessed needs of children and families.  It is an ongoing challenge for Child Welfare to provide the breadth and depth of services to meet the complex needs of children who are in out of home care, however, evidence from surveys, focus groups, and CFSR results indicates that there has been substantial improvement in the ability of Child Welfare to meet children's mental health needs.  Child Welfare has also expanded partnerships and collaboration to expand access to services, but there is still concern that service availability is uneven throughout the state. |
| **Case Planning** | Since 2016, **Child Welfare has improved** completion of case plans as well as including families and Tribes in the process.  Child Welfare has implemented tools such as quality assurance, CQI, and the Family Report to focus on case planning and ensuring the plans are inclusive. |
| **Family and Community Connections for Children in Substitute Care**<br><br>SIGNIFICANT PROGRESS | Since 2016, **Oregon has made significant progress** in this area, framed by the Vision for Transformation and multiple new efforts to connect children to their families and communities.  The Vision for Transformation underscores the importance of these connections by stating: "We all know that infants, children, adolescents, and young adults do best growing up in a family that can provide love, support, life-long learning, shared values, and important memories." |

| Research Question Topic | Finding |
|---|---|
| **Child Welfare Staffing Resources** | **Oregon made progress** in improving staffing resources during the specified timeframe.  Child Welfare has expanded the leadership team to prioritize equity, training, and workforce considerations, and has started tracking caseload data to manage workloads.  Even so, Child Welfare has had challenges in providing training for caseworkers despite increasing training and coaching resources. |
| **Independent Living Services** | **With respect to independent living services, since 2016, Child Welfare has**<br><br>**1) improved policy language,**<br><br>**2)** expanded its service array by developing the Tiered ILP Model, which provides age-appropriate and developmentally appropriate IL services,<br><br>3) improved its assessment of the needs of older youth by continued use of the Transition Readiness Discussion Guide and the Youth Assessment Summary to assess independent living needs appropriately, and<br><br>4) improved IL service delivery by restructuring the IL program, including surveying young adults about the efficacy of their IL services, and adding staff dedicated to the program. |

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

## V.     Dr. Cynthia Richter-Jackson (3 hours direct testimony)

Dr. Richter-Jackson will testify in accordance with her March 1, 2024 rebuttal report attached as Exhibit 6, her deposition of April 29, 2024[4], and her review of additional documents related to case files that were produced after the completion of Exhibit 6.

Dr. Richter-Jackson holds a master's degree in Social Work from the University of Illinois and served children and families within the care of the Illinois Department of Children and Family Services for 31 years.  Prior to her retirement on May 1, 2023, she served as the Executive Administrator for the consent decree in *B.H., et al. v. Walker*, 1:88-cv-05599, in the Northern District of Illinois.

As described and supported in detail in her report and expected testimony, Dr. Richter-Jackson will testify that her team of professional case reviewers—each of whom has an advanced educational degree and over 30 years' experience in the field of child welfare—conducted a deep dive into the case documentation of 95 case files.  She will also explain the use of the case review instrument designed to capture the explanation for the data and the individual briefing of each case.

### A.     Strengths in Child Welfare casework practice.

Dr. Richter-Jackson found several strengths in Child Welfare casework practice:

- Continuity of caseworkers;

- Caseworkers making regular face to face contact with children and their caregivers;

- Attention to promoting family connections by strong efforts to place siblings together;

- Support of parent/child and sibling visitation;

---

[4] This deposition will take place after this Statement has been submitted to the Court.

- Diligent efforts used in family finding to promote connectedness and permanency planning;

- Use of secondary service providers to support engagement of parents in addressing addiction and independent living planning for older youth;

- Caseworkers acting quickly to assess parents and children/young adults resulting in timely service referrals;

- Children and young adults receiving indicated testing and evaluations, specifically the "Rapid Assessment" and more comprehensive psychological evaluations;

- Caseworkers quickly responding to changing case circumstances as evident in changing permanency goals;

- Caseworkers assertively moving the case forward when safety threats are mitigated and before starting unsupervised visits or a Trial Home Visit;

- Caseworkers taking a non-punitive approach towards parents and actively offering and providing services throughout the case, regardless of permanency goal changes;

- Caseworkers respecting the child and young adult's "voice" regarding their services, permanency goals, and living arrangements; and

- Good decision making to support the child and young adult's best interests.

**B.    Flaws in plaintiffs' reviewers' approach, methodology, and conclusions.**

Dr. Richter-Jackson also found that plaintiffs' case reviewers used a flawed methodology, did not complete a comprehensive case review, relied on inaccurate data, and admit that their review is not statistically representative. Additionally, Dr. Richter-Jackson comes to the following conclusions regarding plaintiffs' review of the case files:

- Plaintiffs' reviewers made several methodological errors that undermine the accuracy and validity of their findings;

- Plaintiffs' reviewers' observations of a child and young adult's circumstances did not include consideration of factors that are not within the control of Child

Welfare, such as parental substance abuse patterns and relapses, service refusal, and pre-adoptive parents changing their minds;

- Plaintiffs' reviewers miscalculated the number of children and young adults that experienced a founded allegation of maltreatment in care. They also made an association between maltreatment in care and trial home visits that is unsupported in the data or case reviews. Plaintiffs' reviewers did not identify or differentiate between children who experienced a founded incident in care as opposed to during a trial home visit;

- Plaintiffs' reviewers failed to realize that for children and young adults in the Reunification group, 75% of trial home visits resulted in reunification. They also mischaracterized a disrupted trial home visit as a failure when, in fact, the disruption led to a change in goal for the child;

- Plaintiffs' reviewers improperly concluded that short-term placements strongly suggest there is a shortage of placement resources in Child Welfare. Many short-term placements are a part of providing immediate safety to children and young adults upon entry or unexpected disruptions. Assessment and the permanency planning processes for younger children was documented to be occurring during these placements, and case management activities were in process to locate more restrictive environments for young adults who required or refused treatment. These short-term placements are unavoidable and were not related to a lack of resource availability;

- Plaintiffs' reviewers made findings by correlating data fields and adding anecdotal information from short meetings with reviewers, leading to faulty

**Page 3 – DEFENDANTS' EXPERT WITNESS STATEMENTS - DR. CYNTHIA RICHTER-JACKSON**

associations and observations and conclusions that were inappropriately
generalized to the entirety of ODHS;

- Plaintiffs' reviewers express "sadness" regarding the length of time for children
  and young adults to achieve adoption finalization based only on their data on a
  small sample of children and young adults, without considering the time it takes
  to transition a child/young adult who is bonded to their family of origin to the care
  of another adult; and

- For children and young adults in congregate care, plaintiffs' reviewers
  mischaracterized not achieving an assigned permanency goal as equating it to not
  having a permanent family. When considering contextual information regarding
  the child and young adult's history, child and young adult's voice, and the
  emotional and physical bonds that many children and young adults hold so dearly
  for their parent(s), one cannot conclude this from any data element.

The foregoing witness statement is merely a summary of the testimony defendants
anticipate offering from this witness as of the date of this submission. Defendants reserve the
right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other
evidence raise matters defendants did not reasonably anticipate. Defendants also reserve the
right to supplement this witness's statement after she and her team have had the opportunity to
review and analyze supplemental case file information that has been recently produced.

VI.    **Dr. Sarah Vinson (2 hours direct testimony)**

Dr. Vinson will testify in accordance with the December 15, 2023 report attached as Exhibit 7, filed under seal, her April 5, 2024 rebuttal report attached as Exhibit 8, and her deposition of April 25, 2024.[5]

Dr. Vinson is a triple-board certified child and adolescent, adult, and forensic psychiatrist with medical licenses in multiple states.  She completed general/adult psychiatry residency training at Cambridge Health Alliance, a Harvard Medical School Program, and separate fellowships in Child & Adolescent and Forensic Psychiatry at Emory School of Medicine.  She reviewed the records of the named plaintiffs.  She also reviewed the records of children interviewed by plaintiffs' Dr. Anne Farina.

Dr. Vinson states that there are nationwide critical access challenges to children's mental health services, even without the added complexity of addressing the trauma-related diagnoses and behavioral aggression problems that were present in this case.  Caregivers for children and and young adults, be they familial or institutional like ODHS, contend with this reality when seeking community-based care or therapeutic residential environments.  In cases where a child or young adult 1) is not responsive to the prescribed treatment, 2) requires greater intensity in the level of care, and/or 3) faces potential discrimination due to sexual or gender minority status, additional barriers are posed to accessing, providing, and receiving appropriate mental health care.  The very real barriers posed by both the inadequacies of the mental health system and, in this case, the family of origin, must be weighed considerably when assessing ODHS's efforts and actions.  Further, evaluation of ODHS's actions as it relates to service provisions cannot be done in a vacuum or judged by the outcome, as the outcome is ultimately dependent on many factors.

---

[5] This deposition will take place after this Statement has been submitted to the Court.

As described and supported in detail in her report and expected testimony, Dr. Vinson will testify to her conclusions on the following questions for each of the named plaintiffs:

1) Did the treatment rendered to the named plaintiff meet the standard of care reflected in the community?

2) Did ODHS provide or attempt to provide to the named plaintiff with the treatment recommended by medical and mental health care professionals?

3) Were ODHS's actions concerning the named plaintiff's medical and mental health care appropriate for the treatment recommended by medical and mental health providers?

4) Were ODHS's actions concerning the provision of medical and mental health care medically reasonable?

Regarding each named plaintiff, Dr. Vinson found the following:

**Alec and Kylie**: In Alec and Kylie's case, ODHS met the standard of care reflected in the community; provided or attempted to provide the siblings with the treatment recommended by mental health and medical providers; acted in a manner appropriate for the treatment recommended by mental health and medical providers; and acted in a manner that was medically reasonable concerning the provision of medical and mental healthcare for them.

**Bernard**: Bernard and ODHS appeared to be in a cycle; Bernard's mental health treatment which failed to sufficiently stabilize his symptoms effectively or fully meet treatment recommendations and lack of placement stability contributed to acting out behaviors, which were followed by placement disruptions, inadequately addressed symptoms and the undermining of treatment stability. All of this made consistent treatment engagement to address the symptoms that started the cycle even more difficult to address. Given the circumstances, any foster care organization would have been challenged by Bernard's case, thus it is likely that ODHS met the

community standard of care.  At times, ODHS fell short in providing Bernard with the treatment recommended by mental health and medical providers in a timely or consistent manner, though clearly there were repeated attempts to connect him with services.  When care was provided, it was appropriate for the treatment recommended by mental health and medical professionals as well as medically reasonable.

**Naomi**: With respect to Naomi, ODHS met the standard of care reflected in the community; provided or attempted to provide Naomi with the treatment recommended by mental health and medical providers; acted in a manner appropriate for the treatment recommended by mental health and medical providers; and acted in a manner that was medically reasonable concerning the provision of medical and mental healthcare for them.

**Norman**: In Norman's case, ODHS met the standard of care reflected in the community; provided or attempted to provide him with the treatment recommended by mental health and medical providers; acted in a manner appropriate for the treatment recommended by mental health and medical providers; and acted in a manner that was medically reasonable concerning the provision of medical and mental healthcare.

**Ruth**: For Ruth, ODHS met the standard of care reflected in the community; provided or attempted to provide her with the treatment recommended by mental health and medical providers; acted in a manner appropriate for the treatment recommended by mental health and medical providers; and acted in a manner that was medically reasonable concerning the provision of medical and mental healthcare for her.

**Simon**: In Simon's case, ODHS met the standard of care reflected in the community; provided or attempted to provide him with the treatment recommended by mental health and medical providers; acted in a manner appropriate for the treatment recommended by mental

health and medical providers; and acted in manner that was medically reasonable with respect to provision of medical and mental healthcare for him.

**Unique**: For Unique, ODHS attempted to address Unique's medical and mental health needs following the treatment recommended by her medical and mental health providers. Unique's referral to an out-of-state residential treatment facility was considered only after she was not responsive to the recommended interventions rendered to her, exhausting many in-state placement options. Unfortunately, Unique did not receive a quality standard of care during her out-of-state placement. Upon understanding that Unique was not provided with the appropriate care, ODHS intervened and acted appropriately, by coordinating services and acquiring the treatment necessary for Unique to achieve stabilization.

**Wyatt and Noah**: With respect to Wyatt and Noah, ODHS met the standard of care reflected in the community; provided or attempted to provide them with the treatment recommended by mental health and medical providers; acted in a manner appropriate for the treatment recommended by mental health and medical providers; and acted in a manner that was medically reasonable concerning the provision of medical and mental healthcare for them.

Dr. Vinson will also testify about Dr. Farina's conclusions. To respond to them, Dr. Vinson reviewed the case files of the children and young adults that Dr. Farina interviewed. The information reviewed in the case files contributed to her rebuttal opinions, and she can testify as to their incorporation into her opinions.

Dr. Vinson will explain that Dr. Farina's conclusions are based on select children and young adults interviews, and review of select case records and case discovery documents. Dr. Farina's analysis and methodology are inherently flawed, and thus her opinions are unreliable. Dr. Vinson has the following key rebuttals:

**Page 4 –    DEFENDANTS' EXPERT WITNESS STATEMENTS - DR. SARAH VINSON**

1. Nothing in the additional materials reviewed after her original report substantively impacts the professional opinions contained in that report.

2. Given the actual forensic mental health questions in this case and the approach employed by Dr. Farina, she lacked a sound basis for her sweeping expert opinions.

3. Dr. Farina's credibility as an objective expert is compromised not only by her flawed approach but also by her gross overreach in her opinions.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

<u>**PLAINTIFFS' EXPERT WITNESSES**</u>

**I.     Dr. Angelique Day ( 1 hour direct testimony).**

      **A.     Overall progress.**

Dr. Day will testify that the number of children and young adults in Oregon's foster care system has decreased from approximately 8,000 children and young adults in 2017 to approximately 5,000 in 2021.  Data also shows progress in assessing the needs of transition-aged young adults in order to link them with appropriate services.  Overall, young adults are more likely to receive ILP services as of December 15, 2023, than they were as of the publication of her 2019 report.

      **B.     New interventions.**

Dr. Day will testify about several new interventions ODHS has implemented, including:

- Use of the Early Transfer Protocol and Family Report, which involves a permanency worker in the case much earlier than before;

- Use of engagement tools such as the All About Me book and increased use of Youth Decision Meetings to enhance engagement of children and young adults in the planning process;

- A tiered ILP service model intended to expand services to 14-15 year olds and enhanced services for young adults; and

- An array of new trainings offered to caregivers to provide evidence-based training and specialized information about how to support young adults with transition planning and independent living skills.

ODHS has also implemented a strategy to increase the number of young adults in family-based settings and reduce reliance on congregate care placements.  ODHS is also working to improve placement capacity by:

- Reviewing their SAFE home study language to ensure it is equitable and inclusive;

- Providing additional staff training on the home study process;

**Page 1 –     DEFENDANTS' EXPERT WITNESS STATEMENTS - DR. ANGELIQUE DAY**

- Considering how the certification process impacts relative resources;

- Implementing a new resource family inquiry system, which went live in January 2021;

- Exploring a certification technology tool to streamline the certification process and match placements;

- Developing a GIS mapping tool to aid in targeted recruitment of resource parents;

- Participating in an interagency workgroup to expand the capacity of resource parents to meet higher levels of child and young adult's needs;

- Providing resource parents with funds for childcare, tutoring, and respite;

- Hiring 16 Resource Family Retention Recruitment Champions to recruit resource parents; and

- Increasing its use of Youth Decision Meetings to engage children and young adults in decisions about their future.

**C.      Improved metrics.**

Dr. Day will testify about improvements at Child Welfare since she authored her initial report in 2019.  For example, ODHS has improved on a metric that tracks whether the agency made efforts to involve parents, children, and young adults in the case planning process on an ongoing basis: from April 2019 to March 2020, 42% of cases were rated as a strength on this metric, compared to 56% in the March 2020 to February 2021 period.  ODHS also showed progress on having quality and frequent visits with children and young adults, from 69% in the April 2019 to March 2020 period to 78% in the January 2020 through December 2020 period, which exceeded the PIP goal level of 74%.

In 2019, ODHS met its standard of monthly face-to-face contact in 91.2% of cases, and improved that number to 92.4% in 2020.  ODHS also showed improvement on a measure related to assessing and addressing the needs of children, young adults, and families: from April 2019 to

March 2020, 31% of cases were rated as a strength on this metric, compared to 47% in the March 2020 to February 2021 period, again exceeding the PIP goal level of 45%.

In 2021, fewer children and young adults were considered runaways compared to 2006. Data also reflects that more resided in supervised independent living arrangements and that more were placed in kinship care arrangements, all of which Dr. Day concluded were positive developments.  In fact, ODHS places a larger proportion of children and young adults in kinship care relative to the national average.

ODHS has also improved on several metrics related to connection to family and kin.  For example, from February 2019 to January 2020, 69.2% of cases were rated a strength on whether the department made concerted efforts to place children with relatives, when possible, compared to 88.3% in the March 2020 to February 2021 period.  ODHS has improved their practice of connecting children in foster care as a whole with kin since Dr. Day's 2019 report.

In the 2022 Annual Progress and Services Report, the percentage of cases rated as a strength on the measure stability of foster care placement improved from 74% from March 2020 to February 2021, compared with the period from April 2019 to March 2020 where it was 71%. The rate of child placement moves in general decreased from 5.2 per 1,000 days in 2019 to 4.7 per 1,000 days in 2020.

ODHS is also making efforts to train more staff in transition planning.  In 2019, 20 staff attended computer-based training on transition planning, and in 2020, 64 staff attended.

ODHS's permanency outcomes have also improved.  The percentage of cases rated as a strength on the measure did the agency make concerted efforts to achieve permanency improved from 38% in the April 2019 to March 2020, compared to the period from March 2020 to February 2021, where it was to 44%.

**Page 3 –      DEFENDANTS' EXPERT WITNESS STATEMENTS - DR. ANGELIQUE DAY**

### D.    Resource parent recruitment, retention, and training.

Dr. Day will testify that the totality of ODHS's efforts in resource parent recruitment, retention, and training are in line with best practices in the field.  Based on the available data, ODHS has made progress on improving children and young adults engagement in case and permanency planning and progress on improving placement resources and placement stability. ODHS now offers specialized training for caregivers specific to supporting young adults in transition planning.

### E.    Improved services to transition-aged young adults.

Dr. Day will testify that ODHS has improved service delivery to transition-aged young adults.  As of July 2022, ODHS serves children and young adults ages 14 through 23.  The department also provides a higher provider reimbursement rate for 16 to 20 year olds, offers more intensive services for a subset of 16 to 20 year olds, and has expanded the number of 21 to 23 year old slots from 50 to 200.  ODHS has also reported significant progress in providing housing supports for transition-aged young adults.

Dr. Day will testify that Oregon outperforms the national average in several areas.  From 2013 to 2021, transition-aged young adults in Oregon were more likely to receive a service (61%) compared to the national average (47%).  Relative to the rest of the nation, young adults in Oregon were more likely to receive educational financial assistance (increase from 14% to 22% in Oregon from 2018 to 2021) and K-12 academic support (increase from 37% in 2018 to 40% in 2021).

Dr. Day will testify that Oregon outperforms the national average in several outcomes that related to 21 year olds.  That population had a lower likelihood of being incarcerated, being young parents, and being unstably housed.  That population was also more likely to enroll in

postsecondary education in 2021 than young adults nationwide.  Oregon has more positive outcomes than negative outcomes for this population relative to the national average.  Dr. Day will also testify that she is encouraged by this development.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

II.    **Patricia Rideout, JD (30 minutes direct testimony)**

A.    **Background.**

Patricia Rideout will testify that she and Dr. Sue Steib were hired by plaintiffs to perform

a review of 95 case files for this present litigation.  She and Dr. Steib had previously completed a

case file review in 2019, regarding the named plaintiffs in this litigation as well.  The 95 case file

review was completed in 2023, with an amended report written in 2024.  Ms. Rideout will

explain that through the review, they were seeking to form an opinion about the practice with

respect to those 95 case files, not the broader group of all children and young adults in out-of-

home care in Oregon.

B.    **Positives of caseworkers.**

Ms. Rideout will testify that documentation in the 95 case files was very strong, and

documentation is very important in child welfare.  Children and young adults in her case file

review did not experience a high number of changes in their primary caseworker.  This was true

for each of the sample case categories she and her team reviewed.  She will further testify that

caseworkers did a good job having regular contact between caseworkers, children, young adults,

and their caregivers.  Regular contact is important when a child or young adult is taken into out-

of-home care, as the caseworker is responsible for the child or young adult, and because it is

important for caseworkers to develop relationships with the children and young adults.   Overall,

Ms. Rideout noted that caseworkers made appropriate use of these secondary service providers in

the files she reviewed.

C.    **Engagement and involvement of family and relatives.**

Ms. Rideout will testify that caseworkers searched for relatives, including paternal

relatives, both as potential placement resources and simply to renew or maintain family contact

for the child or young adult.  Further, she witnessed family search and engagement efforts and

Tribal engagement processes which have likely made a significant difference in ensuring that children and young adults who cannot go home remain with family and community.  These searches are very important to keep children and young adults coming into out-of-home care connected to extended families even beyond blood relatives.  In her case file review, parent-child visits occurred weekly or more often for most children and young adults unless parents were not available or declined contact.  She will explain this is important for children and young adults coming into out-of-home care to experience as little upset as possible, as family time keeps their hopes up and strengthens the odds of having as stable as possible out-of-home care experience.  Most of those visits were supervised, and it seemed that the court's norm was to order supervision.  In those case files, efforts were made to place siblings together and, where this was not achieved, to hold sibling visits regularly.  Caseworkers made appropriate use of secondary service providers to support engagement of parents in addressing addiction and to support independent living planning for older youth when these were called for.

> **D.**    **Case file review instruments.**

Ms. Rideout will testify that during the course of her case file review in 2023, she and her team initially used a case review instrument that allowed for the reviewer to give each case file a grade.  Approximately half of the 11 instruments had an A or a B grade, and approximately half left the field blank.  She will explain that only one reviewer filled out and kept those case review instruments.  None of those case review instruments contain a grade below B.

> **E.**    **Involvement of the court.**

Ms. Rideout will testify that in the reunification group of the 95 case file review, there were instances where children had a hard time getting a court to change their case goal from reunification to termination of parental rights.  This was outside the control of Child Welfare.

F.    **Maltreatment in care.**

Ms. Rideout will testify that of the 95 randomly-selected case files, two incidents of maltreatment in care did not appear to meet their definition of maltreatment in care because they involved incidents of abuse committed by third parties—a stranger and a classmate at school. Ms. Rideout will explain that almost all maltreatment in care experienced by children in care in their review sample occurred during a trial home visit. During a trial home visit, the child has returned to their parents, and in a sense, only the lack of resumption of legal custody by the parent distinguishes the situation from an official reunification. Maltreatment in care that occurs during a trial home visit is not indicative of harm to children who are in true out-of-home care.

G.    **Ms. Rideout agrees with the State's experts in several areas.**

Ms. Rideout observed that Ms. Moss's finding of progress in family and community connections for children and young adults in care was supported by the strengths she observed in the case sample she and her team reviewed in the areas of family search and engagement and Tribal identification.

Ms. Rideout will testify that Child Welfare's Vision for Transformation reflects a good aspirational summary of a good system. She acknowledges the importance of Child Welfare's Vision for Transformation as a statement of core values and intent.

Ms. Rideout agrees with many of the pros and cons about the use of consent decrees or court orders as presented by Mr. Dimas and Ms. Ahluwalia. She acknowledges that the use of consent decrees or court orders to drive system change has not always proved successful. Ms. Rideout will explain that a court order has the potential to improve a child welfare system only if it requires that critical human services systems that intersect with child welfare fully collaborate on necessary activities to promote improvement. Ancillary public and private

**Page 3 –    DEFENDANTS' EXPERT WITNESS STATEMENTS - PATRICIA RIDEOUT**

systems, funding bodies, and juvenile courts and the judiciary must become involved and support progress under the court order.

Ms. Rideout will testify that in her review, Oregon's caseworkers performed their jobs conscientiously. Children in out-of-home care were provided adequate food, shelter, clothing and medical care, nor were children routinely placed in physical danger. She will testify that she cannot state that Oregon Child Welfare is in crisis.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission. Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

### III.    Dr. Sue Steib (30 minutes direct testimony)

#### A.    Background.

Dr. Sue Steib will testify that she and Patricia Rideout were hired by plaintiffs to perform a review of 95 case files for this present litigation.  She and Ms. Rideout had previously completed a case file review in 2019, regarding the named plaintiffs in this litigation as well. The 95 case file review was completed in 2023, with an amended report written in 2024.  She will explain that the case file review was a qualitative review and it was not intended to extrapolate quantitative conclusions to children and young adults in the case as a whole.  Oregon does not have more children and young adults in congregate care than the national average.

#### B.    Better documentation.

Dr. Steib will testify she witnessed improved documentation in the 95 case file review she conducted in 2023, as compared to the case files she reviewed in 2019.  The files she reviewed showed that the system was paying attention to recording case plans, and nearly all children had a case goal, which is good.  She will explain that a documented case goal and case plan is a benefit to those files and those children.

#### C.    Positives of caseworkers and secondary service providers.

Dr. Steib will testify that children and young adults in her case file review did not experience a high number of changes in their primary caseworker.  This was true for each of the sample case categories she and her team reviewed.  She will further testify that caseworkers generally made regular face to face contact with children and their caregivers on at least a monthly basis.  Dr. Steib will also explain that she saw heavy involvement by independent living staff in cases with young adults, to help them transition to independent living.  She also noted addiction specialist involvement, to allow for support to help addicted parents get into detox and treatment.  Addiction specialists are helpful and a useful support for a case worker to have.

**Page 1 –**    **DEFENDANTS' EXPERT WITNESS STATEMENTS - DR. SUE STEIB**

**D.      Engagement and involvement of family and relatives.**

Dr. Steib will testify that caseworkers searched for relatives, including paternal relatives, both as potential placement resources and simply to renew or maintain family contact for the child or young adult.  Further, she witnessed family search and engagement efforts and Tribal engagement processes which have likely made a significant difference in ensuring that children and young adults who cannot go home remain with family and community.  In her case file review, parent-child visits occurred weekly or more often for most children and young adults unless parents were not available or declined contact.  Most of those visits were supervised and it seemed that the court's norm was to order supervision.  In those case files, efforts were made to place siblings together and, where this was not achieved, to hold sibling visits regularly.  Caseworkers made appropriate use of secondary service providers to support engagement of parents in addressing addiction and to support independent living planning for young adults when these were called for.

**E.      Case file review instruments.**

Dr. Steib will testify that during the course of her case file review in 2023, she and her team initially used a case review instrument that allowed for the reviewer to give each case file a grade.  Approximately half of the 11 instruments had an A or a B grade, and approximately half left the field blank.  She will explain that only one reviewer filled out and kept those case review instruments.  None of those case review instruments contain a grade below B.

**F.      Maltreatment in care.**

Dr. Steib will testify that of the 95 randomly-selected case files, two incidents of maltreatment in care did not appear to meet their definition of maltreatment in care because they involved incidents of abuse committed by third parties—a stranger and a classmate at school.  She will explain that almost all maltreatment in care experienced by children in care in their

review sample occurred during a trial home visit. During a trial home visit, the child has returned to their parents, and in a sense, only the lack of resumption of legal custody by the parent distinguishes the situation from an official reunification. Maltreatment in care that occurs during a trial home visit is not indicative of harm to children who are in true out-of-home care.

### G.    Dr. Steib agrees with the State's experts in several areas.

Dr. Steib observed that Ms. Moss's finding of progress in family and community connections for children and young adults in care was supported by the strengths she observed in the case sample she and her team reviewed in the areas of family search and engagement and Tribal identification.

She acknowledges the importance of Child Welfare's Vision for Transformation as a statement of core values and intent.

Dr. Steib agrees with many of the pros and cons about the use of consent decrees or court orders as presented by Mr. Dimas and Ms. Ahluwalia. She acknowledges that the use of consent decrees or court orders to drive system change has not always proved successful. Dr. Steib will explain that a court order has the potential to improve the child welfare system only if it requires that critical human services systems that intersect with child welfare fully collaborate on necessary activities to promote improvement. Dr. Steib will explain that ancillary public and private systems, funding bodies, and juvenile courts and the judiciary must become involved and support progress under the court order.

Dr. Steib will testify that during her review, she did not observe any intentional efforts not to provide for the best interest of the child. She also did not observe anything that could be interpreted as indifference to the needs of children. She could not say that Oregon's system was in crisis.

The foregoing witness statement is merely a summary of the testimony defendants anticipate offering from this witness as of the date of this submission.  Defendants reserve the right to elicit additional testimony from this witness in the event the Court, plaintiffs, or other evidence raise matters defendants did not reasonably anticipate.

DATED: April 19, 2024.            ELLEN ROSENBLUM
                                  ATTORNEY GENERAL
                                  FOR THE STATE OF OREGON


                                  *s/ Lauren F. Blaesing*
                                  David B. Markowitz, OSB #742046
                                  DavidMarkowitz@MarkowitzHerbold.com
                                  Laura Salerno Owens, OSB #076230
                                  LauraSalerno@MarkowitzHerbold.com
                                  Harry B. Wilson, OSB #077214
                                  HarryWilson@MarkowitzHerbold.com
                                  Lauren F. Blaesing, OSB #113305
                                  LaurenBlaesing@MarkowitzHerbold.com
                                  Vivek A. Kothari, OSB #182089
                                  VivekKothari@MarkowitzHerbold.com
                                  *Special Assistant Attorneys General for Defendants*

                                  Adele J. Ridenour, OSB #061556
                                  AdeleRidenour@MarkowitzHerbold.com
                                  *Of Attorneys for Defendants*

                                  Carla A. Scott, OSB #054725
                                  carla.a.scott@doj.state.or.us
                                  Sheila H. Potter, OSB #993485
                                  sheila.potter@doj.state.or.us
                                  *Of Attorneys for Defendants*

2127184