**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Lauren F. Blaesing, OSB #113305**
LaurenBlaesing@MarkowitzHerbold.com
**Vivek A. Kothari, OSB #182089**
VivekKothari@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085
*Special Assistant Attorneys General for Defendants*
*Additional Counsel of Record Listed on Signature Page*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| WYATT B. and NOAH F. by their next friend Michelle McAllister; KYLIE R. and ALEC R. by their next friend Kathleen Megill Strek; UNIQUE L. by her next friend Annette Smith; SIMON S. by his next friend Paul Aubry; RUTH T. by her next friend Michelle Bartov; BERNARD C. by his next friend Ksen Murry; NAOMI B. by her next friend Kathleen Megill Strek; and NORMAN N. by his next friend Tracy Gregg, individually and on behalf of all others similarly situated,<br><br>                                            Plaintiffs,<br><br>        v.<br><br>TINA KOTEK, Governor of Oregon in her official capacity; FARIBORZ PAKSERESHT, Director, Oregon Department of Human Services in his official capacity; APRILLE FLINT-GERNER, Director, Child Welfare in her official capacity; and OREGON DEPARTMENT OF HUMAN SERVICES,<br><br>                                            Defendants. | Case No. 6:19-cv-00556-AA<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE JIM DIMAS AND UMA AHLUWALIA AT TRIAL** |

Page 1 –    DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE
            JIM DIMAS AND UMA AHLUWALIA AT TRIAL

# INTRODUCTION

This Court should deny plaintiffs' motion to exclude the expert testimony of Mr. Dimas because his testimony is reliable and relevant to the issues in front of the Court. Similarly, this Court should also deny plaintiffs' motion to exclude the expert testimony of Ms. Ahluwalia because her testimony is also reliable and relevant to the issues before the Court. Additionally, although plaintiffs combine their arguments about Mr. Dimas and Ms. Ahluwalia, this Court should consider the admissibility of their testimony independently: Mr. Dimas and Ms. Ahluwalia submitted separate expert reports on related, but distinct topics.

This Court should deny plaintiffs' motion to exclude the testimony of Ms. Ahluwalia because it relevant, reliable, and based on sufficient facts and data. As explained below, Ms. Ahluwalia's testimony about the modern policy direction in child welfare is relevant to this Court's determination of whether defendants' practices "shock the conscience." Ms. Ahluwalia will also testify about how the legal obligations imposed by consent decrees, settlements, or injunctions in similar child welfare class actions are inconsistent with the modern direction of child welfare policy, and that testimony is relevant to the question of what the proper remedy should be in this case. Ms. Ahluwalia's testimony is reliable because she has extensive experience in state human services agencies, including extensive experience in child welfare. As this Court has already ruled, "an expert's opinion may be based on the expert's experience and knowledge of [an] industry as a whole," and that principle is especially applicable in the field of human services. (Dkt. 275 at 8-9.) Finally, Ms. Ahluwalia's opinion is based on sufficient facts

and data. Ms. Ahluwalia interviewed over a dozen child welfare leaders and experts, which is a reliable method for forming an opinion on the modern direction of child welfare policy.

Similarly, this Court should deny plaintiffs' motion to exclude the testimony of Mr. Dimas because it is also relevant, reliable, and based on sufficient facts and data. Mr. Dimas's testimony about the effectiveness of the legal obligations imposed by child welfare consent decrees, settlements, or court orders is relevant to the question of whether plaintiffs have Article III standing and whether plaintiffs' requested relief would serve the public interest. Additionally, like Ms. Ahluwalia, Mr. Dimas has extensive experience running state human services agencies, he served as a monitor over a child welfare consent decree for ten years, and has consulted for human services agencies—including child welfare agencies—implementing systemic changes. His testimony is reliable. Finally, Mr. Dimas's testimony is based on sufficient facts and data. Mr. Dimas relied on federal Child and Family Services Review ("CFSR") data, which plaintiffs themselves relied on in their Complaint.

Finally, as to both Mr. Dimas and Ms. Ahluwalia, there should not be much question about the reliability of their opinions—even plaintiffs' experts Dr. Sue Steib and Ms. Patricia Rideout "agree with many of the pros and cons about the use of consent decrees or court orders presented" by Mr. Dimas and Ms. Ahluwalia. (Dkt. 385 Ex. 9 at 7.) To the extent that plaintiffs now disagree with Mr. Dimas and Ms. Ahluwalia's opinions, they can cross examine them at trial or present evidence to the contrary.

## LEGAL STANDARD

Testimony from a witness with specialized "knowledge, skill, experience or training" is admissible if the expert's testimony (1) "will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "is based on sufficient facts or data;" (3) "is the product of

reliable principles and methods;" and (4) "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 515 (C.D. Cal. 2012) (cleaned up).

In determining whether the proffered evidence would be helpful to the trier of fact, doubts should be resolved in favor of admissibility. *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223, 1240-41 (E.D.N.Y. 1985). "The rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments (reviewing case law applying *Daubert*). Trial courts are required to "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Benson Tower Condo. Owners Ass'n v. Victaulic Co.*, 105 F. Supp. 3d 1184, 1207 (D. Or. 2015) (citation omitted). Instead, the existence of contrary evidence goes to the weight not the admissibility of an expert's opinions. In a bench trial, the risk of prejudice is diminished. *F.T.C v. BurnLounge, Inc.*, 753. F.3d 878, 888 (9th Cir. 2014) ("When we consider the admissibility of expert testimony, we are mindful that there is less danger that a trial court will be unduly impressed by the expert's testimony or opinion in a bench trial.").

Expert testimony is "relevant" if the knowledge underlying it has a "valid scientific connection to the pertinent inquiry." *Daubert*, 509 U.S. at 591. "The relevance prong under *Daubert* means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1154 (E.D. Wash. 2009).

A witness can qualify as an expert through "knowledge, skill, experience, training, or education," which need only exceed "the common knowledge of the average layman." *United*

*States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) (citing Rule 702), *cert. den*, 143 S. Ct. 2509 (2023). This standard is "liberal." *Id.*

As this Court explained in its prior ruling, when deciding whether to exclude expert testimony, the court's "duty is to evaluate not the correctness of the expert's conclusion, but the principles and methodology used to generate the conclusions." (Dkt. 275 at 3) (citing *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).) The standard is flexible, because "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

## ARGUMENT

This Court should deny plaintiffs' motion to exclude the testimony of Ms. Ahluwalia and Mr. Dimas. In this case, plaintiffs ask for expansive relief that would indefinitely bind a state agency. Ms. Ahluwalia and Mr. Dimas both have relevant experience working with state child welfare agencies subject to consent decrees that contain similar legal obligations to those plaintiffs seek to impose on defendants in this case. As explained below, they also based their opinions on sufficient facts and data, their testimony meets the admissibility standards set out by the federal rules of evidence, and will be relevant to the issues in this case. The expert opinions of Jim Dimas and Uma Ahluwalia are not inadmissible simply because plaintiffs disagree with them. To the extent that plaintiffs deem Mr. Dimas or Ms. Ahluwalia's opinions unpersuasive, they can make those arguments at trial.

**I.     This Court should deny plaintiffs' motion to exclude the testimony of Ms. Ahluwalia.**

As explained below, this Court should deny plaintiffs' motion to exclude the testimony of Ms. Ahluwalia because it is relevant, reliable, and based on sufficient facts and data.

### A. Ms. Ahluwalia's testimony is relevant.

Ms. Ahluwalia's testimony is relevant and helpful to the Court for several reasons. First, as explained below, Ms. Ahluwalia will testify about how the child welfare field has evolved in recent years, which is relevant when considering whether the "practices" plaintiffs criticize satisfy the deliberate indifference standard. Second, this is an equitable case in which plaintiffs seek expansive injunctive relief. Ms. Ahluwalia will explain how plaintiffs' requested relief will create barriers toward Oregon's ability to move in the modern direction of child welfare practice.

#### 1. Ms. Ahluwalia's testimony is relevant and helpful to whether defendants' practices "shock the conscience."

In this case, to win relief on their substantive due process claims, plaintiffs must prove that defendants' practices "shock the conscience." *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 844 (9th Cir. 2010). At trial, plaintiffs will argue that defendants are deliberately indifferent to the rights of children in foster care for failing to remove children from their homes, for placing them in kinship placements, and for returning children to their homes earlier than plaintiffs would like. In making that determination, this Court should consider defendants' practices in the context of modern child welfare policy. Ms. Ahluwalia's testimony will be helpful to the Court because she will testify about the modern direction of child welfare agencies.

Specifically, Ms. Ahluwalia will explain that, in the past, the focus was on removing children from their families and finding new, permanent homes for the children. (Decl. of Andy McStay ("McStay Decl.") (Dkt. 363) in Supp. of Pls.' Mot. to Exclude Defs.' Expert Testimony of Jim Dimas and Uma Ahluwalia ("Pls' Mot.") (Dkt. 362) 12/15/2023 Expert Report of Uma Ahluwalia ("Ahluwalia Report"), Ex. C at 6.) The modern direction of child welfare, however, focuses on prevention. In 2018, Congress enacted major child welfare reform legislation called the Family First Prevention Services Act (the "Family First Act"), which allows states to draw

down federal funding for prevention services before a child must be removed and placed into foster care. Now, when children must be removed, modern child welfare agencies emphasize kinship care and maintaining a child's connections with their caregivers, because studies show that preserving family connections improves children's health and well-being and leads to more positive outcomes.

At trial, plaintiffs will argue that defendants do not provide enough oversight of communities to prevent child abuse,[1] but the national conversation around child welfare is moving in the opposite direction. Specifically, Ms. Ahluwalia will explain that national experts and modern child welfare agencies "recognize[] that racism is a public health crisis that is deeply felt through inequities in the old model of child welfare," and that "[c]hild welfare policy and practice is evolving from a system that imposed a paternal and often cookie-cutter approach." (McStay Decl. Ex. C, Ahluwalia Report at 8, 11.) She will explain that, instead of policing and surveilling families and communities—which has had a significant disparate impact on communities of color—the modern approach is more collaborative. Modern child welfare

---

[1] For example, plaintiffs seek to use this lawsuit to narrow the scope of who can qualify as a "kinship" placement to relatives only and limit the use of kinship placements to emergency situations. (Pls.' Trial Br. at 10 (Dkt. 375).) But modern child welfare agencies recognize that children should remain in their own communities whenever possible, and a child's community often includes individuals who are not related by blood. Indeed, especially in communities that are already subject to over-policing, requiring strict compliance with rigid certification standards, such as requirements that no person in a household have any sort of criminal record, compounds the disproportionate impacts of the criminal justice system for communities of color. The right level of surveillance and oversight of Oregon's communities is a decision that should be squarely left to state officials and the democratic process, and defendants are not "deliberately indifferent" to the rights of children simply because they disagree with plaintiffs about the appropriate level of surveillance. As defendants explained in their Trial Memorandum, "The surveillance and punishment approach to child welfare has been tried for decades. It does not work." (Defs.' Trial Mem. at 2 (Dkt. 372).)

Page 7 –   DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE
            JIM DIMAS AND UMA AHLUWALIA AT TRIAL

agencies approach the communities most impacted by the child welfare system with humility and grant them a bigger role in the decision-making process. (*Id.*)

Plaintiffs argue that Ms. Ahluwalia is incorrect that plaintiffs' approach to child welfare is outdated and discourages a prevention, and diversion approach, but that is one of the core disputes in this case. This case raises "sensitive federalism concerns" and "involves areas of core state responsibility." *Horne v. Flores*, 557 U.S. 433, 448 (2009). Defendants should be permitted to present expert testimony in defense of their policy choices. Plaintiffs can make their counterarguments at trial.

### 2. Ms. Ahluwalia's testimony is relevant and helpful to deciding whether plaintiffs' requested relief is in the public interest.

Even if plaintiffs prove that defendants' practices "shock the conscience," to obtain an injunction, plaintiffs must also prove that their requested relief does not disserve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Moreover, any injunctive relief should give significant weight to the policy choices of state elected officials. *See Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976) ("When a plaintiff seeks to enjoin the activity of a government agency . . . [their] case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs." (internal quotation omitted)).

Ms. Ahulwalia's testimony is relevant and helpful because it will explain how, and why, plaintiffs' requested relief will frustrate Oregon's efforts to focus on prevention. Among other things, plaintiffs' requested relief will concentrate resources downstream—after a family crisis has become severe enough that a child must enter foster care—rather than the upstream prevention efforts of modern child welfare policy. Consent decrees and court orders in other cases aimed at the downstream result—a child in foster care—have been unsuccessful at

Page 8 –   DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE
JIM DIMAS AND UMA AHLUWALIA AT TRIAL

addressing the root causes for why children end up in the state's custody and the trauma caused by those root causes. Moreover, because settlements, consent decrees, or court orders impose strict legal obligations on child welfare agencies without much flexibility, they stifle innovation and prevent adoption of new or innovative policies and practices as they develop in the dynamic field of child welfare.

Ms. Ahluwalia will explain the funding structures of state governments and how plaintiffs' requested relief will dictate funding priorities. Her testimony is helpful and relevant because "[f]ederalism concerns are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities." *Horne*, 557 U.S. at 448. As the Supreme Court has recognized, "[w]hen a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs." *Id.* Ms. Ahluwalia will provide concrete examples of how similar litigation in other jurisdictions has effectively dictated funding priorities for state social services. For example, Ms. Ahluwalia will explain that the consent decrees or settlements in Arizona, Michigan, West Virginia (proposed settlement), and Kansas impose legal obligations on those states' child welfare agencies to provide crisis stabilization services, but the consent decrees cannot force changes to Medicaid funding structures or guarantee that there are sufficient qualified providers available to do the work. Thus, to comply, states must pull funding away from other programs. Similarly, Ms. Ahluwalia will explain that plaintiffs' approach will concentrate the agency's limited resources away from providing prevention services and toward compliance with plaintiffs' requested relief. Because her testimony bears directly on whether plaintiffs' requested relief will serve the public interest, this Court should reject plaintiffs' argument to exclude her testimony as irrelevant.

B.  **Ms. Ahluwalia's testimony is reliable.**

Ms. Ahluwalia's testimony is reliable. In some fields, such as child welfare, "experience is the predominant, if not the sole basis for a great deal of reliable expert testimony." *Century Indem. Co. v. The Marine Grp.*, LLC, No. 3:08-CV-1375-AC, 2015 WL 5965614, at *2 (D. Or. Oct. 13, 2015) (quoting Rule 702 committee note); *see Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (in certain fields, experience is the primary, if not the only, basis for expertise). As plaintiffs themselves have previously argued in this case, "[i]n child welfare cases specifically, reliance on the expert's own knowledge and experience . . . typically meets the *Daubert* reliability standard." (Dkt. 160 at 8.) This Court agreed, noting that "an expert's opinion may be based on the expert's experience and knowledge of the industry as a whole." (Dkt. 275 at 8-9 (citing *United States v. Laurienti*, 611 F.3d 530, 548 (9th Cir. 2010).)

Uma Ahluwalia has 28 years of experience in human services, including in child welfare. Specifically, Ms. Ahluwalia served for twelve years as the director of the Montgomery County Department of Health and Human Services in Maryland, where she oversaw the implementation of the Affordable Care Act, among other things. (McStay Decl. Ex. C, Ahluwalia Report at 3.) Ms. Ahluwalia served as the Interim Director in the Child and Family Services Agency in Washington, D.C., while the agency was under the *LaShawn A. v. Williams*, Case No. 1:89-cv-0174-TFH, consent decree, which involved A Better Childhood, who is lead plaintiffs' counsel in this case. She also served as Assistant Secretary of the Department of Social and Health Services in the State of Washington for the Children's Administration, where she led the settlement efforts in the *Braam v. State of Washington*, Case No. 98-2-01570-1 class action. (*Id.*)

For the past fifteen years, Ms. Ahluwalia has worked on developing strategies for multi-sector responses aimed at strengthening families and improving child safety and well-being, with a particular emphasis on data sharing and using data as a tool to serve children and families. Ms.

Page 10 –   DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE
             JIM DIMAS AND UMA AHLUWALIA AT TRIAL

Ahluwalia also began her career as a social worker and has experience carrying a social work caseload. Based on her extensive experience, Ms. Ahluwalia's testimony about the modern direction of child welfare is reliable and admissible under Rule 702.

### C. Ms. Ahluwalia's testimony is based on sufficient facts and data.

In addition to being reliable, Ms. Ahluwalia's opinion is based on sufficient facts and data. Plaintiffs' argument that Ms. Ahluwalia did not employ a methodology is incorrect. As courts have explained, "[o]ne need not leverage a multi-variate regression or conduct laboratory tests to qualify as having used a methodology, let alone a reliable one." *PerkinElmer Health Scis., Inc. v. SRC Living LLC*, Case No. 5:20-CV-02083-JWH-KK, 2022 WL 3130237 at *3 (C.D. Cal. June 22, 2022). In cases involving expert testimony on areas such as state regulations or state policies, interviewing industry leaders "is a reasonable approach to undergird [expert] testimony regarding what are essentially qualitative insights." *Id.* (where expert was testifying about California regulatory requirements, interviewing industry leaders was a sufficient methodology to satisfy Rule 702); *see also United States v. Sims*, 550 F. Supp 3d 907, 918 (D. Nev. 2021) (expert's testimony about human trafficking was admissible under Rule 702 where the expert had a seventeen-year career and had conducted numerous interviews with both victims and traffickers); *United States v. Brooks*, 610 F.3d 1186, 1195-96 (9th Cir. 2010) (same).

Here, Ms. Ahluwalia conducted interviews with over a dozen industry leaders and experts, including interviewees from the Child Welfare League of America, Chapin Hall at the University of Chicago, the Annie E. Casey Foundation, the University of Maryland School of Social Work – Institute for Innovation and Implementation, the Alliance for Strong Families and Communities, and the National Indian Child Welfare Association, among others. (McStay Decl. Ex. C, Ahluwalia Report at 5-6.) Ms. Ahluwalia also employed a reliable methodology in conducting the interviews; she asked the interviewees the same questions and reached her

conclusions about the areas of evolutions in child welfare practice outlined in her expert report *after* conducting the interviews. (*See* Decl. of Vivek Kothari in Supp. of Defs.' Resp. to Pls.' Mot. to Exclude Jim Dimas and Uma Ahluwalia at Trial ("Kothari Decl.") Ex. 1, Ahluwalia Dep., at 46:21-48:1.)

Based on Ms. Ahluwalia's extensive experience in human services and child welfare and her interviews with over a dozen industry leaders and experts, her testimony is based on sufficient facts and data and satisfies the minimal admissibility requirements under Rule 702.

## II. This Court should deny plaintiffs' motion to exclude the testimony of Mr. Dimas.

This Court should deny plaintiffs' motion to exclude the testimony of Mr. Dimas because his testimony is relevant, reliable, and based on sufficient facts and data to satisfy the minimum admissibility requirements of Rule 702.

### A. Mr. Dimas's testimony is relevant.

This Court should deny plaintiffs' motion to exclude Mr. Dimas's testimony because it is relevant and helpful to the issues the Court must decide in this case.

#### 1. Mr. Dimas's testimony is relevant to the question of whether plaintiffs' injuries are redressable by the relief they seek.

Mr. Dimas's testimony is relevant to the question of whether plaintiffs have Article III standing to pursue their claims. Plaintiffs bear the burden of proving standing at trial "in the same way as any other matter on which the plaintiff bears the burden of proof." *Bennett v. Spear*, 520 U.S. 154, 167-68 (1997). To prove they have standing, plaintiffs must prove three elements: (1) injury in fact; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is redressable by a favorable decision from the court. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992). As to the third element—redressability—plaintiffs must prove that there is a "substantial likelihood" that the relief they seek will redress their alleged injuries. *M.S. v.*

*Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018). It is not uncommon for parties to submit expert reports on the effectiveness of a plaintiffs' proposed injunctive relief, especially in cases involving complex government policy areas. *See Washington Env't Council v. Bellon*, 732 F.3d 1131, 1144 (9th Cir. 2013) (where defendants' experts identified a "multitude of independent third parties [who were] responsible for the changes contributing to Plaintiffs' injuries," plaintiffs failed to establish standing).

Mr. Dimas will testify at trial that the obligations enforced through court orders or consent decrees that have resulted from similar class actions have not been effective in improving child welfare systems.[2] (McStay Decl. Ex. D, Expert Report of Jim Dimas ("Dimas Report") at 5-6.)   He will explain that both result in legally enforceable obligations on a child welfare agency that channel behavior and affect child welfare policy, practice, culture, and outcomes.

Similarly, plaintiffs in this case seek a court order requiring defendants to bring Oregon's maltreatment in care rate—a federally mandated reporting requirement—down to the "national average." (Pls.' Trial Br. at 36 (Dkt. 375).) Mr. Dimas reviewed other states' federally-mandated reported data and determined that states that have operated under a consent decree for over ten years perform worse than states that have operated under a consent decree for six or fewer years. (McStay Decl. Ex. D, Dimas Report at 5-6.) Mr. Dimas will also explain that, in addition to failing to reliably produce lasting, systemic improvements, consent decrees reliably do lead to unintended consequences. That evidence is relevant to the redressability element of standing.

---

[2] Mr. Dimas's testimony is about the effect of the legal obligations that other courts have imposed or enforced against child welfare agencies, so the difference between a consent decree and a court order did not weigh heavily in his analysis.

**Page 13 –   DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE JIM DIMAS AND UMA AHLUWALIA AT TRIAL**

      **2.**      **Mr. Dimas's testimony is helpful for determining what obligations have been effective at improving child welfare systems, and what obligations have not been effective.**

Mr. Dimas will also offer testimony about what an effective remedy might look like, and how to structure an injunction to avoid, to the extent possible, some of the negative pitfalls that have resulted in similar cases throughout the country. In an equitable case such as this, where the Court has some discretion in crafting a remedy, expert testimony about the efficacy of specific provisions is relevant and helpful. *See eBay Inc.*, 547 U.S. at 392 (observing that "[a]ccording to well-established principles of equity, a plaintiff seeking a permanent injunction must" demonstrate, among other things, that the public interest would not be disserved by the injunction).

Specifically, Mr. Dimas will clarify what specific obligations in court orders or consent decrees make them ineffective, such as an obligation to meet specific statistical "metrics." Mr. Dimas will explain that imposing a legal obligation on a government agency to hit certain metrics does not account for outside factors that contribute significantly to the ultimate well-being of children in foster care, such as structural racism, poverty, and other complex needs of families and underserved communities. Mr. Dimas will explain that a focus on metrics fosters a culture of strict compliance and fear rather than a culture of creativity, flexibility, and problem-solving, which can stifle innovation and progress. Similarly, Mr. Dimas will explain that other legal obligations imposed by consent decrees or injunctions that require strict compliance with timelines, procedures, processes, and deadlines are too inflexible to affect sustainable, systemic change and are inconsistent with effective change management in large, complex organizations. That testimony is relevant.

Nor does Mr. Dimas's identification of the downsides of system reform litigation make his opinion unhelpful. Indeed, courts and other commentators have also recognized that there are

downsides to system reform injunctions. *See*, *e.g.*, *Angela R. by Hesselbein v. Clinton*, 999 F.2d 320, 326 (8th Cir. 1993) ("Federal courts operate according to institutional rules and procedures that are poorly suited to the management of state agencies." (quoting Donald L. Horowitz, *Decreeing Organizational Change: Judicial Supervision of Public Institutions*, 1983 Duke L.J. 1265, 1303-05) (1983)); *Missouri v. Jenkins*, 515 U.S. 70, 99 (1995) (explaining that long-term consent decrees do not serve the public interest because "[e]ach additional program ordered by the District Court—and financed by the State . . . the greater [the agency's] reliance on continued supervision by the District Court"). Plaintiffs will make arguments, and present evidence, about the benefits of their requested relief at trial, so this Court should hear expert testimony about the downsides, too.

        **B.**        **Mr. Dimas's testimony is reliable.**

Jim Dimas has over 40 years of experience working in human services agencies as both a state executive and a consultant. He has extensive experience working with human services agencies implementing systemic reforms in particular. He has both state and local-level experience in child welfare, including working within New York City's child welfare system with the Coalition for Hispanic Human Services, the New York Foundling, and Edwin Gould Services for Children and Families. (McStay Decl. Ex. D, Dimas Report at 4.) Mr. Dimas has also worked with state child welfare systems in Alabama, Connecticut, Georgia, Illinois, Maryland, South Carolina, Wisconsin, Arkansas, Florida, Indiana, Louisiana, and Ohio. (*Id.*)

Mr. Dimas also has a unique perspective that is particularly relevant in this case. Specifically, Mr. Dimas worked as a monitor under the consent decree adopted in *Kenny A. by Winn v. Perdue*, No. 1:02-CV-1686-MHS, 2005 WL 8162778 (N.D. Ga. Oct. 27, 2005), which was another child welfare class action filed by plaintiffs' lead counsel in this case. After serving as a monitor over the *Kenny A.* consent decree, he was appointed as the Secretary of Human

Page 15 –   DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE
               JIM DIMAS AND UMA AHLUWALIA AT TRIAL

Services for the state of Illinois. (McStay Decl. Ex. D, Dimas Report at 4, 23-28.) Mr. Dimas has worked extensively with states involved in child welfare class action litigation and consent decrees, including by developing and implementing an analytics-driven performance management strategy to help Alabama exit a consent decree and by helping Georgia develop a plan to exit its consent decree.

Mr. Dimas's experience is highly relevant to this case, and he offers a unique perspective. Plaintiffs seek the appointment of an outside expert to serve in the same role that Mr. Dimas served in *Kenny A*. If this Court determines that an injunction is necessary, this Court should consider the effects of that relief on the state agency from the perspective of an experienced child welfare professional who has extensive experience overseeing a consent decree.

### C. Mr. Dimas's testimony is based on sufficient facts and data.

Finally, this Court should deny plaintiffs' motion because Mr. Dimas's testimony is based on sufficient facts and data. When reaching his conclusions, Mr. Dimas analyzed child welfare literature and reviewed publicly available, and federally mandated child welfare data through the CFSR. Plaintiffs themselves relied upon Oregon's 2008 and 2016 CFSR when forming the allegations in their Complaint. (Compl. ¶¶ 211; 215; 237; 256; 294.) And, the publicly-reported CFSR data is also the same data that the Children's Bureau relies upon when implementing the Adoption Assistance and Child Welfare Act—the statute underlying plaintiffs' second claim for relief in this case. (Compl. ¶¶ 308-09.) This Court should reject plaintiffs' argument that Mr. Dimas did not rely on sufficient facts and data when he relied on the same facts and data plaintiffs have relied on throughout this case.

### III. Plaintiffs' arguments in support of exclusion are unavailing.

Although plaintiffs combine their analysis of Mr. Dimas and Ms. Ahluwalia's expert opinions, this Court should consider their admissibility separately. But, regardless, plaintiffs'

combined analysis provides no basis for excluding the testimony of either Mr. Dimas nor Ms. Ahluwalia.

First, it is incorrect that Mr. Dimas and Ms. Ahluwalia did not engage with or cite to "the major research" on this topic of consent decrees. As an initial matter, plaintiffs have provided no evidence that the articles they cite to are "the major research" on the topic of consent decrees. Moreover, both Mr. Dimas and Ms. Ahluwalia reviewed literature discussing the effectiveness of child welfare class actions when forming their opinions in this case. (McStay Decl. Ex. C, Ahluwalia Report at 20-25; Ex. D, Dimas Report at 29-33.) Finally, at least one of the articles plaintiffs identified is consistent with Mr. Dimas and Ms. Ahluwalia's opinions. *See* Jessica A. Church, 42 J. of Soc. & Soc. Welfare 135, 140-42 (2015) (noting "several problems" with the "broad scale reform efforts" of "[c]ivil litigation and subsequent court supervision of state-run child welfare systems").

Second, plaintiffs' argument that Mr. Dimas and Ms. Ahluwalia did not review the relief plaintiffs request in this case is inaccurate and provides no basis for exclusion. Both reviewed the Complaint which contains a description of plaintiffs' requested relief. Plaintiffs' expert, Dr. Farina, reviewed the same relief when reaching her opinions regarding the effectiveness of plaintiffs' requested relief. (*See* Kothari Decl. Ex. 2 (plaintiffs' counsel identifying the "proposed order" that Dr. Farina reviewed as the relief requested in the Complaint).) And, importantly, Mr. Dimas and Ms. Ahluwalia reviewed consent decrees and settlement agreements in lawsuits brought against other states by lead plaintiffs' counsel here. To the extent that plaintiffs contend the relief they are requesting here is different than the relief their counsel requested in other states, they can make that distinction at trial.

Page 17 –   DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE
             JIM DIMAS AND UMA AHLUWALIA AT TRIAL

Third, plaintiffs are incorrect that Mr. Dimas and Ms. Ahluwalia ignored all state-by-state distinctions. Instead, Mr. Dimas and Ms. Ahluwalia evaluated the specific consent decrees, and their effects, in each state they evaluated. Mr. Dimas explained in his deposition that:

> Q: Well, as I understand it you've rendered an opinion here that consent decrees in general are not effective at improving outcomes for kids in care. Is that right?
>
> A: Correct.
>
> Q: And so my question is just directed at whether the provisions of any specific consent decree, what those specific provisions are, do they make a difference in that analysis?
>
> A: They do. *And I can articulate that difference*. I think the more focused they are the more prone to success they are; and the more diffused and broad they are, the less likely they are to be successful.

(Kothari Decl., Ex. 3, Dimas Dep. at 103:24 to 104:12 (emphasis added).)[3] Ms. Ahluwalia also has identified specific aspects of the legal obligations imposed by consent decrees in other states that will likely hinder, rather than help, Oregon's progress toward building a modern child welfare agency. (McStay Decl. Ex. C, Ahluwalia Report at 13-15.) For example, Ms. Ahluwalia will explain that the metrics in consent decrees have stifled innovation and created barriers toward adopting new service approaches. (*Id.* at 13.) Additionally, Ms. Ahluwalia will explain that the mandates of other consent decrees, if imposed here, would mandate practices inconsistent with the direction that modern child welfare agencies are moving—toward prevention, shared accountability, and providing wraparound services. (*Id.* at 14.)[4]

---

[3] Similarly, contrary to plaintiffs' assertion that Mr. Dimas did not analyze whether any child welfare system improved on any of the CFSR metrics, Mr. Dimas testified that the data was not available. (Kothari Decl., Ex. 3, Dimas Dep. at 120:16-121:2 ("No. Mostly because the national data indicators workbook has been a work-in-progress and earlier versions of it were substantively different from the current version.")

[4] This Court should also reject plaintiffs' argument that this Court should exclude Mr. Dimas and Ms. Ahluwalia's testimony because Mr. Dimas explained in his report that consent decrees commonly contain "'hundreds of process measures.'" (McStay Decl. Ex D, Dimas Report at 16.) First, that statement appeared only in Mr. Dimas's report, not Ms. Ahluwalia's report, and this Court should reject plaintiffs' attempt to conflate Mr. Dimas's testimony with Ms. Ahluwalia's testimony. Moreover, Mr. Dimas's statement was not aimed at Arizona in

**Page 18 –    DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE
                JIM DIMAS AND UMA AHLUWALIA AT TRIAL**

Moreover, plaintiffs' arguments about the differences between states not only does not provide a basis to exclude Mr. Dimas and Ms. Ahluwalia's testimony, the arguments support their opinions and show why they are relevant. For example, plaintiffs note that it is possible that the consent decree in Mississippi was unsuccessful because Mississippi has a significantly higher child poverty rate than states like Massachusetts. (Pls.' Mot. at 8 (Dkt. 362).) That is exactly the problem Mr. Dimas and Ms. Ahluwalia both identify in their reports—the legal obligations imposed by consent decrees, settlements, or court orders cannot solve complex societal issues like poverty, addiction, the availability of qualified medical and mental health providers, and the federal funding through programs such as Medicaid that are available to states. To the extent that plaintiffs wish to present evidence to the contrary or test Mr. Dimas's opinions on cross examination, they can do so at trial. But their disagreement with Mr. Dimas's opinions is not a basis to exclude them now.

Finally, the fact that Mr. Dimas and Ms. Ahluwalia both acknowledged that it is possible for consent decrees or injunctions to facilitate positive change does not provide any basis for exclusion. Instead, it shows that defendants' experts are credible and will give balanced opinions that will help the Court fashion an appropriate remedy, if necessary. Mr. Dimas and Ms. Ahluwalia can explain to the Court where the obligations imposed by consent decrees and injunctions have resulted in positive change amid the evolution of dynamic child welfare practices. This Court should hear that testimony.

Plaintiffs' arguments are all largely aimed at the correctness of Mr. Dimas and Ms. Ahluwalia's opinions and should be reserved for trial. *See Primiano*, 598 F.3d at 564 (in ruling

---

particular, so any arguments plaintiffs wish to make about how the obligations reflected in Arizona's settlement will be helpful in Oregon should be reserved for trial, not this motion.

**Page 19 –    DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE
             JIM DIMAS AND UMA AHLUWALIA AT TRIAL**

on a motion to exclude expert testimony, a court should not evaluate the correctness of the expert's conclusion, rather the principles used to generate the conclusions). This Court should deny plaintiffs' motion.

## CONCLUSION

This Court should deny plaintiffs' motion to exclude the expert testimony of Jim Dimas and Uma Ahluwalia. Mr. Dimas and Ms. Ahluwalia have decades of experience in child welfare and their opinions are based on sufficient facts and data. Moreover, each expert has unique and important experience that is relevant to the issues before the Court. Before granting any injunctive relief in this case, this Court should consider the effects and downsides of similar legal obligations on state child welfare agencies in other jurisdictions.

DATED: April 23, 2024.

ELLEN ROSENBLUM
ATTORNEY GENERAL
FOR THE STATE OF OREGON
*s/ Vivek A. Kothari*
David B. Markowitz, OSB #742046
DavidMarkowitz@MarkowitzHerbold.com
Laura Salerno Owens, OSB #076230
LauraSalerno@MarkowitzHerbold.com
Harry B. Wilson, OSB #077214
HarryWilson@MarkowitzHerbold.com
Lauren F. Blaesing, OSB #113305
LaurenBlaesing@MarkowitzHerbold.com
Vivek A. Kothari, OSB #182089
VivekKothari@MarkowitzHerbold.com
*Special Assistant Attorneys General for Defendants*

Adele J. Ridenour, OSB #061556
AdeleRidenour@MarkowitzHerbold.com
*Of Attorneys for Defendants*

Carla A. Scott, OSB #054725
carla.a.scott@doj.state.or.us
Sheila H. Potter, OSB #993485
sheila.potter@doj.state.or.us
*Of Attorneys for Defendants*

2126648

Page 20 –   DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE
JIM DIMAS AND UMA AHLUWALIA AT TRIAL