**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Lauren F. Blaesing, OSB #113305**
LaurenBlaesing@MarkowitzHerbold.com
**Vivek A. Kothari, OSB #182089**
VivekKothari@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR  97201
Telephone: (503) 295-3085
*Special Assistant Attorneys General for Defendants*
*Additional Counsel of Record Listed on Signature Page*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| WYATT B. and NOAH F. by their next friend Michelle McAllister; KYLIE R. and ALEC R. by their next friend Kathleen Megill Strek; UNIQUE L. by her next friend Annette Smith; SIMON S. by his next friend Paul Aubry; RUTH T. by her next friend Michelle Bartov; BERNARD C. by his next friend Ksen Murry; NAOMI B. by her next friend Kathleen Megill Strek; and NORMAN N. by his next friend Tracy Gregg, individually and on behalf of all others similarly situated, | Case No. 6:19-cv-00556-AA <br><br> **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE STACEY L. MOSS** |
| Plaintiffs, | |
| v. | |
| TINA KOTEK, Governor of Oregon in her official capacity; FARIBORZ PAKSERESHT, Director, Oregon Department of Human Services in his official capacity; APRILLE FLINT-GERNER, Director, Child Welfare in her official capacity; and OREGON DEPARTMENT OF HUMAN SERVICES, | |
| Defendants. | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE STACEY L. MOSS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................2

    I.    Ms. Moss is the President and CEO of Public Knowledge, a child welfare consulting firm, with nineteen years of experience in the child welfare field. ............................................................................................................2

    II.    In 2016, Ms. Moss and Public Knowledge authored a report criticizing Oregon's child welfare system...................................................................4

    III.    In 2023, Ms. Moss authored a follow-on report that demonstrates that ODHS has improved or significantly improved in the relevant topic areas. ..........5

LEGAL STANDARD................................................................................................................8

ARGUMENT ................................................................................................................9

    I.    Ms. Moss is qualified to assess defendants' progress in the areas identified in her report.............................................................................................10

    II.    Ms. Moss's opinions are relevant. ........................................................12

    III.    Ms. Moss's methodology meets the standards for admissibility under *Daubert*. ................................................................................................12

        A.    Ms. Moss is an expert with the experience necessary to review and assess the wealth of data and information regarding Child Welfare's recent reforms...................................................................12

        B.    Plaintiffs' critiques of Ms. Moss's methodology are unavailing...............14

    IV.    This Court should also admit Ms. Moss's testimony rebutting the testimony of plaintiffs' expert, Dr. Day.............................................................18

    V.    Plaintiffs' ad hominem attacks and conspiracy theories are unfounded...............20

CONCLUSION................................................................................................................21

**INTRODUCTION**

This Court should deny plaintiffs' motion to exclude the expert testimony of Stacey Moss. Ms. Moss is the President and CEO of Public Knowledge, a nationally recognized consulting firm that specializes in advising child welfare agencies. Ms. Moss has nineteen years of experience in the child welfare field including over a decade of experience training child welfare officials and helping child welfare agencies implement various programs and reforms.

In 2016, Ms. Moss and Public Knowledge analyzed aspects of Oregon's child welfare system. Ms. Moss served as the Data Lead and Subject Matter Expert for that effort. Public Knowledge's 2016 Report criticized Child Welfare and plaintiffs have repeatedly cited to it as a basis for this lawsuit.

For this case, defendants invited Ms. Moss and Public Knowledge to again conduct an evaluation, this time of Child Welfare as an agency. Ms. Moss and her team spent several years analyzing quantitative and qualitative data. They reviewed over a thousand documents and datasets specific to Oregon's child welfare system and conducted a substantial number of surveys, focus groups, and interviews to assess the progress and improvement (if any) at Child Welfare.

After this rigorous review, Ms. Moss determined that Child Welfare made progress or significant progress in each of the issue areas identified by plaintiffs in their Complaint. Ms. Moss will explain to this Court that there has been a cultural shift at Child Welfare that focused the agency on evidence-based, data-driven, and prevention-focused processes. That shift has resulted in fewer children entering care and more children in kinship placements, decreased out-of-state and congregate care placements, and a centralized and formalized response to allegations of abuse and neglect, among other things.

Plaintiffs intend to present the outdated criticisms from the 2016 Public Knowledge Report at trial.  This Court should also hear Ms. Moss's up-to-date opinions about Child Welfare's recent improvements and progress.

## BACKGROUND

I.    **Ms. Moss is the President and CEO of Public Knowledge, a child welfare consulting firm, with nineteen years of experience in the child welfare field.**

Ms. Moss has nineteen years of experience in the child welfare field.  (Stacey Moss Resume ("Moss Resume"), attached to Decl. of Stacey Moss ("Moss Decl.") as Ex. 1.)  After graduating from the University of Wyoming College of Law in 2006, Ms. Moss spent two years practicing law in juvenile court, in private practice, and as an Assistant Attorney General with the Wyoming Attorney General in the Departments of Family Services, Transportation, and Health.  (*Id*.)  As an Assistant Attorney General, Ms. Moss provided day-to-day legal advice to Wyoming state agencies, including the Wyoming Department of Family Services.  (*Id*. at 30.)  She represented caseworkers and CPS investigators, assisted the Department of Family Services to write and review its policies, trained new caseworkers, and provided opinions on legislative policies.  (*Id*.)

Beginning in 2008, Ms. Moss transitioned to the Guardians Ad Litem Program of the Wyoming Office of the Public Defender, where she ultimately served as Director.  (*Id*.)  In that capacity, Ms. Moss trained, supervised, and managed attorneys throughout Wyoming who represented children in child welfare and juvenile justice proceedings, in addition to training program staff, approving all program expenditures and revenue, and tracking and maintaining the program budget.  (*Id*.)  Ms. Moss left the Guardians Ad Litem Program in 2013, when she began working for Public Knowledge.  (*Id*. at 29.)

Currently, Ms. Moss serves as the President and CEO of Public Knowledge. (*Id.*) Public Knowledge is a management consulting firm, founded in 1994, with expertise in child welfare systems. (*See generally*, Public Knowledge Child Welfare Experience and Qualifications , Moss Decl. Ex. 2; Decl. of Steven Rizzo in Supp. of Pls.' Mot. to Exclude Stacey L. Moss ("Rizzo Decl.") (Dkt. 361) 12/15/2023 Public Knowledge's Child Welfare Review Assessment Findings Report "2023 Moss/Public Knowledge Report" Ex. 8 App. J.) Since consulting on its first child welfare project in 1996, Public Knowledge has consulted on over 180 child welfare projects in over 40 states. (Moss Decl. Ex. 2.) Public Knowledge has experience advising over a dozen states whose child welfare agencies operate under federal court supervision. (*Id.*) Public Knowledge's federal class action work includes providing expert testimony, monitoring child welfare agencies, and assessing state child welfare agencies' compliance with settlement agreements and consent decrees. (*Id.*)

Ms. Moss has personally consulted on child welfare projects in fourteen states. (*Id.* at 1.) For example, Public Knowledge and Ms. Moss have worked with the North Carolina Department of Health and Human Services since 2020. (*Id.* at 7, 11, 14-15, 24.) As part of that work, Ms. Moss delivers training and coaching to the executive leadership team for the child welfare agency in that state. From 2017 to 2019, Public Knowledge and Ms. Moss provided support to the Oklahoma Department of Human Services while that agency underwent an organizational change regarding eligibility and enrollment for benefits across multiple programs, including child welfare. (*Id.* at 24, 27, 100, and 102.) Public Knowledge and Ms. Moss have similarly assisted the Mississippi Department of Child Protection Services with implementing a statewide model of child welfare practice in conjunction with a statewide settlement agreement that followed a federal class action. (*Id.* at 7, 17, 26, 35, 38, 44, and 51.) In that role, Ms. Moss has

conducted trainings and worked with executive leadership to aid in Mississippi's efforts to

establish a prevention-focused and trauma-informed child welfare system.  (*Id*.)  Additionally,

Public Knowledge has consulted on various aspects of Oregon's child welfare system.  In 2018,

for example, Public Knowledge and Ms. Moss conducted an assessment and alternatives analysis

for the Court Appointed Special Advocates program in Oregon.  (Moss Resume, Moss Decl. Ex.

1 at 9.)

Ms. Moss holds a Child Welfare Law Specialist certification from the National

Association of Counsel for Children and a Project Management Professional certification from

the Project Management Institute.  (*Id*. Ex. 1 at 1.)  She has authored numerous publications on a

wide variety of child welfare topics, including the yearly Juvenile Court Law Update, How a

Child Enters the Juvenile Court System – a Handbook for Foster and Relative Caregivers, and A

Handbook for Educators: Navigating Wyoming's Juvenile Court System.  (*Id*. at 33.)  Ms. Moss

also regularly conducts trainings and gives presentations on child welfare and other topics,

including Child Welfare and CCWIS Systems Overview, Juvenile Court Training Modules, and

Mock Permanency and Shelter Care Hearing Training Videos.  (*Id*. at 35-36.)  Ms. Moss is also a

frequent presenter at conferences addressing child welfare issues including the American

Association of Health and Human Services Attorneys (AAHHSA) Conference, the Children's

Bureau's Capacity Building Center for Courts, the Children's Bureau CIP Grantee Meeting, and

the Wyoming Children's Justice Conference.  (*Id*.)

## II.    In 2016, Ms. Moss and Public Knowledge authored a report criticizing Oregon's child welfare system.

In 2016, Public Knowledge conducted the Child Safety in Substitute Care Independent

Review for Oregon ("2016 Public Knowledge Report").  (Rizzo Decl. Ex. 4.)  Ms. Moss was the

Data Lead and Subject Matter Expert on that project.  (Moss Resume, Moss Decl. Ex. 1 at 16.)

That report identified several areas needing improvement within Oregon's child welfare system. In particular, the report criticized ODHS for a lack of sufficient substitute care providers and a lack of a coordinated response to alleged abuse in care. (2016 Public Knowledge Report, Rizzo Decl. Ex. 4 at 4.) The 2016 Public Knowledge Report determined that the culture at ODHS "needs to change." (*Id.* at 5.)

The 2016 Public Knowledge Report has been an important component of plaintiffs' case. The Complaint cites the 2016 Public Knowledge Report, and plaintiffs relied on the 2016 Public Knowledge Report in their motion to certify the class and trial brief. (Compl. (Dkt. 1) ¶¶ 213-14; Motion to Certify the Class (Dkt. 64) at 32; Pls.' Trial Br. (Dkt. 375) at 26.) Plaintiffs also repeatedly questioned ODHS officials about the findings in the 2016 Public Knowledge Report during depositions. This Court discussed the 2016 Public Knowledge Report extensively when certifying this class. *Wyatt B. v. Kate Brown*, No. 6:19-CV-00556-AA, 2022 WL 3445767, at *13, *25 (D. Or. Aug. 17, 2022).

**III.    In 2023, Ms. Moss authored a follow-on report that demonstrates that ODHS has improved or significantly improved in the relevant topic areas.**

In 2023, Ms. Moss authored a follow-up report that assessed ODHS's progress and improvement in eleven different areas since 2016. Ms. Moss's report assessed ODHS in the following areas:

- Safety for children under child welfare supervision

- The organizational culture of child welfare

- Data-driven decision-making and quality of services offered

- Resource parent recruitment, retention, and support

- Permanence for children in substitute care

- Permanency planning

**Page 5 –      DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE STACEY L. MOSS**

- Individualized assessments for children and families

- Service provision based on assessed needs

- Case planning

- Family and community connections for children in substitute care

- Child welfare staffing resources

(2023 Moss/Public Knowledge Report, Rizzo Decl. Ex. 8 at 9-10.)

Ms. Moss engaged in a rigorous process to reach her conclusions; she gathered and synthesized numerous sources of quantitative data and qualitative data. For qualitative data, Ms. Moss and Public Knowledge conducted eleven focus groups and twenty-seven interviews with Child Welfare staff and leadership. (*Id.* at 21-22.) They also drafted and administered a comprehensive survey of Child Welfare staff and leadership. The survey consisted of forty-seven questions that addressed each of the topic areas above. (*Id.* at 347-352.) It asked respondents questions such as "Does CW address safety threats and safety concerns of children in substitute care?;" "Has the organizational culture of CW improved during the tenure of Rebecca Jones Gaston?;" and "Does CW recruit and retain substitute care providers who can care for children who are living with high needs?." (*Id.*) The survey was sent to approximately 1,800 individuals and over 900 responded. (*Id.* at 22.)

For quantitative data, Ms. Moss reviewed internal and external data regarding Child Welfare's performance on child safety and permanency measures. (*Id.* at 14-15.) Ms. Moss and her team reviewed data from the Child and Family Services Reviews ("CFSR"), Annual Progress and Services Reports, National Child Abuse and Neglect Data System, National Youth in Transition Database, and OR-Kids, among others. (*Id.* at 211-267.) In sum, Ms. Moss and her team reviewed more than a thousand documents, conducted substantial surveys, interviews, and

focus groups, and reviewed numerous datasets consisting of countless individual data points. (2023 Moss/Public Knowledge Report, Rizzo Decl. Ex. 8.)

After engaging in this rigorous and comprehensive review of ODHS's practices and processes, Ms. Moss concluded that ODHS made progress or improved in each of the areas described above. (*Id*. at 23-110.) In four of the areas, ODHS showed significant improvement. (*Id.*) Ms. Moss's report explains her methodology and the basis for her opinions in painstaking detail. (*Id*.) The report spans 390 pages including appendices. As just a few examples: Oregon now has one of the highest rates of kinship placements in the country (34%) (*id.* at 169); Oregon eliminated reliance on out-of-state placements entirely (*id.* at 137); Oregon decreased reliance on out of home care by 20% (*id.* at 17); Oregon created a centralized child abuse hotline (ORCAH) (*id.* at 23, 31-36); Oregon increased its retention and recruitment efforts for resource (foster) homes (*id.* at 53-57); Oregon implemented Structured Decision Making®, which is an evidence-based tool for screening, investigating, and assessing allegations of abuse or neglect (*id.* at 32); and the Oregon Legislature funded rate increases for resource families, comprehensive information systems, recruitment of new resource and respite families, behavioral health services, and therapeutic foster care services (*id.* at 12).

Moreover, Ms. Moss concluded that a culture change at Child Welfare has indeed occurred. As Ms. Moss explained:

> Focus group participants noted that Ms. Jones Gaston and her
> Executive Leadership Team brought stability and comfort that staff
> did not feel with previous leaders and brought hope to child
> welfare. There is a consistent belief that, since 2019, this Executive
> Leadership Team has improved staff morale, improved the practice
> of leading by example, and brought a focused mission to the
> agency.

(*Id*. at 43.)  Ms. Moss elaborated that the current executive leadership team has implemented a formal Vision for Transformation, which includes a continuous quality improvement ("CQI") infrastructure to use data to inform decision-making and performance monitoring, revised the agency's Procedural Manual to increase clarity and accountability in agency directives, and brought a "prevention focus" to child welfare.  (*Id*. at 43-44.)

## LEGAL STANDARD

Rule 702 provides that an expert must be "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  That rule "contemplates a broad conception of expert qualifications."  *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004).  Judges are given broad discretion to determine whether an expert's testimony is reliable and also how to determine whether the testimony is reliable.  *Id.* at 1017. The touchstone of Rule 702 is the helpfulness of the expert testimony, *i.e.*, whether the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue."  *United States v. Downing*, 753 F.2d 1224, 1235 (3d Cir. 1985).  Courts act as "gatekeepers" to ensure that an expert's testimony is both "relevant" and "reliable" under Rule 702.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

In particular, a witness is qualified to testify as an expert where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

**Page 8 –**    **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE STACEY L. MOSS**

In determining whether the proffered evidence would be helpful to the trier of fact, doubts should be resolved in favor of admissibility. *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223, 1240-41 (E.D.N.Y. 1985). "The rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments (reviewing case law applying *Daubert*). Trial courts are required to "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Benson Tower Condo. Owners Ass'n v. Victaulic Co.*, 105 F. Supp. 3d 1184, 1207 (D. Or. 2015) (citation omitted). Instead, the existence of contrary evidence goes to the weight, not the admissibility, of an expert's opinions. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. In a bench trial, the risk of prejudice is diminished. *F.T.C v. BurnLounge, Inc.*, 753. F.3d 878, 888 (9th Cir. 2014) ("When we consider the admissibility of expert testimony, we are mindful that there is less danger that a trial court will be unduly impressed by the expert's testimony or opinion in a bench trial.").

## ARGUMENT

This Court should deny plaintiffs' motion to exclude the testimony of Ms. Moss. Ms. Moss easily meets the liberal standards for admissibility of expert testimony. Ms. Moss is an expert in child welfare with nineteen years of experience in the field, as an attorney, government official, and consultant. Ms. Moss reviewed and relied on copious amounts of facts and data in forming her opinions. And Ms. Moss's wealth of relevant experience is a reliable foundation for her expert opinions. Because Ms. Moss conducted a rigorous and comprehensive assessment of Child Welfare's performance in the specific areas raised by the Complaint, this Court should hear her testimony.

**Page 9 –**     **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE STACEY L. MOSS**

I.    **Ms. Moss is qualified to assess defendants' progress in the areas identified in her report.**

Ms. Moss is qualified to perform the assessments and to reach the conclusions she offers in her report. A witness "who is qualified as an expert by knowledge, skill, experience, training, or education," may offer expert opinion testimony. Fed. R. Evid. 702. The witness's "knowledge, skill, experience, training, or education," need only exceed "the common knowledge of the average layman." *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) (citing Rule 702), *cert. den*, 143 S. Ct. 2509 (2023). This standard is "liberal." *Id.*

Ms. Moss easily meets this standard. Ms. Moss is a sought-after consultant with nineteen years of experience in the child welfare field. She began her career as a child welfare attorney and then moved into a management role, leading the Guardian Ad Litem program in the Wyoming Office of the Public Defender. For the last decade, Ms. Moss has held various roles at Public Knowledge, a health and human services-focused consulting group, including as President and CEO. In that capacity she has assisted child welfare agencies across the country at all levels of government in achieving their child welfare goals by helping them implement new programs and reforms. Ms. Moss also has ample experience reviewing and assessing child welfare agencies' progress towards goals and is competent to provide an opinion on ODHS's progress here.

Plaintiffs' arguments to the contrary are unavailing. Plaintiffs contend that Ms. Moss is not qualified to give a legal opinion about the meaning of the Fourteenth Amendment, substantive due process, or the various federal statutes at issue in this case. (Pls.' Mot. at 10.) But Ms. Moss does not purport to be a constitutional law scholar or provide legal opinions and defendants are not offering her as an expert on those topics. Ms. Moss brings a wealth of

experience helping child welfare agencies work towards goals and assess reforms, which qualifies her as an expert under Rule 702.

Plaintiffs also fault Ms. Moss for using the phrase "deliberately indifferent" once in her 390-page report. But at her deposition, Ms. Moss explained that she used the phrase in its ordinary meaning because it was used in the Complaint, not in any technical legal sense. (3/18/2024 Moss Dep. at 38:4-39:3, Rizzo Decl. Ex. 1.) Because this is a bench trial, there is no risk that the Court will be unduly prejudiced or confused by Ms. Moss's use of this phrase. *F.T.C*, 753. F.3d at 888 ("[T]here is less danger that a trial court will be unduly impressed by the expert's testimony or opinion in a bench trial."); *see also United States v. Two Eagle*, 318 F.3d 785, 792 (8th Cir. 2003) ("[T]estimony is not defective merely because it utilized the words of the legal standard. Commonly used words and their plain meaning often match their legal meaning."). Regardless, the phrase "deliberately indifferent" is not integral to any of Ms. Moss's findings or methodology and a single, fleeting use of this phrase does not justify excluding Ms. Moss's testimony in its entirety.

Plaintiffs also contend that Ms. Moss is not an expert in child welfare because she has never worked for a child welfare agency as a caseworker, certifier, or child protective services worker. (Pls.' Mot. at 9.) But Ms. Moss has advised numerous child welfare agencies and organizations in her career. (Moss Resume, Moss Decl. Ex. 1 at 2-29.) Although Ms. Moss has never been a caseworker or agency director, she represented those individuals in her role as a child welfare attorney and now routinely trains child welfare officials and provides guidance on best practices in the child welfare field. Moreover, Ms. Moss and her team interviewed or surveyed hundreds of child welfare employees in formulating her opinions. She has also trained

caseworkers in multiple states on their role, job, and procedures.  Ms. Moss has sufficient experience in the field of child welfare to provide her opinions in this case.

## II.    Ms. Moss's opinions are relevant.

Ms. Moss's testimony is also highly relevant to the case.  "The relevance prong under *Daubert* means that the evidence will assist the trier of fact to understand or determine a fact in issue."  *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1154 (E.D. Wash. 2009). Here, Ms. Moss's testimony is undeniably relevant.  The topic areas of her report were taken directly from plaintiffs' Complaint and the key findings of the report address specific issues raised in plaintiffs' pleadings.  (*See generally* 2023 Moss/Public Knowledge Report, Rizzo Decl. Ex. 8 at 1-4 (summarizing methodology and findings).)  Ms. Moss's report follows the 2016 Public Knowledge Report, which plaintiffs cited in their Complaint, dispositive motions, and trial brief, and which this Court relied on when certifying this class action.  Ms. Moss's testimony is highly relevant to this Court's evaluation of plaintiffs' claims.  Plaintiffs do not argue otherwise.

## III.    Ms. Moss's methodology meets the standards for admissibility under *Daubert*.

### A.    Ms. Moss is an expert with the experience necessary to review and assess the wealth of data and information regarding Child Welfare's recent reforms.

This Court should admit Ms. Moss's testimony because her methodology is reliable, based on sufficient fact and data, and will be helpful to the Court.  Ms. Moss's experience in the field of child welfare is a proper basis for expert testimony.  In some fields, "experience is the predominant, if not the sole basis for a great deal of reliable expert testimony."  *Century Indem. Co. v. The Marine Grp.*, LLC, No. 3:08-cv-1375-AC, 2015 WL 5965614, at *2 (D. Or. Oct. 13, 2015) (quoting Fed. R. Evid. 702 committee note); *see Hangarter*, 373 F.3d at 1015 (in certain fields, experience is the primary, if not the only, basis for expertise).  As the Supreme Court

observed, "[l]ife and the legal cases that it generates are too complex to warrant" an overly

mechanical approach to assessing the reliability of expert opinions. *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137, 151 (1999). It is appropriate to modify and adapt the *Daubert*

inquiries "to evaluate the reliability even of experience-based testimony." *Id*. Moreover, Ms.

Moss based the "Guiding Principles" of the 2023 Moss/Public Knowledge Report on the

principles that guided the 2016 Public Knowledge Report and her methodology was the same as

the "methodology for all assessments regardless of the project." (2023 Moss/Public Knowledge

Report, Rizzo Decl. Ex. 8 at 13-14.)

As plaintiffs acknowledge, experience and particularized knowledge are well-established

and accepted bases for an expert opinion, particularly in the child welfare field. *See* Pls.' Resp.

in Opp'n to Mot. to Dismiss Moot Claims (Dkt. 160 at 8) ("In child welfare cases specifically,

reliance on the expert's own knowledge and experience, . . . typically meets the Daubert

reliability standard.") (compiling cases). With non-scientific experts, the *Daubert* factors (peer

review, publication, potential error rate, etc.) simply are not applicable and reliability depends

heavily on the knowledge and experience of the expert rather than the methodology or theory

behind it. *Siring v. Oregon State Bd. of Higher Educ. ex. rel. E. Oregon Univ.,* 927 F. Supp. 2d

1069, 1072 (D. Or. 2013) (quoting *United States v. Hankey,* 203 F.3d 1160, 1169 (9th

Cir.2000)). Thus, in a case like "this case, where no scientific knowledge is necessary and the

witnesses' expertise is based on 'personal knowledge or experience,'" that experience is given

significant weight in assessing admissibility. *B.K. by next of friend Tinsley v. Faust,* No. CV-

00185-PHX-ROS, 2020 WL 2616033, at *3 (D. Ariz. May 22, 2020) (quoting *Kumho Tire Co.,*

526 U.S. at 150; citing Fed. R. Evid. 702).[1]  As this Court has explained, " an expert's opinion may be based on the expert's experience and knowledge of the industry as a whole."  (Op. and Order: Defs.' Mot. to Exclude Experts (Dkt. 275) at 8-9.)

Here, Ms. Moss's vast knowledge qualifies her as an expert.  Her experience includes her prior evaluation of Oregon's child welfare system and the many occasions in which she has advised child welfare agencies and other officials on how to implement and assess reforms.  For her assessment in this case, Ms. Moss and Public Knowledge conducted surveys, focus groups, and interviews.  Ms. Moss also reviewed more than a thousand additional documents and data compilations.  Based on her years of experience in the field, Ms. Moss was able to review and assess this massive amount of information, identify the key areas for assessing progress and improvement in Oregon's child welfare system, and assess what reforms and developments constitute progress and improvement.  (Moss Decl. Ex. 2.)  This type of assessment requires "specialized knowledge" in the field of child welfare and Ms. Moss has ample knowledge in the field to render reliable opinions.

###     B.     Plaintiffs' critiques of Ms. Moss's methodology are unavailing.

Plaintiffs lodge two criticisms against Ms. Moss's methodology, but neither withstands scrutiny.  First, plaintiffs speculate that the hundreds of caseworkers, staff members, and other Child Welfare employees that participated in the assessment were "biased" and that Ms. Moss should have instead sought input from children, parents, judges, and CASAs.  (Pls.' Mot. (Dkt. 360) at 15.)  As a threshold matter, there is no evidence that the hundreds of assessment participants were biased.  Together, the focus groups, interviews, and surveys sought input from

---

[1] This statement of the law is taken verbatim from plaintiffs' own briefing.  *See* Pls' Response in Opposition to Motion to Exclude Expert Testimony (Dkt. 160) at 8.

**Page 14 –     DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE STACEY L. MOSS**

individuals at all levels of Child Welfare, including caseworkers, managers, and consultants. Public Knowledge did not report respondents' names as part of the survey or focus groups, and respondents had no incentive to downplay or ignore any concerns they had about the agency's culture or operations. Indeed, many offered suggestions for where Child Welfare could continue to improve. Regardless, plaintiffs' arguments go to the weight, not the admissibility, of the evidence. When assessing the sufficiency of the facts or data relied upon by an expert, the Court looks for "foundation, not corroboration." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025 (9th Cir. 2022). Where other data or information contradicts an expert's findings, the proper remedy is cross-examination, not exclusion. *Id.* ("Each of the defendant's countervailing considerations were appropriate matters for impeachment, not admissibility.").

Further, plaintiffs' criticisms ignore that Ms. Moss also reviewed and analyzed data which incorporated the experiences and perspectives of children and families. For instance, the CFSR process involves an onsite review of child welfare case files as well as partner interviews. (3/25/2016 CFSR Statewide Assessment Instrument at pp. 8, 110, Defs.' Trial Ex. 1051.) The onsite CFSR reviews are conducted year-round and result in summary reports about the experiences of individual children and families. (*Id.*) The CFSR reviews are cited and discussed at length through the 2023 Moss/Public Knowledge report. (*See, e.g.*, 2023 Moss/Public Knowledge Report, Rizzo Ex. 8 at 18, 40-42, 120-121, 157-58.) Likewise, the CQI process includes the CQI Advisory Committee, made up primarily of non-child welfare employees, including people with lived experiences in the child welfare system. (Pls.' Trial Ex. 192 at 12.) The CQI output, cited in the 2023 Moss/Public Knowledge Report, considers the perspectives of those individuals with lived experiences. (*See, e.g.*, 2023 Moss/Public Knowledge Report, Rizzo Decl. Ex. 8 at 50, 126.)

Second, plaintiffs contend that Ms. Moss's report and findings should be excluded because Ms. Moss testified that she did not engage in "implementation science" when drafting the report.  Plaintiffs' assertions are based on a fundamental misunderstanding of relevant concepts.  Ms. Moss's role in this case was *assessing* ODHS's progress and improvements in specific topic areas.  She did not engage in *implementation*, because she was not actually performing the child welfare work or advising Child Welfare on its implementation methods.  As Ms. Moss explained at her deposition, her report was not an "implementation science study"; it was an "assessment project."  (3/18/2024 Moss Dep. at 105:9-105:13, Decl. of Lauren Blaesing in Supp. of Defs.' Resp. to Pls.' Mot. to Exclude Stacey L. Moss ("Blaesing Decl.") Ex. 2.)  To be sure, Ms. Moss's opinions were informed by her knowledge of the field of implementation science, but Ms. Moss was clear that Child Welfare, not Public Knowledge, was actually engaging in "implementation."  Ms. Moss explained that "Using implementation science requires defining effective interventions, establishing how practice needs to change, identifying responsible parties, and pinpointing where in the system the effective interventions will be most successful. . . . *CW has implemented new and improved practice across the system*, and it will take time to see the full impact of those changes."  (2023 Moss/Public Knowledge Report, Rizzo Decl. Ex. 8 at 14 (emphasis added).)  For those reasons, Ms. Moss's "assessment" of ODHS's progress is admissible even though she did not assist in the implementation of any of the reforms being assessed.

Relatedly, plaintiffs argue that Ms. Moss's work should be excluded because plaintiffs' counsel disagrees with Ms. Moss's definition of the word "progress."  In her report, Ms. Moss defines "progress" as "The actions CW has made to implement recommendations or address concerns through identifiable and credible strategies and processes."  Plaintiffs argue that Ms.

Moss should have used the definition of the word "progress" from Webster's Dictionary instead of the definition used in the report. But Ms. Moss explained that "progress" has a specialized meaning in the child welfare field:

> Q. Why doesn't or didn't Public Knowledge use the Merriam Webster's Third International Dictionary?
>
> A. Progress has a lot of meanings in child welfare around implementation science, CQI, and so this was part of a definition that we were applying to this assessment with the knowledge and background of what it means in child welfare.

(3/18/2024 Moss Dep. at 72:21-73:2, Blaesing Decl. Ex. 2.) It is well-established that a testifying expert can define and use specialized terms for a particular industry. *See*, *e.g.*, *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir. 2000) ("[A] trial court's reliance on individuals experienced in a particular field for the purposes of obtaining explanation of the technical meaning of terms used in the industry is 'prudent.'"). Hence, because Ms. Moss is a child welfare expert, it is appropriate for her to use the specialized meaning of the word "progress" in her report.

On substance, plaintiffs challenge Ms. Moss's definition of "progress" for focusing on "identifiable and credible strategies and processes" and not rigid measurements of progress in "marked stages or degrees." But Ms. Moss and defendants' other experts have explained why inflexible metrics and timetables are counter-productive in the child welfare field. ("[P]rogress and improvement should be slow and planful. . . . [P]lanful implementation takes time and occurs in stages. The goal should be a commitment to continued improvement and a consistent evaluation of progress and continued needs.") (2023 Moss/Public Knowledge Report, Rizzo Decl. Ex. 8 at 12.) Defendants are not the only ones who take the position that metrics are counter-productive. Another court in this district, at the recommendation of Dr. Marty Beyer, an

independent special master, has refrained from imposing hard metrics on Child Welfare on the

issue of temporary lodging.  As Dr. Beyer explained, the Child Welfare "preoccupation with

settlement agreement metrics has gotten in the way of effective solutions . . . the focus should

shift away from metrics." (2/29/24 Dr. Beyer Final Report, Defs.' Trial Ex. at 11.)  Regardless,

Ms. Moss's opinion that ODHS took action in key areas "through identifiable and credible

strategies and processes" is obviously relevant and helpful testimony regardless of plaintiffs'

concerns about the use of the word "progress."  Plaintiffs' semantic concerns about the definition

of the word "progress" are no basis for excluding Ms. Moss's testimony.

IV.     **This Court should also admit Ms. Moss's testimony rebutting the testimony of plaintiffs' expert, Dr. Day.**

       Ms. Moss also filed a rebuttal report challenging the opinions and conclusions of

plaintiffs' expert, Dr. Angelique Day.  Ms. Moss reviewed Dr. Day's report concerning the

aging-out subclass and determined that many of Dr. Day's conclusions were inaccurate or

unfounded.[2]  For example, Dr. Day opined that ODHS had not made "reasonable efforts" to

reconnect youth with kin, apparently unaware that Oregon has one of the highest rates of kinship

placements in the country.  (3/1/2024 Public Knowledge Supplemental Assessment of Services

for Youth Aging Out of Foster Care ("Moss/Public Knowledge Suppl. Report"), Rizzo Decl. Ex.

13 at 4.)  Dr. Day opined that Oregon should reduce its reliance on out-of-state placements,

apparently unaware that Oregon has not placed a child out of state in years.  (Moss/Public

Knowledge Suppl. Report, Rizzo Decl. Ex. 13 at 5-6.)  Dr. Day relied on 2022 data for most of

---

[2] Ms. Moss and her team also conducted interviews to understand Child Welfare's efforts specifically in the area of independent living services.  (Moss/Public Knowledge Suppl. Report, Rizzo Decl. Ex. 13 at 7-8.)  Plaintiffs' critiques of this rebuttal evidence mirror plaintiffs' critiques of Ms. Moss's own expert report.  Plaintiffs' arguments fail for the reasons discussed above.

Page 18 –     **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE STACEY L. MOSS**

her conclusions, which she described as the most recent data provided, apparently unaware that more recent data is publicly available and was produced to plaintiffs in discovery. (Moss/Public Knowledge Suppl. Report, Rizzo Decl. Ex. 13 at 14-15.) Dr. Day also repeatedly states that there is no evidence that ODHS has made improvements or progress in specific areas, and Ms. Moss identifies the various programs and initiatives that Dr. Day ignored when reaching these conclusions. (Moss/Public Knowledge Suppl. Report, Rizzo Decl. Ex. 13 at 3-6) (describing, inter alia, cross-collaboration across child-serving system, increased investment in independent living infrastructure, and tiered independent living service model.)

For the reasons explained above, Ms. Moss's knowledge of the child welfare field and her comprehensive review of ODHS's policies and practices qualifies her to provide opinions about Dr. Day's findings.

Moreover, Ms. Moss's rebuttal testimony will be helpful to the Court. Here, the experts disagree about the adequacy of ODHS's efforts in highly specialized areas of child welfare practice. For instance, the experts disagree about the extent of cross-collaboration across the child welfare system, the existence and features of Oregon's tiered independent living program, the existence and adequacy of the services provided to foster children before they turn sixteen, and the existence and adequacy of the mental health components contained within the Child and Adolescent Needs and Strengths Tool. Each of these topic areas is technical and specialized and the Court would benefit from hearing expert testimony about them. Moreover, Dr. Day bases her criticisms on outdated information. This Court would benefit from the testimony of an expert in the field when analyzing the data and other information that Dr. Day missed.

Plaintiffs' arguments to the contrary are unavailing. Plaintiffs contend that Ms. Moss's background in child welfare work is not specifically focused on "aging out subclass issues" and

thus her testimony is inadmissible.  (Pls.' Mot. at 16.)  But that is not the case.  As an attorney, Ms. Moss has provided legal advice and client representation in the context of independent living.  At Public Knowledge, she's offered policy recommendations and training on the topic of independent living in Wyoming and Mississippi.  Ms. Moss possesses the qualifications to offer these opinions.

Even without this specialized expertise, however, Ms. Moss is qualified.  Her general expertise in the area of child welfare is sufficient to qualify her to provide opinions on Oregon's system.  As the Ninth Circuit has explained, an expert's knowledge need only exceed "the common knowledge of the average layman."  *United States*, 51 F.4th at 854 (citing Fed. R. Evid. 702), *cert. den*, 143 S. Ct. 2509 (2023).  Courts have repeatedly rejected the argument that an expert with specialized knowledge in a subject area must have expertise in the specific facts of the case.  *See*, *e.g.*, *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 318 F. Supp. 2d at 889 ("A court abuses its discretion when it excludes expert testimony solely on the ground that the witness's qualifications are not sufficiently specific if the witness is generally qualified.").  Ms. Moss is qualified to evaluate and rebut Dr. Day's testimony.

## V.    Plaintiffs' ad hominem attacks and conspiracy theories are unfounded.

Throughout their motion, plaintiffs lodge unfounded conspiracy theories and insults at Ms. Moss and defense counsel.  Plaintiffs read nefarious intent into the fact that defense counsel retained Ms. Moss as an expert and provided her with access to documents and individuals to facilitate the drafting of her report.  Plaintiffs argue that these practices are proof of "pervasive clubbiness," an "echo chamber," and a "mutual admiration society" shared by Ms. Moss and defense counsel.  Plaintiffs' conspiracy theories and insults have no factual basis.  It is unremarkable that Ms. Moss entered into a retainer agreement with the undersigned counsel's law firm.  It is also unsurprising that defense counsel provided an expert with access to discovery

documents and relevant witnesses.  These things happen in nearly every lawsuit involving expert

testimony.  Plaintiffs' insults have no place in this litigation and are no basis for excluding Ms.

Moss's comprehensive, meticulously detailed report.

**CONCLUSION**

This Court should deny plaintiffs' motion to exclude the testimony of Ms. Moss.

DATED: April 23, 2024.               ELLEN ROSENBLUM
                                     ATTORNEY GENERAL
                                     FOR THE STATE OF OREGON


                                     *s/ Vivek A. Kothari*
                                     David B. Markowitz, OSB #742046
                                     DavidMarkowitz@MarkowitzHerbold.com
                                     Laura Salerno Owens, OSB #076230
                                     LauraSalerno@MarkowitzHerbold.com
                                     Harry B. Wilson, OSB #077214
                                     HarryWilson@MarkowitzHerbold.com
                                     Lauren F. Blaesing, OSB #113305
                                     LaurenBlaesing@MarkowitzHerbold.com
                                     Vivek A. Kothari, OSB #182089
                                     VivekKothari@MarkowitzHerbold.com
                                     *Special Assistant Attorneys General for Defendants*

                                     Adele J. Ridenour, OSB #061556
                                     AdeleRidenour@MarkowitzHerbold.com
                                     *Of Attorneys for Defendants*

                                     Carla A. Scott, OSB #054725
                                     carla.a.scott@doj.state.or.us
                                     Sheila H. Potter, OSB #993485
                                     sheila.potter@doj.state.or.us
                                     *Of Attorneys for Defendants*

2126647.8