**P. ANDREW McSTAY, JR.**, OSB 033997
andymcstay@dwt.com
**WILLIAM D. MINER**, OSB 043636
billminer@dwt.com
**DAVIS WRIGHT TREMAINE LLP**
560 SW Tenth Avenue, Suite 700
Portland, OR 97205
Telephone: (503) 241-2300

**MARCIA ROBINSON LOWRY** (*pro hac vice*)
mlowry@abetterchildhood.org
**ANASTASIA BENEDETTO** (*pro hac vice*)
abenedetto@abetterchildhood.org
**LINDSAY GUS** (*pro hac vice*)
lgus@abetterchildhood.org
**A BETTER CHILDHOOD**
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel: (646) 795-4456

*Attorneys for Plaintiffs*
*Additional Counsel of Record Listed on*
*Signature Page*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| WYATT B., *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>TINA KOTEK, *et al.*,<br><br>　　　　　Defendants. | Case No. 6:19-cv-00556<br><br>PLAINTIFFS' SUPPLEMENTAL ADVERSE WITNESS STATEMENTS |

Page 1 - PLAINTIFFS' SUPPLEMENTAL ADVERSE WITNESS STATEMENTS

4895-7096-5689v.1 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main ∙ (503) 778-5299 fax

Following discussions with Defendants, Plaintiffs supplement their prior witness list with more detailed statements regarding testimony from potential adverse witnesses that they may call. These witness statements are provisional and do not limit Plaintiffs' capacity to cross-examine adverse witnesses called by Defendants.

1. **Name and Title:** Lacey Andresen, Deputy Director for Child Welfare Program and Practice, Oregon Department of Human Services.

    a. **Time Estimate:** 1 hour

    b. **Brief Description of Testimony:** Ms. Andresen will testify regarding the overall operation of child welfare and her familiarity with child welfare programs and services, as well as her particular familiarity with abuse in care, sensitive file reviews, and child death investigations.

    c. **Child Care Plans and Needs of Children:** Ms. Andresen will testify that juvenile courts rely on DHS's child-centered case plans. Permanency workers are responsible to inform dependency parties about the child's medical status. Complex trauma and its cumulative effects can reach into adulthood, and DHS has responsibility to meet the child's medical needs, which can also be addressed as part of a Child Protective Services assessment. During her work at DHS Marion County, Andresen did not observe a practice of meeting with foster parents, in contradiction of claims in the 2021 Vision for Transformation.

    d. **Protection of Youth:** Ms. Andresen will also testify regarding DHS's responsibility to preserve the rights of children who are abused in care. Children who are physically injured are to be seen by a designated medical professional pursuant to Karly's Law but whether DHS responsibly informs the child's

Page 2 – PLAINTIFFS' SUPPLEMENTAL ADVERSE WITNESS STATEMENTS

4895-7096-5689v.1 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

      medical providers about abuse in care is far from clear. Andresen will testify that she has approved backdating of information by permanency workers in Or-Kids and there is no requirement for supervisors to document their review of case notes in OR-KIDS.

  e. **Lack of Transparency:** Ms. Andresen will testify regarding her receipt of multiple Sensitive Issue Reports and/or participation in multiple Sensitive File Reviews. She is the Critical Incident Review Team (CIRT) executive leadership representative. Andresen will testify concerning her role and involvement in these activities. She has claimed a lack of memory about her receipt of SIRs.

2. **Name and Title:** Sara Fox, Treatment Services Manager, Child Welfare, Oregon Department of Human Services.

  a. **Time Estimate:** 1 hour

  b. **Brief Description of Testimony:** Sara Fox, as the head of Treatment Services, can discuss the sharp drop in BRS and PTRS placements, the relationship of treatment services resources to temporary lodging, the scope of FOCUS programming, and the overall resources for foster youth, particularly youth with disabilities.

  c. **Placement Capacity and Stability:** Ms. Fox will be able to speak about the availability of BRS placements to support youth, treatment foster care, and other unique placements and services for children with disabilities. She can speak to the sharp drops in capacity across different treatment services resources.

  d. **Service Array and Quality:** Ms. Fox can also testify regarding day services,

Page 3 - PLAINTIFFS' SUPPLEMENTAL ADVERSE WITNESS STATEMENTS

4895-7096-5689v.1 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

      FOCUS services, independent living programs, and other non-residential services. Ms. Fox can identify how many of such programs remain only in a pilot status.

  e. **Funding and Legislative Work**: Ms. Fox can also speak to the funding of treatment services in the legislature, how DHS requests funds for treatment services, and historic efforts to find funding for treatment services.

  f. **Transparency**: Ms. Fox can speak to instructions to her team from Child Welfare's Executive Leadership Team to remove "negative" words like "crisis," "gap," and "lack" from their communications, particularly with the Legislature.

3. **Name and Title:** Kevin George.

  a. **Time Estimate:** 1 hour

  b. **Brief Description of Testimony:** Mr. George began working for DHS in approximately 1990 as a permanency worker. George also certified foster care homes, and he became the Foster Care Coordinator in 1997. Subsequently, George became the Manager of the Foster Care Program and was familiar with maltreatment in care statistics. In approximately 2017, George took a lateral career move when the then-Child Welfare Manager reviewed the fitness of managerial personnel. George took on grant management duties rather than retire. George will testify to his participation in the CSFR process, and his knowledge that Oregon has not passed any of the three prior CFSRs. Foster care homes must be certified in accord with Title IV-E in order to be eligible for reimbursement, and the consequence of inaccurate placement data on eligibility

Page 4 - PLAINTIFFS' SUPPLEMENTAL ADVERSE WITNESS STATEMENTS

4895-7096-5689v.1 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

impacts Title IV-E funding. As part of this mandate, and to protect child safety, Oregon's adopted the SAFE Home Study. Completion of the SAFE Home Study was required for regular certification of a foster home. George will testify to concerns regarding the branch offices' fidelity to the SAFE Home Study.

c. **Child Safety**: George will testify to his participation in the drafting of the Oregon Administrative Rules ("OARs") relating to certification, placement matching, and casework supervision. George will testify that the purpose behind Child-Specific Certification (CSC) was to expedite the certification for individuals known to the children, such as a neighbor, teacher, relative, grandmother, and the like. CSC candidates were certified specifically for the child only, not to place other children in the home under the CSC. The CSC process sought to reduce trauma for the subject child, who would reside with adults known to them. An expedited process represented the route to a CSC. DHS Central Office became aware that branch offices used the CSC process to certify providers unknown to children. George communicated his concerns with this practice to local branch offices and to his supervisors. The use of CSC in this manner was not supported by policy, and using CSC to place a child in the home of a stranger increases the risk of harm to the child.

d. **Child Abuse Investigations**: George will testify to his participation in the Foster Care Safety Team, and his observation that branches' assessments of abuse in care are inconsistent. George will testify that having the branch offices conduct their own investigations raised the potential for conflict, which went unaddressed.

Page 5 - PLAINTIFFS' SUPPLEMENTAL ADVERSE WITNESS STATEMENTS

4895-7096-5689v.1 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

e. **Transparency at DHS**: George will testify to the process for handling Sensitive Issue Reports (SIR), which he received between 2009-2017. SIRs were issued out of concern for media attention and to apprise agency leadership. He participated from time to time in Sensitive File Reviews (SFR) that were mainly performed by subordinate Foster Care Coordinators. One purpose was to make recommendations regarding practice improvements. Following the completion of an SFR, DHS leadership would speak directly to branch upper management who had responsibility to implement the recommendations. George will testify to his involvement in the SIR and SFR process and the recommendations made in specific cases.

4. **Name and Title:** Dawn Hunter, Program Manager.

   a. **Time Estimate:** 1 hour

   b. **Brief Description of Testimony:** Ms. Hunter was one of two co-program managers at Marion County Child Welfare for more than 16 years. As Program Manager, Hunter saw the goal of her position to "assess allegations of abuse and maintain or work with community partners to manage safety of children in the community and children within the care of child welfare." Hunter will testify to her responsibilities as Program Manager, which included oversight of the Child Protective Services ("CPS") and Certification units of Marion County, and the paralegals.

   c. **Lack of Transparency and Accountability:** Hunter will testify to the process of a Sensitive Issue Report ("SIR") and Sensitive File Review ("SFR") through the lens of a Program Manager. She will discuss the concerns identified in the

Page 6 - PLAINTIFFS' SUPPLEMENTAL ADVERSE WITNESS STATEMENTS

4895-7096-5689v.1 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

various sensitive file reviews, the related recommendations, and their lack of implementation. Hunter will testify that no changes in personnel, training, or practice occurred as a result of the serious instances of abuse in care. Hunter will testify to her concurrent oversight of CPS investigations while also seeking to minimize and deny the potential claims of foster children, and the impact it had on the children's ability to have their needs met.

Hunter will testify to her understanding of the responsibilities and parameters for informing the parents and parties to the juvenile proceeding about abuse in foster care, as well as medical and mental health providers who treat or evaluate the child. Hunter will testify that transparency is a high priority of ODHS, and generally serves the best interest of the parties. She will have no explanation for why the parents and parties in the foster care abuse cases she oversaw did not receive this information. Hunter will testify that as of June 2022, she had not undertaken to understand what led to the abuse of foster children under her watch and had taken no corrective action with regard to practice in Marion County Child Welfare in response to the SFR and meeting with Melanie Parent.

d. **Maltreatment and Lack of Accountability:** Hunter will testify to specific instances of abuse to foster children that occurred while she was Program Manager, and the consequent investigations that she oversaw, including the Mooney case where eight foster children were sexually abused in a foster home. She will also testify about a foster family that was certified under a CSC and where (at least) four children were physically and sexually abused in the home.

4895-7096-5689v.1 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

Hunter will also testify that she conducted the CPS assessment relating to the allegations associated with lead plaintiffs Wyatt and Noah B. Hunter will testify about the dispositions to these various investigations.

Hunter will testify to her oversight of the certification unit in Marion County, its certification process and practice over time, and the identified errors that led to instances of abuse. Hunter will testify to placement capacity of these homes and the practice of overfilling them. She will also testify to the ongoing use of the child-specific certification process to place children with strangers who had not undergone the regular certification process, and to the harms that causes to foster children.

5. **Name and Title:** Rebecca Jones Gaston, former Director, Child Welfare Program, Oregon DHS.

   a. **Time Estimate:** N/A (designation of deposition transcript)

   b. **Brief Description of Testimony:** Ms. Jones Gaston's testimony describes the role of Child Welfare, the scope of its authority and responsibilities under the law, and the initial efforts under the Vision for Transformation.

   c. **Deliberate Indifference:** Ms. Jones Gaston's testimony indicates that she was aware of complaints of abuse and neglect of youth but did not investigate. In response to a report by a Casey Family Programs consultant that "overdue assessments are a safety disaster waiting to happen," Ms. Jones Gaston mildly stated those overdue child safety assessments were a "clinical and important issue that we are addressing." In response to data showing that the overdue

Page 8 - PLAINTIFFS' SUPPLEMENTAL ADVERSE WITNESS STATEMENTS

4895-7096-5689v.1 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

assessments were increasing in recent months, she replied that: "There is a continued focus on addressing the challenge of overdue assessments."

d. **Caseloads and Hiring:** Ms. Jones Gaston's testimony indicates the limited efforts to improve caseloads and the efforts to obtain funds for staffing from the legislature. She also acknowledges reports that some case workers continued to have as many as 50 cases to work.

e. **Compliance with Federal Standards:** Ms. Jones Gaston's testimony discusses Oregon's lengthy engagement with the federal government in attempting to resolve a set of deficiencies identified by federal authorities and the Program Improvement Plan developed for Oregon. Ms. Jones Gaston also identified county debriefs from the annual Child and Family Services Review (CFSR) and discussed several negative outcomes involving youth identified in Oregon's self-review.

f. **Lack of Placements and Services**: Ms. Jones Gaston identifies that alterations to services for youth remain in the earliest phases, stating that DHS still "expect[s] to roll out the first demonstration sites" in March 2022 as part of executing the Vision for Transformation. Under this Vision, "there is not at this time a long-term plan at this moment for following children in a longitudinal study sort of manner" and that Ms. Jones Gaston "could not speak to" what the exact date for any case review to evaluate the efficacy of the Vision for Transformation.

6. **Name and Title:** Fariborz Pakseresht, Director, Oregon Department of Human Services.

Page 9 - PLAINTIFFS' SUPPLEMENTAL ADVERSE WITNESS STATEMENTS

4895-7096-5689v.1 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

a. **Time Estimate:** 1 hour.

b. **Brief Description of Testimony:** As head of DHS, Director Pakseresht can speak to the overall direction of the department, the multiple reform efforts since he took on his current role in September 2017, and the role of DHS with Oregon state government.

c. **Reform Efforts within DHS:** According to Director Pakseresht, the present Vision for Transformation lacks defined metrics for success. Those metrics have not been determined yet and would arrive only after a further multi-year process. That multi-year process would first answer the questions of what work DHS should do, who would do it, who is accountable and responsible for the work, how to measure success – then and only then would DHS attempt to measure its outcomes. No timeframe for that effort exists, and he could only speculate on when DHS would reach that point. Director Pakseresht can also explain the relative roles of the Governor, the Director of DHS, and the Director of Child Welfare in setting out budgetary priorities in requests for funding to the Oregon legislature. He can discuss how DHS set its legislative priorities and how that affected the ultimate budget for DHS in recent legislative sessions.

d. **Lack of Placements and Supports**: Director Pakseresht can testify to the "lack of adequate mental and behavioral health capacity in Oregon" for foster youth. He can testify to the overall lack of mental and behavioral health services in Oregon and DHS's halting efforts to improve the availability of those services. His ongoing communications with former Governor Kitzhaber indicate that agencies like DHS "cannot solve" the problems they face. He agrees with the

Page 10 - PLAINTIFFS' SUPPLEMENTAL ADVERSE WITNESS STATEMENTS

4895-7096-5689v.1 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

former governor that Oregon lacks "an effective delivery model" for its child welfare services. A blueprint for "appropriate supports and services, interventions, and protective factors" both "doesn't exist and needs to be developed." He can verify in testimony that he reported this in a January 2022 email, roughly 18 months after the May 2020 unveiling of the Vision for Transformation.

e. **Caseloads**: Director Pakseresht will also be able to testify about the challenges surrounding caseloads for child welfare case workers, the development of a proposed caseload standard, and DHS's prolonged challenges in fully staffing the agency. He can discuss his ongoing monitoring of this experience of attempting to create an appropriate caseload model for case workers in DHS.

f. **Child Safety**: Director Pakseresht can discuss different decisions made around child safety within DHS. For instance, Director Pakseresht can discuss why he called the services of Dynamic Life "priceless" and "a great investment" in September 2022, while authorizing expenditure of millions of dollars to a single contractor, at a rate 100 times that of foster parents. At that same time, that contractor was not conducting background checks on its employees, not properly training its employees to use the holds they placed on children, and sustaining high rates of complaints regarding abuse and neglect of youth. Director Pakseresht can explain why DHS chose to allow Dynamic Life to function as a contractor not subject to Child Caring Agency (CCA) regulations, preventing the statewide abuse investigation agency OTIS from investigating restraints on children. He can discuss why DHS continued to partner with a

4895-7096-5689v.1 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

troubled agency despite numerous red flags inside and outside his agency, until the serious problems were exposed in the press in November 2023.

Pakseresht will testify that in 2024, DHS advocated against licensure for individuals providing services in temporary lodging and temporary lodging prevention programs; took the position that children served by unlicensed temporary lodging providers were not entitled to the same rights, protections ,and procedures enjoyed by all other children and youth in the care of DHS; and that DHS did not have an obligation to investigate third party abuse.

7. **Name and Title:** Melanie Parent, Foster Care Coordinator, Child Welfare, Oregon DHS.

   a. **Time Estimate:** 1 hour

   b. **Brief Description of Testimony:** Parent has been a DHS Foster Care Coordinator (FCC) since approximately 2013. One of her managers was Kevin George. Parent will testify that the 2018 Secretary of State audit noted that DHS "Management has failed to address a work culture of blame and distrust, plan adequately for costly initiatives, address the root causes of systemic issues, use data to inform key decisions, and promote lasting program improvements." Parent has observed the distrust and blame, and what the audit also noted as "Chronic management failures and high caseloads jeopardize the safety of some of the state's most vulnerable children."

   c. **Inadequate Placements:** The SAFE Home Study process must be completed prior to issuing full certification of approval to operate a foster home; Child Specific Certification (CSC) can be issued as a temporary certificate where the

Page 12 - PLAINTIFFS' SUPPLEMENTAL ADVERSE WITNESS STATEMENTS

4895-7096-5689v.1 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

full study process has not been completed. Parent will testify that DHS uses CSC because of a shortage of available placements; CSC is not preferred. The less DHS knows about the applicant the greater the risk and danger in placing a child. Issuance of a CSC makes it much harder or more difficult for the certifier to then recommend denial upon completion of the full SAFE Home Study. Use of CSC with strangers also impacts placement matching requirements.

d. **Lack of Accountability:** Parent will testify regarding her participation in Sensitive File Reviews (SFRs), which she performed at least through 2021. The purpose of the SFR is to gather information about an abuse incident and provide input. The fact of SFRs is not reflected in policy. There is no SFR committee and no team-based discussions about particular abuse incidents and need for improvements. There is no specific training or qualifications required to perform a SFR, nor a specific SFR form or template. There is no protocol for storage of SFRs; rather, SFRs are saved to an individual's hard drive or to email and there is no access to a shared file. SFRs are not filed as part of the provider files. There is no way to search SFRs for specific terms or recurring issues, and any auditor would have to locate and search each SFR separately to determine, for example, whether there were recurring SAFE Home Study issues. The FCC SFRs did not correspond or track with concomitant Child Protective Services file reviews of the same abuse incident. Emails between caseworkers that expressed concerns regarding a home are not always uploaded in OR-Kids and therefore are not available for review during an SFR. Sometimes a manager

       may ask FCCs to find information about an issue that was reviewed. There is no way for members of the public to request/review information about SFRs. There is no mechanism to determine how many SFRs have been performed and whether there are recurring issues, and this is problematic. Parent will testify to the specific recommendations she made in connection with her SFR of various certification files, including that of the certified home of Casey and Melissa Miller. Parent will testify that there is no indication that these recommendations were implemented, as evidenced by repeated inquiries.

   e. **SGM Youth:** Ms. Parent can testify to challenges for SGM youth in placements.

8. **Name and Title:** Michelle Pfeiffer, Child Welfare Legislative Coordinator, Oregon DHS.

   a. **Time Estimate:** 30 minutes

   b. **Brief Description of Testimony:** Michelle Pfeiffer will testify to her training and experiences as a Child Protective Services ("CPS") and Office of Training, Investigations and Safety investigator, including the investigation(s) specific to the allegations in *JM et al v. Major et al.*, U.S. District Court, District of Oregon, Case No. 6:18-CV-00739-AN, and her ultimate dispositions. Pfeiffer will testify about the responsibilities and requirements of a CPS and OTIS investigator, the expectations for coordination and information exchange in connection with a CPS and OTIS investigation, and explanations that trigger a concern for child safety. Pfeiffer will also speak to the bias and lack of independence of CPS investigations in the context of the desperate need for

Page 14 - PLAINTIFFS' SUPPLEMENTAL ADVERSE WITNESS STATEMENTS

4895-7096-5689v.1 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

foster placements. Pfeiffer will also testify to her policy work, including bill analysis and legislative promotion of ODHS.

DATED this 24th day of April, 2024.

**DAVIS WRIGHT TREMAINE LLP**

By: *s/ P. Andrew McStay, Jr.*
P. Andrew McStay, Jr. OSB 033997
andymcstay@dwt.com
William D. Miner, OSB 043636
billminer@dwt.com
560 SW Tenth Avenue, Suite 700
Portland, OR 97205
Tel: (503) 241-2300

**A BETTER CHILDHOOD**

Marcia Robinson Lowry (*pro hac vice*)
mlowry@abetterchildhood.org
Anastasia Benedetto (*pro hac vice*)
abenedetto@abetterchildhood.org
Lindsay Gus (*pro hac vice*)
lgus@abetterchildhood.org
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel: (646) 795-4456

**DISABILITY RIGHTS OREGON**

Emily Cooper, OSB 182254
ecooper@droregon.org
Thomas Stenson, OSB 152894
tstenson@droregon.org
511 SW Tenth Avenue, Suite 200
Portland OR 97205
Tel: (503) 243-2081

**RIZZO BOSWORTH ERAUT PC**

Steven Rizzo, OSB 840853
srizzo@rizzopc.com
Mary D. Skjelset, OSB 075840
mskjelset@rizzopc.com
1300 SW Sixth Avenue, Suite 330
Portland, OR 97201
Tel: (503) 229-1819

Attorneys for Plaintiffs

Page 15 - PLAINTIFFS' SUPPLEMENTAL ADVERSE WITNESS STATEMENTS

4895-7096-5689v.1 0201450-000001

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax