**EMILY COOPER**, OSB 182254
ecooper@droregon.org
**THOMAS STENSON**, OSB 152894
tstenson@droregon.org
**DISABILITY RIGHTS OREGON**
511 SW 10th Avenue, Suite 200
Portland, OR 97205
Tel: (503) 243 2081

*Attorneys for Plaintiffs* [full counsel list in signature block]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| WYATT B., *et al.*, <br><br>　　　　　　　　Plaintiffs, <br><br>　　v. <br><br>TINA KOTEK, *et al.*, <br><br>　　　　　　　　Defendants. | Case No. 6:19-cv-00556 <br><br> **PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT TESTIMONY FROM DR. SARAH VINSON** <br><br> **Oral Argument Requested** |

## PRELIMINARY STATEMENT

Defendants intend to present at trial opinion testimony from Dr. Sarah Vinson. Her testimony is not admissible under Federal Rule of Evidence 702 & 703. Defendants offered a primary opinion signed by Dr. Sarah Vinson from Lorio Forensics in December 2023, then in April 2024 offered a rebuttal opinion to Plaintiffs' expert Dr. Anne Farina, also signed by Dr. Sarah Vinson. *See* Exh. B & C. Defendants designated Dr. Vinson as their expert on these topics. The December 2023 report revisited the foster care files of the ten named plaintiffs, to assess whether DHS's care of those youth had been "within the standard of care in the community," as well as the general reasonability of DHS's response in providing medical and mental health services. The report found, with limited exceptions, mostly related to out-of-state placements, that their treatment had been reasonable. The April rebuttal report was a six-page review that contained various critiques of Dr. Farina's December 2023 report, including explaining that placements Dr. Farina deemed unacceptable or inappropriate should be attributed instead to the difficulties presented by the foster children's behaviors.

Dr. Vinson's testimony is not admissible because her testimony would inappropriately parrot the testimony of other investigators not before the Court. She lacks actual knowledge of the facts underlying her opinion and would only recite what other investigators have written for her. Dr. Vinson did literally no work on the report for more than a year from December 2022 to December 2023, other than attending a single hour-long conference with defense counsel. During that time, other investigators spent 900 hours, effectively researching and writing the report. Dr. Vinson's time records indicate that her only work on either researching or writing the report in the 12 months before its release on December 15, 2023, came on December 13 and 14, 2023. Dr. Vinson parachuted in to sign her name to someone else's report at the last minute. The same thing

took place with her April 2024 rebuttal report. Her colleague spent 137 hours researching and writing the report across months, and Dr. Vinson spent 2.7 hours reading her colleague's work in March and signing the report.

Further, the opinions attributed to Dr. Vinson in the two reports are based on a fundamentally unreliable methodology. First, the reports' "standard of care reflected in the community"—in which the standard of care is "practically driven by the reality of what is possible"—allows decision-making to be driven, not by what a child actually needs, but by whatever resources the state has, no matter how inadequate. Second, the reports repeatedly embrace circular logic, affirming that the various placements were the best possible, for instance, on the grounds that those were the placements DHS had found. Because the reports never look outside DHS's own records and take all such records at face value, they rarely conclude that 1) any other placements were available or 2) that any selected placement was unreasonable. Third, the report relies on pure speculation about the status of Oregon's current mental health system and array of placements to assume in every case that DHS has no factual or legal role in determining the variety of placements available.

## ARGUMENT

### I.    Legal Standard of Review

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides that "a witness qualified as an expert by knowledge, skill, experience, training, or education" may offer expert testimony if "the testimony is based upon sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.  Rule 702 "clearly contemplates some degree of regulation of the subjects and theories about which an expert may

testify," and accordingly, as the gatekeeper for expert testimony, this Court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  The burden is on the party offering the expert testimony to prove its admissibility.  *Daubert*, 509 U.S. at 592 n.10.

## II.    Dr. Vinson Cannot Testify as an Expert Because She Failed to Participate Meaningfully in the Research Process and Would Merely Repeat Other's Opinions

The Court should not allow Dr. Vinson to testify as an expert because Dr. Vinson serves only as a mouthpiece for other people's work and has not meaningfully participated in the work in more than a year.

### a.    Factual Background and Billing Records Review

Based on the billing records submitted by Defendants, between December 1, 2022, and December 1, 2023, Dr. Vinson billed exactly *one hour* on the report during that time.[1]  Namely, she attended a meeting with defense attorneys for an hour in July 2023. During that time, her two assistants, Dr. Jackson and Ms. Aguilar, billed roughly 900 hours reading the child records for their qualitative substance, analyzing them, and actually writing the report. With the report due per the pretrial order on December 15, 2023, Dr. Vinson attended one meeting with defense counsel on December 4 for an hour. Billing records indicate that Dr. Vinson spent 14.6 hours on December 13 and 6.7 hours on December 14 finalizing the report. In total, Dr. Vinson worked fewer hours

---

[1] Dr. Vinson had previously billed time in 2021 and 2022 early in the contract, but billing records indicate she slowed and then stopped participating in the process. *See* Exh. A, at 1-11. Dr. Vinson billed 1 hour in a November 2022 billing; 8 hours in October 2022; no time in July or August 2022; 5 hours in June 2022; 4.33 hours in February through May 2022; 9.5 in January 2022; 21 hours in December 2021; 35 hours in November 2021; and 3.5 in August and September 2021. *Id.* Between December 2022 and the publication of the December 2023 report, she billed for 23.3 hours of work. She claimed 51.13 hours in 2022, and 59.5 hours in 2021.

on the primary report in three years (133.93) than both her assistants did just in November 2023 (135.5). Her assistants billed roughly 932 hours in compiling the December 2023 report, including virtually all the work in the year before its production, accruing more than $400,000 in costs to the taxpayer.

The billing details make it clear that Dr. Jackson and Ms. Aguilar were not only conducting the research, but effectively writing the report. For instance, Ms. Aguilar's entries in December are labeled "edits and finalizing Norman," "edits and finalizing Ruth," etc., indicating that she was not only editing but making final the segments of the report corresponding to each youth. Similarly, in August 2023, Dr. Jackson, not Dr. Vinson, billed for time meeting with defense counsel and "Alec and Kylie report writing." In July 2023 Ms. Aguilar billed for "report writing" regarding Norman and Ruth. One of Dr. Jackson or Ms. Aguilar billed extensively for "report writing" in Bernard's section in March and April 2023. More granular analysis of who did what is challenging, since several invoices merely reflect a block billing of hours. For instance, Lorio's November 16, 2023 invoice merely bills $50,812.50 for 135.5 hours of unexplained case work by persons unknown at $375 per hour.[2] Defense counsel had to amend the contract in December 2023 to prevent such block billing.[3]

A similar process repeated with the rebuttal report. Dr. Vinson billed five hours in early January 2024, almost all of it simply to read Dr. Farina's 2023 report.[4] Ms. Aguilar billed 137 hours in the months to follow, but Dr. Vinson billed for no work between January 11 and March

---

[2] While these records do not illustrate who did what, the Court can tell that all hours billed at $375 per hour were *not* work completed by Dr. Vinson. Dr. Vinson bills at a higher rate of $450 per hour. Dr. Jackson and Ms. Aguilar both bill at $375 per hour. Exh. B, at 3.
[3] *See* Exh. D, at 1 [December 7, 2023 Amendment to Contract.]
[4] Dr. Vinson billed one hour for "record review" on January 7, 1.65 hours for "report review" on January 9, and 3.3 hours for "report review" on January 11. Exh. A, at 37. She did not make another billing entry until March 29. *Id.* at 40.

29.[5] On March 29, she billed 1.1 hours for "rebuttal report review and research," then on March 31, 1.65 hours for the same purpose. Again, Ms. Aguilar's time entries indicate that she was completely writing the report: she was conducting "record reviews" for each of the children Dr. Farina met with, meeting with defense attorneys, and billed for "report writing," and "report drafting discussion." From January 2024 through April 16, 2024, Lorio Forensics billed Markowitz Herbold $55,646.25, of which $3,465 was for 7.7 hours of work by Dr. Vinson, the remaining $52,000 was for 137 hours of work by Ms. Aguilar.

### B. A "Mouthpiece Expert" Who Merely Parrots Someone Else's Work May Not Testify

Experts in all fields rely on assistants and reviewing the materials of others. Plaintiffs recognize that many experts properly supervise others in conducting substantial work that contributes to valid expert reports. *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp*., 285 F.3d 609, 615 (7th Cir. 2002) (an expert may use assistants to "collect data" for the expert to "apply concededly appropriate techniques in a concededly appropriate manner" to analyze). Indeed, Plaintiffs' own experts use assistants appropriately in preparing their reports. However, a witness who merely swoops in at the last moment and signs their name to someone else's work is not an expert who can testify to an independent, admissible opinion. *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 291 (E.D. Va. 2001) ("Unquestionably, Rule 26 requires an expert witness to prepare his own Rule 26 Report."). An expert witness may not testify as the "mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *Factory Mut. Ins. Co. v. Alon USA L.P*., 705 F.3d 518, 524 (5th Cir. 2013).

---

[5] Defendants had previously informed Plaintiffs that Dr. Vinson would be out on medical leave starting in early February for roughly a month, returning March 5. Considering this representation, Plaintiffs agreed to extend the deadline for this rebuttal report to April 5.

The line between an appropriately supervised and delegated use of assistants and a prohibited ghost writing or parrot testimony lies in large part whether, and to what extent, the assistant exercises "discretion" independent of the testifying expert. *Dura Auto. Sys. of Indiana, Inc*, 285 F.3d at 615 (expert could not rely on work of third party where "breadth of the expert discretion that they exercised" was significant, and third party "constructed the model" for the process); *Jarose v. Cnty. of Humboldt*, No. 18-CV-07383-RS, 2023 WL 2333880, at *4 (N.D. Cal. Mar. 1, 2023) (experts can use assistance as long as they do not "exercise professional judgment that is beyond the expert's ken"). Assistants to an expert must perform "their work at the direction and under the guidance of" the expert. *TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. SACV1400341JVSDFMX, 2016 WL 6922051, at *3 (C.D. Cal. May 31, 2016). A witness may not testify as an expert where the "opinions expressed in an expert report are not the opinions of the expert." *Trigon, Inc.*, 204 F.R.D. at 291.

### c. Dr. Vinson's Effective Absence from the Records Analysis and Report Writing Process Make Her Unqualified to Testify

While many cases make it clear that experts can rely on "associates of [one's] own firm to gather data," Dr. Vinson's wholesale absence from the process for more than a year while her assistants compiled data and effectively wrote the report defies even this lenient standard. *Herman v. Marine Midland Bank*, 207 F.R.D. 26, 31 (W.D.N.Y. 2002) (where third party billed more than half the hours and accounted for more than half the fee, expert plainly worked "hand in glove" on a joint venture in drafting expert report); *Derrickson v. Cir. City Stores, Inc.*, No. DKC 95-3296, 1999 WL 1456538, at *7 (D. Md. Mar. 19, 1999), *aff'd sub nom. Johnson v. Cir. City Stores, Inc.*, 203 F.3d 821 (4th Cir. 2000) (impossible for court to understand expert's opinion without understanding data manipulation by assistant).

Dr. Vinson did no work (other than attending an attorney meeting) for a full calendar year from December 1, 2022, to December 1, 2023, prior to the finalization of the report, while her assistants billed 900 hours analyzing data and drafting the report. In considering the actual role of Dr. Vinson, the Court must recall that her assistants did not generate quantitative data that could be quickly analyzed once gathered: they were not measuring how metal samples bent under pressure or how much of a chemical precipitated out of solution. An expert could conceivably look at such quantitative data results in a short time and draw meaningful conclusions. Instead, Dr.Vinson's assistants were making qualitative judgments, with high degrees of subjective determination, about the individual suitability of hundreds of specific decisions around housing, treatment, and care for foster youth.

None of Dr. Vinson's billings indicate that she was engaged in supervising or reviewing Ms. Aguilar or Dr. Jackson's work at any point. No records report weekly, monthly, or even semi-annual reviews among the investigators to verify that the work was being done appropriately or to keep Dr. Vinson apprised of developments. Dr. Vinson simply could not have reasonably reviewed and understood hundreds of hours of research on the ten named plaintiffs, laden with subjective and qualitative questions of individual appropriate treatment and placement, in the course of two days, much less contributed meaningful input to the process, before signing and submitting the report.

For instance, Ms. Aguilar spent virtually all of her billing time in May 2023 (roughly 50 hours), June 2023 (roughly 50 hours), and most of July 2023 (roughly 40 hours) just reviewing Norman's records. Norman, as the Court may recall, spent much of his childhood in foster care, went to 50+ placements, and re-entered foster care three times. ECF 1. He first entered care in 2006 and was intermittently involved with DHS through 2019. His case file, reviewed by Ms.

Aguilar, is 54,000 pages long. His history in foster care is highly complex. Norman's portion of the Lorio report is 15 pages long. Nevertheless, Dr. Vinson's billing statement indicates that she reviewed the entirety of at least 140 hours of Ms. Aguilar's work on Norman in two hours and 21 minutes on December 13, 2023.[6] In those two hours and 21 minutes, Dr. Vinson would have the Court believe, she formulated a serious opinion on whether Norman's treatment across a decade and a half in care met the standard of care and whether DHS provided him with appropriate medical and mental health care throughout his long, complex ordeal in foster care. Dr. Vinson plainly could not have meaningfully reviewed 140 hours of her colleague's work on such a complex topic in two hours and 21 minutes.[7] Dr. Vinson could barely have read the 15-page passage in depth and with care in that time frame, much less developed an independent opinion about the suitability of his 50+ placements and countless decisions about his care and mental health treatment over 13 years.

Regarding the rebuttal report, Dr. Vinson could not have meaningfully reviewed 137 hours worth of research by Ms. Aguilar in 2.75 hours over two days at the end of March 2024, much less adopted a meaningful opinion on the quality of services or placements for 9 children in foster care in that time. The same phenomenon—marginal participation by Dr. Vinson until all the research and writing was completed—observed in the main report repeated itself in the rebuttal report.

---

[6] Since Dr. Vinson's billing records do not show any activity for more than a year from December 1, 2022, to December 13, 2023, other than two hour-long meetings with counsel, Dr. Vinson could not have reviewed Ms. Aguilar's work from May, June, and July 2023 at any point before December 13, 2023. *See* Exh. A, 11-35.

[7] The Court can also take notice that Dr. Vinson billed for this exact 2 hour and 21 minute interval for "report writing" on December 13 and 14, 2023 in each instance for Unique, Simon, Naomi, Wyatt & Noah, Ruth, and Bernard. Exh. A, at 35.  Naomi was only in care for a year and her file is about 1/10 the size of Norman's but Dr. Vinson spent the same amount of time in "report writing" for Naomi as for Norman, down to a three-minute interval, according to Dr. Vinson's billing statement.

At a deposition, Dr. Vinson was confronted with billing records indicating that she had only billed for a single hour of work from December 2022 to December 2023. After being confronted with her own billing records, she then claimed that she doesn't "bill for the conversations that we have between each other" and does the "[s]ame with legal meetings," that not billing for those services "was just something we did as practice."[8] The problem with Dr. Vinson's statement is that for a long stretch of time, the legal meetings where the *only* thing that she billed for, including attorney meetings in July 2023 and December 2023.[9] Elsewhere, Dr. Vinson billed routinely for attorney meetings.[10] No paper trail exists to document at any point any degree of supervision of Dr. Vinson's employees by Dr. Vinson. Since Dr. Vinson's claim about how she does not bill for legal meetings was false, her assertion that—in the context of $450,000 worth of billing to the state of Oregon, where Dr. Vinson measured her time down to 0.05 hours, or three-minute intervals—that she just didn't bill for her time supervising her staff is implausible.

While one expert can consider works by others in their field, there are "limits to this general rule." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 978 F. Supp. 2d 1053, 1066 (C.D. Cal. 2013). An expert's testimony cannot be a conduit for an underlying expert's opinion, where that underlying expert's opinion is at issue. *Id.* Rule 702 and 703 allow experts to rely on "facts and data," not other expert's opinions specifically created for litigation. *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1012 (C.D. Cal. 2003), *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005) (expert's reliance on "excerpts from an opinion by another expert generated for the purposes of another litigation is

---

[8] Exh. F, Vinson Tr., 81-83.
[9] Exh. A, at 35 (12.4.23, Atty. Meeting – Vinson); *id.* at 28 (7.11.23, Atty. Conference – Vinson).
[10] Exh. A., at 1, 4, 6 (showing attorney meetings billed for Dr. Vinson on May 5, 2022; January 20, 2022; November 18, 2021; September 16, 2021; September 6, 2021; and August 16, 2021).

improper"). Based on her perfunctory participation in the process in the year prior to the 2023 report's release and the rebuttal report, Dr. Vinson's testimony would simply vouch for her subordinates' opinions. She may not repeat other people's opinions as her own.

### d.    Plaintiffs' Redress

In consideration of Defendants' representations regarding Dr. Vinson's leave, Plaintiffs allowed her to submit a belated rebuttal report and agree to a last-minute deposition. Billing documents were only fully disclosed to Plaintiffs on April 19, 2024. Only at her deposition on April 24, three weeks from the start of trial, did her effective nonparticipation in the report-writing process become clear. At this point, further deposition of Dr. Jackson or Ms. Aguilar is imrpracticable. While Plaintiffs would not oppose further disclosures of the communications between Dr. Vinson and her subordinates, such disclosures would likely come too late to redress fully the harms created by Defendants' designation of an expert who did not do the work or form the opinions discussed. Defendants should not be permitted to substitute or supplement Dr. Vinson's testimony with testimony from Ms. Aguilar or Dr. Jackson, whom Defendants failed to designate and whom Plaintiffs have had no opportunity to depose. Plaintiffs' only suggestions are to preclude testimony from Dr. Vinson entirely, or that the Court give Dr. Vinson's testimony a negligible weight.

### III.    The Lorio Report Fails to Use a Reliable Methodology, Relying Instead on Quasi-Clinical Concepts Created by Defense Counsel, Speculation, and Circular Logic

An elemental part of the admissibility of an expert opinion is a valid methodology, usually grounded in some scientific process. *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 593 (1993). The analysis of whether a methodology is valid includes inquiry into whether it can and has been tested, whether it is subject to peer review and publication, what any known or potential error rate may be, and whether it is generally accepted. *Id.* at 593-94.

a. **The Lorio Report Uses a Definition of "Standard of Care" that Centers on DHS's Limitations, Rather Than the Child's Need**

In the 2023 report, the first question raised for each of the ten youth is whether "treatment rendered to the named plaintiff me[]t the standard of care reflected in the community?" A "standard of care" is a common term for medical and other clinical practices. "The standard of care requires that medical service providers exercise that degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances." *Hoeg v. Newsom*, 652 F. Supp. 3d 1172, 1189 (E.D. Cal. 2023). What a "standard of care" might mean applied, not to a provider, but to a child welfare system was somewhat peculiar. In particular, the "standard of care reflected in the community" as constructed by the Lorio report led to bizarre results, where clearly subpar treatment and planning was treated as adequate.[11]

The rebuttal report expanded on Lorio's unique concept of "standard of care," stating:

> The community standard of care is also practically driven by the reality of what is possible. This reality is a critical consideration given that child welfare systems contend with national and regional gaps in the mental healthcare treatment and residential placement options available to youth, gaps that can be even more pronounced for publicly insured youth.

Exh. C, at 6. The definition of a community standard of care, as propounded in the Lorio reports, indicates that treatment of children and placement of children can be completely ill-suited to a

---

[11] *See, e.g.,* Exh. B, Appx. G, at 4-6 (noting that repeated evaluations of Ruth recommended significant mental health care in May 2017, again in December 2017, and again in March 2018, none of which she received, even as her behaviors and emotional dysregulation caused problems at school and at home); *id.* at 9 (noting that in December 2017, a psychologist recommended that she go to a treatment foster care placement, which she never received, but was left with grandparents who did not believe in psychopharmaceuticals and prevented her treatment); *id.* at 7 (in May 2018 after not receiving or even being referred indicated mental health care for a year and as her symptoms grew worse and worse, Ruth was placed at a residential treatment center, then moved to an out-of-state placement after a month); *id.* at 12 (finding that Ruth received the standard of care in the community in treatment and placement, despite not receiving indicated supports for a year).

child's needs, as long as the child welfare system is having difficulty identifying or accessing more appropriate alternatives. Applying this standard to the medical context would allow a receptionist to do brain surgery as long as the hospital couldn't find any brain surgeons. If a child with acute mental health diagnoses needs a treatment foster care home, but no such supports are available in the community, Lorio's construction of "standard of care in the community" excuses DHS. DHS can place the youth with a relative who doesn't believe in psychiatry or psychopharmaceuticals and who thwarts the child's mental health care, because that home was what was available. *See fn*. 11.

At her deposition, Dr. Vinson was asked where she had gotten this peculiar construction of the "standard of care in the community." She repeatedly emphasized that defense counsel framed the specification of the "standard of care in the community" and that she, as a forensic investigator, could only answer the question before her.[12] By cabining this question in this way, her focus was limited to "what is practically available," not what is clinically appropriate or, in her terms "clinically ideal."[13] . Further, her assessment of the "standard of care" was not actually aimed at DHS as a whole, but at the reasonableness of a DHS *caseworker*.[14] Using that artificially-restricted standard of care, Lorio's report further shrunk its focus to the capacity of a lone caseworker, not the strength and capacity of a state agency with a multi-billion dollar budget. The broad questions about DHS care the report claims to answer differs substantially from the answer

---

[12]  Exh. F, Vinson Tr. 220:7-25; 221:1-4.

[13] Exh. F, Vinson Tr. 224:18-25; 225:1.

[14] Exh. F, Vinson Tr. 222:18-25; 223:1 (contrasting the standard of care from the American Academy of Pediatrics, which is for "clinicians and pediatricians," and the "degree to which the target audience of AAP has more control" over relevant factors "than an ODHS caseworker may.").

it actually attempts to provide—whether any individual caseworker actually did their best work under the circumstances.

A peer in the field seeking to answer the questions before the Court would not narrow its inquiry to the arbitrarily contracted scope identified by defense counsel and Lorio. The American Academy of Pediatrics standard of care for foster youth states that: "Treatment must address all developmental, educational, and mental health conditions associated with biopsychosocial adversity."[15]  The "standard of care" that she articulated was not consistent with Oregon laws and rules governing foster care.[16] Focusing on what a DHS caseworker can't do, rather than what a child needs, is the opposite of a reasonable, accepted methodology in assessing a standard of care.

### b.  The Lorio Report Demonstrates Repeated Use of Circular Logic

The 2023 Lorio Report reviews and relies on DHS records regarding the treatment and care for the named plaintiffs, while the rebuttal report does the same for youth reviewed by Dr. Farina. In both reports, the Lorio Report's logic relies on two unfalsifiable premises: 1) if a child did not get an appropriate placement, it was because the appropriate placement was not available or would not accept the youth; and 2) if the child got a placement, it must have been appropriate. Because the DHS records rarely include comments from caseworkers indicating that the caseworker is intentionally choosing an inappropriate placement for a youth even though a better one was

---

[15] Am. Acad. of Pediatrics, *Fostering Health: Standards of Care for Children in Foster Care, Ch. 3 Practice Parameters for Developmental and Mental Health Care* (July 2021) *at* https://downloads.aap.org/AAP/PDF/Foster%20Care/Ch3_PP_%20Developmental.pdf.

[16] *See, e.g.,* OAR 413-010-0180(1)(a) ("Every child and young adult in the legal custody of the Department has rights, including but not limited to the right [t]o be placed in the least restrictive environment that appropriately meets individual needs. . . ."); ORS 418.322 (restricting how, when, and for how long Oregon DHS may place youth in congregate care settings, including a prohibition on co-locating foster youth with adjudicated youth in congregate care and prohibiting placement of foster youth in shelter care settings or short-term placements for more than 60 days at a time or 90 days in a year).

available, unskeptical reliance on the representations in DHS records will always yield a favorable review. *Cf. S.C. v. Metro. Gov't of Nashville & Davidson Cnty.*, 579 F. Supp. 3d 999, 1031 (M.D. Tenn. 2022), *aff'd* 86 F.4th 707 (6th Cir. 2023) (holding in another matter where Dr. Vinson testified as an expert that "some aspects of Dr. Vinson's testimony elided important facts and relied on deceptively selective recitations of the relevant information").

For instance, Lorio's report indicates that, even though Unique's extensive mental health history dated back years, her repeated cycling between psychiatric facilities starting at the age of 7 raises no red flag. At age 7, Unique was placed at the Jasper Mountain SAFE Center for 7 months starting in November 2016, an "extension" from the typical 90-day admission. Exh. B, Appx. I, at 5. She remained relatively stable at a treatment foster care placement for the better part of a year, then cycled back to the SAFE Center in May and August of 2018 as she decompensated following an unsuccessful reunification effort with her mother. *Id.* at 6. She then spent a month at Albertina Kerr's subacute facility. *Id.* After a month in a foster home, she was sent out of state to Acadia for five months, at age 10, where she was abused. *Id.* at 7.  She then moved directly from Acadia to the Parry Center, where she stayed from April 2019 to February 2020, even though her psychiatrist had recommended that she be stepped down to a treatment foster care placement (much like the one she had previously been stable in for a year) in September 2019, and she was fully deemed ready for discharge in December. *Id.* at 7-9. In response to years of an elementary-school-aged girl being pinballed around a variety of psychiatric facilities for years, the Lorio report blames Unique. "Unique experienced a series of placement disruptions due to her aggressive behaviors," and ODHS's difficulties in finding her placement only after Unique had "exhausted various other placement options due to her behaviors." Exh. B, Appx. I, at 12. The Lorio Report concludes that Unique's placements in-state (not at Acadia) "met the standard of care reflected in her

community." *Id.* at 14. Her protracted stays at Jasper Mountain's SAFE center and at Parry Center, long after release was indicated simply do not register.

The circular logic of the report prevents Lorio from adequately considering whether any particular setting (except the out-of-state settings) is inappropriate for a youth based on abusive or restrictive conditions. For instance, among the placements that Lorio found to be appropriate is the 2013 placement of Norman at Give Us This Day, the now-infamous abusive setting that was the subject of a statewide scandal and the loss of its license. Exh. B, Appx. F, at 5. Lorio also found Naomi's placement at the Klamath County Youth Inspiration Program, which was housed inside an active juvenile detention center, in a setting that "present[s] as a detention-like pod" and whose rooms are "designed the same as a detention cell with a toilet and a sink," and where youth were strip-searched, to be appropriate and within the standard of care.[17] YIP's practices of housing foster youth in a jail-like setting, withholding access to tampons to girls on the condition of good behavior and conducting strip searches of foster youth led DHS to stop using YIP to house foster youth not involved with the juvenile justice system there shortly after Naomi's time there.[18] This placement in a youth detention center was provided by DHS, despite the fact that a recent evaluation had recommended a treatment foster care placement, not incarceration. In response to questioning about this decision-making process, Dr. Vinson responded at her deposition that the placement

---

[17] Exh. E [April 23, 2019 Email from Sara Fox] (discussing as credible reports of youth being strip searched at YIP, a youth being denied medication for 3 days, youth not being allowed to leave, and an end to all community based activities, planning to put a hold on DHS referrals and remove the four in YIP custody; indicating facility is surrounded by a 10-12 foot fence with razor wire, that rooms are "designed the same as a detention cell with a toilet and a sink," that the facility does "present as a detention-like pod;" also).

[18] *Id.* (noting that noting that DHS had "previously addressed the tampon issue," indicating that within the last week the facility had purchased tampons but had not let youth know they were available); Exh. B, Appx. E, at 6 (stating that Naomi was "housed in a secure facility on the same campus as JDH [Juvenile Detenion Hall]"); *id.* (stating that for 30 days as part of a "Safety Behavior Agreement" Naomi was not allowed to contact her mother or grandmother).

was better than living on the streets, a threshold for placement standards that would justify nearly any outcome.[19] She stated that, in certain circumstances, strip searches of foster youth are "probably helpful."[20] In its rebuttal report, Lorio likewise questions Dr. Farina's conclusions that placing a boy with serious mental health needs in a hotel for five months was inappropriate, instead blaming the boy's "behaviors including assault and threatening peers and staff" at a prior placement as evidence that would apparently justify a five-month stay in a hotel room as an acceptable practice. Since Lorio begins its analysis with the virtually unshakeable and unexamined presumption that any in-state placement recommended by DHS is acceptable, its circular logic consistently leads it to ratify even highly questionable placements.

   c. **Lorio's Reports Merely Assume Without Evidence That Appropriate Placements Are Both Unavailable and Unavailable for Reasons Out of DHS's Control**

Another constant refrain of the Lorio reports is that any difficulty finding placements is due to lack of placement resources and that ODHS is not at fault for any lack of placements, an observation grounded only in speculation and assumption. "An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." *Tyger Const. Co. Inc. v. Pensacola Const. Co.,* 29 F.3d 137, 142 (4th Cir. 1994); *Kendall Dealership Holdings, LLC v. Warren Distribution, Inc*., 561 F. Supp. 3d 854, 859 (D. Alaska 2021). Every Lorio analysis of the named plaintiffs contains the same boilerplate allegations, such as: that DHS's options are curtailed by "very real barriers posed by . . . the mental health system," that an assessment of DHS's actions "cannot be done in a vacuum." Lorio's conclusions about the appropriateness of DHS's care of the youth are hedged in by similar caveats: DHS provided "Ruth

---

[19] Exh. F, Vinson Tr. 145:21-25; 146:1-9.
[20] Exh. F, Vinson Tr. 147:15-25; 148: 1-2.

with the treatment recommended by mental health providers *when possible and permitted by mental health treatment market realities*." Exh. B, Appx. G, at 12.

Completely absent, however, from any part of the Lorio reports is any particular assessment of or demonstrated knowledge base of those "barriers posed by . . . the mental health system" or actual knowledge of the "mental health treatment market realities." Dr. Vinson is from Atlanta, Georgia, and has no particular familiarity with Oregon, its mental health system, the scope of DHS's role, or its foster care system, outside her participation as an expert in this litigation. While Dr. Vinson reviewed records pertinent to this case, including DHS training materials, court documents, and the child records at issue, she had no particular familiarity with the array of services in Oregon, nor did she analyze at any point if alternative services were in fact available to the youth. The Lorio reports simply assume, whenever a youth did not get a more appropriate placement, that the reason was the lack of placements. Plaintiffs readily agree that characteristically Oregon is short of adequate placements for youth. It is also quite possible that, even in an environment of overall paucity of placements, DHS may have missed opportunities to place youth in more appropriate settings by failing to conduct timely reviews and plans. By failing to conduct this basic analysis, Lorio's review simply creates a certainty of excuse for DHS whenever a child is harmed.

Even Lorio's own review highlights such opportunities. For instance, Norman was placed at Jasper Mountain in February 2013. By June 2013 the facility director expressed concern to DHS that DHS had not yet created a discharge plan for Norman and that the lack of a plan exacerbated Norman's fear of abandonment and being forgotten. Exh. B, Appx. F, at 4. When Norman was discharged in August to a regular foster home, rather than the recommended treatment foster care home, Lorio simply blamed the lack of community resources, but failed to consider whether the

delay in producing an appropriate discharge plan hampered Norman's transition to the community. Exh. B, Appx. F, at 5. DHS's choice to place Norman in yet another inappropriate setting led to more disrupted placements and further trauma to Norman. By simply attributing virtually every bad outcome to the lack of resources and disregarding DHS's own role and responsibilities, the report's methodology adopts speculation and assumption as its process.

Lorio's reports likewise always attribute the lack of placements and resources as being outside DHS's control, without conducting any examination of that assumption or even developing a basic understanding of what processes are or are not within DHS's control.[21] Lack of placements are vaguely attributed to barriers in the "mental health system" or the "gap-ridden mental healthcare system," and "not a lack of appropriate consideration, planning, and effort by ODHS." Exh. B, Appx H, at 9. Yet repeatedly, the report indicates that providers have recommended specific services that are actually controlled by DHS, not the "gap-ridden mental healthcare system." Norman, Unique, Bernard, Naomi, Ruth, and Simon are repeatedly recommended by clinical staff to a therapeutic foster care/treatment foster care setting.[22] Those recommendations

---

[21] *See, e.g.,* ORS 418.027 (assigning responsibility to Director of DHS or their designee to "enter into agreements with persons, families or child caring agencies found suitable for the placement of children in the legal custody of the Department of Human Services").

[22] Exh. B, Appx. C, at 7 (Bernard had to wait at a Robinswood for months waiting for a therapeutic foster care home recommended for him); *id.* at 10 (Bernard recommended again for TFC, but was placed in a youth shelter, then returned to Robinswood when no TFC placement was available); *id.* Appx. E, at 5-6 (Naomi was recommended for TFC but no such placement was ever found; she was then moved to a shelter placement, then to the incarcerative YIP program); *id.* Appx. F, at 5 (11-year-old Norman was recommended for TFC in June 2013 while at Jasper Mountain but no program was located for months, while he remained in a restrictive placement, went to a non-treatment foster home for two days, and to Give Us This Day's care); *id.* at 6 (DHS was again unable to find TFC placement for Norman in 2014, so he went instead to a residential treatment facility, then St. Mary's); *id.* at Appx. G, at 5 (Ruth recommended for TFC in 2017 but never referred for placement); *id.* Appx. H, at 4 (Simon recommended for TFC, but it was unavailable, so he was placed in a relative foster home with no therapeutic element, then a motel, then St. Mary's); *id.* Appx. I, at 5 (Unique left at SAFE Center for seven months awaiting TFC placement).

for therapeutic foster care are, in different cases, simply ignored, a placement is not found and a less suitable one imposed, or the setting is available only after a substantial wait. Since DHS is completely in charge of the treatment foster care/therapeutic foster care system, Lorio's shifting of blame to the "gap ridden mental healthcare system"—apparently OHA—that is not responsible for these placements bespeaks a lack of familiarity with Oregon and a predisposition to make findings in favor of DHS wherever possible, even based on unjustified and unexamined assumptions.

### Conclusion

Dr. Vinson should not be permitted to testify in support of conclusions she did not draw, research she did not do, about youth she is not familiar with. Her extreme withdrawal from the entire report-writing process, devolving both the original research and the writing onto her staff cannot be remedied by two days' worth of review at the eleventh hour.

Regardless of who wrote the reports, the methodology behind them depends on an arbitrarily limited construction of the "standard of care" as outlined by defense counsel, whose focus wanders from the propriety of the actions of DHS as a whole to scrutinizing only those actions of an individual caseworker. Similarly, the reports' groundless assumptions and circular logic consistently inform a narrative of the propriety of DHS's actions, even in the face of compelling evidence to the contrary. Because of the deficient methodology and approach, the Lorio reports designate even placements that *DHS* finds unacceptable to be adequate. Dr. Vinson expressed the perspective that any outcome better than living on the street is good enough for government work. Her view is not shared by the law or any mainstream academic or scientific body.

//

19

Dated the 1st day of May, 2024.

**DISABILITY RIGHTS OREGON**

By: _s/ Thomas Stenson_

Emily Cooper, OSB #182254
ecooper@droregon.org
Thomas Stenson, OSB #152894
tstenson@droregon.org
511 SW 10th Avenue, Suite 200
Portland OR 97205
Tel: (503) 243 2081
Fax: (503) 243 1738

**DAVIS WRIGHT TREMAINE**
P. Andrew McStay, Jr. OSB #033997
andymcstay@dwt.com
William D. Miner, OSB #043636
billminer@dwt.com
560 SW Tenth Avenue, Suite 700
Portland, OR 97205
Tel: (503) 241-2300

**A BETTER CHILDHOOD**
Marcia Robinson Lowry (_pro hac vice_)
mlowry@abetterchildhood.org
Anastasia Benedetto (_pro hac vice_)
abenedetto@abetterchildhood.org
Lindsay Gus (_pro hac vice_)
lgus@abetterchildhood.org
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel: (646) 795-4456
Fax: (212) 692-0415

**RIZZO BOSWORTH ERAUT PC**
Steven Rizzo, OSB 840853
srizzo@rizzopc.com
Mary D. Skjelset, OSB 075840
mskjelset@rizzopc.com
1300 SW Sixth Avenue, Suite 330
Portland, OR 97201
Tel: (503) 229-1819
Fax: (503) 229-0630

Attorneys for Plaintiffs