IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


WYATT B. et al.                                      Civ. No. 6:19-cv-00556-AA

                    Plaintiffs,                          **OPINION & ORDER**

          v.

TINA KOTEK et al.,

                    Defendants.
_____

AIKEN, District Judge.

        The parties have each filed a motion to exclude expert testimony and opinions
advanced by their opponent.  Plaintiffs move to exclude the testimony of Jim Dimas,
Uma Ahluwalia, and Stacey Moss.  Defendants move to exclude the testimony of Dr.
Sue Steib and Patricia Rideout.

        Plaintiffs' Motion to Exclude Jim Dimas and Uma Ahluwalia, ECF No. 362, is
DENIED.  Plaintiffs' Motion to Exclude Stacy Moss, ECF No. 360, is DENIED.

        Defendants' Motion to Exclude Dr. Sue Steib and Patricia Rideout, ECF No.
364, is GRANTED in part and DENIED in part.

## LEGAL STANDARD

        Federal Rule of Evidence 702, which governs the admissibility of expert
testimony, provides that "a witness qualified as an expert by knowledge, skill,
experience, training, or education" may offer expert testimony if "the testimony is

based upon sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Civ. P 702.

Rule 702 "contemplates some degree of regulation of the subjects and theories about which any expert may testify," and as the gatekeeper for expert testimony, a court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

The burden is on the party offering the expert testimony to prove its admissibility. *Daubert*, 509 U.S. at 592 n.10. The requirement that expert testimony assist the trier of fact to understand the evidence or to determine a fact in issue "goes primarily to relevance." *Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* at 591-92; *see also In re Paoli R.R. Yard Pcb. Litig.*, 35 F.3d 717, 743 (3d Cir. 1994) (an expert's testimony "will be excluded if it is not scientific knowledge for purposes of the case"). Moreover, "an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1058, (9th Cir. 2008). "This is because opinion testimony that is couched as a legal conclusion or that merely tells the factfinder what result to reach is not helpful to the finder of fact." *Sancom, Inc. v. Qwest Communs. Corp.*, 683 F. Supp. 2d 1043, 1052 (D.S.D. 2010).

## DISCUSSION

## I.    Plaintiffs' Objections

Plaintiffs argue that Jim Dimas and Uma Ahluwalia should not be permitted to testify about the efficacy of consent decrees and settlement agreements because testimony about remedies is not relevant, useful, or helpful in resolving the issues in the case at trial.  Plf. Mot at 3-4, ECF No. 362.  Plaintiffs combine their argument for the two experts and maintain that the opinions of Mr. Dimas and Ms. Ahluwaila on what it has cost other states to litigate similar cases and cost of compliance with consent decrees is not relevant.  *Id.* at 4.  Plaintiffs assert that Mr. Dimas and Ms. Ahluwaila inappropriately relied on inaccurate assumptions about Plaintiffs' requested relief and drew incorrect premises without any review of Oregon's child welfare system.  *Id.*

Plaintiffs also move to Exclude Stacey Moss on the basis that her contract to consult as an expert "was not the product of a competitive procurement process."  Plf. Mot. to Exclude Moss at 4, ECF No. 360.  Plaintiffs take issue with Ms. Moss as an expert, challenging whether her report was truly "independent."  *Id.*

### A.    Jim Dimas

#### 1.    *Expert Background*

Mr. Dimas has over 40 years of experience working in, managing, and directing human services agencies, including child welfare, economic services and supports, and public health.  McStay Decl., Ex. D at 4, ECF No. 363, ("Dimas Report").  For ten years, Mr. Dimas served as a monitor under consent decree adopted in *Kenny A. by Winn v. Perdue*, No. 1:02-CV-1686-MHS, 2005 WL 8162778 (N.D. Ga. Oct. 27, 2005),

which was another child welfare class action filed by plaintiffs' lead counsel in this case. *Id.* Mr. Dimas has served as an executive within state governments and as a consultant to state and local child welfare. His work includes assisting states with exiting consent decrees, developing and implementing performance management strategies to deal with caseloads and caseworker and foster parent attrition in Georgia; cross-agency collaboration to provide services to families at risk of entering the child welfare system in Illinois; consulting on strategies for improving consent decree performance in Maryland and Wisconsin; executive coaching to help drive race equity work in Connecticut' and executive coaching to develop an evidence-informed race equity strategy in South Carolina. *Id.*

### 2.    *Expert Testimony / Report*

Mr. Dimas will testify at trial that the obligations enforced through court orders or consent decrees resulting in similar class actions have not been effective in improving child welfare systems. Dimas Report at 5-6. He will explain that court orders and consent decrees "result in legally enforceable obligations on a child welfare agency that channel behavior and affect child welfare policy, practice, culture, and outcomes." *Id.* Mr. Dimas reviewed other states' federally mandated reported data and determined that those states that have operated under a consent decree for over ten years perform worse than other states that have operated under a consent decree for six or fewer years. *Id.* Mr. Dimas will also explain that, in addition to failing to reliably produce lasting, systemic improvements, consent decrees lead to unintended consequences.

The testimony Mr. Dimas will offer includes what an effective remedy might look like, how to structure an effective injunction, and how to avoid negative "pitfalls" associated with consent decrees. Mr. Dimas will clarify what specific obligations in other court orders make such remedial measures ineffective, such as aiming for specific "metrics." Mr. Dimas will explain that a focus on metrics "fosters a culture of strict compliance and fear rather than a culture of creativity, flexibility, and problem solving, which can stifle innovation and progress." *Id*. at 13, 16. Dimas also opines on the costs of litigation and the costs of enforcing consent decrees in other states. *Id*. at 8.

### 3. *Analysis*

As to relevance, Plaintiffs argue that Mr. Dimas testimony on the efficacy of consent decrees or settlement agreements is "entirely irrelevant to any issues currently before the Court." Plf. Mot. at 5. Defendants respond that Mr. Dimas' testimony on that matter *is* relevant to the question of whether Plaintiffs have Article III standing—specifically, whether there is a substantial likelihood that the relief Plaintiffs seek—a supervised consent decree—will redress their alleged injuries. Def. Resp. at 12. In Defendants' view, court orders and consent decrees of the type Plaintiffs seek are not substantially likely to redress their injuries.

Defendants argue that it is not uncommon for parties to submit expert reports on the effectiveness of proposed relief and that, in an equitable case such as this, where the Court has some discretion in crafting a remedy, expert testimony about the efficacy of specific provisions is relevant, useful, and helpful. *Id*. Defendants

maintain that, because Plaintiffs will present evidence at trial "about the benefits of their request relief" the Court should hear expert testimony about the downsides of such relief to assist it in rendering its decision about a remedy. *Id.* at 15.

District Courts have permitted parties to present expert testimony regarding a proposed remedy. *PennEnvironment v. PPG Indus., Inc.*, No. 12-527, 2019 WL 2210692, at *7 (W.D. Pa. May 22, 2019). Further, courts have found relevant expert's testimony that discusses the expert's experience with "what worked and didn't work" based on their familiarity with the role of independent monitors and monitoring committees. *See Coal. for Equity & Excellence in Maryland Higher Educ. v. Maryland Higher Educ. Comm'n*, 295 F. Supp. 3d 540, 554 (D. Md. 2017).

The Court finds that Mr. Dimas' testimony on the efficacy on consent decrees and settlement agreements would be relevant and helpful to the Court's determinations on whether Plaintiffs' requested remedies are substantially likely to redress their injuries. At this stage of litigation, it is not known whether Plaintiffs are entitled to a remedy, but Mr. Dimas' testimony about downsides and pitfalls of consent decrees, and his testimony on what has worked, will be useful, to the extent the Court has discretion to fashion a remedy, if the trial results in an outcome so warranting.

As to reliability, Plaintiffs argue that Mr. Dimas' testimony should be excluded because it is not reliable. Plaintiffs assert that the methodology Mr. Dimas used "ignores state-by-state distinctions and all case-by-case distinctions." Plf. Mot. at 7. Plaintiffs urge that the Court cannot rely on reports based on methodology that

assumes that "Mississippi . . . is the same as Massachusetts in all ways except that Mississippi is under a consent decree and Massachusetts is not." *Id.* at 7-8. Plaintiffs state that Mr. Dimas' report does not grapple with any of the real and important differences between states, and that Mr. Dimas did not consider Oregon-specific data. Plaintiffs also assert that Mr. Dimas did not base his report on "the major research" available. *Id.* at 6. Plaintiffs also contend that Mr. Dimas improperly failed to consider "Plaintiffs' requested relief or Oregon's child welfare system." *Id.* at 4.

The Court understands that one of the basic premises in Mr. Dimas' report is that states exiting monitoring under a consent decree still failed to perform at a level comparable to states that have never been in consent decrees. Dimas Report at 2. Plaintiffs assert that such a premise is unreliable because Mr. Dimas did not consider "even the most rudimentary controls for . . . differences between states." Plf. Mot. at 8; Dimas Report at 2. Plaintiffs contend that such methodology is flawed, and that Mr. Dimas compared consent decree and non-consent decree jurisdictions against the most recent round of the CFSR data to see whether a system met or fell below a static federal average. Plf. Mot. at 8. And, in his deposition, Mr. Dimas stated that he did not try to determine whether any child welfare system improved on any of the CFSR metrics during the time it was under a consent decree:

Q:    So you are not attempting to measure improved outcomes with this chart or this exercise.

A:    It compares the performance of states to the national average which is an important and relevant benchmark.

> Q:    Did you make any attempt in the context of this report to track the performance of a jurisdiction over time on the national standards?
>
> A:    No. Mostly because the national data indicators workbook has been a work in-progress and earlier versions of it were substantively different from the current version.

McStay Decl., Ex. B, Dimas Dep. 120:16-121:2.  Plaintiffs point to more deposition testimony where Mr. Dimas stated that a child welfare system might improve performance according to national standards while under a consent decree:

> Q:    I mean, isn't it possible that a state could have had really poor performance on a metric, entered a consent decree, improved that performance dramatically but still not be meeting the national average?
>
> A:    That's possible.
>
> Q:    Would you view that as improvement?
>
> A:    Well, I would, but that was not the question I was addressing.

Ex. B, Dimas Dep. 121:25-122:8.

Plaintiffs argue that failing to control for an obvious distinction between two comparison groups is "a massive and obvious error."  Plf. Mot. at 9.  In Plaintiffs view, Mr. Dimas' report fails to consider or control for any differences between "one piece of litigation and another" and does not address the question of whether states under a consent decree had failing metrics *to begin with*, necessitating the consent decree, compared to states without consent decrees and whether the non-consent decree states were already achieving good metrics, therefore not requiring consent decrees to generate improvement.  Plaintiffs' argument is well-taken.  However, the Court declines to exclude opinion testimony based on unreliability.

The Court finds that Mr. Dimas is reliable and based his analysis on sufficient facts and data, including child welfare literature, review of publicly available, and federally mandated child welfare data through the CFSR.  He also relies on 40 years of experience in the child welfare system, which include 10 years as a consent decree monitor and another several years helping states achieve the goals of their consent decrees.  If Plaintiffs find Mr. Dimas' testimony to be incorrect, Plaintiffs can assert that at trial, cross-examine Mr. Dimas, and contradict his testimony with their own evidence.

Plaintiffs' argument that Mr. Dimas did not cite to "major research" is not supported in Plaintiffs' briefing.  Although Mr. Dimas does not cite to every article Plaintiffs find to be correct, he cites to a significant body of literature and government data that can not be said to be insignificant or unreliable.  Finally, that Mr. Dimas did not include Oregon-specific laws or policies in his report are matters for cross examination at trial.  Those challenges go to the weight of the testimony, rather than its admissibility.

Defendants maintain that their experts all reviewed the Complaint.  Whether they did or not, the Court finds that to be immaterial at this stage of the litigation and an issue that does not go to the requirements in Rule 702.

In sum, the Court determines that Mr. Dimas is qualified as an expert by knowledge, skill, experience, and training; that his testimony is based upon sufficient facts and data; that the testimony is the product of reliable principles and methods;

and that he has applied the principles and methods reliably to the facts of the case. *See* Fed. R. Civ. P. 702.

### B.    Uma Ahluwaila

The Court evaluates each expert independently. However, Plaintiffs combined their arguments for exclusion, discussed above, and applied them to both experts jointly. Thus, summarized, Plaintiffs' arguments for exclusion of Ms. Ahluwaila are the same as those raised for Mr. Dimas: that Ms. Ahluwaila's testimony on the efficacy of consent decrees, settlements, and opinion on litigation costs is irrelevant; her testimony is unreliable because it is based on methodology that involved research of data in states other than Oregon; that she did not consider state-by-state or case-by-case differences; and that she did not review Plaintiffs' requested relief before forming her opinion that the requested relief fails to address the root causes for why children end up in custody.

#### 1.    *Expert Background*

Ms. Ahluwaila holds 28 years of experience in social work and executive leadership in child welfare and human services. *See* McStay Decl., Ex. C at 3, Expert Report of Uma Ahluwaila ("Ahluwaila Report"). She served as director of the Montgomery County Department of Health and Human Services in Maryland for 12 Years. *Id*. There she implemented the Affordable Care Act and oversaw the move to a more integrated and inter-operable health and human services enterprise. *Id*. Ms. Ahluwaila served as Interim Director in the Child and Family Services Agency in Washington, DC while under the consent decree in *LaShawn A., et al., v. Williams,*

*et al.*, USDC, District of Columbia, Case No. 1:89-cv-01754-TFH. *Id.* She also was
the Assistant Secretary of the Department of Social and Health Services in the State
of Washington for the Children's Administration where she led the settlement of the
class action lawsuit in *Braam, et al., v. State of Washington, et al., Superior Court of
the State of Washington (Whatcom),* Case No. 98-2- 01570-1. *Id.*

Ms. Ahluwalia has a master's degree in social work from the University of
Delhi in India and a specialist, postmaster's degree in health services administration
from George Washington University. Ms. Ahluwalia's opinions are based on her 28-
year career in human services, years of experience in child welfare, the interviews of
key informants, a literature review, review of the Vision for Transformation, publicly
available child welfare data, and a review of consent decrees from jurisdictions across
the country, including consent decrees in Mississippi, Arizona, Florida, Georgia,
Kansas, Maryland, South Carolina, Michigan, New Jersey, Oklahoma, Washington
D.C. *Id.* at 4, 10.

### 2.    *Expert Report / Testimony*

Ms. Uma Ahluwalia's report hones in on how child welfare practitioners are
focusing on evolving, developing best practices centered on (1) prevention; (2)
diversion; (3) a multi-sectoral response; (4) wraparound services; and (5) centering
child voices. Ahluwalia Report at 6-7 (defining these areas and terming them "the
five evolutions"). Ms. Ahluwalia opines that Plaintiffs' requested relief does not
comport with the evolving best practices and instead is focused on an outdated "top-
down" approach that "sacrifices flexibility, frustrates efforts to engage with other

systems, fails to address the root causes for why children end up in custody in the first place, and prevents the adoption of best practices as they arise in this dynamic field. *Id.* at 7. The remainder of the report examines those five "evolutions" and identifies key factors aimed at improving a system response to child welfare. Ms. Ahluwalia's opinion is that Plaintiffs' requested relief will not help Oregon's child welfare agency keep up with evolutions in the field and constitutes a "narrow" response "aimed at ending monitoring and not improving outcomes for children." Ahluwalia Report at 13.

### 3. Analysis

#### i. Relevance

Defendants contend that Ms. Ahluwalia's testimony is relevant to whether Defendants' practices "shock the conscience." *See Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 844 (9th Cir. 2010). As can be seen from the parties' pretrial documents, Plaintiffs will argue that Defendants are deliberately indifferent to the rights of children in foster care for failing to remove children from their homes, for placing them in kinship placements, and for returning children to their homes earlier than plaintiffs would like.

Defendants argue that the Court will need to consider Defendants' practices in the context of modern child welfare policy. Def. Resp. at 6. Defendants contend that Ms. Ahluwalia's testimony will be helpful to the Court because she will testify that, in the past, the focus was on removing children from their families and finding new, permanent homes for the children. Ahluwalia Report at 6. The modern direction of

child welfare, however, in Defendants' view, focuses on prevention.  Defendants will argue that Plaintiffs' requested relief fails to take a modern view of child welfare.

The Court finds that Ms. Ahluwalia's testimony is relevant, helpful, and useful to the Court's evaluation of Defendants' policy decisions.  Her expert testimony is also relevant to the Court's analysis of Plaintiffs' requested relief, and whether the requested relief is in the public interest.  Any injunctive relief should give significant weight to the policy choices of state elected officials.  *See Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976) ("When a plaintiff seeks to enjoin the activity of a government agency . . . [their] case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs." (internal quotation omitted)).  Plaintiffs' disagreement with Ahluwalia's opinion can be addressed at trial through cross-examination.

### ii.    *Reliability*

As to reliability, Ms. Ahluwalia's 28 years' experience in child welfare is a primary basis for expertise in the field.  In some fields, such as child welfare, "experience is the predominant, if not the sole basis for a great deal of reliable expert testimony." *Century Indem. Co. v. The Marine Grp., LLC*, No. 3:08-CV-1375-AC, 2015 WL 5965614, at *2 (D. Or. Oct. 13, 2015) (quoting Rule 702 committee note); *see Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (in certain fields, experience is the primary, if not the only, basis for expertise). As plaintiffs themselves have previously argued in this case, "[i]n child welfare cases specifically, reliance on the expert's own knowledge and experience . . . typically

meets the Daubert reliability standard." ECF No. 160 at 8. Based on her extensive experience, Ms. Ahluwalia's testimony about the modern direction of child welfare is reliable and admissible under Rule 702.

Plaintiffs assert that Ms. Ahluwalia's opinion is based on insufficient data and that her methodology is incorrect. Plf. Mot. at 4, 6, 7-8. As courts have explained, "[o]ne need not leverage a multi-variate regression or conduct laboratory tests to qualify as having used a methodology, let alone a reliable one." *PerkinElmer Health Scis., Inc. v. SRC Living LLC*, Case No. 5:20-CV-02083-JWH-KK, 2022 WL 3130237 at *3 (C.D. Cal. June 22, 2022).

In cases involving expert testimony on areas such as state regulations or state policies, interviewing industry leaders "is a reasonable approach to undergird [expert] testimony regarding what are essentially qualitative insights." *Id*. (where expert was testifying about California regulatory requirements, interviewing industry leaders was a sufficient methodology to satisfy Rule 702); *see also United States v. Sims*, 550 F. Supp 3d 907, 918 (D. Nev. 2021) (expert's testimony about human trafficking was admissible under Rule 702 where the expert had a seventeen-year career and had conducted numerous interviews with both victims and traffickers); *United States v. Brooks*, 610 F.3d 1186, 1195-96 (9th Cir. 2010) (same).

The Court finds that Ms. Ahluwalia conducted interviews with over a dozen industry leaders and experts, including interviewees from the Child Welfare League of America, Chapin Hall at the University of Chicago, the Annie E. Casey Foundation, the University of Maryland School of Social Work – Institute for Innovation and

Implementation, the Alliance for Strong Families and Communities, and the National Indian Child Welfare Association, among others. Ahluwalia Report at 5-6. Ms. Ahluwalia also employed a reliable methodology in conducting the interviews; she asked the interviewees the same questions and reached her conclusions about the areas of evolutions in child welfare practice outlined in her expert report after conducting the interviews. *See* Kothari Decl., Ex. 1, Ahluwalia Dep., at 46:21-48:1.

Based on Ms. Ahluwalia's extensive experience in human services and child welfare and her interviews with over a dozen industry leaders and experts, the Court determines that her testimony is based on sufficient facts and data and satisfies the minimal admissibility requirements under Rule 702.

Last, Plaintiffs' argument that Ms. Ahluwalia did not review Plaintiffs' requested relief is not supported by her deposition testimony or her report, which discusses, albeit briefly, that Plaintiffs' requested relief in the complaint will be insufficient to redress the harms they allege. The Court finds no basis under Rule 702 to exclude Ms. Ahluwalia as an expert witness in this case.

### C.    Stacey Moss

#### 1.    *Expert Background*

Ms. Moss has nineteen years of experience in the child welfare field. (Stacey Moss Resume ("Moss Resume"), Decl. of Stacey Moss ("Moss Decl."), Ex. 1.  After graduating from the University of Wyoming College of Law in 2006, Ms. Moss spent two years practicing law in juvenile court, in private practice, and as an Assistant Attorney General with the Wyoming Attorney General in the Departments of Family

Services, Transportation, and Health. *Id.* As an Assistant Attorney General, Ms. Moss provided day-to-day legal advice to Wyoming state agencies, including the Wyoming Department of Family Services. *Id.* at 30. She represented caseworkers and CPS investigators, assisted the Department of Family Services to write and review its policies, trained new caseworkers, and provided opinions on legislative policies. *Id.*

Beginning in 2008, Ms. Moss transitioned to the Guardians Ad Litem Program of the Wyoming Office of the Public Defender, where she served as Director. *Id.* In that capacity, Ms. Moss trained, supervised, and managed attorneys throughout Wyoming who represented children in child welfare and juvenile justice proceedings, in addition to training program staff, approving all program expenditures and revenue, and tracking and maintaining the program budget. *Id.*

Ms. Moss left the Guardians Ad Litem Program in 2013, when she began working for Public Knowledge. *Id.* at 29. Ms. Moss is the President and CEO of Public Knowledge, a nationally recognized consulting firm that specializes in advising child welfare agencies. In 2016, Ms. Moss and Public Knowledge analyzed aspects of Oregon's child welfare system. Ms. Moss served as the Data Lead and Subject Matter Expert for that effort.

Public Knowledge's 2016 Report criticized Child Welfare. For this case, Defendants invited Ms. Moss and Public Knowledge to again conduct an evaluation, this time of Child Welfare as an agency. Ms. Moss and her team spent several years analyzing quantitative and qualitative data. They reviewed over a thousand

documents and datasets specific to Oregon's child welfare system and conducted a substantial number of surveys, focus groups, and interviews to assess the progress and improvement at Child Welfare. Ms. Moss has personally consulted on child welfare projects in fourteen states. *Id.* For example, Public Knowledge and Ms. Moss have worked with the North Carolina Department of Health and Human Services since 2020. *Id.* As part of that work, Ms. Moss delivers training and coaching to the executive leadership team for the child welfare agency in that state.

The 2016 Public Knowledge Report has been a component of Plaintiffs' case. The Complaint cites the 2016 Public Knowledge Report, and Plaintiffs relied on the 2016 Public Knowledge Report in their motion to certify the class and trial brief. Compl. ¶¶ 213- 14, ECF No. 1; Motion to Certify the Class at 32, ECF No. 64; Pls. Trial Br. at 26, ECF No. 375.

From 2017 to 2019, Public Knowledge and Ms. Moss provided support to the Oklahoma Department of Human Services while that agency underwent an organizational change regarding eligibility and enrollment for benefits across multiple programs, including child welfare. *Id.* at 24, 27, 100, and 102. Public Knowledge and Ms. Moss have similarly assisted the Mississippi Department of Child Protection Services with implementing a statewide model of child welfare practice in conjunction with a statewide settlement agreement that followed a federal class action. *Id.* at 7, 17, 26, 35, 38, 44, and 51.

### 2. *Expert Report / Testimony*

Plaintiffs challenge the expert opinion of Ms. Moss and the admissibility of the Public Knowledge LLC Reports from 2016, 2023, and 2024. Plf. Mot. to Exclude Moss at 12-16. Plaintiffs also challenge admissibility of all exhibits attached to the declaration of Steven Rizzo, which include a variety of documents, including images of the Public Knowledge website. The Public Knowledge Reports are voluminous, and the Court has reviewed each to assess the overall findings and conclusions.

Ms. Moss determined that Child Welfare made progress or significant progress in each of the issue areas identified by Plaintiffs in their Complaint. The topic areas of her report in 2023 was taken directly from Plaintiffs' Complaint and the key findings of the report address specific issues raised in Plaintiffs' pleadings. *See generally*, 2023 Moss/Public Knowledge Report, Rizzo Decl. Ex. 8 at 1-4 (summarizing methodology and findings). Ms. Moss's later reports follows the 2016 Public Knowledge Report, which Plaintiffs cited in their Complaint, dispositive motions, and trial brief, and which this Court relied on when certifying this class action. Ms. Moss's testimony is highly relevant to this Court's evaluation of Plaintiffs' claims. Ms. Moss will testify that there has been a cultural shift at Child Welfare that focused the agency on evidence-based, data-driven, and prevention-focused processes. Ms. Moss opines that this shift has resulted in fewer children entering care and more children in kinship placements, decreased out of-state and congregate care placements, and a centralized and formalized response to allegations of abuse and neglect, among other things.

### 3. *Analysis*

###### i.    *Reliability: Expertise*

As an initial matter, Plaintiffs launch a host of challenges on the basis of Ms. Moss reliability and status as an expert that are not supported in law and the Court will address those arguments first.

Plaintiffs attack Ms. Moss's reliability on the basis that she has (1) not appeared as a lawyer in federal court; (2) never testified as an expert before; (3) never litigated a civil rights claim; (4) never litigated an Americans With Disabilities Act Claim; (5) never litigated a Child Welfare Act claim; (6) never worked for a child welfare agency; (7) never been employed as a caseworker; and (8) Never litigated a claim involving the Adoption and Safe Families Act  Plf. Mot. to exclude Moss at 9-10.

From that argument, in the context of this case and expert witness, the Court can discern no legally supported grounds to exclude Ms. Moss under application of Rule 702.  Ms. Moss has never purported to have taken on any of those roles, nor would she have needed to in order to qualify as an expert under Rule 702.  Ms. Moss holds two decades of experience in the field of child welfare field, which is a proper basis for her testimony here.  "[E]xperience is the predominant, if not the sole basis for a great deal of reliable expert testimony." *Century Indem. Co.,* 2015 WL 5965614, at *2 (quoting Fed. R. Evid. 702 committee note).

Next, Plaintiffs challenge the admissibility of Ms. Moss's testimony on grounds that her expert witness contract was "not the product of a competitive procurement process."  *Id.* at 3-4.  Plaintiffs argue that there is "pervasive clubbiness" between

Public Knowledge, Markowitz Herbold, the DOJ, and DHS. *Id*. at 15. The hyperbolic statements are not well taken. Plaintiffs' argument could not be more out of place and has no application here in evaluating admissibility under Rule 702.

Continuing, Plaintiffs assert that Ms. Moss is not reliable because she was not engaged by the State of Oregon to complete an independent review, but instead retained by Markowitz Herbold and the Oregon Department of Justice to serve as a consulting expert witness. *Id*. at 11. Plaintiffs fail to explain why this distinction matters at all and fail to support this argument with any legal basis for exclusion under Rule 702.

Additionally, Plaintiffs launch semantic challenges to "linguistic choices" made in the expert reports, asserting that some text would be more accurately stated with different text. *Id*. at 11, 14-15. This is not a basis to exclude Ms. Moss's testimony or the reports. This challenge is unsupported by legal authority and the Court finds no basis to exclude on any grounds encompassed in Rule 702.

Plaintiffs also challenge admissibility of Ms. Moss's testimony because internal communications, such as "Microsoft Teams" messages between Ms. Moss, Public Knowledge staffers/assistants, and Defendants were not made available to Plaintiffs in discovery. *Id*. at 16. The Court has already addressed this issue at an earlier point in the case and Plaintiffs' resuscitation of old arguments already rejected are unavailing. The Court cannot discern legally supported grounds to exclude Ms. Moss or any of the challenged reports on the basis that Plaintiffs could not obtain emails and Microsoft Teams messages between Defendants, Ms. Moss, her assistants, and

Public Knowledge, especially where the Court has already ruled that Plaintiffs were not entitled to those documents.

Next, Plaintiffs pluck from the 2023 Public Knowledge Report a statement that the Public Knowledge helps its clients "plan for implementation and execute these plans using the best available evidence in implementation science." *Id*. at 13. In light of that, Plaintiffs assert that "Moss has no formal education, or credentials, in the field of implementation science and there is no evidence that the PK team actually utilized implementation science methods" and that the 2023 report merely creates an "aura of implementation science."

The Court finds that the Ms. Moss's credentialing leaves no doubt that she possesses reliable, experience-based expertise to opine on the issues in the report. Ms. Moss does not set herself out to be an "implementation scientist," nor does she need to have that qualification to opine on the issues in the reports. In a case like "this case, where no scientific knowledge is necessary and the witnesses' expertise is based on 'personal knowledge or experience,'" that experience is given significant weight in assessing admissibility. *B.K. by next of friend Tinsley v. Faust*, No. CV00185-PHX-ROS, 2020 WL 2616033, at *3 (D. Ariz. May 22, 2020).

Here, in sum, Ms. Moss's vast knowledge qualifies her as an expert. Her experience includes her prior evaluation of Oregon's child welfare system and the many occasions in which she has advised child welfare agencies and other officials on how to implement and assess reforms. For her assessment in this case, Ms. Moss and

Public Knowledge conducted surveys, focus groups, and interviews.  Ms. Moss also reviewed more than a thousand additional documents and data compilations.

Based on her years of experience in the field, Ms. Moss was able to review and assess this massive amount of information, identify the key areas for assessing progress and improvement in Oregon's child welfare system, and assess what reforms and developments constitute progress and improvement.  Moss Decl. Ex. 2.  This type of assessment requires "specialized knowledge" in the field of child welfare and Ms. Moss has ample knowledge in the field to render reliable opinions.

### ii.    *Reliability: Methodology*

Plaintiffs lodge two criticisms against Ms. Moss's methodology.   First, Plaintiffs speculate that the hundreds of caseworkers, staff members, and other Child Welfare employees that participated in the assessment were "biased" and that Ms. Moss should have instead sought input from children, parents, judges, and CASAs. Pls.' Mot. to exclude Moss at 15.

As a threshold matter, there is no evidence that the hundreds of assessment participants were biased.  Together, the focus groups, interviewers, and surveys sought input from individuals at all levels of Child Welfare, including caseworkers, managers, and consultants.  Public Knowledge did not report respondents' names as part of the survey or focus groups, and respondents had no incentive to downplay or ignore any concerns they had about the agency's culture or operations.  Plaintiffs' arguments go to the weight, not the admissibility, of the evidence.  When assessing the sufficiency of the facts or data relied upon by an expert, the Court looks for

"foundation, not corroboration." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025 (9th Cir. 2022).

Plaintiffs also fault Ms. Moss for using the phrase "deliberately indifferent." Plf. Mot. to exclude Moss at 10-11. It appears that Ms. Moss uses the phrase once in her 390-page report. At her deposition, Ms. Moss explained that she used the phrase in its ordinary meaning because it was used in the Complaint, not in any technical legal sense. Rizzo Decl. Ex. 1, Moss Dep. 38:4-39:3. Because this is a bench trial, there is no risk that the Court will be unduly prejudiced or confused by Ms. Moss's use of this phrase. *See United States v. Two Eagle*, 318 F.3d 785, 792 (8th Cir. 2003) ("[T]estimony is not defective merely because it utilized the words of the legal standard. Commonly used words and their plain meaning often match their legal meaning.").

### iii.    Relevance

The Court finds that Ms. Moss's testimony is relevant to the case. "The relevance prong under Daubert means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1154 (E.D. Wash. 2009). Here, The topic areas of her report were taken directly from Plaintiffs' Complaint and the key findings of the report address specific issues raised in Plaintiffs' pleadings. *See* 2023 Moss/Public Knowledge Report, Rizzo Decl. Ex. 8 at 1-4 (summarizing methodology and findings). The Court does not apprehend any argument from Plaintiffs to the contrary. The Court also finds no basis to exclude Ms. Moss's testimony for use as rebuttal evidence.

## II.    Defendants' Objections

Defendants argue that the testimony of Dr. Sue Steib and Patricia Rideout should be excluded for three principal reasons: (1) their opinions are not the product of reliable principles or methods; (2) their opinions do not "fit" the claims because they address "only anecdotal findings" that "cannot be extrapolated to Oregon's foster care program as a whole"; and (3) The two experts stated in the report that they faced time constraints preventing them from reviewing every document in the case files. Def. Mot. at 2, ECF No. 364.

### A.    Dr. Sue Steib and Patricia Rideout

#### 1.    *Expert Backgrounds*

Dr. Steib has over forty-five years of experience in the field of child welfare and both a master's degree and Ph.D. in social work.  *See* Feb. 2, 2024, Steib & Rideout Amended Expert Report at 7, ECF No. 365-1 ("Steib/Rideout (Feb. 2, 2024)").  She worked in Louisiana's child welfare system for thirty-one years, in positions ranging from caseworker to Director of Child Welfare Programs.  *Id.* at 7.  Dr. Steib served for eight years as a Senior Director of Strategic Consulting at Casey Family Programs, where she led the organization's efforts to improve outcomes for children and families in Louisiana and Oklahoma.  *Id.*  Subsequently, she directed the Research to Practice Initiative at the Child Welfare League of America.  *Id.*  Dr. Steib has since consulted for a number of states to help them improve their child welfare outcomes and has conducted many case sample reviews in the process.  *See* Lowry Decl. Ex. B, Steib Dep. 13:9-15:15; 73:1-2.

Ms. Rideout has over thirty years of child welfare experience, a juris doctorate, is the owner of Rideout Consulting, and is the lead consultant on team decision making at Evident Change.  Steib/Rideout (Feb. 2, 2024).  She served as a senior consultant at the Annie E. Casey Foundation's Family to Family Initiative for over 10 years and was the director of Cuyahoga County Division of Children and Family Services in Cleveland, Ohio from 2011 to 2015.  *Id*.  Ms. Rideout also served as a Juvenile Court Magistrate in Toledo, Ohio.  *Id*.  Dr. Steib testified that she and Ms. Rideout relied on "[t]he standards that we're all aware of as child welfare professionals that are well established in – in the field."  Steib Dep. 77:13-19.  Ms. Rideout testified: "I've done this work for a lot of years and . . . I think I have a pretty good sense of what good practice is, and so for those reasons I think I have the foundation to spot problematic as well as, you know, better-than-average practice without having metrics to compare it to."  Rideout Dep. 61:13-18.

### 2.    *Expert Report / Testimony*

The challenged report provides "key findings from a review of the randomly selected case records of 95 children who were in out-of-home care on June 30, 2022, and had been placed there by the Oregon Department of Human Services ("DHS"), and our opinions about the practices reflected in those records."  Cases included the following groups:

> Thirty children with a goal of return to family, half having been in care for less than 18 months and half for more than 18 months,
>
> Twenty-five children with a goal of adoption,
>
> Twenty children placed in congregate settings, and

> Twenty children who have experienced maltreatment while in
> out-of-home care.

Steib/Rideout (Feb. 2, 2024) at 6.    The experts reviewed administrative data

describing the experiences of children in out-of-home care through Oregon DHS

between 2019 and 2022.    The report states that the opinions are based on "the

reviewers' education, training, and professional experience and [] their review of the

information made available to them as of the date of the report.  *Id*.

Dr. Steib and Ms. Rideout collected data and input it into different matrices

analyzing ten data points, including the number of short-term placements in the last

30 days and the number of disruptive adoptive placements for each child.  *Id*. at 8.

The report made findings in the 95 case studies about reunification, permanency

(finalized adoption), number of children who experienced maltreatment in care,

maltreatment during "trial home visits"—when a child in custody undergoes a trial

period back with family from which they were initially removed, and use of short-

term placements.  *Id*. at 8-16.    From the case files reviewed, the report mentioned in

its conclusion that the use of short-term placements and "potentially inappropriate"

trial home visits was "concerning and was notable across all samples. . ."  *Id*. at 17.

Further, that "almost all maltreatment in care experienced by children in our sample

occurred during a trial home visit."

### 3.    Analysis

#### i.    Reliability

Defendants argue that Dr. Steib and Ms. Rideout did not use a reliable methodology. Def. Mot. at 4. Defendants assert that, to be admissible, experts must explain how they reached their conclusions and point to an objective source, such as a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like. *Id.*; citing *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("Daubert II").

In Defendants' view, Dr. Steib and Ms. Rideout offered "merely personal opinions about how well a system is operating without a basis in objective standards or recognized methodologies." Def. Mot. at 5. Defendants assert that Plaintiffs' experts did not base their case file review on any recognized methodology; did not employ case-review instruments; and did not compare their results to any objective standards. *Id.*

Defendants further contend that Ms. Rideout stated that she did not compare the 95 Oregon case files to any standards or compare them to foster care practices in any other jurisdictions. *Id.* Defendants emphasize that an expert cannot rely on experience alone without explaining how that experience was applied to reach the resulting opinion, urging the Court that it cannot "take their [the experts'] word for it." *Id.* at 6; citing *Arjangrad v. JPMorgan Chase Bank, N.A.*, No. 3:10-cv-01157-PK, 2012 WL 1890372, at *5 (D. Or. May 23, 2012)

In the child welfare context, courts have admitted expert testimony based on review of the named plaintiffs' case files for purposes of comparison against accepted professional standards. *See, e.g., B.K. by Tinsley v. Faust*, No. CV-15-00185-PHX-

ROS, 2020 WL 2616033, at * 5 (D. Ariz. May 22, 2020) (admitting the testimony of an expert who reviewed the named plaintiffs' case files when the expert "has decades of social work and child welfare experience," and "is qualified to provide testimony on at least the care received by B.K. and B.T. while in the Arizona child welfare system, and whether that care meets the standards of professional practice."); *Kenny A. v. Perdue*, Civil Action No. 1:02-cv-1686-MHS, 2004 WL 5503780, at *13 (N.D. Ga. Dec. 13, 2004) (rejecting a challenge to an expert report based on review of only five individual case files because "[e]ven though Ms. Smith's report by itself may be insufficient to establish class-wide constitutional violations, it will still assist the Court, in conjunction with all the other evidence presented, in understanding how services are provided in the individual setting and how individual children are harmed when appropriate services are not provided.").

Here, Ms. Rideout provided in her report evidence of substantial experience, expertise, and published work, in the field of child welfare. *See* Wilson Decl., Ex. 1 at 9. Dr. Steib, Ph.D., LCSW, has over 45 years of child welfare experience including direct practice, agency administration, research, and consultation. *Id*. at 10.

Their report states that "Case materials were reviewed in a general way by plaintiffs' attorneys and paralegals and that the "review sample and individual case categories ***are not statistically representative of all children in out-of-home care in Oregon***. *Id*. at 14, 15. From that, it is clear that the 17-page report does not purport to be an all-encompassing assessment of Oregon's child welfare system, but is what it says it is—a general review of 95 cases in which Ms. Rideout and Dr. Steib

identify areas of concern and areas where DHS is succeeding. To the extent that Ms. Rideout or Dr. Steib purport to testify that their findings apply to the Oregon child welfare system as a whole, such testimony is excluded.

However, consistent with the above cited caselaw, the Court declines to exclude Dr. Steib and Ms. Rideout on the basis that their report is not expressly based on scientific standards. Dr. Steib testified that she and Ms. Rideout relied on "[t]he standards that we're all aware of as child welfare professionals that are well established in – in the field." Steib Dep. 77:13-19. Ms. Rideout testified: "I've done this work for a lot of years and . . . I think I have a pretty good sense of what good practice is, and so for those reasons I think I have the foundation to spot problematic as well as, you know, better-than-average practice without having metrics to compare it to." Rideout Dep. 61:13-18.

The Ninth Circuit has held that an expert's opinion may be based on the expert's experience and knowledge of the industry as a whole. *United States v. Laurienti*, 611 F.3d 530, 548 (9th Cir. 2010). The Court concludes that Dr. Steib and Ms. Rideout have adequately set forth a basis for their expert opinions on professional standards in the area of child welfare. The Court therefore declines to exclude the testimony or opinions of Dr. Steib or Ms. Rideout.

Defendants also assert that, due to time constraints, Dr. Steib and Ms. Rideout did not reliably review the case files. Def. Mot at 6. Defendants assert that Plaintiffs' experts missed important information, pointing out as an example that the documents the experts reviewed did not include the Office of Training, Investigations,

and Safety ("OTIS") Documentation, even though that documentation was contained within the case files.  Def. Mot at 6-7; Wilson Decl. Ex. 5, Steib and Rideout Rebuttal Report at 3 (March 1, 2024) (Rideout stating that their review did not include OTIS documentation).  Defendants then contend "Steib and Rideout did not adequately explain why they lacked time to conduct a more reliable review of case files."  *Id*. at 7.

Plaintiffs respond that, when asked whether she was confident in her conclusions, despite the time constraints preventing her from reviewing every document in the case files, Dr. Steib stated "No. Not our fundamental conclusions as we state them in our report."  Steib Dep. 68:9-18.

First, it is not clear from Defendants' briefing, and the Court is not required to guess, why Defendants need an explanation from Plaintiffs' experts about "why they lacked time" to review every document in the case files.  Plaintiffs assert that it is because Defendants delayed producing documents for the experts' review. Regardless, the Court does not require that information for any part of its analyses of admissibility of the report thus far, under Rule 702.

Second, Defendants do not provide a developed argument explaining why admissibility is contingent on Dr. Steib and Ms. Rideout reading every document in each voluminous case file.  The report explained, and the Court understands, the limitations and the parameters of the experts' review.  Neither Dr. Steib nor Ms. Rideout purport to opine on any document which they have not reviewed.  The Court declines to exclude Dr. Steib and Ms. Rideout on this basis.

### ii.    Relevance

Defendants assert that, for an opinion to fit this case, it must demonstrate "widespread actual injury." Def. Mot. at 7. Further, that the 95 case files Steib's and Rideout's opinions do not—and cannot—offer the Court any information about the Oregon Child Welfare system as a whole. *Id.*

"Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92. Further, "fit" is "not always obvious, and scientific validity for one purpose is not necessarily validity for other, unrelated purposes." *United States v. Webb*, 115 F.3d 711, 717 (9th Cir. 1997). Rather than asking "what do you know?," the fitness inquiry asks, "how does it help?" *Id.* Thus, even if the proponents of an expert's testimony meet their burden of establishing that the testimony qualifies as scientific knowledge, "the court must still exclude the evidence if it does not 'fit' the matters at issue in the case." *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1397 (D. Or. 1996).

In child welfare cases, courts have found expert testimony based on similar case file reviews to be relevant. *See, e.g., B.K. by next of friend Tinsley,* 2020 WL 2616033, at *3; *see also* Opinion & Order at 7-10, ECF No. 275.

Dr. Steib and Ms. Rideout's expert testimony satisfies the relevance threshold. Their opinions are relevant to myriad of facts that will be at issue at trial, including whether Defendants place foster children at risk of harm by prematurely placing them on trial home visits, *see* Steib/Rideout (Feb. 2, 2024) at 13, 15; whether permanency is being delayed for foster children in Oregon, *id.* at 16; and whether

Defendants' insufficient availability of appropriate placements results in children being placed in inadequate temporary placements, *id.* at 13-14.

Additionally, Dr. Steib and Ms. Rideout's opinions will help the Court to understand the real-life implications of the data that Plaintiffs intend to present about the case files the experts studied.  As they note, their report is intended "to provide real-life context through information about children's life experiences while in the care of Oregon DHS, to accompany the many data reports already available" and "reflect the stories underneath the metrics." *Id.* at 6.

Further, Dr. Steib and Ms. Rideout's conclusions are need not "offer the Court any information about the Oregon Child Welfare system as a whole" to be relevant. *See* ECF 364 at 8.  The Ninth Circuit has observed that as a general matter, so long as the evidence is relevant and the methods employed are sound, neither the usefulness nor the strength of statistical proof determines admissibility under Rule 702. *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005).  The Court finds the testimony of Dr. Steib and Ms. Rideout to be helpful and relevant.  However, as addressed above in its discussion of reliability, any testimony purporting to apply the conclusions in this limited case study to the child welfare system as a whole is excluded.

## CONCLUSION

For the reasons explained above, Plaintiffs' Motion to Exclude Jim Dimas and Uma Ahluwalia, ECF No. 362, is DENIED.  Plaintiffs' Motion to Exclude Stacy Moss, ECF No. 360, is DENIED.  Defendants' Motion to Exclude Dr. Sue Steib and Patricia Rideout, ECF No. 364, is GRANTED in part and DENIED in part.


It is so ORDERED and DATED May 8, 2024.


        /s/Ann Aiken     
        Ann Aiken
        District Judge