**P. ANDREW McSTAY, JR.**, OSB 033997
andymcstay@dwt.com
**WILLIAM D. MINER**, OSB 043636
billminer@dwt.com
**DAVIS WRIGHT TREMAINE LLP**
560 SW 10th Avenue, Suite 700
Portland, OR 97205
Telephone: (503) 241-2300

*Attorneys for Plaintiffs; additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
### EUGENE DIVISION

|  |  |
|---|---|
| WYATT B. and NOAH F. by their next friend Michelle McAllister; KYLIE R. and ALEC R. by their next friend Kathleen Megill Strek; UNIQUE L. by her next friend Annette Smith; SIMON S.; RUTH T.; BERNARD C.; NAOMI B.; and NORMAN N., individually and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>    v.<br><br>TINA KOTEK, Governor of Oregon in her official capacity, FARIBORZ PAKSERESHT, Director, Oregon Department of Human Services in his official capacity; APRILLE FLINT-GERNER, Director, Child Welfare in her official capacity, and OREGON DEPARTMENT OF HUMAN SERVICES,<br><br>               Defendants. | Case No. 6:19-cv-00556-AA<br><br>**MOTION FOR ATTORNEYS' FEES AND COSTS** |

# TABLE OF CONTENTS

**Page**

MOTION FOR ATTORNEYS' FEES AND COSTS ........................................................ 1

I.    PLAINTIFFS ARE PREVAILING PARTIES AND DEFENDANTS HAVE
      CONTRACTED TO PAY THEIR REASONABLE COSTS AND FEES .............................. 1

II.   PLAINTIFFS OBTAINED EXCELLENT RESULTS IN SETTLEMENT THAT MERIT A
      FULL FEE AWARD.......................................................................................... 2

      A.    The Result is What Matters ................................................................. 3

      B.    The Settlement Results for Plaintiffs Were Excellent............................. 4

      C.    Plaintiffs' Claims Focused on Improving the Safety of Foster Youth; the Services,
            Programs, and Placements Available to Them; and the Quality of Their Casework
            and Support and Were Thus Inextricable From One Another ................... 9

III.  USING THE LODESTAR CALCULATION, THE COURT SHOULD FIND PLAINTIFFS'
      ASSERTED HOURS AND RATES JUSTIFY THE FULL AWARD REQUESTED ......... 13

      A.    Plaintiffs' Hours Reflect Reasonable Expenditures of Time ................... 14

      B.    Plaintiffs' Billing Rates Are Reasonable ............................................ 19

            1.    Davis Wright Tremaine ............................................................ 20

            2.    A Better Childhood ................................................................. 22

            3.    Disability Rights Oregon.......................................................... 24

            4.    Rizzo Bosworth Eraut PC ......................................................... 26

      C.    Adjustment of the Lodestar ................................................................ 28

IV.   AWARD OF COSTS ...................................................................................... 29

CONCLUSION .................................................................................................. 32

DAVIS WRIGHT TREMAINE LLP ....................................................................... 32

A BETTER CHILDHOOD .................................................................................... 32

DISABILITY RIGHTS OREGON ........................................................................... 33

RIZZO BOSWORTH ERAUT, PC .......................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*31 Foster Child. v. Bush*,
329 F.3d 1255 (11th Cir. 2003) ............................................................................ 4

*Arizona v. ASARCO LLC*,
773 F.3d 1050 (9th Cir. 2014) .............................................................................. 10

*Ashley W. v. Holcomb*,
34 F.4th 588 (7th Cir. 2022) .................................................................................. 4

*Ave. 33, LLC v. Aventurine Cap. Grp., LLC*,
No. 3:23-CV-00896-YY, 2024 WL 554285 (D. Or. Jan. 16, 2024),
*report and recommendation adopted as modified*,
No. 3:23-CV-896-YY, 2024 WL 1554169 (D. Or. Apr. 10, 2024) ........................ 25

*Barnard v. Theobald*,
721 F.3d 1069 (9th Cir. 2013) ................................................................................ 3

*Barrios v. California Interscholastic Fed'n*,
277 F.3d 1128 (9th Cir. 2002) ........................................................................... 2, 3

*Blum v. Stenson*,
465 U.S. 886 (1984) ............................................................................................ 3, 9

*Braam v. State of Wash.*,
98-2-01570-1 (Wash. Cir. Ct. Jul. 31, 2004)
*available at* https://clearinghouse.net/doc/48055/; ................................................ 7

*Burlington N. R. Co. v. Dep't of Revenue*,
934 F.2d 1064 (9th Cir. 1991) ................................................................................ 7

*Burt v. Hennessey*,
929 F.2d 457 (9th Cir. 1991) ................................................................................ 27

*Cabrales v. Cnty. of Los Angeles*,
935 F.2d 1050 (9th Cir. 1991) ................................................................... 9, 14, 15

*Carson P. ex rel. Foreman v. Heineman*,
240 F.R.D. 456 (D. Neb. 2007) .............................................................................. 4

*Chalmers v. City of Los Angeles*,
796 F.2d 1205 (9th Cir. 1986), *amended*, 808 F.2d 1373 (9th Cir. 1987) ............. 16

*City of Riverside v. Rivera*,
    477 U.S. 461 (1986) ................................................................................ 4, 12

*Connor B. ex rel. Vigurs v. Patrick*,
    774 F.3d 45 (1st Cir. 2014) ...................................................................... 4

*Corder v. Gates*,
    947 F.2d 374 (9th Cir. 1991) .................................................................... 9

*Cuellar v. Joyce*,
    603 F.3d 1142 (9th Cir. 2010) .................................................................. 19

*Cunningham v. Cnty. of Los Angeles*,
    879 F.2d 481 (9th Cir. 1988) .................................................................... 9

*D.G. ex rel. Stricklin v. Yarbrough*,
    No. 08-CV-074-GKF-FHM, 2012 WL 7829602 (N.D. Okla. Dec. 19, 2012),
    *report and recommendation adopted in part, rejected in part sub nom.*
    *D.G. ex rel. Strickland v. Yarbrough*,
    No. 08-CV-074-GKF-FHM, 2013 WL 1343151 (N.D. Okla. Mar. 31, 2013) ................ 22, 29

*Democratic Party of Washington State v. Reed*,
    388 F.3d 1281 (9th Cir. 2004) .................................................................. 14, 16

*Dennis v. Chang*,
    611 F.2d 1302 (9th Cir. 1980) .................................................................. 19

*Farrar v. Hobby*,
    506 U.S. 103 (1992) ................................................................................ 2

*Fischer v. SJB-P.D. Inc.*,
    214 F.3d 1115 (9th Cir. 2000) .................................................................. 2

*Flores v. Barr*,
    934 F.3d 910 (9th Cir. 2019) .................................................................... 7

*Gates v. Deukmejian*,
    987 F.2d 1392 (9th Cir. 1992) .................................................................. 4, 9, 19

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ........................................................................ *passim*

*Ibrahim v. U.S. Dep't of Homeland Sec.*,
    912 F.3d 1147 (9th Cir. 2019) .................................................................. 3

*Jones v. George Fox Univ.*,
    No. 3:19-CV-0005-JR, 2022 WL 4120783 (D. Or. Sept. 9, 2022) ........................ 27

*Keith v. Volpe*,
    644 F. Supp. 1317 (C.D. Cal. 1986), *aff'd*, 858 F.2d 467 (9th Cir. 1988) .............................. 18

*Kenny A. ex rel. Winn v. Perdue*,
    454 F. Supp. 2d 1260 (N.D. Ga. 2006) ...................................................................... 5, 28

*LaShawn A. v. Barry*,
    No. CIV. 89-1754 (TFH), 1998 WL 35243112 (D.D.C. Feb. 18, 1998) ............................... 23

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Turner*,
    305 F. Supp. 3d 1156 (D. Or. 2018).......................................................................... 22

*Lovell v. Chandler*,
    303 F.3d 1039 (9th Cir. 2002)............................................................................. 3, 27

*M.D. v. Abbott*,
    No. 2:11-CV-00084, 2020 WL 3972800 (S.D. Tex. July 14, 2020)...................................... 6

*Marisol A. ex rel. Forbes v. Giuliani*,
    111 F. Supp. 2d 381 (S.D.N.Y. 2000) .......................................................................... 6

*Moore v. James H. Matthews & Co.*,
    682 F.2d 830 (9th Cir. 1982).................................................................................. 14

*Moreno v. City of Sacramento*,
    534 F.3d 1106 (9th Cir. 2008).................................................................................. 14

*Nadarajah v. Holder*,
    569 F.3d 906 (9th Cir. 2009)................................................................................... 22

*Nunez v. BAE Sys. San Diego Ship Repair Inc.*,
    292 F. Supp. 3d 1018 (S.D. Cal. 2017) ...................................................................... 28

*O'Neal v. City of Seattle*,
    66 F.3d 1064 (9th Cir. 1995).............................................................................. 10, 15

*Ohler v. United States*,
    529 U.S. 753 (2000) ............................................................................................. 11

*Oregon Advoc. Ctr. v. Mink*,
    322 F.3d 1101 (9th Cir. 2003)................................................................................. 24

*Oregon Nat. Desert Ass'n v. McDaniel*,
    No. CIV 06-242-AA, 2011 WL 4625715 (D. Or. Sept. 30, 2011) (Aiken, J.) ......................... 4

*Perdue v. Kenny A. ex rel. Winn*,
    559 U.S. 542 (2010) ...................................................................................... 3, 5, 6

*Pierce v. Cnty. of Orange*,
   905 F. Supp. 2d 1017 (C.D. Cal. 2012) ......................................................................... 15

*Richard S. v. Dep't of Developmental Servs. of State of Cal.*,
   317 F.3d 1080 (9th Cir. 2003) ........................................................................................ 2

*Roberts v. City of Honolulu*,
   938 F.3d 1020 (9th Cir. 2019) ................................................................................. 14, 15

*Roberts v. Interstate Distrib. Co.*,
   242 F. Supp. 2d 850 (D. Or. 2002) ............................................................................... 18

*Rodriguez v. Barrita, Inc.*,
   53 F. Supp. 3d 1268 (N.D. Cal. 2014) .......................................................................... 15

*Schwarz v. Sec'y of Health & Hum. Servs.*,
   73 F.3d 895 (9th Cir. 1995) .......................................................................................... 10

*Smith v. Hughes Aircraft Co.*,
   22 F.3d 1432 (9th Cir. 1993) ......................................................................................... 27

*Steinke v. Washington Cnty.*,
   903 F. Supp. 1403 (D. Or. 1995) ........................................................................... 14, 15

*Texas State Tchrs. Ass'n v. Garland Indep. Sch. Dist.*,
   489 U.S. 782 (1989) ....................................................................................................... 2

*Toussaint v. McCarthy*,
   926 F.2d 800 (9th Cir. 1990) .......................................................................................... 7

*Tozer v. City of Portland*,
   No. 3:22-CV-01336-AN, 2023 WL 8295886 (D. Or. Nov. 30, 2023) ........................... 25

*United States v. Heller*,
   551 F.3d 1108 (9th Cir. 2009) ...................................................................................... 11

*United States v. Suquamish Indian Tribe*,
   901 F.2d 772 (9th Cir. 1990) .......................................................................................... 7

*Van Gerwen v. Guarantee Mut. Life Co.*,
   214 F.3d 1041 (9th Cir. 2000) ...................................................................... 13, 16, 26, 27

*Webb v. Sloan*,
   330 F.3d 1158 (9th Cir. 2003) ............................................................................. 3, 10, 16

*Wyatt B. by McAllister v. Brown*,
   No. 6:19-CV-00556-AA, 2021 WL 4434011 (D. Or. Sept. 27, 2021) ......................... 6, 11

*Wyatt B. v. Kate Brown*,
   No. 6:19-CV-00556-AA, 2022 WL 3445767 (D. Or. Aug. 17, 2022)................................... 17

*Zargarian v. BMW of N. Am.*,
   LLC, 442 F. Supp. 3d 1216 (C.D. Cal. 2020) ....................................................................... 15

**Federal Statutes**

28 U.S.C.
   § 1920 ............................................................................................................................... 1, 27
   § 794a ............................................................................................................................... 1, 27
   § 794e ..................................................................................................................................... 24

42 U.S.C.
   § 1988(b) .......................................................................................................................... 1, 27
   § 10805 ................................................................................................................................... 24
   § 10805(a)(1)(B) .................................................................................................................... 24
   § 12205 ............................................................................................................................. 1, 27
   § 15043 ................................................................................................................................... 24
   § 15043(a)(2)(A)(i) ............................................................................................................... 24

Adoption Assistance and Child Welfare Act ................................................................................ 1

Americans with Disabilities Act .......................................................................... 1, 3, 11, 20, 27

Rehabilitation Act ........................................................................................................................ 1

**State Statutes**

ADA, Section 504, and Adoption Assistance and Child Welfare Act ......................................... 10

National Center for Youth Law ................................................................................................... 22

ORS 192.517 .............................................................................................................................. 24

**Regulations**

42 C.F.R. § 41.51 ........................................................................................................................ 24

45 C.F.R. § 1326.21 .................................................................................................................... 24

**Constitutional Provisions**

Fourteenth Amendment .......................................................................................................... 1, 11

**Other Authorities**

American Lawyer, Oct. 23, 2023, *available at*
https://www.law.com/americanlawyer/2023/10/30/big-laws-approach-to-billing-rate-hikes-in-
2024/ ................................................................................................................................. 19

https://www.documentcloud.org/documents/6586161-Final-Settlement-ABC-Hennepin-County-
Case.html *T.F. v. Hennepin County*, 0:17-cv-01826 (D. Minn. Jul. 12, 2019) ........................ 7

U.S. Dep't of Labor, CPI Inflation Calculator, *at* https://data.bls.gov/cgi-
bin/cpicalc.pl?cost1=500&year1=202211&year2=202405 ..................................................... 19

## MOTION FOR ATTORNEYS' FEES AND COSTS

Plaintiffs move the Court to award reasonable attorneys' fees and costs associated with litigating the present matter. The settlement agreement in this matter prescribed that Plaintiffs were entitled to appropriate attorney's fees and costs. ECF 481, at 11-12. In the present case, Plaintiffs raised claims regarding the foster care system arising out of the Fourteenth Amendment (via Section 1983); the Adoption Assistance and Child Welfare Act (via Section 1983); the Americans with Disabilities Act; and the Rehabilitation Act. ECF 1, at 63-69. Each of these statutory schemes allow for the collection of reasonable attorney's fees and other costs for a prevailing party. 42 U.S.C. § 1988(b); 42 U.S.C. § 12205; 29 U.S.C. § 794a. The Court can also tax costs under 28 U.S.C. § 1920. As Plaintiffs are prevailing parties, having sought and obtained meaningful relief under these statutory schemes, the Court should award the Plaintiffs reasonable fees of $10,920,301[1] and $592,304.13[2] in costs, as stated and documented herein. This motion is supported by the extensive record in this case and the concurrently filed Declarations of Marcia Lowry, Tom Stenson, Emily Cooper, William Miner, Steven Rizzo, James McDermott, Jake Cornett, Shenoa Payne, and Lynn Walsh together with the exhibits attached to those Declarations.

## I.    PLAINTIFFS ARE PREVAILING PARTIES AND DEFENDANTS HAVE CONTRACTED TO PAY THEIR REASONABLE COSTS AND FEES

Plaintiffs are prevailing parties for the purposes of this motion. First, Defendants agreed—although not expressly using the term "prevailing party"—that Plaintiffs were entitled to a reasonable attorney's fee award and costs. Second, a plaintiff is a prevailing party as a matter of law whenever

---

[1] Plaintiffs sought a total of $11,418,124.60 in fees; however, based on the opinion of Plaintiffs' expert, that amount has been reduced by $497,823.67. Please also note that there is a discrepancy between the amount claimed by DWT and the amount in the McDermott Declaration based on time included on July 3 and after McDermott had completed his review.

[2] This amount is $42.83 less than the amount stated in McDermott's Declaration due to an improper cost removed after Mr. McDermott had executed his Declaration.

they "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Passantino v. Johnson & Johnson Consumer Prod*., Inc., 212 F.3d 493, 518 (9th Cir. 2000). Under either the settlement agreement or under the law applying to civil rights fee statutes, Plaintiffs are entitled to reasonable fees.

Prevailing party status can be obtained through settlement. "The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, *or comparable relief through a consent decree or settlement*." *Farrar v. Hobby*, 506 U.S. 103, 111 (1992) (emphasis added). The Ninth Circuit has repeatedly recognized that a plaintiff who achieves a "binding and enforceable settlement" is a prevailing party. *Richard S. v. Dep't of Developmental Servs. of State of Cal.,* 317 F.3d 1080, 1088 (9th Cir. 2003); *Barrios v. California Interscholastic Fed'n*, 277 F.3d 1128, 1134 (9th Cir. 2002).

A plaintiff must "be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Texas State Tchrs. Ass'n v. Garland Indep. Sch. Dist*., 489 U.S. 782, 792 (1989). A plaintiff prevails wherever it "can force the defendant to do something he otherwise would not have to do." *Fischer v. SJB-P.D. Inc*., 214 F.3d 1115, 1118 (9th Cir. 2000). It does not matter, based on the Supreme Court's restatement of "prevailing party" status, that Defendant may have had some success on some issues. The settlement changes the legal relationship between" Oregon foster children and the Defendants, achieving success on a "significant issue" and "some of the benefit" Plaintiffs sought in filing their complaint.

## II.    PLAINTIFFS OBTAINED EXCELLENT RESULTS IN SETTLEMENT THAT MERIT A FULL FEE AWARD

Plaintiffs' exceptional degree of success in this matter determines the scope of the award. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory

fee." *Hensley*, 461 U.S. at 435. Federal courts do not reduce a fee award "simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Id*. "A 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010). Plaintiffs' reasonable fees are typically determined by calculating the "lodestar," or "the number of hours worked multiplied by the prevailing hourly rates." *Id.* at 546. The "strong" presumption is that the lodestar yields a reasonable result. *Id.* at 552. "When . . . the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee contemplated by § 1988." *Blum v. Stenson*, 465 U.S. 886, 897 (1984).

The Ninth Circuit has held repeatedly that under Section 1988, a prevailing party that largely achieves the results that they sought is entitled to full fee awards. "Congress passed section 1988 to attract competent counsel to prosecute civil rights cases . . . [and] fee awards should be the rule rather than the exception." *Barnard v. Theobald*, 721 F.3d 1069, 1077 (9th Cir. 2013). "[T]he extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees' under § 1988." *Webb v. Sloan*, 330 F.3d 1158, 1168 (9th Cir. 2003) (quoting *Hensley* 461 U.S. at 440). A settlement or adjudication yielding "excellent results" should yield a full fee. *Ibrahim v. U.S. Dep't of Homeland Sec.*, 912 F.3d 1147, 1172 (9th Cir. 2019). Under the ADA and Section 504, a civil rights plaintiffs should similarly recover an attorneys' fee. *Barrios*, 277 F.3d at 1134; *Lovell v. Chandler*, 303 F.3d 1039, 1058 (9th Cir. 2002) (fees and costs compensable under ADA, including expert fees).

A.    **The Result is What Matters**

The essential element of the federal caselaw—emphatically stated over and over by the U.S. Supreme Court and the Ninth Circuit—is that the *results* matter, not the outcome of individual

motions, nor even (with one exception discussed below) whole claims. "Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters." *Hensley*, 461 U.S. at 435. An "excellent result" yields a full fee. *City of Riverside v. Rivera*, 477 U.S. 461, 579 (1986); *Sorenson*, 239 F.3d at 1147. This Court has, itself, determined "the degree of success as the most relevant and critical factor in determining fees. *Oregon Nat. Desert Ass'n v. McDaniel*, No. CIV 06-242-AA, 2011 WL 4625715, at *3 (D. Or. Sept. 30, 2011) (Aiken, J.). An excellent result is not necessarily the "type of relief requested" by the party in the complaint. *Gates v. Deukmejian*, 987 F.2d 1392, 1404 (9th Cir. 1992). "Again, the most critical factor is the degree of success obtained." *Hensley*, 461 U.S. at 436.

## B.      The Settlement Results for Plaintiffs Were Excellent

The relief in this matter is exceptional, first and most importantly, because many such cases never result in any benefit at all. *See, e.g., Ashley W. v. Holcomb,* 34 F.4th 588, 594 (7th Cir. 2022) (overturning trial court decision and dismissing proceedings); *Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 62 (1st Cir. 2014) (approving denial of relief after trial); *31 Foster Child. v. Bush*, 329 F.3d 1255, 1261 (11th Cir. 2003) (approving dismissal of litigation); *Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 545 (D. Neb. 2007) (dismissing litigation). The present settlement was achieved after 5 years of litigation, on the eve of trial, in a case with more than 500 docket entries so far. Plaintiffs were prepared to put on dozens of witnesses and introduce hundreds of exhibits at trial.

The settlement agreement demonstrates excellent success for all children in care. ECF 481. First, the settlement agreement's provisions will benefit all children in care, including children in every subclass. Every member of the general class and every member of the subclasses will benefit from enforcement of the "Ultimate Outcomes," which involve maltreatment in care; re-entry into foster care; timely case planning; timely mental and physical health assessments; appropriate and

necessary medical and mental health care services, and treatment; appropriate and quality placements; notification of maltreatment in care; and up to two more areas of interest determined by the neutral. ECF 481, 3-5. These substantive areas of focus match up well with the original areas of interests identified in the complaint, such as prompt assessments, prompt case planning, safe placements, appropriate placement, adequate therapeutic care and placements. ECF 1, at 70-73. Some areas of relief discussed by the complaint were merely more specific or subclass-focused versions of the relief achieved. For instance, Plaintiffs sought placements that were appropriate for SGM youth or aging out youth, but the overall analysis of appropriate and quality placements should include, where appropriate, consideration of the age, gender identity, and sexual orientation of the youth in those homes. ECF 1, at 72-73. Plaintiffs also sought to address the staffing of Oregon DHS, but because the inadequate staffing impacted timeliness of case planning and the safety of children, not because Plaintiffs wished to increase the employment prospects of case workers in Oregon. ECF 1, at 71. Similarly, the Plaintiffs requested relief around recruitment and retention of foster parents, but to ensure that foster youth had appropriate quality placements, not simply for the sake of multiplying the number of foster parents. *Id.* at 71. The measurable outcomes around appropriate and quality placements will assist the class. Further, since the Neutral can select up to two more measurable outcomes to enforce, it is entirely possible that the Neutral will, in fact, choose to measure other outcomes that are responsive to Plaintiffs' complaint, to the extent the settlement does not reach the crux of the claims of Plaintiffs.

The excellent relief in this case is comparable to what other courts have similarly found to be excellent outcomes for fee purposes. In the *Kenny A.* fee decision, the trial court commended a settlement that addressed: "timely commencement and thorough completion of investigations of reported abuse or neglect; regular visits of foster children by case workers; approval and licensure of foster homes and other placements; the percentage of children who are the victims of substantiated

maltreatment while in foster care; the percentage of children in foster homes that exceed their licensed capacity; the percentage of children who have experienced multiple moves while in foster care; and periodic judicial reviews of the safety and status of foster children." *Kenny A. ex rel. Winn v. Perdue*, 454 F. Supp. 2d 1260, 1289 (N.D. Ga. 2006).[3] A Texas fee decision in a similar matter determined that Plaintiffs "received the main and core remedy sought, which is in essence the systemic and ongoing reform of the Permanent Managing Conservatorship class foster care system." *M.D. v. Abbott*, No. 2:11-CV-00084, 2020 WL 3972800, at *3 (S.D. Tex. July 14, 2020); *see also Marisol A. ex rel. Forbes v. Giuliani*, 111 F. Supp. 2d 381, 398 (S.D.N.Y. 2000) (settlement of "litigation has led to institutional reform and improvement of most aspects of ACS's operations"). Since courts reviewing comparable matters with settlements resulting in broad relief for foster youth typically find those results to be excellent, this Court can likewise find the relief in this case to be similarly excellent results.

The relief obtained in this matter is also remarkable for *how* it will be enforced, not just *what* will be enforced. A neutral expert selected by Plaintiffs will assess Defendants' progress on the measurable outcomes for the next ten to twelve years, unless Defendants meet the terms for release before that time. ECF 481, at 10. The neutral will have the power to bring any dispute regarding a failure to meet the measurable outcomes to an arbitrator who can determine any violation and enforce a remedy, with the District Court's assistance. *Id.* at 10-11. This Court previously described the complaint in these terms: "In their prayer, Plaintiffs seek declaratory and injunctive relief, as well as *the appointment of a neutral monitor* to assess and report on Defendants' compliance with the terms of the requested injunction." *Wyatt B. by McAllister v. Brown*, No. 6:19-CV-00556-AA, 2021 WL 4434011, at *2 (D. Or. Sept. 27, 2021) (emphasis added). Whether such a neutral would be appointed

---

[3] The trial court's fee decision was later reversed by the U.S. Supreme Court on the decision to offer a fee enhancement, but otherwise left intact. *Kenny A.*, 559 U.S. 542.

has been central to this case since its outset. In the present case, Defendants staunchly and specifically opposed a "third party monitor" from the outset of the case. ECF 117, at 9; ECF 45, at 6 (complaining that plaintiffs seek to "appoint an out-of-state-monitor"); ECF 31, at 18 (condemning any outcome to the case imposing any outcome to the lawsuit "enforced by an unelected unsworn monitor").[4] They continued to object to any neutral oversight throughout the case until the eve of trial. ECF 386, at 29, 52, 94-95, 264 (extensive discussion in Defendants' trial lay witness statements about the problems of monitors, including a statement that it is "offensive" that Plaintiffs seek a monitor at all).

Some child welfare settlements do not utilize neutrals, including the class settlements in Arizona, Washington state, and some county level settlements.[5] Having a court-appointed neutral realizes substantial benefits in verifying reports of progress from the state defendants rather than Plaintiffs having to rely on statistics and reports produced by Defendants, as well as having a trusted, neutral, expert voice the District Court can listen to. Case law demonstrates that appointment of a special master, court monitor, or neutral following trial or summary judgment is a further step requiring exceptional circumstances. *Burlington N. R. Co. v. Dep't of Revenue*, 934 F.2d 1064, 1072 (9th Cir. 1991); *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 775 (9th Cir. 1990) *Toussaint v. McCarthy*, 926 F.2d 800, 802 (9th Cir. 1990) (while prisoners had properly obtained permanent

---

[4] Plaintiffs are restricted from speaking about any positions taken by either party in mediation, so any discussion of Defendants' positions relates exclusively to the *public* positions taken by Defendants in their nonconfidential filings as part of the case in chief. No statement in this motion should be interpreted as discussing Defendants' positions in mediation.

[5] *B.K. v. McKay*, Revised Settlement Agreement, 2:15-cv-00185, ECF 529-1, at 15 (D. Ariz. Aug. 31, 2020 (describing a process of exit from the agreement by which the Arizona Department of Child Safety would provide "written plans, policies, programs, tools, measurement methodologies, reports and other materials" to plaintiffs directly, in support of their exit process, with no neutral expert involvement) *available at* https://clearinghouse.net/doc/137840/; *see also Braam v. State of Wash.*, 98-2-01570-1 (Wash. Cir. Ct. Jul. 31, 2004) (imposing a means of supervision through an appointed panel) *available at* https://clearinghouse.net/doc/48055/; *T.F. v. Hennepin County*, Stipulation and Settlement Agreement, 0:17-cv-01826 (D. Minn. Jul. 12, 2019) (settling foster care lawsuit without neutral intermediary) *at* https://www.documentcloud.org/documents/6586161-Final-Settlement-ABC-Hennepin-County-Case.html.

injunctive relief, appointment of an independent monitor was not justified). Even a prevailing party

at trial may not get an independent monitor simply on request. *Flores v. Barr*, 934 F.3d 910, 914 (9th

Cir. 2019) (district court declined to appoint an independent monitor in class action for detained

immigrant youth). The common thread throughout civil rights reform litigation is that plaintiffs tend

to prefer appointment of a neutral, monitor, or similar intermediary. The courts' limitation of such

appointments to exceptional circumstances illustrates the remarkable success of Plaintiffs in the

present matter. Even if Plaintiffs had gone to trial and prevailed, the appointment of a neutral would

have required a further exceptional showing. Achieving that relief in settlement—appointment of a

neutral monitor, whose role was the focus of so much concern by Defendants for years—represented

an enormous win for Plaintiffs and all foster youth.

The relief is also remarkable because Defendants' public position as of a few months ago,

both in their own pleadings and through two experts that they retained, categorically stated that:

"Consent decrees create narrow metrics and do not provide a blueprint for the state agency to

transform itself. . . ." ECF 363-3, at 15. They likewise categorically stated that "consent decrees

struggle to produce lasting improvements in child welfare outcomes [and] reliably produce

unintended consequences." ECF 363-4, at 6. This public resistance to settlement dates back at least

to 2020. *See* ECF 117, at 9 (accusing Plaintiffs' counsel of following a "playbook" in this and 22

other lawsuits seeking settlements entailing "decades of monitoring by third parties, without

ascertainable benefit to children in those states"). The categorical public opposition to any injunctive

or consent decree resolution continued until the eve of settlement. ECF 386, at 94-98 (lay witness

statements from DHS staff extensively criticizing all injunctive relief in all child welfare cases). In

their trial brief, weeks before settlement, Defendants categorically stated "the system cannot be

meaningfully improved through an injunction or an outside monitor unfamiliar with Oregon's

system." ECF 372, at 17.[6] Plaintiffs moved Defendants, in a space of weeks, from a public position of disapproving *any* settlement to approving a settlement that granted Plaintiffs the lion's share of the relief they sought.

Overall, the settlement achieved substantial benefits for foster children throughout the state, touching on the core elements of the Plaintiffs' original complaint, even if the ultimate relief may differ in some respect from the initial request. *Gates*, 987 F.2d at 1404 (not important whether relief is of the type sought in complaint). Both the scope of substantive rights established by settlement and the mechanism of enforcement (i.e., through a neutral expert) represent a real benefit to foster youth, results not delivered in every systemic lawsuit on foster care.

### C.    Plaintiffs' Claims Focused on Improving the Safety of Foster Youth; the Services, Programs, and Placements Available to Them; and the Quality of Their Casework and Support and Were Thus Inextricable From One Another

Ordinarily, a prevailing party should receive a full fee if the result of their litigation obtains excellent results. *Hensley*, 461 U.S. at 435. In complex civil rights litigation, the "range of possible success is vast." *Id.* at 436. "Rare, indeed, is the litigant who doesn't lose some skirmishes on the way to winning the war." *Cabrales v. Cnty. of Los Angeles*, 935 F.2d 1050, 1053 (9th Cir. 1991). Where a party's degree of success in litigation or settlement is not excellent, but obtains only "partial or limited success," a court may proportionally reduce the fee award. *Id.* Separate reduction in fees for "partial or limited success" is rarely appropriate. *Blum v. Stenson*, 465 U.S. 886, 900 (1984) ("Because acknowledgment of the 'results obtained' generally will be subsumed within other factors used to calculate a reasonable fee, it normally should not provide an independent basis for increasing the fee

---

[6] *But see* Oregon Dep't of Human Servs., Daily Digest Bulletin June 26, 2024 (declaring that DHS is "pleased to announce that Kevin Ryan will serve as the 'Neutral' required by the settlement," that he would help the state "improve outcomes for children and families," that his appointment is a "positive outcome of this litigation," that he will be "well-positioned to examine" DHS practices, and that DHS "looks forward to collaborating" with him).

award."); *Corder v. Gates*, 947 F.2d 374, 378 (9th Cir. 1991) (holding that "district courts ordinarily should not make a separate adjustment for limited success"). Ordinarily, any negative considerations involving the degree of success should be included in the overall lodestar calculus of reasonable time, not separately accounted for by reducing the lodestar. *Cunningham v. Cnty. of Los Angeles*, 879 F.2d 481, 488 (9th Cir. 1988); *see discussion* Part III *infra*.

Reductions for "partial or limited success" are sharply limited by two important factors. First, the party must actually lose on a core *claim*, not a single theory of a larger argument, a collateral motion, or procedural step. *Natural Res. Def. Council v.* Winter, 543 F.3d 1152, 1163 (9th Cir. 2008) (holding that, while plaintiff's complaint articulated a "number of alleged causes of action," it pursued only "two statutory claims" that the court examined for the "partial success" analysis); *O'Neal v. City of Seattle*, 66 F.3d 1064, 1069 (9th Cir. 1995) ("The [class certification] motion itself was not a separate claim, but rather a method of pursuing her ultimately successful claims."). Second, the claims on which the party did not prevail must be "distinctly different claims for relief based on different facts and legal theories." *Schwarz v. Sec'y of Health & Hum. Servs.*, 73 F.3d 895, 901 (9th Cir. 1995). In civil rights litigation, unsuccessful pursuit of one claim may bolster or support the successful litigation of a successful claim. *Arizona v. ASARCO LLC*, 773 F.3d 1050, 1061 (9th Cir. 2014) (no need to reduce fees regarding unsuccessful claims "given the overlap between Aguilar's harassment claim and her other claims"); *Passantino*, 212 F.3d at 518 (full fees merited where Plaintiff "prevailed on her retaliation claims, which were inextricably intertwined with her [unsuccessful] discrimination claims").

In the present matter, all of Plaintiffs' four core claims (Substantive Due Process, ADA, Section 504, and Adoption Assistance and Child Welfare Act) have survived to the present. *See* ECF 1, at 63-68 (articulating Plaintiffs' four claims); ECF 45, at 6 (Defendants identified those four claims for relief as the claims at issue in the motion to dismiss). In assessing what constitutes a "claim" for

the purpose of this analysis, courts look to the overarching legal claims for relief, not single elements of nor arguments in support of each claim. *See, e.g.*, *Webb,* 330 F.3d at 1162 & n.3 (noting that Plaintiff's complaint contained "nine claims for relief," only one of which was dismissed; allowing recovery for fees spent on related, unsuccessful false arrest claim and due process claim for failure to train). While the scope of one of Plaintiffs' four claims was limited by the Court in its decision on the motion to dismiss, none of the four claims were, in fact, dismissed. *Schwarz*, 73 F.3d at 902 (a claim is "unsuccessful" under *Hensley* "once it has been dismissed by the plaintiff or by the court"). Only the limited reduction in scope of the substantive due process claims under the Fourteenth Amendment affected any of the core claims of Plaintiffs. *Wyatt B.*, 2021 WL 4434011, at *9 (excluding assertions of "a right to a duration of foster care reasonably related to the purpose of government custody," "the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody," "the right to assistance to find lawful, suitable permanent housing that will not result in homelessness upon exit from foster care," "the right to a connection with an adult resource who will maintain a stable, long-term relationship with the child after he or she ages out of the system," and "the right to independent living services to prepare to exist foster care successfully"). None of the other aspects of the substantive due process claim were affected by the motion to dismiss. The Defendants' motion to dismiss AACWA, ADA, and Section 504 claims were denied in their entirety. *Id.* at *11. No other motion practice or orders substantively affected Plaintiffs' claims.

On the eve of trial, the Court did grant several of Defendants' motions *in limine*, but these rulings were procedural and did not dismiss any claims. "A motion *in limine* is a procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009). "*[I]n limine* rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753,

758 n.3 (2000). While the Court tentatively limited the presentation of certain evidence, the Court's rulings *in limine* did not and could not dismiss any claims or grant summary judgment on any claims.

At all points, on all claims involving the general class and all subclasses, the fundamental focus of Plaintiffs' suit was the core grounds on which it was resolved: ensuring the safety of foster youth; their adequate care and treatment through the services, programs, and placements available to them; and the quality of their casework and support. These interests manifested throughout the complaint, the opposition to the motion to dismiss, the class certification process, and the trial preparation process. Individual focuses of certain discovery efforts, motions practice, and subclass claims merely presented individual instances or manifestations of these core interests. Whether youth with disabilities found appropriate placements or got the services that they needed was merely one aspect of whether the overall class found adequate care and treatment through appropriate placements or services.[7] Whether SGM youth found responsive, affirming placements was only one aspect of these overall unifying themes of adequacy of care and treatment. Whether DHS was concealing certain records or changing how it counted certain abuse reporting standards was an aspect of the overarching themes of ensuring child safety. No aspect of those claims narrowed by the order on the motion to dismiss, and no procedural motion granted or denied annulled any claim in its entirety.

Even if one were to consider a single aspect of the substantive due process claims as a separate claim, such "claims" would surely be "related to" the ones on which the Plaintiffs succeeded. *Hensley*, 461 U.S. at 434. A lawsuit with some successful claims and some related unsuccessful claims "cannot be viewed as a series of discrete claims," but the district court must instead focus on "the overall relief obtained by the plaintiff" in setting fee awards. *Id.* at 435. Claims are "related" for the purpose of

---

[7] Defendants previously made a basically similar point, stating that the Plaintiffs' "disability statute claims collapse into their general class claims," for instance, by stating that children with disabilities did not receive "timely and adequate assessments" and exposing children with disabilities to a "disproportionate risk of harm." ECF 117, at 52-53.

fees analysis when they "involve a common core of facts" and "involve related legal theories." *Rivera*,

477 U.S. at 566. The dismissed aspects of the substantive due process claim clearly share a "related

legal theory" to the successful aspects of Plaintiffs' substantive due process claim—they share the

identical legal theory. The dismissed aspects of Plaintiffs' substantive due process claim likewise

share the same common core of facts with the successful aspects of Plaintiffs' substantive due process

claims—they address the same foster youth, similar questions of harm to the youth, similar questions

of resources, capacity, and casework. Since any aspects of the Plaintiffs' four claims that were

affected by subsequent rulings were deeply entwined in the same fact and same legal theories as the

four successful claims, the Court should issue no downward adjustment for partial success.

## III.   USING THE LODESTAR CALCULATION, THE COURT SHOULD FIND PLAINTIFFS' ASSERTED HOURS AND RATES JUSTIFY THE FULL AWARD REQUESTED

"A court determines the 'lodestar' amount by multiplying the number of hours reasonably

expended on the litigation by a reasonable hourly rate." *Van Gerwen v. Guarantee Mut. Life Co*., 214

F.3d 1041, 1045 (9th Cir. 2000). In "rare and exceptional cases" with "specific evidence," the Court

may deviate upwards or downwards from the lodestar. *Id.* Based on the extensive records of Plaintiffs'

counsel's timekeeping, the declarations submitted, and the supporting expert opinions, the Court

should find that a full award (after the discount from Plaintiff's expert) is appropriate. Plaintiffs

submit that a large portion of their legal work on this case—drafting the complaint, opposing the

motion to dismiss, pursuing class certification, obtaining discovery, negotiating a settlement and

preparing the case for trial—was not only reasonably necessary to the prosecution of the present case,

but successful. Where that work was not successful or only partially successful, it was nevertheless

reasonably calculated to move the litigation towards the successful result achieved. *See Cascadia*

*Wildlands*, 987 F.Supp.2d at 1093-94 (plaintiff's unsuccessful claim "furthered larger goal" of

litigation and was thus not separate for fees calculation). Such work merits compensation to a prevailing party.

Plaintiffs' hourly rates are consistent with the prevailing market in Oregon as supported by the 2022 Oregon Bar Economic Survey and the opinion of James McDermott, an experienced Oregon litigator who has opined on the reasonableness of the fees sought by Plaintiffs. Decl. McDermott, at ¶¶ 4-6.

### A.    Plaintiffs' Hours Reflect Reasonable Expenditures of Time

Plaintiffs pursued a difficult case over five years of litigation, right to the threshold of trial. Plaintiffs' major efforts were all reasonable courses of action. A plaintiff's attorney may reasonably bill for all work "reasonably expended" "to advance the litigation of the case." *Roberts v. City of Honolulu*, 938 F.3d 1020, 1025 (9th Cir. 2019). A prevailing attorney can recover for "every item of service which, at the time rendered, would have been undertaken by a reasonable and prudent lawyer to advance or protect his client's interest." *Moore v. James H. Matthews & Co.*, 682 F.2d 830, 839 (9th Cir. 1982); *see also Steinke v. Washington Cnty.*, 903 F. Supp. 1403, 1407 (D. Or. 1995). "By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). In civil rights cases filed *pro bono*, a lawyer is "not likely to spend unnecessary time" as the "payoff is too uncertain." *Id.*

Every attorney undertakes some reasonable action that is unsuccessful. It "is not legally relevant that plaintiffs' counsel expended a certain limited amount of time pursuing certain issues of fact and law that ultimately did not become litigated issues in the case or upon which plaintiffs ultimately did not prevail." *Hensley*, 461 U.S. at 431. "[A] lawyer who takes on only those battles he is certain of winning is probably not serving his client vigorously enough; losing is part of winning." *Cabrales*, 935 F.3d at 1053. Attorneys who do reasonable work get paid for their work, even if they

do not prevail on their motions. Defense counsel for Defendants surely expected to get paid for *all* of the work they did on the motion to dismiss, the opposition to class certification, their many *Daubert* motions, their multiple motions to dismiss named plaintiffs on mootness grounds, and the motion to disqualify the Court as biased—even where that motion practice achieved little or no success. *Democratic Party of Washington State v. Reed*, 388 F.3d 1281, 1286 (9th Cir. 2004) (prevailing parties can obtain fees for any legal work for which a private party's attorney would "ordinarily bill their clients for the time").

Case law is uniform and emphatic in saying that Plaintiffs' motions practice or discovery efforts were not unreasonable wherever they were unsuccessful. *O'Neal*, 66 F.3d at 1069 (proper to award fees to prevailing plaintiff for time spent on unsuccessful motion for class certification). "[A] plaintiff who is unsuccessful at a stage of litigation that was a necessary step to her ultimate victory is entitled to attorney's fees even for the unsuccessful stage." *Cabrales*, 935 F.2d at 1053. A plaintiff may claim reasonable fees associated with drafting motions or pleadings that are denied, or even those that are never filed. *Roberts*, 938 F.3d at 1025 (attorney time spent on motion for preliminary injunction while negotiating resolution of case was reasonable, even though it was never filed); *Pierce v. Cnty. of Orange*, 905 F. Supp. 2d 1017, 1032-34 (C.D. Cal. 2012) (work on unsuccessful motions by prevailing party was compensable, as was work on generating 440 declarations ultimately not admitted at trial); *Cascadia Wildlands*, 987 F.Supp.2d at 1096 (time spent on never-filed preliminary injunction motion compensable); *Zargarian v. BMW of N. Am.*, LLC, 442 F. Supp. 3d 1216, 1229 (C.D. Cal. 2020) ("not unreasonable for Plaintiff's counsel to work on a motion" that is rendered moot or that counsel decides not to file for strategic reasons); *Rodriguez v. Barrita*, *Inc.*, 53 F. Supp. 3d 1268, 1282 (N.D. Cal. 2014) (reasonable to bill for time spent investigating witnesses' criminal records, even though the evidence was excluded at trial). Plaintiffs' legal work has in all ways been reasonable, even in those instances where it has been unsuccessful.

Legal work which is *not* reasonable is not simply work which is unsuccessful. Different lawyers may make different tactical choices around motions and discovery in the same matter, though each might still act reasonably. A difference of opinion between two parties about the merits of a motion or an avenue of evidentiary pursuit does not make one party's expenditure of time unreasonable. *Steinke*, 903 F. Supp. at 1408 (not proper to "second guess plaintiffs' litigation strategies" in assessing fees). An attorney who bills for time pursuing evidence not admitted in the case, even while acknowledging "that there was little chance discovery unrelated to the record would be admissible," acts unreasonably. *Van Gerwen*, 214 F.3d at 1048. Ninth Circuit precedent indicates that excluding all time spent on a motion requires that the motion be "wholly unrelated to the claims on which [the plaintiff] succeeded." *Webb*, 330 F.3d at 1169 (time spent on unsuccessful motion for summary judgment was compensable). The vast majority of other precedent on the question of time not "reasonably expended" typically relates more to hourly billings that are merely inflated, redundant, or excessive, rather than discounting a whole endeavor by prevailing party's counsel. *See, e.g., Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1214 (9th Cir. 1986), *amended*, 808 F.2d 1373 (9th Cir. 1987) (reducing award of fees for "excessive number of hours" spent researching and briefing). Using the "reasonable and prudent lawyer" standard established by the Ninth Circuit and being mindful for the high standards of unreasonable conduct, the Plaintiffs' legal work—supported in extensive declarations, documentation, and fee expert declarations—meets the standards for a full fee award.

The Court can rely on another helpful point of reference in finding reasonable claims of hours from Plaintiffs' counsel: the billings of Defendants' counsel. Here, even the earlier reports from Defendants indicate that they had spent millions more on attorney's fees by early February 2024 than

Plaintiffs seek for the entire duration of the case.[8] The time spent by opposing counsel, while not determinative, is "one particularly good indicator" of the reasonableness of the time spent by the prevailing party. *Reed*, 388 F.3d at 1287; *see also Ferland*, 244 F.3d at 1151 (holding that, while comparison of hours between prevailing party's attorneys and opponents' attorneys has limitations, such comparisons are useful when controlling for relevant differences and "the possibility that the prevailing party's attorney—who after all did prevail—spent more time because she did better work"). In considering the reasonableness of Plaintiffs' claimed hours, the Court should consider the far greater number of hours spent by Defendants' counsel and find Plaintiffs' request reasonable. *See* Decl. McDermott, at ¶¶ 38-43 (comparison with Defendants' fees indicates reasonable fees).

The present matter was a complex, challenging matter raising difficult questions of law and fact, both of which required extensive legal work from a variety of legal organizations with different areas of expertise. *See Wyatt B. v. Kate Brown*, No. 6:19-CV-00556-AA, 2022 WL 3445767, at *33 (D. Or. Aug. 17, 2022) (outlining expertise of class counsel in "class actions, foster care litigation, disability rights, and constitutional rights litigation"). Several attorneys from Davis Wright Tremaine contributed massively to the general litigation of the case, the trial preparation, and the overall tactical and strategic path forward for the case. A Better Childhood, a national child welfare litigation group, contributed substantial expertise and experience in the unique and challenging field of child welfare work. Disability Rights Oregon contributed substantial expertise in matters relating to children with disabilities, as well as local knowledge of Oregon's unique therapeutic and governmental structures affecting children in care. Rizzo Bosworth Eraut PC has long experience in tort claims involving foster youth and deep familiarity with issues specific to DHS's internal protocols. Attorneys from

---

[8] Per a February 5, 2024 memorandum, the state reported spending a total of $17,896.777 on the litigation "to date," including $13,990,253 in attorneys' fees and $3,906,524 in expenses. Pltfs. Tr. Exh. 1, at 13 *available at* https://olis.oregonlegislature.gov/liz/2024R1/Downloads/CommitteeMeetingDocument/283065.

each of these organizations contributed uniquely to the success of the litigation, creating a whole that was greater than the sum of its parts.

While the collaboration between four different organizations brought substantial benefits to the class of foster youth, achieving the benefits of collaboration across these four different organizations required extensive internal communication, strategic discussion, and routine meetings to ensure that the different participants in the litigation kept informed on the movement of a complex matter and kept the matter moving forward. Likely similar internal communications, strategic discussions and routine meetings occurred among Defendants' counsel as well.

One, two, or three attorneys simply could not have managed the level of work required to bring this complex case to resolution. Had a pair of motivated but inexperienced lawyers sought to represent the whole class in a case this complex, the Court might well have not approved them as class counsel. While in a simpler case, the number of attorneys or the volume of meetings, calls, and other check-ins would be potentially duplicative, the complexity and sweeping scope of the present case required participation from numerous lawyers, with their own areas of expertise and knowledge. *See, e.g., Keith v. Volpe*, 644 F. Supp. 1317, 1324 (C.D. Cal. 1986), *aff'd*, 858 F.2d 467 (9th Cir. 1988) (where plaintiffs' attorneys in complex litigation claimed 600 hours, or roughly a quarter of all time, in conference with each other, district court reduced time in internal conference only by 100 hours, allowing about than 20% of counsel's total billed time in internal conferences).

If the variety of experience and the unique resources of counsel was a prerequisite for serving as class counsel, it cannot have been unnecessary for the counsel from different organizations to meet and communicate to advance the case. If a "reasonable and prudent" attorney would have engaged in conferral with their co-counsel, that practice is reasonable, not duplicative.

**B.    Plaintiffs' Billing Rates Are Reasonable**

Plaintiffs have applied reasonable in-state rates, except to the extent permitted under the law for out-of-state counsel. In this district, courts typically refer to the Oregon State Bar's Economic Survey as the "initial benchmark" for assessing the reasonability of attorney fee rates. *Roberts v. Interstate Distrib. Co.*, 242 F. Supp. 2d 850, 857 (D. Or. 2002). Attorneys may, from that starting point, "argue for higher rates based on inflation, *specialty*, or any of the factors described" regarding reasonability of fee. *Id.* at 857 (emphasis added).

The Oregon State Bar 2022 Economic Survey of 2021 billing rates was released in March 2023, based on an online survey conducted between September 2022 and November 2022. While this survey was a welcome update for practitioners, even the short time between the 2022 survey and the present has seen a remarkable period of inflation, both in general consumer metrics and in legal services particularly. Using a conventional inflation calculator, consumer goods worth $500 in January 2021 cost $600.33 as of May 2024.[9] Nationally, inflation has struck legal rates particularly hard, with a 7.7% across the board rise in 2023 and with 6% to 8% increases anticipated in 2024.[10]

In each case, Plaintiffs' counsel has sought no payment from any plaintiff, next friend, or third party. Plaintiffs' counsel has relied exclusively on the prospect of earning any fee through motions practice or through settlement from Defendants. The Ninth Circuit recognizes that *pro bono* attorneys are entitled to fees. *Cuellar v. Joyce*, 603 F.3d 1142, 1143 (9th Cir. 2010) ("The fact that Cuellar's lawyers provided their services pro bono does not make a fee award inappropriate."). Inducing *pro bono* attorneys to take on civil rights cases is, in fact, one of the primary Congressional purposes of

---

[9] U.S. Dep't of Labor, CPI Inflation Calculator, *at* https://data.bls.gov/cgi-bin/cpicalc.pl?cost1=500&year1=202211&year2=202405.

[10] "Big Law's Approach to Billing Rate Hikes in 2024," American Lawyer, Oct. 23, 2023, *available at* https://www.law.com/americanlawyer/2023/10/30/big-laws-approach-to-billing-rate-hikes-in-2024/.

Section 1988 and the related fee award statutes, along with encouraging civil rights defendants to comply with civil rights laws. *Dennis v. Chang*, 611 F.2d 1302, 1306 (9th Cir. 1980). Plaintiffs' counsel have labored for years without any pay, forgoing millions of dollars in other paying work and carrying hundreds of thousands of dollars in direct costs of litigating the matter. *Gates*, 987 F.2d at 1406. Had the Plaintiffs lost the case, the Plaintiffs' attorneys would have had no recourse for reimbursement. Considering these enormous financial risks, the *pro bono* participation of Plaintiffs' counsel was only possible because of the reasonable possibility of recouping substantial costs and fees in the event of success in this matter.

In light of the high risks of litigation and, in the context of such lengthy, complex litigation, the long period of time the fees went unpaid, plaintiffs may seek reimbursement at the *current* market rate for reimbursement, even for work performed years ago. *Id.* ("A fee award at current rates is intended to compensate prevailing attorneys for lost income they might have received through missed investment opportunities as well as lost interest."). Plaintiffs need not adjust their claimed hours in 2019, for instance, downwards to 2019 rates.[11]

### 1.    Davis Wright Tremaine

DWT is a well-established full service law firm in Portland with a strong litigation department. DWT handles cases for businesses in every sector of the economy across many jurisdictions. DWT has extensive experience in high-stakes litigation involving antitrust, securities, consumer class action and regularly sues governments.  While A Better Childhood and Disability Rights Oregon were the subject matter experts when it comes to child welfare and the ADA, DWT firm was instrumental in going toe to toe with the Markowitz Herbold/Department Justice defense firms.

---

[11] Although Plaintiffs are not required to adjust earlier hours to the then set rates, DWT and DRO are seeking the rates charged for the particular time period involved.

DWT provided extensive litigation support throughout the case with two different sets of lawyers. In 2019 through 2021, the primary attorneys at DWT working on the matter were counsel Paul Southwick and partner Greg Chaimov. Mr. Southwick had extensive federal court litigation experience; Mr. Chaimov was a former Legislative Counsel with a deep knowledge of Oregon law and considerable experience in litigation against and involving government agencies. Decl. Miner, at ¶ 7. Chaimov and Southwick brought extensive knowledge of court practices and procedures, assisted with initial case assessment and development, and provided ongoing strategy and support and case development.

Upon the departure of Mr. Southwick and the retirement of Mr. Chaimov, DWT partners Andrew McStay and William Miner substituted into the case on behalf of DWT.[12] Mr. McStay, with his federal court experience (including as a clerk for the Ninth Circuit), provided valuable advice and direction. Mr. Miner similarly provided ongoing strategic direction and served in the lead role of a settlement attorney along with Ms. Lowry of ABC.

In addition to the attorneys above, DWT primarily utilized two paralegals, Jennifer Davis, a 30+ year veteran with extensive trial experience, and David MacKenzie a paralegal with approximately 6 years of intensive litigation experience. Both paralegals were instrumental in collecting, organizing, summarizing and producing the documents in this case.

The rates sought for Greg Chaimov are $610 (2019),  $650 (2020) and $690 (2021). These rates are reasonable as they fall between the median and 95th percentile of the 2022 bar survey results. Additionally, Plaintiffs seek hourly rates of former DWT counsel Paul Southwick of $460 (2019) and $510 (2020). While these amounts would have been outside of the 2017 bar survey, they fall within the acceptable ranges of the 2022 survey and are reasonable. Decl. McDermott, at ¶ 31.

---

[12] It should be noted that Mr. Southwick continued with the case at his own firm until 2023. Only Mr. Southwick's time while he was DWT is being sought.

The rates sought for DWT partners Andrew McStay and William Miner are in the below table. Both Messrs. Miner and McStay began their careers at the same time at DWT in 2004; however, Mr. McStay graduated a year before Mr. Miner and clerked for the Ninth Circuit prior to starting at DWT, which explains the nominal difference in rates. As described above, most of their work on this case occurred between 2022 and 2024. The rates sought for Messrs. McStay and Miner are reasonable as they fit within the median and 95th percentile of the 2022 Economic Survey for attorneys with 16-20 years of experience as adjusted for inflation.  Decl. McDermott, at ¶ 32.

|  | 2022 | 2023 | 2024 |
|---|---|---|---|
| Median as adjusted | $457 | $486 | $501 |
| 95th Percentile as adjusted | $734 | $781 | $805 |
| McStay Rate | $625 | $700 | $805 |
| Miner Rate | $615 | $695 | $800 |

The other rates for other DWT timekeepers are within the range allowed by the 2022 Oregon bar survey, as adjusted for inflation and appropriate for the stature and experience of attorneys and paralegals at DWT. Decl. McDermott, at ¶ 33.

### 2.    A Better Childhood

A Better Childhood is a nonprofit organization dedicated to protecting the rights of children in foster care. Its attorneys have unique experience and familiarity with both the unique law associated with child welfare litigation and the unique facts and circumstances of child welfare work. Its offices are based in New York City, but it engages in a national practice. In the Ninth Circuit, a prevailing attorney may receive a fee award at a higher rate for "distinctive knowledge and skills developed

through a practice specialty," where those skills are "needed in the litigation," and not available elsewhere at the local rate. *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Turner*, 305 F. Supp. 3d 1156, 1165 (D. Or. 2018) *citing Love v. Reilly*, 924 F.2d 1492, 1496 (9th Cir. 1997). Attorneys from A Better Childhood request and should receive a hourly rate consistent with their practice in New York City.

Virtually every comparable statewide foster care lawsuit has involved uniquely qualified counsel from ABC, Children's Rights, or the National Center for Youth Law. Similar expertise in such litigation does not exist elsewhere. The Ninth Circuit has recognized comparable areas of "specialty" meriting enhanced rates. *Nadarajah v. Holder*, 569 F.3d 906, 912 (9th Cir. 2009) (immigration attorneys with particular knowledge of "constitutional immigration law and litigation involving rights of detained immigrants" had adequately identified a specialty for fee enhancement). The confinement of a specialized area of practice to a handful of national organizations demonstrates that those skills were both needed in the litigation and not available elsewhere.

A Better Childhood has successfully sought and obtained such rates based on out-of-market fees on just this theory. The Oklahoma district court, for instance, granted an out-of-state rate in 2013 (albeit one lower than sought by ABC), finding "involvement of non-local counsel with expertise was necessary, and attorney Lowry's acknowledged expertise." *D.G. ex rel. Stricklin v. Yarbrough*, No. 08-CV-074-GKF-FHM, 2012 WL 7829602, at *5 (N.D. Okla. Dec. 19, 2012), *report and recommendation adopted in part, rejected in part sub nom. D.G. ex rel. Strickland v. Yarbrough*, No. 08-CV-074-GKF-FHM, 2013 WL 1343151 (N.D. Okla. Mar. 31, 2013). The District of Columbia court similarly awarded a New York rate, finding that "other advocacy groups lacked either the time or the resources to take on such a huge case, and that a local law firm may possibly have had the time but would have lacked the expertise necessary to conduct such specialized litigation." *LaShawn A. v. Barry*, No. CIV. 89-1754 (TFH), 1998 WL 35243112, at *7 (D.D.C. Feb. 18, 1998). Considering the

unique challenges of this type of litigation and the extremely short list of attorneys capable of leading such an effort, New York rates for attorney's fees meet the Ninth Circuit standard. Additionally, the rates charged by ABC attorneys fall within the range for litigation market rates according to the most recent Oregon Economic Bar Survey.

Ms. Lowry's rate of $800 per hour is reasonable given her 50+ years of specialized experience litigating child welfare cases. Ms. Post's rate of $600 per hour is reasonable for an attorney with 24 years of child welfare experience. For attorneys with 7-10 years of experience, the requested rate of $450 per hour is reasonable both in Oregon and New York. The requested rate of $400 per hour is reasonable for attorneys with 7-10 years of experience in both Oregon and New York. The requested rate of $350 per hour for an attorney with three years of experience is also reasonable in Oregon and New York. Decl. McDermott, at ¶¶ 17-19.

ABC's sole mission is to ensure foster children have the safe and healthy childhoods they deserve. As a 501(c)(3) non-profit, ABC is funded by a variety of sources including public interest grants and individual donations. In addition, ABC relies on attorney's fees from its work to maintain an operating budget and continue its mission. ABC maintains a small, lean staff—generally six or fewer attorneys—a limited budget while fighting for the rights of children in foster care around the country. All fees received in these cases go back into the organization's operating budget to allow it to continue furthering its mission. ABC has dedicated over 16,000 hours to this case. Accordingly, ABC should not be deprived of the reasonable fees it needs to sustain its mission and continue the vital work of improving the childhoods and lives of foster children in Oregon and nationwide.

### 3.    Disability Rights Oregon

Disability Rights Oregon (DRO) seeks fees for its work in support of this case. DRO is a statewide nonprofit organization, designated under federal law as the Protection and Advocacy System for the state of Oregon. 42 U.S.C. § 15043; 45 C.F.R. § 1326.21; 42 U.S.C. § 10805; 42

C.F.R. § 41.51; 29 U.S.C. § 794e; ORS 192.517. As part of its Congressionally mandated role, DRO must advocate for people with disabilities, including through litigation. 42 U.S.C. § 15043(a)(2)(A)(i); 42 U.S.C. § 10805(a)(1)(B); *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1113 (9th Cir. 2003). Children in foster care are a unique and important element of DRO's constituency.

DRO is primarily funded by an array of federal grants related to protection and advocacy for people with disabilities. DRO has very limited resources. DRO dedicated resources and attorney time to advocating for foster youth with disabilities that might have otherwise gone to important advocacy for services for people with mental illness, prisoners and jail detainees with disabilities, the rights of people with intellectual and developmental disabilities to obtain services in the community, or the physical accessibility of public spaces around Oregon. Declaration of Jake Cornett. Some of those might have yielded reasonable attorney's fees. Each of them would have yielded some useful social good. If DRO makes a full recovery of fees, it will pour those funds back into doing good work for people with disabilities around the state. Considering the volume of attorney time and resources DRO has put into this case, DRO should not be deprived of the reasonable fees it needs to sustain its mission and continue the necessary work of improving conditions for people with disabilities.

Disability Rights Oregon is a statewide agency based in Portland, Oregon. The fee rates sought by Plaintiffs for DRO attorney work reflect the current standards in the most recent Economic Bar Survey. Emily Cooper is an attorney with 22 years of experience, in a variety of complex class action, civil rights, and disability rights contexts. Chris Shank is an attorney with 25 years of experience who has extensive experience in practice with youth with disabilities, in the context of special education, foster care, juvenile justice, and juvenile dependency. Tom Stenson is an attorney with 19 years of experience, participating in numerous successful class actions and civil rights proceedings. Sam Shaw is a paralegal with one-year of experience.

For Ms. Cooper and Ms. Shank, the median rate for attorneys with 21-30 years of experience

in Portland is $450 an hour, with a 95th percentile rate of $697 an hour. For Mr. Stenson, the median

rate for attorneys with 16-20 years of experience in Portland is $425 an hour, with a 95th percentile

rate of $600. Consistent with these findings and the subsequent inflation of these rates, Plaintiffs have

sought a reimbursement rate close to the 95th percentile in those categories. Attorney work earlier in

the case has been discounted by small amounts, though Plaintiffs were not required to do so.

Comparisons to recent fee awards in this district sustain these rates.[13] Decl. McDermott, at ¶¶ 22-25.;

Decl. Payne, at ¶¶ 29-32.; Decl. Walsh, at ¶¶ 10-12..

### 4.    Rizzo Bosworth Eraut PC

Plaintiffs moved for the appointment of Mary Skjelset and Steven Rizzo (Rizzo Bosworth

Eraut PC ("RBE")) as co-counsel for the class on December 6, 2023 in order to "to provide

additional resources to the class to prepare for the May 2024 trial." ECF 316 at 3. The Motion relied

on the supporting Declarations of Counsel, which described the particular subject-matter expertise

offered by these experienced attorneys. ECF 317-8. For example, the Motion stated that both

Skjelset and Rizzo have "extensive experience" litigating civil rights claims relating to foster care

abuse against the Oregon Department of Human Services ('DHS') on behalf of children in the foster

care system," including successful resolution of multiple cases: e.g. *J.M. et al v. Major et al.,* Case

No. 6:18-cv-00739-AN (four infants and toddlers; $40,000,000 settlement inclusive of fees); *A.G. et*

*al. v. Burroughs et al.*, U.S. District Court, District of Oregon, Case No. 3:13-cv-01051-AC

---

[13] *See, e.g.*, *Ave. 33, LLC v. Aventurine Cap. Grp., LLC*, No. 3:23-CV-00896-YY, 2024 WL
554285, at *6 (D. Or. Jan. 16, 2024), *report and recommendation adopted as modified*, No. 3:23-
CV-896-YY, 2024 WL 1554169 (D. Or. Apr. 10, 2024) (sustaining as reasonable billing for a
Markowitz Herbold attorney with 38 years of experience at $735/hr; an attorney with 17 years of
experience at $630/hr; and an attorney with 14 years of experience at $600/hr; allowing paralegal
compensation in the range of $200 to $260 per hour); *Tozer v. City of Portland*, No. 3:22-CV-
01336-AN, 2023 WL 8295886, at *3 (D. Or. Nov. 30, 2023) (sustaining a 2023 rate of $925/hr for
an attorney with 43 years of experience and a rate of $750/hr for an attorney with 28 years of
experience; reducing a request for an attorney with 8 years of experience to $415/hour and an
attorney with 6 years of experience to $308/hr).

(establishing "persistent errors" theory of deliberate indifference"; $15,000,000 settlement inclusive of fees); and *A.F. v. Evans et al.*, U.S. District Court, District of Oregon, Case Nos. 2:18-cv-01404-SI (one child; $875,000 settlement; $1,770,543 attorney fee awarded in full). On January 4, 2024, this Court appointed Skjelset and Rizzo as co-class counsel – over the objection of the Defendants – citing their "considerable experience litigating tort and civil rights claims involving the children in the Oregon foster care system" and their "relevant experience with litigating claims involving DHS and with interpreting and assessing DHS practices and records." (ECF 324 at 3). As discussed in the Declaration of Steven Rizzo, the combined experience and work performed by Skjelset, Rizzo, and their paralegal team, substantially contributed to the successful settlement, which was reached shortly after the the Defendants' eleventh-hour motion to disqualify the Court was denied.

The fee rates sought by Plaintiffs for Skjelset and Rizzo attorney work reflect the current standards in the most recent Economic Bar Survey for attorneys in downtown Portland. Steven Rizzo has 40 years of experience in a variety of complex civil cases, including robust trial experience. Mary Skjelset has 17 years of experience advocating and litigating on behalf of children in foster care, in the juvenile court system and in the civil realm. For Mr. Rizzo, the median 2021 hourly billing rate for attorneys in downtown Portland with over 30 years of experience is $425 an hour, with a 95th percentile rate of $798 an hour. For Ms. Skjelset, the median rate for attorneys with 16-20 years of experience in Portland is $425 an hour, with a 95th percentile rate of $683.[14] To account for inflation and lost opportunity costs, Rizzo and Skjelset seek the 95th percentile from Table 36 of the OSB 2022 Economic Survey. Decl. McDermott, at ¶ 37.

---

[14] *See* Oregon State Bar, 2022 Economic Sruvey, *at* https://www.osbar.org/_docs/resources/Econsurveys/22EconomicSurvey.pdf, Table 36, p. 43.

C.      Adjustment of the Lodestar

The lodestar calculation, multiplying the hours reasonably expended by the reasonable rate, yields a presumptively reasonable award. *Van Gerwen,* 214 F.3d at 1045. Once the lodestar is calculated, the court may deviate upward or downward based on certain defined factors, to account for "rare and exceptional cases." *Id.* The original formulation of these factors in *Hensley* yielded 11 factors, although some of them have been determined to be subsumed ordinarily in the lodestar calculation or otherwise no longer subject to inclusion. *Id.* n.2.

In the settlement agreement, Plaintiffs agreed not to seek a multiplier or fee enhancement. ECF 481, at 12. The court obviously has discretion to adjust the lodestar appropriately. Plaintiffs note the following factors briefly as they relate to the case. None of them merit reducing the lodestar downward.

Carrying out this case to its successful conclusion clearly required substantial "time and labor," embraced issues of serious "novelty and difficulty," and required significant "skill to perform the legal service properly." *Van Gerwen*, 214 F.3d at 1045 n.2. As discussed above, attorneys for Plaintiffs were precluded from other employment by accepting the case. *Id.* The briefing likewise discusses the "customary fee." *Id.* Plaintiffs pressed a difficult case forward at all points, moving the case from class certification in August 2022 to trial in May 2024, demonstrating consideration for the "time limitations imposed by the client or the circumstances." *Id.* Plaintiffs have already discussed the excellent "results obtained" extensively. *Id.* The "undesirability" factor raises a new question: the lack of progress on the general conditions of foster youth as of April 2019 and the lack of system-wide efforts by other attorneys for decades demonstrates the extreme challenges of representing foster youth in a long, expensive, difficult fight. *Id.* Under the tenth factor, the "professional relationship with the client," in the course of their work, Plaintiffs' counsel had an extended professional relationship with foster youth, including keeping up with them as they grew into adulthood. *Id.*

Finally, under the eleventh factor, awards in comparable cases have yielded comparable results, considering the dramatic inflation in attorney's fees. *Id.* In short, all the factors articulated by the *Hensley* court run in Plaintiffs' favor and merit a full award. To the extent that the Court finds some factor running against Plaintiff, the Court could consider the remaining factors in Plaintiffs' favor to offset any reduction.

## IV.    AWARD OF COSTS

Plaintiffs seek an appropriate award of all other costs in this matter, consistent with federal law. The Plaintiffs' costs include expert fees, travel costs, deposition costs, transcripts, copying and printing, trial preparation, and assorted other costs. All these costs are reasonable and compensable under the civil rights acts at issue. 42 U.S.C. § 1988(b); 42 U.S.C. § 12205; 29 U.S.C. § 794a. Some of these costs are also reimbursable under 20 U.S.C. § 1920. Expert fees are recoverable under the ADA. *Lovell*, 303 F.3d at 1058. They are likewise recoverable under Section 504. *Jones v. George Fox Univ.*, No. 3:19-CV-0005-JR, 2022 WL 4120783, at *4 (D. Or. Sept. 9, 2022).

Much as with attorneys' fees, the accrual of reasonable costs is not limited to merely those costs essential to litigating the matter, nor are costs excluded where the underlying motion is unsuccessful or the evidence is not admitted. As long as a litigant reasonably believed the costs to be "reasonably necessary" in the matter, the costs are reimbursable. *Burt v. Hennessey*, 929 F.2d 457, 459 (9th Cir. 1991). A prevailing party may be reimbursed for the costs associated with a deposition not used at trial, for instance, so long as the deposition was "necessarily obtained." *Smith v. Hughes Aircraft Co.*, 22 F.3d 1432, 1439 (9th Cir. 1993).

In the present case, Plaintiffs exhibited substantial care in selecting and paying relevant experts, particularly considering that they bore the burden in the case and particularly in comparison to Defendants' practices. Plaintiffs' total costs for the entire case are less than what Defendants spent

just on the main Public Knowledge report. Plaintiffs sought individual experts that would support specific elements of their case and did not hire duplicate experts.[15] Plaintiffs also hired modestly priced experts for the purposes of their work.[16] Plaintiffs also did not permit their experts to engage in bloated years-long endeavors, containing costs by confining expert work to periods of a year or less.[17] Plaintiffs, in light of their limited resources, demonstrated substantial care in limiting costs of experts.

Plaintiffs bill for some travel costs, primarily in light of the need for ABC staff to travel to Oregon as needed. Developing the case, identifying named plaintiffs, and otherwise preparing the matter for filing took extensive time for on-site investigation by ABC staff. After the case was filed, ABC staff made best efforts to communicate virtually with co-counsel, opposing counsel, and the court. Much of the travel in later years of the case was to attend settlement proceedings, because building trust towards settlement often requires an in-person approach. *Nunez v. BAE Sys. San Diego Ship Repair Inc.*, 292 F. Supp. 3d 1018, 1057 (S.D. Cal. 2017) (approving as reasonable travel costs to attend mediation). Choosing a less expensive means to attend settlement conferences, if that means was less likely to achieve a resolution, would have been penny wise and pound foolish. Plaintiffs' travel costs reflect a judicious balance between being physically present for essential stages of the

---

[15] By contrast, Defendants hired two different former administrators of foster care systems to produce two different reports opining on the efficacy of child welfare litigation and settlement—Mr. Dimas and Ms. Ahluwalia and her team. Defendants also produced two different rebuttal experts— Dr. Vinson and Dr. McBeath—to rebut Dr. Farina's report.

[16] For instance, Dr. Farina—a university professor with a Ph.D. in social work—worked for Plaintiffs at $140 per hour. Defendants hired Dr. Vinson at $475 per hour, and with her supporting staff (including one with a master's in social work) billing at $375 per hours. Dr. McBeath—also a Ph.D. in social work—also billed at $450 per hour for his report.

[17] Here again, Plaintiffs' use of experts contrasts with Defendants. Plaintiffs employed Dr. Steib and Ms. Rideout for a matter of months in 2019 to conduct their case reviews and similarly, over a matter of roughly a year between May 2023 and trial, for their case reviews. Dr. Farina was employed for less than a year. Defendants permitted both Dr. Vinson and Ms. Ahluwalia to engage in sprawling, multiyear endeavors that cost close to a half-million dollars in Dr. Vinson's case and $75,000 in Ms. Ahluwalia's case.

litigation and limiting expenses. *See Kenny A.*, 454 F.Supp.2d at 1293 (approving $162,181 in travel expenses); *D.G.*, 2013 WL 1343151, at *3 (awarding $50,121 in transportation costs).

Plaintiffs conducted a number of depositions in this matter, but numerous factors contributed to the number of depositions in this case. First, substantial turnover in the staff at DHS required that Plaintiffs interview successive holders of offices multiple times. Plaintiffs deposed two different heads of Child Welfare, as well as two acting heads of Child Welfare. Second, the uncertainty about the timing of trial required successive rounds of discovery, including depositions to ensure that plaintiffs had the most recent information available. Plaintiffs could not go to trial in 2024 with only those depositions they had completed in 2020. Third, Plaintiffs had the disadvantage of trying to assess a large, complex system from the outside, with thousands of employees. Often when asked a question, a deponent would respond that they did not know and that those matters were outside their responsibility. Plaintiffs did their best to search for as many needles in as many haystacks as possible. Defendants' witness list demonstrated the enormous challenges for Plaintiffs acting from the outset, with no way to know ahead of time which DHS employees among thousands Defendants would call as witnesses. Plaintiffs had deposed fewer than half of those witnesses on Defendants' lay witness list. Last, Plaintiffs had no control over how many experts Defendants called, but had an obligation to be prepared to respond to their testimony. In short, the number of depositions reflected the complexity and opacity of DHS's operations, as well as Defendants' own choices and the turnover among their staff, not Plaintiffs' lack of care in selecting witnesses for deposition.

Plaintiffs' declarations and supporting documentation demonstrate that these costs were reasonably incurred in the course of litigating the present matter. The Court should award full costs in this matter.

## CONCLUSION

Considering all these factors, the Court should determine that the costs and fees sought by Plaintiffs are reasonable and subject to recovery under the relevant laws awarding fees and costs to civil rights litigants. In light of the outstanding results obtained in the matter, Plaintiffs should obtain a full award with no reduction. Plaintiffs' hours of attorney time, while substantial, are reasonable in light of the complexity and difficulty of the case. Plaintiffs' fees and costs demonstrate significantly more restraint and caution in the incurring of those expenses than Defendants' corresponding practices in both fees and costs, showing the overall reasonableness of Plaintiffs' overall fee and cost practice. In order to vindicate Congress's express intention 1) to incentivize future civil rights litigation and 2) to encourage other civil rights defendants to follow the law, the Court should award the full fees and costs requested by Plaintiffs.

Dated: July 3, 2024

**DAVIS WRIGHT TREMAINE LLP**

By: _s/ William D. Miner_
P. Andrew McStay Jr., OSB 033997
andymcstay@dwt.com
William D. Miner, OSB 043636
billminer@dwt.com
560 SW 10th Avenue, Suite 700
Portland, OR 97205
Tel: (503) 241-2300

**A BETTER CHILDHOOD**
Marcia Robinson Lowry (*pro hac vice*)
mlowry@abetterchildhood.org
Anastasia Benedetto (*pro hac vice*)
abenedetto@abetterchildhood.org
355 Lexington Avenue, Floor 16
New York, NY 10017
Tel: (646) 795-4456

**DISABILITY RIGHTS OREGON**
Emily Cooper, OSB 182254
ecooper@droregon.org
Thomas Stenson, OSB 152894
tstenson@droregon.org
511 SW 10th Avenue, Suite 200
Portland, OR 97205
Tel: (503) 243-2081


**RIZZO BOSWORTH ERAUT, PC**
Steven Rizzo, OSB 840853
srizzo@rizzopc.com
Mary D. Skjelset, OSB 075840
mskjelset@rizzopc.com
1300 SW 6th Avenue, Suite 330
Portland, OR 97201
Tel: (503) 229-1819


*Attorneys for Plaintiffs*