**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WYATT B.; NOAH F., by their next friend Michelle McAllister; KYLIE R.; ALEC R., by their next friend Kathleen Megill Strek; UNIQUE L., by her next friend Annette Smith; SIMON S.; BERNARD C.; NAOMI B.; NORMAN N., <br><br> *Plaintiffs - Appellants*, <br><br> v. <br><br> TINA KOTEK, Governor of Oregon in her official capacity; FARIBORZ PAKSERESHT, Director, Oregon Department of Human Services in his official capacity; APRILLE FLINT-GERNER, Director, Child Welfare in her official capacity; OREGON DEPARTMENT OF HUMAN SERVICES, <br><br> *Defendants - Appellees*. | Nos. 24-4689 <br> 24-6384 <br><br> D.C. No. <br> 6:19-cv-00556-AA <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted June 13, 2025
San Francisco, California

Filed August 12, 2025

Before: Sidney R. Thomas and Lucy H. Koh, Circuit
Judges, and Roslyn O. Silver, District Judge.[*]

Opinion by Judge Koh

## SUMMARY[**]

### Settlement Agreements/Substantive Due Process

The panel reversed the district court's interpretation of
the term "Child in Care," as that term was used in a class
action settlement agreement between the Oregon
Department of Human Services ("ODHS") and a class of
Oregon foster children who experienced serious abuses
while in ODHS's legal custody.

The parties disputed whether the term "Child in Care"
included two sets of children (collectively, "Disputed
Children"): (1) children over whom ODHS has legal
custody, but who have not been removed from their parents'
home, and (2) removed children in ODHS's legal custody

---

[*] The Honorable Roslyn O. Silver, United States District Judge for the
District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

who had been temporarily placed back in their parent's home on a trial basis for a period not to exceed six months.

The panel rejected ODHS's argument that plaintiffs had waived the right to assert claims on behalf of the Disputed Children. Contrary to ODHS's contention, the complaint contained sufficient allegations to put ODHS on notice that plaintiffs brought claims on behalf of both sets of children. Further, the Disputed Children were included in the class certified by the district court: "[a]ll children . . . who are or will be in the legal *or* physical custody of [O]DHS."

The panel held that the Disputed Children were covered by the term "Child in Care," as used in the settlement agreement. Once the state assumes wardship of a child, the Due Process Clause imposes an affirmative duty on the state to provide the child with reasonable safety and minimally adequate care. The Ninth Circuit has repeatedly held that this right extends to children in the care of foster parents. This precedent applies with equal force to the Disputed Children, over whom ODHS retained full legal custody and responsibility.

---

## COUNSEL

Thomas Stenson (argued) and Emily R. Cooper, Disability Rights Oregon, Portland, Oregon; Marcia R. Lowry and Anastasia Benedetto, A Better Childhood, New York, New York; for Plaintiffs-Appellants.

Christopher Perdue (argued) and Denise G. Fjordbeck, Assistant Attorneys General; Benjamin Gutman, Solicitor General; Ellen F. Rosenblum, Attorney General; Oregon

Department of Justice, Salem, Oregon; for Defendants-Appellees.

---

## OPINION

KOH, Circuit Judge:

This appeal concerns a dispute over who would benefit from a class action settlement. Plaintiff foster children ("Plaintiffs") brought a putative class action against the Oregon Department of Human Services ("ODHS") alleging, among other things, a violation of their substantive due process right to be free from serious abuses while in ODHS's legal custody. The parties settled their claims but could not agree on who benefited from the parties' settlement agreement ("Settlement Agreement"). Specifically, the Settlement Agreement benefited any "Child in Care" of ODHS but left it to the district court to decide the scope of that term.

The district court held that children in the legal custody of ODHS but physically placed with their parents were excluded from the term "Child in Care" because the district court believed that these children were not entitled to due process protections. The only question before us is whether two sets of children excluded by the district court are afforded substantive due process protections: (1) children who have not been removed from their parents' home but are within ODHS's legal custody ("Not-Removed Children"), and (2) children in "Trial Home Visit" ("THV") status, which consists of children in ODHS's legal custody who were removed from their parents' home but who were

temporarily placed back in their parents' home on a trial basis for a period that cannot exceed six months ("THV Children") (collectively, "Disputed Children"). We hold that they are afforded substantive due process protections, and therefore, we reverse.

## I.

### A.

In 2019, ten foster children filed this lawsuit on behalf of all Oregon foster children. Specifically, Plaintiffs brought a putative class action on behalf of a "general class" consisting of "[a]ll children for whom [ODHS] has or will have legal responsibility and who are or will be in the legal and physical custody of [ODHS]." Plaintiffs alleged that, among other violations, ODHS violated the substantive due process rights of class members to be free from serious abuses while in ODHS's legal custody. Plaintiffs named as defendants ODHS, the Governor of Oregon, the Director of ODHS, and the Director of the ODHS Child Welfare Division, in their official capacities.

The district court then certified the "General Class" of: "All children for whom [ODHS] . . . has or will have legal responsibility and who are or will be in the legal *or* physical custody of [O]DHS." In its class certification order, the district court analyzed the commonality requirement of Rule 23(a)(2) and stated that Plaintiffs alleged that there was "a severe lack of foster homes which result[ed] in children being placed in inappropriate placements." In the discussion of inappropriate placements, the district court explicitly referenced the 12% of the 7,260 children in Oregon foster care who "were in 'Trial Home Visit' status, meaning that they were living with their parents . . . while [O]DHS retained custody." ODHS did not file a subsequent Rule

23(c) motion seeking to amend the General Class definition
to exclude children in the legal but not the physical custody
of ODHS, and the district court never amended the General
Class definition.

After years of litigation, on the eve of trial, the parties
reached the Settlement Agreement, which incorporated the
General Class definition from the district court's class
certification order. To effectuate the Settlement Agreement,
however, the parties left open the question of whether the
term "Child in Care," as used in the Settlement Agreement
to describe who would benefit, should include two sets of
children: (1) the Not-Removed Children, and (2) the THV
Children. As part of the Settlement Agreement, the parties
agreed to submit these remaining issues to the district court
after further briefing.

The relevant language of the Settlement Agreement,
concerning the term "Child in Care," reads:

> The Parties dispute the legal scope of this
> definition. Specifically, the dispute pertains
> to whether the Settlement Agreement's
> defined term Child in Care excludes: 1)
> children who have not been removed and
> their family is receiving services through
> ODHS in-home (*i.e.*, through ODHS Family
> Preservation) because while those children
> may be in ODHS's legal custody . . . they are
> not in ODHS's physical custody and not "in
> care"; and/or 2) children who have been
> removed, are in ODHS's legal custody, but
> are not in ODHS's physical custody because

> they are placed in-home with a parent or legal
> guardian[1] (*i.e.*, on Trial Home Visit).
>
>     The Parties will each submit these issues
> by motion to the Court for resolution in a
> limited judgment, so that it is appealable by
> either Party. . . . If either Party appeals the
> Court's decision on this dispute, the Parties
> agree it shall not affect the other terms of this
> Settlement Agreement, which shall otherwise
> proceed, including the awarding of attorney
> fees.

#### B.

Oregon law considers two instances under which foster children will be physically placed with their biological parents. First, children may be in ODHS's legal custody but not yet removed from the home (again, "Not-Removed Children"). *See* Or. Rev. Stat. § 419B.349. Even so, ODHS maintains responsibility for the child and can remove the child from the parent's home without further action by the court. *See* Or. Rev. Stat. §§ 419B.337, 419B.373.

Second, Oregon law permits ODHS to administer a trial home visit, during which children in the legal custody of ODHS live with their parents for a period that cannot exceed six months following the children's removal from their parents' homes (again, "THV Children"). *See* Or. Admin. R.

---

[1] At oral argument, Plaintiffs' lawyer conceded that children placed in-home with a non-parent legal guardian are not at issue in this appeal. Instead, Plaintiffs' appeal focuses only on those children placed in-home with a parent.

§§ 413-100-0005(27), 413-310-0410(18). [2] THV Children can be returned to ODHS's physical custody at any time during the THV without any further legal proceeding and entirely at ODHS's discretion. Or. Admin. R. § 413-100-0005(27) (a "[t]rial reunification" is the placement of a child with the "primary caregiver the child was removed from, for a limited and specified period").

The record recounts instances of serious abuses of children conditionally placed with parents while in ODHS's legal custody. For example, named plaintiffs Wyatt, three years old, and Noah, one year old, were placed in ODHS's legal custody on September 6, 2018. Despite evidence of abuse in their mother's home, ODHS implemented a "safety plan" in which the children remained with their mother. According to the record, "[n]o caseworker visited the home . . . to check on whether this safety plan was effective and whether the children were safe." ODHS finally removed the children from their home when, a week after the implementation of the safety plan, a case worker responded to a report that Wyatt and Noah's mother made "suicidal threats on Facebook." When the case worker investigated, the case worker observed Noah "tumble off the couch" and saw that the mother "did not react or try to catch him." In response, ODHS removed Wyatt and Noah from their mother's home and placed them with foster parents.

Not long after, on October 4, 2018, Wyatt and Noah were reunited with their mother on a THV. Their mother's house was "so cluttered that it was uninhabitable." Moreover, during the THV, one of Wyatt and Noah's siblings disclosed

---

[2] ODHS's regulations use the term "trial reunification" instead of "trial home visit." *See id.* In keeping with the parties' briefs, we use the latter term herein.

that the children had spent time with their mother's husband, with whom their mother was not allowed contact. Their mother was also violent towards the children and "punch[ed] and hit" Wyatt "all over," and "grab[bed] [Noah] by the arm and [flung] him in his crib."

Another named plaintiff, Unique, came into ODHS's legal custody when she was around six years old. Her mother was diagnosed with significant mental health issues and was verbally abusive to her children. Unique's stepfather was in prison for sexually abusing Unique's siblings and was suspected of sexually abusing Unique as well. ODHS removed Unique from her mother's home and eventually placed her in a therapeutic foster home. Despite her mother's mental health struggles and her mother's therapist informing ODHS that her mother was not ready to have Unique returned to her care, ODHS nevertheless returned Unique to her mother on a THV because ODHS allegedly could not "locate [another] therapeutic placement." After two weeks at her mother's house, Unique had a behavioral outburst. In response to the outburst, Unique's mother locked Unique out of the house. Unique's mother called the crisis response service team screaming "get this little bitch out of my house 'cause I'm fucking done now, she can't come back in, she's on the porch now, she ain't allowed in my fucking house. All her shit is packed." On the phone call, Unique could be heard crying in the background, "mommy, please don't do this."

## C.

Consistent with the Settlement Agreement, the parties submitted the question of the scope of "Child in Care" to the district court. The district court ruled in favor of ODHS, finding that the scope of "Child in Care" excluded the

Disputed Children.[3] The district court began its analysis by outlining the theories of liability asserted in Plaintiffs' Complaint and observed that Plaintiffs had asserted "a series of substantive due process rights" to which "children placed in foster care" were entitled. As the district court reasoned, "[b]y its terms, the Complaint sought to bring claims on behalf of a general class of children in foster care" based on the scope of the substantive rights protected by the Due Process Clause. Thus, the district court concluded that the term "Child in Care" turned on the scope of the underlying substantive due process rights being asserted.

After analyzing relevant case law, the district court found that children living with their biological parents do not have substantive due process rights to be free from serious abuses while in ODHS's legal custody. Accordingly, it found that the Disputed Children were not beneficiaries of the Settlement Agreement.

We have jurisdiction to review the district court's order under 28 U.S.C. § 1291.

## II.

As an initial matter, ODHS argues that any claim on behalf of the Disputed Children has been waived because Plaintiffs neither included allegations about children in the care of their parents in the Complaint nor advanced arguments about such children throughout the litigation.

---

[3] In addition to the substantive due process claim, Plaintiffs also brought claims under the Americans with Disabilities Act and Rehabilitation Act on behalf of a subclass of General Class members "who have or will have physical, intellectual, cognitive, or mental health disabilities." Because this subclass is subsumed within the General Class, we need not address the subclass separately.

Although the district court adopted a similar view, we find no support for that position in the record.

ODHS's argument is patently inconsistent with the district court's underlying class certification order. In that order, the district court explicitly discussed the 12% of Oregon's 7,260 foster children who were in "'Trial Home Visit' status." The district court then announced a single definition of the General Class that has remained unchanged since the class was certified in August 2022. The General Class consists of: "All children for whom [ODHS] has or will have legal responsibility and who are or will be in the legal *or* physical custody of [O]DHS." This class definition was incorporated into the Settlement Agreement. At all points since August 2022, the General Class has included all children in ODHS's legal custody regardless of whether they are in ODHS's physical custody. The district court did not alter the definition of the General Class in the order and judgment at issue in this appeal. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation.").

Furthermore, ODHS neither filed a subsequent Rule 23(c) motion seeking to amend the class definition to exclude the Disputed Children, nor did ODHS appeal the district court's class certification order under Rule 23(f). *See, e.g., Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 479 n.9 (2013) (observing that, under Rule 23(c), a certification order may be altered or amended "as the case unfolds"); *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 955 (9th Cir. 2005) ("Federal Rule of Civil Procedure 23(f) permits a discretionary interlocutory appeal from a district court order denying or granting a class certification."). On the contrary, ODHS stipulated to the definition of the

General Class in the Settlement Agreement. ODHS cannot at this late hour relitigate whether Plaintiffs' Complaint alleged substantive due process violations as to children in ODHS's legal but not physical custody.

Moreover, the Complaint explicitly stated that "[c]hildren often are returned to the care of their parents even though the conditions underlying the removal of the children have not been addressed." Throughout the Complaint, Plaintiffs detailed the serious abuses experienced by Not-Removed Children and THV Children while they were living with their parents. Again, the Complaint discusses the serious abuses plaintiffs Wyatt and Noah faced while in ODHS's legal custody both before Wyatt and Noah were removed from their mother's physical custody and after they were returned on a trial home visit. The Complaint also detailed the serious abuses that occurred when plaintiff Unique was returned to her mother's care on a THV because ODHS could not locate a therapeutic placement. Thus, the Complaint thoroughly addressed the Disputed Children. Any allegation by ODHS that Plaintiffs now seek to rewrite the Complaint is inconsistent with the record. *See Flores v. Lynch*, 828 F.3d 898, 907 (9th Cir. 2016) (rejecting the government's contention that the parties' settlement agreement covered only unaccompanied minors, reasoning in part that though the "litigation initially focused on the problems facing unaccompanied minors," the complaint also addressed issues relating to accompanied minors).

## III.

The district court relied on the substantive scope of the Disputed Children's due process rights in order to define the term "Child in Care." Thus, the question before us now is whether the Disputed Children have a substantive due

process right to be free from serious abuses while in ODHS's legal custody so as to be included in the term "Child in Care." "We review de novo a district court's decision regarding the scope of a constitutional right." *United States v. Napier*, 436 F.3d 1133, 1135 (9th Cir. 2006).

"Generally, the Fourteenth Amendment's Due Process Clause does not confer any affirmative right to governmental aid and typically does not impose a duty on the state to protect individuals from third parties." *Henry A. v. Willden*, 678 F.3d 991, 998 (9th Cir. 2012) (cleaned up). This rule is subject to two important exceptions. "First, there is the 'special relationship' exception—when a custodial relationship exists between the plaintiff and the State such that the State assumes some responsibility for the plaintiff's safety and well-being." *Id*. (internal citation omitted). Second, there is the "state-created danger exception," where "the state affirmatively places the plaintiff in danger by acting with deliberate indifference to a known and obvious danger." *Id*. (internal citation omitted). "If either exception applies, a state's omission or failure to protect may give rise to" liability under 42 U.S.C. § 1983. *Id*. (internal citation omitted).

The district court held that children must be in the physical custody of ODHS to be included within the term "Child in Care," as children in the physical custody of their biological parents do not have a substantive due process right to be free from serious abuses. We reject that holding. As explained more fully below, we hold that the special relationship exception applies to the Disputed Children because the Disputed Children are in the legal custody of ODHS. By assuming control over virtually all aspects of a child's life through wardship and legal custody, ODHS

restrains the child's liberty in a manner that gives rise to a protected interest under the Due Process Clause.**[4]**

### A.

The Ninth Circuit has repeatedly held that children who are placed with foster parents, but who remain wards of the state and within the legal custody of the state, are protected by the Due Process Clause. *See Henry A*., 678 F.3d at 1000 (finding that the "special relationship doctrine applies to children in foster care"); *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 842 (9th Cir. 2010) ("The Fourteenth Amendment substantive due process clause protects a foster child's liberty interest in social worker supervision and protection from harm inflicted by a foster parent."). That some children who are wards of the state and in the state's legal custody are placed with their biological parents, rather than with foster parents, does not affect the existence of due process protections. "[O]nce the state assumes *wardship* of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child." *Tamas*, 630 F.3d at 846 (emphasis added) (quoting *Lipscomb v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992)). Oregon has done just that. *See* Or. Rev. Stat. § 419A.004(39) (defining a ward as a person "within the jurisdiction of the juvenile court under ORS 419B.100"); Or. Rev. Stat. § 419B.328(1); Or. Rev. Stat. § 419B.337(1) (child must be a "ward" to be placed in ODHS's legal custody).

---

[4] Because we conclude the special relationship exception applies, we need not address the question of whether the state-created danger exception also applies.

ODHS argues that "[s]tate juvenile law does not govern the scope of" substantive due process protections. It is true that "the Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989). That does not mean, however, that state law is irrelevant. In evaluating whether the special relationship exception applies, the critical question is the level of restraint that a state has imposed on an individual's liberty. *See Henry A.*, 678 F.3d at 1000. The state necessarily imposes such restraints on liberty through the power given to the state by law. Therefore, some evaluation of state law is not only permissible but also necessary in determining whether a special relationship exists. *See, e.g., id.* (considering the custodial status of children in the state foster care system in assessing allegations that the state's failure to provide for the children's needs,"*e.g.,* food, clothing, shelter, medical care, and reasonable safety," had "transgress[ed] the substantive limits on state action" (quoting *DeShaney*, 489 U.S. at 200)); *cf. Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004) (considering California's statutory requirements for pretrial detainees charged under California's Sexually Violent Predator Act to determine whether the state's actions violated plaintiff's substantive due process rights (citing Cal. Penal Code §§ 4001, 4002(a); Cal. Welf. & Inst. Code § 6602)). Insofar as substantive due process cases do not discuss state law, it is because the state's control over the individual's liberty is not in dispute.

Under Oregon law, wardship does not in and of itself equate to legal custody. Rather, a child can be a ward of the court, and a parent can maintain control through legal custody. In the instant case, however, the Disputed Children

were both wards of the court and in the legal custody of ODHS. In Oregon, "[a] juvenile court's determination that a child is within the jurisdiction of the court affects the rights of the parents. When a juvenile court asserts jurisdiction over a child, that child is made a ward of the court." *In re H.C.*, 328 P.3d 769, 776 (Or. Ct. App. 2014) (citing Or. Rev. Stat. § 419B.328(1)). "Once a child is made a ward of the court," the court "decides who will have legal custody of the child based on its determination of what is in the best interest and welfare of the child." *Id*. "[T]he juvenile court may direct that the ward remain in the legal custody of the ward's parents, or it may direct that the ward be placed in the legal custody of . . . [O]DHS." *Dep't of Human Servs. v. S.M.*, 323 P.3d 947, 949–50 (Or. 2014) (citing Or. Rev. Stat. §§ 419B.331, 419B.337).

ODHS has been awarded legal custody over the Disputed Children. In such circumstances, biological parents have been stripped of the rights they might otherwise have, including, but not limited to, the right to provide the child with care, education, discipline, and the right to authorize medical care for the child. Or. Rev. Stat. §§ 419B.337, 419B.373. Instead, ODHS assumes legal responsibility for the child. ODHS has both the "dut[y] and authority" to, among other things, "have physical custody and control of the ward," "supply the ward with food, clothing, shelter and incidental necessaries," "provide the ward with care, education and discipline," and "authorize ordinary [and emergency] medical, dental, psychiatric, psychological, hygienic or other remedial care and treatment for the ward." Or. Rev. Stat. § 419B.373(1)–(4); *see S.M.*, 323 P.3d at 950 (discussing "the authority that a legal custodian has to make decisions for the ward"). "Those are just some of the many consequences inherent in a court's assertion of jurisdiction

over a child that demonstrates that a finding of jurisdiction interferes with a parent's right to direct the custody and control of the child." *In re H.C.*, 328 P.3d at 776.

By assuming this control over virtually all aspects of a child's life through wardship and legal custody, ODHS restrains the child's liberty in a manner that gives rise to a protected interest under the Due Process Clause. *See Henry A.*, 678 F.3d at 1000 ("When the State asserts this type of custody over a person 'and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by . . . the Due Process clause.'" (quoting *DeShaney*, 489 U.S. at 200)). Indeed, the Ninth Circuit has repeatedly held that children who are placed with foster parents are protected by the Due Process Clause, and ODHS does not dispute this fact. *See id.*; *Tamas*, 630 F.3d at 842 ("The Fourteenth Amendment substantive due process clause protects a foster child's liberty interest in social worker supervision and protection from harm inflicted by a foster parent.").

ODHS's categorical argument that children living with their biological parents have no due process right to be free from serious abuses while in ODHS's legal custody is inconsistent with Ninth Circuit precedent. In *Cox v. Department of Social and Health Services*, for example, a Washington father murdered his two sons, then housed with their grandparents, during a temporary parental visit to the father's home. 913 F.3d 831, 835–36 (9th Cir. 2019). The Ninth Circuit explained that the "Fourteenth Amendment's substantive due process clause protect[ed]" the boys' interests "in social worker supervision and protection from harm inflicted by [a third party]." *Id.* at 837 (quoting *Tamas*, 630 F.3d at 842). Though the *Cox* court went on to conclude

that the plaintiffs had failed to show the requisite deliberate indifference needed to establish liability, *id.* at 838, this does not alter the clear finding that the *Cox* plaintiffs had a protected due process interest. Therefore, *Cox*'s holding directly contradicts ODHS's argument that the return of a child to a parent's physical custody voids the state's obligation to protect them.

Similarly, in *B.K. ex rel. Tinsley v. Snyder*, the Ninth Circuit found that a child's placement in the state's "'legal custody[] trigger[s the state's] legal obligations to the child." 922 F.3d 957, 963 (9th Cir. 2019). In *Snyder*, the named plaintiff, on behalf of a class of all children in Arizona foster care, alleged that the state's failure to provide timely and adequate medical, dental, and mental health care to the class violated their due process rights. *Id*. at 969, 977 n.6. Arizona maintained exclusive responsibility for the delivery of "health care and other services to the thousands of children in the Arizona foster care system." *Id*. at 963. Given that Arizona assumed responsibility for the children's health care, the state could violate the class's due process rights by failing to deliver the promised care. *See id*. at 967 (The named plaintiff "has standing to press her due process claims . . . [as] she has serious medical diagnoses that require prompt and adequate medical care from her custodian, which is the State of Arizona," and if Arizona failed to provide her safety "through the deficient statewide policies and practices she alleges, the harm to her will have been caused by those officials.").

Significantly, in *Snyder*, the Ninth Circuit upheld the district court's certification of the "General Class,"[5] which

---

[5] The General Class definition in *Snyder* did not specify the physical placement of class members. One subclass, the "Non-Kinship Subclass,"

included "all children who are or will be in the legal custody of [the state]," regardless of whether those children were placed with state-approved foster parents or with their own biological parents. *Id.* at 965. "[I]n all class actions, commonality cannot be determined without a precise understanding of the nature of the underlying claims." *Id.* at 968 (internal citation and quotations omitted). "[T]o assess whether the putative class members share a common question, the answer to which will resolve an issue that is central to the validity of each one of the class member's claims," the Ninth Circuit determined that it "must identify the elements of the class member's case-in-chief." *Id.* (internal quotation marks and alterations omitted). "Based on the nature of the plaintiff's due process claims," the Ninth Circuit upheld the certification of the General Class, finding that "a state's policies and practices can expose *all* persons within its custody to a substantial risk of harm." *Id*. (emphasis in original). Thus, the due process protections afforded to children in legal custody of the state did not depend on the children's physical placement with state-approved foster parents but rather turned on Arizona's

---

included all members of "the General Class who are not placed in the care of an adult relative," *id.* at 972, which suggests that some members of the General Class were placed with adult relatives. This presumably included children placed with their biological parents. Arizona juvenile law permits the state to "place a child with a parent," Ariz. Rev. Stat. § 8-514.02(A), and a child may be in the physical custody of a parent while under "the legal care, custody and control" of the state, *see Oscar F. v. Dep't of Child Safety*, 330 P.3d 1023, 1025 (Ariz. Ct. App. 2014) (cleaned up). Although *Snyder* did not explicitly discuss children physically placed with their biological parents, it is clear that the state obligations common to the class in *Snyder*, as here, stem from the state's legal custody over the children.

assumed responsibility for the children's care. *See id*. at 969–73.

Ninth Circuit case law, therefore, supports Plaintiffs' contention that the Disputed Children maintain a substantive due process right, stemming from the state's legal custody over them, to be free from serious abuses even when placed with their biological parents. When a child legally depends on ODHS for his or her needs to be met, ODHS's duties under the Fourteenth Amendment do not depend on whether the child is housed with a foster parent or a biological parent with no legal rights, as the power of ODHS over the child's liberty is identical in both cases.

### B.

The district court misconstrued precedent when it held that "in order for there to be a 'special relationship' . . . the child must be in the physical custody of [O]DHS." The cases relied upon by the district court for its proposition— *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), *Murguia v. Langdon*, 61 F.4th 1096 (9th Cir. 2023), *Patel v. Kent School District*, 648 F.3d 965 (9th Cir. 2011), and *Lipscomb v. Simmons*, 962 F.2d 1374 (9th Cir. 1992)—are inapposite and do not support the district court's categorical physical custody requirement for substantive due process protections.[6]

The district court primarily relied upon cases in which the state possessed neither legal nor physical custody over

---

[6] The district court also discussed *Henry A. v. Willden*, but that case affirmatively supports application of the special relationship exception where, as here, the state assumes ultimate responsibility to provide for a child's basic needs. 678 F.3d at 1000 (finding that the "special relationship doctrine applies to children in foster care").

the children at issue. For example, in *DeShaney*, the Supreme Court found no state liability under the special relationship exception because plaintiff Joshua was in his father's physical and legal custody when his father beat him so severely that he fell into a life-threatening coma. *DeShaney*, 489 U.S. at 192, 199–201 (concluding that the state had no "affirmative duty to protect" Joshua because, although Joshua was briefly placed in custody of the hospital, the authorities "dismissed the child protection case and returned Joshua to the [physical and legal] custody of his father" before Joshua's father assaulted him).

Similarly, in *Murguia*, the Ninth Circuit concluded that, as the state never took the plaintiff twins into its custody, the special relationship exception did not apply. *See Murguia*, 61 F.4th at 1110 (finding that the plaintiff twins' mother and father "retained long-term responsibility for the care of the twins, as well as long-term control over decisions regarding the twins [and t]he special-relationship exception therefore [did] not apply"). Thus, though the state had various brief, non-custodial encounters with the twins, the state could not be held liable under § 1983 because the twins' mother had legal and physical custody of the twins when she drowned them in a motel bathtub. *Id*. at 1100–05, 1109–10.

*Patel* likewise is distinguishable. In *Patel*, the plaintiff claimed that mandatory school attendance created the requisite "special relationship" between the school and its students. *Patel*, 648 F.3d at 973. But the state never took legal custody of the student, and the student's mother retained legal custody and "could have removed" the student from school "at any time." *Id*. at 974. As part of that legal custody, the student's mother had ultimate responsibility for the student's "food, clothing, shelter, medical care, and reasonable safety." *Henry A.*, 678 F.3d at 1000.

In contrast to *DeShaney*, *Murguia*, and *Patel*,[7] ODHS takes legal custody of the Disputed Children, and with that legal custody, ODHS assumes responsibility for virtually all aspects of their lives. Moreover, ODHS's legal custody unqualifiedly "interferes with a parent's right to direct the custody and control of the child." *In re H.C.*, 328 P.3d at 776. Thus, *DeShaney*, *Murguia*, and *Patel* demonstrate only that when the state has not assumed legal custody and so does not have responsibility for virtually all aspects of the child's life, the child cannot claim due process protections. These cases say nothing about a circumstance where a child's biological parent has been stripped of legal custody over a child, and that authority has instead been assumed by the state.

## IV.

For the reasons discussed above, we REVERSE the district court's order and REMAND for further proceedings consistent with this opinion.

---

[7] *Lipscomb* is also inapposite, as the *Lipscomb* plaintiffs alleged an equal protection violation and not a due process violation. *Lipscomb*, 962 F.2d at 1377 (analyzing whether Oregon's policy denies plaintiff families equal protection of the law). Here, as Plaintiffs do not allege an equal protection violation, *Lipscomb* does little to guide our analysis.